**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SHANNON PHILLIPS, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 1:19-cv-19432 |
| | : | |
| v. | : | |
| | : | Hon. Joel H. Slomsky, U.S.D.J. |
| STARBUCKS CORPORATION d/b/a | : | |
| STARBUCKS COFFEE COMPANY, | : | |
| | : | **FILED VIA ECF** |
| Defendant. | : | |
| | : | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Starbucks Corporation d/b/a Starbucks Coffee Company ("Starbucks") hereby submits the following statement of undisputed facts in support of its Motion for Summary Judgment. These facts are submitted as "undisputed" solely for purposes of the Motion for Summary Judgment in recognition of the appropriate standard of review. Starbucks may present evidence disputing these facts at trial or future proceedings.

**I.       BACKGROUND ON STARBUCKS**

1.       Starbucks is known for coffee and human connection – striving to build an enduring company, one person, one cup, and one neighborhood at a time. (Plaintiff Shannon Phillips Deposition Transcript, "Pl. Dep.," attached hereto as Exhibit A; Pl.'s Dep. Exh. 6, pp. 40, attached hereto as Exhibit B.)

2.       Starbucks has a steadfast commitment to certain core values and principles, including providing a work environment where all partners[1] are treated with respect and dignity and embracing diversity to create a place where partners can be themselves. (Pl.'s Dep. Exh. 6,

---

[1] Starbucks refers to its employees as "partners."

pp. 40.)

## II.     MS. PHILLIPS' BACKGROUND & EMPLOYMENT HISTORY

3.      Shannon Phillips ("Ms. Phillips") is White. (Second Amended Complaint, ¶ 3.)

4.      Ms. Phillips began her employment with Starbucks on December 12, 2005. (Second Amended Complaint, ¶ 20; Pl.'s Dep., 134:13-16.)

5.      Ms. Phillips acknowledged her understanding and receipt of Starbucks non-discrimination and retaliation procedures, as well as the existence of the complaint procedure. (Pl.'s Dep. Exh. 5, attached hereto as Exhibit C.)

6.      Ms. Phillips started with Starbucks as a District Manager and was promoted in 2011 to Regional Director of Operations for "Area 71" which encompassed Philadelphia and some surrounding suburbs. (Second Amended Compl., ¶ 21.)

7.      Approximately nine District Managers ("DMs") reported to Ms. Phillips, including DM Benjamin Trinsey, who is White and DM Paul Sykes who is Black ("Mr. Sykes"), both of whom oversaw stores in Philadelphia.  (Second Amended Compl. ¶ 31-32.)

8.      Holly Hylton, who is White, served as the Store Manager responsible for the Starbucks store located at 18th and Spruce Street in Philadelphia, one of the stores located within Area 71.  (Pl.'s Dep., 23:14-17; Relevant portions of Camille Hymes Deposition Transcript, "Hymes Dep.," attached hereto as Exhibit D, Hymes' Dep. 87:11-17; Second Amended Compl., ¶ 34.)

9.      Mr. Sykes served as the DM of the 18th and Spruce Street Store.  (Relevant portions of Paul Sykes Deposition Transcript, "Sykes Dep.," attached hereto as Exhibit E, Sykes Dep., 10:20-11:1; 16:12-15.)

### III.   APRIL 12, 2018 INCIDENT AND SUBSEQUENT REFORMS

10.   On April 12, 2018, two Black men were arrested at the Starbucks store located at 18th and Spruce Street in Philadelphia while waiting to begin a business meeting.  (Pl.'s Dep. 22:1-7;Hymes Dep. 77:1-17; Relevant portions of Ebony Johnson Deposition Transcript, "Johnson Dep.," attached hereto as Exhibit F,18:10-21.)

11.   The Black customers were not even in the store for more than three minutes when Ms. Hylton, called the police, having them arrested.  (Pl.'s Dep., 36:3-15.)

12.   The incident garnered significant national media attention.  (Relevant portions of Zeta Smith's Deposition Transcript attached hereto as Exhibit G, 28:17-19.)

13.   By the following weekend, these arrests sparked protests throughout Philadelphia, which Ms. Phillips classified as "riots."  (Pl.'s Dep., 162:18-163:17.)

