# EXHIBIT A

SHANNON L. PHILLIPS

**Page 1**

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW JERSEY
- - -

SHANNON PHILLIPS
                      :   CIVIL ACTION NO.
        vs.           :   19-19432
                      :
STARBUCKS             :
CORPORATION d/b/a     :
STARBUCKS COFFEE      :
COMPANY               :
                      - - -

TUESDAY, JANUARY 26, 2021
- - -
VIDEOTAPED DEPOSITION OF
SHANNON L. PHILLIPS, taken pursuant to
notice, was held by and between all parties
present via communication technology using
WebEx, commencing at 10:07 a.m., before
Kimberly S. Gordon, a Registered
Professional Reporter, Certified Court
Reporter and Notary Public.

- - -

ELITE LITIGATION SOLUTIONS, LLC
One Penn Center
1617 J.F.K. Boulevard, Suite 340
Philadelphia, Pennsylvania 19103
www.elitelsllc.com ~ (215) 563-3703

**Page 2**

```
 1 APPEARANCES:
 2
 3          CONSOLE MATTIACCI LAW, LLC
            BY:  KATHERINE C. OELTJEN, ESQUIRE
 4              HOLLY W. SMITH, ESQUIRE
            1525 Locust Street, 9th Floor
 5          Philadelphia, Pennsylvania 19102
            215.545.7676
 6          oeltjen@consolelaw.com
            hollysmith@consolelaw.com
 7          Representing the Plaintiff
 8
            LITTLER MENDELSON, P.C.
 9          BY:  RICHARD HARRIS, ESQUIRE
            MARC D. ESTEROW, ESQUIRE
10          Three Parkway, Suite 1400
            1601 Cherry Street
11          Philadelphia, Pennsylvania 19102
            267.402.3040
12          267.402.3029
            rharris@littler.com
13          mesterow@littler.com
            Representing the Defendant
14
15          ALSO PRESENT:
            RICK CHRISTIAN, VIDEOGRAPHER
16          ROBYN RUDERMAN, ESQUIRE
17
18                  - - -
19
20
21
22
23
24
```

**Page 3**

```
 1                  - - -
 2              I N D E X
 3                  - - -
 4
 5 Testimony of:  SHANNON L. PHILLIPS
 6
 7
 8 By Mr. Harris............................6
 9
10
11                  - - -
12          E X H I B I T S
13                  - - -
14 EXHIBIT NUMBER    DESCRIPTION    PAGE MARKED
15 P-1      Second Amended Complaint      40
16 P-2      FLEMKE0001 to 0016            55
17 P-3      Plaintiff's Response to       74
18          Defendant's Request for
19          Admissions
20 P-4      EEOC Charge                  107
21 P-5      STARBUCKS 000140             134
22 P-6      10-page document,            135
23          excerpts from Guide
24 P-7      PHILLIPS00348 to 00455       168
```

**Page 4**

```
 1                  - - -
 2      DEPOSITION SUPPORT INDEX
 3                  - - -
 4
 5 Direction to Witness Not to Answer
 6 Page      Line
 7 None
 8
 9
10 Request for Production of Documents
11 Page      Line
12 None
13
14
15 Stipulations
16 Page      Line
17 None
18
19
20 Question Marked
21 Page      Line
22 None
23
24
```

SHANNON L. PHILLIPS

5

1      THE VIDEOGRAPHER:  Good
2  morning.  We are now on the record.
3  My name is Rick Christian.  I'm a
4  videographer retained by Elite.
5  Today's date is January 26, 2021, and
6  the video time is 10:07 a.m. Eastern.
7      This deposition is in the
8  matter of Shannon Phillips versus
9  Starbucks.  The deponent is Shannon
10  Phillips.
11      Would counsel like to state
12  your appearance for the record?
13      MS. OELTJEN:  Good morning.
14  Kate Oeltjen of Console & Mattiacci
15  Law for the Plaintiff, Shannon
16  Phillips.  My colleague Holly Smith
17  is not yet present, but I do expect
18  that she will join us at some
19  juncture this morning.
20      MR. HARRIS:  Richard Harris and
21  Marc Esterow on behalf of Littler
22  Mendelson and the Defendant,
23  Starbucks Corporation, and joining
24  with us this morning is Robyn

6

1  Ruderman, in-house counsel for
2  Starbucks.
3      THE VIDEOGRAPHER:  All right.
4  If there are no other appearances,
5  the court reporter is Kim Gordon and
6  will now swear-in the witness.
7          - - -
8      SHANNON L. PHILLIPS, after
9  having been duly sworn, was examined
10  and testified as follows:
11          - - -
12      EXAMINATION
13          - - -
14  BY MR. HARRIS:
15  Q.   Good morning, Ms. Phillips.  How are
16  you?
17  A.   I'm good.  Thank you.
18  Q.   Ordinarily, we would be in a
19  conference room, and in that conference room,
20  there would be a court reporter, whom just
21  swore you in, and she would be taking down
22  everything that you say.  And then we'd also
23  have a videographer and Rick Christian is the
24  videographer today, and he would also be

7

1  videotaping your deposition, so he's going to
2  do the same thing today even though we're
3  doing it through Webcast.  So we're going to
4  be recording your deposition.  Do you
5  understand that?
6  A.   I do.
7  Q.   Okay, good.  Can you hear me okay?
8  A.   I can.  Can you hear me okay?
9  Q.   Okay.  Your sound is coming through
10  perfectly.  And can you actually see me?
11  A.   I can.
12  Q.   Okay, great.  I can see you as well.
13      So we're going to take your
14  deposition this morning.  And what that means
15  is we're going to ask you a few questions,
16  and hopefully, if you understand the
17  question, you'll be able to answer those
18  questions.
19      And so far, have you been able to
20  understand the things that I've said thus
21  far?
22  A.   Yes, I have.
23  Q.   Okay.  And during the course of this
24  deposition, I'm going to ask that you only

8

1  speak to me unless we go on a break and then
2  you can certainly speak to others, but while
3  you're on the stand, you are actually
4  precluded from talking to your counsel.  Do
5  you understand that?
6  A.   I do.
7  Q.   And certainly, even during the course
8  of this day, you actually cannot talk to your
9  counsel about your testimony.  Do you
10  understand that as well?
11  A.   I do.
12  Q.   Okay.  Ms. Phillips, is this the
13  first time you've ever had your deposition
14  taken?
15  A.   Yes.
16  Q.   Okay.  Prior to you coming today, did
17  you speak to anyone about your deposition
18  other than your counsel?
19  A.   Oh.  My mom knows that I'm here.  My
20  kids know, yes, that I'm doing a deposition.
21  Q.   Okay.  Did you talk to them about
22  what you intend on testifying to this
23  morning?
24  A.   Just the truth.

SHANNON L. PHILLIPS

9

1   Q.   Okay.  Did you look at any documents
2 before you came this morning?
3   A.   No.
4   Q.   When was the last time you looked at
5 any documents prior to your deposition?
6   A.   Last night.
7   Q.   Okay.  What did you review?
8   A.   I reviewed, Kate had sent me --
9          MS. OELTJEN:  Shannon, stop.
10          THE WITNESS:  Sorry.
11          MS. OELTJEN:  So, Shannon, this
12       is where I'm just going to say you
13       can't tell Mr. Harris about anything
14       that I sent to you that are my
15       thoughts or words or comments or
16       communications between you and I, but
17       you can tell Mr. Harris about any
18       documents that you looked at that
19       were not a result of us communicating
20       and communicating about legal advice.
21          THE WITNESS:  Okay.
22          I looked at some documents that
23       were like the filing and the -- just
24       to refresh my memory.  And some, I

10

1       think they were called
2       Interrogatories, something like that,
3       to refresh my memory because it had
4       been a while since we put that
5       together.
6 BY MR. HARRIS:
7   Q.   Anything else?
8   A.   No, I don't think so.
9   Q.   Okay.  Did you look at any news
10 reports or recounts of the incident that
11 happened in April of 2018?
12   A.   No.
13   Q.   Okay.  Did you look at any videos?
14   A.   No.
15   Q.   Okay.  All right.  So you said one of
16 the documents that you reviewed you said was
17 the Complaint, if I'm not mistaken.  Did you
18 review the Complaint?
19          MS. OELTJEN:  Objection.  You
20       can answer.
21          THE WITNESS:  Yes, I did.
22 BY MR. HARRIS:
23   Q.   Okay.  And as I understand the Second
24 Amended Complaint, does that contain all of

11

1 the allegations that you're raising in this
2 lawsuit against Starbucks Corporation?
3          MS. OELTJEN:  Objection.  You
4       can answer.
5          THE WITNESS:  Yes.
6 BY MR. HARRIS:
7   Q.   Okay.
8          MS. OELTJEN:  Rich, I'm sorry
9       to interrupt you.  Marc, there's
10       something going on with your video
11       that's like flashing like a strobe
12       light.  I don't know if anyone else
13       is seeing that, but -- no?  Just me?
14          MR. HARRIS:  It's by design,
15       Kate.
16          MS. OELTJEN:  Yes, you're
17       trying to throw me off my game.  All
18       right, sorry, bear with me one
19       second.  It's like real --
20          MR. ESTEROW:  Sorry.
21          MS. OELTJEN:  No.
22          MR. ESTEROW:  It's okay.
23          MS. OELTJEN:  I guess if I'm
24       the only one that's seeing it --

12

1          MR. HARRIS:  We can go off the
2       record for a second.
3             - - -
4       (A discussion off the record occurred.)
5             - - -
6          THE VIDEOGRAPHER:  Going off
7       the record, the time is 10:12 a.m.
8       Off the record.
9             - - -
10       (Off the videotape record.)
11             - - -
12          THE VIDEOGRAPHER:  All right.
13       The time is 10:13 a.m.  Back on the
14       record.
15          MS. OELTJEN:  Rich, I'll just
16       add for the record that my colleague
17       Holly Smith has now joined us.
18          MR. HARRIS:  Good morning, Ms.
19       Smith.  How are you?
20          MS. SMITH:  Had some tech
21       issues, but I'm here.  Nice to see
22       you.
23          MR. HARRIS:  Nice seeing you as
24       well.  Nice meeting you.

SHANNON L. PHILLIPS

13

1      Kim, would you mind repeating
2  the last question for me, please, and
3  for the rest of the audience?
4          - - -
5  (Whereupon, the pertinent portion of the
6   record was read by the court reporter.)
7          - - -
8  BY MR. HARRIS:
9   Q.  Ms. Phillips, to paraphrase or
10  summarize what I understand your complaint
11  is, you have essentially three allegations.
12  One is you're alleging that you were the
13  victim of reverse discrimination?
14          MS. OELTJEN:  Objection.  You
15      can answer.
16          THE WITNESS:  Yes.
17  BY MR. HARRIS:
18   Q.  Okay.  You're also alleging that you
19  were retaliated against, yes?
20          MS. OELTJEN:  Objection.  You
21      can answer.
22          THE WITNESS:  Yes.
23  BY MR. HARRIS:
24   Q.  Okay.  And is there a third complaint

14

1  that you're raising in this lawsuit?
2   A.  I don't think so.  I'm not sure.
3   Q.  Okay.  So essentially you're arguing
4  that in your lawsuit that you were the victim
5  of reverse discrimination based on the
6  incident that occurred in April of 2018
7  inside the 18th and Spruce store?
8          MS. OELTJEN:  Objection.  You
9      can answer.
10          THE WITNESS:  Yes, that's
11      correct.
12  BY MR. HARRIS:
13   Q.  Okay.  And you're also alleging that
14  you were retaliated against based on your
15  complaint to someone in the organization at
16  Starbucks?
17          MS. OELTJEN:  Objection.  You
18      can answer.
19          THE WITNESS:  Yes.
20  BY MR. HARRIS:
21   Q.  Okay.  All right.  Now, let's go back
22  to, you have some detailed allegations in
23  your lawsuit that's based in the Second
24  Amended Complaint.  You said that you had a

15

1  chance to review that.  Did you not?
2   A.  I think I reviewed that last night.
3  I reviewed, I reviewed the Complaint.  I
4  think it was the Second Amended one.  I'm not
5  100 percent sure, but I think so.
6   Q.  Okay.  And you identified certain
7  individuals in that Complaint, but you
8  identified the two young men that were
9  arrested in April of 2018 as two black men.
10  Do you recall seeing that?
11          MS. OELTJEN:  Objection.  You
12      can answer.
13          THE WITNESS:  Yes.
14  BY MR. HARRIS:
15   Q.  Do you recall their names?
16   A.  I do not.
17   Q.  Did you ever know their names?
18          MS. OELTJEN:  Objection.  You
19      can answer.
20          THE WITNESS:  I'm sure I did,
21      but it's been about three years.  So,
22      I'm sorry, I don't remember them.
23  BY MR. HARRIS:
24   Q.  Did you recall writing down their

16

1  names anywhere?
2   A.  Back in 2018?
3   Q.  From 2018 until today's date.
4   A.  I did write down their names, yes.
5   Q.  Okay.  But as you sit here and as you
6  looked at the documents, nothing would
7  refresh your recollection to tell you what
8  their names are today as you sit here and
9  testify?
10          MS. OELTJEN:  Objection.  You
11      can answer.
12          THE WITNESS:  I would have to
13      refer to my notes, and I don't have
14      my notes in front of me.  So I don't,
15      off the top of my head, no, I'm
16      sorry, I don't recall their names.
17      If you want me to look at my notes,
18      I'm more than happy to.
19          MS. OELTJEN:  Can't.
20      Mr. Harris has your notes.  So,
21      Shannon, if he wants to show them,
22      don't -- you don't have to go and
23      collect things.  Mr. Harris has them.
24          THE WITNESS:  Okay.

SHANNON L. PHILLIPS

---

17

1  BY MR. HARRIS:
2   Q.  So, Ms. Phillips, despite looking at
3  the documents that you were reviewing before
4  you testified today, as you sit here, you
5  cannot remember the two individuals' names
6  who were arrested inside the 18th and Spruce
7  store?
8         MS. OELTJEN:  Rich, I'm going
9      to object, and I'm going to put on
10     the record that in the over 5,000
11     pages of documents that Starbucks
12     produced I don't recall seeing their
13     names anywhere.
14         MR. HARRIS:  You're not
15     testifying, Kate, but thank you.
16         MS. OELTJEN:  I am not, but
17  this is not --
18         MR. HARRIS:  You're not
19  testifying.
20         MS. OELTJEN:  You can --
21         MR. HARRIS:  Thank you very
22  much.
23         MS. OELTJEN:  She's asked and
24     answered it multiple times --

---

18

1         MR. HARRIS:  So I'm asking it
2      again.
3         MS. OELTJEN:  -- she doesn't
4      recall their names.  You got it,
5      Rich, she doesn't remember their
6      names.
7  BY MR. HARRIS:
8   Q.  Ms. Phillips, again?
9   A.  Are you asking me if I remember their
10  names again?
11  Q.  Yes, I'm asking you that again.
12  A.  So I have to be honest, I don't
13  remember their names off the top of my head.
14  I'm sorry.
15  Q.  Okay.  Was that a significant event
16  that happened, the event that took place on
17  April of 2018?
18  A.  Yes, it was very significant.
19  Q.  What made it significant?
20  A.  It was a horrible situation.  It
21  happened in a store that was under my
22  umbrella.  Two men were arrested.  It was I
23  think probably the worst thing that ever
24  happened at Starbucks in all honesty.

---

19

1   Q.  When you say "horrible", what made it
2  horrible?
3   A.  What made it horrible?  Two men were
4  arrested in a store of mine, and obviously,
5  that should never have happened.  And what
6  came after, the protesting.  And it was just
7  a very terrible situation all around.
8   Q.  Can you describe to me the events
9  that led to their arrest?
10  A.  The events that led to their arrest?
11  Q.  Yes.
12  A.  I wasn't in the store when it
13  happened, so I can tell you what I know based
14  on what was shared with me.  Is that what you
15  want me to do?
16  Q.  Let's put a finer point on it.  As a
17  result of the two men getting arrested, there
18  was an investigation that was done
19  internally?
20         MS. OELTJEN:  Is that a
21     question?
22  BY MR. HARRIS:
23  Q.  Was there not an investigation,
24  Ms. Phillips?

---

20

1         MS. OELTJEN:  Objection.  You
2      can answer.
3         THE WITNESS:  If you mean by
4      "investigation" did the company
5      review the security tapes from the
6      store, yes.  There were multiple
7      calls with a manager at the store
8      that was involved and her district
9      manager as well as a slew of people
10     from Seattle wanting to understand
11     better what had happened.  So I would
12     say that was the investigation.
13  BY MR. HARRIS:
14  Q.  Okay.  Did you speak to the manager
15  that was on duty at the time the gentlemen
16  were arrested about the incidents that led to
17  their arrest?
18  A.  The night that it happened?
19  Q.  At any time thereafter.
20  A.  Oh.  Yes, I did.
21  Q.  Okay.  What were you informed by her?
22  A.  About what they were arrested?
23  Q.  Yes.
24  A.  That two men had come into the store

---

ELITE LITIGATION SOLUTIONS, LLC

SHANNON L. PHILLIPS

21

1  and they had asked to use the restroom.
2  Starbucks had a policy, it was called Safe
3  and Welcoming, that restrooms were for
4  customers only.  So she said to them,
5  according to her, "I'm happy to provide you
6  the restroom code", because the doors were
7  locked, they had codes on them, "upon making
8  a purchase".  And they didn't make a
9  purchase, so she didn't provide the code.
10      She said that they went down and sat
11  in the café.  And our cafés at the time,
12  there is the Safe and Welcoming policy, there
13  was a Code of Conduct hanging in the stores,
14  and the stores were trained on how to
15  approach people that were non-customers in
16  the store, somebody who hadn't purchased
17  something.
18      So she approached them and said, "Can
19  I get something started for you", and they
20  said, "No, won't be purchasing anything
21  today".  My understanding is she let them
22  know, you know, "The cafés are for our
23  customers only.  If you're not purchasing
24  something, I need you to move along", and

22

1  they did not.
2      At that point, she called the police
3  and said, "I have two gentlemen in the café
4  refusing to make a purchase and refusing to
5  leave".  And then the police came to the
6  store, and from there, the police were the
7  ones that made the decisions.
8   Q.   Okay.  That's extremely detailed.
9  You remember all of that from 2018?
10   A.   I do.  It was a significant incident.
11  Yes, I do.
12   Q.   Okay.  And did you speak to anyone
13  else other than the manager about the
14  incidents that led to the arrest of the two
15  gentlemen in the store?
16   A.   Yes, of course.  The night it
17  happened, I didn't speak to the manager.  The
18  night it happened, her district manager Paul
19  Sykes had reached out to me, told me what
20  happened.  And I then reached out to my boss
21  at the time, her name was Camille, to let her
22  know what had happened and relayed the
23  information that the manager had given to
24  Paul and Paul had given to me.  That was kind

23

1  of how it worked at Starbucks where you
2  would, you know, share up the chain kind of
3  what had happened in the store when an
4  incident had happened.
5      And so I spoke with Paul about it, I
6  spoke with my boss about it, and then I
7  believe the next day there was a phone call,
8  a conference call that there were a lot of
9  people on from Seattle as well as our local
10  level people, me, the district manager, the
11  store manager, where the manager then relayed
12  to I'll say senior leaders in the company
13  that were on this call what happened.
14   Q.   And did you think based on your
15  discussion with the manager -- do you recall
16  the manager's name?
17   A.   Yes, Holly.
18      SPEAKER:  Yes, I got to listen.
19      THE WITNESS:  Sorry, I don't --
20  I heard something.
21      MR. HARRIS:  No, I think I
22  heard someone else's voice as well.
23  BY MR. HARRIS:
24   Q.   You said the manager who called the

24

1  police in April of 2018, her name was Holly?
2   A.   That's correct.
3   Q.   Okay.  How long had you worked with
4  Holly before that incident?
5   A.   I think about five years.
6   Q.   Did you hire Holly?
7   A.   I did not.
8   Q.   Okay.  Typically, in hiring, -- you
9  were the Regional Director.  Is that
10  accurate?
11   A.   That's correct.
12   Q.   As of April of 2018, correct?
13   A.   Well, I mean I had been there a lot
14  longer than that, but yes, April 2018 I
15  was the Regional Director.
16   Q.   Understood.  And the Regional
17  Director is responsible for hiring the
18  district managers.  Is that accurate?
19   A.   Correct.
20   Q.   And then the district managers hire
21  the store managers or the café managers?
22   A.   Yes.  I would sign-off on promotions
23  as well.  So I would meet with the store
24  manager, typically they would do a coffee

SHANNON L. PHILLIPS

25

1  tasting, the potential store manager, and
2  they would do a coffee tasting.  And because
3  we had very open lines of communications, so
4  it was important to have relationships at all
5  levels.
6    Q.   Okay.  So Holly, do you remember
7  Holly's last name who was the store manager?
8    A.   Hylton.
9    Q.   Holly Hylton, okay.  And after
10  talking to Holly Hylton, did you believe that
11  she had applied, I believe you called it --
12  what was the name of the procedure that you
13  said that was applicable as to why she
14  escorted the gentlemen out of the store?
15         MS. OELTJEN:  Objection.  You
16      can answer.
17         THE WITNESS:  It's called Safe
18      and Welcoming.
19  BY MR. HARRIS:
20    Q.   Okay.  The Safe and Welcoming policy,
21  do you believe that she had applied it
22  appropriately?
23    A.   I don't think the police should have
24  been called, but I think they were called as

26

1  a result of this flawed policy, yes.
2    Q.   Okay.  I don't recall you mentioning,
3  and correct me if I'm wrong, does the policy
4  actually call for notifying the police or law
5  enforcement?
6         MS. OELTJEN:  Objection.  You
7      can answer.
8         THE WITNESS:  So the Safe and
9      Welcoming policy -- let's see, does
10      it actually -- yes, it kind of goes
11      through the steps or it went through
12      the steps of how to address something
13      and then, if it escalated, do this,
14      and it kind of gave you different
15      avenues to go down.
16  BY MR. HARRIS:
17    Q.   I don't recall you mentioning, did
18  the gentlemen, what was in their conduct that
19  escalated this incident that rose to the
20  level that the police should be contacted?
21         MS. OELTJEN:  Objection.  You
22      can answer.
23         THE WITNESS:  I don't -- I'm
24      going to make sure I understand the

27

1      question.  What in their conduct rose
2      to the level that the police should
3      have been called?
4  BY MR. HARRIS:
5    Q.   Yes.  You said something about
6  "escalation".  So I'm trying to figure out
7  what was in the conduct of the gentlemen in
8  the store that rose to the level that the
9  police should have been contacted.
10         MS. OELTJEN:  Objection.  You
11      can answer.
12         THE WITNESS:  So, according to
13      the Safe and Welcoming policy, the
14      café was for customers only.  There
15      were signs posted in the store about
16      that.  We reserved the cafés for
17      paying customers.
18         So, if someone wasn't making a
19      purchase, they were what we would
20      call a non-customer, so we would ask
21      them to leave the store.  And if
22      someone refused to leave the store,
23      then I think that would have turned
24      it into a more escalated situation.

28

1         I don't know if Holly felt
2      threatened in some way.  I don't, I
3      don't know what was going through her
4      mind.  But I know that based on what
5      she shared there were non-customers
6      in the store that were refusing to
7      leave, so she decided to make the
8      phone call to the police.
9  BY MR. HARRIS:
10    Q.   You said "threatened".  Did she
11  mention to you that she felt threatened?
12         MS. OELTJEN:  Objection.  You
13      can answer.
14         THE WITNESS:  I'm sorry, I said
15      I don't know if she felt threatened
16      in some way, but --
17  BY MR. HARRIS:
18    Q.   I know, but you mentioned that.
19  Where did you get that from?
20    A.   Well, I think in the Safe and
21  Welcoming procedures, -- you know, without
22  looking at them directly, I would hate to
23  paraphrase, but the policy was around issues
24  that would arise in the store, non-customers

SHANNON L. PHILLIPS

29

1  in the store, you know, drug use in the
2  restrooms, lots of things that happened in
3  the stores, one of which was people, it
4  listed it out, loitering.  So I believe that
5  she felt these folks were loitering in the
6  store since they weren't making a purchase.
7  So --
8     Q.   Was that your recollection of what
9  she told you that she felt the individuals
10 were loitering?
11         MS. OELTJEN:  Objection.  You
12     can answer.
13         THE WITNESS:  I don't recall
14     honestly what she said at the time.
15     I know they were non-customers in the
16     store.
17 BY MR. HARRIS:
18    Q.   Okay.  And as I understand the policy
19 that you're referring to, the policy, does it
20 not indicate that the police should be called
21 only in unique or escalated circumstances?
22         MS. OELTJEN:  Objection.  You
23     can answer.
24         THE WITNESS:  Without looking

30

1     at it in front of me, it would be me
2     guessing.  So, you know, I don't want
3     to guess at exactly what it says.
4  BY MR. HARRIS:
5     Q.   How about your recollection of what
6  it says?
7         MS. OELTJEN:  Objection.  If
8     you don't have a recollection and you
9     would be guessing, then you've
10     answered the question.
11 BY MR. HARRIS:
12    Q.   I'm asking you to provide us based on
13 your information and inference based on the
14 information that you had since you were
15 responsible for that store.
16         MS. OELTJEN:  Rich, I'm not
17     going to allow the witness to guess
18     today.
19         MR. HARRIS:  I'm not asking her
20     to guess.  I'm asking her --
21         MS. OELTJEN:  That's the only
22     --
23         MR. HARRIS:  I'm not asking her
24     to guess, and we both can't talk at

31

1     the same time.  So I apologize.
2         I'm not asking the witness to
3     guess, but I'm asking her based on
4     her information and based on her
5     being experienced in running,
6     operating or overseeing that store.
7         THE WITNESS:  Can you ask me
8     the question again?  And, I'm sorry,
9     I forgot at this point.
10 BY MR. HARRIS:
11    Q.   Sure, no problem.  Do you recall
12 whether or not the policy would require the
13 police to be called in any circumstance in
14 which someone was not making a purchase?
15    A.   I don't recall.
16    Q.   Do you recall whether or not that
17 would be the spirit of the policy?  Did you
18 train on the policy?
19         MS. OELTJEN:  Objection.
20         THE WITNESS:  The policy was
21     taught by our Partner Resource
22     Manager and our P&AP Manager.  So I
23     didn't teach the policy, no.
24 BY MR. HARRIS:

32

1     Q.   Did you ever attend a training
2  regarding the policy?
3     A.   I attended the training with the
4  store managers.
5     Q.   Okay.  And based on the training that
6  you received, in what circumstances would the
7  police be called?
8         MS. OELTJEN:  Objection.  You
9     can answer.
10         THE WITNESS:  It was a long
11     time ago.  I'm sorry, it was well
12     over three years ago that I went
13     through the training, so I just --
14     I'm sorry, I don't recall.
15 BY MR. HARRIS:
16    Q.   Okay.  Now, after -- you said that
17 you spoke to, I believe you said her last
18 name was Holly -- what was her last name,
19 excuse me?
20    A.   Hylton.
21    Q.   Holly Hylton.  After speaking to
22 Ms. Hylton, did you speak to anyone else
23 about the incident that took place in April
24 of 2018 in the store at 18th and Spruce

SHANNON L. PHILLIPS

33

1 Street?
2   A.   Yes, I did.
3   Q.   Okay.  About the incident?
4   A.   Yes.
5   Q.   Anyone else that had personal
6 knowledge of what happened why the two
7 gentlemen were in the store?
8   A.   Had personal knowledge, no.  Holly
9 was the only person I talked to that was in
10 the store when it happened.
11   Q.   Okay.  Did you look at the videotape?
12 I think you referred in your testimony a few
13 moments ago about a videotape that was in the
14 store of the incident that took place.
15   A.   I did not.  The P&AP person, her name
16 was Rhonda, she looked at it.  She shared
17 that she looked at it.
18   Q.   Okay.  "P&AP", for the record, could
19 you tell us what that means?
20   A.   Partner and Asset Protection.
21   Q.   Okay.  So that's sort of like the
22 security detail?
23       MS. OELTJEN:  Objection.
24       THE WITNESS:  Sort of.  They're

34

1       looking out for the assets and the
2       partners in the company.  Some
3       companies call it Loss Prevention,
4       but this is tied more to the partners
5       as well, not just assets.
6 BY MR. HARRIS:
7   Q.   Not just the assets, okay.
8       Based on your discussion with the
9 person responsible for -- "P&AP", is that
10 what you said?
11   A.   P&AP, yes.
12   Q.   -- P&AP, did you have a sense that
13 the gentlemen that were in the store were
14 loitering?
15       MS. OELTJEN:  Objection.  You
16       can answer.
17       THE WITNESS:  The word
18       "loitering", the way we looked at it
19       was if a customer was in the store
20       not making a purchase.
21       So were the men loitering?  The
22       way I understood it, they were in the
23       store and hadn't made a purchase.
24 BY MR. HARRIS:

35

1   Q.   Okay.  Is that how you would define
2 "loitering" as well?
3   A.   Personally, no.  I think, you know,
4 somebody being there for hours and hours I
5 would personally consider loitering, but the
6 way we looked at it in terms of the policy
7 that Starbucks had given us it was a
8 non-customer, so someone who had not made a
9 purchase.
10   Q.   Did you ever look, after the
11 incident, did you ever look at the social
12 media or media outlet reports demonstrating
13 what the gentlemen were doing in the store
14 prior to their arrest?
15   A.   I don't think there were videos of
16 what they were doing prior to their arrest.
17 If I recall, the videos were more as they
18 were getting arrested.
19   Q.   Did you see --
20   A.   That's what I remember seeing.
21   Q.   Okay.  Did you see those videos as
22 they were getting arrested?
23       MS. OELTJEN:  Objection.  You
24       can answer.

36

1       THE WITNESS:  Yes, I did.
2 BY MR. HARRIS:
3   Q.   Okay.  Were you aware -- and I
4 believe Ms. Hylton, did she tell you that the
5 gentlemen had been in the store for less than
6 three minutes before she notified the police?
7       MS. OELTJEN:  Objection.  You
8       can answer.
9       THE WITNESS:  Just to make sure
10       I understand the question, did
11       Ms. Hylton tell me that they had been
12       in the store less than three minutes
13       before she called the police?
14 BY MR. HARRIS:
15   Q.   Yes.
16   A.   No, I don't recall her telling me
17 that.
18   Q.   Did you find that out through other
19 sources?
20   A.   Yes, I must have found that out
21 through other sources.
22   Q.   Did you listen to the radio tape of
23 when she notified the police?
24       MS. OELTJEN:  Objection.  You

SHANNON L. PHILLIPS

37

1    can answer.
2         THE WITNESS:  Are you referring
3    to the 9-1-1 call?
4  BY MR. HARRIS:
5    Q.   I am.
6    A.   Yes, I heard a video of the --the
7  police put out a video of the or a recording
8  I think of the 9-1-1 call.  So I did hear it,
9  yes.
10   Q.   What was your reaction?
11   A.   To the 9-1-1 call?
12   Q.   Yes.
13   A.   What was my reaction?
14   Q.   Yes.
15   A.   I recall her saying to the police, "I
16 have two gentlemen in my café refusing to
17 make a purchase and refusing to leave", and I
18 guess that accurately described what was
19 happening in the store.
20      Does that mean I think the call
21 should have happened to the police?  No.  But
22 my reaction to the call was she accurately
23 described what was happening.  There were two
24 people in the store not making a purchase and

38

1  not leaving, and that went against the
2  Starbucks Safe and Welcoming policy.
3    Q.   As the leader for that district, --
4    A.   Region.
5    Q.   Correct me if I'm wrong.  Thank you
6  for correcting me.
7         -- for that region, what should have
8  happened based on the facts as you understand
9  it?
10        MS. OELTJEN:  Objection.  You
11   can answer.
12        THE WITNESS:  What should have
13   happened?  I don't think the police
14   should have been called.  I believe
15   Holly was following a flawed policy
16   that the company put out.  But I,
17   personally, I don't think the police
18   should have been called.
19 BY MR. HARRIS:
20   Q.   What steps did you take as the leader
21 for that region --
22        MS. OELTJEN:  Objection.
23 BY MR. HARRIS:
24   Q.   -- after the incident of April 2018?

39

1    A.   What steps did I take?
2    Q.   Yes.
3    A.   The next day I went into the city to
4  the store, met with the district manager and
5  the store manager.  My boss Camille also came
6  that day into the city.  We spent I believe
7  the whole day in the store kind of talking
8  about what happened and what we needed to
9  do going forward.
10        We came up with some plans around
11 information that we were being given, that
12 there were potentially going to be protests
13 happening.  So I took steps reaching out to
14 my other district managers to provide support
15 into the city.
16        The -- I don't know if you want me to
17 keep talking about all the steps, but I did a
18 lot from there.
19   Q.   When you said that -- one of the
20 things that you mentioned was that when you
21 came into the city that you met with Camille,
22 who was your supervisor, correct?
23   A.   She came into the city as well.  She
24 lived in Bethesda.  Yes, she came in as well.

40

1    Q.   Okay.  And when you met with Holly
2  Hylton, was anyone else there during the
3  course of that meeting with Holly?
4    A.   Certainly, her district manager Paul
5  would have been there.  I don't recall if we
6  sat down with Holly with Camille or before
7  Camille got there.  I'm sure Camille sat with
8  Holly and Paul and I as well.  I don't
9  recall.
10   Q.   Okay.
11        MR. HARRIS:  May the witness be
12   shown Exhibit Number 1.
13        THE VIDEOGRAPHER:  Sure, just
14   one moment.
15             - - -
16   (P-1 marked for identification.)
17             - - -
18 BY MR. HARRIS:
19   Q.   So, Ms. Phillips, this is the Second
20 Amended Complaint.  Is this the document that
21 you had a chance of reviewing yesterday?
22        MS. OELTJEN:  Excuse me, Rich,
23   is the witness able to scroll through
24   the document?  I'm not.

SHANNON L. PHILLIPS

---

41

1          MR. HARRIS:  That's a wonderful
2     question, Kate. I do not know.
3          THE VIDEOGRAPHER:  This is
4     Rick. I'm the only one controlling
5     the document. I can scroll to
6     wherever we need, if that's okay.
7          MS. OELTJEN:  So I would just
8     ask, Rich, today that the witness
9     have the ability to scroll through
10     any document that you show her,
11     particularly if you're going to ask
12     her about that document.
13          MR. HARRIS:  I don't know if
14     we'll be able to do that, but we'll
15     see what we can do.
16 BY MR. HARRIS:
17    Q.   So, Ms. Phillips, showing the first
18 page of that document, does that -- does this
19 document, is this document a fair
20 representation of what you reviewed yesterday
21 prior to your deposition?
22          MS. OELTJEN:  I can't let her
23     answer that question if she can't
24     look at the whole document, Rich.

---

42

1          MR. HARRIS:  I'm going to go
2     through page by page.
3          MS. OELTJEN:  Okay. But just I
4     just want to make it clear that right
5     now all the witness can see is the
6     first page, so she can't answer
7     whether or not the whole thing is
8     what she reviewed yesterday.
9          MR. HARRIS:  Understood.
10 BY MR. HARRIS:
11    Q.   Let's go through page number 1. Is
12 page number 1, does that look like the same
13 page number 1 that you reviewed of the Second
14 Amended Complaint yesterday?
15    A.   To be perfectly honest, I skimmed
16 through it last night just to refresh my
17 memory. So this is likely the document. I'm
18 sure it is. If you want me to read each
19 page, I'm happy to tell you if I read through
20 this or --
21          MR. HARRIS:  Rick, could you
22     blow that up a little bit larger,
23     please? Thank you.
24          THE WITNESS:  Okay.

---

43

1 BY MR. HARRIS:
2    Q.   Does that appear to be the same first
3 page that you reviewed yesterday?
4    A.   It does.
5    Q.   Okay. Let's go to the second page.
6 Is this the same second page of the Second
7 Amended Complaint that you reviewed
8 yesterday?
9    A.   Yes, I think so. Yes.
10    Q.   When you say you think so, is that a
11 figure of speech or is there something
12 different in this document that you recall
13 that you saw yesterday?
14          MS. OELTJEN:  Objection. You
15     can answer.
16          THE WITNESS:  I just didn't
17     read it, you know, 100 percent
18     thoroughly.
19          I'm sorry. I'm confident this
20     is the same thing I reviewed. I
21     just, you know, kind of skimmed
22     through it, so --
23 BY MR. HARRIS:
24    Q.   Understood, okay. Let's go to the

---

44

1 third page to make sure that it is the same
2 document, and if that doesn't do it, we'll go
3 to the fourth page.
4    A.   Yes, this looks right.
5    Q.   Okay, very good. So the Second
6 Amended Complaint, what's been now shown to
7 you as Exhibit Number 1, that's the document
8 that you reviewed yesterday prior to your
9 deposition. Is that accurate?
10    A.   I skimmed through it. I wouldn't say
11 I reviewed it in great detail, but I did skim
12 over it.
13    Q.   Okay, you skimmed it. All right.
14 Now, you testified that -- strike that.
15 Let's now go to --
16          MR. HARRIS:  I'm sorry, Kim, I
17     apologize, can you repeat the last
18     question that I asked Ms. Phillips?
19              - - -
20     (Whereupon, the pertinent portion of the
21     record was read by the court reporter.)
22              - - -
23 BY MR. HARRIS:
24    Q.   Ma'am, again, after the April of 2018

---

ELITE LITIGATION SOLUTIONS, LLC

SHANNON L. PHILLIPS

45

1  incident, you indicated that you went to the
2  city, meaning Philadelphia, and met with
3  Camille Hymes.  Whom else did you meet with?
4          MS. OELTJEN:  Objection.  You
5  can answer.
6          THE WITNESS:  The day after?
7      Is that --
8  BY MR. HARRIS:
9    Q.   Yes.
10   A.   Is that when you're referring to?
11   Q.   Yes, the day after.
12   A.   I probably met with a lot of
13 different people, but I can't say I recall
14 exactly who all I talked to that day.
15   Q.   All right.  Did you meet with Paul
16 Sykes?
17   A.   Yes.
18   Q.   And Paul Sykes was the district
19 manager at the time for the store?
20   A.   Yes.
21   Q.   And you said that you met with Holly
22 Hylton, who was the store manager who was on
23 duty and the young lady who contacted the
24 police?

46

1    A.   Yes.
2    Q.   Do you recall meeting with anyone
3  else?
4    A.   I know Camille came that day.  So,
5  obviously, I met with Camille.  I don't
6  recall who else I talked to that day.
7    Q.   Did you meet with any of the partners
8  in the store?  And under Starbucks'
9  nomenclature, "partners" are the individuals
10 that work in the store, the baristas, et
11 cetera.
12   A.   I would have talked to the partners
13 that were working in the store.  I can't tell
14 you if they were the same partners that had
15 been there the previous night.  Probably not.
16 Because they typically worked mostly nights
17 or mostly days.
18   Q.   Understood.  Did you meet with, do
19 you recall meeting with any of the partners
20 in the store when you arrived at the store on
21 the day after the incident?
22          MS. OELTJEN:  Objection.  You
23 can answer.
24          THE WITNESS:  Do I recall

47

1  meeting with partners?  I can't say I
2  recall it.  That would have been my
3  practice to.  I always went into
4  stores and talked to all the
5  partners.
6  BY MR. HARRIS:
7    Q.   Do you recall any of them talking to
8  you about how Ms. Hylton had treated other
9  partners, specifically African American
10 partners?
11   A.   No, I do not recall that.
12          MR. HARRIS:  Did I say "Smith"?
13 I meant to say "Hylton" if I did.
14          THE COURT REPORTER:  You said
15 "Hylton".
16          THE WITNESS:  I don't know what
17 you said, but I knew what you meant.
18          MR. HARRIS:  Okay.  Okay.
19 Ms. Hylton.  So, Holly Smith, excuse
20 me, I meant to say "Hylton".  I
21 apologize.
22 BY MR. HARRIS:
23   Q.   So do you recall speaking to any of
24 the African American partners about

48

1  Ms. Hylton and her treatment of African
2  American patrons in the store?
3    A.   The day after the event?
4    Q.   Yes.
5    A.   I don't recall.
6    Q.   Two days after the incident?
7    A.   Through the course, I did have
8  conversations with partners in the store, but
9  I would be guessing if I said it was that day
10 or it was that night or it was the following
11 day.  I spent pretty much non-stop, until I
12 was let go, in the city.
13          So there were lots of conversations
14 with lots of different people, but I would be
15 guessing as to who and when.
16   Q.   Okay.  Irrespective of when you spoke
17 to the partners, do you recall any of the
18 partners complaining about Ms. Hylton and her
19 treatment of black patrons in the store?
20   A.   No, I do not.
21   Q.   Do you recall any of the patrons
22 talking about how Ms. Hylton treated black
23 partners in the store?
24          MS. OELTJEN:  Objection.  You

SHANNON L. PHILLIPS

49

1    can answer.
2        THE WITNESS:  Do I recall
3    conversations with customers about
4    Holly's treatment of black partners?
5    Is that the question?
6  BY MR. HARRIS:
7    Q.   No, that isn't the question.  My
8  question is:  Do you recall any of the
9  partners complaining about Ms. Hylton how she
10 treated them, specifically black partners?
11       MS. OELTJEN:  You've changed up
12   your question a couple times, Rich,
13   like so I just --
14       MR. HARRIS:  Yes, I asked a
15   different question.
16       MS. OELTJEN:  Okay.  Can you
17   say it one more time?  Because I want
18   to make sure I --
19 BY MR. HARRIS:
20   Q.   Ms. Phillips, do you understand the
21 question?
22   A.   I think you asked me if I recall any
23 partners talking about how Holly treated
24 black partners in the store.

50

1    Q.   Yes.
2    A.   Is that correct?
3    Q.   That is correct, and that's the
4  question.
5    A.   No, I do not.
6    Q.   Okay.  Do you remember having a
7  conversation with Mr. Sykes about complaints
8  made against Holly Hylton regarding black
9  customers or black partners?
10   A.   No.
11   Q.   Okay.  Now, Mr. Sykes is African
12 American.  Is he not?
13   A.   Yes.
14   Q.   Okay.  Do you recall -- strike that.
15       What sorts of conversation did you
16 have throughout this process after the
17 incident that led to the arrest of these two
18 gentlemen regarding what sort of leadership
19 steps need to be taken within the store?
20       MS. OELTJEN:  Objection.  You
21   can answer.
22       THE WITNESS:  What sort of --
23   conversations with who?
24 BY MR. HARRIS:

51

1    Q.   Mr. Sykes, Paul Sykes.
2    A.   Oh.  Just to make sure I'm
3  understanding the question, what
4  conversations did I have with Paul Sykes
5  about what leadership steps needed to be
6  taken in the store --
7    Q.   Yes.
8    A.   -- after the incident happened?
9    Q.   Yes.
10   A.   Initially, we did not talk about any
11 change in leadership.  Very quickly, it
12 became -- store managers had their business
13 cards posted on the condiment carts where you
14 would, you know, do your coffee, so the
15 manager's name ended up being on social
16 media.  And so, at that point, we decided to
17 move her to a different store and bring a
18 different manager in because we were
19 concerned that, you know, her name and face
20 had been sort of publicized.
21       Shortly after -- well, no, that
22 manager remained at the store until I left.
23 So her name was Angela.
24       MR. HARRIS:  Kim, can we go off

52

1    the record for one moment?  This
2    might be a good time to take a
3    comfort break.
4        THE VIDEOGRAPHER:  Going off
5    the record, the time is 10:51 a.m.
6            - - -
7        (A recess occurred.)
8            - - -
9        THE VIDEOGRAPHER:  All right.
10   The time is 10:59 a.m. Eastern.  Back
11   on the record.
12 BY MR. HARRIS:
13   Q.   Ms. Phillips, welcome back.
14   A.   Thank you.
15   Q.   So I asked you a question about
16 Mr. Sykes.  Mr. Sykes was one of the district
17 managers that was responsible for the 18th
18 and Spruce store.  Was he not?
19       MS. OELTJEN:  Objection.  You
20   can answer.
21       THE WITNESS:  He was the
22   district manager that that was his
23   store, yes.
24 BY MR. HARRIS:

SHANNON L. PHILLIPS

53

1    Q.   Okay.  Ben Trinsey was also another
2  district manager as well?
3    A.   He was, in Philadelphia, the other
4  half.  It was kind of split from east to
5  west.
6    Q.   Okay.  And so they were the two
7  district managers responsible for the City of
8  Philadelphia and I think for the surrounding
9  counties as well?
10   A.   Just the city.
11   Q.   Just the city, okay.  Now, as a
12  result of the incidents that dealt with the
13  April 2018 incident at the 18th and Spruce
14  store, Mr. Sykes as well as Mr. Trinsey, they
15  were both separated from the organization,
16  correct?
17          MS. OELTJEN:  Objection.  You
18      can answer.
19          THE WITNESS:  Paul was still
20      there when I left.  He was not
21      separated, no.  Ben, I put him on a
22      suspension, and he later took a
23      package and left, yes.
24  BY MR. HARRIS:

54

1    Q.   Are you aware that Mr. Sykes was
2  subsequently separated as well?
3    A.   Paul did not get separated from the
4  company.  That's incorrect.
5    Q.   He's still currently employed?
6    A.   Oh, I'm sorry, when you say
7  "separate", I thought you meant like the
8  company separated him, terminated him.
9          He is no longer with the company.  He
10  was not let go.
11   Q.   Okay.  I'm sorry, say that again.
12  What was the last thing?  You tailed off at
13  the end.
14   A.   He left on his own.
15   Q.   Okay, understood.  Have you spoken to
16  Mr. Sykes since you left the organization?
17   A.   I have.
18   Q.   And when did you leave the
19  organization again, for the record?
20   A.   May of 2018.
21   Q.   So approximately one month after the
22  incident that took place that led to the
23  arrest of the two gentlemen?
24          MS. OELTJEN:  Objection.

55

1          You can answer.  Sorry,
2  Shannon.  You can answer.
3          THE WITNESS:  Okay.
4          Approximately one month, yes,
5      that's correct.
6          MR. HARRIS:  All right.  May
7      the witness be shown Exhibit
8      Number 26.
9              - - -
10      (P-2 marked for identification.)
11              - - -
12  BY MR. HARRIS:
13   Q.   Ms. Phillips, as I understand it, you
14  are under the treatment of a psychologist or,
15  slash, therapist?
16   A.   Yes.
17   Q.   Okay.  And her name would be Dr.
18  Finsky (ph).  Am I pronouncing that
19  correctly?
20   A.   Flemke.
21   Q.   Flemke.  Flemke, F-L-E-M-K-E.
22   A.   That's correct.
23   Q.   Okay.  When did you begin treating
24  with Dr. Flemke?

56

1    A.   Originally, I -- when, I'm sorry, is
2  the question?  I can't recall.  I would have
3  to ask her.
4    Q.   When you first began seeing
5  Dr. Flemke, it was not related to the
6  incident involving your separation from
7  Starbucks, correct?
8          MS. OELTJEN:  Objection.  You
9      can answer.
10          THE WITNESS:  That's correct.
11  BY MR. HARRIS:
12   Q.   So you began seeing Dr. Flemke, as I
13  understand your records, was based on you
14  going through a divorce.  Is that fair?
15          MS. OELTJEN:  Objection.  You
16      can answer.
17          THE WITNESS:  That's not
18      correct.
19  BY MR. HARRIS:
20   Q.   Do you remember when you began seeing
21  Dr. Flemke?  Was it more than ten years
22  before April of 2018?
23   A.   No, it was not.
24   Q.   It was less than that?

SHANNON L. PHILLIPS

57

1    A.   Yes, less than that.
2    Q.   Can you give us a range?
3    A.   I started seeing her, let me think,
4   probably in 2013 maybe.
5    Q.   Okay.  In 2013?
6    A.   Maybe.  I'm not 100 percent sure on
7   that.  I'm estimating.
8    Q.   Okay, all right.  But certainly
9   several years before the April 2018 incident
10  and certainly May when you separated from the
11  organization?
12        MS. OELTJEN:  Objection.  You
13     can answer.
14        THE WITNESS:  Yes, that's
15     correct.
16  BY MR. HARRIS:
17   Q.   All right.  Now, as a result of your
18  treatment, I know certainly you spoke to your
19  therapist about many things, but one of which
20  you spoke to Dr. Flemke was about you
21  separating from Starbucks?
22   A.   Yes.
23   Q.   Do you recall describing to
24  Dr. Flemke the incident involving the two

58

1   gentlemen that were arrested?
2    A.   Do I recall describing it?  I
3   probably did.  I can't say I recall it.
4    Q.   Do you remember how you characterized
5   the incident to Dr. Flemke?
6    A.   I don't.
7    Q.   Do you recall telling Dr. Flemke in
8   the same way you testified today that it was
9   a horrible or horrific incident?  And, again,
10  I'm paraphrasing.
11   A.   I probably said that.
12        MS. OELTJEN:  Objection.  You
13     can answer.
14        THE WITNESS:  I'm sorry.  What
15     did you say, Kate?
16        MS. OELTJEN:  I said you can
17     answer.  I'm sorry, Shannon, if you
18     just give me a beat to put down the
19     objection.
20        THE WITNESS:  Do I recall
21     describing it as a horrible, horrific
22     event?
23  BY MR. HARRIS:
24   Q.   Yes.

59

1    A.   Probably.  That's what I think of it
2   as, so I probably would have said that.
3        MR. HARRIS:  May the witness be
4     shown page 8 of the document.  At the
5     bottom, there's a Bates stamp number
6     that says FLEMKE0008.
7        MS. OELTJEN:  Rich, I just have
8     a question.  I'm trying to
9     understand.  Are you entering this as
10    an exhibit or are you just -- I mean
11    I don't think that you entered it.
12    So I'm trying to understand.
13        MR. HARRIS:  I'm not entering
14    it as an exhibit.
15        MS. OELTJEN:  Okay.
16        MR. HARRIS:  Her testimony will
17    be what's going to be important.  It
18    will be an exhibit at the end.  I'll
19    move all of them in at the same time.
20        MS. OELTJEN:  Okay.  And are
21    they going to be, are we going in
22    sequential order, so like this would
23    be D-2?
24        MR. HARRIS:  It's actually, I

60

1   think it's listed as, on our exhibit
2   list, as Plaintiff Exhibit Number 26.
3   But for the purposes, we'll put it
4   down as P-2, yes, we'll put it down
5   as P-2 for the purposes of the
6   record.
7        MS. OELTJEN:  Okay.
8        MR. HARRIS:  So we'll mark this
9     as P-2?  Can we have this marked as
10    P-2?
11        MS. OELTJEN:  So then here's
12    all I would ask so that the record
13    accurately reflects like what the
14    witness is testifying about, could
15    you please call out the Bates
16    number --
17        MR. HARRIS:  Sure.
18        MS. OELTJEN:  -- of what you're
19    looking at?  Thank you.
20        MR. HARRIS:  Yes, sure.  The
21    Second Amended Complaint did not have
22    a Bates Number, so --
23        MS. OELTJEN:  That's fine.  I
24    got it.

SHANNON L. PHILLIPS

61

1         MR. HARRIS:  All right.  So
2    we'll have this marked as P-2, Bates
3    stamp beginning with 1 through,
4    FLEMKE-1 through FLEMKE-16, and we'll
5    have this marked as P-2 for the
6    purposes of the record.
7    BY MR. HARRIS:
8    Q.   Ms. Phillips, directing your
9    attention to the top of page 8 of this
10   document, there's --
11        MR. HARRIS:  And could you
12   highlight for us, Rick, the first
13   paragraph of the top of that page?
14   BY MR. HARRIS:
15   Q.   Ma'am, could you read that statement
16   first?  And then after you finished reading
17   it, let me know, and I'll ask you a few
18   questions.
19   A.   Do you want me to read it out loud or
20   just --
21   Q.   Read it to yourself, excuse me.
22   A.   Okay.
23   Q.   All right.  Ma'am, it says that
24   you -- now, this is an entry of April 25th.

62

1    And that's April 25th of what year would you
2    have seen Dr. Flemke?
3    A.   April 25th.  That would have been
4    2018.
5    Q.   Okay.  So this is a couple weeks
6    after the incident?
7    A.   That's correct.
8    Q.   All right.  And you described to your
9    therapist, and if I'm reading this correctly,
10   it says, "Patient came into discussed the
11   trauma of the whole Starbucks/racism" -- and
12   that says "expert"?  Is that what that word
13   is?
14   A.   I'm guessing "experience".
15   Q.   Oh, "experience", okay.  "And how the
16   media completely sold a sound byte that
17   misrepresented the whole thing".  That's what
18   you told your therapist?
19        MS. OELTJEN:  Objection.
20        THE WITNESS:  Did you want me
21   to answer?
22   BY MR. HARRIS:
23   Q.   Yes.
24        MS. OELTJEN:  You can answer.

63

1    I'm sorry.
2         THE WITNESS:  Is that how I
3    described it?  I don't remember how I
4    described it, but these are her notes
5    that she obviously took.
6    BY MR. HARRIS:
7    Q.   Yes.  Do you remember saying that to
8    her?
9    A.   I can't say I totally remember saying
10   that.  It's been a long time.  I'm sorry.
11   Q.   Is that something likely that you
12   would have said to her?
13        MS. OELTJEN:  Objection.  You
14   can answer.
15        THE WITNESS:  I think -- I'm
16   sorry.  The question was is it
17   something I might have said to her?
18   BY MR. HARRIS:
19   Q.   No.  Is it something that you would
20   have likely have said to her?
21   A.   That I would have likely said to her?
22   It's possible that I said that.
23   Q.   What was misrepresented by the media?
24   A.   The media represented exactly what

64

1    happened, and there was no sharing that it
2    was a Starbucks policy that had been
3    followed.  So it came across as, I think, it
4    came across as two men being arrested because
5    they were black instead of the store manager
6    following a policy that she thought she was
7    doing the right thing and made Holly out to
8    be kind of the -- that it was her decision in
9    what she had done versus there was no media
10   about "this is a person that was following a
11   policy that the company had instituted".  So
12   I felt like it was being misrepresented.
13   Q.   So then that would have been
14   something likely you would have told her?
15        MS. OELTJEN:  Objection.
16        THE WITNESS:  I can answer?
17        MS. OELTJEN:  Yes, you can
18   answer.  I'm sorry.
19        THE WITNESS:  It's likely I
20   would have said that, yes.
21   BY MR. HARRIS:
22   Q.   Is it your testimony that Ms. Hylton
23   did not have discretion in contacting law
24   enforcement?

SHANNON L. PHILLIPS

65

1          MS. OELTJEN: Objection. You
2     can answer.
3          THE WITNESS: Is it my
4     testimony that Holly did not have
5     discretion? It's my testimony that
6     Holly was following a policy that
7     Starbucks had instituted around
8     non-customers being in the café, and
9     unfortunately, it was a horrible
10    situation that followed.
11   BY MR. HARRIS:
12    Q.   Are you aware of any other instance
13   on or around April of 2018 where white
14   customers were in the store and did not make
15   a purchase and where law enforcement were
16   contacted?
17          MS. OELTJEN: Objection. You
18    can answer.
19          THE WITNESS: Just to make sure
20    I'm understanding, am I aware of any
21    other instances in the store where
22    white customers that were not making
23    a purchase police were called?
24   BY MR. HARRIS:

66

1    Q.   Yes.
2    A.   I didn't receive -- I didn't get like
3   information anytime the police were called
4   about from a store. It wasn't something that
5   I received on a, you know, weekly or monthly
6   basis. So I can't answer if police were
7   called.
8    Q.   After -- you indicated that after
9   this process there were several people that
10  came to the store. Significant members of
11  the organization came from Seattle, et
12  cetera, and so there was a detailed
13  description of police activity for that
14  particular store. Didn't that take place?
15          MS. OELTJEN: Objection. You
16    can answer.
17          THE WITNESS: I'm a little --
18    I'm sorry, I'm confused by the
19    question. You said a lot of people
20    came from Seattle.
21   BY MR. HARRIS:
22    Q.   I'll ask a different question,
23   Ms. Phillips.
24    A.   Sure.

67

1    Q.   As a result of the April 2018
2   incident, --
3    A.   Yes.
4    Q.   -- there was a significant amount of
5   information and data that was collected
6   regarding when law enforcement was contacted
7   by members of that store, correct?
8          MS. OELTJEN: Objection. You
9     can answer.
10          THE WITNESS: I don't know the
11    answer to that. I don't know if that
12    was collected.
13   BY MR. HARRIS:
14    Q.   Wouldn't that have been something
15   that you would have wanted to know?
16          MS. OELTJEN: Objection. You
17    can answer.
18          THE WITNESS: The question is
19    did I collect information or is it
20    something I would have wanted to
21    know?
22   BY MR. HARRIS:
23    Q.   No. Isn't that something that you
24   would have wanted to know since it was a

68

1   store in your region?
2    A.   I would have wanted to know that,
3   yes.
4    Q.   Okay. What steps did you take to
5   find that information out?
6    A.   What steps did I take? I had lots of
7   conversations with customers in the store,
8   many of whom -- I recall one specific black
9   customer telling me that he had seen white
10  non-customers be asked to leave as well. But
11  since I didn't work in the store, you know, I
12  didn't see that happen.
13          I know that the policy is not
14  discriminate against who. We were not to
15  pick and choose. We had to say a
16  non-customer is a non-customer and was not
17  allowed to stay in the store.
18    Q.   Do you recall speaking to a black
19   customer indicating that they had seen white
20   customers asked to leave, do you recall that
21   customer saying that the police were called?
22    A.   I think the customer left, the
23   non-customer left, so the police were not
24   called.

SHANNON L. PHILLIPS

69

1   Q.   Okay.  What data did you personally
2 review in terms of when law enforcement was
3 contacted regarding that particular store?
4   A.   I wouldn't have had access to
5 information of when -- police were called all
6 the time from stores, but that was not
7 something I had access to that information.
8   Q.   Why wouldn't you have?  It's my
9 understanding that each store tracks police
10 involvement.
11   A.   By "tracks", if they sent in an
12 incident report, that would be something I
13 wouldn't find out about -- I would have found
14 out about later.  I would get a copy of an
15 incident report.
16   Q.   Yes.  And so the incident reports
17 would detail whether or not when law
18 enforcement were contacted?
19       MS. OELTJEN:  Is that a
20   question?
21       MR. HARRIS:  That is.
22       THE WITNESS:  It would depend
23   on what happened as an outcome of the
24   police interaction.

70

1 BY MR. HARRIS:
2   Q.   What data did you review in terms of
3 police contact with that store as a result of
4 the incident that took place in April of
5 2018?
6   A.   I don't recall.  I'm sorry, I don't
7 recall what information I reviewed.
8   Q.   Now, ma'am, as I understand it, you
9 are -- strike that.
10     In your interrogatory responses, you
11 indicated that you had been taking or been
12 prescribed Lexapro for depression and anxiety
13 as a result of the incident where you were
14 separated from the organization.  Is that
15 accurate?
16       MS. OELTJEN:  Objection.  Can
17   we mark from here forward as
18   "confidential"?  And I'll let you
19   know when we're done.
20       MR. HARRIS:  Sure, absolutely.
21       MS. OELTJEN:  Thank you.
22       THE WITNESS:  I've been -- I am
23   on Lexapro for anxiety and
24   depression.  I have been on Lexapro

71

1     for longer than this incident, but
2     certainly, I have not gotten off of
3     it based on continued, something like
4     this event happening, yes.
5 BY MR. HARRIS:
6   Q.   Okay.  So when did you first begin
7 taking Lexapro for your anxiety and
8 depression?
9   A.   During my divorce.
10   Q.   And when was that for the record?
11   A.   15 years ago.
12   Q.   Okay.
13   A.   And I was off of it for a while,
14 so --
15   Q.   So you first began taking it 15 years
16 ago?
17   A.   Yes.
18   Q.   Okay.  And you said you were off of
19 it for a while.  How long were you off of it?
20   A.   Years.
21   Q.   Can you give us an estimate?
22   A.   I would be guessing.  I was on
23 Lexapro for a couple years during and after
24 my divorce, and then I was off of it maybe --

72

1 I don't remember how many years, honestly.  I
2 don't recall.  I'm sorry.
3   Q.   All right.  And who prescribed you
4 Lexapro most recently?
5   A.   My family doctor, Dr. Seretis.
6   Q.   All right.  And so if I understand it
7 accurately, you began, you first began taking
8 Lexapro for anxiety and depression as a
9 result of your divorce?
10   A.   That's correct.
11   Q.   Then there was a window where you did
12 not take it, yes?
13   A.   That's correct.
14   Q.   And then you began taking it again.
15 When was the first time you began taking it
16 again?
17   A.   I would be guessing on the date, but
18 it was during I remember when Victor Hughes
19 was my boss.  So it was prior to Camille.
20   Q.   Approximately what year was that,
21 ma'am?
22   A.   Maybe 2014.  I'm guessing.
23   Q.   All right.  And so you continued to
24 take it in 2014 through up until now?

SHANNON L. PHILLIPS

73

1   A.   Yes, that's correct.
2   Q.   Okay.
3        MR. HARRIS:  And for the
4   record, that was P-2, meaning Dr.
5   Flemke's medical records.
6        MS. OELTJEN:  So we will
7   designate the medical records as
8   "confidential" as well they're
9   stamped that way.
10       MR. HARRIS:  Yes.
11       MS. OELTJEN:  And then, Rich,
12  if you're done with that line, I can
13  remove the "confidential" designation
14  on your next question.
15       MR. HARRIS:  I am done.
16       MS. OELTJEN:  Okay.  So that
17  concludes the "confidential" portion
18  of that testimony.
19       MR. HARRIS:  May the witness be
20  shown, in our document exhibit list,
21  Rick, Exhibit Number 2, Plaintiff's
22  Responses to Defendant's Request for
23  Admissions.  Could you highlight that
24  for us, Rick?  Thank you.

74

1          - - -
2       (P-3 marked for identification.)
3          - - -
4   BY MR. HARRIS:
5   Q.   Ms. Phillips, did you have a chance
6   to review or skim through this document as
7   well as you testified this morning?
8   A.   I don't think so.
9   Q.   Review page 1, and after you finished
10  reviewing page 1, we'll go to the next page.
11  And after you finish reviewing the entire
12  document, I'll ask you questions.
13  A.   Okay.  Do you want me to just read it
14  to myself?
15  Q.   Yes, read it to yourself.  And then
16  after you finished reviewing each document,
17  let us know, and then Rick will go to the
18  next page.
19  A.   Okay.  Okay.
20  Q.   All right.  Let's go to page 2.
21  A.   Okay.  Okay.
22  Q.   All right.  Go to the next page.
23  A.   Okay.
24  Q.   Go to the next page.

75

1   A.   Okay.  Okay.
2   Q.   --
3   A.   I'm sorry, you're breaking up.  I'm
4   not hearing you.  I'm sorry, I didn't hear
5   you.
6   Q.   Let me see for a second.
7   A.   Can you hear me?
8        MS. OELTJEN:  I can hear you,
9   Shannon.
10       MR. HARRIS:  I can hear you
11  now.
12       MS. OELTJEN:  You had a yellow
13  triangle with an exclamation point
14  next to it.
15       MR. HARRIS:  Let's see if our
16  connection is a little bit better
17  now.
18       THE WITNESS:  I can --
19  BY MR. HARRIS:
20  Q.   Can you hear me now, Ms. Phillips?
21  A.   I can.
22  Q.   Okay.  Showing you what's been marked
23  as P-3, the questions that were posed and the
24  Request for Admission --

76

1   A.   I'm sorry, you're cutting out.  I'm
2   not able to hear you.
3        MS. OELTJEN:  And I see the
4   court reporter shaking her head too,
5   Rich.  I think everyone is having
6   trouble.
7        THE VIDEOGRAPHER:  Do you want
8   to go off the record?
9        MS. OELTJEN:  Yes, why don't we
10  go off the record since we lost
11  Mr. Harris.
12       THE VIDEOGRAPHER:  The time is
13  11:29 a.m.  Going off the record.
14          - - -
15       (Off the videotape record.)
16          - - -
17       THE VIDEOGRAPHER:  All right.
18  The time is 11:30.  Back on the
19  record.
20  BY MR. HARRIS:
21  Q.   Ms. Phillips, prior to us going off
22  the record, I showed you a document known as
23  the Request for, Responses to Defendant's
24  First Set of Requests for Admissions.  That's

SHANNON L. PHILLIPS

77

1  been marked as P-3. Did you provide the
2  answers to those questions posed in that
3  document?
4        MS. OELTJEN: Objection.
5  BY MR. HARRIS:
6  Q.  You can answer, ma'am.
7        MS. OELTJEN: You can answer.
8  I'm sorry.
9        THE WITNESS: It looked -- the
10  questions weren't listed. Only the
11  responses. So I'm not sure what the
12  questions were.
13  BY MR. HARRIS:
14  Q.  You didn't see the questions in the
15  document that was shown on the screen?
16        MR. HARRIS: All right, we're
17  having technical difficulties again.
18  Let me see if I can try to get a
19  different connection. Can we go off
20  the record?
21        THE VIDEOGRAPHER: Going off
22  the record, the time is 11:31 a.m.
23            - - -
24        (A recess occurred.)

78

1            - - -
2        MR. HARRIS: Rick, would you be
3  so kind as to put on the screen for
4  us Exhibit, Plaintiff's Exhibit
5  Number 3, which was Plaintiff's
6  Responses to Defendant's First Set of
7  Request for Admissions. And now if
8  you can please turn to the Request
9  for Admission Number 2?
10        THE VIDEOGRAPHER: Is that the
11  Roman Numeral II there?
12        MR. HARRIS: No, it should be
13  Question Number 2, not that.
14  Actually, it will be one of the
15  questions that are asked. So that's
16  Question Number 1 and then Question
17  Number 2, yes. Can you highlight
18  Question Number 2? And then we'll go
19  to the subsequent answer that
20  Ms. Phillips read.
21  BY MR. HARRIS:
22  Q.  All right. Ms. Phillips, we're going
23  to try to ask, I'm going to try to show you
24  the questions and then the answers, but right

79

1  now, I'm focusing on Question Number 2.
2        MS. OELTJEN: Hey, Rich, this
3  is an Interrogatory. I thought you
4  wanted Admissions.
5        MR. HARRIS: I do. This is the
6  wrong question? Okay, this is the
7  wrong document.
8        MS. OELTJEN: I think these
9  are, this is the wrong document.
10  These look like Rogs to me.
11        MR. HARRIS: They are. All
12  right, let's go to Request for
13  Admission, it should be, Rick, it
14  should be, on our exhibit list, it
15  should be Exhibit Number 2, but we're
16  going to mark it for the record P-3.
17        And the document, the title of
18  the document is Plaintiff's Responses
19  to Defendant's First Set of Request
20  for Admission. That's it. All
21  right. Perfect.
22        Now, let's go to Question
23  Number 2 on this document. No, keep
24  going. There you go.

80

1  BY MR. HARRIS:
2  Q.  All right. Ms. Phillips, this
3  document has now been marked as P-3 for
4  Plaintiff Exhibit Number 3. It is actually
5  titled Plaintiff's Responses to Defendant's
6  First Set of Request for Admission. First,
7  I'll read the question, and then you can
8  provide the answer. "During your employment
9  at Starbucks, you never complained to Partner
10  Resources or anyone above you in Starbucks
11  hierarchy that you believed you were being
12  discriminated against because of your race".
13        Is that accurate, Ms. Phillips, you
14  did not complain to anyone within Starbucks
15  organization that you were being
16  discriminated against based on your race?
17  A.  Did you want to put my answer up
18  there?
19  Q.  Yes, and you can read that to
20  yourself.
21  A.  Okay.
22  Q.  All right. And so the answer that's
23  provided as the response, is that the
24  response that you provided in response to

SHANNON L. PHILLIPS

81

1  this question that was posed to you?
2          MS. OELTJEN:  Objection.  Can
3      you ask it a different way, Rich, so
4      that you're not getting --
5          MR. HARRIS:  Yes, that was
6      extremely awkward.  I'm going to ask
7      it, I'll try to ask it differently.
8  BY MR. HARRIS:
9    Q.   So, first, regarding all the Requests
10  for Admissions, did you have a chance to
11  review and provide answers to the questions
12  that were posed to you?
13    A.   Yes.
14    Q.   All right.  And the answers that are
15  provided, those are the answers that you
16  provided either through your counsel or
17  answers that you provided in response to the
18  questions that were posed?
19    A.   Yes.
20    Q.   Okay.  And all of the answers that
21  were provided were accurate at the time that
22  you wrote them.  Were they not?
23    A.   Yes.
24    Q.   Okay.  And so the answer to this

82

1  question is you've stated, as I understand
2  it, "Admitted that Plaintiff did not complain
3  to Partner Resources or her supervisor that
4  she believed she was being discriminated
5  against because of her race".  Is that
6  accurate?
7    A.   That is accurate.
8    Q.   Okay.
9          MR. HARRIS:  Can we go to
10      number 7, please?
11  BY MR. HARRIS:
12    Q.   Question Number 7 is, "During your
13  employment at Starbucks, you never complained
14  to Partner Resources or anyone above you in
15  the Starbucks hierarchy" -- is that the same
16  question I posed?  I'm sorry.
17          MS. OELTJEN:  No.
18          MR. HARRIS:  Okay.
19          MS. OELTJEN:  It's a different
20      question.
21  BY MR. HARRIS:
22    Q.   All right.  "During your employment
23  at Starbucks, you never complained to Partner
24  Resources or anyone above you in the

83

1  Starbucks hierarchy that you believe you were
2  being retaliated against because you made a
3  prior complaint of race discrimination".  Is
4  that also accurate?  Do you remember this
5  question?
6    A.   I do remember this question.  Do you
7  want to put the answer up?
8    Q.   Yes, let's go to the answer.
9  "Without waiver of the General Objections and
10  subject thereto, Plaintiff Admits that she
11  never complained to Partner Resources or
12  anyone above her in the Starbucks hierarchy
13  on her own behalf that she was being
14  retaliated against".  Is that also accurate?
15    A.   That is accurate.
16    Q.   So you never complained that you were
17  being discriminated against based on your
18  race while you were an employee.  Is that
19  fair?
20          MS. OELTJEN:  Objection.  You
21      can answer.
22          THE WITNESS:  Yes, that's fair.
23  BY MR. HARRIS:
24    Q.   And you never complained that you

84

1  were being retaliated against based on your
2  race while you were an employee as well?
3    A.   Yes, that's fair.
4          MR. HARRIS:  Can we go to
5      Request for Admission Number 5?
6          THE VIDEOGRAPHER:  I'm sorry,
7      is that the same document?
8          MR. HARRIS:  It is the same
9      document.  I'll let you know when I
10      change the document.
11          Actually, let's go to Number 3,
12      Rick, first.
13  BY MR. HARRIS:
14    Q.   "During your employment at Starbucks,
15  you never heard, read, or were made aware of
16  any comments or statements by Camille Hymes
17  that you consider discriminatory toward white
18  people".
19          Now, Camille Hymes, for the record,
20  she was your supervisor.  Was she not?
21    A.   She was.
22    Q.   Okay.  And she's African American?
23    A.   She is.
24    Q.   The answer you provided, "Denied.

SHANNON L. PHILLIPS

85

1  Without waiver of the General Objections and
2  subject thereto", what was your response?
3    A.   Are you asking me to read it?
4    Q.   Yes, please.
5    A.   "Plaintiff believes that many of the
6  comments and statements made by Hymes in
7  connection with Plaintiff's termination are
8  evidence of discrimination and/or retaliation
9  in connection with Plaintiff's termination".
10   Q.   Okay.  What statements specifically
11 are you referring to?
12        MS. OELTJEN:  Objection.  You
13    can answer.
14        THE WITNESS:  The statements
15    specifically are when I was told to
16    put Ben on a suspension, Ben Trinsey.
17    I asked why we would be putting him
18    on suspension.  She shared with me
19    that there had been an allegation of
20    that a black assistant manager had
21    complained that she was making less
22    than her white counterpart who is
23    also an assistant manager, and at
24    that point, Camille said that Ben was

86

1    going to be placed on suspension
2    because of this allegation.  I
3    responded that that was completely
4    false, that Ben had been a partner
5    for 15 years and there had never been
6    any complaint of discrimination, and
7    that the -- what they were referring
8    to in terms of salaries was not
9    something Ben had any control over.
10    So I said, "This is wrong."  I
11    did not want to, I didn't want to
12    suspend him.  I felt like it was the
13    wrong thing to do.  And I believe I
14    said, "This is completely wrong.  Ben
15    is not a racist.  He volunteers all
16    the time.  He's my community lead".
17    And I was told to change my verbiage,
18    not say anything about salaries but
19    to say something like "the volume and
20    seriousness of the allegations",
21    something to that effect.
22        I felt like this was, this was
23    being discriminatory towards Ben.
24    And I think, because I complained

87

1    about it, I think the company decided
2    to let me go as well.
3  BY MR. HARRIS:
4    Q.   So let me understand this what you're
5  saying.  What specifically in Ms. Hymes'
6  statements to you regarding Ben Trinsey do
7  you recall, are you asserting were
8  discriminatory?
9        MS. OELTJEN:  Objection.  You
10    can answer.
11        THE WITNESS:  Camille told me
12    to put him on suspension for
13    allegations that he -- that were
14    false, and it was under false
15    pretenses that I was to put him on a
16    suspension.  I feel like it was
17    because he was white that he was
18    being suspended.
19  BY MR. HARRIS:
20    Q.   Did Ms. Hymes tell you that?
21    A.   Did she come out and say "because
22  he's white"?  No.
23    Q.   Of course.  Did she make any
24  statements to infer that he was being

88

1  suspended because he was white?
2        MS. OELTJEN:  Objection.  You
3    can answer.
4        THE WITNESS:  There was no good
5    reason to put him on suspension.  And
6    the one reason that I was given was
7    not true, it was not accurate, and I
8    said that, "this is not right, it's
9    not accurate".
10  BY MR. HARRIS:
11    Q.   Now, Ms., as I understand it,
12  Ms. Hymes said or requested that you place
13  Mr. Trinsey on suspension pending the outcome
14  of the investigation?
15        MS. OELTJEN:  Objection.
16        THE WITNESS:  That's correct.
17        MS. OELTJEN:  Objection.  You
18    can answer.
19        THE WITNESS:  That's correct.
20  BY MR. HARRIS:
21    Q.   All right.  And then at the
22  conclusion of the investigation, was it
23  determined that the allegations were
24  inaccurate?

SHANNON L. PHILLIPS

89

1   A.   I no longer worked there, so I don't
2   know.
3   Q.   Okay.  So you don't know the outcome
4   of the investigation?
5   A.   I do not.
6   Q.   So you can't state with any certainty
7   as to whether or not it was accurate that
8   Mr. Trinsey had discriminated against a black
9   assistant store manager?
10          MS. OELTJEN:  Objection.  You
11      can answer.
12          THE WITNESS:  The reason that
13      they were saying -- the complaint was
14      around her salary.  Ben did not have
15      any control over her salary.  So that
16      would be false to say that he
17      discriminated against an assistant
18      manager based on her salary.  That's
19      false.
20   BY MR. HARRIS:
21   Q.   All right.  And did you subsequently
22   speak to Mr. Trinsey after you left the
23   organization?
24   A.   Yes.

90

1   Q.   All right.  Did Mr. Trinsey advise
2   you that he was not terminated as a result of
3   the allegation?
4          MS. OELTJEN:  Objection.  You
5      can answer.
6          THE WITNESS:  Did he advise me
7      that he was not terminated?
8   BY MR. HARRIS:
9   Q.   Based on that precise allegation that
10   you just raised.
11   A.   He remained on suspension, he said,
12   he told me that he remained on suspension
13   and, in lieu of being separated/terminated,
14   that his attorneys worked out a separation
15   agreement.
16   Q.   Okay.  Did he ever advise you that he
17   was going to be terminated as a result of
18   that precise allegation?
19          MS. OELTJEN:  Objection.  You
20      can answer.
21          THE WITNESS:  I don't know.  I
22      don't think -- I'm not sure,
23      honestly.
24   BY MR. HARRIS:

91

1   Q.   What is your recollection based on
2   the conversation you had with Mr. Trinsey?
3   A.   I believe that Ben Trinsey, through
4   his attorneys, worked out an agreement to
5   leave the organization and not be separated.
6   Q.   I understand that.  I'm talking about
7   specifically regarding the allegation as it
8   relates to whether or not he had anything to
9   do with setting the pay scale for an African
10   American assistant store manager.
11          MS. OELTJEN:  Objection.  You
12      can answer.
13          THE WITNESS:  I don't know how
14      that allegation turned out because I
15      no longer worked there.
16   BY MR. HARRIS:
17   Q.   But you spoke to Mr. Trinsey after
18   you left?
19   A.   That's correct.
20   Q.   So did he inform you whether or not
21   that allegation was founded or unfounded?
22          MS. OELTJEN:  Objection.  You
23      can answer.
24          THE WITNESS:  I don't recall if

92

1      he -- I don't know if he ever
2      received information about the
3      outcome of an investigation.  If he
4      did, I don't remember him sharing it
5      with me.
6   BY MR. HARRIS:
7   Q.   Wasn't that the reason, I think as I
8   understand it, the reason why he was placed
9   on suspension and you were the person who
10   advised him of that?
11   A.   Yes.
12   Q.   And he never informed you whether or
13   not the allegation was founded or unfounded?
14   A.   As a part of the investigation how it
15   turned out?  Is that what you're asking?
16   Q.   Yes, that's what I'm asking.
17   A.   I no longer worked there.  I don't
18   know how the investigation turned out, I'm
19   sorry, and if he ended up finding out, I
20   don't recall him sharing it with me.
21   Q.   You spoke to him after you left the
22   organization.  Did you not, Ms. Phillips?
23          MS. OELTJEN:  Objection.
24   BY MR. HARRIS:

SHANNON L. PHILLIPS

93

1    Q.   And you spoke to him on several
2  occasions.  Did you not?
3    A.   Yes.
4    Q.   Okay.  How often did you speak to him
5  after you left?
6    A.   We kind of bonded since we both were
7  let go within a day of each other.  So we
8  talked quite a bit after --
9    Q.   Right.
10    A.   -- about our kids and what we were
11  going through, the loss of -- yes, we talked
12  a lot.
13    Q.   All right.  In any of those
14  conversations that you had with Mr. Trinsey,
15  did he ever inform you that the reason why he
16  was separated was because of the allegation
17  related to the disparate treatment between an
18  African American assistant manager regarding
19  the pay rate?
20        MS. OELTJEN:  Objection.  You
21     can answer.
22        THE WITNESS:  I don't know if
23     he ever had conversation about the
24     outcome of the investigation.  I

94

1     believe everything went through his
2     attorney working out a separation
3     agreement in lieu of him being
4     separated.  So I don't know what
5     those conversations were.  I don't, I
6     don't know, I'm sorry.
7  BY MR. HARRIS:
8    Q.   Okay.  So it is your hypothesis that
9  he was being terminated because of his race
10  but not because of any information you had
11  directly?
12        MS. OELTJEN:  Objection.
13  BY MR. HARRIS:
14    Q.   You can answer, ma'am.
15    A.   I put Ben on a suspension.  I didn't
16  do the termination.  I put Ben on a
17  suspension based on allegations that I know
18  were false.
19    Q.   Did you ever speak to the assistant
20  store manager that made the allegation?
21    A.   Prior to or after?
22    Q.   At any point --
23    A.   Of course.
24    Q.   -- prior to the assistant, that

95

1  assistant manager that we're referring to,
2  the African American assistant manager.
3    A.   Yes.
4    Q.   Did she ever raise those allegations
5  to you?
6    A.   No.
7    Q.   Did you ever ask her about those
8  allegations regarding Ben Trinsey?
9    A.   I found out about those allegations
10  the day before I was let go.  I didn't have
11  any conversation with her from the point that
12  I found out about that allegation until I was
13  let go.
14    Q.   Okay.  Did you speak to anyone other
15  than Ms. Hymes about those allegations?
16    A.   In that meeting, Camille was there,
17  Nathalie Cioffi was there and Paul Pinto was
18  there.  And then subsequently that night, I
19  went home and I called my Partner Resource
20  Manager, Ebony Johnson was her name, and I
21  talked with her about it as well.
22    Q.   Okay.  Now, do you recall either --
23  strike that.
24        What day did you have a conversation

96

1  with Ms. Ebony Johnson?
2    A.   I don't have my notes in front of me.
3  It was the day before I was -- I had a
4  conversation with Camille, Paul and Nathalie
5  in Camille's hotel lobby.  Then that's where
6  I was shared the information about Ben.
7        That night I went home and I had a
8  conversation over the phone with Ebony
9  Johnson.  The next morning is when I met Ben,
10  and Nathalie joined us for that, where I
11  placed him on suspension.  It might have been
12  May 7th, but I'm not 100 percent sure without
13  looking at my notes.
14    Q.   Okay.
15        MR. HARRIS:  May the witness be
16     shown Request for Admission Number 9.
17  BY MR. HARRIS:
18    Q.   Do you remember this question,
19  "During your employment at Starbucks, you did
20  not tell Camille Hymes that you believed
21  Mr. Trinsey was being falsely accused of
22  racial bias because he was white"?  And your
23  answer?  Is that an accurate statement what's
24  been shown as your response to Number 9?

SHANNON L. PHILLIPS

97

1   A.   One second.  "That in
2   describing/objecting to Defendant's racially
3   motivated treatment/suspension that she did
4   not use the words "because he is white"",
5   that's accurate.
6   Q.   So you never said that the reason why
7   Mr. Trinsey was being placed on suspension
8   was because he was white?
9   A.   I didn't use the words "because he is
10  white".
11  Q.   So you never complained to Ms. Hymes
12  that he was being treated, in your
13  estimation, treated differently because of
14  his race?
15         MS. OELTJEN:  Objection.  You
16      can answer.
17         THE WITNESS:  I complained I
18      felt like he was being -- I
19      complained.  I didn't use the words
20      "because he is white".
21  BY MR. HARRIS:
22  Q.   And why not?
23  A.   Just not the verbiage I chose to use.
24  My complaint was, "This is wrong.  Ben

98

1   Trinsey is not racist.  He's worked here for
2   15 years and there's never been any claim of
3   racism by any partner that I'm aware of, and
4   the allegations that you're telling me are
5   something he had nothing to do with.  So
6   there's -- this is not right.  This is unfair
7   what you're asking me to do with Ben
8   Trinsey".
9   Q.   But you never used the term "race" or
10  suggested that he was being treated
11  differently because of his race?
12         MS. OELTJEN:  Objection.  You
13      can answer.
14         THE WITNESS:  I don't recall
15      saying I think he's being treated
16      unfairly because of his race.  I
17      don't know if that was the verbiage I
18      used.
19  BY MR. HARRIS:
20  Q.   So you don't know.  Do you recall the
21  verbiage that you used?
22  A.   I know that I said, "This is wrong.
23  Ben Trinsey is not racist.  These allegations
24  are false.  He had nothing to do with

99

1   salaries of assistant managers.  This is not
2   something he had any input to", so to place
3   him on a suspension for something he had no
4   control over I said was wrong.  I felt like
5   it was wrong, and I stand by that.
6   Q.   Did you speak to anyone in the
7   organization other than Ms. Hymes about the
8   allegations that you're raising in this
9   lawsuit that Ben Trinsey was treated
10  differently because of his race?
11         MS. OELTJEN:  Objection.  You
12      can answer.
13         THE WITNESS:  The conversation
14      that Camille and I had was also -- as
15      I said, Nathalie Cioffi was there and
16      Paul Pinto were there.  And then a
17      subsequent conversation I had with
18      Ebony Johnson I raised the same
19      complaint, I said, "What we're doing
20      is wrong, placing him on suspension
21      for an allegation of racial disparity
22      that he had no control over,
23      someone's salary.  This is the wrong
24      thing to do, and I wholeheartedly

100

1      disagree with this course of action".
2         I don't know the exact verbiage
3      I used, but that was the sentiment.
4   BY MR. HARRIS:
5   Q.   Okay.  Given that sentiment, do you
6   recall using race, bringing up race at all in
7   your discussions with any of the folks you
8   just mentioned?
9         MS. OELTJEN:  Objection.  You
10      can answer.
11         THE WITNESS:  I'm not sure.  I
12      can't answer.
13  BY MR. HARRIS:
14  Q.   Well, this was a particularly
15  racially-charged moment in the history of
16  your employment with Starbucks.  Was it not?
17         MS. OELTJEN:  Objection.
18  BY MR. HARRIS:
19  Q.   You can answer.
20  A.   Yes, it was.
21  Q.   All right.  So, given the racial
22  complexities of the issues that were
23  happening, why didn't you use the word
24  "race"?

SHANNON L. PHILLIPS

101

1        MS. OELTJEN:  Objection.  You
2    can answer.
3        THE WITNESS:  I don't know.
4    I'm not sure.
5    BY MR. HARRIS:
6    Q.   Didn't Ms. Hymes talk to you about
7    leadership within the organization and what
8    leadership would look like --
9        MS. OELTJEN:  Objection.  You
10    can answer.
11    BY MR. HARRIS:
12    Q.   -- during this time period between
13    April of 2018 and May of 2018?
14    A.   We had lots of conversations about
15    the leadership that was current and what it
16    needed to look like going forward at the
17    store level, at the DM level.  Yes, we had
18    lots of conversations.
19    Q.   Did she also inform you that what she
20    wanted out of the leaders within that region,
21    she wanted transparency and accountability?
22    Did she not?
23        MS. OELTJEN:  Objection.
24        THE WITNESS:  Did she say, "I

102

1        want transparency and
2        accountability"?
3    BY MR. HARRIS:
4    Q.   Yes.  Did she say that?
5    A.   I don't remember.  I don't recall at
6    this time.  I'm sorry.
7    Q.   Was that --
8    A.   She may have.
9    Q.   Would that have been the impression
10    that you got from her conversations regarding
11    the leadership style or leadership skills
12    that she wanted people to exude?
13        MS. OELTJEN:  I'm sorry, Rich,
14        you cut out at the end.  I didn't
15        hear you after "people to" --
16        MR. HARRIS:  Sure.
17    BY MR. HARRIS:
18    Q.   Would that have been the impression
19    that you received from Ms. Hymes regarding
20    the kinds of skill sets that she or
21    characteristics of the leaders within her
22    region, she wanted them to be transparent and
23    accountable?
24        MS. OELTJEN:  Objection.  You

103

1    can answer.
2        THE WITNESS:  I would not
3        always agree with that, no.
4    BY MR. HARRIS:
5    Q.   What don't you agree with?
6    A.   I don't believe that she was always
7    transparent.  I don't believe that she was.
8    I'm sorry.
9    Q.   In what ways was she not transparent
10    with you?
11    A.   Not necessarily with me.  She and I
12    had a conversation where I remember her
13    specifically saying, "We need to get our
14    stories aligned", and that did not seem like,
15    it did not seem like a transparent
16    conversation.  It seemed like, "Let's get our
17    stories straight for the folks, the
18    higher-ups that were coming in the next day",
19    for example.
20    Q.   The stories aligned as it relates to
21    what?
22    A.   What had happened.
23    Q.   When?
24    A.   That specific conversation was about

104

1    a roundtable that some partners had sat in on
2    virtually specifically about a partner named
3    Charlie.
4    Q.   What about that?
5    A.   Charlie had come to the conversation.
6    Camille had invited him because she had met
7    him at a Black Partner Network event.  She
8    had invited him to this virtual roundtable,
9    and he did not represent well.  He was
10    disrespectful to senior leaders, and she was
11    very upset about it.  And the next day
12    everybody was coming back to the city, her
13    boss Zeta, Zeta's boss Rossann, and I recall
14    having the conversation where she said, "We
15    need to get our stories aligned".
16        There was another conversation where
17    she said, "It's bad, Shannon.  It's really,
18    really bad.  We're all on the line here".  So
19    I did not always feel like she was
20    transparent, no, I'm sorry.
21    Q.   Where did she fall short there?  As I
22    understand it, you said someone else's
23    performance in the meeting wasn't up to par.
24    How did that impact Camille?

105

1          MS. OELTJEN:  Objection.  You
2     can answer.
3          THE WITNESS:  Well, because he
4     was representing all of us.  He was
5     representing the Philadelphia market,
6     and she was a part of that.
7          And so I believe she felt like
8     it made her look bad.  And she had
9     specifically invited him, so I'm sure
10    she was embarrassed and it wasn't a
11    good look.
12 BY MR. HARRIS:
13    Q.   Understood.  But how was that
14 impacting you?  How did she want you to align
15 with her story?
16         MS. OELTJEN:  Objection.  You
17    can answer.
18         THE WITNESS:  I don't know.
19    When she said "we need to get our
20    stories aligned", I recall
21    responding, "The story is the truth,
22    and that's what I would portray".
23 BY MR. HARRIS:
24    Q.   That's what you said to her?

106

1    A.   That is what I said to her.
2    Q.   Okay.  And do you remember
3 approximately when that was?
4    A.   I took notes.  So, if you want me to
5 refer to my notes, I can, but I can't tell
6 you off the top of my head.
7    Q.   Approximately what year?
8    A.   What year?
9    Q.   Yes.
10   A.   2018.
11   Q.   Okay.  What month?
12   A.   It would have been late April or the
13 beginning of May.
14   Q.   Okay, late April or beginning of May.
15 So that would have been before the incident
16 where the two men were arrested or after?
17   A.   After.
18   Q.   Okay.
19         MR. HARRIS:  May the witness be
20    shown, Rick, on our list, Number 5,
21    the Phillips EEOC Charge, please.
22    And if I'm counting accurately, we'll
23    mark this as P-4.
24         - - -

107

1    (P-4 marked for identification.)
2         - - -
3 BY MR. HARRIS:
4    Q.   Ma'am, do you remember preparing with
5 the assistance of counsel an Administrative
6 Charge with the EEOC, the Equal Employment
7 Opportunity Commission?  Do you recall doing
8 that?
9    A.   I know that I did.  I recall doing
10 it.  I don't necessarily remember when, but
11 yes, I recall it.
12   Q.   Okay.  As part of that Charge of
13 Discrimination, do you remember the factual
14 allegations that you raised in your EEOC
15 Charge?
16         MS. OELTJEN:  Objection.  You
17    can answer.
18         THE WITNESS:  I believe the
19    allegations were that I was
20    terminated based on my race and I was
21    retaliated for complaining that
22    someone else was being targeted
23    because of his race.
24 BY MR. HARRIS:

108

1    Q.   Okay.  Do you remember reviewing this
2 document to verify its accuracy?
3    A.   I don't remember reviewing it, but
4 I'm sure that I did.
5    Q.   All right.  And I believe, if you
6 look at the bottom of this page, it has a
7 date May 22, 2018 and it has your signature?
8    A.   That's correct.
9    Q.   All right.  And the signature
10 verified that the statements made within this
11 document are accurate to the best of your
12 ability?
13   A.   Yes.
14   Q.   Okay.  Do you recall --
15         MR. HARRIS:  Now, let's go to
16    the second page of this document,
17    excuse me.
18 BY MR. HARRIS:
19   Q.   First off, I'll allow you to read
20 this first page.
21         MR. HARRIS:  Go back, Rick.
22 BY MR. HARRIS:
23   Q.   And under the factual setting of that
24 document, please read that to yourself, and

SHANNON L. PHILLIPS

109

1  after you finished reading, let me know.
2    A.   Where it says "The Particulars Are"?
3    Q.   Yes.
4    A.   Thank you.  Okay.
5    Q.   All right.  The second paragraph
6  says, "Respondents terminated my employment
7  because of my race and because I had
8  complained of race discrimination".  Do you
9  remember stating that?
10        MS. OELTJEN:  Objection.  You
11     can answer.
12        THE WITNESS:  Yes.
13  BY MR. HARRIS:
14    Q.   Okay.  Now, a few moments ago you
15  agree with me you stated in the Request for
16  Admission responses that you actually never
17  complained to anyone within the organization
18  that you were being treated differently
19  because of your race?
20        MS. OELTJEN:  Objection.  You
21     can answer.
22        THE WITNESS:  I never
23     complained that I was being -- I'm
24     sorry, say it one more time?

110

1  BY MR. HARRIS:
2    Q.   Yes.  You agree with me in your
3  Request for Admission responses you indicated
4  specifically that you never complained to
5  anyone within Starbucks that you were being
6  treated differently because of your race?
7        MS. OELTJEN:  Same objection.
8     You can answer, Shannon.
9        THE WITNESS:  I was terminated
10     because of my race.  I did not
11     complain to anyone prior to that.
12  BY MR. HARRIS:
13    Q.   That's your supposition, correct?
14  That's your supposition that you were being
15  treated differently because of your race?
16        MS. OELTJEN:  Objection.  You
17     can answer.
18        THE WITNESS:  Yes.
19  BY MR. HARRIS:
20    Q.   And you have no evidence of that,
21  correct?
22        MS. OELTJEN:  Objection.  You
23     can answer.
24        THE WITNESS:  I have no

111

1        evidence of that?  Is that the
2        question?
3  BY MR. HARRIS:
4    Q.   That is the question.
5    A.   So I was a very strong performer.
6  The month prior, my boss had given me a
7  $40,000 bonus and said, "It's a great year to
8  be Shannon Phillips".
9        So it wasn't performance related.
10  The only thing that changed was this
11  incident, and then I was subsequently let go.
12    Q.   Did Ms. Hymes inform you -- strike
13  that.
14        The incident happens, then you were
15  let go.  Is that what happened?  So I
16  understand the chronology.  The incident
17  April 2018 occurs.  Then you were let go soon
18  thereafter.
19    A.   In terms of relevant work history,
20  because that's what this site is, I had a
21  very long record of strong performance.
22  After this incident happened, within a month
23  I was let go.
24        So yes, I believe I was let go

112

1  because this incident happened because of the
2  unfortunate aftermath that caused Starbucks a
3  lot of bad publicity and because specifically
4  because I was white.
5    Q.   But more than you were let go, if I
6  understand it correctly, after this incident,
7  you weren't the only person that was
8  terminated, correct?
9    A.   The other person that was terminated
10  was Holly, the store manager, who is also
11  white.  And subsequently, Ben Trinsey
12  arranged a separation agreement in lieu of
13  being separated, and he was white.
14    Q.   Paul Sykes was also separated as
15  well.  Was he not?
16        MS. OELTJEN:  Objection.
17        THE WITNESS:  That's incorrect.
18        MS. OELTJEN:  You can answer.
19        THE WITNESS:  That's incorrect.
20     Paul was there, and Paul left on his
21     own.  He did not get separated.
22  BY MR. HARRIS:
23    Q.   But Ben Trinsey left on his own as
24  well?  He resigned?

ELITE LITIGATION SOLUTIONS, LLC

SHANNON L. PHILLIPS

113

1    A.    His attorneys worked out an agreement
2  in lieu of him being separated.  I believe he
3  was going to be separated.  That's what his
4  attorneys believed, so they worked out an
5  agreement.
6    Q.    Do you know if that's the case for
7  Paul Sykes as well?
8    A.    That is not the case for Paul Sykes.
9  Paul --
10    Q.    You know that how?
11    A.    I remained in contact with Paul.
12  Paul requested a transfer to New York City
13  because he wanted to move there and
14  cohabitate with his boyfriend.  His lease was
15  up.  And the company did not allow him to
16  transfer, so he put in his notice and
17  resigned and moved to New York and took a job
18  with Apple.
19    Q.    Do you recall whether or not anyone
20  else was terminated as a result of the
21  incident, the incident as it related to the
22  April 2018 issue where the two gentlemen were
23  arrested?
24    A.    Holly the store manager, me, and Ben.

114

1    Q.    And that's it?
2    A.    That I'm aware of at least while I
3  was there.
4    Q.    Do you think that Holly should have
5  been terminated?  Do you agree with that
6  termination?
7    A.    I think -- it wasn't my decision to
8  terminate her.  I think that she followed a
9  flawed policy that Starbucks instituted that
10  caused an incident that should never have
11  happened.  Should that have cost her her job?
12  It wasn't my decision.  I didn't have a say
13  in it.
14    Q.    I understand it wasn't your decision.
15  Do you agree with it?  You were the leader of
16  that region.  Do you agree with the
17  termination decision?
18    A.    I would have liked to have seen
19  Starbucks take ownership of their own policy
20  and not hold it against someone for following
21  it.  So I think it was a flawed policy.  I
22  think that's why they no longer have it.
23    Q.    I understand what you're saying about
24  the policy, but I'm asking you specifically

115

1  about the termination decision of Ms. Hylton.
2  Do you think that the termination should have
3  occurred for Ms. Hylton?
4    A.    I'm the type of person that wants to
5  stand behind people.  So, if we teach you a
6  policy and then you follow the policy that
7  the company rolled out, I do not necessarily
8  feel like you should be held responsible for
9  following the policy that the company told
10  you to follow.
11        So I don't know that that would have
12  been my decision had I been involved in it.
13  So no.
14    Q.    I'm not following you.  Do you agree
15  with the termination decision or not?  I
16  understand your reservations regarding the
17  application of the policy.  But the question
18  is whether or not you agree with the decision
19  as to whether or not Ms. Hylton should have
20  been terminated?
21        MS. OELTJEN:  Objection.  You
22  can answer.
23        THE WITNESS:  I would have
24  wanted to have more conversation with

116

1        Holly to understand.  It happened
2        very quickly, within just a couple
3        days.  So I don't feel like I had
4        enough information.
5            When I make a decision to let
6        someone go, I know that I'm changing
7        their life, and I would have wanted
8        to do more due diligence, to
9        understand better her thought process
10        what was happening, review more
11        information before I would have made
12        that decision.
13  BY MR. HARRIS:
14    Q.    What information would you have
15  needed to make to review?
16    A.    I would have wanted to have a
17  conversation with Holly about what was going
18  on in her mind; what else was happening in
19  the café; what other customers, the
20  interaction was; what kind of situation
21  caused her to make this decision to call the
22  police.  I did not want to jump to a
23  conclusion.
24    Q.    I thought you spoke to her.

SHANNON L. PHILLIPS

117

1      MS. OELTJEN:  Rich, can you let
2   her finish her answer, please?
3      MR. HARRIS:  Yes, sure.
4   BY MR. HARRIS:
5   Q.   I'm sorry, Ms. Phillips, for
6   interrupting.  Go ahead.
7   A.   Okay.  I would have wanted to review
8   the security tape myself and not just take
9   what she told me as, you know, the word
10  handed down.  I like to try to review all the
11  facts.  I would have wanted to talk to the
12  other partners that were working the night it
13  happened to understand their take and what
14  their perceptions and what they saw and heard
15  was.  Unfortunately, I didn't get to do that.
16     So I wouldn't make a decision to
17  terminate somebody and change their life
18  without having what I feel are all the
19  relevant facts and details.
20  Q.   My understanding, when you first
21  began your testimony this morning, you
22  testified that you spoke to Ms. Hylton after
23  the incident, the day after?
24  A.   That's correct.

118

1   Q.   Did you not find out what was on her
2   mind, what drove her decision-making?
3   A.   In that conversation, it was merely
4   gathering the facts of what happened, not
5   what led up to it or what was on her mind or
6   anything else happening.  It was merely the
7   facts.  Because I needed to send in a recap
8   of the incident to my boss and as well as a
9   lot of other people in the company.
10     So my conversation with Holly was
11  really, you know, "what time did this occur".
12  It was the basic facts of what happened.  I
13  didn't watch the video.  I didn't see any of
14  it for myself.  It was just giving the facts
15  from her as she saw it to relay up in a
16  recap.  I hope that makes sense.
17  Q.   How long were you at the store the
18  day afterward?
19  A.   I don't recall.
20  Q.   Were you there a few hours?
21  A.   I'm sure I was.
22  Q.   Okay.  During the few hours that you
23  were there, what information did you gather
24  in terms of whether or not she was the

119

1   appropriate person to lead that store moving
2   forward?
3   A.   The day after it happened when we
4   went to her store, I'm trying to remember, we
5   may have moved her out of that store that
6   day.  I just don't remember exactly how
7   quickly things started to happen, but --
8   actually, I think she was on a conference
9   call is where she shared the information.
10  Q.   Did you ever ask her what was on her
11  mind?
12  A.   I may have.  I might have.  It's, I'm
13  sorry, it's been almost three years.  I don't
14  remember.
15  Q.   One of the things that you just
16  testified to was that in order for you to
17  make a decision, such as terminating someone,
18  you would have liked to have known what they
19  would have been thinking to make the decision
20  that led to their termination?
21  A.   That's correct.
22  Q.   Is that a fair, accurate statement?
23  Okay.
24     As a result of doing that, you had a

120

1   conversation with Ms. Hylton right after the
2   incident, and you can't tell us what she was
3   thinking of or about that led her decision to
4   call the police?
5      MS. OELTJEN:  Objection.  You
6   can answer.
7      THE WITNESS:  To the best of my
8   ability, I remember Holly saying they
9   were not customers and she asked them
10  to become customers to purchase
11  something, and they told her that
12  they weren't going to be purchasing
13  anything.
14     So she asked them to, you know,
15  to please move along, that the cafés
16  are for customers only, and they
17  refused to leave.  So she called the
18  police.
19  BY MR. HARRIS:
20  Q.   And you didn't find anything wrong
21  with that --
22     MS. OELTJEN:  Objection.
23  BY MR. HARRIS:
24  Q.   -- based on the policy and the

SHANNON L. PHILLIPS

---

121

1  application of the policy?
2       MS. OELTJEN: Objection. You
3  can answer.
4       THE WITNESS: I definitely
5  think the policy was flawed.
6  BY MR. HARRIS:
7   Q.  I understand that.
8   A.  I definitely think that.
9   Q.  I understand that completely you
10  think that the policy is flawed. I'm asking
11  specifically about calling the police on
12  these two gentlemen. You don't find any
13  problems with calling the police on these two
14  gentlemen even though they had not made a
15  purchase?
16       MS. OELTJEN: Objection. She
17  told you earlier today that she
18  didn't think the police had been
19  called. You can answer.
20       MR. HARRIS: She can testify.
21       THE WITNESS: I did not believe
22  that the police should have been
23  called. I also don't believe the
24  police should have made the decision

---

122

1       to arrest these young men.
2       I think it was a horrible
3       situation that stemmed from a bad
4       policy and sort of spiraled into a
5       really awful situation.
6  BY MR. HARRIS:
7   Q.  Do you think that the reason that it
8  spiraled into an awful situation has to do
9  something with race in this country?
10       MS. OELTJEN: Objection.
11  BY MR. HARRIS:
12   Q.  And this wasn't an isolated
13  situation? You agree with me, right,
14  Ms. Phillips, that calling police on African
15  American men will have an impact differently
16  than it may have on someone who is not
17  African American?
18   A.  Yes, absolutely.
19   Q.  All right. So, if you're going to
20  call the police, that's a leadership
21  decision, don't you think that that would
22  have an impact on the outcomes very
23  differently if the customers are white versus
24  black?

---

123

1   A.  I believe that, yes.
2   Q.  All right. And that's why you said
3  you wouldn't have called the police?
4   A.  I don't believe I would have, no.
5   Q.  But you don't believe that calling
6  the police should have been something that
7  would warrant termination?
8       MS. OELTJEN: Objection. You
9  can answer.
10       THE WITNESS: I would not have
11       called the police. I don't believe I
12       would have.
13       That said, I believe that this
14       manager thought she was following a
15       policy of the company. So I don't
16       think she, in her mind, thought she
17       was making a decision racially
18       motivated. But she was making a
19       decision, based on non-customers
20       being in the store, she needed to
21       enforce the non-customer rule and not
22       have people in the store that weren't
23       customers.
24       I don't think that it should

---

124

1       have happened, but I also think that
2       she probably thought she was doing
3       the right thing in instituting a
4       policy that we gave her, you know, at
5       Starbucks.
6  BY MR. HARRIS:
7   Q.  As a leader of that region, what
8  would you have instructed your employees to
9  do if they were posed with the same
10  situation?
11   A.  If the same situation came up, what
12  would I have instructed a leader to do if
13  they had reached out to me?
14   Q.  Yes.
15   A.  I probably would have asked some
16  qualifying questions. "Okay, so there's two
17  non-customers in the store. Are they causing
18  a disturbance? Are they looking at
19  inappropriate content? You know, is there a
20  reason that we need to have them removed"?
21       And if those answers were "no,
22  they're not doing anything disruptive,
23  they're merely in the café", I would have
24  said, "I don't think we need to call the

---

125

1 police".
2   Q.   Based on those questions that you
3 just posed, you had a conversation with
4 Ms. Hylton after the incident, did you ask
5 her any of those questions?
6   A.   Well, it was too late to make the
7 decision on calling the police.  That already
8 happened, but --
9   Q.   Sure.  But just to figure out what
10 was driving her decision-making, did you ask
11 her any of those questions?
12   A.   I did -- I know that I asked her, you
13 know, "tell me when you approached them in
14 the café, tell me about that interaction".  I
15 asked her, you know, when the police came and
16 "did they ask you if they wanted them
17 arrested".  She said, "No, we did not want
18 them arrested".  She asked them, "We don't
19 want you to arrest these people.  We just
20 wanted them to move along if they weren't
21 going to be customers".  So, you know, I did
22 ask her some questions, yes.
23   Q.   And so based on the information you
24 provided, you felt comforted to know that she

126

1 could lead the store?
2       MS. OELTJEN:  Objection.  You
3    can answer.
4       THE WITNESS:  Based on the
5    answers that she gave me, did I feel
6    comfortable with her leading the
7    store?  Is that your question?
8 BY MR. HARRIS:
9   Q.   Yes, that is my question.
10   A.   I think Paul and I probably would
11 have had conversation around whether she was
12 the right person to be a store manager moving
13 forward.  We might have demoted her to an
14 assistant manager because we felt like she
15 needed more one-on-one training.  A store
16 manager really is making decisions for their
17 whole unit.
18      So likely we would have come to a
19 decision that, you know, a different region
20 might be better for her based on that
21 decision-making that happened.  But, you
22 know, that didn't happen because she was gone
23 right -- she was gone within a couple days.
24   Q.   Okay.

127

1       MR. HARRIS:  Rick, could you
2    please put up P-4 again?  And can you
3    go to the, I believe it's the second
4    page now?  That's good.  That page is
5    fine.  Could you highlight that page
6    for us, please?  Thank you.
7 BY MR. HARRIS:
8   Q.   Ms. Phillips, could you please read
9 that entire page to yourself?  And after
10 you've finished, please let me know, and I'll
11 ask you a few questions.
12   A.   Okay.
13   Q.   And, Ms. Phillips, as I understand
14 it, this Administrative Charge, the
15 information contained in this document, you
16 prepared this information, the factual
17 scenario?
18       MS. OELTJEN:  Objection.
19    You're going to, you're hitting in
20    privileged and work product, Rich.
21       MR. HARRIS:  Okay.
22       MS. OELTJEN:  Can you ask a
23    different way?
24       MR. HARRIS:  Yes, sure.

128

1 BY MR. HARRIS:
2   Q.   Separate and apart from the
3 conversations you had with counsel, the
4 information that's contained in this document
5 is accurate as of May of 2018.  Is that a
6 fair statement?
7   A.   Yes.  I didn't finish reading it, but
8 --
9   Q.   Okay, feel free to finish reading it.
10   A.   Okay.  Okay.
11   Q.   All right.
12       MR. HARRIS:  Can you go to the
13    next page?
14 BY MR. HARRIS:
15   Q.   Take your time and try to read that.
16 That's a little small.  I can read it, but --
17   A.   I can read it.
18   Q.   Okay, very good.
19       MS. OELTJEN:  Is some
20    information at the top cut off there?
21       THE VIDEOGRAPHER:  Yes, I just
22    cut this out just to -- it would help
23    me with the other language, if that's
24    okay.

SHANNON L. PHILLIPS

129

1          MS. OELTJEN:  Okay.  That's
2     fine.  I just --
3   BY MR. HARRIS:
4     Q.   All right.  Ma'am, you agree with me
5   on either one of those two pages you don't
6   mention at all a conversation -- hello?  Can
7   you hear me?
8     A.   Yes.
9          Do you mind if I just run to the
10  bathroom really quick?
11    Q.   No, we can take a quick break.
12    A.   Okay.  Thank you so much.
13    Q.   No problem.
14         THE VIDEOGRAPHER:  Going off
15     the record, the time is 12:41 p.m.
16              - - -
17         (A recess occurred.)
18              - - -
19         THE VIDEOGRAPHER:  All right.
20     The time is 12:48.  Back on the
21     record.
22  BY MR. HARRIS:
23    Q.   Showing you what has been marked as
24  P-4, did you have a chance to review the

130

1   factual recitation of the events that led up
2   to you filing your Administrative Charge?
3     A.   Yes.
4          MS. OELTJEN:  Objection.  You
5     can answer.  And you did.
6   BY MR. HARRIS:
7     Q.   And the information that you prepared
8   in that document, and that was -- I think you
9   signed it May 18, 2018?
10    A.   It's not in front of me, but I'm sure
11  that's probably right.
12    Q.   It was certainly May of 2018.  The
13  precise date I could be mistaken.
14    A.   Okay.
15    Q.   But it was in May of 2018, okay.
16         And you agree with me that was
17  shortly after you had left the
18  organization --
19    A.   Yes.
20    Q.   -- when you signed that document?
21  All right.
22         And so the information that you have
23  in that recitation was accurate and it was
24  detailed.  Was it not?

131

1          MS. OELTJEN:  Objection.  You
2     can answer.
3          THE WITNESS:  Yes, I believe it
4     was.
5   BY MR. HARRIS:
6     Q.   Okay.  You agree with me in the
7   information that you just read on either two
8   pages you don't mention at all a conversation
9   with Ms. Ebony Johnson?
10    A.   Yes, that's correct.
11    Q.   Ms. Phillips, do you recall receiving
12  anti-harassment training and
13  anti-discrimination/anti-retaliation training
14  as well during your time with Starbucks?
15    A.   I'm sure I did.  We did a lot of
16  different trainings through like a
17  MyLearning.
18         MR. HARRIS:  May the witness be
19     shown Bates stamp number
20     STARBUCKS-140.
21         THE VIDEOGRAPHER:  Which
22     exhibit is that?
23         MR. HARRIS:  I'm sorry, Exhibit
24     Number 7 on our list.  And it's

132

1     titled Phillips Partner Guide
2     Acknowledgement.
3          THE VIDEOGRAPHER:  Sure,
4     Counsel, just give me one second.  I
5     just have to reorient it and rotate
6     it before I show it.
7          MR. HARRIS:  No problem.
8   BY MR. HARRIS:
9     Q.   While we're getting that document,
10  Ms. Phillips, do you know who replaced you in
11  your position?
12    A.   My area was kind of broken up.  So
13  Marcus, who was an existing regional
14  director, took the two districts in
15  Philadelphia.  And then --
16    Q.   And who is Marcus?  You said Marcus.
17    A.   Marcus.
18    Q.   Do you remember his last name?
19    A.   Eckensberger, I think.
20    Q.   Do you recall his nationality or
21  race?
22    A.   He's white.
23    Q.   Okay.  And you were going to say
24  someone else?

SHANNON L. PHILLIPS

133

1   A.   And then I had interviewed actually a
2   candidate for D.C.  Her name was Linda, I
3   believe.  She ultimately took the balance of
4   my region, but then I know that that has
5   since changed and she doesn't have it
6   anymore.
7   Q.   All right.  But, initially, when you
8   first left the organization, one portion went
9   to Marcus Eckensberg?
10   A.   Eckensberger.
11   Q.   Eckensberger, excuse me.  And the
12   other portion went to Linda Johnson.  Is that
13   accurate?
14   A.   Ultimately.  I think there were some
15   interim, TJ Wolfersberger had the area for
16   some time until Linda came in, but yes,
17   ultimately, it went to Linda and Marcus.
18   Q.   All right.  Linda Johnson and Marc
19   Eckensberger, they're both Caucasian,
20   correct, or white?
21   A.   Marcus, not Marc.  Marcus.
22   Q.   Marcus, excuse me.
23   A.   That's okay.
24   Q.   Marcus?

134

1   A.   Yes.
2   Q.   Okay.
3                    - - -
4         (P-5 marked for identification.)
5                    - - -
6   BY MR. HARRIS:
7   Q.   Showing you what's been now marked
8   as --
9        MR. HARRIS:  Are we up to P-5?
10   BY MR. HARRIS:
11   Q.   Do you recognize this document,
12   Ms. Phillips?
13   A.   I think it's what I signed probably
14   when I got my Partner Guide when I first
15   started.  Because it's dated my hire date,
16   12/12/05.
17   Q.   And the Partner Guide is the document
18   or series of documents that describe the
19   anti-discrimination policy, the
20   anti-harassment policy, retaliation policy?
21        MS. OELTJEN:  Objection.
22        THE WITNESS:  I can answer?
23        MS. OELTJEN:  Yes.  Yes.
24        THE WITNESS:  Okay.  The

135

1        Partner Guide had all kinds of
2        information, but that may have been
3        covered in it.
4   BY MR. HARRIS:
5   Q.   All right.  And this shows that you
6   signed and dated this December 12, 2005, but
7   you had ongoing training up until the time
8   you left the organization, right?
9   A.   That's correct.
10        MR. HARRIS:  Now, may the
11        witness be shown -- thank you.  So
12        that's P-5.
13        May the witness be shown P-,
14        yes, P-6 which is, Rick, Exhibit
15        Number 6, Partner Guide.  And let's
16        go to Bates stamp --
17   BY MR. HARRIS:
18   Q.   Partner Guide, that's what you were
19   just referring to?
20   A.   Yes.
21                    - - -
22        (P-6 marked for identification.)
23                    - - -
24        MR. HARRIS:  Can we now go to I

136

1        believe it's STARBUCKS-1?  All right,
2        let's go to page 1 first.
3   BY MR. HARRIS:
4   Q.   So this has an introduction and it
5   has all the different items that are inside,
6   Values, How You Communicate, Policy
7   Standards, et cetera, Mission, those things.
8   Is that accurate?
9        THE WITNESS:  That's correct.
10   BY MR. HARRIS:
11   Q.   All right.
12        MR. HARRIS:  Let's go to
13        page 5.  I believe -- I'm sorry.
14        It's STARBUCKS-5.  Can you highlight
15        that?  Rick, can you --
16        THE VIDEOGRAPHER:  I'm sorry.
17        I'm not seeing "5" in the corner.  I
18        just see "29".
19        MR. HARRIS:  No problem.  Let's
20        go to 27.  That's fine.  All right.
21        Let's go to the bottom of the page
22        where it says Harassment and
23        Discrimination Prohibited.
24   BY MR. HARRIS:

SHANNON L. PHILLIPS

137

1    Q.   This is Starbucks Anti-Harassment and
2 Discrimination policy.  Are you familiar with
3 this policy, Ms. Phillips?
4    A.   It's been a while since I read it,
5 but yes.
6    Q.   Okay.  And this essentially says you
7 can't discriminate against anyone based on
8 race, ethnicity, et cetera?
9    A.   That's correct.
10    Q.   Okay.
11        MR. HARRIS:  All right.  Can
12    you go to policy number -- page 27 at
13    the bottom, so two pages later.
14    Okay, at the bottom again of this
15    document where it says Retaliation
16    Prohibited?
17 BY MR. HARRIS:
18    Q.   And this is the Anti-Retaliation
19 policy as well?
20        MS. OELTJEN:  Objection.  You
21    can answer.
22        THE WITNESS:  Yes.  Again, it's
23    been a while since I've read it, but
24    yes, it looks -- yes.

138

1 BY MR. HARRIS:
2    Q.   And you were trained on this as well.
3 So, in addition to having it in the Partners
4 Guide, you were actually trained on it and
5 you trained others on this anti-harassment as
6 well as anti-retaliation policy in your
7 region?
8    A.   I don't know that I trained others at
9 my level, but I did receive ongoing yearly
10 updates to the guide, yes.
11    Q.   And when the individuals would
12 complain, you would advise them of these
13 policies.  Would you not?
14    A.   If a partner complained of
15 discrimination or retaliation?
16    Q.   Yes.
17    A.   So, if a partner complained, it would
18 have gone through our Partner Resources,
19 there would have been an investigation, and
20 then I would have been involved in making
21 decisions based on the outcome of the
22 investigation, yes.
23    Q.   Okay.
24        MR. HARRIS:  Let's go to

139

1        page 30.  All right, there we go.
2 BY MR. HARRIS:
3    Q.   So this is -- do you recognize this
4 policy or this portion of the Partners Guide,
5 How We Communicate?
6    A.   I mean I -- again, it's been a while
7 since I read it, but it looks familiar, yes.
8    Q.   Okay.  Can you paraphrase what this
9 essentially means to laypeople outside the
10 organization?
11    A.   Could you make it a little larger?
12 It's hard for me to read.  I just want to
13 make sure I'm looking, reading it and knowing
14 what I'm talking about.
15        MS. OELTJEN:  Yes, we want you
16    to do that today, Shannon.  So
17    definitely let them know if you can't
18    read the document.
19        MR. HARRIS:  Rick, could you
20    put that down a little bit so we can
21    read the first paragraph?  There you
22    go.  Thanks.
23        THE WITNESS:  Sure.  You want
24    me to explain to you what this means?

140

1 BY MR. HARRIS:
2    Q.   You can just paraphrase it for us.
3    A.   Sure.  This is about how we want to
4 treat each other at Starbucks, with respect
5 and dignity all the time.  And if you have
6 concerns, that you should raise them through
7 the channel, meaning to your supervisor first
8 and to Partner Resources if necessary.
9        If you have a conflict, you know, the
10 first step is to try to resolve it with that
11 person, and then if that's not possible, to
12 seek support from your supervisor or
13 ultimately it references the BEC line, the
14 Business Ethics and Compliance hotline if you
15 needed to.
16    Q.   So, for example, the complaint that
17 you are saying that you lodged with Ms.
18 Johnson in your complaint that was not
19 mentioned in your Administrative Charge,
20 there was a process by which you could
21 communicate that as I understand this?
22        MS. OELTJEN:  Sorry, I thought
23    you were done.  Objection.  You can
24    answer.

141

1         THE WITNESS:  My complaint to
2    Ebony was that I felt like we were
3    treating Ben unfairly, that we were
4    putting him on suspension based on
5    allegations that were false.
6         I had already shared those with
7    my boss, the Partner Resource Manager
8    and the Partner Resource Vice
9    President, and then I shared them
10   with my Partner Resource, I'm sorry,
11   Nathalie was the Partner Resource
12   Director, Paul was the VP, and then
13   my Partner Resource Manager Ebony
14   that night.
15   BY MR. HARRIS:
16   Q.   This Ethics and Compliance hotline,
17   was that available to you?
18   A.   It was available to anyone.
19   Q.   You included even at your level?
20   A.   Of course.
21   Q.   You did not call the hotline.  Is
22   that fair?
23   A.   I did not.
24   Q.   Do you know whether or not there was

142

1    an investigation into the statement that you
2    made after you left the organization?
3         MS. OELTJEN: Objection. You
4    can answer.
5         THE WITNESS:  Which statement?
6    BY MR. HARRIS:
7    Q.   The statement regarding when you
8    alleged that you had spoken to Ms. Ebony
9    Johnson, do you know whether or not there was
10   an investigation into that statement that you
11   made?
12   A.   I don't know.  The next day was when
13   I was told I was going to be separated.  So I
14   don't know what came of that.
15   Q.   Did Ms. Hymes inform you why you were
16   being separated?
17   A.   She said the situation is not
18   recoverable.  That's what she said.
19   Q.   What situation specifically was she
20   referring to?
21        MS. OELTJEN: Objection. You
22   can answer.
23        THE WITNESS:  I assumed it to
24   mean the situation that had happened

143

1    in Philly and the horrible aftermath
2    of it, that it was not recoverable,
3    and that's what I took it to mean.
4    BY MR. HARRIS:
5    Q.   Okay.  Why was she laying it at your
6    feet, if you know?
7         MS. OELTJEN: Objection. You
8    can answer.
9         THE WITNESS:  Why was she
10   laying it at my feet?  I believe that
11   -- there was a time I think she
12   thought her job was also in jeopardy.
13   But at this point, I believe that
14   anyone involved that was
15   unfortunately white was going to be
16   let go and anyone that was involved
17   that was African American would end
18   up staying.
19   BY MR. HARRIS:
20   Q.   So all right, let me go backwards.
21   You started off by saying anyone that was
22   involved was going to be let go as a result
23   of the April 2018 incident, but then you
24   characterized it and said that anyone that

144

1    was white was going to be let go but
2    non-white individuals were not going to be
3    let go.  Is that your characterization?
4    A.   That's correct.
5    Q.   Okay.  Do you have any evidence that
6    that was the case other than your
7    supposition?
8         MS. OELTJEN: Objection. You
9    can answer.
10        THE WITNESS:  Well, the store
11   manager had been let go.  The black
12   district manager was still going to
13   be employed.  I was the regional
14   director and I was white, and I was
15   now going to be let go.  And my boss,
16   who was black, was not losing her
17   job.
18        The only other person it
19   impacted was a white district manager
20   who did not oversee the store but was
21   a leader in the Philadelphia market.
22   So it seemed pretty clear to me who
23   was being let go.
24   BY MR. HARRIS:

SHANNON L. PHILLIPS

145

1    Q.   Okay.  Whether you agree or disagree
2  with Ms. Hylton, you agree with the statement
3  that reasonable minds could differ as to
4  whether or not her conduct warranted
5  termination?
6           MS. OELTJEN:  Objection.  You
7      can answer.
8           THE WITNESS:  Do I -- I'm
9      sorry, ask me one more time?
10  BY MR. HARRIS:
11    Q.   Yes, sure.  Whether you would
12  personally agree with the termination of
13  Ms. Hylton, you agree that reasonable minds
14  could differ in determining her conduct
15  warranted her being terminated by calling the
16  police on two individuals that were sitting
17  in the store?
18    A.   Yes.  If after investigation, you
19  know, if we had all the facts that was the
20  determination, I would have supported that.
21    Q.   Okay.  And you had no facts to
22  dispute that that termination decision wasn't
23  warranted --
24           MS. OELTJEN:  Objection.

146

1  BY MR. HARRIS:
2    Q.   -- based on the information that you
3  uncovered?
4           MS. OELTJEN:  Objection.  You
5      can answer.
6           THE WITNESS:  Do I have any
7      facts that the termination was not
8      warranted?  Is that the question?
9  BY MR. HARRIS:
10    Q.   Yes.  Based on as I understand your
11  testimony, you stated that there was an
12  application of the policy and that's why
13  Ms. Hylton called the police?
14    A.   Correct.
15    Q.   But you also said that if it were you
16  you would not have called the police?
17    A.   That's correct.
18    Q.   All right.  And so you agree that
19  certainly individuals could have decided that
20  the decision to call the police was
21  unwarranted and, therefore, warranted her to
22  be terminated?
23    A.   I think that as a higher level leader
24  with a lot more years of experience I would

147

1  have made a different decision in that
2  moment.  That said, I also believe that
3  Starbucks gave this policy that she thought
4  she was trying to follow, and I think there
5  should have been some ownership on Starbucks'
6  part versus just terminating her, maybe
7  giving her -- obviously, she was a
8  five-year-or-more partner with the company.
9  She may have needed additional training on
10  decision-making.  I don't know.
11           But I think, you know, in that
12  moment, I think she clearly made the wrong
13  decision.  Did it warrant her termination?
14  Perhaps it did.  Perhaps it did warrant her
15  termination.  I wasn't involved with that
16  decision.  But certainly, I can understand
17  why the decision was made.
18    Q.   Okay.  And so if you understand why
19  the decision was made, then you understand
20  that it did not have anything to do with her
21  race?
22           MS. OELTJEN:  Objection.  You
23      can answer.
24           THE WITNESS:  I'm not sure I

148

1      agree with that.
2  BY MR. HARRIS:
3    Q.   Okay.  But you have no independent
4  evidence to suggest that her termination
5  decision was based on race?
6    A.   I think if the same situation had
7  happened but Holly was black, I don't believe
8  she would have been terminated.
9    Q.   Do you think that same situation
10  would have happened had Holly would have
11  called the police on two white individuals?
12           MS. OELTJEN:  Objection.  You
13      can answer.
14           THE WITNESS:  Do I think Holly
15      would have called the police on two
16      white individuals?
17  BY MR. HARRIS:
18    Q.   Yes.
19    A.   I do actually.
20    Q.   She told you that?
21    A.   I think she -- she was following what
22  she thought to be a very black-and-white
23  policy and that there was not a lot of room
24  perhaps for her judgment in it.  So I believe

SHANNON L. PHILLIPS

149

1  she would have called the police whoever it
2  was. I do.
3    Q.   Okay.
4         MR. HARRIS:  This is a good
5    time for us to take a break.  So how
6    about we'll go off the record?
7         THE VIDEOGRAPHER:  All right.
8    The time is 1:07 p.m.  Going off the
9    record.
10         - - -
11    (A recess occurred.)
12         - - -
13         THE VIDEOGRAPHER:  All right.
14    The time is 1:48 p.m.  Back on the
15    record.
16  BY MR. HARRIS:
17    Q.   All right.  Ms. Phillips.  Welcome
18  back.
19    A.   Thank you.
20    Q.   Ms. Phillips, I asked you a few
21  questions about Ms. Hymes' leadership
22  requirements for the leaders within her
23  region, and I recall you testifying to the
24  leadership qualities that she did not

150

1  possess.  But my question to you was:
2         Do you recall Ms. Hymes demanding
3  from the leaders in her region to be
4  transparent and accountable?
5    A.   Sometimes.
6    Q.   Okay.  When you say "sometimes", she
7  did demand that of you?
8    A.   I think she wanted me to be
9  transparent and accountable.  There were
10  other times I felt like, you know, if we were
11  getting our stories aligned that that didn't
12  feel very transparent, but --
13    Q.   Absent the incident in which you said
14  you brought up the incident or the isolated
15  incident regarding, and I'll use your term,
16  "a lack of transparency", other than that
17  incident that you mentioned, do you agree
18  that Ms. Hymes was transparent and
19  accountable as her leadership style to you
20  and others?
21         MS. OELTJEN:  Objection.  You
22    can answer.
23         THE WITNESS:  Sometimes, yes.
24  BY MR. HARRIS:

151

1    Q.   Any other incident than the one that
2  you mentioned?
3    A.   I -- there were things that I didn't
4  always think were transparent with Camille.
5    Q.   Okay.  And something other than the
6  incident that you already testified to that
7  you're referring to?
8    A.   That's correct.
9    Q.   Okay.  And did you confront her with
10  that?
11    A.   No.  I felt more like she shared
12  information, and we were, we kind of bonded
13  and so she would maybe share information
14  differently than she would share with others.
15    Q.   Okay.  When you say you bonded with
16  her -- so, up until you were terminated, you
17  assessed your relationship with Ms. Hymes as
18  being fair and consistent?
19         MS. OELTJEN:  Objection.  You
20    can answer.
21         THE WITNESS:  I would say up
22    until the, this incident happened in
23    April, yes.  Prior to that, I would
24    say that she had been fair and

152

1    consistent.
2  BY MR. HARRIS:
3    Q.   Okay.  As of -- after the April 2018
4  incident when she made the difficult
5  challenge of -- well, strike that.  Let me
6  step back.
7         Who made the decision to terminate
8  Ms. Hylton?
9    A.   I found out after the fact, but I
10  know that Camille and Paul Pinto I believe
11  made that decision.  I can't answer that
12  wholeheartedly.  I found out after she was
13  already gone.
14    Q.   Okay, Paul Pinto.  And what was his
15  role?
16    A.   He was a Partner Resource Vice
17  President.
18    Q.   And Paul Pinto, what race is he?
19    A.   He's white.
20    Q.   Okay.  And Camille Hymes -- so
21  together they made the decision to terminate
22  Ms. Hylton?
23    A.   They're the ones that informed me of
24  the decision.  I don't know if they made that

SHANNON L. PHILLIPS

153

1  decision.  I'm not 100 percent sure on.
2    Q.   Did you speak to Ben Trinsey or Paul
3  Sykes about the decision to fire Ms. Hylton?
4    A.   Did I speak to them?
5    Q.   Yes.
6    A.   Well, after I found out she was gone,
7  then obviously I spoke to Paul Sykes about it
8  because that was one of his store managers,
9  and we needed to figure out who was -- you
10  know, we had pulled somebody to cover this
11  store, but that left a hole someplace else.
12  So there was, you know, certainly a
13  conversation about Holly and the fact that
14  she was no longer a part of this team.
15    Q.   Okay.  Let me switch gears back to
16  Ben Trinsey.  Do you know if Ben Trinsey
17  would have been separated if he did not sign
18  the separation agreement --
19       MS. OELTJEN:  Objection.
20  BY MR. HARRIS:
21    Q.   -- or the package as you testified
22  to?
23       MS. OELTJEN:  Objection.  You
24    can answer.

154

1       THE WITNESS:  I don't know.
2    Because I placed him on suspension,
3    and then that happened after I was
4    gone.  So I don't know.
5  BY MR. HARRIS:
6    Q.   You spoke to him several times
7  afterwards, correct?
8    A.   Yes.  I know from his standpoint, but
9  I don't know from the company's standpoint.
10    Q.   All right.  Do you know the results
11  of that investigation involving the assistant
12  store manager that led to Mr. Trinsey being
13  placed on suspension?
14       MS. OELTJEN:  Objection.  You
15    can answer.
16       THE WITNESS:  I don't.
17  BY MR. HARRIS:
18    Q.   Okay.  Now, it was Starbucks' policy,
19  and we went through some of the policies,
20  when there was an allegation of a nature that
21  involved the assistant manager that had
22  complained about Mr. Trinsey to conduct an
23  investigation?
24       MS. OELTJEN:  Objection.  You

155

1    can answer.
2       THE WITNESS:  I just want to
3    make sure I understand the question.
4    You're asking if the assistant
5    manager complained should there have
6    been an investigation according to
7    the way Starbucks would react?
8  BY MR. HARRIS:
9    Q.   Yes.
10    A.   Not -- I don't think there should
11  have been in this instance.  Because the
12  fa--- the allegation was around pay, and that
13  wasn't something he had to do with.
14       So I think there wouldn't have been
15  an investigation.  It would have been
16  explained to her, "Your pay is based on
17  education and experience, and that was
18  different than the other person's which is
19  why there was a different pay".
20    Q.   Do you know that for certainty or
21  you're speculating as to that that there was
22  a difference in pay based on experience?
23    A.   I do --
24    Q.   Yes?

156

1    A.   I know that, yes.
2    Q.   Okay.  How do you know that?  How did
3  you find that information out?
4    A.   Because when a district manager would
5  be promoting someone, be it a shift
6  supervisor to assistant or assistant to store
7  manager, that information, their resume,
8  qualifications would be given to our Partner
9  Resource Manager Joyce Bareno (ph) at the
10  time, and the person that made the
11  allegation, Joyce was the one who came up
12  with her salary recommendation.
13       So Joyce 100 percent, she had been
14  with the company more than 25 years, she used
15  something called the salary calculator to
16  determine, and she always said it surrounded
17  two things, it was experience and education.
18  The person that made that allegation I
19  believe had a high school degree and did not
20  have experience, and the person that she was
21  complaining was making more than her was a
22  person named, I think her name was Darryl,
23  something like that, Darryl or Darren, and
24  she had a Master's degree.  So that had been

SHANNON L. PHILLIPS

157

1    the difference.
2        Because at the time that she was
3    promoted, Ben had even asked, you know,
4    "That's lower than what I promoted Darryl
5    to", and Joyce had come back and said, "It's
6    because of experience and education. That
7    person had a Master's. She has a high school
8    degree".
9    Q.   Ms. Phillips, you have significant
10   details around that incident. Can you tell
11   me -- as I understand the policy, doesn't the
12   DM or the district manager have some
13   discretion to make sure that there's parody
14   irrespective of the educational background?
15       So, for example, I understand
16   initially that that's the calculus that gets
17   done by the HR team, but ultimately, the DM
18   can actually make sure that there's parody
19   and could give them the same amount of pay.
20   Is that accurate?
21       MS. OELTJEN: Objection. You
22       can answer.
23       THE WITNESS: That's not
24       accurate. At the time that we had

158

1        Joyce Bareno, our Partner Resource
2        Manager that we had for years and
3        years and years, she ultimately died,
4        but when she was our Partner Resource
5        Manager, she made the decisions on
6        salary. The DM did not have a
7        decision or discretion.
8    BY MR. HARRIS:
9    Q.   And that was the case up until the
10   time that you left the organization?
11   A.   No. Because then Joyce died, and we
12   didn't have a Partner Resource Manager for a
13   period of time. We had, I forget what his
14   name was, someone that just kind of covered,
15   and then ultimately we got Ebony Johnson and
16   she was in a TLA. She had been a part of the
17   --
18   Q.   And for the record, what's "TLA"?
19   What does that mean for the record?
20   A.   A Temporary Limited Assignment.
21   Q.   Okay.
22   A.   Ebony had been part of the I&D team
23   in Seattle, which is Inclusion and Diversity,
24   and she had -- you know, her role was

159

1    eliminated or they wanted her to move and she
2    lived in Texas and couldn't move, but
3    ultimately, within the last couple weeks, you
4    know, of my time there, that's -- I'm trying
5    to remember when we got Ebony. It might have
6    been because of this incident. It was right
7    around the time that this happened that Ebony
8    stepped in to be our Partner Resource
9    Manager.
10   Q.   And as a result when Ebony jumped in
11   to be your Partner Resource Manager, did that
12   provide district managers the discretion to
13   have individuals within their reporting
14   structure to have the same level of
15   compensation?
16       MS. OELTJEN: Objection. You
17       can answer.
18   BY MR. HARRIS:
19   Q.   If they have the same title and same
20   responsibilities.
21   A.   I wouldn't necessarily say that they
22   had a discretion of -- well, let me think of
23   how to say that. Ebony was new to the role
24   so she didn't know, you know, she was just

160

1    trying to figure out the Partner Resource
2    role coming from a different department.
3    Q.   Okay.
4    A.   So we promoted people. When Ebony
5    had stepped in, we were more influencing
6    because she didn't know. She didn't know C
7    market from D market, which is pay structure
8    based on cost of living.
9        She didn't know -- you know, she just
10   didn't have all the information. So we kind
11   of had to give her quite a bit more "here's
12   what I promoted to last time" or "here's an
13   average of what people make" so that she
14   could try to function in that role.
15   Q.   Okay. The detail that you just
16   described regarding the involvement of Ben
17   Trinsey, did you speak to anyone else
18   regarding the information that you just
19   testified to, and specifically, I'm talking
20   about the information as it relates to how
21   compensation was set and whether or not there
22   were any other factors that affected the pay
23   differential?
24       MS. OELTJEN: Objection. You

161

1      can answer.
2          THE WITNESS:  Did I talk to
3      anyone besides who?  Ben?
4  BY MR. HARRIS:
5      Q.   Anyone besides Ben, yes.
6      A.   Yes.  I spoke to, I had that
7  conversation with Camille, Paul Pinto and
8  Nathalie that as a part of the conversation
9  where I said I didn't agree with why we were
10  putting him on a leave, and then I also had
11  the conversation with Ebony Johnson that
12  night.
13     Q.   Okay.  Did you speak to anyone else
14  other than the people who you just mentioned?
15     A.   No.
16     Q.   Okay.  Did you do any other
17  independent investigation regarding the
18  backgrounds of the two individuals being
19  involved?
20     A.   The next day I was told I was being
21  let go.  So no.
22     Q.   Okay.  After the April 2018 incident,
23  did you think Paul Sykes was appropriate to
24  continue to be responsible for that market?

162

1          MS. OELTJEN:  Objection.  You
2      can answer.
3          THE WITNESS:  Meaning before I
4      was let go?
5  BY MR. HARRIS:
6      Q.   Yes.  After the April incident where
7  the two individuals were arrested, did you
8  think that Paul Sykes was the appropriate DM
9  to run that market?
10     A.   In the moment, yes, he had all the
11  relationships and connections.  You know,
12  long-term would that have been the best
13  situation?  I don't know.  We might have made
14  a different decision over the long-term, but
15  certainly in the moment, yes.
16     Q.   And why do you say "in the moment"
17  why that was appropriate?
18     A.   Because there was a lot of chaos, you
19  know, with the rioting, and our partners were
20  feeling a lot of external pressure as well as
21  the pressures they were feeling on the job.
22  I mean coming to work and, you know, being
23  faced with rioters, that was a very stressful
24  situation for the partners.  Additionally,

163

1  you know, many of our partners were getting,
2  you know, told by their friends and family
3  that they shouldn't work for Starbucks
4  anymore.
5          And Paul was closest to those stores
6  as the district manager, so he had
7  relationships with people that were scared
8  and nervous and didn't know if they should
9  remain with the company.  And so, at that
10  time, I felt he was the right person to
11  continue in the role.
12     Q.   What riot are you referring to?
13     A.   Well, a couple days after the
14  incident, there started being protests
15  outside and inside the store, and those
16  lasted for a period of time.  So there were
17  different organizations that were protesting.
18     Q.   Yes, there were protests, but you
19  said "riot."  So I want to make a distinction
20  between rioting and protest.  Can you tell me
21  when the riots occurred?
22     A.   I would say it was originally
23  protests outside the store, and at some
24  point, they came, the group came into the

164

1  store and they were screaming with bullhorns
2  and I was called terrible names as were
3  everybody that worked there.  The police said
4  to me, "If this goes badly, go into the
5  bathroom and lock yourself in until I come
6  get you".  So I would constitute that more of
7  a riot.
8      Q.   Okay.  Did you inform Camille that
9  you thought the protest, protesters were
10  rioting?
11     A.   Camille was there.
12     Q.   Okay.  Did she also share the same
13  sentiment that that would be considered
14  rioting?
15          MS. OELTJEN:  Objection.  You
16      can answer.
17          THE WITNESS:  Yes, I believe
18      she did.  We talked about closing the
19      store because we were all, quite
20      frankly, afraid for our lives.  But
21      the decision was made not to close
22      the store, so we were there.
23  BY MR. HARRIS:
24     Q.   Okay.  Was anyone injured?

SHANNON L. PHILLIPS

165

1    A.    Was anyone injured?  I don't think
2    so.
3    Q.    Was there any property damage done to
4    that store at 18th and Spruce?
5    A.    As a part of the protests and rioting
6    inside the store?
7    Q.    Yes.
8    A.    People were up on top of tables that
9    tipped over.  So, you know, there was some
10   damage.  But no windows were broken out.
11         At one point, we used to keep the
12   shades down because to keep the sun out and
13   the café cooler, and at one point, some of
14   the protesters were screaming that they
15   wanted the windows open and so the police
16   actually were trying to get the windows open.
17   I think some shades were broken in the
18   process trying to get them up fast enough.
19   But minimal damage.
20   Q.    But no property damage that you can
21   assess attributed to the conduct of any of
22   the protesters?
23         MS. OELTJEN:  Objection.  Other
24         than what she just testified to.

166

1    BY MR. HARRIS:
2    Q.    Well, I think you just testified to
3    that the shades or the blinds being drawn
4    were, that was done by the police, not by
5    protesters?
6    A.    Well, the protesters were screaming
7    with bullhorns that the shades needed to be
8    up, they wanted visibility, and the police as
9    well as maybe Starbucks people were trying to
10   get them up as fast as possible.
11   Q.    I understand.  So I guess my question
12   is different.  Do you recall any property
13   damage being performed at the hands of any of
14   the protesters?
15         MS. OELTJEN:  Objection.  You
16         can answer.
17         THE WITNESS:  So other than
18         like the tables getting turned over
19         from people standing on top of them.
20         Some -- you know, in the cafés, we
21         have tall displays that were knocked
22         out of the way.
23              I'm not sure what other damage
24         you're asking, but there was some

167

1    damage.  There was no -- we didn't
2    have any windows broken, if that's
3    what you're asking.
4         MR. HARRIS:  Okay.  May the
5    witness be shown Exhibit Number 17,
6    Rick, which is PHILLIPS Bates stamp
7    348 through 55.
8         THE VIDEOGRAPHER:  Sure, just
9    one second.
10        SPEAKER:  Oh, shit.
11        THE WITNESS:  That wasn't at my
12   house, by the way.
13        MS. OELTJEN:  That was at mine.
14   Please don't write that down.
15        MR. HARRIS:  Could you get that
16   on the record, please, Kim?
17        MS. OELTJEN:  He's a minor.
18   Please.
19        MS. RUDERMAN:  All I can say is
20   I'm glad I'm not alone with rogue
21   teenagers in my house.
22        MS. OELTJEN:  I will send my
23   husband a text and see if we can get
24   that.  I'm so sorry, Shannon.

168

1         THE WITNESS:  That's okay.  I
2    just didn't want it to seem like it
3    was coming from me.
4         MS. OELTJEN:  I'll own it.  I'm
5    so sorry.
6         MR. HARRIS:  Kate, there's no
7    problem with that.  I would be
8    surprised if that didn't happen by
9    now.
10        MS. OELTJEN:  That actually is
11   the first time that someone other
12   than me has heard my children
13   swearing on the Xbox.  So I'm sorry.
14        MR. HARRIS:  It sounds like
15   you're having fun, so that's good.
16              - - -
17   (P-7 marked for identification.)
18              - - -
19        MR. HARRIS:  All right.  So,
20   Rick, can you actually go to the next
21   page, please?  Oh, good, that's fine.
22   If you can scroll down?  Thank you.
23   BY MR. HARRIS:
24   Q.    Showing you what's been marked as now

SHANNON L. PHILLIPS

169

1  P-6 (sic), Ms. Phillips, is this an exchange
2  of text messages between you and Ben Trinsey.
3    A.   Yes.  It looks that way.
4         MR. HARRIS:  Okay.  Rick, could
5      you scroll back up so we can get the
6      date of this exchange?
7  BY MR. HARRIS:
8    Q.   So it says Wednesday, May 9th.
9         Ms. Phillips, when were you separated
10  from the organization?
11    A.   I believe that day.  I think it was
12  Wednesday, May 9th.  I would have to look at
13  my note to make sure that's the right day,
14  but I think it is.  It might have been
15  before, I'm sorry.
16    Q.   But it's somewhere around the same
17  time either the day before or around the time
18  that you were separated from the
19  organization?
20    A.   Yes.
21    Q.   Okay.  And Ben Trinsey, again, for
22  the record, happened to be the district
23  manager for one of the Philadelphia markets
24  that you were responsible for?

170

1    A.   The one that I had placed on leave of
2  abs-, on suspension the day before I was let
3  go, yes.
4    Q.   And for the record, Ms. Hymes told
5  you to place Ben Trinsey on suspension
6  pending the outcome of the investigation?
7    A.   That's correct.
8    Q.   Okay.  So this is an exchange either
9  on or about or sometime thereafter you were
10  separated from the organization between you
11  and Mr. Trinsey?
12    A.   Correct.
13    Q.   Okay.  And at the top is -- in gray,
14  that's Ben texting you.  Is that accurate?
15  And you're in the blue?
16    A.   Yes.
17    Q.   Okay.
18         MS. OELTJEN:  Rich, just a
19      housekeeping item.  I see a telephone
20      number showing up on here that I
21      should have redacted, so if we can
22      mark --
23         MR. HARRIS:  Okay.  Yes, sure.
24      For sure, absolutely.

171

1         MS. OELTJEN:  Just designate
2      those as "confidential".  Make sure
3      if you're going to file them they get
4      redacted.
5         MR. HARRIS:  Absolutely, I will
6      do so.
7  BY MR. HARRIS:
8    Q.   Can you describe to us this exchange
9  between you and Mr. Trinsey, Ms. Phillips?
10    A.   Sure.  So he sent me a text.  "This
11  is my personal cell".  He had obviously
12  gotten a new number.  "I heard from my sm's".
13  So he had heard from his store managers that
14  I had been, well, that I had left the
15  company.  The announcement was that I was
16  leaving the company.
17         And, obviously, he feels bad, "Can I
18  call you".  I said, "I'm telling my mom.  Can
19  I call you shortly".
20    Q.   All right, sounds good.
21         MR. HARRIS:  Can we go to the
22      next page?
23  BY MR. HARRIS:
24    Q.   All right.  Can you describe the top

172

1  of this exchange, Tim Osevala?
2    A.   Osevala.
3    Q.   Osevala, okay.  And who is Tim
4  Osevala?
5    A.   He was another one of my district
6  managers.  He showed up at my house crying
7  the day that he got the news that I had left
8  the organization, and I said, "He said he
9  e-mailed Camille", that was my boss, "that
10  his SMs want to know how to reach out to me
11  to say thank you".
12    Q.   Okay.  And, again, this exchange is
13  between you and Ben continuing talking about
14  you and what kind of leader you were to him?
15    A.   Yes.
16    Q.   Okay.
17         MR. HARRIS:  Can we go to the
18      next page?
19  BY MR. HARRIS:
20    Q.   All right.  Again, this is between
21  you and Ben Trinsey, yes?
22    A.   Yes, uh-huh.
23         MR. HARRIS:  Can you scroll
24      down some more?  You can continue.

SHANNON L. PHILLIPS

173

1      All right.  You can continue through
2      this as well.  All right, you can
3      stop here.
4  BY MR. HARRIS:
5   Q.   All right.  Can you describe what
6  this exchange was about?
7   A.   This is about the Safe and Welcoming
8  policy that I mentioned that was in place,
9  and so Ben is saying, "I'm sure you're
10  already aware but this is the very Specific
11  error in the training.  I'm sure this would
12  help you in your case", as to why this
13  incident had happened in the first place.
14   Q.   All right, let's con-- --
15      MR. HARRIS:  I'm sorry.  Can we
16      highlight that, Rick, so that we're
17      talking about -- so you and I are
18      referring to the same information?
19      THE VIDEOGRAPHER:  I apologize.
20      What am I highlighting?
21      MR. HARRIS:  Can you highlight
22      the portion that shows a copy or a
23      snapshot of the policy, the Safe and
24      Welcoming Place?  And there's a

174

1      highlighted portion, there's a
2      section that's been highlighted.  Can
3      we go to that?  I don't know if you
4      can make that larger.
5      THE VIDEOGRAPHER:  Yes, it's
6      distorted.  Blowing it up more will
7      increase the resolution of that
8      section.
9      MR. HARRIS:  Okay.
10      THE VIDEOGRAPHER:  Because it's
11      a screenshot.
12  BY MR. HARRIS:
13   Q.   Are you able to see what that says,
14  Ms. Phillips?
15   A.   No.  I'm sorry.
16   Q.   Nor am I.  Okay.  But this is the
17  Safe and Welcoming Place Role Play Card.  So
18  this is the document you were referring to
19  that Ms. Hylton relied on when she called the
20  police on the two individuals in the store?
21      MS. OELTJEN:  Objection.
22      THE WITNESS:  This specific
23      card was a Role Play Card, so it was
24      part of the training.  I can see at

175

1      the top it says Role Play Card.  So,
2      as part of the Safe and Welcoming
3      training, there were specific
4      scenarios that were role plays that
5      they would read through and kind of
6      discern how to respond if this was
7      what was happening.
8      So this is one of those Role
9      Play Cards, but I can't really read
10      what it says.  I'm sorry.
11  BY MR. HARRIS:
12   Q.   Okay, no problem.
13      MR. HARRIS:  Can we go to the
14      next one?  Can we scroll down, Rick?
15      Thank you.
16  BY MR. HARRIS:
17   Q.   But you remember reviewing this after
18  when Ben sent this to you?
19   A.   I had actually already e-mailed the
20  information to myself, so I already had it,
21  but I sent myself all of the Safe and
22  Welcoming training.
23   Q.   When did you do that, Ms. Phillips?
24   A.   I want to say it was May 3rd, but I

176

1  could be off on that date.
2   Q.   Was that consistent with company
3  policy to e-mail proprietary information to
4  yourself?
5      MS. OELTJEN:  Objection.  You
6      can answer.
7      THE WITNESS:  No, it was not.
8  BY MR. HARRIS:
9   Q.   Okay.  Was the policy public?
10   A.   The Safe and Welcoming policy?
11   Q.   Yes.
12   A.   I don't think it was private.
13  Because we had a Code of Conduct that was
14  printed and hanging in every store.  And part
15  of Safe and Welcoming was "restrooms are for
16  customer use only" and we had signs that said
17  that in every restroom, so it wasn't a
18  secret.
19   Q.   Was the information in the Safe and
20  Welcoming card, was that in an area that only
21  could be viewed by employees or by customers
22  as well?
23   A.   Only by partners.
24   Q.   Okay.  "Partners" meaning employees?

SHANNON L. PHILLIPS

177

1   A.   That's correct.  I'm sorry, they
2  don't call them employees at Starbucks.
3   Q.   Right, partners, correct.  I
4  understand.
5       MR. HARRIS:  Okay.  Can we go
6    to the next one?
7  BY MR. HARRIS:
8   Q.   Did you think that that policy was
9  going to help you in your lawsuit as Ben
10 suggested?
11      MS. OELTJEN:  Objection.  You
12   can answer.
13      THE WITNESS:  I think the
14   policy was flawed, and I think it led
15   to the scenario that happened which
16   ultimately led to me being let go.
17   So I felt like the policy was a big
18   part of what caused this incident to
19   happen in the first place, and the
20   incident is what caused me to be
21   separated when I was told the
22   situation is not recoverable.
23 BY MR. HARRIS:
24   Q.   Okay.  All right.  When you say, when

178

1  you're talking about the people that are
2  going to pay, are you talking about the
3  entire organization or are you talking about
4  someone in particular?
5       When you say, "Maybe.  Those Bs are
6  gonna pay", are you talking about the entire
7  company or are you just talking about a
8  certain individual or individuals, plural?
9   A.   I am not even sure what I was talking
10 about.  Honestly, I was probably in shock.
11 And it's been a few years since I typed that
12 text message, so I don't know who I was
13 thinking about.
14      MR. HARRIS:  Can you scroll
15   down, please?  All right, keep going.
16 BY MR. HARRIS:
17   Q.   When you say "sons of bitches", are
18 you talking about the entire organization or
19 are you talking about someone in particular?
20   A.   I don't remember.  I don't really
21 remember.  I'm sorry.
22      MR. HARRIS:  As you scroll down
23   -- okay, we can go to the next page.
24 BY MR. HARRIS:

179

1   Q.   And it says, this is Ben, he says,
2  "Sbux", so Starbucks, "finally called me
3  about an hour ago.  I have a phone interview
4  with the Friday morning".  What was he
5  referring to here?
6   A.   I don't remember.  I'm sorry.  I
7  don't recall.
8   Q.   Do you know if Ben informed you that
9  he was, had reached out to potentially
10 getting another role within the organization
11 and that's what he was referencing here in
12 this text message?
13   A.   No.  He didn't have an interview for
14 a different role, no.
15   Q.   When he says "I have a phone
16 interview with the Friday morning", what was
17 he referring to here?
18   A.   I would be guessing, but maybe a
19 phone interview with like the PRSC about the
20 investigation that was taking place maybe.
21 I'd be guessing though.  I'm not -- he
22 definitely wasn't interviewing for another
23 role.  When he says "interview", that's
24 not -- he doesn't mean an interview for a

180

1  different role.
2   Q.   Okay.
3       MR. HARRIS:  All right.  Can
4    you go to the next page, please?  All
5    right.  Can you go to the next page?
6  BY MR. HARRIS:
7   Q.   Can you describe what this actually
8  exchange deals with?
9   A.   Can you go right prior to that?
10 "They said would likely get a call back next
11 week".  I'm just not sure what he was talking
12 about.
13   Q.   Sure.
14   A.   Oh.  Allyn and Jaicee, those were the
15 two assistant managers.  Okay, and --
16   Q.   So Allyn was whom?
17   A.   Was the assistant manager that was
18 making more than Jaicee --
19   Q.   Okay.  And what -- is there --
20   A.   I'm sorry, I --
21   Q.   What does Ben say in response to
22 that?
23   A.   Ben's response, "They said would
24 likely get a call back next week".

SHANNON L. PHILLIPS

181

1   Q.   Okay.  So that's dealing with the
2   investigation, if I understand the exchange
3   correctly?
4   A.   I think so.
5   Q.   All right.
6   A.   Yes.
7   Q.   So, if I understand this exchange,
8   Ben is describing that there was actually an
9   investigation regarding the allegations made
10  by Allyn in reference to her pay in
11  connection to Jaicee.  Is that fair?
12       MS. OELTJEN:  Objection.  You
13    can answer.
14       THE WITNESS:  You have that
15    backwards.  Jaicee was the one
16    complaining that Allyn --
17  BY MR. HARRIS:
18  Q.   About Allyn, that's right.  I'm
19  sorry.
20  A.   That's okay.
21  Q.   And that's what I'm referring to.  So
22  Jaicee was complaining about Allyn, but
23  that's what Ben was referring to when he was
24  saying that he was being interviewed in

182

1   connection to the investigation?
2   A.   I think so.  The phone interview,
3   that sounds like that's what it was about.
4   It's been a while, but --
5   Q.   And then there's a discussion
6   regarding a Layla.  Who might that be?  And
7   who is Layla?
8   A.   She was a former partner that no
9   longer worked for us.
10  Q.   And was there an investigation
11  regarding Layla?
12  A.   Her -- Layla's mother had sent a
13  letter after the April incident saying that
14  her daughter Layla had not been promoted and
15  she should have been.  And in the letter,
16  actually, Layla's mom, I believe if I
17  remember correctly, said it was because Layla
18  was Muslim and was in, you know, her full
19  attire.  But then apparently Ben is saying
20  that she felt she wasn't getting promoted
21  because of her age.  And I said, "How old is
22  she?  Did she think she was too young or too
23  old", with regard to her age and not getting
24  promoted.

183

1        Because I didn't remember -- I mean I
2   remember Layla having some performance
3   issues, but I -- if somebody says "I'm not
4   getting promoted because of my age", I wasn't
5   sure if she was saying "because I'm too old"
6   or "because I'm too young".  I wasn't sure
7   what her complaint was.
8   Q.   Understood.
9        MR. HARRIS:  I'm sorry, could
10    you go back, Rick?  There was -- can
11    you scroll up?  Keep going.  And I
12    believe there's an exchange where Ben
13    says something about a pay
14    calculator.  Can you keep going?
15       THE WITNESS:  Oh, the salary
16    calculator.
17       MR. HARRIS:  The salary
18    calculator?
19       MS. OELTJEN:  It's at the
20    bottom of that page that you're on.
21       MR. HARRIS:  Can we go down?
22    There we go.  Does it say -- keep
23    going.  There we go.
24  BY MR. HARRIS:

184

1   Q.   All right.  And this is from Ben.  So
2   Ben is responding to you where they're
3   talking about Layla, but then he says, "And
4   why Allyn was being paid more than Jaicee.
5   Just explained I used my pay calculator and
6   due to Allyn's masters degree Joyce
7   recommended more".
8        So, when it says that "I used pay
9   calculator", that suggests that Ben used a
10  pay calculator, not someone other than him.
11  Does it not?
12  A.   That's sort of the way it reads, but
13  that's incorrect.  Joyce was the one who
14  would have access to the salary calculator.
15  I didn't even have access to it, so I know
16  Ben didn't.
17  Q.   But does he not say that in this text
18  message exchange that he did have pay calc-,
19  that he used pay calculator?
20  A.   That's what it says.  My guess is he
21  meant to say, "Just explained Joyce used pay
22  calculator and due to Allyn's masters degree
23  Joyce recommended more".
24       That's what he would have meant.

SHANNON L. PHILLIPS

185

1  That's not exactly what it says, but you're
2  -- I can tell you that Ben didn't have access
3  to the calculator, the salary calculator. I
4  didn't even have it. So it was something
5  Partner Resources had.
6          MR. HARRIS: Can you go down,
7      Rick? Continue. So his -- stop
8      there.
9  BY MR. HARRIS:
10   Q.   It says, "I think she was older than
11  that", and then it goes to say, "You didn't.
12  Have any say in Jaicee's pay". And then he
13  says, "I know. Pay calculator". Is that
14  what he says?
15   A.   Yes.
16   Q.   Okay. Did you say Ebony was the one
17  asking you the questions? "She knows how pay
18  works". "Nope. It was holly from the" --
19  what's the "bec"?
20   A.   Business Ethics and Compliance.
21   Q.   Okay.
22   A.   And it looks like, "When Holly checks
23  in on the process, she'll know that's
24  correct. DMs don't determine pay".

186

1          MR. HARRIS: Okay, keep going
2      down.
3  BY MR. HARRIS:
4   Q.   And Ben says, "Apparently I do have
5  an opportunity on food safety certifications.
6  It sounds like my sm's were not following the
7  process for getting their ssv's certified.
8  Definitely a miss on my part but also they
9  knew the process and should be held
10  accountable for it". What is he referring to
11  there?
12   A.   So, in the City of Philadelphia,
13  anybody that was running a shift, a shift
14  supervisor or above, had to be food safety
15  certified. And so apparently the way this
16  reads is that there were some supervisors
17  that didn't have their certification.
18          Because it says, "It sounds like my
19  sm's were not following the process for
20  getting their shifts certified. Definitely a
21  miss on my part but also they knew the
22  process and should be held accountable for
23  it". So his store managers must have missed
24  getting a shift or multiple shifts food

187

1  safety certified.
2   Q.   Okay. And then you said it's not a
3  terminable offense or separated for it. But
4  "maybe a corrective action", that's what he
5  says.
6   A.   You would never get separated for
7  that, right. And he said "maybe I'd get a
8  corrective action", yes.
9   Q.   Okay. So doesn't this seem to
10  suggest that they were not only looking into
11  the pay issue but also the safety
12  certification issue as well? So it wasn't
13  just one isolated incident that was being
14  investigated but more than one other issue --
15          MS. OELTJEN: Objection. You
16      can answer.
17  BY MR. HARRIS:
18   Q.   -- as it relates to Ben Trinsey?
19          MS. OELTJEN: Objection. You
20      can answer.
21          THE WITNESS: The way I would
22      read this is they were looking for
23      something.
24  BY MR. HARRIS:

188

1   Q.   Fair, as they were looking for
2  something. But nonetheless, he even
3  identified, meaning "he" being Ben Trinsey,
4  identified an issue that he missed certainly
5  wasn't enough to rise to the level of being
6  terminated but certainly something that dealt
7  with an issue regarding his ability and his
8  management of store managers?
9          MS. OELTJEN: Objection. You
10      can answer.
11          THE WITNESS: That's correct.
12      And my guess is there were also
13      shifts in Paul's district that were
14      missing certifications as well.
15  BY MR. HARRIS:
16   Q.   Okay, fair point. But then there was
17  also the issue regarding Layla regarding the
18  allegation that was made by her mother when
19  she sent in the note to the store saying that
20  her daughter was not being promoted, so that
21  dealt with an age issue.
22   A.   Well, the mother said it was because
23  she was Muslim, but then apparently Layla
24  said it was because of her age. And I think

SHANNON L. PHILLIPS

189

1  I saw my text saying, "How old was she?  In
2  her 30s"?  Like, I don't even know how old
3  she was.  That certainly had no bearing on
4  her getting a promotion or not getting a
5  promotion.
6          And then in this, it looks like
7  they're saying somebody complained he hires
8  externally.  However, only 2 of his 14
9  managers were externally hired.  The other 12
10  were internally promoted.  So that was
11  clearly incorrect.
12   Q.   Okay.  But it appears that they're
13  investigating or looking into other areas of
14  his management responsibilities and duties
15  separate and apart from the issue regarding
16  Jaicee and Allyn's pay?
17          MS. OELTJEN:  Objection.  You
18      can answer.
19          THE WITNESS:  It looks that
20      way.
21          MR. HARRIS:  Okay.  Can you go
22      down, please?
23  BY MR. HARRIS:
24   Q.   And so this text message exchange

190

1  deals with his hiring practices.  2 of 4 were
2  hired externally as opposed to internally.
3  Is that what that means?
4   A.   So, out of 14 store managers, 2 were
5  externally hired, the other 12 internally
6  promoted.
7   Q.   Okay.  And what's the preference or
8  the value within the organization?  Is the
9  preference to hire internally, to promote
10  within?
11   A.   It is a big part of the culture to
12  develop the people internally, yes, and then
13  we also -- they also appreciated sometimes an
14  outside perspective.  So we would hire
15  externally as well, but certainly, internals
16  were given preference, yes.
17   Q.   So that was something they were also
18  assessing as it relates to Ben as well?
19          MS. OELTJEN:  Objection.  You
20      can answer.
21          THE WITNESS:  From the text, it
22      looked like somebody said he hires
23      too many externals was a complaint.
24      Clearly, that wasn't correct because

191

1          12 of 14 were internal.
2          So were they looking at that?
3      I think any complaint at that point
4      that came forward they were looking
5      at.
6  BY MR. HARRIS:
7   Q.   Understood.
8          MR. HARRIS:  Can you scroll
9      down, please?  I'm going to pass this
10      because I think that's just
11      confidential information, so we'll go
12      through that.
13  BY MR. HARRIS:
14   Q.   Now, without actually going on the
15  details of Mr. Trinsey's separation, was he
16  still with the organization when you were
17  having this exchange with him?
18   A.   No.  He was already gone.
19   Q.   Okay.  And so he informed you as to
20  the details of his separation in that text
21  message exchange?
22   A.   I'm sorry, it's not on the screen
23  anymore.
24   Q.   All right.

192

1          MR. HARRIS:  It's in the
2      previous -- could you go up, Rick?
3          THE WITNESS:  "6 months
4      severance plus they won't contest
5      when I apply for unemployment".
6  BY MR. HARRIS:
7   Q.   Okay.  Now, that was a standard
8  separation, correct?  That was nothing that
9  he -- I mean, based on his years of service
10  and tenure within the organization, that
11  would have been a consistent severance?
12          MS. OELTJEN:  Objection.  You
13      can answer.
14          THE WITNESS:  I don't know.  I
15      never gave a severance package to a
16      district manager before.
17  BY MR. HARRIS:
18   Q.   Okay.  How long had Mr. Trinsey been
19  working for the organization?
20   A.   15 years.
21   Q.   "6 months", does that seem to be fair
22  based on his tenure with the organization in
23  your estimation?
24          MS. OELTJEN:  Objection.  You

SHANNON L. PHILLIPS

193

1      can answer.
2          THE WITNESS:  I just don't know
3      what the standard severance package
4      was because I never gave any.  I
5      never had any severance packages that
6      I gave to a district manager.  So I
7      don't know if that seemed fair.
8  BY MR. HARRIS:
9      Q.   All right.  Had you given any
10  severance packages to store managers in your
11  market, in your region?
12     A.   Prior in 2008 when we laid off some
13  assistant managers, I was involved in
14  severance packages for assistant managers.
15     Q.   Ms. Phillips, are you still employed
16  with Raymour & Flanigan?
17     A.   I am.
18     Q.   And how long have you been employed
19  with Raymour & Flanigan?
20     A.   I was hired in August of 2018.
21     Q.   So you were out of work from roughly
22  four months, three months?
23     A.   Three months, uh-huh.
24     Q.   Okay.  And how much did you -- what

194

1  was your gross annual compensation at
2  Starbucks?
3      A.   I remember going through the
4  documents and my W-2s were listed, but off
5  the top of my head, I don't remember what it
6  was.
7      Q.   All right.  And how much are you
8  currently making approximately?
9      A.   I just got another increase in the
10  beginning of this month, January, and now I'm
11  at a pay plan of 160.
12     Q.   All right.  Do you recall what the
13  difference is roughly between what you're
14  currently making versus what you made at
15  Starbucks, what the delta is, if any?
16     A.   There's definitely a delta.  I
17  believe when I left there maybe I was making,
18  it would be a guess, maybe 250 as my base
19  salary but then I also had like bonus
20  potential and stock options.
21     Q.   Okay.
22     A.   And that might be wrong.  I could be
23  off on that.
24     Q.   Okay.  So, if I understand it, you

195

1  were -- there's a delta between how much you
2  were making at Starbucks versus what you're
3  currently being employed -- versus your
4  current compensation package?
5      A.   That's correct.
6      Q.   But you were out of work for
7  approximately three months?
8      A.   That's correct.
9      Q.   Okay.  So there's roughly a $90,000
10  difference between the two?
11     A.   That would be just in the salary, but
12  I also received stock options every year as a
13  regional director and then they would -- so,
14  for I don't know however many years, they
15  were vesting.  So I had a lot of stock
16  potential as well.  That was taken away when
17  I was let go.
18     Q.   Is Raymour & Flanigan a publicly
19  traded company?
20     A.   It's not.
21     Q.   Do you participate in their, in
22  Raymour & Flanigan's retirement package
23  and/or portfolio?
24     A.   They have a 401(k) plan, but we found

196

1  out because the company was not profitable
2  that there's not a contribution from the
3  company.
4          MS. OELTJEN:  Can we just mark
5      that as "confidential"?  I don't know
6      is --
7          MR. HARRIS:  Yes.  Yes.  I
8      agree with that, yes, --
9          MS. OELTJEN:  Thank you.
10         MR. HARRIS:  -- that it's
11     confidential.
12         THE WITNESS:  Not supposed to
13     be sharing on --
14         MS. OELTJEN:  No, you're doing
15     what you should do, and Rich and I
16     will just mark it as "confidential".
17         MR. HARRIS:  We'll mark it as
18     "confidential", that's right.
19     Thanks, Kate.
20         Can we go back to the text
21     message exchange again, Rick?  And
22     specifically, if you can go down, and
23     I believe it's at the bottom,
24     right-hand corner, it's PHILLIPS-367.

SHANNON L. PHILLIPS

197

1    Okay, stop there.
2  BY MR. HARRIS:
3    Q.   And at the top, again, that's you in
4  the blue, correct, Ms. Phillips?
5    A.   Yes.
6         MR. HARRIS:  Rick, could you go
7     up again to the previous page?  I
8     want to get to the bottom.  All
9     right, stop there.
10  BY MR. HARRIS:
11    Q.   So this is in reference to a story
12  that Ben Trinsey had provided you that was in
13  the Huffington Post, I believe?  Do you
14  recall that?
15    A.   He's telling me that Dina Romang got
16  fired.  He said, "Dina", and I said, "Romang?
17  I heard.  Last Friday".  And he said he
18  didn't realize she had been let go, and I
19  said the story is that she gave a pound of
20  coffee to a vendor.
21    Q.   Got it.
22         MR. HARRIS:  I'm sorry, let's
23     go down further.  I think this is
24     where the Huffington Post article

198

1     comes up.
2  BY MR. HARRIS:
3    Q.   There's a link to a Huffington Post
4  article?
5    A.   I sent this to him, but I don't
6  recall what this article was about.  I'm
7  sorry.
8         MR. HARRIS:  Okay, keep going
9     down.
10  BY MR. HARRIS:
11    Q.   Do you recall if the article dealt
12  with whether or not Starbucks was letting go
13  of everyone in the market that had any
14  interaction with the April 2018 incident?
15         MS. OELTJEN:  Objection.  You
16     can answer.
17         THE WITNESS:  Do I recall if
18     that's what the article was about?
19  BY MR. HARRIS:
20    Q.   Yes.
21    A.   I honestly don't have any
22  recollection of what that article is about.
23    Q.   Okay.
24         MR. HARRIS:  Can you go down,

199

1     please, Rick?  And I think you can go
2     all the way down to 373 at the
3     bottom, right-hand corner.  Oh, go
4     up.  Let me see, there's some blue
5     there.  Let me see we didn't miss
6     anything.  Okay.
7  BY MR. HARRIS:
8    Q.   Here, it says -- you're talking about
9  Delma.  Who is Delma?
10    A.   She was another district manager in
11  South Jersey.
12    Q.   Okay.  What was she being
13  investigated for?
14    A.   I don't remember, but apparently, if
15  I'm saying don't say anything to Delma about
16  her being under investigation, Ben was
17  probably going to reach out to Delma, so I
18  didn't want him to bring it up to her.  She
19  was probably there.
20         MR. HARRIS:  I'm sorry, can we
21     go off the record for one moment?  It
22     looks like someone is ringing my
23     doorbell.
24         THE VIDEOGRAPHER:  Going off

200

1     the record, the time is 2:43 p.m.
2            - - -
3       (A recess occurred.)
4            - - -
5         THE VIDEOGRAPHER:  All right.
6     The time is 2:52.  Back on the
7     record.  And I'll pull that up.
8         MR. HARRIS:  All right.  Can
9     you go up to the very top of this
10     exchange?  Right where there was the
11     link regarding the Huffington Post
12     article.  So 367.
13         THE VIDEOGRAPHER:  I'm sorry,
14     which?
15         MR. HARRIS:  It should say
16     "367" at the bottom, right corner.
17         THE VIDEOGRAPHER:  Oh, 367?
18         MR. HARRIS:  Yes.  Okay.
19  BY MR. HARRIS:
20    Q.   Showing you what's been marked as
21  Exhibit Number 6 (sic), I believe P-6 (sic),
22  is that accurate, it's still the exchange
23  that we were talking about a moment ago
24  between you, Ms. Phillips and Ben Trinsey?

SHANNON L. PHILLIPS

201

1    A.   Yes.
2    Q.   And this was after you were separated
3  from the organization?
4    A.   I --
5    Q.   Or either the same day or sometime
6  thereafter?
7    A.   I'm sure it was.  I don't see a date
8  on it, but I'm sure it was.
9    Q.   Which was?  Sometime afterward?
10   A.   It would have been after, right.
11   Q.   Okay.  And when Ben says at the top
12  "she's still my favorite and the best fsm",
13  to whom was he referring?
14   A.   The person prior who said Dina Romang
15  was no longer.  She was a Facility Service
16  Manager.
17   Q.   Okay.  And you give Mr. Trinsey the
18  Huffington Post article, correct?
19   A.   Yes.
20   Q.   As opposed to him giving you the
21  article, you gave it to him?
22   A.   Yes.
23   Q.   And then --
24   A.   On LinkedIn.

202

1    Q.   Right, on LinkedIn.  It was an
2  article on LinkedIn.  You posted it to your
3  text message.  And then you say, "Saw this
4  today...guess it isn't just white people they
5  wanna get rid of".  Is that what you said?
6    A.   That's what I said.
7    Q.   Okay.  And so the article dealt with
8  making changes as a result of the April 2018
9  incident regarding personnel and staff.  Is
10  that your recollection of what the LinkedIn
11  article said?
12       MS. OELTJEN:  Objection.
13       THE WITNESS:  I have no idea
14    what the article was.  I'm sorry.  If
15    you want to bring it up, I'm happy to
16    look at it, but I just don't
17    remember.
18  BY MR. HARRIS:
19   Q.   Okay, no problem.  But you say in
20  response to the article "guess it isn't just
21  white people they wanna get rid of"?
22   A.   The way I read that, my guess is this
23  article was perhaps someone saying "I was
24  fired for my age".  And I would have said, "I

203

1  guess it's not just white people they're
2  getting rid of.  It's somebody who is
3  complaining they're being let go because of
4  their age or some other reason".  But I
5  don't, I don't -- that's me just guessing.
6    Q.   But, Ms. Phillips, as you sit here,
7  you don't recall any incident in which there
8  would have been an article after the
9  April 2018 incident involving someone
10  complaining about age?
11       MS. OELTJEN:  Objection.  You
12    can answer.
13       THE WITNESS:  After the
14    April 2018 incident, lots of
15    different articles came out about
16    Starbucks partners complaining of why
17    they were let go.  I remember that.
18    I --
19  BY MR. HARRIS:
20   Q.   Do you remember any article about
21  that would have been posted in something that
22  you sent to Ben Trinsey that dealt with age
23  and not race?
24   A.   I'm sorry, I don't remember what this

204

1  article was about.
2    Q.   But you do agree with me that this
3  was a particularly highly-charged,
4  racially-charged incident that occurred in
5  April of 2018?
6    A.   Yes, I agree.
7    Q.   All right.  And so the discussion was
8  regarding race.  In fact, all the North
9  American stores were shut down around
10  Memorial Day so that individuals could
11  receive implicit bias training.  You're aware
12  of that?
13   A.   It happened after I left, but yes,
14  I'm fully aware.
15   Q.   Okay.  And the training dealt with
16  race?  Did not deal with age, did not deal
17  with any other areas, dealt with race
18  specifically and whether or not implicit bias
19  factored into the decision-making of
20  individuals within the store?
21   A.   Are you asking me?
22   Q.   Yes, I'm asking you.
23   A.   I wasn't a part of the training.  I
24  know it was about unconscious bias.  I don't

ELITE LITIGATION SOLUTIONS, LLC

SHANNON L. PHILLIPS

205

1  know if it was strictly about race or if it
2  was also about LGBT or age discrimination.  I
3  don't know the answer to that because I
4  wasn't there.
5    Q.   Okay, that's fair.  But specifically,
6  your response to the Huffington Post article
7  dealt with, "I guess it just wasn't white
8  people they were trying to get rid of"?
9    A.   That was my response.
10        MR. HARRIS:  Thank you.  I have
11     no further questions.  Counsel may.
12        MS. OELTJEN:  You have
13     surprised me by being all done,
14     Mr. Harris.  So why don't we just
15     take a five-minute question -- can we
16     just take a five-minute break for me
17     to decide whether or not I'm going to
18     have any questions.
19        MR. HARRIS:  Sure, absolutely.
20        THE VIDEOGRAPHER:  All right.
21     Going off the record, the time is
22     2:52 p.m.
23           - - -
24        (A recess occurred.)

206

1           - - -
2        THE VIDEOGRAPHER:  Okay.  The
3     time is 2:59.  Back on the record.
4        MR. HARRIS:  Can you -- Rick,
5     would you be so kind as to show
6     Ms. Phillips the text message
7     exchange on PHILLIPS-373?  So scroll
8     down from 367, and now we can go to
9     373.  Okay, let's stop there.
10        All right, let's start at the
11     top of what's been marked as Bates
12     stamp 373 and P-6 (sic).
13  BY MR. HARRIS:
14    Q.   Again, it's Mr. Trinsey at the top.
15  He says, "That's funny.  That is the one
16  thing I told him.  He didn't believe me at
17  first.  I told him.. my team was waiting for
18  an announcement but it never came".  Who is
19  Mr. Trinsey referring to?
20    A.   I'm not sure.  Could you go up just
21  slightly?
22    Q.   Sure.
23    A.   Okay.  Okay.  Okay.
24    Q.   Okay.  Who was Mr. Trinsey referring

207

1  to?
2    A.   Michael Scott.
3    Q.   Okay.  And who is Michael Scott?
4    A.   Michael used to be one of the
5  district managers on my team, so he was one
6  of my district managers and then he was
7  promoted into a different role.  So, at this
8  time, he was in a role called the ROC, the
9  Regional Operations Coach.
10    Q.   Okay.  And was -- all right.
11        MR. HARRIS:  Let's go to the
12     next top of that page.
13  BY MR. HARRIS:
14    Q.   "That's funny.  That is the one thing
15  I told him.  He didn't believe me at first.
16  I told him.. my team was waiting for an
17  announcement but it never came".  That's --
18  Ben is referring to Mr. Scott?
19    A.   I think so.  His team was waiting for
20  an announcement.  They never sent out an
21  announcement that Ben was not coming back to
22  the organization.  So that's what he was
23  referring to.
24    Q.   Understood.  And then this is you in

208

1  the blue again where it says, "It didn't
2  mention you not coming back...only permanent
3  leadership.  Crazy!  It did say thanks to
4  Paul.  Whatever".  So there was some sort of
5  announcement?
6    A.   This was the announcement, now this
7  jogs my memory, this was an announcement of
8  the new leadership structure, so who would be
9  taking what districts, and it didn't mention
10  anything about Ben not coming back.  It only
11  mentioned that I guess Brian Jerdone (ph) was
12  probably the new leader for this area.
13    Q.   And Michael Scott, what was his race
14  or ethnicity?
15    A.   Michael Scott?
16    Q.   Yes.
17    A.   Michael is white.
18    Q.   Okay.  And so he was promoted during
19  this time period?
20    A.   No.  But he was -- when I first came
21  here -- I'm sorry, that might have been
22  confusing.  He was a district manager on my
23  team when I first came to the area.  He had
24  been promoted into this position prior to

SHANNON L. PHILLIPS

53 (Pages 209 to 212)

209

1  this happening.
2  Q.   And he was not terminated?
3  A.   He was not a -- he didn't oversee the
4  store, so he had no direct involvement.  As a
5  Regional Operations Coach, he sort of
6  supported Camille in helping coach and
7  develop leadership skills in the regional
8  directors mainly.
9  Q.   Okay.  And then it says, Mr. Trinsey
10  responds and says "F em".  And, "Yep!  They
11  got rid of everyone!  Guess that's what they
12  wanted.  F em!".
13      So, in that response, you don't make
14  any delineation between they got rid of
15  everyone white versus everyone black?  You
16  don't make any delineation based on race in
17  this text message exchange, do you?
18  A.   I do not.
19      MR. HARRIS:  Thank you very
20  much.  Now I'm actually done now, so
21  I don't have further questions.
22      MS. RUDERMAN:  Wait.  Wait.
23  Wait.  Rich, before you officially
24  end Ms. Phillips' deposition --

210

1      MS. OELTJEN:  Hang on.  What's
2  happening?
3      MS. RUDERMAN:  Can we confer?
4      MS. OELTJEN:  Yes.  I was like
5  you cannot ask my client questions.
6      MS. RUDERMAN:  No, I'm not
7  asking any questions at all.
8      MR. HARRIS:  We can confer,
9  yes.
10      MS. RUDERMAN:  I'm just asking
11  if Rich and I can confer.
12      MR. HARRIS:  We can.  We can
13  confer.
14      MS. OELTJEN:  Carry on.  I'm
15  going to --
16      THE WITNESS:  I'm sorry, I
17  didn't who was speaking.
18      MR. HARRIS:  We're going to go
19  off the record.
20      THE VIDEOGRAPHER:  Okay.  The
21  time is 3:05.  Off the record.
22          - - -
23      (A recess occurred.)
24          - - -

211

1  BY MR. HARRIS:
2  Q.   Ms. Phillips, you have a question for
3  me?
4  A.   I do.
5      THE VIDEOGRAPHER:  I'm sorry,
6  one second.  The time is 3:14.  Back
7  on the record.
8      THE WITNESS:  Can I ask now?
9  BY MR. HARRIS:
10  Q.   Yes.  Ms. Phillips, you have a
11  question for me?
12  A.   I do.  I just wanted to know if it
13  was all right if I went back and clarified
14  something about Michael Scott.
15  Q.   Yes, you can.
16  A.   Okay.  So I said Michael Scott was my
17  district manager and then he was promoted.
18  That wasn't wholeheartedly accurate.  So he
19  was my district manager, and then the regions
20  changed and he aligned to somebody else as a
21  district manager before he was promoted into
22  that position.
23  Q.   Understood.
24  A.   I just wanted to clarify.

212

1  Q.   No problem at all.
2      Ms. Phillips, would you agree with
3  the statement that under Starbucks' policy
4  that if someone made an allegation dealing
5  with disparate treatment based on race that
6  the organization had an obligation to
7  investigate those allegations?
8  A.   I do.
9  Q.   Okay.  And based on your experience
10  in 15 years with the organization, that had
11  always happened in any instance in which you
12  were aware of where someone complained about
13  race?
14  A.   I was only there 13 years.
15  Q.   13 years, okay.  I'm sorry.  13
16  years.
17  A.   That's okay.  As far as I know, when
18  someone complained of a discriminatory
19  allegation, I think that's what you said, --
20  Q.   Yes.
21  A.   -- it was always investigated.
22  Certainly, if I was the leader, it was.
23      MR. HARRIS:  Okay.  Thank you.
24  I have no further questions.

ELITE LITIGATION SOLUTIONS, LLC

SHANNON L. PHILLIPS

54 (Pages 213 to 216)

213

1          MS. OELTJEN:  I do not have any
2   questions for you.  But we would like
3   to read and sign, please.
4          MR. HARRIS:  Okay.  What that
5   means, Ms. Phillips, did your counsel
6   advise you as to what read and sign
7   means?
8          THE WITNESS:  I don't --
9          MS. OELTJEN:  That she can't
10  answer.  But if you would like to ask
11  her if she knows what reading and
12  signing means, you can ask her that
13  question.
14  BY MR. HARRIS:
15  Q.   Yes.  Do you know what reading and
16  signing means, Ms. Phillips?
17  A.   I don't.  I'm sorry.
18  Q.   All right.  At the conclusion of
19  today, there's going to be a transcript
20  that's going to be created.  After the
21  transcript is created, Ms. Oeltjen and you
22  will be able to go over the transcript to see
23  if you want to make any corrections,
24  additions, et cetera.  So, after you look

214

1   over it, you review it and if after you've
2   either made any corrections or additions or
3   omissions, then you can actually sign that
4   document verifying its accuracy, and that's
5   what read and sign means.
6   A.   And this will come to me like via
7   e-mail or something?  How will I get it?
8          MS. OELTJEN:  I can -- we can
9   go off the record and I can explain
10  it to you.
11         THE WITNESS:  Okay.
12         MR. HARRIS:  However form she
13  deems appropriate.
14         THE WITNESS:  Okay, thank you.
15         THE VIDEOGRAPHER:  I will go
16  off the record.  The time is
17  3:17 p.m.  That concludes this
18  deposition.  Going off the record.
19              - - -
20         (Witness excused.)
21  (Deposition concluded at 3:17 p.m.)
22              - - -
23
24

215

1
2          CERTIFICATE
3
4       I, KIMBERLY S. GORDON, a
   Registered Professional Reporter, Certified
5   Court Reporter and Notary Public of the
   State of New Jersey, do hereby certify that
6   prior to the commencement of the
   examination, SHANNON L. PHILLIPS was duly
7   sworn by me to testify to the truth, the
   whole truth and nothing but the truth.
8
       I DO FURTHER CERTIFY that the
9   foregoing is a verbatim transcript of the
   testimony as taken stenographically by and
10  before me at the time, place and on the date
   hereinbefore set forth, to the best of my
11  ability.
12       I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
13  nor counsel of any of the parties to this
   action, and that I am neither a relative nor
14  employee of such attorney or counsel, and
   that I am not financially interested in this
15  action.
16
   _Kimberly S. Gordon_
17  KIMBERLY S. GORDON, RPR, CCR
   Notary Number: 2165607
18  Notary Expiration: 5/23/2024
   Dated:  FEBRUARY 9, 2021
19
20       (The foregoing certification
21  of this transcript does not apply to any
22  reproduction of the same by any means,
23  unless under the direct control and/or
24  supervision of the certifying reporter.)

216

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason in
6   the appropriate space on the errata sheet for
7   any corrections that are made.
8          After doing so, please sign the
9   errata sheet and date it.
10         You are signing same subject to
11  the changes you have noted on the errata
12  sheet, which will be attached to your
13  deposition.
14         It is imperative that you
15  return the original errata sheet TO THE
16  DEPOSING ATTORNEY within thirty (30) days of
17  receipt of the deposition transcript by you.
18  If you fail to do so, the deposition
19  transcript may be deemed to be accurate and
20  may be used in court.
21
22
23
24

SHANNON L. PHILLIPS

217

```
 1        - - - - - -
           E R R A T A
 2        - - - - - -
 3   PAGE  LINE  CHANGE
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```

218

```
 1
 2        ACKNOWLEDGMENT OF DEPONENT
 3
 4        I,_____, do
 5   hereby certify that I have read the foregoing
 6   pages, 1 - 218, and that the same is a
 7   correct transcription of the answers given by
 8   me to the questions therein propounded,
 9   except for the corrections or changes in form
10   or substance, if any, noted in the attached
11   Errata Sheet.
12
13
14   _____
15   SHANNON L. PHILLIPS        DATE
16
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22
23   _____
     Notary Public
24
```

ELITE LITIGATION SOLUTIONS, LLC

# EXHIBIT B



WELCOME

# PARTNER GUIDE

A Guide  o Your Partner Experie  ce

**U S. Store Edition**

STARBUCKS

STARBUCKS 000001

# HOW WE COMMUNICATE

Starbucks reputation for integrity flows from our steadfast commitment to our core values and principles found in Our Mission: *To inspire and nurture the human spirit—one person, one cup, and one neighborhood at a time.* Starbucks values its partners and depends on them to fulfill Our Mission.

Partners are expected to communicate with other partners and customers in a professional and respectful manner at all times. The use of vulgar or profane language is not acceptable.

Several resources are available to help partners communicate their concerns, provide input about our business practices and report matters that fail to uphold the company's legal, ethical and moral objectives.

## Partner Communication with Manager

Starbucks has created a vital learning community for the sharing of talents, skills, knowledge and personal qualities. We strive to enrich our understanding and culture by focusing on a shared mission and value system. The essence of management development and training is supported by Starbucks acknowledgment that our managers and partners are the company's finest assets.

The most important working relationship a partner will have at Starbucks is the one with his or her manager, who is there for support. To provide that support, managers need to know of any concerns or questions. Partners should talk with their manager if they have any questions, concerns or suggestions regarding their position or responsibilities.

Partners who need to contact the manager during non-working hours should call the manager to talk directly rather than sending a text message.

If a partner's manager is unable to assist, questions may be referred to the district manager (or for store managers, the regional director) or the Partner Resources Support Center at (866) 504-7368.

## Conflict Resolution

Starbucks endorses an atmosphere of mutual respect and support. If a partner experiences a disagreement or conflict with another partner, the partner should first discuss the problem with the other partner and make every effort to resolve it in a respectful manner. If unsuccessful, the partner should seek manager assistance in resolving the matter respectfully and professionally.

The following chart is provided as a reference guide when resolving disputes. Alternatively, partners may at any time report concerns or ask for guidance by calling the Ethics & Compliance Helpline at (800) 611-7792 or starbucks.com/helpline.

STARBUCKS 000042

# EXHIBIT C

# PARTNER ACKNOWLEDGEMENT

By signing below, Partner acknowledges that he or she has received the Starbucks Coffee Company *Partner Guide for U.S. Stores* (the *"Partner Guide"*). Partner further acknowledges that he or she will take the time to thoroughly read and review the *Partner Guide*, that he or she will be expected to abide by its contents, and that his or her failure to uphold the policies and expectations set forth in this *Partner Guide* may result in corrective action, up to and including termination of employment.

Partner additionally understands that:

- The contents of the *Partner Guide* do not constitute a contract of employment or a guarantee of employment for any fixed period of time.

- Partner's employment with Starbucks Coffee Company is at will and may be terminated at any time, with or without notice.

- Starbucks Coffee Company may change its policies, practices and procedures at any time, with or without notice.

- This *Partner Guide* supersedes any and all prior personnel policies or employment handbooks provided to Partner.

Print name __Shannon Phillips__

Signed __Shannon Phillips__

Date __12/13/05__

Partner number _____    Store number _____

Manager: Please send the signed acknowledgement to Partner Shared Services (PSS) in the envelope provided.

JANUARY 2005

STARBUCKS PARTNER GUIDE — U.S. STORES, VERSION 2

# EXHIBIT D

# In The Matter Of:

## *SHANNON PHILLIPS v.*

### *STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY*

---

## *CAMILLE HYMES*
### *January 29, 2021*

---

*Terry Burke Reporting*

*Registered Professional Reporters*

*terryburkermr@gmail.com*

*(215) 205-9079*

Min-U-Script® with Word Index

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 9

1  accordingly.  But obviously I haven't seen
2  those notes as well.  So I'd ask that you put
3  those notes down until a question is being
4  asked, and you need to look at those notes to
5  refresh your recollection, then advise the
6  Court, as well as Kate and I know.
7        THE WITNESS: Okay.
8  BY MS. OELTJEN:
9    Q.  And then the way that will work is
10  preserve those notes as you are looking at
11  them and if you refer to them today, then we
12  will ask that you give them to your counsel
13  and that he get them to us.
14        MR. HARRIS: Sure.
15  BY MS. OELTJEN:
16    Q.  Is that a good plan?
17    A.  It sounds like a plan.
18    Q.  Okay.  So other than that, you don't
19  have anything open on your screen, you are
20  not looking at any information?
21    A.  (Witness shakes.)
22    Q.  Okay, terrific.
23        We can take a break today at any
24  time for any reason.  I promise you that I

Page 10

1  will take breaks periodically without regard
2  to whether or not you ask for one, but today
3  is not intended to be a physically
4  uncomfortable experience for you, so you can
5  let me know that you need a break at any
6  time.  You don't need to let me know why you
7  need the break.  All I ask is that you wait
8  until you finished answering a question and
9  before I get to the next one, just say I'd
10  like to take a break.
11        Does that sound okay?
12    A.  It does.
13    Q.  Okay.
14        I don't want you to answer any
15  question that you don't understand today.  So
16  if I've asked a question that you don't
17  understand or that you need clarification
18  about, please let me know and I will try to
19  provide that clarification or I will ask a
20  better question.
21        If you proceed to answer any of
22  my questions, I am going to assume that you
23  have understood it.
24        Do you understand that?

Page 11

1    A.  Yes.
2    Q.  Is there any reason that you are not
3  able to testify truthfully today?
4    A.  No.
5    Q.  Are you under the influence of any
6  drug, alcohol, or medication that would
7  inhibit your ability to testify truthfully?
8    A.  No.
9    Q.  Are you under the influence of any
10  drug, alcohol, or medication that would
11  inhibit your ability to recall events that
12  occurred in the past?
13    A.  No.
14    Q.  And have you been diagnosed with any
15  medical condition that would inhibit your
16  ability to recall events that occurred in the
17  past?
18    A.  No.
19    Q.  Do you have any other questions of me
20  before we begin?
21    A.  No.
22    Q.  Okay, terrific.
23        Miss Hymes, are you currently
24  employed?

Page 12

1    A.  Yes.
2    Q.  And where are you employed?
3    A.  Starbucks Coffee Company.
4    Q.  And how long have you been employed
5  there?
6    A.  Six years.
7    Q.  And what is your current position?
8    A.  Regional vice president for the
9  Mid-Atlantic retail operations.
10    Q.  And what geographic region, I guess
11  if you could identify it by state, falls into
12  the Mid-Atlantic in Starbucks organization?
13    A.  Pennsylvania, Maryland, Washington,
14  DC, Virginia, North Carolina and South
15  Carolina.
16    Q.  And are you responsible for Starbucks
17  operations in full in each of those states or
18  are you responsible for parts of the states
19  that you listed for me?
20    A.  For Pennsylvania, it's mostly the
21  Philadelphia area.
22        Maryland is fully mine, and so
23  are the other states and the District of
24  Columbia.

Page 9

1 accordingly. But obviously I haven't seen
2 those notes as well. So I'd ask that you put
3 those notes down until a question is being
4 asked, and you need to look at those notes to
5 refresh your recollection, then advise the
6 Court, as well as Kate and I know.
7        THE WITNESS: Okay.
8 BY MS. OELTJEN:
9   Q. And then the way that will work is
10 preserve those notes as you are looking at
11 them and if you refer to them today, then we
12 will ask that you give them to your counsel
13 and that he get them to us.
14        MR. HARRIS: Sure.
15 BY MS. OELTJEN:
16   Q. Is that a good plan?
17   A. It sounds like a plan.
18   Q. Okay. So other than that, you don't
19 have anything open on your screen, you are
20 not looking at any information?
21   A. (Witness shakes.)
22   Q. Okay, terrific.
23        We can take a break today at any
24 time for any reason. I promise you that I

Page 10

1 will take breaks periodically without regard
2 to whether or not you ask for one, but today
3 is not intended to be a physically
4 uncomfortable experience for you, so you can
5 let me know that you need a break at any
6 time. You don't need to let me know why you
7 need the break. All I ask is that you wait
8 until you finished answering a question and
9 before I get to the next one, just say I'd
10 like to take a break.
11        Does that sound okay?
12   A. It does.
13   Q. Okay.
14        I don't want you to answer any
15 question that you don't understand today. So
16 if I've asked a question that you don't
17 understand or that you need clarification
18 about, please let me know and I will try to
19 provide that clarification or I will ask a
20 better question.
21        If you proceed to answer any of
22 my questions, I am going to assume that you
23 have understood it.
24        Do you understand that?

Page 11

1   A. Yes.
2   Q. Is there any reason that you are not
3 able to testify truthfully today?
4   A. No.
5   Q. Are you under the influence of any
6 drug, alcohol, or medication that would
7 inhibit your ability to testify truthfully?
8   A. No.
9   Q. Are you under the influence of any
10 drug, alcohol, or medication that would
11 inhibit your ability to recall events that
12 occurred in the past?
13   A. No.
14   Q. And have you been diagnosed with any
15 medical condition that would inhibit your
16 ability to recall events that occurred in the
17 past?
18   A. No.
19   Q. Do you have any other questions of me
20 before we begin?
21   A. No.
22   Q. Okay, terrific.
23        Miss Hymes, are you currently
24 employed?

Page 12

1   A. Yes.
2   Q. And where are you employed?
3   A. Starbucks Coffee Company.
4   Q. And how long have you been employed
5 there?
6   A. Six years.
7   Q. And what is your current position?
8   A. Regional vice president for the
9 Mid-Atlantic retail operations.
10   Q. And what geographic region, I guess
11 if you could identify it by state, falls into
12 the Mid-Atlantic in Starbucks organization?
13   A. Pennsylvania, Maryland, Washington,
14 DC, Virginia, North Carolina and South
15 Carolina.
16   Q. And are you responsible for Starbucks
17 operations in full in each of those states or
18 are you responsible for parts of the states
19 that you listed for me?
20   A. For Pennsylvania, it's mostly the
21 Philadelphia area.
22        Maryland is fully mine, and so
23 are the other states and the District of
24 Columbia.

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 25

1    A.  Yes.
2    Q.  And sales of approximately a billion
3  dollars annually; correct?
4    A.  Yes.
5    Q.  And you had six direct reports;
6  correct?
7    A.  Yes.
8    Q.  And were those all regional directors
9  that reported to you?
10   A.  Yes.
11   Q.  And then what were the job
12  responsibilities of the regional directors
13  that reported to you?
14   A.  They were responsible for the same
15  framework as I described, which is P&L
16  responsibility, the care and consideration
17  for our partners, our customers.  And then
18  the profitability of the business.
19   Q.  And is it fair to say that each
20  regional director had a subset of the total
21  region that you were responsible for?
22   A.  Correct.
23   Q.  So it would be accurate to say that
24  their responsibilities tracked yours, but

Page 26

1  they had a much smaller area that they were
2  responsible for?
3    A.  Correct.
4    Q.  Okay, so let's flash forward in our
5  discussion to January of 2018.  Does that
6  sound okay?
7    A.  Yes.
8    Q.  Okay.  And in January of 2018, did
9  you have six direct reports?
10   A.  Yes.
11   Q.  And do you recall the names of your
12  six direct reports as of January 2018?
13   A.  I do.  During that time frame, I was
14  shifting and moving and promoting, so this
15  may be inaccurate just for your edification
16  because that was several years ago.  And I've
17  moved a lot of people and promoted and
18  transferred a lot of people, so.
19       If I can recall --
20   Q.  Yep.
21   A.  -- I had -- even at that time in
22  January I might have not had Linda at that
23  point.  So Shannon Philips, Jen Pivarnik,
24  Jeff Danley.  I probably had Phillip Laws in

Page 27

1    DC.  And TJ Wolfersberger.  That makes five.
2  Who am I missing?  I may have had Linda
3  Johnson at the time.  I can't recall in the
4  January, but I do remember her in that year
5  that she was working for me.  So I may have
6  had five and moved to six.  I can't recall.
7    Q.  We are going to look at a lot of
8  documents today, and it is possible that in
9  looking at some of those documents your
10  memory will be jogged as to who your reports
11  were.  So if that happens, just let me know
12  so that we can clarify.
13       Does that sound all right?
14   A.  Sure.
15   Q.  Okay, terrific.
16       And would it be fair to say that
17  you had, between December 1st, 2014 and early
18  2018, you had had the opportunity to assess
19  Shannon Philips' performance in her role?
20   A.  Yes.
21   Q.  And what was your general view of
22  Shannon's performance in that time period?
23   A.  I felt as though she was a strong
24  performer.  Her key performance indicators

Page 28

1  and her metrics were very good.
2    Q.  And when you refer to key performance
3  indicators, what are you referring to?
4    A.  The customer connection scores.  Her
5  sales increases year over year.  Her
6  partner -- and we call employees partners --
7  so her partner metrics in terms of stability
8  was strong.
9    Q.  Anything else?
10   A.  I thought that she was a partner that
11  understood our culture, that was deeply
12  immersed in connecting with our partners, was
13  a developer of talent.
14   Q.  And during that time period -- and
15  again, we're December 1, 2014, to the early
16  part of 2018, and for clarity of the record,
17  everything -- when I say "early," I'm not
18  referring to anything that happened after
19  April 12, 2018, associated with the Spruce
20  Street store in Philadelphia.
21   A.  All right.
22   Q.  During that time period, had you ever
23  had a concern or a thought or received a
24  complaint or any indication that Shannon

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 29

1  Phillips treated employees of different races
2  differently?
3     A. No, that did not come up, even though
4  our partners reached out to our PRO team.  We
5  have discovered after that time period that
6  they had reached out, but the PRO partner
7  that was receiving all of that information
8  passed away, and so the PRO partner
9  unfortunately did not reveal all of the
10  documented complaints that were coming in
11  prior to her passing.
12     Q. Okay, so I want to unpack a little of
13  what you just said to me.
14        So should I understand from your
15  testimony that partners, I will use
16  Starbucks' language, that partners had
17  complained that Shannon Phillips had
18  discriminated against them?
19     A. Yes.
20        MS. OELTJEN: Okay.  And so I'll
21  put on the record that I don't have any
22  documents that refer to that, relate to that,
23  or evidence that, and those certainly would
24  have been implicated by our document request.

Page 30

1  BY MS. OELTJEN:
2     Q. Okay.  And they were about
3  Miss Phillips herself rather than about the
4  region, is that accurate?
5     A. This was with regards to her
6  conversation -- and I don't believe I have
7  any documentation either.  So this is as a
8  result of the conversations that we had with
9  our partners during the time where we had
10  roundtables after April 12th where they had
11  shared that they had reached out to Shannon
12  Philips directly and their district managers,
13  and unfortunately the now deceased Joyce
14  Verino, that they had issued complaints on
15  the lack of opportunities that were being
16  provided to those that were African American
17  and/or those that had special relationships
18  with Shannon Phillips, Paul Sykes and Ben
19  Trinsey.
20     Q. Okay.  So I understand the first part
21  of what you said.  I just want to clarify the
22  last part of what you said.
23        So are you saying that some
24  partners felt that people that had

Page 31

1  relationships with Shannon, Ben, and Paul
2  were treated differently than those who did
3  not, who had those relationships; is that
4  right?
5     A. Correct.
6     Q. Okay.
7        And are you able to identify
8  anyone by name who provided you with this
9  information?
10     A. We instituted roundtables, and in
11  those roundtables they were strictly
12  listening sessions.  And because I cannot
13  refer to my notes, I do recall one that
14  reached out to Rossann to share those
15  complaints specifically.
16     Q. Is that an employee by the first name
17  of Charlie?
18     A. That is another employee.  So
19  there's --
20     Q. Okay.
21     A. There's several that I am aware of.
22        But I can't tell you the name,
23  I'm sorry, if I can't refer to my notes or
24  look it up.

Page 32

1     Q. So I am just trying to understand.
2  So I understand that you told me you had a
3  roundtable and that is when you received this
4  information.
5     A. Multiple roundtables.
6     Q. Okay.
7     A. Weekly roundtables.
8     Q. And did you take notes during those
9  roundtables?
10     A. I did not.
11     Q. Okay.
12     A. The intention was to be present for
13  our partners and to understand and hear what
14  they were saying.
15     Q. And I understand you told me several
16  times that you can't refer to your notes.  Do
17  you believe that the names are in the notes
18  that you created?
19     A. No.  So I have, I believe I have an
20  e-mail from Rossann that has the name of a
21  partner on it.  All of my e-mails were sent
22  for discovery.  So I think there was a scan
23  and that e-mail from Rossann includes
24  Rossann's note that says racial

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 49

1   action.
2     A.  Do you want me to scroll to the
3   corrective action?  I am only looking at the
4   page in which you have open.  So would you
5   like me to continue to read past this page?
6     Q.  Yes.  So you are free to toggle onto
7   the next page, and if you need assistance,
8   just let me know and I can force that onto
9   your screen.
10    A.  So the -- okay.
11        Okay.
12    Q.  Have you had a chance to review the
13  information that appears on 46 and 47 under
14  the green heading of "Performance and
15  Development Processes"?
16    A.  Yes.
17    Q.  And does this, is this consistent
18  with what you told me earlier in your mind
19  about the progressive discipline policy -- or
20  practice -- excuse me -- of Starbucks?
21    A.  Yes.  Specifically the line that
22  says, "In cases of serious misconduct,
23  immediate separation from employment may be
24  warranted."

Page 50

1     Q.  Okay.  And that is a line that you
2   are pulling from -- sorry -- that section
3   appears under "Corrective Action" on
4   STARBUCKS 47, the third paragraph down;
5   correct?
6     A.  Correct.
7     Q.  Okay.  And so it goes on to say,
8   "Examples of serious misconduct include, but
9   are not limited to," and it says "violation
10  of safety and/or security roles"; correct?
11    A.  Along with many others.
12    Q.  Okay.
13    A.  And it is a limited list, yes, of
14  serious misconduct.
15    Q.  Okay.
16        Was Shannon Phillips terminated
17  for misconduct?
18    A.  I would say yes.
19    Q.  And were you involved in the decision
20  to terminate her?
21    A.  I was.
22    Q.  And tell me each and every reason why
23  Miss Phillips was terminated?
24    A.  The primary reason for the separation

Page 51

1   was because Shannon did not have the ability
2   to understand the gravity of the situation.
3   There was multiple examples and evidence of
4   her lack of curiosity, especially during the
5   time after the incident, to understand what
6   the partners were going through.
7         There was, I would say,
8   borderline insubordination when we were
9   asking Shannon to issue a suspension to Ben
10  because numerous allegations had come up with
11  regards to his treatment of his partners.
12        Additionally, during the
13  roundtables that were actually filmed, the
14  one specifically that was filmed and then the
15  subsequent roundtables, either before or
16  after, partners were calling out in distress
17  emotionally on their experience under her
18  leadership.  And as a result of the partners'
19  overwhelming concerns and stated issues, we
20  felt that it was not ideal to have her
21  continue to work in the leadership capacity.
22    Q.  Have you told me all of the reasons
23  why Ms. Phillips was terminated?
24    A.  I think what I shared covers the

Page 52

1   essence.
2     Q.  Well, so I am going to push you on
3   that, Miss Hymes.
4     A.  Sure.
5     Q.  Because I am trying to understand
6   every reason why she was terminated.  So if
7   there is a reason that you haven't shared
8   with me, please do so.  This is the time.
9     A.  This is -- okay.  So may I offer one
10  as an example?
11    Q.  So if it is a reason, I want to hear
12  about it.
13    A.  Yeah.
14    Q.  If it is not a reason, then I don't
15  want to hear about it.  All of the reasons
16  why she was terminated.
17    A.  So it was clear that she was not able
18  to lead her partners in a moment of crisis.
19  Her leadership presence, reaction response,
20  ability to navigate through what needed to
21  occur was not present or evident.  The logic,
22  the ability to take ownership for the way in
23  the manner in which our partners were calling
24  out of the experience that they had under her

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 53

1  leadership.
2          So there was a lack of
3  understanding, a lack of empathy, a lack of
4  action that all came to light during and
5  after the incident that occurred on
6  April 12th.
7      Q.  Okay.  Have you told me all of the
8  reasons why Miss Philips was let go now?
9      A.  I believe so, yes.
10     Q.  Okay.  You referred to one of the
11 partner roundtables being filmed?
12     A.  Yes.
13     Q.  Tell me, when you say "filmed," do
14 you mean it was video recorded?
15     A.  I believe -- I don't know if it was
16 video recorded, but it was broadcasted.
17     Q.  And so does a recording of that exist
18 today?
19     A.  I do not know.  I know it was
20 broadcasted, so we had a roundtable --
21 actually, it was an auditorium of partners
22 that came in to express what they were
23 feeling, what concerns they had.  The
24 individuals that were participating were some

Page 54

1  of the local leaders and all of the partners
2  that were in the market that decided to
3  partake.  And then on the other coast in
4  Seattle, there were executive leaders and key
5  stakeholders in the room to listen to the
6  conversation as it unfolded.
7      Q.  Were you present?
8      A.  I was.
9      Q.  And were you present in Philadelphia
10 or in Seattle or somewhere else?
11     A.  In Philadelphia.
12     Q.  And you said it was an auditorium?
13     A.  Yes.
14     Q.  Where was it?
15     A.  I can't remember the name of the
16 intersection.  So it was, it was inside of --
17 we have a store and I don't recall the
18 intersection.  I'm sorry.
19     Q.  That is okay.  Are you able to
20 otherwise identify for me where in
21 Philadelphia the -- I understand you can't
22 tell me the exact intersection.
23     A.  No.
24     Q.  Was it at the Spruce Street store?

Page 55

1      A.  No, it was not.
2      Q.  Was it at the 34th Street store?
3      A.  Yes.
4          Sorry, I can't refer to my notes,
5  so I apologize.  This was many years ago.
6      Q.  About how many people attended in
7  Philadelphia?
8      A.  For that conversation?
9      Q.  Yes.
10     A.  I would say somewhere in the ballpark
11 of 30.
12     Q.  And you said there were local leaders
13 present, is that accurate?
14     A.  Yes.
15     Q.  And who falls into the category of
16 local leaders?
17     A.  Myself, the district managers.
18 Michael Scott, who at the time was operating
19 in the capacity of a regional ops coach, I
20 believe.  I think that was his title back
21 then.
22          And there was an absence of
23 Shannon Phillips for the early stages of that
24 meeting as she was late.

Page 56

1      Q.  And did any -- so I count one, two,
2  three, four, five, about five local leaders,
3  so I am counting you, the two district
4  managers, Michael Scott and Shannon Phillips.
5  I get five.  Does that sound about right to
6  you?
7      A.  I'm sure there were others.  I don't
8  know if we had -- I think Nathalie Cioffi who
9  was in PRO was in France.  But we may have
10 had a PRO leader there, but I can't recall.
11     Q.  Was Ebony Johnson, do you know if she
12 was there?
13     A.  Yes.  She may have been there, but I
14 don't recall.
15     Q.  Okay.  And so of the about 30 people,
16 somewhere between five and six were local
17 leaders and were the rest employees below the
18 store manager level or were there some store
19 managers there as well?
20     A.  I believe there were store managers
21 there, but mostly hourly partners.
22     Q.  Okay.
23          And was Miss Philips mentioned by
24 name by any hourly partner that you can

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 57

1 recall?
2    A.  I don't recall.
3    Q.  And did anyone make a specific
4 complaint or accusation or otherwise express
5 anger at Miss Philips during that roundtable?
6    A.  They referred to their experience,
7 lack of positive experiences as a result of
8 the leadership in the market.  The lack of
9 understanding to the experiences that they
10 had, their desire to be heard, their desire
11 for equity and inclusion.
12       So it was an inference to the
13 leaders that were leading the market.
14    Q.  And that would include you; right?
15    A.  Correct.
16    Q.  Okay, so we started down that path
17 because you had told me that you believed
18 Miss Phillips was terminated for misconduct.
19       Do you recall that?
20    A.  For -- yes.
21    Q.  So then you took me through all the
22 reasons why she was terminated.
23    A.  Uh-huh.
24    Q.  In your mind, are all of those

Page 58

1 reasons equivalent to misconduct or is there
2 one or two or three particular things that
3 rose to the level of misconduct in your mind?
4    A.  Yes.  So I can go to that specific
5 example where it was -- that was probably one
6 of the most important meetings to be present
7 and to lead through.  And Mrs. Phillips was
8 extremely late for that meeting and was not
9 able to -- did not receive those partners as
10 they were coming in.
11       She shared with me that she had a
12 digestive issue, and I was concerned because
13 when she was late I called and her voice
14 indicated as if she was just waking up.  She
15 had ample opportunity to call me in advance
16 that she would be missing from being present
17 with her partners leading up to the meeting,
18 but she did not.
19       I would say that that is a very
20 clear example of misconduct in terms of being
21 available to partners or communicating in
22 advance of being late for a very important
23 meeting, as a very small example.
24       To continue, when she arrived,

Page 59

1 she was in the corner and did not engage with
2 our partners.  There were several leaders --
3 well, actually one specifically, where I had
4 a conversation in the concern in which her
5 leadership presence was being demonstrated.
6       Where our partners needed to see
7 strength to feel as though their comments
8 were important, we actually had to pivot,
9 because it is the expectation of the leader
10 to kick off the meeting and welcome the
11 partners.
12       And so Michael Scott specifically
13 and I conferred that since Shannon was
14 incapable in the moment to lead, that he
15 could kick off the meeting and I would
16 facilitate the conversation.
17       Shannon remained in the corner
18 for the entire duration of the meeting, and
19 then following the meeting, I actually had to
20 pull her aside.
21       So what our partners needed to
22 hear in that moment was I'm sorry, I hear
23 you, and we are going to fix it, and that
24 should come from the local leader.  And in no

Page 60

1 instance was she able, capable, willing or
2 demonstrating any of that.
3       So after that conversation, I
4 pulled her aside to ask her to take some time
5 off because it was evident she was unable to
6 lead.  I'm still -- I apologize, I'm still
7 shaking because that was probably one of the
8 most critical moments and when our partners
9 were literally physically crying and upset
10 and comforting one another, and she was not
11 able to stand up as a leader and emotionally
12 deal with what they were going through.
13    Q.  She had told you that she wasn't well
14 that day; correct?
15    A.  When she arrived she said that her
16 digestive issue was fine.
17    Q.  And did she share with you, there's
18 a -- do you know a gentleman by the name of
19 Reggie who was involved in the events around
20 the arrests in Philadelphia?
21    A.  Yes.  He was in public affairs.
22    Q.  Okay.  And did Miss Philips also
23 share with you that she had been taking calls
24 from him at 3:30 in the morning, I guess that

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 121

1  you can see, all of the notes that were
2  coming down were to sort of outline a story
3  of drug abuse and, you know, sort of this
4  narrative of -- the narrative that was being
5  created based on what Shannon was sending me
6  was the narrative that there was some sort of
7  hostility or aggression that was happening in
8  the store to prompt Holly to call the police.
9        And this is April 14th. So this
10  is, again, through the discovery of having
11  the conversations and then realizing that
12  this, this is not the context for which this
13  situation occurred.
14    Q. Okay. So I just want to back up a
15  little bit.
16        So other than forwarding
17  information to you, have you seen a document
18  where you felt that -- that you felt
19  demonstrates that Shannon Phillips herself
20  was trying to create a narrative to explain
21  what happened with Holly?
22    A. That is correct.
23    Q. What document is that?
24    A. I'm sorry, say that one more time?

Page 122

1    Q. So I am asking you, so I see these
2  e-mails, and to me they are Shannon
3  forwarding information to you relevant to the
4  market. Right? And you have described that
5  as Shannon creating a narrative.
6        So I am trying to understand what
7  are you looking at when you are saying
8  Shannon was trying to create a narrative to
9  support Holly calling the police?
10    A. I'm just going to -- I'm not exactly
11  sure, and with all due respect, I'm not
12  exactly sure of the question.
13    Q. That is fine. I don't interpret it
14  as disrespectful when you are saying you
15  don't understand my question.
16    A. Okay.
17    Q. So I will ask it a different way.
18    A. Okay.
19    Q. Is it fair to say that you received
20  this information from Shannon and you
21  understood that information to be Shannon
22  trying to offer a narrative to explain why
23  Holly may have called the police?
24    A. Yes.

Page 123

1    Q. Have you ever heard Shannon Phillips
2  say that it was appropriate that Holly called
3  the police?
4    A. No.
5    Q. And are you aware that she was asked
6  at her deposition whether or not she would
7  have called the police herself and she
8  answered, in my opinion, emphatically that
9  she would not. Does that surprise you?
10    A. That does not surprise me.
11    Q. So I am just trying to understand are
12  you intending to infer that Shannon was
13  trying to falsely create the impression to
14  support Holly's story by providing inaccurate
15  or otherwise false information?
16        MR. HARRIS: Objection to that
17  characterization, but you can answer.
18        THE WITNESS: Okay.
19        Absolutely not infer. Shannon's
20  integrity in terms of sharing the truth.
21        I was sharing that we were
22  building context for understanding to, number
23  one, help our partners understand what was
24  going on. To be able to explain to local

Page 124

1  leadership. And then also to the media.
2        So this truly is to allow for
3  others to understand the context in which
4  this event occurred.
5        So just so that if I were to, for
6  the record, share that she was being
7  distrustful, I would say that directly.
8  BY MS. OELTJEN:
9    Q. Okay, perfect.
10        And you never found Shannon to be
11  untrustworthy?
12    A. No.
13    Q. And have you ever known Shannon to
14  lie?
15    A. I have suspected that in some
16  instances I was not getting the full truth.
17    Q. Have you ever understood that Shannon
18  was telling you something that was not true?
19    A. Yes.
20    Q. And when was that?
21    A. When she would show up late to
22  meetings.
23    Q. And how often would Shannon show up
24  late to meetings?

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 85

1    A. I do.
2    Q. So we've discussed Mr. Sykes and
3  Miss Philips. Who is Ronda Knight?
4    A. She was an asset and protection
5  manager for Starbucks.
6    Q. And how about Frank Adams?
7    A. Frank Adams was, I believe, covering
8  for Nathalie at the time in PRO.
9    Q. When you say "PRO," are you referring
10 to human resources?
11   A. Yes, uh-huh.
12   Q. And who is Melanie Keen?
13   A. Partner resources.
14   Q. Okay. And Mr. Borges writes to you,
15 "Thank you for the partnership, Camille.
16      "It appears the story hasn't
17 gained any traction.
18      "I do want to make sure we
19 connect with local PD and gather any details
20 possible from them.
21      "Ronda: Are you able to connect
22 with Phila PD?"
23      Have I read that correctly?
24   A. Correct.

Page 86

1    Q. So based on this e-mail is it fair to
2  say that as of Friday morning, April 13th,
3  the social media group at Starbucks was of
4  the opinion that the story was not widely
5  circulating?
6    A. Correct.
7    Q. It is kind of funny to look at that
8  now. Right?
9      Okay, so and at this point you
10 had not had a conversation with Mr. Kelly, is
11 that accurate?
12   A. That is accurate.
13   Q. Okay.
14      At the time that you had received
15 that last e-mail -- so we are looking at the
16 early morning hours of Friday, April 13th --
17 and feel free to look at your calendar to
18 orient you to time and place, so to speak --
19 had you had any conversation with anyone in
20 the Philadelphia market other than Shannon
21 Phillips?
22   A. I don't recall.
23   Q. And --
24   A. I'm so sorry, it has been so long so

Page 87

1  I apologize. I can't recall.
2    Q. That is fine. If you don't recall
3  today, I just ask that you let me know that.
4  You don't need to apologize.
5    A. Yeah.
6    Q. Do you recall between April 12th and
7  April 13th discussing with Shannon any action
8  that needed to be taken with regard to the
9  individual who had called the police?
10   A. I do not recall.
11   Q. And did you know as of April 12th
12 when you spoke to Shannon who the store
13 manager was in the 18th and Spruce store?
14   A. Yes.
15   Q. And that is a woman by the name of
16 Holly Hilton; correct?
17   A. Correct.
18   Q. And as of April 12th, anyway, did you
19 have any concern that Miss Hilton had
20 violated company policy in calling the
21 police?
22   A. I don't recall any conversation that
23 I had on that day. I'm sorry.
24   Q. And in general, does Starbucks keep a

Page 88

1  record of calls to the police by location?
2  So meaning if I wanted to know how often the
3  police were called in 2018 to the Spruce and
4  18th Street store, is that a record that
5  Starbucks keeps?
6    A. No, not to my knowledge.
7    Q. To your knowledge in 2018, up to
8  April 12th, had the police been called to any
9  other stores in your area, in the big area
10 that you are responsible for?
11   A. I am certain that the police have
12 been called in the past. Specifically in the
13 area of drug overdoses in our restrooms.
14   Q. And is that a uniquely urban store
15 problem?
16   A. Yes, yes, I would say -- well, I
17 mean -- I would say so, yes. In areas where
18 there is high usage. So urban areas, yes.
19 But I'm sure that's not exclusive.
20   Q. Sure. So you may see some in
21 suburban areas, but you are more likely to
22 see problems associated with drug use in
23 cities; correct?
24   A. Yes.

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 93

1   A.  No.
2   Q.  And do you know what the video was
3   that led to the shift in approach?
4   A.  I do not.
5   Q.  Okay.  So now we have covered a bit
6   of April 12th and we are on April 13th.  On
7   either of those days, had Shannon done
8   anything either affirmatively or by failing
9   to do something that in your mind was a cause
10  for termination?
11  A.  No.
12  Q.  And so would it be fair to say that
13  as of Friday, April 13th, you did not think
14  that the events at the Spruce and Locust --
15  I'm sorry, at the Spruce and 18th store were
16  going to blow up, so to speak, or garner the
17  attention that it ultimately did?
18  A.  No.
19       (Phillips 6 was marked for
20  identification.)
21  BY MS. OELTJEN:
22  Q.  Miss Hymes, I am going to try to show
23  you things as chronologically as I can, but
24  this is still Friday, April 13th, but it is

Page 94

1   going to be back to the morning hours.
2   A.  Okay.
3   Q.  So you should have Phillips 6 in
4   front of you.
5   A.  I do.
6   Q.  Okay.  And this is a single page --
7   I'm sorry, a two-page document, the first
8   page bears the stamp of STARBUCKS 323.
9        Is that the document that you
10  have?
11  A.  Yes.
12  Q.  Okay.  And is it fair to say that in
13  part in this e-mail exchange Miss Phillips
14  has provided a recap of an incident involving
15  police at the Philadelphia Starbucks?
16  A.  She provided a recap of the police?
17  Q.  I'm sorry, she provided a recap of an
18  incident involving the police at Philadelphia
19  Starbucks?
20  A.  Yes.
21  Q.  And you respond to her recap by saying
22  "Outstanding recap...thank you."
23  A.  Correct.
24  Q.  Okay.

Page 95

1        I am just looking for a spot to
2   put the sticker that isn't going to cover up.
3   Here we go.
4        (Phillips 7 was marked for
5   identification.)
6   BY MS. OELTJEN:
7   Q.  All right, so you should have in
8   front of you Phillips 7, which, again, is
9   another e-mail chain.  If you look at the
10  first page you should see the Bates stamp
11  STARBUCKS 919.
12       Is that the document that you
13  have in front of you?
14  A.  Yes.
15  Q.  Okay.  So why don't you take a moment
16  to review this document and let me know when
17  you are ready to answer some questions.
18  A.  Okay.
19       (Pause.)
20       Okay.  Is there more?  Wait,
21  there might be more.
22  Q.  There are three pages, ma'am.
23  A.  (Pause.)
24       Yeah.

Page 96

1        (Pause.)
2        Okay.  I am finished.
3   Q.  You are ready, okay.
4        So first I have a question for
5   you that you may not know the answer to, but
6   if you look on the first page of this
7   document, you see an April 14th, 2018,
8   12:05 a.m. from John Kelly.  And then if you
9   look at the response above, it is actually
10  dated the day prior at 9:28 p.m.
11       Do you see that?
12  A.  I do.
13  Q.  So do you think this is a function of
14  one employee being in Seattle and on Seattle
15  time and another employee being on the East
16  Coast on East Coast time?
17  A.  I don't know.
18  Q.  Okay.  Do you know where John Kelly
19  is based out of?
20  A.  John Kelly is based out of Seattle.
21  Or was.
22  Q.  Okay.  And you would certainly agree
23  with me that the e-mail from Paul Sykes that
24  appears at the top of Phillips 7 is

Page 105

1　in Starbucks locations was something that was
2　impacting the Philadelphia market?
3　　A.  Yes, uh-huh.
4　　　　　(Phillips 10 was marked for
5　identification.)
6　BY MS. OELTJEN:
7　　Q.  So Miss Hymes, this is Phillips 10.
8　This, again, is an e-mail.  It should be six
9　pages long, the first page of which is
10　STARBUCKS 885.
11　　　　　Is that the document that you
12　have on your screen?
13　　A.  Yes.
14　　Q.  Just take a moment to scroll through.
15　I am not going to ask you questions at
16　granular level of detail, but do whatever you
17　need to do to answer some questions on this
18　document.
19　　A.  Yes.
20　　Q.  Can you tell me generally what is
21　plaintiff -- I'm sorry, Phillips 10?
22　　A.  It is an e-mail from 2017 and it
23　highlights the methadone clinics and the
24　shelters that surround our stores in the

Page 106

1　city.
2　　Q.  And if we look at the top of
3　Phillips 10, it is actually an e-mail from
4　Saturday, April 14th, 2018, at 6:36 a.m. from
5　Shannon to you forwarding a 2017 exchange;
6　correct?
7　　A.  Correct.
8　　Q.  Okay.  And is there -- if you are
9　Starbucks -- I'm just trying to
10　understand this -- if you are in your
11　position or Shannon's position at Starbucks,
12　why is it important to know where methadone
13　clinics are located?
14　　A.  I believe that based upon Holly's
15　recollection of why she called the police on
16　two African American males, was because she
17　felt threatened.  And as a result of that,
18　the narrative that Shannon was building in
19　terms of a reason for Holly to call the
20　police was because there was concern of a
21　risk or threat by these two young men.
22　　　　　So what I believe Shannon's
23　intention was was to create the narrative in
24　support of the store manager.

Page 107

1　　Q.  Okay.  So you mentioned Holly.  So
2　let's talk about Holly Hilton.  Holly is no
3　longer employed by Starbucks; correct?
4　　A.  No.
5　　Q.  Was it her choice to go or was it
6　Starbucks's choice that she would go?
7　　A.  She was let go.
8　　Q.  And what was her reason for being let
9　go?
10　　A.  The primary reason is because we
11　were, in our efforts to conduct an
12　investigation, we found racist comments in
13　her social media that was very disparaging
14　towards African Americans.
15　　　　　Subsequently, in reviewing the
16　videotape, we noticed that the two men that
17　were in the store were in the store for less
18　than two minutes before she elected to call
19　the police.
20　　Q.  So did Starbucks reach a conclusion
21　that Holly Hilton was racist?
22　　A.  I don't think that she was separated
23　based on what Holly was or wasn't in terms of
24　her unconscious bias.  In fact, I know that's

Page 108

1　not the case.
2　　　　　The separation for Holly was
3　based on extremely poor decision making.
4　　Q.  Then you referenced -- so let me make
5　sure I understand.  Holly was let go for
6　extremely poor decision making in connection
7　with --
8　　A.  Go ahead.
9　　Q.  -- it was her decision to call the
10　police on the two individuals who were in the
11　store at 18th and Spruce; correct?
12　　A.  Correct.  And also, she shared that
13　she was getting death threats and her family
14　was being called.  And so we felt like the
15　best scenario for her was to separate.
16　　Q.  Did Starbucks pay her any money to
17　go?
18　　A.  I do not know.
19　　Q.  In connection with any fears that
20　Holly articulated that she had about her own
21　life, did Starbucks do anything to ensure her
22　safety?
23　　A.  The conversations that happened
24　outside of business operations were between

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 141

1  they lawyers that represent the company or --
2          MR. HARRIS: They are both lawyers,
3  Kate.  For the record, they are both lawyers.
4          MS. OELTJEN: That's fine.  Thank
5  you.
6          Rich, are you going to make a
7  representation as to whether or not they work
8  in the legal department or acting as lawyers?
9          MR. HARRIS: I can't make that
10  representation, but they are both lawyers.
11          MS. OELTJEN: Okay.
12          (Phillips 17 was marked for
13  identification.)
14  BY MS. OELTJEN:
15      Q.  Okay, Plaintiff's Exhibit 17 should
16  be on your screen.  You should have STARBUCKS
17  3217.  It is a two-page document, so it
18  continues to STARBUCKS 3218.
19      A.  Okay.
20          Is there a -- I can answer the
21  question, but is there a way we can take a
22  break?  It's two o'clock and we're on
23  Exhibit 17 and I'm sorry, I'm getting a
24  little fatigued.

Page 142

1      Q.  Okay, we can definitely take a break.
2      A.  Okay.  Do you want to do that before
3  you ask me the question or --
4      Q.  I haven't asked a question so we can
5  take a break.
6      A.  Okay.  Is ten minutes --
7          MR. HARRIS: 15.
8          THE WITNESS: 15 minutes work for
9  everyone?
10          MS. OELTJEN: Yes.
11          THE WITNESS: Or ten minutes?
12          MR. HARRIS: That's fine.
13          VIDEO SPECIALIST: 1:59, we are
14  off the record.
15          (Recess.)
16          VIDEO SPECIALIST: The time is
17  2:21.  We are back on the record.
18  BY MS. OELTJEN:
19      Q.  Okay, Miss Hymes, we are back.  And I
20  had shown you before the break Phillips 17.
21          Is that the document that you
22  have in front of you?
23      A.  Yes.
24      Q.  Simple question for you here, can you

Page 143

1  just tell me what this is?
2      A.  This is a partner communication to
3  all non-store partners on the current state
4  of the Philadelphia incident.
5      Q.  And what do you mean when you
6  say "all non-store partners"?
7      A.  So these are partners that support
8  our employees in the store, so this would be
9  administrative staff, executives.  District
10  manager and above, for the most part,
11  employees.
12          (Phillips 18 was marked for
13  identification.)
14  BY MS. OELTJEN:
15      Q.  So Phillips 18 should be in front of
16  you.  I am just moving the exhibit sticker so
17  it is not covering any words.
18          This is a two-page document.  You
19  should have STARBUCKS 1728 to 1729.
20          Is that what you have in front of
21  you?
22      A.  Yes.
23      Q.  Okay.  Could you take a moment to
24  review this document and let me know when you

Page 144

1  are ready to answer some questions.
2      A.  (Pause.)
3          Okay.
4      Q.  Can you tell me what this document
5  is, please?
6      A.  It is a note to Shannon so that she
7  can see the media activity that is happening.
8  And then also reinforcement of my support.
9      Q.  And is what you write to Shannon on
10  Sunday, April 15th, 2018, at the top of
11  Phillips 18, is everything in here accurate
12  and reflecting how you felt at the time that
13  you wrote the e-mail?
14      A.  Yes.
15      Q.  And had Shannon done anything to
16  disappoint you in connection with the events
17  at the Philadelphia store as of the time that
18  you wrote this e-mail?
19      A.  No, no.  No.
20          (Phillips 19 was marked for
21  identification.)
22  BY MS. OELTJEN:
23      Q.  What is in front of you is Phillips
24  19.  This is a two-page document.  The first

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 145

1 page is 1720, STARBUCKS 1720.  Excuse me.
2 And the second page is 1721.
3        Is that the document that you
4 have in front of you?
5    A.  Yes.
6    Q.  Could you take a moment to review it
7 and let me know when you are ready to answer
8 a question?
9        MR. HARRIS: I apologize, Kate.
10 I got knocked out of the document platform so
11 I am going to try to get back in.
12        MS. OELTJEN: Okay.
13        THE WITNESS: Okay, I reviewed
14 it.
15 BY MS. OELTJEN:
16    Q.  I am just going to wait until your
17 counsel is able to look at it before I ask
18 you a question.
19    A.  Okay.
20        MR. OELTJEN: Are you there?
21        MR. HARRIS: I am there.  Thank
22 you.
23        MS. OELTJEN: Okay.
24 BY MS. OELTJEN:

Page 146

1    Q.  Can you tell me what this is, please,
2 Miss Hymes?
3    A.  Is a tick tock for Kevin's visits to
4 Philadelphia.
5    Q.  And Kevin is?
6    A.  The CEO of Starbucks.
7    Q.  And what is a tick tock as that
8 phrase is used within the Starbucks
9 organization?
10    A.  It's a timeline.
11    Q.  Okay.
12    A.  Of activity.
13    Q.  And if you look at the tick tock, I
14 see Sunday and Monday, but I don't see a
15 month and day by number rather than day of
16 the week.
17        Do you agree?
18    A.  Yes.
19    Q.  And do you recall when the CEO of
20 Starbucks came into Philadelphia?
21    A.  Not off of the exact top of my head
22 because I can't refer to my note.  But I do
23 believe it is that Sunday, the 15th.
24    Q.  Okay.

Page 147

1    A.  I'm pretty sure it was the 15th
2 because they came very quickly.
3    Q.  Okay.
4    A.  After reviewing the videotape to see
5 that the Donte and Rashon had only been in
6 the store for two minutes.
7    Q.  And how did -- when did you learn
8 that it had only been two minutes?
9    A.  Prior to their arrival.
10    Q.  And so -- I'm sorry.  I thought you
11 had finished.
12    A.  No.  Prior to their arrival.  We had
13 gone through that discovery, I would say,
14 that weekend.
15    Q.  Okay.
16    A.  And had reviewed tape.
17    Q.  Okay.  And do you recall ever sharing
18 with Shannon or being in Shannon's presence
19 when she should have or would have learned
20 that the gentleman had only been in the store
21 for two minutes?
22    A.  I'm quite certain that she was
23 informed.
24    Q.  Okay.

Page 148

1        And what leads you to say you're
2 quite certain?
3    A.  Because it was a part of every single
4 conversation we had once we learned that
5 those men, there was no hostility towards the
6 partner.  There should not have been a need
7 for threat.  And so we had to go through
8 understanding what actually took place.  So
9 continued discovery.
10    Q.  Okay.
11        (Phillips 20 was marked for
12 identification.)
13 BY MS. OELTJEN:
14    Q.  Miss Hymes, Phillips 20 should be on
15 your screen.  This is STARBUCKS 1717.
16        Is that what you have?
17    A.  Yes.
18    Q.  Okay.  Why don't you take a moment to
19 review this and then I will have a question
20 or two.
21    A.  I read it.
22    Q.  Okay.
23        Is this an e-mail from you to
24 Shannon Phillips, Paul Sykes, Benjamin

Page 157

1  of receiving this e-mail?
2    A.  No.
3    Q.  Okay.  But it is intended to be a
4  positive message to you and Shannon; correct?
5    A.  Yes.
6    Q.  And she includes a Rudyard Kipling
7  poem; right?
8    A.  Yes.
9    Q.  And there is irony there; right?  I
10  will withdraw that.
11      Okay.  Go ahead, did you have
12  something to add?
13    A.  I'm not exactly sure of the irony.
14    Q.  I withdrew it, Miss Hymes.  I
15  withdrew it.  You don't have to address it.
16    A.  Yeah.  At this time I was not reading
17  e-mails.  I was taking care of our partners.
18  So I apologize.  These notes that were coming
19  in, I was wholly focused on what was going on
20  with our partners at this time.  So I
21  apologize.
22    Q.  I withdrew my comment and it was
23  really related to the author of the poem, not
24  to you.

Page 158

1    A.  Okay.
2      (Phillips 25 was marked for
3  identification.)
4  BY MS. OELTJEN:
5    Q.  So if you look at Phillips 25, which
6  should be on your screen.  This is STARBUCKS
7  823.
8    A.  Okay.
9    Q.  It is a single page e-mail dated
10  Thursday, April 19th, 2018.
11      Is that what you have there?
12    A.  Yes.
13    Q.  Okay.  And at this point in time, had
14  there been additional protests or
15  demonstration activity at the 18th and Spruce
16  Street store?
17    A.  Yes.
18      So there was activity that
19  Saturday, which -- let me go back to that
20  calendar that you sent.
21      Saturday the 14th was a small
22  protest.  A larger protest on Sunday.  Two
23  protests on Monday, the 16th.  And then the
24  Omega protest was on the 22nd.

Page 159

1    Q.  And to what organization are you
2  referring when you say "the Omega protest"?
3    A.  Omega Psi Phi, which is an African
4  American fraternity.
5    Q.  And with any of those protests, did
6  the people come into the store?
7    A.  Yes.  We actually went to go visit
8  the protesters before the protest so that we
9  could have a conversation with them to
10  understand and listen to their concerns.
11      We asked for them to try to find
12  a reconciliation, and based on the
13  conversations that we had in the hotel room,
14  we ended up in the store after the protest
15  with coffee and had connection as our stores
16  were intended.
17    Q.  Is that with the one particular
18  organization that was protesting or was that
19  with every group or individual that came to
20  protest?
21    A.  Primarily the leaders of the Omega
22  Psi Phi fraternity.
23    Q.  Okay.
24      So Phillips 25 refers to Shannon

Page 160

1  being in the store with Paul over the
2  weekend.  Do you see that where he writes,
3  "I'm sure Shannon will be here supporting"?
4    A.  Yes, I see that.
5    Q.  Okay.  And so now we are on Thursday,
6  April 19th.
7    A.  Uh-huh.
8    Q.  Had Miss Phillips either done or
9  failed to do something at this point that
10  resulted in you being unhappy with her
11  performance?
12    A.  No.  The concerns didn't really begin
13  until maybe around this time where we started
14  to see evidence of a lack of leadership and
15  command in the store.  Small evidence.  And
16  the partner complaints had not started to
17  funnel in as a result of the roundtables
18  until probably the 23rd.  So I would say, as
19  I can recall, there were hints and glimmers
20  of concerns, but not anything that would lead
21  me to separation.
22      (Phillips 26 was marked for
23  identification.)
24  BY MS. OELTJEN:

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 165

1  might have gaps.
2      Q.  It refers to "Angela to remain the
3  SM," and it says "8th and Bruce," but should
4  we understand that to be "18th and Spruce"?
5      A.  Yes.
6      Q.  Okay.  And who is Angela?
7      A.  Angela Grass is the store manager
8  that was at, I want to say, 18th and Market.
9  And so when Holly was let go, she took over
10  the store.
11     Q.  And so since -- are you able -- if
12  this e-mail is dated Thursday, April 19th,
13  and it is referring to Angela to mean at 18th
14  and Spruce, is it fair to assume that by this
15  time Miss Hilton had been let go from the
16  organization?
17     A.  I don't know the date at which we
18  separated Holly.  So she may have just been
19  removed for her personal safety, mental
20  health, that type thing.  So I don't know the
21  date in which that happened.
22     Q.  Okay, that's fine.  And under
23  "Operations," there are some other tasks that
24  are assigned to Shannon; correct?

Page 166

1      A.  Yes.
2      Q.  Okay.  And then under "Leadership" it
3  says, "Do partners exhibit excellence?"  And
4  under that it says "Assess talent and
5  capability of partners at all levels,"
6  and "Create people plan for Area 71"; is that
7  right?
8      A.  Yes.
9      Q.  And that looks like that was assigned
10  to you, that task?
11     A.  Yes.
12     Q.  So what did you do in connection with
13  that task of assessing talent and capability
14  of partners at all levels?
15     A.  The primary assessment of talent is
16  the partner feedback.  So really
17  understanding what has been your experience
18  at Starbucks.  Where do you feel like you
19  have been developed.  Where do you feel like
20  there are shortfalls.  What would you say
21  about your leader.  To get a very clear
22  picture of what it is to work for Starbucks
23  specifically and then the impact of the
24  leader.

Page 167

1          And that's what I was referring
2  to in terms of the roundtables that started
3  on, around the 23rd, and they actually did
4  not, they were not complete by the 30th.
5          But based on what my findings
6  were and what I was sharing, that's when we
7  scheduled the roundtable with Seattle, so
8  that Seattle could understand what I was
9  taking in.
10     Q.  Okay.  So I believe you told me that
11  you thought -- I can't remember what
12  descriptor you used -- but my understanding
13  was there were lots of roundtables, is that
14  accurate?
15     A.  Yeah.  Some formal, some informal.
16     Q.  Okay.
17     A.  So some were, like the exhibit that
18  you showed earlier where there was the block
19  for the two days --
20     Q.  Uh-huh.
21     A.  -- that is the result of our partners
22  reaching out in distress and us to go visit
23  to talk to those partners to find out the
24  relevance, the authenticity of it, any

Page 168

1  evidence, anything that they could share from
2  their perspective on their experience as a
3  partner.
4          So the roundtables were either
5  formal in nature, which were typically held
6  in the basement of 18th and Spruce.
7  Sometimes they were held in other stores.  As
8  I mentioned, I think the 34th and Walnut was
9  the other store that was in more of an
10  auditorium format.
11         And then there were literally
12  one-on-ones that the partner was so
13  distressed that we would take them outside of
14  the store and have conversations that would
15  be either at the -- some included Rossann,
16  who was my boss's boss.
17     Q.  And that is Rossann Williams?
18     A.  Yeah.
19         So that's what we mean by
20  leadership and demonstration of excellence.
21     Q.  Okay.  So let's break that down a
22  little bit.
23         First of all, I am trying to
24  understand the type of feedback you were

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 169

1  getting. So I certainly understand that you
2  want me to know that partners were
3  distressed.
4        Was there ever a partner who came
5  to you and said, used Shannon Phillips' name
6  and pointed to a specific failing or action
7  on her part that was the nature of causing
8  their distress?
9  A. Maybe if I could break it into
10 categories of the complaints that they had
11 for the local leadership either at the
12 district manager or at the RD level.
13       The one that stood out the
14 greatest was this idea of favoritism. So
15 there was a perception in the group that
16 Shannon had special relationships with some
17 partners over others.
18       So it's interesting that you pull
19 out the documents because those are the
20 individuals that they would say Shannon had
21 the special relationships with. So there was
22 a differentiated experience with Shannon for
23 those partners in which she was either close
24 personally or professionally. Sleepovers at

Page 170

1  the house. Now, again, I don't have evidence
2  of that, but the perception of a leader is
3  important.
4        And then there were others who
5  felt as though there was an absence in
6  leadership. So store managers would say that
7  there was many times where Shannon would be
8  scheduled to visit, those visits would be
9  canceled. There was a particular sort of
10 perception that if it rained, Shannon would
11 cancel, they would already know to adjust
12 their schedules.
13       There were visits to specific
14 store managers more than other store
15 managers. There would be opportunities for
16 promotion based on the relationships that she
17 and the district managers had based on their
18 personal relationships that were perceived to
19 be greater than those that were not.
20       So there was polarities between
21 the partners in the exhibits that you showed
22 me specifically to the partners that were
23 sharing their concerns.
24       In terms of patterns, they were

Page 171

1  all over the board, but for the most part, it
2  was the African American community that would
3  share.
4        There were also practices that
5  were happening in the market that would
6  affect the effectiveness and excellence where
7  partners would say, well, there was an
8  unwritten rule. Paul and Ben worked on the
9  opposite sides of Broad Street. So there was
10 an unwritten rule that talent couldn't be
11 exchanged across the streets.
12       And so partners would be
13 struggling with staffing the stores to serve
14 the customers, and for whatever reason
15 partners, either from a promotional
16 standpoint or to move over, whatever, extra
17 hours, were not allowed to cross Broad
18 Street. This was a perception in the market
19 that was toxic from a unification and
20 community standpoint.
21       Furthermore, there was one
22 particular instance where partners were
23 sharing that some of the work that they were
24 doing in a store -- I can't remember the name

Page 172

1  of the store -- but it will come to me --
2  where they were being paid to volunteer at
3  different facilities like YouthBuild out of
4  the funds from the store P&L.
5        So again, the perception -- and
6  then going to look at, I think it was 1201
7  Market Street, I believe it was, where we
8  always had a high labor, couldn't figure it
9  out. I would always ask like what is going
10 on because the labor was really out of line.
11       And the answer came back that we
12 would just add more labor because of the
13 demand, but what we were finding through the
14 interviews is that partners were actually
15 volunteering and getting paid through the
16 store.
17       And so that is a part of the
18 conversations, the roundtable did not exhibit
19 excellence. It was an indication that there
20 was some level of lack of leadership.
21 Partners were also sharing that they had come
22 forward either to Shannon or to the district
23 managers with their concerns, yet none were
24 documented.

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 189

1 perception of their trust in their leader had
2 been fully and wholly damaged.
3    Q.  Did any investigator that either
4 works for Starbucks or was engaged by
5 Starbucks, to your knowledge, ever conclude
6 that Mr. Trinsey discriminated against
7 specific partners because of their race?
8    A.  I don't have that documentation.
9    Q.  Did anyone ever tell you that any
10 investigator had concluded that Mr. Trinsey
11 had discriminated against any partner because
12 of his or her race?
13    A.  I don't have that, I don't have the
14 documentation for that.
15    Q.  So when you are referring to
16 something being substantiated by the
17 investigation, it was conduct other than
18 whether or not, the ultimate question of whether or
19 not Mr. Trinsey discriminated against
20 someone, is that accurate?
21    A.  Correct.
22       MS. OELTJEN: Could we take five
23 minutes?
24       MR. HARRIS: Sure.

Page 190

1       MS. OELTJEN: Thank you.
2       VIDEO SPECIALIST: 3:15.  We are
3 off the record.
4       (Recess.)
5       VIDEO SPECIALIST: The time is
6 3:20.  We are back on the record.
7 BY MS. OELTJEN:
8    Q.  Miss Hymes, I just want to clarify a
9 couple of things.
10       So earlier you told me that, you
11 said 65 percent of the hourly workers below
12 the leadership level in the store in
13 Philadelphia are, I believe you meant to say
14 non-Caucasian, but you didn't actually -- you
15 just said 65 percent, is my recollection.
16       So is that 65 percent are white
17 or 65 percent are not white?
18    A.  Based on my estimates --
19    Q.  Yes.
20    A.  -- non-white.
21    Q.  Okay.
22       And then you were telling me
23 about Shannon's reaction to you asking her to
24 place Mr. Trinsey on suspension.  Why don't

Page 191

1 you tell me, take me through that
2 conversation, tell me what was there and what
3 exactly you remember being said?
4    A.  Based on my recollection, I don't
5 recall if whether Paul Pinto was there or
6 Nathalie Cioffi.  I believe it was Nathalie
7 Cioffi, but I can't confirm 100 percent.  But
8 there was someone from partner resources
9 there and Shannon Phillips.
10       And we took her through a high
11 level overview of the concerns that were
12 coming through from our partners and the need
13 to remove him from leading so that we could
14 conduct a full investigation on their
15 allegations.
16       The immediate response from
17 Miss Philips was that he was being treated
18 unfairly and that there could be no way that
19 Ben was inequitable towards African Americans
20 and that she was wholly against us suspending
21 the district manager to do an investigation.
22 And she did not want to deliver the talking
23 points to Paul to put him on separation.
24       We had to reexplain what our

Page 192

1 process was and where we were in terms of
2 what our partners were saying and how they
3 were feeling and our responsibility to
4 understand if their allegations could be
5 substantiated up to get to the truth.
6       She remained steadfast in her
7 disdain for the process, reiterated that she
8 did not agree, but said that she would do
9 what she was told.
10       I don't know if that is a quote,
11 but it was along those lines, which took
12 myself and the partner of human resources
13 aback significantly.
14       We wanted to ensure that there
15 was a witness to how she was to deliver the
16 message out of respect for Ben, because he
17 needed to understand the severity of the
18 situation and then what the next steps would
19 be so he would not be lost in ambiguity.
20       Miss Philips subsequently
21 delivered that message in a manner which was
22 unprofessional.  She created a space for Ben
23 to receive that message as if she was being
24 held against her will by reading off the

Page 197

1  think that Ms. Phillips would still be
2  employed by Starbucks today in some capacity?
3      MR. HARRIS: Objection to the
4  hypothetical question. You don't have to
5  answer that, ma'am.
6  BY MS. OELTJEN:
7      Q. Actually, you can answer.
8      MS. OELTJEN: Rich, we can call
9  the judge if you want. Hypotheticals are
10 okay and you asked my client --
11     MR. HARRIS: Hypotheticals are
12 not okay. They are not. She is not an
13 expert. She is not an expert. A
14 hypothetical is inappropriate.
15 BY MS. OELTJEN:
16     Q. Miss Hymes, Miss Hymes, I am going to
17 put this question on the record and your
18 attorney -- just pause -- let him say what he
19 wants to say because we are going to preserve
20 this.
21     MR. HARRIS: That is fine.
22 BY MS. OELTJEN:
23     Q. Miss Hymes, if Shannon had done well
24 in that conversation with Ben, would you have

Page 198

1  wanted to terminate her on May 9th?
2      MR. HARRIS: Objection. You do
3  not have to answer that question.
4      MS. OELTJEN: So it is Friday
5  afternoon at 3:31. We can go to the judge or
6  we can agree to bring this before the judge.
7  But I don't think that is a proper
8  instruction, Rich.
9      MR. HARRIS: You can bring it
10 before the judge at another time. That is
11 fine.
12     MS. OELTJEN: All right.
13     MR. HARRIS: You don't have to
14 answer that question, Miss Hymes.
15     MS. OELTJEN: So we will preserve
16 it. So you are not going to argue later,
17 Rich, that by failing to call the judge in
18 this moment I have waived my right to bring
19 it before the Court; correct?
20     MR. HARRIS: Of course not.
21     MS. OELTJEN: Okay. Then we can
22 carry on.
23 BY MS. OELTJEN:
24     Q. Ms. Hymes, as of May 8th at 7:28

Page 199

1  a.m., had you decided to terminate Shannon
2  Phillips?
3      A. I would say that she was -- yes.
4      Q. And so when precisely did you make
5  that decision?
6      A. Probably right around that time
7  frame, yes.
8      Q. Okay.
9          Did Ms. Cioffi's e-mail lead to
10 your ultimate decision to terminate
11 Miss Philips?
12     A. No. It was further evidence that the
13 decision that I made was the right one.
14     Q. Okay.
15         So, but you had not made the
16 decision to terminate Ms. Phillips on May 9th
17 when you started having the conversation with
18 her about putting Mr. Trinsey on suspension;
19 correct?
20     A. I think I was formulating the
21 separation at that time.
22     Q. But nothing had been finalized;
23 correct?
24     A. That timeline, I don't know, within

Page 200

1  the 48 hours or so, I don't recall the exact
2  moment, when we started to initiate the
3  paperwork for the separation. But that -- I
4  don't know what date that was. That was the
5  8th? So that was, for me, evidence that the
6  decision that I made to separate Shannon was
7  the right one, unfortunately.
8      Q. So was her conversation with you and
9  Paul Pinto and Nathalie Cioffi about Ben
10 Trinsey a factor in her termination or not a
11 factor in her termination?
12     A. I don't think that that was a factor.
13 It was just evidence at that point that the
14 decisions that I was making were the right
15 ones.
16         So for the exact date of when we
17 started to draw the paperwork was somewhere --
18 I don't know the exact date, but based on all
19 of the roundtable conversations, a week or
20 two before that was leading me to a space
21 where we had to figure out how we would
22 support Shannon in the moment. We had
23 considerations of maybe moving her out of
24 that role because of the behaviors in those

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 201

1  weeks leading up to the roundtables.
2          And then ultimately that time
3  where she was mentally absent from the
4  May 2nd experience with our partners really
5  trying to navigate how do we ensure that
6  Shannon has a soft landing.
7          We explored maybe something
8  outside of the region in like a community
9  leader role, which was starting to evolve.
10  And then as more information came in, we
11  changed the organizational structure. More
12  information came in, sort of the behaviors
13  that were coming through from Shannon, the
14  observations that others were making, it just
15  made sense to move forward with the
16  separation because I did not have confidence
17  that she could lead through the repair of
18  what our partners are telling us what's
19  happening to them in the market.
20      Q. And so again, in connection with what
21  the partners were telling you -- so I'm
22  really looking for specifics -- I want to
23  know, you know, partner John Smith told me
24  that Shannon had done A, B, C, and that was

Page 202

1  not acceptable. That's not a hypothetical.
2  It is just an example. I am trying to, are
3  you -- and I don't want a situation.
4          My question is really intended to
5  know what people said to you about Shannon?
6  And I don't want to conflate the area with
7  Shannon. So what were the specific -- who
8  was specifically making a complaint to you
9  about Miss Philips herself rather than
10  dissatisfaction with the area that you
11  attributed to Miss Phillips?
12          MR. HARRIS: If you can answer,
13  Miss Hymes.
14          THE WITNESS: Sure.
15          So there were multiple instances
16  where we would have roundtables with
17  partners. So I don't have partner names. I
18  can give you Charlie as one. I don't recall
19  his last name. Charlie Raboteau. I don't
20  know how to pronounce it.
21  BY MS. OELTJEN:
22      Q. We may come to it in a document.
23      A. Uh-huh. And several other
24  roundtables had -- and again, I recognize

Page 203

1  your question in terms of not conflating, but
2  that is actually the responsibility of the
3  leader, to maintain an environment where they
4  feel like they are, their issues have been
5  addressed, that their leaders are handling
6  complex and difficult situations in a manner
7  that would support their growth and
8  development. And out of those conversations
9  and roundtables, I determined that Shannon
10  was not fit for the role.
11      Q. So is it -- I'm generally trying to
12  understand what you are saying.
13          So --
14      A. Sure.
15      Q. So should I take away from this that
16  as a result of negative feedback that you
17  received about the experience of partners
18  working in Philadelphia, that without those
19  partners attributing it to Shannon, that you
20  as her boss attributed it to Shannon because
21  it is something that she should have
22  addressed?
23      A. She is responsible for the partner
24  experience and the customer experience, along

Page 204

1  with the profitability.
2      Q. So I shouldn't understand that at the
3  roundtables there were lots of partners lined
4  up to offer you a specific complaint about
5  Shannon Phillips; correct?
6      A. Your question was with specific
7  names, and so during those roundtables we did
8  not make note of who those individuals were.
9      Q. No.
10      A. My earlier testimony --
11      Q. I asked use Shannon's name in
12  complaining. That is what I'm trying to
13  understand.
14      A. Yes. So in my earlier testimony I
15  had shared that there was sentiment that she
16  would cancel, she would not show up when it
17  was raining. That she would have
18  preferential treatment towards those in which
19  she had special personal relationships with.
20  So those are specific examples in the
21  consensus of a group.
22          In leading through the crisis,
23  the one thing that you have to have as a
24  leader is trust. Partners in distress and

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 205

1  threat cannot be led through crisis in an
2  effective way with excellence if they do not
3  trust their leader.  And the overwhelming
4  theme that was coming through the roundtables
5  was they did not trust her.
6      Q.  And they used her name, so they said
7  I don't trust Shannon?
8      A.  Her, yes.
9      Q.  Okay.
10         And did people share that they
11  didn't trust Ben?
12     A.  Yes.
13     Q.  And did people share that they didn't
14  trust Paul?
15     A.  Not to my recollection.
16     Q.  So did anyone criticize Paul at any
17  of these roundtables?
18     A.  Yes.  Charlie very specifically.
19     Q.  And was Paul coached, counseled or
20  placed on any disciplinary action as a result
21  of any feedback from the roundtables relating
22  to his performance?
23     A.  No.  Nor was Shannon or Ben.  There
24  was like no progressive discipline for all

Page 206

1  three.  There was separation --
2      Q.  Right.
3      A.  -- based on the allegations for Ben
4  that were substantiated and then for the
5  decision that I made to separate Shannon
6  based on her inability to lead through the
7  crisis.
8      Q.  And so you did not reach any
9  conclusions about Paul's performance that
10  resulted into his job changing in April or
11  May of 2018; correct?
12     A.  Can you restate the question?
13     Q.  Sure.  So you just described to me
14  that Ben was separated and that you made the
15  decision to terminate Shannon.  And so my
16  question to you was you did not make any
17  similar determination as it relates to Paul;
18  right?
19     A.  There were very different behaviors
20  that were being demonstrated during that time
21  where there was, for Ben, prior to his
22  suspension a level of denial of what was
23  happening.  And for Paul it was very
24  different.

Page 207

1         So what I saw, as well as many of
2  the other leaders that either lived in
3  Seattle that were in or outside -- or
4  internally was that he was taking ownership
5  of what was happening, and his behaviors and
6  actions were very clearly different from Ben.
7  Taking accountability, recognizing when he
8  could have paid more attention to his
9  partners.  Spending more time in the stores.
10  So the actions that were happening throughout
11  the crisis were very starkly different.
12     Q.  What did Ben -- so Ben was actually
13  the district manager responsible for the
14  store where the arrest took place; right?
15     A.  Paul was.
16     Q.  Paul.  Sorry, we have been mixing
17  them up all day.
18         So Paul was the DM for the store
19  where the arrest took place; correct?
20     A.  Yes.
21     Q.  And Paul had actually been involved
22  in promoting Holly Hilton to store manager;
23  correct?
24     A.  I'm certain of it, but yes, I am

Page 208

1  sure.
2      Q.  When you say -- I believe you told me
3  that you felt that Paul was taking ownership,
4  is that accurate?
5      A.  Correct.
6      Q.  What do you recall --
7      A.  Not specifically for the incident.
8  For the responses and reactions of the
9  partners who were feeling that there was a
10  sense of inequity and a lack of responsiveness
11  to what was happening and what their
12  experiences were.
13     Q.  So what are you, when you say a sense
14  of inequity, so of course anyone who watches
15  the news knows that that has been in the news
16  for a very long period of time and something
17  people are talking about.
18         Are you referring to the general
19  sense of inequity in the United States or are
20  you referring to a problem with equity within
21  the Starbucks organization?
22     A.  So in my earlier testimony I
23  clarified that there was a perception of
24  people getting promoted based on their

Page 209

1 relationships with their leaders or based on
2 the color of their skin. So that's the
3 inequity that I'm referring to again.
4 Q. Okay. And those are different
5 things, you would agree with me, correct,
6 personal relationships, the color of their
7 skin?
8 A. Uh-huh, yes.
9 Q. And is it your understanding as a
10 manager that in fact one of them is
11 prohibited by law and the other is not;
12 correct?
13 A. Yes. But both are inappropriate.
14 Q. Fair enough. But one is actually
15 illegal and the other is not; correct?
16 A. And I would say in the Starbucks
17 world they are equally weighted.
18 Q. Okay. And that's fine.
19 But in terms of individuals who
20 were complaining that the color of their skin
21 made a difference in how they were treated at
22 Starbucks, did anyone make those complaints
23 with regard to Ben?
24 A. Yes.

Page 210

1 Q. And so who complained that the color
2 of their skin made a difference in how Ben --
3 I'm sorry -- Paul -- I know that's not what I
4 just said --
5 A. Okay.
6 Q. Did anyone complain that the color of
7 their skin made a difference in how Paul
8 Sykes treated them?
9 A. Not to my knowledge.
10 Q. And did you ever ask Paul if you
11 thought -- if he thought that the color of
12 his skin made a difference in how Shannon
13 Phillips treated him?
14 A. No.
15 Q. And did Paul ever complain to you
16 about Shannon's leadership?
17 A. No.
18 Q. And did anyone ever complain to you
19 that the color of their skin made a
20 difference in how Shannon treated them?
21 A. Yes. So that was in the roundtables
22 where they shared that based on -- so yes,
23 based on their conversations with either
24 Shannon or Ben, that they felt like the

Page 211

1 promotions that were happening in the market
2 were happening because they were either of a
3 personal relationship nature or because of
4 the color of their skin. That is what came
5 through during the roundtables and very, very
6 broadly during the May 2nd conversation with
7 Seattle.
8 Q. And did you ever take the name of an
9 employee who complained or intimated or
10 suggested that vis-à-vis Shannon Phillips the
11 color of their skin made a difference in how
12 they were treated at Starbucks?
13 MR. HARRIS: Objection. Asked
14 and answered. But you may answer,
15 Miss Hymes.
16 THE WITNESS: Yes.
17 So in my earlier testimony, I
18 shared that the responsibility of
19 interviewing an investigation is housed in
20 our PRO team. So my attention was wholly
21 focused on managing the crisis that was in
22 front of me, making sure that those partners
23 that had issues were having conversations
24 with PRO. So I would be -- I would

Page 212

1 potentially intake if any partner had an
2 issue, but I would not document names or I
3 would give them the phone number for our
4 partner resources to, you know, reach out to
5 them so that they could have very private,
6 confidential conversations with regards to
7 the lack of experience that they were
8 involved in.
9 BY MS. OELTJEN:
10 Q. So if I asked this I genuinely don't
11 remember, so I appreciate you answering again
12 if I have.
13 A. Uh-huh.
14 Q. But did anyone in that partner
15 resources or anyone that partner resources
16 may have retained, to your knowledge, ever
17 conclude that Shannon Phillips treated an
18 employee differently because of the color of
19 his or her skin?
20 MR. HARRIS: That's been asked
21 and answered, but you may answer again.
22 THE WITNESS: No.
23 BY MS. OELTJEN:
24 Q. Okay.

Page 213

1   A.  The racial inequities were squarely
2  with Ben, which we documented.
3          The concern for Shannon was that,
4  number one, she did not have awareness or
5  address it because the partners had shared
6  that they had complained before.  There was
7  no resolution to it so all of these issues
8  were festering.  And as a result of the
9  event, it opened up all of the unanswered
10  issues that our partners had because they
11  thought they were being heard through their
12  leader Shannon.
13          And when the partners at
14  leadership levels came to listen, they shared
15  that their issues that they had taken to
16  their leaders, plural, had been unresolved.
17          Furthermore, I was not aware.  So
18  if those conversations were happening, those
19  conversations were happening, Shannon never
20  raised it to me.  So I only knew that these
21  issues occurred post event.  Had I known that
22  our partners were in a position of suffering
23  or having feelings of inequity, I would have
24  addressed it.

Page 214

1   Q.  And I believe this morning you told
2  me that for a long period of time that the
3  PRO person who was assigned to Ms. Phillips
4  had subsequently passed away; correct?
5   A.  Yes.
6   Q.  And so to your knowledge, is it
7  possible that Shannon passed this information
8  along to her PRO person and that it just
9  stopped there?
10          MR. HARRIS:  Objection.  Calls
11  for speculation.
12  BY MS. OELTJEN:
13   Q.  You can answer.
14          MR. HARRIS:  You can answer,
15  Miss Hymes, if you can.
16          THE WITNESS:  Can you repeat the
17  question?
18  BY MS. OELTJEN:
19   Q.  Sure.  I am just trying to -- so
20  earlier you told me, I believe you told me
21  her name was Ms. Verino; is that correct?
22   A.  Yes.
23   Q.  Okay.  Miss Verino had passed away.
24  I understand that you told me that the

Page 215

1  process when someone receives a complaint of
2  discrimination is to notify partner
3  resources; correct?
4   A.  Yes.
5   Q.  Did you ever take any steps to
6  uncover whether or not Miss Phillips had in
7  fact notified partner resources of any
8  allegations of racially driven inequity in
9  her area?
10   A.  I am so sorry, my dogs are barking in
11  the background.  I am just going to hold for
12  one second.
13          MS. OELTJEN:  No problem.  Why
14  don't we go off the record.
15          VIDEO SPECIALIST:  The time is
16  3:51.  Off the record.
17          (Pause.)
18          VIDEO SPECIALIST:  The time is
19  3:52.  We are back on the record.
20  BY MS. OELTJEN:
21   Q.  Okay, Miss Hymes, before we took a
22  little break, essentially what I was trying
23  to ask is if you took any steps to uncover
24  whether or not Shannon had referred any

Page 216

1  concerns about racial inequity in her area to
2  partner resources?
3          MR. HARRIS:  Miss Oeltjen, I
4  think your camera isn't on.  At least I can't
5  see you any more.
6          MS. OELTJEN:  Okay.  Well, who
7  needs to see me?  There I am.
8          THE WITNESS:  So as far as I can
9  recall, we did not see any evidence of those
10  claims actually taking action.  So there was
11  no action that I saw that was taken or
12  documentation that would indicate that based
13  on the conversations of the partners that
14  that was actually addressed.
15  BY MS. OELTJEN:
16   Q.  Did you ever go to Miss Philips and
17  say, you know, Partner X, at the roundtable,
18  says that they came to you and they raised
19  issues associated with racial inequity, do
20  you remember it, did it happen, et cetera?
21   A.  We were together a lot and as things
22  would unfolding, I would share.  If there was
23  an indication of inequity specifically
24  relating to Shannon Phillips that would

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 205

1 threat cannot be led through crisis in an
2 effective way with excellence if they do not
3 trust their leader.  And the overwhelming
4 theme that was coming through the roundtables
5 was they did not trust her.
6 Q.  And they used her name, so they said
7 I don't trust Shannon?
8 A.  Her, yes.
9 Q.  Okay.
10 And did people share that they
11 didn't trust Ben?
12 A.  Yes.
13 Q.  And did people share that they didn't
14 trust Paul?
15 A.  Not to my recollection.
16 Q.  So did anyone criticize Paul at any
17 of these roundtables?
18 A.  Yes.  Charlie very specifically.
19 Q.  And was Paul coached, counseled or
20 placed on any disciplinary action as a result
21 of any feedback from the roundtables relating
22 to his performance?
23 A.  No.  Nor was Shannon or Ben.  There
24 was like no progressive discipline for all

Page 206

1 three.  There was separation --
2 Q.  Right.
3 A.  -- based on the allegations for Ben
4 that were substantiated and then for the
5 decision that I made to separate Shannon
6 based on her inability to lead through the
7 crisis.
8 Q.  And so you did not reach any
9 conclusions about Paul's performance that
10 resulted into his job changing in April or
11 May of 2018; correct?
12 A.  Can you restate the question?
13 Q.  Sure.  So you just described to me
14 that Ben was separated and that you made the
15 decision to terminate Shannon.  And so my
16 question to you was you did not make any
17 similar determination as it relates to Paul;
18 right?
19 A.  There were very different behaviors
20 that were being demonstrated during that time
21 where there was, for Ben, prior to his
22 suspension a level of denial of what was
23 happening.  And for Paul it was very
24 different.

Page 207

1 So what I saw, as well as many of
2 the other leaders that either lived in
3 Seattle that were in or outside -- or
4 internally was that he was taking ownership
5 of what was happening, and his behaviors and
6 actions were very clearly different from Ben.
7 Taking accountability, recognizing when he
8 could have paid more attention to his
9 partners.  Spending more time in the stores.
10 So the actions that were happening throughout
11 the crisis were very starkly different.
12 Q.  What did Ben -- so Ben was actually
13 the district manager responsible for the
14 store where the arrest took place; right?
15 A.  Paul was.
16 Q.  Paul.  Sorry, we have been mixing
17 them up all day.
18 So Paul was the DM for the store
19 where the arrest took place; correct?
20 A.  Yes.
21 Q.  And Paul had actually been involved
22 in promoting Holly Hilton to store manager;
23 correct?
24 A.  I'm certain of it, but yes, I am

Page 208

1 sure.
2 Q.  When you say -- I believe you told me
3 that you felt that Paul was taking ownership,
4 is that accurate?
5 A.  Correct.
6 Q.  What do you recall --
7 A.  Not specifically for the incident.
8 For the responses and reactions of the
9 partners who were feeling that there was a
10 sense of inequity and a lack of responsiveness
11 to what was happening and what their
12 experiences were.
13 Q.  So what are you, when you say a sense
14 of inequity, so of course anyone who watches
15 the news knows that that has been in the news
16 for a very long period of time and something
17 people are talking about.
18 Are you referring to the general
19 sense of inequity in the United States or are
20 you referring to a problem with equity within
21 the Starbucks organization?
22 A.  So in my earlier testimony I
23 clarified that there was a perception of
24 people getting promoted based on their

Page 229

1 along with all the other leaders, her
2 behaviors, and determined that this role
3 wasn't even for her and then they decided to
4 restructure. So I just want to make sure
5 that that is wholly the picture.
6     I don't know what date and what
7 happened on each day, but that's the timeline
8 in terms of the logic behind each one of the
9 sequencing of how this unfolded to Shannon's
10 separation.
11   Q. Okay. Thank you.
12     What I want to know in this
13 moment, because I am very focused on the
14 timeline, is, what I want to know in this
15 moment, is it fair to say that based on your
16 response that at least as of April 23rd,
17 2018, you had not reached a conclusion that
18 Shannon would be removed from her position or
19 might be appropriate for another one;
20 correct?
21   A. That is correct.
22   Q. And so it would be fair to say that
23 as of April 23rd, 2018, in your opinion
24 Shannon was still doing her job to your

Page 230

1 satisfaction?
2   A. The roundtables began on April 23rd.
3   Q. Okay.
4   A. Where more people from Seattle flew
5 in so that we could have roundtables
6 throughout the city and talk to as many
7 partners as possible. Those roundtables
8 occurred from the 23rd, probably through
9 May 5th. And then as we were conducting
10 roundtables we would have debrief sessions in
11 the basement of 18th and Spruce to discuss
12 our findings.
13     (Phillips 33 was marked for
14 identification.)
15 BY MS. OELTJEN:
16   Q. Okay, Phillips 33 should be on your
17 screen. This is a two-page document. You
18 should have Starbucks 685 to 686. Is that
19 what you have?
20   A. Yes.
21   Q. Okay. And so my question to you in
22 this, again, because I am trying to move it
23 along, this is an e-mail from Shannon to you.
24     Is there anything in this e-mail

Page 231

1 that disappointed you?
2   A. Well, let me read the e-mail.
3   Q. Please.
4   A. (Pause.)
5     Is there another page?
6   Q. Yes, there is another page. So you
7 can toggle down at the top.
8   A. In terms of disappointing me, I don't
9 understand the question.
10   Q. So my question is, this e-mail that
11 Shannon sent to you, is this evidence that
12 she's doing what you expected of her?
13   A. This is, this is the work of a
14 collective group of people and her taking
15 notes of the plan from the task force. So
16 this is not Shannon's work. This is the work
17 of a collective group of people that have
18 either flown in from Seattle or that were
19 part of like Zeta or everyone else. So this
20 was the recap. She would take dictation,
21 recap the dictation and send it out.
22   Q. Okay.
23   A. She was engaged in the conversation,
24 but this is not the work of solely Shannon

Page 232

1 Phillips.
2   Q. Okay.
3     So at the bottom, it seems to
4 outline some things that Ebony and Shannon
5 are going to be working on together.
6     Do you see that?
7   A. Yes.
8   Q. Partner roundtables being one of
9 those things; is that correct?
10   A. Yes.
11   Q. And so was Shannon involved in any of
12 the organization or details surrounding the
13 partner roundtables?
14   A. Shannon, the one that was marked
15 February 2nd where she was present, yes.
16 However, there were many roundtables that I
17 was not a part of, so there were a lot of
18 people conducting roundtables throughout the
19 city. So we were not able to be present for
20 many because we had partner resources like
21 Ebony, Nathalie. We had a vice president in
22 partner resources that was present, Jen
23 Frisch. We had partner resources pretty much
24 canvassing the market to understand our

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 241

1   we had a subsequent conversation with Charlie
2   one on one, that is when he shared.
3           I was with Rossann and maybe
4   Nathalie Cioffi to follow up on his concerns.
5   He was apologetic, I do remember that, for
6   being disrespectful to Shannon.  And he
7   provided -- I don't know the details.  But he
8   provided examples of when he had reached out
9   to either Shannon or Paul on his concerns.
10  Q.  And so Charlie described for you that
11  he had issues with both Shannon and Paul?
12  A.  Yes.  Not addressing the leadership
13  concerns that he had at his store in which he
14  was housed.  His treatment.  The lack of
15  addressing some of the systemic issues that
16  were in the store from a safety perspective.
17  Q.  And so based on your knowledge of the
18  structure at the Starbucks organization, is
19  it accurate to say that the store manager
20  would have been responsible for addressing
21  Charlie's concerns as a front line person;
22  correct?
23  A.  Yes.
24  Q.  And then it would have fallen to

Page 242

1   Paul; correct?
2   A.  Charlie claimed that he had
3   escalated.
4   Q.  And then if Paul did what he was
5   supposed to do, it most likely would not ever
6   reach the level of the regional director;
7   correct?
8   A.  Correct.
9   Q.  And you are a rung above the regional
10  director and is it your presumption that any
11  number of issues are handled by your
12  subordinates without ever reaching your
13  attention?
14  A.  Correct.
15  Q.  It is just going to take me a minute
16  to bring up the next exhibit.  We are on the
17  last screen, if that makes you feel any
18  better, the exhibits that I am looking at.
19  A.  It actually does.  Thank you.
20          (Phillips 37 was marked for
21  identification.)
22  BY MS. OELTJEN:
23  Q.  All right, so this is an e-mail dated
24  Tuesday, April 24th, 2018.  You are welcome

Page 243

1   to read as much or as little of it as you
2   would like.  It is Phillips 37, STARBUCKS 3402.
3   A.  Uh-huh.
4   Q.  Do you know who Rebecca Stout is?
5   A.  Store manager for 25349.
6   Q.  Yes.  And do you know if, do you know
7   where geographically that store is located?
8   A.  Rebecca has moved a few times, but
9   it's in Philadelphia.
10  Q.  Okay.
11  A.  So I don't remember that.
12  Q.  And do you know, what is Becky's
13  race, if you know?
14  A.  I don't.
15  Q.  Have you ever met her?
16  A.  I believe I have, yes.
17          (Phillips 38 was marked for
18  identification.)
19  BY MS. OELTJEN:
20  Q.  Phillips 38 is STARBUCKS 229.  It is
21  a two-page document.  The second page is 230.
22          Can you take a moment to review
23  this and then I will have some questions for
24  you.

Page 244

1   A.  Okay.
2   Q.  Can you tell me what the e-mail from
3   Paul Pinto dated Tuesday, April 24th, 2018,
4   is referring to?
5   A.  It's referring to the early phases of
6   the input that we received from our partners
7   in terms of their experience, and then it
8   also looks as though there may be a capture
9   of their concerns around the scheduling of
10  the 5-29 event, but I'm not certain.
11  Q.  Okay.  And the 5-29 event is when
12  Starbucks closed all of its stores to conduct
13  racial bias training; correct?
14  A.  Correct.
15  Q.  And who conducted that training?
16  A.  The leaders in the local markets
17  across the US.  And much of it was VDO, so
18  there were videos that were prerecorded,
19  workbooks, exercises that were facilitated by
20  local leaders.
21          In this document, I will just
22  point out, this is where one, two, three,
23  four, five, six, this is, to my prior
24  testimony, documenting the prior conflicts

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 245

1  that are resurfacing with racial allegations.
2  So this is sort of the start of an
3  understanding of what our partners are saying
4  in terms of inequity.
5      Q.  So if you turn to the second page.
6      A.  Uh-huh.
7      Q.  There appears to be a table.
8      A.  Yep.
9      Q.  So one of the first actions listed,
10 it says, "PRM presence."  What is a PRM?
11     A.  Partner resources manager.  So I'll
12 just help to guide you through the hierarchy.
13         Paul Pinto at the time was the VP
14 partner resources.  He was on assignment.
15 And then underneath Paul would have been
16 Nathalie Cioffi, who is the partner resources
17 director.  So it goes VP director and then
18 underneath the director are the partner
19 resource managers.  So that at the time was
20 Ebony for the Philadelphia market.
21         So per my prior testimony, those
22 are the partner resource managers that would
23 field the partner concerns throughout the
24 market.  They were literally in the market.

Page 246

1  So Nathalie's based out of Bethesda.  So she
2  was in market.  Ebony and Paul Pinto to
3  support roundtables, along with the senior
4  vice president of partner resources at the
5  time, Jennifer Frisch, F-R-I-C-H.  I don't
6  think there's a "T" in there.  Frisch.
7          And there may have been another
8  PRN that got pulled in, but I can't recall.
9      Q.  Okay.
10         (Phillips 39 was marked for
11 identification.)
12 BY MS. OELTJEN:
13     Q.  Okay, we are looking at Phillips 39.
14 This is a two-page document.  We have
15 STARBUCKS 252 to 253.
16     A.  Uh-huh.
17     Q.  So the first page appears to be an
18 e-mail from Nathalie Cioffi to you dated
19 April 24th at 10:10 a.m. with the subject
20 of "PRO Plan"; correct?
21     A.  Yes.
22     Q.  And then the next page is the PRO
23 plan, some of which looks very similar to
24 what we saw in the prior exhibit; correct?

Page 247

1      A.  It was a living document, yes.
2      Q.  Okay.
3          And so as of this date, anyway,
4  Shannon Phillips is still considered a key
5  stakeholder; correct?
6      A.  Yes.
7      Q.  Okay.  And had you made any decision
8  to terminate Ms. Phillips as of April 24th,
9  2018?
10     A.  The start of the roundtables, that
11 first note that you showed where there were
12 issues of racial inequities, even at that
13 moment, I had no concern until after the
14 series of roundtables and feedback from the
15 partners.  And then, and then the subsequent
16 leadership presence throughout that week and
17 in the following week leading up to the 2nd
18 of May.
19         (Phillips 40 was marked for
20 identification.)
21 BY MS. OELTJEN:
22     Q.  Phillips 40 is on your screen.  This
23 is STARBUCKS 630.
24     A.  Uh-huh.

Page 248

1      Q.  This is an e-mail exchange between
2  you and Shannon Boldizsar.
3          Do you see that?
4      A.  Yes.
5      Q.  Can you explain to me what you meant
6  when you wrote "not aligned" on April 24th,
7  2018?
8      A.  No, I don't recall.
9      Q.  Okay.
10     A.  If it is to Shannon Boldizsar, I
11 don't know the context of this e-mail.
12     Q.  Okay, that was my question.
13         (Phillips 41 was marked for
14 identification.)
15 BY MS. OELTJEN:
16     Q.  Okay, Phillips 41 is on your screen.
17 This is STARBUCKS 299.
18         Is that the document that you
19 have?
20     A.  Yes.
21     Q.  Excuse me one second.  I have sibling
22 fighting on my end.  Can we go off the record
23 for a second?  I am sorry.
24     A.  Yes.

Page 253

1  Risk."  Do you see that?
2  A.  Yes.
3  Q.  What does that mean?
4  A.  That means they are at risk in their
5  current role based on their leadership.
6  Q.  And then the "Timing of Transition"
7  column, is that transitioning Shannon into a
8  community leader role that you are referring
9  to?
10  A.  These are hypotheticals so it is an
11  early draft of what could happen.
12  Q.  Okay.  And so then Marcus
13  Eckensberger appears on this list, and am I
14  correct in understanding that you were
15  contemplating moving him from Area 147 to
16  Area 71 to replace Shannon?
17  A.  Yes.
18  Q.  Okay.  And then Michael Scott is
19  listed here and it says for his position
20  ROC-TLA.  What is that?
21  A.  That is, in the current role, that's
22  a region's ops coach.
23  Q.  And then it looks like you are
24  contemplating moving him to backfill Marcus's

Page 254

1  position; is that correct?
2  A.  Correct.
3  Q.  And what does that note indicate,
4  "RDO Training 5-15"?
5  A.  Region director training.
6  Q.  And so he was already scheduled to
7  have that training without regard to him
8  having an RDO position?
9  A.  Yes.  We typically do that if we
10  anticipate someone moving into an RDO role,
11  either temporarily or permanently.
12  Q.  Okay.
13  Ben Trinsey appears on this list,
14  but there is no proposed position for him;
15  correct?
16  A.  Correct.
17  Q.  And had you decided already that Ben
18  Trinsey would be fired?
19  A.  I don't believe so.
20  Q.  Okay.  And then Mr. Sykes is on this
21  list, and it looks like you were thinking of
22  moving him to a suburban market, district
23  manager position; is that correct?
24  A.  Correct.

Page 255

1  Q.  And why did you think it would be
2  appropriate to move Mr. Sykes to a suburban
3  market?
4  A.  The market was in crisis, and based
5  on the early conversations that were
6  uncovering, it is important for the entire
7  organization to have a certain level of trust
8  in their leaders.  And also as a
9  responsibility for me to ensure that I had
10  the very best leaders that I could possibly
11  have to lead our partners through this in a
12  way that they were whole.
13  And the question came up do you
14  have the very best leaders that you have in
15  the company to lead this market.  And I
16  couldn't look my leaders in the face to say
17  yes.  Based on what I was observing, the
18  outcomes, the sentiment of the partners, I
19  did not feel like these leaders were the
20  leaders to take this company and those
21  partner experiences through healing.
22  And so I had to make decisions on
23  whether or not these players were the right
24  players, right leaders that could be honest,

Page 256

1  transparent, that our partners trusted and
2  that could lead them out.  So this was the
3  early plan and that was the lens that I was
4  using in order to make decisions on who was
5  going to move the market out and forward.
6  Q.  In connection with making this early
7  plan, did you consider the race of Ms. Phillips?
8  A.  Absolutely not.
9  Q.  And did you consider the race of
10  Mr. Trinsey?
11  A.  Absolutely not.
12  Q.  And did you consider the race of
13  Mr. Sykes?
14  A.  Absolutely not.
15  (Phillips 44 was marked for
16  identification.)
17  BY MS. OELTJEN:
18  Q.  This is Plaintiff's Exhibit 44 -- I'm
19  sorry, Phillips 44.  The first page, it is
20  a -- it is a single page document.  You
21  should have STARBUCKS 3852.
22  Is that the document that you
23  have in front of you?
24  A.  Yes.

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 257

1    Q.  Take a moment to review it and let me
2   know when you are ready.
3    A.  I'm ready.
4    Q.  Okay.  This is an e-mail exchange
5   between Shannon Phillips and Shannon Boldizsar;
6   correct?
7    A.  Correct.
8    Q.  And it refers to the Philly TLA
9   position; correct?
10   A.  Correct.
11   Q.  And Shannon Boldizsar writes in part
12  that you had recommended Shannon Phillips for
13  the role.
14      Did you see that?
15   A.  I do.
16   Q.  And is that accurate as of the date
17  of this e-mail, April 25th, 2018?
18   A.  Absolutely, because this role allows
19  for her to move out of P&L responsibility
20  that would have no direct reports and would
21  not be leading a team.  And so I thought that
22  this may be a way to create continuity for
23  her employment at Starbucks in this moment.
24   Q.  Miss Hymes, I believe today generally

Page 258

1   it is fair to say that you have told me that
2   you learned a lot of things that were going
3   on in the Philadelphia market that you were
4   not aware of prior to the arrest.
5       Is that an accurate
6   generalization?
7    A.  Yes.
8    Q.  Does your lack of knowledge fall on
9   you in any way?
10   A.  It does.  I have responsibility for
11  not recognizing the significance of the
12  leadership impact.  I have reflected on what
13  I have done -- I should have done
14  differently, and I take ownership for it.
15   Q.  And have you ever been disciplined in
16  any way as a result of anything that occurred
17  in the Philadelphia market that related in
18  any way to the arrest at Spruce Street?
19   A.  No.  But we've had honest
20  conversations about my lessons and I had a
21  responsibility to restore the partner
22  situation there.
23      The difference between what I'm
24  sharing with you in terms of ownership and

Page 259

1   accountability is that I never heard that
2   from Ben, Paul, or Shannon, none of it.  There
3   is -- accountability lies with all of us.
4    Q.  Were you, did you ever receive a
5   criticism in a performance review as a result
6   of anything that happened?
7    A.  Yes, yes.  I literally lost my bonus,
8   and that is a clear indication of the way in
9   which the organization felt was a signal that
10  there was accountability, and I fully
11  accepted that loss of my bonus or partial
12  bonus because I do realize I'm accountable.
13      But at no point in time did the
14  leaders that were leading Philadelphia have
15  any sense of a deep understanding of the
16  significant gap in the partner experience at
17  that time.  Accountability was not a
18  conversation.  It mostly was centered around
19  self-preservation and a lack of connection to
20  what our partners were saying, as indicated,
21  an example I continue to go back to make.
22      Second, because that was the
23  epitome of what I saw demonstrated in the
24  lack of leadership in that moment.

Page 260

1       And to that end, I stood up in
2   front of those partners who were crying and
3   hurt and apologized.  And subsequently, even
4   after Shannon's departure, a sense of
5   disappointment in myself in roundtables after
6   she left because I was responsible for
7   knowing more and I should have asked, and I
8   shared that very publicly with everyone,
9   including the store managers and the
10  partners, that they had to go through that
11  experience.
12   Q.  You said, you referred to both losing
13  your bonus and losing a partial bonus.  Which
14  is it, ma'am?
15   A.  It is partial.
16   Q.  And was that for part of 2018?
17   A.  Yes.
18   Q.  Was that loss more than $100,000 or
19  less than $100,000?
20   A.  Less than 100,000.
21   Q.  Less than $50,000?
22   A.  I'd say it's about that.
23   Q.  And were you ever told that your job
24  was at risk?

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 289

1  were not all the way up to date.  So we were
2  literally managing in a crisis, so the
3  complete accuracy may be delayed by a day or
4  two based on findings or when people were
5  able to update.
6          (Phillips 59 was marked for
7  identification.)
8  BY MS. OELTJEN:
9     Q.  Phillips 59 is on your screen.  This
10 is a two-page document starting at STARBUCKS
11 525, and I draw your attention to the e-mail
12 at the top from Zeta to you where she
13 writes "would eliminate Shannon from these
14 action plans."
15         Do you see that?
16    A.  I do.
17    Q.  So again, I am just going to ask if
18 this memory jogged your recollection.
19         Was there any firm plan with
20 regard to Shannon Phillips at this time?
21    A.  I'm sure in that window after May 2nd
22 there was conversation on whether or not we
23 wanted to continue employment with Shannon.
24 But I don't know if a final decision had been

Page 290

1  made at that time.  If you have other
2  documents.  But I can't remember the specific
3  date we landed.
4     Q.  Okay.
5          (Phillips 60 was marked for
6  identification.)
7  BY MS. OELTJEN:
8     Q.  Phillips 60 is in front of you.  This
9  is STARBUCKS 485 to 486.  This, again, is
10 another document referring to Charlie
11 Raboteau.
12    A.  Okay.
13    Q.  At the bottom there is an e-mail from
14 Shannon Phillips to Cindi West, you and
15 Nathalie Cioffi dated May 3rd, 2018.
16         Do you see that?
17    A.  Yes.
18    Q.  Okay.  So Miss Philips writes, "Hi,
19 Cindi.  Sadly, Charlie didn't really show up
20 as we'd probably hoped.  I can only say he
21 was confrontational and disrespectful to the
22 senior leaders that were on the other end of
23 the Zoom call (Denise Nelson, Rossann, Zeta
24 and others).  We can discuss more on the next

Page 291

1  call."
2          Have I read that section correctly?
3     A.  Yes.
4     Q.  And do you know, is Miss Philips
5  referring to the roundtable discussion from
6  the day prior that folks from Seattle joined?
7     A.  Yes.
8     Q.  Okay.  And so Mr. Raboteau spoke at
9  that meeting?
10    A.  Yes.
11    Q.  And do you have a recollection of
12 Mr. Raboteau's demeanor at that meeting?
13    A.  Hurt.  Upset.  Suffering.  Maybe
14 disrespectful.  This is, again, sort of
15 another indication of the placation to the
16 leadership and not actually listening to what
17 the partner has to say.  And so our
18 conversation at the executive level was what
19 is ailing Charlie.  Not whether or not he was
20 disrespectful, because we recognize that our
21 partners were in distress and they were
22 suffering.
23         So Cindi is in my, in my earlier
24 testimony, is the person that does all of the

Page 292

1  intake for partner resources.  So in many of
2  the times and where we have executive
3  letters, there's sort of an indication, in
4  writing, what the complaints of the partner
5  are to really help the investigator
6  understand the sentiment of the partner.  Not
7  the fact that they were disrespectful.
8          So nobody was actually concerned
9  on the way in which the message was
10 delivered.  Everyone on the call from
11 Seattle, including myself and others, were
12 more concerned with what he was saying.  And
13 so this actually is evidence that the focus
14 from Shannon in her leadership is in the
15 wrong area.
16    Q.  And did you tell her that at the time
17 that she wrote this e-mail?
18    A.  Yes.  So we had to have conversations
19 around what the partners were feeling and how
20 she had to show up differently.  The
21 conversation on May 2nd was really around
22 recognizing that our partners really needed
23 strong leadership in that moment.  Like you
24 had to show up.  You have to listen.  You

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 293

1  have to not be concerned in terms of the
2  emotions.  All the, you know, love that's
3  coming in from other people to tell you you
4  are doing a great job, and the primary focus
5  is not in the spotlight of what you are
6  viewing, but how you can support your
7  partners in the moment of crisis.
8       And literally on that day she was
9  like I don't think I'm built for this.  This
10  is difficult for me.
11       And my conversation to her was
12  you got to shift.  In the conversations that
13  we have, in the calls, you are silent.  You
14  don't speak up.  You are kind of like not
15  present.  That was the conversation on
16  May 2nd.  Very clearly.
17       Which was like, okay, maybe take
18  some time off.  Like help me understand what
19  you are going through.  But you can't focus
20  on the wrong things.
21       Again, the same indication.  So
22  even after that conversation, we were
23  starting to talk about what the partners were
24  saying in terms of their experiences and a

Page 294

1  complete and absolute denial that we should
2  open up an investigation on the allegations
3  of what the partners were saying about one of
4  her leaders.
5       Again, it was these things to me
6  call up a very implicit understanding of the
7  mind set of my leader at that time, which was
8  one that was sort of non-focused on the
9  actual issue.  Which was not the way the
10  partners were delivering their message, but
11  the message itself.
12       Q.  And so should she have understood
13  that whatever the partner said should be
14  taken at 100 percent true and at face value?
15       A.  No.  But there had to be some level
16  of empathy and understanding that someone was
17  crying out for help.  And it was our
18  responsibility to listen.  The delivery isn't
19  good, but that wouldn't be the highlight of
20  the message.
21       And everyone who she mentioned
22  understood that.  Rossann understood that.
23  Zeta understood that.  Denise understood
24  that.  There's extreme patience for people

Page 295

1  who, you know, have had a traumatic moment
2  and who felt like they needed to be heard.
3       (Phillips 61 was marked for
4  identification.)
5  BY MS. OELTJEN:
6    Q.  So this is Phillips 61.  It is
7  STARBUCKS 2320.  This is an e-mail that you
8  don't appear to be on from Jennifer --
9    A.  I can't see it.  I am still on --
10  okay, there we go.
11    Q.  Got it, okay.
12       So this is an e-mail that you
13  don't appear to be on, but it is from
14  Jennifer Frisch to Paul Pinto dated May 4th,
15  2018, and it says, "Zeta called me today from
16  Philly asking me to engage in a separation
17  package for Shannon."
18       Have I read that correctly?
19    A.  Yes.
20    Q.  And so as of Friday, May 4th, had it
21  absolutely been determined that Shannon would
22  be terminated?
23    A.  Yes.  As indicated in the note.
24    Q.  But isn't it accurate that at this

Page 296

1  time the company was still also talking about
2  something called a coffee break for Shannon?
3    A.  We were exploring options for coffee
4  break, yes.
5    Q.  And what is coffee break, please?
6    A.  So a coffee break is when a partner
7  that has been around for ten years, has been
8  under our employment for ten years, can step
9  away from their role but still receive their
10  benefits.
11    Q.  And so is it also accurate that they
12  could still reflect on a resume, for
13  instance, that they were considered to be an
14  employee at Starbucks, put on leave of some
15  time or on a coffee break?
16    A.  I believe so.  I don't know that
17  detail, but I would believe so, yeah.
18    Q.  Presumably if they are receiving
19  benefits?
20    A.  Yeah.
21    Q.  So on a coffee break they receive
22  benefits, but they don't receive any salary;
23  is that correct?
24    A.  Correct.

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 309

1    Q.  This is Phillips 64, which is
2  STARBUCKS 288.
3    A.  Okay.
4    Q.  Do you have that on your screen?
5    A.  Uh-huh.
6    Q.  And this looks like you organized a
7  meeting with Shannon in the Warwick Hotel
8  lobby on May 7th, 2018, at 12:30 p.m.
9         Do you see that?
10    A.  Yes.
11    Q.  And was that the discussion about Ben
12  Trinsey and placing him on suspension?
13    A.  Based on my recollection, yes.
14    Q.  Okay.  And you had that in the lobby?
15  Was there like a private place?
16    A.  There's a private corner with a very
17  long community table.  Nobody goes in that
18  corner, so it is very private.
19    Q.  Okay.
20         Sorry, you are hearing some
21  arguing from my peeps.  My peeps are also
22  tired, Ms. Hymes.  They've had to be quiet
23  for too long.
24         (Phillips 65 was marked for

Page 310

1  identification.)
2  BY MS. OELTJEN:
3    Q.  Okay, so I think this may very well
4  be our last exhibit, and I am just going to
5  ask you some questions about the phone
6  numbers that appear in some text messages,
7  because I don't know who they belong to.
8    A.  Okay.
9         Do I have permission to look them
10  up if their name isn't on it?  Well, it says
11  their name right there, so.
12    Q.  Yes, so some you might be able to see
13  and some you might not.
14    A.  Okay.
15    Q.  So let me first just ask you -- and I
16  apologize for any background noise that you
17  are hearing on my end, but I am just trying
18  to get through -- so if you look at the
19  second page of this, there is a nickname that
20  appears here for Wifey 2.
21    A.  That's me.
22    Q.  That is you.  You are Wifey 2.  Okay.
23    A.  Yes.  My husband calls -- so for
24  whatever reason I have to change that because

Page 311

1  it is showing up in my text messages.
2    Q.  Yes.  That's what I'm wondering.
3    A.  Yeah.
4    Q.  Okay.  So that is not -- that's a
5  nickname that someone in your personal life
6  has given you, not someone in your
7  professional life has given you?
8    A.  That is my husband's nickname for me.
9  Like it shows up on his phone as Wifey 2.
10    Q.  Okay.
11    A.  And so maybe because with the
12  download you can see that.
13    Q.  That is okay.  That is all I wanted
14  to know.
15    A.  Hopefully it doesn't show up for the
16  people that I lead.  I don't think it does.
17    Q.  I don't know.
18    A.  I have to fix that.
19    Q.  Okay.
20         Ms. Hymes, I think I am about
21  done.  I am sticking by my promise of six
22  o'clock, but if we could just take five
23  minutes for me to get my ducks in a row, I'd
24  appreciate it.

Page 312

1    A.  Okay.  Five minutes.  Return at 5,
2  say, 52?
3         MS. OELTJEN: 5:52 is fine.
4         THE WITNESS: Okay.  Thank you.
5         VIDEO SPECIALIST: 5:46.  We are
6  off the record.
7         (Recess.)
8         VIDEO SPECIALIST: The time is
9  5:52.  We are back on the record.
10  BY MS. OELTJEN:
11    Q.  Miss Hymes, we have covered a lot of
12  territory today and we have been talking
13  since ten o'clock this morning.
14         Am I correct at the end of the
15  day that with regard to the employees that,
16  starting at the store manager level and going
17  up to Ms. Smith, as it related to the 18th
18  and Spruce Street location, that Holly
19  Hilton, the store manager, was terminated;
20  correct?
21    A.  Correct.
22    Q.  And she is white; correct?
23    A.  Correct.
24    Q.  And Paul Sykes, her district manager,

# EXHIBIT E

# In The Matter Of:

*SHANNON PHILLIPS v.*
*STARBUCKS*

---

*PAUL JUNIOR SYKES*
*June 3, 2021*

---

*Terry Burke Reporting*
*Registered Professional Reporters*
*terryburkermr@gmail.com*
*(215) 205-9079*

Min-U-Script® with Word Index

SHANNON PHILLIPS v.
STARBUCKS

PAUL JUNIOR SYKES
June 3, 2021

Page 5

1  answers are verbal.  So Terry is not able to
2  take down into the record that you nodded your
3  head or shrugged your shoulders and then decide
4  what that means.  So if the answer is yes,
5  please say yes.  If the answer is no, please say
6  no.  In other words, use your words.
7       Does that sound okay?
8  A.  Yes.
9  Q.  Okay.  I don't want you to answer any
10  question tonight that you don't understand.  So
11  if I ask something or if Mr. Harris asks you
12  something that you don't -- I'm sorry,
13  Mr. Esterow asks you something that you don't
14  understand, say I don't understand or let us
15  know that you need clarification and we will
16  absolutely provide that clarification to you.
17       Does that sound okay?
18  A.  Yes.
19  Q.  If you proceed to answer a question, I
20  am going to assume that you have understood it.
21       Do you understand that?
22  A.  Yes.
23  Q.  Is there any reason that you are not
24  able to testify truthfully today?

Page 6

1  A.  No.
2  Q.  Are you under the influence of any drug,
3  alcohol, medication or other substance that
4  would inhibit your ability to either testify
5  truthfully or remember something that occurred
6  in the past?
7  A.  No, I am not.
8  Q.  Mr. Sykes, are you represented by
9  counsel tonight?
10  A.  No.
11  Q.  And have I ever offered representation
12  for tonight's deposition?
13  A.  No.
14  Q.  And have I ever given you any, have I
15  ever told you that you should say any particular
16  thing or testify in any particular way?
17  A.  No.
18  Q.  And has Miss Phillips ever told you that
19  you should say any particular thing or testify
20  in any particular way?
21  A.  No.
22  Q.  And have you ever communicated with the
23  counsel for Starbucks who is here tonight,
24  either Mr. Harris or Mr. Esterow?

Page 7

1  A.  No.
2  Q.  Okay.
3       And do you have any interest, or do
4  you have any financial interest in the outcome
5  of Ms. Phillips' litigation?
6  A.  No.
7  Q.  Mr. Sykes, have you ever been employed
8  by Starbucks?
9  A.  Yes.
10  Q.  During what time period were you
11  employed by Starbucks?
12  A.  I just celebrated 15 years, so I know I
13  started in June of 2003 and I left in June of
14  2018.
15  Q.  June 2018, did you say?
16  A.  Yes.
17  Q.  Okay.  And when you left in June of
18  2018, was it your choice to leave?
19  A.  Yes.  I resigned.
20  Q.  And did anyone at Starbucks ever tell
21  you at any time in 2018 that you were at risk of
22  losing your job?
23  A.  No.
24  Q.  Were you ever placed on any corrective

Page 8

1  action or disciplinary notice or a performance
2  improvement plan at any time in 2018?
3  A.  No.
4  Q.  Were you ever told by anyone at
5  Starbucks that you would need to transfer your
6  work location in order to remain employed by
7  Starbucks?
8  A.  Yes.
9  Q.  And who told you that?
10  A.  I believe it was Marcus, who was the
11  regional director at the time.  And I think it
12  could have been Camille Grammar and/or someone
13  from the partner resources team.  I don't
14  remember.
15  Q.  Okay.  Would that be Marcus Eckensberger,
16  does that ring a bell?
17  A.  Yes.
18  Q.  And is it Camille Hymes?
19  A.  Yes.  I said Grammar.  Sorry.
20  Q.  And did they tell you where you would
21  have to transfer to?
22  A.  Somewhere outside of the city.
23  Q.  Okay.  And were you told why?
24  A.  No.  I wasn't told why.  Well, wait a

SHANNON PHILLIPS v.
STARBUCKS

PAUL JUNIOR SYKES
June 3, 2021

Page 9

1  minute.  I am trying to remember.
2    Q.  Sure, take your time.  There's no rush.
3    A.  I don't know that I, I don't remember if
4  I was told why.  I remember that I put in a
5  transfer request to move up to New York City and
6  then they came back with that.  That's what I
7  remember.
8    Q.  Okay.  So would it be accurate, then, to
9  say that you requested transfer to New York
10  City and the response from Starbucks was to say
11  we can't transfer you to New York City but you
12  have to transfer somewhere else outside of
13  Philadelphia?
14    A.  Yes, absolutely.
15    Q.  And were you given a reason why they
16  wouldn't relocate you or allow you to transfer
17  to New York City?
18    A.  Yes.  Well, when I put in my transfer
19  request, I remember correctly, when I met with
20  Camille and Marcus, which was, I don't know,
21  maybe a week later -- I don't remember -- I
22  don't remember who told me, but apparently they
23  had spoken with all of my managers that I
24  oversaw.  Got feedback and said I needed to work

Page 10

1  outside of the city.  So I don't remember what I
2  was supposed to work on.  I just remember it
3  being prompted by my putting in a transfer
4  request to New York City.  Prior to that, I
5  hadn't heard anything about my performance.
6    Q.  Okay.  And is it accurate to say that by
7  June of 2018 that Shannon Phillips had been
8  terminated from Starbucks?
9    A.  Yes.
10    Q.  And before her termination, was Shannon
11  Phillips your boss?
12    A.  Yes.
13    Q.  And how long was Shannon Phillips your
14  boss for?
15    A.  I believe I arrived to the Philadelphia
16  market in June of 2015.  And then up until
17  whenever she was terminated.  I don't remember
18  when.  Maybe it was a month or two before I
19  left.
20    Q.  And when you say you arrived in the
21  Philadelphia market, what position did you
22  arrive in Philadelphia to take?
23    A.  Yes.  And so I was a district manager at
24  the LA market and I transferred to Philadelphia

Page 11

1  as a district manager.
2    Q.  Okay.
3      And when you transferred to
4  Philadelphia, how many stores were you responsible
5  for?
6    A.  Either, I think it was -- it was 11 or
7  13.
8    Q.  And were any of those stores or were all
9  of those stores located in the City of
10  Philadelphia?
11    A.  Yes.
12    Q.  They were all in Philly?
13    A.  Yes.
14    Q.  How, during the time period 2015 to
15  2018, how do you describe Shannon Phillips as a
16  boss?
17    A.  She was extremely detailed, really
18  supportive.  Really present with the partners,
19  everyone in the district, like within our region
20  knew who she was.  She was very genuine.  But
21  she had, she had a really great business sense,
22  and so I know that I always respected the things
23  that she taught me, but also the relationships
24  that she created with people.  Going into the

Page 12

1  store with her, we would do our district tours,
2  which were things that we did with our regional
3  directors.  You know, I was very open and honest
4  with her around what my opportunities were, what
5  my strengths were and I didn't feel scared of
6  her to share those things with her.  I knew that
7  I would get feedback, but I also knew that I
8  would get support.
9    Q.  Did you consider her to be approachable?
10    A.  Yes.
11    Q.  Did you consider her to be approachable --
12  I am sorry, did you consider her to be supportive
13  of your own career development?
14    A.  Yes.
15    Q.  Mr. Sykes, this may seem a silly
16  question, but do you consider yourself or do you
17  identify as either Black or African American?
18    A.  Yes.
19    Q.  And do you feel that Miss Phillips ever
20  treated you differently because of the color of
21  your skin?
22    A.  Not at all.
23    Q.  Have you ever in the time that you
24  worked for Ms. Phillips observed her treat an

Page 13

1 employee differently and conclude that she was
2 treating that employee in whatever manner
3 because of that employee's skin color?
4   A.  No.
5   Q.  Did you ever complain to Paul Pinto
6 about Shannon Phillips' management?
7   A.  No.
8   Q.  Did you ever complain to Paul Pinto that
9 Shannon Phillips played favorites?
10   A.  No.
11   Q.  And do you know Paul Pinto?
12   A.  Yes.
13   Q.  And who do you recall Paul Pinto being
14 within the Starbucks organization?
15   A.  I believe he was the VP of partner
16 resources.
17   Q.  And am I correct in understanding that
18 partner resources is the Starbucks version of
19 human resources?
20   A.  Yes, yes.  Sorry.
21   Q.  No, that is okay.  I am getting the
22 lingo down by now, Mr. Sykes.
23        Okay, and then, and when you
24 arrived in Philadelphia as a district manager,

Page 14

1 is it fair to say that you had had other
2 supervisors at Starbucks other than Shannon
3 Phillips?
4   A.  Yes.
5   Q.  Do you know how many supervisors you had
6 had at Starbucks by the time you came under
7 Ms. Phillips' leadership?
8   A.  Definitely more than five.
9   Q.  And how would you rank Ms. Phillips in
10 terms of, you know, where you think she falls in
11 terms of your strongest manager?
12   A.  I would say top two.  I would say the
13 person who promoted me to district manager, Toni
14 Singer, just because I learned so much from her,
15 and then I would say Shannon Phillips are my top
16 two at Starbucks.
17        COURT REPORTER: I am sorry, Toni,
18 the last name?
19        THE WITNESS: Singer.  She was a
20 regional director in the LA market many, many
21 years ago.  She no longer works for Starbucks.
22 She promoted me to district manager in 2007.
23 BY MS. OELTJEN:
24   Q.  I am going to take you back to April of

Page 15

1 2018.  Do you recall something of note occurring
2 in a store that was in your area of responsibility
3 in April of 2018?
4   A.  I do.
5   Q.  And what do you recall occurring?
6   A.  I was at the gym because I was at one of
7 my workouts with my trainer and I received a
8 call from my store manager Holly.  I can't
9 remember what her last name is at this moment.
10 And she shared with me that she had asked two
11 customers to leave the store and they refused to
12 leave the store and the police were called.
13        And the police, there were multiple
14 police officers, and they got those gentlemen
15 out of the store.
16   Q.  And what, if anything, did you do when
17 Holly shared this information with you?
18   A.  I asked her if they were Black.  And the
19 reason being is when she told me the amount of
20 police officers that came into the store to
21 remove them, and she didn't explain that there
22 was any -- other than them not agreeing to
23 leave, there wasn't a commotion, if you will.
24 It just naturally came to me.  And that was it.

Page 16

1        And then I think later on that
2 night I had got -- I don't remember.  It was a
3 few years ago.  But I had -- I'm on social
4 media, but I'm not active on social media.  But
5 I don't remember -- I think I received an e-mail
6 that had said some sort of video clip from my
7 Rittenhouse store was posted online.  And it
8 hadn't picked up a lot of traction yet, but it
9 picked up enough that it wasn't what it soon
10 became at that point.  And that's what I
11 remember.
12   Q.  Okay.  And the store you are referring
13 to as your Rittenhouse store, is that the store
14 at 18th and Spruce in Philadelphia?
15   A.  Yes.
16   Q.  Okay.  Did you call Shannon Phillips to
17 let her know anything about what Holly had shared
18 with you?
19   A.  I did.
20   Q.  And is it fair to say that neither you
21 nor Ms. Phillips had anything to do with the
22 arrests of any gentlemen in the 18th and Spruce
23 Street store?
24   A.  No.

Page 45

1 26, which requires you to identify when you are
2 intentionally withholding a document over
3 because of an objection. If that is what you
4 want to do, at least be accurate in understanding
5 how the Federal Rules are supposed to work. I
6 can't read your mind and know that you are
7 withholding something.
8          MR. ESTEROW: Kate, Starbucks and
9 the defendant has no obligation to produce
10 documents that are not responsive. If you
11 wanted documents relating to Mr. Sykes'
12 employment, you should have requested them in
13 discovery. You did not and here we are.
14          MS. OELTJEN: I think you need to
15 read the request again, Marc, but I appreciate
16 your glibness on the record.
17          MR. ESTEROW: Gladly.
18 BY MR. ESTEROW:
19    Q. Mr. Sykes, I am sorry, we are going to
20 continue.
21          So we were talking about your
22 executive letter that you sent in June 2018, and
23 I would like to ask you, you sent this letter
24 after your transfer to New York was denied; is

Page 46

1 that correct?
2    A. Yes.
3    Q. Okay. Did anyone ever explain to you
4 why your request to transfer to New York was
5 denied?
6    A. I remember having a conversation with
7 Marcus and maybe it was Camille and maybe it was
8 Nathalie. It was maybe a week or week and a
9 half after I submitted my transfer request, and
10 I remember thinking to myself, I have never
11 heard anything prior to this. Everything was
12 triggered once I put in my transfer request.
13    Q. Understood. Did Marcus and/or Camille
14 or Nathalie ever meet with you to talk to you
15 about your transfer request?
16    A. Not -- I think we had that meeting, just
17 that meeting.
18    Q. When you say "that meeting," what are
19 you referring to?
20    A. The meeting where we met to discuss my
21 -- I put in my transfer request, and then maybe
22 a week, a week later I received a request to
23 meet with them, and that was all of it.
24    Q. Okay. And during that meeting, did

Page 47

1 Marcus or Camille -- am I correct that you don't
2 remember who you met with?
3          MS. OELTJEN: Objection.
4          THE WITNESS: Well, I remember it
5 was Marcus, and I believe it was Nathalie. I
6 don't think Camille was present.
7 BY MR. ESTEROW:
8    Q. Okay. Did either Marcus or Nathalie at
9 this meeting explain to you why your transfer
10 request to New York City was denied?
11    A. They said that they spoke with my
12 managers and got feedback.
13    Q. Understood. And did they explain to you
14 that they talked to some of the managers in your
15 stores who had reported that your leadership
16 style was harsh?
17    A. No -- well, yes. That's what they said.
18    Q. Okay. Did they also explain that some
19 of your managers expressed concerns to them
20 about not being supported by you?
21    A. No, they didn't say that.
22    Q. Did they explain to you that some of
23 these stores managers in your store felt
24 unprepared to effectively lead in their stores?

Page 48

1          MS. OELTJEN: Objection.
2          THE WITNESS: No.
3 BY MR. ESTEROW:
4    Q. Did they explain to you that partners
5 did not feel safe to speak up in the stores
6 underneath your auspices?
7          MS. OELTJEN: Objection.
8          THE WITNESS: No.
9 BY MR. ESTEROW:
10    Q. And what was the reason they gave you
11 about your -- what was the reason they gave you
12 about the denial of your request to transfer to
13 New York?
14          MS. OELTJEN: Objection.
15          THE WITNESS: That they spoke with
16 my managers and something to the effect of my
17 leadership style being harsh, which I thought
18 was a pretty offensive statement because I
19 hadn't heard anything like that before. And I
20 brought that to their attention. And I also
21 said, remember saying, I hadn't heard any of
22 this until I put in my transfer request. And so
23 after I put in my transfer request, I think
24 Marcus said that he started meeting with my

Page 49

1 managers.
2 BY MR. ESTEROW:
3    Q.   Understood.  So thereafter you said --
4    A.   Marcus and Nathalie.
5    Q.   Okay.  So thereafter you sent the letter
6 to Roz Brewer, Rossann Williams, Howard Schultz
7 and Kevin Johnson that we were talking about
8 earlier; is that right?
9    A.   Yes.
10   Q.   Do you recall -- strike that.
11         Do you recall saying in that letter
12 that you were (inaudible) had been diminished by
13 the incident that occurred on April 12th?
14         COURT REPORTER: I am sorry, you'll
15 have to repeat that.
16         MS. OELTJEN: I didn't hear it.
17 BY MR. ESTEROW:
18   Q.   Do you recall stating in that letter
19 that your experience at Starbucks had been
20 diminished by the incident that occurred on
21 April 12th?
22   A.   Vaguely.  It's possible.
23   Q.   Do you recall stating that you were
24 saddened and frustrated over how you had been

Page 50

1 treated by regional vice president Camille Hymes
2 and RDO Marcus Eckensberger?
3    A.   Yes.
4    Q.   So you felt that Camille Hymes had
5 treated you unfairly?
6    A.   I did.
7    Q.   In what way?
8    A.   I never received any feedback before.  I
9 had been working around the clock supporting our
10 teams.  The moment I put in my transfer request
11 the temperature completely changed and I didn't
12 know why.
13   Q.   Do you recall stating in that letter
14 that Camille and Marcus are out to make
15 themselves appear and look a certain way at the
16 cost of anyone?
17   A.   Yes.
18   Q.   In reading your letter you wrote that
19 "There is no way I could work under Marcus and
20 Camille in another district."
21         Do you remember stating that?
22   A.   Yes.
23   Q.   And you wrote, "Now I am being kicked
24 out, except there are no handcuffs, but I feel

Page 51

1 so incredibly hurt, confused and saddened."
2         What did you mean by that?
3    A.   This is what I said before.  I worked
4 for the company for 15 years.  I had been there
5 day in and day out during this dramatic
6 incident working around the clock.  And I often
7 have reflected that had I not put in my transfer
8 request form, things might have been different
9 for me.  But I just remember thinking at the
10 time, you know, Ben left, or was fired.  Shannon
11 was fired.  And I know I wasn't being fired.  I
12 just remember feeling that I'm getting a
13 completely different perspective and/or side
14 from them once I initiated this and I hadn't,
15 hadn't gotten any of that before.
16   Q.   Mr. Sykes, you understood that in the
17 aftermath of the April 12th arrests that
18 Starbucks was not permitting you to maintain a
19 role as the district manager in Philadelphia,
20 did you not?
21   A.   Did I what?  Can you repeat that?
22   Q.   Sure.  You understood that in the
23 aftermath of the April 12th arrests that
24 Starbucks was not permitting you to maintain a

Page 52

1 role as a district manager in Philadelphia?
2         MS. OELTJEN: Objection.
3         THE WITNESS: After I submitted my
4 transfer request.
5 BY MR. ESTEROW:
6    Q.   But regardless, regardless of your
7 transfer request, you had no way of maintaining
8 a role as a district manager in Philadelphia
9 according to what Starbucks told you?
10   A.   I was never told that.  It was after I
11 put in my transfer request form, I was told that
12 my transfer was denied and I'd have to move out
13 of the City of Philadelphia.
14   Q.   So you could not maintain a role as a
15 district manager in Philadelphia?
16   A.   Yes.
17   Q.   Understood.
18         MR. ESTEROW: I believe I am
19 finished or almost finished.  Why don't we take
20 a five-minute break.
21         VIDEO SPECIALIST: Stand by,
22 please.  The time is 7:44 p.m. Eastern.  Off the
23 video record.
24         (Recess.)

# EXHIBIT F

**In The Matter Of:**

*SHANNON PHILLIPS v.*
*STARBUCKS CORPORATION*

*EBONY JOHNSON*
*May 4, 2021*

*Terry Burke Reporting*
*Registered Professional Reporters*
*terryburkermr@gmail.com*
*(215) 205-9079*

Min-U-Script® with Word Index

Page 17

1   sure.  No worries.
2   Q.   Keep going.
3   A.   So also -- I'm sorry about that.
4        So also in part in terms of the
5   investigation, there's also a piece where you
6   put together the information that you have
7   received from various witnesses, things like
8   that, completing some sort of, sometimes a
9   written report.  It may also be visible to our
10  legal team.  And also circling back with the
11  complainant along with whoever that manager may
12  be if there is going to potentially be some sort
13  of action that would be taken in terms of what
14  the findings were.
15  Q.   Okay, great.  Before I ask the next
16  question, I will just say again, if my head is
17  down, it is just because I am taking notes, so I
18  apologize.
19  A.   Okay.
20  Q.   I don't intend to be impolite to you by
21  not looking at you.  Zoom is, Zoom is Zoom, I
22  guess, right?  We are all struggling through it.
23  A.   That is correct.
24  Q.   Okay, so you take the TLA position some

Page 18

1   time in early April of 2018; correct?
2   A.   Correct.
3   Q.   And when was the first time that you
4   learned that two gentlemen had been arrested in
5   a Starbucks store in the City of Philadelphia?
6   A.   It was -- well, in terms of the arrest,
7   it was technically the same day.
8   Q.   Had you finished your answer, ma'am?
9   A.   Yes.  Sorry.
10  Q.   Do you recall who first informed you of
11  the arrest?
12  A.   I don't know who.  It was -- I will tell
13  you how.  There was an e-mail communication that
14  came to the various leaders in that particular
15  market.  I want to say -- I actually can't say
16  because I don't know exactly who the person was.
17  But somebody at our corporate headquarters
18  e-mailed to let us know that there was an
19  incident that occurred at one of our stores in
20  Philadelphia, and that two gentlemen, Rashon and
21  Donte, actually, were arrested that day.
22  Q.   And have you ever heard anyone suggest
23  or make a statement to the effect that Shannon
24  Phillips had anything to do with those arrests?

Page 19

1   A.   I don't recall anybody saying that.
2   Q.   And are you aware of any information or
3   facts that lead you to conclude that Shannon
4   Phillips had anything to do with those arrests?
5   A.   I am not aware.
6   Q.   Okay, so you received an e-mail
7   communication informing you of the arrest, and
8   did you do anything in response to that e-mail
9   or because of that e-mail that you can recall?
10  A.   I did.  I made a decision to just, for
11  your knowledge, I was based in Dallas-Fort Worth
12  during the TLA and it required travel back and
13  forth to the market.  And I decided that I was
14  going to book a ticket and go out to
15  Philadelphia to understand what was going on.
16  Q.   And do you recall when you arrived in
17  Philadelphia?
18  A.   I don't.  It was either the next day or
19  two days later, but I don't know the exact date,
20  no.
21  Q.   And do you recall, you know, obviously
22  you landed at the airport.  What was the first
23  thing that you did after you arrived in
24  Philadelphia in connection with your work for

Page 20

1   Starbucks?
2   A.   I went to the store where the incident
3   occurred.
4   Q.   And do you recall who was there from any
5   management team?
6   A.   I don't.  There were a lot of people
7   there.
8   Q.   Was Shannon Phillips there?
9        MR. ESTEROW: Object to form.  You
10  can answer.
11       THE WITNESS: I don't know.
12  BY MS. OELTJEN:
13  Q.   Was Camille Hymes there?
14  A.   Yes, I believe Camille was there.
15  Q.   Was Paul Sykes there?
16  A.   On that particular day?  I don't know.
17  Q.   And do you know Paul Sykes?
18  A.   I know of him.
19  Q.   Have you ever met him?
20  A.   Yep, I've met him.
21  Q.   And what was his position at the time or
22  in April of 2018, if you know?
23  A.   He was a district manager.
24  Q.   And did he have any responsibility for

Page 21

1   the store where the arrest occurred?
2     A.  I don't know.
3     Q.   And so you arrived at the store and then
4   what happened, if you can recall?
5     A.  Everybody was talking about what
6   happened, so various team members, other folks
7   that were in the location were just kind of
8   recanting the situation that occurred.  So it
9   was more just a lot of conversation about the
10  situation.
11    Q.  Do you recall if the store manager of
12  that store was present?
13    A.  She was not present.
14    Q.  And do you recall her name?
15    A.  I don't.
16    Q.  Do you know anything about whether or
17  not that store manager still works for
18  Starbucks?
19    A.  I don't believe she works for them any
20  more, no.
21    Q.   And were you involved in any decision
22  having anything to do with whether or not that
23  store manager would continue to work for
24  Starbucks?

Page 22

1     A.  I was not involved in that decision.
2     Q.   How many days were you in Philadelphia
3   on this trip that you first have described for
4   me?
5     A.  I believe it was four.
6     Q.   And what did you do on behalf of
7   Starbucks for those four days?
8     A.  I was going into different locations in
9   and around where the arrest had taken place.
10  There were conversations being had with various
11  team members, store managers, our loss
12  prevention department, various folks there,
13  as well as some of our leaders from Seattle had
14  come in.  Zeta Smith had come in.  Tom -- what
15  was Tom's last name?  There was another, there
16  was another senior leader.  His first name is
17  Tom.  He came in as well.  And just trying to,
18  again, understand the situation and what
19  occurred and that was what was happening just
20  the first few days, is just more of discovery.
21    Q.   And during the four days that you were
22  there on this first trip, you used the word
23  discovery.  So what, if anything, do you believe
24  you discovered about Starbucks' operations in

Page 23

1   Philadelphia during those four days?
2     A.  Well, in terms of operations, I mean
3   that's really, I wasn't really looking for that.
4   I just was trying to understand how things
5   actually occurred.  So in terms of operations,
6   that really wasn't my -- that wasn't really my
7   point.  I'm dealing more with kind of the
8   emotional and the feelings and the aftermath of
9   what was occurring with both partners, as well
10  as other, you know, leaders and things in the
11  particular market at that time.
12    Q.  Okay.
13    A.  So the discovery in terms of operations,
14  that was handled by the operations team.
15    Q.  Okay, so forgive me.  I don't work at
16  Starbucks so I may have used an incorrect word.
17  I am trying to understand what you believed
18  yourself to have discovered during the four days
19  that you were traveling in the Philadelphia
20  market.  What did you learn is what I am trying
21  to understand?
22    A.  I learned -- oh, I'm sorry.  Go ahead.
23    Q.  No, you are good.  I am done.
24    A.  Okay.  You are like let me finish asking

Page 24

1   the question.  All right, so sorry about that.
2          I learned that two African American
3   men came into our store, wanted to go to the
4   restroom before a business meeting they were
5   having at that particular store, and they were
6   told no because they weren't purchasing an item
7   to go to the bathroom.  So that's what I learned
8   initially outside of what the media and
9   everything else was happening really, really
10  quickly at that point.  But pretty much the same
11  story came from other team members or partners,
12  rather, in terms of folks that were there and
13  witnessed it.  And that there was some confusion
14  around the policy.
15         There was, you know, we had a
16  policy in place at that time, you know, just
17  urban market, things going on in bathrooms and
18  such.  And so there was a policy that was there
19  to alleviate, you know, folks sleeping in
20  bathrooms and shooting up heroin, or whatever
21  they were doing in there, for our customers and
22  partner safety.
23    Q.  Is that policy that you are referring to
24  the Safe & Welcoming policy?

Page 25

1   A.   Correct.
2   Q.   Did you learn anything else during your
3   initial four days in Philadelphia?
4   A.   I am sure, but I don't remember exactly
5   everything that I learned that day.
6   Q.   I believe you told me that there was
7   confusion around the policy; is that correct?
8   A.   That's what I was told by the partners.
9   Q.   And are you able to describe what the
10  confusion was?
11  A.   The confusion was around deciding who
12  can go to the bathroom or who couldn't go to the
13  bathroom and does getting a cup of water
14  constitute a purchase versus paying for a paid
15  drink, those types of confusion.
16  Q.   And did you yourself have any
17  understanding at that time of the Safe &
18  Welcoming policy?
19  A.   Not until I arrived because the markets
20  that I worked in we didn't have issues such as
21  these, so I learned more about the policy once I
22  arrived in terms of what it meant for an urban
23  market.
24  Q.   Okay.  So is it fair to say, then, that

Page 26

1   Safe & Welcoming, it was your understanding that
2   Safe & Welcoming wasn't used in every market
3   that Starbucks had stores in?
4   A.   No, that's not what I said.
5   Q.   I am sorry, you said no, that's not what
6   you said?
7   A.   Yeah, I didn't say that.
8   Q.   No, I didn't say --
9   A.   I said I -- oh.
10  Q.   So I am just trying to understand what
11  you understand.
12       So was it your understanding back
13  in April of 2018 that the Safe & Welcoming
14  wasn't used everywhere?
15  A.   No, that's not my understanding.  That's
16  not what I am saying.
17  Q.   Okay.  So do you have any knowledge as
18  to whether or not Safe & Welcoming was used
19  across all of Starbucks stores or not?
20  A.   I don't have that knowledge, no.
21  Q.   Okay.  Is it fair to say, though, that
22  you had not had any understanding of the Safe &
23  Welcoming policy prior to April of 2018?
24  A.   No.  I knew about the policy.  It just

Page 27

1   was more heightened, I assume, in terms of urban
2   markets and what happens in those areas.  So I
3   knew there was a policy there.  I knew what the
4   policy was stating in terms of providing a
5   welcoming place for customers and team members.
6   I call them team members.  They are partners.  I
7   don't work for Starbucks any more, so we are
8   going to probably go back and forth in terms of
9   verbiage, but.
10  Q.   That is okay.  I will understand you are
11  referring to employees; correct?
12  A.   Yes, ma'am.
13  Q.   Okay.
14       Okay, so, but it is fair to say
15  that you understood that the employees were
16  confused about the Safe & Welcoming policy; is
17  that correct?
18  A.   Yes.
19  Q.   During that initial four-day visit, did
20  any employee of Starbucks complain to you that
21  they believed that they were being treated
22  unfairly because of their race?
23  A.   During those four days?
24  Q.   Yes, ma'am.

Page 28

1   A.   I don't believe so.  It came after.
2   Q.   Okay.
3        And did you work with Shannon
4   Phillips during those initial four days in
5   Philadelphia?
6   A.   Worked with?  I mean I saw her.  There
7   was a form of some sort that was put together
8   with Howard Schultz, and so there was some
9   initial contact.  But in terms of like working
10  side by side with her the first four days,
11  everybody was all spread out, so.
12  Q.   Okay.  So you left at the end of four
13  days, you left Philadelphia at the end of four
14  days; is that correct?
15  A.   Yes.
16  Q.   And did you return at some point?
17  A.   Yes, I did.  I came back the next week.
18  Q.   Okay.  And how many days did you stay in
19  Philadelphia on the second trip?
20  A.   I don't remember.
21  Q.   Do you have any recollection of when you
22  returned?
23  A.   No.  It was the next week.  I had a baby
24  at that time that was here in Dallas with my mom

Page 29

1  and I was going back and forth to Philadelphia
2  for -- every week, every other week for -- I
3  don't even know -- six months.
4     Q.  Okay, during your second trip to
5  Philadelphia, can you remember anything you did
6  in connection with your work for Starbucks?
7     A.  Anything specific?  No.
8     Q.  Do you recall if during that second trip
9  any employee complained to you that they had
10 been treated unfairly because of their race?
11    Sorry, I have dogs and kids so you
12 will hear them all today at some point,
13 Miss Johnson.  I apologize.
14    A.  No worries, no worries.
15    No, I don't remember what trip it
16 was when some of those complaints started to
17 come in.
18    Q.  Okay.  So, but complaints started to
19 come in; is that correct?
20    A.  They did.
21    Q.  Okay.  So do you recall anyone
22 complaining directly to you that they had been
23 treated differently because of their race?
24    A.  There were multiple people that came to

Page 30

1  me.  In terms of exact names and who, there's
2  one that stands out.  But there were several.
3     Q.  Okay.  Why don't you tell me the one
4  that you can recall with some specificity,
5  please?
6     A.  Her name was Jaicee Huff.
7     Q.  And what is Miss Huff's race, if you
8  know?
9     A.  She's African American.
10    Q.  And what did Miss Huff tell you, if
11 anything?
12    A.  She stated that she was recently
13 promoted to an assistant store manager and that
14 she found out there was another young lady who
15 was also promoted around the same time who was a
16 white female.  They were talking at a meeting of
17 some sort and whatever happened in their
18 conversation, she found that she was being paid
19 significantly less than this individual and she
20 had some issues and concerns about it because
21 she felt that they had similar backgrounds,
22 experiences.  And she also was concerned that
23 this individual was friends with the district
24 manager and Shannon, the regional director at

Page 31

1  that time.
2     Q.  Okay.  Where were you when Ms. Huff
3  shared this information with you?
4     A.  What do you mean, where was I?
5     Q.  So just that, were you in the store,
6  were you at home receiving the complaint over
7  the phone?  Do you recall where you were when
8  Miss Huff shared this information with you?
9     A.  I don't know where I was at, to be
10 honest.  I don't remember.
11    Q.  Do you recall if Miss Huff spoke to you
12 in person?
13    A.  She has spoken to me in person.
14    Q.  And --
15    A.  Now, for that particular complaint, I
16 don't know if it was in person or over the
17 phone, but I talked to her probably 40 times.  I
18 don't know.  It was all the time.
19    Q.  Okay.  So you spoke to her maybe 40 times
20 over what period of time, if you can recall?
21    A.  Six months.
22    Q.  Okay.
23    A.  The entire time I covered the market.
24    Q.  Okay.  So she sought you out a lot, is

Page 32

1  that what I should understand?
2     A.  Yeah, I guess you could say that.
3     Q.  Can you think of any other employee in
4  the Philadelphia market that you spoke to more
5  than you spoke to Miss Huff?
6     A.  No, I can't think of it.
7     Q.  Do you know if when Miss Huff shared her
8  concerns about her pay, if that was the first
9  time you had spoken to her?
10    A.  I don't know if it was the very first
11 time, no.  I don't know that.
12    Q.  Can you recall if you had met Miss Huff
13 in person before she shared information with you
14 about the concerns she had regarding her pay?
15    A.  Before?  I'm not sure.  I'm trying to
16 kind of scan in my head who was at the open
17 forum.  She may have been there.  I don't know.
18 I don't know.  I'm sorry.  I don't know the
19 answer to it.
20    Q.  That is okay.  You can only remember
21 what you remember.  You don't need to be sorry.
22    Okay, so Miss Huff shared this
23 information with you and what, if anything, did
24 you do in response to receiving that information?

Case 1:19-cv-19432-JHS-AMD   Document 70-4   Filed 11/12/21   Page 108 of 166 PageID: 967
SHANNON PHILLIPS v.
STARBUCKS CORPORATION

EBONY JOHNSON
May 4, 2021

Page 33

1  A.  I started looking into the concern.  So
2 talking to other assistant managers, going back
3 through the system, looking at various
4 promotions, trying to see if there was equity in
5 what the promotions looked like.  I just started
6 doing some digging based on what she was saying.
7 Conversations with various team members.
8  Q.  Who was Miss Huff --
9  A.  And --
10  Q.  Oh, I am sorry, ma'am.  I thought you
11 had finished.
12  A.  No, go ahead.
13  Q.  Who was Miss Huff's store manager at the
14 time?
15  A.  Oh, God, what was that manager's name?
16 I don't know the person's name.
17  Q.  And who was Ms. Huff's district manager
18 at the time, if you know?
19  A.  Ben, Ben Trinsey.
20  Q.  And so when Miss Huff was sharing
21 information with you about her pay, did she
22 provide you with any information about whether
23 or not she thought her store manager had a role
24 in determining her pay?

Page 34

1  A.  I don't know.
2  Q.  Does the name Carmen Williams ring a
3 bell?
4  A.  I believe she was a store manager.  I
5 don't know if she was Jaicee's manager, though,
6 but.  I believe she was a store manager at that
7 time.
8  Q.  Ms. Williams is African American or
9 black; correct?
10  A.  Yes.
11  Q.  Did Miss Huff ever provide you with any
12 information about Ms. Williams?
13  A.  Not that I can remember.
14  Q.  And did Ms. Williams ever refer to
15 Ms. Phillips directly, meaning did she use the
16 name Shannon Phillips in any discussion with you
17 about her pay?
18  A.  About Carmen's pay?
19  Q.  I am sorry, Miss Huff.  Did I say
20 Ms. Williams?  I apologize.
21  A.  I was like what?
22  Q.  Let me withdraw that and I will ask the
23 question again so it is more clear.  Sorry about
24 that.

Page 35

1  Did Miss Huff ever use Shannon
2 Phillips' name during any discussion that she
3 had with you about her pay?
4  MR. ESTEROW: Objection.  Asked and
5 answered.
6  You can answer, Ebony.
7  THE WITNESS: I don't remember if
8 she used Shannon's name or not.
9 BY MS. OELTJEN:
10  Q.  When you indicated that you, I believe
11 you told me that you started looking into the
12 concern that Miss Huff had, is that accurate?
13  A.  Yes.
14  Q.  Did you consider yourself to be
15 conducting an investigation into a complaint by
16 Ms. Huff?
17  A.  Yes.
18  Q.  And is it fair to say that you spoke
19 with multiple people about Miss Huff's complaint?
20  A.  I did.
21  Q.  And were those individuals, did you
22 consider those individuals to be participating
23 in your investigation?
24  A.  Yes.

Page 36

1  Q.  And is there a Starbucks policy that
2 protects people who participate in investigations
3 from being retaliated against for their
4 participation?
5  A.  Starbucks does have a non-retaliation
6 policy, so that relates to all things,
7 investigations, complaints.
8  Q.  And so --
9  A.  They don't really allow for that.
10  Q.  Okay.  And so employees who participate
11 or provide information in connection with an
12 investigation would be protected by Starbucks
13 anti-retaliation policy; correct?
14  A.  Yes.
15  Q.  Did you ever speak with Ms. Phillips
16 about anything having to do with Miss Huff?
17  A.  I believe I did.  I talked to her.  I
18 talked to Ben as the district manager.  My
19 manager.
20  Q.  Anyone else that you can recall?
21  A.  Camille as the leader of the region.
22  Q.  Anyone else that you can recall?
23  A.  In terms of names of other partners in
24 the city.

SHANNON PHILLIPS v.
STARBUCKS CORPORATION

EBONY JOHNSON
May 4, 2021

Page 37

1   Q.   Do you recall the name of the assistant
2   store manager that Ms. Huff believed was paid
3   more than she was?
4   A.   No.
5   Q.   Did you ever reach a conclusion as to
6   whether or not Ms. Huff's complaint was founded
7   or not?
8   A.   I did.
9   Q.   And what was your conclusion?
10   A.   She was paid in -- her pay was not
11   equitable as an assistant store manager with
12   like backgrounds.
13   Q.   And did you ever reach a conclusion as
14   to who was responsible for any inequity in
15   Ms. Huff's pay?
16   A.   So during that time, the district
17   manager who approved and put the pay into the
18   computer system, that was Ben Trinsey.  He was
19   the DM.  And upon speaking with Ben during that
20   investigation, he stated that he had approval
21   from his manager, who was Shannon, to pay the
22   other assistant store manager the pay that she got
23   because that person held a bachelor's degree and
24   Jaicee did not have a bachelor's degree.

Page 38

1   Q.   And does --
2   A.   So he stated that was the -- sorry.  He
3   stated that was the reason why that person was
4   offered the pay for the promotion that she
5   received, it was the educational differences.
6   Q.   And does anyone in human resources have
7   responsibility for also approving pay of an
8   assistant store manager?
9   A.   Not approving, no.
10   Q.   Do they have any responsibility in
11   connection with pay?
12   A.   No.  There is no responsibility to us.
13   Basically what happens or what should have
14   occurred is when there is an internal promotion,
15   we have what was called a comp calculator that
16   was used to input various data about the
17   internal applicants, the years with the company,
18   years in role, any prior experience outside of
19   that, current pay, what market they are in,
20   geography, all of that, and it spits out a
21   recommended salary amount.
22          And in that investigation Ben did
23   explain that he did not use the comp calculator,
24   that he got approval from Shannon to pay that

Page 39

1   other assistant store manager the pay that she
2   was offered.
3   Q.   Right.  And so did you ever ask Shannon
4   where the figure came from or what Shannon's
5   understanding of the process was?
6   A.   I don't remember.
7   Q.   And did you ever reach a conclusion that
8   Ms. Phillips' intentionally discriminated
9   against Ms. Huff in connection with her pay?
10   A.   So the complaint wasn't about
11   discrimination.  It was about the pay not being
12   equal.
13   Q.   Okay.  And so did Ms. Huff ever allege
14   that her pay wasn't equal because of her race?
15   A.   Did she allege that?  I don't remember.
16   Q.   Did Miss Huff refer to her own race and
17   the race of the higher paid assistant store
18   manager in connection with her complaint to you?
19   A.   She did state that the other person was
20   white.  So she mentioned that the other person
21   was white.
22   Q.   Do you consider yourself a human
23   resources professional?
24   A.   I'm a D&I professional now, but.

Page 40

1   Q.   And D&I is diversity and inclusion; is
2   that correct?
3   A.   That's correct.
4   Q.   And do you consider diversity and
5   inclusion work to fall within the larger
6   category of human resources?
7   A.   Possibly.  I think they have their own
8   entity.
9   Q.   Okay.  How many years of human resources
10   experience do you have?
11   A.   20.
12   Q.   And do you have any education or training
13   specifically in the area of human resources?
14   A.   I do.
15   Q.   And tell me what training or education --
16   and education you have in the area of human
17   resources?
18   A.   I have a bachelor's degree.  I'm human
19   resources certified.
20   Q.   What is your bachelor's degree in,
21   ma'am?
22   A.   In business administration.
23   Q.   And you said you are human resources
24   certified?

SHANNON PHILLIPS v.
STARBUCKS CORPORATION

EBONY JOHNSON
May 4, 2021

Page 41

1  A.  Correct.
2  Q.  What certification is that, meaning who
3  offered that certification?
4  A.  My school.  It was the University of
5  Phoenix.
6  Q.  And do you have any other human resources
7  certifications?
8  A.  No.
9  Q.  Have you ever heard of SHRM?
10 A.  Yes, I've heard of SHRM.
11 Q.  Are you a member or have you ever been?
12 A.  I am a member.
13 Q.  And have you ever attended any of their
14 conferences?
15 A.  I have.
16 Q.  And when was the last time you attended
17 one of their conferences?
18 A.  I don't know.
19 Q.  Have you ever presented at one of their
20 conferences?
21 A.  No.
22 Q.  When you were working at Starbucks, did
23 you consider yourself a human resources
24 professional?

Page 42

1  A.  Yes.
2  Q.  And as a human resources professional,
3  at any time during your discussions with Ms. Huff,
4  did you think she was complaining that she had
5  been discriminated against during her time at
6  Starbucks because of her race?
7  A.  Can you repeat the question?
8  Q.  Sure.
9      Did you at any time that you were
10 speaking with Ms. Huff about her experiences at
11 Starbucks, did you understand her to be making a
12 complaint of race discrimination?
13 A.  It would appear to be that, yes.
14 Q.  And when you were conducting your
15 investigation, were you investigating the issue
16 of whether or not Ms. Huff had been discriminated
17 against?
18 A.  I look at, when I think about this
19 question, I look at what I was actually looking
20 into in terms of the pay.  So I look at those
21 separately, right?  So, you know, when I have a
22 conversation with a partner or a team member,
23 like I remember asking her what are you saying
24 is happening here and she said that she felt

Page 43

1  that she was not being paid fairly for being
2  promoted to assistant store manager and she had
3  a concern that a white person who she felt had
4  less experience or same type of experience got
5  paid more, and she believed it was because they
6  were friends.  But she mentioned the race pretty
7  frequently, so I guess maybe it is one in the
8  same.  But ultimately I was looking at the
9  differences in the pay and why that was
10 happening.
11 Q.  Did you ever speak to Ms. Huff's store
12 manager in connection with your investigation?
13 A.  Was the store manager Carmen?  Because I
14 talked to various store managers.  But I said I
15 didn't remember who she was actually reporting
16 to at that time.  There was a lot of movement
17 happening with the partners as well, so.
18 Q.  Okay.  At that time, in connection with
19 Ms. Huff's complaint, did her store manager,
20 whoever it was -- I understand you can't
21 recall -- but whoever the store manager was, did
22 the store manager have any role in setting
23 Ms. Huff's pay?
24 A.  No.  The district manager.

Page 44

1  Q.  And did you reach a conclusion that
2  Mr. Trinsey set Miss Huff's pay at whatever
3  level it was at because of her race?
4  A.  No.
5  Q.  And did you ever reach a conclusion that
6  Mr. Trinsey discriminated against Miss Huff?
7  A.  No.
8  Q.  Did you ever reach a conclusion that
9  Ms. Phillips, whatever her involvement was in
10 Miss Huff's pay, that her involvement in setting
11 that pay was because of Ms. Huff's race?
12 A.  No.
13 Q.  Did you ever conclude that Ms. Phillips
14 discriminated against Ms. Huff because of her
15 race?
16 A.  No.
17 Q.  Did you ever make any recommendation to
18 anyone about any action that should be taken
19 against Mr. Trinsey?
20 A.  Recommendation?
21 Q.  Yes, ma'am.
22 A.  Did I make a recommendation?  I believe so.
23 Q.  Do you recall what that recommendation
24 was?

Page 45

1    A.  Separation.
2    Q.  And do you recall who you made that
3   recommendation to?
4    A.  No.
5    Q.  And why was it your recommendation that
6   Mr. Trinsey be separated from Starbucks?
7    A.  Because he violated code of conduct.
8   There was multiple things that Ben was being
9   investigated for, not just the inequity in pay
10   of assistant store managers.
11    Q.  Okay.  Please tell me everything you can
12   recall Starbucks investigating Mr. Trinsey for?
13    A.  So inappropriate comments about race,
14   people being gay, treatment of other
15   partners/team members.
16    Q.  What inappropriate comments was it
17   alleged that Mr. Trinsey made about race?
18    A.  I don't remember the exact comment.
19    Q.  Did you document these comments
20   anywhere?
21    A.  I believe so.  I believe they were an
22   e-mail to my manager.  There's also, at Starbucks
23   we had a department called the business ethics
24   and compliance department that dealt with things

Page 46

1   around Title VII, and so I know that that team
2   was also aware of some of the complaints around
3   the comments.
4    Q.  Okay.  So I just want to make sure I
5   understood.  It was your understanding that
6   Mr. Trinsey was accused of making inappropriate
7   comments about race; is that correct?
8    A.  Yes.
9    Q.  And I believe you told me that Mr. Trinsey
10   was also accused of making inappropriate comments
11   about people being gay; is that correct?
12    A.  Yes, I believe that was it.  There was
13   multiple things.
14    Q.  And do you recall any comments that
15   Mr. Trinsey was alleged to have made about people
16   being gay?
17    A.  Do I recall the comments that were
18   said --
19    Q.  Yes, ma'am.
20    A.  -- or alleged that he said?  No.
21    Q.  And are you aware of any conclusion that
22   was reached about a specific violation of
23   Starbucks' code of conduct by Mr. Trinsey?
24    A.  The exact verbiage of the policy, I

Page 47

1   don't recall.
2    Q.  Other than Ms. Huff, can you recall the
3   name of any individual who complained about
4   Mr. Trinsey's behavior?
5    A.  I can't recall the name, but there were
6   a few.
7    Q.  When you were conducting your
8   investigation, did you take any notes or
9   otherwise memorialize conversations that you had
10   with people?
11    A.  I did, and those, again, were done via
12   e-mail and various recaps, which I don't have
13   access to, so.
14    Q.  And you believe that was an e-mail to
15   either your supervisor or the business ethics
16   and compliance department; is that correct?
17    A.  Yes.
18    Q.  And when you sent those recaps, did you
19   do it right after an interview or did more time
20   go by before you submitted a recap?
21    A.  Usually within 24 hours of talking to a
22   partner, so it was fresh.
23    Q.  And do you recall ever sending a recap
24   that mentioned in any way any conversation that

Page 48

1   you had with Shannon Phillips?
2    A.  I don't remember.
3    Q.  But Miss Phillips was someone who
4   participated in your investigation; is that
5   correct?
6    A.  Yes.
7    Q.  Did Miss Phillips ever tell you she
8   didn't think Mr. Trinsey was being treated
9   fairly?
10    A.  I don't recall being told that.
11    Q.  Do you recall Miss Phillips telling you
12   anything about Ben Trinsey?
13    A.  No.
14    Q.  Do you recall Miss Phillips calling you
15   upset because she had just been told to place
16   Mr. Trinsey on administrative leave?
17    A.  No.
18    Q.  Do you recall any discussion with
19   Miss Phillips about placing Mr. Trinsey on
20   administrative leave?
21    A.  No.
22    Q.  When you worked for Starbucks, did they
23   issue you a laptop?
24    A.  They did.

SHANNON PHILLIPS v.
STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY

CAMILLE HYMES
January 29, 2021

Page 69

1 certain instances.
2         And so we really -- Shannon
3 helped to lead that conversation and identify
4 where we could enhance our Safe & Welcoming
5 policy, along with her district managers.
6     Q. Is Safe & Welcoming still used by
7 Starbucks today?
8     A. Yes. With enhancements. As a result
9 of our lessons from the Philadelphia
10 situation.
11     Q. And once those arrests took place,
12 the Safe & Welcoming policy was pulled in the
13 City of Philadelphia for a time; correct?
14     A. I don't recall that.
15     Q. Okay, we will go through some
16 documents.
17     A. I don't.
18     Q. You mentioned that this was broadcast
19 or recorded; correct?
20     A. Broadcast. I am not aware if it was
21 recorded.
22     Q. Are you aware, when you say "broadcast,"
23 was it both a video and an audio broadcast or
24 was it just audio?

Page 70

1     A. Video and audio.
2         MS. OELTJEN: Rich, you know what
3 I am going to say. We don't have that, so to
4 the extent that it exists, we think it is
5 responsive to existing document requests.
6         MR. HARRIS: Agreed.
7         MS. OELTJEN: Okay.
8         MR. HARRIS: Agreed.
9         MS. OELTJEN: If it doesn't
10 exist, we would just ask for the defendant to
11 put that in writing.
12         MR. HARRIS: Sure. My
13 understanding it was just a broadcast, but it
14 was not recorded, but I will certainly
15 investigate that.
16         MS. OELTJEN: Thank you, sir.
17         MR. HARRIS: Absolutely.
18 BY MS. OELTJEN:
19     Q. Is it possible that you are a little
20 confused, Miss Hymes, on the timeline and
21 that Miss Philips actually worked for two
22 days following that roundtable?
23     A. I don't recall her working. I
24 remember that conversation being very direct

Page 71

1 in terms of the concerns that I had based on
2 what she was demonstrating. So if she had
3 worked, I don't recall.
4     Q. Did you --
5     A. I remember her --
6     Q. I am sorry. I thought you finished.
7 I apologize.
8     A. Yeah, that's okay.
9         I remember her taking time off,
10 but I don't know if she decided she wanted to
11 work an additional day, or.
12         But the conversation was for her
13 to step away, request, because of what was
14 being demonstrated.
15     Q. Had Starbucks ever had anything
16 happen in its history, to your knowledge,
17 like what occurred in Philadelphia in April
18 of 2013?
19     A. Not to my knowledge.
20     Q. So it would be fair to say that no
21 other regional director certainly that
22 reported to you had ever been through
23 anything like what was going on in the
24 Philadelphia market?

Page 72

1     A. I would say all of our partners,
2 every single person in that market mattered.
3     Q. Well, I agree that everyone matters
4 for sure, and I was not implying by my
5 question that people didn't matter.
6     A. Uh-huh.
7     Q. I am trying to ask, can you point to
8 a similar crisis situation that has occurred
9 in the time you have been in Philadelphia? I
10 am sorry. That you have been with Starbucks?
11 Excuse me.
12     A. Yeah. No, that was quite a unique
13 situation.
14     Q. And we will go back to it. We will
15 go through your employment history in
16 general, but I am assuming that you worked
17 before you joined Starbucks?
18     A. I did.
19     Q. Okay. And had you ever had
20 experience with a crisis of the same level as
21 what was going on in Philadelphia in any
22 other time in your professional experience?
23     A. No.
24     Q. During the partner roundtable, was

# EXHIBIT G

# In The Matter Of:

*SHANNON PHILLIPS v.*
*STARBUCKS CORPORATION*

---

*ZETA ELAINE SMITH*
*June 8, 2021*

---

*Terry Burke Reporting*
*Registered Professional Reporters*
*terryburkermr@gmail.com*
*(215) 205-9079*

Min-U-Script® with Word Index

SHANNON PHILLIPS v.
STARBUCKS CORPORATION

ZETA ELAINE SMITH
June 8, 2021

Page 25

1  Q.     I'm sorry.  Do you recall why he was
2  terminated?
3  A.     Performance.
4  Q.     Anyone else?
5  A.     There's someone but I don't know if
6  that was -- I know that she was getting
7  performance managed, but I don't know if -- if she
8  left on her own volition or -- or not.
9  Q.     Okay.  So I would like to flash
10  forward a little bit to April of 2018 -- well,
11  actually, withdraw that.
12      Is it possible that the -- that the
13  employee that you just were referring to was Nora
14  Essawi?
15  A.     Yes.
16  Q.     Okay.
17  A.     Yes.
18      And if I could go back, June was
19  African.
20  Q.     Okay.
21  A.     The gentleman that replaced June was
22  African-American.
23  Q.     Okay.
24  A.     And I believe Nora was Indian.
25  Q.     Okay.

Page 26

1      Okay.  Now we'll go to April of 2018.
2      Did something significant happen in
3  April of 2018 in connection with Starbucks'
4  operations in the City of Philadelphia?
5  A.     Yes.
6  Q.     And what was that, ma'am?
7  A.     An incident occurred at one of the
8  Philadelphia locations that made national news.
9  Q.     Do you recall where -- which
10  Starbucks location the incident occurred at?
11  A.     The one on Spruce Street.  I don't --
12  Spruce and 18th.  I get all the numbers mixed up.
13  Q.     Is that location sometime referred --
14  sometimes referred to as the Rittenhouse location?
15  Have you ever heard that?
16  A.     I don't know.
17  Q.     Okay.  In April of 2018, did you have
18  an office at a Starbucks location, meaning
19  including their headquarters or any one of their
20  -- their campuses?
21  A.     I had an office in Seattle.
22  Q.     And is that where you would generally
23  report to work?
24  A.     Yes.
25  Q.     And would you travel back east to any

Page 27

1  of the locations that you were ultimately
2  responsible for with any regularity?
3  A.     Yes, part of my role was to spend
4  part of my time out in the field with the field
5  leaders and part of my time in headquarters doing
6  strategy work.
7  Q.     And had you been to Philadelphia in
8  2018 before April?
9  A.     Yes.  I'm not sure exactly the
10  timing, but it had to be within a six-month period
11  prior to --
12  Q.     Prior to April?
13  A.     Prior to April, yeah.
14  Q.     And when you were in Philadelphia
15  prior to April of 2018, did you ever meet with or
16  work with Shannon Phillips?
17  A.     Yes, we rode together.
18  Q.     And what were your impressions of
19  Ms. Phillips during the time that you rode
20  together?
21  A.     That she had good relationships with
22  her partners that she was doing some very good
23  community work, actually quite noteworthy on that
24  end, and, you know, we spent most of the time, you
25  know, visiting and connecting with partners and

Page 28

1  showing support.
2  Q.     Did you like Shannon Phillips?
3  A.     Did I like her professionally?
4  Q.     So it's just an open-ended question.
5  If you would like -- if you have a different
6  feeling about her professionally than you do
7  personally, please feel free to let me know.
8  A.     I -- I respected Shannon and I liked
9  her as a person.
10  Q.     When was the first -- I withdraw
11  that.
12      When you referred to an incident in
13  the 18th and Spruce Street location, you are
14  referring to the arrest of two African-American
15  gentlemen by the Philadelphia Police, correct?
16  A.     Correct.
17  Q.     And that event was picked up by local
18  and national media, correct?
19  A.     Correct.
20  Q.     And is it accurate to say that that
21  event placed Starbucks in a very negative light
22  with the public?
23  A.     Correct.
24  Q.     And so did you as a Divisional Senior
25  Vice President view that event as a brand risk for

Page 33

1  CEO -- COO -- excuse me -- at the time.
2      Q.      And what was Ms. Williams' or Miss
3  Brewer's role in the decision to terminate Miss
4  Phillips?
5      A.      It was just an inform.
6      Q.      Did they offer -- did either --
7  either woman offer an opinion as to whether or not
8  that decision was appropriate?
9      A.      I don't know for Roz because I did
10 not speak with her directly.  I know that Rossann
11 was supportive of the decision.
12     Q.      How do you know that Roz Brewer was
13 informed of the decision if you were not the one
14 that told her?
15     A.      Because Rossann said that she did.
16     Q.      And did Rossann report to Miss Brewer
17 in any way?
18     A.      Yes.
19     Q.      Why did you endorse the decision to
20 terminate Miss Phillips?
21     A.      I felt that in a crisis we need
22 leadership, and I did not see that from Shannon
23 over a several-week period of time.
24         Part of that was the attendance of,
25 you know, some critical meetings or calls, whether

Page 34

1  she's showing up or showing up late or not being
2  able to get into contact with her, to not
3  directing the team that was really hers in the
4  midst of a crisis.
5      Q.      Have you ever seen any document that
6  sets forth any time, for example, when
7  Ms. Phillips failed to show up someplace that she
8  was expected to be?
9      A.      Have I seen a document -- say that
10 again.
11     Q.      Have you ever seen a document -- so,
12 for instance, an email -- that describes an
13 occasion when Ms. Phillips failed to show up
14 someplace that she was expected to be?
15     A.      I -- I don't know.  I don't -- I
16 don't -- I know that there were multiple
17 conversations and I was witness to those times
18 where she was late.
19         I do know that Camille had
20 conversations with her and concerns about it.  And
21 I do know that Camille had -- had documented that
22 because she -- she shared that with me.
23     Q.      So I want to break down your answer.
24         Tell me every conversation you can
25 recall that you were present for in which Shannon

Page 35

1  Phillips was provided any information in April or
2  May of 2018 that her performance was lacking in
3  any way.
4      A.      So this is -- this is my conversation
5  with Camille, or you want my conversation with
6  Shannon?  Just so I'm clear in your question.
7      Q.      All right.  No, I appreciate you
8  asking for the clarity.
9         I want to know about any conversation
10 that you were either part of or witness to in
11 which Shannon was receiving information from
12 anyone that her performance was materially lacking
13 in April or May of 2018.
14     A.      Okay.  I was not a witness to Shannon
15 getting specifically addressed about her
16 performance.  I would receive the information from
17 either Paul or Camille sharing the discussions
18 that they had with Shannon.
19     Q.      So you don't have any firsthand
20 information about whether or not those
21 conversations actually took place, correct?
22     A.      When you say "firsthand," meaning was
23 I standing there when they were having the
24 conversation?
25     Q.      Well, so, to me, firsthand is when

Page 36

1  you observe something yourself.
2         Does that seem like a fair definition
3  to you?
4      A.      Yes.  And if that's the case, I
5  observed some of the behaviors that were a concern
6  of which I personally shared that back to Camille
7  as part of my role for her to then, you know,
8  coach Shannon.
9      Q.      And I appreciate you sharing that,
10 but what I'm trying to understand is, do you have
11 any information or any observation in which you
12 saw Shannon being told that her performance was
13 not okay?
14     A.      I was not witness to those
15 conversations.
16     Q.      And did you know anything about Miss
17 Phillips' length of service with Starbucks in
18 April and May of 2018?
19     A.      Meaning how long she had been with
20 Starbucks at that time?
21     Q.      Yes, ma'am.
22     A.      Yes.  I'd have to do that in my head.
23         I know she had been an RD at least
24 for five or six years at that point.  And she was
25 a DM at least five years from that point.

Page 37

1  Q.    Does it comport with your
2  recollection that it was more than 12 years with
3  Starbucks, almost 13?
4  A.    That would sound close to what I just
5  approximated.
6  Q.    And so in your mind, was it important
7  to you as a leader that a long-standing employee
8  like Miss Phillips receive information that her
9  performance was not okay so that she could correct
10 whatever the perceived deficiencies in her
11 performance were?
12 A.    Yes, you -- you communicate when
13 performance needs to be addressed.
14       (Robyn Ruderman joins the
15 deposition.)
16 BY MS. OELTJEN:
17 Q.    Were there ever any other options
18 other than termination that were discussed, to
19 your knowledge, about Ms. Phillips' employment
20 with Starbucks?
21 A.    I know that there was conversations
22 or consideration of a community role of some sort.
23 Q.    And were you supportive of that?
24 A.    I was supportive of a -- of a
25 community role early in the discussion.

Page 38

1  Q.    Was there -- given your answer and
2  reference to an "early in the discussion," was
3  there an event that changed your mind and led you
4  to conclude that Ms. Phillips needed to be
5  terminated from the business?
6  A.    I don't think there was a single
7  event.  I think it was a combination of the
8  derailing behaviors that were either shared with
9  me or that I witnessed myself.
10       And so any consideration of future
11 job opportunities were not -- were no longer
12 considered because then it was about performance,
13 and we're not going to move someone who was
14 struggling in role to another role.
15 Q.    With respect -- with respect to the
16 behaviors that you observed yourself, have you
17 identified all of those for me or are there other
18 behaviors that you considered in connection with
19 your endorsement of Shannon's termination?
20 A.    So I spoke to the -- the tardiness of
21 at least three critical meetings, and tardiness
22 and/or cannot get ahold of.
23       I -- I would say as an example when I
24 said about leadership during a crisis, you expect
25 leaders to direct, to calm the seas, if you will,

Page 39

1  to be able to marshal resources, to be able to
2  provide answers when asked.  I did not see any of
3  that with Shannon during this period of time.
4        And, in particular, what stood out to
5  me, just very small examples, we were standing
6  in -- in the store, Spruce and 18th, and someone
7  came up to her to ask her about merchandising of
8  the pastry case because one of the products was
9  out or something like that, and instead of being
10 able to direct, something to me that an RD or even
11 a DM should be able to do, she actually directed
12 it to someone else to answer.
13       And at that point, I mean, that's
14 what a field leader does, you -- you're about
15 operations.  And so even in the midst of a crisis,
16 some of the default expertise that you have, you
17 should be able to lead through that.
18       So I would say there was -- there was
19 examples like that around operations that I felt,
20 hey, you should be able to direct at that point.
21       But as I shared, I was -- I was just
22 very concerned about the lack of leadership that I
23 saw and that many of her own team were now --
24 stopped coming to her to ask questions and started
25 going to other people, which was a sign of the

Page 40

1  lack of leadership that she was exhibiting.
2        MS. OELTJEN: Miss Smith, I
3  apologize.  My 12-year-old has just answered my
4  door and there's someone there.  We don't need to
5  go off the record.  I'm just going to mute myself
6  and stop my video and come right back.  I'm so
7  sorry.
8        THE WITNESS: Do you want us to take
9  a break?
10       MS. OELTJEN: Is this a good time for
11 a break for you, ma'am?
12       THE WITNESS: Sure.
13       MS. OELTJEN: Okay.  Why don't we do
14 that.  Thanks.
15       VIDEOGRAPHER: The time is now 3:55.
16 Going off the video record.
17       (Recess.)
18       VIDEOGRAPHER: The time is now 4:05.
19 This begins Media No. 2.
20       You may proceed.
21 BY MS. OELTJEN:
22 Q.    Miss Smith, before our break you were
23 sharing with me some information about performance
24 deficiencies regarding Ms. Phillips, and you gave
25 me one example of -- I'm just going to summarize

Page 41

1   it by referring to it as the pastry case example.
2        Are you able to give me any more
3   specific examples related to the categories of
4   deficiencies that you have testified to?
5   A.      So I think during that -- the time of
6   crisis, which lasted for several weeks, what I
7   would look for in a leader, especially a leader
8   who had been leading for six years or so, is
9   that -- number one, that the team would come to
10  her for direction, and they were not.
11       Number two, that she would be
12  leading, she would be directing, she would be
13  providing insight.
14       When we would have debriefs from the
15  store visit, you know, I'd expect her to be very
16  actively involved in the conversations or trying
17  to address what was being shared or some of the
18  questions that had been raised from the store
19  visit, and there was -- there was very little
20  conversation or response from her.
21       So, you know, the expectation of a
22  Regional Director, especially at that time, were
23  just not being met.  And, as I said, this went on
24  for several weeks where it was very similar
25  examples week over week.

Page 42

1        To me, the telling sign was when your
2   team does -- stops coming to you and starts going
3   to other people for direction.
4   Q.      And when you give that example -- and
5   you did earlier in your testimony just a moment
6   ago as well -- saying that the team -- you
7   expected that the team would go to Shannon, are
8   you able to point to any examples of any team
9   member that you felt should have gone to Shannon
10  and instead went to someone else?
11  A.      The specificity of, you know, DMs --
12  I would say I remember Paul, who was the DM of
13  that particular location, coming up to Shannon
14  asking about -- and it was something -- because we
15  had just rolled out a -- a promotion, whatever,
16  and I remember him asking her about how to kind of
17  handle that.
18       And I remember her just kind of
19  deferring to someone else.  I don't -- I don't
20  recall who she deferred to, but I do recall
21  thinking to myself, Okay, well, you know,
22  that's -- that's the DM coming to you.  You know,
23  you should be in a position to answer.
24       I -- you know, I can try to recollect
25  from years ago names, but I don't have anything

Page 43

1   off the top of my head.  It may come to me as we
2   --
3   Q.      Okay.  If it does come to you, let me
4   know, because I -- I will just generally state
5   that I'm interested in all of the examples you can
6   give me behind any area of performance deficiency
7   you've identified for Ms. Phillips.  Okay?
8        So you'll stop me and let me know if
9   you remember something else.  Does that sound
10  good?
11  A.      Yes.  Thank you.
12  Q.      Have you ever referred to a policy
13  within Starbucks called Safe & Welcoming?
14  A.      I -- at that time there was not a --
15  a nationwide policy for that, so I was -- I had
16  heard of it in -- actually post the incident in
17  Philadelphia.
18  Q.      And when you heard of it, did you
19  learn that that was the policy that was being used
20  by Starbucks in its operations in the City of
21  Philadelphia?
22  A.      My understanding was that was a -- a
23  localized policy or procedure, if you will, to
24  address some of the challenges that they were
25  having within the city.

Page 44

1   Q.      And during the time that you were
2   responsible for a city's strategy for Starbucks,
3   was that policy of Safe & Welcoming rolled out to
4   any other locations of Starbucks other than those
5   in the City of Philadelphia?
6   A.      Yeah, that particular policy that
7   was -- was executed, I guess, in Philadelphia was
8   very different than what I was working on with the
9   U.S. strategy.  There was not a -- an official
10  U.S. strategy at that time.
11       When we did eventually roll out a
12  new -- a new policy, whatever was being used in
13  Philadelphia, if anything, we -- we did not use
14  resources from -- from actually most of the
15  regions.  We kind of started from scratch on where
16  we felt the needs were.
17       So I can't say we used whatever had
18  been used in the -- the actual U.S. policy.
19  Q.      Is it accurate to say that Starbucks
20  stopped using Safe & Welcoming in the City of
21  Philadelphia shortly after the arrests on April
22  12th?
23  A.      When you say "Safe & Welcoming," I'm
24  not sure what -- what you are referring to.  If
25  you're saying the actual policy or the concept of

SHANNON PHILLIPS v.
STARBUCKS CORPORATION

ZETA ELAINE SMITH
June 8, 2021

Page 81

1   Q.    Sure.
2   A.    Okay.  So Paul's position is that
3   the -- the call made by the store manager was not
4   racially motivated.
5   Q.    That's correct.
6   A.    And that it was based off of the Safe
7   & Welcoming program.
8   Q.    Yes.  That's what he testified to.
9        Do you agree with that?
10       MS. OELTJEN: Objection.
11       THE WITNESS: I don't -- I -- I -- I
12  mean that's -- that's Paul's perspective.
13       Are you asking me my perspective?
14  BY MR. HARRIS:
15  Q.    Yes.
16  A.    I can't tell you what is racially
17  motivated or not, but I know that the statements
18  from others have been there was this -- this
19  program that it -- the SM thought that she was
20  following.
21  Q.    Do you think that race played a
22  factor in the store manager contacting the police?
23  A.    Personally?
24       MS. OELTJEN: Objection.
25  BY MR. HARRIS:

Page 82

1   Q.    Yes, personally.
2   A.    Personally, yes.  I think there was
3   unconscious bias there.
4   Q.    Okay.  Mr. Sykes also testified that
5   Miss Phillips' termination was also racially
6   motivated.
7        Do you agree with that assessment?
8   A.    That Shannon's termination was based
9   off of her race?
10  Q.    Yes.
11  A.    I do not agree with that.
12  Q.    Mr. Sykes as -- in evidence of that
13  statement suggests that he would have been
14  terminated because of his race if Shannon's
15  termination was not based on race.
16       MS. OELTJEN: Is there a question?
17  BY MR. HARRIS:
18  Q.    Do you agree with that statement?
19  Yes, that's the question.  Do you agree with that
20  statement?
21       MS. OELTJEN: Objection.
22       THE WITNESS: That Shannon --
23  BY MR. HARRIS:
24  Q.    Yes, I'll ask it again.
25  A.    Thank you.

Page 83

1   Q.    Mr. Sykes testified that Shannon
2   Phillips' termination must have been based on
3   race; otherwise, he would have been terminated
4   because he was the DM responsible for that store.
5        MS. OELTJEN: Objection.
6        THE WITNESS: I do not agree with
7   that.
8        I mean, there -- this -- as I have
9   shared the last couple of hours, this was -- this
10  was all performance related --
11  BY MR. HARRIS:
12  Q.    Do you --
13  A.    -- not race based.
14  Q.    Do you recall who replaced Mr. --
15  strike that.
16       Do you recall who replaced Miss
17  Phillips in her role after she was terminated?
18  A.    Marcus Eckensberger, a white male.
19  Q.    Was race a factor in the decision to
20  hire Mr. Eckensberger?
21  A.    No, it was his performance, knowing
22  that he had done -- well, he was a very
23  experienced RD.  He had led in New York City.  He
24  had a very good track record, and we knew he would
25  hit the ground running in leading a team,

Page 84

1   certainly through crisis, because he's been
2   through several of those.
3   Q.    Were there any discussions regarding
4   the leadership regarding issues of race after the
5   April 18 incident regarding Starbucks wanting to
6   rehabilitate its brand?
7        MS. OELTJEN: Objection.
8        THE WITNESS: There was conversation
9   around diversity and inclusion and race.  There
10  was training that followed, so, yes.
11  BY MR. HARRIS:
12  Q.    Prior to the training that occurred,
13  were there any discussions that you would be aware
14  of that Starbucks wanted to do something big,
15  other than the training, to impact its brand
16  regarding race relations?
17       MS. OELTJEN: Objection.
18       THE WITNESS: That Starbucks wanted
19  to do something in addition to training around
20  race relations?
21  BY MR. HARRIS:
22  Q.    Yes.
23  A.    I know that there was a lot of
24  activity around diversity and inclusion from
25  working with consultants, having listening

SHANNON PHILLIPS v.
STARBUCKS CORPORATION

ZETA ELAINE SMITH
June 8, 2021

---

Page 85

1  sessions, what could we be doing to support the
2  Philadelphia community specifically, so it became
3  a much bigger conversation than just the
4  Philadelphia incident.
5      Q.     Mr. Sykes also testified in an
6  unrelated topic regarding the HR function being
7  responsible for setting compensation.
8          Is that accurate?
9          MS. OELTJEN: Objection.
10         THE WITNESS: The HR function --
11 BY MR. HARRIS:
12     Q.     Being responsible for setting
13 compensation for store managers or assistant store
14 managers.
15     A.     So they provide guidance to -- to
16 compensation.
17     Q.     Are -- is it the expectation that the
18 leadership would be responsible for setting
19 compensation?
20     A.     Based off of the guidance, yes.
21 The -- the -- the leadership makes the final
22 decision.  They -- they are provided
23 recommendations from HR.
24         MR. HARRIS: Thank you, Miss Smith.
25 I have no further questions.

---

Page 86

1          MS. OELTJEN: I just have one follow-
2  up.
3          EXAMINATION
4  BY MS. OELTJEN:
5      Q.     Miss Smith, your counsel asked you
6  several questions about whether or not you believe
7  race played a role in various decisions.
8          Do you recall that?
9      A.     Yes.
10     Q.     Do you believe that white people can
11 be discriminated against because of their race?
12         MR. HARRIS: White people generally
13 or white people in this case?
14 BY MS. OELTJEN:
15     Q.     Well, it's a general question in the
16 context of you testifying to your belief about
17 whether or not certain individuals were
18 discriminated against or not.
19         You can answer.
20     A.     Do I -- do I believe that white
21 people can be discriminated against because of
22 their race?
23     Q.     Yes, ma'am.
24     A.     In general, anybody can be
25 discriminated against because of their race, but I

---

Page 87

1  think history will show you nine times out of ten,
2  it is people of color.
3          MS. OELTJEN: Miss Smith, I thank you
4  so much for your time today.
5          THE WITNESS: Thank you.
6          MR. HARRIS: I have one other follow-
7  up question.
8          Actually, strike that.  I have no
9  further questions for you, Miss Smith.  Thank you.
10         MS. OELTJEN: We can -- we're all
11 done then.  Thank you.
12         We can go off the record.
13         VIDEOGRAPHER: The time is now 5:19.
14 This concludes Media No. 3 in the video
15 deposition.
16         (Deposition concluded.)
17
18
19
20
21
22
23
24
25

---

Page 88

1          WITNESS CERTIFICATION
2
3          I hereby certify that I have
4  read the foregoing transcript of my deposition
5  testimony, and that my answers to the questions
6  propounded, with the attached corrections or
7  changes, if any, are true and correct.
8
9
10 _____  _____
11 DATE        ZETA ELAINE SMITH
12
13
14 _____
15 PRINTED NAME
16
17
18
19
20
21
22
23
24
25

---

# EXHIBIT H

# In The Matter Of:

*SHANNON PHILLIPS v.*
*STARBUCKS CORPORATION*

*PAUL J. PINTO*
*April 1, 2021*

*Terry Burke Reporting*
*Registered Professional Reporters*
*terryburkermr@gmail.com*
*(215) 205-9079*

Min-U-Script® with Word Index

Page 97

1   A.  -- using that commonly, but I think that
2   could have been Camille's word for it.
3   Q.   Okay.  Do you recall, as of the time
4   that this e-mail was sent to you, had anyone
5   suggested to you that Shannon Phillips should be
6   fired?
7   A.   Not that soon, no.
8   Q.   When was the first time -- well, I
9   withdraw that.
10        Did you speak with Shannon Phillips
11  during the time that you were in the Philadelphia
12  market beginning on April 15th?
13  A.   Oh, constantly, yeah.
14  Q.   Okay.  And do you have any recollection
15  of the first time that you spoke to or saw
16  Shannon?
17  A.   The first time, no.  It would have
18  been -- well, let me back up.  So I know it was
19  in the store and she was sitting at a table with
20  a few of her district managers.  I don't recall
21  what day that was.
22  Q.   Do you recall anything that you discussed?
23  A.   Well, we would have discussed all
24  aspects of the incident.

Page 98

1   Q.   And during that initial discussion, was
2   it your impression that Ms. Phillips was engaged
3   in addressing the incident?
4   A.   No.
5   Q.   You thought she was not engaged in
6   addressing the incident?
7   A.   I would say there was some red flags and
8   it started to emerge.
9   Q.   When?
10  A.   From the beginning.
11  Q.   From the beginning?
12  A.   Yes.
13  Q.   Were you involved in the decision to
14  terminate Ms. Phillips?
15  A.   It was not my decision to make.  I was
16  involved in conversations around the possibility
17  of.
18  Q.   Who made the decision to fire Shannon
19  Phillips?
20  A.   It would have been Camille.
21  Q.   It would have been or it was?
22  A.   The leader is responsible for that
23  decision, so it was Camille.
24  Q.   So I'm sorry to put you on this, but I

Page 99

1   just want to be careful that we are being precise
2   on the language.
3        Do you have any personal knowledge
4   that it was Ms. Hymes who decided that Ms. Phillips
5   should be terminated?
6   A.   Yes.
7   Q.   Okay.  And so you then are telling me
8   that Ms. Hymes decided to terminate Ms. Phillips,
9   is that accurate?
10  A.   That's right.
11  Q.   Okay.
12        You said you were involved in
13  discussions; is that correct?
14  A.   That's right.
15  Q.   And were you ever asked for an opinion
16  as to whether or not Ms. Phillips should be
17  fired?
18  A.   No.
19  Q.   Did you ever offer an opinion as to
20  whether or not Ms. Phillips should be fired?
21  A.   No.
22  Q.   Do you know why Ms. Phillips was fired?
23  A.   Yes.
24  Q.   And why do you believe Ms. Phillips was

Page 100

1   fired?
2   A.   Because it became clear through the
3   initial approach through this incident that she
4   was just completely not equipped to handle this
5   matter and coming out of it she wasn't provided
6   with direction and leadership needed in the
7   market.  And it became clear that there was
8   absolutely no way that she would have been able
9   to emerge this market out of this successfully.
10  Q.   So why didn't Starbucks just move her to
11  another market?
12  A.   It was not my decision to make.  I don't
13  know.  I can't answer that.
14  Q.   Did you ever suggest that Starbucks just
15  move Ms. Phillips to another market?
16  A.   No.
17        I would also add that by being in
18  the market so fully for weeks and weeks, as well
19  as all other leaders in the market, lots of
20  other performance-related issues had emerged as
21  a result of her lack of leadership.
22  Q.   Like what?
23  A.   There were practices that should have
24  been in place that were not in place that were

Page 101

1   rolled out company wide years before.
2           There were inequitable practices
3   with pay that emerged that she should have had
4   awareness to.
5           There were, there was a lack of
6   transparency around leadership and it was -- it
7   also became pretty clear that she didn't have a
8   significant leadership presence in the market.
9   Rarely in stores, rarely spending time with
10  leaders.  As a result of our conversations and
11  round tables and discussions and touring of
12  stores, all of that emerged.
13      Q.  So did you document any of that?
14      A.  It would have been documented in all
15  sorts of findings that we were rolling up in a
16  variety of different ways.
17          Most of it was probably through
18  recap discussions at the end of each day with
19  the leaders.  As leaders were sort of being
20  dispatched out to a variety of stores and a
21  variety of listening sessions, we would always
22  sort of reconvene and talk through what we
23  learned.
24      Q.  And were those discussions documented,

Page 102

1   or notes or minutes or transcriptions, or
2   recordings, et cetera, generated as a result of
3   those discussions?
4       A.  I would say probably parts of it are
5   somehow documented in some ways, but there
6   wasn't a specific effort to create transcriptions
7   for all of that.
8       Q.  Did you record any of the roundtables or
9   interviews or discussions that you were part of?
10      A.  No.
11      Q.  And did you take notes at any of the
12  roundtables, interviews or discussions that you
13  were part of?
14      A.  I'm sure I did.
15      Q.  And where are those notes today, sir?
16      A.  It would have been part of business
17  journals.  I submitted everything I had.
18      Q.  You did.  So you recall handing over
19  business journals in connection with
20  Ms. Phillips' matter?
21      A.  I recall going through my computer for
22  anything I can find.  I think actually Starbucks
23  still has my computer.  And I recall flipping
24  through all of my journals to see what would

Page 103

1   have been related.  I don't recall whether or
2   not I handed any of those over, but I also don't
3   keep them for many years.  I probably keep the
4   last one or two, and that's it.
5       Q.  Do you recall receiving an instruction
6   at any point in time that you should save
7   whatever you had relating to Shannon Phillips?
8       A.  Yes.
9       Q.  And do you know when you received that
10  instruction?
11      A.  No.
12      Q.  But before you left Starbucks, accurate?
13      A.  Yes.
14      Q.  Okay.
15          And when you said you were flipping
16  through your business journals, is that like,
17  you know, handwritten notes or is it, you know,
18  something that you keep on an iPad or your
19  computer?
20      A.  (Indicating.)
21      Q.  You have one, okay.  Terrific.  It is a
22  notebook that looks like that?
23      A.  Yes.
24      Q.  And do you recall if you flagged anything

Page 104

1   as being related to any of the events in the
2   Philadelphia market of Starbucks from April and
3   May of 2018?
4       A.  Specifically I don't recall flagging
5   anything in a journal.  But I certainly recall
6   flagging things that needed to be discussed and
7   decided.
8       Q.  Okay.  In what format?
9       A.  Conversation.
10      Q.  Okay.
11      A.  I mean at the time, there were probably,
12  I would have -- I probably would have taken
13  notes on specific stories that were told to me
14  from partners for followup on themes.  But once
15  that data was used for that way, I wouldn't have
16  kept it.
17      Q.  Okay.  So let's break down further what
18  you said.  You said you learned that there were
19  practices that should have been implemented in
20  the market and weren't; correct?
21      A.  Yes.
22      Q.  What specific practices are you
23  referring to?
24      A.  Just store operating procedures and

Page 149

1  that she had worked on with Nathalie to talk
2  through the sort of sustainment plan for Philly,
3  leadership sustainment plan.
4    Q.  If you turn to the second page of this
5  document.
6    A.  Okay.
7    Q.  I'd like to talk about the first box.
8    A.  Okay.
9    Q.  At the top.  Okay, so I see Shannon's
10  name.  Do you see that?
11    A.  Yes.
12    Q.  And it lists a "Current Position" and a
13  "Proposed Position"; correct?
14    A.  Yep.
15    Q.  And then under the column "At Risk," it
16  says "yes," and under the column "timing of
17  transition," it says "June 1st"; correct?
18    A.  Correct.
19    Q.  And under "Notes" it says, "Hiring
20  manager:  Shannon Boldizsar"; correct?
21    A.  Right.
22    Q.  Okay.  So what happened, if you know,
23  between April 24th and April 25th that led to
24  Shannon Phillips being identified as at risk in

Page 150

1  her current position?
2    A.  Yeah.  I'm not, I'm not sure if this
3  was -- if we had already had conversations about
4  how her leadership cannot continue at this point,
5  but I know that they were probably definitely
6  started, because this was also around the time
7  where Camille was having conversations with
8  Shannon about how she was feeling and what she
9  wanted to do.  And the reason I know that is
10  because Shannon Boldizsar was on our social
11  impact team.  And her and Shannon were in
12  conversations about their potentially being a
13  different role she could play in the community
14  leadership space.
15    Q.  And it indicates on this list as well
16  that Ben Trinsey is at risk.
17      Do you see that?
18    A.  Yes.
19    Q.  And it similarly identifies Paul Sykes
20  as being at risk; correct?
21    A.  Right.
22    Q.  Was Mr. Sykes ever terminated by
23  Starbucks?
24    A.  I don't know.  I was sort of out of the

Page 151

1  picture before he transitioned, so I'm not -- I
2  think he wanted to transition to the New York
3  market and we couldn't support that so he left,
4  but I'm not sure that that's what happened.
5    Q.  Okay.  Is it safe to say that certainly
6  by June 1st, 2018, you are unaware of any decision
7  by Starbucks to fire him?
8    A.  Yes.
9    Q.  Okay.  So he did not lose his job as a
10  result of anything that happened in connection
11  with the arrest of the two gentlemen in Philly;
12  correct?
13    A.  I don't know that for sure, but I don't
14  think so.
15    Q.  Okay.
16      And to your knowledge, had anyone
17  as of the date that Camille is sending this memo,
18  had anyone said to Shannon like, hey, listen,
19  we're really not happy with how you're performing?
20    A.  Yeah.  I'm pretty sure that Camille had
21  had those conversations, because those would
22  have happened before and during the conversations
23  with Shannon Boldizsar.
24    Q.  Okay.  Do you have any personal firsthand

Page 152

1  knowledge as to whether or not those
2  conversations took place?
3    A.  I don't have a recollection of that
4  timeline.
5    Q.  And as a human resources professional,
6  is it fair to say that you certainly have been
7  involved in the terminations of employees before?
8    A.  Involved in what capacity?  Just
9  involved --
10    Q.  In your capacity as a human resources
11  professional?
12    A.  Yes.
13    Q.  Okay.  And do you think it's important
14  for an employee who is performing poorly to be
15  told that they are performing poorly?
16    A.  Yes.
17    Q.  So in your mind, if Camille was unhappy
18  with Shannon's performance as a human resources
19  professional, you believe Shannon should have
20  been told?
21    A.  Yes.
22    Q.  And do you have any explanation for why
23  Ms. Camille had written down as a proposed
24  position for Mr. Sykes "DM in a suburban market"?

SHANNON PHILLIPS v.
STARBUCKS CORPORATION

PAUL J. PINTO
April 1, 2021

---

Page 161

1   a text message.
2          Is that what it looks like to you?
3   A.   Yeah.
4   Q.   Okay.  And we can designate the numbers
5   as confidential, but is this you at 617-678-4521?
6   A.   Yeah, I think that was my work cell.
7   Q.   Okay, so that is a phone that you had
8   when you were working for Starbucks?
9   A.   Yes.
10  Q.   And when you left Starbucks, it sounded
11  like you gave them your computer, based on your
12  earlier testimony; is that right?
13  A.   That's right.
14  Q.   And did you turn over your phone as well?
15  A.   Yes.
16  Q.   Okay.  So let's go through this page of
17  text messages, if you don't mind.
18  A.   Okay.
19  Q.   So at the top, do you see on May 4th,
20  2018 --
21  A.   Yes.
22  Q.   -- Nathalie Cioffi writes, I think it is
23  meant to say "Shannon's departure.  Have you
24  discussed package?  Zeta was asking."

---

Page 162

1          And then you below respond, "No, we
2   have not.  Camille had a convo with her about
3   what she wants to do.  I have not been involved
4   yet.  Find out from Camille."
5   A.   Yep.
6   Q.   Do you see that?
7          And then Nathalie writes, "Desire
8   for accelerated process with you next week.
9   Appetite for package."
10         Have I read that correctly?
11  A.   Yes.
12  Q.   Okay.  And then you ask "From Shannon?"
13  And she said, Nathalie says, "No.  Give me a
14  call later this afternoon."
15         Do you see that at 1605?
16  A.   Yes.
17  Q.   And then did you call Ms. Cioffi after
18  this text exchange?
19  A.   I'm sure I did.
20  Q.   And do you have any recollection of that
21  discussion?
22  A.   Not, not this particular discussion, but
23  it is a discussion I am sure I would have had or
24  have had.

---

Page 163

1   Q.   Okay.  Do you have any understanding why
2   there was, as of May 4th, 2018, a "Desire for
3   accelerated process with you next week?"
4   A.   Let me just read the contents of this.
5   Q.   Take your time.  You can read the whole
6   thing.  You should, in fact, read the whole
7   thing.
8   A.   (Pause.)
9          Okay.  What is not clear from me is
10  why Nathalie would have said "desire for
11  accelerated process with you next week.  Appetite
12  for package."
13         Oh, I think this is because I said
14  find out from Camille.  Okay.
15         So this would have been Camille had
16  had conversations with Shannon about the direction
17  that she was going in with her leadership, and
18  it would have been a start to the conversations
19  about what she would be looking for in a severance
20  package and this looks like the time frame that
21  that was occurring.
22  Q.   Okay.
23         Sorry, I am just bringing up the
24  next one.

---

Page 164

1   A.   Okay.
2          (Phillips 72 was marked for
3   identification.)
4   BY MS. OELTJEN:
5   Q.   Okay, Phillips 72, also known as
6   STARBUCKS 5891 also looks to be a text exchange.
7   Why don't you read the full text exchange and
8   then let me know when you are ready.  The full
9   text exchange on this page and then let me know
10  when you are ready.
11  A.   Okay.
12         (Pause.)
13         Okay.
14  Q.   Have you had a chance to read this full
15  page?
16  A.   I did.
17  Q.   Okay.  This appears to me to be a text
18  exchange between you and Zeta Smith.  Is that
19  accurate?
20  A.   Yes.
21  Q.   Okay.  And would you often communicate
22  with Ms. Smith in connection with your work
23  together?
24  A.   Yes.

---

Page 169

1   made involving Mr. Trinsey's conduct?
2       A.   I don't recall one.  I know there was
3   the pay difference piece, but I don't recall.
4       Q.   So I think this is why I got confused in
5   my back and forth with you earlier.
6             Was there a specific allegation
7   relating to a race-based pay difference coming
8   from one of Mr. Trinsey's stores?
9       A.   Yes.
10      Q.   Okay.  And was an employee or multiple
11  employees alleging that Mr. Trinsey had played
12  some role in perpetuating or effectuating a pay
13  difference?
14      A.   There was a pay difference.  Whether or
15  not, you know, he purposely decided to
16  perpetuate that difference based on race was not
17  determined.
18      Q.   So Mr. Trinsey was not placed on leave
19  as a result of any concern about pay difference,
20  or he was?
21      A.   It was overall leadership, which is why
22  we needed to remove him from that, from that
23  role, so that we could further investigate
24  allegations that were being surfaced.

Page 170

1       Q.   And is there any documentation relating
2   to any allegations that were made regarding
3   Mr. Trinsey's conduct?
4       A.   I think Nathalie would probably be better
5   equipped to answer that.  Not that I'm aware of
6   or that I've seen.
7       Q.   Okay.  But you haven't seen any; correct?
8       A.   No.
9       Q.   Okay.
10      A.   At this point, I would have been informed
11  from other HR leaders in the market about what
12  was going on and less involved in the day-to-day
13  decisions around what was happening in the
14  markets.
15      Q.   Were you ever aware of or part of any
16  discussion in which it was contemplated that
17  Paul Sykes should be placed on any sort of
18  leave?
19      A.   I'm trying to remember if we talked
20  about a leave in particular, but I know that
21  there were questions and discussions around
22  whether or not he was the right leader for that
23  market.
24            That sort of goes back to that --

Page 171

1       Q.   Sorry about that.  It is off.  For some
2   reason it still rang anyway.
3       A.   I was just going to say that goes back
4   to that document where you had at risk and
5   possible suburban market.  So that conversation.
6       Q.   At some point in time were you part of a
7   discussion with Shannon Phillips relating to
8   placing Mr. Trinsey on suspension?
9       A.   Yes.
10      Q.   Okay.
11      A.   Yes.
12      Q.   Tell me everything that you can recall
13  of that discussion?
14      A.   We were in the basement of the store
15  where the event happened and Camille was there,
16  and I can't remember if Nathalie was there or
17  not.  There might have been an additional person
18  there.
19            And we were sharing with Shannon
20  that he needed to be placed on leave while we
21  investigated further the allegations that were
22  surfacing.
23            And we also had some conversations
24  with her about how to approach it and what to

Page 172

1   say.  And I remember that her demeanor was very
2   odd.  It was very stoic and she just acted very
3   robotic and verbatim wrote everything that we
4   said in her notebook.
5       Q.   Anything else you can recall?
6       A.   No.
7       Q.   Okay.  Is it possible that that
8   conversation took place in the lobby of the
9   Warwick Hotel in Philadelphia?
10      A.   I believe, I thought we were in the
11  store in the basement.
12      Q.   Okay.  At the time that you were having
13  the discussion with Shannon, had a decision been
14  made whether or not Ms. Phillips was going to be
15  terminated or have some other change in her
16  status with Starbucks?
17      A.   No, because that was earlier on.
18      Q.   When you say "that was earlier on," you
19  are referring to the conversation about Ben
20  Trinsey was before a decision had been made to
21  terminate Shannon?
22      A.   Yes.
23      Q.   Okay.  You told me that you shared the
24  allegations that were surfacing.

SHANNON PHILLIPS v.
STARBUCKS CORPORATION

PAUL J. PINTO
April 1, 2021

---

Page 193

1   community.  All of that.
2   Q.  We saw an e-mail, actually it was a text
3   message -- excuse me -- a text message that said
4   that Miss Philips had crashed and burned.
5        Did you agree with that assessment?
6   A.  Yes.
7   Q.  How so and why?
8   A.  It became very clear that her leadership
9   started with panic, went into this just complete
10  freeze.  She wasn't upholding her responsibilities
11  by being present and it was clear that there was
12  no way that that market would recover under her
13  leadership as a result of her escalated
14  ineffective leadership.
15  Q.  When you say "present," what do you mean
16  by that, physically present or emotionally
17  present or both?
18  A.  I would say both.  I think what was
19  uncovered during this process is a whole bunch
20  of leaders got much closer to the market and her
21  impact on the market than ever happened before,
22  and it was clear that she was not the right
23  leader to move that market forward.
24  Q.  Now, was that your personal assessment

---

Page 194

1   or was it others who also came to that assessment
2   as well?
3   A.  It was --
4        MS. OELTJEN: Objection.
5        MR. HARRIS: Withdrawn.
6        MS. OELTJEN: I can't instruct you
7   not to answer.
8        MR. HARRIS: Withdrawn.  I will
9   rephrase the question.
10  BY MR. HARRIS:
11  Q.  Based on your personal assessment of
12  Miss Philips, can you tell us how you assessed
13  her leadership during the time period from April
14  of 2018 up until the time that she was separated
15  from the organization?
16  A.  How I assessed it?
17  Q.  Yes.
18  A.  Yeah.  It, you know, like I had
19  mentioned before, I had worked with Shannon very
20  closely through many of her promotions and
21  development opportunities.  So it was very
22  common for her and I to have conversations about
23  where she was showing up well and where she
24  wasn't showing up well and, you know, we'd

---

Page 195

1   confide in each other about, you know, performance
2   and just have very open conversations about it.
3        The Shannon that I saw during this
4   was a completely different person.  It was, it
5   was -- it just, you know, completely paralyzed
6   leadership.  It was initially we were trying to
7   figure out how we could support to give her the
8   tools and resources necessary to be successful,
9   but she wasn't doing her part.  And then it
10  became clear that the market was being impacted
11  as a result of that leadership the closer and
12  closer we got.
13  Q.  What was her part, Mr. Pinto?
14  A.  It was absent.
15  Q.  Okay.
16  A.  It was absent.
17       MR. HARRIS: May Mr. Pinto be shown
18  Starbucks Exhibit Bates stamped 403 through 406.
19  Rick, are you able to do that for me?
20       VIDEO SPECIALIST: You said 403
21  through 406?
22       MR. HARRIS: Yes.
23       VIDEO SPECIALIST: One moment.
24  BY MR. HARRIS:

---

Page 196

1   Q.  I am showing you what has been marked as
2   Bates stamped 403.
3        Should we mark this, Terry, as
4   Exhibit No., is it 73?  Is that what number we
5   are on?
6        MS. OELTJEN: If you don't mind,
7   can you mark it to identify it as a defense
8   exhibit, not a Plaintiff's Exhibit, please.
9        MR. HARRIS: Sure.  No problem.
10       MS. OELTJEN: You were using P's,
11  which is why I went with Phillips.
12       MR. HARRIS: Okay, no problem.  We
13  mark this for the purposes of Mr. Pinto --
14       MS. OELTJEN: I can give you your
15  last number.  I will tell you.
16       MR. HARRIS: Why don't you tell me,
17  Kate.  Thanks.
18       MS. OELTJEN: I will.  I will let
19  you know what you last used.
20       I am sure Marc will correct me if I
21  am wrong, but I think the last number you used
22  was P-7.
23       MR. HARRIS: Okay.  We will mark
24  this as P-8.

---

# EXHIBIT I

# In The Matter Of:

*SHANNON PHILLIPS v.*
*STARBUCKS CORPORATION*

*NATHALIE CIOFFI*
*April 2, 2021*

*Terry Burke Reporting*
*Registered Professional Reporters*
*terryburkermr@gmail.com*
*(215) 205-9079*

Min-U-Script® with Word Index

Page 69

1   Q.   Were you part of any discussion or aware
2   of any discussion in which any change in
3   Mr. Sykes' status was considered?
4   A.   Yes.
5   Q.   And what were those discussions that you
6   can recall, please?
7   A.   For him not to be in the district in
8   Philadelphia.
9   Q.   And who was part of those discussions?
10  A.   Myself, Camille.  I am not entirely
11  sure, so I cannot guess to that.  Mark
12  Eckensberger and Paul Pinto.  But mostly myself,
13  Camille and Marcus Eckensberger.
14  Q.   And was there anyone who was
15  particularly in favor of having Mr. Sykes move
16  out of the district, if you know?
17  A.   I think all from, yeah, Paul Sykes could
18  not remain in this district.
19  Q.   But he did; right?
20  A.   No, he did not.  Well, he did not.  He
21  made the choice to not wanting to move where we
22  wanted to move him, but he didn't have the
23  choice to stay in the district.
24  Q.   Well, how much later was that in

Page 70

1   May 2018, that was some time later; correct?
2   A.   Yes, it was later than May 18.  It would
3   have been in that same time, in that summer part
4   Paul Sykes was asked to be moved to a different
5   district.
6   Q.   And are you able to say when that was?
7   A.   I would have to look at, I'm not able to
8   pinpoint a date.  It would have been around that
9   summer.
10  Q.   So certainly after Mr. Trinsey was
11  suspended; correct?
12  A.   Yes.
13  Q.   And certainly after Miss Philips was
14  fired; correct?
15  A.   Yes.
16  Q.   And isn't it accurate that Mr. Sykes
17  asked to be allowed to transfer to New York?
18  A.   Yes, yes.
19  Q.   And Starbucks was not able to accommodate
20  that request; correct?
21  A.   We are able to accommodate.  It would
22  decline the request.
23  Q.   Okay.  But he wasn't fired; right?
24  A.   Not on the request.

Page 71

1   Q.   Well, at any point in time did Starbucks
2   tell Mr. Sykes that he needed to leave and it
3   was Starbucks choice that he do so?
4   A.   No.
5   Q.   Do you have any explanation for why
6   actions were taken by Starbucks against
7   Mr. Trinsey and Ms. Phillips well before
8   anything related to Mr. Sykes?
9           MR. ESTEROW: Object to form.  You
10  can answer.
11          THE WITNESS: I have my, I have my,
12  what my observation and the why.  The
13  explanation is that -- it was a -- when we came
14  into the City of Philadelphia and following the
15  event, I think what it highlighted was there was
16  a lack of leadership.  There was a lack of
17  understanding the partner's sentiment.  Lack of
18  standards in the store.  The list is on.  So
19  that's the reason for Shannon Phillips was
20  removed from the position.  Ben Trinsey was
21  suspended following the whole slew of things
22  between the partner sentiment and the actual
23  state of the district.
24  BY MS. OELTJEN:

Page 72

1   Q.   So that wasn't my question.
2   A.   I'm sorry.
3   Q.   That's okay.  My question was do you
4   have an explanation for why Starbucks took
5   action first against Ben Trinsey and then
6   Miss Philips and then time passed before
7   anything happened in connection with Mr. Sykes'
8   employment?  I am trying to understand if you
9   have an explanation for why there was that gap
10  in time?
11          MR. ESTEROW: Object to form.  You
12  may answer.
13          THE WITNESS: Paul Sykes, as much
14  as I think -- for Paul Sykes, the district was
15  not in good standing either for which he had to
16  be removed.  But Paul Sykes was very willing to
17  work with us and very willing to say, okay, this
18  is a disaster, I'm going to do something
19  different.  We're going to work together.  We're
20  going to collaborate and we're going to do this.
21  There was vastly different behavior.  Sort of
22  bundle up, sort of, all right, let's do this.
23  This is not great.  We're going to work on this.
24          His behavior and his attitude was

Page 73

1  super willing to kind of change the fact and
2  kind of, all right, this is not good, but we
3  have to move forward.  We have to change the
4  situation here, and I'm going to be, I'm going
5  to be along this with you.
6        He was really, he was extremely
7  collaborative and kind of creating with us along
8  and really hard working.  Paul Sykes had a
9  different type of like, he had a little bit more
10 leadership and collaborations with us.
11 BY MS. OELTJEN:
12   Q.   Is it fair to say that Mr. Sykes was the
13 senior most boots-on-the-ground employee in the
14 City of Philadelphia who was Black?
15        MR. ESTEROW: Object to form.  You
16 may answer.
17        THE WITNESS: One more time.  Can
18 you repeat the question?
19 BY MS. OELTJEN:
20   Q.   Sure.  Wasn't Mr. Sykes the most senior
21 Starbucks employee working, you know, within the
22 City of Philadelphia?
23        MR. ESTEROW: Object to form.  You
24 may answer.

Page 74

1        THE WITNESS: As a district manager
2  or any employee in Philadelphia?
3  BY MS. OELTJEN:
4    Q.   Was there anyone higher than Mr. Sykes
5  working in Philadelphia?
6        MR. ESTEROW: Object to form.  You
7  may answer.
8        THE WITNESS: Anyone higher.  So
9  the original director and then --
10 BY MS. OELTJEN:
11   Q.   Right.  He wasn't based in Philadelphia;
12 right?
13   A.   Correct.
14   Q.   Shannon Phillips had responsibility for
15 a large area; correct?
16   A.   Right, right.
17   Q.   And then Camille Hymes had responsibility
18 for a large geographic area; correct?
19   A.   Correct, yes.
20   Q.   And Mr. Sykes' only responsibilities
21 were for stores in the City of Philadelphia;
22 correct?
23   A.   For his district, correct, yes.
24   Q.   Okay.  So he was the most senior African

Page 75

1  American Starbucks employee working within that
2  district; correct?
3        MR. ESTEROW: Object to form.  You
4  may answer.
5        THE WITNESS: The most senior
6  within the district, yeah.  The district manager
7  is the most, is the highest in the district.
8  BY MS. OELTJEN:
9    Q.   And there was, I think you will agree
10 with me, there was a lot of media attention on
11 Starbucks in the City of Philadelphia in April
12 and May of 2018; correct?
13   A.   I do agree with you.
14   Q.   And so do you think that Mr. Sykes' race
15 led to any conclusion by Starbucks that he
16 should be allowed to stay in the district
17 because of all the media scrutiny that was
18 happening?
19   A.   No.
20   Q.   Why not?
21   A.   Because that was never part of the
22 consideration.  That was never part of the
23 discussion.  The discussions were based on
24 partner sentiment, partner engagement, partner

Page 76

1  concern, state of the stores, operational
2  standards, teamwork.
3    Q.   Wasn't Mr. Sykes just as responsible for
4  anything that was going on in the City of
5  Philadelphia related to the operations of the
6  stores, et cetera, as Mr. Trinsey was?
7        MR. ESTEROW: Object to form.  You
8  may answer.
9        THE WITNESS: He had the same level
10 of responsibility, yes.
11 BY MS. OELTJEN:
12   Q.   And weren't there also complaints coming
13 from partners that reported up to Mr. Sykes and
14 not Mr. Trinsey about how things had been
15 operating in the City of Philadelphia?
16   A.   I assume, so there was concerns for
17 multiple partners, some I was privy to, some
18 went directly to the PRSC.  It would be my
19 assumption that there must have been complaints
20 from all districts.
21   Q.   And wouldn't Mr. Sykes have been as
22 responsible for complaints coming from stores
23 that he managed as Mr. Trinsey was for
24 complaints coming from stores that he managed?

# EXHIBIT J

# In The Matter Of:

*SHANNON PHILLIPS v.*
*STARBUCKS CORPORATION*

---

*BENJAMIN TRINSEY*
*May 21, 2021*

---

*Terry Burke Reporting*
*Registered Professional Reporters*
*terryburkermr@gmail.com*
*(215) 205-9079*

Min-U-Script® with Word Index

SHANNON PHILLIPS v.
STARBUCKS CORPORATION

BENJAMIN TRINSEY
May 21, 2021

Page 29

1   was homeless at one point in time?
2     A.   That's correct.
3     Q.   And tell me what you know about that in
4   connection with her hire by Starbucks?
5     A.   I just know that she fled New York City
6   to get out of an abusive relationship.  And so
7   she had a place for her kids to stay, but that
8   she was living in a shelter.
9     Q.   Did you hire her?
10    A.   No.
11    Q.   Did you promote her?
12    A.   Yes.
13    Q.   Was anyone else involved in Jaicee's
14  promotion?
15    A.   I mean her store manager helped develop
16  her.
17    Q.   And did you think it was important
18  during your time as a district manager to have a
19  racially diverse group of employees in your
20  stores?
21    A.   Yes.
22          MS. OELTJEN: Mr. Trinsey, if you
23  don't mind, I just want to take a five-minute
24  break.  I might have a couple of additional

Page 30

1   questions for you, but we won't be too much
2   longer on my end.  Mr. Harris may have questions
3   for you as well.
4          THE WITNESS: Okay.
5          MS. OELTJEN: If we could go off
6   the record.
7          VIDEO SPECIALIST: We are going off
8   the record.  The time is 10:34 a.m.
9          (Recess.)
10          VIDEO SPECIALIST: We are back on
11  the record.  The time is 10:42 a.m.
12  BY MS. OELTJEN:
13    Q.   Mr. Trinsey, you are no longer employed
14  at Starbucks; correct?
15    A.   That's correct.
16    Q.   And how did your employment end?
17    A.   I don't really know how to like classify
18  it.  I guess I left, but I also -- I got a
19  lawyer and he worked with Starbucks on the terms
20  of me leaving.
21    Q.   Okay.  So I just want to tell you, never
22  tell me anything, or Mr. Harris, anything that a
23  lawyer has told you.  That is your --
24    A.   Sure.

Page 31

1     Q.   -- confidential information.  It is
2   privileged.
3     A.   Okay.
4     Q.   So Mr. Trinsey, do you think that you
5   had a choice to stay at Starbucks?
6     A.   No.
7     Q.   Okay.  So it was your understanding that
8   no matter what your employment with Starbucks
9   was going to end?
10    A.   That's correct.
11    Q.   Do you believe that your race played a
12  role in your employment ending at Starbucks?
13    A.   Yes.
14    Q.   And do you think you were treated fairly
15  by Starbucks?
16    A.   No.
17    Q.   And why not?
18    A.   I mean I'll go back to the reasons for
19  suspension.  The very process and standard that
20  they have for determining pay, they know, they
21  wrote it, they created it, but they were somehow
22  implying that I controlled it.  So like, you
23  know, I knew that, you know, they were willing
24  to do anything to get me out.

Page 32

1     Q.   And earlier I think I referred to your
2   HR business partner as Joyce Verillo.  It is
3   Joyce Verino; right?
4     A.   It is Joyce.  Again, it was so long ago.
5   I'm not good with last names.
6     Q.   Sure.
7          Is there anything else that you
8   would like me to know about your treatment by
9   Starbucks?
10    A.   No.  I was just really disappointed.
11  It's like it's damaged my trust in anybody or
12  anything.
13    Q.   Did Miss Phillips ever talk to you about
14  your testimony today?
15    A.   No.
16    Q.   Did she ask you to say anything in
17  particular today?
18    A.   No.  When she notified me, she just said
19  tell the truth.
20    Q.   And do you have any financial stake in
21  the outcome of Ms. Phillips' matter against
22  Starbucks?
23    A.   No.
24          MS. OELTJEN: I don't have any

Page 33

1 further questions for you today, Mr. Trinsey. I
2 thank you very much for your time today.
3         THE WITNESS: Thanks.
4 BY MR. HARRIS:
5    Q.  Mr. Trinsey, if I may, can you tell me
6 what your educational background is?
7    A.  I went to culinary school.
8    Q.  Okay.  Do you have a college degree?
9    A.  No, I didn't finish.
10    Q.  Okay.  So when you said you went to
11 culinary school, what school did you attend?
12    A.  Art Institute of Philadelphia.
13    Q.  Okay.  And from what years did you
14 attend?
15    A.  2000 to 2002.
16    Q.  And were you employed with Starbucks,
17 again remind me, was that 2003?
18    A.  Correct.
19    Q.  Okay.  And you were hired initially as a
20 barista?
21    A.  Yes.
22    Q.  Okay.  And then you worked up through
23 the organization, did you not?
24    A.  That's correct.

Page 34

1    Q.  And then ultimately you were the
2 regional manager?
3    A.  District manager.
4    Q.  District manager, excuse me.  District
5 manager.  And part of your region included
6 Philadelphia?
7    A.  That's correct.
8    Q.  Okay.  And Mr. Trinsey, do you know how
9 your compensation was set?
10    A.  No, I wasn't a part of that discussion,
11 so.  But I would assume it followed the same
12 standard that I had to as a district manager.
13    Q.  And what was that standard?
14    A.  You submit a resume and tenure with the
15 company and the pay is determined by human
16 resources.
17    Q.  You said pay is determined by human
18 resources.  Does human resources make a
19 recommendation regarding pay?
20    A.  Human resources makes the recommendation,
21 yes.
22    Q.  But ultimately it is the leader who
23 decides what the pay compensation would
24 ultimately be?  Human resources makes the

Page 35

1 recommendation and then ultimately the leader
2 decides what compensation would be for that
3 employee who is being selected?
4         MS. OELTJEN: Objection.
5 BY MR. HARRIS:
6    Q.  You can answer that question.
7    A.  I can answer the question?
8    Q.  Yes.
9    A.  Oh, I was trained that you always follow
10 the guidelines of HR.  So I didn't -- I honestly
11 didn't even know it is an option.  Same thing
12 with partner asset and protection.  There's --
13 the systems exist for this reason.
14    Q.  But when the system spit out disparities,
15 who is responsible for correcting those
16 disparities, would it be the leader's
17 responsibility?
18         MS. OELTJEN: Objection.
19         THE WITNESS: I don't understand
20 your question.
21 BY MR. HARRIS:
22    Q.  Sure.  If the system spits out a
23 disparity in compensation, who is responsible
24 for reconciling those disparities?

Page 36

1         MS. OELTJEN: Objection.
2 BY MR. HARRIS:
3    Q.  You can answer the question.
4    A.  Human resources.
5    Q.  Okay.  So your testimony is that human
6 resources is responsible for setting pay and
7 actually deciding pay?
8    A.  Correct.
9    Q.  All right.  Let me give you some
10 information.  Mr. Pinto testified a few weeks
11 ago, and specifically he says it is the leader's
12 responsibility for setting pay.
13         Do you disagree with that statement?
14         MS. OELTJEN: Objection.
15 BY MR. HARRIS:
16    Q.  You can answer.
17    A.  Yes.
18    Q.  Okay.  And you said that you were trained
19 differently than what Mr. Pinto testified to.
20 Who trained you accordingly?
21         MS. OELTJEN: Objection.
22         THE WITNESS: Michael Scott.
23 BY MR. HARRIS:
24    Q.  And Michael Scott's position was?

Page 53

1　　　Now, Mr. Trinsey, you testified
2　that the employees that made allegations, you
3　are saying, and I understand, that the employees
4　that made allegations against you, that those
5　allegations were false or inaccurate.  Is that
6　accurate?
7　　　MS. OELTJEN: Objection.  I am
8　sorry, I didn't hear you, Rich.  You cut out.
9　So could you just ask -- I don't know what
10　Mr. Trinsey just answered.
11　　　MR. HARRIS: Sure.
12　BY MR. HARRIS:
13　　Q.  The allegations against you made by the
14　employees, you testified that the allegations
15　were false because you had no control over
16　setting compensation?
17　　A.  Correct.
18　　Q.  Okay.
19　　　Do you think it was appropriate for
20　Starbucks HR or the other organization that you
21　identified, partner asset protection, to conduct
22　an investigation based on the employee's making
23　these allegations?
24　　　MS. OELTJEN: Objection.

Page 54

1　　　THE WITNESS: Sure.  I mean you
2　have to look into any allegation.
3　BY MR. HARRIS:
4　　Q.  Okay.  And that was done and that's
5　pursuant to the policy in which you are aware of?
6　　　MS. OELTJEN: Objection.
7　　　THE WITNESS: I wasn't involved in
8　all of the details so I don't know.
9　BY MR. HARRIS:
10　　Q.  Sure.  Not the details, but let's go
11　over process.  Specifically when an allegation
12　is made, the policy is for every single allegation
13　that is made there is supposed to be an
14　investigation?
15　　　MS. OELTJEN: Objection.
16　　　THE WITNESS: Sure.
17　BY MR. HARRIS:
18　　Q.  Okay.  And that was done here.  And
19　although you just --
20　　A.  Yeah.  And I will say I was a part of
21　many allegations but we never -- you know, I
22　never suspended anybody while they were being
23　investigated, especially for something you know
24　is like not -- is out of their control.

Page 55

1　　Q.  Okay.  Okay.  Now, if -- okay.
2　　　You testified initially, in the
3　beginning of your testimony you said that you
4　had testified at a deposition before.
5　　　Can you tell us the nature of that
6　allegation?
7　　A.  Sure.  It was I had separated a store
8　manager for, she was manipulating her employee's
9　pay and, you know, there was digital evidence of
10　it.  And so, you know, I worked with -- I
11　reported it to partner asset and protection and
12　then they recommended separation so I separated
13　her.  And then Starbucks was being sued for age
14　discrimination.
15　　Q.  Okay.  And what happened with that case?
16　　A.  I had a deposition, but I don't know the
17　outcome of that case, so.
18　　Q.  But age wasn't a factor in the decision
19　making?
20　　A.  No.
21　　Q.  Okay.  And would that have been a
22　decision, the separation that you -- separating
23　that particular employee, you were responsible
24　for making that separation?

Page 56

1　　A.  Based off of the recommendation of the
2　partner asset and protection, yes.
3　　Q.  Okay.  How did the allegation first come
4　to your attention?
5　　A.  A partner in her store shared it with me.
6　　Q.  And then you conducted an investigation
7　or asset protection conducted an investigation?
8　　A.  I shared that with partner asset
9　protection and they conducted the investigation.
10　　Q.  But ultimately you made the decision as
11　to separate the employee, it wasn't asset
12　protection?
13　　A.  No.  Again, I'm going back to, the
14　standard is you go off the recommendation of,
15　you know, either human resources or partner
16　asset and protection.  They do that so it is a
17　third party reviewer so that, you know, you
18　don't risk discrimination.
19　　Q.  Understood.  But you ultimately made the
20　decision?
21　　　MS. OELTJEN: Objection.
22　　　THE WITNESS: I decided to follow
23　the policy of the company, yeah.
24　BY MR. HARRIS:

# EXHIBIT K

# REDACTED: Non-Responsive

2018-05-04 22:04:07 UTC <Zeta Smith <"+1 ██████████">>: Things need to escalate with Shannon.  She has crashed and burned

2018-05-04 22:14:59 UTC <Paul J Pinto <██████████>: Ok Nathalie gave me the heads up.  Just got back- what do you need from me?

2018-05-04 23:05:32 UTC <Zeta Smith <"+1 ██████████">>: Jen appears to be working the package. Need to help Camille with a plan for Shannon to exit.

2018-05-04 23:20:43 UTC <Paul J Pinto <██████████>: Ok.  Can you chat tomorrow?

2018-05-04 23:36:27 UTC <Zeta Smith <"+1 ██████████">>: I am in the air at 8:10 or so, so can call you before I board or can call you when I land at 4pm your time. I have too quick of a layover to call you earlier.  Thoughts?

2018-05-05 00:26:22 UTC <Paul J Pinto <██████████>: 4 is good.  Thanks

2018-05-05 00:31:02 UTC <Zeta Smith <"+1 ██████████">>: Ok.  Will call you driving home

2018-05-05 00:37:29 UTC <Paul J Pinto <██████████>: 👍👍

2018-05-07 00:21:12 UTC <Paul J Pinto <██████████>: Was jen more open to a coffee break?

2018-05-07 00:21:31 UTC <Zeta Smith <"+1 ██████████">>: I am speaking with her now

2018-05-07 00:25:13 UTC <Paul J Pinto <██████████>: 👍👍

2018-05-07 00:26:59 UTC <Zeta Smith <"+1 ██████████">>: If the package is good enough, we won't need coffee break

2018-05-07 00:27:44 UTC <Paul J Pinto <██████████>: True, but she may be more interested in saving face

2018-05-07 00:46:10 UTC <Zeta Smith <"+1 ██████████">>: Agree as well.  I shared that with Jen.  I also told her that Shannon reached out to Camille and they will be speaking tomorrow.  She said hear her out, but do NOT bring up coffee break option.  If Shannon does, we will get back to her....

2018-05-07 00:47:27 UTC <Paul J Pinto <██████████>: Ok

2018-05-09 03:12:11 UTC <Paul J Pinto <██████████>: Just got this from Shannon

{files\Image\FullSizeRender_13.jpg}

2018-05-09 03:12:41 UTC <Paul J Pinto <██████████>: I've tried to call Camille about a game plan... no answer

2018-05-09 03:12:58 UTC <Zeta Smith <"+1 ██████████">>: Here we go!

2018-05-09 03:13:04 UTC <Paul J Pinto <██████████>: Yep

**EXHIBIT**

Ph  ps 72 Ap  1, 2021

# EXHIBIT L

Richard R. Harris (*admitted pro hac vice*)
Marc D. Esterow (NJ No. 210102016)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102.1321
267.402.3000 (t)
267.402.3131 (f)
rharris@littler.com
mesterow@littler.com

*Attorneys for Defendant,*
*Starbucks Corporation*
*d/b/a Starbucks Coffee Company*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SHANNON PHILLIPS, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 1:19-cv-19432-RMB-AMD |
| | : | |
| v. | : | |
| | : | **DEFENDANT'S RESPONSES AND** |
| STARBUCKS CORPORATION d/b/a | : | **OBJECTIONS TO PLAINTIFF'S FIRST** |
| STARBUCKS COFFEE COMPANY, | : | **SET OF REQUESTS FOR** |
| | : | **PRODUCTION OF DOCUMENTS** |
| Defendant. | : | |
| | : | |

Defendant Starbucks Corporation d/b/a Starbucks Coffee Company (hereinafter "Starbucks"), by and through its undersigned counsel, submits the following responses and objections to Plaintiff Shannon Phillips' ("Ms. Phillips") First Set of Requests for Production of Documents.

**OBJECTIONS AND LIMITATIONS APPLICABLE TO ALL REQUESTS**

In addition to any objections or limitations stated below in Starbucks' specific responses to Ms. Phillips' First Set of Requests, Starbucks incorporates the following objections and limitations into each of its responses:

**19. The entire contents of the personnel or other files (including, but not limited to, all documents related to performance and discipline) of each individual who was hired to replace Plaintiff or perform any job duties performed by her during her employment, including, without limitation, files maintained by or in the possession of Defendant's personnel department, human resources department, managers, legal department, and/or supervisors.**

<u>**RESPONSE:**</u>  Between May 9, 2018 and the present, the following individuals were or currently are Regional Directors responsible for supporting Districts Ms. Phillips previously supported as a Regional Director:   Marcus Eckensberger, TJ Wolfersberger, Linda Johnson, and Dominic Alessandrini.   Starbucks objects to producing the "entire contents" of Mr. Eckensberger's, Mr. Wolfersberger's, Ms. Johnson's, and Mr. Alessandrini's personnel files because such a Request seeks documents that are neither relevant nor proportional to the needs of this case, because it seeks confidential, personal, and private information that would invade the privacy rights of Starbucks' non-party current and former employees, because the phrase "other files" is vague and undefined, and because Ms. Phillips has made no showing of particularized relevance to justify production of the "entire contents" of Mr. Eckensberger's, Mr. Wolfersberger's, Ms. Johnson's, and Mr. Alessandrini's personnel files.  *See Saller v. QVC, Inc.,* Civ. A. No. 15-2279, 2016 WL 4063411 at \*4 (E.D. Pa. Jul. 29, 2016) ("[D]iscovery of personnel files must be limited to documents relevant to the plaintiff's claims because of the confidential information within these files."); *Jeffress v. Ocwen Fin. Corp.*, Civ. A. No. 15-6330, 2016 WL 6276443, at \*\*3-4 (E.D. Pa. Oct. 27, 2016) (denying motion to compel on nearly identical discovery request); *Bracey v. Price,* Civ. A. No. 09-1662, 2012 WL 849865, at \*2 (W.D. Pa. Mar. 13, 2012) (providing that party demanding production of complete personnel files must "demonstrate the particularized relevance of them"); *Paluch v. Dawson*, Civ. A. No. 06-01751, at \*3 (M.D. Pa. Dec. 12, 2007) (denying motion to compel production of entire personnel files); *Chiaradonna v. Rosemont College,* Civ.

A. No. 06-1015, 2006 WL 3742777 at *2 (E.D. Pa. Dec. 11, 2006) (stating that discovery of personnel records is usually permitted only for parties or similarly situated individuals, and even in those cases, courts tailor disclosure only to relevant issues); *Sosky v. International Mill Serv., Inc.*, Civ. A. No. 94-2833, 1995 WL 368173, at *6 (E.D. Pa. June 21, 1995) (denying motion to compel production of entire personnel file, reasoning that "Plaintiff is not entitled to the entire personnel file, as some items in the file likely are confidential personal and family matters that are not relevant. . . .").  Accordingly, at this time Starbucks will not produce any documents in response to this Request; however, if there are particular aspects from Mr. Eckensberger's, Mr. Wolfersberger's, Ms. Johnson's, and Mr. Alessandrini's personnel files that Ms. Phillips believes are necessary to her pursuit of this action, she should identify those aspects, and in response Starbucks would be willing to meet and confer with Ms. Phillips' counsel.

**20. The entire contents of the personnel or other files (including, but not limited to, all documents related to performance and discipline) of each individual who was hired or considered for any role previously filled by Plaintiff prior to her termination or for which she was considered prior to her termination including without limitation, files maintained by or in the possession of Defendant's personnel department, human resources department, managers, legal department, and/or supervisors.**

**RESPONSE**:  Starbucks directs Ms. Phillips to its responses and objections to Request No. 19, which Starbucks incorporates by reference as if set forth in full herein.  Ms. Phillips has made no showing of particularized relevance to justify production of the "entire contents of the personnel or other files . . . of each individual who was hired or considered for any role previously filled by Plaintiff prior to her termination or for which she was considered prior to her termination . . . ."  By way of further response, Starbucks also asserts the following proportionally objections to this Request:

# EXHIBIT M

## Chat with Ben Trinsey Personal

5/9/2018 8:54:17 PM – 6/29/2020 11:16:28 PM

**Export Details:**

Device Phone Number  +1 ▮▮▮▮▮▮

Device Name  Shannon's iPhone

Device ID  ▮▮▮▮▮▮▮▮▮▮

Backup Date  Friday, July 17, 2020 10:26 AM

Backup Directory  ▮▮▮▮▮▮▮ Redacted ▮▮▮▮▮▮▮

iOS  13.1.2

Current Time Zone  (UTC-05:00) Eastern Time (US & Canada)

Created with  iExplorer v4.3.4.0

**Participants:**

▮▮▮▮▮▮▮ Ben Trinsey Personal



Wednesday, May 9, 2018

Ben Trinsey Personal

Hi Shannon.  It's Ben.  This is my personal cell.  I heard from my sm's.  They're hurting from hearing about you.  I'm pissed.  You have been an incredible leader, friend, boss.  I'm sad and in all honesty don't even want to go back even if they let me.  Can I call you?                                   8:54 PM

Me
I'm telling my mom. Can I call you shortly?     8:55 PM

Ben Trinsey Personal
Sure                                               8:55 PM

Me
Sorry. Should've sent to this number.            9:42 PM

Ben Trinsey Personal
?                                                  9:43 PM

Me
I sent the last text to your work phone...sorry.  9:43 PM

Page 1

CONFIDENTIAL

PHILLIPS00348

Me

Since when can't partners give a pound of coffee away??!!          9:54 PM

Ben Trinsey Personal

She's still my favorite and the best fsm.                          9:57 PM

Me

https://m.huffpost.com/us/entry/us_5b204db9e4b0adfb826eec77/     9:58 PM
amp

Me

Saw this today...guess it isn't just white people they wanna get rid   9:58 PM
of.

Ben Trinsey Personal

Wow.                                                              10:01 PM

Me

Yep.                                                          10:01 PM

Me

It was on LinkedIn today...                         10:01 PM

Me

I fucking hate that place!                          10:02 PM

Me

What are you doing this weekend? Is Mirabel home?      10:02 PM

Ben Trinsey Personal

I got David Mack's 10 year plaque in the mail today.              10:03 PM

Me

I have Paul's 15...lol! Should I give it to someone??      10:03 PM

0:03 PM

Redacted Non Responsive                             0:04 PM

0:04 PM

CONFIDENTIAL                                              PHILLIPS00367

# EXHIBIT N

# In The Matter Of:

*SHANNON PHILLIPS v.*
*STARBUCKS CORPORATION*

---

*SHANNON BOLDIZSAR*
*May 4, 2021*

---

*Terry Burke Reporting*
*Registered Professional Reporters*
*terryburkermr@gmail.com*
*(215) 205-9079*

Min-U-Script® with Word Index

SHANNON BOLDIZSAR                    19

1   otherwise handling -- I'm summarizing --

2   otherwise handling the crisis.

3                So when you were doing that crisis

4   work, were you physically present in Philadelphia?

5        A.   I was not.

6        Q.   Did you ever come to Philadelphia in

7   April of 2018?

8        A.   No.

9        Q.   And did you ever come to Philadelphia in

10  May of 2018?

11       A.   No.

12       Q.   Is there an acronym used within

13  Starbucks of TLA?

14       A.   Yes.

15       Q.   And can you tell me what TLA means, if

16  you know?

17       A.   Time limited assignment.

18       Q.   And was there a time in April of 2018

19  when you were in a position to interview

20  candidates for a time limited assignment?

21               MR. ESTEROW:  Object to form.  You

22  can answer, Shannon.

23               THE WITNESS:  There was a -- we

24  were considering a potential for an internal

SHANNON BOLDIZSAR                    20

```
 1   Starbucks partner employee to potentially serve
 2   in a TLA role.  And we were not -- again, we
 3   were in crisis mode.  It was not a formal job.
 4   It was not posted.  It had no job description.
 5   It was, it was an exploring.  We did not conduct
 6   what I would call or what I would refer to as
 7   formal interviews because it was not a posted
 8   position, but we conducted more of conversations
 9   and dialogues to explore with internal partners
10   whether they might be a fit for a potential
11   role.
12   BY MS. OELTJEN:
13       Q.   When you say "we were considering a
14   position for an internal candidate to serve in
15   that TLA role," to whom are you referring in
16   the "we"?
17       A.   That would be the team, our government
18   affairs team at the time.
19       Q.   Could you identify by name, please?
20       A.   Sure.  Zulima Espinel, Kim Winston and
21   James Roth.
22       Q.   And did any of the individuals that you
23   just identified report to you?
24       A.   No.
```

TERRY BURKE REPORTING

SHANNON BOLDIZSAR                    21

1        Q.    Were they above you, below you, or the
2    same level in the government affairs organization,
3    if you know?
4        A.    They were my supervisors.
5        Q.    Okay.
6        A.    Excuse me.  Zulima and James were my
7    supervisors.  Kim was a peer.
8        Q.    Okay.  Was Shannon Phillips one of the
9    candidates that you spoke to in connection with
10   the potential TLA assignment?
11       A.    I would not call Shannon a candidate,
12   but she was somebody who was recommended that we
13   talk with about the TLA role.
14       Q.    Who else did you speak to about the TLA
15   role and that person was someone who was
16   interested in the role?
17       A.    I don't recall.
18       Q.    Was Miss Phillips the only person you
19   spoke to?
20       A.    No.
21       Q.    Are you able to say how many other
22   people you spoke to who were interested in the
23   role?
24       A.    No.

SHANNON BOLDIZSAR                              22

1      Q.   More than five?

2      A.   I, I believe a handful.  So approximately

3  five.

4      Q.   Okay.

5           And did you have a discussion with

6  anyone in which giving the TLA role to one of

7  those handful of people was discussed?

8      A.   Can you please repeat that?

9      Q.   Sure.  That was a poor question.  I will

10  give you that, Ms. Boldizsar.  That was not very

11  artfully done.

12           Were you ever part of any discussion

13  or are you aware of any discussion in which a

14  particular person who you had spoken to in

15  connection with the TLA role was discussed as

16  someone who should actually get that role?

17      A.   No.

18      Q.   Are you aware of anyone ever being

19  considered to receive the role?

20      A.   No.

21      Q.   Was a salary band ever discussed for the

22  role?

23      A.   No.

24      Q.   Was a supervisory structure ever

SHANNON BOLDIZSAR                    23

1    discussed for the role?

2         A.   No.

3         Q.   Was a job description ever drafted for

4    the role?

5         A.   No.

6         Q.   Was a time period, you know, going into

7    the time limited assignment part of the role,

8    was a time period ever determined for the role?

9         A.   Can you rephrase that?  It wasn't about

10   being determined, but --

11        Q.   Sure.

12        A.   Can you be more exact?  That would be

13   helpful in how I answer your question.

14        Q.   Sure.

15             So let me ask you this:  In order

16   for an assignment to be considered a TLA

17   assignment, is there a maximum period of time

18   that that role is allowed to last for?

19        A.   I believe at Starbucks that varies.

20        Q.   So have you ever seen a scenario where

21   someone has been in a TLA role for multiple years?

22        A.   Oh, not in my group and I cannot recall

23   a specific instance within the company.

24        Q.   In any discussions that you were part of

SHANNON BOLDIZSAR                              26

1   termination?

2       A.   No.

3       Q.   What happened to the TLA position, if

4   anything?

5       A.   We determined, and when I say "we," our

6   team determined that it was not going to meet

7   our needs and set Starbucks up for success given

8   the crisis situation that was evolving daily,

9   and we decided not to proceed with next steps.

10      Q.   And did anyone, either inside Starbucks'

11  organization or outside of Starbucks' organization

12  ever perform any of the tasks that had been

13  discussed as being part of the potential TLA role?

14              MR. ESTEROW:   Object to form.  You

15  can answer.

16              THE WITNESS:   Yes.

17  BY MS. OELTJEN:

18      Q.   And who or what performed those tasks?

19      A.   Those tasks were performed by the

20  government affairs team itself, the members of

21  the government affairs team.  The four names --

22  excuse me, the three names and myself that we --

23  I shared earlier.  And if you would like me to

24  repeat those, I am happy to.

SHANNON BOLDIZSAR                    30

1           The only reason Miss Phillips did

2    not receive the TLA position, as far as you

3    know, is that the company decided not to create

4    the position; is that correct?

5        A.   That is correct.

6        Q.   And were you ever part of any discussion

7    where it was stated that Ms. Phillips was not

8    qualified for the potential TLA role?

9        A.   If you could rephrase that, I would

10   appreciate it.

11       Q.   Sure.  In the context of whatever

12   exploratory discussions you were having with

13   anyone about the potential TLA role, did you

14   ever hear anyone say Shannon Phillips should not

15   get the role because she is not qualified?

16       A.   No.

17       Q.   Did anyone ever speak out about Shannon

18   Phillips as a potential candidate for that role?

19           MR. ESTEROW:  Object to form.  You

20   can answer.

21           THE WITNESS:  No.

22   BY MS. OELTJEN:

23       Q.   Was there anything about the discussion

24   that Shannon had with you or anyone else that

SHANNON BOLDIZSAR                    33

1      A.   I'll say no on that one.  I do not know
2   that person.
3      Q.   Okay.
4           MS. OELTJEN:  All right, I do not
5   have any further questions and I thank you very
6   much for your time today.
7           MR. ESTEROW:  All right.
8   BY MR. ESTEROW:
9      Q.   All right, Shannon, just a couple short
10  questions for you.
11          You testified that the TLA position
12  was not going to meet our needs and set Starbucks
13  up for success.  What did you mean by that?
14          MS. OELTJEN:  Objection.  You can
15  answer.
16          THE WITNESS:  We were unable to
17  find -- well, the situation was evolving at the
18  time on a frankly hour-by-hour day-to-day basis
19  and our needs were also evolving in the market.
20  And the candidates that -- it was determined
21  that the candidates that we spoke with were --
22  we would put them probably in a much more
23  difficult position than their expertise or --
24  excuse me, than their skills and qualifications

TERRY BURKE REPORTING

SHANNON BOLDIZSAR                              34

1    would allow.

2    BY MR. ESTEROW:

3        Q.    What made the situation difficult?

4    Strike that.

5              What would have made the situation

6    difficult for those candidates?

7        A.    The sensitivity of which we were getting

8    the inquiries and the need for, again -- the

9    need for ongoing deep relationships with some of

10   those policy makers and elected officials.

11             Can you restate the question, Marc,

12   and then I need to -- I wanted to fully answer.

13             MR. ESTEROW:  Sure.  Terry, could

14   you repeat back my question.

15             (The question was then read back by

16   the reporter.)

17             THE WITNESS:  Yes.

18             And we were not only getting

19   inquiries from the police chief and the police

20   department, but elected officials at all levels

21   of government, and it became quickly apparent to

22   our team that the expertise that we had as

23   government affairs professionals was not

24   something that could just quickly be learned or

SHANNON BOLDIZSAR                    35

1  picked up on regardless of what we thought we

2  were looking for in those TLA positions, but

3  required that, if you will, sensitivity and

4  expertise in dealing with and working with

5  elected officials.  So specifically the

6  government affairs professional aspects.

7  BY MR. ESTEROW:

8       Q.   Understood.

9            How did Starbucks come to hire

10 Bellevue Strategies as an outside consultant?

11            MS. OELTJEN:   Objection.

12 BY MR. ESTEROW:

13      Q.   You can answer the question, Shannon.

14      A.   I am not aware of the specific details,

15 but I believe that, I believe that we were

16 contacted by Mustafa via e-mail reaching out to

17 Starbucks.  I was not involved in his direct

18 hiring.

19      Q.   Understood.

20      A.   The firm's direct hiring.  Excuse me.

21      Q.   Great.  So as far as you are aware,

22 Starbucks was not, was not seeking to hire

23 Bellevue, rather Bellevue approached Starbucks,

24 am I getting your testimony correct?

# EXHIBIT O

| | |
|---|---|
| **From:** | Shannon Phillips |
| **Sent:** | Friday, April 20, 2018 5:30 PM |
| **To:** | Camille Hymes |
| **Subject:** | Re: Urgent Requests - Public Affairs TLA for Philly |

I would suggest Michael Scott for this. I don't have anyone on my DM team that I think would be able to step into this position.

Sent from my iPhone

On Apr 20, 2018, at 8:01 PM, Camille Hymes <​███████████████> wrote:

> Team,
> Please vet perspectives prior to sending me your recommendations.  We're on the clock for this one.
>
> As a filter, this opportunity is for someone with high emotional intelligence, existing Philadelphia community connections, interpersonal savvy, executive presence and strong project management/communication skills.
>
> Questions, please call me live.
>
> Sent from my iPhone
>
> Begin forwarded message:



> **From:** Shannon Boldizsar <​██████████████>
> **Date:** April 20, 2018 at 7:44:40 PM EDT
> **To:** Zulima Espinel <​████████████>, James Roth <​██████████>,
> Kim Winston <██████████, Camille Hymes <​██████████>,
> Shannon Phillips <​██████████>, Virginia Tenpenny
> ██████████, Rodney Hines <██████████, Zabrina Jenkins
> <​██████████>, Kristopher Clemmons <​██████████>,
> Jennifer Bibby <██████████, David Oclander <​██████████>,
> Alicia Vermaele <​██████████>
> **Subject: Requests - Public Affairs TLA for Philly**

> Team,
>
> As we work to finalize and implement our Philly Forward plan, there's an urgent need to have a partner on the ground to advance our efforts and be our voice with critical stakeholders including government affairs and community influencers. This will be an external affairs position that will help us lead our work locally, and coordinate as necessary, around government affairs, community investments, brand and partners. We know there are current partners that likely have the type of experience and skills necessary to take on this role, hit the ground running, and be our advocate. They need to know Philly. We are reaching out to you to get recommendations of partners we might consider for a 6-12 month opportunity, based in Philly.
>
> We need to move quickly, so hope to have your suggestions by Sunday evening at 5p. Please send to me directly and I'll compile for next steps. Thanks much!

1

STARBUCKS000719

Shannon

STARBUCKS000720

# EXHIBIT P

**From:** Shannon Phillips
**Sent:** Wednesday, April 25, 2018 1:57 PM
**To:** Shannon Boldizsar
**Subject:** Re: Philly TLA

Lol! We were talking yesterday and I told her I had recommended Ben. She felt like he wasn't the right person and that I am. Of course, I'd love to do this but I am not sure I am qualified. I have lots of experience in Philly and certainly engaging with community organizations but very little engaging with governmental organizations. I'd love to discuss and have no hard feelings if I'm not the right person. 😊

Let me know when you'd like to connect.

Talk soon,
Shannon

Sent from my iPhone

On Apr 25, 2018, at 4:41 PM, Shannon Boldizsar <███████████████████> wrote:

> You are aware Camille recommended you for this role?
> If so, are you interested and can I put 30 min. on your calendar to discuss with our team?
> Shannon



**EXHIBIT**
Phillips 44

STARBUCKS003852

# EXHIBIT Q

**From:**          Shannon Boldizsar
**Sent:**          Wednesday, May 2, 2018 2:06 PM
**To:**            Shannon Phillips
**Subject:**       RE: Thank you!

Hello my friend,

Quick follow-up on TLA role we spoke about during our recent call. For now, we remain on hold with our approach, and wanted to be sure to reach out to keep you informed.

My colleague, Kim, has been in Philadelphia conducting follow-up meetings. Some have been positive and friendly, while others are sensitive. It quickly became clear that putting any TLA partner into this mix would not set any of us up for success moving forward.

We will be in touch if/when our approach changes.

P.S. Camille is aware 😊

Shannon

**From:** Shannon Phillips
**Sent:** Monday, April 30, 2018 6:30 AM
**To:** Shannon Boldizsar ◄                              ► James Roth ◄                              ►
**Subject:** Thank you!

Good Morning Shannon & Jamie,

I wanted to reach out and say thank you for connecting with me on Thursday afternoon.

I had been in Philadelphia all day and was navigating out of the city during our connect and I fear I likely didn't come across very strategic and possibly a bit scattered. In sharing about the recent experience in the city, I should also have shared that a few days in, I was able to sit down with key stakeholders (PRO, P&AP, Camille, Zeta) to come up with our 'early lessons learned' and then created a plan to move forward: both immediate, 30-day, and sustainment. If you'd like to see what we came up with and shared out, I'd be happy to share this with you.

At any rate, I do appreciate the consideration for this new, exciting position. I had the opportunity to connect with Rodney Hines later on Thursday as well, and he was excited and supportive of me for this role as well.

Have a fantastic Monday!

Many thanks,
Shannon

Shannon Phillips
Starbucks Coffee Company
A71 – regional director

1

STARBUCKS005641

*Recognize, Appreciate, Support, Include & Delight.*

2

STARBUCKS005642