**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SHANNON PHILLIPS, | CIVIL ACTION NO.: 2:19-cv-19432 |
| *Plaintiff*, | |
| v. | |
| STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY | Hon. Joel H. Slomsky, U.S.D.J. |
| *Defendant*. | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Shannon Phillips, through her undersigned counsel, hereby submits this response to the numbered paragraphs set forth in Defendant's Statement of Undisputed Material Facts In Support of Defendant's Motion for Summary Judgment ("DSF"). Plaintiff also submits a separate Statement of Additional Facts that Preclude Summary Judgment ("PSF") following her response to DSF and within this document.

## I.      BACKGROUND ON STARBUCKS[1]

1.      Starbucks is known for coffee and human connection—striving to build an enduring company, one person, one cup and one neighborhood at a time. (Plaintiff Shannon Phillips Deposition Transcript, "Pl. Dep.," attached hereto as Exhibit A; Pl.'s Dep. Exh. 6, pp. 40, attached hereto as Exhibit B.)

---

[1] Plaintiff repeats the headings used by Defendant in DSF for organizational purposes only. As the headings are not supported by any citation to the record, and consistent with this Court's policies and procedures requiring "specific" citation to the record, Plaintiff denies each and every statement made in any heading.

1

**RESPONSE:** Disputed. Defendant Starbucks ("Defendant" or "Starbucks") is a for-profit, publicly traded company, that strives to return "value" (i.e. money) to shareholders by increasing its positioning as a "brand" in the marketplace and driving retail sales. In 2020, Starbucks reported total revenue of $23.5 billion or $0.79 earnings per share. Excerpt from Starbucks 2020 10-K filing with the Securities and Exchange Commission, PHILLIPS001105-1129, attached hereto as "Exhibit 1". Plaintiff did not testify in any manner about this factual allegation at her deposition; rather, Defendant entered excerpts of the employee handbook at her deposition and this allegation quotes from its own handbook, not from any testimony of Plaintiff.

2.     Starbucks has a steadfast commitment to certain core values and principles, including providing a work environment where all partners [FN1: Starbucks refers to its employees as "partners."] are treated with respect and dignity and embracing diversity to create a place where partners can be themselves. (Pl. Dep, Exh. 6, pp. 40).

**RESPONSE:** Disputed. The record demonstrates that Starbucks' did not have a "steadfast commitment" to provide a work environment where all partners are treated with respect and dignity. Plaintiff's Second Amended Complaint ("Sec. Am. Complaint"), ¶¶ 35-95; PSF ¶ 70.

## II.    MS. PHILLIPS' BACKGROUND & EMPLOYMENT HISTORY

3.     Shannon Phillips ("Ms. Phillips") is White. (Second Amended Complaint, ¶ 3.)

**RESPONSE:** Undisputed that Ms. Phillips is "Caucasian/white."

4.     Ms. Phillips began her employment with Starbucks on December 12, 2005. (Second Amended Complaint, ¶ 20; Pl.'s Dep., 134:13-16.)

**RESPONSE:**  Undisputed.

2

5.      Ms. Phillips acknowledged her understanding and receipt of Starbucks non-discrimination and retaliation procedures, as well as the existence of the complaint procedure. (Pl.'s Dep. Exh. 5, attached hereto as Exhibit C.)

**RESPONSE:** Disputed. The cited to record evidence, Exhibit C, also known as STARBUCKS000140, is an acknowledgement of receipt of an employee handbook from <u>2005</u>; Defendant has not produced the employee handbook that existed in 2005 and that Plaintiff was acknowledging receipt and agreement to be bound by in 2005. Exhibit C does not support the factual averment made by Defendant in No. 5 related to what any policy was at that time or what Plaintiff ***understood*** about any policy therein. Instead, Exhibit C is a document that speaks for itself and procedurally, at this stage, all inferences related to same must be drawn in favor of Plaintiff as the non-moving party.

6.      Ms. Phillips started with Starbucks as a District Manager and was promoted in 2011 to Regional Director of Operations for "Area 71" which encompassed Philadelphia and some surrounding suburbs. (Second Amended Compl., ¶ 21.)

**RESPONSE:** Undisputed, however, the correct citation to the record includes Paragraph 22 of the Sec. Am. Complaint.

7.      Approximately nine District Managers ("DMs") reported to Ms. Phillips, including DM Benjamin Trinsey, who is White and DM Paul Sykes who is Black ("Mr. Sykes"), both of whom oversaw stores in Philadelphia (Second Amended Compl. ¶ 31-32.)

**RESPONSE:** Undisputed.

8.      Holly Hylton, who is White, served as the Store Manager responsible for the Starbucks store located at 18th and Spruce Street in Philadelphia, one of the stores located within

3

Area 71. (Pl.'s Dep., 23:14-17; Relevant portions of Camille Hymes [sic] Deposition Transcript, "Hymes Dep.," attached hereto as Exhibit D, Hymes' Dep. 87:11-17; Second Amended Compl. ¶ 34.)

**RESPONSE:** Undisputed.

9.      Mr. Sykes served as the DM of the 18th and Spruce Street Store (Relevant portions of the Paul Sykes Deposition Transcript, "Sykes Dep.," attached hereto as Exhibit E, Sykes Dep., 10:20-11:1; 16:12-15.)

**RESPONSE:** Undisputed.

## III.    APRIL 12, 2018 INCIDENT AND SUBSEQUENT REFORMS

10.     On April 12, 2018, two Black men were arrested at the Starbucks store located at 18th and Spruce Street in Philadelphia while waiting to begin a business meeting. (Pl.'s Dep. 22:1-7; Hymes Dep. 77:1-17; Relevant portions of Ebony Johnson Deposition Transcript, "Johnson Dep.," attached hereto as Exhibit F, 18:10-21.)

**RESPONSE:** Undisputed.

11.     The Black customers were not even in the store for more than three minutes when Ms. Hylton, called the police, having them arrested. (Pl.'s Dep., 36:3-15.)

**RESPONSE:**  Disputed as stated. Plaintiff testified that she "must have found that out through other sources" that the individuals arrested were in the store for less than three minutes before the police were called.  No evidence related to the arrests, including any video, has been produced by Starbucks. Ms. Phillips, **who had nothing to do with the arrests**, testified that the arrests should never have happened during her deposition. Shannon Phillips Deposition Transcript ("Plaintiff

4

Tr") 19:01-97, attached hereto as "Exhibit 2". At the time of the arrests, Ms. Hylton was an employee and agent of Defendant and her actions are imputed to Starbucks, not Ms. Phillips. *See* No. 8, *supra.*

12.     The incident garnered significant national media attention. (Relevant portions of Zeta Smith's Deposition Transcript attached hereto as Exhibit G, 28;17-19.)

**RESPONSE:** Undisputed.

13.     By the following weekend, these arrests sparked protests throughout Philadelphia which Ms. Phillips classified as "riots." (Pl.'s Dep., 162:18-163:17.)

**RESPONSE:**   Disputed.   Ms. Phillips testified at length about the variety of demonstration activities that occurred during the days following Starbucks' call to police, describing them as largely protests and referring to "riot[ing]" behavior only in reference to when people came into the store and damaged tables, window shades, display cases and were "screaming" "terrible names" and using bull horns in close proximity to Ms. Phillips and employees. The police instructed Ms. Phillips "If this goes badly, go into the bathroom and lock yourself in until I come get you." Phillips Tr. 163:18-167:03. Ms. Phillips referred to the activity at the 18th and Spruce Street store following the arrests as "protests" in internal emails produced by Starbucks. *See* STARBUCKS000856 attached hereto as "Exhibit 3".

14.     Following the incident, Starbucks initiated an effort with its leadership to better understand the community it serves and to guide the market and partners who worked there through the aftermath and toward recovery. (Hymes Dep., 116:10-23; 166:10-168:3.)

**RESPONSE:**   Disputed. After Defendant called police resulting in the arrests, it engaged to protect its "brand" from negative social media reaction.  Internal emails about protecting Starbucks

brand centered around race. Zeta Smith Deposition Transcript ("Smith Tr.") 28:24-29:2, attached here to as "Exhibit 4"; Paul Pinto Deposition Transcript ("Pinto Tr.") 85:14-17, attached hereto as "Exhibit 5"; STARBUCKS000941-000943, STARBUCKS003068-3090 and STARBUCKS003100-3123, attached hereto as "Exhibit 6".

15.     Starbucks leaders, including the CEO and other members of Starbucks' leadership, flew to attend meetings with civic leaders. (Hymes Dep., 146:19-23; 230:2-230:21; 247:7-18.

**RESPONSE:**  Disputed. The cited to record evidence does not support an averment that anyone from Starbucks "flew to attend meetings with civic leaders." Plaintiff does not dispute that Seattle based employees flew to Philadelphia.

16.     Specifically, Ebony Johnson, Partner Resources Manager (Black), was one of the employees who navigated the array of feelings and emotions that resulted from the wrongful arrests. (Johnson Dep., 22:21-23:11).

