IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

SHANNON PHILLIPS,

              Plaintiff,

   v.

STARBUCKS CORPORATION d/b/a
STARBUCKS COFFEE COMPANY,

              Defendant.

CIVIL ACTION
NO. 19-19432

### OPINION

**Slomsky, J.**                                                  **August 31, 2022**

## I.    INTRODUCTION

This case focuses on the employment decisions made by a company after a store employee called the police to remove from the premises two African American men which caused their wrongful arrest. This incident occurred on April 12, 2018. Plaintiff Shannon Phillips ("Plaintiff" or "Ms. Phillips") brings this suit against her former employer, Defendant Starbucks Corporation, doing business as Starbucks Coffee Company ("Defendant" or "Starbucks"), alleging that she was terminated because of her Caucasian race in the aftermath of the incident. Prior to her termination, Plaintiff oversaw the Philadelphia market as the Regional Director of Operations.

Ms. Phillips avers in this case that she was subjected to: (1) "reverse" race discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq; 42 U.S.C. § 1981 ("Section 1981"); and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–1 et seq; and (2) retaliation in violation of Title VII and the NJLAD. In essence, Plaintiff argues that Starbucks discriminated against her and other Caucasian employees to rectify its public image after the incident garnered significant attention in the national news media.

Before the Court is a Motion for Summary Judgment filed by Defendant Starbucks.  In the Motion, Defendant argues that summary judgment should be granted in its favor on the entirety of Plaintiff's Second Amended Complaint because a reasonable jury could not find that Plaintiff was the target of racial discrimination or retaliation in violation of the anti-discrimination statutes. Instead, Defendant proffers that Plaintiff was terminated because of her failure to lead her fellow employees in a positive manner after the April 2018 incident, rather than because of any discriminatory animus.  For reasons stated infra, Defendant's Motion for Summary Judgment will be granted in part and denied in part.

## II.      BACKGROUND

### A.      Factual Background

On December 12, 2005, Plaintiff Shannon Phillips, who is a Caucasian female, began her employment with Defendant Starbucks Corporation.  (See Doc. No. 79-5, Pl. Ex. 2, Phillips Dep. 134:15–16.)  She started at the company as a District Manager and was promoted in 2011 to Regional Director of Operations for "Area 71," which includes all stores in Philadelphia and several suburbs near the city.  (Doc. Nos. 70-2 ¶ 6, 79-3 at 3.)  As Regional Director, Plaintiff oversaw several District Managers, including District Managers Paul Sykes ("Mr. Sykes"), who is African American, and Benjamin Trinsey ("Mr. Trinsey"), who is Caucasian.  At the time of the April 12, 2018 incident, Mr. Sykes was the District Manager responsible for the Starbucks store located at 18th and Spruce Streets in Philadelphia, Pennsylvania (the "18th and Spruce Store"), and Holly Hylton ("Ms. Hylton") worked directly below Mr. Sykes as manager of the 18th and Spruce Store.  (Doc. Nos. 70-2 ¶ 8–9, 79-3 at 3–4.)

On April 12, 2018, two African American men—Rashon Nelson and Donte Robinson— entered the 18th and Spruce Store to conduct a business meeting there. (Doc. No. 79-5, Pl. Ex. 2, Phillips Dep. 22:1–7.)  Shortly after their arrival, store manager Holly Hylton, who is Caucasian,

called the police because the two men remained in the store while not making a purchase.  (Id. at 34:21–38:2.)  When the police arrived, Mr. Nelson and Mr. Robinson were arrested.  (Id. at 18:22–19:19.)  The incident garnered significant attention in the national news media.  The event also sparked protests at the 18th and Spruce Store and throughout the Philadelphia area.  Altogether, the public response to the incident was of general concern because of the appearance that an instance of racial discrimination had occurred at the 18th and Spruce Store.  (Doc. Nos. 70-2 ¶ 12–13, 79-3 at 3.)

On May 2, 2018, after Starbucks reached a settlement with Mr. Nelson and Mr. Robinson, Defendant issued a public statement that "Starbucks will continue to take actions that stem from this incident to repair and reaffirm our values and vision for the kind of company that we want to be."  (Doc. No. 79-3 at 39.)  These actions included meeting with civic leaders, investigating the incident at the 18th and Spruce Store, revising Starbucks' "Safe and Welcoming Policy" that was originally created to handle non-customers at Defendant's stores, working with consultants, conducting roundtable discussions in Philadelphia from April 23, 2018 to May 5, 2018 with Starbucks leaders, and closing all Starbucks locations on May 29, 2018 to conduct racial bias training.  (Doc. Nos. 70-2 ¶ 14–18, 79-3 at 5–8, 37; see also Doc. No. 79-5, Pl. Ex. 2, Phillips Dep. 21:10–17.)  Further, Defendant fired Ms. Hylton, the Store Manager at the 18th and Spruce Store who had called the police to arrest the two men.  (Doc. Nos. 70-2 ¶ 19, 79-3 at 8.)

Although it is undisputed that Plaintiff was not directly involved in the events that unfolded on April 12, 2018, her actions in the wake of the incident remain in dispute.  Because she was the Regional Director of Operations for the area which included the 18th and Spruce Store, Plaintiff was called upon by Starbucks leadership to support and implement their post-incident efforts.  (Doc. Nos. 70-2 ¶ 21, 79-3 at 8–9.)  According to Starbucks, however, Plaintiff displayed poor

leadership and "failed to perform the essential functions of her role as Regional Director" after the April 2018 incident.  (Doc. No. 70-1 at 21.)  In support of this notion, Defendant points to deposition testimony of several of Ms. Phillips' supervisors: Camille Hymes ("Ms. Hymes"), the Regional Vice President for Mid-Atlantic Retail Operations; Paul Pinto ("Mr. Pinto"), Vice President of Partner Resources; and Zeta Smith ("Ms. Smith"), Divisional Senior Vice President.  (See Doc. No. 70-2 ¶ 22–36.)  Specifically, Defendant notes that these supervisors testified that Plaintiff, inter alia, was "physically and mentally absent from meetings," "appeared overwhelmed," and "lacked awareness of how critical the situation was for Starbucks and its partners." (Doc. No. 70-1 at 9.)

