**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SHANNON PHILLIPS, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 1:19-cv-19432 |
| | : | |
| v. | : | |
| | : | Hon. Joel H. Slomsky, U.S.D.J. |
| STARBUCKS CORPORATION d/b/a | : | |
| STARBUCKS COFFEE COMPANY, | : | **FILED VIA ECF** |
| | : | |
| Defendant. | : | |
| | : | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW</u>**

# TABLE OF CONTENTS

**PAGE**

I.    IN TIMES OF UNCERTAINTY – TRUE LEADERS TRANSFORM WITH CONFIDENCE ................................................................................................ 1

II.    LEGAL ARGUMENT ................................................................................. 4

    A.    Standard of Law ........................................................................... 4

    B.    Ms. Phillips Presented No Evidence Of Reverse-Race Discrimination At Trial ................................................................... 6

        1.    The Record Is Devoid Of Direct Evidence Of Reverse Race Discrimination At Trial ........................................... 7

        2.    Ms. Phillips Failed To Offer Evidence That Similarly Situated Non-White Employees Were Treated More Favorably Than Her .................. 10

        3.    Because Ms. Phillips Was Ultimately Replaced By Two White Employees, There Is Not Even an Inference of Racial Discrimination ..................................................... 12

    C.    The Evidence Presented At Trial Demonstrated That Starbucks Terminated Ms. Phillips Because Of Her Lack Of Strategic Leadership Skills Required To Lead Starbucks Through The Crisis .................................... 14

    D.    Ms. Phillips Fails To Present Any Evidence Supporting Theory Of The Case – That Ms. Phillips Was A "Scapegoat," "Fall Guy," or "Sacrificial Lamb" .................................................... 17

    E.    Punitive Damages Were Unwarranted Given the Evidence Presented, And The Court Must Vacate the Award in its Entirety .................................... 19

        1.    Starbucks Made Good-Faith Efforts to Implement and Enforce its Anti-Discrimination Policy .................... 20

        2.    Starbucks' Conduct Was Not Reprehensible as a Matter of Law ............ 21

III.    CONCLUSION ........................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acampora v. Konica Business Machines USA, Inc.*,
  No. CIV.A. 95–3936, 1997 WL 214800 (E.D. Pa. 1997)........................................15

*Allia v. Target Corp.*,
  No. CIVA07-4130 NLHAMD, 2010 WL 1050043 (D.N.J. Mar. 17, 2010) ...........................7

*Baran v. ASRC Fed., Mission Sols.*,
  401 F. Supp. 3d 471 (D.N.J. 2019), *aff'd sub nom. Baran v. ASRC/MSE*, 815
  F. App'x 633 (3d Cir. 2020) ........................................................................4, 5

*Bento v. Plainfield Pub. Sch. Dist.*,
  No. A-2127-20, 2022 WL 17332215 (N.J. Super. Ct. Nov. 30, 2022)....................................6

*Billet v. CIGNA Corp.*,
  940 F.2d 812 (3rd Cir. 1991) ......................................................................14

*Bleistine v. Diocese of Trenton*,
  914 F. Supp. 2d 628 (D.N.J. 2012) ..................................................................7

*Boykins v. CLBW Assocs.*,
  No. CIV. A. 11-6126, 2013 WL 6506309 (E.D. Pa. Dec. 11, 2013)......................................13

*Braddock v. SEPTA*,
  Civ. A. No. 13-06171, 2014 WL 6698306 (E.D. Pa. Nov. 25, 2014)....................................11

*Brewer v. Quaker State Oil Ref. Corp.*,
  72 F.3d 326 (3d Cir. 1995)..........................................................................14

*CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*,
  499 F.3d 184 (3d Cir. 2007)....................................................................21, 22, 23

*Collins v. Boyd*,
  541 F. App'x 197 (3d Cir. 2013) ..................................................................5, 6

*Ditzel v. Univ. of Med. & Dentistry of New Jersey*,
  962 F.Supp. 595 (D.N.J. Apr. 14, 1997)..............................................................7

*Erickson v. Marsh & McLennan Co.*,
  569 A.2d 793 (N.J. 1990)............................................................................6

*Fatzinger v. Lehigh Valley Hosp.*,
  130 F. Supp. 2d 674 (E.D. Pa. 2001) ................................................................14

*Fuentes v. Perskie,*
  32 F.3d 759 (3d Cir. 1994)................................................................6

*Glavan v. City of Irvington,*
  No. L–6270–02, 2008 WL 2840881 (App. Div. July 25, 2008)................7

*Goodman v. Pa. Tpk. Comm'n,*
  293 F.3d 655 (3d Cir. 2002)................................................................5

*Hazen Paper Co. v. Biggins,*
  507 U.S. 604 (1993)................................................................6

*Johnson v. Campbell,*
  332 F.3d 199 (3d Cir. 2003)................................................................5

*Kautz v. Met-Pro Corp.,*
  412 F.3d 463 (3d Cir. 2005)................................................................15

*Keller v. Orix Credit Alliance, Inc.,*
  130 F.3d 1101 (3d Cir. 1997)................................................................14

*Kolstad v. Am. Dental Ass'n,*
  527 U.S. 526 (1999)................................................................19, 20

*Lightning Lube, Inc. v. Witco Corp.,*
  4 F.3d 1153 (3d Cir. 1993)................................................................5

*Lyles v. Flagship Resort Dev. Corp.,*
  371 F. Supp. 2d 597 (D.N.J. 2005)................................................................5

*Maietta v. United Parcel Serv., Inc.,*
  749 F. Supp. 1344 (D.N.J. 1990) ................................................................13

*Martin v. Health Care & Ret. Corp.,*
  67 F. App'x 109 (3d Cir. 2003) ................................................................14

*Mathews v. Hermann,*
  No. CIV. A. 07-01318, 2008 WL 1914781 (E.D. Pa. Apr. 30, 2008) ................10

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973)................................................................6

*Mercado v. Wells Fargo,*
  No. CV 15-4086, 2017 WL 4862417 (D.N.J. Oct. 27, 2017)................13

*Merke v. Lockheed Martin,*
  645 F. App'x 120 (3d Cir. 2016) ................................................................12

*Monaco v. Am. Gen. Assur. Co.*,
  359 F.3d 296 (3d Cir. 2004)...........................................................................11

*Opsonic v. Norfolk S. Corp.*,
  335 F. App'x 220 (3d Cir. 2009) ....................................................................10

*Osuala v. Community College of Phila.*,
  No. CIV. A. 00-98, 2000 WL 1146623 (E.D. Pa. Aug. 15, 2000) .........................12

*Outten v. Genesis Health Care, LLC*,
  Civ. A. No. 13-4708, 2014 WL 3964918 (E.D. Pa. Aug. 12, 2014)......................10

