# Exhibit B

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
2    _____
     SHANNON PHILLIPS,                 :   CRIMINAL ACTION NUMBER:
3            Plaintiff,                :   19-19432
                                       :
4            v.                        :
                                       :
5    STARBUCKS CORPORATION d/b/a       :
     STARBUCKS COFFEE COMPANY,         :   JURY TRIAL
6            Defendant.                :   VOLUME 2
     _____  :   PAGES 22 - 239
7
         Mitchell H. Cohen Building & U.S. Courthouse
8        4th & Cooper Streets
         Camden, New Jersey  08101
9        June 6, 2023
         Commencing at 9:21 a.m.
10
     B E F O R E:        THE HONORABLE JOEL H. SLOMSKY,
11                       UNITED STATES DISTRICT JUDGE

12   A P P E A R A N C E S:

13
         CONSOLE MATTIACCI LAW, LLC
14       BY: LAURA C. MATTIACCI, ESQUIRE
         BY:  KATHERINE C. OELTJEN, ESQUIRE
15       BY:  HOLLY W. SMITH, ESQUIRE
          1525 Locust Street, Ninth Floor
16       Philadelphia, Pennsylvania 19102
         For the Plaintiff
17

18       HOLLAND & KNIGHT LLP
         BY:  RICHARD HARRIS, ESQUIRE
19       BY:  TARA PARAM, ESQUIRE
         BY:  KATHLEEN PRINCIVALLE, ESQUIRE
20       2929 Arch Street, Suite 800
         Philadelphia, Pennsylvania 19104
21       For the Defendant

22
      Ann Marie Mitchell, CRR, RDR, CCR, Official Court Reporter
23            AnnMarie_Mitchell@njd.uscourts.gov
                     (856) 576-7018
24
      Proceedings recorded by mechanical stenography; transcript
25          produced by computer-aided transcription.

1   **A L S O   P R E S E N T**:

2

3       SHANNON PHILLIPS, Plaintiff

4       ROBYN RUDERMAN, ESQUIRE, Starbucks Corporation

5       MARCUS ECKENSBERGER, Starbucks Corporation

6       MATTHEW HIGGINS, Courtroom Deputy

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        -   -   -

2                      I N D E X

3                        -   -   -

4

5   Opening Statements                        Page

6       MS. MATTIACCI                          27
        MR. HARRIS                             44
7

8                 E X A M I N A T I O N S

9   Witness              Direct   Cross   Redirect   Recross

10

11  PAUL PINTO

    BY MS. MATTIACCI         49                166
12  BY MR. HARRIS                    124               190

13  SHANNON PHILLIPS

14    BY MS. MATTIACCI        192

15
                      E X H I B I T S
16

17       NUMBER              ADMITTED PAGE

18       Exhibit 71          153

19       Exhibit 105         160

20       Exhibit 111         133

21

22

23

24

25
```

*United States District Court*

```
 1              (PROCEEDINGS held in open court before The Honorable
 2    JOEL H. SLOMSKY at 9:21 a.m.)
 3              THE COURT:  Please be seated.
 4              THE DEPUTY CLERK:  I think counsel wanted to bring
 5    something up before the jury comes in.
 6              THE COURT:  Okay.
 7              MS. MATTIACCI:  Yes, Your Honor.  We had a letter
 8    with some legal research for Your Honor to consider in regards
 9    to the mixed motive jury instruction and the New Jersey Law
10    Against Discrimination jury instruction, so we brought you a
11    physical copy of the letter and a couple of the cases.
12              THE COURT:  All right.  You can hand it up.
13              The other defense counsel has been given a copy.
14              MR. HARRIS:  Thank you, Your Honor.  And we also have
15    done the same.  We have cases that we are going to rely on for
16    the proposition that the jury can only be charged under either
17    mixed motive or pretext.  It can't be both.
18              THE COURT:  Okay.  We'll take a look at those cases.
19    And I'd like counsel to consider whether or not we can use the
20    federal charge on compensatory damages, I don't think we need
21    the state one.  And the punitive damages charge may be a
22    little different.  But maybe compensatory combined together,
23    it might simplify things.  All right?
24              MR. HARRIS:  All right.  Sounds good.
25              THE COURT:  With that, we have the submissions, let's
```

 1  bring in the jury.

 2          MS. MATTIACCI:  I'm sorry, Your Honor?

 3          THE COURT:  Let's bring in the jury.

 4          MS. MATTIACCI:  Yes, sir.

 5          THE COURT:  Now, counsel, I realize that we have a

 6  court reporter here, we're not doing electronic sound

 7  recording in this courtroom.  But if you could somehow always

 8  speak into a mic, do so.  I don't know if you want to give

 9  your openings from the podium, you can turn the podium towards

10  the jury.

11          I don't micromanage where you stand in the courtroom.

12  That's strictly up to you, but please keep your voice up so

13  everyone can hear it.  All right.  I know that the court

14  reporter will be able to hear it, but I want to make sure that

15  everyone in the courtroom and myself can hear it, because we

16  tend to lower our voice at the end of a sentence.  Okay.

17          MS. MATTIACCI:  Your Honor, I was going to stand

18  right here and you're okay if I was standing, right, so close?

19          THE COURT:  Yes.  Keep your voice up.

20          MS. MATTIACCI:  Will do.

21          THE DEPUTY CLERK:  All rise for the jury.

22          (Jury in.)

23          THE COURT:  Please be seated.  Good morning, members

24  of the jury.  Welcome back.

25          RESPONSE:  Good morning.

```
 1           THE COURT:  At this point, we will give openings of
 2    counsel, and we'll start with plaintiff's counsel.
 3                      OPENING STATEMENT
 4           MS. MATTIACCI:  Thank you, Your Honor.
 5           Good morning.
 6           RESPONSE:  Good morning.
 7           MS. MATTIACCI:  May it please the Court, opposing
 8    counsel, members of the jury, my name is Laura Mattiacci, and
 9    as I said at the beginning of jury selection, I have the
10    absolute privilege of representing Shannon Phillips in this
11    case against Starbucks Corporation.
12           I just first want to very sincerely and personally
13    thank each and every one of you for your service here.  I know
14    there's personal sacrifice, driving, waiting, security and
15    everything that comes with that, and we really deeply
16    appreciate you being here for that.
17           I promise you, I will not waste your time.  And that
18    this is not a waste of time.
19           Justice needs to be served, and that's where you come
20    in, to administer that at the end of this case.
21           I'm going to take you through what happened so you
22    understand the facts and then the question that you're
23    ultimately going to be considering.
24           The scapegoat, the sacrificial lamb, the fall guy.
25    This is what Starbucks made Shannon Phillips in this case.
```

1          Ultimately you're going to be asked, in May of 2018,
2     would Starbucks have fired Shannon Phillips if she was black.
3          Now, I want to introduce you here to the names that
4     you're going to hear throughout the case.
5          I have a larger one here; it's easier to see on this.
6          So if we start here at the bottom, Holly Hylton.  She
7     was a store manager.  And she was white.  She was the store
8     manager for the store at 18th and Spruce Street in
9     Philadelphia in April of 2018.
10          And below her were baristas and hourly employees that
11     worked at that location.
12          Ms. Hylton reported up to Paul Sykes, who was black,
13     who was the district manager.
14          Philadelphia was split in two at this time.
15     Mr. Sykes had one half of the city, and Mr. Trinsey, Ben
16     Trinsey, was the district manager for the other half of the
17     city.
18          Above the district manager was Shannon Phillips.  She
19     was the regional director.
20          And Mr. Trinsey, Mr. Sykes and other district
21     managers reported up to Ms. Phillips.
22          Ms. Phillips was in charge of about 100 stores in
23     Maryland, South Jersey, the Main Line and the Philadelphia
24     region.
25          Ms. Phillips reported up to Ms. Hymes, who is black,

1    the regional vice president.

2           Ms. Hymes reported up to Zeta Smith, the divisional

3    senior vice president, who was also black, who reported up to

4    Rossann Williams, the executive vice president, who is white,

5    who reported up to Rosalind Brewer, the chief operating

6    officer and president, who is black.

7           Ms. Brewer reported in to the CEO and president,

8    Kevin Johnson, who is white, and also involved in the case is

9    Howard Schultz, the founder and corporate CEO of Starbucks,

10   who is also white.

11          These are the names and people that you will be

12   hearing about throughout this case.  And several of them will

13   be testifying in this case.

14          Let me tell you about Shannon Phillips.

15          She lives in Woolwich Township, Swedesboro, where she

16   raises her two daughters -- her daughter and son, two kids.

17          At the time she was terminated she had worked there

18   for 13 years.  Starbucks uses the word "partner" instead of

19   employee.  Even if you're a part-time hourly employee they

20   call you a partner, because everybody gets a certain amount of

21   stock options when you come in, and that's the way that they

22   utilize it, just like if you're at Disney and they call their

23   employees cast members.

24          She had an excellent performance history.  You're not

25   going to see any negative performance reviews, no negative

1   performance write-ups, nothing.  She was a rising star.

2          She rose up to the rank of regional director.  She

3   had previously been a district manager.  She was a district

4   manager in Ohio, where she grew up.  And after her divorce and

5   she was raising her kids on her own, she was offered the

6   promotion to regional director in Philadelphia, so she moved

7   to Philadelphia on her own with her kids that are around 12

8   years old at the time and took that job.

9          She -- in fact, in February of 2018 -- in February of

10  2018, which is just about six weeks before her termination,

11  she had received a performance bonus and $90,000 in stock

12  options that were going to vest, but she was terminated and

13  they were taken away from her.

14         Her boss Camille Hymes had told her in February 2018

15  this is a great year to be Shannon Phillips, she was doing

16  such a good job.

17         On April 11, 2018 she was considered an excellent

18  high-ranking partner.

19         And in May of 2018, she was fired.

20         Now, everybody knows who Starbucks is, but just to

21  give you some background, this is a humongous international

22  company.  34,000 stores in 80 countries.  15,000 employees

23  just in the US.  290,000 employees in 2018.  They're worth

24  over $110 billion.

25         So what happened?  Why did she get fired in May of

1   2018?

2           Well, first, let me talk to you about the "Safe and
3   Welcoming" policy.

4           In the end of 2017, beginning of 2018, there was a
5   lot of situations that were happening in stores, Starbucks
6   stores, in urban areas, where there was crime, robberies, a
7   lot of overdoses that were happening in bathrooms.

8           In fact, in Philadelphia in her region there were six
9   deaths in the bathrooms of Starbucks in two years.  And
10  partners were getting stuck with needles, employees were
11  getting hurt.

12          So in Seattle, the higher-ups in Seattle where
13  Starbucks corporate headquarters are, they came up with a new
14  policy called Safe and Welcoming.

15          It originally was launched in California, in San
16  Francisco.

17          And the policy was if in these certain stores, in the
18  cities if you were going to be in Starbucks, you had to make a
19  purchase before you used the bathroom or sit at the café.

20          Prior to that, it was -- they advertised themselves
21  as a third -- where you could come in and just sit there, but
22  in order to try to make it safer for everybody, they
23  instituted this policy.  And there was training on the policy.
24  There was a full day.

25          And partners or the employees were told if somebody

1  comes in and they don't make a purchase, you invite them, what

2  can I make for you, what can I get for you.

3       If they want to use the bathroom, you have to say,

4  well, you need to make a purchase before using the bathroom.

5       If the person insisted on not making a purchase or

6  insisted on not leaving after that, the manager was to go

7  behind and discreetly call 911.  And that was the policy that

8  was in place.

9       This is the store at 18th and Spruce where it's

10 located close to Rittenhouse Square in Philadelphia.

11      Now, these are not in dispute, these facts.

12      On April 12, 2018, Starbucks had the Safe and

13 Welcoming policy in place at the 18th and Spruce store.

14      There had been a history of crime and safety issues

15 at the Philadelphia stores.

16      Shannon Phillips did not create this policy.  She did

17 not run the training on the policy.  She didn't -- she was not

18 at the store -- we're going to get to the calls of the arrest,

19 she was not at the store during the incident that occurred.

20 She did not directly supervise the employees.

21      So let's look at the timeline.

22      April 12, 2018, there was two men, African American

23 men who came into the store at 18th and Spruce.  One of them

24 asked to use the restroom, and the store manager, Holly Hylton

25 who was there that day, told the gentlemen that they need to

 1    make a purchase if they were going to use the restroom.

 2          They said they weren't going to make a purchase, went

 3    back and sat down --

 4          MR. HARRIS:  Objection, Your Honor, may I see you at

 5    sidebar?

 6          THE COURT:  No, not at this point.

 7          Go ahead.

 8          MS. MATTIACCI:  Starbucks did -- I'll -- Starbucks

 9    did an investigation on it, and Starbucks' conclusion on the

10    investigation was that the men were in the store for about 20

11    minutes, in which the store manager asked multiple times if

12    they wanted to purchase something, told them they had needed

13    to purchase something or else they had to leave.

14          They refused to leave, and at one point said, why --

15    you can call the cops.

16          So Ms. Hylton went back, she called 911.  She said to

17    the -- on 911, I have two gentlemen in my store, they're

18    refusing to make a purchase, they're refusing to leave.

19          Within minutes, there were bike cops in the area,

20    they came in, the bicycle cops went up to the two gentlemen,

21    spent ten minutes with them, trying to tell them that they

22    needed to make a purchase or they needed to leave.

23          They still refused to make a purchase, still refused

24    to leave, they called for backup.  Backup came in, the two

25    gentlemen were arrested and taken out.

1          The final 46 seconds of that event that lasted around

2    30 minutes, was caught on videotape by a customer who had a

3    cell phone.  And those 46 seconds were tweeted out by the

4    customer.

5          When it was tweeted out, it lit a firestorm.  And

6    there was an enormous amount of publicity and press around it.

7          The headlines were that there was racial bias, that

8    911 would not have been called if they were white, and these

9    men who had not done anything expect be in a Starbucks were

10   arrested.  So that happened on the 12th.

11         Like I said, Ms. Phillips, she was not there that

12   day.  Ms. Hylton was there.

13         Mr. Sykes was in the area, but he was not physically

14   at the store that day.  And in the aftermath of this, they

15   fired -- Starbucks fired three people.

16         They fired Holly Hylton, the white employee who

17   called 911.  They fired Shannon Phillips, the second-level

18   supervisor.  They did not fire Paul Sykes.  And they suspended

19   and then fired Ben Trinsey.

20         So in the aftermath of this event, they fire three

21   people, all white, and they also did not fire Camille Hymes,

22   who was Ms. Phillips' boss.

23         But Holly Hylton had followed the policy.  That was

24   the policy of Starbucks.  And initially, the CEO released a

25   statement that weekend in which he went on and -- on video on

*United States District Court*

1   the website and said:  Blame on the manager is not -- is

2   misplaced.  It's our fault.  We put this policy in place.  It

3   could open up to implicit bias.  We're going to do training,

4   we're going to make it right, but it's our fault and this

5   blame is misplaced.

6           He put that out in writing as well, but this is where

7   the investigation and the apology happens.  It didn't go over

8   well.  It didn't go over well.  There was huge protests in

9   response to that.  And on Saturday and Sunday -- excuse me --

10  through Saturday and Sunday -- and then the apology was the

11  14th.  There was huge protests that came in.

12          People were flooding the stores.  A man with a bull

13  horn who was leading the protests was screaming:  Fire the

14  manager, fire the manager, fire the manager.  We'll talk about

15  policy later.  Fire the manager.

16          There was more protests, and then Holly was fired

17  either the 16th or the 17th, right in here.  Because there was

18  more protests happening, they brought Holly in.  They had her

19  sign a nondisclosure agreement, and she was out.

20          The CEO and all the people from Seattle come into the

21  stores, and they fly in from Seattle, and they come to

22  Philadelphia, and he starts visiting the stores.  And then, he

23  goes on Gayle King on the 18th.  And now, he's saying he had a

24  manager -- you know, a rogue manager who did this thing, she

25  shouldn't have done it, and completely changes the tune.

*United States District Court*

1          So it's no longer about our policy.  Now they're

2   burying the fact that it was their policy that she followed,

3   and instead, he apologizes for the arrest, says, of course,

4   you know, the arrest shouldn't have happened, but the story by

5   Starbucks has changed.

6          The men go on Good Morning America on the 19th.

7          And during this whole week, it's very, very stressful

8   obviously.  It's not usual for the CEO and all the bigwigs

9   from Seattle to be flying in and coming down on these stores

10  right in Philadelphia.  There was an enormous amount of press

11  that is happening.

12         And through this whole thing, Shannon Phillips is

13  working.  She's in the stores every single day.  She's

14  supporting the partners every single day.  She's not

15  responsible for what happened on the 12th.  It wasn't her

16  policy.  She didn't make it.

17         It got to the point where Camille Harris (sic) and

18  Zeta Smith up here, they instituted what they call a tap-out

19  policy which is a way for people to take off, the managers to

20  take off because the intensity of the situation was so great

21  that people needed to have like a little mental break from

22  everything that was happening.

23         So on the 21st and the 22nd, Shannon Phillips was

24  tapped out.  They tapped her out.  They said:  Go home, rest,

25  get renewed.

 1          There are smaller protests that are happening.  It's
 2    starting to subside.  It's starting to die down a little bit.
 3          They then start talking to her about potentially
 4    taking a leadership position, a community leadership position
 5    for Shannon, and they call it a TLA, which is a temporary
 6    limited assignment.  Starbucks has these things where for
 7    maybe 6 months, maybe 12 months -- this position was set for 6
 8    to 12 months -- you would do a special job, and this is where
 9    you could maybe move into like another corporate type of job
10    for that.
11          And so they were saying:  Hey, Shannon, you know, we
12    think you would be great for this leadership position.
13          And she was like:  Okay.  You know, I would -- that
14    would be nice, and I'd like to be considered for that.  That
15    seems like a good opportunity.
16          Meanwhile, she's still working, she's still working.
17          There was a planned protest on the 27th.  You'll see
18    documentation of how heavily involved she is during this whole
19    time, how engaged she is, how her employees that are reporting
20    up to her and people she's working with are -- love her and
21    are thanking her for everything that she's doing.
22          She's involved with the Black Partners Network, which
23    is a group in the Philadelphia stores -- actually, throughout
24    the company that came in to hold some roundtable discussions
25    and things of that nature.  She's heavily involved with the

 1   Black Partners Network.  She's involved in operations.  You're

 2   going to hear about P&AP, which is partner and asset

 3   protection.  It's basically the division of Starbucks that

 4   deals with the investigations that happen, safety issues, and

 5   things like that.

 6          There's an entire department that deals with that,

 7   and they were trying to figure out how to revise the Safe and

 8   Welcoming policy so that people who are not committing crimes

 9   don't get arrested but at the same time keep employees safe so

10   they're not dealing with some drug overdoses or needle issues

11   or aggressiveness with the stores.

12          So that's all being worked on by these other

13   divisions.

14          She's tapped out on the 28th and 29th.

15          And then things start boiling back up because there's

16   a settlement that Starbucks reaches with the two men who were

17   arrested on May 2nd.  And when the settlement happens,

18   Starbucks takes this opportunity to take what was an event

19   caused by their bad policy, or their policy, and switches it

20   to a PR campaign for themselves, that they are dedicated to

21   diversity and implicit bias and all of this.

22          So they announce with this settlement that they paid

23   the men an undisclosed amount of money, but that the CEO would

24   personally mentor the two men as they progressed in whatever

25   business that they're doing.  They announce they're going to

1   shut down 8,000 stores at the end of May in which there's

2   going to be bias training for everybody.

3           They bring in -- here is the actual statement that

4   they posted on the website:  The agreement between the parties

5   includes a confidential financial settlement as well as a

6   commitment to continued listening and dialogue between the

7   parties as a means towards developing specific actions and

8   opportunities, action needed to happen.  Starbucks will

9   continue to take actions that stem from this incident to

10  repair and reaffirm our values and visions for the kind of

11  company we want to be.

12          This is coming from the CEO.

13          And so everybody from Seattle comes back to

14  Philadelphia.  It's all over the news again.  They've said

15  that they're going to have former Attorney General Eric Holder

16  be the speaker at this bias training.  They said they're

17  bringing in the rapper Common to do videos about it, and this

18  was going to be a huge event.

19          The next day, the CEO, Mr. Schultz, and Rosalind

20  Brewer, who you see here, they go to Morehouse College, and

21  they have a talk that they do, and it's all about what

22  happened on the 12th and implicit bias.  They were getting

23  backlash from the students at Morehouse that feel that they're

24  not taking it serious enough, that there's more that needs to

25  be done, and there's a lot of pressure.

1          So coming in on the 3rd, Camille Hymes says to

2   Shannon Phillips:  This is bad.  This is really bad.  We're

3   all on the line here.

4          And Ms. Phillips is like:  What do you mean?  We

5   haven't done anything.

6          And she's then told on Friday, where she was supposed

7   to visit the stores:  You know what?  Why don't you do those

8   stores on your own.  You can go visit the stores on your own.

9   We're going to take a group of executives from Seattle around

10  the stores on Friday.

11         And that day, unbeknownst to her, on May 4th, they

12  start sending text messages to each other and reach out to

13  legal and say:  Let's get a release agreement ready for

14  Shannon.  We're firing Shannon.

15         What had she done?  She had done nothing to deserve

16  this.

17         She was tapped out on the 5th and the 6th.

18         The 7th she walks in, and she's about to talk to

19  Camille about Friday and why, you know, she was marginalized

20  on Friday and told to go on her own.  And instead, they say to

21  Shannon:  We want you to go, call Ben, and suspend Ben because

22  there's been allegations of race discrimination concerning pay

23  of people that report in to Ben.

24         And Shannon says:  What are you talking about pay

25  discrimination?  We don't set the pay.  HR sets the pay.  It's

1   a whole comp department that deals with the pay.  They send us

2   the number.  We just give the number.  How could he be guilty

3   of anything having to do with setting the pay?

4           And they said:  He needs to be suspended.  You need

5   to suspend him.

6           Meanwhile, they know they're going to fire her.

7           So they give her a script, she goes in to Ben, she

8   reads the script to him, and he's suspended.

9           This is at 8:00 a.m. on the 8th.

10          They then tell her to tell him that she would be the

11  point of contact.  She told him -- I'm sorry.  They told

12  Shannon that she was then to call his direct reports, his

13  store managers, and tell them:  Ben is taking time away.  I

14  will be your point of contact.

15          And she does that:  She goes back, she makes all

16  these phone calls.  She tells everybody that.

17          She's then summoned to Camille's hotel room.  She

18  walked into Camille's hotel room -- I mean, to hotel lobby and

19  Ms. Hymes says:  The situation is unrecoverable.  You're going

20  to have to -- we have to make a change in Philadelphia.

21          And Ms. Phillips, Shannon Phillips, says:  Am I

22  leaving Philadelphia, or am I leaving Starbucks?

23          And she says:  You're leaving Starbucks.

24          13 years she put into this company.

25          They said to meet her the next day.  They wanted her

1   to sign a nondisclosure agreement and a release agreement to

2   release them of any and all claims that she could have against

3   them.  They offered her six months' pay.

4        She said:  I'm not signing it.  I'm not going to be

5   the scapegoat again.

6        So May 4th, we're talking 16 business days from the

7   arrest to the termination decision.  16 days.

8        What do they say the reason is for her termination?

9   They say that Shannon Phillips was physically and emotionally

10  absent after the April 12th arrests.

11       And what is their evidence that she was physically

12  and emotionally absent?  Nothing.  They are not going to have

13  anything to substantiate this allegation against her.

14       And, in fact, at the end of this case when I stand up

15  in front of you for closing argument, this is going to be

16  filled with all the engagement that she was involved in during

17  these weeks, all of the support and thank yous that people

18  were giving her for everything that she was doing during this

19  time because this was -- this was not just a job for her; this

20  was her career.

21       She doesn't have a college degree.  She was working

22  in the same place for 13 years.  She had kids approaching

23  around 20 years old at the time that she was terminated.  And

24  she would have to start all over.

25       She was the scapegoat.  She was a sacrificial lamb.

1  The evidence will show she was the fall guy because Starbucks

2  wanted to stand up in front of you and present evidence about

3  implicit bias and training and all of that, but, really, it

4  was about the brand.  What Starbucks cared about was the

5  brand, and what was best for the brand at the end was to get

6  rid of the white people that were in line and be able to say

7  they took action.

8          So at the end of this case, essentially, this is the

9  question you're going to be asked:  In May of 2018, would

10 Starbucks have fired Shannon Phillips if she was black?  The

11 evidence in this case will show you absolutely not.

12         Shannon is going to tell you about the impact this

13 has had on her life and how it was devastating for her.

14         She was now in her house in Swedesboro with no real

15 options, no safety net, and by herself as a single mom.

16         She eventually got a job at Raymour & Flanigan, but

17 it's nowhere near what the potential was going to be and where

18 she saw her life and for generations after her that she could

19 establish by a position at Starbucks, this national, huge

20 company that at one time she believed in.

21         At the end of this case, I'll just ask you for the

22 justice that needs to be administered in this case to right

23 this wrong.

24         Thank you.

25         MR. HARRIS:  May I address the ladies and gentlemen

1   of the jury, Your Honor?

2          THE COURT:  Yes, Counsel, please.

3                   OPENING STATEMENT

4          MR. HARRIS:  Ms. Mattiacci, good morning.  Good

5   morning, Ms. Phillips.

6          Implicit bias.  Implicit bias, by definition, is the

7   notion that we have preconceived notions, and it affects or

8   impacts the quality of our decision-making.

9          Each one of you yesterday were brought into the back

10  to go over whether or not you could be fair and impartial.

11  And in fact, His Honor said to each one of you:  Could you

12  evaluate the evidence presented by both sides?

13         Each one of you said yes.

14         His Honor said:  It would not be unreasonable for you

15  to have some preconceived notions or prejudice.

16         But each one of you said you could set that aside to

17  be fair to both sides.

18         You took an oath, in fact.  You didn't just say it

19  outside this courtroom.  You took an oath that said that you

20  would be fair and impartial and you would be objective for or

21  against either side based on the competency of the evidence

22  presented in this courtroom.  That's what you said because we

23  know that one thing is for certain.  The one thing that we

24  know is when someone takes the stand that they're going to try

25  to tell the truth.

1          We know individuals may have feelings.  But feelings

2     don't have to do with evidence.

3          There isn't any dispute that Ms. Phillips believes

4     that she was discriminated against.  No dispute at all.  But

5     what she has to prove is competent evidence that she was in

6     fact discriminated against.

7          The leaders of Starbucks came to this place in

8     Philadelphia at 18th and Spruce to evaluate whether or not

9     Ms. Holly Hylton make a mistake of judgment.

10          Counsel argues that in fact the young men were in the

11     store for 20 minutes.  The evidence will demonstrate that they

12     were in the store for less than 3 minutes before the police

13     were called.  That's why she was terminated.  It wasn't

14     because of her race.  It was because of a lack of judgment for

15     two men who were sitting in a Starbucks doing nothing at all.

16     That's outrageous.  That's a lack of judgment.  That's why she

17     was terminated.

18          In fact, you'll hear from several witnesses that will

19     take the stand and will say just that.  There will be no

20     witness who will say that in fact the gentlemen that were in

21     the store did anything wrong.  It's evidence.  It's subjective

22     evidence.  It's competent evidence.  It has nothing to do with

23     feelings.

24          In fact, you will hear evidence that the person who

25     was replaced -- who replaced Ms. Hylton was in fact white,

1  Angela Grass.  White woman.  Replaced Holly Hylton.  So if

2  race was a factor in the decision-making, then why would she

3  have been replaced by someone who was already in the store?

4        In fact, the same person that Ms. Phillips in fact

5  supervised.  They brought someone into that location to

6  stabilize the store who could demonstrate leadership.

7        You'll also hear, the evidence is uncontroverted,

8  that, in fact, the person who replaced Ms. Phillips was, in

9  fact, our corporate representative, Mr. Marcus Eckensberger,

10 white male.

11       In fact, her role was split in two.  Ms. Linda

12 Johnson and Mr. Marcus Eckensberger both replaced the duties

13 which Ms. Phillips previously held.

14       Linda Johnson, white woman.  Objective evidence, it's

15 not feelings.

16       So one would think if race was the motivating factor

17 and in fact was a determining factor in this case, you will

18 see the complexion of demographics of the organization prior

19 to 2018.

20       It would be different after the incident if in fact

21 race was a factor in the decision-making by the leadership of

22 the organization.  Pressure tested.

23       Camille Hymes will testify as well as Mr. Pinto, who

24 you will see shortly, that will testify to the demographics of

25 the organization prior to 2018 and after 2018.

```
 1              Leadership.  What is leadership?
 2              Leadership isn't a fixed set of skills.  It's
 3    understanding the moment in which you are being called to
 4    lead.  Leadership is also tenuous.  It's fragile.
 5              A leader has the responsibility of leading those that
 6    they're entrusted to have follow.
 7              But it's based on trust.  The trust had been
 8    fractured.
 9              You'll hear from the witness who will testify that
10    the partners that were responsible for the stores that are at
11    issue were in pain.  It had nothing to do with race.  Black
12    and white alike were in pain.
13              That's why when they brought the leader from the
14    other store to replace Ms. Hylton; it was someone, Angela
15    Grass, who had stabilization in that market.  She was a strong
16    leader.  She was calm.  She could handle the pressure.  It had
17    nothing to do with her race.
18              The same being with Mr. Eckensberger, also in the
19    Philadelphia market, was a peer of Ms. Phillips.  They didn't
20    bring someone outside the market.  They brought someone who
21    was in a neighboring market to come in and stabilize the
22    situation.
23              Mr. Eckensberger, a white male.  Linda Johnson, a
24    peer of Ms. Phillips, a white female.
25              Counsel doesn't believe that you all can be fair.
```

1    That why it was left that out that Ms. Hylton was replaced by

2    Angela Grass.  And Ms. Phillips was replaced by Marcus

3    Eckensberger as well as Linda Johnson.  Counsel is certainly

4    aware of the facts in this case and what the evidence will be

5    presented.

6          But why didn't she tell you that?  She's hoping that

7    you're going to have preconceived notions about the evidence,

8    that it's going to impede your ability to be fair and

9    objective to Starbucks Corporation.

10         But I have faith in the jury system.  I trust the

11   oath that you said that you would do in this courtroom, that

12   you would be fair and impartial.  You didn't say it to me.

13   You didn't say it to Ms. Phillips.  You didn't say it to

14   counsel on behalf of Ms. Phillips.  You said it to His Honor,

15   each and every one of you.

16         What we know about implicit bias is that our

17   decision-making improves once we become aware that we may in

18   fact have a preconceived notion.  That's what we know about

19   it.

20         So I'm asking you to confront your biases that you

21   may have.  I'm asking you to look at the objective evidence,

22   not feelings, for or against one side or the other, but the

23   objective, fair and competent evidence.

24         And after you do that, you will learn that in fact

25   that trust had been compromised.  That in fact the morality

 1   had been lost to the organization in which Ms. Phillips was

 2   responsible for.  That's why Mr. Eckensberger came to the

 3   market.  That's why Ms. Johnson came to the market.  That's

 4   why Holly Hylton was replaced by Angela Grass.  It wasn't her

 5   race.

 6              And it's her burden.  She has to prove it.

 7              Evaluate the witnesses as they take the stand as if

 8   they were someone that you could love.  Because that's what's

 9   required.  That's what's required.

10              Thank you.

11              THE COURT:  All right.  First witness?

12              MS. MATTIACCI:  Yes, Your Honor.  The plaintiff calls

13   Paul Pinto as of cross.

14              THE DEPUTY CLERK:  Please state and spell your name.

15              THE WITNESS:  My name is Paul Pinto, P-A-U-L,

16   P-I-N-T-O.

17              (**PAUL PINTO**, PLAINTIFF'S WITNESS, having been duly

18   sworn, testified as follows:)

19              MS. MATTIACCI:  May I proceed, Your Honor?

20              THE COURT:  Yes, you may.

21              MS. MATTIACCI:  Thank you.

22                        DIRECT EXAMINATION

23   BY MS. MATTIACCI:

24   Q.  Mr. Pinto, you worked at Starbucks in the HR capacity as

25   of April and May of 2018.  Correct?

*Pinto - Direct*                                     50

```
 1  A.   I did.

