**Exhibit C**

```
 1                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2   _____
     SHANNON PHILLIPS,              :  CRIMINAL ACTION NUMBER:
 3         Plaintiff,              :  19-19432
                                    :
 4         v.                       :
                                    :
 5   STARBUCKS CORPORATION d/b/a     :
     STARBUCKS COFFEE COMPANY,       :  JURY TRIAL
 6         Defendant.               :  VOLUME 3
                                    :  PAGES 240 - 456
 7   _____
          Mitchell H. Cohen Building & U.S. Courthouse
 8        4th & Cooper Streets
          Camden, New Jersey  08101
 9        June 7, 2023
          Commencing at 9:26 a.m.
10
11   B E F O R E:        THE HONORABLE JOEL H. SLOMSKY,
                         UNITED STATES DISTRICT JUDGE
12   A P P E A R A N C E S:

13
          CONSOLE MATTIACCI LAW, LLC
14        BY: LAURA C. MATTIACCI, ESQUIRE
          BY:  KATHERINE C. OELTJEN, ESQUIRE
15        BY:  HOLLY W. SMITH, ESQUIRE
           1525 Locust Street, Ninth Floor
16        Philadelphia, Pennsylvania 19102
          For the Plaintiff
17

18        HOLLAND & KNIGHT LLP
          BY:  RICHARD HARRIS, ESQUIRE
19        BY:  TARA PARAM, ESQUIRE
          BY:  KATHLEEN PRINCIVALLE, ESQUIRE
20        2929 Arch Street, Suite 800
          Philadelphia, Pennsylvania 19104
21        For the Defendant

22
      Ann Marie Mitchell, CRR, RDR, CCR, Official Court Reporter
23            AnnMarie_Mitchell@njd.uscourts.gov
                      (856) 576-7018
24
      Proceedings recorded by mechanical stenography; transcript
25          produced by computer-aided transcription.
```

1    **A L S O   P R E S E N T**:

2

3        SHANNON PHILLIPS, Plaintiff

4        ROBYN RUDERMAN, ESQUIRE, Starbucks Corporation

5        MARCUS ECKENSBERGER, Starbucks Corporation

6        MATTHEW HIGGINS, Courtroom Deputy

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        -   -   -

2                      I N D E X

3                        -   -   -

4

5

6                E X A M I N A T I O N S

   Witness                Direct   Cross   Redirect   Recross
7

8  SHANNON PHILLIPS

9    BY MS. MATTIACCI        263
     BY MR. HARRIS                   317
10
   CAMILLE HYMES
11
     BY MS. MATTIACCI        388
12

13               E X H I B I T S

14

       NUMBER              ADMITTED PAGE
15
       Exhibit 18            366
16

17

18

19

20

21

22

23

24

25
```

*United States District Court*

1          (PROCEEDINGS held in open court before The Honorable

2     JOEL H. SLOMSKY at 9:26 a.m.)

3          MR. HARRIS:  Your Honor, before we bring out the

4     jury, I think there's an issue that I'd like to discuss with

5     the Court.

6          Ms. Phillips is currently on the stand, and the issue

7     that I'd like to discuss specifically deals with what I'm

8     going to cross-examine her on, so I'd ask that she be

9     sequestered for the purpose of this limited argument.

10         THE COURT:  The system's not working in the

11    courtroom.

12         (A discussion off the record occurred.)

13         MR. HARRIS:  Judge, I'll start over.

14         So good morning.  The issue that I'd like to discuss

15    with this Court this morning deals with an evidentiary issue

16    that has been discussed previously in terms of the videotape

17    production and the showing of the videotape.

18         Because of the very nature of that discussion, I

19    would ask that Ms. Phillips be sequestered because she's

20    currently on the stand, and it directly impacts her

21    cross-examination.

22         THE COURT:  You want her sequestered now?

23         MR. HARRIS:  Yes.  Prior to me making the argument,

24    because I would be able to cross-examine Ms. Phillips

25    specifically on this issue that I want to address before the

1    Court.

2            MS. MATTIACCI:  She's a party to the case, Your

3    Honor.  She's a party to the case, Your Honor, so we would

4    object to that sequestration and this issue, as created by the

5    defendant, so they shouldn't also benefit from having the

6    witness sequestered, but...

7            MR. HARRIS:  Judge, respectfully, this was not

8    created by the defense.  This is an issue that had been going

9    on for two years.  And what has happened, and counsel has

10   argued before this jury, that, in fact, the incident report is

11   suggesting that the gentlemen that were in the store were

12   there -- were in the store for 20 minutes, knowing full well

13   that that's not the evidence in this case.

14           The reason why I specifically did not produce it in

15   issue in this case is because we were going to have to have a

16   trial within a trial; but I'm happy to have Donte and Rashon

17   testify to how long they were actually in that store when the

18   police were called.

19           But that's not what this case is about.  This case is

20   about Ms. Phillips's leadership specifically.  But now that it

21   has become that, because the counsel has argued specifically

22   to suggest that they were in the store for 20 minutes and

23   knowing full well that wasn't the case at all.  We produced

24   the document, we produced the videotape which shows how long

25   they've been in the store.  I think the jury should be

1    entitled to see that.

2          MS. MATTIACCI:  May I be heard, Your Honor?

3          THE COURT:  Yes.

4          MS. MATTIACCI:  The only evidence that was produced

5    by the defendant in this case concerning what happened on

6    April 12th was the investigation report, Exhibit 160, that

7    they produced that said the men were in the store for

8    10 minutes before the police were called.  That was the only

9    evidence they produced.

10         They put the issue of the video into light for this

11   Court because of their exhibit list.  For the very first time

12   on their exhibit list, they take a 46-second clip off the

13   internet and say they want to play it.

14         We say it's irrelevant because it's irrelevant.  It's

15   beyond the point.  Everybody has testified she was not

16   terminated for what happened on April 12th, so we object to

17   them just playing this 46-second clip.

18         In response to that, when Your Honor denied the

19   motion in limine, you said:  As long as they can lay a

20   foundation to be able to put in, that that might be able to be

21   put in as background evidence.

22         We then -- after that was decided at 5:30 at night on

23   Friday night, this past Friday night, for the very first time,

24   we get sent 24 video clips from all different angles,

25   purportedly from what happened on April 12th in that store.

1  They don't have time stamps.  They don't have dates.  They're

2  clipped up.  There are all sorts of -- sometimes they jump in

3  time.

4        I immediately Friday night responded by email to

5  opposing counsel and said:  Please produce the full,

6  continuous videos with time stamps.  We can't tell anything

7  from this.

8        They don't send us anything on Friday, nothing

9  Saturday, nothing Sunday.  We file our motion on Sunday saying

10  that they should be precluded from using the 46-second video.

11        Plus, this video was requested two years ago -- I'm

12  sorry, three years ago, three years ago in this case, and they

13  never produced it.  And then they don't produce it on Monday,

14  and they don't produce it on Tuesday.

15        We have now opened the case.  We have -- I've opened.

16  A whole HR VP has been cross-examined.  The plaintiff is on

17  the stand right now.  And last night at 9:25 at night, they

18  produce 10 hours of video.  It is suddenly continuous:  five

19  videos, 2 hours apiece, from all different angles of the

20  store, including angles that were not included on Friday

21  night.  10 hours.

22        These videos purportedly show that the men were in

23  the store around 3-and-a-half minutes before 911 was called.

24  And we had -- we had requested this, and they never produced

25  it.  And now they want to stand up here and show the jury that

```
 1   after we have already opened the case.  This is outrageous.

 2          We had -- the investigation report was what they had

 3   produced to us.  If they wanted to also utilize some video

 4   that contradicted their own investigation report, fine,

 5   produce it in time.

 6          But to do it at this stage of the case, Your Honor,

 7   is completely outrageous.  They should be precluded from using

 8   any video, and the jury should be instructed that this is the

 9   behavior and how they conducted their discovery.

10          MR. HARRIS:  May I be heard, Judge?

11          THE COURT:  Yes.

12          MR. HARRIS:  The reason why I provided the video

13   clip, because it was the video clip that created the

14   international issue that became an event as a crisis.  To

15   provide context, that's why I produced the video.

16          THE COURT:  Which video clip?

17          MR. HARRIS:  The video clip that was recovered --

18   that I think it was issued on YouTube that went around the

19   world, 3 million hits.

20          THE COURT:  The 46-second one?

21          MR. HARRIS:  Yes.  That's what I produced.

22          THE COURT:  The other day in court last week, you

23   told me it was a 46-second video.

24          MR. HARRIS:  Correct.

25          THE COURT:  Now it's a 10-hour video.  What's going
```

 1   on here?  Why wasn't this produced earlier in the litigation?

 2          MR. HARRIS:  I can tell you why, Judge.

 3   Specifically, the video itself, it was never contested as to

 4   what happened within the store.

 5          We objected to it because that's not why she was

 6   terminated.  It had nothing to do with why Ms. Phillips was

 7   terminated for the employment case.

 8          THE COURT:  Then why do you need the 46-second clip?

 9          MR. HARRIS:  Because it provided context of why it

10   was a crisis.

11          The jury's going to hear that this was a crisis.

12   Well, why was it a crisis?  Because this clip was sent out.

13   That was it.  That was the only reason why I was showing the

14   clip, to show that this was a crisis.  That is it.

15          THE COURT:  So what you're saying is that it's not

16   relevant to the case now you're saying?

17          MR. HARRIS:  Judge, I'm not saying that.  Here's what

18   I'm saying specifically:  The full video is not relevant.  It

19   has now become relevant because now Ms. Phillips is on the

20   stand, and counsel has argued that the gentlemen were in the

21   store for 20 minutes.  That's not true.

22          It was never contested before this day that they were

23   in the store for less than 3 minutes.  Until now, it was never

24   contested.  Until now.

25          Ms. Phillips worked there.  She knows how long they

```
 1   were in the store.  She could have certainly have told her

 2   counsel how long they were in the store.

 3            THE COURT:  Ms. Phillips was not there that day.

 4            MR. HARRIS:  I understand, but she conducted an

 5   investigation, like every other witness in this case.

 6            Ms. Hymes testified to, two years ago, in 2021, that

 7   she conducted an investigation, that she looked at the video

 8   and she saw them in the store for 2 minutes.  They never

 9   requested the video after Ms. Hymes' testimony.

10            THE COURT:  The bottom line is that -- and I don't

11   have a written response to what the plaintiff's motion is.

12            MR. HARRIS:  I do have a response, Judge.

13            THE COURT:  But I don't know if you filed it of

14   record.  I haven't seen.

15            MR. HARRIS:  It was filed last night, Judge.

16            THE COURT:  All right.  I'll take a look at it, and I

17   may reconsider it.

18            But I've said it in the court:  I've watched the

19   46-second video.  If you can authenticate it in a proper way,

20   I said we'll let the jury see it, because it does have some

21   relevance to the case.

22            But beyond that, I think that I'm not inclined to do

23   it, but I'll keep an open mind until I read what you said, and

24   also consider what you said during your argument.

25            But to produce 10 hours of video at this stage of the
```

 1  litigation is just absolutely prejudicial to the defendant --

 2  to the plaintiff in this case, because counsel has the right

 3  to examine the video, to see whether or not the videos are

 4  tampered with or edited or deleted or if there was any

 5  changes.

 6          So this is all part of the lawyering and discovery in

 7  the case.  And to produce it at this point, the 10 hours, is

 8  just -- I'm sure if the shoe was on the other foot, you'd be

 9  arguing the same thing as Ms. Mattiacci if you got evidence at

10  this late in the litigation.

11          This was asked for three years ago.  I am -- I can't

12  understand why the videos and what happened in the store was

13  not made available in discovery.  It certainly is relevant to

14  the claim of the defense under Rule 26.

15          MR. HARRIS:  If I may, Judge?

16          THE COURT:  Yes.

17          MR. HARRIS:  Counsel -- remember, let's place this in

18  the proper context.

19          At the time that the video was requested -- in fact,

20  specifically -- the video was not specifically ever requested

21  in discovery, number one.  What was requested in discovery

22  were documents and evidence related to the arrest, which we

23  produced.

24          What -- we specifically objected to that based on the

25  relevancy of her termination decision.  That's number 1.

1          Witnesses have subsequently testified, including

2    Ms. Phillips, regarding what happened within the store as

3    providing the context which led to the termination, only for

4    the purpose of leading to her performance and her leadership,

5    not as to whether or not what happened on the tape led to her

6    performance, led to her termination.

7          What counsel is now suggesting, which is very

8    different than how the case was developed, that, in fact, the

9    video was the reason for the termination.

10         Witnesses after witnesses have testified that they

11   subsequently found out that what Ms. Hylton had previously

12   said was inaccurate, was, in fact, she initially said that

13   they had been in the store for a long time.

14         Ms. Phillips testified that she didn't actually

15   disagree with what happened in her deposition, so, therefore,

16   it was never in contravention until right now, when they're

17   now arguing that the gentlemen had been in the store for

18   20 minutes.

19         THE COURT:  What are you seeking?  What kind of

20   remedy are you seeking?

21         MR. HARRIS:  What I am seeking is to be able to show

22   the entire video to provide further context if they're now

23   arguing that the gentlemen were in the store for 20 minutes.

24   It had never been an issue how long they were at the store

25   until right now.  They were only in the store for less than 3

1    minutes.

2           And for somehow -- and counsel is certainly aware of

3    this.  There wouldn't have been an international event for two

4    gentlemen being in the store for 20 minutes.  They know that

5    that's not what happened.

6           The purpose of me showing the limited clip -- the

7    limited video was to show that this became an international

8    issue, an event for an organization because of the 40 seconds

9    that were shown across the world.  That's it.  So that the

10   jury can actually see that, which was discussed.  Otherwise,

11   they would get the impression of some video that they have

12   never seen.  They wouldn't know why two people were arrested

13   without incident.  And Ms. Phillips was -- testified and has

14   testified at her prior hearing that, in fact, she wouldn't

15   have called the police herself.  That's why it was never an

16   issue.

17          It is now becoming an issue because counsel is

18   suggesting as if the incident report was somehow legitimate or

19   competent evidence that was produced, but it wasn't at issue.

20          MS. MATTIACCI:  Your Honor, may I be heard?

21          THE COURT:  Yes.  I'm not sure whether you're pulling

22   up the video.  I don't want to keep the jury waiting too long.

23          MS. MATTIACCI:  Your Honor, there is a --

24          MR. HARRIS:  May I approach?  I'm sorry, Judge.  This

25   is my...  thank you.

```
 1          MS. MATTIACCI:  Counsel is completely misstating my

 2   arguments.

 3          I have said very specifically, it's not my fault that

 4   Starbucks' own investigation report says that the men were in

 5   the store for 10 minutes.  That's their investigation report.

 6   That's a document in evidence.

 7          THE COURT:  Did you use the word 20 minutes?

 8          MS. MATTIACCI:  No.

 9          THE COURT:  No.  Okay.

10          MS. MATTIACCI:  The investigation report, yes,

11   20 minutes, because it's -- the investigation report says they

12   entered at 4:10 and that the police were called at 4:22.  And

13   then the -- and then the police were subsequently called, and

14   the police were talking to them for 10 minutes.

15          THE COURT:  Okay.  I understand.

16          MS. MATTIACCI:  So with that, I always couched it,

17   and even in opening and even with Ms. Phillips, was, what does

18   the investigation report from Starbucks says.

19          That's it.  So Starbucks, I guess, lied in their

20   investigation report.  You know, that's not my problem.

21          But we requested this.  Their response that you'll

22   see that they filed last night at 1:30 in the morning says

23   that they have this full video because they preserved it as

24   part of the litigation hold for this case.

25          So they preserved it as part of this case yet failed
```

1    to give it to us until the eve of the third day of trial?

2          I mean, that's -- we don't know the custodian of it.

3    We don't know the chain of custody of these documents.  We

4    don't know about how the time-stamping was put in.

5          And Your Honor, the 46-second clip has hearsay all in

6    it.  It's statements of customers that are in the store

7    saying, what did they do, they didn't do anything.

8          The hearsay -- the videos that counsel is now relying

9    on, the full videos have no sound.  You can't hear anything it

10   says, and they're completely different angles than the

11   46-second clip.

12         We -- and let me be clear, I don't think any of

13   this -- it's meaningless, because we're not -- we are

14   stipulating, admitting to the fact there was a 40-second clip,

15   second clip, that went out on Twitter that went viral, that

16   caused a firestorm for the company and a PR nightmare.  None

17   of that is in dispute.  They don't need background evidence on

18   that.

19         THE COURT:  That was the only thing that was shown

20   publicly, that 46-second clip?

21         MS. MATTIACCI:  Yes.  And we agreed to that.  And we

22   agree that this created a huge PR nightmare for Starbucks.

23   That's nothing that needed to be, you know, shown.

24         The only reason counsel wants to show it is to

25   conjure up feelings of the jury to feel bad for the gentlemen

1   that were arrested.  And they should not have been arrested.

2   That's not this case, though.

3        He wants to try the case about whether 911 should

4   have been called, whether the men should have been arrested.

5   That is not this case.  This case is about whether Shannon

6   Phillips was terminated because she was white.

7        MR. HARRIS:  Objection.

8        THE COURT:  Last word, Mr. Harris, and then I'll make

9   a ruling.

10       MR. HARRIS:  Judge, specifically, if you look at what

11  counsel argued yesterday, using the investigation report, she

12  specifically said 20 minutes.

13       She also said in the document that the video was

14  actually saved.

15       That's why I have to now show it, because she pointed

16  to that part in the investigation report.

17       The investigation report was created by Ms. Hylton,

18  who had obviously --

19       MS. MATTIACCI:  No, it wasn't.  It was not created by

20  Ms. Hylton.

21       THE COURT:  Wait, Ms. Mattiacci.  Don't interrupt.

22       MS. MATTIACCI:  I'm sorry.  I'm so sorry, Your Honor.

23       MR. HARRIS:  Ms. Hylton provided the correct -- it

24  wasn't prepared by Ms. Hylton.  She provided the information

25  that went into the report.

```
 1          So of course Ms. Hylton would have said 20 minutes.

 2   That's where the asset protection person got the information

 3   from, from the store manager.  The store manager is not the

 4   one who actually had the contents of the information.  That's

 5   why we didn't use it.  That's why we didn't discuss it,

 6   because it was inaccurate.

 7          But if counsel is now suggesting as if that report

 8   somehow demonstrates what would have been captured in the

 9   45 seconds, knowing that she's had this for several years and

10   never subsequently asked for it, that wasn't at issue.  That's

11   why they never addressed it.

12          THE COURT:  All right.  You wanted to say something

13   else?

14          MS. MATTIACCI:  Oh, he just misstated that

15   Ms. Hylton, Holly Hylton, created the investigation report.

16   It was not.  It was --

17          MR. HARRIS:  Judge, that's not what I said.

18          MS. MATTIACCI:  It was not.  It was Ronda Knight who

19   did it and also in the report said she had secured the videos.

20          And I just want to point out, this issue was raised

21   May 30th, Your Honor, in the pretrial conference.

22          When we had oral argument on the motion in limine, I

23   said Exhibit 160 is the only exhibit we have that shows what

24   happened that day from Starbucks, just give me your

25   information.
```

1           And there was nothing to substantiate a longer --

2     there was no longer video created.  I didn't even know it

3     existed.  We just wanted it.

4           THE COURT:  All right.  Let me make a ruling here.

5     Based upon Document Number 134 --

6           (Court reporter clarification.)

7           THE COURT:  I have read Document Number 134, which is

8     plaintiff's motion for sanctions against defendant and renewed

9     motion in limine to preclude defendant from introducing the

10    46-second arrest video TR005 at trial.  And I've also read the

11    defendant's response in opposition to plaintiff's motion for

12    sanctions and renewed motion in limine, which is a three-page

13    document, a two-and-a-half page document.  And I've listened

14    carefully to what counsel have just argued.

15          It's obvious to me that based upon what counsel is

16    saying, that the entire video, whatever defendant had in their

17    possession, was requested early on in discovery.

18          Mr. Harris (sic) says they requested all evidence

19    related to what happened in the store that day, and I don't

20    have the discovery request in front of me, but it is quite

21    obvious in a case like this that that kind of request would

22    encompass the turning over of the videos that were in

23    Starbucks' possession of what happened in the store that day.

24          Now we learn today for the first time, or at least

25    I'm learning for the first time, there were 10 hours of video,

1    not just a 40-second clip taken on what looks like a cell

2    phone by someone else in the store.  And it is that clip that

3    went viral on the internet and other media, which created what

4    I'll call the firestorm of publicity against Starbucks for the

5    handling of the two men, African American men that went into

6    the store.

7           Mr. Harris is saying that we believed it wasn't

8    relevant to the case, but when we had our final pretrial

9    conference, I was informed that there was a 40-second clip,

10   and the defense wanted to play it for the jury.  And I thought

11   it was background information and would be relevant just for

12   the jury to see what happened to these two men, and the

13   prejudice arising from it as argued by the defendant was not

14   undue, where it would outweigh the probative value of the

15   playing of that clip.  But it still has to be properly

16   authenticated before it's admissible.

17          Now I learn that defendant has put together a

18   compilage of excerpts from 10 hours of video, and I will not

19   allow that to be played.  That is -- number one, turning it

20   over at this late date is absolutely prejudicial to the

21   defense for reasons stated by Ms. Mattiacci.  They just have

22   not had -- they will not have time to properly investigate the

23   10 hours of video and to properly analyze what's on there and

24   see whether or not what's there is somehow relevant or not

25   relevant, but it's what's -- Ms. Mattiacci has given some

1   other reasons.

2          But I can't think of a more prejudicial situation

3   right now in this case, for that clip not to have been turned

4   over for a comprehensive examination by defense -- by

5   plaintiff's counsel.

6          Despite what Mr. Harris says, it does have some

7   relevance in this case, and that's why I said that the defense

8   can play it.

9          Ms. Mattiacci has objected to playing of any of the

10  40-second clip, and I'm going to allow it if it's

11  authenticated.

12         I believe that based upon what I'm hearing from the

13  evidence thus far, there is some claim in this case by

14  plaintiff that the firestorm of publicity caused Starbucks to

15  overreact and fired Ms. Phillips based upon her race, and

16  others of African American descent were not fired.

17         And so the tape would have some relevance in the

18  case, because you have two African American men who are

19  arrested in the store, and that clip went viral and led to the

20  protests, and the amount of publicity that followed that was

21  considerable.  And it was publicity that was all over the

22  media and the newspapers, local television.  It's something

23  that you couldn't miss, so to speak.  That's how widespread it

24  was.

25         So Ms. Mattiacci, when she made her statements, was

1  relying upon a report prepared by -- on the time was relying

2  on a report produced by the defense, but the videos were

3  never -- never produced in full.

4         So I'll stand on my original ruling with respect to

5  the 40-second clip.  I'm convinced that the jury can put it in

6  proper perspective in this case after they see it, but to play

7  any additional portions of the clip would be unduly

8  prejudicial.  Based on this record, it would be highlighting

9  an incident that from what both sides are saying to me now is

10 not the real issue in the case.

11        So that the probative value of playing all those

12 additional clips would be outweighed under -- by its

13 prejudicial effect in my judgment under Rule 403.

14        I will not impose the sanctions.  I'll deny the

15 motion for sanctions, and I think counsel is making the --

16 defense counsel is making the request in good faith, and -- on

17 behalf of his client, and I will not impose sanctions.  But I

18 will -- I'll deny the motion for sanctions.

19        And with respect to the renewed motion in limine to

20 preclude the defendant from introducing the 46-second arrest

21 video, I'll again deny that without prejudice.  It still has

22 to be authenticated and properly presented to the jury under

23 the Federal Rules of Evidence.

24        All right.  Can we bring in the jury at this point?

25        MS. MATTIACCI:  Your Honor, I request a moment to

1   speak with my client.

2          She -- this was produced -- these videos are produced

3   to us, this evidence we've requested, while she's on the

4   stand.

5          I follow the rules, so I have not spoken to my client

6   at all about this, and I think it's only fair that I be able

7   to have a few minutes with my client to speak about this

8   evidence that they just produced last night.

9          THE COURT:  All right.  Do you want a short recess?

10         MS. MATTIACCI:  Yes, Your Honor.

11         MR. HARRIS:  Objection, Your Honor.  I have a

12  question.

13         THE COURT:  Yeah.

14         MR. HARRIS:  There's nothing that's happened in this

15  courtroom that would impact Ms. Phillips's testimony.

16         The Court had never permitted me to introduce the

17  video.  It's still not the case.  It was not on our witness

18  list.  We had no intention of doing it up until the time that

19  counsel brought up the incident report.

20         So it's not relevant.  She doesn't need to speak to

21  her client now.  She can testify to what she was going to

22  testify to.  And to do so now places us in a prejudiced

23  position.  There's nothing about what we had had on our

24  witness list to suggest that her testimony would change.  It

25  was never in the case in the first instance.

```
 1              MS. MATTIACCI:  Your Honor, they produced -- they
 2     produced video evidence that we have requested while our
 3     client is on the stand, after I've already opened and had a
 4     witness, and I can't even talk to her.  That's so prejudicial
 5     to me and to our side.  I should at least be allowed five
 6     minutes, ten minutes, to explain the circumstance of what just
 7     happened, because this is a completely -- perversion of the
 8     Federal Rules of Civil Procedure and evidence.  It's
 9     outlandish that they would wait until now, until 9:40 last
10     night.
11              THE COURT:  All right.  I'll afford you a few minutes
12     to talk to your client.
13              Once a witness is under cross-examination, though,
14     the party that called the witness can't speak to the witness.
15     That's understood.
16              But we're still on direct examination, so I'll afford
17     you a few minutes.
18              MS. MATTIACCI:  Okay.
19              THE COURT:  Okay?
20              MS. MATTIACCI:  Thank you.
21              THE COURT:  We'll take a recess.  And again, try to
22     keep it quick, because I don't want to keep the jury waiting.
23              (Recess at 9:55 a.m. until 10:01 a.m.)
24              THE COURT:  Bring in the jury.
25              (Jury in.)
```

*Phillips - Direct*                                263

```
 1            THE COURT:  Please be seated.

 2            Good morning, members of the jury.  I just want to

 3  apologize for the delay in getting started this morning.

 4            I had to consider some matters outside your presence

 5  with counsel, and that was the reason for the delay.  We were

 6  working.  So -- and we also had some problem with the audio

 7  broadcast in the courtroom, and that had to be fixed.

 8            So again, we apologize for the delay.  I don't like

 9  to keep you sitting in the back, waiting and wondering what's

10  going on.

11            But we're prepared to proceed at this point.

12            Ms. Phillips, you can take the witness stand, and

13  Counsel, you can continue your direct examination.

14            MS. MATTIACCI:  Thank you, Your Honor.

15                  DIRECT EXAMINATION - CONTINUED

16  BY MS. MATTIACCI:

17  Q.   Good morning.

18  A.   Good morning.

19  Q.   I believe where we left off yesterday, take a look at the

20  calendar here.

21       We were talking about Monday -- I'm sorry.

22       We were talking about the call that you had with Reggie

23  Borges at 3:30 in the morning.

24       Can you tell the members of the jury about that call and

25  about when that happened?
```

*Phillips - Direct*                           *264*

1  A.   Sure.  So it was the morning of the -- when the interview

2  happened with Gayle King and Howard Schultz.  Reggie called me

3  because he had gotten to the store where the interview was

4  taking place, and he wanted to tell me that everything was

5  perfect, thank you so much and you're a hero and I probably

6  shouldn't have called this late, but that was kind of par for

7  the course at that point.

8  Q.   Great.  And I believe we left off with this document

9  which was 154.

10      And is this the email on April 19th at 10:30 in the

11 morning that you sent to Tim and the others?

12 A.   It is.

13 Q.   Okay.  Was the interview with Gayle King and the CEO the

14 morning of Thursday, April 19th?

15 A.   Yes, I believe it was.

16 Q.   Did you have partners, employees, that were leaning on

17 you during this time?

18 A.   I did, certainly.

19 Q.   Did you help to support them?

20 A.   I did.  I certainly did.

21 Q.   Let's take a look at 153.

22      This is an email sent to you by Paul Sykes and Paul Sykes

23 is African American.  Correct?

24 A.   He is.  He was the district manager of the store.

25 Q.   And he was the district manager of the store where the

*Phillips - Direct*                265

1  arrests took place?

2  A.   That's correct.

3  Q.   Okay.  Can you read what Mr. Sykes said to you?

4  A.   Hi Shannon.  I am tired, and I need you to wordsmith this

5  email for me before it hits Camille.  Can you please take a

6  look at this and make any appropriate corrections and send to

7  Camille.  Thank you, Paul.

8  Q.   Okay.  And so Mr. Sykes is asking you to review his

9  document and make sure it's okay before it goes to your boss,

10 Camille?

11 A.   That's correct.

12 Q.   Can you summarize the nature of the email that he is

13 sending to Camille?

14 A.   Sure.  So we had created this group, the Philadelphia

15 protests response team.  Obviously there were a lot of

16 protests happening, and we thought it would be wise to have,

17 you know, a group of people that would need to be involved in

18 one text thread, one email thread, so that as things continued

19 to happen, we could kind of mobilize the group to support the

20 stores in how they needed.  And this kind of details out the

21 roles and responsibility in the event a protest is happening.

22 Q.   Did you in fact review the email for him and approve it

23 before it went to Ms. Hymes?

24 A.   I did.

25 Q.   Let's take a look at 136.

*Phillips - Direct*                              266

```
 1        And this is -- this is actually the email that we were

 2   just looking at before, but it went out under your cover

 3   ultimately.  Correct?

 4   A.   That's correct.

 5   Q.   It talks about you being in a field leadership -- you as

 6   a field leadership partner as well as others.  Correct?

 7   A.   Yes, it does.

 8   Q.   Was Ms. Hymes okay with this?

 9   A.   I believe she was.

10   Q.   Let's take a look at 148.

11        This is an email chain, April 19th, between yourself and

12   the Black Partners Network, in particular Andrea.

13        If we go to the next -- to the bottom of the chain.

14        The original email is from Andrea Monroe.  And she was

15   the leader of the Black Partners Network in the Philadelphia

16   region.  Correct?

17   A.   That's correct.

18   Q.   And so is she stating in here that -- suggesting an

19   opportunity for there to be roundtable discussions with black

20   partners and white -- everybody, together to discuss their

21   concerns?

