# Exhibit E

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

```
_____
SHANNON PHILLIPS,              : CRIMINAL ACTION NUMBER:
        Plaintiff,            : 19-19432
                              :
        v.                    :
                              :
                              :
STARBUCKS CORPORATION d/b/a   : JURY TRIAL
STARBUCKS COFFEE COMPANY,     : VOLUME 5
        Defendant.           : PAGES 656 - 820
_____ :
```

        Mitchell H. Cohen Building & U.S. Courthouse
        4th & Cooper Streets
        Camden, New Jersey  08101
        June 9, 2023
        Commencing at 9:25 a.m.

**B E F O R E**:        **THE HONORABLE JOEL H. SLOMSKY**,
                        **UNITED STATES DISTRICT JUDGE**

**A P P E A R A N C E S**:

        CONSOLE MATTIACCI LAW, LLC
        BY: LAURA C. MATTIACCI, ESQUIRE
        BY:  KATHERINE C. OELTJEN, ESQUIRE
        BY:  HOLLY W. SMITH, ESQUIRE
         1525 Locust Street, Ninth Floor
        Philadelphia, Pennsylvania 19102
        For the Plaintiff


        HOLLAND & KNIGHT LLP
        BY:  RICHARD HARRIS, ESQUIRE
        BY:  TARA PARAM, ESQUIRE
        BY:  KATHLEEN PRINCIVALLE, ESQUIRE
        2929 Arch Street, Suite 800
        Philadelphia, Pennsylvania 19104
        For the Defendant

     Ann Marie Mitchell, CRR, RDR, CCR, Official Court Reporter
               AnnMarie_Mitchell@njd.uscourts.gov
                    (856) 576-7018

     Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.

1

2  **A L S O   P R E S E N T**:

3

4       SHANNON PHILLIPS, Plaintiff

5       ROBYN RUDERMAN, ESQUIRE, Starbucks Corporation

6       MARCUS ECKENSBERGER, Starbucks Corporation

7       MATTHEW HIGGINS, Courtroom Deputy

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*

```
 1                      -   -   -

 2                    I N D E X

 3                      -   -   -

 4

 5

                E X A M I N A T I O N S
 6
    Witness              Direct   Cross   Redirect   Recross
 7

 8  MARCUS ECKENSBERGER

 9    BY MR. HARRIS          681
      BY MS. MATTIACCI                709
10

11                  E X H I B I T S

12
        NUMBER               ADMITTED PAGE
13
        Exhibit 6            724
14
        Exhibit 12A          666
15
        Exhibit 12F          666
16
        Exhibit 12O          666
17
        Exhibit 12P          666
18
        Exhibit 15           666
19
        Exhibit 16           666
20
        Exhibit 18           724
21
        Exhibit 22           666
22
        Exhibit 29           666
23
        Exhibit 30           666
24
        Exhibit 39           666
25
```

*United States District Court*

```
 1          Exhibit 43              724

 2          Exhibit 44              666

 3          Exhibit 50              666

 4          Exhibit 51              666

 5          Exhibit 52              666

 6          Exhibit 53              666

 7          Exhibit 54              666

 8          Exhibit 57              666

 9          Exhibit 58              666

10          Exhibit 60              666

11          Exhibit 62              666

12          Exhibit 66              666

13          Exhibit 67              666

14          Exhibit 70              666

15          Exhibit 71              724

16          Exhibit 78              666

17          Exhibit 79              666

18          Exhibit 86              724

19          Exhibit 90              724

20          Exhibit 94              666

21          Exhibit 102             666

22          Exhibit 105             724

23          Exhibit 106             666

24          Exhibit 108             666

25          Exhibit 111             724
```

| 1  | Exhibit 121 | 666 |
| 2  | Exhibit 127 | 666 |
| 3  | Exhibit 129 | 666 |
| 4  | Exhibit 131 | 666 |
| 5  | Exhibit 132 | 666 |
| 6  | Exhibit 134 | 666 |
| 7  | Exhibit 135 | 666 |
| 8  | Exhibit 136 | 666 |
| 9  | Exhibit 139 | 724 |
| 10 | Exhibit 140 | 724 |
| 11 | Exhibit 141 | 666 |
| 12 | Exhibit 142 | 666 |
| 13 | Exhibit 143 | 666 |
| 14 | Exhibit 144 | 666 |
| 15 | Exhibit 146 | 666 |
| 16 | Exhibit 147 | 666 |
| 17 | Exhibit 148 | 666 |
| 18 | Exhibit 149 | 666 |
| 19 | Exhibit 150 | 666 |
| 20 | Exhibit 151 | 666 |
| 21 | Exhibit 152 | 666 |
| 22 | Exhibit 153 | 666 |
| 23 | Exhibit 154 | 666 |
| 24 | Exhibit 155 | 666 |
| 25 | Exhibit 156 | 666 |

1          Exhibit 158          666

2          Exhibit 159          666

3          Exhibit 160          724

4          Exhibit 161          666

5          Exhibit 162          666

6

7

         Closing Arguments                              Page
8
             MS. MATTIACCI                               762
9            MR. HARRIS                                  795

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            (PROCEEDINGS held in open court before The Honorable
 2   JOEL H. SLOMSKY at 9:25 a.m.)
 3            THE COURT:  Can we bring in the jury?
 4            MS. MATTIACCI:  Yes, Your Honor.  We do have a
 5   stipulation on punitive damages, net worth.
 6            THE COURT:  Why don't you be seated.
 7            MS. MATTIACCI:  Your Honor, the defendant has agreed,
 8   we have a stipulation as to an amount for the net worth of
 9   Starbucks Corporation of $112 billion.
10            THE COURT:  Okay.
11            MS. MATTIACCI:  So and after the jury comes in, I
12   will be resting, but I have an exhibit list and would like to
13   move all of our exhibits into evidence.  I believe they are,
14   but we have an exhibit list for Your Honor with all the
15   exhibits that plaintiff has identified and moved in.
16            MR. HARRIS:  No objection.
17            THE COURT:  All right.  I'm just wondering if you
18   want to read the -- why don't you just read in front of the
19   jury the exhibit numbers, the following exhibits have been
20   admitted into evidence.
21            Just give the numbers.  You don't have to describe
22   them.
23            MS. MATTIACCI:  Okay.
24            THE COURT:  So we have it in one place.
25            MS. MATTIACCI:  Okay.
```

1          THE COURT:  Okay?

2          MS. MATTIACCI:  Yes.

3          THE COURT:  Then you rest.

4          And, Counsel?

5          MR. HARRIS:  Yes, Your Honor.  At the conclusion of

6  the plaintiff's case we will be moving for directed verdict on

7  all claims.

8          THE COURT:  Okay.

9          MR. HARRIS:  Judge, how would you like to us do that?

10          THE COURT:  We'll come to sidebar.

11          MR. HARRIS:  Okay.  Come to sidebar outside of the

12  presence of the jury?

13          THE COURT:  The jury can stay in the box.  We'll come

14  to sidebar.

15          MR. HARRIS:  All right.  Judge, we have a brief that

16  we'll be submitting as well.

17          THE COURT:  Hmm?

18          MR. HARRIS:  We have a brief, a written brief that

19  we'll be submitting in addition to our oral argument on the

20  Rule 50 motion at the conclusion of --

21          THE COURT:  Oh, I didn't realize that.

22          MR. HARRIS:  Yes.

23          THE COURT:  How long is the brief?

24          MR. HARRIS:  It's approximately 17, 18 pages, Judge.

25          THE COURT:  17?  Then I'll have to read it at a

 1  break.

 2          MR. HARRIS:  Yes.

 3          THE COURT:  So all right.  I'll figure out what to

 4  do.

 5          All right?  Do you have any witnesses you are

 6  calling?

 7          MR. HARRIS:  Yes.  I will be calling our corporate

 8  representative, Mr. Marcus Eckensberger.

 9          THE COURT:  Okay.  And then you'll rest?

10          MR. HARRIS:  And then we'll be resting.

11          THE COURT:  All right.  Let's bring in the jury.

12          So we'll be giving closings today and also be

13  charging the jury?

14          MS. MATTIACCI:  Yes, Your Honor.  We're ready for

15  that.

16          THE COURT:  And we'll have the charge conference too.

17          MS. MATTIACCI:  Yes.

18          THE COURT:  Okay.

19          (Jury in.)

20          THE COURT:  Please be seated.

21          Good morning, members of the jury.  I hope you've had

22  a good evening and a good morning so far.

23          All right.  Ms. Mattiacci.

24          MS. MATTIACCI:  Thank you, Your Honor.

25          The plaintiff is entering into evidence the following

```
 1  exhibits:  12R, Bates 5781 -- I'm sorry, I'm just identifying
 2  it to how I identified it during the trial for Exhibit 12.
 3           THE COURT:  Just say exhibit number so and so.
 4           MS. MATTIACCI:  Okay.  12A, 12F, 12O, 12P, 15, 16,
 5  22, 29, 30, 39, 43, 44, 50, 51, 52, 53, 54, 57, 58, 60, 62,
 6  66, 67, 70, 78, 79, 86, 90, 94, 102, 105, 106, 108, 121, 127,
 7  129, 131, 132, 134, 135, 136, 139, 140, 141, 142, 143, 144,
 8  146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 158,
 9  159, 160, 161, 162.
10           And just to clarify for Exhibit 12, Your Honor,
11  because we only entered certain Bates numbers, I'm just going
12  to quickly read the Bates numbers of Exhibit 12.
13           5781, 5760, 5769 to 5770, 5795, 5865 -- I'm sorry,
14  5869, not 5865.
15           And the prefix to those Bates numbers is Starbucks.
16           Those are plaintiff's exhibits, Your Honor.
17           THE COURT:  All right.  So admitted.  Go ahead.
18           (Exhibit 12A, Exhibit 12F, Exhibit 12O, Exhibit 12P,
19  Exhibit 15, Exhibit 16, Exhibit 22, Exhibit 29, Exhibit 30,
20  Exhibit 39, Exhibit 43, Exhibit 44, Exhibit 50, Exhibit 51,
21  Exhibit 52, Exhibit 53, Exhibit 54, Exhibit 57, Exhibit 58,
22  Exhibit 60, Exhibit 62, Exhibit 66, Exhibit 67, Exhibit 70,
23  Exhibit 78, Exhibit 79, Exhibit 86, Exhibit 90, Exhibit 94,
24  Exhibit 102, Exhibit 105, Exhibit 106, Exhibit 108, Exhibit
25  121, Exhibit 127, Exhibit 129, Exhibit 131, Exhibit 132,
```

 1   Exhibit 134, Exhibit 135, Exhibit 136, Exhibit 139, Exhibit

 2   140, Exhibit 141, Exhibit 142, Exhibit 143, Exhibit 144,

 3   Exhibit 146, Exhibit 147, Exhibit 148, Exhibit 149, Exhibit

 4   150, Exhibit 151, Exhibit 152, Exhibit 153, Exhibit 154,

 5   Exhibit 155, Exhibit 156, Exhibit 158, Exhibit 159, Exhibit

 6   160, Exhibit 161 and Exhibit 162 admitted marked for

 7   identification.)

 8           MS. MATTIACCI:  And do you need me to read in the

 9   punitive damages stipulation?

10           The defendant has agreed and the parties have

11   stipulated that the net worth of Starbucks is $112 billion.

12           And with that, Your Honor, the plaintiff rests.

13           THE COURT:  All right.

14           Let's see, Mr. Harris, your case now.

15           MR. HARRIS:  Thank you, Your Honor.

16           THE COURT:  We'll -- members of the jury, before the

17   defense begins, I need to take a short conference with counsel

18   out of your presence.

19           And I'll call you back into the courtroom as quickly

20   as I can.  All right?

21           So just bear with us.  Again, I don't like to keep a

22   jury just waiting in the jury assembly -- in the jury room for

23   an extended period of time, but there are times during a trial

24   when I have to confer with counsel out of your presence.

25           So with that, I'll ask you to just go back in the

 1   jury room.

 2          (Jury out.)

 3          THE COURT:  All right.  Mr. Harris, you have a

 4   motion, and can I see the brief?

 5          MR. HARRIS:  Yes.

 6          May I approach?

 7          THE COURT:  Yes.  Thank you.

 8          All right.  Let me hear counsel on the motion you

 9   want to make.

10          MR. HARRIS:  Your Honor, we would move for a directed

11   verdict on all claims, including specifically let's first

12   start with punitive damages.

13          The plaintiff has not demonstrated sufficient

14   evidence that a reasonable fact-finder could find that there

15   was a reckless indifference for the law.  And so with that, we

16   would move to have that claim dismissed.

17          The record is overwhelming in terms of the reasons

18   for the decision to terminate Ms. Phillips, which includes,

19   and not limited to, the lack of leadership in the moment of

20   crisis.

21          The evidence also demonstrates, particularly on the

22   relationship of punitive damages, that Mr. Pinto as well as

23   others were fully aware of the nondiscriminatory policy as it

24   relates to discrimination.

25          The evidence is also clear through the exhibit that

1   was moved into evidence regarding the partners guide which

2   specifically articulates the culture as well as the

3   nondiscriminatory and harassment policy of Starbucks.

4           And with that, we would move to dismiss the claim of

5   punitive damages.

6           THE COURT:  All right.

7           MR. HARRIS:  As it relates to the larger issue before

8   this Honorable Court, Ms. Phillips, through her counsel, has

9   not offered direct evidence of discrimination, and so,

10  therefore, this Court would have to analyze the circumstantial

11  evidence that has been presented in this case.

12          One way in which a circumstantial evidence can be

13  brought in a reverse discrimination case would have to be

14  through comparator evidence.

15          But before we get to comparative evidence, what we

16  know through the record, which was brought out yesterday

17  through Ms. Zeta Smith specifically, was Exhibit Number 90,

18  the most important document in this case.

19          In Exhibit 90 -- and I'll ask this Court to review

20  this now, which specifically shows an email from Ms. Zeta

21  Smith to Camille Hymes.  And in that email, there's a

22  discussion regarding having Ms. Phillips's position be

23  replaced by Mr. Marcus Eckensberger.

24          Mr. Eckensberger is here in this courtroom.  He's the

25  corporate representative.  This Court has had the opportunity

1    to see Mr. Eckensberger for one week.

2         And he would be testifying, assuming that this case

3    would go to a jury.

4         However, if you look at Exhibit Number 90, you will

5    see where Ms. Smith has stated:  Would eliminate Shannon from

6    these action plans, would add that your peer VPs would be

7    rotating in market throughout the next 45 days.

8         But more importantly, as it relates to Ms. Phillips,

9    we can leverage Christa and your peer team -- those were other

10   vice presidents -- but more importantly, it says:  Would get

11   Marcus in as quickly as possible based on his experience in

12   crisis situations.

13        So, Judge, the legitimate nondiscriminatory reason

14   that was offered in this courtroom was twofold:  was

15   leadership, but more importantly, was based on Ms. Phillips's

16   inability to handle the crisis.

17        So the decision was made to have Ms. Phillips

18   replaced with a white male prior to the termination decision

19   actually was given to Ms. Phillips, which was on May 8th.

20   Therefore, there is no evidence of racial animus.  As a

21   result, that cannot go to the jury.

22        Moreover, the evidence has also shown, through

23   Mr. Sykes, as presumably the one comparator in this case.

24   Mr. Sykes specifically said he was not at the same level as

25   Ms. Phillips.

```
 1          The problem with the plaintiff's case is they have

 2   not offered sufficient circumstantial evidence to go to a

 3   jury.

 4          As this Court is well aware in the cases that we've

 5   cited in our brief, the law presumes when there is someone --

 6   and my word not the Court's words regarding the presumption.

 7          But there is a lack of demonstration of animus when

 8   the person is replaced by the same race of the individual that

 9   was terminated or dismissed.

10          In this case, we have an important fact that can't be

11   contradicted, which is that on May 8th, Ms. Phillips was

12   terminated.  On May 3rd, the decision was made to replace them

13   with the same person of the same race.  Therefore, that cannot

14   go to the jury.

15          The reason why that's particularly important in this

16   case, because we do not have a comparator.  There is not one

17   regional director of the same -- of an opposite race of

18   Ms. Phillips that was terminated by the decision-makers in

19   this case.

20          We also know from the record, uncontradicted, that

21   Ms. Rossann Williams, Zeta Smith, also participated in the

22   decision along with Mr. Paul Pinto.  It was a collective

23   decision.

24          Therefore, the jury cannot conclude that they have a

25   sufficient comparator because the case has no direct evidence.
```

1  And, therefore, we move to dismiss all claims.

2        THE COURT:  All right.  Let me hear from plaintiff

3  counsel.

4        MS. MATTIACCI:  Your Honor, this is one of the most

5  outrageous cases of race discrimination and blatant race

6  discrimination I have ever come across.

7        There's been a plethora of evidence.  Let's first

8  start with pretext.

9        They have morphed their answer in terms of what their

10 stated reason is for the termination multiple times in this

11 case.

12       In fact, with Your Honor, the original jury

13 instruction submitted said that their stated reason was that

14 she was physically and emotionally absent.  That's what they

15 wanted the jury to hear in their drafted jury instructions.

16 We get into trial and now they've morphed it into, quote,

17 leadership and inability to handle crisis.

18       There wasn't a shred of evidence that occurred

19 considering that.  In fact, Mr. Sykes, who was the only

20 witness that testified who was there with her every single

21 day, who is African American and below her, testified that she

22 (sic) was with Ms. Phillips every day throughout this crisis,

23 that she supported him, that he leaned on her.

24       We had a plethora of documents of her being engaged

25 during this time, of working through the crisis, all these

1  people that were sending her thank-you notes and supporting

2  her, and they didn't have a shred, not even an internal text

3  message amongst themselves to say, oh, somehow Shannon

4  Phillips is failing.

5          The jury completely understands this is something

6  they have made up after the fact, and there is more -- way

7  more than a preponderance of the evidence the amount -- in the

8  quality and quantity of the evidence to show that their stated

9  reason is absolutely pretext.

10          THE COURT:  Well, at this stage, I have to look at

11  the evidence in the light most favorable to plaintiff on this

12  motion to see whether or not there's sufficient evidence for

13  these three claims to go to the jury.  So I know you're saying

14  preponderance to the evidence, but I really have to look at it

15  in the light most favorable to the plaintiff.

16          MS. MATTIACCI:  Yes, Your Honor, I'm sorry.  I'm

17  probably overstating it and already doing my closing.

18          But, you know, for purposes of the Rule 50 motion,

19  taking all the evidence that you see in the light most

20  favorable to the plaintiff, no reasonable jury could conclude

21  anything other than the fact that she was discriminated

22  against because of her race.  In fact --

23          THE COURT:  And I don't make credibility

24  determinations at this point.  That's not my function either.

25          MS. MATTIACCI:  Yes.

```
 1            THE COURT:  All right?

 2            MS. MATTIACCI:  Yes.

 3            THE COURT:  It's to see whether or not there's

 4  sufficient evidence for the jury to decide this case based

 5  upon the evidence presented.

 6            MS. MATTIACCI:  Yes, Your Honor.

 7            THE COURT:  All right.  But go ahead.  I interrupted.

 8  I'm sorry.

 9            MS. MATTIACCI:  No.  I was just going to say, to

10  address counsel's specific point about the replacement being

11  white, that's not of issue in this case.

12            This is a case in which they needed a scapegoat in

13  this situation, in this PR crisis that they were having, and

14  that action needed to be taken against someone in order to

15  quell the public and also those higher-ups in Seattle.

16            There's no way that they would be firing somebody who

17  was black at that time because that would have just completely

18  backfired on them.  They needed to make sure that they fired

19  somebody who was white, which they did with Ms. Phillips and

20  also with Mr. Trinsey.  And that's -- that was the motivation.

21  It was what was the straw that broke the camel's back.  Taking

22  all facts in the light most favorable to the plaintiff, it was

23  her race.

24            Even Mr. Sykes testified that he believed that if --

25  that her race played a role in the decision to terminate her
```

1  and that the fact that he was black played a role in the

2  decision to terminate -- not terminate him.

3          He was there.  Race was being discussed all day,

4  every day.  This was the main topic of discussion at Starbucks

5  from April 12th through the time that Ms. Phillips was

6  terminated.  It was all about race.

7          Mr. Sykes testified even at the roundtables, it was

8  about race and hearing from the black partners that worked

9  there and what their views were on everything that was going

10 on.

11         And he believed, based upon those circumstances and

12 what the circumstances do show, there was absolutely no

13 legitimate reason to fire Ms. Phillips at that time.  She had

14 not done anything.

15         So, Your Honor, with that, I think taking all facts

16 in the light most favorable to the plaintiff, the case should

17 proceed to the jury.

18         THE COURT:  Is this the evidence you rely on to

19 overcome pretext too, or is it more?

20         MS. MATTIACCI:  I think it's both, bias and pretext,

21 Your Honor.  You know, I think that we saw -- you saw the

22 witnesses on the stand.  I think Camille Hymes testified

23 multiple times and her demeanor and the way in which she was

24 testifying -- I know Your Honor's not making credibility

25 determinations, but just taking the facts in which she stated

1  them, she made an implication that somehow when she spoke to

2  Ms. Phillips about the arrest of the two men, that

3  Ms. Phillips was insistent that Ms. Holly Hylton not be

4  terminated in contrast to how Mr. Sykes responded according to

5  her in which he, quote, she -- he got it and felt that there

6  was implicit bias that was in play.

7         Mr. Sykes completely contradicted that.  He said:

8  No, that's not, in fact, what I told her.  In fact, I said

9  that I felt sorry for Holly Hylton because she just followed

10  the policy of Starbucks.

11         So there is a racial animus that is pervasive through

12  this case, and at the end of the day when a decision for a

13  head to roll had to be made, that head was not going to be a

14  black head.  They were looking for a white person to blame for

15  this, and that's exactly what they did.

16         MR. HARRIS:  Judge, may I just respond to the one

17  point --

18         THE COURT:  Yes, absolutely.

19         MR. HARRIS:  Your Honor, the cases that I've cited in

20  our brief specifically stand for the proposition that

21  subordinates by definition are not comparators.  That is a

22  longstanding theory of law and has been well developed in this

23  circuit.  I believe it's the *Westinghouse* case as well as

24  others that I've cited.

25         So by definition, Ms. Phillips doesn't have a

```
 1   comparator in this case.  Counsel has argued that the evidence

 2   that they've attempted to present is that Mr. Sykes is a

 3   comparator.  He is not.  By definition, he is her subordinate,

 4   so, therefore, they'd have to show another regional director.

 5   So, therefore, they can't satisfy their burden and that

 6   doesn't go to a jury.

 7           THE COURT:  One of the matters -- I'm considering it.

 8   It doesn't sound like -- that unless I'm wrong, that

 9   plaintiffs relied upon comparator evidence --

10           MS. MATTIACCI:  No.

11           THE COURT:  -- in this case at all to prove their

12   claim.  It's more circumstantial and with Mr. Sykes's

13   testimony, perhaps, direct evidence of race discrimination.

14           So comparator evidence is not in the case from what I

15   can see.

16           MS. MATTIACCI:  Exactly, Your Honor.

17           MR. HARRIS:  Mr. Sykes --

18           THE COURT:  You don't need comparator evidence to

19   prove your case.

