**Exhibit D**

1              **UNITED STATES DISTRICT COURT**
2              **FOR THE DISTRICT OF NEW JERSEY**
   _____
   SHANNON PHILLIPS,                    :   **CRIMINAL ACTION NUMBER:**
3          **Plaintiff,**               :   **19-19432**
                                        :
4              **v.**                    :
                                        :
5  **STARBUCKS CORPORATION d/b/a**       :
   **STARBUCKS COFFEE COMPANY,**         :   **JURY TRIAL**
6          **Defendant.**               :   **VOLUME 4**
                                        :   **PAGES 457 - 655**
7  _____

8          Mitchell H. Cohen Building & U.S. Courthouse
           4th & Cooper Streets
9          Camden, New Jersey  08101
           June 8, 2023
10         Commencing at 9:18 a.m.

11  **B E F O R E**:        **THE HONORABLE JOEL H. SLOMSKY,**
                           **UNITED STATES DISTRICT JUDGE**

12  **A P P E A R A N C E S**:

13

14      CONSOLE MATTIACCI LAW, LLC
        BY: LAURA C. MATTIACCI, ESQUIRE
15      BY:  KATHERINE C. OELTJEN, ESQUIRE
        BY:  HOLLY W. SMITH, ESQUIRE
16       1525 Locust Street, Ninth Floor
        Philadelphia, Pennsylvania 19102
17      For the Plaintiff

18      HOLLAND & KNIGHT LLP
        BY:  RICHARD HARRIS, ESQUIRE
19      BY:  TARA PARAM, ESQUIRE
        BY:  KATHLEEN PRINCIVALLE, ESQUIRE
20      2929 Arch Street, Suite 800
        Philadelphia, Pennsylvania 19104
21      For the Defendant

22
     Ann Marie Mitchell, CRR, RDR, CCR, Official Court Reporter
23              AnnMarie_Mitchell@njd.uscourts.gov
                       (856) 576-7018
24
     Proceedings recorded by mechanical stenography; transcript
25          produced by computer-aided transcription.

1    **A L S O   P R E S E N T**:

2

3        SHANNON PHILLIPS, Plaintiff

4        ROBYN RUDERMAN, ESQUIRE, Starbucks Corporation

5        MARCUS ECKENSBERGER, Starbucks Corporation

6        MATTHEW HIGGINS, Courtroom Deputy

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

- - -

I N D E X

- - -


E X A M I N A T I O N S

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **CAMILLE HYMES** | | | | |
| BY MS. MATTIACCI | 460 | | 532 | |
| BY MR. HARRIS | | 502 | | 559 |
| **ZETA SMITH** | | | | |
| BY MS. MATTIACCI | 561 | | 621 | |
| BY MR. HARRIS | | 609 | | |
| **PAUL SYKES** | | | | |
| BY MS. MATTIACCI | 625 | | | |
| BY MR. HARRIS | | 637 | | |


E X H I B I T S

| NUMBER | ADMITTED PAGE |
|---|---|
| Exhibit 86 | 617 |

*United States District Court*

```
 1              (PROCEEDINGS held in open court before The Honorable

 2    JOEL H. SLOMSKY at 9:18 a.m.)

 3              THE COURT:  Let's bring in the jury.

 4              Is the witness here?

 5              MR. HARRIS:  Yes.

 6              (Jury in.)

 7              THE COURT:  Please be seated.

 8              You may resume your questioning.

 9              MS. MATTIACCI:  Yes, Your Honor.  Thank you.

10                    DIRECT EXAMINATION - CONTINUED

11    BY MS. MATTIACCI:

12    Q.   Good morning, Ms. Hymes.

13    A.   Good morning.

14    Q.   Yesterday when we left off, we were in the time frame of

15    May 3rd, Thursday, and we had looked at this exhibit, which

16    you put the smiley face after:  Wanna take another shot at

17    that line?

18         So just to orient the jury in time again where we are,

19    this is Thursday, May 3rd.

20         And there is -- at this point, a decision has not been

21    made to terminate Ms. Phillips.  Correct?

22    A.   I don't believe I testified to that.  I believe that I

23    shared yesterday and the facts are that we had been in

24    conversation around the separation.  It just hadn't been

25    communicated.
```

*Hymes - Direct*                                          *461*

```
 1   Q.   Okay.  So you're saying the decision to terminate had
 2   already been made as of May 3rd?
 3   A.   I have not -- I don't recall the exact date, but we were
 4   in conversation around Mrs. Phillips's employment during that
 5   time.
 6   Q.   Okay.  So you may have already decided to terminate her
 7   employment, but you're sending her this email that says:
 8   Wanna take another shot at that line?  With a smiley face.
 9   A.   That is correct.
10   Q.   The next day, which is May 4th, you're aware that there
11   was an incident in which a barista was spit in the face by
12   someone who came in off the street.  Correct?
13   A.   Correct.
14   Q.   And you're aware that Ms. Phillips was in Philadelphia
15   during that time.  Correct?
16   A.   Correct.
17   Q.   And that she visited the stores on May 4th.  Correct?
18   A.   I don't know what stores she visited on May 4, but I'm
19   assuming that she did.
20   Q.   And you're aware that she went and visited the employee
21   who had been spit, correct, spit on?
22   A.   There were so many incidences that I cannot pinpoint
23   after five years what happened on that specific day with one
24   specific partner.  It was unimaginably complex during that
25   time, so to recall one specific moment, I can't do that under
```

*Hymes - Direct*                                        *462*

1   oath.

2   Q.   Okay.  Well, I'm talking about an incident where an

3   employee was spit in the face by another person.

4   A.   There were many incidences like that throughout the time

5   after the incident of April 12th.

6   Q.   And did Ms. Phillips fail in any way to handle those

7   situations in which people were spit in the face and other

8   situations like that?

9   A.   My answer would be yes.  There were multiple times where

10  our partners were crying out for support and help, and either

11  Ms. Phillips was late for the meeting in which they arrived to

12  have conversation with leadership which she was not present,

13  or there were times in which she was present but in the

14  corner, and our partners needed to speak with her.

15      There were also times in which they expressed concerns,

16  and there was a reaction of disconnection from Mrs. Phillips,

17  so to answer your question, it was not satisfactory which led

18  to the conclusion of the separation.

19  Q.   Okay.  Let's take a look at 161.

20      161 is an email about the incident that we just talked

21  about on May 4th.

22      The synopsis is:  Partner said they had to call police

23  because a customer was lunging at them and firefighters.

24  Partner said customer's eyes were red and he was spitting in

25  her face, this customer was also shaking.

*Hymes - Direct*                                    463

```
 1       Do you recall that, or is it just one of many incidents
 2  that you saw like --
 3  A.   It is, unfortunately, during this time, one of many
 4  incidences, but continue, please.
 5  Q.   Okay.  And do you see that there is an email from Ben
 6  Trinsey to Shannon Phillips saying "FYI" in regard to this
 7  particular case, May 3rd/May 4th.
 8       Do you see that?
 9  A.   Yeah, I do.
10  Q.   And then, Ms. Phillips shares that with you on May 3rd:
11  Sharing.  This happened a little bit ago in 8th & Walnut to
12  Store Manager Nicola.  Police were called but never showed up.
13       Do you see that?
14  A.   I do.
15  Q.   And then Nathalie who is in HR says:  Have you or Ben
16  talked to Nicola?  Correct?
17  A.   Yes.
18  Q.   And Shannon writes back at the bottom there:  Ben did.
19  She was heading to the hospital to be checked out.
20       And then Ebony responds back:  Hi Everyone:  I spoke to
21  Nicola, she's doing okay.  She told me these types of
22  incidents happen frequently, it is nothing new, it is normal.
23  The nurse was coming in as we were talking so we were going to
24  reconnect once she is out of the hospital later this evening.
25       And then you write back to Ebony:  Thank you for
```

 1  connecting with her.  She truly has a remarkable spirit.  I

 2  hope she takes time to rest and restore.

 3       That's on May 3.

 4       And May 4th there was an update by Ebony Johnson:  Team:

 5  I had another connect with Nicola tonight and she is a

 6  trouper.  She will be at work tomorrow.  She seemed to be

 7  doing well.  She isn't afraid to work and that she wants to be

 8  there for her partners.  I'm definitely adding her to my list

 9  of people to see while in town next week.  Her tenacity is

10  pretty admirable.  They did some bloodwork and she should know

11  the results in a couple of days.

12       So Ms. Johnson wasn't actually in town.  She was speaking

13  to her via phone.  Correct?

14  A.   It sounds like it was telephonically according to this,

15  yes, and it looks like Shannon is going to check in on her

16  tomorrow, the next day, to follow your sequence.

17  Q.   And then on May 4, 2018, you write:  Thank you Ebony &

18  Shannon.  We appreciate the close connections you're keeping

19  with Nicola.  Correct?

20  A.   Correct.

21  Q.   Is there any documentation, Ms. Hymes, that Ms. Phillips

22  failed in any way to support these partners when they were

23  going through these types of crises, any documentation?

24  A.   There is no documentation.  There were multiple

25  conversations.

*Hymes - Direct*                            *465*

```
 1  Q.   And no documentation of those conversations.  Correct?

 2  A.   Correct.

 3  Q.   Let's look at 131.

 4       This is Monday, May 7, 2018.

 5       This is one, two, three days after the email that we just

 6  looked at.

 7  A.   I'm sorry, I can't see your calendar.

 8  Q.   Oh, I'm sorry.  Let me turn it for you.

 9       We just looked at an email from May 4th --

10  A.   Okay.

11  Q.   -- in which you were thanking Ms. Phillips for her

12  continued support of Nicola.

13       You'd agree with me that there was a tap-out policy at

14  Starbucks at this time.  Correct?

15  A.   It wasn't a policy.  There's no written policy for

16  tapping out.  It was a method in which we would encourage our

17  partners to take mental health days.  We coined the term

18  "tap-out," but there's no policy, so I just wanted to make

19  sure that that was a clarification:  There's no policy.

20            THE COURT:  May I ask the witness just to move the

21  mic a little closer?

22            THE WITNESS:  Closer?

23            THE COURT:  Yeah.

24            THE WITNESS:  Like that?  Closer?

25            THE COURT:  Yeah.
```

*Hymes - Direct*                     *466*

```
 1            THE WITNESS:  Okay.
 2   BY MS. MATTIACCI:
 3   Q.   Isn't it true that in this time, it was encouraged that
 4   employees take certain days in which they don't work?
 5   A.   Our standard practice is 40 hours per week.
 6        In times of crisis like this or -- it was unprecedented,
 7   we recognized when our partners were in distress, and we
 8   encouraged them to take as much time as they needed.
 9            THE COURT:  That's a little bit too close.
10            THE WITNESS:  Okay.  I'm going to try to strike the
11   balance.  I'm sorry, Your Honor.
12            Is that better?
13            THE COURT:  Yes.
14            THE WITNESS:  A little better?  Okay.
15   BY MS. MATTIACCI:
16   Q.   Let's look at 135.
17        135 is an email from Larry Wang --
18   A.   Larry Wang is the way it's pronounced.  He was my chief
19   of staff.
20   Q.   Your chief of staff.  Correct?
21   A.   Yeah.  Yes.
22   Q.   And do you see here there's a chart at the top.  Correct?
23   A.   Yes.
24   Q.   And at the bottom, it says, from Larry Wang:  Hello all,
25   Thank you again for your participation on today's call.
```

*Hymes - Direct*                    *467*

```
 1    Attached are notes from both yesterday and today's call

 2    regarding potential protests in Philadelphia.

 3         I've also attached a standard operating procedure to

 4    protect partner well-being during times of crisis that we have

 5    just enacted here in the Mid-Atlantic.

 6         Based on the procedure, we will different leaders cover

 7    activities, some effective immediately.

 8         And there are specific days that were set aside for

 9    people to take off.  Correct?

10    A.   Yes.

11    Q.   And that included you.  Correct?

12    A.   Yes.

13    Q.   And it included Ms. Phillips.  Correct?

14    A.   Correct.

15    Q.   And in this case, it talks about Ms. Phillips being off

16    on the 21st and 22nd.  Correct?

17    A.   Yes.

18    Q.   And then you say to Ms. Smith:  We just instituted a new

19    practice for mental health and well-being during an extended

20    crisis, smiley face.  Thank you for your leadership this

21    morning and challenging us to tap out.  Correct?

22    A.   Correct.

23    Q.   And then Zeta Smith writes back:  Love it!

24    A.   Correct.

25    Q.   And this wasn't just a one-time thing; this extended
```

*Hymes - Direct*                    *468*

```
 1   throughout this whole time period that we've been talking

 2   about.  Correct?

 3   A.   Um...

 4   Q.   In terms of a tap-out schedule --

 5            (Court reporter clarification.)

 6            THE WITNESS:  Is it okay for me to answer the

 7   question?

 8   BY MS. MATTIACCI:

 9   Q.   Well, let me ask the question.

10        You'd agree with me that this tap-out -- the policy of

11   the tap-out was not something that was just a one-time thing;

12   it extended throughout this time period?

13   A.   Yes.  This is something that we designed as a result of

14   the crisis.  It's not something that has been instituted

15   throughout the history of Starbucks.  I don't necessarily

16   recall the specific date in which we started to recognize that

17   our partners were becoming fatigued.

18        Once we started to recognize that there was fatigue

19   because our partners were always on, we started a conversation

20   around how we could ensure that our partners have mental

21   health days.

22   Q.   Okay.  Do you recall that Ms. Phillips was tapped out the

23   5th and the 6th, the weekend before she was advised of her

24   termination?

25   A.   I do not recall that, no.
```

*Hymes - Direct*         *469*

1   Q.   Let's go back to 131.

2   A.   Okay.

3   Q.   So we're back to May 7th, and Ms. Phillips sends you an

4   email and she says: Touched base with Paul. The stores will

5   be ready for tomorrow's visit. Additionally, Dana and Jackie

6   were scheduled to be in the city supporting as well and

7   they'll also be in the stores to make sure all is perfect.

8      Do you see that?

9   A.   I do.

10   Q.   And this was -- at this time, the decision to terminate

11   Ms. Phillips had been made. Correct?

12   A.   I'm so sorry. I continue to answer this question. I'll

13   restate that we had been in conversation whether or not

14   Shannon Phillips was the right leader.

15      After five years, I cannot recall the exact date the

16   decision was made.

17   Q.   Okay. No documentation of that either, I guess?

18   A.   Correct.

19   Q.   You agree with me that there was conversations prior to

20   this with -- involving Zeta Smith and HR to put together a

21   severance package for Ms. Phillips so that she would leave.

22   Correct?

23   A.   Correct. I do not recall the date for point of

24   clarification and context.

25   Q.   Now, this was the same day that you told Ms. Phillips

*Hymes - Direct*                                    *470*

1    that she would have to suspend Ben Trinsey.  Correct?

2    A.   I do not recall the date, but I do recall asking Shannon

3    to suspend Ben Trinsey after the findings of an investigation

4    that warranted further investigation, after the complaints of

5    the partners in terms of his leadership and the way he was

6    connected with his partners.

7         We needed to do a full investigation, and we had asked

8    Mr. Trinsey to remove himself from the presence of our

9    partners so that they could feel comfortable and secure to be

10   able to share their concerns freely.

11   Q.   Was there any investigation done up until this point

12   regarding Mr. Trinsey?

13   A.   Not that I know of.  It is a result from the roundtables

14   where partners began to express their concerns around his

15   leadership.

16        This event served as, unfortunately, a bright light into

17   some of the situations and circumstances in terms of the

18   leadership.  There was a full collection of leaders in the

19   market who were talking with our partners in great lengths to

20   better understand their partner experience.

21        And as a result of those conversations with our partners,

22   we needed to address their concerns.

23   Q.   Okay.  So this is the -- talking about the roundtables?

24   A.   The roundtables, yes.  The roundtables, we had

25   one-on-ones.  We had impromptu store visits.  We had partners

*Hymes - Direct*                                471

```
 1  that would reach out directly to partner resources, that were
 2  ad hoc.  There were several avenues and channels in which our
 3  partners reached out with concerns.
 4  Q.   Okay.  And you will agree with me that no one complained
 5  about Shannon Phillips by name.  Correct?
 6  A.   That is not correct.  So some of our partners had shared
 7  in confidence that there were concerns around her consistency
 8  in showing up for scheduled meetings.  They actually said that
 9  the weather was predictive of whether or not she would show up
10  for a meeting.  These are things that came out as a result of
11  the roundtables.
12  Q.   Give me a name of someone, who said that?
13  A.   I don't have names.
14  Q.   You have no names of anyone that said that.
15       Isn't it true that in these roundtables no one named
16  Ms. Phillips by name?
17  A.   That is not true.
18       MS. MATTIACCI:  May I approach the witness, Your
19  Honor?
20       THE COURT:  Yes.
21       THE WITNESS:  Thank you.
22  BY MS. MATTIACCI:
23  Q.   You're welcome.  Ms. Hymes, you had your deposition taken
24  in this case?
25  A.   Yes.
```

*Hymes - Direct*                                    *472*

 1   Q.   And in that deposition you swore to tell the truth.

 2   Correct?

 3   A.   I do and I do.  I did and I do.

 4   Q.   Okay.  I'm going to direct your attention to your

 5   deposition, page 56.

 6   A.   Okay.

 7   Q.   The question was asked of you:  Was Ms. Phillips

 8   mentioned by name by any hourly employee that you can recall?

 9       Answer:  I don't recall.

10       And did anyone make a specific complaint or accusation or

11   otherwise express anger at Ms. Phillips during that

12   roundtable?

13       They referred to their experience, lack of positive

14   experience as a result of the leadership in the market.  The

15   lack of understanding to the experiences that they had, their

16   desire to be heard, their desire for equity and inclusion.

17       And that was an inference to the leaders that were

18   leading the market?

19       Do you see that?

20   A.   I do.

21   Q.   And so you'd agree with me that one -- you testified

22   before that no one mentioned Ms. Phillips by name.  It was an

23   inference to the leadership?

24   A.   That question in the deposition was specific to

25   roundtable.  I just responded under oath that that was a

*Hymes - Direct*                                          *473*

1   roundtable and I do not recall.  There were other

2   conversations that were either one-on-one visits or impromptu

3   phone calls in which that was mentioned, which is why I'm

4   sharing this today.

5        This deposition is correct and truthful and my testimony

6   today as well.

7   Q.   Okay.  And you have no documentation about any of these

8   impromptu phone calls in which you got a call from somebody?

9   A.   There were multiple conversations.  That calendar is

10  understated in terms of the amount of activity and

11  conversations that we had with our partners in the midst of a

12  crisis.

13       So what I will share with you is that we were on 24/7 --

14            MS. MATTIACCI:  Objection, Your Honor, unresponsive.

15  Motion to strike.

16            THE COURT:  Sustained.

17  BY MS. MATTIACCI:

18  Q.   Ms. Hymes, when you -- you just were testifying about

19  these roundtables, you said there's an inference in

20  leadership.  Inference that leadership was a problem?

21  A.   There were direct statements from our partners expressing

22  concern.

23  Q.   And that leadership would include you.  Correct?

24  A.   It could be, yes.  To which I felt comfortable to

25  address -- I felt comfortable enough to acknowledge that there

 1   was a failure.  I promised to work with our partners to

 2   address those concerns with urgency.

 3       I showed up in a manner in which our partners felt

 4   confident that I would follow through on my commitment.

 5       I did not see that same intent reflected in Shannon.  In

 6   fact, there was a diversion.  There was a persona of

 7   victimization of Shannon Phillips and there was not an

 8   acknowledgement of the responsibility that was -- that should

 9   have been taken when our partners were expressing concern.

10       There were diversions to the concerns.  There was an

11   absence of physical presence when those concerns were being

12   expressed.

13   Q.   Where in any document, text, anything, does it say

14   anything that Shannon Phillips somehow was painting herself as

15   the victim in this?  Where?

16   A.   Those are the conversations that both Shannon and I would

17   have together.

18   Q.   You would agree with me that when you say that these

19   roundtables, we're talking about the Philadelphia region.

20   Correct?

21   A.   Yes.  The Philadelphia area.

22   Q.   The Philadelphia area.

23       And they were -- the people that were talking, you're

24   saying that they were not naming people individually, like

25   saying that Mr. Sykes was doing something or Mr. Trinsey was

*Hymes - Direct*                                    *475*

```
 1   doing something or Ms. Phillips was doing something.  Correct?
 2   It was just generally conversation about --
 3   A.   They were very specific.  They were adding specific names
 4   to certain situations during the roundtables or the one-on-one
 5   conversations with PRO.  With PRO, they do not necessarily
 6   share the specific names of the people who are sharing.
 7   Q.   You'd agree with me then that some of the complaints
 8   pertain to Mr. Sykes.  Correct?
 9   A.   I would assume yes.
10   Q.   And Mr. Sykes was not terminated or suspended pending an
11   investigation into his conduct.  Correct?
12   A.   There was a stark difference between Mr. Sykes's behavior
13   and Mr. Trinsey's behavior, where Mr. Sykes would take
14   ownership.  He would actually acknowledge where he maybe
15   misstepped or didn't follow through.  He would then follow up
16   with the partner.
17        That was not the case of Mr. Trinsey.  Once again,
18   Mr. Trinsey would not take ownership or accountability for
19   what the partners were saying.
20        It is the behaviors that differentiated the outcome for
21   both Mr. Trinsey and Mr. Sykes, full stop.
22   Q.   Ma'am, you never even had a conversation with Mr. Trinsey
23   about these alleged behaviors.  Isn't that true?
24   A.   That is not true.
25   Q.   Oh, so you had a conversation with him in which you
```

*Hymes - Direct*                               *476*

```
 1  addressed, prior to his suspension, these allegations of

 2  alleged behaviors?

 3  A.   We had multiple conversations with Mr. Trinsey,

 4  impromptu, not formal.  I cannot tell you in the last five

 5  years in my memory when that occurred, where it occurred.

 6  Q.   Okay.  So you have a impromptu conversation with

 7  Mr. Trinsey regarding alleged behaviors.

 8       Did you give him an opportunity to improve that?

 9  A.   We gave him an opportunity to own it.  We gave him an

10  opportunity to say how he would address it.  And that did not

11  happen.

12  Q.   What specifically are you saying that Mr. Trinsey did in

13  his failure to lead?  What are you saying he did?

14  A.   There was a denial of ownership.

15  Q.   What does that mean?

16  A.   That means that whether the person said that they -- if

17  the person said that they had an issue, he didn't comprehend

18  that that issue should have been addressed immediately, that

19  he should have had a conversation, there should have been

20  engagement with partner resources and that there would be a

21  closeout.

22       There was always an external factor in the explanation

23  for Mr. Trinsey.

24  Q.   What issue?  You're saying --

25  A.   It could be what you mentioned yesterday, which was a
```

1   difference in pay salary between an African American and a

2   white person.  That is --

3   Q.   So you talked to him about that prior to suspending him?

4   That's what you're saying?

5   A.   I am saying that there were allegations and we had

6   conversations around whether or not there was a closure.

7   Q.   My question is:  Did you speak to Mr. Trinsey directly

8   about an allegation of pay disparity, yourself?

9   A.   As I recall, that was a conversation.

10  Q.   And you gave him an opportunity to cure that issue on the

11  pay?

12  A.   Yes.

13  Q.   And he refused to cure the issue?

14  A.   There was -- yes.

15  Q.   Okay.  Let's take a look.

16       Now, isn't it true in regards to Ben Trinsey, that the

17  original plan was for him to be suspended on May 8th and that

18  you and Paul Pinto were going to be the ones to suspend him?

19  A.   I don't recall the exact plan.  I would welcome any

20  written documentation.

21  Q.   This is Exhibit 50.  This is an email from Sunday, May

22  6th in which you say, private and confidential is the subject.

23       Recap of Philly support for next week.

24       Paul, Zeta, Nathalie, to ensure we are aligned on

25  approach for suspensions and separations, please see the

*Hymes - Direct*                                    *478*

1   sequence below.

2       Monday:  Larry, Ben deliver communication plans one on

3   one with store managers.

4       Tuesday morning:  Camille and Paul discuss concerns

5   raised in the district and advise that he will be on paid

6   suspension pending investigation.

7       Communication will be sent to the store managers.  Brian

8   Dragone will be activated as the interim DM.

9       Do you see that?

10  A.   I do.

11  Q.   So you'd agree with me that the original plan as of

12  Sunday, May 6, was for you and Paul Pinto to be the ones to

13  suspend Ben Trinsey?

14  A.   Correct.

15  Q.   When in fact, that's not what happened.  Correct?

16  A.   I don't recall -- well, I do recall asking Shannon to

17  have the conversation with Ben.  Correct.

18  Q.   Yes, so instead you send Ms. Phillips in to be the one to

19  suspend Mr. Trinsey, even though you knew she was already

20  going to be terminated as of that time?

21  A.   Correct.

22  Q.   And you did that because you wanted to see if she would

23  screw it up so you would have something to document.  Isn't

24  that true?

25  A.   That, unfortunately, sounds very -- that's a very

*Hymes - Direct*                                            479

 1  disturbing statement, so I'm going to have to say no.

 2  Q.   Don't you think it's disturbing to have to send somebody

 3  to suspend their subordinate when they are just a dead man

 4  walking and they don't know it?  That's pretty disturbing,

 5  don't you think?

 6  A.   Well, I will say this:  There is an opportunity for every

 7  leader to take accountability.

 8       And if you find that your leader needs a suspension or

 9  you have to deliver a difficult message, the leader in the

10  market is supposed to be able to deliver that with care and

11  concern, with strength and with resolve that the intention is

12  to protect the partners who are complaining.

13       Once again, this is not about the partner that is being

14  investigated for not serving their partners.  This is about

15  the leader stepping up to do the work to ensure that the

16  partners that they're leading are taken care of.

17       Now, it is not comfortable.  It is actually the worst

18  thing to do as a leader, to have to suspend or terminate

19  someone.

20       But when you are in role, you have to act as the leader

21  up to and including the final day of your responsibilities.

22       So to answer your question, it's not comfortable, and

23  especially during this time of crisis, there were very many

24  uncomfortable moments.