14.   Following the incident, Starbucks initiated an effort with its leadership to better understand the community it serves and to guide the market and the partners who worked there through the aftermath and toward recovery.  (Hymes Dep., 116:10-23; 166:10-168:3.)

15.   Starbucks leaders, including the CEO and other members of Starbucks' leadership, flew to Philadelphia to attend meetings with civic leaders.  (Hymes Dep., 146:19-23; 230:2-230:21; 247:7-18.)

16.   Specifically, Ebony Johnson, Partner Resources Manager (Black), was one of the employees who navigated the array of feelings and emotions that resulted from the wrongful arrests.  (Johnson Dep., 22:21-23:11.)

17.   Additionally, Starbucks leadership met at the 18th and Spruce location to obtain a detailed background with respect to the events leading preceding the arrests.  (Hymes 229:22-230:12; Johnson Dep., 21:3-10.)

18.     As a result of these arrests Starbucks:

    a.  Revised Starbucks' Safe and Welcoming Policy to implement lessons learned from the arrests in the Philadelphia store.  (Hymes Dep., 69:6-10);

    b.  Required Starbucks leaders to undertake substantial training to ensure that the situation would never happen again, including working with consultants, and conducting "listening sessions" about what could be done to support the Philadelphia community.  (Smith Dep., 84:3-85:4);

    c.  Conducted a series of roundtable discussions throughout the city of Philadelphia from April 23, 2018 to May 5, 2018, where Starbucks leaders could participate to discuss the incident and findings.  (Hymes Dep., 229:22-230:12.)

    d.  Closed all Starbucks locations on May 29, 2018 to conduct racial bias training lead by local leaders.  (Hymes Dep. 244:11-14.)

19.     Starbucks also terminated Ms. Hylton's employment because of her inappropriate actions in calling the police on two Black customers.  (Hymes Dep., 107:20-108:12.)

## IV.    MS. PHILLIPS' INABILITY TO LEAD DURING A TIME OF CRISIS

20.     Following the arrests, Ms. Phillips as the Regional District Manager, oversaw the Philadelphia market, including the 18th and Spruce Store.  (Second Am. Compl., ¶ 21-33.)

21.     As the Regional Director for the Philadelphia market, Ms. Phillips' responsibilities included working with leadership to support its partners, its stores, and its customers in Philadelphia.  (Hymes Dep., 25:11-26:3; 93:1-10, 293:1-10.)

22.     Following April 2018 incident, senior leaders, specifically Camille Hymes,

Regional Vice President for Mid-Atlantic Retail Operations, who supervised Ms. Phillips, observed Ms. Phillips demonstrate a complete absence of leadership during this incident. (Hymes Dep., 12:7-9; 22:9-13; 52:14-53:6.)

23.     Ms. Hymes observed that Ms. Phillips appeared overwhelmed and lacked awareness of how critical the situation had become for Starbucks and its partners. (Hymes Dep., 204:22-205:8; 212:14-213:12; 59:6-60:12.)

24.     According to Ms. Hymes, in the aftermath of the crisis, Ms. Phillips stated that she did not think she was "built for this," and that it was difficult for her. (Hymes Dep., 292:16-293:10.)

25.     Ms. Phillips was physically and mentally absent from meetings. (Relevant portions of Paul Pinto Depositions Transcript, "Pinto Dep.," attached hereto as Exhibit H., 194:15-23.)

26.     Ms. Phillips' inability to physically show up resulted in a perception by her supervisors and subordinates that she "would not show up when it was raining." (Hymes Dep., 204:11-21.)

27.     When she did show up, Ms. Phillips was late, disengaged, and observed standing in the corner, including at meetings that Starbucks expected her to lead. (Hymes Dep., 58:4-59:18; 124:20-22; 293:11-16.)

28.     Paul Pinto, Vice President of Partner Resources (White), similarly observed that Ms. Phillips was neither physically nor emotionally present. (Pinto Dep., 193:15-23.)

29.     Mr. Pinto classified Ms. Phillips's leadership as "completely paralyzed" and driven by "panic." (Pinto Dep., 193:8-14; 195:3-12.)