**RESPONSE:**  Disputed as stated. Plaintiff does not dispute that Ms. Johnson was a human resources business partner who spent time in Philadelphia following the arrests triggered by Starbucks' telephone call to police. Plaintiff disputes the unsupported allegation that she "navigated" anything.

17.     Additionally, Starbucks leadership met at the 18th and Spruce location to obtain a detailed background with respect to the events leading preceding the arrests. (Hymes [sic] 229:22-230:12; Johnson Dep., 21:3-10.)

**RESPONSE:**  Disputed as stated. The cited to record testimony does not support the allegation. However, Plaintiff does not dispute that elsewhere in the record it is stated that in the aftermath of the arrests, various members of the Starbucks management, including Plaintiff, met at the Spruce

Street store. Pinto Tr. 82:13-17; Smith Tr. 19:21-20:3; Camille Hymes Deposition Transcripts ("Hymes Tr.") 134:17-24, attached hereto as "Exhibit 7".

18.     As a result of these arrests Starbucks:

**RESPONSE:**  Disputed. There is no citation to the record to support that any of the allegations below were the "result" of "these arrests."

a.     Revised Starbucks' Safe and Welcoming Policy to implement lessons learned from the arrests in the Philadelphia store. (Hymes Dep., 69:6-10);

**RESPONSE:**  Undisputed.

b.     Required Starbucks leaders to undertake substantial training to ensure that the situation would never happen again, including working with consultants, and conducting "listening sessions" about what could be done to support the Philadelphia community. (Smith Dep., 84:2-85:4.);

**RESPONSE:**  Disputed as stated. The cited to record allegation does not support any allegation that any leaders were "required" to undertake "substantial" training "to ensure the situation would never happen again…" Smith Tr. 84:2-85:4.

c.     Conducted a series of roundtable discussions throughout the City of Philadelphia from April 23, 2018 to May 5, 2018, where Starbucks leaders could participate to discuss the incident and findings (Hymes Dep., 229:22-230:12).

**RESPONSE:**  Undisputed.

      d.     Closed all Starbucks locations on May 29, 2018 to conduct racial bias training lead by local leaders (Hymes Dep. 244:11-14.)

**RESPONSE:**  Undisputed.

19.     Starbucks also terminated Ms. Hylton's employment because of her inappropriate actions in calling the police on two Black customers. (Hymes Dep., 107:20-108:12).

**RESPONSE:**  Disputed as stated. Plaintiff does not dispute that Ms. Hylton was terminated. Plaintiff is not sure what Defendant is alleging by stating that she was "also terminated" for inappropriate actions and the cited to record evidence does not support any inference that anyone else was "also" terminated for inappropriate actions.

## IV.    MS. PHILLIPS INABILITY TO LEAD DURING A TIME OF CRISIS.

20.     Following the arrests, Ms. Phillips as the Regional District Manager, oversaw the Philadelphia market, including the 18th and Spruce Store. (Second Am. Compl., ¶¶ 21-33.)

**RESPONSE:**  Disputed. The cited to record support refers to the Ms. Phillips' employment history with Starbucks prior to the arrests and incorrectly states her title. Ms. Phillips title was Regional Director of Operations for Area 71. Sec. Am. Compl. ¶22; Phillips Tr. 24:13-15.

21.     As the Regional Director for the Philadelphia market, Ms. Phillips' responsibilities included working with leadership to support its partners, its stores, and its customers in Philadelphia. (Hymes Dep., 25:11-26:3; 93:1-10, 293:1-10.)

**RESPONSE:**  Disputed. Ms. Phillips' title was never "Regional Director for the Philadelphia market." Ms. Phillips' title was Regional Director of Operations for Area 71, a geographic area that encompassed approximately one hundred (100) stores across Pennsylvania, Southern New

Jersey, Delaware and Maryland. Sec. Am. Compl. ¶¶21-24. The job description for the Regional Director of Operations position, a document which speaks for itself, sets forth the responsibilities for the position. STARBUCKS005545-5548, attached hereto as "Exhibit 8".

22.     Following [sic] April 2018 incident, senior leaders, specifically Camille Hymes, Regional Vice President for Mid-Atlantic Retail Operations, who supervised Ms. Phillips, observed Ms. Phillips demonstrate a complete absence of leadership during this incident. (Hymes Dep., 12:7-9; 22:9-13; 52:14-53:6.)

**RESPONSE:**  Disputed. Ms. Hymes testified to a number of instances where she observed or was aware of Ms. Phillips exhibiting positive leadership following the April 2018 arrests. Hymes Tr. 94:12-23; 135:19-136:9; 144:6-19; 149:4-150:5; 159:24-160:12; 161:1-10; 231:10-232:7; 247:3-6; 269:17-270:21. Moreover, Ms. Hymes testified that she ignored incoming positive feedback regarding Ms. Phillips' performance following the April 2018 arrests, while acknowledging that positive feedback about Ms. Phillips' was given. Hymes Tr. 156:24-157; STARBUCKS000346, attached hereto as "Exhibit 9".

23.     Ms. Hymes observed that Ms. Phillips appeared overwhelmed and lacked awareness of how critical the situation had become for Starbucks and its partners. (Hymes Dep., 204:22-205:8; 212:14-213:12; 59:6-60:12.)

**RESPONSE:**  Disputed. The cited to record evidence does support any allegation that Ms. Phillips was "overwhelmed" nor that she "lacked awareness" of the situation.

24.     According to Ms. Hymes, in the aftermath of the crisis, Ms. Phillips stated that she did not think she was "built for this," and that it was difficult for her. (Hymes Dep., 292:16-293:10.)

9

**RESPONSE:**  Undisputed only that the allegation is "[a]ccording to Ms. Hymes.

25.     Ms. Phillips was physically and mentally absent from meetings. (Relevant portions of Paul Pinto Depositions [sic] Transcript, "Pinto Dep.," attached hereto as Exhibit H., 194:15-23.

**RESPONSE:**  Disputed. The cited to deposition testimony does not support the allegation. Further, Ms. Phillips worked diligently throughout the relevant time period, attending meetings and striving address ever-changing conditions in the Philadelphia market during the relevant time period. Phillips Tr. 45:21-46:17; STARBUCKS003527-3528, attached hereto as "Exhibit 10".

26.     Ms. Phillips' inability to physically show up resulted in a perception by her supervisors and subordinates that she "would not show up when it was raining." (Hymes Dep., 204:11-21.)

**RESPONSE:**  Disputed. The cited to record testimony does not support the allegation. First, Hymes (falsely) testified that prior to the events that there was a perception that Ms. Phillips would cancel when it "was raining" on certain store visits. Hymes Tr. 204:11-17. Hymes' efforts to paint a false picture of Ms. Phillips' pre-arrest performance is belied by Hymes' testimony that she did not have any performance concerns about Ms. Phillips before the Philadelphia arrests. Hymes Tr. 76:16-76:24. Moreover, despite repeated asks through counsel, Defendant has never been able to produce the name of any supervisor or employee who lodged a complaint about Ms. Phillips or her behavior.  To the contrary, Mr. Sykes testified that Ms. Phillips was "very, very present" and "working pretty much from open to close" during the weeks following the April 2018 arrests. Paul Sykes Deposition Transcript ("Sykes Tr.") 18:5-20, attached hereto as "Exhibit 11". Mr. Sykes disputed that Ms. Phillips was "checked out" and stated that Ms. Phillips "provided whatever emotional support [he] and the partners needed" during this time. *Id*. Likewise, Mr. Trinsey

testified that Ms. Phillips frequently "checked in which stores" during the weeks following the April 2018 arrests and that during these visits, Ms. Phillips "showed compassion." Ben Trinsey Deposition Transcript ("Trinsey Tr.") 59:1-9, attached hereto as "Exhibit 12".

27.     When she did show up, Ms. Phillips was late, disengaged, and observed standing in the corner, including at meetings that Starbucks expected her to lead. (Hymes Dep., 58:4-59:18; 124:20-22; 293:11-16.)

**RESPONSE:**  Disputed.  Plaintiff incorporates herein her response to No. 26 above.

28.     Paul Pinto, Vice President of Partner Resources (White), similarly observed that Ms. Phillips was neither physically nor emotionally present. (Pinto Dep. ,193:15-23.)

**RESPONSE:**  Undisputed that Mr. Pinto testified as alleged about <u>his</u> "observations."  Plaintiff incorporates herein her response to No. 26 above that contains the observations and beliefs of her subordinates.

29.     Mr. Pinto classified Ms. Phillips's [sic] leadership as "completely paralyzed" and driven by "panic." (Pinto Dep., 193:8-14; 195:3-12.)

**RESPONSE:**  Undisputed only that Mr. Pinto testified as cited. Plaintiff incorporates herein her response to No. 26 above that contains the classifications, observations and beliefs of her subordinates.