By contrast, according to Plaintiff, the record reflects that Ms. Phillips exhibited positive leadership after the April 2018 incident.  To support this, Plaintiff points to deposition testimony of her supervisor Ms. Hymes, as well as testimony from the two District Managers she supervised at the time, Mr. Sykes and Mr. Trinsey.  (See Doc. No. 79-3 at 9–14.)  As previously noted, Mr. Sykes was the District Manager who directly supervised the 18th and Spruce Store, and Mr. Trinsey was another District Manager in Area 71.  For purposes of the Motion for Summary Judgment, it is important to note that Mr. Sykes is African American, and Mr. Trinsey is Caucasian. (See Doc. Nos. 70-2 ¶ 7, 79-3 at 3.)

Sometime in May of 2018, an African American employee at a location supervised by Mr. Trinsey brought a complaint about pay disparity to Ebony Johnson ("Ms. Johnson"), a Partner Resources Manager at Starbucks.  Upon receiving the complaint, Starbucks began an investigation of Mr. Trinsey and, thereafter, Starbucks leadership decided to place him on suspension.  (Doc. No. 70-4, Def. Ex. H, Pinto Dep. at 169:10–24.)  In addition, several complaints by store employees were lodged against Mr. Sykes regarding issues with his leadership style.  (Doc. No.

4

79 at 15; see also Doc. No. 70-4, Def. Ex. H, Pinto Dep. at 150:22–151:4; Def. Ex. E, Sykes Dep. at 48:15–29.)  Yet, Defendant did not perform a similar investigation into Mr. Sykes, nor did the company take any adverse action against him to address these complaints.  (Doc. Nos. 70-2 ¶ 41–44, 79-3 at 15–16.)

On May 7, 2018, Plaintiff had a meeting with several of her supervisors: Ms. Hymes, Mr. Pinto, and Nathalie Cioffi ("Ms. Cioffi"), who was a Partner Resources Director.  At the meeting, Ms. Phillips learned of the supervisors' decision to place Mr. Trinsey on suspension pending the investigation into the African American employee's pay disparity complaint.  (Doc. No. 79 at 15.)  Because Mr. Trinsey worked in Plaintiff's Region, Area 71, she was directed to inform him of the suspension.  (Doc. Nos. 70-1 at 22, 79 at 28.)  In response, however, Plaintiff expressed to her supervisors that such a decision was "unfair" and "wrong," that Mr. Trinsey is "not a racist," and that he had nothing to do with setting employee pay.  (Doc. No. 79-5, Pl. Ex. 2, Phillips Dep. 97:1–98:24.)  Despite her initial disagreement with the decision of the supervisors, Plaintiff complied with the request and placed Mr. Trinsey on suspension.  (Doc. No. 79 at 15.)  Nevertheless, on May 9, 2018, two days after the meeting with her supervisors, Plaintiff's employment at Starbucks was terminated without prior notice or a warning.  (Doc. Nos. 70-2 ¶ 75, 79-3 at 42, 50.)

## B.     Procedural Background

On August 17, 2020, Plaintiff filed her Second Amended Complaint, which is the operative complaint in this case.  (Doc. No. 36.)  In the Second Amended Complaint, Plaintiff brings the following claims: (1) race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq (Count One); (2) race discrimination in violation of 42 U.S.C. § 1981 (Count Two); and (3) race discrimination and retaliation in violation of the New

Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–1 <u>et. seq.</u> (Count Three).  Plaintiff alleges that she was unlawfully terminated in violation of these statutes.[1]

On November 12, 2021, the instant Motion for Summary Judgment was filed by Defendant, seeking to dismiss the entirety of the Second Amended Complaint.  (Doc. No. 70.)  On December 23, 2021, Plaintiff filed a Response in Opposition.  (Doc. No. 79.)  On January 6, 2022, Defendant filed a Reply.  (Doc. No. 82.)  On February 1, 2022, Plaintiff filed a Sur-Reply.  (Doc. No. 86.)  On February 8, 2022, Defendant filed a Sur-Reply.  (Doc. No. 87.)  On March 28, 2022, the Court held a hearing on the Motion with counsel for the parties.  The Motion is now fully briefed and ripe for disposition.

## III.    STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." <u>Favata v. Seidel</u>, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting <u>Azur v. Chase Bank, USA, Nat'l Ass'n</u>, 601 F.3d 212, 216 (3d Cir. 2010)).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  For a fact to be considered

---

[1]    In the Second Amended Complaint (Doc. No. 36), Plaintiff also alleges that Starbucks wrongfully failed to hire her for a Temporary Limited Assignment ("TLA") role.  However, this claim is no longer at issue.  In her Response to the Motion for Summary Judgment, Plaintiff clarified that she "is not pursuing a discriminatory or retaliatory failure to hire claim in connection with the TLA position described in her Second Amended Complaint."  (Doc. No. 79 at 16.)  Thus, the only adverse employment action at issue is Plaintiff's termination.

"material," it "must have the potential to alter the outcome of the case." Favata, 511 F. App'x at 158.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  See Anderson, 477 U.S. at 247–49.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party.  See id. at 255.  If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  See id. at 250.

## IV.    ANALYSIS

### A.    Race Discrimination under Title VII, Section 1981, and the NJLAD

Counts One, Two, and Three of the Second Amended Complaint allege race discrimination under Title VII, Section 1981, and the NJLAD, respectively. [2]  These anti-discrimination statutes

---

[2]    Title VII makes it an "unlawful employment practice for an employer . . .  to discriminate against any individual . . ., because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e–2(a)(1).  Section 1981 provides: "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  And the New Jersey Law Against Discrimination proscribes: "It shall be an unlawful employment practice,

prohibit an employer from engaging in race discrimination against an employee.[3]  Under all three statutes, when there is only circumstantial evidence of race discrimination, the discrimination claims are analyzed under the burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  The <u>McDonnell Douglas</u> framework first requires that a plaintiff bringing a Title VII claim establish a <u>prima facie</u> case of discrimination.  411 U.S. 792, 802 (1973).  If the plaintiff establishes a <u>prima facie</u> case, the burden shifts to the defendant to "articulate some legitimate, non[-]discriminatory reason" for the adverse employment action.  <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802.  If the defendant does advance a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to prove that the reason is pretextual, and the real reason for the adverse action is discrimination.  <u>See</u> <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 410 (3d Cir. 1999); <u>Boykins</u>, 722 F. App'x at 152.