*Raiczyk v. Ocean County Veterinary Hospital*,
  377 F.3d 266, 269 (3d Cir. 2004)......................................................................5

*Reeves v. Sanderson Plumbing Products, Inc.*,
  530 U.S. 133, (2000)......................................................................................5

*Ridley v. Costco Wholesale Corp.*,
  217 Fed. App'x 130 (3d Cir. 2007)....................................................................19

*Samuel v. Target Realty, LLC*,
  No. CV 19-2203, 2021 WL 4774858 (E.D. Pa. Oct. 13, 2021)...........................7

*Savarese v. Agriss*,
  883 F.2d 1194 (3d Cir. 1989).....................................................................21, 23

*Silvera v. Orange County Sch. Bd.*,
  244 F.3d 1253 (11th Cir. 2001) ......................................................................10

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003).....................................................................................21

*Thomas v. Ethicon, Inc.*,
  No. CIV. A. 93-3836, 1994 WL 171345 (E.D. Pa. May 5, 1994) .........................13

*Thompson v. Bridgeton Bd. Of Educ.*,
  9 F. Supp. 3d 446 (D.N.J. 2014) .......................................................................6

*TransWeb, LLC v. 3M Innovative Properties Co.*,
  16 F. Supp. 3d 385, 391-92 (D.N.J. 2014)..........................................................5

*Varughese v. Robert Wood Johnson Med. Sch.*,
  No. CV1602828FLWLHG, 2017 WL 4270523 (D.N.J. Sept. 26, 2017) .................8

*Velez v. QVC, Inc.*,
  227 F. Supp. 2d 384 (E.D. Pa. 2002) .................................................................8

iv

*Watkins v. Nabisco Biscuit Co.*,
   224 F. Supp. 2d 852 (D.N.J. 2002) ................................................................9

*Weiss v. Parker Hannifan Corp.*,
   747 F. Supp. 1118 (D.N.J. 1990) .................................................................19

*Whitmore v. MAFCO Worldwide, LLC*,
   No. 1:19-CV-8477-NLH-KMW, 2020 WL 4696744 (D.N.J. Aug. 13, 2020) .......................8

*Wilcher v. Postmaster Gen.*,
   441 F. App'x 879 (3d Cir. 2011) ................................................................10

*Williams v. Greyhound Lines Inc.*,
   No. CIV. A. 97-6997, 1998 WL 551981 (E.D. Pa. Aug. 11, 1998) ........................13

**Statutes**

42 U.S.C. § 1981 ...................................................................................6

42 U.S.C. § 1981a(b)(1) ...........................................................................19

Title VII of the Civil Rights Act .........................................................6, 19, 21

Fed. R. Civ. P. 50 ..............................................................................4, 5, 6

Fed. R. Civ. P. 50(a) ..............................................................................4, 5

Fed. R. Civ. P. 50(a)(1) .............................................................................4

Fed. R. Civ. P. 50(b) ..............................................................................4, 5

Fed. R. Civ. P. 59 ...................................................................................4

**Other Authorities**

THE PHILADELPHIA INQUIRER (May 29, 2018) ..........................................................18

## I.    **IN TIMES OF UNCERTAINTY – TRUE LEADERS TRANSFORM WITH CONFIDENCE**[1]

In the midst of a crisis, a great leader cannot hide behind others in hopes that their reputation for leading in times of non-crisis will carry them through it. Rather, a true leader demonstrates "the willingness to step up, put [themself] out there, and lean into courage." Brenee Brown, Dare to Lead, 2018. Leaders are expected to assess the situation and establish creative and strategic solutions beyond the tactical day-to-day operations. Leaders especially do not cower in the corner, but instead rise to meet their challenge.

On April 12, 2018, two Black men – Donte Robinson and Rashon Nelson – were arrested at the Starbucks store located at 18th and Spruce Street in Philadelphia while waiting for a business meeting. Mr. Robinson and Mr. Nelson were in the store for ***approximately three (3) minutes*** when the White Store Manager ("SM") called the police. Once the police arrived at the store, the men were arrested. The crisis that followed was unlike anything Starbucks had ever faced. The arrests garnered significant national media attention and resulted in an emotional outpour from the City of Philadelphia as well as outrage from partners (*i.e.*, Starbucks employees) who reported to Ms. Phillips. In stark contrast to this emotional response, Ms. Phillips, who served as Regional Director overseeing the Philadelphia market, had no response. In fact, Ms. Phillips could not see (and still cannot understand to this day) why the SM should ***not*** have called the police on two Black men for doing absolutely nothing. Rather, Ms. Phillips was and is satisfied that the SM probably thought she was doing the right thing and simply followed Starbucks' alleged policy. (Phillips, Trial Tr. (June 7, 2023), at 322:25-323:3). Instead of exhibiting outrage and action as a

---

[1] "Crisis can bring uncertainty and one of the things from a leadership perspective that I found effective is to come in, set your vision, really ensure to instill confidence in leadership above you. And then understand what resources are needed to move forward from the crisis, whatever that is." Eckensberger, Trial Tr. (June 9, 2023), at 689:10-18. Mr. Marcus Eckensberger (White) is the individual who replaced Plaintiff, Ms. Shannon Phillips.

response to the unjust arrests, Ms. Phillips now somehow attempts to transform herself into the victim by stating Starbucks terminated her because she is White. Ms. Phillips cannot see beyond herself – just as she failed to do so following the arrests.

During this time of crisis, Starbucks' Philadelphia market needed a specific type of strategic leadership. The market needed someone who could face and move through these challenges to help make Starbucks a better (and safer) place for both its partners and customers. The common, everyday leadership that Ms. Phillips previously provided would not suffice. Starbucks needed strategic leadership. However, Ms. Phillips simply could not meet the task, and she failed by not even attempting to face the challenges ahead. During this time where Starbucks employees were desperately seeking strong and strategic leadership, the record reflects that Ms. Phillips:

- **Provided no solutions or insight to the needs of the market** (Hymes, Trial Tr. (June 8, 2023),[2] at 523:13-16; 525:23-526:8 ("I would have expected to see summaries of partner sentiment, patterns on unusual incidences throughout the market. I would have liked to have seen solution-based summaries of how to activate"));

- **Appeared overwhelmed, frozen, and lacked awareness of how critical the situation was for Starbucks and its partners** (*Id.* at 527:4-12 ("There was a disconnect in owning some of the challenges that our partners were facing and how to address those, so the strategy was absent because there was an absence of acknowledgement and ownership, so just the fundamentals were missing"); Pinto, Trial Tr. (June 6, 2023), at 149:22-150:9 ("I had never seen her so stuck and frozen"));

---

[2] For ease of reference, the trial transcript will be cited as: "[Last Name of the Testifying Witness], Trial Tr. (Date of Testimony), at [Page]:[Line]".