 2  Q.   You've been an HR professional for a long time?

 3  A.   Correct.

 4  Q.   In terms of your background, you even have a labor

 5  relations certificate.  Correct?

 6  A.   Correct.

 7  Q.   And you are very familiar with the laws that protect

 8  against discrimination.  Correct?

 9  A.   Yes.

10  Q.   You're aware that there's a law that protects against

11  discrimination in May of 2018 when the plaintiff was

12  terminated?

13  A.   Yes.

14  Q.   You'd agree with me that laws against discrimination do

15  not just protect black or minority people, they also protect

16  white people as well?

17  A.   Yes.

18  Q.   So a white person cannot be discriminated against or

19  treated differently in the workplace because of the color of

20  their skin?

21  A.   Correct.

22  Q.   You worked at Starbucks for 12 years.  Correct?

23  A.   Close to 13 or 13, I believe.

24  Q.   And Ms. Phillips had already been working at Starbucks

25  for two years when you joined.  Right?
```

 1    A.    That's correct.

 2    Q.    So she came in 2005, and you were in 2007?

 3    A.    Correct.

 4    Q.    In April of 2018, your position was vice president,

 5    partner resources.  Correct?

 6    A.    Correct.  That was a TLA assignment.

 7    Q.    And a TLA assignment meaning that a temporary limited

 8    assignment?

 9    A.    Correct.

10    Q.    Starbucks has these TLAs as opportunities to do some work

11    outside of what the position was before, and then you could

12    also then move on to a different position after the TLA.

13    Correct?

14    A.    One part of it.  It's for other reasons as well.

15    Q.    I'm sorry?

16    A.    I said that's one part of it.  There could be other

17    reasons as well.

18    Q.    Okay.  In your case when you took the TLA position as

19    vice president of partner resources, that was something that

20    you had for a period of time, and then you moved on to another

21    position.  Correct?

22    A.    I did.  Yep.

23    Q.    You didn't leave Starbucks?

24    A.    No.

25    Q.    Starbucks calls their employees "partners."  Correct?

Pinto - Direct                         52

 1  A.   Right.
 2  Q.   And that applies all the way down to a part-time hourly
 3  employee and all the way up?
 4  A.   Correct, yeah.
 5  Q.   So when we and the jury hears the word "partner
 6  resources" during this case, that's the same as human
 7  resources?
 8  A.   That's correct.
 9  Q.   As the vice president of human resources in April and May
10  of 2018, you were in charge of all Starbucks policies.
11  Correct?
12  A.   In charge of all the policies -- could you be a little
13  more specific?  I mean --
14  Q.   From an HR standpoint, making sure that they were being
15  followed.
16  A.   Yes.
17  Q.   Correct?
18  A.   Yes.  The people-related policies.
19  Q.   Okay.  You were not in charge of the Safe and Welcoming
20  policy.  Correct?
21  A.   No.
22  Q.   Now, let's talk about the different levels.
23       Can you see that okay?
24  A.   Yes.
25  Q.   Now, each store of the Starbucks' stores had a store

*Pinto - Direct*                                          53

1    manager.  Right?

2    A.    That's right.

3    Q.    That would be the highest-ranking person in the store?

4    A.    Yes.

5    Q.    Below the store manager would be an assistant store

6    manager?

7    A.    Some.  The layers have changed and evolved over the years

8    but there would be assistant store managers, shift

9    supervisors, yes.

10   Q.    Okay.  And we also have shift supervisors?

11   A.    Right.

12   Q.    And baristas?

13   A.    Barista, yep.

14   Q.    And other helpers or hourly employees that worked in the

15   store?

16   A.    Some stores at the time I believe had café attendants and

17   that would be, you know, individuals that would clean the café

18   that weren't at a barista level yet.

19   Q.    Some were full time, some were part time?

20   A.    Correct, yes.

21   Q.    And then the store manager reports up to a district

22   manager.  Correct?

23   A.    Yes.

24   Q.    And district manager, the shortened version that

25   Starbucks often uses is DM.  Correct?

*Pinto - Direct*                                           54

```
 1   A.    That's correct.
 2   Q.    And then the district manager reports up to the regional
 3   director.  Correct?
 4   A.    Correct.
 5   Q.    And the acronym used is RDO; is that right?
 6   A.    Yes.  RDO or just RD.
 7   Q.    The regional director reported up to the regional vice
 8   president?
 9   A.    Yes.
10   Q.    The regional vice president reported to the divisional
11   senior vice president?
12   A.    Yes.
13   Q.    And divisional senior vice president reported up to the
14   executive vice president.  Correct?
15   A.    Yes.
16   Q.    And then that person would report up to the chief
17   operating officer and group president.  Correct?
18   A.    Yes.
19   Q.    Who then reported to the president and CEO.  Correct?
20   A.    Correct.
21   Q.    In terms of the names on this board just for the record's
22   sake, we have Holly Hylton as the store manager in May -- in
23   the time frame being April and May of 2018?
24   A.    Yes.
25   Q.    And then Paul Sykes was the district manager?
```

*Pinto - Direct*                                              *55*

1    A.   Yes.

2    Q.   And he was black.  Correct?

3    A.   Correct.

4    Q.   Holly Hylton was white?

5    A.   Yes.

6    Q.   Shannon Phillips was the regional director at this time?

7    A.   Yes.

8    Q.   And she was white?

9    A.   Yes.

10   Q.   Camille Hymes was the regional vice president, and she

11   was black?

12   A.   Yes.

13   Q.   Zeta Smith was the divisional senior vice president, and

14   she was black?

15   A.   Yes.

16   Q.   Rossann Williams was the executive vice president, and

17   she was white?

18   A.   Yes.

19   Q.   And Rosalind Brewer was chief operating officer and group

20   president, and she was black?

21   A.   Yes.

22   Q.   And she reported to Kevin Johnson and the president and

23   CEO who was white?

24   A.   Correct.

25   Q.   And that was in this time frame in April and May of 2018,

1  Howard Schultz, who was the founder and the former CEO, he was

2  involved in this situation as well.  Correct?

3  A.   He was present in the market, yes, and involved.

4  Q.   Okay.  When you say "present in the market," physically,

5  and he was also involved in the decision-making that was

6  happening.  Correct?

7  A.   It depends on what decision-making.  He wasn't directly

8  involved with some of the field-level decisions, but from a

9  Starbucks strategic level, yes.

10  Q.   Okay.  Now, you supported Camille Hymes.  Correct?

11  A.   In my prior role, yes.

12  Q.   In April and May of 2018, you were supporting Zeta Smith.

13  Correct?

14  A.   That's correct.

15  Q.   And then you reported up to Jen Frish?

16  A.   Yes.

17  Q.   And what was Jen Frish's title?

18  A.   I believe the title at that time was senior vice

19  president of partner resources.

20  Q.   And below you is Nathalie Cioffi.  Correct?

21  A.   Correct.

22  Q.   And Ms. Cioffi supported Camille Hymes.  Correct?

23  A.   Correct.  I would say she eventually supported Camille

24  Hymes in that market.

25  Q.   What do you mean by that?

1    A.   So maybe it would be helpful if I clarify a little bit.

2         So when I moved into the TLA role, the reason was that my

3    boss, Julie, was going out on a medical leave.  And I believe

4    the timing for that was probably about November or December

5    prior to this time frame.  And we thought it was going to be

6    for a short period of time, so I was doing my role and

7    covering the VP role at the same time for a few months.

8         And then, when we discovered that her medical situation

9    was such that it would be a much longer period, then I moved

10   fully into the VP role and filled the director role in the

11   market as we moved around the markets a bit.

12        So that's why there was about a four- or five-month

13   stretch where it's a little ambiguous.

14   Q.   Okay.  But focusing in on the April/May 2018 time frame,

15   this was the organization as it appeared.  Right?

16   A.   I think that's accurate, yes.

17   Q.   Now you'd agree with me that as of April 12th, the Safe

18   and Welcoming policy was in effect at Starbucks.  Correct?

19   A.   Correct.

20   Q.   And you'd agree with me that the Safe and Welcoming

21   policy came about because there was a history of deaths and

22   overdoses and robberies that were occurring in some stores in

23   urban areas.

24   A.   That's correct.

25   Q.   Correct?

*Pinto - Direct*          58

1   A.   Yes.

2   Q.   And this included the 18th and Spruce store in

3   Philadelphia?

4   A.   To my knowledge, yes.

5   Q.   And with the Safe and Welcoming policy, part of that was

6   that a customer or somebody who came into the store couldn't

7   use the restroom unless they made a purchase. Correct?

8   A.   That was correct. Yeah, I think that was correct. I

9   think there was some iterations of the policy, so I think

10   maybe someone that was leading operations at that time may be

11   a better person to ask for what was actually in effect at that

12   time, but I think that was a component.

13   Q.   And operations was the division that was in charge of

14   creating and instituting the Safe and Welcoming policy.

15   Right?

16   A.   That's right.

17   Q.   And it also included in the 18th and Spruce store and

18   other urban stores that people who came in, they had to make a

19   purchase in order to stay in the store. Correct?

20   A.   Right.

21   Q.   And part of the Safe and Welcoming policy was that if a

22   person continued to stay in the store or insist on using the

23   restroom without making a purchase, that the store manager was

24   to call 911. Correct?

25   A.   I don't believe that that's the direction in the policy.

1    I think that's one option.  But my recollection of the policy

2    is that there should be a conversation with their leader

3    before police are called.

4    Q.   This is part of the Safe and Welcoming policy at that

5    time?

6    A.   I'm not sure.  That's why I said there's been iterations

7    of it, so maybe someone that's closer to the policy at that

8    time would be better to answer it.

9    Q.   Okay.  And ops is the one -- Ms. Shannon Phillips did not

10   create this policy.  Correct?

11   A.   That's right.

12   Q.   She wasn't the one in charge of deploying the policy.

13   Correct?

14   A.   Deploying it?

15   Q.   Sending it out from Seattle and making sure that

16   stores are --

17   A.   No.  And by ops -- maybe there's some confusion as to

18   what I meant by ops.  By ops, I mean the store operations so

19   the leaders in the store:  DM, RD.  That's what I'm referring

20   to in ops, not a department in Seattle somewhere.

21   Q.   Okay.  So you're saying that the DM and the RM, in this

22   case, Shannon Phillips and Paul Sykes, were in charge of

23   creating the Safe and Welcoming policy?

24   A.   No.  Implementing it and knowing the details of it.

25   Q.   Okay.  Implementing it.

 1        But there's a different division in Seattle that was in

 2   charge of actually creating it and deploying it.  Correct?

 3   A.   I think there was probably multiple teams in Seattle that

 4   were involved in it, yeah.  You may be thinking of ops

 5   services which was a function in Seattle, and it was a group

 6   that created basically what stores needed to operate well.

 7   Q.   Okay.  And Ms. Phillips was not in charge of training

 8   people on the policy either.  Right?  That was done by ops

 9   services?

10   A.   That was not done by ops services.  That would have been

11   done in the field, by managers in the field.

12             (Court reporter clarification.)

13             THE WITNESS:  That would have been done in the field,

14   yes.

15   BY MS. MATTIACCI:

16   Q.   What do you mean "in the field"?

17   A.   The stores.  That would have been store-level leadership

18   that was responsible for training on the policy.

19   Q.   Isn't it true that it was Ronda Knight who did the

20   training on the Safe and Welcoming policy for Philadelphia?

21   A.   Possibly.  But Ronda Knight, I believe -- I'm not sure

22   about this.  It might be a better question for Marcus, to be

23   honest with you, but my knowledge of Ronda Knight's

24   involvement in the market was after the April 12th incident,

25   not before.

*Pinto - Direct*                                                   *61*

1   Q.   Okay.  So Ronda Knight is with the P&AP.  Right?

2   A.   That's right.  And I believe she was the P&AP person for

3   the market for a while, so she probably had some involvement

4   in it.  To what extent, I don't know.

5   Q.   Okay.  And P&AP stands for partner and asset protection.

6   Correct?

7   A.   That's right, yep.

8   Q.   And this would be the department of Starbucks that would

9   deal with security issues.  Correct?

10  A.   Yes.

11  Q.   Safety issues for the employees.  Right?

12  A.   Yes.

13  Q.   And Ronda Knight didn't just come into the Philadelphia

14  market with the Safe and Welcoming at the time of the arrest.

15  Correct?  She had been involved in it previous?

16  A.   I believe so.  My involvement with Ronda was when we were

17  all here post the April 12th event.

18  Q.   Okay.  Do you believe that Shannon Phillips was

19  responsible -- excuse me -- was responsible for what happened

20  on April 12, 2018?

21  A.   No.

22  Q.   So Starbucks -- you're not saying that she was fired for

23  what happened on April 12, 2018.  Right?

24  A.   No.

25  Q.   And Paul Sykes wasn't responsible for what happened on

*Pinto - Direct*          62

1   that day.  Correct?

2   A.   No.

3   Q.   And isn't it true that Ms. Hylton followed the Safe and

4   Welcoming policy by calling 911 after they did not leave the

5   store.  Correct?

6   A.   It's probably debatable.  I don't -- I think there were

7   probably other options within the policy.

8   Q.   You were not at the store on April 12, 2018?

9   A.   No.

10  Q.   You were not even in Philadelphia at the time.  Correct?

11  A.   Nope.

12  Q.   And at that time, Ms. Phillips was overseeing about 100

13  stores?

14  A.   That's probably about right.  Somewhere in that vicinity.

15  Q.   Let's take a look at Exhibit 94.

16       MS. MATTIACCI:  I'm sorry, Your Honor, just trying to

17  get it.

18       It is not on the screen for the jury, Your Honor, but

19  it should be on your screen.

20       THE COURT:  I have it, yes.

21       MS. MATTIACCI:  Can you see that?

22       THE COURT:  Yes.

23       MS. MATTIACCI:  Okay.

24       THE COURT:  Just for the record, when you say

25  Exhibit 94, these were all joint exhibits?

*Pinto - Direct*                                          63

```
 1              MS. MATTIACCI:  They are numbered for joint purposes
 2    but not for admissibility, so we're still going to lay the
 3    foundation for admission.
 4              THE COURT:  All right.
 5              MS. MATTIACCI:  But we just numbered our -- so we
 6    didn't have any duplicates.
 7              MR. HARRIS:  Judge, I don't have any objection for
 8    any of the exhibits that have been identified as joint
 9    exhibits to be published immediately to the jury.
10              THE COURT:  All right.
11              MS. MATTIACCI:  I might.
12              So, I was going -- I mean, if he doesn't have any
13    objection to anything I'm doing, then I could just go ahead --
14              THE COURT:  All right.
15              MS. MATTIACCI:  -- but on the reverse, I may not feel
16    that same way.
17              THE COURT:  We'll take them one at a time.
18              MS. MATTIACCI:  Okay.  Thank you, Your Honor.
19              All right.  I'm showing -- so for purposes, Your
20    Honor, of this cross, then I would assume they're all in.
21              Okay.  May I publish for the jury, Your Honor?
22              THE COURT:  Yes.
23              When you say "all in," you mean admitted?
24              MS. MATTIACCI:  Admitted.
25              THE COURT:  Okay.
```

1   BY MS. MATTIACCI:

2   Q.   Okay.  I'm showing you what has been marked as

3   Exhibit 94.  This is an email chain, and let's take a look --

4   let's take a look at this first one here from John Kelly on

5   April 14, 2014 (sic).

6        This is two days after the arrest.  Correct?

7   A.   Correct.

8   Q.   Okay.  And who is John Kelly?

9   A.   I cannot remember his title at the time, but he -- yeah,

10  I can't remember his title, but he was a very senior executive

11  within Starbucks, and the -- Reggie Borges' team reported in

12  to him.

13  Q.   Do you recall his title being global public -- in charge

14  of global public affairs and social impact?

15  A.   That sounds right.

16  Q.   And Reggie Borges, he was in charge of media relations?

17  A.   That's right.

18  Q.   Mr. Kelly, to your knowledge, was out of Seattle.

19  Correct?

20  A.   That's right.

21  Q.   And so when the timestamp on here says 12:05 a.m., that

22  would be on Eastern Time, three hours earlier.  Correct?

23  9:05?

24  A.   Correct.

25  Q.   Okay.  So this would be Friday night, he is saying:  We

Pinto - Direct                                    65

 1   need to get on a call ASAP with the SM and DM --
 2        That's the store manager, Holly, and the district
 3   manager, Paul Sykes.  Correct?
 4   A.   Correct.
 5   Q.   -- and determine exactly -- I think he meant to say "what
 6   happened," but it says:  exactly happened that led to police
 7   being called.  We are trying to manage a potentially major
 8   brand risk here without all the facts.
 9        Reggie, can you please schedule ASAP.  And if it has to
10   be early tomorrow morning, then that's fine, but we all need
11   to have a sense of real urgency here to get a comprehensive
12   clarity on the facts.  Correct?
13   A.   Correct.
14   Q.   And then you are -- sent this email on Saturday morning,
15   early, with the importance:  High, FYI...  Correct?
16   A.   Correct.
17   Q.   So you knew as of this time that there was this issue
18   that was occurring.  Correct?
19   A.   Correct.
20   Q.   The focus for Starbucks at this time was the brand risk
21   that was happening because this was a crisis from a PR
22   standpoint.  Right?
23   A.   Yes, and probably just a crisis in general that needed to
24   be handled.
25   Q.   And there was an investigation that took place on

*Pinto - Direct*                                          66

```
 1  Saturday by P&AP.  Correct?

 2  A.   Not aware of that.

 3  Q.   You're not aware of an investigation?

 4  A.   No.  There may have been.  I was first, I think, fully

 5  aware of the incident on either Saturday night or Sunday

 6  morning.  Actually, it was probably Saturday afternoon.

 7  Q.   Well, when you got this email you became aware of it.

 8  Right?  This was Saturday --

 9  A.   I didn't necessarily read the email when I got it.  It

10  was a Saturday.

11       So the first time I was aware of it was when Camille

12  called me, Saturday.

13  Q.   Okay.  You recall late -- later in Saturday evening, that

14  the CEO sent out a message regarding the event.  Correct?

15  A.   I'm not sure.

16  Q.   Okay.  Let's look at Exhibit 51.  It says:  Message from

17  Kevin.

18       And Kevin being Kevin Johnson, the president and CEO of

19  Starbucks.  Correct?

20  A.   Yes, that's right.

21  Q.   And it says:  By now you may be aware of a disheartening

22  situation in one of our Philadelphia area stores this past

23  Thursday that led to a reprehensible outcome.

24       And this was being distributed out.  Correct?

25  A.   That's right.
```

*Pinto - Direct*                                          67

```
 1   Q.   When I say "out," I mean out to the public.
 2   A.   I don't know if it was to the public or just internally.
 3   Q.   Okay.  Well, it says, Dear Starbucks partners and
 4   customers.
 5   A.   Oh, okay, yes.  It would have been public then.
 6   Q.   And he says, he's writing to convey three things.  The
 7   first one is to:  Once again, express our deepest apologies to
 8   the two men who were arrested.
 9        And he also says:  In the coming days he will be joining
10   the regional vice president Camille Hymes, who is on the
11   ground in Philadelphia to speak with partners.
12        And Camille Hymes was Ms. Phillips' boss.  Correct?
13   A.   That's right.
14   Q.   And he says here on Saturday night:  Regretfully, our
15   practices and training led to a bad outcome.  The basis for
16   the call to the Philadelphia Police Department was wrong.  Our
17   store manager never intended for these men to be arrested, and
18   this should never have escalated as it did.  Correct?
19   A.   Correct.
20   Q.   And he also did a video, Kevin Johnson did a video
21   presentation or posting on the website where he said that the
22   blame would be misplaced on the store manager?
23   A.   I don't recall that video.  I'm not sure.  It's five
24   years, so...
25   Q.   Okay.  At this point, the tweet had gone out two days
```

*Pinto - Direct*                                      68

```
 1  earlier of the 46-second clip.  Right?

 2  A.   That's right.

 3  Q.   And this had lit a firestorm, would you agree with me?

 4  A.   Yes, yes.

 5  Q.   It went viral across -- internationally even?

 6  A.   Yes.

 7  Q.   And it was very bad press for Starbucks?

 8  A.   Absolutely.

 9  Q.   Did you hear anyone from Starbucks say that Holly Hylton

10  was a racist?

11  A.   No, not that I recall.

12  Q.   And the people that knew her closely and worked with her,

13  didn't believe that she was a racist.  Correct?

14       MR. HARRIS:  Objection.  I don't know that he can

15  testify to that, Judge.

16       THE COURT:  Sustained.

17  BY MS. MATTIACCI:

18  Q.   She wasn't fired due to a conclusion that she had engaged

19  in race discrimination.  Correct?

20  A.   Correct.

21  Q.   You'd agree with me that internally, as of this weekend,

22  the Friday, Saturday and Sunday that internally there was

23  support for Ms. Hylton.  Correct?

24  A.   Yes.

25  Q.   And there was concern for her safety.  Correct?
```

Pinto - Direct                                          69

```
 1   A.   Yes.

 2   Q.   She was getting death threats.  Correct?

 3   A.   Correct.

 4   Q.   And the decision was made to move her out of the

 5   Philadelphia region.  Correct?

 6   A.   Not entirely.  She -- with my involvement -- do you want

 7   me to explain it?

 8   Q.   Well, I think I can lead you through --

 9   A.   Okay.

10   Q.   -- the fact that she was removed from the job and sent

11   home for a period of time.  Correct?

12   A.   Correct.

13   Q.   And then she was then, Monday or Tuesday, relieved of her

14   employment at Starbucks.  Correct?

15   A.   I can't remember the exact day, but soon after was

16   relieved of her employment, yes.  We separated her.

17   Q.   And there was no conclusion -- her separation wasn't due

18   to her engaging in serious misconduct or anything.  Correct?

19   A.   No.

20   Q.   As part of being exited from Starbucks, she had to sign a

21   nondisclosure agreement.  Correct?

22   A.   She did.

23   Q.   And you recall that --

24   A.   She didn't have to.  She signed one.

25   Q.   And she signed one over burgers and fries in Roz's hotel
```

*Pinto - Direct*                                          70

1   room.  Correct?

2   A.   No, that's not correct.  We did have burgers and fries

3   with Roz.  I was in the room.  But that's not when she signed.

4   Q.   Was it around that same day?

5   A.   It was around that time.  I'm not sure it was that same

6   day.

7   Q.   And you were talking about this with Roz.

8        When you say Roz, you mean Rossann Williams.  Correct?

9   A.   That's right.  No, no.  Rossann Brewer.

10  Q.   Oh, Rosalind Brewer?

11  A.   Rosalind Brewer, yes.

12  Q.   So you were in the hotel room with Rosalind Brewer?

13  A.   Correct.

14  Q.   Around the time that she signed the NDA and talking about

15  it over burgers and fries?

16  A.   It was within a day or so or two of that, yes.

17  Q.   You then came to Philadelphia yourself.  Correct?

18  A.   I came that Sunday.

19  Q.   So you were there on Sunday.  And the termination would

20  have been either Monday or Tuesday.  Right?

21  A.   I would have to see the document to verify that.  I can't

22  recall which date the termination was.

23  Q.   So you came into town and one of these days was when you

24  were in the hotel room with Rosalind Brewer.  Correct?

25  A.   Probably.  I think that's accurate.

*Pinto - Direct*                    71

```
 1   Q.   Do you recall on Tuesday is when Starbucks announced that
 2   it was going to shut down its 8,000 stores in order to have
 3   implicit bias training for everybody?
 4   A.   Do I recall which day?  Could you --
 5   Q.   Yeah.
 6   A.   No, I don't.
 7   Q.   Do you recall it being in the beginning of the week when
 8   you were there?
 9   A.   I don't.  And I'm actually rethinking that timeline.  The
10   conversation with Rosalind Brewer in the hotel with Holly
11   could have been later in the week.
12        Because from my recollection, we first wanted to make
13   sure that Holly was safe and felt safe and didn't want her to
14   come into the store while the protests were going on, because
15   she was getting threats and calls.
16        So from my recollection, I think we remember -- I
17   remember asking her to, you know, just stay home and we would
18   pay her for a few days until we figured out what was going on.
19   So it could have been later in that week.  I don't know -- I
20   don't think it was that jam-packed.
21   Q.   Okay.  Well, we'll get to these days.
22   A.   Okay.
23   Q.   You'd agree with me when you came in on Sunday, you went
24   over to the 18th and Spruce store location.  Right?
25   A.   Yes.
```

1    Q.   You described it as it was a little nuts there?

2    A.   Absolutely.

3    Q.   There was a lot of people and a lot of protesters?

4    A.   Yes.

5    Q.   And then in this week, the beginning of the week, all the

6    bigwigs from Philly -- or from Seattle were flying into

7    Philly.  Correct?

8    A.   Yes.

9    Q.   Let's take a look at exhibit -- okay.  Showing you

10   Exhibit 53.  This is an email that you received Sunday night

11   on the 15th from Ms. Hymes to you.  And it attaches a

12   schedule.

13        And if we look at the schedule, this is the CEO's

14   schedule that week.  Correct?

15   A.   It looks like it, yes.

16   Q.   So on Sunday, he's scheduled to have a call with the

17   mayor's police chief, with lawyers.  He's then going to film a

18   KJ Workplace Live newsroom video, and that's the video we were

19   talking about.  Correct?

20   A.   Yes.

21   Q.   And then he's going to be interviewed with Joe DiStefano

22   of Philadelphia Inquirer and philly.com?

23   A.   Yeah, that looks right.

24   Q.   And then they were determining when to publish this

25   video.  He then departs from Seattle and arrives to

*Pinto - Direct* 73

1  Philadelphia on Sunday.  Correct?

2  A.   It looks that way, yes.

3  Q.   And then it says there's going to be a debriefing with

4  the leadership team in Philadelphia, Roz, Vivek and Rossann.

5  Correct?

6  A.   That's correct.

7  Q.   And Vivek is also a high-ranking executive at Starbucks

8  at this time?

9  A.   Vivek, yes.

10  Q.   Then Monday the 16th there's a Starbucks meeting at the

11  store.

12      And this is Kevin again, Roz and Rossann at the top.  All

13  meeting.  It's Monday morning, 7:00 to 8:00, Good Morning

14  America, it says Kevin.

15      And then to be determined, Wake Up With WURD - Philly's

16  most important black radio station.  Correct?

17  A.   That's right.

18  Q.   His next thing on the agenda was on Monday:  Meeting with

19  others in the community?  Mayor?  Police commissioner?

20  Meeting with men.  It looks like those were possible

21  appointments?

22  A.   Yeah.  It looks that way.  This looks like it probably

23  would have been an early iteration.  We would have received it

24  probably just as a heads-up to know where the leaders are in

25  the market.

*Pinto - Direct*         74

1  Q.   Okay.  Because he didn't appear on Good Morning America

2  at that time.  Correct?

3  A.   Excuse me?

4  Q.   The CEO did not go on Good Morning America at that time?

5  A.   I'm not sure.

6  Q.   Do you recall him going and being interviewed by Gayle

7  King later in the week?

8  A.   I do recall that, yes.

9  Q.   That was something that was being discussed obviously

10 between the people at the higher-ups, including yourself?

11 A.   It would not have included me, it would have been above

12 my pay grade.

13 Q.   Well, I don't mean you directly, but I just mean in terms

14 of conversation in the workplace and what was happening at

15 Starbucks at the time, the fact that he was being interviewed

16 on Gayle King regarding this event.

17 A.   I wouldn't have been involved in those conversations, I

18 would have been more focused on the market and what was

19 impacting the market, not necessarily the more strategic

20 Starbucks events that were being planned.

21 Q.   Okay.  There's -- we were talking -- beginning of this

22 schedule was about Kevin Johnson, but now we also have here:

23 Howard departs for Philly.  Howard meaning Howard Schultz.

24 Correct?

25 A.   Yes.

*Pinto - Direct*                                          75

```
 1   Q.   And then, there's on the schedule Workplace Live
 2   broadcast, and it also involves -- it indicates Kevin, Roz,
 3   Vivek and Rossann in Philly.  Correct?
 4   A.   That's right.
 5        And that all happened Tuesday?
 6   Q.   This was all the plan for Monday and Tuesday.
 7   A.   Okay.
 8   Q.   You recall you flew out of Philly and back home on the
 9   19th.  Correct?
10   A.   Not specifically, but that sounds about right.
11   Q.   Do you recall 17th and 18th, we have the Gayle King
12   interview happening and also the two men went on Good Morning
13   America.  Correct?
14   A.   I recall that those events occurred.  I'm not sure
15   specifically if it was the 18th.
16   Q.   Now, when you flew back on the 19th of April, there was
17   no indication at all that Shannon Phillips was going to lose
18   her job.  Correct?
19   A.   Correct.
20   Q.   And you hadn't seen or heard anything that she did that
21   would justify her termination.  Correct?
22   A.   Not at that time.
23   Q.   You'd agree with me that in the wake of this, Starbucks
24   made a significant change in connection with the bathroom and
25   café use policy?
```

1    A.    I think a change happened.  I don't remember how soon

2    after that was.  It was during the time of crisis.  That, I

3    know.

4    Q.    Okay.  So during the time of crisis, they made a change

5    and were not using the Safe and Welcoming policy anymore?

6    A.    Correct.

7    Q.    And instead, they decided to let everybody come into and

8    sit at the back -- use the bathroom or sit in the café without

9    making a purchase, no matter what?

10   A.    Correct.

11   Q.    Now, you'd agree with me that the -- the protests were

12   continuing at Starbucks?

13   A.    Yes.

14   Q.    And through the following week as well, there continued

15   to be protests happening.  Right?

16   A.    Yes.

17   Q.    Starbucks instituted a tap-out plan.  Correct?  Do you

18   recall that?

19   A.    Yeah.  It wasn't a formal thing, but it was definitely

20   leaders were stretched and fatigued and just needed to take a

21   break, so we made it clear that when they needed it, they

22   should say something and we would cover it.

23   Q.    Okay.  Let's take a look at 135.

24         This is as of -- this is a forward, actually, to you from

25   Camille Hymes on Friday the 20th.

1    A.   Yep.

2    Q.   And it says:  We just instituted a new practice for

3    mental health and well-being during an extended crisis, with

4    smiley face emoji.  Thanks for your leadership this morning

5    and challenging us to, quote, "tap out."

6         And the forwarded message comes from Larry Wang.  And he

7    says to a whole group of folks, including Ms. Hymes,

8    Ms. Phillips, Ms. Knight from P&AP:

9         Thank you all again for your participation on today's

10   call, attached are notes from both yesterday and today's call

11   regarding potential protests in Philadelphia.

12        I have also attached a standard operating procedure to

13   protect partner well-being during times of crisis that we have

14   just enacted here in the Mid-Atlantic.

15        Based on the procedure, we will have different leaders

16   covering activities, some effective immediately.

17        And then the tap-out plan as of that Friday was Ms. Hymes

18   would be tapped out for two days, Ms. Phillips would be tapped

19   out for that weekend, and it also talked about Mr. Scott and

20   Mr. Sykes.

21        And you were a recipient of this email.  Correct?

22   A.   Yes.

23   Q.   At the top, Zeta Smith says:  Love it?

24   A.   Yes.

25   Q.   As of the 20th, Ms. Phillips hadn't done anything to

1  justify her being terminated.  Correct?

2  A.   No.

3       Well, can I go back to that answer?

4       There were certainly behaviors that were starting to

5  emerge through the protests and crisis that were concerning.

6  Q.   So you're saying the first week, as of Friday the 20th,

7  there was -- conduct of hers that would justify terminating

8  her?

9  A.   Leading to it, yes.

10 Q.   Mr. Pinto, isn't it true that around this time, you had,

11 and, in fact, for a week after this, supported Ms. Phillips

12 getting a TLA role that was a leadership community position?

13 A.   She was a candidate for it.

14 Q.   And you supported that.  Correct?

15 A.   I did, yes.

16 Q.   And you thought that she was going to be great in that

17 role?

18 A.   I thought she would be, yes.

19 Q.   So even though you're trying to say on Friday the 20th

20 there were some behaviors leading to it, you were in full

21 support that she would be in this community leadership role?

22 A.   Yes.

23 Q.   And in terms of Starbucks, there's a progressive

24 discipline policy.  Correct?

25 A.   Yes.  Guideline.

*Pinto - Direct*                                         79

1   Q.   And you'd agree with me that if there's any sort of

2   performance issue, the first step would be to have a

3   conversation with the person, a coaching conversation.  Right?

4   A.   Normally, yes.

5   Q.   And that coaching conversation should be documented.

6   Correct?

7   A.   Yes.  Depends on the level of coaching conversation.

8   Oftentimes, it's just a coaching conversation that's not

9   documented.

10  Q.   Okay.  So if it's not a big deal, it's something that you

11  just do verbally, you don't have to document it?

12  A.   Correct, yeah.

13  Q.   And then, the next step would be to do a written warning.

14  Correct?

15  A.   It depends, but yes.

16  Q.   And then maybe another written warning.  Correct?

17  A.   Again, it depends, but yes.

18  Q.   And then a suspension.  Correct?

19  A.   Rarely.

20  Q.   Suspensions rarely occur.  Right?

21  A.   Correct.  Our belief at the time was that if you are

22  ready to suspend someone, you should be ready to terminate

23  someone because suspensions are just punitive and it doesn't

24  really lead to corrective behavior.

25  Q.   Okay.  So that's why they shouldn't be used.  They don't

*Pinto - Direct* 80

```
 1   really lead to corrective behavior.  Right?