22   A.   Partners in general, sure.

23   Q.   And if we go up to your -- to the email that she sent

24   directly to you.  First, let's read what you said to her at

25   the bottom there at 113.
```

 1  A.   I said:  Thank you, Andrea.  I truly appreciate your

 2  support for our partners at this time.

 3  Q.   Is Andrea African American?

 4  A.   She is.

 5  Q.   And what did she respond?

 6  A.   She said:  Absolutely.  How are you holding up?

 7  Q.   And what was your response to her?

 8  A.   I said:  I'm holding up.  I so appreciate your support

 9  and pulling this together so timely.  I know many of our

10  partners need to talk, and while we've offered on-site EAP

11  counseling (upstairs at 4th & South) all week from 12:00 to

12  6:00 through tomorrow, and may extend, I actually feel like

13  getting a group together is better for partners to be able to

14  share with other partners and talk.  I really appreciate you

15  taking the lead on providing this, and I hope many partners

16  turn out for what I know will be a genuine and needed

17  conversation.

18       Thank you.

19  Q.   And the EAP counseling that you referred to, is that

20  where outside therapists were brought in to talk to employees

21  if they wanted to talk to them?

22  A.   That's correct.  We had brought in -- I think I mentioned

23  this yesterday -- EAP, which is Employee Assistance Program.

24  We had brought counselors into the store for anyone to come

25  and have a conversation, but we weren't getting a lot of

 1  people showing up, so we thought maybe this, bringing partners

 2  together in a bigger group, might spark more conversation and

 3  support.

 4  Q.   Were you also involved in making sure that employees were

 5  safe in the stores during these times?

 6  A.   I was.

 7  Q.   Let's take a look at 146.

 8       The bottom email of 146 is from Dina Campion to Paul

 9  Sykes and yourself, copying Ronda Knight on April 17th.

10       Who is Dina Campion?

11  A.   I believe she was -- if I'm correct, I think she was

12  Ronda Knight's boss in P&AP.

13  Q.   Okay.  So and P&AP, that was the partner and asset

14  protection group?

15  A.   That's correct.

16  Q.   And in summary of this email, were there plans that were

17  being put in place to help keep partners safe during the

18  protests?

19  A.   That's correct.  We had the Philadelphia protest team.

20  We also had instituted some roving security, so these were

21  security officers that were in plainclothes that were sitting

22  in the café, really just to make the partners feel more safe

23  and protected.

24  Q.   And that wasn't something that was done prior to

25  April 12th.  Correct?

*Phillips - Direct*                                           *269*

 1  A.   No.

 2  Q.   In the email there where it talks about the Global

 3  Guardian team, is that the plainclothes roving security that

 4  was being put in place?

 5  A.   That's correct.

 6  Q.   And then you respond back to Dina.  Can you read what you

 7  said there?

 8  A.   Sure.  I said:  Hi Dina, Zeta, Paul Pinto, Camille and I

 9  had a meeting last night and decided that the Global Guardian

10  team should continue through the next two weeks.  Can you

11  please extend for us and confirm back that this has been done?

12  Q.   And Dina responds back:  I'm on it.  Security team will

13  communicate as soon as it's confirmed.

14  A.   That's correct.

15  Q.   And then, can you read your response at the top?

16  A.   I said:  Thank you so much, Dina.  I truly appreciate all

17  your support.

18  Q.   So you were actively engaged in making sure that

19  everybody was remaining safe during this time?

20  A.   I was.  100 percent engaged.

21  Q.   To your knowledge, was Starbucks watching the reaction of

22  the public and the press closely for every move that it made

23  during this time?

24  A.   Yes.  We were getting a barrage of daily emails of every

25  news story, every social media news story.  It was a lot.  So

*Phillips - Direct*                    270

1   they were monitoring it very closely, what the media was

2   saying.  And every day we were getting updates with all the

3   articles.

4   Q.   Let me show you now Exhibit 142.

5        At the top of 142, Camille Hymes, your boss, sends to you

6   and Ebony Johnson an FYI email, correct, forwarding the one

7   below?

8   A.   That's correct.

9   Q.   And then, if we look at the email below from Jaime

10  Ryan (sic), the subject is:  Social/media/partner read

11  out_Thursday 4:30 PT.

12       It says:  Since this morning's report, coverage has

13  increased as the narrative continues to shift towards Rashon

14  Nelson and Donte Robinson's appearance on Good Morning America

15  and an article in the AP, where they provided their version of

16  events in the store.  The Philadelphia Police Commissioner

17  issued a new apology during a press conference, and the Mayor

18  of Philadelphia also provided an updated statement.

19  Conversation on social and traditional media also continues

20  regarding the hoax coupon, and the team is working in lockstep

21  with Twitter on removal of hoax-related social content.

22       We are preparing for the possibility of the investigation

23  from the store incident to be closed/published in the next day

24  or two -- or over the weekend by the Office of Professional

25  Responsibility.  We have not heard of any anticipated

*Phillips - Direct*          *271*

1    third-party press conferences or otherwise planned for

2    tomorrow, but we are monitoring.

3         And the hoax coupon was something that was going on at

4    the same time as well?

5    A.   It was.

6    Q.   And that was a coupon that was not legitimate but being

7    presented?

8    A.   It was.

9    Q.   And if we look down on Social where it says Channel

10   Overview, it is being relayed that:

11        There have been 4,400 mentions related to the hoax coupon

12   today; 30 percent of today's conversation volume is from

13   people and media noting they are fake.  At the same time,

14   we've seen #StarbucksChallenge mentions fall in velocity since

15   this morning.  Correct?

16   A.   That's correct.

17   Q.   And then, it was:  Conversations related to the two

18   gentlemen speaking out publicly this morning has totaled

19   61,800 mentions.

20        So "this morning," meaning on April 19th?

21   A.   That's correct.

22   Q.   These mentions related to two minutes between the

23   gentlemen's arrival and the 911 call.  People are also

24   continuing to share links to the GMA full interview.

25        Now, if we go to the second page, there are more bullet

Phillips - Direct                 272

1   points about the retweets of the viral video and how many

2   times specifically the post has been retweeted.  81,800 times.

3   Correct?

4   A.   That's correct.

5   Q.   And they're tracking it in terms of hour to hour of how

6   often that this story is being mentioned.

7        There's also reports in the media of how it's being

8   reported in the newspapers.  Correct?

9   A.   That's correct.

10  Q.   Of note, it says in the third bullet point, CNNMoney's

11  Richard Quest responds why Kevin Johnson's response to the

12  incident, quote, "shows companies like Facebook and Equifax

13  how to handle a crisis" by immediately apologizing, conducting

14  on-the-ground meetings, and announcing racial bias training

15  education for partners.  Correct?

16  A.   That's correct.

17  Q.   So they were also monitoring the response of the public

18  and the media and social media of the different actions that

19  Starbucks is taking and how it's being received?

20  A.   Absolutely.

21  Q.   And if we go down, there's a chart with how many times

22  the social media mentions, and the reach is for different

23  topics:  Philadelphia Overview -- Overall, Starbucks Training

24  Announcement.  And they're even tracking down to whether the

25  sentiment is positive or whether it's neutral.  Correct?

*Phillips - Direct*                                    *273*

```
 1   A.   Yes, that's correct.
 2   Q.   They have graphs tracking the volume over time showing
 3   Philadelphia-related coverage since Friday, 4/13 at midnight
 4   from US and Canada outlets with a reach more than 100 people.
 5   Correct?
 6   A.   That's correct.
 7   Q.   And this is tracking it day by day.  Correct?
 8   A.   That's correct.
 9   Q.   And then you were sent or you were forwarded by
10   Ms. Hymes:  Bold articles represent news since last report.
11   And these are headlines that were made.  So the first headline
12   says:  Men Arrested at Starbucks Speak Out, Philadelphia
13   police commissioner apologizes for how he handled Starbucks
14   arrests.
15        And this goes on and on for many, many pages of every
16   single headline and article that is being written about this
17   situation; is that correct?
18   A.   That is correct.  It was a major brand risk, as John
19   Kelly mentioned early on, and they were tracking everything:
20   What the media was saying, how people were responding, what
21   our response was, how people were responding to that.  It was
22   a firestorm.  That's all I can say.
23   Q.   And this goes on for like 15 pages here; is that correct?
24   A.   Oh, I'm sorry.  Yes, that's correct.
25   Q.   During this time, were you engaged in helping to figure
```

*Phillips - Direct*                           *274*

1  out coverage and support for the partners during the ongoing

2  protests that were happening?

3  A.   I was.

4  Q.   Let me show you Exhibit 62.

5       This is a string of emails involving Ronda Knight and

6  others that we have discussed before, and you recognize this

7  as talking about upcoming protests that would be happening?

8  A.   Yes, that's correct.

9  Q.   Okay.  And that information was forwarded to you on

10 Friday by Ms. Hymes, and it says:  For your visibility.

11 Correct?

12 A.   It does.

13 Q.   What is your response to Ms. Hymes in regards to the

14 protests that was coming up on Sunday and police support?

15 A.   I said:  Hi Camille, we are set for Sunday.  We will have

16 our partners out of the store by 2:30.  An additional group of

17 partners will be at a nearby store:  18th & Market, so that

18 when the protest ends they can come to the store to work the

19 balance of the day.

20      The following group is confirmed to be in the store

21 during the protest will be:  DM-Paul Sykes, myself, DM-Delma

22 Wells, DM-Tim Osevala, District Manager-Michele Liontas,

23 ROC -- which was the regional operations coach -- Michael

24 Scott, and store manager of the store-Angela Grass.

25      Thank you, Shannon.

*Phillips - Direct*                              *275*

1  Q.   Let's take a look at 44.

2       Exhibit 44 is an email that you sent on Monday,

3  April 23rd, in regards to the Philly task force.

4       Can you read what you say there at the top, and then

5  explain what this email is that you're sending to Ms. Hymes?

6  A.   When you say read at the top, the headline of the email

7  or do you mean --

8  Q.   The first line in the two bullets.

9  A.   Sorry.

10      Hi Camille, I wanted to provide you some line of sight as

11 we move forward in Philadelphia:

12      Task Force has been created to support new/revised

13 "Safe & Welcoming" procedures and engage Denise's team.

14      Dina Campion has been engaged by you to support ongoing

15 P&AP support in "hot spot" stores.  This list was created in

16 November during "All Hands Calls."

17 Q.   And then I believe we talked about earlier the hot spots

18 stores meaning different stores within the city that had a

19 particular heightened risk of crime or homelessness.  Right?

20 A.   Right.  Drug use, crime, yep.

21 Q.   Let's look at Exhibit 66.

22      This is a thank you that you get from Rana Beresford.

23 Correct?

24 A.   That's correct.

25 Q.   And can you read what Rana says to you and who she is?

*Phillips - Direct*       *276*

1  A.   Sure.  The headline is:  Acting with courage, challenging

2  the status quo and finding new ways to grow our company and

3  each other.

4      And she says:  Thank you so much for your courageous

5  leadership and endless patience.  It's always reassuring to

6  know that you are out there to support my entire store, and

7  customers.

8      Thank you.

9      Rana was a store manager.  I believe she was in South

10 Jersey, maybe down towards the shore, Rio Grande or something

11 like that.

12 Q.   And then 152 is your response.  This is -- the one that

13 we just read from Rana Beresford, you had forwarded that to

14 Jackie Johnson.  Correct?

15 A.   It looks like I did.

16 Q.   And --

17 A.   Well, it looks like I must have sent it to her and

18 probably then sent it to Jackie because I say:  Thank you so

19 much, Rana.  Receiving this today meant the world to me.

20     And then I probably copied Jackie, because Jackie

21 responded:  Awe how sweet.  You are loved.

22 Q.   Who was Jackie?

23 A.   She was another district manager of mine.

24 Q.   Did you continue that week to engage and work with the

25 Black Partners Network?

*Phillips - Direct* 277

1    A.   I did.

2    Q.   Let's look at 67.

3         This one, for some reason the typing is really small on

4    this version of the email.

5         Are you able to see that?

6         Let's see if I can go up one.

7         This is from April 23rd.

8    A.   So this was about Andrea coming to town, the senior P&AP

9    manager.  That would have probably been Dina's boss.

10        Oop, kind of went away.

11   Q.   Yes.  I was just looking at that.  If we look at the

12   bottom email, it will give you some more information about the

13   P&AP group.

14   A.   Uh-huh.  I'm sorry.  I don't see it on the screen.

15   Q.   Yes.  Sorry.  This email is problematic for some reason.

16   It's very strange.

17        Okay.  Can you read that at the top?  Yes, absolutely?

18   A.   So Camille was asking:  Are you available to spend time

19   with Andrea this week?

20        And I said:  Yes.  Absolutely.  We'd welcome Andrea in

21   the market this week.  Let me know when she will be coming

22   into town and we'll take it from there.

23        Many thanks, Shannon.

24   Q.   Okay.  And what was the role and the project that you

25   would be working on?

*Phillips - Direct*                                    *278*

1   A.   So Andrea was Dina's boss in P&AP, and we had kind of

2   thrown out the Safe and Welcoming policy, so now we were

3   allowing anyone into the store to be in the cafés or use the

4   restrooms, but we also had these issues still existing of drug

5   use and overdoses and homelessness in the cafés and theft.

6        And so Andrea, we felt like would possibly have some good

7   ideas and solutions of what we could do in the stores going

8   forward to balance, you know, the needs of the customers and

9   the partners and also, you know, be able to have the cafés

10  open for customers and noncustomers alike.

11  Q.   And at the top here what you're responding to is

12  Ms. Hymes saying to you, let me know your thoughts, are you

13  able this week to meet with them?

14  A.   That's correct.

15  Q.   Let's look at Exhibit 70 from Tuesday, April 24th.  This

16  is an email from Rebecca Stout, store manager.

17       Can you read what she says to you there?

18  A.   Sure.  Hi Shannon, I just wanted to reach out and thank

19  you for your leadership over the past week-and-a-half.  You

20  truly exemplify what it means to be a servant leader.

21       I know I wasn't in Philadelphia last week but I've

22  checked in with partners in the area to ensure they felt safe

23  and felt they could share any concerns if necessary.  All the

24  partners think very highly of Starbucks and they feel what

25  happened isn't a true representation of what we stand for.

*Phillips - Direct*                                          *279*

 1          I appreciate your keeping us informed every week via
 2   conference calls and inviting shifts so that everyone is
 3   included.
 4          Multiple shifts came up to me and told me how included
 5   and supported they felt, that there was a conference call for
 6   them explaining the situation as well as how we will move
 7   forward.
 8          As always, I truly appreciate your positivity, compassion
 9   and leadership.
10          Thank you, Becky Stout.
11   Q.   Let's look at 141.
12          This bottom email from Tuesday, April 24th is from you to
13   a group of folks, including Mr. Sykes and Mr. Trinsey.
14          And can you explain what this email is?
15   A.   So I was asked to come up with a Philly task force.  And
16   these would be partners in the stores as well as DMs that
17   would be able to engage with Seattle, like op services.
18          That was the group in Seattle that had originally
19   developed the Safe and Welcoming.  And so there were going to
20   be revisions made and so they wanted a group of people who
21   could represent here's what's happening in our stores and we
22   have a need to have, you know, safety procedures in place.
23          So be able to accurately engage with Seattle folks so
24   they could understand where the stores were coming from and
25   develop a better program going forward.

*Phillips - Direct*                                    *280*

```
1   Q.   And you forwarded that on to Michael Scott?

2   A.   I did.

3   Q.   What was Michael Scott's role in this?

4   A.   It was called the ROC.  He was the regional operations

5   coach.

6   Q.   And what was his -- vis-à-vis this situation, what would

7   he do or did he do?

8   A.   I believe the original role of the ROC was to kind of

9   support Camille in developing the regional directors, but in

10  this case Michael Scott was very instrumental in helping pull

11  resources together and determine who should receive and what

12  information and he was very much a support during this time.

13       So I wanted to make sure he was obviously included on

14  this information.

15  Q.   Let's take a look at 144.

16       This is an email coming from Katie Bowman to you:

17  Sending a little sunshine.

18       And what does it say?

19  A.   Sending you lots of warm thoughts, hugs and sunshine.  I

20  have always loved working with you and for you, Shannon.  I am

21  so very grateful for the leader and partner you are,

22  encouraging everyone to be their very best and authentic self.

23  Proud to be your partner.

24  Q.   Even at this time, were there ongoing protests that were

25  happening and you were continuing to engage and support the
```

*Phillips - Direct*                                        281

1   partners?

2   A.   Yes.  There were ongoing protests in the city, at the

3   store that it happened, 18th and Spruce, and then sometimes

4   they would march down to other stores.  So I remember a day

5   when me and the district managers and store managers were

6   literally running to the next store so that we could be ahead

7   of the protesters and get the hourly baristas out of being

8   in -- having to deal with the protest activity, like in the

9   back room or some of the stores had basements, but to get them

10  out of there so we could kind of be the face of what was

11  happening.

12  Q.   I'm just going to bring up a text message.  One moment.

13          THE COURT:  While you're looking for that, I need to

14  speak to the court reporter.

15          (A discussion off the record occurred.)

16          THE COURT:  You may proceed.

17          MS. MATTIACCI:  Thank you, Your Honor.

18  BY MS. MATTIACCI:

19  Q.   I'm showing you what has been marked as Exhibit 12, and

20  the particular Bates number on this is Starbucks 5769.

21      And does this represent a text chain of folks who were on

22  the Philadelphia Protest Response Team?

23  A.   That's correct.

24  Q.   And if we look down to April 27th, is this indicating to

25  you that there was a potential protest that was going to be

1  happening?

2  A.    Yes.  There was a protest that we had become aware of

3  from the civil affairs unit.  We had developed a relationship

4  with two specific officers from that unit.  And we had become

5  aware that there was going to be a protest, so I was headed

6  into the store to make sure that I was there to support.

7  Q.    Camille is asking down here about the civil affairs unit.

8  She's asking you to call them.

9        And what are you responding to?

10  A.   Oh, she was asking a couple messages above to call Gary

11  and Lieutenant Cruz.  Those were the two civil affairs unit

12  folks that we had developed a relationship in this period of

13  time.

14        And she was telling me to get in touch with them, and I

15  let her know that that was actually who informed us of the

16  protests.

17  Q.   Let's look at Exhibit 78.

18        This is an email that you received from Jennifer O --

19  A.   Otepka.

20  Q.   Otepka.  Who is Jennifer Otepka?

21  A.   She had been a store manager, I think maybe down south at

22  Somers Point, but she had moved a couple years ago at this

23  point to maybe North or South Carolina, I believe.

24  Q.   Can you read what she says here to you on April 26th?

25  A.   Sure.  Hey Shannon, I hope all is well.  I know this

1  email, for me personally, is long overdue --

2  Q.   Shannon.   Sorry.   Just for the benefit of --

3  A.   Slow down?

4  Q.   -- Ann Marie.

5  A.   Am I reading too fast?  I'm sorry.

6       -- but better late than never.

7       As I transition with new beginnings with a new DM - my

8  reflections over my 11 years and my Starbucks journey has

9  flashed before me and I felt the need to shoot you an email to

10  not only say hey but also to thank you for the impact that you

11  have made on me as a manager.

12       Though I am now a manager in the Southeast, your impact

13  as a regional director has truly impacted me during my time in

14  the Mid-Atlantic.  As I share my Starbucks journey with

15  partners and most recently a developing shift supervisor, I

16  always find myself starting off my story with, I am where I am

17  today because someone believed in me.  And though it may be

18  overlooked by some, I will always remember that day in

19  Haddonfield, sitting in the conference room in front of Delma

20  Wells and Marie Monzo during my PIAT --

21       That stands for "putting it all together."  When someone

22  was trying to get promoted to a store manager position, they

23  would do a bit of a presentation for their district managers

24  and myself to showcase that they were ready.

25       -- during my PIAT as an ASM, crying my eyes out because I

1   felt lost as a partner.  You told me, "Jenn, as a partner, you

2   may not know the business side of your role - like

3   understanding the P&L or understanding reports, but you do

4   hold characteristics of a great manager that are not teachable

5   - your drive and willingness to grow and deliver."  I recall

6   you even offering to teach me personally if that's what it

7   took.

8        I don't know if there's -- Oh.

9        In my time as a manager, I have referenced this exact

10  moment so many times.  When it comes to any kind of

11  development piece, sharing my own personal story or when

12  another partner is also feeling lost, I am where I am because

13  you believed in me and put your stamp of approval to push me

14  forward.  And I wanted to let you know that I am so grateful

15  for that.

16       You and Michelle -- that was her district manager -- have

17  taught me so much in my time with you, and I always remember

18  that.

19       I am currently still in the store that I opened when I

20  transitioned to North Carolina, and I'm about to hit my 2-year

21  mark.  I have had many people here as well believe in me as

22  you have, and I'm continuing to grow.

23       I have just completed the very first IPLD round for Area

24  141 as well as leading some others for our district.

25       I miss you all greatly up there, and still connect with a

*Phillips - Direct*                              285

1  few managers in the Southern New Jersey area.  I hope that you

2  and your family are doing well.

3       Again, thank you so much for believing in me.

4  Q.  You forwarded that email on Friday the 27th to Ms. Hymes.

5  Correct?

6  A.  I did.

7  Q.  Can you read what you said to Ms. Hymes?

8  A.  Do you ever notice when you need to hear it the most,

9  someone reaches out to tell you they appreciate you.  I hope

10 you aren't reading this until you are back --

11      Camille must have been tapped out at this time.

12      -- and that you didn't watch the partner open forum

13 today.  I didn't either, by the way, I was at 18th and Spruce

14 at the time.  But I talked to TJ after and he said Rossann

15 said during the partner open forum that Camille Hymes is the

16 kind of leader she aspires to be.

17      I want you to know I feel the same and I so appreciate

18 who you are and all of your support.  Thank you for being you.

19 Enjoy this note.  I certainly did.  Jen has been gone from

20 area 71 -- that was what they called the area that I

21 oversaw -- for two years, transferred to North Carolina.

22      Talk soon, Shannon.

23 Q.  This is one week before they start drafting your release

24 severance agreement.

25      Did you have any indication whatsoever that your job was

*Phillips - Direct*                                      *286*

1   in jeopardy?

2   A.   No, never.

3   Q.   Let's look at 79.

4        This is from April 26th.  The bottom is from Andrea

5   Monroe, the -- it's coming from her email, the Black Partners

6   Network.

7        She says:  Partners, thank you for taking the time to

8   connect yesterday.  We appreciate the candor and the

9   thoughtful discussion.  The issues and concerns raised are all

10  valid.  We intend to make every effort to communicate those

11  concerns and work to find a resolution.

12       As stated, please reach out with additional thoughts or

13  concerns.

14       Again, thank you for trusting the BPN and looking out for

15  upcoming discussion dates.

16       And then you respond on the 27th to her, can you read

17  what you said there?

18  A.   Hi Andrea.  I'd love to engage the BPN as well as the

19  WDN -- that was the women's development network -- AFN, the

20  Armed Forces Network -- and Oradell Café around some

21  additional listening tours like what you did this week and

22  maybe ongoing events as we continue to move forward.

23       Please look for a note coming from me to all the network

24  leaders and thank you for so quickly putting this together.  I

25  think it was truly needed at this time for the partners.

*Phillips - Direct*                287

```
 1        Talk soon, Shannon.
 2   Q.   Let's look at 151.
 3        151 is an email down at the bottom to Dennis.
 4        And who is Dennis?
 5   A.   That would have been Dennis Brockman.  He had previously
 6   been a regional director peer.  He was in DC.  But at this
 7   point, he had moved, I think, back to maybe Chicago, and he, I
 8   believe, had been promoted to Camille's level, a regional vice
 9   president, at this time.
10   Q.   He had come into Philadelphia to -- during this time and
11   went and visited the stores and visited the different partners
12   in the stores?
13   A.   That's correct.  When we were tapped out, meaning to take
14   the time off, they would bring in leaders from outside the
15   market to help support so that there was still supporting
16   coverage to help the stores.
17   Q.   And can you read what you said to him at the bottom
18   there?
19   A.   Hi Dennis, I'm sure Camille shared that I was "tapped
20   out" the weekend you came in and I didn't even know you were
21   in town supporting.  Camille mentioned something about "and I
22   looked over at Dennis..." and I asked Dennis who?  At any
23   rate, I wanted to reach out and express my appreciation for
24   coming in to Philly to support Camille and my team over the
25   weekend.
```

*Phillips - Direct*                                    288

 1        It truly does take a village...

 2        Talk soon, Shannon.

 3   Q.   And what was Mr. Brockman's response to you?

 4   A.   Hey Shannon, it was my pleasure, thanks for your

 5   leadership and guidance through the lens of our mission during

 6   these difficult times.  As always one team.  Dennis.

 7   Q.   He was a VP?

 8   A.   Yes.  I believe he -- at this point, he was the same

 9   level as Camille, a vice president.

10   Q.   You're aware around this time, there was some discussion

11   about you being nominated for a community leadership position

12   that would be a TLA, or a temporary leadership assignment.

13   Correct?  Temporary limited assignment?

14   A.   That's correct.

15   Q.   And were you interested in that position?

16   A.   When I first originally heard about the position, I

17   didn't necessarily think of myself for it.  But I did enjoy

18   working in the community space.  I had a lot of community

19   relationships in Philadelphia and throughout my region.  And I

20   was very honored that my boss, Camille, had put me forth as

21   someone she supported for this role.  I thought -- I had had a

22   TLA once before, that Hamptons TLA, and it resulted in a

23   promotion to the regional director role, so this might have

24   turned into some other role within the organization.

25   Q.   Let's take a look at 86.

Phillips - Direct                    289

```
 1        86 is a message that came out from Rossann Williams.
 2   Correct?
 3   A.   That's correct.
 4   Q.   And that was on May 2, 2018?
 5   A.   That's correct.
 6   Q.   And this announcement lets everyone know that Starbucks
 7   had reached a settlement with the two gentlemen who were
 8   arrested.  Correct?
 9   A.   It does.
10   Q.   And is Ms. Williams relaying here that as they prepare
11   for next steps, that there would be training happening on
12   May 29th where no partner would be asked to lead or
13   facilitate, but all partners would be in a learner role?
14   A.   That's correct.
15   Q.   Were you on board with the diversity training?
16   A.   Of course.  Absolutely.
17   Q.   Did you become aware on this date that the gentlemen also
18   went on and spoke with Robin Roberts about the settlement?
19   A.   Yes, I was aware.
20   Q.   And what did you hear them say about that part of the
21   promises that were being made by the CEO?
22   A.   Kevin Johnson had told them that he would be their
23   personal mentor.  He was the CEO of Starbucks at the time.  He
24   said that additional action would be taken, that it didn't
25   stop here.  This was only the beginning.  And the two men
```

*Phillips - Direct*                                           *290*

1    talked about on Good Morning America that they were seemingly

2    excited to have him as a mentor.

3    Q.   Did you learn around that time that folks from Seattle

4    were flying back in to have meetings in Philadelphia about

5    next steps?

6    A.   I did.  So after the settlement was announced and the men

7    were on Good Morning America, the media coverage increased

8    again, and the spotlight was kind of back on Philadelphia.  So

9    at that point, a bunch of people were flying back out to the

10   market.

11   Q.   Did you learn on that same day that the community

12   leadership position for which you were in contention, that you

13   would not be getting that?

14   A.   I did.  I heard from Shannon Boldizsar, who would have

15   been the person that that position reported to, the position

16   was being put on hold.

17   Q.   Was there any indication whatsoever from anybody that

18   your job was in jeopardy as of this point?

19   A.   No, no.

20   Q.   Let's take a look at 158.

21        The first email just to orient in time is May 3rd, which

22   is the day after.

23        And you are sending this to Brett Battes and Camille

24   Hymes and Ebony Johnson.

25        And if we look to the actual message, can you say what

*Phillips - Direct*                              *291*

1  you were saying there?

2  A.   I am sending you a note that we intend to send out to our

3  Philadelphia store managers.  Are you able to please review

4  and let me know if you feel this is in alignment with the

5  direction we plan on taking around Safe & Welcoming.

6      Many thanks.

7  Q.   Why were you feeling that you need to send something out?

8  A.   So like I said, we had done away with Safe and Welcoming

9  but that left kind of an absence for our in-store partners of

10 what to do in cases of drugs in the store, someone in the

11 bathroom, homelessness in the store.  And, quite frankly, the

12 store folks were afraid to even call the police, even if it

13 was an extreme situation, because of what had obviously

14 happened at 18th and Spruce.

15     So I felt the need to send something, hey, I understand

16 where, you know, your concerns, that you don't have a real

17 policy at this point to go to, and let them know that we were

18 working on it, and we'd figure it out.

19 Q.   But it wasn't your role to actually develop this policy

20 itself?

21 A.   Oh, no.  No.  It was just that it was in place, and then

22 it wasn't in place, and now we were still having the issues in

23 the stores, so we were trying to figure out:  Okay.  What are

24 we going to put in place for our stores so they feel

25 supported?

Phillips - Direct                    292

1  Q.   And Mr. Battes, was his role in a media role?

2  A.   I believe so.

3  Q.   What does he say to you in response?

4  A.   I believe he sends it to Lisa.

5  Q.   Oh, you're not on this particular email.

6       What does it say?

7  A.   Lisa, There is a request from the local Philadelphia

8  leadership team to send a message to stores.  Given the

9  tremendous sensitivity to anything that is communicated to

10 stores, would you partner with Camille and her local team to

11 guide appropriate wording, content, and next steps.

12      Thanks, Brett.

13 Q.   And then Lisa responds?

14 A.   Hi Guys - The only flag to change is the first line, "as

15 we removed the previously shared 'Safe & Welcoming'

16 procedures" as that isn't something we can have be made

17 public.

18 Q.   And what was the concern around that, that they didn't

19 want the public to know about the Safe and Welcoming

20 procedure?

21 A.   Well, in the beginning, like you heard yesterday, there

22 was support for what had happened initially with Holly.  She

23 had followed the policy.  Kevin was saying it was our policy

24 and our training, and that's what we need to focus on, not the

25 person.

Phillips - Direct                    293

 1        But as that was not received well with, you know, the

 2   protest activity and everything that was happening, the --

 3   kind of the storyline changed, and it was Holly, you know, as

 4   sort of a rogue store manager, had made this bad decision, and

 5   they had kind of abandoned the Safe and Welcoming procedures

 6   as not really owning it anymore, so they obviously wanted me

 7   to take that line out in case, I guess, what my note ended up

 8   being made public.  They did not want that out.

 9   Q.   And then Ms. Hymes responds to you?

10   A.   Wanna take another shot at that line, smiley emoji?

11   Q.   So Ms. Hymes was engaging you to write this note at this

12   time to go out and having you revise it, but, in fact, they're

13   going to draft your release and nondisclosure agreement the

14   next day.  Correct?

15   A.   Obviously, I found that out later.  I didn't know that at

16   the time, but yes.

17   Q.   And you were planning -- your future plans, as it

18   pertained to this whole situation and your work, involved

19   continuing to be engaged with the situation and help work

20   through it.  Correct?

21   A.   100 percent.  There was one conversation, and it might

22   have been the second or third, where I remember Camille, my

23   boss, saying to me:  We may be operating in this kind of state

24   for the next year-and-a-half to two years.  Is that something

25   you want to do?

*Phillips - Direct*                    294