20           MR. HARRIS:  Mr. Sykes doesn't have direct evidence.

21           THE COURT:  I can't hear you.

22           MR. HARRIS:  Mr. Sykes doesn't have direct evidence.

23   Mr. Sykes gave his opinion.  That's not direct evidence.

24   Mr. Sykes did not say that he participated in any decision.

25           THE COURT:  Well, he did give his opinion, yes.  It
```

 1   may not be direct evidence, you may be correct, but certainly,

 2   it's -- he was there day to day.  He was interacting with the

 3   people from corporate headquarters.

 4          As the first-level Starbucks employee over the store

 5   in question, he most certainly was heavily involved with the

 6   events after -- you know, after the day of the arrests.

 7          MR. HARRIS:  Absolutely.  Agreed with that.

 8          But the problem is Mr. Sykes testified before this

 9   Court that he did not participate with others, nor was he

10   consulted about the termination decision of Ms. Phillips.  The

11   reason why they can't have this case go before the jury is

12   because of that important fact.

13          In order for there to have direct evidence, one of

14   the decision-makers would have had to have said that race was

15   a factor in the decision.

16          Because Mr. Sykes did not participate in that

17   decision --

18          THE COURT:  Wait a minute.  Wait a minute.

19          Are you saying to me that the plaintiff, who had a

20   race discrimination, has to bring in a corporate employee who

21   said race was a factor or else they can't prove their case?

22          MR. HARRIS:  I'm not saying that.  I'm saying that's

23   direct evidence, and I'm saying this case is circumstantial.

24          What this Court just asked the question about was

25   whether or not perhaps that Mr. Sykes had direct evidence.

United States District Court

1    I'm saying it wasn't direct evidence because he didn't

2    participate in the decision-making, so, therefore, it would

3    have to be circumstantial evidence.

4            THE COURT:  Okay.

5            MR. HARRIS:  The way that you present circumstantial

6    evidence in an employment case is to use comparator evidence.

7    They don't have that.

8            They specifically argue that Mr. Sykes was a

9    comparator.  He's either a comparator or not.  He can't be a

10   comparator because he was not on the same level as

11   Ms. Phillips; therefore, they cannot have -- they don't have

12   direct or circumstantial evidence, which is the problem in

13   this case.

14           THE COURT:  Well, his testimony, again, viewing it in

15   the light most favorable to the plaintiff, contributes to the

16   claim of race discrimination.

17           I guess you could argue to the jury what his -- you

18   know, his credibility and where he was in the hierarchy, but

19   it seems to me that his testimony does contribute to the

20   plaintiff's case circumstantially at the very least to the

21   claims made in this case, and obviously, we saw Mr. Sykes.  He

22   is African American.

23           MR. HARRIS:  Correct.  But that doesn't make him have

24   sufficient evidence.

25           THE COURT:  But he's not a comparator.  You keep --

```
 1  you know, don't go --

 2          MR. HARRIS:  She argued that.  I didn't argue that.

 3          MS. MATTIACCI:  I did not.

 4          MR. HARRIS:  She argued that the comparator evidence

 5  was Mr. Sykes a few moments ago.  We can look at the record.

 6  I didn't make that argument.

 7          MS. MATTIACCI:  No.  It was in comparison to how

 8  Ms. Camille Harris (sic) analyzed it in going to her, the

 9  racial bias in which she was viewing the situation and lying

10  about it.

11          THE COURT:  Plaintiff -- from what I can see,

12  plaintiff is not relying upon comparator evidence in this

13  case.  It's not the theory they're going on, and they're

14  correct.

15          MS. MATTIACCI:  That's absolutely correct, Your

16  Honor.

17          THE COURT:  All right.  Let me read your memorandum.

18          And just bear with us.

19          MR. HARRIS:  Sure.

20          THE COURT:  All right.  I read the memorandum.

21          The memorandum makes reference to a retaliation

22  claim.  There is no retaliation claim in this case.

23          MR. HARRIS:  That is correct, Judge.  I was just

24  citing the case that stands for the proposition regarding

25  pretext.
```

```
 1            But, correct --

 2            THE COURT:  Okay.

 3            MR. HARRIS:  -- retaliation is not in this case

 4  whatsoever.

 5            THE COURT:  Yeah.  There was one heading also that

 6  had the word "retaliation" in it, so --

 7            MR. HARRIS:  Correct.  It's not in this case at all.

 8            THE COURT:  All right.  I have considered the

 9  arguments of counsel, and I've read the defendant's motion for

10  judgment as a matter of law pursuant to Federal Rule of Civil

11  Procedure 50(a).

12            And you'll file this of record?

13            MR. HARRIS:  Yes, Your Honor.  We will.

14            THE COURT:  All right.  And I am going to deny the

15  motion.  In my judgment, there's sufficient evidence on this

16  record, again, viewing it in the light most favorable to the

17  plaintiff, for a reasonable jury to conclude that there is

18  race discrimination.  And when I look at the elements of the

19  claims, that is really the element that's in dispute here in

20  this case.

21            And so obviously, I've listened carefully to the

22  evidence presented over the last three days -- because we

23  started with the testimony on Tuesday -- and the evidence is

24  sufficient for the jury to decide this case, so I will deny

25  the motion.
```

*Eckensberger - Direct*        681

```
 1          All right.  Let's bring in the jury, and you can

 2   present your case.

 3          (Jury in.)

 4          THE COURT:  Please be seated.

 5          Again, members of the jury, I want to thank you for

 6   your patience.

 7          And at this point, the defendant may present

 8   evidence.

 9          MR. HARRIS:  Your Honor, the first witness for the

10   defense would be -- and it appears the only witness will be

11   Mr. Marcus Eckensberger.

12          THE DEPUTY CLERK:  Good morning, sir.

13          THE WITNESS:  Good morning.

14          (MARCUS ECKENSBERGER, DEFENDANT'S WITNESS, having

15   been duly sworn, testified as follows:)

16          THE DEPUTY CLERK:  Would you please state and spell

17   your name.

18          THE WITNESS:  Yes.  Marcus, M-A-R-C-U-S,

19   Eckensberger, E-C-K-E-N-S-B-E-R-G-E-R.

20          MR. HARRIS:  May I proceed, Your Honor?

21          THE COURT:  Yes.

22                        DIRECT EXAMINATION

23   BY MR. HARRIS:

24   Q.  Mr. Eckensberger, good morning.

25   A.  Good morning.
```

*United States District Court*

*Eckensberger - Direct*                    *682*

 1  Q.  Can you give us a little bit of your educational

 2  background first?

 3  A.  Yes.  High school education, Bronx New York, and that was

 4  it.  Then I went right to work through high school.

 5  Q.  Okay.  And where did you work after high school?

 6  A.  I worked for Burger King Corporation for 17 years in the

 7  US and then in Central and South America.  And then I moved to

 8  Starbucks in 2004, so I've been employed with Starbucks for 19

 9  years.

10  Q.  In 2004, what position did you hold for the Starbucks

11  Corporation?

12  A.  District manager.

13  Q.  And in your role as a district manager, could you tell us

14  what your responsibilities were?

15  A.  I had direct oversight from about 10 to 12 retail

16  locations.  At the time, it was in Central New Jersey,

17  Princeton, New Brunswick, up to Newark, in that area.

18  Q.  And how many -- in your role as a district manager -- is

19  that what you said?

20  A.  Yes.

21  Q.  Okay.  As a district manager, approximately how many

22  employees did you oversee?

23  A.  About 200 and 225 employees.

24  Q.  And what was your budget of profit and loss

25  responsibility?

*Eckensberger - Direct*                683

1   A.   About 100, 120 million.

2   Q.   And then as I understand it, you were promoted from that

3   role?

4   A.   I went into licensed stores as a district manager,

5   supporting license accounts in Pennsylvania, New York state

6   and Atlantic City, New Jersey.  I had that for about two

7   years.  Then I went to New York City and then I was promoted

8   to regional director in 2010 and moved to Lakeland, Boston.

9   Q.   Let me stop you there.  Licensed stores, what does that

10  mean?

11  A.   You may see a Starbucks in a airport, a hotel, on a

12  travel plaza, in a casino.  So those are owned and operated by

13  those venues but Starbucks has an account rep, district

14  manager that would go in and consult to the contract, coach

15  the licensee on operations, their business and how to maintain

16  profitability.

17       So I did that role for about two years to help broaden my

18  breadth of leadership experience.

19  Q.   Who hired you in that role, if you can recall?

20  A.   Yep, it was a gentleman named Jeffrey Peters.  He's

21  currently still employed with Starbucks Corporation.

22  Q.   And then when you left that role from the licensed stores

23  you were promoted once again?

24  A.   Well, at that point I came in, it was 2008, the economy

25  was in a little bit of a spiral.  So I was asked to come into

*Eckensberger - Direct* 684

```
1   Midtown Manhattan so I worked in New York City during 2008

2   through 2010.  The company calls that our transformational

3   agenda.  There's several books written about that time.

4   Howard Schultz was coming back into the organization in 2008.

5        And I was in the mix of all of that in New York.

6   Q.  Howard Schultz, CEO?

7   A.  Yes.

8   Q.  Did you have -- or interface with him during that time

9   period?

10  A.  Yes.

11  Q.  And then you were promoted once again?

12  A.  Yes.  I was promoted to regional director in New England,

13  in 2010, July of 2010.

14  Q.  And you may have already said it, but for the edification

15  of the jury, could you describe the area that you were

16  responsible for in 2010?

17  A.  Sure.  I had basically Boston, Boston in Massachusetts

18  north, up New Hampshire and Maine.  I was accountable for

19  about 100 retail locations in that market.  About $150 million

20  in sales at the time.

21       Boston is a unique market for us, so we have a nationally

22  scaled competitor that's from there, so it's a pretty

23  interesting and fun market for Starbucks.

24  Q.  Could you describe who your leadership was at that time

25  that selected you for that role?
```

1  A.   That was Zeta Smith.  She was in a regional vice

2  president role at the time, and she promoted me to regional

3  director in northeast, in New England.

4  Q.   Did you also have interface or connections with

5  Ms. Rossann Williams?

6  A.   I did.

7  Q.   Who we've heard throughout the course of this trial.

8  A.   Yes.

9  Q.   Could you describe your contacts with her?

10 A.   Yep.  I've worked in New York as you had heard, so the

11 executives would typically visit the major markets, high

12 profile.  You have Wall Street, you have all the major media

13 brands, high volume.

14     So I knew all of the executives, they all had visibility

15 to my work.  Boston is also a high-profile market for

16 Starbucks, relative to Fidelity, which is a major shareholder

17 of Starbucks, headquarters is in Boston, as well as I had

18 mentioned, you know, home of Dunkin', which is a nationally

19 scaled competitor.

20     It's also a great brewed coffee scene in New England.  So

21 I would very frequently have interface with executives at all

22 levels of the organization.

23 Q.   At some point you were promoted once again?

24 A.   Yes.

25 Q.   And when was that?

*Eckensberger - Direct*                        686

 1  A.   2021.  I was promoted to regional vice president.  I took

 2  over the Mid-Atlantic, which spans from Philadelphia south

 3  through -- through DC, down through Virginia, North and South

 4  Carolina.

 5  Q.   You've heard the events that have been brought in this

 6  case dealing with April of 2018.

 7  A.   Yes.

 8  Q.   Do you remember that time period?

 9  A.   Yes.

10  Q.   What role were you holding in that time period?

11  A.   In April of 2018, I was a regional director in the

12  Mid-Atlantic, working for Camille Hymes.  I had -- my primary

13  area of responsibility was Central and South New Jersey.  I

14  had relocated to the New Jersey area from Boston to work with

15  Camille.

16       At that time, I was doing some dual duty.  I was in

17  charge of Washington, DC.  There was a gap with the regional

18  director down there in January.  So for my development, I was

19  doing two roles, so I was on the Acela train here going from

20  Trenton down to DC and running those two markets for the

21  brand.

22  Q.   Did you have visibility into the events that took place

23  of April 2018?

24  A.   Just as anybody else.  I was a peer of Ms. Phillips.

25       But I did have my hands full, Washington, DC, major

1   market for us.  And it was a turnaround situation from an

2   operational lens.

3       So I was -- my head was down, working hard, but surely we

4   all were impacted by the events in April.

5   Q.   How so were you impacted?

6   A.   Partners across the brand.  When you see your brand on

7   CNN and major news, Good Day America, everybody is impacted.

8   So it is the buzz, it's the talk of customers, it's the talk

9   of your partners, particularly those of color who were hearing

10  from their family and their friends about whatever they heard

11  in the news that day.  So it was definitely a topic for sure.

12  Q.   At some point did you have a conversation with Starbucks

13  leadership about coming to the market after April of 2018?

14  A.   I did.

15  Q.   And when was that first?

16  A.   To the best of my recollection, it was probably the end

17  of April, the very beginning of May, Camille had called me up

18  and she said --

19          MS. MATTIACCI:  Objection, Your Honor.

20  BY MR. HARRIS:

21  Q.   Without going into what Ms. Hymes had said, can you tell

22  us specifically what you did?

23  A.   What I did?

24  Q.   Let me step back.

25  A.   Yep.

*Eckensberger - Direct*                    688

 1   Q.   Do you recall when, approximately, you received a call

 2   from Ms. Hymes?  Without telling us what she said --

 3   A.   Yes.

 4   Q.   -- can you tell us, orient the jury in terms of when that

 5   time period was?

 6   A.   Yep.  It was the last week of April, right at the

 7   beginning of May.

 8   Q.   Without telling us specifically what she said to you, did

 9   you also have conversations with Ms. Zeta Smith?

10   A.   I did not.

11   Q.   Did you speak to anyone else in the organization about

12   moving to this market?

13   A.   I did not.

14   Q.   Okay.  And when you came to the market, approximately

15   when was that after the events of 2018?

16   A.   It was about three-and-a-half, four weeks later, so

17   around the week of May 8th.

18   Q.   If I understand your testimony, you indicated that you

19   first had contact with Ms. Hymes who was your then supervisor

20   in a different market the last week in April?

21   A.   Correct.

22   Q.   Did you have any experience with crisis management prior

23   to April 2018?

24   A.   Yes.

25   Q.   How so?

*Eckensberger - Direct*                               *689*

1  A.   Prior to Starbucks, I was in New York City on 9/11 at the

2  World Trade Center, so to lead my organization through that.

3       Additionally, I was working with Starbucks on April 15,

4  2013, when the Boston Marathon bomb went off.  I was on the

5  ground.  We have several stores that were impacted through

6  that.

7       Additionally, just as the brand was turning around in

8  2008, I was on the ground in New York City and had some

9  experience with that as well.

10 Q.   The two crises that you were responsible for as the

11 regional director, can you give the jury some context as to

12 what you did?

13 A.   Yeah.  I think crisis can bring uncertainty and one of

14 the things from a leadership perspective that I found

15 effective is to come in, set your vision, really ensure to

16 instill confidence in leadership above you.  And then

17 understand what resources are needed to move forward from the

18 crisis, whatever that is.

19 Q.   2008, do you recall what, if any, strategic vision you

20 provided to your organization in 2008?

21 A.   Yeah.  2008, at that time, it was really around

22 operations.  And operational execution.  So I had a lot of

23 input on what ended up becoming the store manager and district

24 manager approach that you heard other witnesses testify to,

25 which is actually the way in which people work.

*Eckensberger - Direct*                                690

1       So I was part of the team that brought that forward and

2   put that in place across the organization.

3   Q.   Do you recall any ideas that you may have had that you

4   brought to bear in 2008?

5   A.   Yep.  Specifically just how -- if you go into a Starbucks

6   and you see people, I'll call it -- we call it deployment but

7   how they're laid out behind the line there.

8       Just some ways to make that more efficient and to think

9   about the production of our beverages in a more proficient

10  manner to move people through the line.

11      So it was a lot of operational things in 2008 and I was

12  in a district manager role in New York.

13  Q.   You indicated that there was another crisis in which you

14  led your organization.

15  A.   Yep.  I'll speak to 2013 and the Boston Marathon bombing.

16      If you recall, Marathon Monday is when the bomb went off.

17      But on Friday, in the city of Boston they had a remand in

18  place.  So stores were open, customers in stores, there was

19  tanks rolling down the street and they remanded everybody in

20  place.

21      That took a big emotional toll on my organization.  I had

22  45 stores, about 200 partners working, and then they had to

23  get locked in in the stores with customers as they were

24  chasing the gentlemen.

25      So with that, I was able to pull in different resources,

*Eckensberger - Direct*                    *691*

1    different funding for positions.

2        We transformed into a -- the roles in stores to help us

3    deal with these things going forward.

4    Q.   Mr. Eckensberger, the time that you had the most recent

5    crisis, did you interface with Zeta Smith during that time

6    period?

7    A.   In 2013 in Boston?

8    Q.   Yes.

9    A.   Yes.

10   Q.   What was your interface, can you tell us what that was?

11   A.   She was my leader.  And I looked to her as a resource.

12   So in crisis, the director, the role of the director is really

13   to lead their market.  And as folks are coming to visit and

14   check on people, they're also looking at operations and seeing

15   what's going on.

16       And if there was any additional resources that I may have

17   needed, whether it was funding, additional positions, I was

18   sure to make sure I shared that with Ms. Smith and people

19   above her as well.

20   Q.   When you say you "shared that," did you initiate the

21   conversations with those leaders to get the resources that you

22   needed?

23   A.   Totally, yes.

24   Q.   Was it the expectation that you would host them when they

25   came into your town or city?

*Eckensberger - Direct*                              *692*

```
 1          MS. MATTIACCI:  Objection, Your Honor, leading.

 2          THE COURT:  Sustained.

 3  BY MR. HARRIS:

 4  Q.   Did you host leaders when they came to your city?

 5  A.   Yes.

 6  Q.   How did you host them?

 7  A.   Making sure that -- I mean, the local leader understands

 8  their market, introduce them to the right people, show them

 9  around, show them what's working, what's not working, what

10  we're working on to move the business forward.  So there

11  should be no surprises.  As the market leader, the expectation

12  is that I know what's going on inside my market and that I had

13  plans in place to address that.

14      And that's really what you want to showcase to executives

15  when they come into your market.

16  Q.   Is that what you did in the crisis that you led?

17  A.   Yes.

18  Q.   Showing you what's been previously marked into evidence

19  as the Safe and Welcoming policy.

20          MR. HARRIS:  May that be shown to the jury.

21          With the Court's indulgence, if I could get the

22  correct exhibit number, if I may.

23          The Court's indulgence, I just want to make sure I

24  have the right exhibit number, Judge.

25          One moment, Mr. Eckensberger.
```

*Eckensberger - Direct*                         693

1   BY MR. HARRIS:

2   Q.   Well, before I get to that exhibit, I will ask you some

3   additional questions, Mr. Eckensberger.

4        When you came into the market in May, I believe your

5   testimony was the first or second week in May, somewhere

6   around May 8th, what was the first thing that you did?

7   A.   First thing that I did was I just tried to get an

8   understanding of what was actually happening in the market up

9   to now, basically.  There was a lot of listening sessions and

10  roundtables for several weeks.  There was several executives,

11  teams in the market, so I met with them, just to get a

12  broad-stroke understanding of what they were seeing and what

13  was actually happening in the market.

14       So we had some meetings.  They gave me a broad-stroke

15  overview through that.  I was able to pull out a couple of

16  themes that I heard across there, and then I just got to work

17  on --

18  Q.   What were some of the things that you heard?

19            MS. MATTIACCI:  Objection, Your Honor, hearsay based

20  on hearsay.

21            MR. HARRIS:  Effect on the listener, Judge, exception

22  to the hearsay role.

23            THE COURT:  Well, ask him what -- I think he can

24  testify to what themes he worked on.

25  BY MR. HARRIS:

*Eckensberger - Direct*                          *694*

1   Q.   What themes did you work on?

2        MS. MATTIACCI:  Objection, Your Honor, because --

3   irrelevant too.  This is all postdating Ms. Phillips's

4   employment there.  It happened after she had already left, so

5   any hearsay that he is obtaining is not in the time that is

6   relevant to Ms. Phillips's employment there.

7        MR. HARRIS:  It's not hearsay.  He's specifically

8   going to talk about themes.  It's not hearsay.

9        THE COURT:  All right.  It's to his understanding, so

10  I'll allow him to describe it.

11  BY MR. HARRIS:

12  Q.   Would you describe the themes that you worked on.

13  A.   Yes.  Four major themes:  One was to triage and respond

14  through the partner roundtables -- the many, many partner

15  roundtables that happened; two, lists were created:  One was a

16  list of facilities items that needed to be repaired so things

17  in the store, partners complaining, hey, this isn't working.

18  This is dirty.  This has been broken for a while.

19       So we had a list -- a rolling list, so I had requested

20  the funds be released so that work can be dispatched and taken

21  care of immediately.

22  Q.   So one was facilities.  Did you come up with that list?

23  A.   No.  That was a collection of things that happened during

24  the roundtables that happened prior to my arrival.

25  Q.   So that was something that you gleaned from --

1    A.   Correct.

2    Q.   -- the roundtable discussions?

3    A.   Yes.

4    Q.   And you created that plan of action regarding the

5    facilities specifically?

6    A.   My directive was we needed to get this released right

7    away and make it happen.  And, yes, I had asked for that

8    resource, the resource was granted and I directed the

9    facilities team to take care of it.

10   Q.   What was the second theme that you identified?

11   A.   The second theme around that same issue, there was a lot

12   of partner concerns that were coming up through the

13   roundtables that ended up getting logged, just many, many

14   concerns.  So I had asked for an additional partner resources

15   or human resources manager to come into the market to support

16   me to close out those cases.

17   Q.   When you say close out the cases, tell the jury what you

18   mean by that.

19   A.   Well -- and I believe there was testimony prior to this

20   that as things come up, what we would typically do is they

21   would get logged in with our partner resource support center.

22        And then somebody from our PRO organization would open up

23   a claim, and they would direct it to either the district

24   manager or an investigator to look further into the claims,

25   and then we would close it out.

*Eckensberger - Direct*                              696

 1       And close it out means we would come to a resolution,

 2  whether it was substantiated or unsubstantiated, and then we

 3  would follow back up with that partner who initiated the claim

 4  on what the result was.

 5       So there was so many claims that we just had to have

 6  another team come in to do that, so I had requested that

 7  resource as well.

 8  Q.   Okay.  So the claims that were in the queue were

 9  addressed by you and your team?

10  A.   Correct.

11  Q.   What was another theme that you identified?

12  A.   The second theme was around just I would say district

13  manager leadership in the market.

14       As you had heard, when I came in, there was actually

15  three district managers in Philadelphia, not two, as that

16  testimony had shared today.

17  Q.   Let me stop you there.

18  A.   Uh-huh.

19  Q.   The testimony thus far has been that there were two

20  identified district managers in the Philadelphia market.

21       Was that accurate?

22  A.   No, that is not accurate.

23  Q.   How many district managers were there?

24  A.   There was three.

25  Q.   And who might they be?

Eckensberger - Direct                    697

1   A.   There was Ben Trinsey, who was the district manager, and

2   he was on suspension when I came; there was Paul Sykes, who

3   you met yesterday; and there was another district manager,

4   Michael Lamborn, who was in the University City section of

5   Philadelphia, UPenn, Penn Med, around that area, but he was

6   clearly part of the Philadelphia team.

7   Q.   Well, let me stop you there.

8        His name hasn't been mentioned before?

9   A.   Correct.

10  Q.   Are you sure that he was a district manager at that time?

11  A.   Yes.

12  Q.   Were you responsible for him?

13  A.   Yes.

14  Q.   Do you know his race?

15  A.   Yes.

16  Q.   Is he still employed with you?

17  A.   He had retired.  He worked with us for several years post

18  incident.

19  Q.   What is his race?

20  A.   White male.

21  Q.   Mr. Eckensberger, now I have the exhibit, the Safe and

22  Welcoming policy of -- I think it was Exhibit Number 139.

23       Do you recognize this diagram?

24  A.   From court.

25  Q.   Yes.

*Eckensberger – Direct* 698