25       You'll continue to recall those during this session, but

*Hymes - Direct*                    *480*

```
 1   what I will share with you is at that moment, Shannon was a

 2   leader.

 3        What actually happened --

 4            MS. MATTIACCI:  Objection, Your Honor --

 5            THE WITNESS:  I'll leave it at that.

 6            MS. MATTIACCI:  -- unresponsive.  Your counsel will

 7   have to --

 8            THE COURT:  I'm going to sustain the objection.

 9            THE WITNESS:  I'll leave it at that.

10            THE COURT:  Ms. Hymes, just try to answer the

11   question.

12            THE WITNESS:  Okay.

13   BY MS. MATTIACCI:

14   Q.   So it's one of the worst things to have to go in and have

15   to suspend somebody.  It was originally going to be you to do

16   it, and then you send Ms. Phillips in.

17        Can we agree with that?

18   A.   I'm going to say that there were three of us there.  We

19   were with Mrs. Phillips.

20   Q.   You were not with Ms. Phillips when she suspended Ben

21   Trinsey.

22   A.   I will tell you under oath we were.

23        We sat and -- we sat with her during that suspension.

24   That is my recollection.

25        I remember that she read off the paper, and she wouldn't
```

*United States District Court*

*Hymes - Direct                        481*

```
 1   look at Ben directly in the eye.  And we couldn't understand
 2   if we were having conversations with Shannon about the
 3   concerns of the partners, how she wouldn't lean more towards
 4   being open and curious to what the partners were saying and
 5   institute the suspension versus reading off the paper directly
 6   to Ben.  I recall that clearly.
 7   Q.   So she failed in her leadership because she read off the
 8   paper?
 9   A.   Yes.
10   Q.   I'm going to show you a text message.  The exhibit number
11   is 12, and the Bates number is Starbucks 5795.
12        This is from May 8, 2018.
13        Hi Nathalie -- from you.
14        I hope you had a great dinner and evening.  Please call
15   me after your conversation with Ben & Shannon.  I'd like to
16   hear how it went prior to my conversation with her.
17        Do you see that?
18   A.   I do.
19   Q.   And does that refresh your recollection that you were not
20   the one in the suspension meeting?
21   A.   No.  I recall something very different, so...
22   Q.   And then after that, you follow up on the same day --
23   A.   Uh-huh.
24   Q.   -- Just a thought...  you might want to send a recap of
25   the Shannon/Ben conversation to Paul/Zeta and I.  It helps to
```

*Hymes - Direct*                      *482*

```
 1  document her lack of leadership -- her continued lack of

 2  leadership.

 3       Do you see that?

 4  A.   I do.

 5  Q.   So May 8, 2018, you are actually putting in a text

 6  message for the very first time anything about any sort of

 7  leadership failure concerning Ms. Phillips.  Correct?

 8  A.   I don't recall that this would be the first conversation

 9  I had around Shannon's lack of leadership, so that's not

10  correct.

11  Q.   Well, you'd agree with me that it was common for all of

12  you, Zeta, Paul Pinto, yourself, to communicate via text

13  message concerning work.  Correct?

14  A.   Yes.  We were not behind desks in offices.

15  Q.   And you testified yesterday that you couldn't possibly

16  document anything that was going on with Ms. Phillips because

17  you were in crisis mode.  Correct?

18  A.   Correct.

19  Q.   You would agree with me that as of May 8, 2018, you were

20  still in crisis mode.  Right?

21  A.   Correct.

22  Q.   And, yet, you wanted to take the time right now, when

23  she's already been -- the decision to terminate her has

24  already been made to now document something; is that correct?

25  A.   As I shared before, I cannot give you the exact date.
```

*Hymes - Direct*                    *483*

```
 1  You're asking me to pinpoint a date.  I cannot do that.  So

 2  that's not correct.

 3  Q.  Well, you did testify a little earlier that you knew that

 4  her severance agreement was already drafted back on May 4th

 5  and 5th.  Correct?

 6  A.  I don't recall the exact date.

 7  Q.  After Mr. Trinsey was suspended on May 8th, his access

 8  was cut off; isn't that correct?

 9  A.  I don't recall the exact date.

10  Q.  You don't recall the exact date?

11  A.  I don't recall the exact date.

12  Q.  Of Mr. Trinsey's suspension?

13  A.  When his suspension -- you said when his communication

14  was cut off?  Is that the question?

15  Q.  Yes, his access to the systems.

16  A.  Yes.  I don't remember the date that Mr. Trinsey's access

17  was cut off.

18  Q.  Okay.  Can we agree that Mr. Trinsey was suspended on the

19  8th?

20  A.  Yes.

21  Q.  Is it common when somebody is suspended, that their

22  access is cut off?

23  A.  Yes.

24  Q.  Okay.  And at that point, Starbucks does an investigation

25  into the allegations regarding pay disparity based upon race.
```

*Hymes - Direct*                    *484*

1    Correct?

2    A.   Correct.

3    Q.   I'm going to show you an email here that discusses the

4    pay disparity allegation.

5         This first email is Wednesday, May 23rd, from Nathalie

6    Cioffi, who is an HR person.  Correct?

7              THE COURT:  Exhibit number?

8              MS. MATTIACCI:  I'm sorry, Your Honor, 102.

9    BY MS. MATTIACCI:

10   Q.   Do you see this email?

11   A.   I do.

12   Q.   And she says:  I want to see if you could partner to look

13   urgently into the matter below.

14        And the partner they're talking about is Jaicee Huff.

15   Correct?

16   A.   Correct.

17   Q.   And it talks about how she was transferred from New York

18   to Philadelphia, and she reported that her pay rate went down,

19   and she doesn't think that it's in -- it's properly set.

20   Correct?

21   A.   Correct.

22   Q.   And so in response to Ms. Cioffi's request, Jeannie Pae

23   says:  Team, Martha Yamin looked into the situation and will

24   respond back to this team.

25        So somebody had already started -- looked into this,

*Hymes - Direct*                    *485*

1  correct, according to this email?

2  A.   On May 23rd.

3  Q.   And the email back from Nathalie says:  Jaicee's rate

4  upon transfer from one store to the next looks appropriate.

5  Her rate at the New York City Boroughs market was $13.46,

6  which was 63.9 percent to the range.

7       Isn't that what PIR means?

8  A.   Yes.

9  Q.   Percentage to the range?

10  A.   Yes.

11  Q.   And when she transferred to the Philadelphia market, it

12  was lowered to $11.32 which Bert brought her to a range

13  63.3 percent.

14       Her transfer rate should've been $11.34 in order to be

15  closely matched to the 63.9 range percentage, but as you see,

16  the difference was only by 2 cents.  This was submitted

17  through EPAN.  In the following week, effective December 3,

18  2012, her pay rate was increased to $11.72 which was due to

19  merit increase.

20       Do you see that?

21  A.   Yes.

22  Q.   And then, this was forwarded to you on May 24th:  Hi

23  Camille and Marcus, Not to flood your inbox - but also wanted

24  to update you that Compensation has provided data regarding

25  Jaicee Huff's claim that her pay is inappropriately low.  This

1  claim appears unsubstantiated (I highlight the relevant

2  portion below).  Ebony and I forwarded the data to the

3  investigator working on Jaicee's case, Holly Klein, who we are

4  connecting with tomorrow.  We will have a further update after

5  that connect.

6       So when you received this email on May 24th, Mr. Trinsey

7  was still on suspension.  Correct?

8  A.   Correct.

9  Q.   Did you call Mr. Trinsey and say: Hey, Mr. Trinsey, we

10 looked into the pay issue and it's unsubstantiated, these

11 allegations, so come on back to the Starbucks?

12 A.   The issue around lack of leadership wasn't a specific

13 allegation.  It was the lack of addressing the allegation with

14 urgency.

15      A lot of times, our partners may have misconceptions.

16 This is a perfect example on pay disparity.  And if it was

17 addressed earlier, this could have been a partner who would

18 have a better understanding of their pay and would not have

19 the misperception that there was a pay disparity.

20      The investigation was not complete as this was not the

21 only complaint coming from our partners.  I do not recall if

22 anyone reached out to Ben at this time to have a conversation

23 on the outcome.  That happens after the full investigation is

24 complete.

25 Q.   Ms. Hymes, a few minutes ago, you just told me that you

*Hymes - Direct*                           487

```
 1   had a conversation with Mr. Trinsey prior to his separation in

 2   which you addressed with him these allegations regarding pay

 3   disparity.  Correct?

 4   A.   It was in which the timing of him addressing the issues

 5   had been lingering; it was not the specific issue.

 6   Q.   It was lingering.

 7        And all that needed to be done by you is to send an email

 8   to Compensation and find out if the pay was too low, and they

 9   could just shoot that data back to you.  Correct?

10   A.   That's Ben's responsibility.

11   Q.   You could have done that at that time, couldn't you?

12   A.   Ben is the district manager responsible for those

13   partners.  That's his responsibility.  This happened -- this

14   concern around pay disparity, I believe, happened prior to the

15   incident.

16        What happened after the incident is that our partners

17   started to come forward with concerns where their leadership

18   was not following through on their issues.

19        I'm sorry to --

20   Q.   Ma'am, so you told Mr. Trinsey to send an email to

21   Compensation, and he refused to do it.  Is that your

22   testimony?

23   A.   That is not.

24   Q.   Okay.  But we can agree that you didn't call Mr. Trinsey

25   and say:  We're sorry we put you on suspension.  It turns out
```

*Hymes - Direct*                                      *488*

```
 1   it was 2 cents, and the claim was unsubstantiated, so come on

 2   back to Starbucks.  Your position's waiting.

 3        That didn't happen, did it?

 4   A.   That did not.

 5   Q.   And, in fact, Mr. Trinsey ended up being terminated from

 6   Starbucks.  Right?

 7   A.   After full investigation.

 8   Q.   Full investigation in which there was no substantiation

 9   of anything.  Correct?

10   A.   That is not correct.

11   Q.   There was a substantiation of the claim?

12   A.   Of our partners not feeling confident about his

13   leadership.  I do not have the full report in front of me, but

14   there was enough evidence to warrant the separation of Ben

15   Trinsey.

16   Q.   There was evidence to warrant the separation.

17        Is this a written document that at one point you have

18   seen, ma'am?

19   A.   There may have been, yes, but I cannot recall after five

20   years.

21   Q.   Do you know why we would not have any report of anything

22   having to do with substantiated claims of Ben Trinsey?

23   A.   I do not.

24   Q.   And so he was terminated for misconduct?

25   A.   I believe so.
```

*Hymes - Direct*                          *489*

```
 1   Q.   We touched on before we broke yesterday about the
 2   reaction to folks at Starbucks that Shannon Phillips had led
 3   and now we're being informed that she's being terminated.
 4        Do you recall that?
 5   A.   I do recall the conversation yesterday, yes.  Yes.
 6   Q.   And we left off with Delma Wells who reported back to you
 7   that she was angry and she felt that the separation was due to
 8   the April 12th incident.
 9        You recall getting that feedback from Ms. Wells.
10   Correct?
11   A.   Yes.
12   Q.   And that you believed that you needed to follow up but to
13   give her a moment to grieve.  Correct?
14   A.   That is correct.
15   Q.   And Jackie Johnson, you spoke to her.  Correct?
16   A.   Correct.
17   Q.   And she was short in conversation, and it was obvious she
18   was not ready to talk.  Correct?
19   A.   Correct.
20   Q.   She said to you that she was doing okay, but that the
21   news took her and her store managers by surprise.  Correct?
22   A.   Correct.
23   Q.   And you felt that high touch was needed in that store?
24   A.   Yes.
25   Q.   And Paul Sykes, he was visibly nervous.  Correct?
```

*Hymes - Direct*                    *490*

 1    A.   Five years ago, I cannot remember the physical

 2    manifestations of Paul Sykes on that day in the moment.

 3    Q.   Mr. Sykes was upset that she was terminated.  Correct?

 4    A.   I -- probably, yes, if you're -- yes.

 5    Q.   Isn't it true that Mr. Sykes thought that Ms. Phillips

 6    was a phenomenal leader?

 7    A.   I don't know if he used those words.

 8    Q.   Well, in a general sense, you'd agree with me that

 9    Mr. Sykes really respected and admired Ms. Phillips?

10    A.   I would agree.

11    Q.   And that he felt fully supported by her through this.

12    Correct?

13    A.   I don't know.

14    Q.   You didn't ask Mr. Sykes if he felt supported?  I mean,

15    he's the district manager in Philadelphia of the store where

16    the incident took place.  You never inquired whether he felt

17    supported by Ms. Phillips through this?

18    A.   I was connecting with a tremendous number of partners.

19    To testify five years later on my conversation with Ben, I

20    cannot do.  Or, I'm sorry, with Paul in this.

21    Q.   So you have no recollection of what Mr. Sykes's feelings

22    were about Ms. Phillips?

23    A.   You are referring to when she was separated and what his

24    feelings were.  I cannot recall.

25    Q.   How about any time before the separation in the weeks

*Hymes - Direct* 491

```
 1  leading up to it?  At no point in time did Mr. Sykes say that
 2  he felt that he was unsupported by Ms. Phillips?
 3  A.   Correct.
 4  Q.   And at no point in time did Mr. Trinsey ever say that he
 5  felt unsupported by Ms. Phillips.  Correct?
 6  A.   Correct.
 7  Q.   David General, you spoke to him.  Correct?
 8  A.   Yes.
 9  Q.   And he relayed to you that he was feeling the loss of
10  both Ben and Shannon.  Correct?
11  A.   Yes.  That's what typically happens when you -- when
12  leaders are transitioning out, yes, there is a deep
13  connection.
14  Q.   He was feeling a lack of trust now, and wasn't sure who
15  to trust.  Correct?
16  A.   I don't know if he said that.  I'm sorry, I don't know
17  the details of that conversation.
18  Q.   You spoke --
19  A.   With David General there were -- had over 500 store
20  managers, so for David General specifically, in this moment I
21  do not recall him saying that.
22  Q.   You do recall who Carmen Williams is, though.  Correct?
23  A.   I do.
24  Q.   And Carmen Williams is African American.  Correct?
25  A.   Yes.
```

*Hymes – Direct*                    *492*

```
 1   Q.   And she was a person that was hired by Ms. Phillips out

 2   of the YouthBuild program.  Correct?

 3   A.   Yes.

 4   Q.   At one point she was homeless, Ms. Williams?

 5   A.   Yes.

 6   Q.   And then when she got the job at Starbucks, she was

 7   trained by Ms. Phillips.  Correct?

 8   A.   Yes.

 9   Q.   And mentored by her?

10   A.   Yes.

11   Q.   And in fact, was promoted several times in Starbucks,

12   correct, up to store manager?

13   A.   That is correct.

14   Q.   And she remains employed today.  Correct?

15   A.   I don't know.

16   Q.   When you spoke to her, she said she was feeling the loss

17   and was really upset.  Correct?

18   A.   Yes.

19   Q.   And she believes that the -- the store managers needed to

20   feel supported and nurtured.  Correct?

21   A.   We all did.

22   Q.   You needed to feel supported and nurtured because of the

23   loss you were feeling from having to terminate Ms. Phillips?

24   A.   We all felt like our partners needed support.  I clarify

25   that statement.
```

*Hymes - Direct* 493

```
 1    Q.   Okay.  They needed support as a result of the loss --

 2    A.   We all felt that.

 3    Q.   -- of Ms. Phillips.  Correct?

 4    A.   No.  The transition of -- the actual incident and

 5    everything that was happening as a result of investigations,

 6    as a result of our customer reactions, as a result of the

 7    roundtables.

 8         So our partners very specifically needed nurturing, not

 9    because of Shannon Phillips specifically.

10         Again, this is what I speak to when I talk about the

11    scope of the -- and the depth of what our partners were going

12    to -- going through, that there was not a specific focus on

13    Shannon Phillips.  That was part of a very complex

14    multivariate change curve that our partners were going through

15    at that time.  So the care and nurturing of our partners was

16    holistic.

17    Q.   What we just went through, though, was your personal

18    observations and interactions with these partners, in

19    particular to their reaction of the departure and termination

20    of Ms. Phillips.  Correct?

21    A.   That is one phase or one incident in the entire scope.

22    Yes.

23    Q.   I understand.  But what we just went through --

24    A.   Yes.

25    Q.   -- has to do with Ms. Phillips?
```

*Hymes - Direct*                                    *494*

1   A.   Yes.

2   Q.   In fact, at this time, you said, as part of your synopsis

3   of the reaction to the termination of Ms. Phillips, that the

4   continuing trauma is triggering old trauma.  Correct?

5   A.   The continuing trauma of the incident?

6   Q.   The continuing trauma of losing Ms. Phillips for these

7   folks that you were just speaking to and recapping their

8   reactions.

9   A.   I don't actually -- a timeline on that, I am not exactly

10  sure what I said.

11  Q.   Do you remember asking for an accelerated EAP program,

12  EAP reimagined?

13  A.   So EAP is employee assistance program.  And our partners

14  needed EAP because of the crisis, not because of the

15  separation of Shannon Phillips.

16       Again, this is not -- our partners were in crisis based

17  on the media, based on what our -- our customer reactions.

18  You actually showed testimony around our customers were

19  spitting in the faces of our store managers.  That requires

20  employee assistance.

21       Our partners were traumatized.  So I don't necessarily

22  know if the inference is specifically to Shannon Phillips, so

23  EAP was not called out because of the separation of Shannon

24  Phillips specifically.

25  Q.   Ms. Hymes, you sent an email on May 12th -- May 10.

 1      Subject:  DM initial reactions and sentiment.

 2      Do you recall that?

 3 A.   Yes.  Well no, I don't recall that.

 4 Q.   And in that, you relayed after you had a chance to

 5 personally connect with the district managers in Shannon's

 6 area, the sentiment that you were getting back in regards to

 7 these people -- in regards to Shannon Phillips.  Correct?  We

 8 just went through that.

 9 A.   The sentiment was more holistic than the separation of

10 Shannon.

11      So in my connections with district managers, there was

12 noted trauma.  It was not due to the separation of Shannon

13 Phillips specifically.

14 Q.   Do you think that the separation of Shannon Phillips

15 helped their feelings of abandonment and trauma or hurt it?

16 Or had no impact whatsoever?  What's your view on that?

17 A.   I would say that every change for a leader has an impact.

18 So for the district managers who were constantly going through

19 change, every change would be an impact to them.

20 Q.   Do you recall that after Ms. Phillips was terminated,

21 that Starbucks fought her application for unemployment

22 compensation benefits?

23 A.   I am not aware of that.

24 Q.   You're aware that you were identified as the

25 decision-maker by Starbucks in fighting the unemployment

*Hymes - Direct*                    *496*

1  compensation?

2  A.   No, I'm not aware of that.

3  Q.   Now, you remain close with Zeta Smith.  Correct?

4  A.   Define "close."

5  Q.   You were together in Seattle last week at a mini

6  Starbucks reunion?

7  A.   We had dinner with a few Starbucks partners, yes.

8  Q.   And you consider her a friend?

9  A.   I do.

10 Q.   Let's look at 12P.

11      12P is a text message exchange, Starbucks 5869.  It's a

12 text message between Paul Pinto and Shannon Phillips.  And as

13 you said, it was pretty common for folks to be texting back

14 and forth about work situations and work-related issues.

15 Correct?

16 A.   Yes.

17 Q.   And if you see here at the top, Mr. Pinto says:  Hi, it's

18 Paul.  Can you call me?

19      And he says:  Do you know where Zeta and Camille are?

20      And Shannon Phillips writes back:  Nope.  I texted

21 Camille about 20 minutes ago but I haven't heard back.

22      And Paul Pinto says:  Are you at the store?

23      And Ms. Phillips says:  At the 18th and Spruce store.

24      And then they are communicating back and forth about

25 where Howard is and where the protesters are.

*Hymes - Direct*                    497

```
 1        And then there's additional communication about Rossann's
 2   location and her status.
 3        So is there any -- any text, any email, any document
 4   saying, oh, man, we're waiting for Shannon Phillips to get to
 5   this meeting, she's not here yet, has anybody seen her?
 6   A.   This is the 18th so I don't know necessarily know if this
 7   is the day -- if you could show me the calendar.  Again, we're
 8   five years in.  If the 18th is a -- what date is that?
 9   Q.   Wednesday.
10   A.   Okay.  That's a Wednesday.
11        I don't know the context behind the text messages, if it
12   was a planned meeting or we had just decided to connect at the
13   18th and Spruce or if I was with other partners and I wasn't
14   able to get out of a conversation.
15        I don't know the context to this.  I don't even know if I
16   was late.
17   Q.   Okay.  But my question was just in regards to Shannon
18   Phillips ever being late, ever being not engaged, anyone ever
19   complaining about her.  Is there a single text message between
20   any of you or a single email or a single document
21   memorializing that?
22   A.   I couldn't -- I couldn't tell you.  That was five years
23   ago.
24             MS. MATTIACCI:  Okay.  No further questions, Your
25   Honor.
```

```
 1           MR. HARRIS:  Judge, may I see you at sidebar briefly
 2    before I cross-examine Ms. Hymes?
 3           THE COURT:  You may proceed.
 4           MR. HARRIS:  I asked, may I see you at sidebar
 5    briefly before I cross-examine Ms. Hymes?
 6           THE COURT:  Yes.
 7           (At sidebar.)
 8           MR. HARRIS:  Your Honor, under Rule 611 of the
 9    Federal Rules of Evidence, which provides for when an
10    individual can be cross-examined, counsel in her
11    case-in-chief, because she brought Ms. Hymes in as an adverse
12    witness, was able to provide and use leading questions.
13           I too am able to lead Ms. Hymes because she is
14    brought in on the other side's case-in-chief.  If I intend to
15    call Ms. Hymes in my case-in-chief, then I would not be able
16    to introduce evidence through leading questions.
17           But the rules do not preclude me from asking
18    Ms. Hymes leading questions when she is not my witness.
19           THE COURT:  Unless I'm missing it, I don't see what
20    you're saying in the rule.
21           MR. HARRIS:  It says when opposing counsel -- it
22    specifically talks about who can ask leading questions under
23    Rule 611.
24           THE COURT:  Let me just read it more carefully.
25           Leading questions should not be used on direct
```

 1  examination except as necessary to develop the witness's

 2  testimony.  Ordinarily the court should allow leading

 3  questions on cross-examination and when a party calls a

 4  hostile witness, an adverse party, a witness identified with

 5  an adverse party.

 6          What does that mean?

 7          MR. HARRIS:  Specifically what that means, Judge, is

 8  that certainly she's able to call Ms. Hymes as an adverse

 9  witness, and so she's permitted to use leading questions.

10          I too am able to use leading questions because she

11  was not brought in in my case-in-chief.  She's not my witness.

12          MS. MATTIACCI:  No, Your Honor.  She's not adverse to

13  him.

14          MR. HARRIS:  She's not my witness in my

15  case-in-chief, Judge.  There's a difference.  When I put her

16  on in my case-in-chief, then I'm permitted to ask open-ended

17  questions, not leading questions.

18          The fact that counsel is bringing her in in her

19  case-in-chief does not preclude me from asking leading

20  questions because it's not my case-in-chief.  That's the

21  distinction.

22          THE COURT:  The rule says ordinarily the court should

23  allow leading questions on cross-examination.  That's a given.

24          MR. HARRIS:  Correct.

25          THE COURT:  And when a party calls a hostile witness.

```
 1   She is a hostile witness.

 2            MS. MATTIACCI:  To me.

 3            THE COURT:  To you.  You called her.  An adverse

 4   party -- oh.

 5            MS. MATTIACCI:  Yeah, comment, an adverse party.

 6            THE COURT:  So when a party calls a hostile witness,

 7   an adverse party or a witness identified with an adverse

 8   party.

 9            MS. MATTIACCI:  None of those.

10            THE COURT:  Now, she's identified with Starbucks.

11            MR. HARRIS:  Correct.  But she's calling her in her

12   case-in-chief, not mine.  That's the distinction.

13            MS. MATTIACCI:  It doesn't matter.

14            MR. HARRIS:  It does matter.  It absolutely matters.

15            THE COURT:  I don't see that the rules say that.

16            MS. MATTIACCI:  It doesn't preclude me.  That's my

17   point.

18            THE COURT:  Wait a minute.  Let me finish.

19            MS. MATTIACCI:  Okay.

20            THE COURT:  I don't see the rule saying what you said

21   the rule says, but it says ordinarily.

22            I will allow some leeway but not the kind of leeway I

23   think you're intimating about.  So let's take it a question at

24   a time, okay, and we'll see where it takes us.

25            MS. MATTIACCI:  Just to state for the record, this is
```

 1  the decision-maker in this case who is for Starbucks, that

 2  they identified as the decision-maker.  She has not testified

 3  in any way adverse to Starbucks whatsoever, so she's not

 4  coming in as a hostile witness to him, she's not an opposing

 5  party to him.  She's not an adverse witness, so he should not

 6  be able to ask leading questions.

 7          I understand Your Honor's ruling on the situation.

 8          THE COURT:  I understand what you're saying, but I

 9  have to take it one question at a time.  I can't make a

10  general ruling, so let's see how it goes.

11          MR. HARRIS:  Your Honor, may I just run to the

12  restroom briefly?

13          THE COURT:  Do you want to take a short recess?

14          MR. HARRIS:  Yes.

15          THE COURT:  We'll take a five-minute recess.

16          MR. HARRIS:  Thank you.

17          (End of sidebar.)

18          THE COURT:  All right.  We're going to take a

19  five-minute recess.

20          We stand in recess.

21          (Jury out.)

22          (Recess at 10:21 a.m. until 10:31 a.m.)

23          THE COURT:  Bring in the jury.

24          (Jury in.)

25          THE COURT:  Please be seated.

*Hymes - Cross*        *502*

1        MR. HARRIS:  May I?

2        THE COURT:  You may, counsel.

3             CROSS-EXAMINATION

4 BY MR. HARRIS:

5 Q.  Good morning, Ms. Hymes.

6 A.  Good morning.

7 Q.  May I show you a document that's already been moved into

8 evidence, Joint Exhibit Number 6?

9 A.  Yes.

10 Q.  It should be on your screen.

11     Actually, I'm going to show you a different one first.  I

12 apologize.

13     Joint Exhibit Number 160.  I jumped the gun on 6, so

14 Exhibit Number 160.

15     Showing what's been marked as Joint Exhibit Number 160,

16 do you recognize this document, Ms. Hymes?

17 A.  I do.

18 Q.  Is this the incident report that you received soon after

19 the incident of April 12th?

20 A.  Correct.

21 Q.  And can you describe to the ladies and gentlemen of the

22 jury what an incident report is designed to do?

23 A.  An incident report is designed to communicate to leaders

24 across operations at every level when a serious incident has

25 occurred, whether that be a violation of our Safe and

1  Welcoming policy, where partner and customer interactions have

2  happened or were engaged in a situation, or if there was a

3  customer threat or incident or a partner threat or incident.

4  Q.   Is the incident report the first opportunity to gather

5  facts of an incident that takes place in one of the cafés?

6  A.   Yes.

7  Q.   Who typically provides the information that is contained

8  in the incident report?

9  A.   The standard protocol is for the -- either shift

10  supervisor or the store manager to call immediately our P&AP

11  and their district manager to report the incident for

12  investigation.

13  Q.   So this particular report, do you know whether or not

14  Ms. Hylton is the person who provided the information that was

15  contained in that incident report?

16  A.   It is safe to assume that she did.

17          MS. MATTIACCI:   Objection, Your Honor, based on

18  assumption.

19          Motion to strike.

20          MR. HARRIS:   If I may?

21          THE COURT:   I'll sustain the objection.

22  BY MR. HARRIS:

23  Q.   Based on the information you just provided, it was either

24  provided by Ms. Hylton or the store manager, if I --

25  A.   The store manager, yeah, correct.  As indicated in the

*Hymes - Cross*                                    *504*

1   document where it says:  The store manager stated.

2       So there's no presumption there.

3   Q.  Okay.

4   A.  It's written.

5   Q.  All right.  So this particular incident report was

6   actually prepared by the store manager of the store at 18th

7   and Spruce?

8       MS. MATTIACCI:  Objection, Your Honor, that's not

9   what was just testified.

10      THE COURT:  Wait a minute.

11      I'll overrule the objection.

12  BY MR. HARRIS:

13  Q.  Could you say it again?

14  A.  Yes.  So the document clearly states that the store

15  manager was interviewed to garner the facts of the situation.

16  Q.  Okay.  So the information that is before you was provided

17  by Holly Hylton specifically?

18  A.  Yes.  So Ronda Knight interviewed Holly Hylton, the store

19  manager of 18th and Spruce, and this is a summary of that

20  conversation.

21  Q.  Was there a follow-up investigation regarding what

22  happened on April the 12th of 2018 outside of this document?

23  A.  Not that I am aware of.

24  Q.  Did you conduct any individual assessment as to whether

25  or not the information in this document was actually accurate?

Hymes - Cross                                    505

```
 1  A.   This incident report was collected over 48 hours or

 2  communicated over 48 hours after the incident occurred, so

 3  there was a delay -- I don't know if there was a delay in

 4  notification, but my first awareness of this incident that I

 5  recall is when I received the phone call from John Kelly on

 6  this date.

 7  Q.   Okay.  Showing what's been marked as Joint Exhibit

 8  Number 6.

 9       Do you recognize this document, Ms. Hymes?

10  A.   Yes.

11  Q.   This was the recap that you received from Ms. Phillips

12  regarding the incident that took place at April 12, 2018?

13  A.   Okay.

14  Q.   Please look over the document.

15  A.   Okay.  So this is the day prior to the incident.

16  Q.   Prior to or after?

17  A.   After.  After the incident.  Prior to the incident

18  report, I mean.

19  Q.   Yes.

20  A.   Yeah.

21  Q.   So if you look at the information that's contained

22  through the bullet points -- I'm going to ask you a few

23  questions.  Have you had a chance to review it?

24  A.   Let me just review one more time.

25       Okay.
```

*Hymes - Cross*                              *506*

1    Q.   The first bullet says:  This store was recently robbed at

2    gunpoint; this may have contributed to why the police

3    department, PD, responded quickly.