30.     In fact, Mr. Pinto observed "red flags" that emerged from the beginning of the crisis with Ms. Phillips, being "completely unequipped to handle" the uproar that followed after the

arrests.  (Pinto Dep., 98:5-12.)

31.     Based on his observations, Mr. Pinto believed that the market would not recover under Ms. Phillips' leadership.  (Pinto Dep., 193:7-14.)

32.     Zeta Smith, Divisional Senior Vice President (Black), also witnessed Ms. Phillip's inability to lead the market following the wrongful arrests of the Black customers.  (Smith Dep., 33:19-23.)

33.     According to Ms. Smith, Ms. Phillips failed to attend meetings, or showed up late for critical meetings or calls, was unreachable, and did not direct her team in the midst of a crisis. (Smith Dep., 33:19-34:4.)

34.     Starbucks expected that Ms. Phillips would at a minimum participate in debrief sessions which involved discussion of the roundtable sessions conducted at various stores, however, her superiors believed she contributed very little to these sessions.  (Smith Dep., 41:2-25.)

35.     Instead of leading partners and answering questions within the purview of her role, such as how to handle a promotion, Starbucks observed Ms. Phillips defer to other partners, which further diminished her superiors and subordinates' confidence in her ability to lead.  (Smith Dep., 38:15-39:17; 42:4-23.)

36.     As a result of her inability to answer questions, many people in her own team stopped coming to her for help and started seeking out others to lead.  (Smith Dep., 39:13-40:1.)

37.     While immediately after the arrests Starbucks leadership Ms. Smith did not view Ms. Phillip's performance as terminable and possibly better suited for a different role, she changed her mind after witnessing "a combination" of "derailing behavior" over the course of several weeks.  (Smith Dep., 37:1-38:14.)

38.     Starbucks did not terminate Mr. Sykes' employment, but rather he resigned from his position with Starbucks.  (Sykes Dep., 7:17-23.)

39.     Specifically, after the incident, Starbucks wanted to move Mr. Sykes to a suburban market, because the Philadelphia market was in a crisis and Ms. Hymes did not believe that Mr. Sykes could lead Starbucks and its partners through the aftermath.  (Hymes Dep., 255:1-256:5.)

40.     However, Mr. Sykes wanted to move to the larger New York market, but Starbucks could not support the move based on feedback they received from his managers revealing that partners viewed his leadership style as "harsh."  (Pinto Dep., 150:22-151:4; Sykes Dep., 48:10-49:1.)

41.     Ms. Phillips claims that Starbucks treated Mr. Sykes more favorably than her because he is Black by not terminating his employment after the two men were arrested at the store within his District.  (Second Amended Compl. ¶61.)

42.     Even though Mr. Sykes did not perform well in the Philadelphia market, Starbucks did not terminate Mr. Sykes' employment because of his strong work ethic and ability to lead, in stark contrast to Ms. Phillips following the April 2018 arrests. (Relevant portions of Nathalie Cioffi Deposition Transcript, "Cioffi Dep," attached hereto as Exhibit I, 4-2-21 Dep., 72:3-73:10.)

43.     Specifically, in the aftermath of the crisis, Mr. Sykes admitted that the situation was not positive for Starbucks, but nonetheless emphasized the importance of collaboration among partners.  (Cioffi Dep., 72:3-23.)

44.     In June 2018, Mr. Sykes ultimately resigned because he did not receive his preferred placement in the New York market.  (Pl.'s Dep., 53:11 – 54:14; Sykes Dep., 7:10-16.)

## V.      SEVERAL PARTNERS BRING COMPLAINTS AGAINST MS. PHILLIPS AND MR. TRINSEY

45.      During several roundtable meetings in late April and early May 2018, multiple partners in the Philadelphia stores complained about the lack of opportunities provided to both Black employees and employees who did not have special relationships with Ms. Phillips.  (Hymes Dep., 30:2-19.)

46.      Those with special relationships with Ms. Phillips, included the two district managers who reported to her - Mr. Sykes and Mr. Trinsey.  (Hymes Dep., 30:2-31:5.)

47.      Specifically, partners perceived Ms. Phillips' leadership style as rewarding partners she was close with either personally or professionally by giving them promotions.  (Hymes Dep.,30:2-31:5; 168:23-170:3.)