30.     In fact, Mr. Pinto observed "red flags" that emerged from the beginning of the crisis with Ms. Phillips, [sic] being "completely unequipped to handle" the uproar that followed after the arrests. (Pinto Dep., 98:5-12.)

**RESPONSE:**  Disputed. The cited to record testimony does not support the entire allegation. Plaintiff disputes that Mr. Pinto's observations were accurate and in support of same incorporates herein her response to No. 26 above.

31.     Based on his observations, Mr. Pinto believed that the market would not recover under Ms. Phillips' leadership. (Pinto Dep., 193:7-14.)

**RESPONSE:**  Disputed. The cited to record testimony does not support the entire allegation. Pinto Tr. 193:7-14. Mr. Pinto also testified that the decision to terminate Ms. Phillips was "not my decision to make" and that he felt she "really excelled" in the area of forging relationships within the Philadelphia community and that at least one other role "would have been great for Shannon" within the organization. Pinto Tr. 98:13-23; 159:01-160:08. Plaintiff disputes that Mr. Pinto's observations were accurate and in support of same incorporates herein her response to No. 26 above.

32.     Zeta Smith, Divisional Senior Vice President (Black), also witnessed Ms. Phillip's [sic] inability to lead the market following the wrongful arrests of the Black customers. (Smith Dep., 33:19-23.)

**RESPONSE:**  Disputed. The cited to record testimony does not support the allegation. Ms. Phillips did not demonstrate an "inability" to lead the market following the arrests. Plaintiff incorporates herein her response to No. 26.

33.     According to Ms. Smith, Ms. Phillips failed to attend meetings, or showed up late for critical meetings or calls, was unreachable, and did not direct her team in the midst of a crisis. (Smith Dep., 33:19-34:4).

**RESPONSE:**  Disputed. Ms. Smith could not provide any specific details in her deposition regarding the above. Smith Tr. 33:19-34:4. Plaintiff worked diligently in the Philadelphia market,

attending meetings and calls. Phillips Tr. 45:21-46:17; Exhibit 9. Plaintiff also incorporates herein her response to No. 26 above.

34.     Starbucks expected that Ms. Phillips would at a minimum participate in debrief sessions which involved discussion of the roundtable sessions conducted at various stores, however, her superiors believed she contributed very little to these sessions. (Smith Dep., 41:2-25.)

**RESPONSE:**   Disputed. Ms. Phillips participated in roundtable discussions, including in connection with managing complex partner feelings and relationships after the arrests. Phillips Tr. 103:20-104:20; STARBUCKS002829, attached hereto as "Exhibit 13".

35.     Instead of leading partners and answering questions within the purview of her role, such as how to handle a promotion, Starbucks observed Ms. Phillips defer to other partners, which further diminished her superiors and subordinate' confidence in her ability to lead. (Smith Dep., 38:15-39:17; 42:4-23.)

**RESPONSE:**  Disputed. Ms. Phillips admits that Ms. Smith testified about a single occasion where Mr. Sykes approached her with a question and Plaintiff "defer[ed] to someone else" but disputes that this occurrence ever took place. To the contrary, Mr. Sykes testified unequivocally that he did not perceive Ms. Phillips to be "checked out" during the weeks following the April 2018 arrests and, instead, believed that Ms. Phillips was "100 percent" present and "provided whatever emotional support [he] and the partners needed in Philadelphia." (Sykes Dep. 22:11-24; 27:1-5).

36.     As a result of her inability to answer questions, many people in her own team stopped coming to her for help and started seeking out others to lead. (Smith Dep., 39:13-40:1).

**RESPONSE:**  Disputed.  Plaintiff incorporates herein her response to No. 16 and 35 above.

37.     While immediately after the arrests Starbucks leadership Ms. Smith [sic] did not view Ms. Phillip's [sic] performance as terminable and possibly better suited for a different role, she changed her mind after witnessing "a combination" of "derailing behavior over the course of several weeks. (Smith Dep., 37:1-38:14.)

**RESPONSE:**  Disputed. There were not "several" weeks between the arrests and Ms. Phillips termination. Hymes Tr. 338:03-347:07; PHILLIPS 751-752, attached hereto as "Exhibit 14".  In fact, there were less than thirty (30) days between the arrests and Ms. Phillips termination. Further, Starbucks considered Plaintiff's race in connection with her employment during this time period. Phillips Tr. 107:20-110:10.

38.     Starbucks did not terminate Mr. Sykes' employment, but rather he resigned his position with Starbucks. (Sykes Dep., 7:17-23.)

**RESPONSE:**  Undisputed.

39.     Specifically, after the incident, Starbucks wanted to move Mr. Sykes to a suburban market, because the Philadelphia market was in a crisis and Ms. Hymes did not believe that Mr. Sykes could lead Starbucks and its partners through the aftermath. (Hymes Dep., 255:1-256:5.)

**RESPONSE:**  Disputed. Plaintiff does not dispute that Defendant considered moving Mr. Sykes to a market outside of Philadelphia. However, Plaintiff disputes any allegation as to the motivation behind Defendant consistently choosing to retain Mr. Sykes while Plaintiff and Mr. Sykes' counterpart Benjamin Trinsey (both white) were terminated. Moreover, Ms. Hymes testified that Defendant's offer to assume a position outside of the Philadelphia market was not intended to be punitive in any way. Hymes Tr. 151:8-17.

40.     However, Mr. Sykes wanted to move to the larger New York market, but Starbucks could not support the move based on feedback they received from his managers revealing that partners viewed his leadership style as "harsh." (Pinto Dep., 150:22-151:4; Sykes Dep., 48:10-49:1.)

**RESPONSE:**  Disputed. Mr. Pinto testified that "I was sort of out of the picture before he transitioned, so I'm not—I think he wanted to transition to the New York market and we couldn't support that so he left, but I'm not sure that that's what happened." Further, Mr. Sykes testified that race motivated Starbucks' and Hymes' personnel decisions post arrests in Philadelphia, saying in part "And there was a lot of conversations about race." Sykes Tr. 34:12-35:17.

41.     Ms. Phillips claims that Starbucks treated Mr. Sykes more favorably than her because he is Black by not terminating his employment after the two men were arrested at the store within his District. (Second Amended Compl. ¶ 61.)

**RESPONSE:**  Disputed as stated. Ms. Phillips points to the favorable treatment by Starbucks of Mr. Sykes in the face of specific complaints of issues coming from stores he was responsible for as evidence of Starbucks' discriminatory animus toward white employees working within the Philadelphia market at the time of the arrests and in the weeks following. *See e.g.* Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment; Sykes Tr. 28:12-35:17.

42.     Even though Mr. Sykes did not perform well in the Philadelphia market, Starbucks did not terminate Mr. Sykes' employment because of his strong work ethic and ability to lead, in stark contrast to Ms. Phillips following the April 2018 arrests. (Relevant portions of Nathalie Cioffi Deposition Transcript, "Cioffi Dep," attached hereto as Exhibit I, 4-2-21 Dep., 72:3-73:10).

**RESPONSE:**  Disputed. Starbucks did not terminate Mr. Sykes because of his race. Sykes Tr. 29:16-24. Further, Starbucks is now contradicting its own earlier factual allegations regarding the

15

reason it denied Mr. Sykes a transfer to the New York market. In No. 40, Starbucks alleges that Mr. Sykes was a "harsh" leader. This contradicts this allegation here that he had "ability to lead."

43.     Specifically, in the aftermath of the crisis, Mr. Sykes admitted that the situation was not positive for Starbucks, but nonetheless emphasized the importance of collaboration among partners. (Cioffi Dep., 72:3-23.)

**RESPONSE:**  Undisputed; there is no evidence that anyone failed to admit that "the situation was not positive for Starbucks" anywhere in the record.

44.     In June 2018, Mr. Sykes ultimately resigned because he did not receive his preferred placement in the New York Market. (Pl's Dep., 53:11-54:14; Sykes Dep., 7:10-16.)

**RESPONSE:**  Undisputed.

## V.     SEVERAL PARTNERS BRING COMPLAINTS AGAINST MS. PHILLIPS AND MR. TRINSEY

45.     During several roundtable meetings in late April and early May 2018, multiple partners in the Philadelphia stores complained about the lack of opportunities provided to both Black employees and employees who did not have special relationships with Ms. Phillips. (Hymes Dep., 30:2-19.)

**RESPONSE:**  Disputed.  Ms. Hymes could not offer a single example of any employee who did in fact complain **about Ms. Phillips**. Ms. Hymes was deposed twice and counsel for Plaintiff repeatedly asked for any/all documents in Defendants' possession demonstrating any complaint about Ms. Phillips. Defendant has not produced a single document to date that evidences any complaint about Ms. Phillips or the identity of any partner who ever made any statement about her failing to provide opportunities to Black partners.  Defendant has not produced an iota of evidence

16

from which the identity of any partner who alleged that Ms. Phillips favored anyone because of a "special relationship" could be gleaned nor could Ms. Hymes identify anyone. Moreover, Ms. Hymes testified **unequivocally** that she never concluded that Ms. Phillips treated Black employees differently than white employees or that Ms. Phillips engaged in any discriminatory conduct. Hymes Tr. 28:22-29:11; 33:15-19. In fact, Ms. Hymes testified that she would be surprised if Ms. Phillips ever engaged in any race discriminatory conduct. Hymes Tr. 110:24-111:11. Further, Mr. Sykes (who is Black) testified that he ranked Ms. Phillips highly among the several managers he had while employed by Defendant. Sykes Tr. 14:01-22.