### 1.    <u>Prima</u> <u>Facie</u> Case of Discrimination

To establish a <u>prima facie</u> case of discrimination, the plaintiff is required to show: (1) she is a member of a protected class; (2) she was qualified for the job that she held; (3) she was terminated; and (4) that her replacement is of a different race than the plaintiff or there is some other basis (such as comparator or statistical evidence) for inferring discriminatory intent.  <u>McDonnell Douglas Corp v. Green</u>, 411 U.S. 792, 800–02 (1973).  <u>See</u> <u>also</u> <u>Jones</u>, 198 F.3d at 410–11 (3d Cir. 1999).

---

 or, as the case may be, an unlawful discrimination . . . [f]or an employer, because of the race . . . of any individual . . . to refuse to hire or employ or to discharge" the employee.  N.J.S.A. § 10:5-12(a).

[3]    Claims of race discrimination under Title VII, Section 1981, and the NJLAD are governed under the same legal framework.  <u>See</u> <u>Ali v. Woodbridge Twp. Sch. Dist.</u>, 957 F.3d 174, 180 (3d Cir. 2020) ("Claims brought under NJLAD and § 1981 are analyzed under the same framework."); <u>Castleberry v. STI Group</u>, 863 F.3d 259, 263 (3d Cir. 2017) ("[Section 1981] claims are subject to the same analysis as discrimination claims under Title VII.")

Here, Plaintiff is a non-minority asserting "reverse race discrimination." The United States Court of Appeals for the Third Circuit directs courts to employ a modified McDonnell Douglas analysis framework in cases of "reverse discrimination." See Ledda v. St. John Neumann Regional Academy, Civ. No. 20-700, 2021 WL 1035106 at *5 (D.N.J. 2021) (citing Iadimarco v. Runyon, 190 F.3d 151, 158 (3d Cir. 1999)). Under this framework, at the motion for summary judgment stage, "all that should be required to establish a prima facie case in the context of 'reverse discrimination' is for the plaintiff to present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." Iadimarco, 190 F.3d at 161.

For cases involving "reverse race discrimination," the prima facie test that a plaintiff must demonstrate is as follows: (1) the plaintiff is qualified for her position; (2) the plaintiff suffered an adverse employment action; and (3) the adverse employment action gave rise to an inference of discrimination. Ellis v. Bank of New York Mellon Corp, 837 F. App'x 940, 941 (3d Cir. 2021).

The Court will use this modified prima facie test in evaluating Plaintiff's claims of discrimination. In this case, the first and second prongs—that Plaintiff is qualified for her position as Regional Director and suffered an adverse employment action when she was terminated—are not in dispute.[4] Therefore, the only prima facie element in dispute is (3), whether the adverse action gave rise to an inference of discrimination.

---

[4]    In Defendant's Motion for Summary Judgment, Starbucks does not dispute that the first prong was met, noting that Plaintiff was qualified for her job. (Doc. No. 70-1 at 6–13.) However, in its Reply, it argues for the first time that this prong is not met because of Plaintiff's "poor performance." (Doc. No. 82 at 6.) As noted by the Third Circuit, "nothing in the burden shifting framework automatically renders an employee who was (allegedly) terminated for poor performance as unqualified for the purposes of the prima facie analysis." Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989). Thus, because Defendant does not otherwise argue that Plaintiff was unqualified to be hired for the position at Starbucks, the Court will consider Plaintiff's qualification for the position of Regional Director of Operations as undisputed.

### a.     Inference of Discrimination

"A plaintiff may show circumstances giving rise to an inference of discrimination with any kind of relevant evidence, including 'comparator evidence, evidence of similar racial discrimination against other employees, or direct evidence of discrimination from statements or actions by [the plaintiff's] supervisors suggesting racial animus." McFadden v. Whole Foods Mkt. Grp., Inc., Civ. No. 19-1103, 2021 WL 736899, at *7 (E.D. Pa. Feb. 25, 2021) (quoting Golod v. Bank of Am. Corp., 403 F. App'x 699, 703 n.2 (3d Cir. 2010)).  Comparator evidence is "evidence that defendant treated 'similarly situated' individuals not within plaintiff's protected class more favorably than it treated plaintiff."  Darby v. Temple Univ., 216 F. Supp. 3d 535, 542 (E.D. Pa. 2016) (citing Moore v. City of Phila., 461 F.3d 331, 340–41 (3d Cir. 2006)).  "While 'similarly-situated' does not necessarily mean identically situated, the plaintiff must nevertheless be similar in "all relevant respects."   Mangold v. PECO Energy, Civ. No. 19-5912, 2021 WL 6072818, at *13 (E.D. Pa. Dec. 23, 2021) (citing Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 222–23 (3d Cir. 2009)).

Here, under the "reverse" discrimination prima facie standard from Iadimarco and Ellis, Plaintiff has offered evidence from which a jury could conclude that Starbucks treated some Caucasian employees less favorably because of race after the April 2018 incident, thus giving rise to an inference of discrimination.