- **Did not attend scheduled meetings, showed up late or was mentally absent** (Hymes, Trial Tr. (June 8, 2023), at 462:6-18 ("There were multiple times where our partners were crying out for support and help, and either Ms. Phillips was late for the meeting in which they arrived to have conversation with leadership which she was not present, or there were times in which she was present, but in the corner, and our partners needed to speak with her. There were also times in which they expressed concerns, and there was a reaction of disconnection from Mrs. Phillips"); Smith, Trial Tr. (June 8, 2023), at 577:8-15 ("at that point, it started building on itself. So there were examples of lateness. There was examples of on the stand-up calls that were occurring, that not taking a leadership position. There were examples of, you know, general follow-up of what was going on, wanting specifics, not getting them."));

- **Was sometimes unreachable by her team** (Smith, Trial Tr. (June 8, 2023), at 570:2-9 ("There was a lack of responsiveness with her team. So some of the team started asking us the questions as opposed to asking her. And that created concern as well."));

- **Appeared disengaged and stood in the corner at meetings where she was expected to lead or where Starbucks' executive leadership was present** *Id.* at 567:1-13 ("we had Howard Schultz [the CEO] that next day or the following day, and she was late."); 586:18-587:20 ("there was a virtual roundtable with shift supervisors, there may have been some store managers. It was probably 15 people. And the COO, Roz Brewer; the president – US president, Rossann; [and] some other people from headquarters . . . It was designed for a partner – tell us how you are feeling. What is going on? . . . [Ms. Phillips] came in probably halfway through that virtual meeting, where her team was sharing what was going on, how they were feeling, *et cetera*. So everyone saw her enter late and then proceed to sit in the

back"); Hymes, Trial Tr. (June 8, 2023), at 516:10-17 ("there was an absence of Shannon in those conversations. There were conference calls, literally, with executives to which you would expect the regional director to lead the conversation to which I would have to step-in, in her absence. We would be waiting on the call for Shannon to show up, and she was absent.").

Ms. Phillips' failure to lead her team during the crisis was her downfall. She was expected to lead her market through this crisis by demonstrating to her supervisors what the needs of the market were and engaging partners to determine what needed to change moving forward. Instead, she froze. This utter lack of strategic leadership in a time of crisis is the ***only*** reason Ms. Phillips was terminated; there is no record evidence demonstrating the contrary. For the following reasons, the record evidence is insufficient to establish Ms. Phillips' claims of reverse-race discrimination, and Starbucks respectfully renews its request that this Court enter judgment as a matter of law in Starbucks' favor on Ms. Phillips' claims. Likewise, the evidence not support the award of punitive damages; and, therefore, alternatively, those awards must be vacated.

## II.    LEGAL ARGUMENT

### A.    Standard of Law

Rule 50 of the Federal Rules of Civil Procedure states as follows in its relevant part:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). Under Rule 50(b), a motion pursuant to Rule 50(a) may be renewed within 28 days after judgment is entered. A party may also request a new trial under Fed. R. Civ. P. 59 as an alternate form of relief.

4

A Rule 50 motion must be granted where "the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Baran v. ASRC Fed., Mission Sols.*, 401 F. Supp. 3d 471, 479 (D.N.J. 2019), *aff'd sub nom. Baran v. ASRC/MSE*, 815 F. App'x 633 (3d Cir. 2020) (quoting *Raiczyk v. Ocean County Veterinary Hospital*, 377 F.3d 266, 269 (3d Cir. 2004)) (granting a post-trial Rule 50 motion); *Lyles v. Flagship Resort Dev. Corp.*, 371 F. Supp. 2d 597, 600 (D.N.J. 2005) (ordering a new trial under Rule 50).

The analysis under Rules 50(a) and (b) are the same, and "[t]he key question is not whether there is literally *no evidence* supporting the party against whom the motion is directed, but whether there is evidence upon which the jury could properly find a verdict for that party." *Id.* (emphasis in the original) (quoting *Johnson v. Campbell*, 332 F.3d 199, 204 (3d Cir. 2003)). *See also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002) (a mere "scintilla" of evidence cannot defeat a Rule 50 motion) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)). Rule 50 requires that the court "review all the evidence in the record . . . [and in] doing so, draw all reasonable inferences in favor of the nonmoving party . . . [without] mak[ing] credibility determinations or weigh[ing] the evidence." *Collins v. Boyd*, 541 F. App'x 197, 205 (3d Cir. 2013) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149–50, (2000)). Therefore, while the court "may not weigh the evidence, determine the credibility of the witnesses, or substitute its version of the facts for the jury's version," it must grant the motion when the record is critically deficient of evidence from which the jury might reasonably afford relief. *Baran*, 401 F.Supp.3d at 479-80 (quoting *TransWeb, LLC v. 3M Innovative Properties Co.*, 16 F. Supp. 3d 385, 391–92 (D.N.J. 2014); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993), *aff'd*, 812 F.3d 1295 (Fed. Cir. 2016); and *Raiczyk v. Ocean County Veterinary Hospital*, 377 F.3d 266, 269 (3d Cir. 2004)).

### B.     <u>Ms. Phillips Presented No Evidence Of Reverse-Race Discrimination At Trial</u>

Ms. Phillips presented *no* evidence at trial such that a reasonable jury could find that she met her burden to prove her reverse race discrimination claim under New Jersey Law Against Discrimination ("NJLAD"), Title VII of the Civil Rights Act ("Title VII"), or 42 U.S.C. § 1981 ("Section 1981").

Ms. Phillips' claims under Title VII, NJLAD and Section 1981 are subject to the well-known burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993), and its progeny. *See also Collins*, 541 F. App'x at 205-06 (affirming and analyzing the granting of a Rule 50 motion under the *McDonnell Douglas* framework). Under this formulation, a plaintiff must first establish a *prima facie* case. *McDonnell Douglas*, 411 U.S. at 802. If they are able to do so, the burden shifts to Starbucks to articulate (*i.e.*, point to evidence showing) legitimate, non-discriminatory reasons for its actions. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Once Starbucks meets that burden, Ms. Phillips must then show that the reasons offered by Starbucks for her termination amount to a pretext for intentional discrimination. *Id.* The ultimate burden of proof always remains with Ms. Phillips to show that Starbucks intentionally discriminated against her because of her race. *Id.*