 2   A.    (Witness nods head.)

 3   Q.    And then the next step then would be termination?

 4   A.    Correct.  I would say that at any given point, depending

 5   on the seriousness of the situation or issue, this could

 6   either be followed or not followed.

 7   Q.    In Ms. Phillips' case, this was not followed at all, was

 8   it?

 9   A.    No.  Pretty rare that at her level this type of process

10   would be followed.

11   Q.    Isn't it true that performance improvement plans were

12   utilized with people that were regional directors?

13   A.    Yes.

14   Q.    Okay.  So it was utilized?

15   A.    Performance improvement plan is not progressive

16   discipline.

17   Q.    Okay.  So now you're saying there's another thing for

18   performance improvement plan.

19         And performance improvement plans were used with regional

20   directors?

21   A.    Yes.

22   Q.    There was no performance improvement plan utilized with

23   Ms. Phillips.  Correct?

24   A.    No.

25   Q.    It went straight to termination?
```

*Pinto - Direct*                                            *81*

```
 1   A.   Correct.
 2   Q.   There's not a single document of anything that
 3   Ms. Phillips did that justifies why she terminated that was
 4   ever sent to her, given to her, or memorialized about her
 5   until the day she was terminated.  Correct?
 6   A.   I'm not sure of that.
 7   Q.   You didn't see anything, did you?
 8   A.   I don't have a recollection, but I'm not sure.  That
 9   would have been something that would have come from Camille.
10   Q.   Okay.  But you were the human resources person that was
11   supporting Camille.  Correct?
12   A.   That's right.
13   Q.   And part of your job was to ensure that there were no
14   decisions that were made that were discriminatory in any way.
15   Correct?
16   A.   Correct.
17   Q.   And to make sure that the termination decisions are
18   justified.  Correct?
19   A.   Correct.
20   Q.   And you didn't do anything to investigate, make sure, see
21   over whether this was a termination that was justifiable.
22   Correct?
23   A.   Not correct.
24   Q.   The only thing you did was talk to Camille.  Correct?
25   A.   I talked to several people, not just Camille.
```

*United States District Court*

*Pinto - Direct*                                              *82*

 1   Q.   Wouldn't you agree with me as a human resources

 2   professional that it's important to put things and document

 3   them in writing?  Correct?

 4   A.   Typically.

 5   Q.   So if, in fact, there was a performance issue, you would

 6   agree with me that something should be sent to the person

 7   before they're terminated outlining whatever alleged

 8   performance issues there are.  Correct?

 9   A.   Not entirely.  I don't completely agree with that.

10   Q.   So you're saying that as a human resources professional,

11   it's good practice to just terminate regional directors

12   without going through any progressive discipline, without

13   giving them a performance improvement plan and just terminate

14   them?

15   A.   That's not what I said either.

16   Q.   Well, where is the document?  Where is the performance

17   improvement plan for Ms. Phillips?

18   A.   There isn't.

19   Q.   Where is the written warning that she was given that her

20   job was sometime -- somewhere in jeopardy?

21   A.   There isn't.  The conversations were had.

22   Q.   And where is the documentation of these conversations

23   even happening?

24   A.   Not sure if they exist or not.  Like I said, Camille may

25   have notes.  Camille may have communications that she sent to

*Pinto - Direct*                                      *83*

```
 1   Shannon, but in terms of what you're thinking of a document, a

 2   formal presentation of something, to Shannon, that does not

 3   exist.

 4   Q.  And you as the HR person, you don't have any of that.

 5   Right?

 6   A.  I don't.

 7   Q.  Did you consider Ms. Phillips a field employee?

 8   A.  Yes.

 9   Q.  And isn't it true that progressive disciplinary policy

10   applied to field employees?

11   A.  That policy is written for store managers that have a

12   guideline on how to handle performance issues with store-level

13   employees.  So, you know, as you get up in more senior

14   management ranks, it's a different type of conversation.

15   Q.  Okay.  Do you recall having your deposition taken?

16   A.  I do.

17          MS. MATTIACCI:  May I approach, Your Honor?

18          THE COURT:  Yes.

19   BY MS. MATTIACCI:

20   Q.  Mr. Pinto, I've handed you your deposition that was taken

21   on April 1, 2021.

22       Do you recall that before your deposition was taken, you

23   took an oath.  Correct?

24   A.  Yes.

25   Q.  And that oath was to tell the true?
```

```
 1   A.   Yes.

 2   Q.   Correct?

 3        Let me direct your attention to page 60, line 24.

 4   A.   I can't see the page number on this.

 5   Q.   It's next to page 58 --

 6   A.   Okay.

 7   Q.   -- on the bottom.

 8        Line 24, where it says:  Did Starbucks ever use a

 9   progressive discipline policy?

10        Do you see that?

11   A.   Yes.

12   Q.   Okay.  The question to you was:  Did Starbucks ever use a

13   progressive discipline policy in the time that you were

14   employed there?

15        Answer:  Yes.

16        Question:  And when did Starbucks stop using a

17   progressive discipline policy, if you know?

18        Answer:  Well, let me revise my answer to that.

19        So, you know, partners did receive discipline processes.

20   So you would get warnings.  You would get written warnings.

21   Very rarely there was suspensions.  And obviously, you know,

22   if it was a first time a performance concern was discussed

23   with someone, as long as it wasn't unsafe or brand damaging or

24   really serious, the recommendation from legal and partner

25   resources would have always been to start with an initial
```

```
 1   conversation -- initial documentation like a record of

 2   conversation.  You could call that a warning.

 3       So to my knowledge, that thinking is still in place.

 4   Whatever form that takes could vary.

 5       Question:  Okay.  And when you were referring -- so

 6   "partners" is the term that Starbucks uses for all employees.

 7   Correct?

 8       And you say:  That's right.

 9       So even though you were at a relatively high level in the

10   company, you would have been referred to as a partner in the

11   company vernacular.  Correct?

12       That's right.

13       And then you say:  And so the written warning that you

14   just described for partners, is there a difference of how the

15   warning policy applies to store-based employees and

16   non-store-based employees?

17       And then continuing down, you say:  So you agree Shannon

18   Phillips' last position at Starbucks was regional director and

19   that position is considered a store-based position or is it

20   categorized in some other way?

21       And you say:  Field.  Correct?

22   A.   Correct.

23   Q.   So you said that the progressive disciplinary policy

24   applies to field positions.  Correct?

25   A.   Yes.  I also said above:  I think there could be, you
```

*Pinto - Direct*                                                86

```
 1   know, if you're an executive level, there's a certain
 2   expectation of performance and you certainly are not going
 3   through the same thing that you would go through with a
 4   16-year-old barista.
 5   Q.   Right.  Correct.  So there's a 16-year-old barista policy
 6   and you might have a higher level of conversation and
 7   documentation for somebody that's higher level?
 8   A.   That's right.
 9   Q.   Okay.
10   A.   Or a different type of approach to discipline or
11   leadership concerns.
12   Q.   But there was none of that done with Ms. Phillips.
13   Correct?
14   A.   There were absolutely conversations had with
15   Ms. Phillips.
16   Q.   Okay.  Undocumented conversations.  That's all?
17   A.   Like I said, I'm not sure if Camille documented any of
18   that.
19   Q.   As far as you know, some undocumented conversations.
20   Correct?
21   A.   Like I said, I'm not sure if Camille documented any of
22   them.
23   Q.   I understand.  I just mean to your knowledge.
24   A.   To my knowledge, I haven't seen it, yes.
25   Q.   You'd agree with me that May 2nd, when Starbucks reached
```

*Pinto - Direct*                                          *87*

```
 1   a settlement with the two men for an undisclosed amount of
 2   money, that that was a big event for Starbucks.  Correct?
 3   A.   It was significant, yes.
 4   Q.   And it was something that everybody was aware of at the
 5   highest levels of the company.  Correct?
 6   A.   Yes.
 7   Q.   There were announcements about it.  Correct?
 8   A.   I believe so, yes.  Yep.
 9   Q.   And the men went back on Good Morning America with Robin
10   Roberts.  Correct?
11   A.   Yes.
12   Q.   And there was additional press, there was additional
13   scrutiny that was happening during that time on Starbucks.
14   Correct?
15   A.   Yes.  Fair.
16   Q.   And in that time frame, Ms. Brewer and Mr. Schultz went
17   to Howard University and spoke with them.  Correct?
18   A.   I actually didn't recall that until you mentioned it, but
19   I think that's probably accurate.
20         MR. HARRIS:  Objection.  I think it was Morehouse
21   College, Judge.
22         MS. MATTIACCI:  It was Morehouse.  What did I say?
23         MR. HARRIS:  Howard.
24         MS. MATTIACCI:  Sorry.
25   BY MS. MATTIACCI:
```

*Pinto - Direct*                                                    *88*

```
 1   Q.   Morehouse College.  Correct?

 2   A.   Correct.

 3   Q.   This was all information that you -- and everybody was

 4   aware of at the highest levels.  Correct?  As far as you know?

 5   A.   Can I ask --

 6   Q.   I'll reask that question.

 7   A.   All right.

 8   Q.   You're aware that former Attorney General Eric Holder was

 9   being brought in to be a speaker.  Correct?

10   A.   I'm aware that he spoke.  I don't know if I was aware

11   that he was being brought in in advance.

12   Q.   You recall that the rapper Common was brought in to do a

13   video.  Correct?

14   A.   Yes.

15   Q.   And that there was a plan to shut down 8,000 of the

16   stores to do the implicit bias training?

17   A.   Yes.

18   Q.   And that in fact did happen.  Correct?

19   A.   Yes.

20   Q.   You're aware that as of May 2nd, the CEO made a pledge to

21   make sure that actions were taken in response to what had

22   happened on April 12th.  Correct?

23   A.   I don't recall specifically what the commitment was.

24   Q.   You don't think he was going to take any action?

25   A.   Oh, absolutely, yeah.
```

*Pinto - Direct*                                        *89*

```
 1   Q.   Okay.  So you'd agree with me that the CEO's plan was to

 2   take action.  That was your understanding?

 3   A.   Yes.

 4            THE COURT:  I think this would be a good time for us

 5   to take our midmorning break.

 6            MS. MATTIACCI:  Yes.  Of course, Your Honor.

 7            THE COURT:  Let's take a five-minute recess.

 8            And members of the jury, just remember my words of

 9   caution, don't discuss the case among yourself.

10            All right.  We'll stand in recess.

11            (Jury out.)

12            (Recess at 11:03 a.m. until 11:18 a.m.)

13            THE DEPUTY CLERK:  All rise.  Court is now in

14   session.

15            (Jury in.)

16            THE COURT:  Please be seated.

17            You may continue, Counsel.

18            MS. MATTIACCI:  Thank you, Your Honor.

19   BY MS. MATTIACCI:

20   Q.   Mr. Pinto, Holly Hylton, after she was terminated, was

21   replaced by Angela Grass.  Correct?

22   A.   Correct.

23   Q.   And Angela Grass is white?

24   A.   Correct.

25   Q.   And at the time Angela Grass came in as store manager of
```

*Pinto - Direct*                                                90

```
 1   18th and Spruce.  Correct?

 2   A.   Correct.

 3   Q.   Reporting up to Ms. Phillips.  Correct?

 4   A.   Through Paul Sykes.

 5   Q.   So she would go Angela to Paul to Shannon?

 6   A.   Correct.

 7   Q.   And isn't it true that Shannon Phillips made the decision

 8   to put Angela Grass in that position?

 9   A.   I don't know.

10   Q.   You don't know who made the decision?

11   A.   I don't.

12   Q.   Isn't it normally the district manager's job to decide

13   who the store managers are?

14   A.   Yes.

15   Q.   And so the normal course, this would be Shannon Phillips'

16   decision.  Correct?

17   A.   The district manager would have been Paul, not Shannon.

18   Q.   The regional manager, I mean.

19   A.   They would be involved, but the hiring manager, it's

20   typically their decision.

21   Q.   Okay.  So both Shannon and Paul would have made the

22   decision to put Angela in?

23   A.   I'm sure at that point, especially for that store, there

24   would have been lots of conversation as to who the right

25   leader would be.
```

```
 1  Q.   And Ms. Phillips agreed that it was Angela Grass to be
 2  the right leader.  Correct?
 3  A.   I assume so.
 4  Q.   Now, Starbucks is saying that they had to terminate
 5  Ms. Phillips' employment because she was physically and
 6  emotionally absent.
 7           MR. HARRIS:  Your Honor, objection.
 8           MS. MATTIACCI:  Correct?
 9           MR. HARRIS:  The foundation hasn't been laid for that
10  statement.
11           THE COURT:  Well --
12           MS. MATTIACCI:  It's cross.
13           THE COURT:  I'll sustain the objection.  You can ask
14  the witness if he knows.
15           MS. MATTIACCI:  Okay.
16  BY MS. MATTIACCI:
17  Q.   Do you know if Starbucks is saying that she was
18  physically and emotionally absent?
19  A.   No.  Where does that come from?
20  Q.   Well, so you don't agree with that?  You don't believe
21  that she was physically and emotionally absent?
22  A.   I would say there was a categorical lack of leadership
23  and absent was part of that.  And certainly physically absent
24  when she needed to be present.  But I would feel odd about
25  saying emotionally absent.
```

Pinto - Direct                                    92

```
 1   Q.   Categorical lack of leadership?

 2   A.   Correct.

 3   Q.   And what else?  Anything else?

 4   A.   Absence.

 5   Q.   Absence, physical absence?

 6   A.   Yes.

 7   Q.   Anything else?

 8   A.   I think that's a good summary.

 9   Q.   Okay.  And you don't -- you personally as the HR person

10   in charge of this region at this time do not have any

11   documentation of any categorical lack of leadership or

12   physical absence.  Correct?

13   A.   Again, it's the same answer.  There might be

14   documentation from Camille to Shannon or conversations that

15   were had, but there's no summary document.

16   Q.   Before the break, we were talking about what happened on

17   May 2nd with the settlement with the two gentlemen and all the

18   publicity that came with that.

19        You'd agree with me that two days later, you became aware

20   that the high-ups at Starbucks, including Ms. Smith, had

21   engaged legal to put together a release and nondisclosure

22   agreement for Ms. Phillips.  Correct?

23   A.   It was about that time, yeah, that sounds about right.  I

24   think there's lots of communication and emails that would

25   highlight that.
```

*Pinto - Direct*                                              *93*

```
 1    Q.   Let's take a look at Exhibit 12.  I'm going to direct the
 2    attention to start at Bates stamps 5781.
 3         These are text messages between Nathalie Cioffi, who was
 4    the HR person that reported to you, and you.  Correct?
 5    A.   Correct.
 6    Q.   And the date on these is 5/4/2018.  Correct?
 7    A.   Correct.
 8    Q.   And the top message says:  Shannon's departure, have you
 9    discussed package.  Zeta was asking.
10         Do you see that?
11    A.   Yes.
12    Q.   And then you responded:  No, we have not.  Camille had a
13    convo with her about what she wants to do.  I have not been
14    involved yet.  Find out from Camille.  Correct?
15    A.   Correct.
16    Q.   And then Nathalie says:  Desire for accelerated process
17    with you next week.  Appetite for package.  Correct?
18    A.   Correct.
19    Q.   And you respond:  From Shannon?  Correct?
20    A.   Correct.
21    Q.   And Nathalie says:  No.  Give me a call later this
22    afternoon.  Correct?
23    A.   Correct.
24    Q.   So Shannon did not want to leave Starbucks.  Correct?
25    A.   Correct.
```

```
 1   Q.   And the appetite for a package was coming from Zeta and
 2   those above her.  Correct?
 3   A.   Camille and Zeta probably had some influence as well,
 4   yes.
 5   Q.   Okay.  And they wanted her to leave.  Correct?
 6   A.   Correct.
 7   Q.   You had not been involved up until this point?
 8   A.   In the decision for a package?
 9   Q.   Yes.
10   A.   I had been involved in conversations about Shannon's
11   leadership.
12   Q.   But no conversations about her actual termination at this
13   point.  Correct?
14   A.   I'm not sure that that would be accurate.  I'm sure that
15   we had -- with everything going on with -- in the market and
16   what the market needed and Shannon's performance, I am sure
17   that there would have been conversations in the mix already
18   prior to this date.
19   Q.   When did you have those conversations?
20   A.   It would have been sometime between that first week of
21   store protests and this date.
22   Q.   So you're saying back from the first week, which is
23   May -- April 12th, that there was talk about terminating
24   Ms. Phillips?
25   A.   I wouldn't say April 12th, because that was the date of
```

1    the event.

2    Q.   Okay.

3    A.   So I would say concerns about her leadership started to

4    emerge when there was the crisis and protests going on in the

5    store.  And her behavior and support of what the market needed

6    was eroding.  And then it got heightened as we pulled in

7    leaders from the other regions to come and help support.

8         And her leadership was not where it needed to be, so some

9    of those concerns started to be discussed.

10   Q.   What were her behaviors during these protests?

11   A.   So sometimes just not showing up.  There were -- you

12   know, her boss, her boss's boss, and her boss's boss and me

13   and support system were in the store and in the market, and

14   she knew events were going to be taking place, and she would

15   just be several hours late or just not even come.

16        And there were very odd behaviors where she wasn't taking

17   a leadership role, you know, she was essentially the general

18   manager of the market in crisis, and she was waiting for

19   everybody else to sort of tell her what to do.  There wasn't a

20   leadership presence in the market.  And partners were in

21   crisis.  There was a lot of tension, and they weren't really

22   getting the full leadership voice that was needed.

23   Q.   You personally observed this?

24   A.   I did.

25   Q.   And is there an email to her at any point in time talking

*Pinto - Direct*                                      96

```
 1  about these odd behaviors or the absences that you're talking

 2  about?

 3  A.   Conversations, yes.

 4  Q.   I'm asking emails?

 5  A.   No.

 6  Q.   Is there a single email to her about anything that you

 7  just talked about?

 8  A.   Like I said, it would have come from her direct leader

 9  which was Camille.  It would not have come from me.

10  Q.   I am asking you:  Are you aware, sitting here today --

11  A.   No.

12  Q.   Let me just finish.

13  A.   Okay.

14  Q.   Are you aware, sitting here today, of any email

15  whatsoever to Shannon Phillips describing the behaviors that

16  you just talked about?

17  A.   I am not aware of anything to Shannon.

18  Q.   Are you aware of any email, text message, internal note

19  amongst yourselves talking about these leadership behaviors

20  that she has to be terminated for?

21  A.   Amongst ourselves there would have absolutely been emails

22  and text messages.

23  Q.   There's emails and text messages prior to this time

24  saying that she has to be terminated?

25  A.   I'm sure there would have been about concerns, yeah.
```

Pinto - Direct                                    97

1   Q.   Okay.  Did you produce any of those?

2   A.   I handed my cell phone and laptop over, whatever was on

3   that.

4   Q.   Let me ask you about -- reminds me of performance

5   reviews.  Starbucks does performance reviews.  Correct?

6   A.   No.

7   Q.   Let me take you back to 2018.

8   A.   Okay.

9   Q.   At 2018, Starbucks did performance reviews.  Correct?

10  A.   I don't think we did then.  It was either -- I think we

11  stopped probably, I would imagine, like maybe about two years

12  before that.

13  Q.   So you're saying in --

14  A.   Or maybe one or -- maybe one year before that, we ended

15  performance reviews.  We went more towards quarterly

16  conversations.

17  Q.   Okay.  So you're saying in 2017, Starbucks stopped doing

18  performance reviews?

19  A.   Again, I'm not 100 percent accurate on the time that we

20  stopped, but it was right about that time.

21  Q.   They were written performance reviews.  Correct?

22  A.   They were when they were being done, yes.

23  Q.   Okay.  So she would have written performance reviews for

24  2015, 2016, 2017.  Correct?

25  A.   She would have had them when we did them, yes.

*Pinto - Direct*          98

```
 1  Q.   Okay.  Have you seen any of those performance reviews as
 2  part of this case?
 3  A.   No.
 4  Q.   Do you know why they were not produced as part of this
 5  case?
 6          MR. HARRIS:  Objection, Judge.
 7          THE COURT:  Overruled.
 8          THE WITNESS:  I don't know that they weren't
 9  produced, so, no, I don't know why.
10  BY MS. MATTIACCI:
11  Q.   How about in 2018, you're saying that everything now
12  turned to verbal in Starbucks land?
13  A.    It was a forward-looking conversation, and so it was
14  quarterly conversations, and, you know, essentially, as an
15  organization, we agreed that the performance appraisal cycle
16  was an enormous waste of time.  Nobody liked getting them,
17  nobody liked doing them, and it wasn't a productive
18  conversation, so we shifted to forward-looking conversations
19  about what goals did an individual have for the future, what
20  development areas they wanted to focus on, and the intent was
21  for the leader and the direct report to capture those
22  commitments.  And that was the direction of performance
23  evaluations moving forward.
24  Q.   But if there was a performance issue that needed to be
25  addressed, that would be something that would be included in a
```

1  performance improvement plan or a written warning.  Correct?

2  A.   Or conversations, coaching conversations.

3  Q.   Okay.  And you're saying that there were some internal

4  emails or text messages amongst yourselves stating that

5  Ms. Phillips would need to be terminated.  Correct?

6  A.   I'm not -- there's a possibility that they exist.  If

7  they exist, they would have been on my phone or my computer,

8  but there were absolutely conversations between us about

9  concerns that were emerging and the leadership that was

10  required in that market moving forward.

11      It was also during that same time about that role, that

12  community role that you asked me about, that we were -- would

13  be supportive of her moving into that role if that were an

14  option.

15  Q.   Right.  And that community role was an option -- not an

16  option, but it was something that was in play in which she was

17  being supported for up until May 2nd.  Correct?

18      Isn't that correct?

19  A.   I'm not sure -- so we weren't the deciders of whether or

20  not she would get that role, so I'm not 100 percent clear on

21  when the decision was made that she would not get that role.

22  Q.   Okay.

23  A.   And if I recall correctly, I think that role was

24  reworking to a different type of capacity, so I'm not

25  100 percent sure what happened with that role.

*Pinto - Direct*                                          *100*

 1   Q.   Well, you'd agree with me that it was sometime before

 2   May 4th that the leadership TLA position that she was in

 3   contention for was no longer hers to have.  Correct?

 4   A.   That's right.

 5   Q.   And you don't have a recollection if it was around

 6   May 2nd.  Does that sound correct to you?

 7   A.   I don't.  But I think there was some communication that I

 8   read that states when we discovered that she was no longer a

 9   candidate for that role.

10   Q.   So she's a candidate for a leadership role as of May 2nd,

11   but then, two days later she's terminated?

12   A.   Correct.

13   Q.   Did she do anything on May 3rd to justify the

14   termination?

15   A.   It's a -- there isn't a single event that led up to the

16   separation, so it wouldn't have been a May 3rd event.  It

17   would have been, like I mentioned, a categorical decline in

18   leadership and lack of presence that was required to bring the

19   market to where it needed to be.

20   Q.   So she had a categorical failure in leadership, but at

21   the same time, you're recommending her for a leadership

22   position in the community that she was in contention before

23   until two days before she was fired.  Is that your testimony?

24   A.   That's where she excelled.  She did an outstanding job on

25   those aspects of her role.

*Pinto - Direct*                                                    *101*

1   Q.   Leadership?

2   A.   In community -- in community-based initiatives.

3   Q.   She was an outreach person.  Correct?

4   A.   For example, the work that she did with YouthBuild was

5   phenomenal.  And that role would have been focused on

6   developing those type of relationships, not the day-to-day

7   operations of the leadership presence that was required.  It

8   was that side piece where she was spending the majority of her

9   time that she excelled in.

10  Q.   And then, let's talk about YouthBuild.  YouthBuild was a

11  school, a second chance school, in Philadelphia for kids that

12  dropped out and didn't complete regular high school.  Correct?

13  A.   I think that's accurate, yep.

14  Q.   And do you recall that in YouthBuild, part of it was for

15  students to learn a trade or learn job skills so that when

16  they left YouthBuild, the second chance school, they would

17  have a job.  Right?

18  A.   Yes.

19  Q.   And inside YouthBuild, Starbucks actually built a mini

20  store.  Right?

21  A.   Yes.

22  Q.   And so students would learn how to run a store and how to

23  be a server at a store through this program.  Correct?

24  A.   I don't know if they learned how to run it, but

25  definitely how to work in the store.

*Pinto - Direct*                                             102

1    Q.   Become a barista --

2    A.   Correct.

3    Q.   -- and could get a job coming out of that school.

4    Correct?

5    A.   Correct.

6    Q.   And Ms. Phillips, she was intimately involved in those

7    projects.  Correct?

8    A.   She was.

9    Q.   And she, in fact, mentored a lot of the kids that were

10   coming out of YouthBuild and, in fact, hired them at

11   Starbucks.  Correct?

12   A.   I know of one she hired.  I'm not sure how many others.

13   Q.   Okay.  And it was important for Starbucks to have a

14   relationship with YouthBuild.  Correct?

15   A.   Correct.

16   Q.   Yes?

17   A.   Yeah.

18   Q.   And in addition to YouthBuild, she was also on women's

19   community groups and leadership assignments.  Correct?

20   A.   She'd been in and out of being involved in the majority

21   of that type of thing through her career, yes.

22   Q.   And within a year of her termination, Starbucks had

23   actually sent her to Costa Rica.  Correct?

24   A.   I'm not sure.

25   Q.   You're not aware of that?

```
 1   A.   I'm sure it's possible.  I'm not aware of when she went

 2   or if she went.

 3   Q.   Okay.  Let's take a look at 108.

 4        This is an email that you are cc'd on from Sunday,

 5   May 6th.

 6        So this is two days after the email we just saw about

 7   there's an appetite for a package by Camille and Zeta and

 8   those higher up for her, for Ms. Phillips?