```
 1       And she said:  You know, think about it overnight and let
 2   me know tomorrow.
 3       The next day, we had a meeting in her hotel, and I told
 4   her absolutely, I was in.  I wanted to be there to support the
 5   Philadelphia partners in my region to move forward through
 6   this situation.
 7   Q.   And is this a document that you had drafted around that
 8   time concerning your plans for the following couple of weeks?
 9   A.   It was.  I sent this out to all the partners:  On
10   Wednesday, May 16th, and Wednesday, May 23rd, I will be at
11   16th and Arch -- that's a store in the city -- from 12:00 to
12   4:00 for open office hours, and I'm interested in hearing from
13   you suggestions on how we can better communicate effectively,
14   what is working/not working in your stores, what your personal
15   experiences are as a Starbucks partner, and what are your
16   biggest challenges.
17       If you would like to share, please stop by between the
18   12:00 and 4:00 time frame.
19       I look forward to connecting with you then.
20       Shannon.
21   Q.   On Friday the 4th, you were scheduled to just have a
22   regular workday in Philadelphia, correct, at first?
23   A.   That's correct.
24   Q.   And then, did that change?
25   A.   It did.  A bunch of people came back to town.
```

Phillips - Direct                    295

1   Q.   When you say "a bunch of people," do you mean the

2   high-level executives from Seattle?

3   A.   That's correct.

4   Q.   Okay.

5   A.   And we met that morning at the store at 18th and Spruce.

6   And there were different groups of people that were going to

7   be traveling together throughout the stores.  And I was told

8   by my boss to travel the stores on my own.  And I thought that

9   seemed odd, that I would be just not a part of one of these

10  broader groups.

11       On the way into the city that morning, I had had a call

12  with Camille in the car, where she said to me:  It's bad,

13  Shannon.  It's really, really bad.  We're all on the line

14  here.

15       And when it was determined that I was going to hit stores

16  on my own, I thought that seemed odd.

17       That day I ended up walking, I think, 8 miles in the city

18  hitting stores on my own.  That was what I was told I was

19  going to do, so that's what I did.

20       And one of those stops was to see a girl, Nicola, a store

21  manager, who the previous night had had an incident happen in

22  her store.

23  Q.   Let's take a look at 162.

24       162 begins with an incident call on May 3rd at 3:40?

25  A.   It's not on my screen.

1  Q.   My fault.  There we go.

2       And this just says -- it's from a support email at

3  Starbucks:  I am sending this as an incident FYI.

4       And can you read the synopsis down there?

5  A.   Sure.  Synopsis:  Partner said they had to call police

6  because a customer was lunging at them and firefighters.

7  Partner said customer's eyes were red and he was spitting in

8  her face, this customer was also shaking.

9  Q.   Okay.  And then, that goes from Ben Trinsey to you, and

10 then you send an email on May 3rd in the evening to Camille to

11 let her know about this.

12      Can you read what this says there?

13 A.   Sure.

14      Hi Camille, I spoke with Nicola, the store manager at 8th

15 & Walnut, who was involved in the situation below.  She is

16 currently at the emergency room being tested, but was in

17 fairly good spirits when I spoke to her, or as well as could

18 be expected.  She shared that she is so "desensitized to this

19 type of situation" that she was just glad she didn't get stuck

20 with a needle.  She also shared that she was glad she was in

21 the store versus a shift as she felt more confident to handle

22 the situation.

23 Q.   When she says "shift," does she mean a shift supervisor?

24 A.   Right.  So the manager on duty would have been a store

25 manager or possibly a shift supervisor.  She was saying she

 1  was glad it was her, that she was better equipped to handle it

 2  than a shift supervisor would have been.

 3  Q.   Okay.  And can you just -- a little slower --

 4  A.   Sorry.

 5  Q.   -- start at "Her concerns"?

 6  A.   She also -- okay.  Sorry.

 7       Her concerns are that with the warmer weather, the

 8  transient population will be coming in more frequently for the

 9  air conditioning, as well as the fact that two mental health

10  facilities just recently shut down, leaving nowhere for the

11  patients to go but on the streets.  She shared that

12  previously, four officers frequented her store multiple times

13  per day but they shared with her that they were told by their

14  supervising officers that they shouldn't be frequenting our

15  stores anymore.  This is unfortunate, and police didn't

16  respond to today's incident for two-and-a-half hours.

17       Of course at that point, the situation was over.

18       Nicola shared that she and her partners aren't security

19  guards, are really not equipped to deal with this without

20  police support.  This is certainly disheartening, what

21  happened at the store as well as the police response time.

22  But we will move forward.  At this point, we will work to

23  rebuild the relationships we previously had with police in our

24  stores, and I'm confident when we get the local P&AP person --

25       We had been approved, as I shared, Ronda, our P&AP

*Phillips - Direct*                    *298*

```
 1  person, covered the whole Mid-Atlantic.  After this incident,
 2  we had been approved for a P&AP person that would be specific
 3  to the area, so that was kind of exciting.
 4      I'm confident when we get the local P&AP person, they
 5  will also be able to help with this moving forward.
 6      Nicola is working tomorrow morning and I will be visiting
 7  her at her store to check in on her.
 8  Q.  So that was the 3rd.
 9      And then the 4th -- the same day, actually, Camille
10  responds to you.
11      And what does she say?
12  A.  It must have been more than just me, because she --
13  Q.  Oh, let me go up.  I think we can see the whole reach of
14  people that she sends this email to, and then I can go back so
15  you can read it.
16      Where it says Partners?
17  A.  Oh, I'm sorry.
18      Partners, Please see the latest incident that occurred in
19  our store this afternoon.  Aside from the extremely concerning
20  exchange of body fluids onto our store manager is the
21  unconfirmed direction of the Philadelphia Police Department
22  leadership to avoid being in our stores.  It took the police
23  department two-and-a-half hours to respond.
24      Any guidance on how we may engage with the police
25  department to rebuild the relationship or confirm their
```

1    position?

2    Q.   So this is the night of May 3rd.  And you were sent that

3    email.  You were one of the recipients, right, where she's

4    asking for some suggestions?

5    A.   Yes, I believe so.

6    Q.   Yeah, I could highlight that.  As well as some of the

7    other folks that we've talked about in this case, Zeta Smith

8    and Dina Campbell (sic) and Andrea Moudakis and Shannon

9    Boldizsar.  Correct?

10   A.   That's correct.

11   Q.   What does Ronda Knight -- and Ronda Knight was the person

12   who originally did the investigation into the original

13   incident in -- on April 12th, and did the incident report.

14   Correct?

15   A.   That's correct.  Ronda Knight was our P&AP person,

16   partner and asset protection.

17        Ronda responds:  Camille, I will reach out to Ben and

18   partners in the morning as I'd like a few more details.  Then

19   I will be reaching out to police if I can get a lieutenant or

20   above.  I will update all once I have more information.

21   High-risk incidents such as this, I would like for someone to

22   contact me as soon as possible when they occur so we can start

23   working on them or with police.

24   Q.   And then just at the top is the rest of it.

25   A.   Camille says:  Partners --

*Phillips - Direct*                                    300

1   Q.   Oh, that one was already read.

2        It was just the thanks so much at the top.

3   A.   Thanks so much for your support.

4   Q.   And then you write --

5   A.   So Ronda had said something in her email something to the

6   effect of I didn't know about it until just now.  I wasn't

7   made aware.  Something to that effect.  It's off the screen.

8   Q.   Oh, sorry about that.

9        But you were responding back and engaging with --

10  A.   Just to Ronda to let her know.

11       I'm not sure if Ben called directly -- that was the

12  district manager of the store -- that it happened.  But you

13  were copied on the message he sent to me at 4:00.  Let me know

14  how the discussion goes tomorrow with the police.

15  Q.   And Ms. Hymes was aware of this situation with Nicola.

16  Correct?

17  A.   Yes.  It looks like Ben sent it to me at 4:00, and I

18  forwarded it to Camille, Nathalie, Ebony, maybe more.  I'm not

19  sure who.

20  Q.   If we go to the top of this chain -- and this is in

21  regards to the issue we had just discussed with Nicola, Ebony

22  Johnson says:  Team, I had another connect with Nicola

23  tonight, and she is a trouper.  She will be at work tomorrow.

24  She seemed to be doing well.  She said she isn't afraid to go

25  to work and that she wants to be there for her partners.  I'm

*Phillips - Direct* 301

1  definitely adding her to my list of people to see while in

2  town next week.  Her tenacity is pretty admirable.  They did

3  some blood work and she should know the results in a couple of

4  days.

5       Shannon, thank you for going to check on her tomorrow

6  while you're out and about.  Ebony.

7       And so this was really like around either midnight or --

8  of May 3rd that she's sending that, 9:00?

9  A.  That's correct.

10 Q.  And then Camille writes back on May 4th:  Thank you,

11 Ebony and Shannon.  We appreciate the close connections you're

12 keeping with Nicola.

13 A.  That's correct.

14 Q.  Let's look at 132.

15      This is also on May 4th.

16      You sent an email to Camille, saying:  Below is the list

17 of hotspot stores in Philadelphia that we discussed roving

18 patrol for.

19      And what was roving patrol?

20 A.  So we were talking about having continued security that

21 would go from store to store and specifically in these hotspot

22 stores where we had high incidents happening of drugs, theft,

23 crime, homelessness.

24 Q.  And this was -- I'm sorry.

25      This was something that you were instrumental in helping

Phillips - Direct                    302

1   to suggest some solutions to the problems?

2   A.   That's correct.

3   Q.   And you still -- going from Friday into Monday, not aware

4   that your -- that a decision had been made to terminate you

5   for being "emotionally and physically unavailable or absent"

6   during this time?

7   A.   No.  I was not aware at all.

8   Q.   Let's look at 140.

9        This is from Monday, May 7.

10       And by the way, you were off the 5th and the 6th.  You

11   were tapped out.  Correct?

12   A.   That's correct.

13   Q.   If we look at Exhibit 140, this is from May 7th early in

14   the morning, you send a Monday update.

15       Can you explain what the Monday update is?

16   A.   Sure.  As a regional director, every week we would send

17   an update to Camille and copy the regionals.  And it was a bit

18   of a template, that's what's in bold:  What were you most

19   proud of this past week?  And then we would kind of fill in

20   the information.

21   Q.   And as part of that week, you received another thank you

22   from one of your peers or subordinates?

23   A.   Michelle Liontas was a district manager of mine.

24   Q.   What did she say there?

25   A.   On May 7th:  Thank you for a wonderful day last week, all

*Phillips - Direct*                                                    303

 1  your support and insight and especially making my birthday
 2  special.  Michelle.  Thank you.
 3      The tag line was:  Delivering our very best in all we do.
 4  Holding ourselves accountable for results.
 5  Q.   Part of the Monday update you have to give is the P&L,
 6  the actual -- what your normal day job would be to make sure
 7  that the business is running smoothly and that is -- that
 8  Starbucks is making money.  Correct?
 9  A.   That's correct.
10  Q.   And so you were taking care of that piece of it as well
11  as the other pieces that were coming up as a result of the
12  engagement on the roundtables and such.  Correct?
13  A.   That's correct.
14  Q.   And how were you doing in terms of sales numbers and
15  fiscally?
16  A.   This particular week, we had sales of 2.726 million,
17  total revenue in my -- total revenue in the area I oversaw was
18  up 6.1 percent.  Comp performance was down 1.3.  Comp
19  performance is same store sales year over year.  So if your
20  store was open a full year, it would be a comp store, versus
21  AOP which is the annual operating plan of 2.79.  So we were
22  behind 68,000.
23      Area level highlights team support for Philly.  As I
24  said, we had a lot of district managers outside of Philly
25  coming in to support, so it was a lot of support for our store

Phillips - Direct                304

1  partners.

2      What worked for the week --

3      Did you want me to keep going?

4  Q.  What was the projected sales?  What does that mean?

5  A.  So for the week that we were starting the projected sales

6  was 2.73 million.

7  Q.  And that was just for your region?

8  A.  That's correct.

9  Q.  And when you say "what worked for the week," lots of

10 continued support in the city, and that meant this previous

11 week these folks were in town.  Correct?

12 A.  That's right.

13 Q.  Rossann Williams, very high up in the company.  Correct?

14 A.  I think she was the president of retail North America at

15 the time.

16 Q.  And she -- right below her was Zeta Smith?

17 A.  That's correct.

18 Q.  Let's look at Exhibit 29.

19     This is also May 7th in the morning.

20     This is an email string regarding YouthBuild.

21     And was there some concern after the events on April 12th

22 that YouthBuild may be pulling back on their relationship with

23 Starbucks?

24 A.  That's correct.

25 Q.  And on May 4th, which was that Friday, Ms. Hymes sends

Phillips - Direct                    305

1    you an email and says:  Can you please help me recount the

2    events leading up to the cancellation of Wired and the expend

3    to Starbucks?

4         And then she sends that on May 7th, following up asking

5    you to provide insight.

6         Can you -- well, we can just go up to the email.

7         You responded to her on that May 7th.

8         Can you read what you said there?

9    A.   Sure.  I think she originally sent this email when I was

10   tapped out, so she followed up Monday morning when I was back.

11        And I say:  Attached is the note I received from Meredith

12   Molloy -- Meredith was -- she worked at YouthBuild.  I think

13   she might have been one of -- I'm not sure what her position

14   was, but she was one of our main contacts.

15        They didn't end the partnership but felt the timing of

16   the week-long campaign should be postponed.  So we had planned

17   to do a campaign with YouthBuild, Wired for YB, where stickers

18   would be put on cups that customers came in and purchased that

19   said "Wired for YB" and they would post pictures of themselves

20   with these cups and the stickers on social media, and it

21   didn't feel like the right time to do it because of everything

22   happening.

23        So that's why she felt the timing should be postponed.

24        Since then I had a conversation with Rodney Hines and

25   upon his advice, Ben, Carmen and I met with a small group of

Phillips - Direct                    306

 1  faculty to talk about the situation and how we as a company

 2  and also as Philadelphia Starbucks partners are working

 3  through it.

 4       YouthBuild wants to support us in our efforts as we move

 5  through this time.  They still feel we are a valued partner

 6  and had asked Ben to go to a conference in Baltimore to speak

 7  on behalf of our partnership, speaking to a large audience

 8  about how we work together.  This conference is in June.

 9       This as far as cost to us, I've also enclosed the

10  receipts for the stickers that we paid for.

11       YouthBuild bought the T-shirts, 15 per store, and had

12  already delivered them to Haddonfield for the district

13  managers to distribute.

14       The sticker cost was allocated to the stores, about 6,000

15  total or $60 per store.

16       I believe we will still do the Wired for YB campaign,

17  they just felt the timing was off.

18       Hope that helps, Shannon.

19  Q.  And when they say they asked Ben, who does that refer to?

20  A.  Ben Trinsey.

21  Q.  And why were they asking for Ben Trinsey to go to the

22  conference in Baltimore?

23  A.  So Ben was the community lead for my region.  He was very

24  actively involved with YouthBuild and volunteered, I think,

25  once a week in the building, so they certainly, you know, knew

*Phillips - Direct*                              307

1  Ben and felt very highly of him and his involvement in the

2  partnership.

3  Q.   This was at 9:55 in the morning that you sent this email.

4       Shortly after that, like around noon or so, were you

5  called into a meeting to speak with Camille and others?

6  A.   I was.

7  Q.   Okay.  And was the topic of the meeting Ben Trinsey?

8  A.   It was.

9  Q.   Just to orient the jury again, where the incident took

10 place on April 12th, it was Ms. Hylton's store who reported to

11 Mr. Sykes who reported to you.  Correct?

12 A.   That's correct.

13 Q.   And you reported to Camille Hymes.

14      Mr. Trinsey had the other half of Philadelphia.

15      Can you describe just generally the area of Philadelphia

16 that he had?

17 A.   We typically -- we cut the city, Center City, at Broad

18 Street, so you had east of Broad or you had west of Broad.

19 And Paul Sykes had the half of the city with Rittenhouse and

20 other stores, and Ben had the other half of the city with 1201

21 Market, 12th and Market, Macy's, so...

22 Q.   Can you tell -- when you went into the meeting, did you

23 know it was going to be about Ben Trinsey?

24 A.   I did not.

25 Q.   What did they tell you, and who was there and what was

*Phillips - Direct*                                    *308*

1   said?

2   A.   Sure.  So the meeting was my boss, Camille Hymes, Paul

3   Pinto, the person you saw yesterday, and Nathalie Cioffi, who

4   was the partner resource.  She reported to Paul Pinto.  I

5   think she supported Camille.

6        And I was told that through some discussions, there had

7   been some allegations against Ben Trinsey that he was racist,

8   that there had been some pay disparity.  A specific assistant

9   manager had complained that she was making less than another

10  assistant manager from a different store, and she felt like it

11  might be because of her race, and that we were going to be

12  placing Ben on suspension to have an investigation.

13  Q.   Did you believe that to be true?

14  A.   No.  I said:  Ben is a 15-year partner with the company.

15  I've never heard of any allegation come up about race with

16  Ben.  He's definitely not racist.  He's my community lead and

17  works with all these community partners.

18       And I also shared that Ben did not have a hand in making

19  the salary decision for the specific assistant manager that

20  was complaining.  But I was told that the investigation needed

21  to happen, and I needed to go ahead and place him on

22  suspension the next day.

23       So I took notes as to what the talking points were.  I

24  know I was -- marked out something and put in "the volume and

25  seriousness of the allegations."  That was what I was told to

1    say.

2         So I took notes to make sure that I covered the right

3    talking points and ultimately left the meeting.

4    Q.   Okay.  So the plan was for you to go the next morning and

5    suspend Ben.  Correct?

6    A.   That's correct.

7    Q.   And let's look at 131.  This is that evening.

8         This is an email that you sent to Ms. Hymes that night on

9    Monday night at 5:25.

10        You say:  Touched base with Paul.  The stores will be

11   ready for tomorrow's visit.  Additionally, Dayna and Jackie

12   were scheduled to be in the city supporting as well and

13   they'll also be in the stores to make sure everything is

14   perfect, with a thumbs-up.

15        Can you describe what is going on right now post the

16   meeting where you're told to suspend Ben.

17        Are you still working and engaging and doing what you've

18   told to do?

19   A.   Of course.  Somebody was coming in, I think maybe Denise

20   Nelson, who oversaw ops services in Seattle, and, you know, we

21   wanted to make sure that we had the right partners in the

22   stores and the stores showed up well, so I was making sure

23   everything was going to be great for the next day.

24   Q.   And then the next morning you go in, and you have the

25   meeting with Ben.

Phillips - Direct                    310

 1  A.   That's correct.  I met Ben at Nathalie Cioffi's hotel.

 2  We sat down, the three of us, in the hotel lobby.  I explained

 3  to Ben that we were placing him on a suspension.  I went

 4  through the talking points.

 5       Ben was obviously in shock.  And I told him:  You know,

 6  the truth will come out, so not to be concerned, that the

 7  truth would come out.

 8       Not to be concerned, but you could see he was very upset,

 9  and I was like:  They're going to investigate, and the truth

10  will come out.

11  Q.   What were you told you needed to do after you suspended

12  Ben?

13  A.   So after that meeting, I went to the store, the 18th and

14  Spruce store, and I held multiple different conference calls,

15  one with Ben's store managers to let them know that Ben was

16  taking personal time off, that's how we were explaining it,

17  and that Brian Dragone, another district manager from outside

18  the city, would be coming in to support the district, you

19  know, during that time that Ben was off.

20       And after I did the call with all the store managers,

21  then I had a separate call with all my district managers to

22  share the same information, that Ben was taking time off, and

23  Brian would be covering.

24       Everyone knew Brian.  I had actually hired Brian, but

25  then at some point in a realignment, he no longer reported to

 1  me.

 2      So after that, then I was told to meet Camille at her

 3  hotel.

 4  Q.  And did you -- her hotel was in Philadelphia?

 5  A.  It was around the corner from the 18th and Spruce Street

 6  store.  I think it was called The Warwick or something.

 7  Q.  So you go to The Warwick, and you go to the hotel lobby,

 8  and is Camille waiting for you?

 9  A.  No.  I let her know -- I probably texted her, I think,

10  that I was there.  I think she came down when I got there.

11      And she said to me:  The situation is not recoverable.

12      At first, I didn't know what that meant.

13      She said:  I have to make a change in Philadelphia.

14      And I said:  Am I leaving Philadelphia, or am I leaving

15  Starbucks?

16      And she said:  You're leaving Starbucks.  Come tomorrow

17  to a meeting with me and Paul Pinto prepared to discuss what

18  you would want in a severance package.

19  Q.  Did she give you any explanation for why?

20  A.  Nope.  That was it.  "The situation is not recoverable,"

21  that's all she said.

22  Q.  Did she have any paperwork for you or anything?

23  A.  No.

24  Q.  She had never, prior to this, given you any warning that

25  your job was in jeopardy.  Right?

*Phillips - Direct*                                    *312*

```
 1   A.   No.  Other than that one phone call where she said:  It's
 2   bad.  It's really bad.  We're all on the line.
 3        You know, I certainly could tell she was nervous and
 4   upset, but I didn't feel anything specific to me.
 5   Q.   And she didn't provide any options for you to stay
 6   employed in any way?
 7   A.   No.
 8   Q.   How did it make you feel?
 9   A.   I was devastated.  I had worked there for 13 years.  I
10   loved the job.  I loved the people that I worked with.  I
11   loved the company.  I was a proud Starbucks partner.  I bled
12   green, as they say.  And all of a sudden, I felt like I was
13   being thrown out like a piece of trash.
14        And I was in shock.
15   Q.   Did you believe that this would happen to you if you were
16   black?
17   A.   No.
18   Q.   Do you think that Ben Trinsey would have been suspended
19   if he was black?
20   A.   I do not.  I think more actions had to happen, more heads
21   needed to roll.  They certainly were not letting any black
22   people go.  It was a very racial situation.  So, yeah.
23   Q.   When -- after you were terminated, did Starbucks contest
24   your application for unemployment?
25   A.   They did.
```

*Phillips - Direct*                                          313

 1  Q.   And what did they accuse you of when you tried to apply

 2  for unemployment?

 3  A.   I believe it was misconduct.

 4  Q.   And nobody had ever told you before that you engaged in

 5  any misconduct.  Correct?

 6  A.   No.

 7  Q.   Did you believe that you were the scapegoat for them?

 8  A.   I absolutely did.  I still do.

 9  Q.   What was it like for you in the time after you were

10  terminated and you go home?  You're still supporting your

11  kids.  Correct?

12  A.   I was.

13  Q.   And can you describe just like physically and mentally

14  what that was like afterwards?

15  A.   It was awful.  I was obviously very depressed.  I didn't

16  know what I was going to do.  I had what I thought was this

17  great career going, with a company that was amazing to work

18  for.

19       At that point, I had no idea what I was even going to do.

20  To be honest with you, I had never even really looked for a

21  job.  I had always kind of been recruited, so I didn't even

22  have an updated resume.  I had no idea what I was going to do.

23  It was a very distressing time.

24  Q.   Was it affecting the way in which, like, your daily day

25  was?  What did that become for you?

*Phillips - Direct*                          *314*

1   A.   You know, I think when you're depressed, you probably

2   sleep too much or maybe you can't sleep, some people.  I

3   probably sleep too much.

4        I wasn't eating well, migraines.  It was just a really,

5   really bad time.

6   Q.   How about medication?  Did you --

7   A.   I was on antidepression medication.

8   Q.   And seeing a therapist?

9   A.   I was.

10  Q.   Did you try to find another job?

11  A.   At first, I wasn't sure what I was going to do.  And then

12  as luck would have it, Raymour & Flanigan -- a recruiter from

13  there called me.  The boss that I had before Camille, his name

14  was Victor Heutz.  He had been interviewing with Raymour &

15  Flanigan, and they wanted him to move to the Philadelphia

16  area.  I think he lived in North Jersey, and he didn't want to

17  move, so he said:  You should speak to Shannon Phillips.

18       And they called me, and I started with them that August

19  of 2018.

20  Q.   Was it anywhere near the level of income and

21  possibilities that you had at Starbucks being at Raymour?

22  A.   No.  Raymour & Flanigan is a small, privately owned

23  company with about 120-some stores.  There's no stock options,

24  obviously, because it's privately owned.  So the salary is

25  very different.  The additional income opportunities are very

```
 1   different.  The opportunity for advancement is regional

 2   director, which is what I am.  I have six stores.

 3        My boss is a VP, and he reports to the owners.  So the

 4   only additional opportunity would be to get to a VP.

 5             MR. HARRIS:  Your Honor?  Excuse me, Your Honor, may

 6   we see you at sidebar briefly?

 7             THE COURT:  All right.  Come to sidebar.

 8             (At sidebar.)

 9             MR. HARRIS:  Your Honor, I didn't want to interrupt

10   counsel's inquiry.  I just wanted to have a quick comfort

11   break, but --

12             MS. MATTIACCI:  I literally have one question left.

13             THE COURT:  I was going to wait until the end of her

14   questioning.

15             MR. HARRIS:  Okay.  That's fine.

16             THE COURT:  You are getting to the end?

17             MS. MATTIACCI:  He knows that too.

18             THE COURT:  All right.  Ask your last question.

19             (End of sidebar.)

20   BY MS. MATTIACCI:

21   Q.  Ms. Phillips, what's been the worst part of all of this

22   for you?

23   A.  It was devastating.  Quite frankly, over five years

24   later, it's still devastating.

25        I always supported the company, I loved what I did, I
```

*Phillips - Direct*                          316

1   loved the company, I loved the people, and I felt like it was

2   all taken away from me, and I didn't feel like I did anything

3   wrong.  I was very much engaged.  I was very much supporting

4   the team.

5        And, yet, I think more heads had to roll, and I had to be

6   one of them.  And it was devastating for that to be how it

7   ended.

8   Q.   When they asked you to sign the severance agreement, it

9   was for six months of pay.  Correct?

10  A.   That's correct.

11  Q.   And why at that time did you not agree to sign that

12  document?

13  A.   A lot of it had to do with the fact that they wanted me

14  to sign a nondisclosure agreement, and I had seen what

15  happened to Holly.  She signed hers over burgers and fries,

16  and all of the sudden, the company talked about her.  They

17  talked about her in the news and said things about her.

18       And certainly my reputation, I don't believe anyone at

19  Starbucks would say they thought I was racist in any way.

20  That's never been said about me, but I had concerns about

21  signing an NDA and what that would mean, what would happen

22  after.

23  Q.   And in connection, being a person that was white, being

24  fired in connection with the events that occurred on April

25  12th and then not being able to defend yourself?

*Phillips - Cross*                    *317*

```
 1   A.   Exactly.
 2              MS. MATTIACCI:  I don't have any further questions.
 3              THE COURT:  All right.  Members of the jury, we'll
 4   take our midmorning recess at this point.
 5              Try to come back in about five, ten minutes.
 6              All right.  We stand in recess.
 7              (Jury out.)
 8              (Recess at 11:34 a.m. until 11:53 a.m.)
 9              THE COURT:  Bring in the jury.
10              (Jury in.)
11              THE COURT:  Please be seated.
12              Cross-examination.
13                         CROSS-EXAMINATION
14   BY MR. HARRIS:
15   Q.   Ms. Phillips, you testified that immediately after the
16   incident, that the events were "horrible."
17        Did I get that accurate?
18   A.   I'm sorry, horrible?
19   Q.   That the events were horrible.  Do you remember
20   testifying?
21   A.   That's correct.
22   Q.   What was horrible?
23   A.   The whole thing was horrible.
24        It was horrible that two men were arrested in one of the
25   stores that ultimately fell under my scope.
```

Phillips - Cross                          318

```
 1       It was horrible what happened as a result of it.  The
 2  whole situation was horrible.
 3  Q.   When you say "what happened as a result," what was
 4  horrible specifically that you're referring to?
 5           MS. MATTIACCI:  Objection, asked and answered, Your
 6  Honor.
 7           THE COURT:  Wait a minute.
 8           I didn't hear your objection.
 9           MS. MATTIACCI:  I said he -- asked and answered.  He
10  just asked her twice what was horrible about it.  She just
11  gave the answer as to what was horrible about it.
12           THE COURT:  All right.  I'll sustain it.
13           Can you ask another question.
14  BY MR. HARRIS:
15  Q.   Did you think the protests were horrible?
16  A.   It was a really bad situation.  Yes.  When people were
17  coming into the stores screaming with bullhorns, it was scary,
18  for me personally.  I was afraid for the partners.
19       Certainly I think everyone should be able to exercise
20  free speech and say what -- you know, how they felt, but being
21  on the receiving end, it was horrible, yes.  Someone screamed
22  in my face that I was a white supremacist because I worked at
23  Starbucks.  It was a horrible situation.
24  Q.   Did you find the protests were justifiable?
25  A.   Did I think they were justifiable?  Of course.  If all I
```

Phillips - Cross                          319

1  saw was this viral video of two men being arrested, I might

2  have been there protesting myself.  I totally understand why

3  people were very angry.

4  Q.   Why do you think that they were angry?

5  A.   Because two men were arrested and had seemingly done

6  nothing wrong, and the question was, you know, why were these

7  two men arrested who had done nothing wrong.

8  Q.   But you know they did nothing wrong.  Right?  You agree

9  with that?

10 A.   I do agree with that.

11 Q.   And you also know that the police were called despite

12 them doing nothing wrong?

13 A.   I do know that.

14 Q.   And you also are aware that Holly Hylton called the

15 police unjustifiably?

16 A.   I'm not sure I agree with that.  I think -- I think Holly

17 was a rule follower.  I think she had two noncustomers in the

18 store that she invited to become customers, and they declined.

19 And I think she felt like she was following the rules.

20     I -- I wasn't there, obviously, but I felt at the time

21 horrible that it happened.  I still feel horrible that it

22 happened.

23 Q.   Do you find it justifiable that the police would be

24 called for doing --

25          MS. MATTIACCI:  Objection, Your Honor.  Asked and

Phillips - Cross                                          320

1   answered and irrelevant.

2           MR. HARRIS:  May I --

3           THE COURT:  I'll sustain the objection.  It's been

4   answered already.

5   BY MR. HARRIS:

6   Q.   What about the policy that directs a partner to call the

7   police?

8   A.   I don't have it in front of me, but if memory serves, it

9   said if you invite -- your first step was to invite them to

10  become customers.  I believe she approached them in the café

11  to invite them to become customers.  They said they weren't

12  going to buy anything.

13          She said if you don't purchase something and you're a

14  customer (sic), you have to leave.  Our cafés are for

15  customers only, and they said we're not leaving.  So the card

16  said discreetly go in the back and call the police.  That's

17  what she did.

18          Would I have done that?  I don't know.  I don't think so.

19  I wasn't there.  But I don't feel what she did -- I don't

20  believe in my heart, I knew Holly, I don't think she did it

21  because they were black.  I think she was -- she likely would

22  have done the same thing if they were noncustomers in the

23  store and they were white.  I think she was a rule follower,

24  and she was trying to follow the rules of having the cafés be

25  for customers only.

*Phillips - Cross*                                    *321*

1  Q.   Do you recall preparing a report to Camille Hymes soon

2  after the event, indicating that the two men that were in the

3  store were aggressive?

4  A.   That I prepared?

5  Q.   Yes.

6  A.   I'm not 100 percent sure.  If you show me, I will be

7  happy to look at it.

8  Q.   You did provide Ms. Camille Hymes a recap of the incident

9  after it happened; did you not?

10  A.   I am sure I did, but it was a long time ago, so I can't

11  say specifically what I said.

12  Q.   Prior to your testimony did you not have a prep session

13  with your counsel?

14          MS. MATTIACCI:  Objection, Your Honor.

15          THE COURT:  Overruled.

16          THE WITNESS:  A prep session with my counselor?

17  BY MR. HARRIS:

18  Q.   Yes.  With your counsel, with your lawyer, did you not go

19  over that you were going to be testifying?

20  A.   Yes.

21  Q.   Didn't look at any documents?

22  A.   Did I look at documents?  Yes, I looked at some documents

23  to refresh my memory.  Uh-huh.  But there were thousands of

24  pages of documents, so I can't say that I specifically looked

25  at the report that you're referring to, I'm sorry.

Phillips - Cross                                    322