```
 1      Okay.  Have you seen this before prior to court?
 2  A.   I was aware of this, and I really didn't pay much
 3  attention to it, prior to court.
 4      This was a test in our San Francisco market to deal with
 5  some of the social issues that were happening in our cafés.
 6  Q.   When you say "test," I don't understand what that means
 7  and nor would the jury.
 8      So can you tell us what that means as a test?
 9  A.   Sure.  You know, Starbucks is a big company, and a lot of
10  people have some really good ideas, and the ideas that are
11  working for some that gain some traction, we would test.
12      And then we would pick a market.  We have a testing team,
13  they would sponsor the test.  It has to be sponsored by a vice
14  president or above.  They sponsor the test.  And basically,
15  for whatever time they want to test some products, they'd put
16  it in place, learn what works, what doesn't work and then you
17  scale it across the organization.
18          MR. HARRIS:  May the witness be shown the second page
19  of that document?
20  BY MR. HARRIS:
21  Q.   Showing what's been previously marked as Exhibit
22  Number 139, do you recognize this portion of that document?
23  A.   From the test, yes.
24  Q.   Okay.  Was this a policy or a practice that you're aware
25  of?
```

*United States District Court*

*Eckensberger - Direct*                    *699*

1   A.   This is not a policy.  What this is, is this was a test

2   in San Francisco.  And then the regional directors in the

3   major markets -- and, again, I've worked with all of the major

4   markets here in the East Coast.  You work with your local

5   partner and asset protection person if you have a lot of

6   incidents, and they may suggest some things to you.  And then

7   the regional director is the one that has the power and the

8   capability to implement these types of tests in their market.

9   Q.   You've heard testimony about the use of this in the

10  incident that took place of April of 2018?

11  A.   I did.

12  Q.   Are you aware of whether or not this policy identifies or

13  provides for the calling of the police?

14  A.   I am not aware of that.

15  Q.   In May of 2018, when you joined the market, did you have

16  conversations with senior leadership, including Rossann

17  Williams, Zeta Smith, and others?

18  A.   Regarding the policy?

19  Q.   Not about the policy but just generally about the

20  leadership and what was needed of you?

21  A.   Yes.

22  Q.   Did you facilitate conversations or meetings while they

23  were in town?

24  A.   Yes.

25  Q.   How did you do so?

*Eckensberger - Direct*                              *700*

 1   A.   Well, as I understood what was happening in the market, I

 2   formulated a strategy, I asked for resources, I made sure I

 3   had their endorsement and their imprint on that strategy, and

 4   then I went to work executing against that strategy.

 5   Q.   Did you have any meetings -- you heard the -- I think the

 6   testimony was that there were show-up calls or something of

 7   that --

 8   A.   Stand-up calls?

 9   Q.   Stand-up calls, yes.

10        Were any stand-up calls held while you were the leader in

11   that market --

12   A.   Yes.

13   Q.   -- in May of 2018?

14   A.   Yes.

15   Q.   Can you describe what participation you had in those

16   stand-up calls?

17   A.   Again, as we're here on the ground locally, the intent of

18   the stand-up calls are for others across the organization to

19   have a firsthand look at what's actually happening, what's

20   working, what's not working, and then what resources are

21   needed to solve for some of the issues coming above.

22        So I would work to ensure that that data was communicated

23   effectively, and then as I put the plan together, I was able

24   to start shifting the dialogue to a report out of the plan so

25   they knew what was happening.

*Eckensberger – Direct*                          701

```
 1   Q.   As opposed to just recording the event?

 2   A.   Correct.

 3   Q.   In those calls, did you set the agenda for those calls?

 4   A.   Yes.

 5   Q.   Did you also facilitate those calls?

 6   A.   Yes.

 7   Q.   When I say "facilitate," what does that mean to you, and

 8   can you educate the jury?

 9   A.   Sure.

10        I would post the call which means open it up, introduce

11   the parties.  There would typically be several departments on

12   the call.  So my role be would be to call on them to share and

13   then recap next steps and follow-up items for the next day.

14   Q.   Mr. Eckensberger, did you have the occasion to supervise

15   Mr. Ben Trinsey?

16   A.   I did not.

17   Q.   Did you have the occasion to supervise Mr. Sykes?

18   A.   Yes.

19   Q.   Can you describe his performance while he was under your

20   leadership?

21   A.   Yes.

22        Initially, Mr. Sykes was very responsive.  He was engaged

23   in the work.  As we started to get through May and into June,

24   it became apparent to me that the vision and the plan that we

25   had with the market, Mr. Sykes was unable to keep pace with.
```

*Eckensberger - Direct*                          *702*

 1          MS. MATTIACCI:  Objection, Your Honor, completely

 2    irrelevant.  This is all postdating Ms. Phillips -- post her

 3    termination.  And he can't speak to anything having to do with

 4    when Ms. Phillips was at Starbucks, in the Philly market.  He

 5    didn't even get in -- come into there until after she was

 6    terminated, and he's testifying about stuff that is completely

 7    irrelevant.

 8          THE COURT:  All right.  I'll overrule the objection.

 9    There can be some testimony about this.

10    BY MR. HARRIS:

11    Q.   Thank you, Mr. Eckensberger.  Describe his performance

12    again.

13    A.   He was struggling with acumen for a district manager in

14    role 11 years.  He wasn't close enough to the details.  He

15    wasn't executing against the operational approaches as they

16    were intended.  He was very distracted with the events that

17    were happening relative to the social issues inside of the

18    market.

19         And he was just really unable to grasp what needed to

20    happen and keep pace with the other new district managers that

21    I had brought into the market.

22    Q.   Were you part of the decision -- strike that.

23         Did you make the decision to offer him an exit out of the

24    organization?

25    A.   I did.

*Eckensberger - Direct*                                    703

1   Q.   How did you do that?  Without telling us what you said

2   specifically then, did you offer him a package as part of his

3   exit?

4   A.   I did.

5   Q.   Did he take that package?

6   A.   He did.

7   Q.   So he exited the organization involuntarily, that would

8   be your testimony?  Or did he resign?

9   A.   It was, I would say, a forced resignation.  He had the

10  opportunity to resign as I presented him the package which

11  enabled him to have a good transition outside of Starbucks.

12  Q.   And he did that?

13  A.   Yes.

14  Q.   Do you recall who replaced Mr. Sykes?

15  A.   Yes.

16  Q.   Who was that?

17  A.   That was -- let's see.  I had Brian Dragone -- I had Dana

18  Roxas replace Mr. Sykes.

19  Q.   I'm sorry, say that again.

20  A.   Dana Roxas.

21  Q.   Do you recall her race?

22  A.   Yes.  She's a white female.

23  Q.   Do you recall the person who replaced Mr. Trinsey?

24  A.   Yes.

25  Q.   Who was that?

*Eckensberger - Direct*                    *704*

```
 1   A.   Brian Dragone.

 2   Q.   What was his race?

 3   A.   White male.

 4   Q.   During the course of your leadership with Mr. -- strike

 5   that.

 6        With Ms. Rossann Williams, Zeta Smith, Camille Hymes, did

 7   race ever come up to one conversation regarding personnel?

 8   A.   Absolutely not.

 9   Q.   Did you engage in any race-based decision-making with the

10   decisions that you made regarding the replacements of

11   Mr. Sykes or anyone else in your organization?

12   A.   Absolutely not.

13   Q.   Did anyone discuss with you your race when you were being

14   selected for the role of taking over Ms. Phillips's position?

15   A.   No.

16   Q.   Did you ever find that Ms. Zeta Smith or Rossann Williams

17   in their conversations with you ever discussed your race or

18   anyone else's race in their decision-making regarding

19   personnel?

20   A.   No.

21            MR. HARRIS:  The Court's indulgence.

22   BY MR. HARRIS:

23   Q.   As part of -- I believe you said you had a vision for the

24   region in which you became responsible for the region that

25   Ms. Phillips previously had?
```

*Eckensberger - Direct* 705

1    A.   Yes.

2    Q.   Did you hold conversations or calls with the folks in

3    your region about how you were going to develop them in terms

4    of their personal development?

5    A.   Yes.

6    Q.   How did you do that?

7    A.   We brought in some support.  My determination was that

8    the market was significantly behind.  So I had asked for an

9    additional district manager head count to be added as well as

10   a new position that I created called an operations coach that

11   came in for about 100 days just to work closely with the store

12   managers, just on some basics, how to write schedules, how to

13   have coaching conversations, how to execute our cleanliness

14   programs, just really some of the basics that they weren't

15   able to get to prior.

16   Q.   The coach that you brought in for the development of your

17   subordinates, did you find that coach to be effective?

18   A.   Yes.

19   Q.   How was your district performing relative to your peers

20   across the enterprise?

21   A.   The Philadelphia market really started to accelerate at

22   that time.  We were running about double the sales comp for

23   the next actually two years prepandemic.

24        Actually, every single store manager in the City of

25   Philadelphia maximized their bonus for the next two years and

*Eckensberger - Direct*                706

1  every KPI doubled.  So much so that they actually awarded the

2  market -- they brought out a president's award which had been

3  retired for 15 years and they brought that award out of

4  retirement to give to myself and the partners in the market

5  for their outstanding work post-incident.

6  Q.   Who provided that president's award to you?

7  A.   The president at the time which was Rosalind Brewer.

8  Q.   Rosalind Brewer?

9  A.   Yes.

10  Q.   We've heard her name mentioned before?

11  A.   Yes.

12  Q.   Did she indicate to you in any way that your race had any

13  impact on the decision to award you the president's award?

14  A.   No.

15  Q.   When you received the president's award, was there

16  actual, any sort of publicity or media attention around it?

17  A.   Yes.  It was presented to me in a company-wide conference

18  with 35,000 people live as well as published on Starbucks

19  news, LinkedIn by Starbucks Corporation, yeah.

20  Q.   Let me step back.

21       You were an employee as a regional director on May 29th

22  of 2018?

23  A.   Correct.

24  Q.   That was the unconscious bias training that went

25  enterprise-wide?

*Eckensberger - Direct*                              707

 1  A.   Yes.

 2  Q.   At the conclusion of that unconscious bias training, it's

 3  my understanding that you received some media attention?

 4  A.   Well, as it was stated, there was a lot of media trucks

 5  in the market.  And part of my strategic approach was, we had

 6  publicly announced we were going to close all the stores down

 7  on May 29th for the unconscious bias training.  And I decided

 8  to pool everybody together in Philadelphia to do it all in

 9  one.

10  Q.   Your decision to pool everyone together in the same

11  place?

12  A.   Yep.  Yes.

13  Q.   What did you decide to do and where did you decide to

14  hold it?

15  A.   I pooled them at The W Hotel downtown, just in a

16  conference room so we can all go through it together.

17       And as we were closing the store down at 18th and Spruce,

18  there was --

19  Q.   Let me stop you there real quick so we have context.

20  A.   Yep.

21  Q.   It was your decision to bring everyone to the same

22  location?

23  A.   Yes.

24  Q.   Why did you want to do that?

25  A.   Number one, for safety.  Number two, for consistency.

*Eckensberger - Direct*                           708

1   Number three, as the leader of the market I thought it was

2   important that if there was some higher-level concerns that I

3   can address them directly with the partners.

4   Q.   What did you do after the session?

5   A.   Well, as we were closing down for the session, there was

6   a lot of media in town, so you know, I decided that I would be

7   the one to hang the sign up at the store, because there was a

8   lot of -- probably had 100 photographers out there waiting for

9   that to happen.

10  Q.   Was there an article in the newspaper after that?

11  A.   Yep.  The very next day that picture was full color,

12  front page, top fold on the Philadelphia Inquirer, which we

13  know is a big publication, with my face hanging the sign to

14  close down 18th and Spruce for the bias training.

15          MR. HARRIS:  The Court's indulgence.

16  BY MR. HARRIS:

17  Q.   Mr. Eckensberger, in your several years of experience

18  with Starbucks, have you or anyone else that you were

19  responsible for have a discussion about race in

20  decision-making?

21  A.   Never, no.

22  Q.   Has any of your leadership team that you reported up to

23  ever, on one occasion, discussed race as part of a

24  decision-making process?

25  A.   No, never.

*Eckensberger - Cross*                                              709

```
 1   Q.   You're sure about that?

 2   A.   Yes, positive.

 3        MR. HARRIS:  I have no further questions for you.

 4   Counsel may.

 5        THE COURT:  Cross-examination.

 6        MS. MATTIACCI:  Thank you, Your Honor.

 7                      CROSS-EXAMINATION

 8   BY MS. MATTIACCI:

 9   Q.   Mr. Eckensberger, you're the corporate designee for

10   Starbucks Corporation for this trial.  Correct?

11   A.   That is correct.

12   Q.   And you've been sitting in this courtroom this entire

13   week, including opening statements and through the testimony

14   of all the witnesses.  Correct?

15   A.   Yes.

16   Q.   And through the entire trial, before the trial, at

17   lunchtime and at nighttime, you're having conversations with

18   defense counsel for Starbucks.  Correct?

19   A.   Correct.

20   Q.   You were here in the courtroom yesterday when Mr. Sykes

21   testified that he was not terminated from Starbucks.  Correct?

22   A.   Yes.

23   Q.   And that his leaving Starbucks was his voluntary choice.

24   Correct?

25   A.   Yes.  That's what he said.
```

*Eckensberger - Cross*                                710

1   Q.   So you're saying -- is he lying when he says that?

2   A.   I presented him with a package to exit Starbucks, part of

3   which was his resignation.  And it also gave him a financial

4   payout as part of his exit.  If he did not choose that, I

5   would have separated him from employment from Starbucks.

6   Q.   Isn't it true that he had the option to go to a suburban

7   store in Philadelphia?

8   A.   Initially.

9   Q.   He was given the option to take the job in the suburbs

10  and if he took it, he would still have been employed with

11  Starbucks.  Correct?

12  A.   We were talking about that initially, but there wasn't an

13  option for him on the table to do that.

14       Once I presented him with that employment package at that

15  time, his choice was to exit the organization.

16  Q.   My question is, he was given the option to go and take

17  the job in the suburbs.  Correct?

18  A.   He never had that option on the table.  I had never

19  formally presented that option to him.  It was something in

20  discussion that I asked him if he would be interested in.

21  Q.   Okay.  So you asked him whether he would be interested in

22  this job in the suburbs?

23  A.   Yeah.

24  Q.   If he would have said yes, I'm interested in the job in

25  the suburbs, he would have the job in the suburbs.  Correct?

*Eckensberger - Cross*                      711

```
 1  A.   I don't know that.  This was very early on when I first
 2  got into Philadelphia.  And as I said, he was very initially
 3  responsive and he was working very well for the first couple
 4  of weeks.
 5  Q.   That's what I'm saying.
 6       Why would you be offering somebody the option to go to
 7  another position if you're not saying that person would have
 8  the opportunity to have that position?  It's not logical to
 9  me.  Right?
10  A.   Yeah.  It was if something comes up in the suburbs, would
11  you be interested in going.
12  Q.   No, in fact, there was a position in the suburbs that
13  they were placing him into.  Correct?  And he didn't want to
14  go into the suburbs.  Remember?
15  A.   No, I don't recall that, no.
16  Q.   You don't recall that.  He wasn't terminated for
17  misconduct.  Correct?
18  A.   No.
19  Q.   And Starbucks, when they gave him this package, they paid
20  him $50,000?
21  A.   Correct.
22  Q.   And so it was him leaving, and he accepted this, what
23  you're saying it was a resignation.  Correct?
24  A.   Yes.
25  Q.   And he voluntarily left?
```

*Eckensberger - Cross*                     712

1   A.   Yes.

2   Q.   You talked about that you were in central New Jersey and

3   also Washington, DC in April of 2018 in the beginning of May

4   of 2018.  Correct?

5   A.   Yes, that's correct.

6   Q.   So you were not in Philadelphia when any of these events

7   occurred.  Correct?

8   A.   Yes, correct.

9   Q.   And you were not in Philadelphia through any of the weeks

10  that we have been discussing up until Ms. Phillips's

11  termination.  Correct?

12  A.   Yes.

13  Q.   And you had no input in the decision to terminate

14  Ms. Phillips.  Correct?

15  A.   None.

16  Q.   When you came in -- you said Mr. Lamborn was the third

17  district manager in Philadelphia?

18  A.   Yes.

19  Q.   Isn't it true Mr. Lamborn had the suburbs of Philadelphia

20  and the store in -- at Penn.  Right?

21  A.   There was several stores in Philadelphia that Mr. Lamborn

22  was accountable for.  The University City stores, there was

23  four or five stores over there, plus Penn Medicine.  They were

24  all within the city limits of Philadelphia.

25  Q.   They were at Penn, but they weren't in Center City

1    Philadelphia?

2    A.   It's still a Philadelphia district as much as the other

3    side of Broad Street is.

4    Q.   There's a difference.

5    A.   Not --

6    Q.   There's Center City, and then there's Penn.  You don't

7    agree with me?

8    A.   No.

9    Q.   Okay.  But you can agree that -- well, maybe you don't

10   know, but in Center City Philadelphia, it was just Ben Trinsey

11   and Paul Sykes.

12        Would you agree with me?

13   A.   For the 23 stores in -- that they were responsible for

14   and then the broader Philadelphia stores, yes.

15        The city of Philadelphia, Michael Lamborn is the district

16   manager in the city of Philadelphia which includes the stores

17   in Penn.

18   Q.   Well, and he only had the stores at Penn.  Correct?

19   A.   Which was --

20   Q.   In terms of the stores in Philadelphia?

21   A.   Yeah.

22   Q.   Thanks.

23        So then, when you took the two -- and when you came over

24   to Philadelphia, you didn't take over Mr. Lamborn's stores,

25   right, at Penn?

*Eckensberger - Cross*                                    714

1   A.   I did, yeah, absolutely.

2   Q.   As a regional director?

3   A.   Yes, I did.

4   Q.   And then you took Mr. Sykes's stores?

5   A.   Yes.

6   Q.   And Mr. Trinsey's stores?

7   A.   Yes.

8   Q.   And you also had Washington, DC?

9   A.   Yes.

10   Q.   And you also had Central New Jersey?

11   A.   Correct.

12   Q.   Isn't it true that the reason that you were covering

13   Washington, DC, is because there was an open position in

14   Washington, DC, they were trying to fill for regional

15   director?

16   A.   Correct.

17   Q.   So why wouldn't they give Ms. Phillips the job in

18   Washington, DC, that you were covering?

19           MR. HARRIS:  Objection.

20           MS. MATTIACCI:  As the corporate designee of

21   Starbucks --

22           MR. HARRIS:  He can't testify --

23           THE COURT:  If he knows.  If he knows.

24   BY MS. MATTIACCI:

25   Q.   As the corporate designee of Starbucks, why didn't they

1  offer Ms. Phillips the job in DC that was available?

2  A.   I don't have any knowledge to that.  I was a peer of

3  Ms. Phillips.  I wasn't in a decision-maker capacity.

4  Q.   And as the corporate designee of Starbucks, you don't

5  know?

6  A.   I don't.

7  Q.   At one point, you were talking about there was four

8  themes that you wanted to discuss.

9       One of them was about the district manager leadership in

10 the market.

11 A.   Uh-huh.

12 Q.   We heard from Mr. Sykes yesterday that the partners there

13 loved Ms. Phillips, and many were very upset.  He was

14 personally very upset and shocked.

15      So are you contending that Mr. Sykes is lying?

16 A.   No, not at all.  Shannon had built a really good, deep

17 connection with a lot of partners in the city of Philadelphia,

18 yes.

19 Q.   The second thing that you talked about was facilities

20 items?

21 A.   Uh-huh.

22 Q.   This was a list of facilities items?

23 A.   Yes.

24 Q.   As the corporate designee of Starbucks, do you know why

25 no list of facility items was ever given to us?

*Eckensberger - Cross*          *716*

1   A.   No.

2   Q.   Do you know why no documents or emails or anything was

3   ever produced to us regarding some issue concerning facilities

4   items?

5   A.   No.

6   Q.   Do you have any knowledge of whether facilities items

7   played any role in the decision to terminate Ms. Phillips?

8   A.   I wasn't privy to the decisions with Ms. Phillips.

9   Q.   And then the third thing you talked about was logs of

10  concerns that needed to be closed out.

11  A.   Uh-huh.

12  Q.   Is this written logs?

13  A.   They would be cases that would get called in to our

14  partner resources support center, and they could be anything.

15       So the director would have visibility to the number and

16  then how cases were progressing.  So there was enough where I

17  felt it appropriate to ask for additional resources to work

18  through the amount of cases.  And these were intake from the

19  roundtables that opened up cases during the roundtables.

20  Q.   Right.  During the roundtables, it came up that there

21  were cases that had been closed years in the past that were

22  going to be relooked at by Starbucks.  Correct?

23  A.   I'm not sure of the specifics.  I believe it was many

24  different things, some of it operational:  I don't have the

25  skills I need or tools I need to do my job, I'm not seeing my

*Eckensberger - Cross*                    717

1  leader enough, I'm not spending enough time on my development,

2  I'm struggling, I'm overwhelmed with the drug issues that are

3  happening in the store, things like that.

4  Q.  And this list of concerns, was this in a written document

5  somewhere?

6  A.  No.  They would have been cases that would have been

7  called into the PRSC.

8  Q.  Okay.  And do you recall or have any knowledge as the

9  Starbucks corporate designee why these logs were not produced

10  to us?

11  A.  No.

12  Q.  Isn't it true that a lot of concerns that were brought up

13  in the past that had already been closed by PRM, that they, in

14  fact, when looked at, were seen to be shown that they were

15  handled appropriately and then, therefore, closed

16  appropriately?

17  A.  I'm not sure.  There could have been some of those.

18  There was a lot, so I believe there was probably a little of

19  everything.

20  Q.  You said on direct examination that calling 911 was not

21  part of the Safe and Welcoming policy?

22  A.  That I'm aware of.

23  Q.  Let's take a look at 160.

24      This is Starbucks Incident Report from Saturday,

25  April 14, 2018 at 2:39 p.m. in regards to the event that

*Eckensberger - Cross*                    718

1    occurred on April 12, 2018.

2        I want to direct to your attention to the incident notes.

3        It says:  Store manager then went to the back to call

4    police as man was becoming hostile and didn't want to buy

5    anything in order to use the tables in the lobby (per

6    Starbucks policy).

7        Do you see that?

8    A.   Yes.  If I can clarify that?

9    Q.   No.  My question is --

10   A.   Yeah?

11   Q.   -- is that what it says?

12   A.   That's what it says.

13   Q.   Okay.  So per Starbucks policy, she called the police.

14   Correct?

15   A.   No.  That's what it says, but Starbucks' policy is not to

16   call the police.  The policy enacted in the stores in

17   Philadelphia was instituted by Ms. Phillips.  That was not a

18   policy across all of Starbucks.

19   Q.   So you're taking the position that the policy of calling

20   the police was a personal policy that Ms. Phillips instituted?

21   A.   Yes.  The Safe and Welcoming that has been referred to,

22   Ms. Phillips put that in her Philadelphia stores.  That was

23   not a company policy across all 8,000 stores.

24   Q.   No one has said it's a company policy through 8,000

25   stores.

*Eckensberger - Cross*                    719

1  A.   The regional director made the decision to put that

2  policy in effect, the test, in her stores in Philadelphia

3  based on the incidents that the market was having.  It was her

4  determination that that's what she needed to do to keep her

5  partners safe.

6  Q.   So you'd agree with me that the Safe and Welcoming

7  policy, which includes a manager calling 911, is a policy that

8  comes out of Seattle.  Correct?

9  A.   No.  It was a test.  I'm not aware -- I was running over

10 200 Starbucks retail locations.  I did not have this policy in

11 place in any of my locations.  I wasn't part of the test.  I

12 was not aware.

13 Q.   Sir, so you're telling me that there was a test policy in

14 Seattle that included calling 911 --

15 A.   I don't know.  I haven't seen the documents or the

16 training, so I don't know if it included calling 911.

17 Q.   As the corporate designee of Starbucks in this trial

18 which includes the Safe and Welcoming policy of the store

19 manager calling 911, you're telling this jury you don't have

20 awareness of what this policy is?

21 A.   It's not a policy.  It was a test that Ms. Phillips

22 enacted in her Philadelphia stores based on her decision.

23 Q.   So when Starbucks puts in their incident report that she

24 went to the back to call the police as the man was becoming

25 hostile and didn't want to buy anything in order to use the

*Eckensberger - Cross*                    *720*

 1  tables in the lobby per Starbucks policy, you're saying it's

 2  not Starbucks policy?

 3  A.   Correct.  That policy would not have been the case across

 4  the river here in New Jersey, in any other store.  That

 5  specific Safe and Welcoming -- I'll call it a program -- was

 6  enacted by Ms. Phillips in her market.

 7           MS. MATTIACCI:  Your Honor, may we take a five-minute

 8  bathroom break, and I can continue with this gentleman?

 9           THE COURT:  Okay.  Let's take our mid-morning recess.

10  We'll stand in recess.

11           (Jury out.)

12           (Recess at 11:00 a.m. until 11:18 a.m.)

13           THE COURT:  Let's bring in the jury.

14           (Jury in.)

15           THE COURT:  Please be seated.

16           You may proceed, Counsel.

17           MS. MATTIACCI:  Thank you, Your Honor.

18  BY MS. MATTIACCI:

19  Q.   Mr. Eckensberger, when we left off, we were talking about

20  Exhibit 160, where it says:  Store manager then went to the

21  back to call police as man was becoming hostile and didn't

22  want to buy anything in order to use the tables in the lobby

23  (per Starbucks policy).

24      Ms. Phillips didn't write that sentence.  Correct?

25  A.   No.

*Eckensberger - Cross*                            *721*

1   Q.   It was written by Ms. Knight.  Correct?

2   A.   Yes.

3   Q.   And she is with partner asset and protection program.

4   Correct?

5   A.   Correct.

6   Q.   And there's a lot of people copied on this, including the

7   Global Security Operations Center.  Correct?

8   A.   Correct.

9   Q.   And it doesn't say:  Per Shannon policy.  Correct?

10  A.   Correct.

11  Q.   It says:  Starbucks policy?

12  A.   Yes.

13  Q.   And, in fact, if we look at 43, Exhibit 43 shows the Safe

14  and Welcoming signage as well as some information and emails

15  that were passed in 2017, when it was adopted in Philadelphia.

16       Do you see that?

17  A.   Correct.  Per Shannon's discretion.

18  Q.   And then if we go to the top email, October 2017,

19  Ms. Phillips forwards this to Camille Hymes.  Correct?

20  A.   Correct.

21  Q.   So Ms. Hymes is ultimately responsible for this region.

22  Correct?

23  A.   She would have endorsed this.  Correct.

24  Q.   And she endorsed the Safe and Welcoming policy --

25  A.   Correct.

*Eckensberger - Cross* 722