4         Did I read that accurately?

5    A.   Correct.

6    Q.   And this is the information that you specifically

7    received from Ms. Phillips.  Correct?

8    A.   Correct.

9    Q.   It says:  The store manager, SM, approached the men in

10   the café multiple times; she was met with aggression, upon

11   which she reached out to the PD for support.

12        Does it not say that as well?

13   A.   Yes.

14   Q.   The men were aggressive with the police, which caused the

15   police to arrest for disorderly conduct.

16   A.   That's correct.  That's what it says.

17   Q.   Okay.  After this incident, did you, Ms. Hymes, find out

18   that the information in this email was inaccurate?

19   A.   Yes.

20   Q.   How did you do that?

21   A.   Video.  A review of the video.

22   Q.   And based on the video review that you saw, that you

23   captured, did it show that the men were being aggressive at

24   all?

25   A.   No.

Hymes - Cross                        507

 1  Q.   Did it show that the men were approached several times by

 2  the store manager?

 3  A.   No.

 4  Q.   Did it show that they were just -- that the men were

 5  engaging in disorderly conduct?

 6  A.   No.

 7  Q.   Was that information shared with Ms. Phillips?

 8  A.   I believe the information was shared with Ms. Phillips

 9  from the store manager.

10  Q.   But you told Mr. Sykes?

11  A.   I'm sorry?

12  Q.   By the store manager -- I'm sorry.  Let me ask that

13  question again.

14  A.   Yes.

15  Q.   The store manager was Ms. Holly Hylton?

16  A.   Yes.

17  Q.   The information that's contained in this document is

18  consistent with what's in the investigation report?

19  A.   That is correct.

20  Q.   But you subsequently found out the information in the

21  investigation report or incident report, as well as this

22  email, was inaccurate?

23  A.   That is correct.

24  Q.   And you specifically had that information that you were

25  able to share that with the DM, Mr. Sykes.  Was he aware of

Hymes - Cross                    508

1  that as well?

2  A.   Yes, he was.

3  Q.   How did he become aware?

4  A.   Through the conversations on what we were beginning to

5  learn about the incident itself.

6  Q.   When you say "beginning to learn," what does that mean?

7  A.   So there was a review of the video, but that didn't

8  happen until Saturday -- Sunday or Monday, where we, again,

9  had a conversation with Holly Hylton and then also reviewed

10  the video.  And she recanted the fact that the men --

11          MS. MATTIACCI:  Objection, Your Honor.  Hearsay.

12          MR. HARRIS:  It's not being offered for the truth of

13  the matter; it's being offered for state of mind.

14          THE COURT:  Sustained.

15  BY MR. HARRIS:

16  Q.   Without telling us what Ms. Hylton said, what did you do?

17  A.   Had multiple conversations with store managers and the

18  district manager to find out the details behind the arrest of

19  the two men, Donte and Rashon, in the store.

20  Q.   Did you share with Ms. Hylton as well as Mr. Sykes the

21  inaccuracies of the information that Ms. Hylton had initially

22  provided?

23  A.   After we discovered that there were inconsistencies, yes.

24  Q.   Did you also share that with Ms. Phillips?

25  A.   Yes.

*Hymes - Cross*                                        *509*

 1   Q.   How did that occur?

 2   A.   We -- I believe -- and, again, you have to forgive me, I

 3   cannot remember exact dates.

 4        But after we discovered that there was an inconsistency

 5   between what was reported by Ms. Hylton and in the incident,

 6   Shannon and I sat together or met together at some point -- I

 7   don't know if it was Saturday or Sunday -- to review the

 8   discrepancies between what was stated and then what actually

 9   happened.

10   Q.   And did you also meet with Mr. Sykes about the same

11   inaccuracies in the information as well?

12   A.   Yes.

13   Q.   Was there an agreement that Ms. Hylton should be

14   separated based on those inaccuracies?

15   A.   Not at that moment, no.

16   Q.   At some point, there was?

17   A.   Yes.

18   Q.   Approximately when in the process after April the 12th?

19   A.   Yes.

20   Q.   Can you tell us --

21   A.   I would say within a week-and-a-half to two weeks.  I

22   don't know the exact date.

23   Q.   Sure.  But was Mr. Sykes supportive of that decision?

24   A.   Yes.

25   Q.   Was Ms. Phillips supportive of that decision?

Hymes - Cross                        510

1    A.   No.

2    Q.   What did she say to you?

3    A.   She was concerned that Holly was separated unjustly, and

4    that she was a victim of the circumstances that were happening

5    in her store, such as the recent robbery.  Her partners felt

6    unprotected.  And she felt that her calling the police was a

7    part of the process for Safe and Welcoming.

8    Q.   After you did your independent assessment of the

9    inaccuracies of Ms. Hylton's response, did you share that with

10   Ms. Zeta Smith as well?

11   A.   Yes.

12   Q.   Any other leaders did you share that with?

13   A.   All the other leaders were aware of the discrepancy of

14   how Holly recounted the incident.  Her decision-making to call

15   the police.  And then her lack of ownership around the

16   situation.

17        Everyone up to and including Roz Brewer was aware of the

18   decision to, and supportive of terminating Holly Hylton.

19   Q.   When you say Roz Brewer, who is that, for the education

20   of the jury?

21   A.   She was the COO at the time.

22   Q.   The chief operating officer?

23   A.   Yes.

24   Q.   And who did Ms. Brewer report in to?

25   A.   Kevin Johnson.

*Hymes - Cross*                                    *511*

```
 1   Q.   Who was Mr. Johnson at the time?

 2   A.   The CEO.

 3   Q.   Was Rossann Williams involved as well?

 4   A.   Yes, she --

 5   Q.   Was she supportive of the decision?

 6   A.   Yes, correct.

 7   Q.   Do you recall the first meeting when you came to

 8   Philadelphia as well as the other leadership within the

 9   organization where you were -- met with Ms. Phillips, not the

10   date specifically but the first encounter that you recall?

11   A.   I do.  That was a Saturday.  I do remember that.

12   Q.   How do you remember the Saturday?

13   A.   I just remember us meeting in the parking lot, having a

14   conversation around the unusual circumstances behind the

15   situation and venturing into the store to have a conversation

16   with our partners.

17   Q.   Was anyone else there with you during that first meeting

18   when you met with Ms. Phillips?

19   A.   No.

20   Q.   What, if anything, did you first say to Ms. Phillips when

21   you first encountered her?

22   A.   I can't recall my exact conversation, but we -- the

23   intent was to get to the root of the incident, to better

24   understand what was happening with our partners and the

25   circumstances behind the arrest of Donte and Rashon.
```

Hymes - Cross                    512

1  Q.   You agree that, at least Ms. Phillips had previously

2  testified -- and I presume you agreed that this was a

3  particularly hot-button and high-profile matter?

4  A.   Yes.

5  Q.   The intensity of the matter was met with protests in and

6  around the store at 18th and Spruce?

7  A.   Yes.

8  Q.   Do you recall whether or not those protests were -- other

9  than being high in intensity, were they violent or aggressive?

10 A.   They were not violent or aggressive.

11 Q.   Would you characterize them as a riot?

12 A.   No.

13 Q.   When you got to the first incident -- strike that.

14      The first meeting --

15 A.   I do want to say --

16 Q.   Sure.

17 A.   -- there was one that was aggressive at 18th and Spruce.

18 I do recall that, where they came in, removing chairs.  It was

19 aggressive.  Very uncomfortable for our partners.  So I will

20 say unequivocally, that was an aggressive -- there were

21 aggressive protests.

22 Q.   Understood.  Would you consider that a riot?

23 A.   No.

24 Q.   What is the distinction between a riot and an aggressive

25 protest in your estimation?

*Hymes - Cross*                                        *513*

```
 1   A.   I believe a riot would institute individuals breaking
 2   glass, harming people, threatening people, taking furniture,
 3   breaking furniture, lighting things on fire.
 4   Q.   That didn't happen here?
 5   A.   No.
 6   Q.   Do you recall the first meeting, as I was asking you,
 7   where leadership from Seattle and the like in which you were
 8   there to encounter the partners?
 9        Do you recall that first meeting?
10   A.   Yes.
11   Q.   Can you tell us what happened in that first meeting?
12   A.   With our partners, there were several.  But one in which
13   our partners were in distress because of the activities behind
14   the community and people who were protesting.  They were
15   concerned about their safety.  They were concerned about how
16   we were going to support them.  They expressed concerns around
17   whether or not they felt comfortable in the leadership at the
18   time.
19        So for sequencing these conversations, that's one that
20   happened at 34th Street.
21   Q.   The meeting at 34th Street, who was also present at that
22   meeting?
23   A.   There was Michael Scott was present at that meeting.
24   There were other district managers that were present.  But
25   primarily baristas and shift supervisors and store managers.
```

*Hymes - Cross*                                     *514*

1   Q.   Do you recall a meeting specifically that included Paul

2   Pinto, yourself, Rossann Williams, other members of senior

3   leadership where Ms. Phillips was present?

4   A.   Yes.

5   Q.   Within the first two weeks after the incident?

6   A.   Yes.

7   Q.   What do you remember specifically about Ms. Phillips and

8   how she showed up in that meeting?

9   A.   There were -- for several meetings, either Mrs. Phillips

10  was late for the meetings.  Sometimes there was an absence of

11  Mrs. Phillips.  There were times in which she would literally

12  be in the corner when we are ready to open up the conversation

13  with our partners.

14       We would check in with -- I specifically would check in

15  with Mrs. Phillips to see if there was anything that I could

16  do to support --

17  Q.   May I stop you there?

18  A.   Yes.

19  Q.   When you said that you were opening up to partners, can

20  you provide us the context of that meeting so we have some

21  sense of the scale, depth and breadth?

22  A.   Many times when there is a crisis within Starbucks -- and

23  we unfortunately have several.  There are times where there

24  are riots, like the Baltimore riots, where leadership would

25  come in and have conversations with our partners so our

*Hymes - Cross*                                    *515*

1  partners can express concerns.

2      In this specific incident, the partners were in sort of

3  an environment like this, almost like a classroom, if you

4  will, environment.  Our leaders were projecting in virtually,

5  some.  There were others that were physically present in the

6  room.

7      And we offer an opportunity for our partners to express

8  their current state.  And to learn more about how we can

9  support them through whatever crisis they're going through.

10 Q.  The matter in which you identified that occurred in

11 Baltimore, did you have roundtable discussions in Baltimore,

12 and were those led by the leadership locally?

13 A.  Yes.

14 Q.  And when they were led by the leadership locally, what

15 did that look like in terms of how they presented?

16 A.  You would often have the regional director as the person

17 that would intro.  They are the leader of the market, so they

18 would welcome visitors or leaders into the market, talk about

19 the intention of the meetings, offer guidance on how it is a

20 safe space to have open conversations.  So they really set the

21 tone for the meetings.

22 Q.  Did that occur when you arrived in Philadelphia after the

23 incident of April the 12th of 2018 with Ms. Phillips?

24 A.  Unfortunately, it did not.

25 Q.  What other expectation did you have in terms of her

Hymes - Cross                516

 1   leading the response or -- strike that.

 2       The response when you came to those meetings?

 3   A.   The expectation, there's actually two channels.  The

 4   first is with our partners to be the face of leadership, to

 5   create a sense of security, a sense of openness, listening,

 6   care.  And that's directly with the partners, as I just

 7   described.

 8       And then the other channel is to executive leaders, where

 9   you have to actually report what's happening every day.

10       Here's how our partners are feeling, here are the

11   outcomes of those conversations.  And in both of those

12   instances, there was an absence of Shannon in those

13   conversations.  There were conference calls, literally, with

14   executives to which you would expect the regional director to

15   lead the conversation to which I would have to step in in her

16   absence.  We would be waiting on the call for Shannon to show

17   up, and she was absent.

18       So I would cover for those.  So there's two very

19   important dimensions of leadership in crisis, where the leader

20   has to actually carry the conversation on what's happening

21   with their people.

22   Q.   Would it be appropriate to describe those two separate

23   channels, one tactical or operational and the other one

24   strategic?

25   A.   I would say yes.

Hymes - Cross                          517

 1        So tactical is when you're reporting up to your leaders
 2   so that they actually have a view of what's happening.  You
 3   have a very long history with your partners, you can discern
 4   what is the most important message that you need to get across
 5   to leaders so they can support you.
 6        And then I would say from a strategic standpoint, that's
 7   with your people, to really understand what's not being said,
 8   to understand their somatic posture, who you need to approach
 9   at a later time to maybe have a private conversation,
10   directing your team, your district managers to do the
11   follow-up.
12        So the regional director has to sort of watch what is
13   happening around them to take note, listen deeply and then be
14   able to engage your team to respond appropriately.
15   Q.   The insight that you were looking for from the regional
16   director, did you receive that at all?
17   A.   That was not happening during this time.  And as we were
18   going through this, again, we were boots on the ground.  So it
19   was just every day, conversations around the very basics of
20   showing up on time to showing up at all or missing calls,
21   especially to executive leaders because the leaders are like,
22   where's Shannon?
23        And so there was sort of coverage that would have to
24   happen.  So those conversations would happen.  Many times or
25   several times there may have been an illness, right?  I don't

Hymes - Cross                          518

1   feel well, which is understandable.

2        But then there's no call prior to missing the engagement

3   that says, I'm not going to be present so don't be surprised

4   when you have to lead the conversation.

5        Those things were absent during this time.

6   Q.   Did you share those deficiencies with Ms. Phillips?

7   A.   Directly.  And that is what led us to the conversation on

8   whether or not to -- she felt equipped to do the role.  I can

9   verbatim remember, because I felt sad when she shared, I'm not

10  built for this.  This is not what I'm built for.

11       I knew that she was under extreme duress.  The intent was

12  to find a way to remove her from the situation.  She was not

13  showing up as a leader for her people.

14       And it was a hard conversation to have.  We started to

15  think of alternatives, not really having an opportunity to

16  really see the leadership footprint that our partners were

17  sharing about what was right and what was wrong in the market.

18       There's always going to be challenges in the market.

19  There's no perfect leader.

20       What I was looking for was a response from that leader to

21  own the deficiencies and to say, we can fix them.  I

22  acknowledge them.  Here's where I could have done things

23  differently.  But those conversations never unfolded.

24  Q.   Let me ask about the two dimensions that you just

25  identified between strategic versus tactical or operational.

Hymes - Cross                    519

1          Is the role of the district manager less strategic than

2     the role of the regional director?

3     A.   It is.  That's correct.

4     Q.   And how are those differences substantial?

5     A.   I would say the regional director, to differentiate from

6     a strategic standpoint, has a broader overview of the themes

7     that are happening throughout the market, where the district

8     manager has a lower scope of view.

9          As a leader, you're able to see patterns of where there

10    are either high points or low points.  And then the leader,

11    the district manager -- or the regional director then

12    formulates a plan to address or close gaps or deficiencies or

13    celebrate successes.  They are individuals who look for

14    problems to solve.

15         So from a strategic standpoint, that's strategy.  What's

16    the problem that we're trying to solve.  And then they develop

17    a plan to address that problem which evolves into strategy.

18    Q.   In the moment of the crisis immediately after April 12th,

19    did Ms. Phillips provide any sort of strategic advice or

20    insight or only tactical advice?

21    A.   At that moment it was tactical advice.

22         To be fair, this was something that we've never

23    encountered before, so the expectation in the first moments is

24    a very tactical approach.  That was the expectation.

25         Evolving from that, after you understand the problem to

*Hymes - Cross*                                            *520*

```
 1   solve, you -- I was looking for more of a strategic approach

 2   to addressing --

 3   Q.   Adding -- I'm sorry.  Adding police officers to stores

 4   where there were protests, tactical or strategic?

 5   A.   Tactical.

 6   Q.   At each rung in the organization, would you agree that

 7   the expectation is that each person would be more strategic up

 8   the rung up until the CEO and your operational, tactical

 9   expertise would have to be -- would be less?

10        So you spend more of your time doing strategic work as

11   opposed to operational or tactic?

12   A.   Correct.

13   Q.   Okay.  And could you explain, then, how it works

14   operationally within the organization.

15        That was a terrible question, so I'll try to do that

16   again.

17   A.   That's okay.

18   Q.   The district manager has a strategic role in the

19   organization, but it's also partly tactical?

20   A.   Mostly tactical, yes.

21   Q.   Mostly tactical, correct?

22   A.   The district manager.

23   Q.   The district -- the regional director, who's above the

24   district manager, is more strategic than tactical?

25   A.   Correct.
```

```
 1        And then --
 2   Q.   And then the vice president?
 3   A.   RVP, yes.
 4   Q.   Yes.
 5        And that would be you?
 6   A.   Yes.
 7   Q.   Your role is more strategic than tactical or operational
 8   than Ms. Phillips?
 9   A.   Correct.
10   Q.   And then as you go up, Ms. Zeta Smith is more
11   strategic --
12   A.   Versus the tactical.
13   Q.   Versus the tactical than you?
14   A.   Yes.
15   Q.   Go up again, Rossann Williams, in charge of North America
16   retail, role's more strategic than tactical than Zeta Smith?
17   A.   Correct.
18   Q.   Rosalind Brewer, again more strategic than tactical than
19   Zeta Smith?
20   A.   Correct.
21   Q.   And now we go up to the CEO, who is actually more
22   strategic than tactical than Rosalind Brewer?
23   A.   Correct.
24   Q.   So at each level of the organization, depending on your
25   leadership role, your role is going to be materially different
```

Hymes - Cross                              522

1   than the role below you?

2   A.   That is correct.

3   Q.   Strategically versus tactically?

4   A.   Correct.

5   Q.   During the middle of a crisis, are you expecting

6   strategic insight from leaders or tactical?

7   A.   On the front lines, it's tactical.

8   Q.   When does it shift to strategic?

9   A.   That's a great question.

10       I would say that once you determine -- and, again, I

11  don't believe it's at the district manager level, but once you

12  determine the patterns and what needs to be solved, it shifts.

13  Right in the moment, you're managing a crisis; it is very

14  tactical.  You are addressing a crisis, and so you're solving

15  for problems that are right in front of you that need to be

16  addressed immediately.

17  Q.   The kind of communication that you expect Ms. Phillips to

18  provide you during the meetings when leadership was getting

19  together, what kind of communications were you expecting?

20  A.   Those were primarily tactical communications, so here is

21  current state, here is what we're doing, here is how we

22  performed last week, here is the effect on the market, so just

23  very tactical summaries.

24  Q.   When it comes to strategic insight, what sort of

25  strategic insight would you have liked to have had?

Hymes - Cross                                       523

1   A.   I would have expected to see summaries of partner

2   sentiment, patterns on unusual incidences throughout the

3   market.  I would have liked to have seen solution-based

4   summaries of how to activate either the district managers or

5   the people in which -- the people who support the district

6   managers, like the P&AP manager and the PRO manager.

7   Q.   What's PRO for the record?

8   A.   Partner resource.

9   Q.   And what's their responsibility?

10  A.   It is to connect with our partners in support for their

11  needs.  That could either be through benefits, could be

12  through their work experience.

13  Q.   So was the expectation for Ms. Phillips to provide you

14  solutions in terms of systemwide thinking, not just individual

15  store-wide thinking?

16  A.   Correct.

17  Q.   And did you share that expectation with Ms. Phillips

18  during this time?

19  A.   Yes.

20  Q.   How often did you do that?

21  A.   We talked every day.

22  Q.   Did you tell her specifically that the insight that she

23  was providing was merely only tactical and not strategic

24  enough?

25  A.   We needed more information on partner sentiment, how we

*Hymes - Cross*                                        *524*

1  were going to address partner concerns.  What would return to

2  me were sort of external factors that were not actionable.

3      And so my concern was around Shannon's interpretation of

4  the gravity of the situation, and then also an acknowledgement

5  of the feedback that was coming in from our partners in terms

6  of their discontent in their experience.

7  Q.   Showing you what's been previously marked as Exhibit

8  Number 140.

9      Ms. Hymes, do you recognize this document?

10 A.   I do.

11 Q.   And I think counsel asked you questions about the profit

12 and loss forecast and calculations on this document.

13     Do you recall that?

14 A.   I do.

15 Q.   You said an important point that I want to ask you again.

16     When you were looking at the numbers on this document,

17 you had some insight.

18     Could you share that again?

19 A.   Comp sales were down.  Total revenue was up because of

20 new stores.

21 Q.   My recollection is you recalled by looking at that

22 document, you were able to glean that additional stores may

23 have been added?

24 A.   Yes.

25 Q.   How were you able to glean that?

*Hymes - Cross*                                                    *525*

```
 1  A.   There is a difference between comp and total revenue.

 2  Q.   Why would that have alerted you that there were more

 3  stores added?

 4  A.   Because there are two different numbers:  One are

 5  comps and the others -- so same store sales versus total

 6  revenue, they're different --

 7  Q.   Any --

 8  A.   -- than the new stores.

 9  Q.   I'm sorry.  Any other insight that you can glean from

10  just looking at that document?

11  A.   There is no overview of sort of what was happening in the

12  market specifically to our partners.

13  Q.   Give us an example of what you would expect to have in

14  this document?

15  A.   So if there were roundtable sessions -- when there were

16  roundtable sessions, there would be a summary of partner

17  sentiment, themes, how we were going about addressing those

18  specifically.

19  Q.   Anything in this document to suggest a solution to one of

20  the problems that were happening during the time of this

21  incident?

22  A.   No.

23  Q.   Do you recall seeing any documents that Ms. Phillips

24  produced to you or your leadership team regarding solutions,

25  not tactics?
```

*Hymes - Cross*                                                                        *526*

 1   A.   No.

 2   Q.   Anything did she produce in terms of strategic insight,

 3   not tactics?

 4   A.   No.

 5   Q.   Anything did Ms. Phillips produce to you to demonstrate a

 6   level of insight about the market specifically that leadership

 7   could be brought to bear to solve any of the problems?

 8   A.   No.

 9   Q.   Would that have been your expectation?

10   A.   Yes.

11          MR. HARRIS:  With the Court's indulgence?

12          THE COURT:  Yes.

13   BY MR. HARRIS:

14   Q.   Ms. Hymes, showing you what's been previously marked as

15   Joint Exhibit Number 105.

16       May I direct your attention to page 2 of this document?

17       Do you recall this email, Ms. Hymes?

18   A.   I just -- if I could take a moment to review.

19   Q.   Please.

20   A.   Yes.

21   Q.   And I'm going to direct your attention to the third page

22   of this document as well.

23   A.   Yes.

24   Q.   Ms. Hymes, this page -- specifically on page 3 of this

25   email, does this memorialize the sentiment you had regarding

Hymes - Cross                    527

```
 1   how Ms. Phillips was showing up in terms of providing
 2   strategic insight and/or tactical advice?
 3   A.    Unfortunately, yes.
 4   Q.    How does this demonstrate the lack of strategic insight
 5   that you were looking for?
 6   A.    Well, if we go through the different points, there was an
 7   awareness of the criticality of the situation.  How the
 8   partners were suffering was part of it.  There was a
 9   disconnect in owning some of the challenges that our partners
10   were facing and how to address those, so the strategy was
11   absent because there was an absence of acknowledgement and
12   ownership, so just the fundamentals were missing.
13   Q.    Ms. Hymes, how did you miss up and until the crisis
14   regarding Ms. Phillips's lack of strategic insight?
15   A.    I strongly believed that Mrs. Phillips at the time was a
16   strong leader.  I had that perception.  Her performance was
17   consistent with the rest of the region, actually sometimes
18   superior.  And sometimes numbers can be misleading, and so
19   what I truly own is not going deeper to connect with our
20   partners to better understand the -- what was happening behind
21   those numbers.
22   Q.    So let me stop you there.
23         So if we call the performance in terms of numbers
24   operational sufficiency --
25   A.    Yes.
```

1  Q.   -- versus strategic insight in terms of patterns and

2  systems --

3  A.   Correct.

4  Q.   -- was Ms. Phillips operationally sufficient?

5  A.   I would say operationally at the time.  Her metrics would

6  lean towards that assumption.  However, after being in the

7  market for an extended period of time, you could see the

8  deficiencies were there.

9  Q.   As it relates to strategic insight, had you -- prior to

10 these incidents, had you shared with Ms. Phillips her lack of

11 strategic insight prior to this incident?

12 A.   Not prior to the incident, no.

13 Q.   Do you attribute that to a failure on your part as a

14 leader?

15 A.   I do.

16 Q.   How have you corrected that since?

17 A.   I have a stronger sense of interrogating reality.  I lean

18 more into having conversations with our partners on a more

19 frequent basis, impromptu visits, more roundtables, getting

20 closer to our partners and what they are experiencing.

21 Q.   What strategic insight did you glean afterwards that

22 you've now systematized across the enterprise?

23 A.   One of which is the understanding of unconscious bias.

24     So with the specific incident of 18th and Spruce, we

25 learned that the two young men that were sitting at the table,

1  but were not aggressive and were subsequently arrested.  In

2  those conversations in Philadelphia specifically, we spoke

3  with the partners to understand what would trigger someone to

4  call the police on people who were sitting in their stores.

5  Based on some of the historical things that were happening in

6  the store, how they could misassociate when they need to call

7  the police.  Those were -- from those very specific

8  conversations, we were able to understand that there was more

9  education that we needed to equip our partners in order to

10  succeed in a challenging environment.

11      And so we instituted a new Safe and Welcoming and a new

12  unconscious bias training that actually is larger than just

13  the enterprise.  We shared that across the industry as an open

14  source for other companies.

15  Q.  Specifically as it related to the incident that took

16  place --

17  A.  Correct.

18  Q.  -- do you know whether or not after this incident, did

19  other leaders emerge to demonstrate the kind of strategic and

20  tactical expertise you were looking for?

21  A.  They did.

22  Q.  Who might they be?

23  A.  I would start with my chief of staff, Larry Wang.  He

24  would coordinate ways in which groups of partners could go

25  around and check on other partners.  We would collect the

Hymes - Cross                    530

 1   information based on -- or the feedback from those partners

 2   and then determine if we needed to make adjustments in

 3   security, adjustments in the amount of time that we spend in

 4   high-, low-, medium-priority stores.  They were physically

 5   present in many of the stores that had higher incidences as a

 6   result of April 12th.

 7        I saw Marcus Eckensberger who came through as well.  Our

 8   partners were sharing that they were in distress because we

 9   were actually growing in sales but they were not operating

10   efficiently.  And so in order to relieve our partners in

11   serving, we instituted operational training so that they were

12   more proficient and they could deliver with stronger and

13   better excellence in the way in which they served our

14   customers.

15        I saw Michael Scott step forward.  He very specifically

16   and very immediately, when he would notice when Shannon would

17   disconnect at a meeting, he would actually pull me aside to

18   say, do you want me to step in for Shannon, she's not here for

19   our partners.

20        And he would physically step in.  And then also

21   contribute to the conversations on how to prioritize the

22   change in work that needed to be made for the market.