48.      Also, Black partners expressed concerns of pay disparities as compared to White partners and they felt that Ms. Phillips did not take a leadership role and correct these inequities. (Pinto Dep., 134:3-12.)

49.      Mr. Pinto also cited Ms. Phillips' lack of awareness of inequitable pay practices happening in her market as one example of how Ms. Phillips did not have a significant leadership presence in the market.  (Pinto Dep., 101:2-12.)

50.      In or around May 2018, one Black assistant store manager who worked in one of Mr. Trinsey's stores, Jaicee Huff, reported to Ms. Johnson a disparity in pay between her salary and that of another White assistant store manager.  (Johnson Dep., 30:3-22.)

51.      Consistent with its policies and procedures regarding the handling of complaints of discrimination in the workplace, Starbucks investigated these claims against Mr. Trinsey.  (Pinto Dep., 169:18-24.)

52.      Complaints about Mr. Trinsey were not merely isolated to Ms. Huff and her

complaints of pay disparities, but rather several other employees complained about Mr. Trinsey's behavior.  (Johnson Dep., 47:2-6.)

53.     Specifically, in or around May 2018, employees also accused Mr. Trinsey of making inappropriate comments about race, sexuality, and the treatment of other partners and team members.  (Johnson Dep., 45:11-15.)

54.     With respect to determining pay, Mr. Trinsey claimed that Human Resources was responsible for monitoring pay disparities. (Relevant portions of Benjamin Trinsey Deposition Transcript, "Trinsey Dep.," attached hereto as Exhibit J, 34:17-21.)

55.     Ms. Phillips asserts that the District Manager did not have discretion in determining pay.  (Pl.'s Dep., 157:9-158:7.)

56.     However, it is the District Manager's responsibility for determining pay and having awareness as to the possible inequities that exist.  (Johnson Dep., 37:13-39-2.)

57.     Ultimately, Mr. Trinsey agreed Starbucks acted appropriately in investigating the allegations against him.  (Trinsey Dep., 53:19-54:2.)

58.     On May 7, 2018, Ms. Hymes, Mr. Pinto, and Nathalie Cioffi (White), Partner Resources Director, met with Ms. Phillips and instructed her, as Mr. Trinsey's manager, to suspend Mr. Trinsey pending the outcome of the investigation into the allegations against him.  (Pl.'s Dep. 95:7-96:13; Hymes Dep., 309:6-13.)

59.     According to Ms. Phillips, she told Ms. Hymes, Mr. Pinto, and Ms. Cioffi that the allegations against Mr. Trinsey were false, that Mr. Trinsey had no control over setting salaries, and that, in her view, it is "unfair" and "wrong" to suspend Mr. Trinsey.  (Pl.'s Dep., 97:11-100:3; Hymes Dep., 190:22-192:19.)

60.     Ms. Phillips made these assertions before knowing the outcome of the

9

investigation.  (Pl.'s Dep., 88:21-89:5.)

61.     At no point did Ms. Phillips complain to anyone at Starbucks that Mr. Trinsey's race motivated the decision to investigate or suspend him or that he was being treated differently because of his race.  (Pl.'s Dep., 96:18-100:3.)

## VI.   STARBUCKS SUBSTANTIATES THE COMPLAINTS AGAINST MS. PHILLIPS AND MR. TRINSEY

62.     Following receipt of Ms. Huff's complaint about a pay disparity, Ms. Johnson continued her investigation into the allegations by speaking with various team members and reviewing promotional histories to see whether there were inequities.  (Johnson Dep., 32:22-33:7.)

63.     Ms. Johnson spoke with Ms. Huff on numerous occasions in the six months following the arrests and concluded that there was, in fact, a disparity in Ms. Huff's pay compared to the White assistant store manager Ms. Huff had referenced in her complaint.  (Johnson Dep., 37:5-12.)

64.     Ms. Johnson did not reach a conclusion that the disparity was a result of race discrimination.  (Johnson Dep., 44:1-4.)

65.     During the course of this investigation, Ms. Phillips never stated that Mr. Trinsey was treated unfairly.  (Johnson Dep., 48:3-21.)