46.     Those with special relationships with Ms. Phillips, [sic] included the two district managers who reported to her—Mr. Sykes and Mr. Trinsey. (Hymes Dep., 30:2-31.5.)

**RESPONSE:**  Disputed.  The cited to record testimony does not support any allegation that Ms. Phillips had a "special relationship" with the district managers that reported to her.

47.     Specifically, partners perceived Ms. Phillips' leadership style as rewarding partners she was close with either personally or professionally by giving them promotions. (Hymes Dep.,[sic]30:2-31:5; 168:23-170:3.)

**RESPONSE:**  Disputed.  Ms. Hymes could not offer a single example of any partner who in fact made the alleged comments above about Ms. Phillips nor has a single document been produced by Starbucks to support this allegation. Ms. Hymes herself admitted that "I don't have evidence of that…" Hymes Tr. 170:01-02.

48.     Also, Black partners expressed concerns of pay disparities as compared to White partners and they felt that Ms. Phillips did not take a leadership role and correct those inequities.

**RESPONSE:** Disputed. This assertion is specifically disputed to the extent that it suggests that Defendant received more than one potential allegation of pay disparities during the relevant time-period. Insofar as this assertion refers to Jaicee Huff's ("Ms. Huff") complaint regarding a "pay difference", Ms. Phillips also disputes that that Ms. Huff attributed the same to race discrimination. Nathalie Cioffi Deposition Transcripts ("Cioffi Tr.") 43:9-13, attached hereto as "Exhibit 15"; Pinto Tr. 168:24-169:3; Johnson 39:10-21. Importantly, Defendant concluded that race discrimination was not the reason for any aspect of Ms. Huff's pay. Hymes Tr. 189:3-21.

49.     Mr. Pinto also cited Ms. Phillips' lack of awareness of inequitable pay practices happening in her market as one example of how Ms. Phillips did not have a significant leadership presence in the market. (Pinto Dep., 101:2-12.)

**RESPONSE:** Disputed. First, Starbucks never concluded that "inequitable pay practices" because of any protected trait were at play in Philadelphia. Pinto Tr. 119:6-11; Hymes Tr. 189:3-21. Second, Pinto also noted that Ms. Hymes, as regional vice president, should have been equally aware of any issues associated with pay. Pinto Tr. 137:10-22.

50.     In or around May 2018, one Black assistant store manager who worked in one of Mr. Trinsey's stores, Jaicee Huff, reported to Ms. Johnson a disparity in pay between her salary and that of another White assistant store manager. (Johnson Dep., 30:3-22.)

**RESPONSE:** Disputed. Ms. Cioffi communicated to Starbucks that she received the complaint from Ms. Huff. STARBUCKS005994-5997, attached here to as "Exhibit 16".

51.     Consistent with its polices and procedures regarding the handling of complaints of discrimination in the workplace, Starbucks investigated these claims against Mr. Trinsey. (Pinto Dep., 169:18-24.)

**RESPONSE:** Disputed. There is no evidence that any complaint by Ms. Huff was "about Mr. Trinsey." *See* Exhibit 15.

52.     Complaints about Mr. Trinsey were not merely isolated to Ms. Huff and her complaints of pay disparities, but rather several other employees complained about Mr. Trinsey's behavior. (Johnson Dep., 47:2-6.)

**RESPONSE:** Disputed.  Ms. Johnson testified that she could not recall the name of any individual other than Ms. Huff who made any complaint nor could she recall (at all) any details of any alleged complaints about Mr. Trinsey. Johnson Tr. 45:01-48:01. Further, Ms. Johnson referred to taking notes or sending "recaps" while she was conducting an "investigation" into Mr. Trinsey. *Id.* Starbucks failed to preserve Ms. Johnson's materials when she left Starbucks and has been unable to provide any evidence that Ms. Johnson's testimony is accurate. May 6, 2020 email exchange between counsel for Plaintiff and Defendant, attached hereto as "Exhibit 17".

53.     Specifically, in or around May 2018, employees also accused Mr. Trinsey of making inappropriate comments about race, sexuality, and the treatment of other partners and team members. (Johnson Dep. ,45:11-15.)

**RESPONSE:** Disputed.  Ms. Johnson testified that she could not recall the name of any individual other than Ms. Huff who made any complaint nor could she recall (at all) any details of any alleged complaints about Mr. Trinsey. Johnson Tr. 45:01-48:01. Further, Ms. Johnson referred to taking notes or sending "recaps" while she was conducting an "investigation" into Mr. Trinsey. *Id.* Starbucks failed to preserve Ms. Johnson's materials when she left Starbucks and has been unable to provide any evidence that Ms. Johnson's testimony is accurate. *See* Exhibit 17. No other defense witness testified that anyone had made complaints about Mr. Trinsey "making inappropriate

comments about race, sexuality, and the treatment of other partners and team members," including those that were involved in placing him on suspension.

54.    With respect to determining pay, Mr. Trinsey claimed that Human Resources was responsible for monitoring pay disparities. (Relevant portions of Benjamin Trinsey Deposition Transcript, "Trinsey Dep.," attached hereto as Exhibit J, 34:17-21.)

**RESPONSE:**  Undisputed; Mr. Trinsey, however, is not "claiming" anything as he is not party to this Action and has no stake in the outcome of the litigation.

55.    Ms. Phillips asserts that the District Manager did not have discretion in determining pay. (Pl.'s dep., 157:9-158:7.)

**RESPONSE:**  Undisputed.

56.    However, it is the District Manager's responsibility for determining pay and having awareness as to the possible inequities that exist.

**RESPONSE:**  Disputed.  Phillips Tr. 157:9-158:7; Trinsey Tr. 34:17-21; Sykes Tr. 23:6-9; 23:12-24:16; 25:13-15.

57.    Ultimately, Mr. Trinsey agreed Starbucks acted appropriately in investigating the allegations against him. (Trinsey Dep., 53:19-54:2.)

**RESPONSE:**  Disputed that the "allegations" were "against him."  *See* Exhibit 16.

58.    On May 7, 2018, Ms. Hymes, Mr. Pinto, and Nathalie Cioffi (White), Partner Resources Director, met with Ms. Phillips and instructed her, as Mr. Trinsey's manager, to suspend

Mr. Trinsey pending the outcome of the investigation into the allegations against him. (Pl.'s Dep. 95:7-96:13; Hymes Dep., 309:6-13.)

**RESPONSE:**  Undisputed.

59.     According to Ms. Phillips, she told Ms. Hymes, Mr. Pinto, and Ms. Cioffi that the allegations against Mr. Trinsey were false, that Mr. Trinsey had no control over setting salaries, and that, in her view, it is "unfair" and "wrong" to suspend Mr. Trinsey (Pl.'s Dep., 97:11-100:3; Hymes Dep., 190:22-192:19.)

**RESPONSE:**  Disputed as stated. Plaintiff also testified that she complained that Mr. Trinsey was being falsely accused of being "racist" and suspended because of false allegations that he was "racist" against the backdrop of a "racially charged" moment in the organization when all of the discussions happening around her were about race. Phillips Tr. 96:18-100:3; Hymes Tr. 185:12-18.

60.     Ms. Phillips made these assertions before knowing the outcome of the investigation. (Pl.'s Dep., 88:21-89:5.)

**RESPONSE:**  Undisputed.

61.     At no time did Ms. Phillips complain to anyone at Starbucks that Mr. Trinsey's race motivated the decision to investigate or suspend him or that he was being treated differently because of his race. (Pl.'s Dep., 96:18-100:3.)

**RESPONSE:**  Disputed.  Ms. Phillips testified that she complained that Mr. Trinsey was being falsely accused of being "racist" and suspended because of false allegations that he was "racist" against the backdrop of a "racially charged" moment in the organization when all of the discussions

happening around her were about race. Phillips Tr. 96:18-100:3; Hymes Tr. 185:12-18; Sykes Tr. 34:23-35:17.

## VI.    STARBUCKS SUBSTANTIATES THE COMPLAINTS AGAINST MS. PHILLIPS AND MR. TRINSEY[2]

62.    Following receipt of Ms. Huff's complaint about pay disparity, Ms. Johnson continued her investigation into the allegations by speaking with various team members and reviewing promotional histories to see whether there were inequities. (Johnson Dep., 32:22-33:7.)

**RESPONSE:**  Disputed.  Ms. Johnson's testimony contradicts with that of Defendant's employee Nathalie Cioffi who stated that Ms. Huff's concerns were investigated by "compensation," the iDea team, and Holly Klein (among others). Cioffi Tr. 119:17-159:09.