First, Plaintiff has presented evidence from which it can be inferred that, solely on account of his race, Mr. Sykes, who is African American, was treated more favorably after the incident than Plaintiff and Mr. Trinsey, who are Caucasian.  After the incident, Mr. Sykes did not suffer an adverse action, despite complaints about his leadership style from employees under his supervision.  (See Doc. No. 79 at 15; see also Doc. No. 70-4, Def. Ex. H, Pinto Dep. at 150:22–

151:4; Def. Ex. E, Sykes Dep. at 48:15–29.)  Moreover, he was directly responsible for the 18th

and Spruce Store at the time of the incident.  (See id.)  When Mr. Sykes was asked at his deposition

whether he believed he was treated more favorably than Plaintiff due to his race, he responded that

he did.  (See Doc. No. 79-11, Pl. Ex. 11, Sykes Dep. 28:12–30:2.)  During Mr. Sykes' deposition,

he testified:

> Q: Do you believe that Ms. Phillips' race played any role in her termination?
>
> A: Yes.
>
> Q: And why do you believe that?
>
> A: I think based on—so she was there one day and then gone the next and sitting
> around multiple meetings with a lot of folks who were higher up in Starbucks
> and hearing some of the conversations that [were] happening, and also that
> [were] shared with me, I had heard that—I don't know if it was from Camille
> [Hymes] . . . or one of the various people visiting, that a strong message needed
> to be sent because our business was being impacted, not only in Philadelphia
> but across the board . . . And that I just remember to the effect of like a message
> needed to be sent that leadership was being held accountable for what had
> occurred in the stores.
>
> I did find it interesting because it happened in my district, and I certainly didn't
> cause that, but it was in my district and it was my manager and I felt really bad
> with what happened with Ben [Trinsey] and then what happened with Shannon
> [Phillips] because they were the furthest from it and I was the closest to it.
> . . .
>
> Q: Okay.  So how did you arrive at the conclusion that race was a factor in Ms.
> Phillips' termination?
>
> A: Well, it happened in my district.  Shannon was the regional director.  Ben
> Trinsey was fired.  It did not happen in his district.  And he was terminated.
> Shannon was terminated.  Holly was terminated.  I was the only one that hadn't
> had any conversations with regards to performance or any of that at the time.

(Id. at 28:12–29:15; 34:23–35:8.)  Yet, Defendant contends that the reason Mr. Sykes was not

terminated was because he "exhibited a higher level of leadership as compared to Ms. Phillips

following the April 2018 arrests," noting the testimony of Nathalie Cioffi ("Ms. Cioffi"), a Partner

Resources Director, to this effect.  (Doc. No. 70-1 at 16; <u>see</u> <u>also</u> Doc. No. 79-11, Ex. 15, Cioffi Dep. at 72:3–73:10) ("Paul Sykes was very willing to work with us and very willing to say, okay, this is a disaster, I'm going to do something different.")

Because Mr. Sykes is an African American employee who did not suffer adverse action after the incident, and the parties dispute the circumstances of his retention, a dispute of material fact exists as to whether Starbucks' treatment of Mr. Sykes gives rise to an inference of discrimination to support Plaintiff's <u>prima</u> <u>facie</u> case.

Second, Plaintiff has pointed to evidence that a similarly situated Caucasian employee was treated less favorably than Mr. Sykes.  According to Starbucks, another District Manager, Mr. Trinsey, who is Caucasian, was suspended for a complaint of pay disparity from an African American employee that he supervised.  Yet, in the deposition testimony of Ms. Johnson, a Starbucks Partner Resources Manager, she said that she could not recall the details of the complaint about pay disparity, and that she could not recall any other employee making a complaint about Mr. Trinsey.  (See <u>id.</u> at 42:9–48:1.)  When asked whether the pay disparity complaint was race-related, she only noted that "it appeared to be."  (<u>Id.</u>)  The notes taken by Ms. Johnson during this process were not produced in discovery, and Starbucks maintains that it "purged her documents in the ordinary course of business" after her employment at Starbucks.  (<u>See</u> Doc. No. 79-11, Pl. Ex. 17 at 104.)  Moreover, Plaintiff submits that setting pay was not one of Mr. Trinsey's responsibilities as a District Manager, which is supported by deposition testimony of Mr. Trinsey and Mr. Sykes.  (<u>See</u> <u>id.</u>)  In opposition, Defendant maintains that setting pay was a District Manager responsibility, supported by the testimony of Ms. Johnson.  (<u>See</u> Doc. No. 70-4, Def. Ex. F., Johnson Dep. at 40:1–49:1.)

Hence, a dispute of material fact remains as to the circumstances surrounding Mr. Trinsey's suspension.[5]   These circumstances are material because Mr. Trinsey was another Caucasian employee who was allegedly discriminated against in the wake of the April 2018 incident.   Thus, viewing the facts in the light most favorable to the Plaintiff, a jury could find that the circumstances of Mr. Trinsey's suspension give rise to an inference of discrimination to support Plaintiff's prima facie case.

Additionally, Plaintiff has pointed to evidence that "race was definitely the topic of discussion" in the twenty-seven-day period between the April 12, 2018 incident and Plaintiff's termination. (See Doc. No. 79-11, Pl. Ex. 11, Sykes Dep. 35:9–14.)  Further, she cites Defendant's public statement after the incident: "Starbucks will continue to take actions that stem from this incident to repair and reaffirm our values and vision for the kind of company that we want to be," and asserts that this evidence that Starbucks had an agenda to terminate non-minority employees after the incident.  (Doc. No. 79-3 at 39.)  This position is relevant here because the Third Circuit has noted that "[t]he court may also consider as circumstantial evidence the atmosphere in which the company made its employment decisions."  Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 641 (3d Cir. 1993).  Therefore, a jury also may find that this evidence gives rise to an inference of discrimination against non-minority employees at Starbucks.

In its Motion for Summary Judgment, Defendant argues that the treatment of Mr. Sykes is not relevant because he is not a proper comparator for Plaintiff, and that Plaintiff may not bring a claim of race discrimination because she was replaced by a Caucasian man.  Neither of these arguments are persuasive.

---

[5]   Additionally, the Court does not weigh conflicting deposition testimony at the summary judgment stage because this would constitute a credibility determination, which is solely within the province of the jury.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

"[W]hether comparators are similarly situated is generally a question of fact for the jury."

Abdul-Latif v. Cnty. of Lancaster, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014) (citing McDonald v.