However, Ms. Phillips' reverse race discrimination claims under NJLAD and Section 1981 are subject to a heightened standard. Under the heightened standard, in addition to the elements of her *prima facie* case, Ms. Phillips must also establish that Starbucks is the "unusual employer who discriminates against the majority." *Erickson v. Marsh & McLennan Co.*, 569 A.2d 793, 799 , (N.J. 1990) (quoting a collection of cases); *see also, e.g.*, *Thompson v. Bridgeton Bd. Of Educ.*, 9 F. Supp. 3d 446, 458 (D.N.J. 2014) (granting summary judgment where plaintiff failed to make a *prima facie* case of reverse race discrimination under NJLAD because she did not show that

defendants were the unusual employer who discriminate against the majority); *Bento v. Plainfield Pub. Sch. Dist.*, No. A-2127-20, 2022 WL 17332215, at *7 (N.J. Super. Ct. App. Div. Nov. 30, 2022), *cert. denied*, 254 N.J. 178, 295 A.3d 217 (2023) (same); *Glavan v. City of Irvington,* No. L–6270–02, 2008 WL 2840881, at *6 (App. Div. July 25, 2008) (same, stating "[t]he mere fact that plaintiff is white and her employers are African American is insufficient"); *Ditzel v. Univ. of Med. & Dentistry of New Jersey*, 962 F.Supp. 595, 603 n. 1 (D.N.J. Apr. 14, 1997) (same and applying the *Erickson* heightened standard to plaintiff's Section 1981 claims). Ms. Phillips must meet this standard "because 'when a [plaintiff] is a member of the majority and not representative of persons usually discriminated against in the work place, discrimination directed against that person is "unusual."'" *Allia v. Target Corp.*, No. CIVA07-4130 NLHAMD, 2010 WL 1050043, at *2 (D.N.J. Mar. 17, 2010) (quoting *Erickson*, 569 A.2d at 799).

In this case, Ms. Phillips did not produce evidence sufficient to establish discrimination even under a non-heightened standard. Nor did she present evidence that Starbucks is the "unusual employer" who discriminates against the majority. Thus, the record evidence was insufficient for a reasonable jury to conclude that Starbucks terminated Ms. Phillips' employment due to her race (White) – under the regular *McDonnell Douglas* or heightened *Erickson* standards. For this reason, and as further discussed below, Starbucks is entitled to judgment as a matter of law.

### 1. The Record Is Devoid Of Direct Evidence Of Reverse Race Discrimination At Trial

This is not a direct evidence case. "A plaintiff seeking to prove his case through direct evidence, confronts a 'high hurdle' because 'the evidence must demonstrate that the decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" *Bleistine v. Diocese of Trenton*, 914 F. Supp. 2d 628, 638 (D.N.J. 2012) (quoting *Anderson v.*

*Consol. Rail Corp.,* 297 F.3d 242, 248 (3d Cir. 2002)). [3] Direct evidence of discrimination may include "statements of a person involved in the decision-making process that reflect a discriminatory or retaliatory animus of the type complained of in the suit." *Whitmore v. MAFCO Worldwide, LLC*, No. 1:19-CV-8477-NLH-KMW, 2020 WL 4696744, at *5 (D.N.J. Aug. 13, 2020). Direct evidence of discrimination may also include "statements or actions by plaintiff's supervisors suggesting racial animus." *Varughese v. Robert Wood Johnson Med. Sch.*, No. CV1602828FLWLHG, 2017 WL 4270523, at *6 (D.N.J. Sept. 26, 2017) (citations omitted).

Here, the record lacks *any* evidence demonstrating that the decision-makers had a racially discriminatory animus or bias towards White employees. The termination decision-makers testified consistently at trial that they did not consider race in making the decision to terminate Ms. Phillips' employment. Camille Hymes (Black), Regional Vice President of Operations – who, as Ms. Phillips' direct supervisor made the decision to terminate Ms. Phillips' employment – testified at trial:

> A. As I mentioned at the very top of this testimony, the decisions that I made were based on behavior. Based on behavior of whether or not these leaders specifically could manage our partners through a crisis, if they were making the proper decisions, had ownership and accountability, that they were able to address the partners' needs and that they were actually showing up in the way in which our partners were asking. And in all three of those instances, color of skin had nothing to do with it. And as we sit here today, five years later, again, there is a lack of accountability in terms of what was going on in that market and the conversation today is about the color of someone's skin. It is offensive.
>
> Q. Okay. How about with the higher-ups in Starbucks that you were talking to? You identified Zeta, Rossann, Frisch, Nathalie, Paul Pinto. When you're having these conversations with them about firing Shannon in this climate, the idea she was white and being fired in the aftermath of April 12th, was never something that was ever discussed?

---

[3] Even in cases where a plaintiff has demonstrated evidence of the use of offensive and derogative racial epithets or actions, courts have found there to be no direct evidence. *See, e.g.*, *Samuel v. Target Realty, LLC*, No. CV 19-2203, 2021 WL 4774858, at *4, 7 (E.D. Pa. Oct. 13, 2021); *Velez v. QVC, Inc.*, 227 F. Supp. 2d 384, 406-07 (E.D. Pa. 2002) (collecting examples and cases).

A. A hundred percent, her race was never a part of the conversation. Whether or not it would be a risk to the organization or not, it was behavior. The conversation around race never came up. For Paul or anyone else. I lead 15,000 partners. The leaders that were at Shannon's level, I had six directors. Jen Pivarnik, white female. Shannon Phillips, white female. Marcus Eckensberger, white male. TJ Wolfersberger, white male. Phillip Laws, black male. I'm missing one. I think that's all of them. When Shannon was separated, terminated, however you would like to phrase it, the replacement for Shannon were two white Americans.

Hymes, Trial Tr. (June 7, 2023), at 446:6-447:22.

At trial, this Court stated on the record that Ms. Phillips may have offered direct evidence of reverse race discrimination through the testimony of former-District Manager ("DM"), Paul Sykes ("Mr. Sykes"). Trial Tr. (June 9, 2023), at 676:11-13 ("with Mr. Sykes's testimony, perhaps, [there is] direct evidence of race discrimination."). While Mr. Sykes testified at trial that he was not terminated because of his race, and that Ms. Phillips' employment was terminated due to her race, this is not direct evidence of discrimination. Mr. Sykes, as Ms. Phillips' **subordinate**, has no personal knowledge of the decision-making process surrounding Ms. Phillips' or his own termination. *See, e.g.*, Sykes, Trial Tr. (June 8, 2023), at 642:9-25; 643:6-10 ("Q. So if there were specific instances regarding the performance of someone that was above your pay grade, that wouldn't be in your presence because of confidentiality reasons. Yes? A. Yes"); 644:9-13; 646:9-18 ("Anything that was specific to [Ms. Phillips], though, [former President of Retail for North America, Rossann Williams] didn't talk to me about that."). *See Watkins v. Nabisco Biscuit Co.*, 224 F. Supp. 2d 852, 861 (D.N.J. 2002) ("statements by nondecision-makers, or statements by decision-makers unrelated to the decisional process itself, [cannot] suffice to satisfy the plaintiff's burden."). Indeed, Mr. Sykes testified that he was not involved in any conversation surrounding Ms. Phillips' performance. Sykes, Trial Tr. (June 8, 2023), at 643:6-644:8.  Nor did he claim to have witnessed any conversation where the decision to terminate her employment was discussed.