 9   A.   Yes.

10   Q.   So let's look at the bottom one first, which was from

11   Saturday, May 5th?

12   A.   Yes.

13   Q.   Hi Jen.

14        And Jen is the person that you reported to.  Right?

15   A.   Correct, Jen Frish.

16   Q.   And this is from Zeta Smith.

17        We are looking to expand Shannon's package to six months.

18   There was an additional discussion today with Camille and

19   Rossann.  We want to make this as lucrative as possible, with

20   peace of mind that she will be financially sound.  Rossann

21   also mentioned "coffee break" as an option, which should also

22   be considered as part of the package.  Paul, Nathalie and

23   Camille are aware of this change in direction.

24        Just wanted to circle back with you as discussion has

25   changed things a bit.
```

1          Do you see that?

2     A.   Yes.

3     Q.   And then, Jen responds back:  I would strongly recommend

4     we do not go down the coffee break option.  Happy to talk to

5     you one on one.

6          Do you see that?

7     A.   Yes.

8     Q.   And then, Jen responds back, you're copied:  Yes, let's

9     discuss.  I will be speaking to Rossann at 4:00 p.m. today.

10    Can we discuss prior?  Correct?

11    A.   Yes.

12    Q.   A coffee break at Starbucks, as stated here, was a

13    sabbatical.  Right?

14    A.   That's right.

15    Q.   And so there would be an option for Ms. Phillips to leave

16    Starbucks, not be working there but maybe come back in 3

17    months or 6 months or 12 months.  Correct?

18    A.   Correct.

19    Q.   And people took those coffee breaks at Starbucks and came

20    back.  Correct?

21    A.   Correct.

22    Q.   And this was something that was being discussed, to have

23    her leave on a coffee break Saturday and Sunday.  Correct?

24    A.   I don't know if it was discussed with her.  I think it

25    came up in conversation here, but the reason why Jen Frish was

*Pinto - Direct*                                    105

```
 1   strongly recommending not to go down the coffee break route
 2   was because in order to be eligible for a coffee break, you
 3   had to be a partner in good standing.
 4   Q.   Right.  It was never discussed with Ms. Phillips about
 5   coffee break.  That was something that was never addressed
 6   with her to your knowledge.  Correct?
 7   A.   To my knowledge.
 8   Q.   But because she was now not a partner in good standing,
 9   she couldn't have coffee break?
10   A.   I'm not going to say she couldn't have coffee break.  I'm
11   saying that it would not have been the best approach.
12   Q.   And again, on 5/2, she was in contention for this
13   leadership community position that we just talked about
14   involving, among other things, YouthBuild.  Correct?
15   A.   Again, I would have to refer to that document that
16   describes why we knew that she wasn't going to move into that
17   role.  But if it's 5/2, then yes, that's correct.
18   Q.   At this point, Friday, Saturday, Sunday, no one has told
19   Ms. Phillips that her job is in jeopardy.  Correct?
20   A.   Friday, Saturday, Sunday the -- which dates?
21   Q.   Friday the 4th, Saturday the 5th, Sunday the 6th of May.
22   No one has, to your knowledge, told Ms. Phillips that her job
23   is in jeopardy.  Correct?
24   A.   I don't think that's accurate.  I think there's some
25   email chain about -- or there's a document that I reviewed
```

*Pinto - Direct*                                    *106*

1   that is in evidence that describes when Camille was going to

2   speak to Shannon and what those conversations -- how it was

3   sort of going to lay out.  There was a point where I,

4   Shannon -- I mean, Camille and I were meeting with Shannon, so

5   if it -- if it falls within those dates, that's not accurate.

6   Q.  So -- but in what you're talking about, there was no

7   direction, communication, to Ms. Phillips that, hey, you're

8   going to be fired.  Correct?

9   A.  Camille absolutely had that conversation with her.  I

10  don't know what date that was without validating the document.

11  Q.  Again, no email, no document, nothing to substantiate

12  what you just said.  Correct?  That you know of?

13  A.  Again, if you're looking for that, you know, full roll-up

14  of performance, no.

15  Q.  No, I'm not looking for a full roll-up of performance

16  right now.

17      I'm just asking you to your knowledge, do you know of any

18  documentation substantiating some conversation warning her

19  about her job being in jeopardy?

20  A.  There probably is a document somewhere that indicates

21  that Camille had the conversation with Shannon.  But...

22  Q.  Okay.  Let's take a look at Exhibit 50.

23      This is an email here from Camille Hymes again on Sunday

24  the 6th to you.  And it says:  Private and confidential.

25  Recap of Philly support for next week.

*Pinto - Direct*                                    107

 1          Paul, Zeta, Nathalie.

 2          To ensure we are aligned on approach for suspension and

 3     separations, please see the sequence below.

 4          So now we're at Monday.  Right?

 5     A.   Right.

 6     Q.   And Ms. Phillips had been off on Saturday and Sunday.

 7     Right?

 8     A.   I don't know.

 9     Q.   Okay.  Monday the 7th.  This email is from the night

10     before or the day before, on Sunday morning at 10:00.

11     Correct?

12     A.   Correct.

13     Q.   Now it says, Monday:  Larry/Ben deliver communication

14     plans one on one with SMs.

15          That's store managers.  Correct?

16     A.   Correct.

17     Q.   Tuesday morning:  Camille and Paul discuss concerns

18     raised in the district and that he will have to be on paid

19     suspension pending investigation.

20          Do you see that?

21     A.   Yes.

22     Q.   And then Tuesday night:  Zeta to connect with Shannon,

23     share care and concern for what's happening in the market and

24     how she is handling the crisis.  Concern for mental and

25     physical well-being.  The job may have outgrown her.  Explore

*Pinto - Direct*                                            *108*

```
 1  what she wants to do next as a follow-up to several
 2  conversations from Camille.  Ask her to skip dinner and to end
 3  the RTs -- which mean roundtables.  Correct?
 4  A.   Correct.
 5  Q.   -- to think about it.  And then Wednesday:  Post
 6  roundtable, Paul and Camille to offer option, coffee break or
 7  separation, start at six months.  Rossann is aligned that we
 8  could go up from there.  Communication goes out regarding
 9  Damon to cover for four to six weeks.
10       Do you see that?
11  A.   Yes.
12  Q.   So as of Sunday morning, the plan is -- when they talk
13  about the suspension, that's Ben, right, Ben Trinsey?
14  A.   Yes.
15  Q.   And he was the district manager not in the district in
16  which the arrests took place?
17  A.   Correct.
18  Q.   Paul Sykes was the district manager in the district where
19  the arrests took place?
20  A.   Correct.
21  Q.   And there is a plan to suspend Ben?
22  A.   Correct.
23  Q.   The plan as of Sunday morning is for Camille -- it says
24  Camille, Paul, Paul meaning you.  Correct?
25  A.   Yes.
```

*Pinto - Direct*                                        109

```
 1   Q.   Camille, Paul discuss concerns in the district and advise
 2   him to be put on paid suspension.
 3        But that is not what ended up happening.  Correct?
 4   A.   That is what ended up happening.  Ben was placed on a
 5   suspension pending investigation.
 6   Q.   Yes.  But it wasn't Camille and Paul who had the
 7   discussion with Ben?
 8   A.   No, no.  This means me and Camille are going to discuss
 9   it with ourselves, not with Ben.
10   Q.   Well, it actually says:  And advise that he will be
11   paid -- be on a paid suspension pending investigation.
12   Correct?
13   A.   Correct.
14   Q.   So the plan was for you and Camille to advise Ben that he
15   would be put on a paid suspension?
16   A.   No.  It doesn't specifically state it here, but the plan
17   was always for Shannon to be the one to inform Ben.
18   Q.   Okay.  So even though you knew that Shannon Phillips was
19   a dead man walking, her termination decision had already been
20   made, you're having Ms. Phillips have to go in and suspend
21   Ben?
22   A.   Well, we knew that there was going to be a leadership
23   change required.  We were in a parallel path trying to figure
24   out how we could best understand what Shannon needed to
25   transition successfully, which I think was highlighted in that
```

*Pinto - Direct*                                           *110*

1  previous document you pulled up.

2  Q.   What she needed to transition successfully out of Philly

3  or out of Starbucks?

4  A.   Out of Starbucks.

5  Q.   Okay.  So the decision had already been made that she was

6  transitioning out of Starbucks?

7  A.   Correct.

8  Q.   When someone transitions out of Starbucks that means

9  they're fired.  Right?

10  A.   It depends.  Sometimes there's a mutual agreement to

11  separate.

12  Q.   Were you hoping that she had a mutual agreement to

13  separate here?

14  A.   I was hoping that we would come to an agreement that

15  would be good for her and good for Starbucks.

16  Q.   And good for Starbucks would be a release agreement.

17  Correct?

18  A.   It's standard, but it's always in conversation whether or

19  not people want to do that or not.

20  Q.   And good for Starbucks would be a nondisclosure agreement

21  she would sign.  Correct?

22  A.   That might be a better question for legal, but that's

23  typically something when we're talking about packages that's

24  included.

25  Q.   And as of this time when the coffee break option is

 1   coming up, would that -- why would that even be discussed in

 2   this email when she's a partner not in good standing?

 3   A.   You'll find that oftentimes because, you know, leaders

 4   know that these benefits are in existence, sometimes leaders

 5   will pull options that are on the menu that don't necessarily

 6   fit the circumstances until there's further conversations with

 7   the HR leaders in terms of application of those policies.

 8        So it's not uncommon for things like that to be surfaced

 9   that may or may not apply to a specific situation.

10   Q.   So you're saying even though she didn't qualify for

11   coffee break because according to Starbucks she was a partner

12   not in good standing, you're willing to offer it to her anyway

13   as of this time?

14   A.   No, that's not what I'm saying.

15        What I'm saying is when Zeta and Rossann discussed coffee

16   break, they're not in the HR organization.  And so when Jen

17   Frish weighed in and said that she strongly recommends that

18   coffee break is not on the table, that is because Jen Frish is

19   much more aware of what would qualify someone for coffee break

20   than the operations leaders.

21   Q.   There were other operations that Starbucks could have

22   went with in terms of Ms. Phillips' employment.  Correct,

23   besides termination?

24   A.   Like what?

25   Q.   Like any job within the organization they could have

*Pinto - Direct*                                    *112*

```
 1   moved her to.  Correct?
 2   A.   If it was the right decision, I suppose.
 3   Q.   She had, at the time, Philadelphia.  Right?
 4   A.   Correct.
 5   Q.   And there's two districts in Philly?
 6   A.   I think so, yes.
 7   Q.   Correct?
 8        And she also had the Main Line.  Correct?
 9   A.   I don't know what the Main Line is.
10   Q.   Oh, it's suburbs of Pennsylvania.
11   A.   I think that's correct.
12   Q.   She also had South Jersey, isn't that correct, southern
13   Jersey?
14   A.   Yeah.  I'm probably not the best person to ask about her
15   specific geography, but, you know, all of this sounds right.
16   Q.   Okay.  How about also Delaware and parts of Maryland?
17   A.   Hmm.  Delaware is one of those regions that would
18   typically go back and forth between a couple of RDs, so I
19   don't know if she had that at the time.  I'm not sure.
20   Q.   It's not unusual at Starbucks for lines and geographies
21   to change.  Correct?
22   A.   Correct.
23   Q.   And sometimes regions are changed and leaders get shifted
24   to other regions.  Correct?
25   A.   Correct.
```

*Pinto - Direct*                                                   113

1    Q.   So even if Starbucks had a desire to move Ms. Phillips

2    out of Philadelphia temporarily, they could have put her in a

3    different region.  Correct?

4    A.   Correct.  If it made sense.

5    Q.   In this case what they did was they took Philadelphia and

6    they gave it to Marcus.  Correct?

7    A.   Correct.

8    Q.   Eckensberger.  And he at the time had Central New Jersey.

9    Right?

10   A.   I believe that's accurate.

11   Q.   So he just added and scooped up Philadelphia.  Correct?

12   A.   Again, I'm probably not the best person to answer this,

13   but he was -- what I can tell you is he was pulled in to

14   support the market, and I think we also made some moves to

15   support the markets that he was leaving, because this was a

16   temporary sort of like crisis, let's get this market fixed.

17        Aside from the event that happened in the store, we still

18   needed to run 100 other stores.

19   Q.   Right.  So as a temporary fix, they put Marcus in these

20   two Philadelphia locations, and then this whole region, they

21   put Linda.  And Linda was being promoted up from a district

22   manager position in order to get this position.  Right?

23   A.   That's right.

24   Q.   So for Ms. Phillips, even if they wanted to take her out

25   of Philadelphia, even if I were to say she did even anything

*Pinto - Direct*                                           114

```
 1   wrong -- which she didn't, but just assuming that, they could
 2   have just put her -- kept her employed by putting her in the
 3   Main Line, South Jersey, Delaware and Maryland.  Right?
 4   A.   Again, it's possible if it made sense.
 5   Q.   Why didn't they do that?
 6   A.   It would be a great question for Camille.  She was her
 7   direct leader.  She knew the capabilities that were needed.
 8   Q.   You as the vice president of HR, you don't have an answer
 9   for this.  Correct?
10   A.   No.  Nathalie Cioffi, who was the director in the market
11   at the time, would have been much closer to the situation than
12   I was.  I was responsible for the eastern half of the United
13   States, so I would not have been in the conversation this
14   specifically at that time.
15   Q.   And the suspension of Ben Trinsey had to do with an
16   allegation that there's a differential in pay between a black
17   employee and a white employee.  Correct?
18   A.   There were multiple allegations that needed to be
19   investigated, and pay disparity was one of them.
20   Q.   Give me each and every allegation that you're saying that
21   was made against Ben Trinsey?
22   A.   Well, again, it -- I don't recall each and every
23   allegation, but there was some leadership questions.  There
24   were some, you know, decision-making questions that were
25   emerging.  Starbucks has a branch of partner resources that's
```

*Pinto - Direct*                                                    115

 1   responsible for investigations, and it was deferred over to

 2   them, but -- PRSC, it conducted the investigation.

 3        So I'm not specific on the final outcome.  Nathalie would

 4   have been much more in the know on the specific, you know,

 5   outcomes of that investigation.

 6   Q.   Can you give me any specific allegations about Ben

 7   Trinsey?

 8   A.   About what?

 9   Q.   Ben Trinsey.

10   A.   Specific allegations?

11   Q.   Specifically, what is he accused of doing?

12   A.   Only what I have firsthand knowledge of.  During, you

13   know, this month period of crisis, there were several leaders

14   brought into the market to go to stores and talk to partners.

15   I was part of that.  I went to one of Ben's stores.  And in

16   that store, partners were complaining about not -- his lack of

17   response, that they don't get development --

18        MS. MATTIACCI:  I'm going to object.  I don't want to

19   hear the hearsay parts of what you're saying.

20        THE WITNESS:  Okay.

21   BY MS. MATTIACCI:

22   Q.   I just want to know specifically what it was that was

23   being complained about.

24        MR. HARRIS:  Judge, may I address that specifically?

25   It goes to effect on the listener.  It goes to effect on the

*Pinto - Direct*                                               *116*

```
 1   listener, which is not hearsay.  He certainly can address that
 2   specifically.  It's not being offered for the truth of the
 3   matter.  He certainly can say based on what he heard, how he
 4   responded, and that's not being offered for the truth.
 5           THE COURT:  Well, why doesn't he give us his
 6   understanding.
 7           MS. MATTIACCI:  That's what I was asking.
 8           THE COURT:  All right.
 9   BY MS. MATTIACCI:
10   Q.   I just want to know the specific allegations against Ben
11   Trinsey, specifically?
12   A.   Could you help me understand how that's different from
13   what I was sharing.
14   Q.   You were going into a story about things that people told
15   you about something.
16       I just want to know specifically what it is they were
17   saying.
18   A.   What they were telling me about the something -- the
19   something was his lack of follow-up with issues that were out
20   in the market.
21   Q.   Okay.  Let me stop you there.
22   A.   Okay.
23   Q.   Who?
24   A.   Ben.
25   Q.   I know.
```

Pinto - Direct                                    117

```
 1        Who made these allegations?
 2   A.   Partners in the store.
 3   Q.   Can you give me a single name?
 4   A.   No.
 5   Q.   Is there a single document about this?
 6   A.   Partner resources -- the PRC would have it.
 7   Q.   Okay.  Can you give me a single name of anybody that
 8   actually -- that sitting here today you can tell me complained
 9   about Ben?
10   A.   No.
11   Q.   Okay.  And you're saying you don't know the outcome of
12   the investigation?
13   A.   Well, he was separated.
14   Q.   Was he separated due to race discrimination allegations?
15   A.   I honestly don't know the specific reason for his
16   separation, but he was separated.
17   Q.   You don't believe that Ms. Phillips is a racist.
18   Correct?
19   A.   No.
20   Q.   And you don't know anyone at Starbucks who believes that
21   Ms. Phillips is a racist.  Correct?
22   A.   No.
23   Q.   And you've never reached the conclusion that Shannon
24   Phillips is biased against black people.  Correct?
25   A.   No.
```

*Pinto - Direct*                                              118

```
 1    Q.   And to your knowledge, no one at Starbucks has ever

 2    reached the conclusion that Shannon Phillips is biased against

 3    black people?

 4    A.   Not to my knowledge.

 5    Q.   And neither you nor anyone at Starbucks ever concluded

 6    that Shannon Phillips wanted employees of one race to be paid

 7    differently than employees of another race.  Correct?

 8    A.   Correct.

 9    Q.   And if there had been issues with unequal pay, according

10    to you, it would be -- equally fall on the district manager

11    who was closer to that market.  Correct?

12    A.   I'm trying to understand this.

13         Could you ask that a little more clearly?

14    Q.   Sure.

15         If there had been issues in Starbucks with pay --

16    A.   Okay.

17    Q.   -- you'd agree with me that whatever issues existed would

18    equally fall on the district manager as it would the regional

19    manager?

20    A.   When you say "fall," do you mean --

21    Q.   Be responsible for.

22    A.   -- their responsibility?

23         They would be responsible for it, yes.

24    Q.   You'd agree with me that pay is determined by a separate

25    compensation department of Starbucks.  Correct?
```

Pinto - Direct                                        119

```
 1   A.   No, I don't agree.
 2   Q.   There's no compensation benefits department at Starbucks?
 3   A.   There is, but it's not completely determined by them.
 4   Q.   Wouldn't you agree with me that they're the ones that
 5   give the pay range and the pay amount for the person to be
 6   given?
 7   A.   Ranges, yes, but it is -- it is a collaboration with the
 8   field as well.
 9   Q.   Isn't it true that besides just the range, they actually
10   give an amount they suggest that the person should be paid.
11   Correct?
12   A.   No.  It's a range.
13   Q.   And then --
14   A.   The leader makes the decision on a salary that is
15   offered.
16   Q.   Once the leader makes the -- wait.  You're saying that
17   the leader makes the decision on it?
18   A.   Correct.
19   Q.   Independently without any oversight from human resources?
20   A.   Not independently.  I said in collaboration.
21   Q.   It's a collaborative decision?
22   A.   Correct.
23   Q.   And so human resources, the benefits department is
24   looking at the amount that is assessed and put into the system
25   for the person to be paid.  Correct?
```

 1   A.   It's multiple data points.  So the compensation

 2   department at Starbucks has all of their expertise as well as

 3   pay data ranges for multiple markets, and they will put

 4   together a paid, you know, philosophy for markets.  And then

 5   they also get data points from what the leaders are sharing in

 6   terms of rates that are being offered, whether it's hard to

 7   find people at those rates or whether we're paying enough or

 8   not too much or if we need to make adjustments.  All of that

 9   gets rolled into what ultimately becomes a market pay

10   structure.

11        And then leaders -- and then that usually ends up with

12   ranges, so -- and ranges can swing as much as, you know,

13   several thousands of dollars.

14        And then there's other components that go in to where in

15   the range the hiring decision was made.  It can be experience,

16   you know, depending on the roll; other things, certifications,

17   et cetera.  But ultimately, it is the leader's decision.  And

18   if that leader needs to make a decision that is out of the

19   range, then there should be a consultation with their HR

20   person as well as sometimes compensation.

21   Q.   Sure.  There's no allegation here, though, that Ben

22   Trinsey set a pay outside of a range.  Correct?

23   A.   No.

24   Q.   No.  And any pay that would ever be identified by a

25   district manager, that's going to be reviewed and approved by

1    a human resources professional.  Correct?

2    A.    Outside of the range?

3    Q.    Inside or outside of the range.  Their eyeballs on the

4    amount that's being paid to the employee.  Correct?  They're

5    looking at it?

6    A.    An HR person?  No.

7    Q.    Yes.

8    A.    No, not at every offer, no.

9    Q.    How about a compensations person?

10   A.    No.

11   Q.    So you're saying at Starbucks, district managers can just

12   willy-nilly pick an amount, pay the person and nobody looks at

13   it at Starbucks?

14   A.    No, that's not what I'm saying.  I just described the

15   entire collaboration that's required to make a hire, but the

16   hiring manager makes the pay decision.

17   Q.    And my question to you is, there's somebody else at

18   Starbucks that's overseeing that final determination?

19   A.    No.

20   Q.    No?  Okay.

21        You can't name a single person who ever made a complaint

22   about Shannon Phillips while she was there.  Correct?

23   A.    In general?

24   Q.    A person.  A name of a person who made a complaint about

25   Shannon Phillips.

```
 1   A.   I don't remember the names, no.
 2   Q.   And you never personally spoke to Shannon Phillips about
 3   any alleged complaints about her.  Correct?
 4   A.   I have -- I don't remember if I spoke to her about
 5   complaints, but I definitely spoke to her about what was going
 6   on in the market.
 7   Q.   When you say -- my question's more specific.
 8        You never spoke to her about any complaints about her.
 9   Correct?
10   A.   Correct.
11          MS. MATTIACCI:  One moment, Your Honor.
12   BY MS. MATTIACCI:
13   Q.   You're not aware of any documentation relating to any
14   allegations that were made regarding Ben Trinsey.  Correct?
15   A.   Like I said, I think PRSC would have that documentation
16   if there was documentation.
17   Q.   But you're not aware of anything that you've seen?
18   A.   No.
19   Q.   You're aware that there were complaints about Paul Sykes
20   concerning his leadership?
21   A.   Yes.
22   Q.   And Paul Sykes, though, was not terminated.  Correct?
23   A.   I think -- I'm not sure ultimately why he's no longer at
24   Starbucks, but he's no longer at Starbucks.
25   Q.   He wasn't terminated from Starbucks.  Correct?
```

```
 1  A.   I don't know.
 2  Q.   He wasn't ever suspended to your knowledge.  Correct?
 3  A.   Not to my knowledge.
 4  Q.   After Shannon was fired by Starbucks, a lot of people in
 5  her region were upset.  Correct?
 6  A.   I don't have knowledge of that.
 7  Q.   You don't recall that there had to be a special EAP
 8  program because people were so upset that Shannon was fired?
 9  A.   No.
10  Q.   And so you have no knowledge, sitting here today, how
11  upset people were.  Is that your testimony?
12  A.   No.
13  Q.   Did you ever go to check on and see how the reaction was
14  to Shannon Phillips' termination?
15  A.   I know that there was a plan to communicate and have
16  conversations with her direct reports, but that would have
17  been Nathalie Cioffi, who was the director of the market at
18  the time, that would have been in that capacity to go check.
19  Q.   Okay.  And you never checked with Nathalie about that?
20  A.   I'm sure I had conversations with her about how the plan
21  was going and if anything came up that was of concern, but
22  nothing sticks out that was significant.
23            MS. MATTIACCI:  No further questions, Your Honor.
24            THE COURT:  You may inquire.
25                          CROSS-EXAMINATION
```

```
 1  BY MR. HARRIS:

 2  Q.   Good afternoon, Mr. Pinto.

 3  A.   Hello.

 4  Q.   Mr. Pinto, can you provide some context to when you used

 5  the term "market"?  What does that mean?

 6  A.   The market area that Shannon --

 7          MR. HARRIS:  I'm sorry.  Hold on one second.

 8          THE WITNESS:  The market area that Shannon was

 9  responsible for, so her -- her region.

10  BY MR. HARRIS:

11  Q.   All right.  When you say "market," you're referring to

12  the region that she was responsible for?

13  A.   Yes.

14  Q.   Which would have included Pennsylvania, New Jersey --

15  south New Jersey, parts of Delaware?

16  A.   Yes.

17  Q.   Anywhere else?

18  A.   I think that covers it.

19  Q.   Okay.

20  A.   I don't know if she had any stores in Virginia, but I

21  don't think so.

22  Q.   All right.  And counsel asked you questions about

23  compensation.

24       If I understand your testimony, compensation is whose

25  responsibility?
```

1   A.   The hiring manager.

2   Q.   Not HR?

3   A.   No.

4   Q.   Why not?

5   A.   Because they are the general manager of that market, and

6   they are the ones that know the salary that it's going to take

7   to hire the right leader in that market.

8        HR is in the conversation, and, you know, they operate as

9   an HR business partner, but they're not the deciders; they're

10  advisors.

11  Q.   They're the advisors -- HR's -- they're the advisors but

12  not the deciders?

13           MS. MATTIACCI:  Objection, Your Honor, leading.

14           THE COURT:  Overruled.

15           THE WITNESS:  That's correct.

16  BY MR. HARRIS:

17  Q.   And so ultimately the responsibility for individuals

18  within Ms. Phillips' market regarding their compensation, that

19  would be whose responsibility?

20  A.   Ultimately Shannon's responsibility.

21  Q.   As it relates to the compensation disparity that was

22  uncovered as it relates to Ben Trinsey, whose responsibility

23  would that have also been?

24  A.   That would have been Ben's primarily, but overall the

25  full compensation strategy would have been Shannon's

 1  responsibility in the market.

 2  Q.   I'm going to step back.

 3       Mr. Pinto, can you tell us what you're currently doing

 4  and where you're currently employed?

 5  A.   Yes.  I am currently a consultant with Seedling Partners

 6  and I'm a partner.

 7  Q.   What does Seedling Partners do?

 8  A.   They provide strategic consulting services for companies

 9  and organizations:  HR consulting services, business

10  consulting services, change management, that sort of thing.

11  Q.   The work that you're currently doing with Seedling

12  Partners, was that influenced at all by the work that you did

13  at Starbucks?

14  A.   Absolutely.

15  Q.   How so?

16  A.   Just from a -- you know, the way that the partner

17  resources organization partners with the business operators to

18  drive a business strategy would be one.

19       Also to understand how people, systems operate within

20  organizations and how to make them more effective and

21  rewarding.

22  Q.   Can you tell us when you first began working at Starbucks

23  until the time that you actually left the organization?

24  A.   The story of or --

25  Q.   Well, let me ask it differently.

*Pinto - Cross*                                              127

1        When did you first begin working at Starbucks?

2   A.   In 2007.

3   Q.   What role did you have when you first came to the

4   organization?

5   A.   When I first started I was a partner resources manager in

6   the northeast region.

7   Q.   Did you get promoted after that?

8   A.   I did.

9   Q.   To what?

10  A.   To a director role.

11  Q.   What year was that?

12  A.   Can I consult my resume?

13  Q.   Approximately.

14  A.   Approximately I think 2010, about that.

15  Q.   And how long did you hold the role as director?

16  A.   So I held the role as director for multiple years.  I

17  want to say it was probably about seven years.  And in between

18  that time, I was also promoted to a divisional director, but

19  then the divisional director role was eliminated so I went

20  back to a director role.

21  Q.   And then you got promoted again?

22  A.   Yes.

23  Q.   And what role was that when you got promoted from

24  director?

25  A.   To the vice president TLA role.

*Pinto - Cross*                                          *128*

1   Q.   Was that the role that you had prior to leading up to the

2   events in April of 2018?

3   A.   It was.

4   Q.   When was the first time you had contact with

5   Ms. Phillips?

6   A.   Oh, she was a district manager in Youngstown, Ohio.

7   Probably very soon after I started, I think I had that market.

8   I think if it wasn't in 2007, it probably would have been 2008

9   or so.

10  Q.   What was your relationship with Ms. Phillips?

11  A.   Great.  Great.  She was someone that we thought had

12  potential to do more.  And I went out in the market one time

13  specifically to spend time with her and understand more deeply

14  what she needed in terms of development and how we could, you

15  know, support her.

16  Q.   Did you do that?

17  A.   Yes.

18  Q.   And how did you support her development in the

19  organization?

20  A.   Post that trip, I think we identified -- there were a

21  couple of things I think that we identified -- Shannon and I

22  have a -- had a longstanding relationship of talking about

23  what she was working on and what she wanted to develop.

24       And I think specifically after that trip, it was about

25  sort of, you know, leadership presence and communication, and

 1   we identified a program out in California to help her develop

 2   that.

 3   Q.   When you say "leadership presence," what do you mean by

 4   that?

 5   A.   How to confidently come across in a room of leaders.

 6   Specifically she had a very strong-minded regional director at

 7   that time and was working on not diminishing herself in the

 8   room with all the other leaders.  So that's one thing that she

 9   wanted to develop on -- develop is my recollection.  And

10   something that would help build the confidence in order to do

11   that.

12   Q.   Do you recall who that regional director was?

13   A.   Dennis Hodson.

14   Q.   When you say show up in the room, is that akin to

15   executive presence?

16   A.   Yes.

17   Q.   Did you also provide support to Ms. Phillips to get

18   training in executive presence?

19   A.   Yes.

20   Q.   What was that training?

21   A.   I can't remember the specific name of it.  It's -- I

22   think it's the name of a woman that is pretty well known.  I

23   should know this.  But I think the program I sent her to, I

24   recall was in California.  It could have been a week-long

25   program.

*Pinto - Cross*                                              130

1    Q.   And Ms. Phillips went to that program?

2    A.   She did.

3    Q.   And it was supported by you and others in the

4    organization?

5    A.   Yes.

6    Q.   At what point did Ms. Phillips get the promotion to

7    regional director of operations?

8    A.   When she came into this market.  I think she had done a

9    couple of developmental roles.  I know she went out to support

10   the Hamptons market for a period of time.

11   Q.   When you say Hamptons, what might that be?

12   A.   Hamptons, New York which is a tough, you know, demanding

13   market.  And then she was -- I want to say the time line was

14   pretty soon after that, into the regional director role.

15   Q.   Do you recall whether or not she had to apply for that

16   role?

17   A.   Yes.

18   Q.   Or was she selected?

19   A.   Yeah.  You generally have to apply for roles.  And then

20   interview process and all of that.

21   Q.   I apologize.

22   A.   Sorry, sorry.

23   Q.   In the regional role, when she applied for that role, was

24   it a process that included interviews?

25   A.   Yes.

*Pinto - Cross*                                              131

```
 1   Q.   By market leaders?

 2   A.   Yes.

 3   Q.   What are the kinds of roles or the people that would have

 4   been involved in that process?

 5   A.   What kinds of roles?

 6   Q.   Yes.  VP or higher?

 7   A.   Oh, yeah.  So there would have been an HR person that

 8   would have interviewed her or maybe one or two.  There would

 9   have been a peer or a future peer-level interview.  And then

10   she would have interviewed with a VP.

11   Q.   Do you recall whether or not Camille Hymes participated

12   in the selection of her to the regional director role?

13   A.   I think she was the decider, but I don't specific -- I'm

14   not 100 percent sure.

15   Q.   It's your recollection that Ms. Hymes was in charge or

16   vice president of that market at the time that Ms. Phillips

17   would have been applying for that role?

18   A.   It is.

19   Q.   Is?

20   A.   Is, yeah.

21   Q.   Okay.  Would Zeta Smith have also been involved in that

22   process as well?