```
 1   Q.   Do you recall looking at a report where you sent an email
 2   immediately after the incident to Ms. Camille Hymes, your
 3   supervisor, identifying specifically what happened on the day
 4   of the incident?
 5   A.   I probably did, uh-huh.
 6   Q.   Okay.  What do you recall in that report that you wrote?
 7   A.   At that point, I would have spoken to Holly, so it
 8   certainly would have been what I had heard from Holly and Paul
 9   Sykes, the district manager.
10   Q.   Do you recall saying that the gentlemen were being
11   aggressive in that report?
12   A.   I don't recall saying it, but I'm sure I did if that's
13   was what was relayed to me.  I would have certainly shared
14   that.
15   Q.   Did you do any independent investigation after the
16   incident to find out whether or not the two individuals that
17   were in the store did anything aggressive?
18   A.   That wasn't -- that wouldn't have fallen under me to do
19   an investigation into -- I mean, you're asking if I
20   investigated whether these men were aggressive with Holly.
21   Like I wasn't there, so I don't know.
22   Q.   I understand that you weren't there.
23        I'm asking something different.
24   A.   Okay.
25   Q.   I am asking as the person who is saying Holly was
```

*Phillips - Cross*                                            323

1   following a policy and that directed her to call the police,

2   did you find out whether or not whether Holly was calling the

3   police was justified on your own?

4           MS. MATTIACCI:  Objection, Your Honor, to the

5   relevance of this line.

6           THE COURT:  Overruled.

7           THE WITNESS:  I'm not sure how I would have known if

8   the men were aggressive.  I wasn't there.  I didn't have

9   access to the video.  I only saw the short clip that was

10  posted that went viral, so I kind of had to take the word from

11  the person that was there.

12  BY MR. HARRIS:

13  Q.  You didn't have access to the video?

14  A.  No, I did not.

15  Q.  Counsel showed you an investigation report, and on the

16  investigation report yesterday, it showed that the video was

17  saved.

18      And you're telling this jury that you didn't have access

19  to it?

20  A.  It was saved in the global security in Seattle.  It

21  wasn't something I had access to, no.

22  Q.  Did you try to get it?

23  A.  No.  At the time, I think I was allowing P&AP to do their

24  job and I was staying in my lane.  That was not my job to

25  investigate.

*Phillips - Cross*                                    *324*

1   Q.   I didn't ask you if you investigated.

2        I asked you, did you try to get it for yourself to

3   conduct your own independent investigation to assess whether

4   or not Holly Hylton did the right thing?

5   A.   So you just said, I'm not asking if you investigated, but

6   then you said I'm asking if you did an investigation?

7   Q.   No, I'm asking --

8   A.   I just want to make sure I understand the question.

9   Q.   Excellent point.

10       I'm asking whether or not you saw any idea to conduct any

11  sort of investigation as to whether or not Holly's actions

12  were justifiable or not?

13       She reported up through you.  Yes?

14  A.   She did.  She reported to a district manager, Paul, who

15  reported to me.  Yes.

16  Q.   There was a firestorm about Holly Hylton's actions

17  specifically.  Yes?

18  A.   Yes.

19  Q.   And at some point you said that there was a change in

20  direction by the leadership of the organization.

21       Did you want to find out whether or not -- what caused

22  that change in direction?

23  A.   At the time, we were having protests in and around the

24  stores.  I wasn't thinking about I should do some sort of

25  independent investigation that would not have fallen to my job

*Phillips - Cross* 325

```
 1   description or responsibility.
 2        I was thinking what do we need to do now and going
 3   forward to make sure, one, this doesn't happen again, and two,
 4   how do we keep people safe in the stores.  And a good
 5   experience still for the customers.
 6             MR. HARRIS:  May the witness be shown Joint Exhibit
 7   Number 6.
 8   BY MR. HARRIS:
 9   Q.   Showing you what's been marked as Joint Exhibit Number 6.
10        Do you recognize this document, ma'am?
11   A.   I do.
12   Q.   This was an email from you to John Kelly, Reggie Borges,
13   Rossann Williams, Zeta Smith, Camille Hymes, Frances Ericson,
14   Garrett Petraia, Paul Sykes, Ronda Knight, Jaime Riley,
15   Shannon Boldizsar, and the subject line says:  Regarding the
16   incident involving the police at Philadelphia Starbucks.
17   A.   That's correct.
18   Q.   And it was an email dated on Friday, April 13th at
19   8:27 a.m.
20   A.   I think it was at 11:01.  I'm sorry.
21   Q.   Yes, that's correct.  I stand corrected.  11:01 was the
22   email you sent out.
23        The response came from Ms. Hymes, your supervisor, at
24   Friday, April 13th at 8:27 a.m.
25        Is that what it says?
```

Phillips - Cross                    326

 1  A.   I think probably on my end it was 11:01, and she probably

 2  responded at 11:27, but maybe because it might have thought

 3  she was a Seattle partner, so that might explain the time

 4  difference.

 5  Q.   Understood, but this is the email you sent out?

 6  A.   Yes.

 7  Q.   You recognize this document?

 8  A.   I do.

 9  Q.   And this is the recap you provided Ms. Hymes as to the

10  incident that took place at the store at 18th and Spruce; is

11  it not?

12  A.   This is the recap that I sent to John Kelly, Reggie

13  Borges, Rossann Williams, and I copied Camille, yes.  I was

14  asked to provide a recap.

15  Q.   Okay.  You've seen this document before.  It's not the

16  first time?

17  A.   That's correct.

18           MR. HARRIS:  Okay.  May this be shown to the jury,

19  Judge?

20           THE COURT:  Yes.

21           MR. HARRIS:  Can we go to the second bullet, please?

22  BY MR. HARRIS:

23  Q.   Well, first, it says:  The store was recently robbed at

24  gunpoint.  This may have contributed to why the police

25  department responded quickly; is that correct?

*Phillips - Cross*                              *327*

```
 1  A.   That's correct.
 2  Q.   Okay.  And the second bullet point says:  The store
 3  manager --
 4       SM, that's store manager, correct?
 5  A.   That's correct.
 6  Q.   All right.
 7       -- approached the men in the café multiple times.
 8       That's what it says?
 9  A.   Yes, that's what it says.
10  Q.   Were you aware that they were approached multiple times
11  by the store manager?
12  A.   That was what was shared with me, yes.
13  Q.   But you've subsequently found out that that's inaccurate.
14  Correct?
15  A.   I don't know if she approached them multiple times.  I
16  know she approached them and asked them to become customers,
17  and they said:  We're not buying anything.
18       She said they told her:  If you don't like it, call the
19  cops.  She was not sure what to do, so she did call the police
20  for support.
21  Q.   Ms. Phillips, you know that that's not accurate.  They
22  were not approached multiple times.  Correct?
23  A.   At the time that I wrote this, I was going off of what
24  was shared with me either from Holly directly or from her
25  district manager, Paul Sykes.
```

Phillips - Cross                    328

```
 1        So I don't know if she approached them multiple times.  I
 2   only ever saw the viral video.  That's what she said.  That's
 3   what I put in the recap.
 4   Q.  As you sit here, are you telling this jury that they were
 5   approached multiple times?
 6   A.  I'm telling you that she --
 7            MS. MATTIACCI:  Objection, Your Honor.
 8            THE WITNESS:  That's what she just said.
 9            MR. HARRIS:  That's not what she said, Judge.
10            MS. MATTIACCI:  Asked and answered.
11            THE COURT:  Sustained.
12   BY MR. HARRIS:
13   Q.  She was met with aggression.
14        Did you also say that?
15   A.  That's what I put in the recap.
16   Q.  Yes.  But as you sit here today, you know that that
17   wasn't true as well?
18   A.  I don't know if she was met with aggression.  Again, I
19   wasn't there.
20   Q.  Okay.  The men were aggressive with police.
21        Do you see that as well?
22   A.  I do.
23   Q.  You know that also wasn't true.  Correct?
24   A.  I know that the police came to the store and also asked
25   the men to either please become customers or leave the store,
```

*Phillips - Cross*                                      *329*

1    and they did not respond to what the police asked, so the

2    police made the decision to arrest them.

3         That wasn't a decision that we had made, obviously.  And,

4    again, I was recapping what was shared with me.

5    Q.   I understand you were recapping what was shared, but as

6    you sit here today, you know that that information that you

7    have in this document is inaccurate?

8    A.   I can't say that it's inaccurate.  I don't know if the

9    men were aggressive with the police.  I was not there.  I was

10   not a police officer there.  I was not a bystander.  I don't

11   know.  This is what was shared with me for the purposes of the

12   next day after the incident.  I was recapping what was shared

13   with me because I was asked to.

14   Q.   When in the -- where in the document does it say that you

15   point out that this information was shared with you by the

16   store manager?  Where do you say that?

17   A.   I don't say that, but that's what it was.

18        I shared that we worked with partner resources, P&AP, and

19   Shannon Boldizsar to support the Safe and Welcoming training

20   for all the partners.  The SMs went through this training with

21   the partner resource and partner and asset protection advisor

22   in December, and then the training was completed with all the

23   partners.

24        And the store manager handled the situation exactly as

25   she was trained from Safe and Welcoming.

Phillips - Cross                                330

```
 1  Q.   Okay.  And then you go on to say:  If I --

 2       That same bullet, after where you state that the men were

 3  aggressive with the police, which caused the police to arrest

 4  for disorderly conduct.

 5       Do you not say that?

 6  A.   I do.

 7  Q.   Okay.

 8  A.   I didn't have any conversation with the police.  This was

 9  relayed to me, but I believe that they were arrested for

10  disorderly conduct.  I'm not 100 percent sure that's correct.

11       Today sitting here, I'm not sure if that's what they were

12  arrested for.  I only knew what was shared to me at that time.

13  Q.   Okay.  The store manager handled the situation exactly as

14  she was trained from Safe and Welcoming.

15       Is that what you said?

16  A.   That's what I said.

17  Q.   And you agree with that?

18  A.   I mean, the Safe and Welcoming policy was very clear.  It

19  said:  You had to be a customer to use the restroom.  You had

20  to be a customer to use the store.

21       Obviously, the intent was not to have people arrested in

22  the stores.  We just wanted to keep the stores safe for

23  customers and partners, and we had gone through a lot of

24  incidents.  It was very disheartening for partners to work in

25  an environment where they were finding dead people in the
```

*Phillips - Cross*                          *331*

1   bathroom.

2       I had a partner get stuck with a needle emptying the

3   garbage in a restroom and get hepatitis and have to do six

4   months of HIV meds.

5       As a part-time barista, you're not paid enough to have to

6   get stuck with needles.

7       You know, this was a company program that we adopted in

8   Philadelphia because we wanted our stores to be safe for our

9   partners and customers and have a good environment for

10  everyone.  That was the intent.  That was probably certainly

11  the intent of the folks that designed it, but that was what it

12  said:  Discreetly go in the back room and call police.

13  Q.  Is there anything about the policy that would suggest

14  that the way that Donte and Rashon presented would suggest

15  that they were somehow homeless or using drugs of any kind?

16  A.  No.  But the policy talked about being a noncustomer, not

17  if they looked like they're homeless or if they look like they

18  might be a drug user.  You were either a customer or you were

19  not a customer.

20  Q.  And wouldn't the facts determine, for example, how long

21  those individuals would actually be in the store to determine

22  whether or not they posed a threat or some other issue that

23  would require calling the police?

24  A.  I'm sorry, ask me again?  I'm confused.

25  Q.  Yes.  Wasn't the point of calling the police based on

*Phillips - Cross*                               *332*

1  someone not just being in the store doing absolutely nothing

2  but based on posing a threat of some sort.  Yes?

3  A.   Yes.  I think it said:  If you felt they were being

4  aggressive, or something to that effect, you should call the

5  police.

6  Q.   Yes.  But nothing how Donte and Rashon presented would

7  suggest that they were a threat?

8        MS. MATTIACCI:  Objection, asked and answered.  We've

9  been down this road.

10        MR. HARRIS:  You saw a clip and -- I'll rephrase,

11  Judge.

12        THE COURT:  Overruled.  You can ask again.

13        THE WITNESS:  The clip that I saw only showed the

14  police arresting them, so I don't what happened prior to that.

15  I don't know why the police made the decision to arrest them.

16  That was obviously made prior to the video starting.

17        So I -- you know, I don't know if they were

18  aggressive.  I was relaying information that was being asked

19  of me to be relayed.

20  BY MR. HARRIS:

21  Q.   Okay.  The clip that you saw, what do you recall seeing?

22  A.   It was very short.  It was -- I remember there were

23  police, and they had their bicycle helmets, and then, I think

24  maybe there were other police that didn't have bicycle

25  helmets.  And each of the men were -- kind of stood up, if I

Phillips - Cross                                  333

1  remember correct.  It's been a while since I saw it, but --
2  and put in handcuffs or something and walked out.
3  Q.   Yes.
4  A.   It was short.  Uh-huh.
5  Q.   They looked like they were -- appeared -- based on a clip
6  that you saw, that they were arrested without incident.  In
7  the clip that you saw?
8  A.   Right.  As I said, if that's what I saw, that clip, I
9  might have been down there protesting myself.  It looked
10 awful.  Of course it did.  It was horrible.
11 Q.   So you testified earlier that there was a change in
12 direction from Kevin Johnson, the CEO, and Howard Schultz, the
13 then founder, as well as president or chair of the board.
14      Did you not?
15 A.   A change in direction in what?
16 Q.   You said there was a change in direction for support of
17 Holly Hylton and then no support of Holly Hylton?
18 A.   That's correct.
19 Q.   What do you attribute the change in direction from?
20 A.   Initially, there was support for Holly, and then the
21 riots and protests start, and people were screaming:  Fire the
22 manager, fire the manager, fire the manager.  Then we can talk
23 about training.
24      And I think it was clear that the original message from
25 Kevin of "Your anger at the store manager is misplaced.  This

*Phillips - Cross*                                    *334*

1  is really about us and our policies," that was not landing

2  well in the media.  People were not responding to that

3  message.

4      We continued to have a lot of protests at the store, and

5  I think the company decided:  We need to change our messaging,

6  and now it is, you know, this person did the wrong thing, and

7  that's -- we're going to look at bias training in all the

8  stores and figure out, you know, how do we move forward from

9  here.

10     And, you know, I certainly understood why we were trying

11 to have training around implicit bias.  It exists.  I get

12 that.  I understand that.

13     I didn't want this to happen again in any other store in

14 Philly or any place else.  It was -- you know, it was -- I

15 don't know what more to say.

16 Q.  Ms. Phillips, you said:  Riot.  What riot occurred?

17 A.  I would say --

18 Q.  Was there a riot?

19 A.  You would probably call it protest, but when folks came

20 into the store and a police officer said to me, "If this goes

21 bad, go hide in the bathroom and I'll come get you," it was

22 very scary.  So whether I call it a protest or a riot, it was

23 a very scary situation.

24 Q.  Is it your testimony that the protests and the protesters

25 that came to the store at 18th and Spruce were engaging in a

*Phillips - Cross* 335

```
 1   riot?
 2   A.   Maybe that was the wrong word choice.  I'll say protest.
 3   Q.   You heard Mr. Pinto testify yesterday regarding when the
 4   leaders came to the market, that you were physically absent.
 5        Do you remember him testifying to that?
 6   A.   I do.
 7   Q.   You disagree with that assessment?
 8   A.   I do.
 9   Q.   Do you remember Mr. Pinto also testifying that when
10   approached by partners, that they were actually looking for
11   leadership which you did not provide?
12   A.   I heard him say that.  I wholeheartedly disagree with
13   that.
14   Q.   What did you do?
15   A.   By the way, he also said that Camille promoted me into
16   the role, and that was incorrect.
17        So I certainly think highly of Paul Pinto, but I think
18   his memory may not be 100 percent accurate.
19   Q.   Okay.  I'll rephrase.
20        You were promoted by someone other than Ms. Hymes?
21   A.   That's correct.
22   Q.   And you also received -- up until prior to the incident,
23   you had received support from her.  Yes?
24   A.   I did.
25   Q.   And she had been a supporter of yours all the way up
```

1    until the incident.  Yes?

2    A.    Absolutely.

3    Q.    Nothing about her treatment of you prior to the incident

4    would suggest that she had been engaging in any sort of

5    race-based behavior.  Correct?

6    A.    Absolutely not.  I was merely pointing out that Paul's

7    memory may not be 100 percent accurate.

8    Q.    Understood.

9          Prior to that, Mr. Pinto had been a supporter of yours as

10   well?

11   A.    Yes, I think so.

12   Q.    And, in fact, he talked about having or supporting you to

13   go to executive presence training.  Yes?

14   A.    Yes, that's correct.  That was maybe ten years before

15   this, but yes.

16   Q.    Was it helpful?

17   A.    The training?

18   Q.    Yes.

19   A.    Yes, absolutely.

20   Q.    What did you learn?

21   A.    It's been probably 15 years now, but I think at the time,

22   I had a regional director who was -- he was not always open to

23   feedback, he was not always open to people speaking their

24   mind, and so Paul thought I should get some training to feel

25   more confident in sharing my thoughts and opinions.

*Phillips - Cross*                               *337*

1      And that's what the -- it was.  It was about executive

2  presence and how to speak, and I found it helpful.  But it was

3  a really long time ago, so I can't tell you exactly, you know,

4  what it was.

5  Q.  When the leaders came into the market, was there an

6  initial meeting that you were responsible for directing with

7  partners?

8  A.  The open forum with Howard, is that what you're talking

9  about?

10 Q.  No.  Soon right after the incident when the leadership

11 came from Seattle and other places, including Camille and

12 Rossann, there was an initial meeting soon after the April

13 12th incident.

14      Do you remember that meeting, the first meeting?

15 A.  Not 100 percent sure I remember which meeting.  There

16 were a lot of different meetings on a lot of different days.

17      If you want to put the calendar up, that might refresh my

18 memory.

19 Q.  Did you have a meeting on the following Monday after the

20 incident?

21 A.  Probably.

22 Q.  What happened in that meeting?

23 A.  I'm sorry, I can't tell you specifically without like

24 looking at some sort of notes from the meeting.  This was a

25 long time ago.  And there were a lot of different meetings

1    with a lot of different people, so I don't want to misspeak

2    about which meeting this was and where it was without knowing

3    to be correct.

4    Q.   Okay.  Do you recall a meeting where the leaders came to

5    the market where in fact on the morning of the meeting, you

6    indicated to Ms. Hymes that you weren't feeling well?

7    A.   I don't recall that, no.

8    Q.   You don't recall not feeling well or you don't recall

9    that meeting at all?

10   A.   Like I said, I don't recall not feeling well, this was a

11   long time ago.  I also know there were a lot of different

12   meetings, so I don't recall this specific meeting and who the

13   attendees were and -- I'm sorry, I can't.

14   Q.   The first meeting that you recall being asked to attend,

15   what do you remember happening in that meeting?

16   A.   I mean, I'm not sure exactly which meeting you're talking

17   about.

18        There -- I went to the store the next day.  My boss came

19   in.  We had a meeting that day, me, my boss, Paul Pinto, Holly

20   Hylton, Paul Sykes.

21        Then the next day protests started.  We had meetings with

22   the police department.  We had meetings with other leaders.  I

23   had meetings with my other district managers to figure out how

24   to support the stores and what was happening.

25        So I'm not trying to not answer your question, I just --

1    I don't know which meeting you're referring to.  I'm sorry.

2    Q.   I'm asking you, the first meeting you recall with

3    leadership in the market, what do you recall happened in that

4    first meeting with leadership?

5    A.   I'm sorry, I don't recall what meeting you're talking

6    about.  If you could tell me the date --

7    Q.   Ms. Phillips, I am not asking about any meeting in

8    particular.

9        I'm asking about the first meeting you recall that

10   happened in your market when the leadership came?

11   A.   The first meeting I actually recall was when Howard came,

12   and he was visiting stores.  And he encountered a store

13   manager who was crying.  And I was told, Howard wants to have

14   an open forum with partners at his hotel.  I think it was the

15   Ritz-Carlton maybe.

16       So in a matter of a couple hours, this meeting was

17   happening and I had to invite all these different partners to

18   come for this open forum with Howard.  That's the first

19   meeting that I remember.

20       But, you know, that may not be the one you're referring

21   to.

22   Q.   If I show you a calendar that counsel has presented,

23   would that help refresh your recollection as to when that

24   meeting with Howard occurred?

25   A.   When the meeting with Howard occurred?  Sure.  Maybe.

 1          MR. HARRIS:  Your Honor, may I borrow counsel's?

 2          MS. MATTIACCI:  For this one question, I would allow

 3   it.

 4          MR. HARRIS:  Thank you.

 5   BY MR. HARRIS:

 6   Q.   Okay.  Showing you the diagram that counsel has prepared

 7   that has the calendars beginning from April the 12th.

 8        Do you see this diagram that counsel prepared?

 9   A.   I do.  I do.

10   Q.   By looking at this document, which is now a diagram of

11   April and May of 2018, does this refresh your recollection as

12   to the meeting that occurred with Howard Schultz in the

13   market?

14   A.   So the incident happened on Thursday.  Friday -- Saturday

15   Camille came to town.  Sunday there were protests.  Monday was

16   when Kevin Johnson came in, but I believe he was meeting with,

17   like, the mayor, different people like that.  I don't think I

18   had any interaction with him.

19        I believe it looks like Howard came the next day on the

20   17th, so that might be the meeting you're talking about.

21   Q.   Is that the meeting that you recall participating in, the

22   meeting with Howard Schultz?

23   A.   Yes.

24   Q.   What leadership role did you have in that meeting with

25   Howard Schultz?

Phillips - Cross                    341

1    A.   I was given the date and time and I had to coordinate who

2    was coming and making sure they got there.  And when they did

3    get there, interacting with them, making theme feel

4    comfortable, speaking up and asking questions of Howard.

5        And at one point a question -- there was a question about

6    P&AP's support.  And I recall saying, you know, we have one

7    P&AP person, Ronda, for the whole Mid-Atlantic --

8    Q.   May I stop you there?

9    A.   Sure.

10   Q.   Let's parse out your role in that meeting.

11       If I understand initially, you said you set up -- I think

12   you said specifically setting up where the meeting occurred?

13   A.   No, no.  I was told where it was going to be.  It was at

14   his hotel.

15   Q.   Okay.  It was at his hotel?

16   A.   Uh-huh.

17   Q.   You said you set up specifically what aspect of it -- it

18   sounded administrative to me.  So what aspect of it did you --

19   A.   It was very rushed.  I found out in a couple hours, he

20   wants to have this, so I'm calling people, trying to figure

21   out, okay, who's off, who can we get off, how can we get

22   coverage in stores so partners can come to this.

23       That's what I recall.

24   Q.   Did you have a conversation with Mr. Schultz?

25   A.   Yes.  In the store, and then also I spoke at the open

*Phillips - Cross*                                    342

1  forum.

2  Q.   You spoke at the open forum?

3  A.   I did.

4  Q.   The one at the Ritz-Carlton?

5  A.   I did.

6  Q.   What did you say?

7  A.   I was just sharing that I had stood up because there was

8  a question about Philadelphia not having a lot of P&AP

9  support, so I don't think he completely understood what that

10 meant.

11      So I was talking with him and saying, we only have one

12 person for the whole Mid-Atlantic.  That's Ronda, and she

13 lives, I think down in Virginia or some place like that, so we

14 don't have a lot of support in Philadelphia.  And that's when

15 he approved a local P&AP person, at that open forum.

16 Q.   Howard Schultz did?

17 A.   Yes.

18 Q.   Was Camille Hymes there at that meeting?

19 A.   I am sure she was.

20 Q.   Was Rossann Williams at that meeting?

21 A.   Yes.

22 Q.   Was Zeta Smith at that meeting?

23 A.   I don't recall.  I kind of feel like she was out of town

24 and she didn't come till later but I might be wrong on that.

25 Q.   Did you interact with Camille prior to the meeting with

Phillips - Cross                                    343

1  Howard Schultz?

2  A.   She was the one, I believe, that called and said Howard

3  wants to have an open forum, can you coordinate, it's going to

4  be, you know, today at such and such a time and then I took it

5  from there.

6  Q.   After the 17th, what do you recall as the next meeting

7  that you participated in?

8  A.   There were so many meetings.  I'm sorry, you want me to

9  tell you about specific meetings.

10 Q.   Yes.

11 A.   And some are etched in my memory because of things that

12 were said that stuck out to me.

13      But there were so many meetings with police department,

14 with the civil affairs unit, with my boss, with my boss and

15 her boss, sometimes in the basement at the store, sometimes in

16 her hotel room.

17      There were -- over the course of this three weeks, there

18 were probably 20-plus meetings that I was a part of.

19 Q.   Okay.  The 20-plus meetings over the course of those

20 three weeks, which one of them did you lead personally?

21 A.   Did I what?

22 Q.   Did you lead personally?

23 A.   I think they were all kind of collaborative.  I don't

24 know that I led any specific meeting that I was in charge of

25 leading, but it was a collaborative effort.  We might come to

1   Camille's hotel room when we were working on the Philly

2   sustainment plan and it would be a group of people in her

3   hotel and we would brainstorm ideas and come up with a plan

4   that was then captured and shared out, hey, these are our

5   early stages of our plan.

6       But I wouldn't say, you know, that I led that meeting.

7   It was a more a collaborative effort between a lot of people.

8   Q.   You said over the course of three weeks there were

9   several meetings that were being had.  Yes?

10  A.   Yes.  Lots of meetings.

11  Q.   Over those meetings, I'm asking specifically, how many

12  did you personally lead for the leadership when they came into

13  the market?

14          MS. MATTIACCI:  Objection, asked and answered.

15          THE COURT:  Overruled.

16          THE WITNESS:  For example, when Andrea came to the

17  market, I met Andrea, I believe it was at The Bellevue store.

18  I led the conversation with her, and then she and I visited

19  stores so that she could engage with partners.  That was, I

20  guess, a meeting I led, because I was the person that was

21  responsible for this Seattle person coming in while she was

22  there.

23  BY MR. HARRIS:

24  Q.   Senior leadership.  Andrea wasn't in senior leadership,

25  was she, Ms. Phillips?