```
 1  Q.   -- that was just discussed.  Correct?

 2  A.   Yes.

 3  Q.   You talked about how on May 29th when the Starbucks

 4  stores were shut down for diversity training, that there was a

 5  lot of publicity around that.  Correct?

 6  A.   Yes.

 7  Q.   You'd agree with me it was positive publicity for

 8  Starbucks.  Correct?

 9  A.   I don't know.  I think it was both.  I don't -- I don't

10  know whether it was positive or negative.  It was publicity

11  for sure.

12  Q.   And were you upset that your picture was on the front

13  page of the paper?

14  A.   I -- no.  I was impartial to it.

15  Q.   You had no feelings.  You weren't happy about it?

16  A.   No.

17  Q.   Was this a sad day at Starbucks?

18  A.   No.

19  Q.   Was it a happy day at Starbucks?

20  A.   No.

21  Q.   It was a neutral day?

22  A.   It was an important day as it marked a need to change.

23  And I think we were all very excited to go on a journey of

24  change, and this was the start to that.  And it was -- it was

25  big national news.
```

*Eckensberger - Cross* 723

```
 1   Q.   It was a big PR campaign as well, wasn't it?

 2   A.   I don't know.

 3   Q.   You're aware that there were celebrities brought in to

 4   do -- by Starbucks, brought them in to do some videos about

 5   the diversity training.  Correct?

 6   A.   Yes.

 7   Q.   Including like the rapper Common.  Correct?

 8   A.   Yes.

 9   Q.   And former Attorney General Holder came in to do a

10   speech.  Correct?

11   A.   Yes.

12   Q.   And Starbucks brought him in and advertised about that.

13   Correct?

14   A.   Yes.

15   Q.   And advertised about all the diversity training that they

16   were doing.  Correct?

17   A.   Yes.

18   Q.   And then you testified on direct examination that the

19   sales numbers doubled after this event.  Correct?

20   A.   In Philadelphia specifically, our operational rigor

21   allowed us to outpace the rest of the US business in sales.

22   Correct.

23           MS. MATTIACCI:  No further questions, Your Honor.

24           THE COURT:  Any redirect?

25           MR. HARRIS:  No, Your Honor.  No further questions as
```

*Eckensberger - Cross*                                724

```
 1   well.
 2           THE COURT:  All right.  You may step down.
 3           THE WITNESS:  Thank you, Your Honor.
 4           (Witness excused at 11:24 a.m.)
 5           MR. HARRIS:  Your Honor, with the Court's indulgence,
 6   may I have a brief moment so I can speak to my co-counsel
 7   regarding if we are going to put on additional evidence?
 8           THE COURT:  Yes.
 9           MR. HARRIS:  Your Honor, after deliberating with our
10   team, I would move in exhibits, with the Court's indulgence,
11   in no particular order, Exhibit Number 160, number 6, 140,
12   105, 86, and number 90, 111, 118 -- I'm sorry, 18.  Not 118,
13   18.  43, 71, and 139.
14           With that, the defense would rest.
15           THE COURT:  Hearing no objections, so admitted.
16           MS. MATTIACCI:  Yes, Your Honor.
17           Could we just have one moment to make sure that that
18   is accurate?
19           THE COURT:  All right.
20           MS. MATTIACCI:  No objection, Your Honor.
21           THE COURT:  All right.  Those exhibits will be
22   admitted.
23           (Exhibit 160, Exhibit 6, Exhibit 140, Exhibit 105,
24   Exhibit 86, Exhibit 90, Exhibit 111, Exhibit 18, Exhibit 43,
25   Exhibit 71, and Exhibit 139 admitted into evidence.)
```

```
 1           MR. HARRIS:  With that, the defense would rest.

 2           THE COURT:  Any rebuttal?

 3           MS. MATTIACCI:  No, Your Honor.

 4           THE COURT:  All right.  Members of the jury, that

 5  concludes the evidence that's going to be presented to you in

 6  the case.

 7           It's now, oh, about 11:30.

 8           I have to confer with counsel outside your presence

 9  about a matter in the case, and I'd like you to return

10  around -- let's say 1:00.  You can go have your lunch hour and

11  we'll give you a little bit more time today, because after I

12  confer with counsel, we want to have lunch.  So we'll give you

13  that extra period of time.

14           I have to discuss some matters with counsel that

15  might be a little lengthy, and I don't want to just keep you

16  sitting in the jury box -- not the jury box, I mean the jury

17  room and then go to lunch.

18           So with that, remember my words of caution, don't

19  discuss the case amongst yourself or with anyone outside of

20  the courtroom, and again, don't do any independent research.

21           And you haven't heard my instructions on the law.  I

22  have to give you the law that you will apply to the facts that

23  you find.  You are the judge of the facts, as we said earlier.

24           So with that, keep -- still keep an open mind until

25  you heard my jury instructions, and I will dismiss you now and
```

 1    ask you to come back at 1:30.

 2          What did I say, 1:00?  1:00.

 3          I try to not keep you sitting as -- just in the jury

 4    room, wondering what is going on, as long as I possibly can.

 5    I don't like to just leave you to do that.

 6          All right.  So with that, you're excused until 1:00.

 7          (Jury out.)

 8          THE COURT:  I hope you've gone over the jury

 9    instructions and the verdict form.

10          MS. MATTIACCI:  We have, Your Honor.

11          THE COURT:  I see some additional things that I want

12    to change also, but I just want to take a short recess, like

13    five minutes.

14          MS. MATTIACCI:  Okay.  Your Honor, just for the

15    purposes, before I forget, I don't know if you want to do it

16    now or later, but I would like to make a Rule 50.  Plaintiff

17    would like to make a Rule 50 motion now that the evidence is

18    all in and the case is closed.

19          THE COURT:  Okay.

20          MR. HARRIS:  And I'll renew my motion.

21          THE COURT:  You want to renew your motion.  All

22    right.

23          MS. MATTIACCI:  So, Your Honor, taking all facts --

24          THE COURT:  Why don't you sit.

25          MS. MATTIACCI:  Okay.

*United States District Court*

1          Your Honor, plaintiff makes a Rule 50 motion in this

2    case now that all of the evidence is in.

3          No reasonable jury could conclude, even taking all

4    those facts in the favor of the defendant, in light most

5    favorable to the defendant, that race was not a factor in the

6    decision here to terminate Ms. Phillips.

7          She was clearly the scapegoat for Starbucks in May of

8    2018 in the aftermath of the viral video of April 12th in

9    which two African American men were arrested and then

10   thereafter came about a -- protests and racial situation at

11   Starbucks, that they admittedly say in terms of discussions

12   and roundtables and actions that they were going to take, were

13   all race-based.  There was no other characteristic involved at

14   this time other than race and race was top of mind throughout.

15         In order for the plaintiff to prevail on the New

16   Jersey Law Against Discrimination, plaintiff is not required

17   to prove that plaintiff's race was the only reason or

18   motivation for defendant's action.  Rather, plaintiff must

19   only prove that plaintiff's race played a role in the decision

20   and that it made an actual difference in defendant's decision.

21         And I think, Your Honor, when you look at the

22   timeline in this case, that there's no actual documents or

23   evidence that there was any indication that Ms. Phillips's job

24   was going to be lost until the time of the settlement with the

25   two gentlemen on May 2nd and the statements of the CEO of

1    Starbucks that:  Actions must be taken.

2            And everyone, the defendant's witnesses, agreed with

3    me that the CEO wanted to see action.

4            That very next day, Ms. Phillips for the first time

5    was removed from plans going forward on things that needed to

6    be done at Starbucks.  And the day after that, they started

7    drafting a severance agreement.  And not just any severance

8    agreement but something they wanted to make as lucrative as

9    possible to try to convince her to take it.

10           No reasonable jury could conclude otherwise that they

11   wanted her out and there is no reasonable jury that could

12   conclude at this point in time that they would be firing her

13   if she was black and having that, the publicity, that they

14   fired a black regional director at this time, it just defies

15   all common sense and all reasonable logic.

16           And then when you couple that with the testimony of

17   Mr. Sykes yesterday, who was there on the ground, working with

18   Ms. Phillips the whole time, not only countering their stated

19   reason of she somehow lacked in leadership and didn't support

20   her partners, he was actually one of the partners and he could

21   testify that he saw her supporting everyone and no one ever

22   complained about her.

23           And he also testified knowing all of these

24   circumstances, being in the meetings with the high-ups up at

25   Starbucks, that he believed that her race absolutely played a

1  role in the decision for them to terminate her, and that he

2  would not have been terminated at that time because he was

3  black.

4          In addition to that, there's uncontroverted testimony

5  that the public relations issue for Starbucks was top of mind,

6  and their public persona of what they wanted to make sure that

7  the world was seeing at that time, even up until the testimony

8  today of the corporate designee, that there was a large amount

9  of publicity and it was positive publicity that resulted in

10 doubling comp value, even just in the Philadelphia market

11 itself.

12         That that was the motivation for the defendant in

13 making more money and in order to do that, it would be the

14 determination of white people who are associated with it that

15 would benefit them.

16         If they terminated a black person at that time, it

17 would not -- it would have blown up in their face.  They would

18 never have done it.

19         So I think, Your Honor, when you look at all of the

20 evidence that has been presented even in the light most

21 favorable to the defendant, there is no reasonable jury that

22 could conclude otherwise on the New Jersey Law Against

23 Discrimination as well as Section 1981 and Title VII.

24         We have to prove that first that defendant terminated

25 plaintiff.  That's not in dispute.  And that her race was a

1 determinative factor in it -- a determinative factor.  We do

2 not have to prove it's the sole reason.  They can say that

3 there were other reasons that that came into play.  But if it

4 was a factor that made a difference in the decision, then that

5 is a determinative factor.

6          In other words, in the *Burrage* case from the United

7 States Supreme Court, Judge Scalia articulated as, is it the

8 straw that broke the camel's back.  And that is the definition

9 of but-for causation right down from the United States Supreme

10 Court.

11          I believe in this case, there's no reasonable jury

12 who could conclude otherwise, even taking all facts in favor

13 of the defendant that her race was not only the straw that

14 broke the camel's back but the whole bale of hay.

15          THE COURT:  Counsel.

16          MR. HARRIS:  Your Honor, counsel cites the wrong

17 standard under the New Jersey Law Against Discrimination.

18          As this Court is well aware, there is a heightened

19 scrutiny in reverse discrimination cases.

20          Counsel articulated the standard to protect members

21 of a protected class as it relates to race.

22          Ms. Phillips is not, so therefore it's a heightened

23 scrutiny, and therefore, the standard would have to

24 demonstrate that Starbucks would be an unusual employer that

25 would discriminate against the majority.  That hasn't been

 1  said.

 2          Moreover, the facts in this case clearly demonstrate

 3  that Starbucks had a legitimate nondiscriminatory reason.

 4          Counsel may disagree with what that decision is, but

 5  it's certainly enough to go to a jury on all of the questions

 6  before this Court.

 7          THE COURT:  All right.  Again, do you have any

 8  rebuttal?

 9          MS. MATTIACCI:  No, Your Honor.

10          THE COURT:  I'll deny your motion.

11          Many of the things I'm hearing from both sides are

12  really a matter of argument for the jury.  There are a good

13  number of conflicts in the testimony that really have to be

14  resolved by a jury.

15          In looking at the evidence, though, in this case and

16  I guess in the light most favorable to the defendant, on your

17  motion, there is sufficient evidence.  And again, I don't make

18  credibility determinations or those judgments.  But there's

19  sufficient evidence for a jury to decide whether or not the

20  reason for the termination was based on race.  So I'll deny

21  the motion.

22          And do you have an additional motion or are we done

23  at this point?

24          MR. HARRIS:  Yes, Your Honor.  I'm renewing my motion

25  under Rule 50, now that the case has been closed.

United States District Court

```
 1              THE COURT:  All right.

 2              MR. HARRIS:  The additional argument that I want to

 3    make just briefly, Judge.

 4              THE COURT:  Go ahead.

 5              MR. HARRIS:  It's not going to be right for

 6    Mr. Ericson (sic), who has testified that in fact he replaced

 7    Ms. Phillips.  So now we hear from him.

 8              He can also talk about his operational excellence.

 9    So therefore -- and he also can demonstrate that not only did

10    he demonstrate operational excellence after Ms. Phillips was

11    replaced, but moreover, the person and people that were

12    involved in the decision to terminate Ms. Phillips were

13    involved in the decision to hire Mr. Eckensberger.

14              The reason why that is particularly important and the

15    reason why I'm asking this Court to grant our motion is that

16    we now know through the evidence that there were three members

17    in the Philadelphia market that were the district managers.

18    We have the gentleman that had the University City market,

19    Mr. Dragone -- I believe that's his last name --

20              MS. PARAM:  Brian.

21              MR. HARRIS:  Lamborn, exactly.

22              -- Brian (sic) Lamborn, who was the third district

23    manager that had University City.  Then we had the other two:

24    Ben Trinsey and Mr. Sykes.

25              What counsel's attempting to argue now that the
```

 1    record is closed is that there were similarly situated people

 2    that were treated differently.

 3          We now know now that the record is closed that that's

 4    not the case.  They have not shouldered their burden, and,

 5    therefore, this matter should not go to the jury.

 6          THE COURT:  All right.  I'll deny that motion too.

 7          Again, many of the things that are being said here

 8    are a matter of argument in the case for the jury.

 9          But, again, the standard is looking at the evidence

10    on this motion in the light most favorable of plaintiff.

11          And don't forget, also included in that standard is

12    the drawing all the inferences from the evidence in the light

13    most favorable to the plaintiff, and, you know, in your

14    motion, drawing all inferences in the light most favorable to

15    the defendant.

16          There is sufficient evidence that has been offered,

17    again, on the issue of race discrimination in this case that

18    will have to be decided by the jury.  And the jury is the

19    trier of fact, and they have to decide the credibility issues

20    and, well, in this instance they -- what testimony they

21    accept, what testimony they don't accept.

22          And this case will be decided by the jury, so both

23    motions will be denied.

24          Let's take a five-minute recess, and we can go over

25    the verdict sheet and the jury instructions that I submitted.

1   All right?

2          MR. HARRIS:  Very well.

3          MS. MATTIACCI:  Thank you, Your Honor.

4          (Recess at 11:42 a.m. until 11:53 a.m.)

5          THE COURT:  I think both sides can appreciate the

6   considerable effort we put into drafting these jury

7   instructions and the verdict sheet in order to make this as

8   simple and clear to the jury as possible as to what the law is

9   and what they have to find.

10         So when I -- if we could start with the verdict

11  sheet.  And I'll tell you, I'll make some comments here.

12         I made some edits in re-reading it again.

13         On question 4, all right.  Has plaintiff proven by a

14  preponderance of the evidence that she suffered compensatory

15  damages for race discrimination and noted by a yes response.

16         It should say in questions 1, 2 or 3, not 1 to 3.

17         Does everybody follow that?

18         MR. HARRIS:  Yes.

19         THE COURT:  And I hope everybody could follow my

20  directions to the jury above in bold.  I think -- I spent a

21  lot of time on that paragraph, giving the jury direction.

22         All right.  And then I want to add the word "against"

23  in question 5.

24         What amount of money do you award plaintiff as

25  compensatory damages for violation of a federally protected

 1    right not to be discriminated -- I want to say "against" in

 2    employment.  It just sounds more grammatically correct:  Not

 3    to be discriminated against in employment.

 4              MS. MATTIACCI:  Your Honor?

 5              THE COURT:  Yes.

 6              MS. MATTIACCI:  Those instructions on that page 2 at

 7    the top, I think that that "and" needs to be changed to "or"

 8    in the first sentence.

 9              THE COURT:  I'm not following what you're saying.

10              MS. MATTIACCI:  Okay.  So at the top of page 2 in the

11    bold --

12              THE COURT:  Right.

13              MS. MATTIACCI:  -- where it says:  If you answer yes

14    to question 1 or 2.  And then you have:  and yes to question

15    3, please proceed to question 4.

16              But I think it's:  If you answer yes to question 1 or

17    2 or yes to question 3.

18              THE COURT:  Okay.  Well, I'm trying to cover all

19    bases now.

20              So if you answered no to question 3 but yes to either

21    questions 1 or 2, please proceed to question 4.

22              I'm trying to give them alternatives.

23              So what do you want me to say, or yes to question 3?

24              MS. MATTIACCI:  Well, they're going to be instructed

25    separately on Title VII and 1981.  Right?

```
 1              THE COURT:  Yes.
 2              MS. MATTIACCI:  So I feel like if they're going to be
 3    instructed separately, they must be, you know, reading
 4    separate instructions, so --
 5              THE COURT:  Well, let's assume they answer yes to
 6    question 1 and question 2 and question 3 -- I'm sorry,
 7    question 1 and question 3.  That covers the first -- that
 8    covers the first instruction.  All right?
 9              Then it says:  If you answered no to 1 and 2 but yes
10    to question 3, proceed to question 4.
11              But if you answered no to question 3 but yes to
12    either question 1 or 2, please proceed to question 4.
13              If you answered no to question 1 -- now, what
14    scenario are you giving?
15              MS. MATTIACCI:  Just the scenario that they would say
16    no to question 1 and 2 but yes to 3.
17              THE COURT:  All right.  That's the second sentence.
18    That's the second alternative.
19              MS. MATTIACCI:  Oh, okay.  I see.  You're doing the
20    alternative all -- okay.
21              THE COURT:  Do you want me to add some language here
22    or just put a heading:  Alternatives.  You think that would --
23              MS. MATTIACCI:  I think that might help because I
24    didn't read it as -- I kind of stopped after that.
25              THE COURT:  We'll put a line:  Alternatives.  We'll
```

United States District Court

1    just write the word "Alternatives" underlined, "Alternatives"

2    colon underlined.  Okay?

3           MS. MATTIACCI:  Okay.

4           THE COURT:  I think that might make it a little

5    clearer.

6           All right.  So that's all my changes on page 5 -- I'm

7    sorry, on page 2.

8           On page 3, in question 7, I'm putting in the word

9    "discriminated against."  I'm adding the word "against" in

10   question 7.

11          In question 10, I'm adding the word "against."

12          In question 11, I'm removing the commas around "by

13   clear and convincing evidence."  It'll just be a straight

14   sentence.

15          And I'm also adding the word "against" after

16   discriminated.

17          Number 12, I'm adding the word "against" after

18   discriminated.

19          And then, in the instructions that follow 12, it

20   says:  You are finished.  It should be:  You have finished

21   your deliberations, not "you are."

22          So this will be the verdict sheet.

23          MR. HARRIS:  Page 1, are we going to address that?

24          THE COURT:  Yeah.  Now, there are two points of law I

25   just want to bring up, maybe one point of law.  I don't know.