23   Q.   Anyone else?

24   A.   There were many --

25   Q.   At the RD level specifically?

*Hymes - Cross* 531

```
 1  A.   All of them.

 2       So we had TJ Wolfersberger who was down in Virginia, who

 3  knew that I actually had to relocate to Philadelphia to sort

 4  of cover, like literally on phone calls where there was an

 5  absence.  And they would actually pick up the work and

 6  leadership in the southern part of the market so that I could

 7  focus in on Philadelphia, specifically Jeff Danley.

 8       So all of them would be coming into the market in support

 9  of our partners during that time.

10  Q.   Do you recall who the regional directors were under your

11  leadership prior to 2018, of -- April of 2018?

12  A.   I do.

13  Q.   Who might they be?

14  A.   Jen Pivarnik, Marcus Eckensberger, Shannon Phillips, Jeff

15  Danley, TJ Wolfersberger, Phillip Laws, and then Larry Wang,

16  my chief of staff.

17  Q.   After Ms. Phillips was separated, do you recall who the

18  regional directors were in your market that you're responsible

19  for?

20  A.   We actually split, so it was Marcus Eckensberger and I

21  believe Linda Johnson came in as a TLA.

22  Q.   Anyone else?

23  A.   Well, there were several -- I think that was it.

24  Q.   Did your organization, from a demographic standpoint,

25  change in any material way prior to 2018 than after May of
```

*Hymes - Redirect*                                    *532*

```
 1   2018, after Ms. Phillips was separated?
 2   A.   The demographics in terms of age or --
 3   Q.   Age, race, gender, ethnicity?
 4   A.   No, no.  There was a change, of course, with Shannon.  I
 5   believe I testified to this yesterday.
 6        Shannon -- well, female/male, but then there was another
 7   female.  So Shannon Phillips, white female.  Marcus
 8   Eckensberger, white male.  Linda, white female.
 9            MR. HARRIS:  I have no further questions for you.
10   Counsel may.
11            THE COURT:  Recross?
12            MS. MATTIACCI:  I do, Your Honor.
13                      REDIRECT EXAMINATION
14   BY MS. MATTIACCI:
15   Q.   We're going to look at Exhibit 16.
16        This is an email from Wednesday, October 25th.
17        And in this email on October 25th, this is an email from
18   Zeta Smith, your boss, to yourself.  And it says:  I plan to
19   send this out to P&AP and Rodney to follow next steps.
20        Jenny was kind enough to pretty up the document.
21        Do you see that?
22   A.   I do.
23   Q.   And the attachment is the Philly Action Plan.
24        Do you see that?
25   A.   I do.  Well, I don't, actually.
```

*Hymes - Redirect*                                    533

```
 1        There we go.
 2   Q.   Okay.  There we go.
 3        So there was a Philly Action Plan as of the 25th.
 4        And this was not put together by Ms. Phillips.  Right?
 5   This was above her level to put this together.  Your boss did
 6   it.  Right?
 7   A.   No.  We all sort of worked on this together.  This was
 8   not Zeta handing down a mandate.  This is based on the
 9   conversations that we had exactly.
10        So Larry Wang was involved in the conversations.  Jeff
11   Danley, Marcus Eckensberger.  So we all had a part in sort of
12   putting together the Philadelphia action plan.
13   Q.   Okay.  Great.
14        So it would be a task in the first column, who was in
15   charge of the task and when the task should be completed by.
16   Correct?
17   A.   Correct.
18   Q.   And you have here:  Extend private security for two
19   weeks, and you have Shannon in the plan to do that through
20   5/4.  Correct?
21   A.   Yes.
22   Q.   And if we go down:  Maintain ongoing communications with
23   Lieutenant Gary ongoing.
24        And you assigned that to Shannon to do.  Correct?
25   A.   That is with Ronda as Shannon as the second.  So Ronda is
```

 1  the primary with Lieutenant Gary, so -- go ahead.

 2  Q.   And she did in fact do that.  Correct?

 3  A.   I'm sure.

 4  Q.   And then there is another task assigned to Shannon:

 5  Write letter of commendation to Captain Glenn regarding the

 6  support of Lieutenant Gary and his team during the protest

 7  events.

 8       And that was to be completed by 4/23?

 9  A.   Yes.

10  Q.   And you have no reason to believe that wasn't done.

11  Correct?

12  A.   It denotes here complete -- or completed -- complete by

13  4/23, so I'm assuming that it was done.

14  Q.   And under operations:  Select and formulate small working

15  groups of store managers designed to elevate the partner and

16  customer experience for the market.  Group to be used as touch

17  point with safety and security updates.

18       Do you see that?

19  A.   Yes.

20  Q.   And you have no reason to believe that she did not do

21  that, Ms. Shannon Phillips.  Correct?

22  A.   I don't recall seeing that, no.

23  Q.   She did in fact do that.  She put together some small

24  work groups.  Correct?

25  A.   Okay.  If you could show me.  I don't recall.

 1   Q.   It says Exhibit 134.

 2        Philly plan, early stages, she sends an email to you:

 3   Here is the list of partners for the task force.  You said in

 4   your note, three to four, but we have five.  We can take one

 5   off if you prefer.

 6        And then she lists folks that she were putting together

 7   for the Philly Task Force.

 8        Do you see that?

 9   A.   I see the people but not the plan.

10   Q.   At the bottom it says:  I want to provide you some line

11   of sight as we move forward in Philadelphia.

12        One, task force has been created to support new and

13   revised Safe and Welcoming procedures and engage Denise's

14   team.

15        Two, Dina Campion has been engaged by you to support

16   ongoing P&AP support in hotspot stores.  This list was created

17   in November during all-hands call.

18        And then she lists the stores for the hotspot stores.

19   A.   Uh-huh.

20   Q.   She lists the stores that the store managers will need

21   support in dealing with homelessness and addressing issues in

22   stores and identifies those specific locations.

23        She notes that:  We will have district manager and

24   stronger store manager support, David General, et cetera, in

25   these stores, support how to approach and have respectful

*Hymes - Redirect*                536

1   conversation while minimizing disruption to the stores.

2       Do you see that?

3   A.   Yes.  This is the tactical plan, yes, I see that.

4   Q.   Okay.  So this is tactical and not strategic in your

5   mind?  That's your distinction?

6   A.   These are very tactical.

7   Q.   Okay.  And you were mad she was doing tactical plans?

8   A.   I was not mad.

9   Q.   Okay.  And was this tactical plan deficient in any way?

10  A.   No, this tactical plan was not deficient.

11  Q.   She also said on the next bullet point:  This Wednesday

12  from 5:00 to 7:00, Andrea and the Black Partners Network will

13  be hosting a session for partners to come and talk through

14  emotions and concerns.

15      She was involved in setting those up.  Correct?

16  A.   Yes.

17  Q.   Next bullet point:  Ebony and I will be working on the

18  strategic go-forward plan that will include:

19      One, partner roundtables.

20      Two, plan to move dialogue to show up at our best and

21  delivering excellence every day.

22      Three, continued engagement communication with civil

23  affairs unit and local PD.

24      Four, recommendations about what is needed for elevating

25  the partner customer experience in the Philly market.

*Hymes - Redirect*                                537

```
 1        Five, Ebony's time in field, two days per week.
 2        And six, assess talent and capabilities of all
 3  Philadelphia leadership.
 4        Do you see that?
 5  A.   I do.
 6  Q.   Okay.  Did you have any problem with her plan that she
 7  laid out here?
 8  A.   This is the outline of what the strategic plan will be.
 9  So correct, that's an outline.
10  Q.   Okay.  So she came up with an outline for the strategic
11  plan, and you were satisfied with that.  Correct?
12  A.   Yes, uh-huh.
13  Q.   All right.  Let's go back to 16.
14        Shannon was also identified to make sure that Angela
15  would remain the store manager at 18th and -- should probably
16  be Spruce, meet one on one with each store partner to confirm
17  if they want to still work at the store, debrief current
18  status of store and community, ongoing.
19        Do you see that?
20  A.   I do.
21  Q.   And she in fact did that.  Correct?
22  A.   Yes.
23  Q.   And then if we look at the next, for future protests,
24  also given to Shannon:  For future protests, if ten protesters
25  or less projected, bring in additional store manager
```

 1   leadership from the district and area to support the store

 2   operations.  District manager on site.

 3        She made sure that was being done.  Right?

 4   A.   Yes.

 5   Q.   And:  If more than ten protesters projected, initiate

 6   protest response team via group text.

 7        And then it says:  Shift supervisors, SSV, and store

 8   managers, call civil affairs team and ops leaders will be on

 9   site ASAP, P&AP to engage GSOC, which is Global Securities

10   Operations Center, correct, is that the acronym?

11   A.   Correct.  This is the tactical plan, yes, the whole

12   thing.

13   Q.   Shannon to be point person and provide briefing and

14   action steps to key stakeholders?

15   A.   Correct, yes.

16   Q.   And she in fact did that successfully.  Correct?

17   A.   Yes.

18   Q.   Shannon is also listed here:  PRM leadership presence in

19   market two to three days a week for the next four weeks.  To

20   uncover additional issues, partner with DMs to address needs,

21   roundtables with store managers and store partners.

22        Do you see that?

23   A.   I do.

24   Q.   And she did engage in that and helped set that up.

25   Correct?

*Hymes - Redirect*                                      *539*

1    A.   So this list is for that one specifically, just that's

2    the PRM, so you have the PRMs and who is accountable.  So I

3    don't know if she set up anything.  It's just who's

4    accountable.

5    Q.   Okay.  Partner training.  She is listed as one of the

6    three along with you and Zeta, to consider moving up the

7    training date for the Philly market.

8         Can this be a pilot for the content?  Consider on-site

9    training at Boys and Girls Club.  Can Brian Stevenson conduct

10   the training?

11        And so -- and this is slated to be completed 5/29 or

12   earlier, and this is being put out on April 25th.  So you'd

13   agree with me that as of this date there's nothing that

14   Ms. Phillips did to justify terminating her when you're

15   putting her in the mix to do all these important tasks on the

16   Philadelphia Action Plan.  Correct?

17   A.   That is not correct.  This is just a list of all the

18   things that we need to do, and who is accountable.  Where I

19   testified earlier is the miss was being able to be focused on

20   what was happening with our partners very specifically, owning

21   the challenges that they had and then being able to respond

22   appropriately in a leadership role of a district -- of a

23   regional director.  That was failing.

24        This is a list that an admin could put together.

25        So what I am sharing with you is the difference between

*Hymes - Redirect*                                    *540*

1    leading a market that is in crisis and instituting as a manner

2    in which you can understand what our partners were going

3    through, own where we failed them, embrace an opportunity to

4    change, and then lead through that change is what was missing.

5    Q.   My question, ma'am, is if she was failing to lead through

6    the crisis so severely as of April 25th, why would you list

7    her as the person who would leverage the local Black Partners

8    Network for continuing the conversation of race relations and

9    inclusion in the community?  Why is she identified as that

10   person if she's such a failure in leadership?

11   A.   That's who is accountable, and in that moment, Shannon

12   was in our employment as the regional director, so that's

13   who's listed.

14   Q.   Well, if she was failing so bad, you'd take her out of

15   the plan.  Right?

16   A.   There was hope that there would be a recovery.  So you

17   don't pull someone so quickly if you don't -- if you're

18   looking for someone to rise to the occasion.

19   Q.   So you're saying that she was failing at this point, but

20   you kept her on the plan because there was some hope?

21   A.   There is accountability.  This -- this document just

22   cites who's accountable.  There are people who are taking

23   initiative who are leading, and then those who are

24   accountable, so it's a mix of both.

25        And Shannon's name, to your point, would be on the sheet

*Hymes - Redirect*                          *541*

 1   if she's the regional director so that there is a clear

 2   identification of the leader in the market and who would be

 3   responsible for the work.

 4   Q.   This is coming from Zeta Smith.  Correct?  So that's your

 5   boss?

 6        If she was failing in the market so bad, wouldn't you say

 7   to Ms. Smith:  Listen, we have a real problem with Shannon

 8   Phillips.  She's late for a meeting, and she's not engaging

 9   with the partners.  I think we need to make a change on the

10   Philly Action Plan here?

11   A.   Those conversations were occurring, as I testified for

12   the last two days.  We've had those conversations.  This is a

13   template that we used to denote who's responsible and who's

14   accountable.

15   Q.   This is Exhibit 105 that counsel showed you of these

16   bullet points.

17        And Mr. Pinto, he says:  I would suggest that you drill

18   it -- we drill it down to what we said and leave the rest for

19   Wednesday's discussion.  Key points:

20        You have not been picking up on my hints around the

21   seriousness of the situation.

22        Do you agree with that, that you were giving her little

23   hints?

24   A.   There were more than hints.

25   Q.   So you didn't agree with his assessment there?

 1   A.   No.  We had direct conversation.

 2   Q.   You say at the top:  She's going to want examples of why

 3   I made this decision.  Let's walk it through so I'm aligned.

 4        Do you see that at the top?

 5   A.   Yes.

 6   Q.   If you're the decision-maker and the direct supervisor of

 7   this person, why do you need to align with these others and

 8   walk it through to come up with some examples of these

 9   particular alleged performance issues?

10   A.   PRO, partner resource office, is the same as HR, so they

11   are counsel for us.  And they are like the ones that we go to

12   to make sure that the decisions that we are making are fair.

13        They are, in many ways, neutral and can help for leaders

14   to align on whether or not we're making the most appropriate

15   decisions.  So that's the answer to that question.

16   Q.   Did you ever put together the examples?

17   A.   I don't recall.  Might have been verbal.

18   Q.   Verbal, right, is that what you're saying?

19   A.   Maybe.  I don't recall.  So you could have something

20   documented, but I just -- it's five years ago.

21   Q.   You talked on direct examination about how you:  Expected

22   summaries of partner sentiment from the roundtables that

23   Shannon Phillips should have created.

24        That's what you said.  Correct?

25   A.   I don't recall that either.

*Hymes - Redirect*                         *543*

1    Q.   You don't recall just testifying that you expected

2    Shannon Phillips to have summaries of partner sentiment from

3    the roundtables she attended?

4    A.   Oh.  I would expect her to summarize and have an

5    understanding of the sentiment of our partners, yes.

6    Q.   Okay.

7    A.   Yeah.

8    Q.   And you're faulting her for not having written summaries

9    of that?

10   A.   I didn't say in writing but to summarize that, to

11   communicate that.  I'm not discerning that that had to be in

12   writing, but at least summarize it for a conversation so that

13   we could address it.

14        So I'm not faulting her for not memorializing it in

15   writing.

16   Q.   Well, you're in some of these roundtables with her.

17   Correct?

18   A.   Correct.

19   Q.   So you have conversation about the roundtables

20   afterwards?

21   A.   Yes.

22   Q.   And you want her to provide a summary of what y'all both

23   just saw.  Is that what you're saying?

24   A.   She's a leader of the market, so I would expect that

25   there is ownership in summarizing what has just occurred in

*Hymes - Redirect*                                        *544*

1   your market, so the answer's yes.

2   Q.   Just a verbal summary?

3   A.   Either way would have been great.

4   Q.   You've never done a written summary of the roundtable

5   discussions that you were part of.  Correct?

6   A.   For other markets, I have, if there was an absence of a

7   regional director.

8   Q.   For the Philadelphia market, you were saying you were

9   going to all these different roundtables and discussions.  You

10  never created a summary of the partner sentiment from those

11  roundtables.  Correct?

12  A.   There were a staff of people that were there.  No, I do

13  not write things down when partners are sharing vulnerably.

14  It creates a lack of psychological safety for our partners.

15       So I don't sit with a pen and paper and then capture

16  their -- they might be worried if their name is attached to

17  sharing something that's -- could be very serious that relates

18  to their supervisor or that relates to what's not going well,

19  so I don't sit with pen and paper as the regional vice

20  president, no.

21  Q.   So you didn't expect Ms. Shannon Phillips to do that

22  either.  Correct?

23  A.   I expected a summary and then an evaluation of what we

24  should do to own what our partners were expressing.

25  Q.   You mentioned there was a staff person there in your

*Hymes - Redirect*                                545

```
 1   meetings.  Were they taking notes for you?

 2   A.   I don't believe so.

 3   Q.   Okay.  So you've -- are just saying you didn't get back a

 4   verbal summary from Ms. Phillips at some point.  That's your

 5   position?

 6   A.   I -- looking for more than a recorder, no disrespect, but

 7   someone that is actually leading the market that would take

 8   the initiative to summarize what was going on with their

 9   people and then to be able to create and identify the specific

10   areas to close gaps and to create a strategy around how to

11   address market issues.

12   Q.   And you expected her to have systemwide thinking

13   solutions around partner sentiment.

14        Is that the phrase you use?

15   A.   I don't know if I used "systemwide."

16        Did I use "systemwide"?

17   Q.   You said:  systemwide thinking solutions.

18   A.   I don't recall.  I may have said it.  I don't know.

19   Q.   Okay.  I was just talking about right now on direct

20   examination.

21   A.   Yes.  I would say what his -- if I remember his question,

22   was, did we have an outcome for systemwide solutions?

23   Q.   And you expected her --

24   A.   And I said yes.

25   Q.   -- to have that?
```

*Hymes - Redirect*                    *546*

 1  A.   No.  I expected her to have solutions for her market

 2  specifically.

 3  Q.   You expected --

 4  A.   The one that she was in charge of leading.

 5  Q.   Counsel was questioning you about strategic versus

 6  tactical, and on the strategic side, you said that you

 7  expected her in this time frame to come to you with systemwide

 8  thinking solutions.

 9       Is that true or not true?

10  A.   That is not true.

11  Q.   Okay.  Because you're all in a crisis during this time.

12  Correct?

13  A.   That is correct.

14  Q.   Are you saying that Mr. Sykes told you that he believed

15  race played a role in Holly's decision to call 911?

16  A.   Can you repeat the question?  I -- can you repeat the

17  question?

18  Q.   Are you saying that Mr. Sykes told you that he believed

19  race played a role in Holly's decision to call 911?

20  A.   No.

21  Q.   Okay.  Didn't he, in fact, tell you that he didn't

22  believe that race played a role?

23  A.   I don't recall that conversation with Paul Sykes from

24  five years ago, no.

25  Q.   I thought you testified on direct examination that there

*Hymes - Redirect*                                547

```
 1  was this contrast between how Shannon Phillips reviewed the

 2  information from April 12th and how Mr. Sykes reviewed the

 3  information?

 4  A.   I don't know if I -- that was my intention.

 5  Q.   Okay.  So you'd agree with me that Mr. Sykes believed

 6  that Ms. Hylton followed the policy.  Correct?

 7  A.   No.  After -- I would say based on her initial reporting

 8  of the incident, which was in error and untrue, that would

 9  have been supported by Paul in that moment.  And then upon

10  further investigation, in reviewing the video, we see that

11  that was not true.

12  Q.   When you say "We reviewed the video," Mr. Sykes reviewed

13  the video too?

14  A.   I don't believe Mr. Sykes reviewed the video, but our

15  P&AP leaders -- everyone reviewed the video.

16  Q.   I'm sorry, P&AP?

17  A.   Partner and asset protection, I'm sorry.

18  Q.   And so you and the partner and asset protection, which

19  would be Ronda Knight.  Who else viewed this -- and you're

20  talking about surveillance video within the store?

21  A.   Yes.

22  Q.   Who else viewed it?

23  A.   I think our executives saw the video.

24  Q.   Your CEO?

25  A.   I'm certain, but I don't -- I'm actually not certain, but
```

*Hymes - Redirect* 548

```
 1   I know our executive leaders reviewed the video.

 2   Q.   Well, who in the executive leadership reviewed it?

 3   A.   I don't know.  I was in Philadelphia, and they're in

 4   Seattle, Washington.

 5   Q.   Well, do you know from conversation --

 6   A.   I know they made a reference -- yes.

 7   Q.   Okay.  From conversation, who do you know reviewed the

 8   full surveillance video?

 9   A.   I don't know the answer to that.

10   Q.   So you know you did.  We know that Ms. Knight from P&AP

11   did, but you can't say who else actually viewed the video.

12   Correct?

13   A.   No.

14   Q.   And Ms. Phillips didn't get to view the video.  Correct?

15   A.   I don't know.  No, I don't -- I don't know.

16   Q.   And the surveillance video doesn't have any sounds.

17   Right?

18   A.   That is correct.

19   Q.   So you can't hear what's being said by the gentlemen in

20   the store; you can't hear what's being said by Ms. Hylton.

21   Correct?

22   A.   You can observe that they are not violent.

23   Q.   I'm not saying violent at all.

24   A.   Uh-huh.

25   Q.   I'm just talking about words being said.
```

*Hymes - Redirect*                      *549*

1         You can't hear what the men say.  Correct?

2   A.    Correct.

3   Q.    You can't hear what Ms. Hylton says.  Correct?

4   A.    Correct.

5   Q.    And you can't hear what the police officers say.

6   Correct?

7   A.    Correct.

8   Q.    So it was determined that Ms. Hylton lied when she gave

9   the initial account of the events that occurred on April 12th;

10  is that correct?

11  A.    Yes.

12  Q.    And she was terminated for lying?

13  A.    Among other things.

14  Q.    Lying and what else?

15  A.    Not taking ownership for her role.  Lying, I would say,

16  is the primary.

17  Q.    Anything else?

18  A.    I'll say that's the primary.

19  Q.    Okay.  So Starbucks paid her money.  Correct?

20  A.    I do not know.

21  Q.    You don't know if Starbucks --

22  A.    I do not know.

23  Q.    Sitting here today in your conversations with all the

24  executives, you don't know that she signed a severance

25  agreement?

*Hymes - Redirect*                    550

```
 1  A.   I don't know what her severance was.  I did not know that
 2  she was paid --
 3  Q.   Okay.
 4  A.   -- so that is an affirmative.
 5  Q.   Is it typical for Starbucks to pay money to employees who
 6  lie and take no ownership for their actions?
 7  A.   I don't think so.
 8  Q.   I just want to take a look at 160.
 9       Actually, first we're going to look at 94.
10       You can see under here an email from you at the top,
11  April 14th at 6:56 a.m.  That's Saturday morning.
12       So the event occurred on Thursday in the late afternoon
13  on the 12th.  So then Friday goes by.  And now it's Saturday
14  morning where you are sending this to Paul Pinto and Frank
15  Adams, a forward of an email from John Kelly that you were
16  part of the recipients of.
17       Do you see that?
18  A.   I do.
19  Q.   And John Kelly, he's also a lawyer at Starbucks?
20  A.   He was serving under the capacity of the senior vice
21  president of public affairs.
22  Q.   So he's senior vice president of public affairs, and
23  you're also aware that he's an attorney?
24  A.   Now I am.  If you say he is.
25  Q.   He writes -- and this says 12:05 a.m., which would be
```

*Hymes - Redirect*                                        *551*

```
 1  midnight Saturday, but because of Seattle's time difference,
 2  you'd agree with me that would be Friday evening at 9:05 p.m.?
 3  A.   No.  It typically it will -- the stamp is on the
 4  receiving end.
 5  Q.   Okay.  So it's either 9:00 or midnight?
 6  A.   Yeah.
 7  Q.   Or midnight meaning Friday night going into Saturday.
 8       He says:  We need to get on a call ASAP with the store
 9  manager and the district manager.
10       So the store manager being Holly Hylton and the district
11  manager meaning Paul Sykes.  Correct?
12  A.   Correct.
13  Q.   And determine what exactly happened that led to police
14  being called.  We are trying to manage a potentially major
15  brand risk here without all the facts.
16       And then he says:  Reggie, can you please schedule ASAP?
17  If it has to be early tomorrow, then fine, but we all need to
18  have a sense of real urgency here to get comprehensive clarity
19  so we can manage the response.
20       Do you see that?
21  A.   Yes.
22  Q.   So that's on the 12th.
23       The event happens, and then this is going into Saturday,
24  early.  Kelly says:  Get the facts ASAP.
25       And to speak with the store manager and the district
```

*Hymes - Redirect*                                552

 1   manager, so that would be Mr. Sykes.  Correct?

 2   A.   Yes.

 3   Q.   Store manager, Holly.  District manager, Paul Sykes.

 4        And that call happens as far as you know, correct, on

 5   Saturday?

 6   A.   I literally drove down from Maryland on Saturday, so it

 7   happened.

 8   Q.   Were you part of that call?

 9   A.   I was physically there.

10   Q.   Physically --

11   A.   So the incident happened on the 12th.  And then when I

12   was notified by John Kelly, I was literally getting dressed

13   for the day.  And I didn't pack a thing, I just got in my car

14   and drove down to the store.

15   Q.   Okay.  So you get to the store.  And an investigation has

16   to be done right away to figure out these facts and make sure

17   that what happened, happened, and it's recorded appropriately

18   and accurately.  Correct?

19   A.   Correct.

20   Q.   So at 2:39, Ronda Knight creates this incident report.

21   Correct?

22   A.   Correct.

23   Q.   And so as part of this report, she says at the bottom

24   here that:  Completed action items, GSOC, which is the Global

25   Securities Operation Center, saved video of the incident.

*Hymes - Redirect*                    *553*

```
 1        Do you see that?
 2   A.   Yes.
 3   Q.   And that is -- they are actually copied on this email up
 4   here.  Correct?
 5   A.   Yes.
 6   Q.   When they say "saved video of the incident," that's the
 7   surveillance video you're talking about.  Correct?
 8   A.   Yes.
 9   Q.   And so that surveillance video was viewed before the
10   incident report was created, correct, recounting the events?
11   A.   I don't think so.  I don't remember the sequence, but I
12   don't think so.
13        I don't know.  I don't know.  If it was --
14   Q.   Would you expect, Ms. Hymes, that they would review the
15   video of this incident --
16   A.   I do.
17   Q.   -- that's creating a major brand risk for them, before
18   they actually type up the incident report?
19   A.   You would expect that, wouldn't you, yes.
20   Q.   Yes.
21   A.   That would be the expectation of the district manager and
22   the P&AP manager, to accurately check the facts.
23        But unfortunately, that did not happen.
24   Q.   I'm talking about the video.
25   A.   Yes.
```

*Hymes - Redirect*                                              *554*

```
 1   Q.   My question is very simple.

 2   A.   Uh-huh.

 3   Q.   You would expect that Starbucks --

 4   A.   Uh-huh.

 5   Q.   -- would review the surveillance video of this incident

 6   before it creates the incident report recounting the facts

 7   that occurred, especially in light of the fact that they were

 8   just told by John Kelly to make sure you get all the facts

 9   clearly.  Correct?

10   A.   The brand, Starbucks itself, is represented by people.

11   So I would have expected the district manager and Ronda to

12   review the video.

13   Q.   Okay.  And the district manager would be Paul Sykes?

14   A.   Correct.

15   Q.   And so the write-up by Starbucks is an incident report

16   here, says that the date and time of the incident was 4:10 and

17   that the men entered the location around 4:10.

18        Do you see that?

19   A.   I do.

20   Q.   It says:  At 4:32, the store manager approached them and

21   asked them if she could get them a coffee or something like

22   that.  Correct?

23           MR. HARRIS:  Objection, Your Honor.  May I see you at

24   sidebar?

25           THE COURT:  Not at this point.
```

*United States District Court*

 1    BY MS. MATTIACCI:

 2    Q.   Do you see that?

 3    A.   Yes.

 4    Q.   And so according to Starbucks' internal report and the

 5    investigation, even after they have the surveillance video,

 6    their report says that the men were in the store for 22

 7    minutes before they were -- the police were even called.

 8    Correct?

 9    A.   That's what the report shows.

10    Q.   You believe that this is untrue.  Correct?

11    A.   I don't remember the exact amount of time that Donte and

12    Rashon were in there, but I don't believe it was 22 minutes.

13    Q.   Okay.

14    A.   I believe the police were called immediately.

15    Q.   You believe that the police were called immediately?

16    A.   If I can recall.  I can't recall.  I can't.

17    Q.   Okay.  So why does Starbucks put in their internal

18    investigative report that the men were in the store for 22

19    minutes before the police were called?

20    A.   I don't know.

21    Q.   And when you got this investigative report and then you

22    look at the video, did you say to them, your investigative

23    report is wrong, why are you saying it's 22 minutes that the

24    men were in store?  In fact the police were called

25    immediately, we need to get a new report, this is wrong.