66.     Notably, Ms. Phillips does not recall ever stating that Mr. Trinsey was treated unfairly because of his race.  (Pl.'s Dep., 98:9-18.)

67.     Ms. Phillips admitted that Starbucks had an obligation to investigate these allegations.  (Pl.'s Dep., 212:1-8.)

68.     Before the investigation into the allegations against Mr. Trinsey concluded, Mr. Trinsey voluntarily resigned.  (Trinsey Dep., 30:16-20; Pl.'s Dep., 53:11-23.)

## VII.   PARTNERS CONTINUE TO BRING COMPLAINTS AGAINST MS. PHILLIPS FOR LACK OF LEADERSHIP AND HER EMPLOYMENT IS TERMINATED

69.    In late April 2018, complaints emerged from partners with respect to Ms. Phillips' lack of physical presence in the market. (Hymes Dep., 160:5-18; 168:21-170:12.)

70.    For example, she cancelled planned store visits at the last minute.  (Hymes Dep, 170:6-12.)

71.    Partners shared that they came to Ms. Phillips and her District Managers with their concerns, yet none were documented, resulting in a perception that partners did not feel seen, valued, or heard in Ms. Phillips' region.  (Hymes Dep., 168:21-172:24.)

72.    Ms. Hymes testified that an "overwhelming theme" emanated from the roundtables that partners in the Philadelphia region "did not trust [Ms. Phillips]," and "partners in distress . . . cannot be led through crisis in an effective way with excellence if they do not trust their leader." (Hymes Dep., 204:24-205:5.)

73.    On May 4, 2018, Ms. Smith texted Mr. Pinto, stating that Ms. Phillips "crashed and burned."  (Pinto Dep., 164:2-11, Exh. 72, attached hereto as Exhibit K.)

74.    In light of these concerns, Ms. Hymes concluded that Ms. Phillips was not able to lead the Philadelphia market and its partners through this moment of crisis.  (Hymes Dep., 52:14-18.)

75.    Because strong leadership was essential during that time, on May 9, 2018, Ms. Hymes decided to terminate Ms. Phillips from her Regional Director role.  (Hymes Dep., 292:16-23.)

76.    Ms. Phillips' asserts that she was terminated because she is White.  (Second Am. Compl., ¶ 71.)

77.    In making the termination decision, Starbucks never discussed or considered Ms.

Phillips' race.  (Hymes Dep., 256:6-8.)

78.     There is no evidence that Starbucks leadership, displayed any discriminatory animus towards White people.  (Hymes Dep. 256:6-8.)

79.     After Starbucks terminated Ms. Phillips' employment, four managers temporarily oversaw Ms. Phillips' region – Marcus Eckensberger, TJ Wolfersberger, Linda Johnson, and Dominic Alessandrini.  (Def.'s Resp. RPD No. 19, attached hereto as Exhibit L.)

80.     After May 9, 2018, Mr. Eckensberger replaced Ms. Phillips.  (Pl.'s Dep., 132:9-22.)

81.     Mr. Eckensbger is White.  (Pl.'s Dep., 132:9-22.)

82.     On June 13, 2018, Ms. Phillips texted Mr. Trinsey and stated that "it looks like [Starbucks] did not only get rid of the white people."  (Hymes Dep., 141:12-19; 142:19-143:4; Pl.'s Dep. Exh. 7, for exhibit identification purposes Bates Stamped PHILLIPS00348 is included and quoted statement is located at Bates Stamp PHILLIPS00367, attached hereto as Exhibit M.)

83.     Ms. Phillips continues to believe that Ms. Hylton followed Starbucks' "Safe and Welcoming" policy, which was put into place to create a safe environment for partners and customers when there is an actual risk to that safety.  (Pl.'s Dep., 64:22-65:10; Johnson Dep., 23:15-25:1.)

84.     Ms. Phillips maintains that Ms. Hylton's decision to call the police was not racially motivated and rather maintained that she "probably thought she was doing the right thing."  (Pl.'s Dep., 63:23-64:12.)