63.    Ms. Johnson spoke with Ms. Huff on numerous occasions in the six months following the arrests and concluded that there was, in fact, a disparity in Ms. Huff's pay compared to the White assistant store manager Ms. Huff had referenced in her complaint. (Johnson Dep., 37:5-12.)

**RESPONSE:**  Disputed.  Ms. Johnson testified that she often spoke to Ms. Huff,  but did not place those discussions as being "following the arrests." Johnson Tr. 37:5-12. Ms. Johnson's testimony contradicts and is inconsistent with the testimony of Ms. Cioffi about the process used once Ms. Huff raised concerns about her pay, both defense witnesses. Cioffi Tr:119-17-159:09.

64.    Ms. Johnson did not reach a conclusion that the disparity was a result of race discrimination.

---

[2] This heading, without any citation to the record, is grossly misleading, even when compared to others within DSF. Not a single fact under this heading relates in any way to any complaint against Ms. Phillips (because there were none) or any "substantia[tion]" of any complaint.

**RESPONSE:**  Undisputed.

65.     During the course of this investigation, Ms. Phillips never stated that Mr. Trinsey was treated unfairly. (Johnson Dep., 44:1-4.)

**RESPONSE:**  Disputed.  See Defendant's No. 59 and Plaintiff's Response to No. 59 and 61.

66.     Notably, Ms. Phillips does not recall ever stating that Mr. Trinsey was treated unfairly because of his race. (Pl.'s Dep., 98:9-18.)

**RESPONSE:**  Disputed as stated. Ms. Phillips does not dispute that she does not recall using the words "because of" Mr. Trinsey's "race" in connection with complaints she made about his race-based treatment. However, Plaintiff otherwise incorporates herein her response to No. 59 and 61 above.

67.     Ms. Philips admitted that Starbucks had an obligation to investigate these allegations. (Pl.'s Dep., 212:1-8.)

**RESPONSE:**  Disputed. Ms. Phillips agrees that "under Starbucks' policy that if someone made an allegation dealing with disparate treatment based on race that the organization had an obligation to investigate those allegations." Phillips Tr. 212:1-8. The cited to record testimony does support any allegations related to any accusation made of or about Mr. Trinsey.

68.     Before the investigation into the allegations against Mr. Trinsey concluded, Mr. Trinsey voluntarily resigned. (Trinsey Dep., 30:16-20; Pl.'s Dep., 53:11-23.)

**RESPONSE:**  Disputed.  Mr. Trinsey was given the option to quit in lieu of termination. Trinsey Dep. 31:4-10.

**VII.   PARTNERS CONTINUE TO BRING COMPLAINTS AGAINST MS. PHILLIPS FOR LACK OF LEADERSHIP AND HER EMPLOYMENT IS TERMINATED**

69.     In late April, 2018, complaints emerged from partners with respect to Ms. Phillips'

lack of physical presence in the market. (Hymes Dep., 160:5-18; 168:21-170:12.)

**RESPONSE:**  Disputed.  Starbucks has not been able to produce a single instance of a "lack of

physical presence in the market" or even provide the identity of a single partner who complained

about Ms. Phillips' throughout this litigation and despite repeated requests for same from counsel

for Plaintiff. This is the same factual allegation that appears in Nos.  25 and 26 above. Plaintiff

incorporates herein her responses to those allegations.

70.     For example, she cancelled planned store visits at the last minute. (Hymes Dep,

[sic] 170:6-12.)

**RESPONSE:**  Disputed. Starbucks has not been able to identify a single store visit that Ms.

Phillips canceled "at the last minute." This is the same factual allegation that appears in No. 25

above. Plaintiff incorporates herein her response to No. 25. In addition, Plaintiff restates that Ms.

Hymes' efforts to paint a false picture of Ms. Phillips' pre-arrest performance is belied by Hymes'

testimony that she did not have any performance concerns about Ms. Phillips before the

Philadelphia arrests. Hymes Tr. 76:16-76:24.

71.     Partners shared that they came to Ms. Phillips and her District Managers with their

concerns, yet none were documented, resulting in a perception that partners did not feel seen,

valued or heard in Ms. Phillips' region. (Hymes Dep., 168:21-172:24.)

**RESPONSE:**     Disputed. Ms. Hymes could not offer any details regarding any

complaints/concerns, admitted that she did not document any of those conversations that the

Defendant seeks to rely upon here and admitted "[now] again, I don't have evidence of that…."

Hymes Tr. 168:21-172:24.

72.     Ms. Hymes testified that an "overwhelming theme" emanated from the roundtables that partners in the Philadelphia region "did not trust [Ms. Phillips]," and "partners in distress…cannot be led through crisis in an effective way with excellence if they do not trust their leader." (Hymes Dep. 204:24-205:5.)

**RESPONSE:**  Undisputed only that Ms. Hymes testified as cited.

73.     On May 4, 2018, Ms. Smith texted Mr. Pinto, stating that Ms. Phillips "crashed and burned." (Pinto Dep., 164:2-11, Exh. 72, attached hereto as Exhibit K.)

**RESPONSE:**  Undisputed.

74.     In light of these concerns, Ms. Hymes concluded that Ms. Phillips was not able to lead the Philadelphia market and its partners through this moment of crisis. (Hymes Dep., 52:14-18.)

**RESPONSE:**  Disputed. Ms. Hymes considered Ms. Phillips' race and her complaints of race discrimination in connection with any "conclusions" about her future with Starbucks. Phillips Tr. 107:20-110:10.

75.     Because strong leadership was essential during that time, on May 9, 2018, Ms. Hymes decided to terminate Ms. Phillips from her Regional Director role. (Hymes Dep., 292:16-23.)

**RESPONSE:**  Disputed. Ms. Hymes considered Ms. Phillips' race and her complaints of race discrimination in connection with any "conclusions" about her future with Starbucks. Phillips Tr. 107:20-110:10.

76.     Ms. Phillips' asserts that she was terminated because she is White. (Second Am. Compl., ¶ 71)

**RESPONSE:** Undisputed that Ms. Phillips' Second Amended Complaint details that her race was a motivating and/or determinative factor in her termination.

77.     In making the termination decision, Starbucks never discussed or considered Ms. Phillips' race. (Hymes Dep., 256:6-8.)

**RESPONSE:**   Disputed. The record contains ample evidence that race played a factor in employment decisions following the April 2018 arrests, including the decision to terminate Ms. Phillips. In the wake of the April 2018 arrests, "race was definitely the topic of conversation" – primarily in terms of "people feeling like there needed to be action taken." Sykes Tr. 35:9-17. Defendant's leaders, including Ms. Hymes, shared the sentiment that "a strong message needed to be sent because [Defendant's] business was being impacted, not only in Philadelphia, but across the board." Sykes Tr. 28:12-29:2.  However, as Mr. Sykes himself observed in discussing his belief that he remained employed following the April 2018 arrests because of his race, "what message would that send if they let me go and there is these conversations about race and I am the Black leader that's there." Sykes Tr.  29:16-24. Finding itself at the center of "conversations" about "being a Black person in the U.S.", Smith Tr. 71:7-12, Defendant insulated Black leaders from negative ramifications stemming from the April 2018 arrests – including those "closest to it" Sykes Tr. 28:12-29:15 – and scapegoated white leaders who had no involvement in the arrests, including Ms. Phillips. Sykes Tr. 28:12-29:15; 34:23-35:8; Trinsey Tr. 26:4-17; Phillips Tr. 107:20-110:10.

78.    There is no evidence that Starbucks leadership, displayed any discriminatory animus toward White people. (Hymes Dep. 256:6-8.)

**RESPONSE:**  Disputed. The record contains ample evidence that race was a factor in employment decisions in Philadelphia following the arrests. For example, and without limitation, caucasian/white employees in leadership positions tied to the Philadelphia market were terminated while Black employees in leadership positions tied to the Philadelphia market were not terminated. Mr. Sykes unequivocally testified that he believed that Ms. Phillips' race played a role in her termination, explaining: "I did find it interesting because it happened in my district, and I certainly didn't cause that, but it was in my district and it was my manager and I felt really bad with what happened with Ben and then what happened with Shannon because they were the furthest from it and I was the closest to it." Sykes Tr. 28:12-29:15; *see also* 34:23-35:8 ("it happened in my district. Shannon was the Regional Director. Ben Trinsey was fired. It did not happen in his district. He was terminated. Shannon was terminated. Holly was terminated. I was the only one who hadn't had any conversations with regards to performance or any of that at that time."). Moreover, adverse action was taken against Mr. Trinsey in connection with allegations of "pay difference" which Defendant interpreted as a race discrimination complaint, while Mr. Sykes was never coached or disciplined in connection with allegations of race discrimination occurring within his stores. Cioffi Tr.. 52:13-53:7; 68:21-70:15. Mr. Trinsey testified that he "felt like [he] was being put up as the scapegoat" because "[he] was white and it was easy to go after [him] and say that [Defendant] made changes in leadership." Trinsey Tr. 26:4-17.