Village of Winnetka, 371 F.3d 992, 1002 (7th Cir. 2004)).  "Factors relevant to the analysis are

whether the employees dealt with the same supervisor, were subject to the same standards, shared

similar job responsibilities and the nature of the misconduct."  Id. at 526.  Defendant argues that,

because Mr. Sykes was a District Manager, he is not a proper comparator for Plaintiff, who was a

Regional Director of Operations.  (Doc. No. 70-1 at 15.)

But "similarly-situated does not necessarily mean identically situated."  Opsatnik v.

Norfolk S. Corp., 335 F. App'x 220, 223 (3d Cir. 2009) (citations and internal quotation marks

omitted).  Plaintiff has proffered evidence that Plaintiff and Mr. Sykes were (1) overseen by the

same supervisors, such as Ms. Hymes, Mr. Pinto, Ms. Smith, and Ms. Cioffi, and (2) subject to the

same standards and responsibilities for overseeing the 18th and Spruce Store.  (Doc. No. 79 at 15;

see also Doc. No. 70-4, Def. Ex. H, Pinto Dep. at 150:22–151:4; Def. Ex. E, Sykes Dep. at 48:15–

29.)  From this evidence a jury could conclude that Plaintiff and Mr. Sykes were "similarly

situated" in all relevant respects.  In any event, Plaintiff is "not required to plead comparator

evidence to support an inference of discrimination," and "evidence of similar racial discrimination

of other employees" could just as well support such an inference.  Golod, 403 F. App'x at 703

(citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511–12 (2002).

And contrary to Defendant's arguments, Plaintiff is not precluded from alleging race

discrimination simply because her replacement, Marcus Eckensburger, is Caucasian.  (See Doc.

No. 70-1 at 13.)  In Pivirotto v. Innovative Systems, Inc., 191 F.3d 344 (3d Cir. 1999), the Third

Circuit held that "it is inconsistent with Title VII to require a plaintiff to prove that she was replaced

by someone outside her class in order to make out a <u>prima facie</u> case." <u>Id.</u> at 355. Thus, this fact does not impact Plaintiff's <u>prima facie</u> case.

Because a jury could conclude that the above-described evidence shows that Starbucks was treating Plaintiff less favorably than others based upon a trait that is protected under Title VII, Section 1981, and the NJLAD, Plaintiff has met her <u>prima facie</u> burden at the summary judgment stage.

### 2. Legitimate, Non-Discriminatory Reason for Adverse Employment Decision

At the second stage of the <u>McDonnell Douglas</u> framework, an employer defendant meets its burden by producing evidence which, taken as true, would allow a reasonable jury to conclude that there was a legitimate, non-discriminatory reason for the adverse employment decision. <u>Fuentes v. Perksie</u>, 32 F.3d 759, 763 (3d Cir. 1994). Courts have explained that this is a "relatively light" burden. <u>Terrell</u>, 320 F.Supp.3d at 657 (quoting <u>Fuentes</u>, 32 F.3d at 763). Significantly, at this step, "the employer need not prove that the proffered reason actually motivated the termination decision . . . " <u>Id.</u> Instead, "throughout this burden-shifting paradigm[,] the ultimate burden of proving intentional discrimination always rests with the plaintiff." <u>Fuentes</u>, 32 F.3d at 763.

Here, Starbucks has met its burden by offering a legitimate, non-discriminatory reason for Plaintiff's termination: Ms. Phillips failed to lead and perform her role as Regional Director of Operations after the incident that occurred at the 18th and Spruce Store. Specifically, Defendant notes that several supervisors, namely, Ms. Hymes, Mr. Pinto, and Ms. Smith, testified that Plaintiff was, <u>inter alia</u>, "physically and mentally absent from meetings," "appeared overwhelmed," "lacked awareness of how critical the situation was for Starbucks and its partners," and "failed to perform the essential functions of a Regional Director" after the incident. (Doc. Nos. 70-1 at 9, 13–15, 21;

15

70-2 ¶ 22–36.)  Thus, this reason suffices as a legitimate, non-discriminatory reason for Plaintiff's termination.

### 3.      Pretext for Discrimination

Yet, a dispute of material fact exists as to whether this reason is pretextual.   The third step of the McDonnell Douglas framework requires Plaintiff to prove by a preponderance of evidence that Defendants' legitimate, non-discriminatory reason was "not its true reason[], but w[as] a pretext for discrimination."  Jones, 198 F.3d at 410.  To demonstrate pretext and defeat summary judgment, Plaintiff must point to evidence from which a jury could "(1) disbelieve the employer's articulated legitimate reason[]; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes, 32 F.3d at 764.

"In the context of a summary judgment proceeding, the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext." Zelesnick v. Temple Univ. Health Sys., Inc., Civ. No. 19-5820, 2021 WL 201300, at *8 (E.D. Pa. Jan. 20, 2021).  "The prima facie case and pretext inquiries often overlap.  As [Third Circuit] jurisprudence recognizes, evidence supporting the prima facie case is often helpful in the pretext stage, and nothing about the McDonnell Douglas formula requires us to ration the evidence between one stage or the other."  Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008), order clarified, 543 F.3d 178 (3d Cir. 2008) (citations omitted).

Plaintiff offers several forms of pretext evidence.  As described supra, she has presented evidence from which a jury could find that minority employees were treated more favorably than non-minority employees after the April 2018 arrests.  Further, she has submitted evidence that directly contradicts Defendant's legitimate, non-discriminatory reasons.  For example, Mr. Sykes,

who was the District Manager for the 18th and Spruce Store, testified that after the incident, Plaintiff was "100 percent" present, and provided "whatever emotional support [Mr. Sykes and other Starbucks partners] needed."  (See Doc. No. 79-11, Pl. Ex. 11, Sykes Dep. at 22:16, 27:1–5.)  Also, Mr. Trinsey, another District Manager, testified to the following about Plaintiff:

> Q. Okay. Can you describe Shannon's performance around the time of April of 2018?
>
> A. April of 2018?
>
> Q. Yes.
>
> A. I know that she was there for all of the partners.  She was in the store in the days after.  Checked in with me.  Checked in with stores.  She was really supportive. . . .
>
> Q. When you said that she showed up for the stores and was supportive, how so?
>
> A. I know that she talked with partners.  You know, she showed compassion.  She showed . . . we will get through this, and you know, talked about our values and what we stand for . . .