As such, his testimony was based on nothing more than speculation and his completely unfounded personal beliefs, which do not constitute direct (nor any) evidence of discrimination.

### 2. Ms. Phillips Failed To Offer Evidence That Similarly Situated Non-White Employees Were Treated More Favorably Than Her

At trial, Ms. Phillips also failed to offer circumstantial evidence to support her reverse race discrimination claims. Ms. Phillips offered no evidence that Starbucks treated similarly-situated employees outside of Ms. Phillips' protected class more favorably than it treated her. Instead, Ms. Phillips relied heavily (and improperly) on Paul Sykes as a comparator to support her claim that she, as the White Regional Director, was selected for separation, whereas Mr. Sykes, as the Black District Manager, was not.

In order to establish her claims through comparator evidence, Ms. Phillips must show that her situation and that of her putative comparator were similar in all relevant respects. *See Opsonic v. Norfolk S. Corp.*, 335 F. App'x 220, 222-23 (3d Cir. 2009). To meet this standard, "the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second guessing employers' reasonable decisions and confusing apples with oranges." *Mathews v. Hermann*, No. CIV. A. 07-01318, 2008 WL 1914781, at *9 (E.D. Pa. Apr. 30, 2008) (quoting *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001)). "[T]o be considered similarly situated, comparator employees must be similarly situated in ***all relevant respects***." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011) (emphasis added) (affirming grant of summary judgment). That determination "takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Id.* Critically, "employers are permitted to hold employees in leadership positions to higher standards and such ***higher-ranked employees are not 'similarly situated' to their subordinates.***" *Outten v. Genesis Health Care, LLC*, Civ. A. No. 13-4708, 2014 WL

3964918, at *7 (E.D. Pa. Aug. 12, 2014) (emphasis added) (citing *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 306 (3d Cir. 2004)).

At trial, the only evidence Ms. Phillips presented of a non-White employee that she claims was treated more favorably than her was former DM Mr. Sykes, who is Black. *See* Trial Tr. (June 6, 2023), at 34:16-19; Hymes, Trial Tr. (June 8, 2023), at 475:10-11. Ms. Phillips claims that Starbucks treated Mr. Sykes more favorably than her because (1) he is Black and (2) she claims Starbucks did not terminate him in the aftermath of Mr. Robinson's and Mr. Nelson's arrests, which occurred at a store in his District.

First, while Mr. Sykes is Black, he is not a proper comparator because he is not similarly situated to Ms. Phillips – he was her subordinate. In addition, Mr. Sykes testified about the vast differences between Ms. Phillips' duties compared to his own. He testified that he oversaw approximately 240 employees and managed a budget of around $13 to $15 million. Sykes, Trial Tr. (June 8, 2023), at 639:18-641:20. Meanwhile, Ms. Phillips oversaw approximately 2,000 employees and a budget between $125 to $150 million. *Id.* Further, Mr. Sykes testified that as Regional Director, Ms. Phillips would have more direct sight lines with Starbucks leadership and that "she would have a broader perspective in terms of what she would see across the enterprise than [himself]." *Id.* at 641:21-642:8. Most importantly, Ms. Phillips as a Regional Director *directly supervised* Mr. Sykes, a DM—therefore, he cannot be her comparator. Phillips, Trial Tr. (June 7, 2023), at 307:9-12. *See Monaco*, 359 F.3d at 306  (holding "the eight vice presidents/branch managers whom [the plaintiff] directly supervised" were not similarly situated to the plaintiff); *Braddock v. SEPTA*, Civ. A. No. 13-06171, 2014 WL 6698306, at *4 (E.D. Pa. Nov. 25, 2014) (holding that plaintiff's putative comparators "were not similarly situated to plaintiff because they were his own subordinates."); *Osuala v. Community College of Phila.*, No. CIV. A. 00-98, 2000

11

WL 1146623, at *7 (E.D. Pa. Aug. 15, 2000), *aff'd,* 259 F. 3d 717 (3d Cir. 2001) (holding "[a]llegations about the failure of [employer] to discipline [plaintiff's subordinates] are inapposite" because employees cannot be similarly situated to their supervisors), *aff'd,* 259 F.3d 717 (3d Cir. 2001).

Second, even if the Court were to find that Mr. Sykes was a comparator – which he is not – Ms. Phillips cannot prove that he was treated more favorably as a result of his race. Although Mr. Sykes denies that he was terminated, he admits that he separated from Starbucks only ***two months*** after the arrests of Mr. Nelson and Mr. Robinson. Sykes, Trial Tr. (June 8, 2023), at 638:20-639:9 ("Q. When you left in June of 2018, you received a package did you not? A. I did, yes. Q. And that's a severance package? A. Yes."). Mr. Sykes also admits that Starbucks gave him a $50,000 severance package when he left the company. *Id.* at 638:20-639:9. Therefore, Mr. Sykes met the same fate as Ms. Phillips just a few weeks later, and he was separated from Starbucks despite being a Black employee.

Accordingly, Ms. Phillips offered no comparator evidence to support her reverse race discrimination claim.

### 3.    Because Ms. Phillips Was Ultimately Replaced By Two White Employees, There Is Not Even an Inference of Racial Discrimination

Finally, the evidence introduced at trial demonstrated that the decision to terminate Ms. Phillips' employment ***had nothing to do with her race***. For the final prong of a plaintiff's *prima facie* case, a plaintiff must establish that their termination "gave rise to an inference of discrimination (such as by replacing the plaintiff with someone not in the protected class)." *Merke v. Lockheed Martin*, 645 F. App'x 120, 124 (3d Cir. 2016) (affirming the grant of summary judgment). At trial, Ms. Phillips admitted that Starbucks replaced her with a White male and White female – Marcus Eckensberger and Linda Johnson. Phillips, Trial Tr. (June 7, 2023), at 362:16-