23   A.   She would have been.

24   Q.   Both African American women?

25   A.   Yes.
```

*Pinto - Cross*                                               132

1   Q.   Would have selected Ms. Phillips?

2   A.   Yes.

3   Q.   Now, when you talk about the market, at some point in

4   April of 2018 there was an incident?

5   A.   Yes.

6   Q.   Can you provide us context of what that incident was?

7   A.   April --

8   Q.   April of 2018.

9   A.   April of 2018, yes.  The incident with the two gentlemen

10  that were arrested in the store.

11  Q.   Do you know their names?

12  A.   Yep.  It is Donte and Rashon.

13       MR. HARRIS:  May the witness be shown Joint Exhibit

14  Number 111?

15       THE COURT:  Yes.

16  BY MR. HARRIS:

17  Q.   I'm showing you what's been marked as Joint Exhibit

18  Number 111.  Do you recognize this?

19  A.   Yes.  It's the partner guide.

20  Q.   And what is the partner guide for the edification of the

21  jury?

22  A.   It's essentially an employee handbook.

23  Q.   Was this -- I think there's a date on the next page.

24       I'll direct your attention to page 7 of that same

25  document, Bates stamp 009.

*Pinto - Cross*                                                    133

 1          Do you see that in front of you?

 2     A.   Keep flipping.

 3     Q.   Do you see that?

 4     A.   Oh, yes.

 5     Q.   Do you see a date at the bottom of that document?

 6     A.   I'm sorry, do I see what?

 7     Q.   A date at the bottom of that document.

 8     A.   Yes, June 17, 2017.

 9     Q.   Would that have been the partner guide that you recall as

10     being in place at the time of the incident, April 2018?

11     A.   Yes.

12          MR. HARRIS:  I'd like to have this moved into

13     evidence, Your Honor.

14          MS. MATTIACCI:  No objection, Your Honor.

15          THE COURT:  Exhibit 111 into evidence.  Received in

16     evidence.

17          (Exhibit 111 admitted into evidence.)

18          MR. HARRIS:  May it be published to the jury?

19          THE COURT:  Yes.

20     BY MR. HARRIS:

21     Q.   Showing what's been marked as Exhibit 111.  It's now

22     being shown on the screen to you and the jury.  Can you tell

23     us what this document reflects?

24     A.   This is the stated mission and values of Starbucks.

25     Q.   What is that, sir?

*Pinto - Cross*                                              134

 1   A.   It is essentially who we are and what we are all about

 2   and the lenses that we make decisions through.

 3   Q.   Without reading the actual document, tell us what that

 4   means to you as an employee.

 5   A.   Yeah, during my time at Starbucks, what it meant to me

 6   was pretty powerful, to be honest, because lots of times

 7   organizations have missions and values that are stated that

 8   aren't really followed upon.  And Starbucks was the first

 9   company I ever worked at that actually did hold them up to

10   following, you know, them as a lens for decision-making.

11        And it also used the mission and values to encourage

12   people that felt we weren't being held up to our mission and

13   values to say something and bring it up.

14        So it sort of gave people a bit of courage to say what

15   needed to be said.

16   Q.   How did the mission and values relate to the incident

17   that took place when Donte and Rashon were being arrested?

18   A.   It was really like holding up a mirror, where, you know,

19   a policy that was in effect for decisions that were being made

20   by our partners that would have an impact that it had on a

21   city and two individuals and a county, based on the actions of

22   one of our partners.

23   Q.   What did you find out about the incident that actually

24   took place?

25   A.   What did I find took place or --

1  Q.   Yes.  About the incident, about specifically what

2  happened.

3  A.   Yeah.

4           MS. MATTIACCI:  Objection, Your Honor, to hearsay.

5           THE COURT:  To his understanding.  Overruled.  This

6  is going into cross.

7           Go ahead.

8           THE WITNESS:  Sure.

9           Yeah, the first time I heard of the incident was when

10  Camille called me on a Sunday, and we were talking about what

11  was coming up.  And what I knew took place as, you know,

12  leading up to that point, Starbucks was really struggling with

13  the use of the cafés and restrooms.  There was a lot of drug

14  use in the restrooms.  We had 16- and 17-year-old baristas

15  discovering people that were deceased in restrooms.  And it

16  was a bit of a, you know, crisis standpoint and homelessness

17  in the cafes that were really making the environment not what

18  Starbucks was all about.

19           And so, you know, this policy was implemented in

20  certain markets.  And so then, you know, seeing how the

21  utilization of that was used with Donte and Rashon that caused

22  them to be arrested and create, you know, so much pain for our

23  partners and the city based on something that we were very

24  involved with forced us to really hold a mirror up to

25  ourselves and understand, you know, what was the path forward,

*Pinto - Cross*                                                          136

 1   you know, that needed to happen and where did we go wrong?

 2   BY MR. HARRIS:

 3   Q.   When you came to the market -- and we were talking about

 4   Philadelphia specifically after the incident of April 2018.

 5   A.   Yes.

 6   Q.   What did you do first?

 7   A.   Hit the ground.  Well, first, was go to the store and see

 8   what was going on.  And it was police cars blocking off the

 9   streets.  There were protests and anger and signs and film

10   cameras and TVs and partners in the store trying to, you know,

11   serve a cup of coffee, and it was -- it was a bit of a mayhem

12   scenario.

13        And Camille, I believe, was there at the time, a couple

14   of other leaders, and was trying to have conversation with the

15   protesters.  It was pretty clear at the time that they had no

16   interest in conversation.  They just wanted to sort of let out

17   all sorts of emotion and frustration and anger.

18   Q.   Did you find that to be offensive, the anger that the

19   protesters had?

20   A.   Offensive, no.  I didn't want it, but, you know, at

21   first, it was really just trying to understand where it was

22   all coming from and what our role in it is and should be

23   moving forward.

24   Q.   And what did you uncover in terms of the role moving

25   forward?

Pinto - Cross                                          137

```
 1   A.   That was more of a longer journey.  I think it was -- a
 2   couple of things that were clear was that, you know, there
 3   was -- there was so much that was emerging, and we had a
 4   series of roundtables with partners, trying to understand the
 5   partner -- partner perspective.  Many of our partners liked
 6   the Safe and Welcoming policy because they didn't want to have
 7   to deal with the homeless situation coming in and the drug use
 8   situation.  They liked to be able to just say:  You are not
 9   allowed if you don't buy something.
10        But there was -- you know, obviously, that direction was
11   not going to be sustainable with everything else that was
12   building in the market as well as in other areas of the United
13   States.
14        And there was just so much of a range of emotion and
15   issues, and we really needed to understand what the issues
16   were that we didn't know about.  And so we launched a campaign
17   that included several roundtables, but also, it was a store by
18   store by store visit.
19        I personally think I went to every single store in Philly
20   to sort of get a pulse of the environment and what partners
21   were up against and what some of the themes were that were
22   emerging.
23   Q.   Did you see Ms. Phillips there?
24   A.   In some of it, yes.
25   Q.   When you saw Ms. Phillips, do you recall the first
```

*Pinto - Cross*                                                        138

 1  instance that you had a conversation with her after the

 2  incident when you first arrived to the market?

 3  A.   The first incident that I had a conversation with her I

 4  think was about one theme that was emerging with baristas that

 5  wanted to move into bigger roles within Starbucks.

 6  Q.   So let me stop you there.

 7  A.   Yeah.

 8  Q.   When you say "one theme emerged," so this was as a result

 9  of the information you gleaned through roundtable discussions?

10  A.   This one particularly was more the visits in the stores

11  that I was making.

12  Q.   Separate and apart from the roundtables?

13  A.   Separate, yeah.

14  Q.   So when you visited the stores, you had conversations

15  with partners directly?

16  A.   Correct.

17  Q.   You and other leaders or just you specifically?

18  A.   Sometimes me and other leaders; sometimes it was just me.

19  We had a whole team of people that we pulled in to really go

20  out and understand what was emerging in the market and what we

21  needed to wrap our heads around and what we needed to fix and

22  correct.

23  Q.   And what did you find from the baristas that you met with

24  personally?

25  A.   Yeah.  One thing that emerged pretty quickly is that they

1   had a hope of becoming better by coming to Starbucks, but when

2   they sort of raised their hand to say, "I want more in terms

3   of my development," there was really no system in place to

4   help them get there.  You know, one example of that would be I

5   was talking to a barista, and I don't remember her name,

6   but -- and she said:  You know, yeah, I thought this was --

7            MS. MATTIACCI:  Objection, Your Honor, hearsay.

8            MR. HARRIS:  Your Honor, it's not being offered for

9   the truth of the matter asserted.

10           THE COURT:  Yeah, I'll sustain the objection then.

11  BY MR. HARRIS:

12  Q.   Without telling us what the barista said to you, what, if

13  anything, did you do next?

14  A.   We started to have conversations with Shannon about

15  development, you know, systems within the market and what that

16  looked like.  But that was one very small component of several

17  themes that were emerging in the market.

18  Q.   Let me just stop you there on that precise point.

19       Would it have been Shannon's responsibility -- and when

20  I'm saying "Shannon," you're referring to Ms. Phillips?

21  A.   Yes.

22  Q.   Would it have been Ms. Phillips' responsibility to come

23  up with systems for development for the baristas, for example,

24  in her market?

25  A.   Yes.  Or just leverage the systems and guidelines that

1  already existed in terms of talent management conversations

2  and cycles that should have been in place in the market.

3  Q.   Did you have a conversation with Ms. Phillips

4  specifically about talent development within the individuals

5  within her marketplace?

6  A.   I did not.  I would have had conversations with Camille.

7  Q.   What other things did you find were emerging as a result

8  of these conversations that you had inside the stores?

9  A.   Lack of presence in the stores.  One theme that was

10 emerging is that there was a small, select group of stores

11 that Shannon would visit but not really all of the other

12 stores, so there wasn't sort of an equity in terms of where

13 she spent her time.

14 Q.   Were the criticisms -- I'll use the term "criticism" --

15 that were lodged by baristas or others in the store, would

16 they be store managers, assistant managers and the like?

17 A.   It was pretty all over the board.  It was -- most of the

18 people that came to roundtables were shift supervisors and

19 above.  Everybody was invited, but most baristas -- you know,

20 not a lot of baristas unless they were super vocal about

21 something would come unless we had things where we paid

22 everybody to be there.  But it was -- it was pretty much, you

23 know, across multiple levels.

24 Q.   Was the criticism among staff members or partners among

25 black and white alike?

 1   A.   Yes.

 2   Q.   How do you recall that?

 3   A.   How do I recall it?  I was there.

 4   Q.   Okay.

 5   A.   Yeah, I was -- especially during the height of the crisis

 6   up until the point where we knew that a leadership change

 7   needed to happen, I was in -- I was in almost every store, I

 8   believe, and I was at the majority of the roundtables.

 9   Q.   When you said that one of -- that was a slice of the

10   themes -- one of the themes that had emerged was this

11   criticism by staff members.

12        Any other themes emerge?

13   A.   Yes.  There were just operational processes that were not

14   in place in the market:  things like store manager approach,

15   district manager approach.  And this is something that

16   Starbucks calls sort of -- you know, it's a -- the approach is

17   something that lays out for those leadership positions how

18   someone should be spending their time and what they should be

19   doing on a monthly/quarterly cycle.  And those approaches were

20   in place for at least two years prior to 2018, and they were

21   not in place in the market.

22   Q.   Why wouldn't that have been discovered before now?

23   A.   That's a great question.  That was one of the "how did we

24   not see this" moments that many of us had, and I know that had

25   hit Camille really hard where she, you know, said she made a

1   lot of mistakes in terms of, you know, how she approached the

2   market.  But, you know, at the time, the Philly market

3   probably did not get as much visitation as some of the other

4   hot button markets like a New York City or a Boston or that

5   type of thing.  That would probably be one reason.

6        And, you know, the other part is that we probably just

7   didn't look as closely as we needed to in terms of what was

8   going on.

9   Q.   Would that have been Ms. Phillips' responsibility, to

10  ensure that the processes and systems were in place as the

11  leader for the market?

12  A.   Absolutely, yeah.  Absolutely.

13  Q.   And what part of the role would the DM have as opposed to

14  the RD, which Ms. Phillips was?

15  A.   Well, the DM would have been responsible to ensure that

16  those specific store-level systems were operating and in

17  place.  And then Shannon's responsibility as the RD would have

18  had the responsibility to ensure that DMs were holding stores

19  accountable to those approaches and systems.

20        MR. HARRIS:  Excuse me, Mr. Pinto.  I believe His

21  Honor is going to --

22        THE COURT:  I think this would be a good time to take

23  a lunch break.

24        MR. HARRIS:  That would be great.

25        THE COURT:  We've been in court for quite a while

*Pinto - Cross*                                                    143

```
 1   now.

 2          Members of the jury, I'm going to ask you to return

 3   at a quarter to 2:00, so you'll have your lunch break at this

 4   point.

 5          We'll recess and, again, a lot more evidence to come,

 6   always keep an open mind, and ask you not to discuss the case

 7   among yourselves or do any outside research.

 8          All right.  With that, we'll stand in recess.

 9          (Jury out.)

10          (Luncheon recess at 12:34 p.m. until 1:45 p.m.)

11          THE DEPUTY CLERK:  All rise.  Court is now in

12   session.

13          THE COURT:  Bring in the jury.

14          Counsel, I don't have a book for 1 to 50.  I have --

15   or to 75.  Is that in the first book, 1 through 75?

16          MR. HARRIS:  Let me make sure you have it.

17          THE COURT:  I have 75 on.

18          MR. HARRIS:  Okay.  Let me check on that.

19          THE COURT:  I don't technically need it, so we can do

20   it at the break.

21          MR. HARRIS:  I think we have it.

22          THE COURT:  Well, if you have it, let me have it.

23          MR. HARRIS:  May I approach?

24          THE COURT:  Yes.  All of the exhibits are on the

25   screen, so I can see them and follow.
```

*United States District Court*

1          Thank you.

2          (Jury in.)

3          THE COURT:  Please be seated.

4          You can continue, Counsel.

5  BY MR. HARRIS:

6  Q.   Mr. Pinto --

7  A.   Hello.

8  Q.   -- showing you what's been previously marked and moved

9  into evidence, I'd like to direct your attention to page 45 of

10 the same document.

11      Showing you what's been marked as, again, Exhibit 111,

12 could you describe to the ladies and gentleman of the jury

13 what this represents?

14 A.   This is the page that refers to corrective action.

15 Q.   Can you explain what that actually means in layman's

16 terms?

17 A.   Yes.  It's essentially the structure of how to handle

18 performance issues that arise within the company and what the

19 approach should be.

20 Q.   Is this a framework by which decisions are made regarding

21 leadership at all levels of the organization?

22 A.   No.  It also depends on what the issue is at hand.

23 Q.   Give us an example.

24 A.   Sure.  This is essentially a structure and a guideline of

25 how the majority of approaches with performance issues should

1    go, giving people an opportunity to correct behavior.

2        But sometimes the behavior or the performance is such

3    that you don't have a luxury of going through this process.

4    So one example at the barista level I could give you is if

5    somebody wrote something offensive to a customer on a cup,

6    which has happened, we wouldn't go through the written warning

7    process and all of that.  It would likely just end in

8    separation if it was found to be accurate.

9    Q.   If I go to the second paragraph of this process, it says:

10   Corrective action may take the form of verbal warning, a

11   written warning, demotion, suspension or separation from

12   employment.

13       Did I read that accurately?

14   A.   That's correct.

15   Q.   It says "may."

16   A.   Right.

17   Q.   It does not say "must."

18   A.   Accurate.

19   Q.   Tell us why does it says may as opposed to must.

20   A.   Because it's not all ironclad.  It depends on the

21   situation that comes up and what's called for.

22   Q.   If I go further down in that paragraph, it reads that:

23   The evaluation of the seriousness of the infraction.

24       Give us some context of that.

25   A.   Sure.  This is, of course, where we would have

1  conversation, collaboration around if something were to

2  deviate from this process.  We would probably include --

3  depending on the level and the infraction, we would probably

4  include legal team or our PRSC team and maybe even

5  senior-level leaders around what we think the right direction

6  and course of action is and whether or not there's some

7  agreement or contention or disagreement with the path forward

8  and what makes sense, given the situation.

9  Q.  Was this framework in place at the time that

10 Ms. Phillips' separation was being contemplated?

11 A.  Yes.

12 Q.  Was this process implemented or executed as it related to

13 Ms. Phillips?

14 A.  Yes.

15 Q.  How so?

16 A.  It was the latter part here, the evaluation of the

17 seriousness of the situation.

18 Q.  When you say "seriousness," why was it so serious?

19 A.  Well, I mean, it's -- you know, one example we would

20 sometimes use when trying to figure out the right course of

21 action, if you wanted to deviate from the stated course of

22 action here, is, you know, sort of the example of someone

23 having cardiac failure.  Right?

24     If someone is in crisis and they need surgery in a

25 cardiac situation, it's not the time to talk about proper diet

1   and exercise.  This is sort of the equivalent of that.  When

2   there's a crisis that needs to be handled where there's going

3   to be significant consequences if you don't handle it in a

4   more elevated manner, then it could cause catastrophic

5   circumstances.  And that was the case here.

6   Q.   Why was it important to make a decision now after April

7   of 2018 when in February of 2018 Ms. Phillips' performance was

8   getting -- was highly regarded?

9   A.   Yeah.

10  Q.   What happened in that month that required a change in

11  direction?

12  A.   I think it would be the magnifying lens that was created

13  in the market with all of the leaders coming in and talking

14  and really digging up under what was actually going on in a

15  much more magnified way than a normal sort of market visit

16  would occur, contributed to that.

17       We saw the seriousness of the lack of leadership in the

18  market.  And we knew based on what the market was going

19  through that a significant change needed to happen, and it

20  couldn't be Shannon leading that market forward.

21  Q.   You made the recommendation, I believe on direct

22  examination you testified that there was a role in community

23  activities as a leadership role for Ms. Phillips that the

24  organization was high input?

25  A.   That's right.

*Pinto - Cross*                                             148

```
 1   Q.   How would that not be inconsistent with separating her
 2   from the role that she previously had?
 3   A.   Well, I just want to make sure I understand, how would it
 4   not be inconsistent?
 5   Q.   That was a bad question.  Let try to rephrase it.
 6        Was it inconsistent to evaluate her for the community
 7   development role while at the same time deciding to separate
 8   her from the role that she was in?
 9   A.   No.  That wouldn't have been inconsistent with the way we
10   treat partners.  It -- you know, she excelled in that area and
11   if there was an opportunity for us to move her into a place
12   where she excelled, we would have done it.  That opportunity
13   didn't happen.
14   Q.   Was that your responsibility in terms of deciding whether
15   that opportunity happened or not?
16   A.   No.
17   Q.   Was that Camille's responsibility?
18   A.   No. No.
19   Q.   Whose responsibility was that?
20   A.   I can't remember the name.  I think it was Shannon -- in
21   community -- in our community development -- community
22   affairs -- it was Shannon something.  I think her last name
23   began with a B.
24   Q.   Shannon Boldizsar?
25   A.   That's right, Shannon Boldizsar.
```

*Pinto - Cross*                                        149

```
 1   Q.   Shannon Boldizsar, does she identify as white?

 2   A.   I don't know.  I don't know.

 3   Q.   Okay.  But certainly Shannon Boldizsar would have been

 4   the person responsible for making the decision about the TLA

 5   role?

 6   A.   That's right.

 7   Q.   And that's the community development role that you're

 8   referring to?

 9   A.   That's right.  And this was actually in conversation as

10   we were talking at the leadership level about the lack of

11   leadership we were seeing.  And I recall one conversation in

12   particular with Camille where Camille said, I really hope this

13   role works out for Shannon because it would solve the entire

14   situation moving forward.

15        So I know Shannon was in her camp.  I mean, not Shannon,

16   Camille.

17   Q.   Camille was in her camp?

18   A.   Correct.

19   Q.   When you say "in her camp," supportive of her efforts to

20   find a transition for her out of her RD role?

21   A.   Correct, correct.

22   Q.   What is it about Ms. Phillips' leadership style in the

23   moment during the crisis that made her inappropriate to lead

24   the organization moving forward?

25   A.   I would use the term "frozen."  There was just inaction.
```

```
 1   It was something that I hadn't seen before in her.  And, you

 2   know, I think once or twice I even just sort of pulled her

 3   aside and said, you know, are you okay?  You know, how are you

 4   doing?  Because I was concerned that there was something going

 5   on other than the volume of, you know, activity going on in

 6   the market.

 7        But I had never seen her so stuck and frozen.  And there

 8   was just nothing coming out of her in terms of market

 9   leadership and ownership that I could see.

10   Q.   Did she share with you what was causing her to be so

11   frozen?

12   A.   No.

13   Q.   Did she offer an explanation as to whether or not she was

14   frozen?

15   A.   No.

16   Q.   Did she offer a different point of view as it relates to

17   her being frozen, or did she concede that she was frozen in

18   the moment?

19   A.   No.  At one point I think she said I'm just tired, but

20   that was when we sort of forced her to take a couple of days

21   off to sort of rest.  I think the -- you know, the tap-out

22   thing that came up was a result of that, when we realized we

23   needed to really to make sure that partners and leaders are

24   taking time off, that they need to take care of themselves.

25   Q.   But did she ever specifically communicate to you, when
```

*Pinto - Cross*                                    151

```
 1    you voiced that she had been frozen, a different point of
 2    view?
 3    A.   No.
 4    Q.   She never said that I am doing the best that I can?
 5    A.   No.
 6    Q.   She never said that --
 7              MS. MATTIACCI:  Objection, Your Honor, leading.
 8              THE COURT:  Sustained.
 9    BY MR. HARRIS:
10    Q.   Did she say to you -- did she offer an explanation as to
11    her behavior during the crisis?
12    A.   No.
13    Q.   Did you look for one?
14    A.   Yes.  I asked.  Yep.
15    Q.   How did you compare Shannon's behavior in the moment of
16    crisis versus Mr. Eckensberger?
17    A.   Marcus came into the market and just got right to
18    business.  He knew that, you know, the Seattle leaders were
19    taking care of the media attention and everything else.  He
20    went right to visits, made sure that the partners in the
21    stores were getting the support that they need, the operations
22    were in place, that they have the resources, supplies, et
23    cetera that they needed to do their job as stress-free as
24    possible.  And put mechanisms in place for us to really
25    continue to uncover issues that were coming up in the market.
```

*Pinto - Cross*                                                 152

```
 1   Q.   Did you uncover additional issues that had only been

 2   identified when Mr. Eckensberger had taken over the role of

 3   the regional -- of the RD, the regional director?

 4   A.   I think it was more the amplification of what was not in

 5   place, the confirmation of what was not in place that was

 6   definitely prior to the incident of April.

 7           MR. HARRIS:  Excuse me, with the Court's indulgence.

 8           Showing what has been previously marked as Joint

 9   Exhibit Number 71.

10           Would you mind putting that on the screen, please.

11   BY MR. HARRIS:

12   Q.   Mr. Pinto, showing you what's been marked as Joint

13   Exhibit Number 71, do you recognize this exhibit?

14   A.   I do.

15   Q.   Is this an email from you to Ms. Camille Hymes, Nathalie

16   Cioffi, Tammi Summers and Ebony Johnson?

17   A.   Yes.

18   Q.   Can you tell us who Tammi Summers was?

19   A.   Tammi was a manager in our diversity, equity and

20   inclusion department.

21   Q.   And this date, this email is dated April the 24th of 2018

22   at 7:06 a.m.?

23   A.   Yes.

24   Q.   The subject line says:  Notes and issues to address?

25   A.   Yes.
```

Pinto - Cross                               153

 1   Q.   It says PR -- the attachment is:  PRO Philly follow-up

 2   actions.  And it looks like that's a document attached?

 3   A.   Yes.

 4         MR. HARRIS:  I'd like to have this marked and moved

 5   into evidence as Exhibit 71.

 6         THE COURT:  Hearing no objection, it will be admitted

 7   into evidence.

 8         (Exhibit 71 admitted into evidence.)

 9         MR. HARRIS:  May this be published to the jury?

10         THE COURT:  Yes.

11   BY MR. HARRIS:

12   Q.   Mr. Pinto, what's on the screen before the jury is

13   Exhibit Number 71.

14        Can you tell us what this document was supposed to do in

15   guiding the actions moving forward?

16   A.   Yes.  So a couple of things.  This is when I was, again,

17   still transitioning the majority of the direct partner

18   resource responsibilities to Nathalie.  So I wanted to make

19   sure that momentum continued with the issues that were

20   emerging and that there was a plan in place to address all the

21   issues that were emerging.

22        And so it accomplishes that, as well as there was a grid

23   or something that followed this that outlined whose

24   responsibility it was to do what.  It might have been the

25   document that was attached here.

*Pinto - Cross*                                    154

```
 1        But this was one of many iterations -- that's it.  One of

 2   many iterations to follow so we understand and ensure that

 3   we're addressing the issues and themes that had surfaced to

 4   date and the plan continued.

 5   Q.   If I go down in that document, it shows prior conflicts

 6   are surfacing -- resurfacing with racial allegations attached.

 7   A.   Yes.

 8   Q.   So I see that.  And partners are experiencing a range of

 9   emotions and need a venue to be heard.

10   A.   Yes.

11   Q.   If I understand your testimony previously, the range of

12   emotions wasn't just limited to African American partners?

13   A.   No.

14   Q.   It was equally among non-African American partners as

15   well?

16   A.   Right.  That's correct.

17   Q.   And did you have a process so that they could be heard as

18   well, everyone in the organization?

19   A.   Multiple processes, yeah.

20   Q.   One of which I think you previously testified to which

21   was the roundtables?

22   A.   Correct.

23   Q.   Anything else?

24   A.   I think we established an email inbox that partners could

25   send stuff to anonymously.  And then we also, we have the PRSC
```

*Pinto - Cross*                                        155

```
 1   department, which functions independently of any field-based

 2   operation or HR operation, has a process where you can go on

 3   the website and post issues that need correction or there's an

 4   800 number you can call with issues.  So we had a campaign to

 5   create awareness around that to make sure that all partners

 6   understood that that was an outlet.

 7   Q.   What is PRSC?

 8   A.   It stands for -- testing my memory now -- partner

 9   resource support center, I believe.

10   Q.   And that was set up after the incident or was that

11   already in place?

12   A.   No, no.  That was always.  Yeah, that was set up years

13   before.

14   Q.   How did that get triggered during the application of

15   these incidents?

16   A.   It was really more of an awareness to it again to help

17   support because the leaders that were in the field trying to

18   uncover all this also had to, you know, ensure that the stores

19   ran and customers were served, you know, the business ran

20   and sort of a sustainment plan.  And so we were pulling in all

21   of these support mechanisms to -- so we could get it off the

22   plate of operators so they could go out and operate their

23   stores and do their jobs and not be focused on all of the

24   distractions.

25   Q.   If I go down the list as well, the bullets show:
```

1   UB-training, Keep it or not - decide later.

2        Can you tell us what that is?

3   A.   Yeah.  Unconscious bias training.

4   Q.   So was there discussion around unconscious bias training

5   at the time?

6   A.   There was.  And this was something that we had brewing

7   before the event.  And, you know, Starbucks was always having

8   conversations to sort of evolve everybody's perspective on a

9   variety of topics.  And this was a training that was targeted

10  towards creating awareness to some unconscious biases that

11  people may have and just be unaware of and how they could

12  potentially come out in either hiring decisions, promotion

13  decisions, that sort of thing, and creating an awareness.

14       And we had done it at higher management levels.  And with

15  the Philly incident happening, I wanted to create a

16  conversation about whether or not this was the right timing

17  for it.  Did it make sense to do that with everything that was

18  going on in Philly.

19  Q.   Ultimately, did that occur so that there was unconscious

20  bias training systemwide?

21  A.   Ultimately, I believe it did.  I think we did end up

22  holding off on the Philly market because we had developed that

23  other training that was mentioned earlier that went out -- I

24  believe it was on the 29th of April.

25  Q.   So let me stop you there.

*Pinto - Cross*                                          157

```
 1        So is there -- the unconscious bias training that was
 2   already in development prior to the incident in April of
 3   2018 --
 4   A.   Right.
 5   Q.   -- that's what you're referring to?
 6   A.   Correct.
 7   Q.   And that dealt with hiring promotion as well as other
 8   kinds of decision-making that happened at the field level?
 9   A.   Not at the field level.  If I recall correctly, we
10   probably started this training, I want to say, maybe a year
11   before to the director and then eventually the district
12   manager level.  And we would often do that to get their
13   opinions on whether or not they felt it would make sense for
14   stores to roll out in a further capacity.
15        And so this was that sort of period where we were
16   deciding what goes out to the field.
17   Q.   And then there was another training, separate and apart
18   from the one that's identified in your bullet points, of the
19   training that -- where it occurred that shut down all of the
20   stores that was provided systemwide?
21   A.   Correct.
22   Q.   And that was done around Memorial Day 2018?
23   A.   Correct.  Yeah, and it's hard to label that as a training
24   as much as a conversation.
25   Q.   Can you describe -- provide context to the jury as to
```

1    what actually happened?

2    A.    Some.   The -- my memory is being tested.  But it was --

3    you know, we were in this difficult spot where so much was

4    coming from different locations, and we wanted partners in the

5    store to feel comfortable talking about things that were

6    coming at them, whether personal experiences, things that were

7    being triggered, that sort of thing.  And we also recognized

8    that, you know, store managers, most of them first-time store

9    managers, probably in their 20s, aren't fully equipped to

10   handle that kind of topic.  And so we approached it as more of

11   a conversation to kind of, you know, uncover some of the

12   issues that were emerging that we still either needed to deal

13   with or where we were getting things right or where we weren't

14   getting things right or addressing situations that way.

15   Q.    Do you believe it was effective?

16   A.    I think it was a good beginning, to be honest with you.

17   I think it depends on the market.  I think in some markets

18   where those type of issues were more common, it was a mix of

19   whether or not it was effective, just based on the

20   circumstances.  And then in other markets, people were

21   wondering why we were even doing it, because there's no issue

22   here.

23        And so I think it was a mix, but I think it was also a

24   good way for us to test and learn what needed to come behind

25   that.

*Pinto - Cross*                                        159

```
 1   Q.   Showing what's been previously marked as a joint exhibit,

 2   105.

 3          MR. HARRIS:  Can you please put that on the screen?

 4   BY MR. HARRIS:

 5   Q.   Mr. Pinto, showing you a document that's been previously

 6   marked as Joint Exhibit 105.

 7   A.   Okay.

 8   Q.   There are several pages to this document.

 9        After you read the first page, let us know.  We'll go to

10   the second page.

11        After the second page, we'll turn it to the third page.

12   A.   Okay.

13   Q.   After you finish looking, let us know as to whether or

14   not you recognize this document.

15   A.   Okay.

16   Q.   Do you recognize this document, sir?

17   A.   I do.

18   Q.   Can you describe what this document seems to reflect?

19   A.   Yep.  This is a document that shows the conversation

20   between me, Zeta and Camille in terms of how the conversation

21   with Shannon will roll out.