```
 1   A.   I would -- she was -- I would have considered her senior
 2   leadership, but it was not Rossann or Roz, if that's what
 3   you're asking.  I mean, when Kevin Johnson and Roz Brewer and
 4   Rossann come to the market, I am not the first person that
 5   they're engaging with.  They're engaging with my boss and
 6   Zeta, her boss.
 7        I had never met Kevin or Roz or Rossann, I think ever, at
 8   that point, so I wasn't being asked to lead meetings with
 9   these people that were coming in that I didn't know and had no
10   contact with, and I don't know that they were, you know,
11   looking for me to lead meetings with them.  It was kind of
12   above my pay grade.
13   Q.   Is it your testimony that there was not any expectation
14   for you to lead any meetings held by senior leadership?  Is
15   that what you're testifying to?
16   A.   I don't recall ever being in charge of a specific
17   meeting, leading a meeting with senior leadership.  And by
18   senior leadership, I'm assuming you mean Kevin Johnson, Howard
19   Schultz, Rossann, Roz Brewer.  No, I don't recall that.
20   Q.   How about your immediate boss, Camille Hymes?
21   A.   Uh-huh.
22   Q.   Yes?
23   A.   What about her?
24   Q.   You weren't responsible for leading a meeting when she
25   came to the market?
```

 1  A.   When you say a meeting, like the first day she came to

 2  the market, we met at the store.  She and I sat down with Paul

 3  and Holly.

 4       If that's me leading a meeting, then I led that meeting.

 5  Q.   I'm talking about group meetings to talk about strategy,

 6  to talk about vision.  Did you lead any of those kind of

 7  meetings?

 8  A.   So they were all -- they were all meetings that we had as

 9  a group where we sat together, people -- district managers,

10  myself, my boss, partner resources, P&AP.  And we would talk

11  about, okay, what do we need to do going forward.

12       But it was a collaborative effort, and we typically met

13  in hotels -- in Camille's hotel room.  So since we were

14  meeting in Camille's hotel room, she would seemingly have been

15  the person kind leading that meeting.

16  Q.   Ms. Phillips, did you lead any meetings involving the

17  roundtables of partners?

18  A.   There were lots of roundtables with partners.  I think

19  Paul spoke yesterday, some impromptu in stores, some that were

20  more formal.

21       The BPN meeting, the Black Partners Network meeting that

22  was organized, that would have been a more formal roundtable

23  meeting versus high-level leaders stopping in stores and

24  sitting down and having conversations with partners.

25  Q.   Did you lead a roundtable meeting, Ms. Phillips, yes or

1  no?

2  A.   I'm sure I did.  I'm sorry, I can't recall which meeting

3  you're referring to.

4  Q.   Did you lead any roundtable meeting?

5       MS. MATTIACCI:  Objection, asked and answered.

6       THE COURT:  You can answer this one question, then

7  we'll take our midday recess.

8       THE WITNESS:  Did I lead any meetings?  Yes, I led

9  meetings.  I don't remember which ones or on what date or who

10 they were with.

11      If it was with high-level leaders like Kevin, Rossann

12 or Roz Brewer, no, I would not have been the one leading those

13 meetings.

14 BY MR. HARRIS:

15 Q.   I didn't ask that question specifically.

16 A.   Okay.

17 Q.   Ms. Phillips, I asked about roundtables.  Did you lead a

18 roundtable meeting.  Yes or no?

19 A.   I would say yes.  At The Bellevue, we invited partners in

20 for a roundtable with Andrea, and that would have been a

21 roundtable that I led the discussion.

22      THE COURT:  Okay.  Let's take our lunch break at this

23 point.

24      Members of the jury, I'll ask you to return at a

25 quarter to 2:00.

*Phillips - Cross*                                    348

 1          And just remember my words of caution.

 2          We'll stand in recess.

 3          (Jury out.)

 4          MR. HARRIS:  Your Honor, respectfully, I would ask

 5  that this Court caution the witness that she's still on the

 6  stand.

 7          THE COURT:  Speak up.

 8          MR. HARRIS:  I would ask the Court to caution the

 9  witness that she's still on the stand while we're having our

10  recess.

11          MS. MATTIACCI:  Oh, you don't have to worry about me

12  breaking the rules, Rich.

13          MR. HARRIS:  I wasn't worried about it.

14          THE COURT:  The witness is on cross, so you can't

15  speak to counsel about her testimony.  Okay?

16          All right.  We'll stand in recess.

17          MR. HARRIS:  Thank you.

18          (Recess at 12:35 p.m. until 1:55 p.m.)

19          THE COURT:  Bring the jury in.

20          (Jury in.)

21          THE COURT:  Please be seated.

22          You may proceed, Counsel.

23          MR. HARRIS:  Thank you.

24  BY MR. HARRIS:

25  Q.  Ms. Phillips, before we broke for lunch, you testified to

Phillips - Cross                                    349

1   the fact that you led one roundtable discussion that you

2   recall.  Yes?

3   A.   I led a lot of meetings, but that was one specifically

4   you asked, which was the first meeting.

5        I think that I was trying to determine which meeting you

6   were talking about, and so --

7   Q.   Let me try to help you out.

8        The roundtable discussions, as Mr. Pinto testified to,

9   were the ones in which partners were being held together,

10  where they were being brought in, so you could actually hear

11  and listen to what they were saying about the market.  Yes?

12  A.   Some of them.  Yes, there were lots of roundtables.  Some

13  of them were with people from Seattle.  Some of them were with

14  local leaders.  My job at that time was to support my partners

15  in the stores --

16  Q.   I understand.

17  A.   -- not lead meetings with the CEO of the company.  That

18  was above my pay grade.

19  Q.   Okay.  The roundtable discussions in which you led when

20  the leadership came in that you can recall leading was one.

21  Yes?

22  A.   Again, I led lots of different meetings with lots of

23  different partners and people at different dates and times.

24  That was one in particular, sure.

25  Q.   Okay.  The one in which you recall, what did the partners

1   share about their experience after the incident of April 2018?

2   A.   That particular meeting was with someone from P&AP, and I

3   believe that the partners were talking about we

4   obviously -- partners were experiencing a lot of external

5   pressure from people that -- friends and family that they

6   shouldn't work at Starbucks, and they didn't feel that way,

7   they wanted to continue to work there, but the problems did

8   exist, that Safe and Welcoming had previously addressed.  Some

9   partners were in favor of Safe and Welcoming, some felt like

10  it did cause bias, and so there were lots of different

11  opinions from different partners.

12  Q.   Okay.  Can we --

13          THE COURT:  Can I just stop you for just one second?

14          MR. HARRIS:  Sure.

15          (A discussion off the record occurred.)

16  BY MR. HARRIS:

17  Q.   The meeting that you were just referring to that you said

18  you led with Andrea, is it your testimony that Andrea was in

19  partner asset and protection?

20  A.   Maybe that was not Andrea.  Maybe that was Dina.  I'm

21  trying to think.  I would have to go back and look at the

22  notes to determine if Andrea -- I -- I'm trying to think.

23      I believe Andrea was in the market from P&AP, I believe,

24  but she might have been from ops services.

25      I didn't know these people that kind of flooded the

 1  market at the time.  I didn't have contact with them ahead of

 2  time, so I didn't know all of them.

 3  Q.  Okay.  Counsel showed you a series of emails and letters

 4  of support.

 5      Do you recall seeing that?

 6  A.  Today?  My counsel?

 7  Q.  Yes.

 8  A.  Yes, uh-huh.

 9  Q.  How many letters of support do you think that you saw or

10  at least that was shown in this courtroom today?

11  A.  I didn't count them.

12  Q.  Approximately eight to ten?

13  A.  Maybe.  Maybe more than that.

14  Q.  Okay.  Of the emails that were shown today in this

15  courtroom, how many of them were from members of -- or

16  partners from -- that were actually in the market?

17  A.  Lots of them were.  They were store managers, district

18  managers that came in to support.

19  Q.  The emails that were shown today that went before this

20  jury, is it your testimony that they were from partners that

21  were actually in the market?

22  A.  Yes, some of them, yeah.

23  Q.  Which ones?

24  A.  And then some of them were outside.

25  Q.  Which ones were from in the market?

*Phillips - Cross*                                            352

1  A.   There were store managers specifically that reached out

2  that had been brought in as support during that time.  And at

3  least a few of those were from store managers.

4  Q.   Store managers that were brought in, is that your

5  testimony?

6  A.   And district managers.  I think I got one from Jackie

7  Johnson, Michelle, Rana.  These were folks that worked outside

8  the city but came in to support, yes.

9  Q.   Okay.  Let's talk about the ones that were already in the

10  market prior to April of 2018 and thereafter.

11      How many of those letters of support were brought to this

12  court today?

13  A.   I would have to go back through and look at them.

14  Q.   You would have to go back and look at the ones that --

15  this was your market, was it not?

16  A.   It was, yes.

17  Q.   And you don't remember the names of any of the store

18  managers that were -- you were responsible for in April of

19  2018 that offered support?

20  A.   I received a ton of support in -- from people inside the

21  market, if that's what you're asking, in Philly:  from Ben,

22  from Paul, from their store managers, from partners.  They may

23  have been highlighted, some of them today; they may not have

24  been.  Some of them were verbal.  These were all written

25  recognition.

Phillips - Cross                                    353

1        But up until the very end, I had a ton of support,
2   including from my boss.
3   Q.   Okay.  I'm talking about the emails that have been shown
4   to the jury of support.
5   A.   Uh-huh.
6   Q.   Were any of those emails or letters from people that were
7   inside your market at the time that you were overseeing it in
8   2018?
9   A.   They were from people inside my market.  Yes, that's
10  correct, many of them were.
11  Q.   They were working for you at the time?
12  A.   Yes.
13  Q.   Okay.  Do you agree with the proposition that leaders are
14  responsible for coming up with systems and processes to help
15  the organization advance their objectives?
16  A.   I believe that.
17  Q.   Okay.  What systems and process did you come up with
18  around 2018, April of 2018, to advance the objectives after
19  the incident?
20  A.   As I mentioned before, they were very collaborative.  We
21  came up with sustainment plans.  These were collaborative
22  efforts.  I'm not going to say I came up with it in my own.
23  We were in groups coming up with plans.
24       But in the moment, it was a crisis, and my job was really
25  to support the stores and the partners through this crisis.

*Phillips - Cross*                                     354

```
 1  And future plans of Safe and Welcoming or how we were going to
 2  deal with the issues in the stores, that felt like -- a little
 3  on the back burner.  We had to get through what was happening
 4  today which was people flooding into the stores, screaming at
 5  our partners, video cameras, taking pictures.  They were on
 6  the front page of papers.  It was a lot of activity happening
 7  that I was trying to support the efforts of.
 8       I think if I wasn't focused on the right activities, I
 9  think Camille would have said something.
10  Q.   Okay.  What idea did you bring to the table as part of a
11  collaboration?
12  A.   I can't tell you specifically from meetings that took
13  place over five years ago that were with multiple people to
14  say:  That was my idea versus that was Michael Scott's idea or
15  maybe that was Paul's idea or maybe that was Camille's idea or
16  Zeta's.  These were group discussions that were brainstorming,
17  that were where are we going to go from here?  What support do
18  we need?
19  Q.   So you can't think of one?
20  A.   I certainly wouldn't take credit for someone else's
21  ideas, so I say they were collaborative.  I'm sure I was
22  throwing out ideas, just like everyone else was.
23  Q.   Give me one of them.
24  A.   Extended security, that was my idea.
25  Q.   That did not come from PA&P (sic)?
```

```
 1   A.    P&AP.

 2   Q.    P&AP, yes.

 3   A.    We had at that point a strained relationship with the

 4   police department, so we weren't getting police support.  I

 5   believe it was my idea getting plainclothes police officer --

 6   or security in the store to support the partners in how they

 7   felt feeling safe.

 8   Q.    How did you communicate that idea?

 9   A.    It was in one of those sustainment plans that we worked

10   on together, and it did come to fruition.  We did have

11   in-store security.

12         And then we talked about roving patrol, but I don't know

13   that that happened.  I think if it did happen, it was after I

14   was gone.

15   Q.    Okay.  So the idea that you recall was during the three

16   weeks of activity prior to the separation decision being made

17   is the idea of having extended security or police activity?

18   A.    You're insinuating that I wasn't being a leader in the

19   market, but this was -- my job was trying to coordinate

20   efforts to make sure that people came into the stores,

21   supported the stores.  There was a time during a protest that

22   Rossann was in the store and went to the basement with the

23   hourly partners.  It was me and my district managers literally

24   behind the counter during this protest trying to serve

25   customers and deal with these protests.  It was not -- it was
```

1  not me sitting around like:  Oh, let me think of new ideas or

2  what we...  It was a crisis that I was trying to manage

3  through.

4  Q.  I understand.

5       In crisis, leaders are supposed to provide strategic

6  vision and direction.

7       Do you agree with that?

8  A.  I do.

9  Q.  Okay.  And so I asked you what sort of strategic advice

10  did you provide the collaboration?  You said that you came up

11  with the idea of extended police support.  Yes?

12  A.  That was one thing.  Yep.

13  Q.  Don't have any others, do you?

14  A.  I also came up with the idea of having an all call with

15  store managers to talk about their concerns and what we're

16  going to do moving forward.

17  Q.  Okay.  And the store call with the store managers, was

18  that the task force that you referred -- that counsel asked

19  you questions about earlier?

20  A.  No.

21  Q.  That was not the task force; that was something else?

22  A.  Right.  That was an all call.

23  Q.  Okay.  The task force that you were asked earlier on

24  direct examination, that was not your idea?

25  A.  The Philly task force?

*Phillips - Cross*                                    *357*

1   Q.   Yes.

2   A.   I don't remember if that was my idea or if it was -- I'm

3   not sure where it came from.  I can't answer that.  It may

4   have been.

5   Q.   Did you lead those calls with the Philly task force?

6   A.   I did.

7   Q.   Do you recall what happened during those calls?

8   A.   I led those calls.  I also led calls that were called all

9   hands calls with folks from Seattle that were -- for me to try

10  to tell you specifics of which calls, you know, I wouldn't

11  want to try to do that.

12  Q.   So when partners brought their concerns about what they

13  were experiencing based on the activity that had come to the

14  market, how did you want the organization of Starbucks to

15  change afterwards?

16  A.   How did I want the organization to change?

17  Q.   Yes.

18  A.   I'm not sure I was thinking about that at the time, how

19  the organization was going to change.

20  Q.   Showing what's been previously marked as Joint Exhibit

21  Number 43.

22       MR. HARRIS:  May the witness be shown that document?

23  BY MR. HARRIS:

24  Q.   And I direct your attention to what's page 2 of Joint

25  Exhibit Number 43.

*Phillips - Cross*                                    358

```
 1        Do you recognize this document?
 2   A.   I do.
 3   Q.   Is this the Safe and Welcoming policy that you were
 4   referring to in your testimony?
 5   A.   It is.
 6        MR. HARRIS:  May this be shown to the jury, Judge?
 7        MS. MATTIACCI:  No objection, Your Honor.
 8        THE COURT:  All right.  It may be shown.
 9   BY MR. HARRIS:
10   Q.   Showing what's been marked as Exhibit Number 43.  Is this
11   the Safe and Welcoming policy that you were referring to in
12   your testimony on direct and cross-examination?  Page 3,
13   please.
14   A.   It's the signage.
15   Q.   The signage which articulates what store managers would
16   do if in fact individuals were in the store.  Yes?
17   A.   This was signage.  So "the restrooms are for customers
18   only" was a sign hanging in the restroom.  "Seating is
19   reserved," those were stickers that went on outside tables and
20   below that was the code of conduct that hung in every store.
21        This wasn't the training materials, if that's what you're
22   asking.
23   Q.   No, I'm asking if this was the policy that you were
24   referring to about the training exhibits.
25   A.   It was the signage for the policy, yes.
```

1   Q.   Okay.  Is there anything in that signage that

2   demonstrates you should call the police?  Anywhere?

3   A.   This was a sign hanging in the store, so I don't think it

4   was going to say if you're a noncustomer we're going to call

5   the police.  And I can't really read the specifics at the

6   bottom.

7          MR. HARRIS:  Can you put that up, as best you can,

8   please?

9   BY MR. HARRIS:

10  Q.   It talks about -- again, I can't see it as well as you,

11  but I'm going to try.

12      At the bottom it says -- let's start with the top:

13  Welcome to Starbucks.

14      Did I read that accurately?

15  A.   That I can read.

16  Q.   We're trying to create a comfortable and enjoyable

17  environment for our customers.

18  A.   That's correct.

19  Q.   And this is -- each bullet point talks about activities

20  that would occur in the store where you could potentially be

21  asked to leave.  Yes?

22  A.   I'm sure it does.  It's hard for me to read the bullet

23  points.  I'm sorry.

24      I can't read the first one.

25  Q.   Solicitation or panhandling at the bottom.  Excessive

Phillips - Cross                    360

1   loitering in or around the store.

2       Yes?  Does it not say that?

3   A.   Yes, I can see that.

4   Q.   Excessive noise, including yelling, disruptive profanity,

5   vulgar and threatening language.

6       All the areas that would -- that would quantify as

7   misconduct.  Yes?

8   A.   Correct.

9   Q.   Persons that perform the above activities may be asked to

10  leave.

11      Does it not say that?

12  A.   It does.

13  Q.   There's nothing in there about calling the police.

14  Correct?

15  A.   In the signage, no.

16          MR. HARRIS:  Can you scroll that down, please?

17          I'm sorry, up.  I apologize.  Up.

18          Yes, I apologize.

19  BY MR. HARRIS:

20  Q.   This is the policy you were referring to as Ms. Hylton

21  was implementing it at the time that she called the police on

22  Donte and Rashon.  Yes?

23  A.   The Safe and Welcoming policy, yes.

24  Q.   Thank you.  After Ms. Hylton was separated, Angela Grass

25  took over her role, did she not?

*Phillips - Cross*                                      361

```
 1   A.   She did.
 2   Q.   Angela Grass.  Did you participate in the process of
 3   having Ms. Grass take a look at the role of Ms. Hylton?
 4   A.   So when we found out that Holly Hylton was gone, Paul and
 5   I discussed who should we bring to the store.  It was a very
 6   obviously difficult time, we wanted a strong leader.
 7        Angela had managed the 16th and Walnut store which was
 8   the highest volume store in the city, and it was also a
 9   high-incident store, where lots of things happened,
10   unfortunately, so we felt like she would be a good person to
11   come over.
12   Q.   And you say "we," you're talking about we.  Who
13   participated in that discussion, Mr. Pinto?
14   A.   I'm sorry, Paul Sykes.
15   Q.   Paul Sykes?
16   A.   Yep.
17   Q.   He was the district manager.  Correct?
18   A.   He was.
19   Q.   Did Camille, was she aware of the decision to have
20   Ms. Grass move to that role?
21   A.   I'm sure she would have been.  We would have informed her
22   at least.
23   Q.   Right.  And she didn't offer any objection?
24   A.   No.
25   Q.   In fact, this was a lot of -- as you said, a lot of
```

1  activity and visibility into the market?

2  A.   Correct.

3  Q.   And Ms. Grass came over from a highly visible, highly

4  active store?

5  A.   A high volume and high-active store, Yes.  I mean, I

6  wouldn't say it was high visibility, but...

7  Q.   High volume?

8  A.   Sure.

9  Q.   High incident?

10 A.   Yes.

11 Q.   And she was the appropriate person to take over that

12 role?

13 A.   We felt --

14 Q.   To replace Holly Hylton?

15 A.   -- that she had strong leadership skills, yes.

16 Q.   Were you aware of Ms. Linda Johnson prior to your

17 separation from the organization?

18 A.   I was.

19 Q.   How did you know her?

20 A.   She was interviewing for a regional position in D.C., and

21 a peer of mine, Jeff Danley, and I interviewed her in maybe a

22 Zoom format.  Something like that.  Not a phone interview,

23 a -- a video interview.

24 Q.   Ms. Johnson, same race as you?

25 A.   She is.

*Phillips - Cross*                                        363

```
 1   Q.   Subsequently after you were separated from the
 2   organization, took over part of your role.  Yes?
 3   A.   She did, yes.
 4   Q.   Mr. Eckensberger, did you know him prior to your
 5   separation from the organization?
 6   A.   I did.  We were peers.
 7   Q.   So you knew him well?
 8   A.   Yes.  I mean, pretty well, as well as any of my peers,
 9   yes.
10   Q.   Understood.  Same race as yours?
11   A.   Yes.
12   Q.   Took over your role, in fact, once you were separated,
13   yes?
14   A.   He took over the Philadelphia stores, yes.
15   Q.   Your market?
16   A.   Well, that wasn't my whole market but it was part of it.
17   Q.   A portion?
18   A.   Sure.
19   Q.   A portion of your market was Philadelphia, and
20   Mr. Eckensberger took over that portion?
21   A.   That's right.
22   Q.   And Ms. Johnson took over the other portion?
23   A.   I think before Linda Johnson got there, I think maybe TJ,
24   another peer, covered it for a while but ultimately, yes,
25   Linda took it over.
```

*Phillips - Cross*                                    364

1  Q.   TJ Wolfersberger?

2  A.   Yes.

3  Q.   Okay.  You knew him as a peer, yes?

4  A.   Yes.

5  Q.   What was his race?

6  A.   His race was white.

7  Q.   So the three people that took over your area of

8  responsibility happened to be the same race as you.  Yes?

9  A.   At the time in Camille's overarching region, the

10 Mid-Atlantic, I think everyone was white.  I don't think there

11 were any African American regional directors at that time.

12 Q.   Are you sure?

13 A.   Well, we were interviewing Linda for DC, it was TJ, Jeff

14 Danley, they're both white men.  It was me, Marcus, who is a

15 white man, and Jen Pivarnik who is a white female.

16 Q.   So the organization was primarily white that Ms. Hymes

17 was responsible for prior to your separation?

18 A.   At that time.

19 Q.   Yes.  And afterwards, do you have any evidence to suggest

20 that it wasn't the same after you left?

21 A.   I wasn't there, so I don't know.

22 Q.   Yes.  But based on the information you received

23 throughout the course of this case, have you seen anything to

24 the contrary?

25 A.   About who came in after I left?

1  Q.   Yes.

2  A.   No, I haven't.

3  Q.   You haven't seen anything or you haven't seen anything to

4  the contrary?

5  A.   I know who came into the market after me.  Marcus took

6  the Philadelphia stores and TJ took the rest of the market

7  until, I think, Linda came and then it changed again and I

8  think Linda got shifted.  So I think there were a lot of

9  changes.  But that's what I know.

10  Q.   But what you also know is the racial composition of the

11  organization did not change after you left.  Correct?

12  A.   That's correct.

13          MR. HARRIS:  May the witness be shown Joint Exhibit

14  Number 18?

15          THE COURT:  Yes.

16  BY MR. HARRIS:

17  Q.   Ms. Phillips, showing what's been marked as Joint Exhibit

18  Number 18.

19      Do you recognize this document?

20  A.   Yes, it looks like the job description for regional

21  director.

22  Q.   That would be your role, correct?

23  A.   It was.

24  Q.   Yes.  The role that you had, Ms. Phillips?

25  A.   I said yes.

*Phillips - Cross* 366

```
 1   Q.   Okay.  Can I direct to your attention, there are
 2   approximately one, two, looks like three pages.
 3        Is this the full description of the job that you held as
 4   the regional director up until the time of your separation?
 5   A.   2009.  Probably.
 6   Q.   Well, look through it, ma'am.
 7   A.   I mean, I don't remember at the very time in 2018 was
 8   this the job description, job descriptions changed, but this
 9   looks like it.
10   Q.   Can you look through it for me, please?
11   A.   Okay.  Do you want to go to the top and I'll start there.
12   Q.   Well, first, I have to make sure that this is the correct
13   job description for you?
14   A.   Oh, I said that it was.  Yes, I think so.
15        MR. HARRIS:  Okay.  May this be moved into evidence
16   and shown to the jury, Judge?
17        MS. MATTIACCI:  No objection, Your Honor.
18        THE COURT:  So admitted and may be shown.
19        MR. HARRIS:  Thank you.
20        (Exhibit 18 admitted into evidence.)
21   BY MR. HARRIS:
22   Q.   Summary of Key Responsibilities.
23        Do you see that, Ms. Phillips?
24   A.   I do.
25   Q.   What does the first one say for the role of regional
```

*Phillips - Cross*                                    367

1  director as the number one responsibility on this list?

2  A.   Leadership.

3  Q.   Describe the leadership as identified in the job

4  description.  What does it say?

5  A.   Setting goals for the work group, developing

6  organizational capability, and modeling how we work together.

7  Q.   What's the second one say?

8  A.   Where it says "Identifies" or "Planning and Execution"?

9  Q.   I apologize.  Identifies.

10 A.   Okay.  Identifies and communicates key responsibilities

11 and practices to ensure the immediate team of direct reports

12 promotes a successful attitude, confidence in leadership, and

13 teamwork to achieve business results.

14 Q.   All right.  Start with confidence in leadership.

15      Do you recognize that as a key component of your

16 responsibility was for your direct reports to have confidence

17 in you.  Yes?

18 A.   Yes.

19 Q.   Planning and Execution.

20      Do you see that?

21 A.   Oh, yes.

22      Do you want me to read that?

23 Q.   Please.

24 A.   Planning and Execution - Developing strategic and

25 operational plans for the work group, managing execution, and

1   measuring results.

2   Q.   What strategic and operational plans did you develop for

3   your area of oversight?

4   A.   Ever or during April?

5   Q.   Ever.

6   A.   I mean, each year we had an annual operating plan that

7   was developed in Seattle, and then it was brought down:  Okay.

8   What does that look like for regional directors?

9        And then we would take it to our district managers and we

10  would go through:  What is this going to look like and how is

11  it going to show up in the stores.

12       So that would have been an example of operational plans

13  for the work group.

14  Q.   Other than the items that were identified in Seattle,

15  ones that you developed on your own, can you tell us one?

16  A.   Sure.  Community plans, that was something that I was

17  highly regarded in, so...

18  Q.   You were, yes.

19       Outside of that?

20  A.   Let's see.  It's been a long time.

21       We had -- we had -- at one point, we had something called

22  Customer Voice, and it was how customers graded us.  And I

23  developed a plan in the Mid-Atlantic for how we were going to

24  improve our Customer Voice results.

25  Q.   That's what you initiated?

 1   A.   The plan?  Yes, uh-huh.

 2   Q.   And that came from someone else.  Customer Voice had been

 3   a wide-standing practice throughout the organization.  Yes?

 4   A.   I thought you were asking plans, and --

 5   Q.   Plans that you developed.

 6   A.   -- so we -- the Customer Voice program was customers

 7   rated us.

 8        So the plan to how we're going to improve our service and

 9   improve our results, that would have been a plan, yeah.

10   Q.   Let's go down to Partner Development & Team Building.

11        Do you recall Mr. Pinto testifying yesterday that when

12   they came to the market, that there were concerns and you

13   received feedback about your ability to develop partners

14   within your region?  Do you remember him testifying to that?

15   A.   I do.

16   Q.   You disagree with that assessment?

17   A.   I do.

18   Q.   So you disagree with the fact that there were several

19   employees in the market or partners that had complained that

20   they were not being developed?

21   A.   Oh, I'm sorry.  That may have been the case.  There's --

22   with 100 stores and an average of 20 partners, somebody

23   saying, "Hey, I'm not getting developed the way I want to" in

24   a store, I'm sure that did happen.  I don't know that that

25   would have been on me.

1      And that prompted me to think about another program that

2  we developed, that I developed with -- in conjunction with my

3  district managers, which was the store manager.

4      If we had high-potential store managers, we wanted to

5  help develop them to district managers.  And so we developed a

6  specific process where they spent time, these store managers,

7  time in the field with me.  We had -- I mean, there were lots

8  of points to the program, but we were very interested in

9  partner development.

10 Q.  So when Mr. Pinto had identified and testified under oath

11 that there were concerns about development districtwide --

12 A.  Region-wide?

13 Q.  Yes, region-wide.

14     You heard him testify to that.  Yes?

15 A.  I did.  I heard him testify to that, yes, and I don't

16 disbelieve that.

17 Q.  You don't disbelieve that?

18 A.  No.

19 Q.  That wasn't the first time you heard that.  Correct?

20 A.  It may have been the first time I heard it, but I think

21 when you're talking about 2,000 people in an organization,

22 that was what I covered, there's going to be somebody that

23 says:  Hey, I'm not getting developed the way I want to.

24 Q.  Understood.  But wasn't that --

25 A.  Was this an overarching theme throughout?  I don't

1   believe that it was.

2       If you looked at the district managers under me, the

3   majority of them were internally promoted.  If you looked at

4   the store managers below them, the majority of them were

5   internally promoted.  So I do not believe that we weren't

6   developing partners.

7   Q.   Understood.

8       When Mr. Pinto testified to you yesterday before this

9   jury that they had received feedback, meaning others in the

10  market, they shared that with you after April of 2018, did

11  they not?

12  A.   I don't recall hearing that during the time frame that

13  we're talking about, no.

14  Q.   So the first time you heard it was when Mr. Pinto

15  testified.

16      Is that your testimony?

17  A.   I believe so, yeah.

18  Q.   Okay.  First bullet point underneath Partner

19  Development & Team Building, what does that say?

20  A.   Challenges and inspires partners to achieve business

21  results.

22  Q.   Inspiration was also part of your role as the leader of

23  the organization?

24  A.   Uh-huh.

25  Q.   Yes?

*Phillips - Cross*                                            *372*

```
 1  A.   Yes.  I'm sorry.  Yes.
 2  Q.   And so that would have been the healing process that you
 3  would have come up with as part of the market.  Yes?  After
 4  the incident of April 2018?
 5  A.   Inspiring partners to achieve business results?
 6  Q.   Yes.
 7  A.   Yes, I think I did that.
 8  Q.   You believe you did that?
 9  A.   I challenged and inspired partners to -- yes.  We kept
10  the stores all open.  We figured out how are we going to keep
11  these stores open and achieve business results serving our
12  customers in a way that our partners feel safe and secure
13  during a very challenging time where we were flooded with
14  senior leaders as well as protesters in the stores.
15       I do believe I did that.
16  Q.   Okay.  Can we go to the next page, where it says
17  Leadership Competencies.
18       Setting Direction, did I say that accurately?
19  A.   Did you what?
20  Q.   Say that accurately?
21  A.   Yes, Setting Direction.
22  Q.   Establishes and communicates a compelling and inspired
23  vision, creates competitive winning strategies and plans,
24  ensures department strategies are aligned with company
25  strategies.
```

1          Did you do that after April 2018?

2    A.   I mean, I was certainly part of ongoing conversations

3    around what we were going to do going forward in terms of

4    strategies and plans, but this was a very short period of time

5    that was unlike any other period of time in my 13 years at

6    Starbucks, so I may not have been establishing plans for

7    winning strategies in the future.  We were trying to get

8    through what was happening right now.

9    Q.   Okay.  We'll go down to Core Competencies.

10         Do you see that?

11   A.   I do.

12   Q.   The third bullet says:  Composure - Remains calm,

13   maintains perspective and responds in a professional manner

14   when faced with tough situations.

15         Did I read that accurately?

16   A.   You did.

17   Q.   All right.  So the expectation of someone in your role

18   when a crisis hits is to remain calm.  Yes?

19   A.   Yes.  I believe I did remain calm.

20   Q.   And maintain perspective and responds in a professional

21   manner, did you do that as well?

22   A.   I do believe I did that.

23   Q.   Okay.

24   A.   I was never told I didn't do that.

25   Q.   Understood.

*Phillips - Cross*                                      *374*

```
 1   A.   You're the first person saying it.

 2   Q.   I didn't suggest that you didn't.

 3   A.   Okay.

 4   Q.   I was asking if that was a responsibility of yours?  Yes?

 5   A.   Yes.

 6   Q.   Okay.  Personal Learning - Takes personal responsibility

 7   for the continuous learning of new knowledge, skills and

 8   experiences.  Yes?

 9   A.   Yes.

10   Q.   What does that mean?

11   A.   Continuous learning of new knowledge, skills and

12   experiences, that could be a number of different things.  It

13   could be experiences that you're having in stores.  It could

14   be completing your My Learning trainings.  It could mean a lot

15   of different things.

16   Q.   Self-investment.  Yes?

17   A.   Yes.

18   Q.   Okay.  Self-investment, that's what that means?

19   A.   Yes.

20   Q.   After April 2018, prior to your separation, what kind of

21   self-investment were you doing to understand what was

22   happening?