```
 1            But first of all, the punitive damage standard under
 2    New Jersey law is different than under federal law.  Under
 3    federal law, it's by a preponderance of the evidence.  Under
 4    New Jersey law, it's by clear and convincing evidence.  At
 5    least that's our research has shown that.
 6            MR. HARRIS:  That's correct.
 7            THE COURT:  The second thing is, is that under the
 8    New Jersey law -- now, I put in here that race was a
 9    determinative factor.  For pretext, it's a determinative
10    factor under federal law or a motivating factor.
11            The way we read New Jersey law, it's determinative
12    factor.
13            Now, it could be both.  It's hard to say.  You know,
14    I've looked at this six different ways in trying to figure out
15    the right thing to do under the law.
16            But I'm more comfortable with determinative factor
17    because I think it's a higher standard, at least that's what
18    I'm hearing from the plaintiff, the way you've structured 1
19    and 2.
20            MR. HARRIS:  Judge, as it relates to question 2 --
21            THE COURT:  Yes.
22            MR. HARRIS:  -- the mixed motivating standard only
23    applies if there's -- under two circumstances, as I understand
24    the law.
25            First, there has to be a demonstration that the
```

```
 1   plaintiff is offering a legitimate and a race-based decision.
 2   There's been no evidence.  They've not offered evidence that
 3   any of the decision-making was based other than Ms. Phillips's
 4   race.  That's why the mixed motivating test doesn't apply in
 5   this case.  They have brought a pretext case, that the
 6   decision that was made by Starbucks was based solely on her
 7   race, not based on the fact of some legitimate factor and her
 8   race.  That's why the jury would be confused, and they haven't
 9   produced evidence sufficient enough to warrant that.
10           Moreover, under Title VII, it is either a pretext
11   case or a mixed motivating factor.  That's the reason why you
12   don't get charged on both, as I understand the law.
13           THE COURT:  First of all, you cited a case the other
14   day for the either or.  I read that -- I think it was the
15   Connolly case.
16           MR. HARRIS:  Yes.
17           THE COURT:  I read that case carefully.
18           So what the Court said is that it's -- both can go to
19   the jury, not one or the other, both.  But I have to make a
20   finding that both apply.
21           MR. HARRIS:  Okay.  Yes, that's correct.
22           THE COURT:  I have to make that --
23           MR. HARRIS:  I stand corrected.  Yes, correct, there
24   has to be a finding that both apply, yes.
25           MS. MATTIACCI:  Your Honor?
```

*United States District Court*

740

```
 1            MR. HARRIS:  I agree with that, correct, Judge, I do.

 2            THE COURT:  You're arguing it doesn't apply?

 3            MR. HARRIS:  No.  I'm arguing that both would have to

 4    apply, that there's a finding that both --

 5            THE COURT:  When you say "both," what do you mean

 6    both?

 7            MR. HARRIS:  Meaning there had to have been

 8    evidence offered --

 9            THE COURT:  But I have to make a finding that pretext

10    applies and mixed motive applies.

11            MR. HARRIS:  Yes.  But the second portion of the

12    mixed motivating factor has to deal with whether or not

13    there's been evidence that they offered to suggest that

14    Ms. Phillips has conceded that a legitimate reason was offered

15    in addition to a pretext.  She has testified that the only

16    decision that Starbucks has offered was based on her race.

17            The reason why mixed motivating factor comes up when

18    a situation where someone has conceded, that I engaged in some

19    sort of misconduct, that was the reason and I agree that.

20            And but similarly situated people were treated

21    different.  That's not what they offered in this case.  They

22    said, and she has testified to:  I have been discriminated

23    against based on my race solely.  That is it.

24            The reason that Starbucks has proffered as the reason

25    for that decision that I lack leadership is pretext to race.
```

1          That's the reason why in this case they have not

2     shown sufficient evidence to be charged on both.

3          MS. MATTIACCI:  No.  Your Honor, that's just not what

4     the law says at all.

5          Mixed motive is to give the jury the opportunity to

6     say, if they conclude that there were some legitimate reasons

7     for her termination but also nonlegitimate reasons, whether

8     the nonlegitimate, being race in this case, was the motivating

9     factor that led to the termination.

10         There can be some other reasons articulated by the

11    defendant as there was in this case, being the leadership

12    failures, but ultimately, that's for the jury to decide.

13         I don't understand even the articulation of what

14    defense counsel is saying.

15         THE COURT:  I denied the motions for directed verdict

16    or judgement as a matter of law.

17         And there is sufficient evidence here for the jury to

18    decide whether there was pretext here or a mixed motive, so

19    I'm going to give 1 and 2, but I just wanted to point out the

20    difference under the New Jersey law.

21         I'm going to use the determinative factor.

22         MS. MATTIACCI:  Okay.  Your Honor, our suggestion

23    would be because I know that the LAD instruction is -- talks

24    about mixed motive, though, that it -- or the New Jersey Law

25    Against Discrimination instruction specifically says -- uses

1   the words "motivating factor" in it and gives more context to

2   how the jury should decide whether there was a violation of

3   the law under LAD.

4           So our suggestion would be that for the New Jersey

5   Law Against Discrimination question, that the jury be asked

6   whether plaintiff proved by a preponderance of the evidence

7   that it -- that the defendant violated the New Jersey Law

8   Against Discrimination when it fired plaintiff.  And I feel

9   like that is a -- that's a question that can then encompass

10  without having to pigeonhole it just to the words

11  "determinative," since that's not what exists under the New

12  Jersey Law Against Discrimination.  It talks about a

13  motivating factor.

14          MR. HARRIS:  But, Judge, it's a heightened standard

15  for reverse discrimination cases, so how is that going to

16  apply?

17          Under *Erickson*, the Court has said that it's an

18  unusual employer to discriminate against a member --

19          THE COURT:  Let's put that aside.

20          We're dealing with whether it's -- under New Jersey

21  law, is it a mixed-motive standard or a determinative factor

22  standard?

23          That's what we're looking at now.

24          MR. HARRIS:  I understand.

25          THE COURT:  And it's a bit unclear.

```
 1          MS. MATTIACCI:  Yes.  If we look at the model jury
 2   instruction, Your Honor, on your draft that you gave us
 3   yesterday on page 33 --
 4          THE COURT:  Let me see.  Let me turn to it.
 5          MS. MATTIACCI:  Sure.
 6          THE COURT:  Right.
 7          MS. MATTIACCI:  So on this third paragraph where it
 8   talks about plaintiff's burden.  It says:  Whether it's more
 9   likely than not, defendant engaged in intentional
10   discrimination because of plaintiff's race.
11          THE COURT:  Where are you reading?
12          MS. MATTIACCI:  The third paragraph where it starts:
13   It is plaintiff's burden.  On page 33.
14          THE COURT:  I have a different 33 in front of me.
15          MS. MATTIACCI:  The top of it says:  Elements of a
16   New Jersey Law Against Discrimination.
17          THE COURT:  That's not on page 33, my 33.
18          What are you looking at?
19          MS. MATTIACCI:  The draft that was given to us
20   yesterday.
21          MR. HARRIS:  No.  We have a new one.
22          THE COURT:  You have that too?  The same?
23          MR. HARRIS:  Elements of New Jersey Law Against
24   Discrimination on page 33.  It is plaintiff's burden.  Yes, it
25   is what I have on page 33.
```

```
 1              THE COURT:  I want to make sure I have the right
 2    thing.
 3              We've done different drafts, so the pages may have
 4    changed.
 5              MR. HARRIS:  Okay.
 6              THE COURT:  Say it again.
 7              MS. MATTIACCI:  I am on page 33 where it says:
 8    Elements of New Jersey Law Against Discrimination.
 9              THE COURT:  Yes.
10              MS. MATTIACCI:  In the third paragraph it starts off
11    with:  It is plaintiff's burden that it is more likely than
12    not.
13              THE COURT:  I see it now.
14              Wait one second.  I just want to look at the other
15    copy.  I was looking at the wrong paragraph.
16              Yeah, we have the same instructions in front of us.
17              Go ahead.
18              MS. MATTIACCI:  Great.
19              So it says:  That is the ultimate issue you must
20    decide, did defendant terminate plaintiff because of her race.
21    Plaintiff may do this directly by proving that a
22    discriminatory reason was, more likely than not, motivated
23    defendant's action, or indirectly by proving that defendant's
24    stated reason for its action is not the real reason for its
25    action, which is the pretext.
```

1          And then in that next paragraph it talks about, in

2     the second sentence, how to prevail.

3          And it says:  To prevail, plaintiff is not required

4     to prove that plaintiff's race was the only reason or

5     motivation for defendant's action.  Rather, plaintiff must

6     only prove that plaintiff's race played a role in the decision

7     and that it made an actual difference in defendant's decision.

8          THE COURT:  How do you want me to read the

9     interrogatory?

10          MS. MATTIACCI:  So my thought was to instead of using

11     the words "determinative" or "motivating," that instead the

12     jury just be asked, did plaintiff prove by a preponderance of

13     the evidence that defendant violated the New Jersey Law

14     Against Discrimination when it terminated plaintiff.

15          And then that way the jury can go back to that jury

16     instruction, read the jury instruction, and determine whether

17     the law was violated by Starbucks.

18          THE COURT:  Do you find that plaintiff has proven by

19     a preponderance of the evidence that --

20          MS. MATTIACCI:  Defendant --

21          THE COURT:  Wait.

22          That defendant violated the New Jersey Law Against

23     Discrimination in defendant's decision to terminate her.

24          MR. HARRIS:  And this Court is going to give an

25     *Erickson* instruction as well.

 1            THE COURT:  When you say an *Erickson* instruction --

 2            MR. HARRIS:  That's the heightened scrutiny statement

 3  under the New Jersey Law Against Discrimination for summation

 4  cases.

 5            THE COURT:  You want me to add that language to an

 6  instruction, to a jury instruction?

 7            MR. HARRIS:  Yes.

 8            THE COURT:  We haven't gotten to the jury

 9  instructions yet.

10            I want to do the verdict sheet first.  We'll get to

11  that.

12            MR. HARRIS:  Okay.

13            THE COURT:  All right.  With that change, I think

14  that concludes the verdict.

15            MR. HARRIS:  I'm sorry, Judge, I apologize.

16            The one thing that I wanted to say for the record on

17  *Connolly*, remember, the court in *Connolly* had direct evidence

18  of discrimination.

19            As I previously argued, this case isn't a direct

20  evidence case, it's a circumstantial evidence case.  That's

21  why there's a distinction, and that's why I'm submitting that

22  a mixed-motive factor should not apply in this instance.

23            THE COURT:  No, I understand your argument.  But

24  we're going to let the jury hear both.  I'm going to charge

25  the jury on both, mixed motive and determinative factor

1   pretext.

2          In terms of the general instructions, the

3   instructions to the jury.

4          What I'm going to do in this case is if you turn

5   to -- obviously the word "draft" will be deleted from the top

6   of the jury verdict form and the jury instructions.

7          Also, I'm going to delete in the table of contents

8   under 17, the word "disparate" treatment.  It will just read:

9   Elements of Title VII pretext.  Elements in Title VII mixed

10  motive will be 18.

11         We'll delete the words "disparate treatment."

12         The Section 1981 and 19, I'm going to delete the

13  words "disparate treatment."

14         MR. HARRIS:  Why would you do that, Your Honor?

15         THE COURT:  Hmm?

16         MR. HARRIS:  Why are you deleting that?

17         THE COURT:  Because I've made a decision.  I think

18  I'm going to send the jury instructions out with the jury, and

19  we don't talk about disparate treatment in the charge itself.

20  It will throw the jury off.  They won't know what those words

21  mean.

22         Now, even though I'm going to send the instructions

23  out with the jury, in your closing arguments, you're not to

24  tell the jury that.  I want them to listen to me when I charge

25  them.  Okay?

```
 1          MS. MATTIACCI:  Of course, Your Honor.

 2          THE COURT:  I'm saying in your closing arguments, and

 3  the judge will send the charge out with the jury.  Okay?

 4  Because they may not pay as much attention, unfortunately.

 5  And I want to make sure they pay good attention.

 6          But other than that, I'm okay with the table of

 7  contents.

 8          Obviously those words that I've deleted will be taken

 9  out in the charge itself on the appropriate page.

10          Now, if we go through these one by one, we have the

11  general introduction to the final jury instructions, we have

12  the function of the judge and jury.  These are all very

13  common.

14          Evidence.  Nothing was judicially noted in this case,

15  as far as I can tell.  Right?  So and then I always eliminate

16  number 4, as to what the evidence is in the case.  Okay?

17          So we'll delete on page 4 "any facts that are

18  judicially noticed," that is facts that I said you must

19  accept.  Right?

20          I also did not tell the jury to disregard any

21  testimony in this case.  Is that correct, Counsel?

22          MS. MATTIACCI:  I think there were some objections to

23  nonresponsive that you did instruct, if I recall.

24          I know there were definitely some sustained

25  objections on nonresponsive.
```

```
 1              THE COURT:  I'll leave it.  But there was nothing
 2   judicially noted.
 3              MS. MATTIACCI:  Correct.
 4              THE COURT:  So we'll delete that on page 4.
 5              Page 6 is questions by the Court.  7, direct and
 6   circumstantial.  8, inferences.  9, motions and objections.
 7   10, questions are not evidence.
 8              Again, I can leave it inadmissible and stricken
 9   evidence, that instruction.  All right?
10              Now, did we have any use of depositions in this case?
11   I know we did on cross-examination.
12              MR. HARRIS:  No, we did not.
13              THE COURT:  Hmm?
14              MR. HARRIS:  No one introduced deposition testimony
15   in their case-in-chief.  Correct.
16              THE COURT:  Yeah.  We don't have that, so this charge
17   will go.  We will not use, use of depositions.  Okay?
18              MS. MATTIACCI:  Yes.
19              THE COURT:  So we'll eliminate that.  And we'll
20   renumber these things.
21              I don't think we have any summaries.  Obviously we
22   have charts.
23              Should we just eliminate the word "summaries," "and
24   summaries"?
25              MS. MATTIACCI:  Yes.
```

```
 1              MR. HARRIS:  Yes.

 2              THE COURT:  On page 13.  We'll just leave it in the

 3    form of charts.  Right?

 4              And the first line and the second line.

 5              MR. HARRIS:  Judge, I may have a chart in my closing

 6    as a demonstrative.

 7              THE COURT:  That's all right.

 8              Well, the charts were not introduced.

 9              MR. HARRIS:  They weren't introduced in evidence.

10    That's correct.

11              THE COURT:  So really we shouldn't be giving this

12    instruction.

13              MR. HARRIS:  Agreed.

14              THE COURT:  So let's delete this instruction.  Okay?

15              Witnesses, there's credibility, obviously this is

16    all -- what we give in every case.

17              Number of witnesses.  This is what we give in every

18    case.

19              Experts.  Did we have any experts testify?

20              MR. HARRIS:  No.

21              MS. MATTIACCI:  No.

22              THE COURT:  I don't think so.  So we'll eliminate the

23    charge on experts.

24              Preponderance of the evidence, plaintiff only.  Okay.

25              Now, I always give just a summary of the claims in
```

 1  the case.  And that's what's on page 16 -- I'm sorry, on page

 2  20 in paragraph 16.

 3          And this is where I'm getting into -- just describing

 4  the three, giving the three a different names, Title VII, 1981

 5  and the New Jersey Law Against Discrimination.

 6          All right.  Counsel satisfied?

 7          MR. HARRIS:  Yes.

 8          MS. MATTIACCI:  Yes, Your Honor.

 9          THE COURT:  And then we get into the model Third

10  Circuit instruction.

11          Again, I don't discuss facts in my charge.  I just

12  charge on the law.  All right?

13          And then we have another model Third Circuit

14  instruction.  Obviously we're going to eliminate the words

15  "disparate treatment" in the heading on pretext.

16          MR. HARRIS:  Which page are you on?

17          THE COURT:  Page 21 of the heading.

18          MR. HARRIS:  Yes, okay.  Thank you.

19          MS. MATTIACCI:  Your Honor, for that jury instruction

20  pretext, plaintiff requests that there be a line included that

21  says that plaintiff does not have to prove that race is the

22  sole reason for the termination.

23          I know it's not included in the model, but it is --

24          THE COURT:  Which one are you on now?

25          MS. MATTIACCI:  I'm on page 21, the pretext

1    instruction.

2          MR. HARRIS:  Absolutely they have to do that.  It's a

3    determinative factor test.

4          MS. MATTIACCI:  We do not have to prove that it is

5    the sole reason.

6          MR. HARRIS:  It is a pretext case.  They have to show

7    that race was the decision for her termination.

8          THE COURT:  Well, I think we give a definition of

9    determinative factor at the end on page 22.

10         Determinative factor means that if not for

11   plaintiff's race, the termination would not have occurred.

12         MR. HARRIS:  Correct.

13         MS. MATTIACCI:  Yes, Your Honor.  I just --

14         THE COURT:  I think that covers it.

15         MS. MATTIACCI:  Okay.  I know it's the model and

16   we're pulling the model.  I just believe that -- the model to

17   be clearer for the jury, because even, you know -- hearing the

18   words "a determinative factor," people believe that it's the

19   only.

20         THE COURT:  What would you want me to add?

21         MS. MATTIACCI:  Just that plaintiff does not have to

22   prove that race was the sole reason for her termination.

23         MR. HARRIS:  I object to that language.

24         MS. MATTIACCI:  There could be other reasons that did

25   not break the camel's back.

```
 1            MR. HARRIS:  I disagree with counsel's assertion.

 2            THE COURT:  This is a charge on the pretext.

 3            MS. MATTIACCI:  Yes.

 4            THE COURT:  It focuses more on the defendant's

 5    conduct, so to speak.

 6            MS. MATTIACCI:  Correct.

 7            THE COURT:  Plaintiff must prove that she was

 8    terminated and race was the determinative factor.

 9            MS. MATTIACCI:  A determinative factor.

10            THE COURT:  Yeah.  And determinative factor means

11    that if not for plaintiff's race, the termination would not

12    have occurred.

13            I think what you're talking about more is mixed

14    motive.

15            MS. MATTIACCI:  No, Your Honor.  If defendant gets up

16    and argues that we have to prove that her race was the only

17    reason she was terminated, that would be inappropriate under

18    the law, under the Burrage case of the United States Supreme

19    Court.

20            For example, let's say that there were other reasons

21    stated, that she was late to meetings and that was one of the

22    reasons, but the late to meetings we can accept --

23            THE COURT:  Well, where do you want me to assert the

24    language?

25            You are describing correctly the law.
```

United States District Court

1          MS. MATTIACCI:  Yes.

2          THE COURT:  What do you want me to --

3          MS. MATTIACCI:  So I think for clarification's sake,

4    the jury should be told that for this --

5          THE COURT:  Where?  Give me language in the specific

6    charge.

7          MS. MATTIACCI:  In that -- on page 22, that first

8    paragraph at the top, right before the words -- after the word

9    "unreasonable."

10          So where it says:  Because you disagree with the

11    business judgement --

12          THE COURT:  What line?  What line are you reading on?

13          MS. MATTIACCI:  The seventh line.

14          MR. HARRIS:  On page 22?

15          MS. MATTIACCI:  On page 22.

16          The sixth line, the sentence starts:  You cannot.

17          So six lines down, it says:  You cannot find

18    intentional discrimination simply because you disagree with

19    the business judgment of defendant or believe it harsh or

20    unreasonable.  You are not to consider defendant's -- harsh or

21    unreasonable.

22          And right there, I think it should say:  but

23    plaintiff does not have to prove that race was the only

24    reason.

25          THE COURT:  All right.  Say it one more time.

*United States District Court*

1    Plaintiff --

2           MS. MATTIACCI:  But plaintiff does not have to prove

3    that race was the only reason for her termination.

4           MR. HARRIS:  Under pretext, Judge, I don't believe

5    that that's appropriate there.

6           THE COURT:  Well, that's a little off, in my opinion.

7           Plaintiff does not have to prove that race was the

8    only reason for her termination but must prove that it was

9    a --

10          MS. MATTIACCI:  Maybe, Your Honor, if we put it right

11   before "ultimately" in that last paragraph, it makes more

12   sense, because then it would say -- it would say:  Plaintiff

13   does not have to prove that race was the only reason for the

14   termination.  Ultimately, you must decide whether plaintiff

15   has proven that her race was a determinative factor in the

16   decision.  But it's "a" determinative factor; it's not "the"

17   determinative factor.

18          THE COURT:  All right.  But I want to use a but.

19          MS. MATTIACCI:  Okay.

20          THE COURT:  But ultimately.

21          MS. MATTIACCI:  That sounds fine, Your Honor.

22          THE COURT:  All right.  Plaintiff does not have to

23   prove that race was the only reason for her termination, but

24   ultimately, you must decide whether plaintiff has proven that

25   her race was a determinative factor in defendant's decision to

1   terminate her.  Determinative factor means...  Okay?

2          MS. MATTIACCI:  Yes, Your Honor.  That's fine.  Thank

3   you.

4          THE COURT:  I'll do that.  Okay?

5          All right.  Next?  I'm going to give the mixed

6   motive.  I take out "disparate treatment" at the top of page

7   23.

8          Section 1981, pretext, take out "disparate treatment"

9   at the top of page 24.

10          And I think we have to include that same language on

11   page 25 --

12          MS. MATTIACCI:  Yes, Your Honor.

13          THE COURT:  -- before "ultimately."

14          I'll make it "but ultimately."

15          And we'll include this -- before the "but

16   ultimately," we'll include the language:  Plaintiff does not

17   have to prove that race was the only reason for her

18   termination.  All right?

19          MS. MATTIACCI:  Yes, Your Honor.

20          THE COURT:  Damages.

21          MR. HARRIS:  Judge, you noted my objection for the

22   mixed motive instruction on page --

23          THE COURT:  All right.  I understand.  You stated

24   that on the record.

25          Damages, compensatory, this is from the Third Circuit

1   model instruction.

2        And same with damages, punitive, Third Circuit model

3   instruction.

4        Now I'm on page 33, Elements of New Jersey Law

5   Against Discrimination, and this is straight from the model

6   instruction.

7        And on damages, compensatory, straight from the model

8   instruction.

9        And there's one on punitive damages on page 38.

10       And then the last instruction is on the nominal

11  damages.

12       Now, the question that Mr. Harris keeps raising is if

13  we go back to under New Jersey law, there's no language in

14  this instruction on it has to be the unusual employer.

15       I've read the *Erickson* case, and a case after

16  *Erickson*.  I've read them carefully.  They are summary

17  judgment cases in which under the burden-shifting test for a

18  reverse discrimination case, that language appears.

19       *Erickson* is a case that goes back many years.  And

20  the model instruction under the New Jersey Law Against

21  Discrimination was never -- never modified to include that

22  language.

23       So I don't know -- once plaintiff gets beyond summary

24  judgment whether or not that language is applicable in a jury

25  instruction.  Under federal law, we give the same jury

1    instruction for reverse discrimination once you get beyond as

2    we do for regular discrimination.  That's what we've always

3    done.

4           So I just want to bring that to your attention and

5    note your objection for the record.  It's a real one, you

6    know, as you read the case, but the model instruction is -- it

7    seems to me is the applicable one that applies here.

8           Counsel?

9           MS. MATTIACCI:  I agree, Your Honor.

10          MR. HARRIS:  Judge, I object, as I indicated

11   previously, and I will continue to do so.

12          THE COURT:  Right.

13          MR. HARRIS:  I think the jury should be charged on

14   the language in *Erickson* because I do think that is the

15   standard that should be considered and contemplated under the

16   New Jersey Law Against Discrimination.

17          THE COURT:  When you think of it in terms of the --

18   what I'll call the big picture, there's no claim here in this

19   case that, you know, Starbucks as a corporation just engages

20   in race discrimination.  That's not being alleged in this

21   case.

22          What's being alleged in this case, and in this

23   particular instance, after the events that occurred at the

24   Starbucks store, that decisions were made based upon race,

25   just in this situation.

```
 1              You're not contending --

 2              MS. MATTIACCI:  No, Your Honor, exactly.  You're

 3    exactly right.