*Hynes - Redirect*                                     *556*

```
 1   A.   We had that conversation over the course of about a
 2   week-and-a-half in terms of validating why the report was
 3   written incorrectly, why the two men were arrested.  And
 4   subsequently, why the report and the video don't match.
 5   Q.   I'm talking about in this moment.
 6   A.   Yeah.
 7   Q.   You're down there.  It's Saturday.  It's 2:40.
 8   Starbucks -- Mr. Kelly is saying to get all the facts, you
 9   have the video, you reviewed --
10   A.   I did not review the video on the day that I arrived.
11   Q.   You didn't look at the video?
12   A.   I did not have access to the video on the day that I
13   arrived.
14   Q.   But certainly Ms. Knight did?
15   A.   I don't know the answer to that.
16   Q.   All right.  Well, Global Security Operations Center did,
17   can we agree on that?
18   A.   Yes.
19   Q.   And then that night at 7:28, the CEO of Starbucks sends
20   out a communication to Starbucks managers, managing directors
21   for the company, for a company operated in joint venture
22   markets.
23        Do you see that?
24   A.   I do.
25   Q.   And in here he says -- he summarizes some of the
```

 1  situation about the disheartening situation in one of our

 2  Philadelphia area stores and expresses deepest apologies to

 3  the two men who were arrested.

 4      And he says in the coming days he'll be joining with you

 5  on the ground in Philadelphia to speak with partners,

 6  customers and community leaders as well as law enforcement.

 7      Had you ever had the CEO of Starbucks join you or name

 8  you personally in a communication like this and single you out

 9  as the person he'd be with?

10  A.   Yes.

11  Q.   In what capacity?

12  A.   With Howard Schultz when we had the Baltimore riots.  In

13  Washington, D.C. for other roundtables or partner open forums.

14  Q.   Okay.

15  A.   Yes.

16  Q.   So you had been in a situation like this before in terms

17  of like a PR crisis?

18  A.   I have not been in a situation like this before.

19  Q.   Okay.  Because this was -- this wasn't just an external

20  protest as was happening in Baltimore, this was personal to

21  Starbucks and their brand.  Correct?

22  A.   Correct.

23  Q.   You would think -- you knew that there was surveillance

24  cameras in the stores, right, you were aware of that?

25  A.   Yes.

1  Q.   Wouldn't you want to, when you got down there on Saturday

2  before the CEO puts out a whole statement out on the internet,

3  to know what that surveillance video looked like, to see what

4  happened?

5  A.   I did not have access to it at that time.

6  Q.   You couldn't ask -- you already got the incident report?

7  A.   I did not have access to the video at that time.

8  Q.   You don't think you could've -- I'm not saying whether

9  you looked at it.  Could you have looked at it --

10        (Court reporter clarification.)

11        THE WITNESS:  The answer is no.

12  BY MS. MATTIACCI:

13  Q.   He says in here:  Our practices and training led to a bad

14  outcome.  The basis for the call to the police department was

15  wrong.  Our store manager never intended for these men to be

16  arrested and it should never have escalated as it did.

17        Do you see that?

18  A.   I do.

19  Q.   Do you agree that the store manager never intended for

20  the men to be arrested?

21  A.   I do not.

22  Q.   You think that that's a lie, a false statement?

23  A.   I don't believe he had all the facts.

24  Q.   So the CEO puts out a statement on the biggest brand risk

25  that has ever hit Starbucks in the history of his company, and

 1   you let -- and he was able to put out a statement without all

 2   the facts?

 3   A.   Yes.

 4   Q.   It says:  Our practices and training led to a bad

 5   outcome.  You agree with that.  Correct?

 6   A.   I do.

 7          MS. MATTIACCI:  I don't have any further questions,

 8   Your Honor.

 9          MR. HARRIS:  If I may.

10                      RECROSS-EXAMINATION

11   BY MR. HARRIS:

12   Q.   Ms. Hymes, as you sit here today, can you think of one

13   strategic meaningful contribution that Ms. Phillips made after

14   April 12, 2018 until the time that she was separated?

15   A.   No.

16          MR. HARRIS:  Thank you.  I have no further questions.

17          THE COURT:  All right.  That concludes the testimony

18   of Ms. Hymes.

19          THE WITNESS:  Thank you.

20          THE COURT:  You may step down.

21          (Witness excused at 11:58 a.m.)

22          THE COURT:  Next witness.

23          MS. MATTIACCI:  Your Honor, our next witness is Zeta

24   Smith.

25          THE COURT:  I'd like to break today at 12:15 for

 1   lunch.

 2          MS. MATTIACCI:  It's as of cross?

 3          THE COURT:  Yeah.

 4          MS. MATTIACCI:  We could do a lunch break now and

 5   come back.

 6          THE COURT:  Well, let's do another 15 minutes --

 7          MS. MATTIACCI:  Okay.

 8          THE COURT:  -- and then we'll come back at 1:30.

 9          MR. HARRIS:  Your Honor, would you like her sworn in

10   before we break or --

11          (**ZETA SMITH**, PLAINTIFF'S WITNESS, having been duly

12   sworn, testified as follows:)

13          THE DEPUTY CLERK:  Please be seated.

14          Could you please --

15          THE WITNESS:  I need my glasses.

16          THE DEPUTY CLERK:  Oh, okay.  Where are they?

17          THE WITNESS:  I gave them to Katie, sorry, in case I

18   need to read something.

19          THE DEPUTY CLERK:  You will.

20          THE WITNESS:  Thank you.

21          THE DEPUTY CLERK:  Now, please state and spell your

22   name.

23          THE WITNESS:  Zeta Smith, Z-E-T-A, last name Smith,

24   S-M-I-T-H.

25          THE DEPUTY CLERK:  Thank you.

*United States District Court*

```
 1                        DIRECT EXAMINATION

 2   BY MS. MATTIACCI:

 3   Q.   Good afternoon --

 4   A.   Good afternoon.

 5   Q.   -- by a minute.

 6        Ms. Smith, this is an organizational chart as it existed

 7   in April and May of 2018.

 8        Do you recognize yourself here as a divisional senior

 9   vice president?

10   A.   Yes.

11   Q.   And you reported up to Rossann Williams.  Correct?

12   A.   Correct.

13   Q.   Who reported up to Rosalind Brewer.  Correct?

14   A.   Correct.

15   Q.   Who reported directly to the CEO and president.  Correct?

16   A.   Yes.

17   Q.   And below you was Ms. Hymes, Camille Hymes?

18   A.   Yes.

19   Q.   And below Ms. Hymes was Ms. Phillips.  Correct?

20   A.   Yes.

21   Q.   Below Ms. Phillips was Mr. Sykes.  Correct?

22   A.   Yes.

23   Q.   And below Mr. Sykes was Ms. Hylton in the Philadelphia

24   18th and Spruce store in April of 2018.  Correct?

25   A.   Yes.
```

Smith - Direct                                        562

```
 1   Q.   You're also familiar with the name Ben Trinsey?

 2   A.   Yes.

 3   Q.   Okay.

 4            THE COURT:  Can I just interrupt one second?

 5            (A discussion off the record occurred.)

 6   BY MS. MATTIACCI:

 7   Q.   You left Starbucks in October of 2018.  Correct?

 8   A.   Yes.

 9   Q.   You are now the CEO of Sodexo, North America Seniors.

10   Correct?

11   A.   Yes.

12   Q.   When you were at Starbucks before you left, you were in

13   charge of a portfolio worth $6 billion.  Correct?

14   A.   Correct.

15   Q.   And your responsibilities included retail operations, the

16   P&L.  Correct?

17   A.   Yes.

18   Q.   And corporate social responsibility?

19   A.   Yes.

20   Q.   And new business development.  Correct?

21   A.   Yes.

22   Q.   You also served on the US operational leadership team and

23   communicated with the CEO regularly.  Correct?

24   A.   Uh-huh, yes.

25   Q.   And prior to Starbucks, you worked at Exxon Mobil for
```

*Smith - Direct*                                            *563*

1  almost 16 years.  Correct?

2  A.   Yes.

3  Q.   Now during your career at Starbucks, you were promoted

4  several times.  Right?

5  A.   Yes.

6  Q.   As part of your trajectory up at Starbucks, you also had

7  a TLA position at one point.  Correct?

8  A.   Yes.

9  Q.   And that was in urban market strategy?

10 A.   I had a couple of TLAs, so you're referring to the last

11 one?

12 Q.   Oh, yes, but if you can explain the other TLAs, that

13 would be great.

14 A.   I was a TLA for the regional vice president opportunity

15 as well in 2009.

16 Q.   Okay.  And when you say "the regional vice president

17 opportunity" --

18 A.   For northeast.  So I sat in that position temporarily and

19 then was promoted.

20 Q.   And TLA is temporary limited assignment.  And sometimes

21 if you get these temporary limited assignment positions, it

22 can result in a promotion?

23 A.   It could, yes.

24 Q.   And, in fact, for you it did result in a promotion.

25 Correct?

1  A.   Yes.

2  Q.   Ms. Hymes reported to you from the fall of 2016 until

3  June of 2018.  Correct?

4  A.   Correct.

5  Q.   And let's talk about Ms. Phillips particularly and her

6  performance.

7       You'd agree with me that her performance numbers were

8  very, very good, weren't they?

9  A.   I would say that she was meeting and exceeding

10 expectations in some of the key KPIs, yes.

11 Q.   And you would describe her P&L as very strong.  Correct?

12      And when we say "P&L," meaning a profit and loss

13 statement in terms of the money that she was generating for

14 Starbucks; she was very strong on that.  Correct?

15 A.   It was favorable, yes.

16 Q.   Well, it was more than favorable.  Correct?  You would

17 describe it as very strong?

18 A.   It was very strong.  I don't know the exact numbers, so

19 I --

20 Q.   Okay.  But your impression in looking back on it, she was

21 very strong?

22 A.   Correct, yes.

23 Q.   Prior to April of 2018, you -- in evaluating

24 Ms. Phillips's performance, you would say that she had a very

25 good relationship with her partners.  Correct?

```
 1  A.   Yes.

 2  Q.   And she was doing some very good community work?

 3  A.   Yes.

 4  Q.   In fact, she was doing some quite noteworthy community

 5  work?

 6  A.   Yes.

 7  Q.   Do you recall she was featured on a commercial for

 8  Starbucks with her work that she did with YouthBuild and the

 9  mentor/mentee Carmen Williams that she was mentoring?

10  A.   Yes.

11  Q.   And you saw that she spent most of her time visiting and

12  connecting with partners in the time that you went and did a

13  ride with her prior to April of 2018.  Correct?

14  A.   When I would be in market, we went to stores and

15  interacted with partners, so I did see her connecting with

16  partners, yes.

17  Q.   You respected her?

18  A.   Yes.

19  Q.   And you also liked her as a person?

20  A.   Yes.

21  Q.   You came to Philadelphia in April of 2018 in the

22  aftermath of the arrests and video that went viral on

23  April 12, 2018.  Correct?

24  A.   Yes.

25  Q.   Okay.  Let's turn our attention now to that day and that
```

 1  time frame.

 2      You were on that particular day on vacation.  Correct?

 3  A.   Yes.

 4  Q.   Your work at that time was being covered by Frances

 5  Ericson?

 6  A.   Correct.

 7  Q.   And that's how you learned about the arrests in the viral

 8  video was from Ms. Ericson.  Correct?

 9  A.   Yes.

10  Q.   You would agree with me as divisional senior vice

11  president, that this arrest and video were a major PR crisis

12  and risk to the brand for Starbucks.  Correct?

13  A.   Yes.

14  Q.   You flew into Philadelphia at that time once you learned

15  about it and came off of vacation or your vacation was over?

16  A.   Vacation was over, and then I flew in that Monday.

17  Q.   So you came in on Monday, and you stayed in Philadelphia

18  from Monday till Thursday.  Correct?

19  A.   Yes.

20  Q.   And you interacted with Ms. Phillips during that week.

21  Correct?

22  A.   I did.

23  Q.   And there was nothing that you saw Ms. Phillips do that

24  week that you thought:  Oop, we got to terminate this person?

25  A.   There were concerns then that week, yes.

Smith - Direct                                    567

```
 1   Q.   Oh, that week there were concerns about her?
 2   A.   Yes.  Because we had Howard Schultz that next day or the
 3   following day, and she was late.
 4   Q.   She was late?
 5   A.   Yes.
 6   Q.   Which day?
 7   A.   That week.  I do not recall the days.  They were all kind
 8   of meshed together.
 9        But whenever he came on-site and we were going to be
10   touring the stores, she was late.
11   Q.   How late?
12   A.   She was not there when we had all divided into groups to
13   go to stores, which took probably 30 minutes to organize.
14   Q.   But she didn't miss any of the meeting.  You're talking
15   about when people were dividing into groups?
16   A.   We were supposed to meet in the morning at the store,
17   divide into groups, and then go out to the stores, and she was
18   not there.
19   Q.   For 30 minutes?
20   A.   She was not there.  By the time we divided into groups,
21   she was not there.
22   Q.   Do you know that she was at the 18th and Spruce store?
23   A.   We were -- she was not at the 18th and Spruce store.
24   Q.   When you were at the 18th -- but you don't know which day
25   this is?
```

 1   A.   I don't.  I'm not sure.

 2   Q.   I'm trying to figure out when this event was.

 3   A.   Whenever Howard Schultz was in town, that morning.

 4   Q.   Well, he was in town during this time period.  He was on

 5   the 17th, and then there was a Gayle King interview, so that's

 6   why I'm trying to figure out exactly what you're talking

 7   about.

 8   A.   Unfortunately, I don't know specific dates, but I know

 9   that the first day that he came, he was touring, and he was

10   late -- she was late, excuse me.

11   Q.   Did you, like, send an email, talk to Camille, say

12   anything to anybody about this?

13   A.   Yeah.  We were all there, wondering where she was.

14   Q.   Did you know that she had -- she was at different stores

15   at that moment?

16   A.   This was at 5:30 in the morning, so she was not at any

17   stores.  We could not get a hold of her.

18   Q.   So it was -- oh, you tried to get a hold of her?

19   A.   I did not try to get a hold of her.

20   Q.   Okay.  Who tried to get a hold of her?

21   A.   I don't -- I remember Camille saying:  We're trying to

22   get a hold of her.  Where is she?

23   Q.   Okay.  So 5:30 in the morning, and you're saying she got

24   there at 6:00 in the morning?

25   A.   We had already divided out.  I did not see her before

*Smith - Direct*                                        *569*

```
 1   we --
 2   Q.   Okay.
 3   A.   -- before we left for -- or after we left for the stores.
 4   Q.   All right.  So you're in town.  You have the CEO -- is
 5   the CEO with you?
 6   A.   Yes, in the store.
 7   Q.   Okay.  And isn't it true that Ms. Phillips was told to go
 8   ahead and go to stores and make sure that they were ready for
 9   the CEO?
10   A.   I don't know.
11   Q.   Isn't it possible that that's what she was doing when
12   you're talking about this?
13   A.   No.  We were asked to all meet at the store at a certain
14   time.  I'm thinking it was 5:30.
15   Q.   How do you know that Ms. Phillips was asked to meet there
16   and not make sure that the stores were ready for the CEO
17   visit?
18   A.   All of the teams were asked to meet at the store because
19   we were going to meet Howard there.
20   Q.   At 18th and Spruce?
21   A.   Correct.
22   Q.   Right.  And wouldn't you think, just generally, it would
23   be a good idea for somebody to go ahead and make sure that
24   store is prepared for the CEO visit?
25   A.   Yes.  But I don't know if that's what actually occurred.
```

*United States District Court*

1    I know that she was late.

2    Q.   Okay.  Besides that, anything else that you are

3    identifying as a reason that she should be terminated for

4    actions that occurred on that week?

5    A.   I think the biggest concern for me was that she was late

6    for a couple of meetings that we had.

7         There was a lack of responsiveness with her team.  So

8    some of the team started asking us the questions as opposed to

9    asking her.  And that created concern as well.

10   Q.   Let me stop you right there.

11        Lack of responsiveness with her team.

12        Define "her team."

13   A.   So her team being the district managers.

14   Q.   Okay.  So the district manager in Philadelphia on the one

15   side of the city where the event occurred is Mr. Sykes?

16   A.   Yeah.

17   Q.   And then on the other side of the city was Mr. Trinsey?

18   A.   Yeah, so --

19   Q.   So let me just ask you.  So the DMs were part of her team

20   and then you're saying that the DM was asking you a question

21   and not asking her a question; is that the issue?

22   A.   Started asking me and Camille questions as opposed to

23   Shannon.  By the time -- by the middle part of that week.

24        And that was a concern of mine, because technically

25   Shannon was his direct report -- or supervisor.

 1   Q.   It was concerning to you that Mr. Sykes -- was it both

 2   Mr. Sykes and Mr. Trinsey or just one of them?

 3   A.   I don't recall Ben.  I was not witness to Ben coming up

 4   to me or in front of me with that.

 5        I was with Mr. Paul.

 6   Q.   Mr. Sykes?

 7   A.   Yes.

 8   Q.   So Mr. Sykes came up to you to ask you a question?

 9   A.   So yes.  A couple of different times.

10   Q.   Okay.

11   A.   But I also witnessed him asking her a question, and she

12   did not know the answer.  And I thought that was interesting,

13   because those are the types of questions that should be

14   answered by the RD.  And it was an operational question,

15   something about the pastry case.

16   Q.   About the pastry case?

17   A.   Yes.

18   Q.   What was the issue?

19   A.   The display or there was a promotion or -- there was

20   something that caught my attention like at that point, of the

21   regional director should know what the promotion is or what

22   should be in the case, and I remember him asking her that

23   specifically and she couldn't answer that.

24   Q.   Okay.  So Mr. Sykes asked Ms. Phillips a question about

25   something with the pastry case?

*Smith - Direct*                              *572*

```
 1   A.   Yes.

 2   Q.   What was the question?

 3   A.   I don't -- I mean, specifically from five years ago, but

 4   I remember it was something about the display of the pastry

 5   case and what should be in it, because I think we were

 6   launching a promotion or something.  There was some question

 7   there.

 8            THE COURT:  All right.  Let's take our break at this

 9   point.

10            MS. MATTIACCI:  Thank you, Your Honor.

11            THE COURT:  It's now 12:15.

12            Members of the jury, I'll ask you to come back at

13   1:30.

14            Remember my words of caution.

15            (Jury out.)

16            (Recess at 12:15 p.m.)

17            MS. MATTIACCI:  Your Honor, before we break for

18   lunch, could we just tell you about a scheduling issue with a

19   witness?

20            THE COURT:  Yes.

21            MS. MATTIACCI:  And the witness can be excused.  I

22   don't want to hold her up on that.

23            THE COURT:  Yes.

24            MS. MATTIACCI:  But after Ms. Smith, then we are

25   going to be calling Mr. Sykes, but via Zoom because he's in
```

 1   Connecticut right now.

 2          Counsel has no objection to it.

 3          MR. HARRIS:  That's correct.

 4          MS. MATTIACCI:  We'll have it all set up.

 5          But he would be available at 4:00.  I don't

 6   anticipate him to be long at all.  I maybe have ten minutes of

 7   questions for him but he can't do it until 4:00 because of his

 8   work commitment, so that's what we were going to do.

 9          THE COURT:  Okay.  All right.

10          MS. MATTIACCI:  Thank you.

11          THE COURT:  Is he your last witness or you have

12   another one?

13          MS. MATTIACCI:  He's our next witness.

14          THE COURT:  Is he your last witness or do you have

15   more witnesses?

16          MS. MATTIACCI:  It may be.  Yeah.

17          THE COURT:  All right.  We'll stand in recess.

18          MR. HARRIS:  Thank you.

19          (Luncheon recess at 12:16 p.m. until 1:33 p.m.)

20          THE COURT:  Counsel, I have a draft jury instructions

21   and a draft verdict sheet.  And we'll give each side two

22   copies of each.

23          This is not a final -- this is not embedded in stone.

24   This is subject to revision.  And I recollect we don't have a

25   similarly situated charge.

 1              I'll take a look at that tonight, all the cases.

 2              It's subject to requesting additions, deletions, et

 3       cetera.  It's just a draft.

 4              MR. HARRIS:  Very well.

 5              THE COURT:  But I want to give it to you enough in

 6       advance so that you can study it and look it over.

 7              MR. HARRIS:  Thank you.

 8              THE COURT:  All right.  So we can give it out.

 9              Let's bring in the jury.

10              (Jury in.)

11              THE COURT:  Please be seated.

12              Ms. Mattiacci, you may continue.

13              MS. MATTIACCI:  Yes, Your Honor.  Thank you.

14       BY MS. MATTIACCI:

15       Q.   Good afternoon.

16       A.   Good afternoon.

17       Q.   So when we left off before lunch, we were talking about

18       an issue concerning the pastry case.  Do you recall that?

19       A.   Yes.

20       Q.   And you said that you were in the store in Philadelphia,

21       and the district manager had a question about something to do

22       with the pastry case, but you can't remember what the issue

23       was with the pastry case?

24       A.   No.  I think there was something around the promotion,

25       the planogram associated with the promotion at the time.

```
 1   Q.   Okay.  And Mr. Sykes was the one who didn't know what to
 2   do or had a question about the pastry case?
 3   A.   He had a question, yes.
 4   Q.   So besides that, the question that -- about the pastry
 5   case, is there anything else that you personally observed that
 6   you're saying was behaviors that led to her termination?
 7   A.   Overall, over the last several -- those several weeks or
 8   that week?  What are you asking me?
 9   Q.   Well, I mean, are you saying that the pastry case --
10   A.   No, I'm not.
11   Q.   -- case question was why she was terminated?
12   A.   No.
13   Q.   Okay.  So she was -- I'm asking for what you personally
14   observed in these -- this time frame.  When you came into
15   Philadelphia, you were there Monday through Thursday of that
16   first week?
17   A.   Yes.
18   Q.   And the -- you told me about a meeting that you believed
19   that she was going to be there for in order to do rounds with
20   the CEO.  Right?
21   A.   Correct.
22   Q.   And then the pastry case.
23        Anything else besides that that occurred in those four
24   days when you were in Philadelphia?
25   A.   I am racking my brain on the dates.  However, I think
```

```
 1  just to paint the picture, everything was moving at lightning
 2  speed.  This was unprecedented times.  CEOs, COO, US president
 3  was there.
 4       So to not -- to not be available when the former or the
 5  founder of the company is at the location was a big deal.  So
 6  it may sound like, okay, she was late.  But at this point in
 7  time, everyone -- it was all hands on deck.
 8  Q.  Ma'am, in that particular issue, where the founder was
 9  going around to the stores in Philadelphia --
10  A.  Yes.
11  Q.  -- when you got to the first store, Ms. Phillips was
12  there.  Right?
13  A.  I don't -- honestly, I don't recall what store -- because
14  we were all divided into different stores.
15       So I was not in the same store she was in during that
16  tour.
17  Q.  So you don't know in that time if she was at a different
18  store preparing it for the CEO.  You don't know that?
19  A.  I don't, no.
20  Q.  Okay.  Is there anything else that you personally
21  observed that you're saying led to Ms. Phillips having to be
22  fired on May 8, 2018?
23  A.  During that first week?
24  Q.  Yeah.  Well, we can start with the first week.
25       Anything else that first week?
```

1   A.   Not that comes to mind.

2   Q.   Okay.  You flew then back to Seattle?

3   A.   Yes.  Where I lived at the time.

4   Q.   So you were in the Seattle for the 20th and the 21st.

5        When did you come back to Philadelphia?

6   A.   That week, that next week, I'm not sure if that was that

7   Monday or that Tuesday.

8   Q.   Okay.  Anything you observed personally that week that

9   you're saying Ms. Phillips needed to be fired for?

10  A.   So I think at that point, it started building on itself.

11  So there were examples of lateness.  There was examples of on

12  the stand-up calls that were occurring, that not taking a

13  leadership position.  There were examples of, you know,

14  general follow-up of what was going on, wanting specifics, not

15  getting them.  They're examples --

16  Q.   Ma'am, I want to know each of these examples so let's

17  break it down.

18  A.   Okay.

19  Q.   Give me an example of a stand-up call in which she did

20  not do, what?

21  A.   So the stand-up call was for the specific market of which

22  she oversaw, she was leading.  She should have led the

23  stand-up call.  She was not leading the stand-up calls.

24  Q.   What is even a stand-up call?  Can you say that?  Define

25  that.

```
 1   A.   That is when certainly in crisis situations, you have a
 2   daily -- sometimes two or three calls each day to talk about
 3   where are we, what do we need to do, set direction, what is
 4   the plan, what is the follow-up on the action items.  Those
 5   are the stand-up calls.
 6   Q.   Okay.  When did that stand-up call happen that you're
 7   saying that she didn't lead?  When?
 8   A.   The stand-up calls were happening daily.  I cannot
 9   remember when they began that first week, but they began that
10   first week.  And then they extended into the rest of the
11   month.  And the ops services group was also involved in the
12   stand-up calls.
13   Q.   So you're saying the first week, meaning the week of the
14   15th the stand-up calls started?
15   A.   Yes.
16   Q.   And they happened every single day?
17   A.   As touch bases, yes.
18   Q.   Was it the same time every day?
19   A.   I don't know.
20   Q.   So it wasn't like an 8:00 a.m. call, it would just happen
21   at different times?
22   A.   There was a routine to the calls.  At my level, I was not
23   on a daily stand-up call.  This was for the local team to talk
24   through the action planning.
25   Q.   So then you weren't on these daily calls.  You were only
```

 1   on which -- so were you on any of the daily calls the first

 2   week from the --

 3   A.   Not on the first week, no.

 4   Q.   Okay.  So then the second week, were you on any of the

 5   daily calls?

 6   A.   I was on one of the daily calls, but I -- it was one of

 7   the dates on the -- during that week.  Unfortunately, I don't

 8   know the specific day.

 9   Q.   So it was somewhere this week the 23rd, 24th, 25th you

10   were on a stand-up call?

11   A.   Yes.  While I was in town I also called into the stand-up

12   call that had the local leadership as well as the ops services

13   team.

14        What surprised me was that she was not leading that call

15   given it was her area.

16   Q.   When you say "not leading the call," what does that even

17   mean?

18   A.   That means setting the direction.  That means talking

19   about what are the action plans for addressing what was

20   happening in the market at the time.

21        She was the closest to the partners and the actions that

22   were needed to address the situation.

23   Q.   So who was leading the call?

24   A.   The person from ops services at times, I believe.

25   Q.   And ops services is out of Seattle.  Right?

 1  A.   Correct.

 2  Q.   And you're in a crisis situation, corporate that is

 3  hitting the highest levels of corporate governance in

 4  Starbucks at this time.  Right?

 5  A.   Correct.

 6  Q.   It would not be normal for ops services to be on a daily

 7  call with Shannon Phillips.  Correct?

 8  A.   Everything was abnormal at this point over the three

 9  weeks, yes.

10  Q.   And so you think that ops services should not have been

11  leading the calls, but Shannon Phillips should have been?

12  A.   I think the leader of the market should be leading their

13  team through crisis with support from ops services.

14  Q.   So you're saying that she did not lead her team through

15  crisis?

16  A.   That is what I'm saying.

17  Q.   Did you come to this conclusion as of the 25th of May --

18  of April?