## VIII.   STARBUCKS EXPLORES THE IDEA OF CREATING A TLA POSITION

85.     In or around April 2018, Starbucks' government affairs team explored the possibility of creating a Temporary Limited Assignment ("TLA") position.  (Relevant portions of

Shannon Boldizsar Deposition Transcript, "Boldiszar Dep.," attached hereto as Exhibit N, 19:18-20:18.)

86.     On April 20, 2018, Shannon Boldizsar, then-Government & Community Affairs, Senior Manager (White), sent an email to Ms. Hymes, Ms. Phillips, and other stakeholders in the Philadelphia market announcing the TLA position and seeking recommendations for candidates. (Bates Label STARBUCKS0000719-0000720, attached hereto as Exhibit O.)

87.     In or around the end of April 2018, Ms. Boldizsar and her government affairs colleagues, including James Roth and Kim Winston, held phone calls with several potential candidates for the role, including Ms. Phillips.  (Boldizsar Dep., 20:13-21.)

88.     On April 25, 2018, Ms. Boldizsar and Ms. Phillips exchanged emails about the role for the first time.  (Hymes Dep. 256:15-257:7; Hymes Dep. Exh. 44, attached hereto as Exhibit P.)

89.     Ms. Boldizsar explained that Ms. Hymes recommended Ms. Phillips for the TLA role, and if Ms. Phillips was interested, they should set up a meeting.  (Boldizsar Dep., 21:8-13.)

90.     In April 2018, Ms. Hymes recommended Ms. Phillips for the TLA role because she would not have direct reports and would not be leading a team, and at the time, Ms. Hymes thought that it was a way to create continuity for her employment at Starbucks.  (Hymes Dep. 257:11-23.)

91.     This recommendation came before Ms. Hymes observed Ms. Phillips' leadership ability severely declined.  (Hymes Dep., 200:8-201:19.)

92.     Ms. Boldizsar emphasized the meeting was not an interview, but instead an informal two-way dialogue to learn more about the position and Ms. Phillips' potential interest in it.  (Boldizsar Dep., 19:18-20:11.)

93.     In their email exchange, Ms. Phillips conceded she did not believe she was qualified for the role and would have "no hard feelings if [she was] not the right person."  (Hymes Dep. 256:15:-257:7; Hymes Dep. Exh. 44.)

94.     On April 30, 2018, Ms. Phillips emailed Ms. Boldizsar and Mr. Roth to thank them for the meeting, however, she noted that she "had been in Philadelphia all day and was navigating out of the city during our connect and [she] fear[ed] [she] likely didn't come across very strategic and possibly a bit scattered. . . ." (Bates Labeled Doc STARBUCKS005641, attached hereto as Exhibit Q.)

## IX.    STARBUCKS DECIDES TO ABANDON THE IDEA OF CREATING A TLA POSITION

95.     In or around May 2018, Ms. Boldizsar and her colleagues decided not to create the TLA position because she felt that the partners she considered for the TLA role were not well suited for the position.  (Boldizsar Dep., 26:3-9.)

96.     Specifically, Ms. Boldizsar determined that the candidates did not have the expertise necessary to ensure that Starbucks continued its commitment to maintaining deep relationship with policy makers and elected officials following the April 2018 arrests.  (Boldizsar Dep., 33:11-35:8.)

97.     As a result, Starbucks did not interview any individuals for the role.  (Boldizsar 22:18-20.)

98.     Starbucks never set a salary for the role.  (Boldizsar Dep., 22:21-23.)

99.     Further, Starbucks never drafted a job description for the role. (Boldizsar Dep., 23:3-5.)

100.    On May 2, 2018, Ms. Boldizsar notified the candidates she spoke to about the position, including Ms. Phillips, that the position was being put "on hold."  (Bates Labeled Doc STARBUCKS005641.)

101.    Starbucks decided not to create this position, and nobody was hired for the role. (Boldizsar Dep., 30:1-5.)

Respectfully submitted,

 */s/ Hannah M. Lindgren*
Richard R. Harris (*admitted pro hac vice*)
Hannah M. Lindgren (NJ No. 292082019)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
267.402.3000 (t)
267.402.3131 (f)
rharris@littler.com
mesterow@littler.com

Dated: November 12, 2021

*Attorneys for Defendant,*
*Starbucks Corporation d/b/a*
*Starbucks Coffee Company*