79.     After Starbucks terminated Ms. Phillips' employment, four managers temporarily oversaw Ms. Phillips' region-Marcus Eckensberger, T.J. Wolfsberger, Linda Johnson, and Dominic Alessandrini. (Def.'s Resp. RPD No. 19, attached hereto as Exhibit L.)

**RESPONSE:**  Disputed as stated. As evidenced by the cited to record evidence, the individuals above had varying degrees of responsibility for the stores formerly known to make-up Area 71 from Plaintiff's termination to the present. (*See* Exhibit L, No. 19, to Defendant's Motion for Summary Judgment.)

80.     After May 9, 2018 Mr. Eckensberger replaced Ms. Phillips. (Pl.'s Dep., 132:9-22.)

**RESPONSE:** Undisputed.

81.     Mr. Eckensb[sic]gr is White. (Pl.'s Dep., 132:9-22.)

**RESPONSE:** Undisputed.

82.     On June 13, 2018, Ms. Phillips texted Mr. Trinsey and stated "it looks like [Starbucks[ did not only get rid of the white people." (Hymes Dep., 141:12-19; 142:19-143:4; Pl.'s Dep. Exh 7, for exhibit identification purposes Bates Stamped PHILLIPS00248 ins included and quoted statement is located at Bates Stamp PHILLIPS00367, attached hereto as Exhibit M.)

**RESPONSE:** Undisputed that Plaintiff shared an article with Mr. Trinsey that detailed other discriminatory behavior by Starbucks.

83.     Ms. Phillips continues to believe that Ms. Hylton followed Starbucks' "Safe and Welcoming" policy, which was put into place to create a safe environment for partners and

customers when there is an actual risk to that safety. (Pl.'s dep., 64:22-65:10; Johnson Dep., 23:15-25:1)

**RESPONSE:**  Disputed. Ms. Phillips believes, and Starbucks' admits, that Defendant's "Safe and Welcoming" policy was flawed and invited bias by partners. Smith Tr. 46:10-47:2; Pinto Tr. 72:20-24. Ms. Phillips did not have any role in developing the policy. Hymes Tr. 67:22-24. Following Defendant's role in the arrests in Philadelphia, the Defendant substantially altered the policy and diminished its use. Pinto Tr. 72:4-6; Hymes Tr. 69:6-10. Ms. Phillips believes that Ms. Hylton's call to the police was wrong. ("I don't think the police should have been called, but I think they were called as a result of this flawed policy, yes." Phillips Tr. 25:23-26:01;….."I personally, I don't think the police should have been called." Phillips Tr. 38:16-18.)

84.     Ms. Phillips maintains that Ms. Hylton's decision to call the police was not racially motivated and rather maintained that she "probably thought she was doing the right thing." (Pl.'s Dep., 63:23-64:12.)

**RESPONSE:**  Disputed. The factual allegation is not supported by the record citation. Plaintiff incorporates herein her response to No. 83 above.

## VIII.  STARBUCKS EXPLORES THE IDEA OF CREATING A TLA POSITION

85.     In or around April 2018, Starbucks' government affairs team explored the possibility of creating a Temporary Limited Assignment ("TLA") position. (Relevant portions of Shannon Bolidszar Deposition Transcript, "Boldiszar Dep.," attached hereto as Exhibit N, 19:18-20:18.)

**RESPONSE:**  Undisputed.

86.     On April 20, 2018, Shannon Boldiszar, then-Government & Community Affairs, Senior Manager (White), sent an email to Ms. Hymes, Ms. Phillips, and other stakeholders in the Philadelphia market announcing the TLA position and seeking recommendations for candidates.) (Bates Label STARBUCKS0000719-0000720, attached hereto as Exhibit O.)

**RESPONSE:**  Undisputed.

87.     In or around the end of April 2018, Ms. Boldizsar and her government affairs colleagues, including James Roth and Kim Winston, held phone calls with several potential candidates for the role, including Ms. Phillips. (Boldiszar Depl, 20:13-21.)

**RESPONSE:**  Disputed. The cited to record evidence does not support any factual allegations as to timing of phone calls or several potential candidates. Instead it refers only to the identity of the colleagues that Ms. Boldiszar considered to be on the "government affairs team."

88.     On April 25, 2018, Ms. Boldizsar and Ms. Phillips exchanged emails about the role for the first time. (Hymes Dep. 256:15-257:7; Hymes Dep. Exh 44, attached hereto as Exhibit P.)

**RESPONSE:**  Disputed as stated. The cited to record evidence does not support any allegation that Plaintiff and Ms. Boldizsar exchanged emails about the role "for the first time."

89.     Ms. Boldizsar explained that Ms. Hymes recommended Ms. Phillips for the TLA role, and if Ms. Phillips was interested, they should set up a meeting. (Boldizsar Dep., 21:8-13.)

**RESPONSE:**  Undisputed.

90.     In April 2018, Ms. Hymes recommended Ms. Phillips for the TLA role because she would not have direct reports and would not be leading a team, and at the time, Ms. Hymes thought that it was a way to create continuity for her employment at Starbucks. (Hymes Dep., 257:11-23.)

**RESPONSE:**  Disputed. Starbucks recommended Ms. Phillips for the TLA position because of her excellent track record of building community relationships within Philadelphia. Smith Tr. 27:14-28:1; Hymes Tr.  27:18-28:1; Shannon Boldizsar Deposition Transcript ("Boldizsar Tr.") 17:10-15, attached hereto as "Exhibit 18". Further, at the time that Ms. Hymes suggested Ms. Phillips for the position, Ms. Phillips had not complained of race discrimination. Hymes Tr. 185:12-18.

91.     This recommendation came before Ms. Hymes observed Ms. Phillips' leadership ability severely declined. (Hymes Dep., 200:8-201:19.)

**RESPONSE:**  Disputed.  Ms. Hymes' recommendation came before Ms. Phillips complained of race discrimination. Hymes Tr. 185:12-18.

92.     Ms. Boldizsar emphasized the meeting was not an interview, but instead an informal tow-way dialogue to learn more about the position and Ms. Phillips' potential interest in it.

**RESPONSE:**  Undisputed.

93.     In their email exchange, Ms. Phillips conceded she did not believe she was qualified for the role and would have "no hard feelings if [she was] not the right person." (Hymes Dep. 256:15-257:7; Hymes Dep. Exh. 44.)

**RESPONSE:**  Disputed. Exhibit 44 is a document that speaks for itself, and Plaintiff is entitled to all inferences in her favor related to the document at this stage. The Defendant has excerpted the

31

document, rather than including it in full. The email exchange occurred before her discussion with Ms. Boldizsar and before she learned what the job description/position description entailed and included. In other words, Ms. Phillips' did not know what the job required. (Himes Dep. 256:15-257:7; Hymes Dep. Exh. 44.)

94.     On April 30, 2018, Ms. Phillips emailed Ms. Boldizsar and Mr. Roth to thank them for the meeting, however, she noted that she "had been in Philadelphia all day and was navigating out of the city during our connect and [she] fear[ed] [she] likely didn't come across very strategic and possibly a bit scattered…." (Bates Labeled Doc STARBUCKS005641, attached hereto as Exhibit Q.)

**RESPONSE:**  Disputed. Exhibit Q is a document that speaks for itself, and Plaintiff is entitled to all inferences in her favor related to the document at this stage.

## IX.     STARBUCKS DECIDES TO ABANDON THE IDEA OF CREATING A TLA POSITION

95.     In or around May 2018, Ms. Boldizsar and her colleagues decided not to create the TLA position because she felt that the partners she considered for the TLA role were not well suited for the position. (Boldizsar Dep., 26:3-9.)

**RESPONSE:**  Disputed. The cited to record testimony does not support the allegation. At the record testimony cited, Ms. Boldizsar said "We determined, and when I say 'we,' our team determined that it was not going to meet our needs and set Starbucks up for success given the crisis situation that was evolving daily, and we decided not to proceed with next steps." Boldizsar Tr. 26:3-9.

96.     Specifically, Ms. Boldizsar determined that the candidates did not have the expertise necessary to ensure that Starbucks continued its commitment to maintaining deep

relationship[sic] with policy makers and elected officials following the April 2018 arrests. (Boldizsar Dep., 33:11-35:8.)

**RESPONSE:**  Disputed as stated. Ms. Boldiszar cited the need for candidates with "specifically the government affairs professional aspects." Boldizsar Tr. 34:18-35:06.

97.     As a result, Starbucks did not interview any individuals for the role. (Boldizsar Dep.22:18-20.)

**RESPONSE:**  Disputed. The cited to record testimony does not support the allegation.

98.     Starbucks never set a salary for the role. (Boldizsar Dep., 22:21-23.)

**RESPONSE:**  Undisputed.

99.     Further, Starbucks never drafted a job description for the role. (Boldizsar Dep., 23:3-5.)

**RESPONSE:**  Undisputed.

100.    On May 2, 2018, Ms. Boldizsar notified the candidates she spoke to about the position, including Ms. Phillips, that the position was being put "on hold." (Bates Labeled Doc STARBUCKS005641.)