(Doc. No. 79-11, Pl. Ex. 12, Trinsey Dep. at 22:16, 27:1–5.)  And Mr. Sykes and Mr. Trinsey testified that Plaintiff worked "pretty much from open to close" and was "very, very present" in the Philadelphia market after the incident.  (Doc. No. 79-3 ¶ 19.)

Moreover, one of Plaintiff's supervisors, Ms. Hymes, confirmed that Ms. Phillips was "a strong performer" in her role as Regional Director, was "a partner that understood our culture," was "deeply immersed in connecting with our partners," and was "a developer of talent."  (Doc. No. 79-11, Pl. Ex. 12, Hymes Dep. 27:1–28:13.)  Also, Ms. Hymes testified to multiple instances of Plaintiff's positive leadership after the incident.   Ms. Hymes testified that Plaintiff was "engaged" in understanding what at occurred on April 12, 2018, was "appropriately leading through the developments," and was "trying to engage the Black Partner Network" at Starbucks.

(Id. at 135:14–136:9, 269:7–270:22.)  From this evidence, a jury could find pretext because this testimony directly contradicts the reason given by Defendant for Plaintiff's termination.

Additionally, Starbucks' lack of documentation is further evidence of pretext.  An employer's lack of documentation about the plaintiff's poor performance is evidence of pretext. See Zelesnick v. Temple Univ. Health Sys., Inc., No. CV 19-5820, 2021 WL 201300, at *8 (E.D. Pa. Jan. 20, 2021).  In Zelesnick, the defendant-employer argued that the plaintiff was terminated because she "was distracted, had not developed a routine, and was making a variety of mistakes." Id. at *8.  However, the court determined that summary judgment was improper, holding:

> Notably, Defendants have not introduced any documentary evidence to prove that Ms. Zelesnick was making mistakes.  While Defendants stated during oral argument that this is due to Ms. Warren having corrected the errors so that there is no paper trail, the absence of documentary evidence makes this a question of credibility, inappropriate for resolution at summary judgment.  And if the jury credited Ms. Zelesnick's testimony that she was performing her work well, it could also conclude that Defendants' proffered reason for firing Ms. Zelesnick was pretextual.

Id.

Likewise, here, there is meager documentary evidence to support Defendant's claim that, "after thirteen years of undisputedly stellar performance," Plaintiff's actions in the twenty-seven days between the incident and Plaintiff's termination were "so severe that the situation 'could not be recovered'[.]"  (Doc. No. 79 at 36–37.)  For example, the notes taken by Ms. Johnson, one of Plaintiff's supervisors, were not produced in discovery, and Starbucks maintains that it "purged her documents in the ordinary course of business" after her employment at Starbucks.  (See Doc. No. 79-11, Pl. Ex. 17 at 104.)  In fact, the only documentary evidence Defendant has produced is a text message exchange on May 4, 2018 between Paul Pinto ("Mr. Pinto"), Vice President of Partner Resources; and Zeta Smith ("Ms. Smith"), Divisional Senior Vice President, where Ms. Smith commented that Plaintiff had "crashed and burned."  (Doc. No. 82-1, Def. Ex. K, at 29.)

Other than Exhibit K, Defendant relies entirely upon deposition testimony to support its proffered reasons for firing Plaintiff.   However, a jury may find, based on this evidence of scant documentation, that Defendant's alleged reason for terminating Plaintiff was pretextual.  (Doc. No. 70-1 at 21.)

The above-described evidence creates a genuine dispute of material fact that precludes summary judgment.  Accordingly, Defendant's Motion for Summary Judgment (Doc. No. 70) on Plaintiff's racial discrimination claims under Title VII, Section 1981, and the NJLAD in Counts One, Two, and Three of the Second Amended Complaint (Doc. No. 36) will be denied.

### B.      Retaliation under Title VII and the NJLAD

In Counts One and Three, Plaintiff brings retaliation claims under Title VII[6] and the NJLAD,[7] alleging that she was terminated for her opposition to Mr. Trinsey's suspension.  For claims of retaliation under Title VII and the NJLAD, courts apply the same McDonnell Douglas burden-shifting approach.  See Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006); see also Tourtellotte v. Eli Lilly & Co., 636 F. App'x 831, 841 (3d Cir. 2016) ("All retaliation and discrimination claims brought under Title VII and the NJLAD, including those based on sex, race, and disability . . . are controlled by the three-step burden-shifting framework set forth in McDonnell Douglas[.]").

---

[6]    Under Title VII, an employer may not discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation . . . under this subchapter."  42 U.S.C. § 2000e-3(a).

[7]    The NJLAD prohibits retaliation against an employee because that employee "has opposed any practices or acts forbidden under [the NJLAD] or because that person has filed a complaint, testified or assisted in any proceeding under [the NJLAD.]"  N.J.S.A. § 10:5-12(b).

Hence, after a plaintiff establishes a prima facie case of retaliation, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Moore, 461 F.3d at 342 (3d Cir. 2006) (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500–01 (3d Cir. 1997)).  In this case, Plaintiff alleges that Starbucks violated Title VII and the NJLAD by retaliating against her in response to her complaints of Defendant's "reverse" race discrimination against Mr. Trinsey, who is Caucasian.

### 1.      **Prima Facie Case of Retaliation**

To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action.[8] Carvalho-Grevious v. Delaware State Uni., 851 F.3d 249, 257 (3d Cir. 2017).  With respect to protected activity, "Title VII's retaliation provisions protect employees who participate in [either] Title VII's statutory process[9] or who otherwise oppose employment practices made illegal by Title VII." Curay-Cramer, 450 F.3d at 134–45.  Plaintiff's case is premised on her opposition to Defendant's allegedly illegal employment practices.  (See Doc. No. 79 at 26.)  In this context, "[t]he employee must have a reasonable, good faith belief that the practice [s]he is opposing constituted unlawful discrimination." Ledda, 2021 WL 1035106, at *7 (quoting Moore, 461 F.3d at 431 (3d Cir. 2006)).