363:11.  Courts uniformly hold that when a plaintiff is replaced by someone of the same race or in the same protected class – as here – her *prima facie* case fails.[4] *See, e.g.*, *Mercado v. Wells Fargo*, No. CV 15-4086 (KM-MAH), 2017 WL 4862417, at *8 (D.N.J. Oct. 27, 2017) (granting summary judgment where "[a]ll three plaintiffs were replaced, and their replacements were of precisely the same racial/ethnic mix as the plaintiffs."); *Williams v. Greyhound Lines Inc.*, No. CIV. A. 97-6997, 1998 WL 551981, at *4 (E.D. Pa. Aug. 11, 1998), *aff'd*, 203 F.3d 818 (3d Cir. 1999) (granting summary judgment on a race discrimination claim, where employee was replaced by another African-American male); *Thomas v. Ethicon, Inc.,* No. CIV. A. 93-3836, 1994 WL 171345, at *6 (E.D. Pa. May 5, 1994) ("Because plaintiff's replacement was another [B]lack [employee], he has no evidence tending to show that non-members of a protected class were treated more favorably than he was."); *Boykins v. CLBW Assocs.*, No. CIV. A. 11-6126, 2013 WL 6506309, at *8 (E.D. Pa. Dec. 11, 2013) (same); *Maietta v. United Parcel Serv., Inc.*, 749 F. Supp. 1344, 1372 (D.N.J. 1990), *aff'd*, 932 F.2d 960 (3d Cir. 1991) (granting summary judgment where employer stated they hired another Italian male to replace Plaintiff).

Not only did the evidence at trial demonstrate that Ms. Phillips was replaced by two individuals of her same race (White), the evidence also demonstrated that these individuals – in particular, Marcus Eckensberger – were selected specifically because of their skills in handling crisis situations. *See* Joint Trial Ex. 90 ("get Marcus in as quickly as possible based on his experience in crisis situations."). Mr. Eckensberger's demonstrated crisis management skills were

---

[4] Starbucks has found over ***seventy (70) cases*** where courts found a lack of racial animus where a plaintiff alleging race discrimination was replaced by someone of the same race. In all of these cases, the Court granted summary judgment, even under the summary judgment standard where all inferences should be made in favor of the nonmoving party.

the very skills that the decision-makers continue to maintain that Ms. Phillips lacked in her leadership.

For these reasons, there is no evidence or inference of discrimination to support Ms. Phillips' reverse race discrimination claims.

### C.    The Evidence Presented At Trial Demonstrated That Starbucks Terminated Ms. Phillips Because Of Her Lack Of Strategic Leadership Skills Required To Lead Starbucks Through The Crisis

This Court should grant judgment as a matter of law in favor of Starbucks because the evidence presented at trial demonstrated that Starbucks terminated Ms. Phillips' employment because of her failure to show the strategic leadership skills necessary to lead Starbucks and its partners through the crisis following the arrests of Mr. Nelson and Mr. Robinson at the Starbucks store on 18th and Spruce. Indeed, this Court cannot second guess Starbucks' legitimate business judgment in making the decision to terminate Ms. Phillips' employment. *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) ("[Courts] do not sit as a super-personnel department that reexamine[] an entity's business decisions. . . . Rather, [a court's] inquiry is limited to whether the employer gave an honest explanation of its behavior."). Smith, Trial Tr. (June 8, 2023), at 599:5-17 ("It was lack of leadership, and you're overseeing $100 - $150 million portfolio, you need to rise to the occasion."). Under controlling precedent, the decision to terminate Ms. Phillips does not have to be the "best" decision; it is only unlawful if the decision to terminate her was based on race. *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (stating that the analysis is "not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [an unlawful one].")

While Ms. Phillips may disagree with Starbucks' evaluation of her job performance, her belief does not establish pretext. *See Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3rd Cir. 1991) ("[T]he fact that an employee disagrees with an employer's evaluation [of her performance] does

not prove pretext."); *Fatzinger v. Lehigh Valley Hosp.*, 130 F. Supp. 2d 674, 679 (E.D. Pa. 2001) ("[I]t is well-established that neither a simple denial of the charges against her, nor her own rosier perception of her performance, saves Plaintiff from summary judgment."). Likewise, the opinions of Ms. Phillips' subordinates relative to her leadership skills are irrelevant in a pretext analysis because what matters is the perception of the decisionmaker. *See Martin v. Health Care & Ret. Corp.*, 67 F. App'x 109, 114 (3d Cir. 2003) (co-workers' opinions that the plaintiff performed her job well did not demonstrate that the decision-makers were lying when they said they thought she performed poorly, and thus, were insufficient to prove pretext); *Acampora v. Konica Business Machines USA, Inc.*, No. CIV.A. 95–3936, 1997 WL 214800 at *7 (E.D. Pa. 1997) (co-worker's belief regarding plaintiff's performance is not indicative of pretext; the focus is on the perception of the decisionmaker); *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) ("[P]retext is not shown by evidence that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

At trial each and every Starbucks decision-maker (all of whom no longer work for Starbucks; and, therefore, had no bias in favor of Starbucks) testified consistently that Starbucks terminated Ms. Phillips' employment because she failed to demonstrate the strong and strategic leadership required of a Regional Director following the April 2018 arrests. As Regional Director, Ms. Phillips was expected to play a key role in leading those changes. Hymes, Trial Tr. (June 8, 2023), at 523:1-6; 546:1-4 ("I expected her to have solutions for her market specifically. . . . The one that she was in charge of leading."); 584:20-585: ("she should have been helping to create the agenda, opening up the call, setting up the expectations and running the call, facilitating the call. ***Not that she had to know all the information, but she should be facilitating her team and the***

15

***group on the call that was in support of this crisis. That's her role as a regional director***.")
(emphasis added).

Nevertheless, Paul Pinto, former Vice President of Partner Resources (who is White), noted
that Ms. Phillips was neither physically nor emotionally present. Pinto, Trial Tr. (June 6, 2023), at
149:22-150:9 ("I had never seen her so stuck and frozen"). Ms. Hymes also testified that Ms.
Phillips was overwhelmed, and the partners in the Philadelphia region did not trust Ms. Phillips to
lead them through the crisis. *See, e.g.*, Hymes, Trial Tr. (June 7, 2023), at 409:25-410:6 ("Shannon
and I were having conversations because of the way she was showing up in the market, so it wasn't
I wanted her out. In fact, the conversation evolved when ***Shannon said: I'm not built for this. I
can't do this. This is too complicated for me.*** And so based on those conversations, very shortly
after the incident, we started to talk about how to explore options."). Ms. Hymes also noticed that
Ms. Phillips appeared disengaged and stood in the corner at meetings where she was expected to
lead or where Starbucks' executive leadership was present. *Id.* at 410:18-411:3 ("the day in which
we had a broadcast with partners, and Shannon was to -- to lead the conversation with our partners.
I think it was at the 34th Street store. And she showed up late. She remained in the corner. Other
leaders had asked if they could assist to initiate the conversation because ***Shannon was not literally
present, even though physically, not mentally in the room with our partners during that time***.").
Most importantly, Ms. Phillips never took accountability, responsibility, nor initiative to solve the
issues in her market. *Id.* at 421:21-422:9 ("When there are open complaints in your market, our
partners are sharing that there are complaints, as a leader you're responsible for closing open
complaints in a timely manner. So the responsibility ultimately lies with the leader. That's why
we're still here today five years later talking about accountability. Accountability begins and ends

with the leader. So whether it is a complaint from a partner or a complaint from a customer, closure is essential.").