22   Q.   If I could specifically address the third page of that

23   email exchange that begins with from Zeta.  It appears from

24   Nathalie Cioffi as well.

25        It says subject:  Key Messages for Shannon 5/8.
```

*United States District Court*

*Pinto - Cross*                                      160

```
 1          And then, it also says at the top of that email:
 2   Paul/Zeta/Nathalie?
 3             THE WITNESS:  Yes.
 4             MR. HARRIS:  I'd like to have this marked as Joint
 5   Exhibit 105 and moved into evidence, Your Honor.
 6             MS. MATTIACCI:  No objection, Your Honor.
 7             THE COURT:  So admitted.  It may be published.
 8             (Exhibit 105 admitted into evidence.)
 9   BY MR. HARRIS:
10   Q.   Directing your attention to that document where it says:
11   I've summarized the themes below to ensure we're aligned on my
12   key talking points for today's conversation with Shannon.
13          Did I read that accurately?
14   A.   Yes.
15   Q.   Is this the email that you were referring to during your
16   direct examination as it relates to the list of items that
17   were going to be discussed as relates to Ms. Phillips
18   regarding --
19   A.   Yes, were going to be discussed and some that had been
20   discussed.
21   Q.   Going to be and had been?
22   A.   Correct.
23   Q.   Regarding her leadership specifically?
24   A.   Correct.
25   Q.   This is the email that you were referring to?
```

 1   A.   Yes.

 2   Q.   Can you please read that second bullet on that document,

 3   please?

 4   A.   Okay.  It's become more apparent over the last few weeks

 5   that you are overwhelmed.

 6   Q.   So is this a reflection of what Camille had shared with

 7   you and the rest of the team regarding the conversations that

 8   she -- when I say "Camille," I'm talking about Ms. Hymes.

 9   A.   Yes.

10   Q.   The conversations that she had had with Ms. Phillips?

11   A.   Yes.

12   Q.   So this wasn't the first conversation?

13   A.   No.

14   Q.   There were several conversations that had led up to --

15           MS. MATTIACCI:  Objection, Your Honor, leading.

16           MR. HARRIS:  I'll rephrase.

17           THE COURT:  All right.

18   BY MR. HARRIS:

19   Q.   Mr. Pinto, you have testified that there were several

20   conversations prior to Ms. Phillips being -- ultimately the

21   decision to separate Ms. Phillips?

22   A.   Yes.

23   Q.   Do you recall whether or not Ms. Hymes had shared with

24   you and the team whether or not those conversations would have

25   happened on multiple occasions?

 1  A.   Yes.

 2  Q.   Does this email reflect or memorialize the fact that

 3  those conversations had been had?

 4  A.   Yes.

 5  Q.   Okay.  And I go to this third bullet point where it says:

 6  Your leadership presence has been severely lacking and is

 7  showing up more frequently (late for field visits with

 8  Zeta/Rossann in market, late for virtual roundtables, late for

 9  leadership -- I'm sorry -- lack of leadership voice on "stand

10  up calls" --

11       What were stand up calls?

12  A.   Stand up calls were something that I believe in the

13  market happened every day.  Some markets do it differently,

14  but it's just a quick touch base in terms of what's going --

15  what's on deck.

16  Q.   Lack of awareness in the details or ops services tours.

17       What was that?

18  A.   Yeah.  Ops services tours were -- ops services is the

19  team in Seattle that works on operationalizing initiatives and

20  tools that I mentioned before that everything the field needs

21  in order to run their organization.

22       And so they came out to the market to, you know, among

23  other things, look at what could be iterated with the Safe and

24  Welcoming, and that's what Camille is referring to.

25  Q.   And I was neglectful by not pointing out to the very

1    first bullet on this document.

2         It says:  This conversation builds on several previous

3    conversations regarding your leadership in the market and my

4    concern for your ability to lead, as the RDA role has evolved.

5    A.   Yes.

6    Q.   Can you tell us about the evolution of the role?

7    A.   The evolution of the role?

8    Q.   Yes.

9    A.   Yeah.  It -- all roles in the organization evolved pretty

10   significantly.  And I would say specifically with the RD role,

11   it dramatically shifted from the type of role of implementing

12   what you were told to do towards being the market leader that

13   tells Seattle what you need to accomplish what you need to

14   accomplish in your market.

15   Q.   Could you be more specific in what you mean by that?

16   A.   Sure.  In the -- I'm trying to think of a topic where

17   that would be a good example.

18   Q.   Let me ask you a different question.

19        Was the expectation as the role evolved for the leader,

20   the RDO, to actually initiate processes and systems?

21   A.   Absolutely.

22   Q.   As opposed to having edicts given to that role?

23   A.   Absolutely.

24        Actually, a good example is what was not in place in our

25   market:  the SM approach and the approaches that I mentioned

1    before.

2        So when those approaches are launched, it is typically

3    done in Seattle during a regional director or, you know, a

4    countrywide meeting, and they roll out a plan.  There's an

5    opportunity for conversation in terms of why we're doing it.

6    There's an opportunity for RDs to say:  This makes sense for

7    my market.  It doesn't make sense for my market, but here's my

8    concerns.  And then programs are massaged so that they're

9    implemented well.

10       There would have been multiple opportunities for Shannon

11   to do so with the approaches because they were a couple years

12   old at that point, and there were various iterations, and they

13   just weren't in place.

14   Q.  When did you first uncover the fact that those systems

15   were not in place?

16   A.  When we started going store to store, district to

17   district, market to market and wondering why the stores were

18   being operated so differently than they were everywhere, and

19   we discovered that multiple of the approaches weren't in

20   place.

21   Q.  Would the expectation of the regional director's role to

22   provide those systems in uniformity among --

23   A.  Yes.

24   Q.  -- and through her market?

25   A.  Yes.  Or if it didn't make sense in their market, provide

1   feedback back, even if the feedback is "I'm not implementing

2   this in my market, and this is why" so that there was an

3   understanding that that is also a good example of the type of

4   leadership shift that was required in the market, rather than

5   being an implementer of programs to be a market leader.

6   Q.   Did you have those conversations specifically with

7   Ms. Phillips about your feedback or reaction to those systems

8   or lack thereof?

9   A.   That would have been Camille.

10  Q.   Mr. Pinto, can you tell us why this process sped up so

11  quickly in terms of the separation of Ms. Phillips?

12  A.   Sure.  Again, it is, you know, sort of the example of the

13  arteries being blocked and surgery required rather than

14  addressing it through diet and exercise.  A change needed to

15  happen immediately.  There were -- you know, she's --

16  Shannon's responsible for 5- -- about 5,000 partners in her

17  market, and the market was experiencing significant

18  difficulties.  All of these issues were uncovered, and change

19  needed to be -- to happen immediately.

20  Q.   And you agreed with that change?

21  A.   I did.

22  Q.   Was it a group decision?

23  A.   No.  It was Camille's decision.

24  Q.   Okay.  Did you participate?  If you had an objection, did

25  you lodge one?

 1  A.    Absolutely.  If there were objections, sure.

 2  Q.    Was it racially motivated?

 3  A.    I didn't hear the first part.

 4  Q.    Was it racially motivated, the decision to separate?

 5  A.    No, absolutely not.

 6  Q.    Why do you say that?

 7  A.    Wasn't a factor.  Didn't enter the conversation.  Wasn't

 8  a concern.

 9  Q.    Mr. Eckensberger replaced Ms. Phillips in that role?

10  A.    He did.

11         MR. HARRIS:  No further questions.  Thank you.

12         THE COURT:  Do you have cross?

13         MS. MATTIACCI:  Yes, Your Honor.  Thank you.

14                    REDIRECT EXAMINATION

15  BY MS. MATTIACCI:

16  Q.    Isn't it true that every single day from April 12, 2018

17  until May 8, 2018, when Ms. Phillips was fired, that everyone

18  at Starbucks was thinking about race?

19  A.    I don't think that's accurate.  I think there were lots

20  of people thinking about how to continue the operation of the

21  stores.

22  Q.    Every day, wasn't race part of the conversation?

23  A.    No.  I would say no.

24  Q.    So even though this whole incident occurred and they

25  implemented store -- company-wide, shutting down every single

 1   store for implicit bias training, you're saying race was not

 2   the discussion every day?

 3   A.   I am saying that.

 4   Q.   On the day that she was terminated, you were thinking

 5   about her race.  Correct?

 6   A.   I was thinking about her leadership.  I wasn't thinking

 7   about her race.

 8   Q.   So you're saying it never crossed your mind that the

 9   person that you're choosing to be terminated is white?

10   A.   No.

11   Q.   You started off the direct examination by Mr. Harris

12   saying that Mr. Trinsey was fired because of pay disparity

13   allegations; is that correct?

14   A.   No.  I said there were multiple allegations.  That was

15   one of them that surfaced that was investigated by the PRSC.

16   And the recommendation was to separate him.

17   Q.   Ms. Phillips was not terminated because of any

18   race-related pay allegations that were connected to

19   Mr. Trinsey.  Correct?

20   A.   Correct.

21   Q.   So any implication that somehow she was responsible for

22   any sort of race discrimination pay allegations vis-à-vis

23   Mr. Trinsey, that's not correct.  Correct?

24   A.   That is not a true statement.  Her role, she would have

25   been ultimately responsible for those type of things that

1    entered in.  But that is not why she was being separated.

2    Q.   And that did not play a role in her separation.  Correct?

3    A.   It did not.

4    Q.   In terms of pay disparity issues, isn't it true that the

5    regional vice president, who in this case would be Camille

6    Hymes, is also responsible for any sort of pay disparity

7    issues that fall below her?

8    A.   It's a bigger scope.  She wouldn't have had eyes on it in

9    the way that Shannon would in her market, but ultimately

10   everything rolled up to Camille from all of her RDs.

11   Q.   Weren't you, in particular to this Mr. Trinsey issue,

12   weren't you concerned that Ms. Hymes wasn't aware of it

13   either?

14   A.   No.  It wouldn't have been reasonable for her to know the

15   pay difference between one store manager over another.

16         MS. MATTIACCI:  May I approach the witness, Your

17   Honor?

18         THE COURT:  Yes.

19   BY MS. MATTIACCI:

20   Q.   I'd like to direct your attention to page 136 of the

21   deposition.

22   A.   Okay.

23   Q.   You got it there?

24   A.   I do.

25   Q.   The question to you was:  To your knowledge, did

1   Starbucks take a look at --

2   A.   Can you tell me where that is?

3   Q.   Yes.  Line 11, page 136.

4   A.   136, okay.

5   Q.   To your knowledge, did Starbucks take a look at its pay

6   practices based on race across markets other than Philadelphia

7   following the events associated with the arrests of the two

8   gentlemen in the city?

9       Answer:  It was part of their annual approach for as long

10  as I can remember, not just based in Philadelphia.

11      Question:  And so if this was an annual event, do you

12  have any explanation for why any concerns associated with how

13  employees were paid in any region managed by Ms. Phillips

14  weren't picked up before?

15      Answer:  Well, I think it was probably because it was

16  within a range of the position.  But it didn't address the

17  specific issue.  I think with our compensation and benefits,

18  the approach is that they set ranges and that -- that they set

19  market ranges based on studies that they do, and they also

20  rely heavily on leaders for more of a microknowledge with

21  what's occurring within their own geographies and even

22  microgeographies within their geographies.

23      Question:  Okay.  So if we're going to do the micro, you

24  know, if you're going to do the microlevel, isn't it true that

25  really the district managers would have the best sense of what

*Pinto - Redirect*                                          170

```
 1   was happening at a microlevel within their market in

 2   connection with pay?

 3        And you said:  Equally.

 4        Correct?

 5   A.   Correct.

 6   Q.   And then it goes on:  It would be equally -- I would have

 7   concerns with the regional vice president that wasn't also

 8   aware of that.

 9   A.   Correct.

10   Q.   And the regional vice president was Camille Hymes.

11   Correct?

12   A.   Correct.

13   Q.   But Ms. Hymes wasn't terminated.  Correct?

14   A.   Correct.  But that's -- what I was referring to here were

15   broader issues, not pay disparities between one store manager

16   and the next.  I think up above where I said it was within the

17   range, which is probably why it wasn't picked up by the equity

18   evaluation from our corporate office, when I talk about

19   microdisparities, what we relied on from the markets is to

20   understand, for example, in Philly with all the bridges and

21   all that, they're very smaller markets where different pay

22   strategies need to be in place.

23        So if Camille were not aware of all of that, yes, I would

24   have concerns.

25   Q.   Well, she must not have been aware, because you're saying
```

1  that y'all found out about this in April and May of 2018.

2  Correct?

3  A.   I don't think she was aware of that one particular issue

4  that PRSC evaluated.  I don't think so.  I don't know for

5  sure.  I didn't ask her about it.

6  Q.   Okay.  But you're holding Ms. Phillips accountable for

7  somehow not being aware?

8  A.   She was not separated over this issue.

9  Q.   Okay.  So the pay disparity/race issue is not one of the

10 reasons that she was separated?

11 A.   It is not.  At all.

12 Q.   Okay.  The second thing that you talked about on direct

13 examination was about baristas saying that they wanted to have

14 a clearer idea of how to be promoted.  Correct?

15 A.   Correct.

16 Q.   And in fact the guide that Mr. Harris showed you, there's

17 a whole section on promotion and the guidelines around how

18 somebody should be promoted.  Correct?

19 A.   I would have to see it.  I didn't -- it's been five

20 years.

21 Q.   Sure.  I can bring it up.  It's going to be Exhibit 111.

22 A.   Okay.

23       MS. MATTIACCI:  We just need to toggle.  Thank you.

24 BY MS. MATTIACCI:

25 Q.   I'm going to go to page 43 on 111.

*Pinto - Redirect*                                    172

         MS. MATTIACCI:  One moment, Your Honor, while I find

the right page.

BY MS. MATTIACCI:

Q.   I'm going to move on from that right now.  We'll come

back to that.

     You talked about Camille Hymes, that there was a lot of

mistakes on Ms. Hymes' part found?

A.   I think she would tell you that there are certain things

that she felt she should have seen sooner.

Q.   Well, you testified on direct examination that Ms. Hymes

made a lot of mistakes.

A.   I don't know if I said she made a lot of mistakes, but I

think she would say that too.

Q.   And to the extent if there was any issues with Shannon

Phillips and these things that were allegedly uncovered in

April and May of 2018, Ms. Hymes is her direct supervisor.

Correct?

A.   She is.

Q.   But she wasn't fired for any of that lack of oversight.

Correct?

A.   Correct.

Q.   And Mr. Sykes wasn't fired in terms of any of this.

Correct?

A.   Correct.

Q.   In terms of the Philadelphia, where the 18th and Spruce

1  store was located and the incident happened on April 12th,

2  this was -- this was the structure.  Correct?

3  A.   What do you mean by "structure"?

4  Q.   Holly Hylton to Paul Sykes to Shannon Phillips.

5  A.   Yes.

6  Q.   And Ben Trinsey's region or half of Philadelphia did not

7  have anything to do with the 18th and Spruce store.  Correct?

8  A.   Correct.

9  Q.   You're implying that there was a failure of some sort by

10 Ms. Phillips to inform the baristas about how to know how to

11 get promoted or what their opportunities are.  Correct?

12 A.   No.  I would say what I was implying was there were very

13 specific approaches on how to create talent cycles in the

14 market.  So there's one-on-ones that were expected, store

15 managers to have with their partners.

16 Q.   Let me stop you right there.

17      One on one with store managers.  So you're saying store

18 managers and their hourly employees should be setting up

19 one-on-ones?

20 A.   Correct.

21 Q.   And Mr. Sykes would be the one that would be supervising

22 Holly Hylton and half of the Philadelphia region in terms of

23 the store managers.  Correct?

24 A.   Correct.

25 Q.   And so to the extent you cover any issues that there

1   weren't one-on-ones happening, half of those were under

2   Mr. Sykes, right, and the other half were under Mr. Trinsey?

3   A.   We looked at the entire market, not just the two

4   Philadelphia districts.

5   Q.   Okay.  But within the Philadelphia districts, you had

6   stores that were under Mr. Sykes, and you had stores that were

7   under Mr. Trinsey.  Correct?

8   A.   That's correct.

9   Q.   And it wasn't like Mr. Sykes' stores had absolutely no

10  issues on that.  You didn't uncover that.  Correct?

11  A.   No.  It was not issue-free.

12  Q.   There were issues concerning Mr. Sykes' leadership in the

13  way he was running his stores, you determined.  Correct?

14  A.   That's correct.

15  Q.   But he wasn't fired?

16  A.   He was not.

17  Q.   And the California leadership training that you talked

18  about, where Ms. Phillips went to California and you set her

19  up, that was years ago, wasn't it?

20  A.   Yes.

21  Q.   It wasn't like something recently, close to her

22  termination that she somehow needed some leadership training

23  or public speaking training in California.  Correct?

24  A.   No.  Like I said, it was after the trip that I made when

25  she was a district manager in Youngstown.  So that was years

 1  before.

 2  Q.   Right.  It was before she even came to Philadelphia.  It

 3  was when she was living in Ohio.  Correct?

 4  A.   That's right.  Yep.

 5  Q.   When Mr. Harris was asking you about the forms of

 6  corrective action, you talked about how you have to evaluate

 7  the seriousness of the infraction?

 8  A.   That's right.

 9  Q.   And that if it's a cardiac failure, the person has to be

10  terminated right away.  Correct?

11  A.   In some cases, that's correct.

12  Q.   And so the conduct of Ms. Phillips was at the highest

13  level of infraction, the highest level of seriousness that she

14  had to be terminated immediately?

15  A.   I don't think it was immediately, but there was a clarity

16  that she was not the right leader for the market moving

17  forward.

18      And so we wanted to enter into conversation with her

19  about what does a departure from that role look like for her.

20  Q.   Meaning being fired?

21  A.   If that was the outcome.  That's what we -- when we tried

22  to have conversations with her about it, she wouldn't.

23  Q.   Well, you had already presented her with a severance

24  package?

25  A.   Because she wouldn't have a conversation with us, so we

1  wanted to give her something to react to.  We tried to engage

2  her in a dialogue before, and she wouldn't engage in a

3  dialogue.

4  Q.    On May 8th, when she went in and had to suspend Ben

5  Trinsey --

6  A.    Yes.

7  Q.    -- that was in the morning.

8       Right after that is when she had the meeting, after she

9  had to call Mr. Trinsey's subordinates and store managers and

10 tell them that he was going away for a while, not coming back,

11 then she was brought into a meeting and she was told that this

12 situation was unrecoverable.  Right?

13 A.    I think that's right.  And I think even before that,

14 Camille had a call with her to give her a heads-up to the

15 situation, that that conversation was going to happen.

16 Q.    There was never a conversation in which an alternate

17 position was offered to her other than the community

18 leadership position.  Right?

19 A.    That's right.

20 Q.    And so that position was pulled away from her, and then

21 there was no other avenue that was presented to her as a

22 possibility?

23 A.    There was no opportunity to discuss another avenue.  She

24 never came back with "Can we look at this?" or "Here's what

25 would be important to me" or "I have an interest in this."

Pinto - Redirect                                              177

1   There was no conversation starter.

2   Q.   Why couldn't of you had that conversation with her?

3   Instead of telling her the situation's unrecoverable, say:

4   Here's some alternative options for you for your employment so

5   you're not tossed out on the street.

6   A.   We could have, but when we tried to have that

7   conversation, she just sat very closed, would not respond and

8   wouldn't engage in dialogue.  It's hard to have a conversation

9   about different avenues or possibilities with someone that's

10  not responding.

11  Q.   What avenues and possibilities were you going to present

12  to her if she gave you that opportunity?

13  A.   I wasn't presenting anything.  I wanted to understand

14  what was important to her.

15  Q.   So you didn't have any avenues -- or I think -- would you

16  agree with me that it was important to her to remain employed?

17  A.   I didn't know anything at that point, to be honest with

18  you.  Like I had described, she was in a frozen sort of state,

19  and so we were trying to figure out how do we correct this

20  market?  And it was hard to have any kind of ideas other than

21  that community role, which we knew she was good at, without

22  having a dialogue.

23  Q.   I'm talking about the meeting in which you terminate her

24  and say the situation's unrecoverable.  You're saying that you

25  had to go to that place because she was so stoic and frozen,

1   she couldn't have a conversation with you?

2   A.   That's right.

3   Q.   But if she wasn't stoic and wasn't frozen, you actually

4   don't have any alternative plans for employment?

5   A.   I think we would have explored plans that she was

6   interested or avenues that she was interested or

7   possibilities.  It's hard to come back to someone with

8   possibilities without knowing where their head's at.

9   Q.   You don't think her head was that she wanted to be there

10  and be able to support her kids?

11  A.   It was hard to tell.

12  Q.   Rossann Williams could have created any position she

13  wanted for Shannon Phillips.  Right?

14  A.   Well, I think she had the power to, but it would still

15  need to make sense.

16  Q.   Yeah.  I mean, international company and her level, there

17  could have been a position that she created?

18  A.   Sure.

19  Q.   But she didn't?

20  A.   No.

21  Q.   And Ms. Phillips had relocated her family from Ohio to

22  New Jersey for this position.  Correct?

23  A.   Correct, yeah.

24  Q.   And at a certain point, Starbucks had requested that she

25  go to the Hamptons for the summer and work the whole summer in

1    the Hamptons, and she did it.  Right?

2    A.   Correct.

3    Q.   And the Hamptons was a really high-profile region to be

4    in charge of because the CEO had a house there.  Right?

5    A.   Correct.  It was a district.

6    Q.   District.

7         So in that district, the CEO had a house there.  Correct?

8    A.   Correct.

9    Q.   And other --

10   A.   Oh, I'm sorry, not the CEO.  Howard had a house there.

11   Q.   Howard Schultz had a house in the Hamptons?

12   A.   Yeah.  I don't know if he was the CEO at that time.  He

13   may have been.

14   Q.   And, in fact, he would visit some of the stores.  Right?

15   A.   Correct.

16   Q.   And there were other high-level executives at Starbucks

17   who also had places in the Hamptons.  Correct?

18   A.   I don't know.

19   Q.   Sometimes there would be meetings at the Hamptons?

20   A.   I don't know.

21   Q.   And Shannon Phillips did a great job when she was the

22   district manager of the Hamptons for that summer.  Correct?

23   A.   She did, yep.

24   Q.   This tap-out policy, I heard an implication on direct

25   examination by you that somehow, because Shannon was tired,

Phillips - Redirect                            180

1    they created this tap-out policy to let her take a couple days

2    off.

3          But that's not true.  Correct?

4    A.   I'm not clear on your --

5    Q.   The tap-out policy wasn't personal to Shannon?

6    A.   It wasn't because Shannon was tired.  It was we realized

7    that we needed a mechanism to ensure that leaders could say:

8    I need some time off.

9    Q.   Right.

10   A.   Yeah.

11   Q.   I mean, it was a very stressful time.  You'd agree?

12   A.   Absolutely, yeah.

13   Q.   And everyone was feeling the stress.  Correct?

14   A.   Yeah.  I was there, yes.

15   Q.   And everyone, including Camille Hymes and Zeta Smith,

16   were told that they needed to tap out?

17   A.   Yes.

18   Q.   And so when Shannon Phillips tapped out, that wasn't just

19   something -- some sort of performance deficiency on her part.

20   Correct?

21   A.   No.  No, no.

22   Q.   If we look at 135, this is -- 135 is the tap-out.

23         Let's go to 71.

24         This is the email that Mr. Harris showed you on direct

25   examination from you to Camille Harris (sic), Nathalie, Tammi

Phillips - Redirect                           181

1   and Ebony on Tuesday, April 24th.

2        And you'd agree with me that nothing in these bullet

3   points has any negative affixation or fixed on anything that

4   Shannon Phillips did.  Correct?  You don't see her name

5   anywhere in this document?

6   A.   No.  It would have also been highly inappropriate for me

7   to do so given that Nathalie, Tammi and Ebony were copied on

8   this.

9   Q.   Why would that be?

10  A.   Because they're not at the level where they would be --

11  well, Nathalie would have been, but Tammi and Ebony were not

12  at the level where they would have been privy to any Shannon

13  performance concerns.

14  Q.   Well, Ebony was in HR.  Right?

15  A.   Yep.

16  Q.   Tammi was in HR?

17  A.   DEI.  And Ebony was a partner resources manager.  She

18  wouldn't have been at the level where we would be discussing

19  director-level performance concerns with her.

20  Q.   So you're saying that there's a bullet point in here that

21  directly reflects on a performance issue of Ms. Phillips?

22  A.   No.  I said yes to your first answer, and also, it would

23  have been inappropriate for me to do that here.

24  Q.   Okay.  Okay.  Just so we're clear, none of these bullets

25  apply to Ms. Phillips' performance issue?

```
 1   A.    No.

 2   Q.    Okay.  On direct examination, you also said that when the

 3   diversity/implicit bias training went into place on May 29th

 4   for Starbucks, that it was more of a conversation rather than

 5   a training.  Correct?

 6   A.    Uh-huh.

 7   Q.    Yes?

 8   A.    That's my understanding, yes.

 9   Q.    And that one of the reasons was because a lot of the

10   store managers were in their 20s and not equipped to have

11   those conversations fully?

12   A.    Correct.  And there was also prior to, which I think was

13   one of the bullet points, when they heard that there was going

14   to be that type of event, there was concerns -- they had

15   concerns about being equipped to facilitate that.

16   Q.    And Ms. Hylton was also in that category.  Correct?

17   A.    Who?

18   Q.    Holly Hylton.  She was a store manager.

19   A.    I don't think she was there at the time.

20   Q.    No.  She had been fired already.  But I mean in terms

21   of she was -- she would have been a store manager in her 20s,

22   not fully equipped to have those conversations?

23   A.    That's right.  Yep.

24   Q.    Let's look at 105, which was these bullet points of

25   Camille Harris that were sent -- of Camille Hymes -- I'm
```

```
 1    sorry -- that were sent to you.
 2          The date on this is May 8th at 8:42 a.m.  This is
 3    actually the day that Ms. Phillips was told that she was to be
 4    terminated.  Correct?
 5    A.   Yes.
 6    Q.   And this is the only document of any sort of articulation
 7    of anything about Ms. Phillips' performance.  Correct?
 8    A.   It's possible.
 9    Q.   This was never shared with Ms. Phillips.  Correct?
10    A.   Don't know.  I didn't.
11    Q.   The response by you at 9:05 was:  I think this is a lot.
12    I would suggest we drill it down to what we said and leave the
13    rest for the Wednesday discussion.
14          Key points:  You have not been picking up on my hints
15    around the seriousness of this situation.
16          So the criticism of Ms. Phillips was that she wasn't
17    picking up on hints?
18    A.   No.  This is -- this is -- sorry.
19          Let me back up.
20          This is my suggestions to Camille on how to pare down her
21    talking points.
22    Q.   Right.  So your summary of what you understood the issues
23    to be were, one, that Ms. Phillips was not picking up on
24    Camille's hints of the seriousness of the situation?
25    A.   Correct.
```

*Franco - Redirect*                          184

 1    Q.   And are you saying that your understanding was that

 2    Ms. Phillips didn't think it was a serious situation?

 3    A.   No.  My understanding from Camille was that Shannon was

 4    not seeing it as serious as it was, based on the multiple

 5    conversations that Camille had with her.

 6    Q.   But you have nothing specific, like actual -- what was

 7    said by Ms. Phillips, to lead somebody to believe that she

 8    didn't think it was serious?

 9    A.   No.

10    Q.   And second was:  As a continuation of our discussions and

11    what has recently come to light, I need to make a leadership

12    change with you in this market.

13         There's no specific example in there at all of what that

14    means.  Correct?

15    A.   Correct.  Just what we talked about today.

16    Q.   I want to -- and the third one is:  I want you to think

17    about what will help you transition successfully out of

18    Starbucks and you and I will meet tomorrow to discuss.

19    Correct?

20    A.   Correct.

21    Q.   So when you were just testifying a few minutes ago about

22    how this conversation that she was going to have with

23    Ms. Phillips was going to include some possible avenues for

24    her to do other things in Starbucks, that actually -- the

25    decision had already been made that they were going to

```
 1   transition her out?
 2   A.   Yeah.  I don't think I testified that it would include
 3   possibilities of other things in Starbucks.  What I was
 4   testifying to was the fact that Shannon did not give us
 5   anything to react to.  That could have been something that she
 6   brought back as an option.  But my testimony was not that we
 7   would present avenues to stay in Starbucks.
 8   Q.   Okay.  So your testimony is the plan was:  We're going to
 9   tell her she's fired, but then if she comes back with
10   something after that, then we'll pivot and maybe do something,
11   but she didn't?
12   A.   No.
13   Q.   And then at the -- next email is Ms. Hymes.  She says:
14   She's going to want examples of why I made this decision.
15   Let's walk it through so I'm aligned.  Correct?
16   A.   Correct.
17   Q.   So you didn't have any specific examples at that time of
18   what the actual issues allegedly were?
19   A.   I may have had at the time, but that would have been a
20   dialogue.
21        Can you scroll up a little bit?  I just want to see the
22   sequence.
23   Q.   That's the top of that page.
24   A.   Okay.  And did that come before or after -- if you can
25   scroll down a little bit.
```

```
 1        I think this is a different one.
 2   Q.   She's going to want examples of why I made this decision.
 3   A.   Above that just a little bit, like -- okay.
 4        Okay.  Got it.
 5        So she's responding to Zeta, is that what it looks like
 6   from the two pages?
 7   Q.   No.  It looks like you were responding to Camille.
 8   A.   By she's going to want examples?
 9   Q.   Yeah.  We can look right at it.  I want to be clear here.
10   A.   Okay.
11   Q.   May 8, 2018 at 6:31.
12   A.   Yeah, that's Camille that wrote that.  She's going to
13   want examples.  Okay.
14   Q.   Right.  She's going to want examples.
15   A.   Okay.
16   Q.   And then Zeta Smith chimes in:  Agree with Paul.  I think
17   the challenge will be to keep it brief, since she will likely
18   want to talk it out.
19   A.   Correct.
20   Q.   And you're saying that you gave her an opportunity to
21   talk it out and she didn't want to take it?
22   A.   And she didn't.  Yeah.
23   Q.   Camille Hymes then responds:  I've spoken with Paul --
24   that means you -- we're aligned.  I plan to proceed with the
25   brief message as recommended below.
```

 1          Do you see that?

 2   A.   I do.

 3   Q.   And then there's messages about back and forth of when it

 4   will actually take place?

 5   A.   Right.

 6   Q.   Camille Hymes is indicating that she's on the call with

 7   her team to announce Ben's leave.

 8          So as you're communicating about firing her, she is on

 9   the phone having to call Ben Trinsey's whole team and all of

10   the store managers under him that report to him and have to

11   tell them that he has been suspended, and you're just waiting

12   there for her to come in for her to be terminated.  Correct?

13   A.   The timing of that is accurate.  I don't think the

14   message was that he was being suspended.

15   Q.   Ms. Hymes is her direct supervisor at this point.  Right?

16   A.   Correct.

17   Q.   So if there were specific examples about failed

18   performance issues, leadership issues, she would be able to

19   give them.  Right?

20   A.   Yes.

21   Q.   You would think?

22   A.   Yes.

23   Q.   But she wants to have a discussion and talk through it --

24   I'm sorry, you present that.

25          She's saying that Ms. Phillips needs examples and wants

*Pileo - Redirect*                                                      188

```
 1   to walk through it and make sure that you're all aligned.