23   A.   Learning new knowledge and skills, I would say, was all

24   we were doing as we visited stores and listened to partners of

25   what they were going through and what they needed in order to
```

1  continue to work for us and be successful and feel good about

2  it.  It was all about new knowledge and experiences.

3  Q.   And my understanding of that component was for you to do

4  some investment to gain insight?

5  A.   I think personal learning is about making sure that you

6  continue to learn and grow.

7  Q.   And grow.

8  A.   Right, uh-huh.

9  Q.   Yes.

10       Insight helps you do that.  Yes?

11 A.   Yes.

12 Q.   To provide foresight to the people you're responsible

13 for?

14 A.   Yes.

15 Q.   Okay.  What sort of insight did you glean to help the

16 people that you were responsible for in moving forward?

17 A.   What insights did I have?

18 Q.   Yes.

19 A.   Okay.

20 Q.   What insights did you have?

21 A.   I'm sorry, I just want to make sure I understand your

22 question.

23       I had a lot of insights in a short period of time.

24 Q.   Okay.  That which you shared with Camille Hymes?

25 A.   We had ongoing daily conversations.  Yes, I'm sure we

*Phillips - Cross*                                    376

1    were talking about everything we were hearing from partners,

2    hearing from store managers, hearing from customers in stores,

3    hearing from the protesters that were coming in.  It was all

4    new experiences.  I had never experienced anything like it.

5    Q.   Insight -- what sort of insight did you glean that you

6    shared with Ms. Hymes?

7    A.   So I think probably the insights I had were the Safe and

8    Welcoming procedure, maybe not such a great procedure, because

9    there is some bias that can come from it or at least perceived

10   bias.  And even when people think they're doing the right

11   thing and following the rules, it can have very bad outcomes.

12   So recognizing how the partners were feeling at this time,

13   that was a lot of insights in speaking with different people.

14   Q.   I'm sorry for interrupting you.

15        And you shared that insight with Ms. Hymes?

16   A.   I'm sure.  Yeah, we talked every day.  We were side by

17   side in the city most of the time, other than when I was

18   tapped out, and we had constant conversations.

19   Q.   Did you share the insight about the self- -- Safe and

20   Welcoming policy to Ms. Hymes after April of 2018?

21   A.   We absolutely talked about the Safe and Welcoming policy.

22   Q.   I understand that.  I'm asking if you shared your insight

23   specifically?

24   A.   I'm sure I did.  I can't recall the exact day or

25   conversation, but we had so many conversations about Safe and

1  Welcoming, about what the stores were still going through with

2  the challenges and how do we bridge these two, where we're

3  creating a safe environment and positive environment for our

4  partners and our customers while also, you know, making sure

5  that we're not having people arrested in the stores.

6  Q.   Okay.   When Mr. Pinto testified that you were frozen in

7  the moment, that was untrue?

8  A.   I'm certainly not suggesting Mr. Paul Pinto is being

9  untruthful, but that conversation never happened with me.   He

10 and I never had that conversation.   He never said to me, "Oh,

11 I think you're frozen or stuck," I think he said.   That was

12 the first time I think I heard that yesterday.

13 Q.   The same person that had supported you up until 2018?

14 A.   Yes.   I think Camille also supported me all the way

15 through until the end.

16 Q.   What do you presuppose Mr. Pinto's motivation was?

17 A.   I actually just think his memory is not 100 percent.

18      He spoke about a meeting that was in the basement at

19 Rittenhouse that didn't happen at that location.   It happened

20 in a hotel lobby.

21      I think maybe he's not remembering correctly.   I'm not

22 suggesting he's being untruthful.   I just am not sure that

23 he's remembering correctly.   I can tell you he never had that

24 conversation with me.

25 Q.   Let me understand what your testimony is.

 1   A.   Uh-huh.

 2   Q.   You recall having a meeting with Mr. Pinto at the

 3   Ritz-Carlton hotel, is that what you said?

 4   A.   No.  We had multiple meetings, but he had talked about a

 5   meeting that we had and he had said it was in the basement of

 6   the Rittenhouse store, and the meeting that he was referring

 7   to happened actually at Camille's hotel lobby.

 8   Q.   Okay.  So you recall having a meeting in the hotel lobby

 9   but not in the basement of 18th and Spruce?

10   A.   Right, uh-huh.

11   Q.   Ms. Hymes's lobby of her hotel where she was staying?

12   A.   Yes.

13   Q.   When she was in the market?

14   A.   Yes.

15   Q.   Do you remember approximately when that was?

16   A.   Oh, I was referring to the meeting where they told me I

17   was putting Ben on suspension.

18   Q.   Is that the only meeting in which you spoke to Mr. Pinto

19   about your --

20   A.   No.

21   Q.   -- leadership?

22   A.   About my leadership?

23   Q.   Yes.

24   A.   We didn't even talk about my leadership during that

25   meeting.  We just talked about Ben Trinsey.

 1        But no, we did not have any conversation about my

 2   leadership.

 3   Q.   From the time of April 12th of 2018 until the time of

 4   your separation, is it your testimony that Mr. Pinto did not

 5   talk to you at all about your leadership, zero?

 6   A.   He did not talk to me at all about my leadership.  That

 7   is 100 percent my testimony.

 8   Q.   Okay.  And so from the time of April 12th of 2018 up

 9   until the time of your separation, is it also your testimony

10   that he never made the statement to you, Shannon -- or to some

11   extent, what's happening with you?  What's going on?

12   A.   No.  He didn't.  That's not correct.

13   Q.   He also never shared with you that you seemed to be stuck

14   or frozen, never said that as well?

15   A.   No.

16        I would remember if he had, because I would have wanted

17   to understand what that meant.

18   Q.   You wanted to understand what that meant if he had said

19   that to you, is that your testimony?

20   A.   It is.  If he had said that to me in 2018, I would have

21   wanted to understand what that meant.  Stuck or frozen, I'm

22   not sure how I was stuck or frozen.  I was showing up, I was

23   doing everything that was asked.

24        I was trying to lead the market at this crisis time, so

25   if he had said that, I would have wanted to understand what he

*Phillips - Cross*                           380

```
 1   meant.
 2   Q.   I'll ask it differently.
 3        Leaders develop tasks, they don't get asked to do tasks.
 4        If I understand your testimony, you said that you were in
 5   the store every day.  Yes?
 6   A.   Not just that store but in Philadelphia.
 7   Q.   In stores?
 8   A.   Uh-huh.
 9   Q.   Yes?
10   A.   Yes.
11   Q.   And that you were actually doing what was being asked of
12   you.  Yes?
13   A.   Yes.  To some extent, yes.
14   Q.   When the leaders from Seattle came into the market, what
15   ideas did you provide any leader that came into the market
16   from Seattle as to what you needed to do?
17        MS. MATTIACCI:  Objection, Your Honor, asked and
18   answered.  Didn't we go through this?
19        THE COURT:  I'll allow it.  Overruled.
20        THE WITNESS:  You're suggesting that --
21   BY MR. HARRIS:
22   Q.   I'm asking you a question, Ms. Phillips.  Can you answer
23   my question?
24   A.   You're suggesting that I was even at these meetings.  I
25   wasn't even invited to these meetings with Kevin Johnson or
```

Phillips - Cross                                381

1    Rossann or Roz Brewer.  I don't think I ever even met Kevin.

2    I might have met Kevin at Howard's roundtable.  I don't think

3    I ever spoke to Roz Brewer.  I was not -- that was above my

4    pay grade.

5         My boss was in town, so if someone was meeting with these

6    high-ups and having meetings, it wasn't me.  It would have

7    been Camille or maybe Zeta.

8    Q.   So Ms. Phillips, as I understand your testimony, are you

9    telling the jury that you never met with Rossann Williams when

10   she came to the market?

11   A.   No, no.  I met with Rossann.  I had lunch actually in a

12   group with Rossann at one point.  But it wasn't a meeting.  We

13   had lunch after Howard's open forum.

14   Q.   So it was just a chat.  You weren't talking about what

15   was happening during a crisis?

16   A.   What I remember from the lunch was her saying, Howard

17   said this is the worst thing that's ever happened at

18   Starbucks.

19   Q.   Yes.

20   A.   And I knew that it probably was, that that was right.

21   Q.   So Howard Schultz, the founder of the organization,

22   says -- says to Rossann and says to the group that this is the

23   worst thing that ever happened to the organization?

24   A.   Yes.

25   Q.   What did you say in that meeting?  It was in your market.

*Phillips - Cross*                                    382

 1   A.   I'm not sure how I responded in the moment.  I thought,

 2   this is a horrible situation and obviously even worse than

 3   anything that's ever happened, which was very disappointing

 4   that it happened in my market.  And also I felt like it could

 5   have happened in any city, it just happened to happen in

 6   Philadelphia.

 7   Q.   Absolutely.  It could have happened in any city but it

 8   happened in your market?

 9   A.   Uh-huh.

10   Q.   Yes?

11   A.   Yes.

12   Q.   So when they were meeting, when the brass came from

13   Seattle, you participated in those meetings, Rossann

14   Williams -- I mean, Rosalind Brewer?

15   A.   I don't think I participated in any meeting with Roz

16   Brewer.

17        With Rossann, I --

18   Q.   Who was at the lunch?

19   A.   It would have been me, Camille, Rossann, I think maybe

20   Zeta was there at that point.  It might have been Paul Pinto.

21   It was a round table.  I can't recall everyone.

22   Q.   So all of them would have had a vantage point in terms of

23   the perspective that you provided in that lunch.  Correct?

24   A.   Whoever was -- if they remember.  I mean, I don't

25   remember it well.  So that was the one thing I remember about

*Phillips - Cross*                                    383

 1   it was Rossann's comment.  And I had not -- I had had very

 2   little interaction with Rossann, ever, so when she made that

 3   statement, it obviously, you know, meant something to me.

 4   Q.   So what did you say?

 5   A.   I'm sure I probably said, I feel terrible that this

 6   happened and you have my word we'll move forward.  That's

 7   probably what I would have said.  I can't say for sure that's

 8   what I said but that's what I would have said.

 9   Q.   Ms. Phillips, you're under oath.

10   A.   Yes.

11   Q.   Is it your testimony that you said a word in that

12   meeting?

13   A.   Lunch?  Yes, absolutely, I would have been talking at

14   lunch, yes.

15   Q.   Saying something strategic, Ms. Phillips.

16   A.   It wasn't a strategic meeting.  It was lunch.

17   Q.   May I ask the question?

18   A.   Sure.

19   Q.   Rossann Williams, the head of North American retail is in

20   your market that says that Howard Schultz has remarked that

21   this particular incident is the worst in his company's

22   history.  Do you remember that?

23   A.   I do.  I just told you that.

24   Q.   And your response is you said something strategic in that

25   meeting?

1  A.   I'm telling you, I don't recall exactly what my response

2  was.  So what I think I would have said, I can tell you, but I

3  don't want to tell you the wrong thing.

4  Q.   You have no independent recollection that you said a word

5  in that meeting that was strategic.  Correct?

6  A.   It was not really a meeting.  It was lunch.  So we were

7  talking about lots of different things, hey, it's really

8  exciting we just got approved for a local P&AP person.  That's

9  wonderful news.  It was a lot of -- it was just conversation

10  over lunch.

11  Q.   So Rossann Williams says it's the worst incident ever in

12  the company's history and you're talking about something

13  dealing with a new hire?

14  A.   It had just been approved that we were going to have a

15  local P&AP person for Philadelphia.  It was a very big deal.

16  I don't think you understand how difficult the situation was,

17  so that was a big deal that he had approved this position.

18  And we were excited about it.

19  Q.   Okay.  So that came up in the meeting?

20  A.   I believe so, yes.

21  Q.   Okay.  You mentioned something about this new hire in

22  that meeting?

23  A.   I'm not sure how it came up, but it -- it came up that

24  Philadelphia was going to be approved for a local person,

25  yeah.  Yep.  It may have been me that said it, it may have

*Phillips - Cross*                                          385

1  been someone else who said, oh, what do you think about the

2  fact that Howard just approved this new position.

3  Q.   So Mr. Pinto or Ms. Hymes said in that meeting, which

4  you're calling a lunch --

5  A.   It was a lunch.  It was at the same hotel where the open

6  forum with Howard took place after.

7  Q.   You're saying if someone testified that you did not say

8  anything strategic, they would be inaccurate?

9  A.   It was lunch.  I don't know that we were talking

10  strategic plans to move forward.  It was lunch.

11  Q.   Did you have 150 -- approximately 100- to $150 million

12  profit and loss responsibility?

13  A.   I did.

14  Q.   And how many stores were you responsible for?

15  A.   About 100.

16  Q.   And how many district managers were you responsible for?

17  A.   It changed over time, but it was anywhere between 8 to

18  12.

19  Q.   And how many store managers were you responsible for?

20  A.   About 100 to -- 80 to 120 at any given time.

21  Q.   All of the areas that you just identified that you were

22  responsible for, you cannot think of one strategic thing that

23  you said to the head of retail when she was in the market, not

24  one?

25           MS. MATTIACCI:  Objection, Your Honor, asked and

 1   answered, like many times.

 2           THE COURT:  Overruled.

 3           THE WITNESS:  You're asking me to recall

 4   conversations that happened more than five years ago and I'm

 5   sorry --

 6           (Court reporter clarification.)

 7           THE WITNESS:  Certain things are etched in my brain,

 8   like the screaming, fire the manager, fire the manager.

 9   That's etched in my brain.

10           Camille saying to me, the situation is not

11   recoverable.  That's etched in my brain.

12           Every conversation with every senior leader that came

13   in, there were a million people that came into Philadelphia

14   between this time frame, so I can't tell you every

15   conversation with every person or every idea that was shared

16   or plan that was made.  That -- I would not -- I just -- I

17   wouldn't be able to recall all that.

18   BY MR. HARRIS:

19   Q.   I'm glad you brought up the fact that there were threats

20   made on the store manager.

21        You testified that there were threats made on Holly

22   Hylton's life.  Yes?

23   A.   That's correct.

24   Q.   You said there were threats made on Paul Sykes.  Yes?

25   A.   I know that he was getting phone calls.  I don't recall

```
 1  if he was getting threats.  But we definitely changed his
 2  phone because he was getting phone calls with -- I don't know
 3  if they were death threats, but threats.
 4  Q.   But threats nonetheless?
 5  A.   Yes.
 6  Q.   Because you were concerned about their safety --
 7  A.   Yes.
 8  Q.   -- and I think you testified on direct examination that
 9  Paul Sykes's card was in the store.  Yes?
10  A.   Yes.
11  Q.   At 18th and Spruce?
12  A.   The store manager and the district manager had their
13  business cards on the condiment carts.
14  Q.   Understood.  But no one threatened you.  Correct?
15  A.   Did anyone threat -- I mean, I was said horrible things
16  to during a protest, but no, my business card was not on the
17  counter so I didn't receive any phone calls of threats.
18  Q.   It wasn't public knowledge as to who you were,
19  Ms. Phillips, was it?
20  A.   That's correct.
21       MR. HARRIS:  All right.  I have no further questions.
22  Thank you.
23       THE COURT:  Do you have any redirect?
24       MS. MATTIACCI:  No, Your Honor.
25       THE COURT:  All right.  You may step down.
```

 1                (Witness excused at 2:46 p.m.)

 2                THE COURT:  Call your next witness.

 3                MS. MATTIACCI:  The plaintiff calls Camille Hymes as

 4  of cross.

 5                THE WITNESS:  Do you want me to stand?

 6                THE DEPUTY CLERK:  Yes, please.

 7                Could you please raise your right hand?

 8                (**CAMILLE HYMES**, PLAINTIFF'S WITNESS, having been duly

 9  sworn, testified as follows:)

10                THE DEPUTY CLERK:  Now, can you please state and

11  spell your name?

12                THE WITNESS:  Camille Hymes, C-A-M-I-L-L-E, last name

13  H-Y-M-E-S.

14                THE DEPUTY CLERK:  Thank you.  Be seated.

15                MS. MATTIACCI:  May I proceed, Your Honor?

16                THE COURT:  Yes.

17                          DIRECT EXAMINATION

18  BY MS. MATTIACCI:

19  Q.   Good afternoon, Ms. Hymes.

20  A.   Good afternoon.

21  Q.   I just want to first direct to your attention to the time

22  frame of April and May of 2018.

23       In that time, your position was regional vice president.

24  Correct?

25  A.   Correct.

 1   Q.   And you were the boss -- direct boss of Shannon Phillips.

 2   Correct?

 3   A.   Correct.

 4   Q.   You reported up to Zeta Smith.  Correct?

 5   A.   I did.

 6   Q.   And she was the divisional senior vice president at the

 7   time?

 8   A.   Yes.

 9   Q.   She reported to Rossann Williams.  Correct?

10   A.   Yes.

11   Q.   Who reported up to Rosalind Brewer.  Right?

12   A.   Correct.

13   Q.   Who reported directly into Kevin Johnson, the CEO.

14   Correct?

15   A.   Yes.

16           THE COURT:  Wait a minute.

17           Ms. Hymes, I need you to speak into the mic.

18           THE WITNESS:  Sure.

19           THE COURT:  Okay.  If you could move up?

20           THE WITNESS:  I'll lean forward.

21           (Court reporter clarification.)

22   BY MS. MATTIACCI:

23   Q.   The position as vice president of retail operations, you

24   held that position for seven years; is that correct?

25   A.   That is correct.

*Hynes - Direct*                                        390

1   Q.   And the business unit that you ran was worth a billion

2   dollars.  Correct?

3   A.   At that time, just about that, yes.

4   Q.   And about two-and-a-half years after Ms. Phillips was

5   fired, you were still working at Starbucks.  Correct?

6   A.   That is correct.

7   Q.   And you were promoted by Starbucks up to corporate vice

8   president.  Correct?

9   A.   That is correct.

10  Q.   You held the position of corporate vice president for

11  two-and-a-half years.  Correct?

12  A.   Yes.

13  Q.   And you just recently have left Starbucks.  Right?

14  A.   Yes.

15  Q.   You're currently at Smoothie King.  Correct?

16  A.   Correct.

17  Q.   And your position is chief operating officer?

18  A.   Correct.

19  Q.   So you report directly into the CEO at Smoothie King?

20  A.   Yes.

21  Q.   You just started that position this week.  Correct?

22  A.   Monday.

23  Q.   Monday.

24       In terms of Ms. Phillips back in the time frame of this

25  case in 2018, you had been supervising her for about four

*Hymes - Direct*                                    *391*

1   years.  Correct?

2   A.   Correct.

3   Q.   You'd agree with me that up until 2018, so from 2014 to

4   2018, when you were directly supervising her, that you

5   considered her a strong performer.  Correct?

6   A.   I did.

7   Q.   And her key performance indicators and her metrics were

8   very good.  Correct?

9   A.   Yes, they were.

10  Q.   Her customer connection scores were good as well.

11  Correct?

12  A.   That is correct.

13  Q.   Her sales, they increased year after year.  Correct?

14  A.   Yes.

15  Q.   Her employee metrics, her employee partner metrics in

16  terms of stability, they were strong.  Correct?

17  A.   They were consistent with the Mid-Atlantic region, yes.

18  Q.   You believe that she was a partner who deeply understood

19  the culture.  Correct?

20  A.   Yes.

21  Q.   And she was deeply immersed in connecting with partners

22  in those four years.  Correct?

23  A.   That was my perception.

24  Q.   And she was a developer of talent.

25       You'd agree with me?

*Hynes - Direct*                                    392

```
 1  A.   I would say, yes, a developer of talent, yes.

 2  Q.   And prior to the incidence on April 12, 2018, you never

 3  considered terminating Ms. Phillips.  Correct?

 4  A.   That is correct.

 5  Q.   You considered Ms. Phillips one of your stronger regional

 6  directors that reported in to you?

 7  A.   I considered Shannon a strong partner, yes.

 8  Q.   And prior to April of 2018, you never placed Ms. Phillips

 9  on any sort of performance improvement plan.  Correct?

10  A.   That is correct.

11  Q.   Or otherwise warned her that her performance was

12  materially deficient.  Correct?

13  A.   Correct.

14  Q.   Now, Starbucks identifies you as the person who made the

15  decision to terminate Ms. Phillips.

16       Is that true?

17            MR. HARRIS:  Objection, Your Honor.

18            THE COURT:  If she knows.

19            MS. MATTIACCI:  Do you know?

20            THE COURT:  Overruled.

21            THE WITNESS:  There was a group of leaders, including

22  myself.  I'm ultimately responsible for the separation of

23  Shannon Phillips, yes, but that was not me unilaterally.  That

24  was over several conversations with our partner resource

25  organization as well as our legal counsel.
```

1  BY MS. MATTIACCI:

2  Q.   Can you give me the names of the folks that collaborated

3  in the decision to terminate Ms. Phillips?

4  A.   You have indicated Zeta Smith as one, Rossann Williams,

5  Jen Frish, Paul Pinto, Nathalie Cioffi.  Those that you've

6  indicated on that board.

7  Q.   And you also consulted with legal, in-house counsel?

8  A.   I would say that Nathalie Cioffi was a direct conduit

9  there, yes.

10      Let's see if there was any -- Robyn Ruderman.  Robyn

11  Ruderman was the counsel.

12  Q.   At the time that Ms. Phillips was terminated, you were

13  aware that there were laws in place that prohibited

14  discrimination.  Correct?

15  A.   Correct.

16  Q.   And particularly discrimination in the workplace?

17  A.   Absolutely.

18  Q.   Now, is it true that the reason that you gave for the

19  termination was because that Ms. Phillips engaged in

20  misconduct?

21  A.   I would say that is correct.  I could further add context

22  to that question, if you allow.

23  Q.   Yes.  We're going to get to that in a minute.

24  A.   Okay.

25  Q.   But the Starbucks's stated reason is that she engaged in

*Hynes - Direct*                                        *394*

1  misconduct?

2  A.   That is correct, and a lack of leadership, a lack of

3  accountability and ownership for the situation, yes.

4  Behavioral-based alone.

5  Q.   Behavioral based?

6  A.   Behavioral based.  The decision was based on the

7  behaviors that were being observed at the time.

8  Q.   She wasn't terminated, then, in connection with the

9  events that occurred on April 12th when 911 was called and the

10 two gentlemen were arrested.  Correct?

11 A.   She was not arrested (sic) based on the incident itself.

12 She was terminated based on her leadership and the

13 incapabilities that pursued post the event.

14 Q.   Let's take a look -- I'm going to show you a document.

15 It's going to appear on the screen right there for you.

16      This is a court document called Plaintiff's -- The Answer

17 to Plaintiff's -- I'm sorry, one second.

18      I'm going to choose another document.

19      121, I'm sorry.  I think that's what I said, but I put up

20 the wrong one.

21      So 121, this is Starbucks Corporation's Answer -- why

22 does it keep doing that -- Answers and Objections to

23 Plaintiff's First Set of Interrogatories.

24      Do you see that?

25 A.   I do.

```
 1  Q.   Okay.  And these are just questions that are asked in the

 2  beginning of the case to the defendant to state in writing

 3  what their explanation is for the termination.

 4       Do you understand that?

 5  A.   I do.

 6  Q.   And if we look --

 7            MR. HARRIS:  Your Honor, may I object?

 8            I don't know if a foundation has been laid that

 9  Ms. Hymes would have ever seen that document.

10            MS. MATTIACCI:  I'm going to get there on this

11  question.

12            THE COURT:  Overruled.

13  BY MS. MATTIACCI:

14  Q.   If we go to the last page of this document, there's a

15  verification there with your name and signature.

16       Do you see that?

17  A.   I do.

18  Q.   And you had certified that the answers to these

19  interrogatories are -- it's a bigger word for questions --

20  were prepared with the assistance of counsel and upon whom you

21  relied, and the answers set forth are true and correct to the

22  best of your knowledge and belief.  Correct?

23  A.   Yes.  I haven't seen this document since 2020.  It's

24  three years later, so I would assume with my signature, that

25  is correct.
```

 1  Q.   Okay.  We asked Starbucks to state with specificity each

 2  and every legitimate, nondiscriminatory reason as to why

 3  plaintiff was terminated on or about May 9, 2018.

 4       And the answer given was:  Ms. Phillips was the Regional

 5  Director for the Philadelphia market where Starbucks faced a

 6  crisis following the widely-publicized April 12, 2018 arrest

 7  of two black males in a Philadelphia Starbucks store.  As the

 8  Regional Director responsible for supporting the store where

 9  the arrests occurred, Ms. Phillips was expected to step up,

10  support the partners in the market, and lead the market

11  through the crisis.  Ms. Phillips failed to do so, and her

12  actions in the weeks after the arrests demonstrated she lacked

13  the leadership skills and ability to guide the market and its

14  partners through the crisis and toward recovery.  Accordingly,

15  Starbucks terminated Ms. Phillips's employment.  Beyond that,

16  Starbucks objects to this Interrogatory because it calls for a

17  narrative response more appropriate for deposition testimony.

18       Do you agree with this answer?

19  A.   I do.

20  Q.   Let's take a look at 54.

21  A.   I'm sorry, 54?

22  Q.   Yeah.  I'm going to put it up on the screen for you.

23       So the arrests occurred on April 12, 2018.

24       So this is five days after the arrests, on April 17th,

25  you send an email to Ms. Phillips and others saying:  I'm so

 1  proud to be your partner.  I know how much you've poured your

 2  heart into this community and our partners.  And I have no

 3  doubt that Howard will feel inspired by his connections with

 4  you and your teams.  Your amazing leadership and kindness will

 5  shine through during this very difficult time.

 6       I appreciate all that you do.

 7       Do you recall sending that email?

 8  A.   Absolutely.  It was an encouraging email.  I could sense

 9  that there was anxiety.  I was foreshadowing what was

10  possible, as you read in the last sentence there, that her

11  leadership will shine through.  It was an encouraging note.

12  It was a note of encouragement.

13  Q.   And you, at that point, didn't have any plans to

14  terminate Ms. Phillips.  Right?

15  A.   No.  This was -- no, I did not.

16  Q.   And she didn't do anything up until that point to justify

17  a termination.  Correct?

18  A.   That is correct.

19  Q.   If we look at Exhibit 43 which I'll put up on the screen

20  for you, this is an email from Saturday, April 14th, which you

21  are sending to Mr. Eckerson (sic).  Correct?

22  A.   To Mr. Eckerson?

23       There's a lot of names on here.  I sent it to John and

24  Nancy -- I'm sorry, where is Mr. --

25  Q.   Oh, I was looking at the very top, I think the last

 1  forward, it looks like you forward it once --

 2  A.   Oh, that's Frances Ericson.   Yes.   There's to Frances

 3  Ericson.   That's a female.

 4  Q.   Okay.   And that she's in HR?

 5  A.   She was -- no.   She was covering for Zeta Smith, who was

 6  on vacation.

 7  Q.   Okay.   So she was covering as your direct supervisor at

 8  this time?

 9  A.   Correct.

10  Q.   And you're sending this to her on Saturday, April 14th,

11  which is two days after the events.

12  A.   Correct.

13  Q.   The email that you're forwarding to her is actually

14  something that was created back in October of 2017, and the

15  subject of the bottom email says:   Safe and Welcoming signage.

16       Do you see that?

17  A.   Yes, I do.

18  Q.   This was the signage that was created back or implemented

19  back in October of 2017.   Correct?

20  A.   This signage was specifically for a market in California.

21  So the signage at the top, the seating is reserved for

22  Starbucks customers, was designed for a test market in San

23  Francisco.   And subsequently used in Philadelphia.

24  Q.   Okay.   And this was the signage in effect at the time of

25  April 12, 2018?

 1   A.   In certain markets in Philadelphia or certain stores in

 2   Philadelphia, correct.

 3   Q.   Okay.  And that would include the store where the arrests

 4   took place?

 5   A.   Correct.

 6        So if you go back to the other page, it shows that this

 7   is for select test stores in California.

 8   Q.   Okay.

 9   A.   Both of those.  So that clearly demarcs (sic).  And same

10   thing for the third one as well.

11   Q.   If we look down at the email from Ronda Knight from P&AP

12   back in October of 2017, she writes an email which you're

13   copied on that says:  Hi, I want to share the below

14   information to help locate and point out shelters, churches

15   and police stations which may be of some assistance to

16   connect, since we continue to have safety and security

17   incidents in our locations in downtown Philadelphia.

18        Here are maps which show our store locations and shelters

19   and churches as well as police stations in a mile radius.

20   Store numbers are listed on the map -- on map by green dots.

21        Just an idea for you as well.  In another region there

22   was a store which was having issues with noncustomers and they

23   were able to connect with a local shelter and provide coffee

24   service which a volunteer came and picked up in the early

25   morning and the shelter served the coffee and we had a

Hynes - Direct                                    400

1   decrease in traffic of noncustomers as well as it helped with

2   community relationship-building.

3        Also, I have listed addresses and phone numbers under the

4   maps if you want to reach out.  Hope this is a tool you can

5   utilize.

6        So this information in regards to the Safe and Welcoming

7   policy was being sent back in October by Ronda Knight.

8   Correct?

9   A.   Correct.

10  Q.   And Mr. Trinsey provided in response to a request the

11  addresses of the methadone clinics that are very close to the

12  stores, which were -- ended up being included in the map as

13  well.  Correct?

14  A.   Correct.

15  Q.   Starbucks had some programs for outreach to the homeless

16  population.  Correct?

17  A.   Correct.

18  Q.   That included one we just saw as an example is providing

19  coffee in the morning?

20  A.   Yes.  Not exactly sure the correlation between the two

21  black men arrested and the methadone clinics and the homeless

22  shelters.  So maybe you can help me understand the question or

23  context behind your questioning with the methadone clinics and

24  the two men arrested at 18th and Spruce.

25  Q.   Ma'am, I wasn't even asking about that.  I was -- I'm

1  just asking you about the homeless population right now and

2  the outreach that was done.

3  A.   Okay.  I'm just -- okay.  Thank you.

4  Q.   There's another program that Starbucks had a lot of

5  action with which was YouthBuild.  Correct?

6  A.   Correct.

7  Q.   And you're aware that there was a former homeless person

8  named Carmen Williams that Ms. Phillips mentored.  Correct?

9  A.   Correct.

10 Q.   And as part of the YouthBuild program, Ms. Williams was

11 able to get a job at Starbucks.  Correct?

12 A.   Yes.

13 Q.   And that was something that was even featured in articles

14 and in commercials for Starbucks, was the relationship between

15 Ms. Phillips and Ms. Carmen Williams and her rise through

16 YouthBuild to Starbucks.  Correct?

17 A.   Absolutely.

18 Q.   And isn't it true that one of the things that

19 Ms. Phillips had suggested was to reach out to Carmen to help

20 figure out best ways to accommodate the homeless population by

21 keeping them safe but also keeping customers safe at the same

22 time because she thought she would have a unique perspective

23 as once being homeless and now being a partner at Starbucks?

24 A.   Yes.

25 Q.   Let's take a look at 136.

*Hymes - Direct*                                      *402*

1        136 is an email from -- I'm going to present that to you.

2        Thursday, April 19th from Ms. Phillips to you and it's

3   called the Philadelphia Protest Response Team.

4        Do you see that?

5   A.   I do.

6   Q.   And in this email, she is advising that:  As we navigate

7   the unpredictable terrain in healing the Philadelphia market

8   with an unfortunate incident, we have created the Philadelphia

9   Protest Response Team.

10       This is something that you wanted her to do.  Right?

11  A.   Correct.

12  Q.   And these are some folks that were in her region that she

13  identified as potential people that would be good in this

14  role.  Correct?

15  A.   Yes.

16  Q.   And so as of the 19th of April, Ms. Phillips had not done

17  anything that, in your mind you were thinking, I got to

18  terminate this person.  Right?

19  A.   Correct.

20  Q.   You'd agree with me that Shannon Phillips was

21  instrumental in helping prepare for protests that were

22  occurring in the stores.  Correct?

23  A.   Correct.  I would say, to add more context, there were --

24  it was a very tumultuous time, and there were moments in which

25  Shannon was present and organizing the response team, and then

 1  there were other moments where she was not present and did not

 2  play an integral role in managing through some of the very

 3  critical aspects of supporting the Philadelphia market.

 4  Q.   Okay.  We're going to -- we'll get more specific on that

 5  maybe.

 6  A.   Okay.

 7  Q.   That first week on that Sunday, the arrests take place on

 8  the 12th, and you recall that Sunday there was a large protest

 9  at the 18th and Spruce store?

10  A.   Yes.

11  Q.   Do you recall that you were at that protest inside the

12  store, trying to speak to the protestors.  Correct?

13  A.   There were many protests throughout the weeks, and I was

14  most likely there, yes.

15  Q.   Do you recall one of the protests that you were at on

16  that Sunday where there -- you were inside the store, there

17  were a lot of news cameras there, there was Channel 6 was

18  there and the store was very filled and there was a man with a

19  bullhorn that was screaming right on top of you, fire the

20  manager, fire the manager, we can talk about policy later,

21  fire the manager?

22  A.   I do remember that incident.  I remember actually hugging

23  him, because he was in such distress.  I mean, this -- the

24  Philadelphia situation was actually a lightning rod.  I

25  recognized that he was looking for media attention, and there

1  was also a desire for healing.

2      I literally wrapped my arms around the protester so that

3  he could understand that we were hearing him.  But in no way,

4  shape or form was I to take direction from someone pointing a

5  bullhorn at me, for clarification.

6  Q.   Okay.  He -- you know, there is video of that whole

7  situation.  He didn't seem too responsive to your trying to

8  explain that there was a policy in place and the manager, you

9  know, had followed the policy?

10 A.   When the cameras are off and you're having a conversation

11 with another human being who is expressing distress and

12 concern, you can -- many things can happen.  Some things that

13 you see on the media are just the sound bites.  But that is

14 just a snapshot of what happened throughout the entire

15 protest.

16     The media would like for you to believe that it's one

17 pitted against another.  But when you sit down and have

18 conversations with people, things can change.

19     So the direction to what you're asking is someone with a

20 bullhorn asking for someone to be fired, that is not the

21 direction that we take at Starbucks in terms of pacifying

22 protestors.  We don't take guidance from protesters on how to

23 manage our partners.

24 Q.   Okay.  But as of the time of that protest, Ms. Hylton was

25 still employed at Starbucks?

Hymes - Direct                                           405

1   A.   That is correct.

2   Q.   And she was fired within two days after that.  Correct?

3   A.   I don't know the timeline.

4   Q.   Okay.

5   A.   I do not know the timeline.  I do know that we did a

6   thorough and complete investigation.  And after learning that

7   what she reported was inaccurate and also learning that there

8   were -- there was a history of racism that she put in her

9   social media, we determined the best course of action for her

10  was to separate from the company.

11  Q.   So there was an investigation into Holly Hylton that

12  involved pulling social media posts that she did?

13  A.   Yes.

14  Q.   And Starbucks pulled this together and concluded she

15  was --

16  A.   There was a full investigation -- I'm sure there was a

17  full investigation of everyone, trying to understand the

18  circumstances behind why two gentlemen who were sitting in a

19  Starbucks store were pointed out, over all the other people

20  who were sitting in a Starbucks store, to be arrested.

21       She, as the manager, would be under investigation, yes.

22  Q.   Okay.  My only question is, do you know why we have not

23  been given any documentation concerning any investigation done

24  into Ms. Hylton that in any way references social media posts

25  and things of that nature?

*Hynes - Direct*                                    *406*