 4              THE COURT:  So when you talk about the unusual

 5    employer, it's sort of misleading, so to speak, because

 6    there's no claim here that Starbucks Corporation is the

 7    unusual employer that engages in this conduct on a wholesale

 8    basis.  I mean, that would be certainly inappropriate.  Nobody

 9    is making that claim.

10              So how do we direct that language to this case?

11              And I think you can make the argument as to what

12    happened here, and you can say to a jury:  Nobody's contending

13    otherwise.  You know, Starbucks otherwise is this kind of

14    company.  It's just not -- I mean, I think nobody would make

15    that claim at all.

16              So I'm going to use the New Jersey instruction, but I

17    wanted to put this on the record so you can preserve your

18    objection.

19              MR. HARRIS:  I understand.

20              THE COURT:  I wanted to make that clear.

21              And I wanted to make clear my thinking on this

22    because we've spent a considerable period of time thinking

23    about what to do after you raised this other standard.

24              But I do believe it's more at the summary judgment

25    level.
```

1          All right.  So this is the jury charge.  We'll make

2   the changes now.

3          I will send it out with the jury in this case with

4   the verdict form.

5          And we'll -- is there anything else counsel wants to

6   put on the record?

7          You've got 35 minutes for lunch, if you want to take

8   lunch now.  I was once a trial lawyer, and sometimes I didn't

9   have lunch before I gave a closing argument.

10         MR. HARRIS:  I won't have one either.

11         THE COURT:  So it's up to you, what you want to do,

12  but we'll stand in recess until 1:00.

13         MS. MATTIACCI:  I'm sorry, Your Honor, are we going

14  to close at 1:00?

15         THE COURT:  Yeah, 1:00.

16         MS. MATTIACCI:  Okay.

17         THE COURT:  And then I'll charge the jury.

18         Do you have any idea how long you'll take?

19         MS. MATTIACCI:  45 minutes maybe, Your Honor.

20         THE COURT:  45 minutes.

21         Mr. Harris?

22         MR. HARRIS:  I won't be that long.

23         THE COURT:  Okay.  Now you go first, you go second,

24  you rebut.

25         MS. MATTIACCI:  Okay.

```
 1            MR. HARRIS:  Judge, can we come back at 1:15?  That's
 2   a little bit longer than the Court has asked for.
 3            THE COURT:  1:15?
 4            MR. HARRIS:  So I can get my ducks in a row.
 5            THE COURT:  All right.  We'll start at 1:15.  We'll
 6   start at 1:15.
 7            MR. HARRIS:  Thank you.
 8            THE COURT:  Okay.
 9            MS. MATTIACCI:  Thank you, Your Honor.
10            THE COURT:  We'll stand in recess.
11            (Luncheon recess at 12:33 p.m. until 1:28 p.m.)
12            THE COURT:  Let's bring in the jury.
13            Counsel, I made one more change to the verdict slip.
14            That last alternative question should be, if you
15   answered no to questions, 1, 2 and 3, please proceed to
16   question 8.
17            The very last one.
18            If they said no to question 1, they go to question 2.
19            If they said no to question 2, they go to question 3.
20            Sorry for the delay, counsel, but doing the
21   amendments and printing everything out is time-consuming.
22            MS. MATTIACCI:  We understand, Your Honor.
23            MR. HARRIS:  I'm not complaining that you needed more
24   time.
25            (Jury in.)
```

1          THE COURT:  Please be seated.

2          Members of the jury, I apologize for the delay, but

3    there were matters I had to concern myself with which took

4    longer than I expected.

5          At this point, we will have counsel for the plaintiff

6    close to you.

7          MS. MATTIACCI:  Thank you, Your Honor.

8                    CLOSING STATEMENT

9          MS. MATTIACCI:  Good afternoon, members of the jury.

10   I don't know if it's better without my glasses or not.  I need

11   them for far.

12         Thank you.  All week you have been here and you've

13   been paying attention, and I know it's not easy.  I know

14   you're making a lot of sacrifices.

15         I told you in the beginning of this week that I would

16   not waste your time, and that this was a very important case.

17   And it is a very important case.  I made promises to you at

18   the opening about what the evidence was going to show, and

19   that evidence came through in documents, it came through in

20   testimony, and I brought it all to you right on that witness

21   stand so that you could see.

22         At the end of the day, this case is not hard.  It's

23   not rocket science.  It's was her race -- did her race make a

24   difference in their decision to terminate her.

25         We can just start with the org chart here.

```
 1           THE COURT:  Counsel, can I ask you to turn your
 2  microphones phones closer.
 3           MS. MATTIACCI:  Absolutely, Your Honor.
 4           I'll speak a little louder as well.
 5           THE COURT:  Okay.
 6           MS. MATTIACCI:  This was the chain of command when
 7  this crisis, this PR crisis occurred.
 8           They get rid of Holly Hylton, white.  They skip over
 9  Paul Sykes, and they take out Shannon Phillips.
10           Camille Hymes, no consequence, Zeta Smith, no
11  consequence, and no consequence up the chain.
12           That's not what happens when there's -- something
13  goes horribly wrong and consequences need to be handed out.
14           If they're going to get rid of people for what
15  happened on April 12th, why isn't it right up the chain of
16  command?
17           And then they come over to this side and get rid of
18  Ben Trinsey, on the other side of the city, that had nothing
19  to do with this.
20           They needed a scapegoat.  They needed a sacrificial
21  lamb.  They needed a fall guy.
22           And when they were choosing who it was going to be,
23  they were not going to choose a black person, because that
24  would have blown up in their face.
25           So instead, they took out somebody who had worked
```

1    their tail off for 13 years and did nothing to deserve what

2    happened to her.

3            All right.  I'm going to talk law for like

4    30 seconds.

5            You're going to see that Judge Slomsky is going to

6    instruct you in the law after we sit down, and he's going to

7    read the instructions for you.

8            You're going to hear that there's three main laws in

9    place, but they all essentially mean similar.

10           Federal is called Title VII.  It's the law against

11   discrimination.

12           There's another federal law called Section 1981.

13   That's also a law against discrimination.

14           And then there's a state law for folks that work in

15   New Jersey called the New Jersey Law Against Discrimination.

16           They all say you can't be chosen for termination or

17   anything in your employment, demotion, suspension, if one of

18   the factors that makes the difference is your race.

19           Does -- do we have to prove that race was the only

20   reason?  No.

21           Starbucks wants to come in and say there was some

22   other reasons why we terminated her.  They can do that.

23           What we have to prove is that race was the straw that

24   broke the camel's back.  That race made the difference.

25           The evidence I've brought to you is not just the

1    straw.  It's the whole bale of hay.  And it's way more than we

2    even need.

3           Now, this is the preamble to the New Jersey Law

4    Against Discrimination.  This is when they -- when the New

5    Jersey state legislators passed this law, they said the New

6    Jersey legislator finds and declares that practice of

7    discrimination against any of its inhabitants because of race,

8    creed, color, national origin, ancestry, age, sex, sexual

9    orientation, are matters of concern to the government and the

10   state, and that such discrimination threatens not only the

11   rights and proper privileges of the inhabitants of the state,

12   but menaces the institutions and foundation of a free

13   democratic state.

14          These laws apply to everyone.  All the inhabitants of

15   the state of New Jersey, whether you're white, black, Asian,

16   Indian, Hispanic, whatever your race is, everyone is protected

17   from discrimination, and we must make sure that everyone is

18   protected from discrimination.  Otherwise, it will threaten

19   the institutions and foundations of our free democratic state.

20          And what happened here is an example of where that

21   law was completely and utterly and egregiously violated,

22   threatening the free democratic state that we live in.

23          Now, let's talk about the burden of proof for a

24   second.

25          You're going to hear words, "preponderance of the

1    evidence."  All it means is more likely than not.  Is it more

2    likely than not that Shannon Phillips's race made a difference

3    in her termination.

4            If you think of like Law and Order and stuff where

5    it's criminal law, it's beyond a reasonable doubt.  That's

6    real high.  If you think of a coffee mug like that, it's like

7    filling mug almost to the top.

8            Preponderance of the evidence is if the mug was

9    filled 50 percent and then there was one drop on top.

10           Now, if you took -- if you look at these -- another

11   way to look at it is these two coffee mugs here.  You got

12   Starbucks on one side and you've got Shannon Phillips's cup on

13   the other side.

14           And I apologize for my terrible graphics, but if you

15   picture this as coffee and the coffee is the evidence, you

16   fill Starbucks' cup with the amount of evidence that they had,

17   and the amount of evidence Shannon Phillips had, and those

18   coffee mugs are equal.  If Shannon Phillips has one drop of

19   coffee more in her mug, we have met our burden.  That's what

20   preponderance of the evidence means, one drop.

21           In this case, we have overflowed the cup.  We are way

22   more than one drop of what we need with all the information

23   and evidence that we have provided.

24           Some of this stuff you saw in opening, and when you

25   saw this in opening, you might have been like, okay, I might

1   have heard about this event a little bit.  I'm familiar with

2   Center City.  But the Safe and Welcoming policy you may not

3   have heard of, because Starbucks didn't want you to hear about

4   it.

5           This is a policy that came out of Seattle.  It was

6   developed to try to keep partners or employees safe in the

7   urban areas.  And this is what caused the 911 call to occur on

8   April 12th.

9           But they've spent all this whole time trying to have

10  you not hear about any of the things with the Safe and

11  Welcoming policy.  They don't want you to know that this

12  policy was in existence, because they had changed their tune

13  throughout the PR crisis that they were involved in.

14          Even today Mr. Eckensberger on the stand called it,

15  well, I think that was just Shannon's policy.

16          This was not Shannon's policy.  This was something

17  that was coming down from Starbucks.  No one here and no one

18  in this case is saying anything about what happened to the two

19  men that are arrested.

20          Mr. Harris wants to try the case about whether 911

21  should have been called, whether the men should have been

22  arrested or not arrested.  That is not this case.  That is not

23  this case.

24          The two gentlemen that were arrested wrongfully, they

25  resolved the case with Starbucks.  Starbucks paid them an

1  undisclosed amount of money, and they had some other benefits

2  that came along with that settlement with the two men.  That

3  case is done.

4         Ms. Holly Hylton, she was terminated, and she was

5  paid a severance.  This is not about whether Holly Hylton

6  should have called 911 or shouldn't have called 911.  That

7  case is done.

8         This case is about whether Starbucks should have

9  fired Shannon Phillips on May 8th.  That's what this case is

10  about.

11         In the opening I did these four bullet points about

12  Shannon Phillips and how she lives in Swedesboro, and 13-year

13  employee of Starbucks, and excellent performance history and

14  rose to the ranks of RDO.

15         But as you saw when she was on the stand, she's so

16  much more than just these four bullet points.  She's a mom,

17  two kids.  She worked her butt off at Starbucks.  She loved

18  that job.  She believed in it.  She believed in the company.

19  And she gave them everything.

20         You heard even Ms. Zeta Smith, high-ranking Zeta

21  Smith.  Camille Hymes.  They all had to admit that

22  Ms. Phillips's performance was outstanding, and they had not a

23  single issue with her before April 12th.

24         She was one of the strongest -- she was described as

25  one of the strongest RDs.

1          Her comp numbers -- this is a sales organization.

2     This is a for-profit corporation.  This is where they're

3     worried about how much money is being brought in.  And there's

4     not a single criticism of her.  Her numbers were better year

5     over year.  Her people loved her.  There was nothing.

6          We even asked for the performance reviews, and they

7     didn't give us anything after 2014, Starbucks.  Why not?  You

8     want the jury to see how excellent she was and what an

9     excellent worker she was?

10          Now, this was also a slide that I had in the opening

11     of the things that were not in dispute.  That was there was a

12     Safe and Welcoming policy in place at 18th and Spruce.  There

13     had been a history of crime and safety issues in the

14     Philadelphia stores.

15          Ms. Phillips didn't create the policy.  She didn't

16     train the employees or partners on it.  She was not in the

17     store when it happened.  She did not even directly supervise

18     the person that called 911, and yet she has to take the fall.

19          This is the same slide I showed you in the opening

20     that she got that performance bonus in February of 2008 (sic)

21     of $90,000 in stock options.  Those options never came to

22     fruition because she was terminated and she lost that.

23          She was an excellent, excellent employee, and then

24     she's fired in May.

25          At the end of this case, in terms of damages, the

1   Judge is going to be determining how much economic loss in

2   terms of money that she lost from not working there anymore.

3   That's going to be something that the Judge determines.

4           You will be determining just the compensatory damages

5   and the punitive damages, compensatory meaning the amount of

6   money that would fairly compensate Ms. Phillips for the

7   loss -- emotional loss and the loss that she suffered as a

8   result of being fired and tainted to her reputation.

9           Credibility.  The reason the eight of you are sitting

10  in these chairs is because of credibility.  Who do you

11  believe?  Who, when they got on the stand and looked you in

12  the eye, did you believe was telling you the truth and who

13  wasn't.

14          That is not something the Judge is ever going to

15  determine.  It's for you to determine.

16          And witnesses from Starbucks sat on this stand and

17  they looked you in the eye, and they lied to you.  When they

18  told you this was something that Shannon Phillips created,

19  that was a lie.

20          When they told you that they never thought of race,

21  ever, in the midst of everything that was happening for this

22  28 days was race, race, race, but on that one -- that one

23  decision, when it came to terminating Shannon Phillips, oh my

24  gosh, we never thought about race at all.  That was not true.

25          When Ms. Phillips got on the stand, she's just a real

1    person.  You know.  Like she's a real person that this

2    happened to.  And she's been fighting for five years since

3    this happened with Starbucks.

4         You can judge her by the way she answered the

5    questions, by her mannerisms, by her eye contact.

6         Defense counsel accused me, I think in opening, of

7    like I didn't trust you or something?

8         I trust you immensely.  You're on this jury because

9    you're smart.  You're on this jury because you have common

10   sense and you can evaluate this evidence and you can evaluate

11   the credibility of these witnesses.

12        They do not have any anything.  They don't have

13   documents, they don't have text messages, they don't have

14   notes.

15        You're going to get this exhibit book back with you

16   in the jury room.  Virtually all of them, the vast majority of

17   them, I entered into evidence and asked the witnesses about.

18        And then we have how many exhibits showing the love

19   that people had for Shannon Phillips from April 12th till she

20   was arrested.  All these things in pink are all the thank you

21   notes that people were sending her for supporting her.  It was

22   remarkable.  I mean, in a workplace, to get that much accolade

23   from people in the midst of this crisis that they took the

24   time to send those notes to Shannon.

25        And there was an insinuation like:  Oh, well, these

1   people were in other markets besides Philadelphia and South

2   Jersey and Delaware, but they were being rotated in.  During

3   this time, they were being rotated in to relieve some other

4   folks who needed a break, so they were actually working in the

5   Philadelphia region, most of them.  There was a few -- like

6   the one woman who had gone to New York.  But other than that,

7   these were folks that were seeing it firsthand, and that's why

8   they were so -- they admired her so much.

9        And then, I showed you the Philly Action Plan and all

10  of the emails about the Philly task force and the patrols and

11  the P&AP engagement and the Black Partner Network, all of

12  these emails that Ms. Phillips was sending and following up on

13  to her superiors and her subordinates, nothing in response

14  that she was somehow deficient, that she somehow wasn't doing

15  a good job.

16       And even -- even if you say:  Okay.  Well, maybe this

17  was like a type of workplace that didn't document performance

18  deficiencies directly to the employee.  They just did a

19  conversation.

20       We got all these text messages.  We said:  We want

21  all of your text messages, Starbucks.  Give it to me for all

22  of the people that are involved in this case.  And we went

23  through all of those text messages.  And there's not a single

24  one where it's like Camille, Ms. Hymes saying to Ms. Smith:

25  Oh, my God, we're waiting for Shannon.  We're at this super

1   important meeting.  Anybody know where Shannon is?  Why is

2   Shannon late?

3          Oh, Shannon was just in this meeting right now, and

4   she really stunk it up.

5          You know what?  We got to do something about Shannon

6   because we can't have her with the leadership.

7          I mean, common sense.  Right?  There would be

8   something, just something.

9          In fact, the only -- the text messages that do come

10  through are Ms. Phillips looking for Ms. Hymes and Ms. Smith.

11  They're the ones that were late.  They're the ones that

12  weren't at the meeting.

13         If there was anything, it wasn't shown to you, never

14  produced, never given to you, and the reason is because it

15  didn't exist.  They don't exist.  They're making up this stuff

16  after the fact.  They're making it up to try to justify the

17  termination.

18         Strategy or strategic -- strategic, tactical, all

19  this gobbledygook that they're throwing at you.  Somehow she

20  wasn't a strategic thinker, so they wanted her to be

21  strategically thinking about things about global operations of

22  Starbucks in the middle of this crisis, but also engaging with

23  the partners and also leading meetings with senior vice

24  presidents.  And all of these expectations, they now say they

25  had of Shannon that she failed to come through on, but never

1    said a single thing.

2         The strategy -- the strategy in place -- of course,

3    Starbucks is strategic.  Starbucks is strategic about

4    everything they do.

5         You saw the exhibits that when the news broke and the

6    video started going viral, they were tracking every single

7    thing.  4,400 tweets.  Retweet of the words "gentlemen are

8    arrested," retweet of that, posting of this, posting of that.

9         How did the public respond to the CEO's last

10   statement?  How about this statement?  How about we tweet

11   this?

12        Okay.  You're a for-profit corporation.  You have a

13   right to do that.  You can track it.

14        But what you can't do is, in response to that, you

15   can't make a decision about someone's life based upon the

16   color of their skin because it benefits you.  That's where you

17   cross the line, and that's exactly what they did here.

18        Let me go back before I get to Mr. Sykes's testimony.

19        Remember, if you're -- remember back on May 2nd,

20   which is when the CEO came back in town.  He did the

21   settlement with the two men.  The two men go on Good Morning

22   America.  They pull back in the CEO by saying he's going to be

23   their mentor, and he's going to mentor them, and then they

24   release a joint statement, a joint statement between the CEO

25   and the men that say that this undisclosed financial

1   settlement has been reached and actions will be taken, and

2   they schedule for May 29th the diversity training where 8,000

3   stores will be closed.

4          There's absolutely nothing up until this point

5   indicating that Shannon Phillips's job is in jeopardy.

6   There's not a document, there's not an email, there's not a

7   text message.  All it is is her being engaged with the Black

8   Partners Network, her being -- specified on Philly Action

9   Plan, and she was in contention for the TLA position.

10          The TLA community leadership position.  This is

11   Exhibit 30, where Camille Hymes describes the person that

12   would be good for the position as -- she said:  We need to

13   filter this opportunity for someone with high emotional

14   intelligence existing in Philadelphia community connections,

15   interpersonal savvy, executive presence and strong project

16   management communication skills.

17          How the heck are you recommending someone for this

18   position -- she recommended Shannon Phillips, and recommended

19   her all the way up to the 2nd.  And then on the 3rd, the day

20   after, and as all the executives are flying into Philadelphia,

21   Zeta Smith says to Camille Hymes:  Eliminate Shannon from

22   these plans.  Eliminate Shannon.

23          The next day, the 4th, is when Zeta Smith requests

24   from legal a release agreement, a severance agreement, and a

25   nondisclosure agreement for Shannon Phillips to sign.  Says

1  nothing.

2       The next day, the 5th, is when Ms. Smith sends a

3  email to HR saying:  We want to make this severance package as

4  lucrative as possible.  As lucrative as possible.  For someone

5  that has engaged in some sort of nefarious conduct that

6  they're accusing Ms. Phillips for, that she's an utter and

7  complete disaster in leadership and her job.

8       What employer, who has no guilty conscience, wants to

9  get together with HR and come up with the most lucrative

10  severance package they can to get this horribly, miserably

11  failing employee out?  Who does that?

12       You only do that because you want her to leave.  You

13  want her to leave, and they need her to leave right then.

14       Paul Pinto said:  I said, why did she have to leave

15  right then?  It was like a heart attack.  It was like a heart

16  attack.  You know, like, it wasn't time for diet and exercise.

17  We had to get rid of her right away because like she was

18  having a heart attack.

19       The only person having a heart attack was Starbucks.

20  Starbucks was having a heart attack because they're back in

21  the news.  The diversity and race issues are bubbling all back

22  up, and the antidote to that heart attack at that moment would

23  not have been to fire a black person.  They wanted

24  accountability besides just Holly Hylton, who was fired at

25  that moment.  Somebody else needed to go.

1          And if race was not an issue, then why don't you just

2    get rid of the store manager who directly supervised and

3    trained the person who called 911.  That would be the person

4    if you're going to get rid of anybody, that person.

5          But no, you skip over that person, and you go to

6    Shannon Phillips, who had done nothing to deserve this.

7          And then, when you know that she's going to be

8    terminated, and you've already drafted and tried to come up

9    with a lucrative as possible -- by the way, they only got to

10   six months.

11         Then the 7th, she's brought into a meeting with

12   Ms. Hymes and Mr. Pinto and told that she has to suspend Ben

13   Trinsey, and told she has to suspend Ben Trinsey because

14   there's allegations of race discrimination concerning pay of

15   subordinates.

16         And Ms. Phillips says:  Mr. Trinsey is not racist at

17   all.  He's a 15-year employee of this company.  He volunteers

18   every Friday at a school for underprivileged kids.  He's the

19   community outreach program for Philadelphia for urban market.

20   And pay is not controlled by a district manager.  Pay is

21   controlled by compensation and HR.  He wouldn't have that.

22         And we know that they found out the next week that

23   the person who was complaining about the pay issue, they

24   looked into it, HR and compensation, and determined that her

25   pay was off by two pennies.  Two pennies.

1          They could have figured that out with an email, a

2     phone call.  Saturday, on Sunday, whenever it was that this

3     allegation surfaced, certainly, without having to suspend him,

4     they could have just called and said:  Was she brought into

5     the market under?  Because she had come from New York when she

6     came into Philadelphia, so her pay did drop, but that when you

7     work in New York, you get paid a little higher because the

8     market's a little more expensive.  And when you come to

9     Philly, your pay's a little lower, but in the range.  It was

10    only off by two pennies.

11         Could have took them two seconds and they could have

12    known that, but they didn't.  They needed a scapegoat.  They

13    needed to blame somebody.  So they take out Ben.

14         And when they have Ms. Phillips go in to suspend him,

15    they know she's terminated already.  She's a dead man walking.

16         Ms. Hymes testified and had to agree with me because

17    we had the email that the original plan on Sunday night was

18    for Ms. Hymes and Mr. Pinto to go and suspend Ben.

19         But in a mean, mean move, they change it, and they

20    say to Ms. Phillips:  You've got to go in there and do it.

21    You go in there and suspend Ben, even though there was

22    absolutely no validity to it.  And she had no idea that she

23    was going to be terminated just hours later.  Hours.

24         Not only do they have her suspend him, but then they

25    have her call all of his subordinates and all of his peers and

1   have these conference calls and tell them:  I'm really sorry,

2   Ben's taking some time away.  I'm your point person while he's

3   gone, and we're going to have some coverage.  And she's

4   scrambling to help people feel -- in this time of crisis, in

5   this time where Starbucks says the partners are emotionally

6   having a breakdown, they do this to their partners that they

7   claim they care about so much.

8          And then Ms. Phillips leaves that meeting, and she

9   goes that same day on the 7th -- or she's told about it on the

10  7th.  She suspends him at 8:00 in the morning on the 8th.

11  After the 8:00 meeting, she then calls all of his subordinates

12  and partners, and then, she's summoned to Camille's hotel

13  lobby at The Warwick.  And she walks in, and Ms. Hymes says:

14  This situation is unrecoverable.

15         And Ms. Phillips says:  What do you mean?

16         And she says:  I have to make a change in

17  Philadelphia.

18         And Ms. Phillips says:  Am I leaving Philadelphia, or

19  am I leaving Starbucks?

20         And she says:  You're leaving Starbucks.

21         Here one day, gone the next.

22         What did Mr. Sykes tell you was planned for that

23  night?  A big dinner.  Big dinner where all the bigwigs from

24  Seattle were coming in because of this issue.  They weren't

25  talking about scones or lattes.  They were talking about the

1   race issue that had caused a PR nightmare for them, that had

2   caused them a PR heart attack, and they wanted heads.

3           And they got Ms. Hymes and Ms. Smith and

4   Ms. Williams, they got to go to that dinner, and they got to

5   report back up and took care of it.  Got him.  We took action.

6   The action was had.

7           If Ms. Phillips was black, would this ever have

8   happened like this?  Absolutely not.  Absolutely not.

9           And we know that because not only of all of the

10  evidence and all of the circumstances that we completely

11  oppose, reject and counter everything Starbucks has said, but

12  Mr. Sykes himself, who is there every day, who was side by

13  side with Shannon for four years and including through this

14  entire crisis and was working with Ms. Hymes and Ms. Smith and

15  saw everything, he came in and testified for you.

16          And I know it was difficult to hear his testimony,

17  the audio, so I have the transcript.

18          And I'm going to take a few minutes because it's

19  really important that you hear what Mr. Sykes had to say.  I'm

20  going to read it, and I have it up on the screen as well for

21  you to follow.

22          Can you describe for the jury the type of boss that

23  Ms. Phillips was during those three years?

24          Yeah, she was probably one of my top two leaders.

25  She was extremely supportive, really genuine.  Every time she

*United States District Court*

1   went into a location with me, we would tour, she had a really

2   great relationship with the people in our locations.

3           Everyone was really receptive of her, and I learned a

4   lot when I would tour with her.  I found her very, very easy

5   to talk to and very easy to share any opportunities that were

6   going on with my district.  I could be completely vulnerable.

7           She would give me great feedback.  Whether it was

8   critical or opportunistic, I knew it was coming from a good

9   place.  I was never intimidated.  I felt really supportive of

10  her.

11          And in particular, did you find her to be

12  approachable?  I asked.

13          Oh, yes, absolutely.

14          Did you consider her to be supportive of your career

15  development?

16          Yes.

17          In the time that you were working under Ms. Phillips,

18  and including April and May of 2018, did you ever hear any of

19  your coworkers or subordinates complain about Ms. Phillips?

20          Never.

21          Can you explain to the members of the jury what it

22  was like day to day in April and May of 2018 in the aftermath

23  of the arrests that occurred on April 12th?

24          Yes, it was extremely stressful.  I tried to block a

25  lot of that out because it was such a stressful time in my

1  life.

2          We were working -- and when I say "we," I mean

3  Shannon, myself, and my former peer at the time, Ben Trinsey.

4  We were working around the clock, seven days a week, from open

5  to close in our locations, supporting our team members,

6  supporting our partners.

7          Did you ever answer any of the calls that were coming

8  in to you where people found -- if you recall, he said that

9  someone got his phone number off of a card that was in one of

10 the locations and his phone kept ringing off the hook after

11 this.

12         He says:  I did.

13         Question:  And what was the sentiment that they were

14 expressing?

15         Answer:  They wanted me to terminate the manager,

16 Holly.  Essentially they wanted her head on a stick.  And

17 every voicemail, when I did pick up the phone and listen to

18 the voicemails, it was, why is she working here?  She needs to

19 be fired, you need to terminate her.  Every single message.

20         Question:  Do you believe that in your firsthand

21 experience of being in the Philadelphia store during April and

22 May of 2018, that Shannon Phillips was physically present in

23 the Philadelphia market during that time?

24         Yes.  She was there around the clock.

25         Did you have -- and did you have the impression that

1   Shannon Phillips had checked out in any way?

2        Never.  She was my support.  You know, she was what I

3   leaned on.  As well as she was supporting me, she was

4   supporting all the team members, all the managers and all the

5   partners that were impacted.  And I know that that was

6   probably a great deal of emotional things on her because, you

7   know, she was my leader, so I downloaded on her.  She was

8   there as much as me.

9        When they finally, I think maybe, allowed me to have

10  a day off, whenever I would be working repeatedly, she hadn't

11  had a day off at that point.  I actually went first.  I don't

12  know when she eventually got a day off, but it was probably

13  two weeks at least of working straight from open to close

14  around the clock.  And she was there with me and Ben from open

15  to close every day.  I don't know actually know when she

16  actually got a break.

17       Question:  Did you ever think Ms. Phillips failed to

18  understand the seriousness of the arrests of the two men and

19  the aftermath?

20       No, I did not.  No.

21       Did you feel that Ms. Phillips provided the emotional

22  support to you and other partners that were needed in

23  Philadelphia during the April and May 2018 time frame?

24       I did.  I don't think I could have been -- I don't

25  think that I could have processed and gone through that

 1   experience at the time without her being there.

 2        Just because she was there, and she was someone for

 3   me to talk to.

 4        And she just provided a lot of emotional support, not

 5   only to myself but to the team members.  She was very

 6   supportive.  Everybody really, really loved Shannon.

 7        He was asked:  Do you believe that Ms. Phillips's

 8   race played a role in her termination?

 9        I do.  I think it's interesting because it happened

10   in my district, but I remember like scratching my head at the

11   time because my peer -- all of a sudden Ben Trinsey was let go

12   during this process, and I remember something came up with him

13   with respect to race involved, not from the partners but

14   something associated with how he paid people.

15        And I thought, well, we don't make any decisions

16   about pay.  That's all handled through human resources.  We

17   don't have any authority to dictate how people were paid.  We

18   got the resume details and gave them to partner resources and

19   then they came up with a figure.  I never had any -- I never

20   had any racial encounters or had any perspective of racism

21   from him and/or her.

22        It's interesting because -- because I can't remember

23   what -- there was a lot of social organizations around the

24   Philadelphia market that had a lot of people of color there,

25   and Shannon would go to a lot of those meetings and she would

1   be more invested in the community, like really rough parts of

2   Philadelphia.  How do we upkeep and how do we build people up

3   and how do we hire people, than sometimes even myself, you

4   know.

5           And I was always in awe of her because she wrapped

6   her head around the community and really advocated not only to

7   hire people of color from the community but to develop them

8   into leadership positions.  She was really, really passionate

9   about that, and actually inspired me to want to do better.

10  And I'm a person of color myself.

11          What were the things that led you to believe that her

12  race, being white, played a role in her termination?

13          Because there was no reason.  Up until that point,

14  Shannon, I remember, we toured prior to that with Camille.

15  Camille, who was our regional vice president, was always

16  really -- said kind things about Shannon.

17          I had never heard about my peers at district manager,

18  we were -- we were always kind of in awe of her.  I never

19  heard anything with respect to race with -- about Shannon

20  or -- I never heard anything.

21          And so when she was kind of here one day, gone the

22  next, similar to Ben, I just figured that all right, she's

23  kind of a scapegoat.  It happened in my district and nothing

24  was being done to me.  I had the district.  I felt so bad

25  because my peer on the other side of me was let go, and my

1    boss who had been there every single day, and Camille was

2    vigorously praising Shannon in front of me.

3          All of a sudden, I think our COO at the time came

4    into the market at one point, and then it was just gone.  And

5    then it was just gone.  And the public, the public wanted

6    accountability.  I am so sorry, I'm trying to go back and

7    remember this time, but it was really stressful.

8          Someone had to be -- someone had to, I guess, be

9    blamed for lack of a better word, about the situation.  And at

10   the time I guess Holly wasn't enough, and so they used Ben and

11   Shannon.

12         And again, it happened in my district and I had

13   plenty of conversations.  No one even asked me about Shannon

14   in terms of like how she was doing.  That's why we were all so

15   confused when she was there one day and she was gone the next.

16   It literally came out of thin air.

17         He was asked:  Do you think the fact that you're

18   black played a role in the fact that Starbucks did not

19   terminate you?

20         Yes, I do.  I actually remember having that

21   conversation with one of my peers when all of this was coming

22   out.  And I remember thinking to myself, well, I feel okay.  I

23   feel okay because, well, I'm black.  And obviously I didn't do

24   anything to put this out there as well, nor do I believe that

25   Holly did, but I know that I felt safe because there was a lot

1   of conversations about being black and showing up at work.

2   And all those conversations that were happening at the time,

3   and so I actually felt real safe.

4       But the conversations with race just continued to

5   escalate and escalate.  It seemed to me, at least my point of

6   view, it seemed that the people who were closer to the

7   situation, like Shannon, who was my boss, maybe Ben, there

8   just needed to be some scapegoats and someone had to pay.

9       And I feel -- felt really comfortable and safe, even

10  though it happened in my district.  I felt that way, quite

11  honestly, because I was black.  And I was the only black

12  leadership team member at the DM level at the time.  And

13  someone needed to be held accountable, I guess, for the

14  situation.

15      So ultimately it ended up being Ben, and it ended up

16  being Shannon.

17      Question:  Were you part of any meetings, roundtable

18  discussions where you could hear the higher-ups, higher-up

19  leaders at Starbucks talking about what their desires were in

20  terms of action?

21      Answer:  I was on many, many leadership roundtables

22  at the time.  Again, going back to remember all of this, I do

23  remember -- trying to go back -- I do remember, I believe his

24  name was Paul Pinto and I think he was vice president of

25  partner resources, which is human resources, I remember he

1    shared with me when I didn't know that Holly was terminated at

2    the time.  And I remember he told me that they had made --

3    Starbucks had leaked to the media that Holly was being

4    separated.  That's clearly what the public wanted.

5           And then I guess that night, the night before they

6    had a conversation with her.  I didn't even know this until

7    the next day.

8           And I remember the detail because I just remember

9    thinking to myself, you know, you kind of hear that in some

10   movies and stuff, like people leaking things to the media.

11   I've never been a part of anything that actually had that

12   happen until I heard him say that when he said it to me, and I

13   thought, wow, they actually -- people actually really do that.

14   They leak stories to the media.

15          He told me that about Holly in terms of the rest of

16   the roundtables that I went to, was essentially get out and

17   they wanted to talk to partners.  They especially wanted to

18   talk to black partners about that experience, and their

19   experiences at Starbucks.  But none of those conversations

20   happened until the incident happened.  And then it's like

21   let's talk to people, let's talk to people, let's talk to

22   people.

23          I also remember in one of the roundtables, jogging my

24   memory -- jogging -- my memory is bad.  I can't remember who

25   said it.