19  A.   What day was that?

20  Q.   A Wednesday.

21  A.   I'm trying to think of dates.

22  Q.   I mean, was she okay up until the 25th, or were you

23  having this --

24  A.   These were conversations that continued to occur over

25  those first two or three weeks, so I'm not sure when you say

```
 1  the 25th what the exact date is, but it was a culmination of
 2  some of the examples that I just shared.
 3  Q.   All right.  When you were having this call and you're --
 4  are you on the call with ops services and Ms. Phillips?
 5  A.   I was only on one of the calls.
 6  Q.   Okay.
 7  A.   At my level, I'm not going to be on a daily stand-up,
 8  because it's more for the local leadership; however, I do
 9  receive report-outs of the calls and their content.
10  Q.   The "report-out," what is that?
11  A.   So those are the -- it's a recap of what was discussed on
12  the stand-up.
13  Q.   Who makes the recap?
14  A.   I don't know.  It could have been -- I mean, it could
15  have been the ops services.  It could have been -- I don't
16  know.
17  Q.   So somebody does a recap of the stand-up calls and then
18  sends you the recap?
19  A.   There was not a sent recap to me.  So this is -- I'm --
20  I'm in charge of understanding what is going on, so people are
21  reporting information to me verbally of what was discussed.
22  So it wasn't like I was emailed a "Here's the minutes from the
23  stand-up" every day.  I did not receive that, not at my level,
24  no.
25  Q.   So when you say "recap," you're talking about a verbal
```

*Smith - Direct*                                            *582*

```
 1   recap?

 2   A.   Yes.  What was discussed at the stand-up today.

 3   Q.   Okay.  And so you -- let's just talk about the one that

 4   you were on because the other ones you're just hearing from

 5   who, Ms. Hymes?

 6   A.   Correct.

 7   Q.   Is she on all of them?

 8   A.   I don't think she was on every single one, but she did

 9   participate.

10   Q.   So for the ones that she wasn't on, how were you getting

11   the summaries?

12   A.   I didn't get a summary every single day.  There was so

13   much happening, and I was in the market, so the updates that I

14   needed, I felt comfortable with, and then sometimes I would

15   get the summary.  But I wasn't getting a recap every single

16   day from the stand-up.  I was getting recaps of what was going

17   on in the market every single day from Camille.

18   Q.   Okay.

19   A.   Or if I was in the market already.

20   Q.   I heard you to articulate that she failed in the stand-up

21   calls.  She failed to lead them.

22        So I'm trying to figure out exactly which call this was

23   and what she did to fail.

24        And so you're saying you actually only participated in

25   one of those calls.  Correct?
```

*Smith - Direct*                                          583

```
 1  A.   Yes.

 2  Q.   And she failed in that call?

 3  A.   Yes, in that it is her team that she is responsible for

 4  leading through a crisis.  That's what leadership is.  She

 5  wasn't leading the call; someone else was leading the call.

 6  Q.   Ops services was leading the call?

 7  A.   Ops services was leading the call, the one that I was on.

 8  Q.   Okay.  And they were actually in charge of leading the

 9  whole market through the crisis.  Right?

10  A.   They were in charge of supporting the market during the

11  crisis, not leading it.

12  Q.   And who from ops services was on there?

13  A.   On the call that I was on?  Oh, my gosh.  There was

14  probably 15 people on there.

15       Damon Kahwati, Denise Nelson, some HR folks, the local

16  operators.  This was like 15 people.

17  Q.   And Denise Nelson, she's one of the top people in ops

18  services.  Correct?

19  A.   Correct.  She was the SVP I think was her title.

20  Q.   Senior vice president.  Correct?

21  A.   I believe.

22  Q.   Yes.

23       And Ms. Phillips was not a senior vice president.

24  Correct?

25  A.   No.
```

```
 1   Q.   And she was certainly not at your level or anywhere close
 2   to your level.  Correct?
 3   A.   Correct.
 4   Q.   And you were on the call and so was this senior VP.
 5   Correct?
 6   A.   Correct.  To listen.
 7   Q.   When you got off that call, was your top conclusion of
 8   that call Shannon Phillips somehow failed in that call?
 9   A.   My conclusion was, I was actually surprised that she was
10   not leading her team or the call or the actions.
11   Q.   What does it mean, leading the team on the call?  I don't
12   understand even what that means.
13   A.   So when you are -- certainly in crisis mode, it is about
14   providing the guidance and the direction to your team.  Your
15   team's looking for you to lead them.  On stand-up calls,
16   that's really the premise of it:  What are the actions that
17   are needed, what are the next steps, et cetera.
18        That should come from the local leader, who is the
19   director of the market.
20   Q.   What did you want her next step -- what did you want
21   Ms. Phillips to say in the call as the next step?
22   A.   Yeah.  So she should have been helping to create the
23   agenda, opening up the call, setting up the expectations and
24   running the call, facilitating the call.  Not that she had to
25   know all the information, but she should be facilitating her
```

```
 1  team and the group on the call that was in support of this
 2  crisis.  That's her role as a regional director.
 3  Q.  So you're saying --
 4  A.  I'd ask that of anyone.
 5  Q.  So the senior VP of op services was running the call
 6  instead of Shannon Phillips, and this was a problem.  Is that
 7  what you're saying?
 8  A.  No.  I didn't say that the senior VP was running the
 9  call.  She was not running the call that I was on.  She was on
10  the call, like I was on the call, listening in to understand
11  what was happening in the market and how she and I could best
12  support.  That was our role on the call.
13  Q.  So who ran the call?  If it wasn't you --
14  A.  That was Damon Kahwati at the --
15          (Court reporter clarification.)
16  BY MS. MATTIACCI:
17  Q.  If you weren't running the call and the senior VP of
18  operations was not running the call, who ran the call?
19  A.  Damon Kahwati, the call that I was on.
20  Q.  And what's Damon's position?
21  A.  He was a director in ops services at the time.
22  Q.  Okay.  And you were disappointed that it was Damon
23  running the call?
24  A.  Yes.
25  Q.  He didn't do a good job?
```

```
 1   A.   It wasn't about the job that he did.  I was disappointed
 2   that it wasn't the leader of the local market who was the
 3   supervisor of many on the call.
 4   Q.   So you then spoke to Ms. Phillips about this?
 5   A.   I did not speak to Shannon about that.
 6   Q.   So it must not have been that much of a big deal if you
 7   didn't even get off the call and call Shannon and say:  Yeah,
 8   you really screwed up on that call.  Why the heck aren't you
 9   leading it?
10   A.   I spoke to Camille about Shannon's leadership on a
11   stand-up call that I felt she should have been on that call
12   leading it.  I did speak to Camille about that.
13   Q.   Did you ever put anything in writing:  an email, a text,
14   a note, anything?
15   A.   No.  I was in market, and we're together 24/7.  We had
16   those conversations directly, so I did not send an email when
17   I could tell her directly.
18   Q.   Okay.  So besides the pastry case and the call with the
19   senior vice president of operations, what else did you
20   personally observe that led to Ms. Phillips's termination?
21   A.   So there was a virtual roundtable with shift supervisors,
22   there may have been some store managers.  It was probably 15
23   people.  And the COO, Roz Brewer; the president -- US
24   president, Rossann; some other people from headquarters that I
25   need to rack my brain on names at this point.
```

```
 1        I was also in the room, and we were virtual.  There was
 2   others from the SSC that were in the room virtually with the
 3   folks in Philadelphia.
 4        So it was over Zoom or whatever the equipment was.
 5        It was designed for a partner -- tell us how you are
 6   feeling.  What is going on?  Because it had been such a
 7   challenging time and challenging environment, what can we do
 8   to help?
 9   Q.   When did this happen?
10   A.   I -- unfortunately, it was -- it was either the week of
11   the 22nd or the week of the 29th --
12   Q.   Okay.
13   A.   -- because I -- that first week I was there.  And then in
14   the next two weeks, we had that -- we had that virtual
15   gathering, and she was not there at the beginning.
16        And she came in probably halfway through that virtual
17   meeting, where her team was sharing what was going on, how
18   they were feeling, et cetera.
19        So everyone saw her enter late and then proceed to sit in
20   the back.
21   Q.   Did you speak to her about this?
22   A.   I did not speak to her about this.
23   Q.   Did you write up any sort of -- even like an email to
24   Camille or --
25   A.   I spoke to Camille about it.  Camille is her direct
```

```
 1   supervisor.  Camille's responsibility is talking to her direct
 2   reports.  For me to call Shannon myself, that's --
 3   Q.   She's too far below?
 4   A.   You know, Camille has the direct report relationship.
 5        But I did express as -- not just me, others -- well, we
 6   all saw her enter 40 minutes, half an hour late to this very
 7   important listening session of her own team.
 8   Q.   So now it's 40 minutes she was late?
 9   A.   Approximate -- I know it was an hour -- it was an hour
10   virtual, and I know at least it was halfway, if not more than
11   halfway through the listening session that she entered the
12   room.
13   Q.   Did you memorialize it, even yourself, like, note to self
14   or anything like that?  Did you walk out of there thinking:  I
15   got to fire Shannon Phillips because she was late for this one
16   meeting?
17   A.   I walked out of that meeting even more concerned about
18   her level of urgency, her leadership with her own team, and
19   not being there to support them for not just that but then
20   arriving late to, you know, a tour, to not leading a stand-up.
21   So these were several examples.  It wasn't just one -- one
22   example.
23   Q.   Ma'am, you know that she was in the middle of leading the
24   18th and Spruce store through this crisis with the partners
25   that were there.  Correct?
```

*1*  A.   Yes.

*2*  Q.   And she was in Philadelphia every day, unlike you.

*3*  Correct?

*4*  A.   Yes.

*5*  Q.   And you didn't have any firsthand knowledge from any of

*6*  these partners that Shannon Phillips was somehow not leading

*7*  them through this crisis?

*8*  A.   Say that one again, please.

*9*  Q.   You don't have any firsthand knowledge, personal

*10* knowledge, that somebody -- a partner came to you and said:

*11* Shannon Phillips -- Shannon Phillips is failing as a leader to

*12* lead me through this crisis?

*13* A.   I did not have any conversation with that, from a partner

*14* there.

*15* Q.   And, in fact, if we look at Exhibit 16.

*16*      This is Philly Action Plan, April 25, 2018.

*17*      And you say:  I plan to send this out to P&AP and Rodney

*18* to follow next steps.

*19*      And Jenny --

*20*      Is that your assistant?

*21* A.   Yes.

*22* Q.   -- was kind enough to pretty up the document.

*23*      And on this Philly Action Plan -- this is for the action

*24* going forward.  Correct?  And some things that have already

*25* been completed.  Correct?

*Smith - Direct* 590

1  A.   Yes.

2  Q.   And Shannon's name is all throughout this document that

3  you had Jenny pretty up.  Correct?

4  A.   Yes.

5  Q.   So why are you having Shannon still do all of these

6  things and be in charge of all of these things if it was true

7  that, in your mind, as of this time that she was such an utter

8  failure and couldn't lead her partners through this crisis?

9  A.   She was the leader of that market at that time.  So the

10 designee for who was in charge should be the leader of that

11 market.

12 Q.   Well, you could decide that she's not going to be the one

13 to maintain ongoing communications with Lieutenant Gary,

14 right, I mean, you could put somebody else in that position.

15 Correct?

16 A.   She was still holding that position, so that should be

17 her responsibility.

18 Q.   I understand she was holding it as of that time, but if

19 you wanted to, you had the power to be able to pull her out of

20 these particular tasks and assignments if you thought that she

21 was failing.  Correct?

22 A.   If I thought she was not capable of extending private

23 security for two weeks, we would not have put her on that.

24      But she is the -- she was the leader at that time.

25 Q.   And you would not have put her in designing to elevate

*Smith - Direct*                                        *591*

```
 1   the partner and customer experience for the market, right,
 2   select and formulate small work groups of store managers, the
 3   groups to be touch points with safe and security updates.  If
 4   she wasn't doing that well, you wouldn't have assigned her to
 5   do that.  Correct?
 6   A.   She knew the people.  That was a strength of hers,
 7   knowing the partners.  So anything having to do with the
 8   partner experience, the leader of that market should have a --
 9   play a key role in that.
10   Q.   And the partners, she was close with her partners, people
11   that reported up to her.  Correct?
12   A.   I think that her partners respected her, yes.  I don't
13   know about being close, but.
14   Q.   They respected her?
15   A.   They respected her.
16   Q.   And she was also assigned to do one-on-ones with each
17   store partner to confirm if they still wanted to work at the
18   store and debrief current status of store community.  Correct?
19   A.   Yes.
20   Q.   And so if she was failing to be able to do that, she
21   wouldn't be designated as somebody who was in charge of this
22   on an ongoing basis.  Correct?
23   A.   She had the relationship with these partners that no one
24   else on this list had.  She had the relationship.  So she
25   would be able to have the candid conversations with these
```

 1  partners.

 2  Q.   And you wanted her to have the candid conversations with

 3  the partners.  Correct?

 4  A.   Yes.  This was a very, very challenging environment.  We

 5  want to have the candid conversation, and it should come from

 6  the leader of the market.

 7  Q.   So if she was failing so miserably in her ability to

 8  support and lead her partners, why would she be the person

 9  that you tasked with making sure she goes and has one-on-ones

10  with them in the store?

11  A.   At this time this was about having the conversations, of

12  understanding how the store partners were doing, and she has

13  that relationship.

14  Q.   In fact, she was tasked with initiating the protest

15  response team as well.  Correct?

16  A.   Yes.

17  Q.   And she did a good job in initiating the protest response

18  team, didn't she?

19  A.   Yes.

20  Q.   She was also tasked with coordinating with the PRM

21  leadership presence in the market.  Correct?

22  A.   Yes.

23  Q.   And dealing with the roundtable discussions.  Correct?

24  A.   Yes.

25  Q.   And in fact as of this time, she's tasked to do this

1    through May of 2018.  Correct?

2    A.   Yes.

3    Q.   So if there had been really significant issues with her

4    and these roundtables, she wouldn't be put on task to --

5    through the week of May 18th to be the person to be

6    coordinating these roundtables going forward.  Correct?

7    A.   As this plan was put together, this was about whoever was

8    the local leader in charge should have these particular

9    responsibilities.  And the timelines associated with that.

10        Obviously through time and the decisions that were made,

11   it did not extend to the 5/18 or whatever the date is that you

12   just shared.

13   Q.   She was also told to leverage her local Black Partners

14   Network connections for continuing the conversations of race

15   relations, inclusion and community.  Correct?

16   A.   Yes.

17   Q.   Did you believe at this time that she was failing in her

18   ability to leverage local Black Partners Network connections?

19   A.   No.

20   Q.   Did you believe that she was doing a good job of

21   continuing the conversations of race relations, inclusion and

22   the community at this time?

23   A.   Say that again, I'm sorry.

24   Q.   Did you believe that she was doing a good job of

25   leveraging the local Black Partners Network for continuing the

1   conversation of race relations, inclusion and the community at

2   this time?

3   A.   I would say there was a concern that had already been

4   expressed, this plan or actions that she was assigned to do.

5        The assessment that she was doing a good job was not the

6   assumption when these action plans were made.  It was about

7   assigning responsibility.

8   Q.   So are you saying that she was doing a terrible job?

9   A.   I'm not -- I'm sorry.

10  Q.   Is she doing a terrible job at this point and you put her

11  on as an ongoing basis to leverage the local Black Partners

12  Network for continuing the conversation of race relations,

13  inclusion?

14  A.   I'm saying I was not in a position to assess whether she

15  was doing a good or bad job with BPN.  At my level I had no

16  exposure to her interaction with BPN or conversations therein.

17  I wouldn't be able to comment.

18  Q.   So as far as you know, she was doing a good job.  Nobody

19  told you otherwise?

20  A.   No one told me otherwise, no.

21  Q.   When the settlement happened with the two men that came

22  in the store and were arrested, that was big news in Starbucks

23  as well, when the settlement occurred.  Correct?

24  A.   Yes.

25  Q.   And the CEO, he released a public, actually joint

 1   statement with the two men who reached the undisclosed

 2   monetary settlement.  Correct?

 3   A.   Yes.

 4   Q.   And that occurred, you recall, on May 2nd?

 5   A.   I assume so.

 6   Q.   Okay.

 7   A.   The dates are a little rusty for me.  I apologize.

 8   Q.   Do you recall the two men going on Good Morning America

 9   to talk about the settlement that was reached with Starbucks?

10   A.   I did not see it, but I do recall that they were on

11   television to talk about it.

12   Q.   Did you hear that as part of the communication that the

13   men gave on Good Morning America was letting the public know

14   that the CEO had promised to be a personal mentor to them

15   going forward?

16   A.   Yes.

17   Q.   And that was important for the CEO's public image, that

18   he would be mentoring these two gentlemen going forward.

19   Correct?

20   A.   I don't know what his motivation -- but I do know he had

21   offered to be their mentor.

22   Q.   And that there were public statements released to that

23   effect, that that is what the CEO of Starbucks would be doing

24   going forward?

25   A.   I would agree with the public statement.

1   Q.   And would you agree that the public statement of the CEO

2   at this time was that this wasn't just the end of the

3   situation, this was the beginning of making sure that there

4   was no bias in decision-making happening in Starbucks.

5   Correct?

6   A.   That was his want and need, to improve on the education

7   in that D, E and I space, yes.

8   Q.   And you'd agree with me that his want and need was also

9   that actions be taken.  Correct?

10  A.   Yes.

11  Q.   And he didn't just want for it just to be a statement but

12  actually for things to actually occur, actions to actually

13  happen going forward after the May 2nd settlement.  Correct?

14  A.   Yes.

15  Q.   And two days after this, isn't it true that you

16  communicated about a decision that had been made to terminate

17  Shannon Phillips?

18  A.   Yes.

19  Q.   And Ms. Phillips, between the time of the Philly Action

20  Plan and this decision to terminate, at least two of the days

21  she was out.  Correct?  Do you know that?

22  A.   What do you mean, she was out?

23  Q.   She was tapped out.

24  A.   She took time off, is that what you're saying?

25  Q.   Yes.

*Smith - Direct*                                                       597

 1  A.   Yes.

 2  Q.   Are you familiar with the phrase "tap out" in Starbucks?

 3  A.   I didn't use that phrase, but I know others have.

 4  Q.   Okay.  And in fact, the next day after the settlement,

 5  you sent an email -- I'm going to show you Exhibit 90.

 6       This is an email that you sent to Camille Hymes in

 7  regards to the Philadelphia additional support plan, and you

 8  say now would eliminate Shannon from these actions.

 9       Would add that your peer VPs be rotating in market

10  throughout the next 45 days.  We can leverage Christa in your

11  peer group, would get Marcus in as quickly as possible based

12  on his experience in crisis situations.

13       Would also make note of what you will be doing post the

14  training on May 29th.

15       I plan to travel in that week to support.  That part of

16  your document does not have to be detailed but want to

17  demonstrate that you are thinking ahead.

18       Do you see that?

19  A.   Yes.

20  Q.   And so she was eliminated from plans the day after the

21  announcement of the CEO.  Right?

22  A.   Yes.

23  Q.   And is it true that the decision to terminate

24  Ms. Phillips was something that you were -- obviously her boss

25  Camille Hymes was a part of but you were also a part of.

```
 1   Correct?

 2   A.   Yes.

 3   Q.   And also was Rossann Williams a part of.  Correct?

 4   A.   Yes.

 5   Q.   Is it typical for the termination of a regional director

 6   to rise all the way up to the level of an executive VP for

 7   awareness?

 8   A.   It depends on the severity.  It wasn't the first and

 9   probably won't be the last.

10   Q.   It's not normal, though, the executive vice president

11   having input into the termination of a regional director.

12   Correct?

13   A.   It is atypical but it does happen, depending on the

14   severity of the situation.

15   Q.   And the severity of the situation, this was a severe

16   situation, and therefore Rossann Williams was brought on

17   board?

18   A.   Yes.  In the Philadelphia market situation, Rossann was

19   very much informed and knowledgeable of what was going on.

20   Q.   And the severity of the situation, are you saying the

21   situation in Philadelphia or the severity of the misconduct of

22   Shannon Phillips?

23   A.   I think the situation in Philadelphia was anything and

24   anyone associated with how severe it was.  And there was a

25   people issue, a lack of leadership, and, yeah, I would
```

 1  consider that severe.

 2      And Rossann had been in market several times, so she was

 3  already involved and already knew many of the -- many of the

 4  partners.  So it was pretty natural for that.

 5  Q.   Would you describe the reason for terminating

 6  Ms. Phillips is that she engaged in severe misconduct?

 7  A.   Those would not be my words, severe misconduct.  She did

 8  not lead.  She did not demonstrate leadership skills

 9  specifically through crisis.

10      We also had understood and uncovered some of the

11  operational standards were of concern too, from store manager

12  approach and RD -- not RD approach.  Store manager approach

13  and DM approach, not being implemented, et cetera.  So I would

14  not say severe misconduct.

15      It wasn't misconduct.  It was lack of leadership, and

16  you're overseeing 100- $150 million portfolio, you need to

17  rise to the occasion.

18  Q.   So it was not misconduct then?

19  A.   I would not categorize it as misconduct.

20  Q.   Would you categorize it as she was not -- strike that.

21      When you're looking at this Exhibit 90, does it indicate

22  to you that -- or when you were responding back to Camille

23  Hymes here, that you were giving her advice and strategy on

24  how to respond and document her own actions at this time?

25  A.   Yes.

1  Q.   And so you were coaching her through this situation so

2  that she would have the -- you say:  demonstrate that you were

3  thinking ahead.  Correct?

4  A.   Yes.  This was going out to a large audience.  She was

5  sending it to me to review and to make sure there were not

6  things that were missed or what could be added.

7  Q.   And the thing that she was sending out to a large group

8  was -- included her in the plan as of this time of May 3rd,

9  that there would be rotational office hours, correct, by

10 Ms. Phillips where people could come in and share their

11 thoughts?

12 A.   Yes.

13 Q.   And so as of this time, May 3rd, it seems that Ms. Hymes

14 was including her in the plan.  You'd agree with that.  Right?

15 A.   Yes.

16 Q.   But then that is what you were saying along, that you

17 want to eliminate her from those plans?

18 A.   Yes.  Because the conversations were already happening

19 over the last couple of weeks, quite frankly.  So at this

20 point, knowing what was coming, that's why I had advised that.

21 Q.   Is there any similar coaching, email or document that was

22 ever given to Ms. Phillips to help her with these alleged

23 leadership issues that you said that she had, to help her

24 improve, get better or meet your expectations?

25 A.   They wouldn't have come from me, because I'm not her

Smith - Direct                                          601

```
 1   direct supervisor, and I don't know what Camille had sent
 2   directly to her via email.
 3   Q.   If Camille failed to provide guidance to Ms. Phillips in
 4   the same way that you were providing guidance to Ms. Hymes
 5   here in order to help her improve and get better, that would
 6   be a failure by Ms. Hymes.  Correct?
 7   A.   I would say I -- Camille or Ms. Hymes has shared with me
 8   conversations that she's had with Shannon about her concern
 9   around her performance.  I don't have the emails specific to
10   that, but she has verified -- or did verify with me when she
11   would have conversations with Shannon, because we were all
12   concerned.  And so --
13   Q.   I'm talking about specifically is there a corresponding
14   email which you have any awareness of that Ms. Hymes would
15   have sent to Ms. Phillips?
16   A.   I do not have awareness of that, no.
17   Q.   And then on the -- Exhibit 22, Jen Frisch sends an email
18   to you on May 4th and says:  Hi Zeta - I have engaged Legal so
19   I'm happy to talk through that with you yet today, over the
20   weekend, or on Monday.  I'll be in Philly next week so I'm
21   happy to partner with Camille and Paul on this moving forward.
22        So was the decision to terminate her made on the 3rd or
23   the 4th, the day you eliminated her from the plans or the next
24   day?
25   A.   The decision to terminate still had not been -- we had
```

 1  not had that conversation yet, so...

 2  Q.   Well, the top email from Jennifer Frisch to Paul Pinto

 3  says:  Zeta called me today from Philly asking me to engage on

 4  a separation package for Shannon.

 5  A.   Right.  So we still needed to get all that information to

 6  then present.

 7  Q.   Okay.  But when you're getting information together to

 8  present for a separation package, that means a decision to

 9  terminate someone, fire someone, has been made?

10  A.   Yeah.  I was thinking it needed to be made official when

11  you have the conversation with the person.

12  Q.   Okay.  I'm not talking about relaying the decision to

13  terminate.

14  A.   I see.

15  Q.   I'm talking about for you, Starbucks, when the decision

16  was made to terminate her?

17  A.   It would have either been the 3rd or the 4th for me to

18  call Jen Frisch, one of those two days.

19  Q.   And there wasn't any discussion about:  Hmm, maybe we can

20  do -- we have these certain concerns about leadership.  Let's

21  do a performance improvement plan and lay out for her exactly

22  where her failures are so that she can then see where she is

23  not getting up to expectations and then improve on that.

24       Is that ever even considered for her?

25  A.   There were coaching conversations; however, we are in

 1  crisis.  There -- things were moving very quickly, and there

 2  was not a 90-day plan that we could afford to have.

 3      This was about rising up as a leader during a crisis.  If

 4  it wasn't happening, we need to do something about that.

 5      There were conversations that were had with Shannon

 6  specifically from Camille about her concerns about

 7  performance.

 8  Q.  But no performance improvement plan was offered to her?

 9  A.  No.

10  Q.  And Starbucks has something called a coffee break.

11  Right?

12  A.  Yes.

13  Q.  And was coffee break something that you were considering

14  for her?

15  A.  It was discussed, yes.

16  Q.  A coffee break would have allowed her -- it's like a

17  sabbatical.  She could have taken a break from the Philly

18  market, from Starbucks, for a certain period of time and then

19  come back.  Correct?

20  A.  Correct.

21  Q.  She wouldn't lose her status as an employee.  Right?

22  A.  Correct.

23  Q.  She wouldn't lose her stock options.  Correct?

24  A.  Correct.

25  Q.  She wouldn't lose her other benefits, correct, her health

Smith - Direct                                604

1   benefits?

2   A.   Correct.

3   Q.   And Ms. Phillips wasn't offered a coffee break, was she?

4   A.   She was not.

5   Q.   Why not?

6   A.   So it was advised not to.  At this point, it was about

7   separating her due to performance.  So to give a coffee break

8   means to do what you just said.  You go on sabbatical and you

9   come back.  She was underperforming.

10  Q.   Let's look at 108.

11       This is an email from you on May 5th, saying:  We are

12  looking to --

13       This is to Frisch, who's in HR.  Right?

14  A.   Uh-huh, yes.

15  Q.   We are looking to expand Shannon's package to 6 months.

16  There was an additional discussion today with Camille and

17  Rossann.  We want to make this as lucrative as possible, with

18  peace of mind that she will be financially sound.  Rossann

19  also mentioned "coffee break" as an option, which should also

20  be considered as part of the package.  Paul, Nathalie and

21  Camille are aware of this change in direction.

22       Just wanted to circle back with you as discussion has

23  changed things a bit.

24       See that?

25  A.   Yes.

1    Q.   Discussion with whom?

2    A.   Just wanted to circle back with you as discussion has

3    changed a bit.

4         I was -- I was implying what Rossann had brought up with

5    coffee break as an option, so I wanted to circle back with her

6    on that.

7    Q.   So Rossann was in favor of coffee break?

8    A.   She had mentioned it as an option.

9    Q.   Okay.  And you wanted to make this as lucrative as

10   possible?

11   A.   Yes.

12   Q.   Because you wanted her to sign it.  Right?

13   A.   When someone's getting separated, you always want to make

14   sure you're doing your best with the -- you know, that they

15   can financially be okay until they find another opportunity,

16   so...

17   Q.   Anytime anyone separated from Starbucks, Starbucks is

18   interested in making sure that that employee is financially

19   okay after the termination?

20   A.   I think it depends on the particular situation.

21   Q.   If somebody is failing so bad in their performance that a

22   coffee break can't be extended, but Starbucks is saying:  We

23   want to instead give them a very lucrative, as lucrative as

24   possible, severance package.  Correct?