**RESPONSE:**  Disputed as stated. The cited to document is a document that speaks for itself and should be read in full rather than excerpted.

101.    Starbucks decided not to create the position, and nobody was hired for the role. (Boldizsar Dep., 30:1-5.)

**RESPONSE:**   Disputed as stated. Starbucks instead hired Bellevue Strategies and Mustafa Rasheed (Black) to perform the responsibilities and duties of the TLA position alongside the government affairs team. Boldizsar Tr. 26:10-29:05.

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS
## PRECLUDING SUMMARY JUDGMENT

### *Plaintiff Ascends To The Rank Of Regional Director Amid Her Spotless Performance Record At Starbucks*

1.      Plaintiff began her employment with Starbucks on December 12, 2005 as a District Manager based out of Youngstown, Ohio. Second Amended Complaint ¶ 20; Phillips Tr. 134:13-16.

2.      Amid her exemplary performance, in 2011, Plaintiff was promoted to Regional Director of Operations ("RDO") for Area 71, a geographic area encompassing approximately one hundred (100) stores across Pennsylvania, southern New Jersey, Delaware, and Maryland. Second Amended Complaint ¶ 20.

3.      Mr. Pinto, who was Partner Resources Manager at the time, endorsed Plaintiff's promotion to RDO and supported various aspects of Plaintiff's professional development because Defendant "wanted to develop her as a leader" within its organization. Pinto Tr. 46:17-49:7

4.      Throughout her tenure as RDO, Plaintiff was widely regarded among Defendant's leadership as an invaluable leader within Defendant's organization, fostering "good relationships with her partners", accomplishing "noteworthy" community work, and remaining consistently engaged with the issues impacting her team. Smith Tr. 27:14-28:1; Pinto Tr. 48:14-16; Boldizsar Tr. 17:10-15.

5.      Plaintiff "understood [Starbucks'] culture, was deeply immersed in connecting with [Starbucks'] partners," and "was a developer of talent." Hymes Tr. 28:10-13.

6.      Likewise, Plaintiff's subordinates viewed her as "approachable", "genuine", and "really supportive." Sykes Tr. 11:14-12:14.

7.     Moreover, Plaintiff's performance on all objective performance indicators and metrics was "very good" and she was considered among the strongest RDOs under Ms. Hymes' purview. Hymes Tr. 27:16-28:8; 34:23-35:1.

8.     Every single defense witness who knew Plaintiff prior to April 2018 testified, unequivocally, that they liked her, respected her, and had positive impressions of her performance. Pinto Tr. 48:9-16; Smith Tr. 28:2-9; Boldizsar Tr. 17:10-15; Hymes Tr. 34:19-22.

9.     At no time during Plaintiff's tenure at Starbucks was Plaintiff placed on a performance improvement plan, warned that her performance was materially deficient, or advised that her job was in jeopardy. Hymes Tr. 34:8-17; Pinto 64:21-65:1.

10.    Defendant has never concluded that Plaintiff discriminated against any individual inside or outside of its organization. Hymes Tr. 28:22-29:11; 33:15-19.

### *Donte Robinson and Rashon Nelson Are Arrested On April 12, 2018 At 18th And Spruce Retail Location After Starbucks Employee Calls The Police Pursuant To Starbucks' Policy*

11.    On April 12, 2018, two (2) Black men – Donte Robinson and Rashon Nelson – were arrested at Defendant's 18th and Spruce retail location after Store Manager, Holly Hylton, called the police. Phillips Tr. 22:1-7; Hymes Tr. 77:1-17; Ebony Johnson Deposition Transcript ("Johnson Tr.") 18:10-21, attached hereto as "Exhibit 19".

12.    Plaintiff played no role in Ms. Hylton's call to the police or the arrests that followed. Pinto Tr. 90:21-91:12.

13.    Plaintiff believes that the police should not have been called. Phillips Tr. 38:12-18; 121:21-122:5.

36

14.      Ms. Hylton called the police pursuant to Defendant's Safe and Welcoming policy which was developed and disseminated by Defendant to deter non-customers from congregating in its retail locations. Phillips Tr. 20:24-22:7; 25:9-18.

15.      Plaintiff played no role in the creation of Defendant's Safe and Welcoming policy and believes that the policy was "flawed." Hymes Tr. 67:22-24; Phillips Tr. 25:20-26:1.

16.      Defendant admits that its Safe and Welcoming policy invited racial profiling by its employees and discontinued its use of the policy within the City of Philadelphia following the April 2018 arrests. Pinto Tr. 72:1-24; Smith Tr. 46:10-25; Hymes Tr. 69:6-10.

17.      No individual responsible for creation or implementation of Defendant's Safe and Welcoming policy was disciplined. Smith Tr. 47:7-11.

### *Plaintiff Works Tirelessly To Lead Her Market And Support Her Partners In The Aftermath Of The April 2018 Arrests*

18.      During the days and weeks that followed the April 2018 arrests, Plaintiff served as a beacon of compassion and support for her partners. Trinsey Tr. 59:1-9; Sykes Tr. 22:11-14; 27:1-5.

19.      Following the arrests, Plaintiff worked "pretty much from open to close" and was "very, very present" in the Philadelphia market, frequently checking in with her stores and reaffirming Defendant's values at every turn. Trinsey Tr. 59:1-9; Sykes Tr. 22:11-14; 27:1-5.

20.      Plaintiff's subordinates did not perceive her to be "checked out" or in any way out of touch with the seriousness of the April 2018 arrests. Sykes Tr. 22:11-14; 27:1-5. Rather, Plaintiff's subordinates perceived her as being "100 percent" present and intent on providing "whatever emotional support [they] needed." *Id.*; Exhibit 9; April 19, 2018 recognition cards, attached hereto as "Exhibit 20".

21.     Defendant's leadership similarly observed Plaintiff's strong leadership during the weeks following the April 2018 arrests. Hymes Tr. 94:12-23; 135:19-136:9; 144:6-19; 149:4-150:5; 159:24-160:12; 161:1-10; 231:10-232:7; 247:3-6; 269:17-270:21.

22.     In late-April 2018, Ms. Hymes recommended Ms. Phillips for a Temporary Limited Assignment (TLA) role to support Defendant's Government and Community Affairs apparatus. Boldizsar Tr. 21:8-13; 24:8-16.

23.     Ms. Hymes never revoked her recommendation of Plaintiff for the TLA role. Boldizsar Tr. 25:23-26:2; 32:13-15.

24.     Defendant never determined that Plaintiff was unqualified for the TLA role. Boldizsar Tr. 30:1-5.

25.     The only reason why Plaintiff was not selected for the TLA role was because Defendant decided not to create the position. Boldizsar Tr. 30:1-5.

### *Starbucks Fixates On Repairing Its Ailing Brand Under The Guise Of A Highly Publicized Campaign To "Reaffirm" Its "Values"*

26.     Plaintiff informed Ms. Hymes of the arrests on April 12th; however, at that time, Ms. Hymes did not believe that the event would "blow up" and garner significant media attention and made no immediate plans to visit the City of Philadelphia. Hymes Tr. 83:2-10; 93:12-18.

27.     It was only after a video of the arrests surfaced and social media activity became "significant and concerning" that Defendant deemed it necessary to "shift [its] approach" and for "leadership to be present" in the Philadelphia market. Hymes Tr. 81:8-19; 92:17-21.

28.     Thereafter, amid an emerging realization that the media blowback from the April 2018 arrests was "turning into a big deal", Defendant's leadership descended upon the City of Philadelphia. Pinto Tr. 77:13-78:21; Hymes Tr. 81:20-23.

29.     Defendant's leadership perceived the public's perception surrounding the April 2018 arrests as a risk to the Starbucks brand and Defendant's bottom line. Smith Tr. 28:24-29:2; Pinto Tr. 85:14-17. Put simply: the April 2018 arrests resulted in "pressure on [Defendant's] entire business." Boldizsar Tr. 13:9-15:9.

30.     On May 2, 2018, Defendant issued a public statement vowing that "Starbucks will continue to take actions that stem from this incident to repair and reaffirm our values and vision for the kind of company that we want to be." Second Amended Complaint ¶ 47.

### *Behind The Scenes, Starbucks Decides To "Send A Message" Through Personnel Changes Affecting White Leaders*

31.     Following the April 2018 arrests, "race was definitely the topic of conversation" at Defendant. Sykes Tr. 35:9-17.

32.     During this time, Defendant determined that "a strong message needed to be sent because [Defendant's] business was being impacted, not only in Philadelphia, but across the board." Sykes Tr. 28:12-29:2.