---

[8]   A plaintiff must show that his participation in protected activity was the but-for cause of any alleged adverse employment action he suffered.  See Univ. of Texas v. Univ. of Tex. Southwestern Med. Ctr. v. Nassar, 570 U.S. 338 (2013).

[9]   This situation usually involves an employee who has "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)).

It is undisputed that Plaintiff suffered an adverse employment action:  her termination from Starbucks on May 9, 2018.  However, the parties dispute whether Plaintiff engaged in protected activity and whether there was a causal connection between the protected activity and the adverse action.

### a.      Engaging in Protected Activity

For the first prong of a prima facie case of retaliation, Plaintiff must demonstrate that she engaged in a protected activity.  "To engage in protected activity, the employee must identify what illegal employment practice is being opposed, by either implicitly or explicitly alleging that a protected characteristic was the basis for the adverse employment action." Bank v. Cmty. Coll. of Philadelphia, Civ. No. 22-293, 2022 WL 2905243, at *6 (E.D. Pa. July 22, 2022) (citing Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)).

"A general complaint of unfair treatment," however, "is insufficient to establish protected activity" under Title VII and the NJLAD.  Curay-Cramer, 450 F.3d at 135. The "complaint[] must be specific enough to notify management of the particular type of discrimination at issue in order to constitute 'protected activity.'"  Sanchez v. SunGard Availability Servs. LP, 362 F. App'x 283, 288 (3d Cir. 2010) (citing Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995)). "Furthermore, although a plaintiff in a retaliation case need not prove the merits of the underlying discrimination complaint," she must have "act[ed] under a good faith, reasonable belief that a violation existed." Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 193 (3d Cir. 2015) (citing Moore, 461 F.3d at 340–41).

Here, Plaintiff alleges that she engaged in protected activity at a May 7, 2018 meeting with Ms. Hymes, Ms. Cioffi, and Mr. Pinto, who were several of her supervisors.  According to Plaintiff, she was told at the meeting to suspend Mr. Trinsey pending an investigation of a pay disparity

complaint by one of his employees, who was African American.  (See Doc. No. 79 at 28.)  In response, Plaintiff asserted that the allegations against Mr. Trinsey were "completely false," and said:

> This is completely wrong.  Ben Trinsey is not a racist.  He's worked here for 15 years and there's never been any claim of racism by any partner that I'm aware of, and the allegations that you're telling me are something he had nothing to do with.  So there's—this is not right.  This is unfair what you're asking me to do with Ben Trinsey . . . He has nothing to do with salaries of assistant managers.  This is not something he had any input to[.]

(Doc. No. 79-5, Pl. Ex. 2, Phillips Dep. at 97:24–99:2.)  In her briefs and at her deposition, Plaintiff confirmed that she did not object to Mr. Trinsey's suspension "because he is white," that she does not "recall saying [']I think he's being treated unfairly because of his race[']" and that she only used the phrase "he is not a racist" when objecting to his "unfair" suspension.  (See id. at 97:19–98:18.)  It is this May 7, 2018 complaint to her supervisors that Plaintiff characterizes as protected activity.

Importantly, the parties do not dispute that Plaintiff said the above statements when she objected to Mr. Trinsey's suspension on May 7, 2018, including that she used the phrase "he is not a racist" when doing so.  (See Doc. Nos. 70-2 ¶ 59, 82 at 13.)  Thus, the material facts of the May 7, 2018 meeting are not in dispute.  Plaintiff argues, however, "Defendant's suggestion that [her] complaint did not implicate race is inaccurate: the very meaning of the word ['racist'] is rooted in race." (Doc. No. 79 at 29.)  In opposition, Starbucks contends that "Ms. Phillips' opinion that Mr. Trinsey is not a racist and [her] immediate denial of the veracity of the complaints against him do[] not constitute protected activity," and that "other than denying that Mr. Trinsey is racist, Ms. Phillips points to no evidence that transforms this statement into a complaint of discrimination." (See Doc. No. 82 at 14.)

For claims of race discrimination under Title VII, allegations that an adverse action was taken against an employee because he was falsely accused of being "racist," rather than because of the employee's own race, do not suffice to constitute "race discrimination." See Lacontora v. Geno Enterprises, LLC, Civ. No. 21-03948, 2022 WL 856076, at *4 (E.D. Pa. Mar. 23, 2022) (citing Ledda v. St. John Neumann Regional Academy, Civ. No. 20-700, 2021 WL 1035106 at *5 (D.N.J. 2021)). In turn, for retaliation claims, a plaintiff must have had a "good faith belief" that he was engaging in protected activity, even though he need not prove the underlying claim of discrimination. See Daniels, 776 F.3d at 193.

Here, the crucial inquiry is whether Plaintiff had a "reasonable, good faith belief" that she was opposing the unlawful discrimination against Mr. Trinsey. Several decisions provide guidance. In Ledda v. St. John Neumann Regional Academy, Civ. No. 20-700, 2021 WL 1035106, at *1 (D.N.J. 2021), a Caucasian teacher, after a series of incidents involving minority students, was fired from a school because his behavior led his supervisor to believe he was a racist. Id. at *1–2. The teacher denied this accusation and brought claims for race discrimination and retaliation under Title VII, claiming that he was subjected to discipline and ultimately terminated "because the defendants perceived him as harboring a racist bias against minority students." Id. at *2. However, the court reasoned that "conflating race and racism is a false equivalence," because "racism is a state of mind or belief, whereas race is a state of being." Id. at *5–6. Thus, the court held that the teacher's objection to the belief that he was "racist" could not have been made with a good faith, reasonable belief that he was opposing Title VII discrimination, holding:

> As we have stated, in order to state a claim for retaliation, Ledda must show that he engaged in protected activity, was subject to adverse action, and a causal connection exists between the protected activity and the adverse employment action. Carvalho-Grevious[v. Delaware State Univ.], 851 F.3d [249,] 257 (3d Cir. 2017). With respect to the first prong, "Title VII protects . . . those who oppose discrimination made unlawful by Title VII." Moore, 461 F.3d at 341. The

employee must have a reasonable, good faith belief that the practice he is opposing constituted unlawful discrimination under Title VII.  Id.; Clark County v. Breeden, 532 U.S. 268, 271 (2001).