The evidence presented at trial overwhelmingly demonstrates that Starbucks terminated Ms. Phillips' employment only because of her complete failure to lead her team through this crisis. Starbucks' decision to terminate Ms. Phillips' employment had absolutely nothing to do with her race.

D.    **Ms. Phillips Fails To Present Any Evidence Supporting Theory Of The Case – That Ms. Phillips Was A "Scapegoat," "Fall Guy," or "Sacrificial Lamb"**

Ms. Phillips' theory of her case was that she was a "scape goat . . . sacrificial lamb . . . fall guy" following the arrests of Mr. Nelson and Mr. Robinson at Starbucks' 18th and Spruce Street Store. Trial Tr. (June 9, 2023), at 763:20-21. She makes the assumption that firing her for that reason must have been because of her race. That assumption is an impermissible leap because firing an employee, regardless of her race, as a "scapegoat" does mean the employee was fired because of her race.

Regardless of that problem, however, there is no merit in Ms. Phillips' theory. Instead, the theory fell flat when she admitted on the stand that her termination was not publicized and no one knew who Ms. Phillips was:

"Q. It wasn't public knowledge as to who you were, Ms. Phillips, was it?

A: That's correct."

Phillips, Trial Tr. (June 7, 2023), at 387:18-20.

Ms. Phillips claimed she was a scapegoat; yet it the SM who called the police, not Ms. Phillips, who was front and center in the media. As Phillips herself testified, "Initially, there was support for [the Store Manager], and then the riots and protests start, and people were screaming: fire the manager, fire the manager, fire the manager," referring to the SM who called the police.

17

Phillips, Trial Tr. (June 7, 2023), at 333:20-22. That was the accountability they were seeking—not Ms. Phillips'. If, believing what Ms. Phillips said, there had to be a scapegoat, it was the SM that called the police. That was who the public was calling to terminate – not Ms. Phillips. According to Ms. Phillips' own theory, the public got what they wanted – their scapegoat was terminated – the store manager. So there would be no need to terminate Ms. Phillips' employment.

Rather, Starbucks chose to publicize Ms. Phillips' White replacement – Mr. Eckensberger (the White Regional Manager who replaced Ms. Phillips). It was Mr. Eckensberger's face that was posted on the front page of the Philadelphia Inquirer the day after Starbucks shutdown 8,000 stores for unconscious bias training.[5] Eckensberger, Trial Tr. (June 9, 2018), at 708:4-14. If race were a factor in Ms. Phillips' termination pursuant to the scapegoat theory, it is nonsensical that Starbucks would highly publicize her White replacement – making him the face of Starbucks' implicit bias training – while leaving her termination confidential.

Tellingly, after receiving this testimony at trial, Ms. Phillips' counsel decided to change her case theory during the rebuttal to her closing argument. She claimed that Ms. Phillips was an *internal* scapegoat. Trial Tr. (June 9, 2023), 813:8-15. Even still, despite this bottom of the ninth switch, there was no evidence presented at trial to support this theory. Starbucks sent out internal releases concerning Mr. Nelson and Mr. Robinson's arrests and Starbucks' response. None of these releases ever mentioned Ms. Phillips' name or her separation. As such, there is no evidence to support the theory that Ms. Phillips was a scapegoat – internally or externally.

Finally, while Ms. Phillips claimed to be a scapegoat based on her race, other White DMs in the Philadelphia market kept their jobs. Ms. Phillips' assertion – that she was a scapegoat

---

[5] Patricia Madej & Michael Boren, "Starbucks closes stores for anti-racial bias training: Recap" THE PHILADELPHIA INQUIRER (May 29, 2018), https://www.inquirer.com/philly/news/starbucks-stores-closed-racial-bias-training-20180529.html.

alleging that all of the White managers in the Philadelphia Market were terminated after Mr. Nelson and Mr. Robinson's arrests –  was proven false during trial. Mr. Eckensberger testified that *another White DM in the Philadelphia market – Michael Lamborn – was not fired*. Eckensberger, Trial Tr. (June 9, 2023), at 712:16-24. Moreover, although Mr. Sykes testified that he was not fired even though he was the DM over the 18th and Spruce Street Store, he also admitted that he received a $50,000 severance package when he left Starbucks only *two months* after the April 2018 arrests – the same package that Mr. Trinsey (a White DM in Philadelphia) received just prior to Mr. Sykes' termination. Thus, putting the question to rest as to whether he "voluntarily" resigned. *Compare* Sykes, Trial Tr. (June 8, 2023), 625:21-626:4 *with id.* at 638:25-639:9. Consequently, Ms. Phillips' claim that all White leaders in the Philadelphia market were terminated following the arrests, whereas the Black leaders were not, proved completely false at trial.

E.     <u>Punitive Damages Were Unwarranted Given the Evidence Presented, And The Court Must Vacate the Award in its Entirety</u>

To recover punitive damages for a Title VII or Section 1981 claim, Ms. Phillips must demonstrate that Starbucks "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Ridley v. Costco Wholesale Corp.,* 217 Fed. App'x 130, 137 (3d Cir. 2007) (quoting 42 U.S.C. § 1981a(b)(1)). However, an employer "may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to comply with Title VII.'" *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999) (citation omitted). Under NJLAD, "punitive damages should only be awarded … in exceptional cases" as the "defendant's conduct must have been wantonly reckless or malicious" in order to support a punitive damages award. *Weiss v. Parker Hannifan Corp.*, 747 F. Supp. 1118,

1135-36 (D.N.J. 1990) ("It should be remembered that punitive damages are intended to punish wrongdoers, not to enrich victims." Thus, "a plaintiff must show more than the minimum conduct necessary to prove the underlying cause of action before an award of punitive damages becomes appropriate.").

### 1.   Starbucks Made Good-Faith Efforts to Implement and Enforce its Anti-Discrimination Policy

Here, the record is clear that Starbucks did make good-faith efforts to implement and enforce its anti-discrimination policy. Therefore, as an initial matter, Starbucks' anti-discrimination policies and regular company training on these policies rebuts any inference that Starbucks acted with the requisite recklessness or maliciousness to justify a punitive damages award in this case. As such, any punitive damages award was improper, let alone the jury's $25,000,000 award in this case.