 2   Correct?

 3   A.   That's right.

 4   Q.   And aligned means that you all have your stories

 5   straight.  Correct?

 6   A.   I think it's more -- this is common in sort of using your

 7   business partner with issues that can get a little heated and

 8   just to make sure that there's a confidence on Camille's part

 9   that the approach sounds like the right approach.

10   Q.   You want to make sure you're all on the same page.

11   Right?

12   A.   I don't know if it's on the same page.  Just that it's

13   clear.  But we were on the same page for this.

14   Q.   Now, none of these bullet points here, they were never

15   shared with Shannon.  There was no email given to her or

16   document or anything.  Correct?

17   A.   Again, not to my knowledge, I did not.

18   Q.   You started talking on direct examination about how there

19   was a shift in the role of the regional director.  Do you

20   remember that?

21   A.   I do, yeah.

22   Q.   When did that shift occur?

23   A.   Over years.

24   Q.   Over years?

25   A.   Over years, yes.
```

Pinto - Redirect                              189

```
 1   Q.   Okay.  So like how much longer before 2018?
 2   A.   I would say that the role started to evolve to more of a
 3   market leadership position -- it would have been when
 4   Camille -- right around the time that Camille first came into
 5   the organization.  And I'm not 100 percent clear on when that
 6   was.
 7   Q.   So that would have been many, many years before?
 8   A.   About four, five years before, I would imagine.
 9   Q.   So four or five years ago, there was a shift in the role
10   of the regional director to be more of a market leader and
11   Ms. Phillips had been successfully doing this new, evolved
12   role for at least four or five years then up until this point?
13   A.   Yes.
14   Q.   And so this alleged failure of hers, where she just fell
15   off the cliff when this incident occurred?
16   A.   Well, also, you know, like I mentioned before, the
17   magnifying lens that was created as a result of this event
18   uncovered many areas where Shannon was not doing her role
19   effectively, that was not caught by the organization or
20   Camille.
21   Q.   And it should have been caught by Ms. Hymes.  Right?
22   That was her failure?
23   A.   That was a failure.
24   Q.   But she wasn't terminated?
25   A.   She was not.
```

Pinto - Recross                                    190

```
 1           MS. MATTIACCI:  I don't have any further questions,
 2  Your Honor.
 3           MR. HARRIS:  Your Honor, may I briefly?
 4           THE COURT:  Yes.
 5                        RECROSS-EXAMINATION
 6  BY MR. HARRIS:
 7  Q.   Mr. Pinto, did you meet with other district managers
 8  other than Ben Trinsey and Paul Sykes when you entered the
 9  market after April 2018?
10  A.   Yes.
11  Q.   How many DMs did you meet with?
12  A.   All of Shannon's.
13  Q.   And how many would they have been, approximately?
14  A.   How many DMs?
15  Q.   Yes.
16  A.   At the time, there was probably somewhere in the
17  neighborhood of 10 to 12, I think.
18  Q.   Of the 10 to 12 that you met with other than Mr. Trinsey
19  and Mr. Sykes, how did you evaluate their performance?
20  A.   Similar.  You know, I just -- in terms of -- and my role
21  wasn't really to evaluate their performance.  It was really to
22  evaluate themes that were coming out from the markets.  But it
23  would have all been a similar approach.
24  Q.   When you understood themes, you would have uncovered
25  themes.
```

*Pinto - Recross*                                            *191*

1       Did you uncover the same themes with the other district

2   managers as you had with Paul Sykes and Ben Trinsey?

3   A.   No.

4   Q.   Different?

5   A.   Different.

6   Q.   How so?

7   A.   There was still a lack of development occurring in the

8   other areas, but the -- with -- well, probably less with --

9   with Ben and Paul, it was, you know, the -- everything that

10  was heightened by the events of April 12th showed sort of a

11  level of nonresponsiveness.

12      And there was a concern that DMs and -- certain DMs were

13  spending way too much effort on community interaction and

14  community initiatives like YouthBuild and not running their

15  organizations.

16  Q.   What are the areas that the DMs were responsible?  One of

17  which was community?

18  A.   Community.  Well, they're really bucketed into three

19  different ways at Starbucks; coffee, community and culture.

20      And community was always an important part for Starbucks

21  in terms of creating that third place environment in stores

22  and partnerships that existed and the right partnerships.

23      And then coffee is really the business.

24      And there was, you know, a big shift into the community

25  bucket, and not enough in the coffee bucket.

*Phillips - Direct*                                            *192*

```
 1            MR. HARRIS:  I have no further questions.  Thank you,
 2  Mr. Pinto.
 3            THE COURT:  All right.  That concludes the testimony.
 4            MS. MATTIACCI:  Yes, Your Honor.
 5            THE COURT:  You may step down.
 6            THE WITNESS:  Thank you.
 7            (Witness excused at 2:54 p.m.)
 8            THE COURT:  Next witness.
 9            MS. MATTIACCI:  The plaintiff calls Shannon Phillips
10  to the stand, Your Honor.
11            (SHANNON PHILLIPS, PLAINTIFF, having been duly sworn,
12  testified as follows:)
13            THE DEPUTY CLERK:  State and spell your name.
14            THE WITNESS:  Shannon Phillips, S-H-A-N-N-O-N,
15  Phillips, P-H-I-L-L-I-P-S.
16                        DIRECT EXAMINATION
17  BY MS. MATTIACCI:
18  Q.  Good afternoon.  You just introduced yourself to the jury
19  so we'll skip that question.
20      Can you tell the members of the jury where you live and a
21  little bit about yourself?
22  A.  Sure.  I live in Swedesboro, New Jersey, it's Exit 2 on
23  the Turnpike or 10 on 295.
24      I've lived there for about 13 years.
25      I have two children.  One, my oldest is my son, 25.  He
```

Phillips - Direct                                   193

1   goes to Rowan and lives with me.  And my other child, Morgan

2   is 24, and she lives in Boston.

3   Q.   You said you've lived there for about 13 years.

4        Where did you come from?

5   A.   I came from Ohio, so I was born and raised in Ohio, in

6   Columbus, kind of the central part of the state.

7        And then after I got married, my ex-husband got a job as

8   a fireman in Cincinnati which is in the southern part of the

9   state.  So we moved to Cincinnati.  And that's when I started,

10  I guess, working professionally.  That was my first adult job.

11  Q.   Okay.  Can we talk a little bit about your background in

12  terms of when you were in high school, what your -- briefly

13  through your working history back then?

14  A.   Oh, sure.  I started working when I was 14.  My first job

15  was at Chuck E. Cheese.  That's when I said I wasn't having

16  children.

17       My dad left when I was very young.  So I started working

18  young to help support.  And I worked all through high school

19  and then, you know, some miscellaneous jobs, Chuck E. Cheese.

20  I went to, after that, the opposite end, a retirement home and

21  worked in the restaurant area there.  And ended up, I think my

22  last job in Columbus was at Houlihan's, a restaurant, where I

23  worked as a cocktail server and ultimately a bartender.

24       And then I got married and moved down to Cincinnati as I

25  said.

Phillips - Direct                         194

1    Q.   Great.  What's your date of birth?

2    A.   Sorry, 6/29/71.

3    Q.   That makes you how old?

4    A.   Almost 52.  Thanks for pointing that out.

5    Q.   Just for the record.

6         Let's talk about your work history -- well, first of all,

7    when did you graduate from high school?

8    A.   1989.

9    Q.   Did you start working shortly after that in adult jobs?

10   A.   So yes.  Uh-huh.  At 21.

11   Q.   Can you describe for the jury your work history, when you

12   started working those jobs?

13   A.   So when we were going to be moving to Cincinnati,

14   obviously I knew I'd be changing jobs.  And I remember my --

15   he would bring home the newspapers, because that's how you

16   found a job back then.  And I saw that Blockbuster Video was

17   hiring.  And I thought, I like watching movies, that would

18   probably be a fun place to work, maybe I'll get free movies.

19   So I was hired there as an assistant manager in 1993.

20        And then I moved up from an assistant manager to a store

21   manager to a training store manager and then I was promoted to

22   a district manager when I was 24.

23        That position was in Chicago, so I moved to Chicago for

24   the job and actually lived apart from my husband for two

25   years.

*Phillips - Direct*                                        195

 1        And then even though we were living apart, I ended up

 2   getting pregnant with my son.  So I obviously wanted to move

 3   back to Cincinnati in the house with him and not try to have a

 4   child in a one-bedroom apartment in Chicago.

 5        So Hollywood Video called, and they were looking to hire

 6   a district manager in Chicago.  I said:  I'm trying to get

 7   back to Ohio.

 8        And luckily for me, they said:  We have a position in

 9   Ohio too.

10        So I ended up leaving Blockbuster and going to Hollywood

11   and moving back to Ohio, where I worked for -- I'm sorry.  I

12   worked for Blockbuster probably for about six years, and then

13   I worked for Hollywood for about the next six years.

14   Q.   Great.  Did you also have another child?

15   A.   Oh, yes.  After my son, 12-and-a-half months later, I had

16   my daughter.  And we were down in Cincinnati, and we had no

17   family.  My family was in Columbus, and his was in Youngstown.

18        I think Paul mentioned when he met me I was a district

19   manager in Youngstown.  We decided we wanted to move closer to

20   family to have help with the kids, and my ex-husband's father

21   was also a fireman, so he was able to get him on at the fire

22   department locally in Youngstown, called Holland, outside

23   Youngstown.

24        And so we moved up there, and that's where I was living

25   until I ultimately got promoted with Starbucks and then moved

Phillips - Direct                                    196

1    here.

2    Q.    Okay.   Thanks.

3         Can we talk about then just your employment at Starbucks

4    in particularly?

5         Can you tell the members of the jury when you started,

6    how you got that job, and the beginning of that?

7    A.    Oh, sure.

8         So I was -- when I left off, I was at Hollywood.  I had a

9    recruiter from one of my stores -- sorry, he was a customer at

10   one of my stores, but his job was a recruiter.

11        He called me and said that he was looking to fill a

12   position for a district manager at a company called CPI.  And

13   they were doing business as Sears Portrait Studios.

14        So I remember saying:  I'm not a picture person.  I am a

15   throwaway camera person.

16        But the future of video at this point was starting to

17   look a little scary.  The timelines had shortened.  People

18   were able to get stuff, you know, downloaded at home and

19   pay-per-view, and so I thought maybe this was a good time to

20   do something different.  My whole adult life was all video,

21   might be time to learn a different industry, so I went on to

22   Sears Portrait, and that was actually my shortest job.  I only

23   worked there two years.

24        During my time there, cell phones became very popular,

25   and people were taking pictures on their cell phones, so the

*Phillips - Direct*                                          197

 1   future of portraits looked a little scary.

 2        The same recruiter ended up calling me back and saying:

 3   You know, I'm really sorry about what's going on at CPI, and I

 4   have this position now that I'm trying to fill for Starbucks,

 5   and are you interested in that?

 6        And I had kind of the same reaction.  I said:  I'm not

 7   really a regular Starbucks customer.  I really only go there

 8   on special occasions or if my boss is in town, but let me do

 9   some research.

10        And I did, and what I found was that it seemed like the

11   culture at Starbucks would be a great fit for me.  It seemed

12   like that they really cared about their people.  They had

13   high-quality products, that was obviously known, and they

14   cared about service, but they also really cared, seemingly,

15   about their people, and that was a draw for me, so I ended up

16   going on to Starbucks in 2005.

17   Q.   What position were you hired into?

18   A.   I was hired in as a district manager, so I had, I think,

19   about 12 stores between Youngstown, Akron and Cleveland.

20   Q.   How long were you a district manager in Ohio for?

21   A.   I was a district manager I think for about

22   five-and-a-half years, but there was that gap that Paul

23   mentioned, where I was out in the Hamptons, so --

24   Q.   Can you tell the members of the jury about that and that

25   opportunity that you did?

Phillips - Direct                                    198

1   A.    Sure.  So I was -- I was called, and it was maybe in late

2   April or early May.  And my boss called me.  That was Dennis

3   Hudson.  Paul mentioned him.  He was my regional director.

4   And he told me that for whatever reason, the district manager

5   in the Hamptons had left suddenly.  I don't know the

6   circumstances, but they needed somebody that could go out

7   there and run the stores over the summer because the stores

8   would basically triple in volume, and you had to hire a lot

9   more people, and there were a lot of influencers out there.

10  The CEO at the time was Howard Schultz, and he had a home out

11  there.  And the divisional vice president, his name was Jim

12  McDermott, and he had a home out there.  And then,

13  additionally, there were just lots of other influential people

14  that visited the Hamptons or came out to the Hamptons, and so

15  it was important that over those summer months from May to --

16  from like Memorial Day to Labor Day, considered like their

17  season, that somebody strong was there to oversee the

18  district.

19      And I had never been to the Hamptons.  All I knew about

20  the Hamptons was from watching Sex in the City, but I thought

21  this seemed like a good opportunity, and my boss at the time,

22  Dennis, really felt like it would be an opportunity for me to

23  kind of showcase what I could do, and it would maybe lead to a

24  promotion to a regional director.

25  Q.    How did that summer go?  Was it successful?

1   A.   It was.  So I was there from May to October.  I came back

2   to Ohio in October.

3        While I was out there, the divisional vice president, Jim

4   McDermott, he had a meeting with the vice presidents at his

5   home, and I was invited.  I don't even know why.  I was a

6   district manager, like way down on the list.  But at the time,

7   I was reporting to a man named Sean Luckman, and I remember

8   Sean saying:  If you get an opportunity to meet Joe Hallinan

9   at this meeting that you go to and connect with him, you

10  should.  He is someone that I would love to -- this is Sean

11  saying this -- that I would love to work for.  He's amazing.

12  He's a great coach.  He was in the military, and he was also

13  in the seminary, so he has this really nice way about him but

14  also firm.

15       And so, when I got to the meeting there were three vice

16  presidents:  Zeta, who was my vice president from being in

17  Ohio, so I knew her; the second one was Andrew, and he was in

18  New York, so now I knew him because I was working in his

19  territory; and Joe.  So I was able to get to know Joe at that

20  meeting and then sit by him and connect with him.

21       And afterwards, we ended up staying connected.  He became

22  a bit of a mentor.  I also went out to a training class in

23  Seattle.  That's where Starbucks is headquartered, and

24  sometimes there would be trainings out there.  So Joe was one

25  of the facilitators, teachers, at that class, so I saw him

Phillips - Direct                                    200

1    again out there.

2        And then the position came up for the regional director

3    position here.

4    Q.   And so around what time frame is this?  Can you give the

5    jury an idea?

6    A.   So I think I got promoted in April.  So I got back in

7    October, and then it would have been the following April.

8    Q.   Of what year?

9    A.   Let me think about that for a second.

10       Maybe 2010, I think.

11       So I remember my VP at the time, Zeta, called me, and she

12   said:  You're probably not going to get the job, but I still

13   want you to go and interview.

14       I go:  Oh, that's a vote of confidence.

15       But I said:  Okay.  You know, why?

16       And she said:  Well, he has his own person that he could

17   promote, and if I had a position, I would promote you, and so

18   Joe would likely go with his own person.

19       And that made sense, but I came out anyway and

20   interviewed.  And I think because I had, you know, met him and

21   stayed connected with him, and now we had a bit of a

22   relationship, that he knew me, I think that's why he

23   ultimately went with me over his own person.

24   Q.   And you did get the job as regional director?

25   A.   I did.

United States District Court

*Phillips - Direct*                                    *201*

```
 1  Q.   How did that impact your family?
 2  A.   At this point, I had gone through a divorce.  My
 3  ex-husband found someone else, and so I was -- my children --
 4  we had split custody, but my children moved with me here.
 5       And so we -- I didn't know the area very well at the
 6  time, but Joe lived in South Jersey, my new boss, and he said:
 7  You know, this is a great place to live and great schools for
 8  your kids.  And at that time -- and the area changed over the
 9  years multiple times as things realigned, but at that time,
10  the area that I came and took over was really Philly, South
11  Jersey and Delaware.  So South Jersey was kind of centrally
12  located.
13       And he lived, I think -- I forget where he lived but
14  Exit 3, and he was like:  Exit 2, 3, or 4 would be really good
15  because you're accessible to Philly, and you're accessible to
16  Delaware, and you're in South Jersey.  So that was where we
17  landed.
18  Q.   So your home base when you were here, like from the time
19  that you were promoted until the time you were terminated, was
20  where?
21  A.   My home base?
22  Q.   Yes.
23  A.   South Jersey.
24  Q.   In your home, though.  Right?
25  A.   Oh, I'm sorry.
```

Phillips - Direct                                  202

```
 1       No.  When I first moved here, we actually -- so Joe lived

 2   locally, and we had an office in King of Prussia.  And I had

 3   an office there, and so did Joe and multiple people.

 4       But then thing -- Joe retired, and I had another boss

 5   named Victor, and then Victor left, and that's when Camille

 6   came in.

 7       So I think at some point, it was said that Camille maybe

 8   hired me into the role.  That's not correct.  She came.  She

 9   was the third VP that I had in this role.

10       And when she came, she wanted to live down in Bethesda,

11   so at that point, they closed the King of Prussia office.  And

12   the regional office was down in Bethesda, so then I became a

13   home-based partner, and my office was at home.

14   Q.  And as a regional director, approximately how many stores

15   were you overseeing from the point where you took over this

16   job in, you know, 2011 time frame until the time you were

17   terminated?

18   A.  I would say it would be around 100 stores, but it would

19   go up and down over the years, and the alignment would change

20   based on store growth.

21       So more stores would open, and your area would get

22   larger, and then they would add another regional director to

23   the mix, and then your store count would maybe drop to about

24   80.  And then more stores would open, and your area would get

25   larger again, and then it would happen again.  I think that
```

Phillips - Direct                              203

1   happened two or three times during my time here.

2   Q.   At the time that you were terminated in May of 2018, what

3   was your region?

4   A.   At that time, it was Philadelphia and the Main Line area,

5   South Jersey, the state of Delaware and down to Ocean City,

6   Maryland.

7   Q.   And approximately how much revenue were you responsible

8   for?

9   A.   About 150 million annually.

10  Q.   Can you describe what the job of a regional director was

11  at Starbucks before you were fired?

12  A.   So I looked at my responsibility as the first point of

13  contact obviously for the district managers, but for all of my

14  stores and the partners in the stores, I felt that it was

15  partner-customer business.  So we -- you know, we're in charge

16  of the partner experience, and that was everybody that worked

17  there, the customer experience and making sure that we had the

18  best service, and then, of course, financially, the stores had

19  to be profitable as well, so it -- kind of partner-customer

20  business.

21  Q.   Did you receive performance reviews when you were at

22  Starbucks?

23  A.   I did.  Every year.

24  Q.   And did that include up until when you were terminated,

25  they still were doing written performance reviews?

*Phillips - Direct*                                           204

1    A.   Yes.  So the last review I would have gotten would have

2    been late 2017.  Starbucks, their year -- their fiscal year at

3    least then went October to September.  So their year ended in

4    September, and we would get reviewed around maybe

5    October/November.

6        So I think that process, as he, Paul, indicated has

7    changed and maybe they don't do written reviews anymore, but

8    at the time I was there, we did do written reviews.

9    Q.   Did you always get positive written reviews?

10   A.   I did.  There were five ratings in the reviews.  It would

11   be CE, consistently exceeds; AE, above expectations; ME, meets

12   expectations; NI, needs improvements; or MI, must improve were

13   the five ratings.  And I was always meets or exceeds.  I never

14   had anything below that.

15   Q.   Did you ever attend meetings for Starbucks outside of New

16   Jersey?

17   A.   So, yes.  As a part of Camille living down in Bethesda,

18   she usually had about a monthly meeting, so I would travel

19   down there.

20       And then there would be larger meetings, broader meetings

21   in Seattle.  And there would also be meetings that they would

22   host in different cities.  That would be maybe store manager

23   and above.  Everyone would come.  One time it was in New

24   Orleans, and it was, I remember, 10,000 people, and it was

25   store managers and above, and everybody did a day of community

Phillips - Direct                                    205

1    service out in the field.  Another time it was in Texas.  So

2    there were meetings outside of New Jersey, uh-huh.

3    Q.   Did you ever travel internationally on behalf of

4    Starbucks?

5    A.   I did.  So Starbucks owned -- I don't know if they still

6    do, but they did own a coffee farm in Costa Rica, so

7    periodically, they would take a group of people that were

8    coffee masters and good performers, and you would be sort of

9    rewarded with this trip to go to Origin and visit the coffee

10   farms and plant coffee trees and feel like you were connecting

11   back to where coffee starts.

12   Q.   When were you sent on that trip?

13   A.   In 2017.

14   Q.   Okay.  So the year before you were terminated?

15   A.   Uh-huh.

16   Q.   Did you ever receive any financial rewards for your

17   performance?

18   A.   So every year at the end of the year, we would be given a

19   bonus based on, you know, the financial performance of your

20   area or whatever you oversaw as well as some nonfinancial

21   things were thought about as well as a part of that.

22        And I did receive bonuses every year.  In fact, right

23   before I was let go in -- I was let go in May, but in

24   February, I received a bonus from my boss Camille.  I recall

25   her calling me and saying, I got to pick one regional director

Phillips - Direct                                206

 1   to give this spot bonus to, and I chose you.  And her comment
 2   was, it's a great year to be Shannon Phillips.  She turned out
 3   to be very wrong, it was not a great year to be Shannon
 4   Phillips, but...
 5   Q.   Let's take a look at that document.
 6           THE COURT:  Ms. Mattiacci, this might be a good time
 7   to take a mid-afternoon break.
 8           MS. MATTIACCI:  Certainly, Your Honor.  Absolutely.
 9           THE COURT:  Why don't we take a five- or ten-minute
10   recess at this point.
11           We'll stand in recess.
12           (Jury out.)
13           (Recess at 3:16 p.m. until 3:35 p.m.)
14           THE COURT:  Bring the jury in.
15           (Jury in.)
16           THE COURT:  Please be seated.
17           You may continue, Counsel.
18           MS. MATTIACCI:  Thank you, Your Honor.
19   BY MS. MATTIACCI:
20   Q.   Ms. Phillips, I am showing you what has been already --
21   I'm not sure if it's been entered yet, but I don't believe
22   there's any objection to our exhibits here.
23           MR. HARRIS:  I have none.  I have no objection.
24           THE COURT:  Okay.
25           MS. MATTIACCI:  Thank you, Your Honor.

 1  BY MS. MATTIACCI:

 2  Q.   Exhibit 127.  Can you explain to the jury what this is?

 3  A.   Sure.  So this is the letter that I got letting me know

 4  about this spot bonus that my boss Camille had recommended me

 5  for.  And the letter, I think, came from Kevin Johnson, who

 6  was the CEO at the time.

 7       And so it would show that November of fiscal year '18,

 8  2018, my annual award would be 50,000.  She gave me this

 9  special equity award that was 41,876, and then that would have

10  been my total equity grant for the year.

11  Q.   Did you end up receiving that grant?

12  A.   I did not.  It was in the form of stock, and so that was

13  taken away when I was let go.

14  Q.   When you were terminated from Starbucks?

15  A.   Yes.  Uh-huh.

16  Q.   Did you have any additional duties or projects that you

17  did on behalf of Starbucks?

18  A.   I did.  I was not -- I was the community lead for

19  Camille's Mid-Atlantic region.  So I oversaw the community

20  involvement in my own area but then I worked with the other

21  regional directors about the relationships that they were

22  creating and working with and helping determine who -- which

23  organizations would get grant money from Starbucks.

24  Q.   Were you active in City Year?

25  A.   I was.  So City Year, that is a -- it's an AmeriCorps

```
 1   program.  If you're ever in Philly and you see young people in
 2   red jackets, that's City Year.  They work in underfunded
 3   schools to help mentor children and work with social and
 4   emotional issues.
 5        We did a lot of work with City Year.
 6        So the young people that would volunteer, it was
 7   basically like a volunteer-type thing, we put on development
 8   days with them and did a lot of events with City Year, and
 9   ultimately I was asked to sit on a women's advisory board with
10   City Year.
11   Q.   Did your daughter volunteer with City Year?
12   A.   She did.  My daughter found out about City Year from my
13   involvement with them and she ended up doing two years at City
14   Year.  Her first year was in Philadelphia and then her second
15   year, she volunteered in New York City.
16   Q.   We heard from Mr. Pinto describing the YouthBuild program
17   that you were involved in.
18        Can you explain to the jury, give them an example of a
19   barista that you had hired through the YouthBuild program and
20   give them a little more information about that?
21   A.   Sure.  So I became aware of YouthBuild in my time at
22   Starbucks, and we went to visit, me and one of my district
23   managers, we went to visit the school.  It's in Philadelphia.
24   And we got to meet the young people.  And they were so excited
25   and engaged in coming to YouthBuild.  It was a second-chance
```

1   school for people who had not finished their high school

2   degree.

3       So they would get their high school degree and they would

4   also come out with some sort of certification.  At that time

5   it was a home healthcare certification or it was a

6   construction certification.

7       And then based on our involvement with them, Starbucks

8   ended up -- I think it was mentioned, they built a store

9   inside the school.  And that was a third certification that

10  the students could go down sort of a retail track instead

11  of -- they could choose that or construction or home

12  healthcare.

13      While I was there, I was always recruiting.  I was a

14  proud Starbucks partner so I always was trying to recruit

15  people that I thought would be good for us.

16      And during one of my visits I met a couple of young

17  people that were doing City Year, and said, hey, if you ever

18  need a job, gave them my card, give me a call, and two of them

19  did.  A girl named Carmen, a girl named Brittany were the

20  first two that we hired.

21      Carmen, specifically, she had come from the sex industry.

22  And she had grown up in the foster care system and really did

23  not have, you know, a great start.

24      But she had this amazing spirit.  And she had such a

25  great outlook on life.  And so we brought her on as a barista,

Phillips - Direct                                                    210

 1   and during that time, Starbucks started some specific
 2   initiatives.  One was around Opportunity Youth, and that was
 3   really looking at that kind of underprivileged youth and what
 4   Starbucks could do to help, and another was the Armed Forces
 5   Network and what we could do around veterans and spouses of
 6   veterans.
 7        But specifically around the Opportunity Youth, because my
 8   area, we were already working in that space with YouthBuild,
 9   Seattle sent out -- his name was Rodney Hines, he was in
10   charge, I think, of community at that time -- came out with a
11   film crew and did a whole film about Carmen and me and
12   YouthBuild and Starbucks and how we were working together and
13   the impact that it had on her.
14        And that film was used -- it was on the community website
15   for a long time.  It was used in their commercials.  We were
16   recognized at a meeting in Texas where we -- it was played and
17   we were asked to stand and be recognized for our work.  It was
18   really -- it was really important what we were doing, I think.
19   Q.  Let's now -- I want to turn your attention to April 12,
20   2018.
21        Prior to that time, was there any indication that your
22   job was in jeopardy?
23   A.  No.
24   Q.  Had you ever received any poor performance reviews or
25   write-ups or warnings of any sort?

Phillips - Direct                          211

1    A.   No, never.

2    Q.   When the video of the arrest was tweeted out, did that

3    cause a huge PR problem/crisis for Starbucks?

4    A.   Yes.

5    Q.   I wanted to show you what has been already entered into

6    evidence as Exhibit 39.

7         This is an email that we saw with Mr. Pinto.

8    A.   I'm sorry, I don't see it.

9    Q.   Oh, my fault.

10        There we go.

11   A.   Now I see it.  Thank you.

12   Q.   Sure.  It says -- you were copied on this email at the

13   top.  The one in the middle on April 14th, 12:05 a.m. from

14   John Kelly, it says:  We need to get on a call ASAP with the

15   store manager or SM and DM.

16        Does SM and DM mean store manager and district manager?

17   A.   That's correct.

18   Q.   And in this case, the store manager was Holly Hylton.

19   Correct?

20   A.   That's right.

21   Q.   And the district manager was Paul Sykes?

22   A.   Yes.

23   Q.   And determine exactly happened that led to police being

24   called.  We are trying to manage a potentially major brand

25   risk here.

Phillips - Direct                              212

```
 1        Correct?
 2   A.   That's right.
 3   Q.   To your knowledge, did that call occur?
 4   A.   It did.  The next morning.
 5   Q.   So on Saturday?
 6   A.   That's right.
 7   Q.   To your knowledge, was there an investigation done by
 8   Starbucks to figure out exactly what happens when the men were
 9   in the store?
10   A.   Yes.  So Ronda Knight was our P&AP person.  She covered
11   all of Camille's market.  I think Paul had said she came in
12   after the fact but she was already our P&AP person.
13        So when this happened, she didn't live locally.  I think
14   she lived more towards Virginia or down that area.  But she
15   was our P&AP person at the time.  She came into town.  And she
16   investigated what had happened.
17   Q.   Okay.  I'm going to show you an exhibit marked 160.
18        This is an email from Ronda Knight on Saturday, April 14,
19   2:39.  And you are a recipient of this email as well as
20   Camille Hymes and Paul Sykes.
21        Can you read for the jury what it says under incident
22   summary?
23   A.   Sure.  Two males entered the Starbucks and stated that
24   they wanted to utilize the restroom at which time the store
25   manager stated they would have to enter the line to make a
```

Phillips - Direct                              213

```
 1   purchase.

 2       Men sat in lobby without a purchase and refused to leave

 3   the store, nor make a purchase.

 4       The two men were arrested once police arrived due to

 5   other reasons police stated.

 6   Q.   Okay.  And the date and time of the incident, what does

 7   it say?

 8   A.   4/12, April 12, 2018, approximately 4:10 p.m.

 9   Q.   Can you then read the incident notes by Ms. Knight?

10   A.   Two noncustomers entered location 17767 -- that's the

11   store number of the 18th and Spruce Streets in Philadelphia,

12   PA -- around 4:10 on April 12, 2018, and stated to the store

13   manager at the counter that they wanted the code to the

14   restroom.

15       Store manager stated to customers that she would be glad

16   to give them the code once a purchase was made as restrooms

17   are for customers only.  The one noncustomer stated he wasn't

18   going to buy anything and proceeded to the restroom.  The

19   other noncustomer proceeded to the tables to sit down.