```
 1  A.   I could not speak on behalf of the attorneys.  Shannon
 2  Phillips was aware that we discovered the situation with the
 3  history on Holly.  She had individual conversations with
 4  Nathalie Cioffi about her social media posts regarding African
 5  Americans.  That is not anything that I would understand if
 6  you were to know or not know the circumstances behind her
 7  separation.
 8  Q.   Ma'am, I'm just saying, we've been in litigation for five
 9  years, and there's thousands of documents over there.
10       I've never seen a document that shows any sort of social
11  media posts of Ms. Hylton and I'm just wondering if you have
12  any knowledge of why that was not given to us at any point?
13  A.   I do not.
14  Q.   Okay.  So let's talk about how at one point you had
15  recommended Ms. Phillips for a community leadership role.
16       Do you recall that?
17  A.   I do.
18  Q.   And that community leadership role ended up being pulled
19  on May 2nd.  Correct?
20  A.   Correct.
21  Q.   But up until May 2nd, you had supported her for that
22  role.  Correct?
23  A.   We were looking for alternatives based on the
24  conversations Shannon Phillips and I had about the
25  circumstances behind this event and her ability to lead in the
```

1   future for the area 71.

2        She and I spoke very frequently in terms of how she was

3   showing up in the market and the trust that was broken in the

4   market, the feedback that was given by the partners.  And so

5   we were exploring alternatives for her based on the

6   in-the-moment investigation that was happening in terms of her

7   leadership.

8        So, yes, we were exploring potential exit strategies for

9   Shannon prior to the actual offer for separation/termination.

10  Q.   Okay.  So you'd agree with me -- my question was very

11  simple.

12       Did you support her for this position up until May 2nd,

13  when it was pulled?

14  A.   I don't know the timeline of when I had the

15  conversations, so under testimony, I want to be very careful.

16       What I will say is between the time of our conversation,

17  Shannon and I had the conversations around what would be best

18  for her and the partners that she was leading who felt as

19  though there was a failure and a lack of accountability.

20       We then determined that this was not the proper approach,

21  and so between -- I don't know the timeline, because this is

22  five years ago, so you'll have to forgive me if I don't know

23  the date specifically.

24  Q.   Okay.  But you just agreed with me that the position was

25  pulled on May 2nd.  Correct?

 1  A.   I couldn't tell you the date.  If that's --

 2  Q.   I thought you just said yes.

 3  A.   I don't -- what I answered to was the fact that I did

 4  support Shannon, and then I didn't.

 5  Q.   Okay.  We can agree on that?

 6  A.   So I don't know the dates.

 7  Q.   Okay.  We can agree on that.

 8       In this time frame, you were supporting her, though.

 9  Sometime between the 19th and when she was separated from

10  employment, you did support her for that position?

11  A.   We were exploring that as an option.

12  Q.   Okay.

13       Let's look at 30.

14       This is an email from April 20th that you send out to

15  your team.  It doesn't have all of the tos, but one of the

16  people it goes to is Shannon Phillips.

17       And you say:  Team, Please vet prospectives prior to

18  sending me your recommendations.  We're on the clock for this

19  one.

20       And this is talking about the community leadership

21  position --

22  A.   Uh-huh.

23  Q.   -- that you had recommended Shannon for.

24       You say:  As a filter, this opportunity is for someone

25  with high emotional intelligence, existing Philadelphia

*Hymes - Direct*                                                    409

 1   community connections, interpersonal savvy, executive presence

 2   and strong project management and communication skills.

 3        Do you see that?

 4   A.   I do.

 5   Q.   And so then Ms. Phillips says:  I would suggest Michael

 6   Scott for this.  I don't have anyone on my DM team that I

 7   think would be able to step into this position.

 8        Do you see that?

 9   A.   (Nodding head.)

10   Q.   But then later on, you recommend to Shannon Boldizsar

11   that you think that Shannon would be good for this position.

12   Correct?

13   A.   That is correct.

14   Q.   Because you thought that she had high emotional

15   intelligence.  Correct?

16   A.   I was actually looking to help her with an exit strategy

17   out.  That was the original note.

18        I came to learn, based on a crisis situation, that there

19   were challenges in leadership presence.  There were challenges

20   in the emotional intelligence space with Shannon Phillips.

21   Q.   Okay.  You wanted her out.

22        And as of April 20th, though, you didn't want her out.

23   Right?  Or had you determined at this point when you sent this

24   email?

25   A.   Shannon and I were having conversations because of the

1  way she was showing up in the market, so it wasn't I wanted

2  her out.  In fact, the conversation evolved when Shannon said:

3  I'm not built for this.  I can't do this.  This is too

4  complicated for me.

5       And so based on those conversations, very shortly after

6  the incident, we started to talk about how to explore options.

7  Q.   So you're saying very shortly after the incident, so it

8  would be before this email or after this email that you're

9  saying you wanted to start exiting her out?

10 A.   We were on a -- I appreciate all of your questions.

11      We were on a very rigorous timeline.  I couldn't tell you

12 in certainty five years later at what moment on what day did

13 we transition from trying to cope through the situation to

14 exploring options for Shannon's exit.

15 Q.   Do you have any documents that could tell us when that

16 day was, whether it be an email, a text message, a note,

17 anything that documents these alleged performance issues?

18 A.   There were conversations almost daily on the concerns in

19 terms of Shannon showing up for specific events.

20      I can tell you the very specific day.  I don't know what

21 day it is, but it was the day in which we had a broadcast with

22 partners, and Shannon was to -- to lead the conversation with

23 our partners.  I think it was at the 34th Street store.  And

24 she showed up late.  She remained in the corner.  Other

25 leaders had asked if they could assist to initiate the

Hymes - Direct                    411

1   conversation because Shannon was not literally present, even

2   though physically, not mentally in the room with our partners

3   during that time.

4        Right after that, I pulled Shannon aside and I asked,

5   because this had been going on for several days, almost weeks:

6   Are you okay?  Is there something that I can do to support

7   you?  This isn't going well.

8        Day after day, whether it was a conference call that she

9   missed or the fact that she wasn't owning what was happening

10  in the market or understanding the gravity of what was

11  happening, it got to a point where we had to have a

12  conversation like:  Is this right for you?

13  Q.   When did that happen, Ms. Hymes?  I'm trying to

14  understand.

15  A.   Whatever date we had the broadcast event.  I don't

16  have -- I have never seen that calendar before, so please

17  forgive me.  I am very far away from that, and it's five years

18  ago.

19       But it was the day in which we had a broadcast meeting

20  with our partners at 34th Street.

21  Q.   You prepared for your testimony with your counsel today,

22  correct, Mr. Harris?

23  A.   Correct.

24  Q.   And in that preparation, were there any documents that

25  could give you any indication that there was, even internally

Hymes - Direct                    412

1    documented, that Shannon Phillips must be fired or any

2    indication to her, any email --

3    A.   We had daily -- we had daily -- I do not have

4    documentation.  We were on the clock 24/7, and we were in a

5    crisis.  We had to handle our partners being in distress.  We

6    had conversations around Shannon being concerned that she was

7    going to be terminated.

8         There were daily conversations, seven days a week, almost

9    24 hours a day.  There was no opportunity for progressive

10   discipline or written documentation.  These were boots on the

11   ground.  We're dealing with our partners having bull horns in

12   their faces, and we are prioritizing time, those who actually

13   drove down to support the market in support of our partners.

14        So to answer your question, there was no written

15   documentation, but there were conversations after every

16   incident where there was a lack of attention to what was

17   happening to our partners.

18        The focus was primarily on the image of Shannon, what was

19   going to happen to Shannon, and not what was going on with the

20   partners who were in extreme distress.  That was a lack of

21   ownership and accountability.  There was a victimization

22   mentality that was happening, and it had to be addressed

23   directly, one on one, in person.  That was the conversation.

24   Q.   Can you give me -- I'll ask you a very open-ended

25   question -- any specific example of where Shannon Phillips

Hymes - Direct                    413

```
 1  completely just was a utter failure of a leader to a point
 2  where she must be terminated right now after 15 years,
 3  after -- after 13 years and 12.9 of them where she had
 4  phenomenal performance?  Like, what is the thing that happened
 5  where she had to be terminated?
 6  A.   So the perception was strong leadership.
 7       The results sometimes are misleading.
 8       When we had roundtables with our partners, our partners
 9  sat and had conversations with us about the leadership of
10  Shannon Phillips.  And over and over again, through those
11  roundtables, the same exact conversations around the lack of
12  accountability, the lack of approachability, the lack of
13  follow-through on really important issues came through.
14  Through those roundtables, our partners were speaking up.
15  Q.   Was there any documentation of anything that was said at
16  the roundtables, concluded from the roundtables, anything?
17  A.   I don't have document- -- we don't document what our
18  partners are sharing with us in the moment.
19  Q.   But this -- these alleged statements are going to lead to
20  the termination of a person that's worked at Starbucks for a
21  long time, and there's nothing that's being memorialized about
22  it?
23  A.   That's correct.
24  Q.   And you're talking about the feedback are from people
25  that work in the stores in Philadelphia?  Is that who's giving
```

*Hymes - Direct*                                    *414*

1   you the feedback?

2   A.   Yes.

3   Q.   And so these are hourly employees and baristas?

4   A.   Baristas, yeah.

5   Q.   Baristas?

6   A.   Uh-huh, store managers and assistant managers.

7   Q.   Okay.  And those store managers and assistant managers,

8   they roll up to district manager, correct?

9   A.   Correct.

10  Q.   And in Philadelphia at this time, there were only two

11  district managers.  Correct?

12  A.   Correct.

13  Q.   It was Mr. Sykes and Mr. Trinsey.  Correct?

14  A.   Correct.

15  Q.   So to the extent that there were people below that were

16  hourly and baristas and store managers and assistant store

17  managers, half of them were coming up to Paul Sykes, and half

18  of them were coming up to Mr. Trinsey.  Correct?

19  A.   That is correct.

20  Q.   And so you're not suggesting that all of these things

21  that you're hearing about concerning not being heard or not

22  being listened to were just under Mr. Trinsey's side of the

23  city.  Right?

24  A.   The leader is responsible for the leaders, so when the

25  partners at whatever level are expressing concerns or distress

Hymes - Direct                                          415

1   or sort of a lack of accountability, that's a reflection of

2   multiple levels, including myself.

3        There were times where I had to reflect and recognize

4   that I could have done better to understand what our partners

5   were sharing with me, and I owned it.  I never diverted

6   attention to methadone clinics or restrooms.  I owned what was

7   happening in that market, and I had the same expectation of my

8   leaders.  If my leaders aren't showing up in a manner in which

9   there is ownership and accountability, that will lead to

10  separation.

11  Q.   Okay.  And so that's what led to the separation of

12  Ms. Phillips.  Right?

13       Ms. Hylton was already terminated, and then Mr. Trinsey

14  lost his job too.  Correct?

15  A.   Correct.

16  Q.   But Mr. Sykes didn't get terminated.  Correct?

17  A.   Not at that moment, but eventually, there was a

18  separation for Mr. Sykes as well.

19  Q.   He was not terminated.  Correct?

20  A.   He was not terminated.

21  Q.   He eventually just left on his own?

22  A.   It is -- I'm not clear on that.  I don't know.

23  Q.   Do you think Mr. Sykes was terminated from Starbucks?

24  A.   I'm answering under the oath that I do not know.

25  Q.   Well, we certainly know that you were not terminated.

```
 1  Correct?
 2  A.   That is correct.
 3  Q.   Let's take a look at this email from April 26th.
 4       This is from Jennifer Otepka to Shannon.
 5           THE COURT:  Does it have an exhibit number?
 6           MS. MATTIACCI:  Yes.  I'm sorry, Your Honor.  78.
 7  BY MS. MATTIACCI:
 8  Q.   It says:  Hey Shannon, I hope all is well.  I know this
 9  email, for me personally, is long overdue; but better late
10  than never.  As I transition with new beginnings with a new
11  DM - my reflections over my 11 years and my Starbucks journey
12  has flashed before me and I felt the need to shoot you an
13  email to not only say hey but also to thank you for the impact
14  you have made on me as a manager.
15       Though I am now a manager in the Southeast, your impact
16  as an RD has truly impacted me during my time in the
17  Mid-Atlantic.  As I share my Starbucks journey with partners,
18  and most recently a developing SSV, I always find myself
19  starting off my story with - I am where I am at today because
20  someone believed in me.  And though it may have been
21  overlooked by som, I will always remember that day in
22  Haddonfield - sitting in the conference room in front of Delma
23  Wells and Marie Monzo during my PIAT as an ASM, crying my eyes
24  out because I felt lost as a partner.  You told me, "Jenn, as
25  a partner, you may not know the business side of your role -
```

Hymes - Direct                             417

1   like understanding the P&L or understanding reports, but you

2   do hold characteristics of a great manager that are not

3   teachable -  your drive and willingness to grow and deliver."

4   I recall you even offering to teach me personally if that's

5   what it took.

6        In my time as a manager - I have referenced this exact

7   moment so many times.  When it comes to any kind of

8   development piece, sharing my own personal story or when

9   another partner is also feeling lost.  I am where I am because

10  you believed in me and put your stamp of approval to push me

11  forward.  And I wanted to let you know that I am so grateful

12  for that.  You and Michelle have taught me so much in my time

13  with you, and I always remember that.

14       And then she talks about currently being in her store.

15       Ms. Phillips forwarded you that email on the 27th, Friday

16  the 27th.  And she said to you:  Do you ever notice when you

17  need to hear it most, someone reaches out to tell you they

18  appreciate you?  I hope you aren't reading this until you are

19  back and that you didn't watch the partner open forum today.

20  I didn't either, by the way, I was in 18th and Spruce at the

21  time.  But I talked to TJ after and he said Rossann said

22  during the POF that Camille Hymes is the kind of leader she

23  aspires to be.

24       I want you to know I feel the same and I so appreciate

25  who you are and all of your support.  Thank you for being you.

Hymes - Direct                                418

1      Enjoy this note.  I certainly did.  Jen's been gone from

2  A71 for two years, transferred to North Carolina.  Talk soon,

3  Shannon.

4      Do you recall getting that email?

5  A.   I do.

6  Q.   As of that time, had you already decided that you were

7  going to terminate Ms. Phillips?

8  A.   I don't have a timeline for the exact date where the

9  decision was made.  I cannot answer that under oath, because I

10 don't have the exact day.

11 Q.   Okay.

12 A.   I'm sorry to -- I can't answer that.

13 Q.   You believe that Ms. Phillips did look up to you.

14 Correct?

15 A.   I do.  And I cared very deeply about the experience that

16 Shannon was going through.  She was struggling.  It was

17 difficult.  It was painful.  I think she felt deeply for our

18 partners.  I strongly believed that we were going to do

19 everything possible to make it a success for a turnaround, but

20 I just didn't see evidence of that as we continued to move

21 through the timeline.

22     It was unfortunate, it was heartbreaking to have to

23 deliver and have the conversation with Shannon that it was

24 just not going to work.  Having her to rebuild trust with a

25 team that didn't trust her, to have her go through repairing

Hymes - Direct                                    419

1    the market when there was a lack of ownership and a focus on

2    other things aside from what was happening in front of us.

3    Q.   You said the team didn't trust her?

4    A.   I would say that the trust was broken.

5    Q.   The trust was broken and they didn't trust Shannon

6    anymore?

7    A.   Yes.

8    Q.   All of the partners?

9    A.   I would say that would be an impossible number, like

10   100 percent.  But I would say a majority of partners expressed

11   in one way or another that they had concerns around leadership

12   in market.  That wasn't Shannon specifically.  That could have

13   been Ben.  It could have been Paul.  It was a leadership

14   concern that came through in the roundtables.

15        Partners were crying.  Partners were in distress.  It was

16   a reality that was being faced in the moment.

17   Q.   Okay.  So you're saying they weren't complaining

18   specifically about Shannon, they were complaining about just

19   leadership in general in the market, and that could have been

20   Ben, that could have been Paul, that could have been Shannon.

21        That's what happened?

22   A.   The leader of the market is responsible for leadership.

23   So it starts from the top.

24        So our partners were referring to the leaders in the

25   market.

Hynes - Direct                                    420

```
 1   Q.   Was it the black partners that were upset with how

 2   Shannon was leading?

 3   A.   That is an unusual question.

 4        I'm referring to all of the partners regardless of what

 5   color they were.  Our partners were expressing concern over

 6   how we were leading through the situation.

 7        There were, however, black partners who shared that there

 8   was inequity in terms of pay, I recall.  So if you're pointing

 9   out one specific ethnicity, I would say that that is an

10   indirect way of saying that there are specific groups that had

11   different issues.

12   Q.   Okay.  So there were some black partners that were

13   complaining that they were underpaid versus the white partners

14   or nonblack partners?

15   A.   That is correct.

16   Q.   Were they alleging that Shannon Phillips was responsible

17   for this?

18   A.   There was a lack of closure to investigating the

19   allegations.

20   Q.   And the investigation into allegations, you'd agree with

21   me was done by BEC, right, the business and ethics commission,

22   committee?

23   A.   The responsible parties are the leaders in the market.

24   They own the outcome.  So they need to follow up, and they

25   need to close it out with our partners.
```

*Hymes - Direct*                                    *421*

1   Q.   But they don't do any of the -- if there is a complaint

2   about pay disparity, it's not the actual person who the

3   complaint is about who does the investigation.  Correct?  It

4   would be some other department?

5   A.   Correct.

6   Q.   So to the extent that there was not closure done on those

7   investigations, that would be that other department that

8   didn't finish the investigation if that in fact was the case?

9   A.   Correct.

10  Q.   And there's no conclusion that was ever reached by

11  Starbucks that Shannon Phillips was somehow discriminating

12  against African American employees.  Correct?

13  A.   No.

14  Q.   And there was no conclusion that she in fact was somehow

15  responsible for setting any pay disparity based upon race.

16  Correct?

17  A.   Correct.

18  Q.   And so how could she be held responsible for complaints

19  that are being made about pay disparity and race when she

20  wasn't the one that had any ability to control that?

21  A.   When there are open complaints in your market, our

22  partners are sharing that there are complaints, as a leader

23  you're responsible for closing open complaints in a timely

24  manner.

25       So the responsibility ultimately lies with the leader.

Hymes - Direct                                            422

1    That's why we're still here today five years later talking

2    about accountability.  Accountability begins and ends with the

3    leader.  So whether it is a complaint from a partner or a

4    complaint from a customer, closure is essential.

5         You usually, at the director level, close that through

6    competent leadership at the district manager level or at the

7    store manager level, but there is full accountability at all

8    times when you're running operations, for closing conflict for

9    customers and for partners.

10   Q.   So if hourly employees and customers had complaints, the

11   first line that should close it is the store manager.

12   Correct?

13   A.   That is correct.

14   Q.   Then if it's not, then the district manager.  Correct?

15   A.   Correct.

16   Q.   And if not, then it goes up to the regional director?

17   A.   Correct.

18   Q.   And if not, then up to you.  Correct?

19   A.   Correct.

20   Q.   There were open complaints concerning Paul Sykes at this

21   time, correct, in 2018?

22   A.   I do not know.  I cannot answer that under oath.  Nor of

23   Ben Trinsey.

24   Q.   Okay.  So these were the only two district managers in

25   Philadelphia, so there were no open complaints in Philadelphia

 1   then?

 2   A.   I don't know how to answer that question.  I have not

 3   looked at the complaints.  That was a very long time ago.  I

 4   can't answer that question.  I'm sorry.

 5   Q.   Okay.  Well, you just said that there were open

 6   complaints and that was a problem but you don't think there

 7   were any under Sykes and you don't know of the same for Ben,

 8   so we don't know what those other complaints were?

 9   A.   Well, I do know the one with the African Americans, that

10   was under Ben Trinsey.

11   Q.   There was a complaint under Mr. Trinsey?

12   A.   I believe so.

13   Q.   Of African Americans --

14   A.   For pay.  Correct.

15   Q.   Okay.  We'll get to that.

16          THE COURT:  Perhaps this is a good time for the

17   mid-afternoon recess.

18          MS. MATTIACCI:  Yes, Your Honor.

19          THE COURT:  Let's stand in recess.

20          (Jury out.)

21          (Recess at 3:41 p.m. until 3:54 p.m.)

22          THE COURT:  Bring the jury in.

23          (Jury in.)

24          THE COURT:  Please be seated.

25          You may continue with your questioning.

1          MS. MATTIACCI:  Thank you, Your Honor.

2    BY MS. MATTIACCI:

3    Q.   Before the break, Ms. Hymes, we had some questioning here

4    about methadone clinics and homelessness.  And I want to show

5    you an Exhibit 138 from April 15th of 2018.

6          You see at the top there, that's Paul Sykes, and he's

7    responding to Reggie Borges at the top of that email there.

8          Do you see that?

9    A.   I do.

10   Q.   And Paul Sykes is the -- was the district manager for the

11   store where the arrest took place.  Correct?

12   A.   Correct.

13   Q.   And Reggie Borges is a high-level executive in media

14   relations for Starbucks or was?

15   A.   He was a director in public affairs.

16   Q.   In public affairs.  Thank you.

17         And he was writing an email to you and to Shannon and to

18   Paul, the -- three days after the arrest, saying:  Team,

19   working with Good Morning America and need to verify some

20   facts.

21         Can you confirm this store was robbed at gunpoint

22   recently, if so, and when was that?

23         And the answers are actually Paul Sykes giving the

24   answers to these questions.  Right?

25         So his answer is that store -- The store was robbed on

Hymes - Direct                    425

1   January 4, 2018.  The person never brandished a weapon but

2   gave the illusion that he was concealing one in his pocket.

3        Then Mr. Borges asked:  How often were drug overdoses,

4   homeless issues, thefts at the store and the surrounding

5   stores?  Can you offer a ballpark figure or rate?

6        And Paul Sykes responds:  I've had three overdoses that

7   resulted in death in my district in the last year-and-a-half.

8   In terms of the theft and homeless issue, it was common, so

9   that would be hard to come -- very hard to come up with.

10        I would say that every week there are at least three to

11   five theft issues occurring in any one of my stores and drug

12   use is also common.  We would commonly find needles in the

13   restroom.  The drug use decreased when we implemented Safe and

14   Welcoming training but there was still some instances.

15        And so you'd agree with me that these answers being

16   provided concerning drug overdoses and homeless issues were

17   being provided by Mr. Sykes and by Ms. Hymes -- I mean,

18   Ms. Phillips in response to requests by Starbucks.  Correct?

19        Do you agree with that?

20   A.   Correct.  The question was, was the store robbed at

21   gunpoint.  Yes.

22   Q.   And then Ms. Phillips also responds back to Reggie and

23   provides some additional information about the district --

24   about the region in general, because Mr. Sykes could only

25   speak about one half of the city and Ms. Phillips had some

1   information that would apply also to the other half of the

2   city.  Correct?

3   A.   Correct.

4   Q.   Again, this is in response to information being requested

5   by Starbucks, so they could prepare for an interview on Good

6   Morning America.  Correct?

7   A.   Yes.

8   Q.   Let's look at Exhibit 15.

9        This is an email from Andrea Moudakis to you on April

10  26th, and it's titled Philadelphia Sustainment Plan.

11       She says to you:  Camille, thank you for the connection

12  yesterday afternoon.  I hope that your meeting with the BPN

13  partners went well.

14       And BPN partners is the Black Partners Network.  Correct?

15  A.   Correct.

16  Q.   You'd agree with me that Ms. Phillips was actively

17  involved in the Black Partners Network at Starbucks.  Correct?

18  A.   Correct.

19  Q.   As we discussed, I will focus P&AP support on not

20  creating duplicative work streams.  Rather, we will support

21  Shannon's needs for short and long-term objectives surrounding

22  S&W --

23       Which means Safe and Welcoming.  Correct?

24  A.   Yes.

25  Q.   The policy.  Correct?

 1   A.    Correct.

 2   Q.    -- law enforcement resources, and a sustainable plan that

 3   can be utilized in Baltimore and DC as well.

 4        One of the successes from yesterday was identifying a

 5   Philadelphia organization that looks promising in helping our

 6   partners with non-emergency services and assistance with

 7   public safety issues, homelessness, et cetera.  I'm looking

 8   forward to learning more about this today.

 9        And then there is embedded pictures about possible

10   resources.  Correct?

11   A.    Correct.

12   Q.    And then it says:  Attached is the plan that Ronda and I

13   will be using to consult Shannon with today.  We are also

14   meeting with Nathalie and Michael.  As I mentioned, I will be

15   available in the city through the weekend in the event that a

16   crisis response team is required.  If not necessary, I will

17   continue to work with the local partners on solidifying their

18   plan.

19        And then she attaches the plan, some agenda below on what

20   her travel schedule would be from Wednesday to Sunday, the

21   29th.

22        Do you see that?

23   A.    I do.

24   Q.    So in response to this email, did you ever say to Andrea:

25   Oh, no, no, no.  No, we won't want Shannon for that position.

*Hymes - Direct*                                    *428*

 1  She's an utter and total failure when it comes to leadership,

 2  and we can't have her be doing these things?

 3  A.   I'm sorry, you were asking me if I said that if Shannon

 4  was an utter and total failure?

 5  Q.   Yeah.   I'm asking that in response to Andrea Moudakis

 6  laying out the plan to provide both short-term and long-term

 7  support for Shannon and also having Shannon be integral to

 8  this Philadelphia sustainment plan, did you call her off and

 9  say:  No, she's terrible?

10  A.   This is the point -- the plan is actually for all of our

11  partners.   This is a plan to address the safety concerns for

12  our partners.   The focus wasn't on whether or not Shannon was

13  incapable in that moment when this email was received.   The

14  focus was on using a collective to support our partners in a

15  crisis.

16  Q.   Using our collective?

17  A.   Our collective teams.

18  Q.   Okay.   The focus was on using our collective teams?

19  A.   Or supporting our collective teams:  our baristas, our

20  shift supervisors, our store managers.   That was the focus.

21  So when I received this, that was not my reaction, so the

22  answer is no.

23  Q.   Okay.   Because, in fact, this email indicates that

24  Shannon would be integral in making sure that those that are

25  below her are safe in the stores when they're working.

*Hymes - Direct*                                            *429*

 1  Correct?

 2  A.   This is for all of our partners to react to, so our

 3  district managers for implementation, for our store managers

 4  for implementation, Shannon as the leader, of course, in that

 5  moment, yes.

 6  Q.   Okay.  And so what I'm just saying is did you respond to

 7  Andrea and say:  No need.  Shannon is a horrible leader.

 8  We're pulling her out of this, and she's not going to be

 9  working in this anymore?

10  A.   I would not use that language, no.

11  Q.   It's my language, I know, but, I mean, paraphrasing,

12  would you say those --

13  A.   No, that's not my language.  That was not my

14  conversations.

15       My conversations were around the safety and security of

16  our partners, the care and concern for what Shannon was going

17  through in that moment.

18       We were managing moment by moment on how to support our

19  partners.  The focus was literally on our partner safety.  So

20  I was not reacting that way in -- after reading this email at

21  4:00 a.m. in the morning.

22  Q.   All right.  So you were okay with -- you didn't have any

23  objection to anything that was being stated in here --

24  A.   No.

25  Q.   -- as it pertained to Shannon?

*Hymes - Direct*                                          *430*

1    A.   No.

2    Q.   This is an email from May 3rd, which is an email from

3    Ms. Phillips to Brett Battes, Subject:  note to Philadelphia

4    SM.

5         And she is talking about sending a note.  It says:  We

6    are sending a note that we intend to send to our Philadelphia

7    store managers.  Are you able to please review and let me know

8    if you feel this is in alignment with the direction we plan on

9    taking around Safe & Welcoming?

10        Do you see that?

11   A.   Okay.  And can you show me again who it was addressed to?

12   Q.   Uh-huh.

13   A.   Shannon to Brett Battes.  Okay.

14   Q.   Okay.  So you recall around May 3rd this time that

15   Shannon was tasked by you to create an announcement to go out

16   to partners to advise them that folks are still working on

17   revising the Safe and Welcoming policy, and we hear your

18   concerns, and we are going to get something more formal out to

19   you at a later date, paraphrasing?

20   A.   Okay.

21   Q.   Do you recall that?

22   A.   Yes.

23   Q.   And so you had Shannon draft that message out to the

24   partners.  Correct?

25   A.   Yes.

Hymes - Direct                        431

1   Q.   So as of May 3rd, had Shannon done something that was so

2   egregious, serious misconduct, that she should be terminated

3   as of May 3rd?

4   A.   We were having conversations in terms of whether or not

5   Shannon was capable of running the market long term at that

6   time.  An assignment of writing a note would not be an

7   indication of whether or not someone would continue in their

8   employment.  They're still obligated to and responsible to

9   carry out duties.

10       So I would say at this point, there were conversations

11  around whether or not Shannon was the right leader for the

12  market, if that's the answer to your question, yes.

13           THE COURT:  What's the exhibit number?

14           MS. MATTIACCI:  The exhibit is 158, Your Honor.

15  BY MS. MATTIACCI:

16  Q.   Mr. Battes forwards this on to Lisa Passe and says that

17  there is a request from the local Philadelphia leadership team

18  to send a message to stores.  Given the tremendous sensitivity

19  to anything that is communicated to stores, would you partner

20  with Camille and her local team to guide appropriate wording,

21  content, and next steps?

22       Do you see that?

23  A.   I do.

24  Q.   Do you agree with Mr. Battes that at this time there was

25  tremendous sensitivity to anything that was communicated to

 1  the stores?

 2  A.   Yes.

 3  Q.   And that was because they wanted to make sure that

 4  anything that Starbucks said, even internally, wouldn't get

 5  out to the public if they didn't want to have it get out to

 6  the public?

 7  A.   I don't know if you can draw a correlation to it not

 8  wanting to go to the public for a note to our store managers.

 9  So I don't think that was the intent or what you're implying.

10  Q.   Okay.  Let's scroll up.

11       Ms. Passe responds:  Hi guys - the only flag to change is

12  the first line, "As we removed the previously shared 'Safe &

13  Welcoming' procedures" as that isn't something we can have be

14  made public.

15       Do you see that?

16  A.   I do.

17  Q.   So would you agree with me now that in fact the reason

18  that there was tremendous sensitivity to anything communicated

19  to the stores was because Starbucks was really concerned about

20  something getting out to the public that they didn't want to

21  have out in the public.  Correct?

22  A.   I cannot draw that correlation.  There was proper

23  sequencing.  So whenever we draft a note to our store managers

24  or our partners, we want to make sure it gets out to them

25  first before it goes public.

1        Because what happens to our partners is that when it gets

2   to the public first and not to our partners, they're then to

3   answer to the media.

4        So in protection of our partners, we sequence.

5        So if -- what you're highlighting here is the proper

6   sequencing of our protocol.

7   Q.   But in particular, she is concerned about having this

8   line shared with the public.  As we previously -- as we

9   removed the previously shared Safe & Welcoming procedure.

10       Do you see that?

11  A.   Yes.

12  Q.   And so Starbucks did not want the public to know that

13  there was a Safe and Welcoming procedure in place as the

14  employees understood it, and just bury the Safe and Welcoming

15  so that was never something that came out to the public again.

16  Correct?

17  A.   That's not true, no.

18  Q.   Well, what would be the reason that this line needs to be

19  removed:  As we removed the previously shared Safe & Welcoming

20  procedures, it isn't something we can have be made public.

21       What other reasonable explanation is there for that

22  sentence?

23  A.   I don't have one.  I really don't.

24  Q.   Okay.  You'd agree with me at this time Starbucks is

25  extremely concerned about their brand?

*Hymes - Direct*                                          *434*

1  A.   Absolutely.

2  Q.   And this is the biggest hit to the brand in the history

3  of Starbucks, this event?

4  A.   Correct.  Yes.

5  Q.   And you respond back to Ms. Phillips:  Want to take

6  another shot at that line?  With a smiley face emoji.

7  A.   Yes.

8  Q.   And so you put it back on Ms. Phillips to revise the

9  statement that was going out to the partners, make sure that

10 she removed the line that says "we removed the previously

11 shared Safe and Welcoming procedures" and put that out.

12 Correct?

13 A.   That's what I wrote.

14 Q.   You're putting a smiley face next to it.  Right?

15 A.   Correct.

16 Q.   And is that an indication that you're mad or a friendly

17 emoji?

18 A.   That is a friendly emoji.

19 Q.   As of this time, are you ready to terminate Ms. Phillips?

20 A.   I will answer as I did previously.  At this time, we were

21 having conversations on whether or not this is the right role

22 for Shannon.

23 Q.   But you never said to Ms. Phillips, your job is in

24 jeopardy, you're going to lose your job?

25 A.   We had many conversations around whether or not this was

Hymes - Direct                                    435

 1   the right job for Shannon.  We were exploring other

 2   opportunities for her outside of region operations, as you

 3   mentioned previously in your questioning for the community

 4   impact role.

 5        There was a lot of stress and a lot of tension.  There

 6   were absences in very critical calls.  There were complaints

 7   that were surfacing from our partners relative to the

 8   management of the market.

 9        This opened up a reveal to the way in which the market

10   was managed that we hadn't seen before.

11   Q.   And I'm --

12   A.   To your point for this specific email, it doesn't give an

13   indication of whether or not there is an immediate termination

14   or separation in this moment.  We are managing moment by

15   moment.

16   Q.   Okay.  Is there any corresponding email around the May

17   3rd time frame that says, Shannon, you are failing, we are

18   looking, we need to terminate you, and laying out any

19   deficiencies in any way, shape or form?

20        Just asking as of that time.

21   A.   We had multiple conversations on whether or not this was

22   the right fit for Shannon.

23   Q.   I understand that.  I am talking about terminating her

24   employment.  Because Starbucks has how many jobs -- how many

25   employees?  Hundreds of thousands of employees.  Right?

*Hynes - Direct* 436