```
 1          I don't know if it was Zeta or Camille or if it was
 2   Paul Pinto, but I remember one of them saying it's better that
 3   we get out and talk to them, meaning leadership at Starbucks.
 4   Everyone is coming in from Seattle, than them wanting to go on
 5   social media or talk to the media.
 6          Question:  Did you ever tell Ms. Hymes that the race
 7   of the two gentlemen that you thought -- did you ever tell
 8   Ms. Hymes that the race of the two gentlemen, you thought,
 9   played a role in Holly's decision to call 911 that day?
10          No, never.
11          Why do you recall that you definitely did not tell?
12          Because I remember talking to Holly after the
13   incident happened.  I remember because she was really
14   emotional and obviously she felt really bad and I remember
15   sharing with her, I said, Holly, you didn't do anything wrong.
16   You were following the policy that Seattle rolled out.  We
17   rolled it out all the way downtown, all of the downtown
18   districts, myself and Ben's district.  I remember telling her
19   you didn't do anything wrong, it's our policy.
20          It's unfortunate how it happened, but that was the
21   policy that Starbucks provided to us, because we had so many
22   incidents in our location in the downtown market and she
23   was -- it's unfortunate what happened, and she was only
24   following the policy that we rolled out.
25          Did you ever think that Mr. Trinsey did or said
```

1    anything that was racially biased?

2        No, never.  Never.

3        Would Mr. Trinsey be able to set the pay of any

4    individual without any oversight by human resources or

5    compensation?

6        No, never.  We had to work through partner resources.

7    That was the policy.

8        I don't know if there's any better evidence that

9    could ever be brought in front of a jury on a race

10    discrimination case than what you just saw right there, a

11    first-hand account.

12        He has nothing to gain from this.  He has a lot of --

13    as he explained, emotional distress from having to live

14    through the whole thing in the first place, but he came in

15    here to tell you the truth, because right is right, and wrong

16    is wrong.

17        And that's why you, members of the jury, are here, is

18    to make things right.

19        I had put this screen up on the opening, and I told

20    you at the end of the case I would come in front of you and

21    show you my calendar with everything filled in.  And I made

22    good on that promise.

23        Defense counsel is unable to stand up in front of you

24    and make any indications on here of any evidence that somehow

25    justifies her termination.  There's no evidence.

1        We know on May 2nd that the joint statement occurred
2   and that this was happening from the highest levels on down.
3        What termination of a regional manager involves
4   people so high up, all the way up to Brewer, the COO.  That's
5   who Mr. Sykes was talking about.  Ms. Rosalind Brewer was
6   coming in to town.  She wanted to know what actions were
7   taken.
8        We know the next day, on May 3rd, that Mr. Johnson
9   and Ms. Brewer went to Morehouse College and spoke at a town
10  hall together.  And they were questioned by a lot of the
11  students about what was happening on April 12th.  And they
12  were getting negative feedback during that time.
13       And that overlaps with what's happening to
14  Ms. Phillips.
15       She suddenly has the TLA position, community
16  leadership position taken away.  That's no longer a
17  possibility.  That happens on the 2nd.
18       She then -- the 4th and the 5th is when Zeta Smith is
19  putting together the lucrative severance package.
20       You have the timeline.  This is the timeline.  This
21  is what happened.
22       Is it a coincidence that this all happened at the
23  same time?  No.  Your common sense tells you exactly what
24  happened.
25       You're going to have the ability in this case to

1    assess punitive damages.  Punitive damages are rare.  They

2    should not be used in a common way.  They should only be

3    reserved for those special cases in which the company has

4    engaged in egregious behavior.

5              This is what they've done here.

6              You're going to be told by the judge that in order to

7    properly assess punitive damages, you should consider the

8    defendant, and you should consider their net worth.

9              It's stipulated that the net worth of defendant is

10   $112 billion.  I can't even conceive what that number means.

11   But you know that this company, through the testimony of

12   Mr. Eckensberger, just said they had their diversity training

13   on the 29th, and they turned this into a PR positive for them.

14             Those two men that were arrested caused us a PR

15   crisis, and that what they had gone through, Starbucks

16   profited off of it, doubled their sales, especially in the

17   Philadelphia market.  They got the cameras back in, and they

18   twisted it all back to make sure that their own pockets got

19   lined as a result of this.

20             You're going to be told that the purpose of punitive

21   damages is twofold.  It's the appropriate amount to punish the

22   defendant for what they did and to deter not only Starbucks

23   but other companies like Starbucks from ever engaging in this

24   type of conduct.

25             The laws protect everyone.

1          The evidence is overflowing.

2          The place where the eight of you sit right now, they

3  call it jury duty because you're serving a duty, but it's

4  service.  Serving the country in the military is the highest

5  service you can do.  Serving on the jury is the second.  It is

6  what distinguishes us from the rest of the world because you

7  sitting in these chairs have the power to make a difference

8  right now, to make a difference in the trajectory of how

9  companies treat their employees.

10          It doesn't matter if you're a tradesman, senior vice

11  president.  It doesn't matter if you have a college degree or

12  don't have a college degree.  It doesn't matter what your race

13  is.  It doesn't matter what your age is.

14          Here on the jury, you're all equal, and you all have

15  an equal say in what happens.  You all have to unanimously

16  agree on this verdict.  And you have an opportunity right now.

17          When you walked in on Monday morning with the jury

18  service slip, you were probably thinking, like, what I think

19  is like:  I don't know what this case is, you know, slip and

20  fall or something that's really not important, but who knows.

21          But, in fact, you were called to serve on this place,

22  an opportunity to actually send a message directly to the CEO

23  of Starbucks, to send a message over to Seattle and say:  Here

24  in New Jersey, we don't do this.  We don't do this to people.

25  Just because you thought it was a good PR move, just because

1   you thought this is the way that I can put a head on a stick

2   and make myself look better, that's not how we do it.  We

3   don't do it in this country, we don't do it in this state, and

4   everyone needs to be protected from discrimination laws;

5   otherwise -- otherwise, everyone becomes vulnerable.

6          In a few minutes, defense counsel is going to stand

7   up in front of you and have -- explain their evidence, which

8   looks similar to that blackboard right there.

9          And when he stands up here, I want you to make him

10  look you in the eye and explain to you how they terminated

11  this woman after 13 years, after she didn't do anything, in a

12  company that has 280,000 employees.

13         You couldn't even find a position for her anywhere?

14  Anywhere?

15         Have him explain to you how race had nothing to do

16  with this, absolutely nothing to do about race when every

17  single thing that was happening in this time frame, every

18  conversation was about race.  It was all being viewed through

19  the lens of race.

20         Make him tell you that it was okay for Starbucks to

21  throw this single mom with two kids, supporting them, out on

22  the street, throw her out on the street, and that race somehow

23  had nothing to do with it, when her own subordinate, her own

24  district manager, Mr. Sykes, who's black and was there every

25  single day, testified in this courtroom to you and told you:

1   Oh, no, I know what happened.  I was there.  She was taken out

2   because she was white.  They needed a scapegoat.

3           And when his answers, when they don't persuade, I

4   want you, members of the jury, to tell Starbucks that here

5   discrimination laws, they are to protect all races.  Tell

6   Starbucks to make sure that in the future when they feel there

7   is a PR crisis and a heart attack happening, the result is not

8   to take an employee and trash her.  Tell Starbucks:  Take

9   accountability.  Accountability.  They need to take

10  accountability for their actions and find in favor of

11  Ms. Phillips.

12          Thank you.

13          THE COURT:  Counsel?

14          MR. HARRIS:  May I address the ladies and gentlemen

15  of the jury?

16                       CLOSING STATEMENT

17          MR. HARRIS:  Counsel.

18          The case is Phillips v. Starbucks.

19          Ms. Phillips is hoping and trying to appeal to what's

20  the worst in some of us.  But you all took an oath, and you

21  promised to be fair and impartial.

22          What's best in you is what corporations want.  What's

23  best in you is what Starbucks decided when they selected you

24  to be a juror in this case.

25          We're relying on what's the best in you, not what's

1    the worst in you.

2           The backdrop of this case is the Civil Rights Act of

3    1964, Title VII, that prevents discrimination based on race,

4    gender, ethnicity, national origin.  The backdrop.  The

5    backdrop, which Ms. Phillips is suing for, is based on that,

6    what's in that photograph.  That's the backdrop.

7           We were asking you to confront whatever biases you

8    may have.

9           When you were selected to be a juror in this case,

10   His Honor said to you, each and every one of you behind that

11   room and said:  We may have prejudices, we may have biases,

12   but can you put that aside to be fair and impartial?  And each

13   and every one of you to a person said that you could.

14          But there's a sacrificial lamb.  Let's think about

15   that for a second.  Let's pressure test that theory.

16          If there's a sacrificial lamb, there is a scapegoat.

17   Who knows about Ms. Phillips?  Where's the tweet about

18   Ms. Phillips?  Where is the leak, press release about

19   Ms. Phillips?  Where is the tweet, text, any message, social

20   media or otherwise about Ms. Phillips?  Let's pressure test

21   that theory.

22          When asked on cross-examination, who knows who you

23   are?

24          Ms. Phillips testified that Paul Sykes received

25   threats, yes.  Holly Hylton received threats.  People called

1  her.  And, in fact, you heard from her testimony, Paul Pinto

2  said that there was a leak in the media about whom?  Holly

3  Hylton, the store manager.  Where's the leak about

4  Ms. Phillips?

5         Counsel talked for 45 minutes.

6         Where is the press about Ms. Phillips?

7         If she were the scapegoat, show it.  If she were the

8  sacrificial lamb, show it.  Where is it?  Pressure test it.

9         The reason why it didn't happen -- the reason why she

10 didn't show it is because it didn't happen.

11        The question was asked:  Ms. Phillips, it wasn't

12 public knowledge as to who you were, was it?

13        What does Ms. Phillips say?  That's correct.

14        April 14th there was a release by Kevin Johnson, the

15 then CEO of Starbucks.  And in the release, he actually talks

16 about the incident that takes place.  And in that release, he

17 actually says the name of Camille Hymes.  And he talks about

18 the incident from what took place as of April the 12th of

19 2018.

20        And so he gives this public statement through his

21 organization about what happened.  Initially, there's an

22 investigation.  In the first portion of the investigation, we

23 immediately began a thorough investigation into our practices.

24 That's what he says on April the 14th.

25        So initially, they're conducting the investigation,

1   but it's not over.  So initially, he makes a statement about

2   that what happened on April 18th was reprehensible.  And so he

3   accepted responsibility despite him not being in the store.

4        But it's because you know what leaders do?  Excellent

5   leaders accept responsibility.  You can defer and delegate

6   authority but not responsibility.  That's what good leaders

7   do.

8        So Ms. Phillips wants to believe that Camille Hymes,

9   her supporter, her supervisor, had racial animus.  She wants

10  you to believe because she is of biracial descent -- remember,

11  Ms. Hymes testified she's biracial -- that the only portion of

12  her that would discriminate against any individual would be

13  the black portion, like separate out the white portion of her

14  DNA, but only the black portion could be unfair and impartial.

15       That's the evidence in this case.  What does she say?

16       Ms. Phillips specifically says that on one of the

17  calls, among leadership and others, that Rossann Williams, the

18  North American president at the time, says:  Camille Hymes is

19  the kind of leader she aspires to be.

20       What does Ms. Phillips say in response to hearing

21  that publicly?  She says:  I feel the same, and I so

22  appreciate who you are and all of your support.  Thank you for

23  being you.

24       That's the same person that has racial animus.

25  That's the same person who can't be fair.  That's the same

1    person who makes race-based decisions as it relates to hiring

2    practices within the workplace.

3          Rossann Williams, one of the largest people in the

4    organization, again, white female, says that she had been in

5    the stores and had heard from the community.  And so we also

6    know from Mr. Sykes, because she saw Ms. Williams in the

7    organization and in the market on more than one occasion.  In

8    fact, he testified that he saw her on five occasions at least

9    that she was there making observations.

10         And we also know from Zeta Smith who testified that

11   when they first came to the market, they were looking for

12   someone to have command presence, they were looking for a

13   leader that could show up.  So when Howard Schultz and the

14   rest of the brass of the organization came here, they were

15   looking for the market leader.

16         What did they find?  She wasn't even present.  She

17   wasn't present.  She wasn't there.  She wasn't there to meet

18   the CEO and the founder of the company.  She wasn't there.

19         In fact, the evidence is she says that she was

20   someplace else in one of the stores.

21         Do you know what leaders do?  They recognize what

22   needs to be done and who needs to do it.  That's what good

23   leaders do.

24         Was the best place in time -- highest use of her time

25   to be at some store or in the place where the CEO comes or the

1   founder of the organization?

2           Zeta Smith says:  You know, that's odd that the

3   person who's leading the market is not here.

4           They subsequently find her, yes.

5           What do we know?

6           After additional facts came out about the incident,

7   the organization started to develop some other information and

8   facts and practices about how they're going to conduct their

9   business.

10          We also know that ultimately they decided that what

11  happened on April the 12th shouldn't have happened.

12          And so that's why you see at the end, that this is a

13  journey.  That's on May 2nd.

14          It changed the company.  It had a profound impression

15  on the organization.

16          You know what's interesting about race in this

17  country?  It assumes that people can't talk about it.

18          Starbucks took the leadership role and said:  We're

19  not only going to talk about it, but we're going to shut our

20  stores down to conduct implicit bias training.  The purpose of

21  that is to improve the quality of all our decision-making,

22  because you know why we can't have a conversation in this

23  country about race.  They took a leadership role.  And the

24  market responded.  Customers actually appreciated that.

25  That's why two years later, the market improved.  That's

```
 1   leadership.