25   A.   Uh-huh, yes.

 1  Q.   And that's intended to make sure that that person signs
 2  the severance package.  Correct?
 3  A.   I think there's an incentive there.
 4  Q.   Because the severance signage would include a release
 5  agreement that would release any and all claims that the
 6  person could have against Starbucks.  Correct?
 7  A.   Yes.
 8  Q.   And the release agreement would also include a promise
 9  from Ms. Phillips never to talk about anything that ever
10  happened at Starbucks.  Correct?
11  A.   Yes.
12  Q.   Is there anyone else at Starbucks who is engaged in such
13  performance issues that they must be terminated that you have
14  sought to make sure they have a severance package that is as
15  lucrative as possible or is Shannon Phillips the only one?
16  A.   In the entire company?
17  Q.   Somebody else who was engaged in behaviors that required
18  termination, but at the same time, Starbucks is looking to get
19  them to sign a severance package as lucrative as possible?
20          MR. HARRIS:  Objection.
21  BY MS. MATTIACCI:
22  Q.   Has that ever happened, to your knowledge?
23          MR. HARRIS:  Objection, Judge.
24          THE COURT:  Overruled.
25          THE WITNESS:  That would be very hard for me to say

 1   about a global company that I don't know specifics on.

 2          I do know of people who received a severance.

 3   BY MS. MATTIACCI:

 4   Q.   Who have engaged in misconduct or conduct that is as

 5   severe as Starbucks is alleging that Ms. Phillips engaged in

 6   here?

 7   A.   I wouldn't know.

 8   Q.   Then, Frisch says:  I would strongly recommend we do not

 9   go down the coffee break option.  Happy to talk to you.

10          Do you see that?

11   A.   Yes.

12   Q.   And that is because she couldn't have this coffee break

13   because of the level of behaviors that she was engaged in?

14   A.   Yes.  That's what was -- that's what she explained to me.

15   Q.   And, ultimately, the most that Ms. Phillips was offered

16   was six months.  Correct?

17   A.   I believe so.

18   Q.   She didn't sign it.  Correct?

19   A.   I believe she did not.

20   Q.   Now, during this time, you're saying that Ms. Hymes's

21   performance, you had no problems whatsoever with Ms. Hymes's

22   performance.  Correct?

23   A.   I did not.

24   Q.   There was shared with you, wasn't it, that there were

25   some feedback in these roundtables that implicated or pointed

*Smith - Direct*                                    *608*

```
 1   to concerns around Paul Sykes's performance.  Correct?

 2   A.   Can you repeat that, I'm sorry?

 3   Q.   It was shared with you that there were concerns about

 4   Paul Sykes's performance around this time.  Correct?

 5   A.   Yes.

 6   Q.   And there was talk about moving him out of Philly to a

 7   suburban store.  Correct?

 8   A.   Correct.

 9   Q.   But they still wanted him to be employed at Starbucks.

10   Correct?

11   A.   Yes.

12   Q.   And they did not want to fire him.  You would agree with

13   me.  Correct?

14   A.   Not at the time, no.

15   Q.   Not at any time did Starbucks fire Mr. Sykes?

16   A.   I know he's no longer with the company, but I don't know

17   why he exited.

18   Q.   You don't have any knowledge that he was terminated.

19   Correct?

20   A.   I do not.

21         MS. MATTIACCI:  I don't have any further questions,

22   Your Honor.

23         Thank you.

24         MR. HARRIS:  If I may?

25         THE COURT:  You may.
```

```
 1                     CROSS-EXAMINATION
 2   BY MR. HARRIS:
 3   Q.   Ms. Smith, good afternoon.
 4   A.   Good afternoon.
 5   Q.   Can you describe to the ladies and gentlemen of the jury
 6   what your current role is?
 7   A.   So I'm the CEO of Sodexo, S-O-D-E-X-O, the Seniors
 8   division, with responsibilities of about 500 million.
 9   Q.   And as the CEO of Sodexo's Seniors division, can you
10   describe specifically what your responsibilities are?
11   A.   So I have P&L responsibilities.  I have 400 clients.  I
12   have 500 senior living communities that we provide dining and
13   maintenance services to.
14   Q.   How many employees report up to you?
15   A.   About 4,000.
16   Q.   And how many -- 4,000 people report to you specifically
17   or in your division?
18   A.   Oh, I'm sorry.  In my division, ten direct reports.
19   Q.   Okay.  And you have 4,000 people that are actually part
20   of your profit and loss responsibilities?
21   A.   Correct.
22   Q.   Okay.  And can you tell us -- dating back to your employ
23   with Starbucks Corporation, can you tell us the last position
24   that you held?
25   A.   It was -- and I don't remember the title, but I was in
```

*Smith - Cross*            *610*

 1  charge of the urban market or what we call the city strategy.

 2  Q.   And what does that entail, ma'am?

 3  A.   So there was a focus on the performance, which had been a

 4  challenge for our urban markets because they were café-onlys,

 5  and trying to understand how to generate a better business

 6  model within the city strategy.

 7  Q.   Can you describe to us some of the strategies that you

 8  employed in that role?

 9  A.   Some of the -- say that again.

10  Q.   Can you describe to the ladies and gentlemen of the jury

11  some of the strategies that you employed in that role?

12  A.   Some of the strategies in working with my team or the

13  strategies of the actual urban market?

14  Q.   Of the urban market first.

15  A.   Of the urban market.  Okay.

16  Q.   And then your team.

17  A.   So this was about labor and what does the labor model,

18  what should that look like.  What should the customer

19  experience look like, what should the layout of a location

20  look like from a safety and security aspect.

21       So there was a lot of work to be done, but we just kind

22  of started creating that framework before I had left the

23  company.

24  Q.   And how did you exit the company, if you can recall?

25  A.   There was a reorganization in 2018, in the fall of 2018.

Smith - Cross                                    611

 1  Q.  So after April of 2018 your role was actually eliminated

 2  or reorganized?

 3  A.  Yes.  So my role in June 2018 went from being a senior

 4  vice president to the role that I was overseeing, the city

 5  strategy, from June 18th to the end of September '18, 2018.

 6  Q.  Can you describe to us what the expectations are as it

 7  relates to you and your reporting structure up in the

 8  organization in the last role that you held as of April of

 9  2018?

10  A.  So which role are we referring to, sir?

11  Q.  That's a good question.

12      As of April 12, 2018, that role specifically.

13  A.  That role -- repeat the question.

14  Q.  Sure, I'll try to.

15      On April 12th of 2018 as I understand it, you reported up

16  to Rossann Williams?

17  A.  Correct.

18  Q.  Can you describe what that reporting relationship was and

19  what the expectations were from Rossann to you?

20  A.  Yes.  So I was in charge of seven regional -- regions

21  over 37 states.

22      We had a US strategy that I was in charge of executing,

23  so that as an example would be how do you drive the

24  performance of drive-through transactions, or what is the

25  customer count -- the average customer count in a location.

*Smith - Cross*                                                    *612*

```
 1        So there was a P&L piece.  There's a people development

 2   piece.  There's a -- I mean, you're driving the business in

 3   the particular KPIs and then bringing strategy to life.

 4   Q.  Ms. Hymes previously testified that at each level of the

 5   organization, the responsibilities of strategy go up and

 6   tactics or operational design go down.

 7        Would you agree with that statement?

 8   A.  True statement.

 9   Q.  And as the organization at each rung, how does culture

10   fit into your responsibilities in driving results?

11   A.  Culture is very important.  And actually I think that's

12   probably one of my top responsibilities is helping to create

13   the culture for the employees that I am responsible for.

14   Q.  And what does that look like, so the jury understands?

15   A.  So I think for me, it was, you know, developing a

16   people-first culture, how do we care and respect for one

17   another.  Having a results-driven environment where, you know,

18   we have goals and we want to achieve and how can we achieve

19   those, but you're basically setting kind of the vision and

20   then working together, how are you going to achieve it.

21   Q.  And as I understand the organization and design of

22   Starbucks when you were working there last, the district

23   manager -- district managers are peers.  Correct?

24   A.  District managers --

25   Q.  System-wide.
```

 1  A.   Yes.

 2  Q.   They're peers?

 3  A.   Correct.

 4  Q.   These district managers actually report up to the

 5  regional directors?

 6  A.   Correct.

 7  Q.   Do you recall how many regional directors as of April

 8  2018 -- April and May of 2018 that there were in the

 9  organization?

10  A.   I believe 160.  I had 80 of them.

11  Q.   You said 160?

12  A.   Yes.

13  Q.   The district managers report up to the regional

14  directors?

15  A.   Yes.

16  Q.   Is the job responsibilities of the district manager

17  materially different than the job responsibilities of the

18  regional director?

19  A.   Materially different?

20  Q.   In terms of strategy versus operational requirements.  Do

21  you understand that question?

22  A.   I do.  When you say "materially," now it's -- I'm not

23  sure.

24  Q.   Well, just strategic.  When I -- okay.

25       My words, not yours.

 1   A.   Okay.

 2   Q.   When I'm talking about strategy, the focus would be

 3   higher towards strategy the higher up you go in the rung.

 4   Correct?

 5   A.   Correct.

 6   Q.   So the district manager strategic responsibilities are

 7   greater than the --

 8   A.   Store manager.

 9   Q.   Than the store managers?

10   A.   Yes.

11   Q.   And the store manager is greater than the assistant store

12   manager?

13   A.   Correct.

14   Q.   And the regional directors' strategic responsibilities

15   are more than the district manager?

16   A.   That is correct.  And the difference is a district

17   manager will oversee, let's say, ten stores or what have you.

18        A regional director will have 100 or so.  So by

19   definition, you have to elevate yourself in creating more in

20   the strategic space, because you can't go to every single

21   store every single day.

22   Q.   When you say "strategic," what does that mean to you?

23   A.   That means setting direction, that means creating kind of

24   this overall vision for the market that -- you know, that the

25   teams would follow.  You're not kind of in the weeds with the

1   day-to-day tactics and details.

2   Q.   When you saw Ms. Phillips's performance after -- during

3   the crisis that was occurring in Philadelphia, did you see

4   her -- I'm going to say that again near a microphone.

5        When you saw Ms. Phillips during the time period of April

6   of 2018 through May of 2018, did you see her engaging in

7   strategic activities versus tactical?

8   A.   No.

9   Q.   No to which part of that question?

10  A.   The strategic part.

11  Q.   Okay.  And was that your expectation?

12  A.   My expectation was, you should be -- you should have the

13  tactics piece because there was so many things going on but

14  you also needed the strategic piece of the planning and the

15  setting direction and where are we going.

16  Q.   When you say strategic, are you referring to

17  Ms. Phillips's performance as it related to the stand-up

18  calls?  Was that an example that you provided?

19  A.   That's an example.

20  Q.   What would your expectations have been of her during the

21  performance of those calls?

22  A.   That she was facilitating the call, that she was setting

23  the tone for the call, that she was setting the expectations

24  and what goals are we trying to achieve.  Here is the action

25  plan, following up on at that, more in a -- I keep saying the

Smith - Cross                                          616

 1  word "leadership," but she's facilitating as opposed to being

 2  a recipient of.

 3  Q.   Was it your expectation that Ms. Phillips provide vision

 4  and direction for the market that she was responsible for?

 5  A.   Yes.

 6  Q.   Did she fail to do that?

 7  A.   Yes.

 8         MR. HARRIS:  I have no further questions.  Thank you.

 9         THE COURT:  Any redirect?

10         MR. HARRIS:  I do have one.  I apologize.  I'm sorry.

11         THE COURT:  Okay.

12         MR. HARRIS:  I spoke too soon.

13         May I show the witness what's been previously marked

14  as Joint Exhibit Number 86?

15         THE COURT:  What number?

16         MR. HARRIS:  86.

17  BY MR. HARRIS:

18  Q.   Ms. Smith, do you recognize what's being shown on your

19  screen as Joint Exhibit Number 86?

20  A.   Is this from Kevin?  I can't -- who is this from?

21  Q.   You have to look.  "To" says:  To US company operated

22  field leaders, May, and then it says:  Update from Rossann.

23         Did I read that correctly?

24  A.   Okay.  Okay.

25  Q.   Do you recall seeing this document sometime on or around

*Smith - Cross*                                    *617*

```
 1   May the 2nd of 2018?

 2   A.   Yeah.  Yes.  Excuse me.

 3           MR. HARRIS:  May this be introduced into evidence?

 4           MS. MATTIACCI:  No objection, Your Honor.

 5           THE COURT:  So admitted.

 6           (Exhibit 86 admitted into evidence.)

 7           MR. HARRIS:  May this be published to the jury?

 8           THE COURT:  Yes.

 9   BY MR. HARRIS:

10   Q.   Ms. Smith, please take a moment to read over this

11   document.

12        Does counsel refer to this distribution regarding the

13   settlement of Donte and Rashon?

14        Ms. Smith, may I read along with you?

15   A.   Sure.

16   Q.   The first line says:  I have spent many hours in stores

17   and communities listening to you, our partners, as have other

18   Starbucks leaders.

19        Did I read that accurately?

20   A.   Yes.

21   Q.   Now, as of May 2, 2018, Rossann Williams had been in the

22   market?

23   A.   Yes.

24   Q.   And she had indicated in the first line of this letter

25   the hours that she spent along with you and other leaders.
```

*United States District Court*

1        Is that accurate?

2   A.   That's accurate.

3   Q.   It also says, if I go down to the second paragraph:  On

4   April 12th a disheartening situation occurred.

5        Do you see that?

6   A.   Yes.

7   Q.   In one of our Philadelphia stores where two of our

8   customers were not treated with dignity and respect.

9        The language that's listed in that second paragraph, was

10  that strategic or tactical?

11  A.   The dignity and respect piece?

12  Q.   Yes.

13  A.   That was strategic.

14  Q.   And that dealt with culture, did it not?

15  A.   Yes.  Correct.  Part of our...

16  Q.   As we go down the next paragraph, where it says:

17  Starbucks has taken full accountability for this experience

18  and committed to make this right.

19        Again, strategic or tactical?

20  A.   Strategic.

21  Q.   The next paragraph -- further on in that document where

22  it says:  Today all constructive conversations and mediation,

23  Starbucks reached an agreement.

24        The fact that an agreement was reached, was that

25  strategic or tactical?

*Smith - Cross*                                         *619*

 1   A.   That could --

 2   Q.   That could be both?

 3   A.   Yes.

 4   Q.   Okay.  So the expectation of leaders is to do both,

 5   strategic and tactical?

 6   A.   Uh-huh.

 7   Q.   Would that be accurate?

 8   A.   Yes.

 9   Q.   To drive the performance of the business?

10   A.   Correct.

11   Q.   To ensure that the culture is being adhered to?

12   A.   Yes.  Very important.

13   Q.   Next paragraph, please.

14        The last statement in that paragraph:

15        This agreement is an important step that allows both

16   sides to move forward.

17        Again, strategic or tactical?

18   A.   Strategic.

19   Q.   As we prepare for the next step, the sessions in our

20   stores on May 29th, I want to address the questions I've been

21   hearing.  Many asked about facilitating or teaching these

22   sessions, so I want to be clear that we are not planning a

23   traditional training session.

24        Again, strategic or tactical?

25   A.   That's tactical.

*Smith - Cross*                                             620

```
 1   Q.   Okay.  For these reasons, no partner will be asked to
 2   lead or facilitate.  Strategic or tactical?
 3   A.   Tactical.
 4   Q.   The fact that you're actually having and shutting down
 5   the stores, was that a strategic decision or a tactical one?
 6   A.   That was strategic.
 7   Q.   And that came from at the top?
 8   A.   Correct.
 9   Q.   As it relates to the responsibilities of the leaders in
10   the organization, you spend most of your time doing what?
11   Strategy or tactics or both?
12   A.   Yeah, you have to have both.
13   Q.   Was it the expectation that Ms. Phillips during the time
14   of the crisis would spend her time doing both strategy as well
15   as tactics?
16   A.   No.
17   Q.   It was not, in your estimation?
18   A.   Repeat the question.  I thought I heard --
19   Q.   Sure.
20        Was it your expectation that she would spend her time
21   doing both strategy --
22   A.   Yes.  I thought you said:  Did she spend her time.
23   Q.   Okay.  Well, then I'm going to ask that next.
24   A.   Okay.
25   Q.   Did she spend her time doing both strategy and tactics
```

*United States District Court*

```
 1   between the time period of April 2018 and May of 2018?

 2   A.   No.

 3            MR. HARRIS:  I have no further questions.  Thank you.

 4            THE COURT:  Any recross?

 5            MS. MATTIACCI:  Just briefly, Your Honor.

 6                        REDIRECT EXAMINATION

 7   BY MS. MATTIACCI:

 8   Q.   Looking at this document --

 9            MS. MATTIACCI:  I have to get the screen up, Your

10   Honor, sorry.

11   BY MS. MATTIACCI:

12   Q.   This is the document that counsel just showed you from

13   May 2, 2018 and -- announcing the settlement with the two men.

14        This is coming from Rossann Williams.  Correct?

15   A.   Yes.

16   Q.   Way up in Starbucks, correct, up at the top of the food

17   chain there?

18   A.   Yes.

19   Q.   And you agree -- I think one thing we can agree on,

20   Ms. Smith, is that everything that Starbucks was doing as of

21   May 2, 2018 was strategic.  Correct?

22   A.   That everything was strategic?

23   Q.   Yep.

24   A.   I think there was strategy and tactics involved.

25            MS. MATTIACCI:  No further questions, Your Honor.
```

Smith - Redirect                                        622

```
 1            MR. HARRIS:  I have no further questions either.

 2            THE COURT:  All right.  You may step down.

 3            THE WITNESS:  Thank you.

 4            (Witness excused at 2:42 p.m.)

 5            THE COURT:  Next witness.

 6            MS. MATTIACCI:  Your Honor, our next witness is

 7  Mr. Sykes, but he's not available until 4:00, so we -- I told

 8  defense counsel, I would be happy to have his witness out of

 9  turn if he wanted to fill the time slot, Your Honor.

10            MR. HARRIS:  Judge, I don't have a witness available

11  today.

12            MS. MATTIACCI:  Well, he has his corporate designee.

13            MR. HARRIS:  I don't plan on calling my corporate

14  designee first.

15            THE COURT:  Oh.  Well, members of the jury, it's now

16  12:42 (sic).  And as often happens in a trial of a case, so

17  many people have to be accommodated in terms of witnesses and

18  the order of the presentation of witnesses that we do run into

19  periods of time where we have to make a decision on what to

20  do.

21            Sometimes it's at the end of the day, sometimes it's

22  early in the day, sometimes it's in the afternoon, like it is

23  now.

24            And, again, I don't like to not proceed, but my

25  understanding is Mr. Sykes will appear by video?
```

```
 1          MS. MATTIACCI:  Yes, Your Honor.  By Zoom.

 2          THE COURT:  By Zoom.  On the screens?

 3          MS. MATTIACCI:  Yes, Your Honor.

 4          THE COURT:  Okay.  And this is not recorded.  This is

 5   live.  Right?

 6          MS. MATTIACCI:  Correct.

 7          THE COURT:  All right.  So what we'll do is we'll

 8   take a recess.  I'll ask you to come back at a quarter to

 9   4:00.  I don't want to just keep you in the room back there

10   waiting.

11          You can go outside if you wish, or -- even though I

12   understand there's some problems with the quality of the air.

13          But, you know, we're going to take a break now until

14   4:00.  But I'd ask you to come back at a quarter to 4:00 so we

15   can start sharply.

16          I think counsel have indicated to me that Mr. Sykes's

17   testimony will be approximately a half hour, so that would

18   keep us on track.

19          And, again, we'll start again fresh tomorrow morning

20   at 9:15.

21          All right.  So why don't we stand in recess until

22   4:00, but I'll ask you to come back to the jury room at

23   quarter to.

24          (Jury out.)

25          THE COURT:  All right.  We'll stand in recess.
```

```
 1              MS. MATTIACCI:  Thank you, Your Honor.

 2              (Recess at 2:45 p.m. until 4:01 p.m.)

 3              Let's bring in the jury

 4              (Jury in.)

 5              THE COURT:  Please be seated.

 6              All right.  I just want to thank the jury for their

 7   patience during this process.  We try to move along the cases

 8   expeditiously but as fairly as we can.

 9              So how do you wish to proceed now?

10              MS. MATTIACCI:  Mr. Sykes?

11              THE WITNESS:  Yes?

12              MS. MATTIACCI:  Okay.  We lost your video for one

13   second.

14              (A discussion off the record occurred.)

15              MS. MATTIACCI:  I think if we just speak loud and

16   clearly, it would be okay.

17              THE WITNESS:  Okay.

18              MS. MATTIACCI:  There seems to be a little delay.

19   Okay.

20              THE DEPUTY CLERK:  Mr. Sykes, can you hear me?

21              THE WITNESS: Hello?  I can.

22              THE DEPUTY CLERK:  Good.  My name is Matthew Higgins.

23   I'm Judge Slomsky's courtroom deputy.

24              THE WITNESS:  Nice to meet you.

25              THE DEPUTY CLERK:  Okay.  And I'm going to ask you to
```

*Sykes - Direct*                                                 625

```
 1   raise your right hand.  Thank you.

 2           (PAUL SYKES, PLAINTIFF'S WITNESS, having been duly

 3   sworn, testified as follows:)

 4           THE DEPUTY CLERK:  Now I'm going to ask you to state

 5   and spell your name.

 6           THE WITNESS:  My name is Paul Sykes, P-A-U-L, last

 7   name S-Y-K-E-S.

 8           THE DEPUTY CLERK:  Terrific.  Thank you.

 9           THE WITNESS:  No problem.

10                       DIRECT EXAMINATION

11   BY MS. MATTIACCI:

12   Q.  So, Mr. Sykes, just to orient the jury, I'm stepping

13   aside to show them an organization chart.

14       And you reported directly to Shannon Phillips during

15   April and May of 2018.  Correct?

16   A.  That is correct.

17   Q.  And right directly below you was Holly Hylton at that

18   time.  Correct?

19   A.  That is correct.

20   Q.  You were employed by Starbucks from June of 2003 until

21   June of 2018.  Correct?

22   A.  That's correct.

23   Q.  So that was about 15 years?

24   A.  That's correct.

25   Q.  Now, when you left Starbucks, that was voluntary for you.
```

 1  Correct?

 2  A.   That is correct.

 3  Q.   You were not terminated by Starbucks?

 4  A.   Correct.

 5  Q.   Is it true that Ms. Phillips supervised you for three

 6  years prior to April of 2018?

 7  A.   Yes.  Yes, she did.

 8  Q.   Can you describe for the jury the type of boss that

 9  Ms. Phillips was during those three years?

10  A.   Yeah.  She was probably one of my top two leaders.  She

11  was extremely supportive, really genuine.  Every time she went

12  into a location with me when we would tour, she had a really

13  great relationship with the people in our locations.  Everyone

14  was really receptive of her.  And I learned a lot when I would

15  tour with her.  I found her very, very easy to talk to, very

16  easy to share any opportunities that were going on with my

17  district.  I could be completely vulnerable.  She would give

18  me great feedback.  Whether it was critical or opportunistic,

19  I knew it was coming from a good place, and I was never

20  intimidated.  I felt really supportive of her.

21  Q.   And in particular, did you find her to be approachable?

22  A.   Oh, yes, absolutely.

23  Q.   Did you consider her to be supportive of your career

24  development?

25  A.   Yes.

*Sykes - Direct*                                    *627*

1  Q.   Did you ever feel that Ms. Phillips treated you

2  differently because of your race?

3  A.   Not at all.  Quite the opposite.

4  Q.   Have you in the time that you worked for Ms. Phillips

5  observed her treat any employee differently and conclude that

6  she was treating that employee differently because of her race

7  or his race?

8  A.   No, none.

9  Q.   In the time that you were working under Ms. Phillips and

10  including April and May of 2018, did you ever hear any of your

11  coworkers or subordinates complain about Ms. Phillips?

12  A.   Never.

13  Q.   Can you explain to the members of the jury what it was

14  like day to day in April and May of 2018 in the aftermath of

15  the arrests that occurred on April 12th?

16       And if you could speak slowly, just because the audio is

17  a little bit delayed.

18  A.   Yes.  It was extremely stressful.  I tried to block a lot

19  of that out because it was so -- it was such a stressful time

20  in my life.  We were working -- when I say "we," I mean

21  Shannon, myself and my former peer at the time, Ben Trinsey,

22  we were working around the clock, seven days a week, from open

23  to close in our locations, supporting our team members,

24  supporting our partners.

25       I myself -- my phone number was leaked.  Well, as a

```
 1  district manager, we had our business cards out, and so my

 2  phone was called consistently, literally 24/7, like all hours

 3  of the night.

 4       And I remember initially when it started, I thought, oh,

 5  okay.  This will die down.  And it just kept and kept and kept

 6  going, and it would not stop.  And it caused a level of

 7  anxiety for me because it was just constantly ringing.

 8       And I remember at the time, I had -- you know, I had been

 9  a district manager.  At that time, it was year 11, and I'd had

10  that number for 11 years, so I didn't want to change it just

11  because it was so much a part of what I did.  And I remember

12  talking to Shannon about it, and she offered to have my number

13  changed, but I said no.  I said, because I -- you know, I

14  thought this at some point will end, and I wanted to keep the

15  number that I've had for 11 years.  I knew it very well.

16       But it was -- I say that to say it was just a very, very

17  stressful time, a time, quite honestly, I wanted to block out

18  and never revisit.

19  Q.  Did you ever answer any of the calls that were coming in

20  to you where people found --

21  A.  I did.

22  Q.  And what was the sentiment that they were expressing?

23  A.  They wanted me to terminate the manager, Holly.  They

24  essentially -- they wanted her head on a stick.

25       And every voicemail, every -- when I did pick up the
```

1  phone or listen to the voicemails, it was:  Why is she working

2  here?  She needs to be fired.  You need to terminate her.

3  Every single message.

4  Q.   Do you believe that in your firsthand experience of being

5  in the Philadelphia store during April and May of 2018, that

6  Shannon Phillips was physically present in the Philadelphia

7  market during that time?

8  A.   Yes.  She was there around the clock.

9  Q.   And did you have the impression that Shannon Phillips had

10 checked out in any way?

11 A.   Never.  She was my support.  You know, she was what I

12 leaned on.  As well as she was supporting me, she was

13 supporting all the team members, all the managers and the

14 partners that were impacted.

15     And I know that that was probably a great deal of

16 emotional things on her, because, you know, she was my leader,

17 so I downloaded on her.  She was there as much as me.

18     When they finally, I think, maybe allowed me to have a

19 day off whenever I'd been working repeatedly, she hadn't had a

20 day off at that point.  I actually went first.  I don't know

21 when she eventually got a day off, but it was probably two

22 weeks at least of working straight from open to close around

23 the clock.  And she was there with me and Ben from open to

24 close every day.  I don't actually know when she actually got

25 a break.

Sykes - Direct                    630

1   Q.   Did you ever think that Ms. Phillips failed to understand

2   the seriousness of the arrests of the two men and the

3   aftermath?

4   A.   No, I did not.  No.

5   Q.   Did you feel that Ms. Phillips provided the emotional

6   support to you and the other partners that were needed in

7   Philadelphia during the April and May 2018 time frame?

8   A.   I did.  I don't think I could have been -- I don't think

9   that I could have processed and have gone through that

10  experience at that time without her being there, just because

11  she was there and she was someone for me to talk to.  And she

12  just provided a lot of emotional support, not only to myself

13  but to the team members.  She was very supportive.  Everybody

14  really, really loved Shannon.

15  Q.   Do you believe that Ms. Phillips's race played a role in

16  her termination?

17  A.   I do.  I think -- it's interesting, because it happened

18  in my district, but I remember like scratching my head at the

19  time, because my peer, all of a sudden, Ben Trinsey was let go

20  during this process.  And I remember something came up with

21  him with respect to race involved -- not from the partners,

22  but something associated with how we paid people.  And I

23  thought, well, we don't make any decisions around pay.  That's

24  all handled through human resources.

25  Q.   If you could slow down, Mr. Sykes, just a little bit.

*Sykes - Direct*          *631*

1    A.    Oh, I'm so sorry.  Where did I last pick up at?

2    Q.    You were talking about Mr. Trinsey's -- you heard

3    allegations of race discrimination against him.

4    A.    Yeah.  Not by any partners.  This was literally after he

5    got separated with respect to something around assistant

6    manager pay being different.