33.     Defendant sought to achieve its goal of sending a "strong message" by ridding its Philadelphia market of white leaders while allowing Black leaders with similar or greater responsibility for the events of April 12, 2018 to remain employed. Sykes Tr. 28:12-29:15; 34:23-35:8; Phillips Tr. 111:19-114:3; 143:9-144:23.

34.     On May 7, 2018, Defendant received a complaint from a Black Assistant Store Manager named Jaicee Huff regarding a "pay difference" between her salary and the salary of her colleague, who was white. Johnson Tr. 30:3-22.

35.     Ms. Huff did not allege that she believed she was discriminated against or that she believed that they "pay difference" was in any way attributable to her race or race discrimination by her manager, Mr. Trinsey. Cioffi 43:9-13; Pinto 168:24-169:3; Johnson 39:10-21.

36.     Defendant unilaterally interpreted Ms. Huff's allegation regarding a "pay difference" as an allegation of race discrimination because Ms. Huff was Black and the employee to whom she compared herself was white. Johnson Tr. 42:9-13.

37.     Defendant initiated an internal investigation into Mr. Trinsey for allegedly perpetuating race-based pay disparities and decided to place Mr. Trinsey on suspension pending the results of same. Pinto Tr. 169:18-24.

38.     Given that it was partner resources, not the District Manager, who determined partner pay, Defendant was well aware that pay disparities were out of Mr. Trinsey's control and that the allegation that he had engaged in race-discriminatory pay practices were factually impossible. Trinsey Tr. 25:3-8; Sykes Tr. 23:6-25:15; Phillips Tr. 86:6-9; 98:22-99:5.

39.     Defendant deviated from its usual practice by placing Mr. Trinsey on suspension pending results of the investigation. Trinsey Tr. 54:20-24.

40.     Defendant suspended Mr. Trinsey because he is white. Trinsey Tr. 26:4-17; Sykes Tr. 28:12-29:15; 34:23-35:8; Phillips Tr. 86:22-87:18.

***Plaintiff Engages In Protected Activity By Objecting To The Race Discriminatory Suspension Of Mr. Trinsey***

41.     On May 7, 2018, Plaintiff was instructed to advise Mr. Trinsey of his suspension, which Defendant knew to be based on factually impossible allegations of race discrimination. Phillips Tr. 95:7-96:13; Hymes Tr. 309:6-13; Trinsey Tr. 25:3-8; Sykes Tr. 23:6-25:15.

42.     Plaintiff objected to Mr. Trinsey's suspension, stating that the allegations of race discrimination against him were false and explaining that Mr. Trinsey was not responsible for determining his subordinates' salaries. Phillips Tr. 86:2-9; Hymes Tr. 190:22-192:19.

43.     Plaintiff complained of race discrimination in connection with the false accusations of racism against Mr. Trinsey. Phillips Tr. 86:10-16; 96:18-100:3; Hymes Tr. 185:12-18; 191:16-19.

44.     Plaintiff believed that Mr. Trinsey was being placed on suspension in connection with false accusations of racism because Mr. Trinsey was white. Phillips Tr. 86:22-87:18.

45.     Defendant admits that falsely accusing an individual of being racist constitutes race discrimination in violation of Starbucks' anti-discrimination policy. Cioffi Tr. 60:20-61:21.

46.     Defendant admits that Plaintiff's complaint regarding the false accusation of racism against Mr. Trinsey constitutes protected activity covered by Starbucks' anti-retaliation policy. Cioffi Tr. 62:2-11.

47.     Ms. Hymes admits that Plaintiff was terminated, in part, because she exhibited "insubordination" when she complained of race discrimination in connection with Mr. Trinsey's suspension. Hymes Tr. 50:22-51:11; 177:14-178:19.

48.     Mr. Pinto, on the other hand, testified that Plaintiff was not "insubordinate" during May 7th meeting and, instead, described her as "stoic". Pinto Tr. 178:13-179:12; 180:14-181:1.

49.     Mr. Pinto disputes that Plaintiff objected to Mr. Trinsey's at all, describing Plaintiff's conduct during the May 7th meeting as: "it was very much like, okay, what am I going to say? Okay, wait. What am I going to say? And then I'm going to say this. Okay. That's how the dialogue was." Pinto Tr. 178:13-179:12; 180:14-181:1.

***Starbucks Terminates Plaintiff After Nearly Thirteen (13) Years Of Dedicated Performance Because Of Her Race And Because She Engaged In Protected Activity***

50.    On May 9, 2018, just two (2) days after she complained of race discrimination in connection with Mr. Trinsey's suspension, Plaintiff was terminated. Hymes Tr. 292:16-23; Defendant's SOF ¶¶ 58, 75.

51.    Defendant admits that the decision to terminate Plaintiff's employment was not made until after she complained of race discrimination in connection with Mr. Trinsey's suspension. Smith Tr. 53:24-54:17; Defendant's SOF ¶ 75.

52.    Prior to her termination, Plaintiff was never advised that her performance was materially lacking or that her job was in jeopardy. Smith Tr. 35:9-36:14; 57:15-19.

53.    Defendant admits that it is important for employees – particularly long-tenured employees like Plaintiff – to be advised of performance deficiencies to provide them the opportunity to remedy same. Smith Tr. 37:6-13.

54.    Defendant admits that Plaintiff's race discrimination complaint was a reason for her termination. Hymes Tr. 50:22-51:11; 177:14-178:19.

55.    Plaintiff was terminated because of her race. Phillips Tr.111:19-112:4; Sykes Tr. 28:12-29:15; 34:23-35:8

***Defendant Turns A Blind Eye To Allegations Of Discrimination And Misconduct Involving Black Leaders***

56.    At the time of the April 2018 arrests, Mr. Sykes was the most senior Black partner working exclusively within the Philadelphia market. Cioffi Tr. 74:20-75:7.

57.    The 18th and Spruce retail location where the April 2018 arrests took place was located within Mr. Sykes' district. Hymes Dep. 207:18-20.

58.     Mr. Sykes had endorsed Ms. Hylton's promotion to Store Manager. Hymes Dep. 207:21-208:1.

59.     Mr. Sykes was never coached, counseled, or disciplined in connection with the April 2018 arrests. Sykes Tr. 34:23-35:8.

60.     During a roundtable discussion facilitated by Defendant following the April 2018 arrests, a Starbucks partner named Charlie Raboteau "very specifically" complained about Mr. Sykes' leadership. Hymes Tr. 205:16-18.

61.     Mr. Sykes was never coached, counseled, or disciplined in connection with Mr. Raboteau's complaint. Hymes Tr. 205:19-23.

62.     In May 2018, Defendant received a race discrimination complaint brought forward by three (3) Black partners – Nusaybah Jackson, Shakayrah Arthur, and Ryan Patrick. Cioffi Tr. 47:5-48:20; Exhibit 15.

63.     Ms. Jackson, Ms. Arthur, and Mr. Patrick worked at Defendant's Center Square retail which is located within Mr. Sykes' district. Cioffi Tr. 46:22-47:4; 77:3-7; Exhibit 15.

64.     In their May 2018 race discrimination complaint, Ms. Jackson, Ms. Arthur, and Mr. Patrick complained specifically about mistreatment by their shift supervisor, Ethan Dion. Cioffi Tr. 48:21-24; 50:18-51:20; Exhibit 15.

65.     In their race discrimination complaint, Ms. Jackson, Ms. Arthur, and Mr. Patrick indicated that they had previously complained of race discrimination in connection with Mr. Dion's conduct to Mr. Sykes in March 2019. Cioffi Tr. 50:18-51:20; Exhibit 15.

66.     Mr. Sykes was never counseled, coached, placed on suspension or otherwise disciplined in connection with the multiple race discrimination complaints coming from a store within his district. Cioffi Tr. 77:3-78:1.

67.     Mr. Sykes was not terminated by Defendant because of his race. Sykes Tr. 29:16-24.

68.     Following the April 2018 arrests, Defendant learned of negative sentiment regarding Ms. Hymes' leadership during the crisis. Smith Tr. 69:7-17.

69.     Ms. Hymes was never counseled, coached, or disciplined in connection with the complaints regarding her leadership during the crisis. Smith Tr. 69:7-17.

70.     Starbucks treated white leaders with responsibility for the Philadelphia market differently than Black leaders with responsibility for the Philadelphia market following the April 2018 arrests. Phillips Tr. 86:22-87:18; 111:19-112:4; Sykes Tr. 28:12-29:15; 29:16-24; 34:23-35:8; Trinsey Tr. 26:4-17.

Respectfully Submitted,

**CONSOLE MATTIACI LAW, LLC**

Dated: <u>December 23, 2021</u>        By:   */s/ Katherine C. Oeltjen*
Stephen G. Console, Esquire
Katherine C. Oeltjen, Esquire
Holly W. Smith, Esquire
1525 Locust Street, Ninth Floor
Philadelphia, PA 19102
(215) 545-7677

*Attorneys for Plaintiff,*
*Shannon Phillips*

44