Here, we cannot conclude that Ledda's complaint sets forth sufficient factual allegations to show that he had a good faith belief that he was opposing discriminatory conduct under Title VII.  Rather, the amended complaint sets forth general conclusory allegations that Ledda believed the school and the Diocese thought he was racist.  As we have explained, an accusation of racism, however wrong, does not fall within the protections of Title VII.  Moreover, while the complaint asserts that Ledda complained of "discriminatory treatment," the allegations do nothing more than indicate that Ledda was upset with the way Cummings handled the incidents with the students.  They do not assert, with any clear factual support, that Ledda complained to Cummings about discriminatory treatment by either Cummings or the Diocese.

Id. at *7.[10]  In sum, the court held that, because accusations of racism are not protected under Title VII, objections that Ledda was not a "racist" could not be made with a "reasonable, good faith belief" that such objections are protected activity.  Id. at *5–7.

This conclusion is further supported by Bank v. Cmty. Coll. of Philadelphia, Civ. No. 22-293, 2022 WL 2905243, at *6 (E.D. Pa. July 22, 2022).  In Bank, a Caucasian professor brought a

---

[10]  In Ledda, the court explained why an accusation of being "racist" was not race discrimination under Title VII, holding:

Ledda's factual averments describe adverse employment actions based upon a perception that he was a racist.  Thus, the well-pleaded allegations in the complaint focus on alleged racism, as opposed to race . . . We note that Ledda's complaint relies on the assertion that his supervisor, and consequently [the school], wrongfully perceived him as a racist.  In this regard, while we have not found any authority directly addressing the question of whether accusations of racism equate to race discrimination under Title VII, in other contexts courts have found that conflating race and racism is a false equivalence.  Thus, it has been held that "[w]hile 'falsely accusing someone of being a racist is morally wrong,' such accusations cannot form the basis of a racial discrimination claim.

Id. at *5 (quoting Lovelace v. Washington Univ. Sch. of Med., 931 F.3d 698, 708 (8th Cir. 2019)) (citations omitted).

retaliation claim against his former employer because he believed that he was fired for accusations

of racism.  Id. at *5.  Relying in part on Ledda, the court held on a motion to dismiss a complaint:

> Because being perceived as racist is not a protected trait under [Title VII], Bank
> cannot show that he had a good faith belief that his complaints were in opposition
> to race-based discrimination or hostile work environment.  See Ledda, 2021 WL
> 1035106 at *7; Lovelace v. Wash. Univ. Sch. Of Med., 931 F.3d 698, 708 (8th Cir.
> 2019) (plaintiff accused of racist behavior had no "reasonable good faith belief that
> the conduct she opposed had constituted racial discrimination in violation of" state
> anti-discrimination law).  Accordingly, Bank's retaliation claims will be dismissed
> without prejudice.

Bank, 2022 WL 2905243, at *6.  Additionally, the court in Bank cited Lovelace v. Wash. Univ.

Sch. Of Med., 931 F.3d 698, 708 (8th Cir. 2019).  In Lovelace, the Eighth Circuit affirmed the

district court's grant of summary judgment on a retaliation claim, holding that the plaintiff

"misunderst[ood] what qualifies as racial discrimination by equating accusations of racist behavior

with racist behavior itself."  931 F.3d at 708.  Thus, the court held that, "[b]ecause [the plaintiff]

could not have had a good faith belief that the conduct she opposed had constituted racial

discrimination . . . her racial discrimination retaliation claim fails."  See id.; see also Alers v. City

of Phila., 919 F. Supp. 2d 528, 557 n.11 (E.D. Pa. 2013) (holding that the notion that a false

accusation of "being a racist is itself a form of racial discrimination" is "at best unintelligible and

at worst preposterous").

This plethora of legal authority counsels in favor of granting summary judgment on

Plaintiff's claims of retaliation under Title VII and the NJLAD.  The undisputed facts of record

show that Plaintiff's objection to Mr. Trinsey's suspension was premised upon accusations that he

is a "racist," not because she believed Mr. Trinsey was being suspended due to his Caucasian race.

Thus, a reasonable jury could not find that Ms. Phillips engaged in protected activity because Mr.

Trinsey "being perceived as racist is not a protected trait" under Title VII and the NJLAD.  Bank,

2022 WL 2905243, at *6.

Moreover, because Plaintiff "wrongfully conflates the ideas of race and racism" and only objected to Mr. Trinsey's suspension on the grounds that he was "not a racist," she cannot demonstrate a "reasonable, good faith belief" that she engaged in protected activity.  Lacontora, No. CV 21-03948, 2022 WL 856076, at *4 (E.D. Pa. Mar. 23, 2022).  Without more, her statements that such treatment was "not right" and "unfair" only amount to a "general complaint of unfair treatment," which is insufficient to support a retaliation claim.  Curay-Cramer, 450 F.3d at 135. Thus, Plaintiff's opposition to the belief that Mr. Trinsey was a racist does not constitute protected activity, and she cannot meet this crucial element of her prima facie case of retaliation.

Therefore, the Court will grant summary judgment in Defendant's favor on Plaintiff's retaliation claims under Title VII and the NJLAD in Counts One and Three of the Amended Complaint (Doc. No. 36).

## V.      CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 70) will be granted in part and denied in part.  Defendant's Motion for Summary Judgment (Doc. No. 70) will be granted as to Plaintiff's retaliation claims in Counts One and Three, and will be denied as to Plaintiff's race discrimination claims in Counts One, Two, and Three.  An appropriate Order follows.