The law is clear that punitive damages are simply not warranted where an employer makes a good faith effort to implement and enforce anti-discrimination policies. In *Kolstad v. ADA*, for example, the Supreme Court held that an employer's efforts to comply with anti-discrimination legislation—via written company policies—precluded liability for punitive damages. 527 U.S. at 546. The Court noted that employers that make such efforts demonstrate that they "never acted in reckless disregard of federally protected rights." *Id.* at 544. To allow such liability would, thus, make an employer vicariously liable for behavior that they sought to prevent. Such a result, according to the Court, would be contrary to, "common law limitations on vicarious liability for punitive damages." *Id*.

There is no dispute that Starbucks maintained anti-discrimination policies and conducted training on those policies. Pinto, Trial Tr. (June 6, 2023), at 157:1-157:4 ("Q: So is there – the unconscious bias training that was already in development prior to the incident of April of 2018 –

A: Right"). As outlined in Starbucks' Partner Guide, "Starbucks is an equal employment opportunity employer of all qualified individuals. ***Starbucks does not discriminate on the basis of race***, color, religion, sex, national origin, age, physical or mental disability, sexual orientation, marital status, veteran status, gender identity and expression, genetic information, or any other basis protected by local, state or federal law." Joint Trial Exhibit 111, Partner Guide at STARBUCKS 000002 (emphasis added). Starbucks' Partner Guide also includes an anti-discrimination policy, which confirms that "Starbucks strictly prohibits discrimination, sexual harassment or harassment on the basis of race, color, religion, sex, national origin or place of origin, age, disability, sexual orientation, marital status, veteran status, gender identity or expression, genetic information, or any other basis protected by law. Starbucks also prohibits harassment of a partner by non-partners, such as vendors, contingent workers or customers." *Id.* at STARBUCKS 000027. Given Starbucks' good faith efforts to implement and enforce its anti-discrimination policy, punitive damages are wholly unwarranted in this case.

### 2. Starbucks' Conduct Was Not Reprehensible as a Matter of Law

In addition, and perhaps even more important for this inquiry, Ms. Phillips failed to present any evidence at trial showing reprehensible conduct by Starbucks that would be needed to support any award of punitive damages—much less one of this magnitude. *See CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc*., 499 F.3d 184, 190 (3d Cir. 2007) (considering the following elements in determining whether a company's actions were reprehensible sufficient to award punitive damages: "[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.") (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419

(2003)). Ms. Phillips presented no evidence that her supervisor intended to, or was, recklessly indifferent to her rights under Section 1981, NJLAD, and Title VII. *See Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir. 1989) ("[R]eckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages."). In this case, the record is devoid of any facts linking any act by Starbucks to the excessive amount the jury awarded. *See, e.g.*, Hymes, Trial Tr. (June 7, 2023), at 444:3-6 ("It is actually offensive that that's a question, because the decisions that are made for all 15,000 partners are based on the behaviors of a partner. It is not based on race."); 444:24-25 ("Never crossed my mind that her skin – whatever is on her skin was – would be a factor in her performance"); 446:10-447:3 ("As I mentioned at the very top of this testimony, the decisions that I made were based on behavior … color of skin had nothing to do with it.").

Moreover, Ms. Phillips also failed to present any credible evidence at trial demonstrating conduct exhibiting malice, an evil motive, or recklessness or callous indifference to a federally protected right because none exists. *See CGB Occupational*, 499 F.3d at 190. Instead, Ms. Phillips relied entirely on the speculative opinion of her *subordinate*, Mr. Sykes. Mr. Sykes admitted to not being aware of the decision-making process, but provided Ms. Phillips with the soundbite she had been looking for – "And so when she was kind of here one day, gone the next, … I just figured that, all right, she's kind of a scapegoat." Sykes, Trial Tr. (June 8,2023), at 632:10-12. But even if the Court accepts Mr. Sykes' summation, it does not meet the punitive damage standard. Especially when those who were involved in the decision-making process – Mr. Pinto and Ms. Hymes – testified that they sought to help Ms. Phillips and find solutions before termination became the only path forward. For example, Mr. Pinto lamented that "when we tried to have that conversation [of alternative options], she just sat very closed, would not respond and wouldn't engage in

dialogue. It's hard to have a conversation about different avenues or possibilities with someone that's not responding." Pinto, Trial Tr. (June 6, 2023), at 177:2-10. Ms. Hymes similarly reflected:

> I cared very deeply about the experience that [Ms. Phillips] was going through. She was struggling. It was painful. I think she felt deeply for our partners. I strongly believed that we were going to do everything possible to make it a success for a turnaround, but I just didn't see evidence of that as we continued to move through the timeline. It was unfortunate, it was heartbreaking to have to deliver and have the conversation with [Ms. Phillips] that it was just not going to work. Having her to rebuild trust with a team that didn't trust her, to have her go through repairing the market when there was a lack of ownership and a focus on other things aside from what was happening in front of us.

Hymes, Trial Tr. (June 7, 2023), at 418:13-419:2. Taking Mr. Sykes' testimony together with Mr. Pinto and Ms. Hymes', the totality of which provides no basis for any liability, much less a punitive damages award.

To sustain an award of punitive damages, Ms. Phillips had to introduce evidence of conduct demonstrating Starbucks' malicious intent. *See Savarese*, 883 F.2d at 1204; *see also CGB Occupational*, 499 F.3d at 190. The evidence introduced demonstrates that Starbucks had no motive to recklessly interfere with Ms. Phillips' federally-protected rights, let alone destroy them. It was Ms. Phillips' burden to marshal evidence of specific conduct through which a rational jury could infer Starbucks' maliciousness. She could not conjure this evidence because none exists. The lack of evidence of reprehensible conduct is dispositive. For these reasons, the Court must vacate the jury's punitive damages award under these circumstances.

## III.   CONCLUSION

For all the foregoing reasons, Starbucks respectfully requests that the Court grant its renewed motion for judgment as a matter of law and enter judgment in Starbucks' favor dismissing all of Ms. Phillips' claims in this action notwithstanding the verdict. Alternatively, the punitive damages awards must be vacated for lack of evidentiary support.

Respectfully submitted,

*/s/ Richard R. Harris*

Richard R. Harris (*admitted pro hac vice*)
Tara Param (NJ Bar ID: 394042023)
Kathleen Princivalle (NJ Bar ID 397722022)
HOLLAND & KNIGHT
2929 Arch Street, Suite 800
Philadelphia, PA 19104
Phone 215.252.9594
Fax 215.867.6070
Mobile 917.309.5752
richard.harris@hklaw.com
tara.param@hklaw.com
kathleen.princivalle@hklaw.com

Dated: July 13, 2023

*Attorneys for Defendant,*
*Starbucks Corporation d/b/a*
*Starbucks Coffee Company*

24