20       Store manager went and waited on other customers.

21       About 4:32 the store manager approaches the two

22   noncustomers and asks them if she could get them a coffee or

23   something as the tables are reserved for customers of

24   Starbucks.

25       The one man replied he wasn't buying anything from her
```

United States District Court

Phillips - Direct                                     214

1    and if she wanted, she could call the police.

2         Store manager then went to the back to call police as man

3    was becoming hostile and didn't want to buy anything in order

4    to use the tables in the lobby, per Starbucks policy.

5         Police arrived at approximately 4:30, three officers, and

6    talked to the two men for about ten minutes.  Then the two men

7    were arrested by police.

8         The store manager talked to police and stated that she

9    did not want the men arrested and had only asked them to

10   leave.  The police stated that at this time it was a police

11   matter and there was probable cause for the men to be

12   arrested.

13        A video was made of this incident by another customer,

14   and the incident was sent out via Twitter, which stated that

15   the men who were arrested were wrongfully targeted as they

16   were African American and that they didn't do anything to have

17   to leave.

18        The video has gone viral and multiple persons are calling

19   the district manager and the store to complain and have said a

20   protest will be occurring due to these men being arrested.

21        Leadership is aware and are working to resolve.

22   Q.   And then down at the bottom where it says Open Action

23   Items, can you read that?

24   A.   P&AP -- that's partner and asset protection -- Manager

25   Knight -- that's Ronda Knight -- retrieve a written copy of

 1   police report and incident from Philadelphia PD.

 2        Shannon Phillips, RDO, and DM Sykes - ongoing in-store

 3   support for store manager and partners, will provide P&AP with

 4   updates or status of incident.

 5   Q.   And then under Completed Actions, what is the first

 6   bullet point?

 7   A.   GSOC - Saved video of incident.

 8   Q.   And what is GSOC?

 9   A.   I think it -- it's at the top of this email, but I think

10   it stands for Global Security Operations Center, GSOC.

11   Q.   And was that a division of Starbucks?

12   A.   That would have been in Seattle, yeah.

13   Q.   What were they in charge of?

14   A.   Global security.  So they would obviously save videos,

15   and if there were issues, probably they would be the one to

16   access it.  And then I'm sure this might have been the

17   department that I went through when we were needing additional

18   security in stores, but it was probably someone specific to

19   that department.

20   Q.   Okay.  And then the second bullet point, just so we can

21   finish this document?

22   A.   Operations leaders as well as support services held a

23   call on 4/14/2018 to review incident and what actions would be

24   taken in this matter as well as responses to social media

25   inquiries.

*Phillips - Direct*                                          216

1    Q.   And the next one?

2    A.   Ronda Knight - Connected with Philadelphia Police

3    Department via email and voicemail (no response as of April

4    14th.)  Also connected with Shannon Boldizsar with

5    governmental affairs, so Shannon could help with connecting to

6    Philadelphia Police Department as well as local leaders in

7    Philadelphia, PA.

8    Q.   And the last one?

9    A.   Shannon Phillips (regional director of operation) and

10   team are in the area today to assist partners with any issues

11   that may arise.

12   Q.   And it says:  Next Expected Update.  What does it say

13   there?

14   A.   Same day at 6:00 p.m., 4/14.

15   Q.   Are you aware of any other updates or any other incident

16   reports that were created as a result of the or related to the

17   April 12th incident?

18   A.   An incident report, no, I'm not aware of anything else.

19   Q.   Now on April 12th, you were not in the store.  Correct?

20   A.   No.

21   Q.   The manager of the store was Ms. Hylton?

22   A.   That's correct.

23   Q.   And Ms. Hylton's direct supervisor is Mr. Sykes.

24   Correct?

25   A.   That's correct.

Phillips - Direct                    217

1    Q.   Are you aware of a message being sent out by the CEO that

2    night that was published on their website?

3    A.   I am.  So Kevin Johnson was the CEO at that time.  He put

4    out a message, I think written and a video message.  And at

5    first, it seemed like the company was taking responsibility:

6    This isn't about this manager.  It's not about one manager.

7    It's about our policies and our training.  Anger at the

8    manager is misplaced.

9         It seemed like, okay, you know, this is obviously a

10   horrible situation that has happened, but the company

11   recognizes that they owned it, and we're going to adjust the

12   policies to -- so that it didn't happen again.

13   Q.   And what was the response publicly to that?

14   A.   Did not go over at all, protests started.  And saying

15   it's about our training or our policies, that was not being

16   received well.  There were protests in the stores where a man

17   had bullhorns, and he was screaming at the top of his lungs:

18   Fire the manager, fire the manager, fire the manager.  We can

19   talk about your training later.  Fire the manager.

20        It was awful, and every -- at that point, more and more

21   protests were happening.  And we were getting updates on all

22   the news, social media, in the regular news.  It was clearly

23   turning into exactly what John Kelly had said:  a major brand

24   risk.

25   Q.   Are you aware that internally, there was support for

Phillips - Direct                              218

```
 1   Holly?
 2   A.   Yes.  Immediately following the incident, like I said,
 3   they -- it seemed like they were supportive.  Ronda's incident
 4   report said:  You know, per Starbucks policy.  She was on the
 5   call the next -- that Saturday morning.  And then even after
 6   that, I think either Kevin Johnson called her or talked about
 7   calling her to support.  So initially, there was support for
 8   Holly.
 9   Q.   Let me show you a document marked as Exhibit 155.  At the
10   bottom is an email from John Kelly, the same person that we
11   saw the email about major brand risk a few minutes ago.
12        He is sending an email, and it says:  I want to suggest
13   Kevin call Holly first thing tomorrow.  Not sure if he will.
14   You okay with that?  Just want him to engage and support her.
15        Do you see that?
16   A.   Yes.
17   Q.   And was this -- when he's saying "Kevin," he means Kevin
18   Johnson, the CEO of Starbucks?
19   A.   Yes, that's correct.
20   Q.   And then in response, your boss writes back -- can you
21   read that email?
22   A.   Sure.
23        Hi John, I believe she would welcome the kind gesture.
24   Earlier today, she shared with me her appreciation of the
25   support she's received thus far.  With our call today, Paul
```

Phillips - Direct                                    219

 1   and Shannon's leadership and physical presence in store,

 2   Kevin's call would be a reinforcement of our commitment to

 3   support her during this challenging time.

 4   Q.   And then above, what does John Kelly say?

 5   A.   He says:  Will give you a call first thing to discuss and

 6   figure out times/numbers.

 7   Q.   And following at the top?

 8   A.   Camille says:  Sounds good.  Thank you for your support

 9   today, John.  Have a good night.  And I'm copied on that.

10   Q.   And in terms of the timing of Ms. Hymes' email here, this

11   is Saturday evening around 9:00.  Correct?

12   A.   That's correct, uh-huh.

13   Q.   And the investigation into the incident by Ms. Knight had

14   been concluded earlier that day.  Correct?

15   A.   That's correct.

16   Q.   And so they had the information -- all the information

17   they needed at that time when this email was sent.  Correct?

18   A.   That's correct.

19   Q.   But then, Saturday evening is when the CEO sends out his

20   video saying that the blame is misplaced on the manager.

21   Correct?

22   A.   That's right.

23   Q.   And the following day, on Sunday is when the protests

24   started to erupt.  Correct?

25   A.   Yes.

*Phillips - Direct*                                            220

```
 1   Q.   Were there news cameras and press at the protests?

 2   A.   Yes, lots of -- lots of press, news vans, both in and out

 3   of the store.  Uh-huh.

 4   Q.   What happened to Holly Hylton?

 5   A.   After the initial support, it wasn't discussed with me,

 6   but after the fact, I had a sit-down in the basement of that

 7   store with Camille, my boss, and Paul Pinto, the person that

 8   testified earlier, and I was told that they had parted ways

 9   with Holly.  Initially -- so the store managers and the

10   district managers have their business cards on the condiment

11   carts out in the cafés, and so Holly and her DM, Paul, their

12   names were now in the social media, and Holly was receiving

13   death threats, and Paul was too.  We had to get Paul a new

14   phone, I remember, a new number.

15        And so it was -- it seemed like, oh, because of these

16   death threats and we're concerned for her safety, we are

17   moving her back to where her family is from, interestingly,

18   also Ohio, and she is going to be leaving Starbucks.  And Paul

19   Pinto, I recall, saying:  She signed an -- her NDA over

20   burgers and fries in Roz's hotel room.

21   Q.   So let's -- just to orient here, that week, where

22   everything was happening from the 12th, the 13th, the 14th,

23   the 15th and through that, what -- can you describe for the

24   jury what you were doing, what your participation was?

25   A.   Sure.  So I was in the store with the district manager,
```

Phillips - Direct                                    221

```
 1   Paul.
 2        Once -- when the protests started, we didn't want these
 3   protesters screaming in the faces of part-time baristas that
 4   were young and inexperienced.  And certainly, I mean, I wasn't
 5   experienced in dealing with it, but certainly, I was more
 6   equipped to handle it than these baristas.
 7        So when these protests would happen, we would send the
 8   baristas, the partners to the basement, and then we would take
 9   over operating the store; we being me, the district manager of
10   that store.  I brought in other district managers from around
11   my area to help support.  They brought store managers in with
12   them as well, so that we had enough support to not just cover
13   that store, but then, protests were happening in other stores,
14   and so we were trying to make sure that the partners in the
15   stores felt supported and didn't feel like that they were
16   having to be on the front lines during all of this.
17        You know, it was an awful situation.
18   Q.   What about the feedback, though, that you were getting
19   from folks that you were working with?  Was it positive or
20   negative?
21   A.   It was all positive.  I felt very supported in the
22   beginning, and I felt like I had the support of everyone.
23   Q.   Okay.  I'm going to show you a text message that you
24   received on 4/15.
25        Do you recognize that?
```

*Phillips - Direct*                                      222

1   A.   I do.  Rachel Kelly had been up here.  She had also been

2   a regional director in the Mid-Atlantic.  And then at this

3   point, she had moved on to a partner resources role in New

4   York City, I believe, and she sent this to me and Camille.

5   Q.   It says:  Thinking of you both.  Sending you strength as

6   you support our partners and the Philadelphia teams.  You two

7   are strong, courageous leaders who are and will continue to

8   handle this with poise and compassion.  Take care and let me

9   know if I can do anything to support you and your teams.

10  Correct?

11  A.   That's correct.

12  Q.   Okay.  So that's on the 15th.

13          THE COURT:  Can I just get the exhibit number again?

14          MS. MATTIACCI:  Yes.  It's Exhibit 12, and the Bates

15  number is 5760.

16  BY MS. MATTIACCI:

17  Q.   Let's look at 52.

18      52 is an email from Camille Hymes to you on April 15th,

19  the same day.

20      And it says:  Sharing for your visibility only.

21      I want to ensure you are informed and feel supported.  I

22  know this is a tough time for you.  I'm here for you.  Call me

23  if you need anything!  And try to rest tonight.

24      And can you describe what this email -- if you can look

25  at the one that she's forwarding you.

*United States District Court*

*Phillips - Direct*                                      223

```
 1        First of all, it's from Reggie Borges.  Who is that?
 2   A.   I believe he was in charge of social media for the
 3   company.
 4   Q.   Okay.  And can you read for the jury the first bullet
 5   point under Updates on my end?
 6   A.   Lester Holt:  The producer is willing to focus on
 7   "reaction to what happened today and the policies currently in
 8   place and what we are doing moving forward and how this will
 9   change policy."
10        This allows Camille to humbly acknowledge the opportunity
11   to listen to the demonstrators and reiterate our commitment to
12   make things right and how we are addressing it.  I think
13   Camille is ready and would be a good bookend, as V said.
14        I believe that's Vivek.
15        I'll get her ready on the store manager question and
16   ensure it echoes what Kevin's letter notes.
17        Reporter wants to go in 45 minutes so I need a go-no go.
18   Q.   And did that actually happen, that interview?
19   A.   It did not.
20   Q.   Was the -- was this whole incident and the aftermath of
21   it covered on Good Morning America?
22   A.   It was.  So the gentlemen went on Good Morning America
23   and talked about what happened.  And it, of course, had a lot
24   of traction already, and Starbucks was really monitoring how
25   much media and publicity the incident was getting as well as
```

1  the reaction.  And so that, of course, kind of...

2  Q.   Let me take you to Exhibit 138.

3  A.   Okay.

4  Q.   This is still on that Sunday again from Reggie Borges.

5  Can you read what's on the bottom of that screen there?

6  A.   Sure.

7       Working with Good Morning America and need to verify some

8  facts.  Can you confirm this store was robbed at gunpoint

9  recently.  If so, when was that?  The store was robbed --

10  these are the answers:  The store was robbed on January 4th.

11  The person never brandished a weapon, but gave the illusion

12  that he was concealing one in his pocket.

13       If I'm correct, Reggie did the bullets of the questions,

14  and then Paul Sykes provided the answers to these.

15  Q.   Okay.  Let me roll up.

16  A.   So --

17  Q.   April 15th, he says --

18  A.   See comments below in red.

19  Q.   Okay.

20  A.   So Reggie's asking:  When was the store robbed?

21       And Paul is responding:  The store was robbed on

22  January 4th.  Yeah.

23  Q.   Okay.  And then, the second bullet point?

24  A.   How often were drug overdose, homeless issues, thefts, at

25  this store and the surrounding stores...can you offer a

*Phillips - Direct*                                      225

1  ballpark figure or rate?

2      Paul says:  I've had three overdoses that resulted in

3  death in my district in the last year and a half.  In terms of

4  theft and homeless issues, it was common so that would be very

5  hard to come up with.

6      I would say that every week there are at least 3 to 5

7  theft issues occurring in any one of my stores and drug use is

8  also common (we would commonly find needles in the restroom).

9  The drug use decreased when we implanted Safe and Welcoming

10 training, but there were still instances.

11 Q.  And then, the last bullet point?

12 A.  Reggie asked:  I remember hearing about a partner being

13 assaulted at knifepoint after helping a customer to open the

14 restroom, any details on that?

15     And Paul responded:  I am not aware of this situation.

16 Q.  And Paul meaning Paul Sykes, because I know we just had

17 Paul Pinto on the stand?

18 A.  Yeah, that was Paul Sykes.

19 Q.  Paul Sykes.

20 A.  And then I think I chime in with some additional

21 information because Paul Sykes was speaking obviously from his

22 vantage point, but that was his -- only his district, so I

23 wanted to make sure Reggie had kind of the feel for the whole

24 Philadelphia city.

25     So I said:  As far as drug overdoses and deaths, Paul is

 1   speaking to his district only, and we've had many more in

 2   Ben's district.  Other half of Center City, Philadelphia, most

 3   recently last week in our 13th & Chestnut store.  I would

 4   estimate at least 10 in the last year.

 5       The partner held at knifepoint was in Ben's district,

 6   carrying a tray of sandwiches from her store two blocks to

 7   another store due to oven not working.  Another partner was

 8   attacked while waiting for the second partner to arrive to

 9   enter the store.  (Our partner -- or I'm sorry.  (Our policy

10   is partners don't enter store alone.)  She was beat up outside

11   our 10th & Chestnut store.  We've had other armed robberies in

12   city:  At 1:00 p.m. at our 1201 Market store -- I don't know

13   why I didn't put the date, but which is -- (attached to the

14   Marriott Hotel in Center City) this year and another armed

15   robbery at Marsh & Silverside.

16       Please let me know if you want more context.  I'm happy

17   to provide.

18   Q.   Okay.  And this information was being requested from you

19   from Reggie Borges?

20   A.   That's correct.

21   Q.   Showing you Exhibit 53, which we have already looked at.

22       This is the schedule of Kevin Johnson and Howard Schultz

23   coming into Philadelphia.

24       So they were in on Sunday and Monday.  Correct?

25   A.   That's correct.  A lot of people came.  Kevin came,

```
 1   Howard Schultz came, Roz Brewer came, Rossann Williams came.
 2        A lot of people came.
 3   Q.   Was this a common occurrence for the CEO, the founder and
 4   the other highest-level executives to be descending upon
 5   Philadelphia?
 6   A.   No.  I'm not sure any of these folks had been ever to
 7   Philadelphia, certainly not in my time.
 8   Q.   Were you physically located in the Philadelphia stores
 9   that week?
10   A.   I was, uh-huh.
11   Q.   And were you engaging with your partners and trying to
12   support them as best you could during that week?
13   A.   I absolutely was.
14   Q.   And was the feedback that you were receiving from your
15   partners, those that are reporting to you and colleagues,
16   positive?
17   A.   Yes.
18   Q.   Okay.  We're going to go through a series of messages
19   that you received during that week, starting with 159.
20        This is on Monday, April 16th from Danielle Weisgerber to
21   yourself and Paul Sykes:  Words of encouragement.
22        Can you read that?
23   A.   Sure.  So Danielle was a store manager in South Jersey,
24   but she was one of the store managers that had come into the
25   city to help support during this time.
```

Phillips - Direct                            228

1       So she says:  Good morning.  After seeing firsthand what
2   you have been going through the past few days, we wanted to
3   send this before we see you in just a little bit.
4       The leadership and strength that the two of you showed
5   all of us yesterday was one of a kind.  Knowing that no matter
6   what hurtful things have been said to both of you and your
7   teams, you have shown us that this too shall pass and we will
8   make it through any challenge that comes our way.
9       The task of leadership is not to put greatness into
10  people but to elicit it, for the greatness is there already.
11  Q.   Look at 54.
12       This is an email from your boss, Camille Hymes, Tuesday,
13  April 17th to you and Paul Sykes, Ben Trinsey and others.
14       Can you read what Ms. Hymes says?
15  A.   I'm so proud to be your partner.  I know how much you've
16  poured your heart into this community and our partners.  I
17  have no doubt that Howard will feel inspired by his
18  connections with you and your teams.  Your amazing leadership
19  and kindness will shine through during this very difficult
20  time.  I appreciate all that you do.
21  Q.   This is the person who they're saying terminated you on
22  the 4th.  Correct?  Or made the decision to terminate?
23  A.   That's correct.
24  Q.   150.  Trial Exhibit 150 is next.
25       This is on Wednesday, April 16th, you receive an email

United States District Court

1   from Erica and then your response at the top.

2       Can you read what you received from Erica?

3   A.   So Erica was a store manager in Delaware.  She says:

4   Shannon, as Philadelphia and Starbucks travel through this

5   time of uncertainty, I wanted to take a moment to thank you

6   for your unwavering leadership and your pursuit to ensure that

7   all people, both customers and partners, no matter what race,

8   ethnicity or background, feel safe and welcome in our stores.

9       Though down here in lower Delaware we are not

10  experiencing your tireless work firsthand, know that our

11  partners still feel your passion and will to make sure that

12  they are able to still perform their jobs of providing

13  legendary service to every customer, proudly serving those who

14  serve.

15  Q.   The next exhibit, 57.

16      Can you explain to the jury what this is?

17  A.   So this is a Green Apron card.

18      We had electronic greeting cards that you could send

19  through email to recognize someone.  And this one came from

20  Elaine, who was my coordinator.

21  Q.   Can you read what Elaine says about you?

22  A.   So the caption is:  Creating a culture of warmth and

23  belonging where everyone is welcome.

24      She says:  Your warmth and caring is felt by all of the

25  partners who are fortunate to know and work with you.  These

Phillips - Direct                                      230

 1   difficult days are not who we are.  We will get through this
 2   together.  Thank you.
 3   Q.   Let's talk a little bit about some of the work you were
 4   doing during this time as well.
 5        Were you engaged with the Black Partners Network?
 6   A.   Yes.  So --
 7   Q.   Can you first explain what the Black Partners Network is
 8   and the acronym being BPN?
 9   A.   BPN.  Sure.  So at Starbucks they're -- I assume they
10   still are.  At the time there were affinity networks.  One was
11   the Black Partner Network.  There was the AFN, the Armed
12   Forces Network, different networks that people could belong
13   to.  They were sort of like more social groups.
14   Q.   Can I just interrupt just for clarity's sake.
15        When you say networks, you're talking about groups of
16   employees or partners within Starbucks that were like social
17   groups because they had something in common?
18   A.   Exactly.
19   Q.   Okay.
20   A.   So somebody that either was, you know, a military veteran
21   or a spouse of a military veteran might sign up in the AFN,
22   the Armed Forces Network they would obviously have engagement
23   and connection with others in that same, you know, situation.
24        So the Black Partner Network or the BPN started.  It was
25   a company program, but specifically in Philadelphia it

 1   started.  I sponsored it as the regional director.  And the

 2   person that led it, her name was Andrea Monroe.  She was hired

 3   into the company.  I hired her as a district manager in

 4   Philly.  Actually she had Paul's district before Paul Sykes

 5   did.

 6        And then at some point she moved into a business

 7   development role.  And that's when we launched the Black

 8   Partner Network in Philly.

 9        So we had as a part of -- we recognized that our partners

10   were really dealing with a lot, not just the stress of what

11   was happening in the stores with protests, but they were also

12   experiencing external pressures, friends and families saying

13   you shouldn't work for this company, they're clearly a racist

14   company, and we were trying to figure out, okay, what can we

15   do to support the partners.

16        So I had brought in EAP, which is employee assistance

17   program, so we had counselors specifically come in to one of

18   the locations, and we kind of advertised it out as open hours.

19   If you want to come and talk to someone, you know, come

20   between these hours and meet with a counselor, and that wasn't

21   giving us a lot of traction.  In fact, these counselors were

22   kind of sitting all day and no one was coming, so we thought,

23   okay, what else could we do.

24        So Andrea and I talked, and she had a great idea, let's

25   pull partners together in a space where, you know, gathering

Phillips - Direct                              232

1  people together, they might feel more open.  So that's what we

2  did.

3  Q.   So I'm going to show you Exhibit 149.

4       This is an email from Andrea Monroe on April 18th to a

5  whole lot of people, subject:  BPN partner discussion.

6       Is this the conversation that you were talking about and

7  the idea that Andrea had?

8  A.   That's exactly right.

9  Q.   Can you read what the bottom says there?

10  A.   Partners, the events of last week have impacted us all.

11  As an African American woman, I am deeply saddened and shaken

12  by what occurred.  I've had the opportunity to connect with a

13  number of partners who are experiencing the same feelings.

14       I strongly believe we need an opportunity to voice our

15  thoughts and feelings in a safe and judgment-free environment.

16  I'm reaching out to ask the following, would you or your

17  partners benefit from getting together to talk?  The BPN would

18  like to facilitate that discussion.  Please let me know if

19  there's any interest in doing so.

20  Q.   Okay.  And then if we scroll up, there's a response from

21  you.

22       And what is your response?

23  A.   Thank you, Andrea, you are awesome.  This is a great

24  idea.  Fully supported.

25  Q.   Let's go to Exhibit 143.

```
 1        On April 18th this is an email from J. Light.
 2        Can you tell the jury who J. Light is and read this
 3   message for us?
 4   A.   So J. Light, when I first got the role, she was my
 5   coordinator but then at some point, Elaine became my
 6   coordinator and J. worked for somebody else.
 7        But she sent this message to me:  We love you, Shannon.
 8   Thank you for putting your heart on the line every day to make
 9   this company welcoming and strong.  Please take care while you
10   are helping so many others.  Let me know if I can do anything.
11   Q.   Let's go to Exhibit 58.
12        This is a message that you received on April 19th from
13   Christina.  And it went to both you and Camille, and can you
14   read the message that she wrote to you?
15   A.   Dear Camille and Shannon, while I can't imagine the type
16   of week you have experienced, I wanted to say thank you for
17   your leadership and representing all the things that do make
18   this a wonderful, remarkable company to be a part of.  I am
19   proud and honored to be your partner.
20        The following poem is by Rudyard Kipling and one I have
21   visited in times of conflict or confusion.  I hope it offers
22   some comfort.  Thinking of you both and sending positive
23   energy.
24   Q.   Who is Christina?
25   A.   I would have to see -- oh, she was Camille's coordinator
```

Phillips - Direct                                    234

```
 1   or a coordinator in Camille's office.  I'm not sure if she
 2   supported Camille or one of the directors in that area.
 3   Q.   Exhibit 60 I'm showing you now from Jackie.
 4        And who is Jackie?
 5   A.   Jackie was one of my district managers.  She had a
 6   district in South Jersey.
 7   Q.   Can you read the message she sent you?
 8   A.   The caption is:  Creating a culture of warmth and
 9   belonging where everyone is welcome.
10        There are no words to describe the dedication and support
11   that you have shown over the past five days.  You truly
12   inspire me and many others.
13        So happy you are my Starbucks family.  Thank you.
14   Q.   I'm going to show you Exhibit 147.
15        As a prelude to 147, would you describe yourself as very
16   engaged during this time or were you absent and not physically
17   or emotionally present?
18   A.   I was in the City of Philadelphia every single day.  I
19   was with the partners.  I was supporting them.  I was
20   completely 100 percent engaged.  For someone to say different
21   is simply not true.
22   Q.   Let's take a look at this email from April 19th from you
23   to Reggie Borges.
24        Can you read that?
25   A.   Sure.  I said:  Hi, Reggie, one of the lessons learned we
```

*Phillips - Direct*                                        235

```
 1   had was that there wasn't a single point of contact in Seattle
 2   and many different people in different disciplines were
 3   reaching out with support, questions, concerns, et cetera.
 4        We've put together a call for tomorrow at 12:00, our
 5   time, and invited you to the call as the Seattle point of
 6   contact.  This would allow you to hear from the -- us in the
 7   field, local P&AP and partner resources as well, and then
 8   share out in Seattle as you see fit.
 9        If you are able to join, we'd appreciate it.  If you
10   think there is another person instead of you that might be
11   better for this, please let me know and we can invite them
12   instead.
13        Thank you so much, Shannon.
14   Q.   You were reaching out to him to let him know of some
15   things that you had learned that week and maybe improve
16   processes for crisis response.  Correct?
17   A.   Yeah.  And we were -- we started having regular calls,
18   and so -- with different people, and we thought at the time --
19   I thought Reggie might be a great person to be our Seattle
20   person, sitting on these calls, and then he would hear all the
21   information from partner resources, from P&AP, the partner and
22   asset protection group, from us as leaders in the field and
23   determine, you know, if actions needed to be taken, who were
24   the right people to give those actions to in the building in
25   Seattle.
```

Phillips - Direct                                    236

 1  Q.   Okay.  Great.

 2       His response to you was that "Cheryl Steele has been

 3  reporting all of the security and protest issues at the store"

 4  and that "She is probably best for this as I am pretty tapped

 5  out" is what he says.

 6       And did you interpret that to mean that he was -- needed

 7  a break from all of what was happening?

 8  A.   He was tired.  Everyone was tired.  It was long days

 9  every day.

10  Q.   Okay.  And then he says:  If it's media and urgent, reach

11  out, but in terms of update, to have Cheryl join the call.

12  Correct?

13  A.   That's correct.

14  Q.   And then you follow up and copy Cheryl.  Correct?

15  A.   I do.

16       Thank you so much.

17       Cheryl, please look for the invite.

18  Q.   Let's look at 154.

19       This is an email on Wednesday, April 18th from Tom

20  Osevala?

21  A.   Osevala.

22  Q.   Osevala.

23       Can you summarize at the top or briefly read what you

24  were saying there and why you were saying it?

25  A.   So, on -- this, I sent out Thursday, but on Wednesday

Phillips - Direct                                        237

 1   evening on my way home from the city, so this maybe was 7:00
 2   or 8:00 at night probably, I got a call from Reggie, and he
 3   said:  Howard's going to do an interview tomorrow morning with
 4   Gayle King in one of the stores, and we need you to select a
 5   store.  It needs to show well on camera.  It needs -- the
 6   camera crews will show up at 2:00, I think, in the morning.
 7   We'll need to have partners on site.  It needs to be in the
 8   city but not Center City, because there was concern for
 9   Howard's security.  Which store?
10       So I was like:  Okay.  I think the best store would be
11   39th and Walnut.
12       It was a newer store that we had opened.  It was in
13   Philadelphia but not Center City, and so I thought it would
14   show well.  It met all the criteria.
15       So hearing this, the district manager of that store, his
16   name was Michael Lamborn, but I -- Michael, in speaking with
17   him, he was going to be there first thing in the morning, so I
18   also called Tim Osevala, a district manager, and said:  Hey, I
19   need eyes on the store to make sure that it's going to be
20   perfect for this interview tomorrow morning that Howard's
21   going to do with Gayle King.  And Tim went into the city
22   with -- he had the Main Line area.  He was not in the city.
23   He came and brought some managers to make sure everything was
24   perfect.
25       And so I'm sending out a note to him and the managers,

1  David, Dave, Dawn and Jean, that went into the store and said:

2  I am only now trying to address the many, many emails I've

3  received over the last 6 days, but I wanted to express my

4  sincere and true appreciation for all of you!  With one phone

5  call, you mobilized to support the store, your peer, and (I

6  feel) me personally.  I know you did a lot of hard work and I

7  can't thank you enough.  The feedback I received from Reggie,

8  in Global Communications -- at 3:30 in the morning, he called

9  me to say:  It's perfect, and you're a hero -- was so

10 incredibly positive and the store showed up at its best based

11 on the Herculean efforts of each of you.

12      I can't thank you enough.

13      Proud to be your partner, Shannon.

14          MS. MATTIACCI:  Your Honor, would this be close to a

15 good time to break for the day, or do you want us to keep

16 going forward?

17          THE COURT:  All right.  It's now 4:27.  That clock is

18 a little slow on the wall.  This would be a good time to break

19 for the day.

20          Members of the jury, we'll come back tomorrow morning

21 at 9:15 and continue with the testimony.  And I guess I've

22 said it already too many times, but always remember that don't

23 speak to anyone outside the courtroom about anything you see

24 or hear in court or any of the testimony or exhibits.  And

25 certainly, don't talk among yourselves, and don't do any

```
 1   independent research.  Don't consult any dictionaries.  Just
 2   think in terms of deciding this case based solely on the
 3   evidence you see and hear in court.
 4          All right.  With that, have a good evening and a safe
 5   trip home, and we'll see you back here tomorrow morning at
 6   9:15.
 7          (Jury out.)
 8          THE COURT:  Counsel, you're referring to a lot of
 9   exhibits, and you have said that every joint exhibit is okay
10   to be admissible into evidence --
11          MR. HARRIS:  That's correct.
12          THE COURT:  -- so I guess all the exhibits you're
13   referring to are admissible in evidence, but at some point at
14   the close of the evidence, I'd like to get a list of all the
15   exhibits so I know that they're one place in the record and we
16   can look at them.  Okay?
17          MS. MATTIACCI:  Absolutely, Your Honor.
18          THE COURT:  All right.  We'll stand in recess.
19          (Proceedings concluded at 4:29 p.m.)
20                          -  -  -
21          I certify that the foregoing is a correct transcript
22   from the record of proceedings in the above-entitled matter.
23
24   /S/ Ann Marie Mitchell          6th day of June, 2023
25   Court Reporter/Transcriber      Date
```

*United States District Court*