```
 1  A.   Correct, yes.
 2  Q.   How many employees were you in charge of when you were
 3  leaving?
 4  A.   15,000.
 5  Q.   Yeah.  So there could be a job for Shannon Phillips at
 6  Starbucks if Starbucks wanted Shannon Phillips to have a job.
 7  Correct?
 8  A.   Correct.
 9  Q.   But it was determined that she would be out on the street
10  and she would not have a job.  Correct?
11  A.   There was a severance package.  Out on the street, I
12  don't necessarily know if I would frame it in that language.
13  Q.   Well, she was terminated.  It wasn't her choice.
14  A.   There was a severance package, yes, correct.
15  Q.   And the severance package included a release agreement
16  where she would promise not to sue Starbucks for any
17  discrimination or any other claims, correct, that she would
18  have to sign?
19  A.   Correct.
20  Q.   She would also have to sign a nondisclosure agreement and
21  be confidential about anything that happened at Starbucks.
22  Correct?
23  A.   Correct.
24  Q.   But she refused to sign it.  Correct?
25  A.   Correct.
```

1   Q.   And she was terminated.  Correct?

2   A.   She also shared that she wanted to embarrass the brand

3   and that she was going to write a book and sue during the time

4   of termination, so yes.

5   Q.   Well, that was after she had been terminated.  Correct?

6   A.   No.  This was the conversation during the termination.

7   Q.   You had already decided to terminate her.  Correct?

8   A.   This is during the conversation.

9   Q.   You're talking about on the 8th?

10  A.   I don't know the exact date of separation, so...

11  Q.   You'd agree with me that the decision to terminate was

12  made on the 4th.  Correct?

13  A.   As I shared with you earlier, I'm so sorry, but I

14  don't -- I did not keep every single date on the calendar from

15  five years ago in my memory.  So we're going through the

16  calendar.

17  Q.   So are you saying at the time that you presented her with

18  the severance package, and she was upset, correct, when you

19  did that?

20  A.   That is correct, yes.

21  Q.   She was very upset?  Correct?

22  A.   Very upset.

23  Q.   And she was very shocked.  Correct?

24  A.   She was in denial.

25       We had -- this is the actual -- the point is that that

1  there was a separation of ownership and accountability.  And

2  so instead of focusing in on the partners and the critical

3  dimensions and the aspects of the partners, it was about her

4  and what -- whether or not her brand was damaged, whether or

5  not there was an opportunity for her to go into a different

6  role.

7         And so when we had all of those conversations, it seemed

8  as if when we were having the separation conversation, that

9  she was very much aware that that conversation was going to

10 happen.  She had actually called me prior to --

11 Q.   Ms. Hymes, I don't mean to cut you off.

12         MS. MATTIACCI:  Objection, nonresponsive, Your Honor.

13 She's going to have an opportunity on direct to say whatever

14 she wants to say.

15         MR. HARRIS:  It was directly responsive to counsel's

16 question.

17         THE COURT:  All right.  Move on.

18         MS. MATTIACCI:  It was not.

19         THE COURT:  Go ahead.  Ask your next question.

20         MS. MATTIACCI:  Thank you, Your Honor.

21 BY MS. MATTIACCI:

22 Q.   Let's look at 90.

23      This is May 3, 2018.  And this is from you to your boss,

24 Zeta.  Zeta Smith.  Correct?

25 A.   Yes.

1  Q.   And you say:  Passing this along for your review prior to

2  your connection with Rossann.

3       So it's Zeta having a conversation with Rossann Williams.

4       It's important to note that she asked that I send this to

5  her directly ASAP.  Please let me know if it's okay to send

6  before 11:00 p.m. PST.

7       And this is a draft that would go to Rossann.  And in it,

8  this is you on May 3rd.  You have a plan for additional

9  Philadelphia support.

10      Do you see that?

11 A.   I do.

12 Q.   And on the second page of the plan, you have rotation of

13 office hours.

14      Do you see this here?

15 A.   Yes.

16 Q.   One day per week in the market, office hours every

17 Wednesday, rotation between Camille, Nathalie and Shannon.

18      Do you see that?

19 A.   I do.

20 Q.   So as of May 3rd, you still had Ms. Phillips in your

21 plans, so much so that you were forwarding it up the chain to

22 two down from the CEO of Starbucks.  Correct?

23 A.   When a person is in position and a market is in crisis,

24 you plan for the leader who is in the role, using their name.

25 You do not then determine, prior to having a conversation with

1  the employee or the partner that will be separated, that they

2  are not a part of the plan.

3      So the responsibility to create continuity and

4  consistency in our partners in the way in which we build our

5  plans is to frame it up in the existing moment.  So that is

6  correct.

7  Q.   Okay.  Let me scroll up.

8      Same day, May 3rd, Zeta Smith to you.

9      Would eliminate Shannon from these action plans.  Would

10 add that your peer VPs be rotating in market throughout the

11 next 45 days.  We can leverage Christa and her peer team.

12 Would get Marcus in as quickly as possible based on his

13 experience in crisis situations.  Would also make note of what

14 you will be doing post the training on May 29th.  I plan to

15 travel in that week to support.  That part of your document

16 does not have to be detailed but want to demonstrate that you

17 are thinking ahead.

18     Do you see that?

19 A.   Uh-huh, yeah.  That is my boss saying that we need to go

20 in a different direction.

21 Q.   And she is saying:  To eliminate Shannon from the plan.

22 Even though you just testified that you would never eliminate

23 a person who is sitting in the position from a plan if they

24 still have the position.

25 A.   That is the way I wrote it during that time but this

Hymes - Direct                    441

 1    actually demonstrates that the supervisor accelerated or

 2    decided that that was not the plan or the approach.

 3    Q.   And so as of May 3rd, Zeta Smith had decided she's out.

 4    Correct?  Ms. Phillips?

 5    A.   We were having conversations, as I testified, all along,

 6    including the conversation with Shannon on whether or not she

 7    was the right fit.

 8         So yes, it was not Zeta Smith's decision.  It was

 9    collective as I had mentioned earlier.

10    Q.   Well, according to this email, Zeta Smith decided, would

11    eliminate Shannon from these action plans after you had

12    included her in the action plans?

13    A.   Yeah.  That's the action plans.

14         We were in, again, a crisis.  We were working on four to

15    five hours of sleep.  We were moving through every single day

16    evaluating feedback from our partners, evaluating the way in

17    which people were showing up as leaders.  We were making

18    plans, we were making adjustments.

19         So it was a very fluid and concerted effort to do the

20    very best that we could in the moment.  And that means

21    sometimes that plans change.

22    Q.   And that somebody has to be terminated immediately?

23    A.   That was not an immediate decision.  That was over the

24    course of the time that you've outlined in the calendar, where

25    we did not feel confident that Shannon could carry forward

 1  even post repair of the market.

 2  Q.   Let's look at 140.  This is an email that Shannon

 3  Phillips sends to you on Monday, May 7th.

 4      And these are Monday morning updates that she would send

 5  every week.  Correct?

 6  A.   Yes.

 7  Q.   And she's including in there an email GA card or a

 8  thank-you card that she received from one of her colleagues.

 9  Correct?

10  A.   Correct.

11  Q.   And she's reporting to you that in terms of her finances,

12  correct, because she had responsibility for a financial

13  portfolio.  Correct?

14  A.   Yes.

15  Q.   And she did well, correct, there were sales of 2.726

16  million dollars in just one week.  Correct?

17  A.   Correct.

18  Q.   That was up 6 percent from the week before.  Correct?

19  A.   Total -- yes.  So the comp was last week was down 1.3,

20  yes.  It's down 1.3.  Total revenue is plus 6 percent, so

21  there were maybe new stores in there.

22  Q.   There was a projection for the following week of

23  2.73 million.  Correct?

24  A.   Correct.

25  Q.   And there was a lot of people coming into the city at

1  this time.  Correct?  May 3, May 4th, May 5th, from Seattle?

2  A.   Yes.

3  Q.   High-ups.  Correct?  High-level executives?

4  A.   Every level was coming in.

5  Q.   Everyone, including the CEO?

6  A.   Yes.

7  Q.   And you're aware that Howard Schultz and Rosalind Brewer

8  visited Morehouse College on May 3rd and did a talk there that

9  included discussions about diversity and bias training?

10 A.   I was not aware, no.  But if it's on the public record,

11 then yes.

12 Q.   Okay.  You'd agree with me that race in general was

13 something that was top of mind in Starbucks throughout this

14 time period.  Correct?

15 A.   Absolutely.  Unconscious bias.  Yes.

16 Q.   And that was discussed about how to improve interactions

17 and communications with folks and make sure that they

18 understand that implicit bias exists and it can impact

19 decision-making.  Correct?

20 A.   And unconscious bias.

21 Q.   Yes.  That's what I said.  Unconscious bias.

22 A.   Implicit bias is what you said.

23 Q.   Implicit bias or unconscious bias.

24      And you agree with me that at the time that the decisions

25 are being made about Shannon Phillips and in particular when

1   she is terminated, her race is something that is in the minds

2   of the decision-makers at that time.  Correct?

3   A.   Absolutely false.  It is actually offensive that that's a

4   question, because the decisions that are made for all 15,000

5   partners are based on the behaviors of a partner.  It is not

6   based on race.

7        Now, our store manager made the decision to arrest two

8   African American men who were not aggressive or demonstrating

9   foul behavior in the store while there were other people that

10  were sitting in that store.

11       That was a concentrated moment to best understand how we

12  could support not only our customers but our partners, and

13  somehow Shannon is the victim here.  And it is unusual to --

14  it's just, again, emblematic of why we're sitting here five

15  years later having a conversation where the two men that were

16  arrested or the partners that went through a struggle, all of

17  that has never been the focus in Shannon Phillips's mind.  It

18  has always been about Shannon Phillips.

19       I could not move forward with a leader who was so focused

20  on themselves and not focused on how to address the issues in

21  the market.

22  Q.   Ms. Hymes, did it ever cross your mind that Ms. Phillips

23  wasn't getting it because she was white?

24  A.   Never crossed my mind that her skin -- whatever is on her

25  skin was -- would be a factor in her performance.

 1  Q.   You'd agree with me that not in her performance, in your
 2  evaluation of her performance?
 3  A.   No.  I am -- if you want to check my DNA, I am half white
 4  and I'm half black.  So my evaluation is very balanced.  If
 5  you're getting to a point where I, as whatever color that I
 6  am, evaluating Shannon as to whatever color she is, it's
 7  absurd and offensive to think that someone would be fired
 8  because of the color of their skin, specifically in this
 9  situation.
10  Q.   Implicit bias, isn't the whole premise that we should not
11  be colorblind, that in fact we should recognize that folks are
12  of different colors, and with that recognition, recognize our
13  own biases that are filtered through our brains based upon
14  stereotypes of whatever that is, and make sure that we are not
15  making decisions based upon those implicit biases.  It's a
16  recognition of the race of the other person.
17       You'd agree with me.  Correct?
18  A.   I would agree of your definition of unconscious bias.
19  Q.   Correct.  And so for someone to say that they never see
20  color or that they are colorblind, that is something that
21  would be indicative that they are not conscious that there
22  could be implicit bias.  Correct?
23  A.   For this specific situation, unconscious bias was not a
24  factor.
25  Q.   Okay.  I'm just asking in generally.

Hynes - Direct                    446

```
1        In general, if somebody were to say I'm colorblind, I do
2   not see color, you'd agree with me then that that person is
3   not recognizing the fact that implicit bias could exist.
4   Correct?
5   A.   I don't know.  I don't know how to answer that question.
6   Q.   Okay.  And so you're saying the issue of Shannon
7   Phillips's race never entered your mind whatsoever when you're
8   making the decision to terminate her?
9   A.   A hundred percent.  A hundred percent.
10  Q.   And the issue of Mr. Sykes's race being black would never
11  enter your mind, not once, when making a decision not to
12  terminate for him any of the leadership issues that were
13  identified?
14  A.   A hundred percent.  As I mentioned at the very top of
15  this testimony, the decisions that I made were based on
16  behavior.
17       Based on behavior of whether or not these leaders
18  specifically could manage our partners through a crisis, if
19  they were making the proper decisions, had ownership and
20  accountability, that they were able to address the partners'
21  needs and that they were actually showing up in the way in
22  which our partners were asking.
23       And in all three of those instances, color of skin had
24  nothing to do with it.  And as we sit here today, five years
25  later, again, there is a lack of accountability in terms of
```

Hymes - Direct                        447

```
 1    what was going on in that market and the conversation today is

 2    about the color of someone's skin.

 3         It is offensive.

 4    Q.   Okay.  How about with the higher-ups in Starbucks that

 5    you were talking to?  You identified Zeta, Rossann, Frisch,

 6    Nathalie, Paul Pinto.  When you're having these conversations

 7    with them about firing Shannon in this climate, the idea she

 8    was white and being fired in the aftermath of April 12th, was

 9    never something that was ever discussed?

10    A.   A hundred percent, her race was never a part of the

11    conversation.  Whether or not it would be a risk to the

12    organization or not, it was behavior.  The conversation around

13    race never came up.  For Paul or anyone else.

14         I lead 15,000 partners.  The leaders that were at

15    Shannon's level, I had six directors.  Jen Pivarnik, white

16    female.  Shannon Phillips, white female.

17         Marcus Eckensberger, white male.  TJ Wolfersberger, white

18    male.  Phillip Laws, black male.  I'm missing one.  I think

19    that's all of them.

20         When Shannon was separated, terminated, however you would

21    like to phrase it, the replacement for Shannon were two white

22    Americans.

23    Q.   We understand that.

24    A.   Do you?

25    Q.   Yes.  We've had testimony.
```

```
 1        So let me just ask the next question.  Okay?
 2        You understand that when Ms. Phillips was in that role,
 3   that her -- that the focus of her job was to support the
 4   partners while also supporting the business.  Correct?
 5   A.   Her focus was a hundred percent on the partners during
 6   this time.
 7   Q.   And not the business at all, are you saying?
 8   A.   No, I'm not.  I mean, it's not a -- it's not black or
 9   white.  It's not extreme as you're describing.
10        Our primary focus at the time was the care of our
11   partners.
12   Q.   Okay.  And there were lots of emails that were exchanged
13   during this time?
14   A.   Correct.
15   Q.   You'd agree with me?
16   A.   Yes.
17   Q.   Amongst any of those emails and in the preparation that
18   you did for your testimony today, have you seen any email or
19   document that went to Ms. Phillips outlining any sort of
20   deficiencies at all?
21   A.   Emails to Shannon on deficiencies?
22   Q.   Yes.
23   A.   There were multiple conversations.
24   Q.   I understand that, Ms. Hymes.  I'm asking specifically
25   about written documents.
```

1   A.   No.

2   Q.   Okay.

3   A.   No.

4   Q.   And there's also -- there's a corrective action program

5   in place in Starbucks.  Right?  That could be utilized to help

6   somebody improve their performance.  Correct?

7   A.   That is correct.

8   Q.   There could be a performance improvement plan that could

9   be used.  Correct?

10  A.   Not in a crisis.

11  Q.   Okay.  So that's off the table in a crisis?

12  A.   In a crisis there is no progressive discipline, there is

13  no written warnings.  You are in a crisis to protect your

14  partners and to ensure that you have the best leader that

15  could lead through a crisis.

16       That is what I chose to do.

17  Q.   Okay.  And Ben Trinsey was suspended as part of this on

18  the same -- the day before that Ms. Phillips was terminated.

19  Correct?

20  A.   I don't recall the sequence in dates.

21  Q.   There's a thing called coffee break at Starbucks.

22  Correct?

23  A.   Correct.

24  Q.   And Starbucks would be a sabbatical (sic).  Correct?

25  A.   Yes.

*Hynes - Direct*                                    *450*

1  Q.   And somebody could go out on the sabbatical for three

2  months, six months and even a year and then come back to

3  Starbucks.  Correct?

4  A.   Correct.

5  Q.   During that time their benefits would be protected?

6  A.   Correct.

7  Q.   So if there was this need right now to get Shannon

8  Phillips out for some reason, they could have offered her a

9  coffee break.  Correct?

10  A.   Correct.

11  Q.   But that was not done for her?

12  A.   No, it was not.

13  Q.   Is that because she was such a failure in her role?

14  A.   A person could ask for a coffee break if they wanted.

15  The decision to move away from when people are not fulfilling

16  their leadership obligations was not to offer a coffee break.

17      So that has been seen -- that has been a practice in the

18  past, but as we -- I would say within the last five years or

19  so, coffee breaks were not an option for people who were

20  underperforming.

21  Q.   You'd agree with me that there were a lot of people very

22  upset after Ms. Phillips was terminated.  Correct?

23  A.   I'm sure.

24  Q.   And you were aware of that personally.  Correct?

25  A.   I knew that Shannon had personal relationships with many

1   of her partners.  Yes.

2   Q.   And the news of her being separated caused a lot of upset

3   for those partners.  Correct?

4   A.   I would say that's not correct.  I would say the vast

5   majority of partners were not in a position where they were

6   focused on Shannon Phillips.  They were not talking about

7   Shannon after her departure.

8        In fact, many of the partners were sharing that they,

9   while they liked Shannon Phillips very much, were appreciative

10  of the new leader.  They had confidence they would be taken in

11  a direction where they were safe and protected.  Or there was

12  presence, leadership presence that could bring them through.

13       I would say the majority of feedback was in that space.

14       So I'm not exactly sure, when you're saying that there

15  were a lot of partners who were upset at the departure of

16  Shannon.

17       Now, Shannon -- I don't want to discredit Shannon because

18  Shannon did a lot for our partners.  She was a leader who

19  cared very deeply.  Developed very personal relationships,

20  would have them at her home.

21       Many of them had described that their relationships

22  actually circumvented the professional level.  So there was a

23  deep connection there.  But they also understood the business

24  need for the separation.  And supported that.

25  Q.   All right.  Let's take a look.

Hymes - Direct                                452

```
 1  A.   Great.

 2  Q.   Exhibit 129.

 3  A.   Uh-huh.

 4  Q.   This is the organizational announcement, Starbucks'

 5  announcement, of the termination of Shannon Phillips.  It went

 6  out to all the Mid-Atlantic partners.

 7       Effective immediately, Shannon Phillips, regional

 8  director for area 71, will be pursuing other employment

 9  interests outside of Starbucks coffee company.

10       Please join me in saying thank you to Shannon for

11  building meaningful relationships with partners and

12  communities in her 13 years of service.  We wish her all the

13  best in her future endeavors.

14       And then it lays out a plan for coverage going forward.

15       Do you see that?

16  A.   I do.

17  Q.   But it wasn't true that it was her decision to leave to

18  pursue other opportunities?

19  A.   I don't believe that it says that it was her decision in

20  this memo, so I'm not sure if you could give more context to

21  your question.

22  Q.   You don't think that the implication here for somebody

23  who doesn't know any better would be that she left to pursue

24  other opportunities on her own?

25  A.   I don't think that is explicit in this email, that you're
```

1   asking me.

2   Q.   Okay.  You then forward that to some people and say:

3   Please do not forward.  The distribution of this memo is

4   intended as a reference for you, your key talking points

5   during your SM or store manager calls.  An official

6   announcement will be published after 5:00 p.m. today.

7        Do you see that?

8   A.   Yeah.  We call that a TikTok.

9        So we make sure that the people who are most affected

10  first learn of their direct supervisors that are leaving so

11  that there's a cascade -- excuse me.  That there's a cascade

12  so that people don't learn either their supervisor is leaving

13  before their supervisor gets to tell them or their direct

14  reports, if that's what you're asking.

15  Q.   So Tim Osevala, who is a district manager in the

16  Philadelphia area, says:  Good afternoon, Camille, wanted to

17  report in that I have spoken with all store managers within

18  district 1080 regarding the announcement.  One item that did

19  come up from a couple of the managers was an interest in any

20  way to pass along notes of thanks to Shannon for her

21  leadership over the years.  I advised I would bubble that

22  forward for consideration.

23       Do you see that?

24  A.   Yes.

25  Q.   Did you allow notes of thanks to go out to her after her

1   termination?

2   A.   Of course.  I don't see that would be rejected.

3   Q.   Oh, did you respond back?  Because I don't see a

4   response.

5   A.   I couldn't even remember if I did or not, so it would be

6   helpful, but I would never say, notes of appreciation could

7   not go to Shannon.

8   Q.   Isn't it true that within a couple days of the

9   termination, that you went out and personally connected with

10  the district managers in her area?

11  A.   Every day -- I literally moved away from my family to

12  Philadelphia.  And I connected with the partners every day.

13  So I don't know what day you might be referring to.

14  Q.   Okay.  So I'm talking about in particular the initial

15  reactions and sentiment, sentiment in response to Ms. Phillips

16  being terminated.

17      Isn't it true that when you spoke to Mr. Osevala, that he

18  was personally saddened by the termination of Ms. Phillips?

19  A.   I'm sure.

20  Q.   And that when you spoke to Delma Wells, she was angry.

21  She thinks the separation is due to the April 12th incident.

22      Do you see that?

23  A.   I don't see it on here but it's okay.

24  Q.   I don't have it up there, but you recall that?

25  A.   I do recall that.

1          THE COURT:  I'm just wondering if we could break at

2     this point.

3          MS. MATTIACCI:  Yes, Your Honor.

4          THE COURT:  It's now a little later than I like to

5     break, but we want the case to move along.

6          And members of the jury, we'll see you back at 9:15

7     tomorrow morning, and I know I sound like a broken record when

8     I give you these words of caution about don't speak to anybody

9     outside the courtroom about the case, even at home.

10          Also, don't talk about the case among yourselves and

11     don't do any independent research.  I know when I use the

12     expression "like a broken record," I'm probably dating myself.

13     But in any event, don't discuss the case.

14          More evidence to come.  We always expect the jury to

15     keep an open mind, and have a good evening.  And we'll see you

16     back tomorrow morning.

17          MR. HARRIS:  Judge, after the jury gets excused, I

18     may have something.

19          (Jury out.)

20          THE COURT:  Yes.

21          MR. HARRIS:  Your Honor, I need to speak to Ms. Hymes

22     specifically about her scheduling.  As you know, she just

23     became the chief operating officer of Smoothie King and so the

24     expectation was -- she just started on Monday, so the

25     expectation was she would be able to go back to Dallas

 1  tomorrow, but since she's on the stand I need to talk to her

 2  about scheduling.  That's it.

 3          THE COURT:  All right.  You can talk to her about

 4  scheduling but not about her testimony.

 5          MR. HARRIS:  Yes.

 6          THE WITNESS:  Thank you.

 7          THE COURT:  Okay.  How much more time do you think

 8  you have?

 9          MS. MATTIACCI:  Not long, Your Honor, maybe like a

10  half an hour.

11          THE COURT:  And direct?

12          MR. HARRIS:  Maybe an hour to an hour-and-a-half.

13          THE COURT:  Okay.  So we start at 9:15.  Sometimes we

14  start a little later, but you can get an idea of when you'll

15  be excused.

16          THE WITNESS:  Thank you.

17          MR. HARRIS:  Thank you.

18          THE COURT:  We'll stand in recess.

19          (Proceedings concluded at 4:41 p.m.)

20                          -  -  -

21          I certify that the foregoing is a correct transcript

22  from the record of proceedings in the above-entitled matter.

23

24  */S/ Ann Marie Mitchell*          *7th day of June, 2023*

25  *Court Reporter/Transcriber     Date*