 2          If someone were the sacrificial lamb, where is the

 3   information about Ms. Phillips?

 4          No one knew her name.

 5          And you heard Ms. Hymes testify that there was never

 6   an acceptance of responsibility.  The difference between her

 7   and Mr. Sykes is Mr. Sykes said, yes, I could have done things

 8   differently.  I could have done things differently.  Accepted

 9   responsibility.

10          When asked whether or not Ms. Hymes could have done

11   things differently, Paul Pinto said, yeah, I think she would

12   agree that she could have done things differently as well.

13          There's a moment of reflection that all of us could

14   do things differently.  But we have to own it.  We have to say

15   I can be better, I can do better.

16          Looking at the management team.  The richness of

17   diversity.  That's not something they run away from.  That's

18   something that they embrace.

19          One of the reasons why Starbucks is a wonderful

20   corporation is because, despite you agreeing with their

21   politics, does not involve any moment, but diverse

22   organization have better results than nondiverse ones.

23          They embrace it.  So we don't run away from that

24   organizational chart; we welcome it, because we know that the

25   decisions that were made in that market were not race-based.
```

1          How do we know that?  Because every single person

2     that was replaced was replaced by someone that was of the same

3     race as Ms. Phillips.

4          The interesting part about Ms. Phillips's timeline is

5     that she gets terminated on May 8th.

6          We now know on May 3rd the decision had been made to

7     replace her, with who?  Mr. Marcus Eckensberger.

8          Let's think about that for a second.  If everyone in

9     the organization is going to make a decision based on race

10    because somehow, God forbid, of 130,000 employees, the

11    organization will fall but for Ms. Phillips.  That's an absurd

12    theory.

13         So if that were the case, let's assume that.  Let's

14    assume that to save this discussion.  They would have talked

15    about it after she would have been terminated.

16         Why are they talking about replacing her?  If they

17    wanted to make some public showing, do you think they would

18    have replaced her with the same race of a person that replaces

19    her?

20         They didn't do that, so it doesn't make sense.

21         As a matter of fact, if they're going to do that,

22    they have to show who they replaced a person with.  So there

23    would be a showing of an African American person or some other

24    race.  There would be a showing, a public showing.

25         So the person that they replaced, if they're going to

1    make this public spectacle, would be of a different race if

2    that's what they were trying to do, to follow their theory.

3              But that didn't happen either.  So we know through

4    the evidence that's uncontroverted, to use counsel's word.  We

5    know on May the 3rd, Marcus Eckensberger, who had already

6    worked with Zeta Smith, was going to be selected for the role.

7              Do you know why?  Do you know why?  Because he could

8    handle a crisis.

9              I would get Marcus in as quickly as possible based on

10   his experience in crisis situations.

11             Something particularly interesting happens in crises.

12   They don't build character, they reveal it.  Crises show what

13   we have, the kind of mettle that makes the best of us.

14             But sometimes some people can't handle the pressure.

15   But others can, others emerge.  Mr. Eckensberger was one of

16   the people that emerged.

17             He steps up.  He shows how leadership can happen.  He

18   shows command.  He shows command presence.  He owns the room.

19   He takes control, he takes charge.  That's what the market

20   needed.  They didn't need someone to hide in the back of the

21   room and cower.

22             And I certainly don't mean any disrespect to

23   Ms. Phillips.  I do not.

24             What am I suggesting is it's offensive to the men and

25   women that work hard to make an organization proud.

1        You heard from every single person on Starbucks

2    Corporation side that testified, that got promoted after this

3    incident.  Got promoted.  They've grown.

4        Camille Hymes is now the CFO of another company.

5        Zeta Smith is now the CEO of another company.

6        Paul Pinto started his own organization.

7        They grew up, they emerged, they developed, they were

8    stronger.  They were better because of it.  That's what

9    leadership does.  They don't cower and fall into the corner

10   and then blame someone else.

11       There's been an argument that there's no

12   documentation, that somehow Starbucks would engage in conduct

13   and dismiss someone without talking about it.

14       Well, you heard from the witnesses in this case that

15   each and every one of them talked about it, what she was

16   failing to do in the moment.

17       A peacetime leader is different than a wartime

18   leader.  What you need from someone in war is very different

19   than what you need from someone in peace.

20       These were turbulent times.  It wasn't an ordinary

21   situation.  And as a result, they needed someone to be able to

22   calm the waters, show strength and show resolve.

23       But we have that.  In fact, we have several.

24   Ms. Hymes in this email says:  This conversation builds on

25   several previous conversations about your leadership.  It

1 became more apparent over the last few weeks that you are

2 overwhelmed.  Your leadership presence has been severely

3 lacking and is showing up more frequently with Zeta, with

4 Rossann and other voices in the market.

5          This is what the leaders saw when they came into

6 contact with Ms. Phillips.

7          Didn't provide insight.  No solutions.

8          Appeared overwhelmed, frozen and lacked awareness of

9 how critical the situation was for Starbucks and its partners.

10          We know that she was frozen.  Do you know how we know

11 that?  We had a glimpse of it on cross-examination.

12          Do you recall me asking Ms. Phillips about the

13 training that she had on executive presence?  I specifically

14 asked her that question because I wanted to find out, what did

15 you learn?  Because executive presence is how you saw Ms. Zeta

16 Smith show up.  Poise, grace under fire.  Executive presence.

17          So I asked, Ms. Phillips, what did you learn?  See,

18 Ms. Phillips thought I was asking operational question, what

19 was the content.  No, I wasn't asking that.

20          I was asking, what did you learn, meaning what

21 insight did you gain.

22          Her answer and her response was -- it took her a

23 while to answer the question:  I don't remember, it was ten

24 years ago.  But it took her a minute to answer the question.

25          I wasn't asking an operational question, I was asking

1   an insightful question.  What did you learn from that

2   experience that could help you in your role in leading the

3   market?

4           Her response was:  I don't remember, it was ten years

5   ago.

6           She was either late or didn't show up at all.

7           And then when she did show up, she stood in the

8   corner as was previously said.

9           Assuming that were the case, assuming that were the

10  case that she stood in the corner while the CEO is in town, do

11  you think that would be enough to question her ability to lead

12  the organization moving forward, assuming that?

13          So we ask Ms. Hymes:  What did your organization look

14  like at the time of April of 2018?

15          What did she say?  White female.  White female.

16  White male.  White male.  Black male.

17          But the black male was replaced by Marcus

18  Eckensberger and he also replaced Ms. Phillips.

19          So the organization after 2018 demographically was

20  marginally the same as it was right after it.  Materially the

21  same as right after.  Not marginally.  Excuse me.  It was

22  materially the same.  It didn't change.

23          So if there's some public outcry as counsel would

24  have you believe, and Ms. Phillips, in their theory of some

25  sort of public display of the organization is still upside

1   down, the organization, where is it based on race?  One would

2   think there would be a public display of how the leadership is

3   changing.

4          There's not one public release showing the

5   demographics of Ms. Hymes's market before or after the

6   incident.

7          If there's a scapegoat, where is it?

8          It's interesting, you heard about the Philadelphia

9   market.

10         Mr. Trinsey was supervised by Ms. Phillips.

11         Remember what happened after the roundtables

12  discussions, there was some suggestion that said that people

13  were being treated differently in terms of pay compensation

14  based on race.

15         Mr. Pinto and others said, it wasn't -- there was no

16  finding that there was an intentional discrimination, but

17  people were complaining, and there was actual differences.  I

18  am not saying that it was any sort of nefarious intent but

19  there were actual differences.  And because of those actual

20  differences, it was certainly responsible to conduct an

21  investigation.

22         So that's what they did.  And the reason why they

23  conducted an investigation, because Mr. Trinsey was still in

24  those stores having the opportunity to supervise some of those

25  employees, those partners, the people that are responsible to

1    look up to you.

2              So it was reasonable to conduct an investigation.

3              As part of the investigation, the evidence was that

4    Mr. Trinsey decided to leave the organization.  Now, it's

5    interesting.  For Paul Sykes, the word was used, he could

6    resign.

7              But for Mr. Trinsey, the language that was used, that

8    he was involuntarily separated.  Interesting, because both of

9    them received severance packages.

10             The next time you quit a job, ask whether or not

11   they're going to give you $50,000.

12             I assume that when you get a severance package, it's

13   because they asked you to leave involuntarily.

14             It's interesting that they use the term with

15   Mr. Trinsey as involuntary, and Mr. Sykes, it's somehow

16   voluntary.

17             But we also found out today, it's interesting, that

18   there was a third person in the market.

19             Why wasn't his name brought out?  Huh.  It's a

20   particularly interesting issue, isn't it?

21             Yes.  Michael Lamborn was the third person in the

22   market.  So there was no discussion about him because it

23   doesn't fit into the narrative that race-based decisions were

24   being made.  Because if Paul Sykes and Ben Trinsey were

25   treated differently, then it gives the perception that race

 1   was involved in the decisionmaking factor.  But the evidence

 2   doesn't support that.

 3          See, counsel had an opportunity to put on additional

 4   evidence through rebuttal.  Did anyone come on the stand and

 5   say to you that Michael Lamborn wasn't in the market?

 6          Her burden.  Ms. Phillips's burden.  She has to prove

 7   by a preponderance of the evidence the claims that she's

 8   raised in this case.

 9          You all took an oath that said you would not provide

10   sympathy for or against.

11          So the face of the organization, you know what gets

12   publicized?  Huh.  Mr. Eckensberger.  You heard him testify

13   about after the May 29th unconscious bias training, there was

14   an article in the newspaper.

15          So the public display is not of the person who gets

16   separated, but who is it of?

17          Stand up, please.

18          It's Mr. Eckensberger.

19          So where's the sacrificial lamb?  Where is the

20   scapegoat?

21          If you're trying to demonstrate that there had to be

22   some sort of public showing of race to help the organization

23   grow and move forward, there would certainly be someone of a

24   different race than Ms. Phillips if you accept their theory.

25          But after May 29th the only publicity you see is the

1  face of Ms. Phillips's replacement.

2          Very handsome picture, I may say.

3          Of course I messed up the screen.

4          There's one more slide I would like to show if I can,

5  if I can get it up on the screen.

6          But I can tell you what the concept is.

7          Do you recall Ms. Hymes testifying in a moment of

8  transparency and vulnerability, Ms. Hymes said that she asked

9  Ms. Phillips how she was doing.  She asked her because her

10 behavior seemed to be incongruent with how she had showed up

11 in the past.

12         And Ms. Phillips said:  I'm not built for this.  I

13 can't do this.  This is too complicated for me.

14         In a time, in a moment of vulnerability and

15 transparency, this is what she said.  I suspect it is deeply

16 painful.  I suspect it hurts deeply when someone that she

17 believed to be a supporter of yours, somehow uses the words

18 against you.  That feeling of betrayal is real, and I am not

19 minimizing for any sense.

20         And so I understand why we're sitting here, and I

21 certainly understand the feelings of Ms. Phillips, I

22 absolutely do.  And I understand why she's upset.  I

23 understand why she's disappointed.

24         And you heard Ms. Hymes say:  I didn't want to have

25 to do this, but I had an obligation to the organization, to

 1   the stakeholders, to have a leader stand in.

 2          So they absolutely looked for another role in which

 3   she thrived which was the community role.  You heard every

 4   single person absolutely say that people appreciate and

 5   respected what she did well.

 6          The reason why we're here is because of a feeling, of

 7   a feeling.  Not because it was, not because it was real, not

 8   because it was actual.  But a feeling of betrayal.

 9          But that feeling should not guide your

10   decision-making.  Because we know the evidence is insufficient

11   as a matter of law to demonstrate that anything happened in

12   this case dealt with race.

13          It is their burden to demonstrate that race was the

14   determining factor.

15          MS. MATTIACCI:  Objection, Your Honor, that's a

16   misstatement of the law.

17          MR. HARRIS:  I'll withdraw.

18          I'll let His Honor tell you what the state of the law

19   is.

20          His Honor is responsible for telling you what the law

21   is in this case, and so if something I said is different than

22   what His Honor says, go with the Court.  But you all have the

23   evidence.  You all heard what the witnesses testified to.  You

24   saw the documents and the emails, and more importantly, you

25   know what she said.

```
 1          I thank you for your undivided attention.  I thank
 2   you for being fair and impartial.  Because I know you're going
 3   to do the right thing.
 4          I absolutely know and trust in the jury system.
 5   Because it requires eight people who are strangers from all
 6   different backgrounds and walks of life to make important
 7   decisions.
 8          Again, the Starbucks Corporation is looking to see
 9   what's best in you.
10          At the end of this case, you will decide, and you'll
11   make a fair and impartial decision.
12          The evidence doesn't demonstrate that Ms. Phillips
13   was somehow treated unfairly.  The law will demonstrate that
14   she has the burden, and she has to prove it through competent,
15   sufficient evidence.  She hasn't done it.
16          Thank you.
17          THE COURT:  Ms. Mattiacci.
18          MS. MATTIACCI:  Thank you, Your Honor.
19          THE COURT:  You have the final word.
20          MS. MATTIACCI:  Thank you.
21          Members of the jury, I want to just directly address
22   some of the stuff he just said.
23          First, who knows about Ms. Phillips, as if something
24   to do with the press?
25          She didn't sign it.  She didn't sign a nondisclosure
```

1    agreement.  So the whole thing was, if she would have signed

2    it, they would have bought her silence and then they could

3    have said whatever they wanted to say about her.  She wouldn't

4    be able to defend herself.  Just like Ms. Hylton couldn't say

5    anything afterwards and anyone that signs signed anything,

6    they can't say anything to defend themselves.  So she hadn't

7    signed it.

8         The answers and the scapegoat, like Mr. Sykes said,

9    the COO was coming into town.  He had just been with the CEO.

10        That's who wanted the answers.  They wanted to know

11   what action had been taken in Philadelphia.  What had been

12   done.

13        And this allowed them to say, we got rid of Shannon

14   Phillips, we got rid of Ben Trinsey.  We took care of it.  We

15   took care of it.  Philadelphia problem.

16        But they don't do anything to Ms. Hymes.  Ms. Hymes

17   kept saying leaders, leaders are in charge.

18        I think Mr. Harris just said, good leaders take

19   accountability, good leaders take responsibility.

20        So why does nothing happen to Ms. Hymes?

21        In fact, she gets promoted.  Promoted right up and

22   gets to save herself.

23        Why does nothing happen to Mr. Sykes?  Because they

24   could not, in that climate, in that situation, fire a black

25   person.  They just don't.

1        The whole thing about Michael Lamborn, as if I left

2   him off for some reason.

3        He was in the suburbs.  He wasn't even involved in

4   the situation.  This was Center City.  Split by Broad.  East

5   and west.  Michael had four stores at Penn, in like the

6   campus, in the bookstore.  And then the rest of the suburbs.

7   He wasn't even a part of this thing that was going on.

8        And the replacement situation is just completely

9   ridiculous.  This is about a unique situation that was

10  happening here, where they needed to account for and blame

11  somebody for what happened on April 12th in Philadelphia.

12       It doesn't matter that they replaced them with a

13  white person.  That doesn't dispel the race discrimination

14  claims.  First of all, Starbucks isn't that stupid.

15       And it's about being able in this moment, in that

16  week of May, to be able say what did you do, and they fired

17  her.  They would have never have done it if she was black.

18       So the whole -- he accused me, I think in opening, of

19  like leaving it out because I didn't want you to all know

20  about it.

21       I left it out because it's irrelevant.  It doesn't

22  matter.  Of course they're going to put -- it doesn't matter

23  who they put in there, because it was all about the

24  appearances, the optics of what they decided to do in the

25  aftermath of April 12th.  And they could report back up to the

1  highest echelons that were coming into Philadelphia that night

2  and that week who had demanded action.

3       Another way to think about it is if Ms. Phillips was

4  black, does this whole thing play out like this?  Does it play

5  out like this?  Does Ms. Hymes say that, you know, she felt

6  overwhelmed and we just had to get rid of her because she was

7  overwhelmed?

8       No.  I mean, you just know it's not.

9       And then the Mr. Trinsey thing, like you can just,

10 from the circumstances -- one, they put Ms. Phillips in as,

11 you know, dead man walking to suspend him.  But then while

12 he's on suspension, you know, when they find out that he's

13 only off by 2 cents and there's no substantiation, they don't

14 even call him.  They don't call Mr. Trinsey and, like, really

15 sorry we put you on suspension after 15 years.  No

16 substantiation to these race allegations against you.  They

17 just let him hang.

18      And then you have these things he was saying up there

19 about betrayal, greed -- well, I wrote down greed.  He said

20 betrayal and I said greed, because that's what this case is

21 about.  It's about Starbucks Corporation and their

22 self-preservation.

23      They accused Ms. Shannon Phillips of standing in the

24 corner.  That was her failure.  She stood in the corner during

25 the meetings.  But in the same breath Ms. Hymes says, she

1    always had to make herself the center of attention.  She was

2    always the victim.  She's the victim now.  Look how she's the

3    victim now.

4         How could you be standing in the corner and also make

5    it all about yourself and also be the victim?  Because it's

6    not true.  It's not true what they told you when they came in

7    here.

8         They just got caught.  That's all.  We got caught.

9    She didn't sign it.

10        You know, Holly Hylton signed it.  Ben Trinsey

11   signed.  But she didn't.  And now we're here, and they have

12   fought her for five years on this.

13        Zeta Smith is now the CEO of Sodexo USA Seniors.

14   Ms. Hymes is now the chief operating officer of Smoothie King.

15   Paul Pinto has moved on to Seedling.  The tentacles of these

16   decisions and if they get away with this, go beyond just

17   Starbucks and go beyond just this case.

18        To come back with a verdict for them what they did is

19   fine, they'll go on and do it again, no consequence, doesn't

20   matter.  This is what we're going to do to save ourselves and

21   if we have to make decisions and it falls along racial lines,

22   but for us, we make more money.

23        Or members of the jury, you send that message back to

24   Seattle.  Send that message back and tell them nope, uh-uh.

25   Today you have the power to do that.

```
 1            Whatever you think will make them listen and register
 2    in their brains that this is unacceptable, they need to take
 3    accountability, and this should never ever happen to anyone
 4    again.
 5            Thank you.
 6            THE COURT:  Let me see counsel at sidebar one second.
 7            (At sidebar.)
 8            THE COURT:  Counsel, it's after 3:00 and we're going
 9    to have to take a recess now or a short break, a comfort
10    break.  But I am looking at the hour, and I think it's going
11    to take 45 minutes to an hour for me to read my jury
12    instructions.  It's going to take us until 4:00.
13            It's getting late on a Friday.  I'm just wondering
14    whether or not we should postpone, or charge the jury and have
15    them come back fresh Monday morning.  Or I'll read the jury
16    instructions Monday morning and have them start deliberating.
17            MS. MATTIACCI:  I mean, we could ask the jury.
18            THE DEPUTY CLERK:  May I say something?
19            THE COURT:  Yes.
20            THE DEPUTY CLERK:  Before we reentered after lunch,
21    the jurors all told me they were going to, and they would wish
22    to, if they were done for the day with the instructions, they
23    wanted to leave and start their deliberations Monday.
24            THE COURT:  They said that?
25            THE DEPUTY CLERK:  They did.
```

*United States District Court*

```
 1            THE COURT:  Okay.  So I'm very hesitant to charge

 2   them at this point and put them to the burden to start

 3   deliberating or make a decision whether they want to

 4   deliberate.  I think the prudent thing to do is to wait until

 5   Monday morning.  Or they can get my instructions on the law

 6   and they can begin their deliberations.

 7            It's been a long day for them today already with the

 8   closings, but I'll defer.

 9            I just want to hear from counsel on it.

10            MS. MATTIACCI:  Well, I think given that the jury has

11   expressed a desire and what Your Honor is saying, that's -- I

12   would prefer it to be today, but if that can't be...

13            THE COURT:  I don't want to force them to do anything

14   today.

15            Mr. Harris?

16            MR. HARRIS:  I'll defer to the Court.  If the jury --

17   if they want to leave, then start on Monday.

18            THE COURT:  If it was earlier, 1:00 at this point, I

19   would charge them, but I think at this point we're going to --

20   I'll instruct the jury to come back at 9:00 on Monday and

21   charge them on the jury -- give them the jury instructions.

22   All right?

23            MR. HARRIS:  Yes.

24            MS. MATTIACCI:  Thank you, Your Honor.

25            (End of sidebar.)
```

```
 1          THE COURT:  Members of the jury, it's Friday
 2  afternoon, about 3:10 at this point.  And my charge that I'll
 3  give you on the law is -- I use the word "considerable."  It
 4  will take some time to explain the law to you.  And I
 5  consulted with counsel, and we decided or believe it best that
 6  we wait until Monday morning.
 7          We recess at this point.  We recess at this point,
 8  and we'll send you home for the weekend and ask you to come
 9  back at 9:15 Monday morning.  And I'll charge you on the law,
10  and then you'll begin your deliberations.
11          So I'm going to dismiss you today for the weekend.
12  I'm sure you can all appreciate at this point the need for a
13  jury to decide a case based solely on the evidence you see and
14  hear in court.  And jurors are permitted to talk to each other
15  when you begin your deliberations and not before that.
16          So don't talk to each other about anything you've
17  seen or heard in court.  And I know I've said that to you many
18  times.
19          Even when you go home for the weekend, don't talk to
20  anybody about the case.  And certainly don't do any
21  independent research about the case.  You've got to decide the
22  case based solely upon what you see and hear in court and
23  what's in evidence, the testimony and the exhibits.
24          So with that, we'll recess for the day.  We'll see
25  you back here Monday morning, and have a great weekend.
```

*United States District Court*

1    That's all I can say.

2           Stand, please.

3           (Jury out.)

4           THE COURT:  See you Monday.

5           MS. MATTIACCI:  Thank you, Your Honor.

6           THE COURT:  One last thing, after I charge the jury,

7    I always ask counsel if there's any changes, additions or

8    deletions, excuse me, in the charge, so keep that in mind.

9    Okay?

10          MR. HARRIS:  Understood.

11          THE COURT:  We'll stand in recess.

12          (Proceedings concluded at 3:09 p.m.)

13                              -  -  -

14          I certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16

17   */S/ Ann Marie Mitchell*          *9th day of June, 2023*

18   *Court Reporter/Transcriber     Date*

19

20

21

22

23

24

25

*United States District Court*