7          We didn't have any authority to dictate how people were

8    paid.  We got their resume details, gave them to partner

9    resources, and then they came up with a figure.

10         I never had any -- I'd never had any racial encounters or

11   had any perspective of racism from him and/or her.

12         It's interesting, because I can't remember what, there

13   were a lot of social organizations around the Philadelphia

14   market that had a lot of people of color there.  And Shannon

15   would go to a lot of those meetings, and she would be more

16   invested in the community, like really rough parts of

17   Philadelphia, how do we upkeep and how do we build people up,

18   how do we hire people, than sometimes even myself, you know.

19         And I was always in awe of her because she wrapped her

20   head around the community and really advocated not only to

21   hire people of color from the community but to develop them

22   into leadership positions.  She was really, really passionate

23   about that and actually inspired me to want to do better, and

24   I'm a person of color myself.

25   Q.    What were the things that led you to believe that her

 1  race, being white, played a role in her termination?

 2  A.   Because there was no reason.  Up until that point,

 3  Shannon -- I remember when we toured prior to that with

 4  Camille, Camille who was our regional vice president, was

 5  always really -- said kind things about Shannon.

 6      I had never heard about my peers at district manager, we

 7  were -- we were always kind of in awe of her.  I never heard

 8  anything with respect to race with -- about Shannon or -- I

 9  never heard anything.

10      And so when she was kind of here one day, gone the next,

11  similar to Ben, I just figured that, all right, she's kind of

12  a scapegoat.  It happened in my district and nothing was being

13  done to me.  I had the district.  And I felt so bad, because

14  my peer on the other side of me was let go, and now my boss,

15  who had been there every single day, and when Camille was

16  vigorously praising Shannon in front of me.

17      All of a sudden, I think our COO at the time came into

18  the market at one point, and then it was just gone.

19      And the public -- the public wanted accountability.

20      And I'm so sorry.  I was trying to go back and remember

21  this time.  It was really stressful.

22      But someone had to be -- someone had to -- someone had

23  to, I guess, be blamed, for lack of a better word, about the

24  situation.  And at the time I guess Holly wasn't enough, and

25  so they -- used Ben and Shannon.

Sykes - Direct                                        633

```
 1        And again, it happened in my district, and I had plenty
 2   of conversations.  Nobody even asked me about Shannon in terms
 3   of, like, how she was doing.  That's why we were all so
 4   confused when she was there one day, and then she was gone the
 5   next.  It literally came out of thin air.
 6   Q.   Do you think the fact that you're black played a role in
 7   the fact that Starbucks did not terminate you?
 8        MR. HARRIS:  Objection, Your Honor.  How can he
 9   answer that question?
10        THE COURT:  Overruled.
11   BY MS. MATTIACCI:
12   Q.   You can go ahead and answer.
13   A.   Yes, I do.  I actually remember having that conversation
14   with one of my peers when all of this was coming out.  And I
15   remember thinking to myself, well, I feel okay, and I feel
16   okay because, well, I'm black.  And obviously I didn't do
17   anything to put this out there as well, nor do I believe Holly
18   did.
19        But I know that I felt safe because there was a lot of
20   conversations about being black and showing up at work.  And
21   all those conversations that were happening at the time.  And
22   so I actually felt real safe.  But the conversations with race
23   just continued to escalate and escalate, and it seemed to me,
24   at least my point of view, it seemed that the people who were
25   closer to the situation, like Shannon, who was my boss, and
```

*Sykes - Direct*                                          634

1   maybe Ben, there just needed to be some scapegoats.  And

2   someone had to pay.

3       And I felt really comfortable and safe, even though it

4   happened in my district.  I felt that way, quite honestly,

5   because I was black and I was the only black leadership team

6   member at the DM level at the time.  And someone needed to be

7   held accountable, I guess, for the situation.  So ultimately

8   it ended up being Ben, and it ended up being Shannon.

9   Q.  Were you a part of any meetings, roundtable discussions

10  where you could hear the higher-up leaders at Starbucks

11  talking about what their desires were in terms of action?

12  A.  I was on many, many leadership roundtables at the time.

13  Again, going back to remember all of this.

14      I do remember -- I'm trying to go back.

15      I do remember, I believe his name was Paul Pinto.  And I

16  think he was a vice president of partner resources, which is

17  human resources.

18      I remember he shared with me when I didn't know that

19  Holly was terminated at the time.  And I remember he told me

20  that they made -- Starbucks had leaked to the media that Holly

21  was being separated.  That's clearly what the public wanted.

22  And then I guess the night before they had had a conversation

23  with her.  I didn't even know this until the next day.

24      And I remember that detail because I just remember

25  thinking to myself, you kind of hear that in some movies and

Sykes - Direct                                        635

 1   stuff, like people leaking things to the media.  I'd never

 2   been a part of anything that actually had that happen until I

 3   heard him say that when he said it to me.  And I thought, wow,

 4   they actually -- people actually really do that.  They leak

 5   stories to the media.

 6        He told me that about Holly.  In terms of the rest of the

 7   roundtables that I went to was essentially get out and they

 8   wanted to talk to partner -- they especially wanted to talk to

 9   black partners about that experience -- about their

10   experiences at Starbucks, but none of those conversations

11   happened until the incident happened.  And then it's like

12   let's talk to people, let's talk to people.  Let's talk to

13   people.

14        I also remember in one of the roundtables -- jogging up

15   my memory, jogging -- my memory is bad -- and I can't remember

16   who said it.  I don't know if it was Zeta or it was Camille or

17   if it was Paul Pinto, but I remember one of them saying, it's

18   better that we get out and talk to them, meaning leadership at

19   Starbucks, everyone is coming in from Seattle, than them

20   wanting to go on social media and/or talk to the media.

21   Q.   Did you ever tell Ms. Hymes that the race of the two

22   gentlemen you thought played a role in Holly's decision to

23   call 911 that day?

24   A.   No, never.

25   Q.   And why do you recall that you definitely did not tell

*Sykes - Direct*                                          636

1   her that?

2   A.   Because I remember talking to Holly after the incident

3   happened, and I remember because she was really emotional.

4   And obviously she felt really bad.  And I remember sharing

5   with her, I said, Holly, you didn't do anything wrong.  You

6   were following the policy that Seattle rolled out.  We rolled

7   it out all the way downtown, all of the downtown districts,

8   myself and Ben's district.  And I remember telling her, you

9   didn't do anything wrong, that was our policy.

10      And it's unfortunate how it happened, but that was the

11  policy that Starbucks provided us, because we had so many

12  incidents in our location in the downtown market.  And she

13  was -- it's unfortunate what happened, and she was only

14  following the policy that we rolled out.

15  Q.   Did you ever think that Mr. Trinsey did or said anything

16  that was racially biased?

17  A.   No, never.  Never.

18  Q.   And would Mr. Trinsey be able to set the pay of an

19  individual without any oversight by human resources, or

20  compensation?

21  A.   No, never.  We had to work through partner resources.

22  That was the policy.

23  Q.   Mr. Sykes, do you have any financial interests at all in

24  the outcome of this case?

25  A.   No.  None.  I'd like to put it behind me as soon as

*United States District Court*

```
 1  possible, to be quite honest with you.

 2           MS. MATTIACCI:  We appreciate your time, thank you.

 3           Mr. Harris may have some questions.

 4           THE WITNESS:  Thank you.

 5           MR. HARRIS:  Your Honor, may I use counsel's device

 6  so that I could see Mr. Sykes?

 7           THE COURT:  Yes.  I think that would be appropriate.

 8                     CROSS-EXAMINATION

 9  BY MR. HARRIS:

10  Q.   Mr. Sykes, I'm going to try to get the screen right so

11  that I can ask you a few questions.  Is that okay?

12  A.   Okay.  Absolutely.

13  Q.   All right.  Mr. Sykes, prior to you testifying today, how

14  many opportunities did you speak to opposing counsel?

15  A.   I spoke to Laura -- I think her name was Laura -- one

16  time, I think, about the logistics of, like, can you make it.

17  I know we communicated -- I don't know if it was email, when I

18  said, well, hey, here's when I'm working.

19       So she talked to me about like some logistics.  I believe

20  that's her name is Laura.  She talked to me about her

21  logistics about this meeting because I have to work and to

22  figure out when I could come in.

23       So I don't know if that was one or two times.  I've been

24  very busy with work.  But it was one or two times.

25  Q.   Okay.  And the two occasions that you spoke to
```

1  Ms. Mattiacci or her fellow colleagues, did you have a chance

2  to talk about what you'd be testifying to today?

3  A.   She just called to talk to me about my deposition and

4  just said that she did send me a copy of the deposition.

5  Q.   She did send you a copy of the deposition?

6  A.   Yes.

7  Q.   Okay.  Mr. Sykes, you indicated at the beginning of your

8  testimony that you're no longer -- that you left Starbucks I

9  believe in June of 2018.

10       Is that accurate?

11  A.   That's correct.

12  Q.   And when you left Starbucks in June of 2018,

13  Mr. Eckensberger was your supervisor, was he not?

14  A.   That's correct.

15  Q.   So he was the regional director that had replaced Shannon

16  Phillips.  Yes?

17  A.   That's correct.

18  Q.   And prior to that, as I understand your testimony, you've

19  received -- strike that.

20       When you left in June of 2018, you received a package,

21  did you not?

22  A.   I did, yes.

23  Q.   And that's a severance package?

24  A.   Yes.

25  Q.   And you received money as a result of that severance

*Sykes - Cross*                                                    639

1   package when you left the organization?

2   A.   I did, yes.

3   Q.   And how much did you receive?

4   A.   I believe it was 50,000.

5   Q.   I'm sorry, I didn't hear you.

6   A.   I believe it was 50k.

7   Q.   Okay.  And that was part of your exit out of the company.

8   Yes?

9   A.   Yes.

10  Q.   Okay.  So, sir, let me go back to the time when you were

11  working as a district manager in the organization prior to

12  June of 2018.  Okay?

13  A.   Yes.

14  Q.   All right.  And I think if I understand your role as a

15  district manager, you had approximately 11 to 13 stores under

16  your responsibility?

17  A.   That's correct.

18  Q.   And how many employees did you have?

19  A.   I don't remember.  It's probably 15 to 20 per location.

20  Q.   Okay.  So a total of how many?

21  A.   Probably approximately 2 to 240.

22  Q.   Okay.  You had 240 employees.

23       And as the regional director, Ms. Phillips was your

24  supervisor.  Correct?

25  A.   Yes, that's correct, yes.

 1   Q.   Yes.  And she approximately had roughly 1- to 2,000

 2   people under her responsibility as the regional director?

 3   A.   Okay.  Yes.

 4   Q.   I mean, you agree with that.  Yes?

 5   A.   Well, yeah.  I just -- I'm going back to thinking how

 6   many district managers we had.

 7        I believe she had eight or nine.  And so if we all had

 8   between 11 and 13 stores, then the math would -- that would be

 9   correct.

10   Q.   Right.  My math is accurate or to a -- approximately?

11   A.   Yeah, approximately, absolutely.

12   Q.   Okay.  And so the responsibilities of the district

13   manager are substantially different than the responsibilities

14   of the regional director.  Yes?

15   A.   Some -- well, I mean, I was never a regional director at

16   Starbucks, so I can't...

17   Q.   Right.

18   A.   Sure.  But I would assume that they are elevated.

19        I know that the performance expectations in terms of KPI

20   were the same.  They were just at the director level as

21   opposed to being at the district manager level.

22   Q.   Right.  And you said KPIs.

23        You're actually talking about the financial performance

24   of the organization?

25   A.   It's key performance indicator, so what we're reviewed on

*Sykes - Cross*                                        641

```
 1  from a performance perspective.

 2  Q.   I understand.

 3       And what was the size of your profit and loss

 4  responsibility for the organization that you were responsible

 5  for?

 6  A.   It's been several years, so I honestly cannot remember.

 7  I just -- I don't remember what my district did in 2018.  It's

 8  just been too long.  Honestly, I just don't remember.

 9  Q.   I understand, but I won't hold you to a specific number.

10       Can you give us the scale approximately?

11  A.   I really -- I don't know.  It's 11 to 13 stores.  I don't

12  know.  13 to 15 million probably.

13  Q.   13 million?  Is that what you said?

14  A.   Yes.

15  Q.   Okay.  And you know Ms. Phillips was responsible between

16  125 to $150 million.

17       Were you aware of that?

18  A.   I mean, if you multiply, that's what I did, to find --

19  every district is a bit different, but if that's how the math

20  adds up, then I would say yes.

21  Q.   Okay.  And so the sight lines in terms of visibility that

22  Ms. Phillips would have with leaders in the organization would

23  have been substantially different than yours.  Correct?

24  A.   I'm sorry, can you please repeat that?

25  Q.   Sure.  I said the sight lines that Ms. Phillips would
```

*Sykes - Cross*                                      642

```
 1  have in terms of leadership within the organization would be
 2  different than the sight lines that you would have in your
 3  role as the district manager?
 4  A.   Yeah.  It was greater.
 5  Q.   Yes, they were greater.  Yes.
 6       So she would have a broader perspective in terms of what
 7  she would see across the enterprise than you?
 8  A.   Absolutely.
 9  Q.   Right.  And she would also have to report up to Camille
10  Hymes in this case.
11       And you wouldn't understand or have any insight into
12  their conversations that they would have individually.
13  Correct?
14  A.   Individual?  No.
15  Q.   Right.  And so you wouldn't have -- certainly wouldn't
16  have any kind of insight or visibility into the conversations
17  that Camille Hymes would have with anyone above her, for
18  example, Zeta Smith?
19  A.   The only insight that I would have is when I was touring
20  the market with -- whether it was Shannon and Camille.  There
21  was times when I toured with Camille, Shannon and Zeta, and
22  obviously, they would have conversations in front of me.  But
23  that would be the only time that I would be privy to those
24  conversations was when they happened in front of me, about
25  what they said.
```

*United States District Court*

*Sykes - Cross*                                                    643

```
 1   Q.   Yes.  Just in front of you.
 2        But in those conversations, you would recognize that
 3   specific performance conversations are always held outside of
 4   the person to keep confidentiality.  Yes?
 5   A.   I'm so sorry, please repeat that.
 6   Q.   Sure.  So if there were specific instances regarding the
 7   performance of someone that was above your pay grade, that
 8   wouldn't be in your presence because of confidentiality
 9   reasons.  Yes?
10   A.   Yes.
11   Q.   Okay.  And that was a policy and practice that the
12   organization had, and that was the same instance, as it was
13   for you, for people that reported underneath you.  Correct?
14        So your assistant store managers --
15   A.   Yes.
16   Q.   -- managers and the like.  Yes?
17   A.   Yes.
18   Q.   Right.  Because you wanted to protect the integrity of
19   those conversations, so they would not be in front of others
20   that were not on the same pay grade.  Correct?
21   A.   That's correct.
22   Q.   Okay.  And as it relates specifically to the
23   conversations that leadership would have around how
24   Ms. Phillips would show up in leadership meetings, you
25   wouldn't have had any insight into that.  Correct?
```

1    A.   That's not totally true, because -- I mean, I may not be

2    privy to it, but if there are things that are specific to my

3    market -- and typically what would happen is, corporate, which

4    would have been Camille and/or a partner resources partner,

5    would reach out to me for feedback.  I was never contacted for

6    any feedback or asked my opinion about her performance.  So

7    only in those incidents would I have provided feedback, but

8    that never happened.

9    Q.   Understood.  Because they had not asked you specific

10   feedback about her performance, but you do not have visibility

11   into what kind of feedback they were getting above you.

12   Correct?

13   A.   That's correct, yes.

14   Q.   Okay.  Did you ever participate in conversations with

15   Rossann Williams specifically?

16   A.   Yes.

17   Q.   Okay.  Did you specifically have conversation with

18   Rossann Williams individually or in -- collectively?

19   A.   Both.

20   Q.   Okay.  On how many occasions?

21   A.   I don't know how many occasions because I don't remember

22   when she came down.

23        First of all, I met Rossann prior to transferring to the

24   Philadelphia market.  So I had probably met her prior to me

25   coming to Philadelphia.  I don't remember how many times.

1      During this specific time period, I mean, it was in my

2  district, so as long as she was there, I talked to her, I saw

3  her, I talked to her both in group meetings and individually.

4  And I don't know how many times that was because I just

5  don't -- I don't remember how many days she was there.  But

6  when she was there, I saw her every day and talked to her

7  because I was there.

8  Q.   Understood.  So she was there often, correct,

9  Ms. Williams?

10 A.   During that time -- I don't know how long she was there,

11 but there was a period of time that she was there.  How many

12 days that was, I can't remember.  I don't remember.

13 Q.   But more than five?

14 A.   More than five, probably less than two weeks, but either

15 at five or more than five.  There were so many people from the

16 Seattle headquarters that came in, it was just -- it was a lot

17 of people at one time.

18 Q.   Correct.  So if I understand your testimony, Rossann

19 Williams, the head of North America retail, was in the market

20 at least five to seven times that you can specifically recall?

21 A.   Yes.

22 Q.   Okay.  And during the time period that Ms. Williams was

23 in the market, there was a high visibility around everyone,

24 including yourself?

25 A.   What do you mean by high visibility?

1    Q.   Yes.  Everyone was looking at how everyone was performing

2    under that microscope between April and May of 2018?

3    A.   Yeah.  Well, I don't know that they were looking at how

4    everyone was performing.  I think the conversations was more

5    about, how are we showing up to our community?  It was less

6    about performance.  I didn't hear any conversations about

7    performance.  It was more about, how are we showing up to the

8    community?

9    Q.   Understood.  So if there were conversations about

10   performance regarding leadership, that wouldn't have been at

11   your level.  That would have been above your level?

12   A.   Well, I'm a leader, so if we were talking and she's

13   talking to me about multi-unit -- you know, level performance

14   or a store manager performing, then I would have been clued in

15   to that.

16   Q.   Fair.

17   A.   Anything that was specific to Shannon, though, she didn't

18   talk to me about that.

19   Q.   Right.  And so the visibility that I'm talking about

20   specifically is Shannon's level or above.

21        You did not have any insight or visibility regarding

22   those conversations.  Correct?

23   A.   No, that's not accurate.

24        Camille made a comment to me.  It was when Shannon -- I'm

25   so sorry.  I'm just trying to remember everything.

 1  Q.   Sure.

 2  A.   It was when Shannon was there, and then Shannon was gone.

 3       And I remember we were all out to dinner at an Italian

 4  restaurant downtown, and Camille made some sort of comment,

 5  because we're all saying:  Where's Shannon?  Where's Shannon?

 6  You know --

 7  Q.   I'm sorry, could you just --

 8  A.   And she had made a comment around --

 9  Q.   Mr. Sykes, I'm so sorry.

10  A.   I'm sorry, can you hear me?

11  Q.   When you say, "Where's Shannon, where's Shannon," can you

12  orient me in terms of when that was?

13  A.   This was the day that she was terminated --

14  Q.   Oh, okay.

15  A.   -- because we were asking, Where was Shannon?  Literally,

16  she was there all day before, and then we were at this big

17  dinner and she was just not there.  And everybody from Seattle

18  and everybody who was working was at this big dinner, and she

19  was not there.

20       And I remember Camille making a comment to me when I

21  asked her -- because at that time, Ben had already been let

22  go.  It was very similar:  Here one day, gone the next day.

23  And it looked very similar with Shannon.

24       And Camille made some sort of comment around -- I

25  remember she shook her head, and then it was some sort of

 1   comment around, it just wasn't going to work.  And I didn't go

 2   into any detail or I didn't ask any clarification because it

 3   was just such a tough time, and it didn't have -- Ben

 4   separated and now Shannon.  It was completely unexpected.

 5       But that's the only -- that's part of what I remember

 6   during that time was my conversation with her with respect to

 7   Shannon.

 8   Q.   Fair.  And that was after Shannon had already been

 9   separated, as you understood it?

10   A.   That was the day.  I think I had actually seen her

11   earlier that day, and then it was dinnertime, because we were

12   all going to dinner, and she wasn't there.  And I remember

13   that was odd, because I had seen her earlier in the day, and

14   she had been there all day.  And for her not to show up at

15   this dinner when, you know, all the leaders from Seattle, all

16   of us were all present, it would have been -- it was odd, so

17   we're all like, where's Shannon?

18   Q.   And that would have been in May of 2018?

19   A.   Yes.

20   Q.   And that would have been somewhere around the second week

21   in May?

22       MS. MATTIACCI:  Objection, Your Honor.  He testified

23   it was --

24       THE WITNESS:  I really don't know.  I think it was

25   sometime in May, but I don't --

*Sykes - Cross*                                              649

 1          THE COURT:  Overruled.

 2    BY MR. HARRIS:

 3    Q.   I'm sorry, sometime in May, sir?

 4    A.   I believe so, but I really don't know the date.

 5    Q.   Okay.  Do you know if it was after the 1st or the 2nd in

 6    May?

 7    A.   I don't remember.

 8    Q.   But you do --

 9    A.   I remember it happened the day that she was separated.

10    Q.   Right.  The day that she was separated.  Correct?

11    A.   Yes.  Because I had seen her earlier in the day, and

12    then, again, the dinner we would have been at, and then she

13    just wasn't there.  Like, here one day, gone the next.

14    Q.   One moment, Mr. Sykes.

15         I just have a few more questions, if you would indulge

16    me --

17    A.   Absolutely.

18    Q.   Thank you.

19         Evidence has been introduced throughout the course of

20    this trial that Ms. Phillips was separated on May 8th.

21         Does that refresh your recollection as the date of the

22    dinner that you were referring to?

23    A.   I don't remember.  I honestly don't remember what the

24    date was.

25    Q.   Okay.

*Sykes - Cross*                                650

1   A.   But if it were May 8th, then it's May 8th.  I just have

2   no recollection of what the date was.

3   Q.   Understood.

4        MR. HARRIS:  May the witness be shown exhibit

5   number -- Joint Exhibit Number 90?

6        Mr. Sykes, I'm going to need some technical help, so

7   if you bear with me.

8        THE WITNESS:  Okay.  No problem.

9   BY MR. HARRIS:

10  Q.   Mr. Sykes, I do have a question before I show you the

11  document.

12  A.   Sure.

13  Q.   Mr. Sykes, when you -- when Ms. Hymes made the statement

14  to you about Shannon's departure from the organization, the

15  only thing that she said to you that you can recall is her

16  saying it just wasn't going to work out.  Correct?

17  A.   Correct.

18  Q.   And you didn't follow up to find out what that meant?

19  A.   No.

20  Q.   Okay.  I believe Exhibit Number 90 is on the screen.

21       MR. HARRIS:  If you could scroll up on that document

22  for me, Grady.

23  BY MR. HARRIS:

24  Q.   Mr. Sykes, I would like for you to read this document--

25  if you could read it to yourself first.  And then there are

1   two pages.  So read the first page.  I'd like you to read

2   that.  After you finish reading the first page, I would also

3   like you to read the second page.  And once you've finished

4   reading both pages, please let me know, and then I'll ask you

5   a few questions, if that's okay.

6   A.   Sure.

7   Q.   Thank you.

8   A.   Okay.

9   Q.   Sir, going up to the first page of that document, the

10  email is from Zeta Smith.

11       Do you remember her?

12  A.   I do, yes.

13  Q.   And she was the senior vice president, was she not?

14  A.   Yes.

15  Q.   And her direct report was Ms. Camille Hymes.  Yes?

16  A.   Yes.

17  Q.   Thursday, May 3, 2018 at 9:15 a.m.  The subject line is

18  draft:  Philadelphia updates on additional support next week

19  and sustainment plan.

20       Did I read that accurately?

21  A.   Yes.

22  Q.   You were not cc'd on this document, were you, sir?

23  A.   I'm sorry?  I was or was not?

24  Q.   You were not copied on this document, Mr. Sykes.

25  Correct?

*Sykes - Cross*                                    *652*

 1   A.   I don't think so.

 2   Q.   Right.  And if I go down to the second page of that

 3   document, you weren't included on that second page either.

 4   Correct?

 5        And that looks like a communication between -- Camille

 6   sent an email to Zeta, and then they're talking about

 7   information that was going to Rossann.

 8        You weren't included in that document as well.  Correct?

 9   A.   I don't think so, but when I look at -- can you scroll

10   down for just a bit?

11   Q.   Sure.

12   A.   I don't know how, but for some reason, I feel like I've

13   seen this, where it says, support, by Delma Wells, Michelle.

14   I feel like I've seen that, but I can't fully recall.  But I

15   feel like I've seen that from somewhere.  But I don't -- I

16   don't recall where or how.

17   Q.   Right.  So you may have actually seen the executed draft

18   or a plan of the draft, but you weren't included in this email

19   communication is my question to you.

20   A.   I don't think so, but I believe I saw this in some sort

21   of written form similar to this, but that's all I can

22   remember.

23   Q.   Understood.  But so that the record is clear, you were

24   not included in either one of the email strings.  Correct?

25   A.   No, I don't believe so.  I don't know how I would have

 1  seen this, but this -- I recall seeing this, but that's it.

 2  Q.   Understood.

 3       If you go up to the top of that document, please.

 4       And I'm going to read the first line, where it says:

 5  Would eliminate -- this, again, is from Zeta to Camille.

 6  Would eliminate Shannon from these action plans.

 7       Did I read that accurate?

 8  A.   Yes.

 9  Q.   Would add that your peer VPs will be rotating in market

10  throughout the next 45 days.

11       And so Zeta is sending a note to Camille about her peer

12  vice presidents, because she was a vice president at the time.

13  Correct?

14  A.   Yes.

15  Q.   We can leverage Christa in your peer team.

16       Do you recall who Christa was?

17  A.   I do not.

18  Q.   Okay.  And would get Marcus in as quickly as possible

19  based on his experience in crisis situations.

20       Did I read that accurately as well?

21  A.   You did.

22  Q.   Right.  And that was Marcus Eckensberger.

23       You know who Marcus is.  Right?

24  A.   I do.

25  Q.   And he was your supervisor specifically?

*Sykes - Cross*                                    654

1   A.   I do.  I remember he made a pretty insensitive comment to

2   me.  I do remember him.

3   Q.   So Marcus was the immediate regional director that took

4   the place of Shannon Phillips after May 3rd of 2018?

5   A.   That's correct.

6            MR. HARRIS:  Mr. Sykes, thank you very much.  I have

7   no further questions for you.

8            THE WITNESS:  Thank you.

9            THE COURT:  Any redirect?

10           MS. MATTIACCI:  No, Your Honor.

11           Thank you, Mr. Sykes.

12           THE COURT:  All right.  Mr. Sykes, we're done with

13  your testimony, so we can terminate the hook-up.  All right?

14           MS. MATTIACCI:  We'll sign off.

15           THE WITNESS:  I'm sorry, I didn't hear that.  Oh,

16  okay.

17           MS. MATTIACCI:  The judge is signing you off and

18  we're going to terminate the hook-up.

19           THE WITNESS:  Thank you.

20           (Witness excused at 4:48 p.m.)

21           MR. HARRIS:  That's a technical term, Judge?

22           THE COURT:  All right.  That concludes the testimony

23  for today, and we'll start at 9:15 tomorrow morning.

24           MS. MATTIACCI:  Yes, Your Honor.

25           THE COURT:  So members of the jury, again, I want to

1    thank you for your patience during this afternoon session, and

2    have a good trip home and a good evening.  And again, remember

3    my words of caution.  More evidence to come, so keep an open

4    mind.  All right?

5            Have a good evening.

6            (Jury out.)

7            THE COURT:  Okay.  We'll stand in recess.

8            MS. MATTIACCI:  Thank you, Your Honor.

9            (Proceedings concluded at 4:49 p.m.)

10                           -  -  -

11           I certify that the foregoing is a correct transcript

12   from the record of proceedings in the above-entitled matter.

13

14   */S/ Ann Marie Mitchell*          *8th day of June, 2023*

15   *Court Reporter/Transcriber     Date*

16

17

18

19

20

21

22

23

24

25

*United States District Court*