## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

SHANNON PHILLIPS,

                    *Plaintiff*,

    v.

STARBUCKS CORPORATION d/b/a
STARBUCKS COFFEE COMPANY,

            *Defendant*.

CIVIL ACTION NO.: 2:19-cv-19432

Hon. Joel H. Slomsky, U.S.D.J.


**PLAINTIFF SHANNON PHILLIPS' PETITION FOR ATTORNEYS' FEES AND COSTS**


Respectfully submitted,

**CONSOLE MATTIACCI LAW, LLC**

By:   */s/ Laura C. Mattiacci*
       Laura C. Mattiacci, Esquire
       Katherine C. Oeltjen, Esquire
       Holly W. Smith, Esquire (*pro hac vice*)
       110 Marter Ave, Suite 502
       Moorestown, NJ 08057

Dated: July 14, 2023          *Attorneys for Plaintiff, Shannon Phillips*

## I.   INTRODUCTION

After five (5) years of hard-fought litigation against one of the world's largest and most profitable corporations, Plaintiff, Shannon Phillips, achieved a complete and total victory on her claims of race discrimination against Defendant, Starbucks Corporation d/b/a Starbucks Coffee Company. On June 12, 2023, after a six (6) day trial, the jury returned a verdict in favor of Ms. Phillips, finding by a preponderance of the evidence that her race was a determinative factor in Starbucks' decision to terminate her employment *and* finding by clear and convincing evidence that in so doing, Starbucks acted with reckless disregard for her civil rights. The jury awarded Ms. Phillips $600,000 in compensatory damages and $25,000,000 in punitive damages against Starbucks. On June 15, 2023, judgment was entered for Ms. Phillips in the amount of **$25,600,000.**[1]

As a prevailing plaintiff under Title VII, Section 1981, and the NJLAD, Plaintiff now seeks an award of her reasonable attorneys' fees and costs, calculated as follows: a lodestar amount of $767,356 with an 85% percent contingency enhancement of $652,252.60, equaling a total fee award of $1,419,608.60 for services rendered through June 28, 2023; and $36,369.45 for reasonable costs incurred through July 6, 2023.[2]

---

[1] The jury's verdict did not include any measure of economic loss damages (backpay or frontpay) which will be determined by the Court. Pursuant to Fed. R. Civ. P. 59(e), Plaintiff filed a Motion to Amend the Judgment to include whatever measure of economic loss damages the Court fixes following the economic loss hearing, currently scheduled for July 19, 2023.

[2] Plaintiff's fee petition does not include costs or time for services rendered on any post-verdict work on this matter (including for the preparation of her fee petition). Plaintiff reserves her right to file an amended Fee Petition at the conclusion of the appeals process to seek renumeration for post-trial fees and costs.

II.   **SHANNON PHILLIPS IS ENTITLED TO HER REASONABLE ATTORNEYS' FEES AND COSTS AS A PREVAILING PLAINTIFF UNDER TITLE VII, THE FMLA, AND THE PHRA**

A.   **An Award of Attorneys' Fees to Ms. Phillips – the Prevailing Party in this Case – is Authorized Under the Relevant Statutes and Crucial to Incentivize "Private Attorney Generals" to Vindicate Important Civil Rights**

Statutory fee shifting provisions are essential to the vindication of important civil rights. *See, e.g., Student Pub. Interest Research Group of New Jersey v. AT&T Bell Labs,* 842 F.2d 1436, 1449-50, n. 13 (3d Cir. 1988); *City of Riverside v. Rivera,* 477 U.S. 561, 576 (1986). Reimbursement of fees is crucial to attracting dedicated and talented attorneys to pursue what are often difficult cases on behalf of individuals against defendants with resources sufficient to fund a vigorous and lengthy litigation. *See id.* Title VII, Section 1981, and the NJLAD each provide for an award of reasonable attorneys' fees and costs to a prevailing plaintiff. *See* 42 U.S.C.S. § 2000e-5 (Title VII); 42 U.S.C. § 1988 (referencing, *inter alia*, Section 1981); N.J. Stat. 10:5-21.1 (NJLAD).

Console Mattiacci Law, LLC ("CML") vindicated Ms. Phillips' statutorily protected right against race discrimination through excellent advocacy in a case that was hard fought at every turn by her former employer, Starbucks – a corporate giant with a net worth of $112 billion. CML took Ms. Phillips' case on a contingency fee basis[3] when very few firms would or could. Having prevailed on each of her claims, Plaintiff is entitled under Title VII, Section 1981, and the NJLAD to reasonable attorneys' fees (including a contingency enhancement) and costs to be paid by Defendant, Starbucks.

---

[3] CML offered to represent Ms. Phillips on an hourly fee basis charging its usual and customary rates or on a contingency fee basis (by which Ms. Phillips would pay no money to our firm). Ms. Phillips chose the contingency fee agreement *See* Declaration of Stephen G. Console ("Console Decl.") (attached hereto as **Exhibit 3**) at ¶15.

### B.  Plaintiff is Entitled to the Full Lodestar of Attorneys' Fees

In civil rights cases, courts use the "lodestar" formula to calculate attorney's fees by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate, which is presumed to be a reasonable fee.  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990). "[W]here a plaintiff has obtained excellent results, [her] attorney should recover a fully compensatory fee." *McGuffey v. Brink's, Inc.,* 598 F. Supp. 2d 659, 674 (E.D. Pa. 2009).  The results here were excellent.

Plaintiff seeks payment of reasonable attorney's fees as determined by CML's lodestar calculation of hours reasonably worked to achieve the excellent result multiplied by CML's reasonable hourly rates.  Computerized printouts setting forth the work performed by CML (by attorney, and in chronological order) for which it now seeks reimbursement are submitted herewith as **Exhibit 1** (organized by attorney) and **Exhibit 2** (organized in chronological order).[4]

CML's lodestar calculation based on that work is summarized as follows:

| Attorney (as referenced in time entries) | Year began practicing | Hours Worked | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Stephen G. Console Co-Managing Member ("SGC") | 1982 | 64.8 | $960 | $62,208 |
| Laura C. Mattiacci Co-Managing Member ("LCM") | 2002 | 388.8 | $870 | $338,256 |
| Kate C. Oeltjen Partner ("KCO") | 2014 | 487 | $520 | $253,240 |

---

[4] CML has exercised billing judgment and does not seek reimbursement for all of the time that was spent working on this case.  Some billing entries have been deleted so that Exhibits 1 and 2 reflect only the time for which Plaintiff seeks reimbursement.  By way of example, approximately 50 hours of work were performed by former-CML associates in 2020 for which Plaintiff is not seeking renumeration. Additionally, valuable contributions were made to this case by legal assistants, paralegals, and law clerks for which Plaintiff does not seek reimbursement. Console Decl. ¶24.

3

| Attorney (as referenced in time entries) | Year began practicing | Hours Worked | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Holly W. Smith Associate Attorney ("HS") | 2020 | 453.8 | $240 | $108,912 |
| Emily Derstine-Friesen Associate Attorney ("EDF") | 2016 | 15.8 | $300 | $4,740 |
| **TOTAL** | | **1410.2** | | **$767,356** |

The reasonableness of CML's lodestar amount is supported by, *inter alia,* the accompanying declarations of CML attorneys Stephen G. Console ("Console Decl."), Laura C. Mattiacci ("Mattiacci Decl."), Katherine C. Oeltjen ("Oeltjen Decl."), and Holly W. Smith ("Smith Decl.") (**Exhibits 3**, **4**, **5**, and **6**, respectively).

As set forth more fully below, the hours expended by CML were reasonable and necessary to win this extremely challenging and hard-fought case, and the rates charged for doing so are reasonable.

### 1. Plaintiff Seeks Compensation for a Reasonable Number of Attorneys' Hours Expended

A plaintiff is entitled to compensation for all hours reasonably expended by counsel on the litigation. *See Hensley*, 461 U.S. at 434. CML's attorneys worked tenaciously for five years to vindicate Ms. Phillips' statutorily protected right against discrimination by her employer, Starbucks. The hours CML expended in this case were reasonable because the firm did what was necessary to win, which it did.

#### a. CML staffed this case according to what was necessary to win it, which it did

CML is a boutique employee rights firm that allocates work among its legal staff in a way so as to ensure excellent representation in an efficient manner. Console Decl. ¶¶ 11-13. The firm's founder and principal attorney, Stephen G. Console, oversees each case and offers input especially

into its initial assessment, strategy, and negotiations. *Id.* ¶14. Each case is staffed according to its need. *Id.* If it is necessary to try a case in court, the firm devotes great resources to what is considered in today's legal world to be an unusual event requiring unique talent and specialized skills. *Id.* If warranted, as was the case here, the case will be tried by firm Member Laura Mattiacci, the firm's designated lead trial counsel for its most significant cases. *Id.*

Generally, the case was staffed as follows: as is her usual role, Emily Derstine-Friesen met and communicated with the client early on, drafted the EEOC Charge, and handled Ms. Phillips' case through the agency process. When the case proceeded to litigation, the case was assigned Katherine C. Oeltjen, a partner at CML, as the attorney in charge of handling Ms. Phillips' case with overall responsibility for all pre-trial matters. Ms. Oeltjen's pre-litigation work was supported by CML associate, Holly W. Smith. As is our firm's practice, Ms. Mattiacci would generally be kept abreast of the case, and then step in to try it. In light of the stakes involved, including the enormous resources our firm had devoted to the litigation, Ms. Mattiacci's involvement when it came time to try the case was crucial. *Id.* ¶17.

CML's case staffing according to particular skills works. *Id.* ¶18. Mr. Console has attested that he has found, in his approximately forty years of experience, that this method of staffing is necessary to advocate for clients at the highest level and achieve the reputation and success that CML has. *Id.*

In a recent opinion approving of the reasonableness of Ms. Mattiacci's time spent preparing for trial, Judge O'Hearn stated: "The reality today is there are fewer and fewer skilled trial attorneys. It is not unusual for one or two attorneys in a firm to be designated as the lead trial attorney, particularly a size of this plaintiff's firm. It is a usual and expected part, in my experience, that when a case is tried, trial counsel comes in and prepares to try the case. I think that this is the

reality of current-day litigation." *Hightower v. Ingerman Management Company, et al.*, 17-cv-08025, ECF No. 400 (D.N.J. Oct. 25, 2022) (emphasis added).

### b.  CML attorneys did the work necessary to win, which it did

**Stephen G. Console** is CML's founder who, with nearly forty years of experience, is recognized as a preeminent employment lawyer. *Id.* ¶¶2-9. Since the outset of this matter, he performed 64.8 hours of work for which Plaintiff seeks reimbursement. *Id.* ¶19. He closely monitored and remained involved with strategizing and decision-making in Plaintiff's case from inception through the jury's verdict. *Id.* Among other things, he: reviewed and revised Ms. Phillips' EEOC Charge and federal court Complaint, engaged in settlement negotiations with Starbucks' counsel at various stages of the case, prepared for and attended a settlement conference, communicated regularly with Ms. Oeltjen and Ms. Smith regarding litigation strategy, had telephone and video conferences with the client, formulated the plan for most efficiently staffing the case and discussed same with litigation and trial attorneys assigned to the matter, reviewed and advised on significant correspondence and filings, strategized and advised on trial strategy, communicated regularly with Ms. Mattiacci, Ms. Oeltjen, and Ms. Smith regarding trial preparations and strategy, and advised on strategy on every day of the trial. *Id.* The itemized time entries for Mr. Console's work are set forth in **Exhibit 1** and are reasonable. *Id.* ¶¶26, 30.

**Emily Derstine-Friesen** is a CML associate attorney who, along with Mr. Console, meets initially with new clients. *Id.* ¶23. She handles a client's case through the administrative agency. *Id.* In this case, Ms. Derstine-Friesen, generally and among other things: conducted the client's initial consultation, met and communicated with the client early on, drafted the EEOC Charge, and handled Ms. Phillips' case through the agency process. *Id.* Ms. Derstine-Friesen performed 15.8

hours of work on this case for which Plaintiff seeks compensation. *Id*. The itemized time entries for her work are set forth in **Exhibit 1** and are reasonable. *Id*. ¶30.

**Katherine C. Oeltjen** was the partner with primary responsibility for the pre-trial litigation of this case, including the supervision of Ms. Smith. Console Decl. ¶ 21. Ms. Oeltjen is a lead litigator who vigorously prosecuted Ms. Phillips' claims through discovery. *Id*. In general and among other things, Ms. Oeltjen conducted comprehensive discovery and developed the factual record necessary to prove at trial that Starbucks intentionally discriminated against Plaintiff when it terminated her employment. *Id*.

From June 2019 through June 2023, Ms. Oeltjen performed 487 hours of work on this case for which Plaintiff seeks reimbursement. Oeltjen Decl. ¶20. In summary and without limitation, she:

- Reviewed and analyzed with all documents submitted to the EEOC by Ms. Phillips;

- Drafted, revised and coordinated filing of Plaintiff's Complaint;

- From drafting of Complaint up to the point of trial was the primary point-of-contact for the Plaintiff at CML;

- Set strategy for and drafted, revised and coordinated filing of Plaintiff's responses to Defendant's Rule 12 pre-motion practice before the Hon. Renee Marie Bumb, U.S.D.J;

- Drafted, revised and coordinated filing of Plaintiff's Amended Complaint(s);

- Set strategy for and drafted Plaintiff's initial discovery requests and initial disclosures;

- Set strategy for and drafted Plaintiff's responses to Defendant's initial discovery requests;

- Selected Plaintiff's documents for responsiveness to Defendant's requests;

- Set strategy for and took the lead on all communications with opposing counsel regarding discovery disputes and motion practice from filing of Complaint through March, 2023;

- Set strategy for and selected witnesses for deposition;

- Prepared for and took all depositions noticed by Plaintiff, including selection of deposition exhibits and supervision of Holly Smith, Esquire in connection with the selection of deposition exhibits;

- Prepared Plaintiff for her deposition;

- Defended Plaintiff's deposition;

- Set strategy for and further drafted and/or revised letters to the Court raising discovery disputes;

- Oral Argument before the Court on discovery motions;

- Coordinated strategy for opposing Defendant's Motion for Summary Judgment and Defendant's Renewed Motion for Summary Judgment;

- Drafted in part, analyzed, revised, finalized and coordinated filing of Plaintiff's opposition to Defendant's Motion for Summary Judgment (including selection of exhibits and opposition to statement of facts);

- Presented oral argument on a portion of Plaintiff's opposition to Defendant's Motion for Summary Judgment;

- Supervised Holly Smith, Esquire in connection with aspects of opposing Defendant's Motion for Summary Judgment;

- Supervised Holly Smith, Esquire in connection with opposing Defendant's renewed Motion for Summary Judgment;

- Participated in two settlement conferences: one before Magistrate Judge Sandra M. Wells and the other before Magistrate Judge Ann Marie Donio;

- Prepared Plaintiff for both settlement conferences;

- Drafted, reviewed and finalized multiple communications with the Court during discovery and pre-trial;

- Assisted in the preparation of this matter for trial and at trial, including without limitation:  by performing legal research; drafting initial witness examinations; conferring with economic loss expert; preparing plaintiff for direct examination; selecting documents for inclusion as trial exhibits; drafting in part various demonstrative exhibits, including organizational charts; reviewing and analyzing witness deposition testimony for purposes of use for impeachment; participating in

on-going and multiple strategy sessions with trial team over the course of several weeks, including with lead trial counsel Laura C. Mattiacci, Esquire; and, otherwise supporting lead-trial counsel as needed during trial.

The itemized time entries for Ms. Oeltjen's work are set forth in **Exhibit 1** and are reasonable. *Id*. ¶10; Console Decl. ¶30.

**Holly W. Smith,** an associate attorney with the firm, supported Ms. Oeltjen on the pre-trial litigation of this case from October 2020 through the verdict. Ms. Smith is a particularly skilled legal writer which was critical in this case given the volume of motion practice in this case. Ms. Smith's research and writing were critical in supporting Ms. Mattiacci's trial preparation efforts and in helping CML to secure a trial victory in this case. *Id.*

From October 2020 through June 2023, Ms. Smith performed 453.8 hours of work on this case for which Plaintiff seeks reimbursement. Smith Decl. ¶9. In summary and without limitation, she:

- Drafted discovery requests and responses;

- Reviewed Defendant's discovery responses and thousands of pages of documents produced in response to Plaintiff's discovery requests;

- Assisted Ms. Oeltjen in preparing for and attended all depositions in this case;

- Conducted legal research on discovery issues;

- Drafted a motion to compel discovery and motion for sanctions related to Defendant's withholding of investigative documents and documents related to Paul Sykes' separation from Starbucks;

- Attended oral argument on discovery motions;

- Drafted multiple letters to the Court regarding scheduling and other matters;

- Drafted Plaintiff's settlement conference memo;

- Drafted Plaintiff's opposition to Defendant's motion for summary judgment and related briefing;

- Presented oral argument on a part of Plaintiff's opposition to Defendant's motion for summary judgment;

- Drafted Plaintiff's opposition to Defendant's motion for reconsideration of the Court's denial of summary judgment;

- Drafted Plaintiff's pretrial memorandum;

- Drafted Plaintiff's proposed jury instructions, verdict sheet, and voir dire;

- Drafted Plaintiff's motions *in limine*;

- Drafted Plaintiff's responses to Defendant's motions *in limine*;

- Prepared for and attended the final pretrial conference;

- Drafted a motion for sanctions against Defendant in connection with Starbucks' late production of surveillance footage of the April 12th arrests;

- Participated in regular strategy calls with Kate Oeltjen, Stephen Console, and Laura Mattiacci during discovery and as the team were preparing for trial;

- Attended every day of trial; and

- Performed legal research and drafted submissions made to the Court during the trial.

The itemized time entries for Ms. Smith's work are set forth in **Exhibit 1** and are reasonable. *Id*. ¶10; Console Decl. ¶30.

**Laura Mattiacci** focused intensively on the trial of Plaintiff's case. Console Decl. ¶20. Ms. Mattiacci is an experienced trial lawyer whose superior skills and successes have commanded the attention and respect of the defense bar. *Id*. Ms. Mattiacci mastered the varied and many facts of the case, worked extensively on trial preparation, and presented the evidence to the jury in a way that was easy to grasp and which allowed them to see that Ms. Phillips was used as Starbucks' scapegoat in the fallout of the April 12th arrests and terminated because of her race.

From October 2019 through June 2023, Ms. Mattiacci performed 388.8 hours of work on this case for which Plaintiff seeks compensation. *Id*. ¶16. Specifically, and without limitation, she:

- Kept abreast of the case through communications with Stephen Console, Kate Oeltjen, and Holly Smith;

- Reviewed the pleadings and "trial binder," which contained the key information to prepare a case for suit and in anticipation of trial;

- Communicated with opposing counsel regarding upcoming trial;

- Communicated and had conferences with opposing counsel regarding pre-trial submissions

- Read and digested deposition transcripts;

- Organized and analyzed Plaintiff's trial exhibits;

- Prepared for and attended the final pre-trial conference;

- Created the trial strategy for the case;

- Met and communicated with the trial team on trial strategy;

- Prepared the client for trial;

- Created demonstrative exhibits for trial;

- Prepared all direct examinations of witnesses;

- Prepared all cross-examination of witnesses;

- Prepared opening and closing arguments;

- Prepared for and presented oral arguments on Plaintiff's motion for sanctions and the Parties' cross-Rule 50 motions;

- Reviewed and revised multiple motions and motion responses drafted by Ms. Smith, including, without limitation, motions *in limine* (and oppositions to Defendant's motions *in limine* and motions to strike), a sanctions motion, and an opposition to Defendant's Motion for Reconsideration of the Court's summary judgment ruling;

- Reviewed and digested the expert report of Plaintiff's economic loss expert;

- Communicated with Plaintiff's economic loss expert and prepared him to testify;

- Communicated with opposing counsel about stipulations and other trial matters;

11

· Reviewed and revised jury instructions, verdict sheet, trial exhibits and voir dire;

· Drafted several letters to the Court regarding pretrial matters;

· Researched evidentiary issues; and

· Tried the six-day jury trial as lead trial counsel to successful verdict.

The itemized time entries for Ms. Mattiacci's work are set forth in **Exhibit 1** and are reasonable. *Id.*; Console Decl. ¶30.

In determining the number of hours reasonably expended on the litigation, Plaintiff is entitled to be compensated for work "useful and of a type ordinarily necessary" to secure the final result obtained from the litigation. *Pennsylvania Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 556 (1986). "In determining what hours are reasonably expended on the suit, the most critical factor is the degree of success obtained." *Tomasso v. Boeing Co.,* 2007 U.S. Dist. LEXIS 70001, *11 (E.D. Pa. Sept. 21, 2007). <u>Plaintiff obtained a total and complete victory in this case.</u>

During this case, up to and including during the trial, Defendant never made a settlement offer greater than the severance amount that Plaintiff was offered on the day she was terminated from Starbucks. As the Supreme Court has noted, if a defendant in a fee shifting case could have avoided the bulk of attorneys' fees for which they find themselves liable by making a reasonable settlement offer, they cannot litigate tenaciously and then be heard to complain about the time necessarily spent by plaintiff in response. *City of Riverside,* 477 U.S. at 581. CML did what was necessary to obtain a verdict for Ms. Phillips, and the hours it expended to do so were reasonable.

### 2. CML's Hourly Rates are Reasonable

CML was established by Mr. Console in 1990 and for 33 years, has specialized in representing non-union employees in all aspects of workplace matters. Console Decl. ¶11.  The

firm is included among the Martindale-Hubbell Bar Register of Preeminent Lawyers, which is exclusive to AV Preeminent Attorneys -- those who have achieved the highest possible peer review rating in both legal ability and ethical standards. *Id.* The firm has achieved a high level of success and a great demand for its services. *Id.* ¶18.

CML charges a reasonable hourly rate for its services. *Id.* ¶34. "Generally, a reasonable hourly rate is to be calculated according to the prevailing market rates in the relevant community." *McGuffey,* 598 F. Supp. 2d at 669 (citing *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990)). CML's rates as reflected in the billing entries (**Exhibits 1** and **2**) and the lodestar chart are in line with prevailing markets rates. *Id.* Specifically, the rates: (a) are the firm's usual and customary rates actually paid for by its hourly clients; (b) are in line with the rates for similar services by lawyers of reasonably comparable skill, experience and reputation; (c) attested to by Mr. Console as within prevailing market rates; (d) in line with rates charged by other firms per published data; and (e) have been approved in several other litigations.

### a. CML's Requested Rates are the Firm's Usual and Customary Rates Actually Paid by the Firm's Hourly Clients

The best evidence of a prevailing market rate is counsel's customary billing rate. *E.g., Mitchell v. City of Philadelphia,* 2010 U.S. Dist. LEXIS 32984, *40 (E.D. Pa. April 5, 2010) (citing *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)); *see also, e.g., Student Pub. Interest Research Group*, 842 F.2d at 1447 ("though not dispositive, the starting point in ascertaining a reasonable hourly rate is the attorney's usual billing rate").

The hourly rates for the attorneys at CML as reflected in the billing entries (**Exhibits 1** and **2**) and summarized in the lodestar chart are <u>the same</u> as the regular rates charged for their services in non-contingent matters. *Id.* ¶31. No upward adjustment in billing rate was made, notwithstanding the contingency and risk of the matters involved, the opposition encountered, and

13

the delay in payment.[5] *Id*. The usual and customary hourly rates used in the calculation of CML's lodestar are the actual rates CML has used to bill the clients it represents on an hourly fee basis, and which have been paid by hourly clients. *Id*.

That the rates requested are within the prevailing market is demonstrated by the fact that people within the Philadelphia area are willing to pay them.

### b. CML's Rates are in Line with the Prevailing Market Rates for Attorneys of Similar Experience, Skill, and Reputation

In considering prevailing market rates, "the district court should 'assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *McGuffey,* 598 F. Supp. 2d at 669 (quoting *Rode*, 892 F.2d at 1183).

The attorneys who performed the bulk of the legal services in this case – Mr. Console, Ms. Mattiacci, Ms. Oeltjen, Ms. Smith, and Ms. Derstine-Friesen – are experienced and talented practitioners of employment law who have earned stellar reputations for their excellent work. Each bills at a rate that lies within the prevailing market rates in the Philadelphia area for attorneys of similar, experience, skill and reputation. *Id*. ¶34.

**Mr. Console** worked on this case from its outset through verdict and seeks an hourly rate of $960 for services performed. *See* **Exhibit 1**. Mr. Console is a 1982 graduate of Villanova Law School. *Id*. ¶3. He has been practicing law for nearly 40 years and has concentrated his practice for the last 32 years exclusively on employment law. *Id.* ¶¶4, 5. He is an elected fellow of the College of Labor and Employment Lawyers (2008) and Martindale-Hubbell has recognized him as an "AV Rated" Attorney – the highest possible peer review rating in legal ability and ethical

---

[5] Under Third Circuit law, to account for the delay in compensation, a plaintiff is entitled to recover reasonable attorney's fees based on his attorney's <u>current</u> hourly rate at the time of the fee petition. *See, e.g., Lanni v. New Jersey*, 259 F.3d 146, 149 (3d Cir. 2001).

standards. *Id.* ¶¶6-7.  From 1998 through 2000, Mr. Console was a member of the Executive Board of Directors of the National Employment Lawyers Association of New Jersey. *Id.* ¶8. He regularly speaks at seminars involving employment law and has done so for decades. *Id.* ¶9.

Mr. Console has been recognized by his peers as a top practitioner. *Id.* ¶10. Without limitation:  He was named as a leading attorney in the state of Pennsylvania in the area of plaintiff's employment and labor law in *Chambers USA: America's Leading Business Lawyers 2005-2006*, as one of the Best Lawyers in America (2008-2014) in the area of Labor and Employment Law in *Best Lawyers in America*, as one of the Best Lawyers in *The Best of the U.S.* (2008-2013), and as one of the Best Lawyers in America in *America's Who's Who*.  Mr. Console was named the Best Lawyers' 2012 Philadelphia Employment Law – Individuals Lawyer of the Year.  He was named to the "Top 100 Attorneys in Philadelphia" and "Top 100 Attorneys in Pennsylvania" by *Philadelphia Magazine* and *Philadelphia Super Lawyers Magazine* from 2008-2015. *Id.* Given his skill, experience, and formidable reputation, Mr. Console's requested hourly rate is reasonable. *Id.* ¶34.

**Ms. Mattiacci** seeks an hourly rate of $870 for services performed on this case. Ms. Mattiacci is a 2002 graduate of the Beasley School of Law at Temple University. Mattiacci Decl. ¶3.  While at the Beasley School of Law, she clerked for the preeminent trial lawyer, James E. Beasley, Sr., and was a standout member of the National Trial Team, where she won several trial advocacy awards and honors, including the ATLA National Championship in Trial Advocacy.  *Id.* ¶4.   She has practiced law since 2002 and has for the last twenty years devoted her practice to the representation of employees.  *Id.* ¶¶5-6.   Ms. Mattiacci is CML's designated lead trial counsel for the firm's most significant cases.  *Id.* ¶7.

15

At CML, Ms. Mattiacci has tried numerous jury trials. *Id.* ¶8. Two settled several days into trial. Thirteen were tried to verdict (eleven of which resulted in verdicts in favor of the plaintiff). She has prepared several other cases for trial, which were settled right after or shortly before jury selection. *Id.*

Ms. Mattiacci has been recognized by her peers as a top practitioner. *Id.* ¶13. She has also been recognized by members of the judiciary for her work, including but not limited to, being appointed to and serving on various committees. By way of example, she was recently appointed by Chief Judge Juan R. Sanchez to serve on the Lawyers' Advisory Committee for the amendments to Local Rules of the U.S. District Court for the Eastern District of Pennsylvania. *Id.* ¶12. She served for four years as an active member of the University of Pennsylvania's Inn of Court and has spoken at many national and local conferences on employment law. *Id.* ¶11. In addition, without limitation: She was named to the list of "Top 50 Female Attorneys in Pennsylvania" by *Philadelphia Magazine* and *Philadelphia Super Lawyers Magazine* 2014-2022, and to their list of "Top 100 Attorneys in Philadelphia" and "Top 100 Attorneys in Pennsylvania" in various years from in 2015-2022. *Id.* ¶13. She has been named to the Pennsylvania "Super Lawyers" list by *Philadelphia Magazine* and *Philadelphia Super Lawyers Magazine* every year since 2013. *Id.* She was named to the "*2011 Lawyers on the Fast Track*" by *The Legal Intelligencer*, a distinction given to only 27 lawyers under the age of 40. *Id.* Given her skill, experience, and track record of obtaining incredible results for CML clients, Ms. Mattiacci's requested hourly rate is reasonable and falls within the market rate. Console Decl. ¶34.

**Ms. Oeltjen** seeks an hourly rate of $520 for services performed on this case. Oeltjen Decl. ¶22. Ms. Oeltjen graduated from Rutgers University School of Law in 2004 with honors and has focused her practice exclusively on the representation of plaintiffs in employment matters for nine

years. *Id*. ¶¶5, 12. Ms. Oeltjen's regular hourly rate has been approved by another court within the Third Circuit. *See Mammen v. Thomas Jefferson University, et al.*, E.D. Pa. Civil Action No. 20-127. Given her level of skill, experience, and reputation, Ms. Oeltjen's requested hourly rate is reasonable and falls within the market rate. Console Decl. ¶34.

**Ms. Smith** seeks an hourly rate of $240 for services performed on this case. Smith Decl. ¶7. Ms. Smith graduated *cum laude* from Temple University Beasley School of Law in 2019 and has been an associate attorney at CML for nearly four years. *Id*. ¶¶3, 5. Ms. Smith's regular hourly rate has been approved by several courts within the Third Circuit. *See e.g.*, *Mammen v. Thomas Jefferson University, et al.*, E.D. Pa. Civil Action No. 20-127; *Hightower v. Ingerman Management Company, et al.* (discussed fully in Section II.B.2.e, *supra*). Given her level of skill, experience, and reputation, Ms. Smith's requested hourly rate is reasonable and falls within the market rate. Console Decl. ¶34.

**Ms. Derstine-Friesen** seeks an hourly rate of $300 for services performed on this case. *Id*. ¶23. Emily is a 2016 summa cum laude graduate of Drexel University Thomas R. Kline School of Law and has practiced employment law at CML for more than six years. *Id*. Ms. Derstine-Friesen's hourly rate was approved by the Honorable Timothy Rice (Ret.) in *Ray v. AT&T*. Given her level of skill, experience, and reputation, Ms. Derstine-Friesen's requested hourly rate is reasonable and falls within the market rate. *Id*. ¶34.

### c. Mr. Console Attests that CML Rates are Within Prevailing Market Rates

Mr. Console has concentrated his practice on employment law for more than thirty-five years. *Id*. ¶5. He is familiar with the rates charged by other attorneys with backgrounds similar to his, as well as to the attorneys within CML who worked on this matter. *Id*. ¶34. He has attested that based on his personal knowledge, the rates that were utilized by CML in calculating its lodestar

in this case are within the prevailing market rates for similar work performed by attorneys of comparable skills and experience. *Id.*

Mr. Console's Declaration should be considered in the Court's evaluation of prevailing market rates. *See, e.g., I.W. v. School District,* 2016 U.S. Dist. LEXIS 4441 at*18-19 (court considered in full the declarations submitted by the plaintiffs' attorneys, including their assertions as to prevailing market rates in the community).

### d. CML's Usual and Customary Rates are in Line with Market Rates per Published Data

CML's usual and customary rates are consistent with rates charged by defense firms based in Philadelphia according to the 2017 National Law Journal Survey of Billing Rates (submitted herewith as **Exhibit 7**), which has been cited by courts in the consideration of attorneys' fees awards. *See, e.g., Mitchell,* 2010 U.S. Dist. LEXIS 32984 at *40, n.12.  For example:

- Blank Rome in 2017 reported a high partner billing rate of $940, low partner billing rate of $445, and average partner billing rate of $640; and a high associate rate of $565, low associate rate of $175, and average associate rate of $350.

- Cozen O'Connor in 2013 reported a high partner billing rate of $1050, low partner billing rate of $300, and average partner billing rate of $555; and a high associate rate of $590; low associate rate of $235, and average associate rate of $345.

- Pepper Hamilton in 2013 reported a high partner billing rate of $850, low partner billing rate of $475, and average partner billing rate of $630; and a high associate rate of $460; low associate rate of $245, and average associate rate of $360.

- Saul Ewing in 2013 reported a high partner billing rate of $850, low partner billing rate of $365, and average partner billing rate of $530; and a high associate rate of $575; low associate rate of $225, and average associate rate of $340.

The Court can reasonably assume that these firms' <u>current</u> hourly rates have increased significantly. *See*, *e.g.*, *Earley v. JMK Assocs.*, 2020 U.S. Dist. LEXIS 66176, at *3–6 (E.D. Pa. Apr. 15, 2020) (acknowledging evidence of regional billing rates having increased between 5

percent and 7 percent in recent years). Plaintiff's lawyers are entitled to be compensated at rates commensurate to those paid by Starbucks to its own lawyers.

### e. CML's Usual and Customary Rates Have Been Approved in Other Litigations

CML's usual and customary rates have been approved by arbitrators and courts in awarding fees to the firm. Console Decl. ¶32. For example, and without limitation:

In October 2022, the Honorable Christine P. O'Hearn awarded CML $939,048 in reasonable attorneys' fees and costs (exclusive of the 40% contingency fee enhancement) including that of Mr. Console, Ms. Mattiacci, and Ms. Smith, remarking that "the skills, ethics, and professionalism exhibited by all the attorneys on the plaintiff's side during this very long, very old case, was exceptional." *See Hightower v. Ingerman Management Company, et al.*, 17-cv-08025, ECF No. 400 (D.N.J. Oct. 25, 2022) (emphasis added). When discussing Ms. Mattiacci's rate, specifically, Judge O'Hearn stated: "the Court has to consider not only the level of experience but the quality of experience, the rate is not dictated or controlled simply by the years or number of experience. Rather it's the breadth of experience, the quality of the experience of the attorney and the rate they can command as a usual and customary rate. Ms. Mattiacci, in the Court's opinion, displayed excellent trial skills, a command of the Rules of Procedure and Evidence, as well as, I think, a level of restraint and professionalism in this case that is unusual to face in federal court[]." *Id.* (emphasis added)

In April of 2022, the Honorable Timothy R. Rice ordered AT&T to pay CML's reasonable attorneys' fees in an age discrimination case, including that of Mr. Console and Ms. Mattiacci. *Ray*, 2022 U.S. Dist. LEXIS 73948 at *24–25. In using the CLS fee schedule as a useful guide and highlighting the gender pay gap in the legal profession, Judge Rice stated that, "[a]lthough [Ms.] Mattiacci has been practicing law for fewer years than [Mr.] Console … and would warrant a rate

19

of $530.00 based on her experience according to the CLS fee schedule, she is entitled to the same $700.00 rate as her fellow shareholder and partner given her expertise and skill as a trial lawyer. Mattiacci has devoted her practice to employment law for 19 years, has been a shareholder for 10 years, is well-recognized as a leading employment trial attorney, and has developed an extraordinary record of courtroom achievement. Her exceptional advocacy skills helped to persuade the jury to award a significant verdict … in a complex case. Such expertise justifies a premium to the rate allocated to an attorney of her experience level in the CLS fee schedule." (emphasis added).

In October of 2021, the Honorable Wendy Beetlestone ordered the defendant to pay plaintiff CML's reasonable attorney's fees as a sanction in a discovery dispute. *Mammen v. Thomas Jefferson University, et al.*, 20-cv-127, ECF No. 74 (Oct. 13, 2021). Judge Beetlestone concluded that the "hourly rates charged by Plaintiff's attorneys [which were CML's usual and customary rates] are reasonable 'calculated according to prevailing market rates in the relevant community,'" including Ms. Oeltjen and Ms. Smith's then-hourly rates. *Id.* (quoting *Blum v. Stenson*, 463 U.S. 886, 895 (1984)). *Id.*

In October of 2020, the Honorable Nitza I. Quiñones Alejandro granted CML's joint motion for an Order approving settlement in an FLSA action in the matter of *Gasper v. Collective*, No. 19-2676, 2020 U.S. Dist. LEXIS 182617, at *18–19 (E.D. Pa. Oct. 2, 2020), based on the usual and customary hourly rates of CML attorneys. The motion was consented to by opposing counsel and approved by the Court, concluding that the CML attorney's requested hourly rate was "well within the range of what is reasonable and appropriate in this market." *See id.* at Dkt. No. 21.

### 3.   CML's Lodestar Calculation, Based on Reasonable Hours and Reasonable Rates, is a Reasonable Attorneys' Fee Award

When an applicant for a fee has demonstrated that the claimed rate and hours are reasonable, the resulting product (the lodestar) may be presumed to be the reasonable fee to which counsel is entitled.  *See, e.g., McGuffy,* 598 F. Supp. 2d at 668.

As demonstrated above, CML has calculated its lodestar based on reasonable hourly rates for hours reasonably expended.  No downward adjustment is warranted.  Accordingly, $767,356 is a reasonable attorneys' fee and should be awarded to Plaintiff as a prevailing party under Title VII, Section 1981, and the NJLAD.

### C.  The Court Should Award Plaintiff A Contingency Fee Enhancement

The NJLAD protects important civil rights and its enforcement is crucial to New Jersey citizens and the state itself. The NJLAD begins with a finding and declaration of the importance of this legislation:

> The Legislature finds and declares that practices of discrimination against any of its inhabitants, because of race [or] . . .sex . . . are matters of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State . . . .
>
> The Legislature further declares its opposition to such practices of discrimination when directed against any person by reason of the race…[or] sex…, in order that the economic prosperity and general welfare of the inhabitants of the State may be protected and ensured.
>
> The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm.  The personal hardships include: economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies; relocation, search and moving difficulties; anxiety cause by lack of information, uncertainty, and resultant planning difficulty; career, education,

> family and social disruption; and adjustment problems, which particularly impact on those protected by this act. Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.

N.J. Stat. §10:5-3.

The Legislature's intention to provide full relief to "all persons protected by this act" would be thwarted if the law's protections as a practical matter are available only to those who can afford to pay competent counsel on a guaranteed hourly basis to represent them. That would be very few victims, indeed, of employment discrimination and wrongful termination. Console Decl. ¶35. Thus, the NJLAD's statutory fee shifting provision is crucial to achieving the law's goals. It provides:

> In any action or proceeding brought under [10:5-1, *et seq.*] the prevailing party may be awarded a reasonable attorney's fee as part of the cost, provided however, that no attorney's fee shall be awarded to the respondent unless there is a determination that the complainant brought the charge in bad faith[.]

N.J.S.A. §10:5-27.1.

The New Jersey Supreme Court has recognized that an award of attorneys' fees is not "reasonable" if it is simply a lodestar "calculated as if the attorney's compensation were guaranteed irrespective of result." *Rendine*, 141 N.J. at 338. According to the New Jersey Supreme Court, "as a matter of economic reality and simple fairness," no fee award may be deemed "reasonable" unless the lodestar "is adjusted to reflect the actual risk that the attorney will not receive payment if the suit does not succeed." *Rendine*, 141 N.J. at 338.

The court in *Rendine* explained that lawyers in the marketplace will not provide legal representation on a contingent basis unless they receive a premium for taking the risk of incurring

considerable time and resources to litigating a case to verdict and receiving no monetary compensation for their services in exchange. In the private market, "[t]o bid for services effectively, parties with only fee awards to offer must be able to pay market rates. They cannot do that when they are denied contingency enhancements because they cannot cover the non-payment risk. A lawyer given a choice between an unenhanced hourly rate in a fee award case and an equal rate in a case where payment is certain will have a strong incentive to decline the fee award case." *Rendine*, 141 N.J. at 339. Lawyers must be sufficiently incentivized to take the gamble of representing clients of little means but with important rights at stake. If they are not, there will not be a market of competent counsel to act as "private attorneys general" to vindicate important civil rights, crucial to New Jersey's citizens and the state itself.

### 1. The Court is Required to Consider a Contingency Enhancement in Fixing an Award of "Reasonable" Attorneys' Fees Under the NJLAD

Under *Rendine*, once the lodestar fee has been calculated, the court "**should** consider whether to increase that fee to reflect the risk of nonpayment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome." *Rendine v. Pantzer*, 141 N.J. 292, 337 (emphasis added). In fact, the Third Circuit has reversed lower court decisions that did not apply a fee enhancement under these circumstances because to do so would be in contravention of *Rendine*. *See*, *e.g.*, *Coleman v. Kaye*, 87 F.3d 1491, 1511 (3d Cir. 1996); *Am. Hardware Mut. Ins. Co. v. Harley Davidson of Trenton, Inc.*, 124 Fed. Appx. 107, 113 (3d Cir. 2005). CML's compensation in this case is entirely contingent on a successful outcome. Console Decl. ¶ 15. After determining the appropriate lodestar, then, the next step is for the Court to consider what is an appropriate contingency enhancement.

The New Jersey Supreme Court in *Rendine* pointed to three primary factors when

23

evaluating a contingency enhancement: (1) whether a case was taken on a contingent basis; (2) whether the attorney was able to mitigate risk of nonpayment in any way; and (3) whether other economic risks were aggravated by the contingency of payment. *Rendine*, 141 N.J. at 339. "Courts may also consider such questions as the strength of the claim, proof problems, and the likelihood of success, because all of those problems may operate as disincentives to attorneys that the fee-shifting mechanism is designed to counteract. *Walker*, 209 N.J. at 138.

The *Rendine* court provided the following guidance for courts to consider when determining the appropriate fee enhancement:

> contingency enhancements in fee-shifting cases ordinarily should range between five and fifty-percent of the lodestar fee, with the enhancement in typical contingency fee cases ranging between twenty and thirty-five percent. Such enhancements should never exceed one-hundred percent of the lodestar, and an enhancement of that size will be appropriate only in the rare and exceptional case in which the risk of nonpayment has not been mitigated at all, *i.e.*, where the "legal" risk constitutes "an economic disincentive independent of that created by the basic contingency in payment…[and] the result achieved…is significant and of broad public interest…." Enhancements of that magnitude will be reserved for cases of that description in which no prospect existed for the attorney to be compensated by payment of a percentage of a large damages award, and in which the relief sought was primarily equitable in nature. Obviously, we remain willing to revisit the issue if presented with compelling evidence that our perception of the proper range of contingency enhancements is inconsistent with the relevant market and therefore is obstructing the availability of competent counsel to conduct fee-shifting litigation.

*Rendine*, 141 N.J. 343–44.

*Rendine* provides that a Court can award an "exceptional" enhancement greater than the 50% and up to 100% where the following elements are present:

> (1) "the risk of nonpayment has not been mitigated at all;" (2) the "legal" risk or risk of failure "constitutes 'an economic disincentive independent of that created by the basis contingency in payment'"; (3) "the result

achieved is significant and of broad public interest;" (4) "no prospect existed for the attorney to be compensated by payment of a percentage of a large damages award;" and (5) "the relief sought was primarily equitable in nature."

*Baughman v. U.S. Liability Insurance Company*, 723 F. Supp. 2d 741, 753 (D.N.J. 2010) (quoting

*Rendine*, 141 N.J. 343-44).

### 2. This Case Warrants an Exceptional 85% Contingency Fee Enhancement of the Lodestar Amount

Guided by the standards set forth in *Rendine*, this case warrants an exceptional enhancement. This case is not "typical" (which might warrant a 20% to 30% enhancement) nor is it "ordinary" (which might warrant up to a 50% enhancement). This case is exceptional, and as such, Plaintiff seeks an 85% contingency enhancement of the lodestar amount. The following factors, without limitation, support this enhancement figure:

*First,* Starbucks is not a typical defendant. With a net worth of $112 billion, Starbucks had access to virtually limitless financial resources to fund this five (5) year litigation. Defendant harnessed those resources and "vigorously resisted" Plaintiff's claims. By the time trial rolled around, Starbucks was represented by two separate law firms and had a team of "corporate counsel and representatives" supporting their efforts from Seattle (all of whom were undoubtedly being paid by the hour).[6] The modern-day David and Goliath scenario presented in this case would be enough for most boutique plaintiffs' firms to decline contingent representation altogether but CML took on the case – and won. This factor weighs in favor of an exceptional contingency enhancement. *See Lockley*, 344 N.J. Super. at 29 (upholding 60% enhancement, reasoning: "there is no doubt that this case was hard-fought on both sides. No quarter was asked and none was given. The State was entitled to assert a vigorous defense and it did so. Fairness requires, however, that

---

[6] *See* Defendant's June 1, 2023 letter requesting that the Court issue a Zoom link of the trial.

plaintiff's counsel be compensated for seeing the matter through to a successful conclusion.")
(emphasis added).

**Second,** CML represented Ms. Phillips on an entirely contingent basis. CML was not guaranteed to receive a penny in exchange for its 1410.2 hours of work unless the case settled or a jury found in Plaintiff's favor. Defendant *never* demonstrated a willingness to consider a reasonable settlement, eliminating Plaintiff's access to the settlement avenue to mitigate the risks of non-payment. CML's payment was entirely dependent upon eventual success at trial. In fact, if Plaintiff had lost at trial, she would have been out her own costs *and* stuck with Defendant's bill of costs, which are surely significant. This factor weighs in favor of an exceptional contingency enhancement. *Baughman*, 723 F. Supp. 2d at 753 (exceptional enhancement beyond 50% is warranted where "the risk of non-payment has not been mitigated at all" and "no prospect existed for the attorney to be compensated by payment of a percentage of a large damages award"); *see also Rendine* (awarding 33% enhancement despite plaintiff not being represented on a pure contingency fee, thereby providing a guarantee of some payment even in the case of defeat at trial); *Hightower*, Dkt. Ent. 404 (Defendant's failure to make reasonable settlement offer undermined Plaintiff's ability to mitigate the risks of non-payment).

**Third,** despite the strength of Plaintiff's claims, she faced long odds at every stage of the case. According to a 2017 study published by the American Bar Association (just two years before CML agreed to represent Ms. Phillips on a contingency fee basis), only 1% of plaintiffs who file federal job discrimination claims win on the merits at trial.[7] Where a Plaintiff does succeed, only a fraction receive punitive damage awards. In a "reverse" race discrimination case stemming from an event as high profile and racially charged as the April 12th arrests, the risk of failure was far

---

[7]Attached hereto as **Exhibit 8.**

greater. Put simply, the cards were always stacked against Plaintiff, but CML took the case on a contingency basis anyway. This factor weighs in favor of an exceptional contingency enhancement. *See Baughman*, 723 F. Supp. 2d at 753 (exceptional enhancement warranted when "the legal risk or risk of failure constitutes an economic disincentive independent of that created by the basis contingency in payment"); *see also Walker*, 209 N.J. at 138 (likelihood of success should be considered by Court in fixing appropriate enhancement).

  **Fourth,** Ms. Phillips bore the burden of proof at trial which required her to prove **intentional** discrimination by a preponderance of the evidence. To obtain punitive damages under the NJLAD, Plaintiff was required to prove the requisite elements by **clear and convincing** evidence. Plaintiff was required to meet her burdens of proof by entirely **circumstantial** evidence. This factor weighs heavily in favor of an exceptional contingency enhancement. *See Walker*, 209 N.J. at 138 (issues of proof should be considered by Court in fixing appropriate enhancement).

  **Finally,** the issues litigated and the result achieved in this case are significant and of broad public interest. The NJLAD protects all citizens of New Jersey from race discrimination, no matter the color of their skin, and it is important for large corporations like Starbucks to know that they cannot violate the NJLAD to prop up their own brand and bottom line. It is also important for the everyday citizens of New Jersey to know that when their civil rights are violated, they can hold large corporations accountable and those rights will be valued over the monetary interests of their discriminators. When the jury rendered its verdict, the public was listening, and the lessons taught and learned in this case reach far beyond Shannon Phillips and Starbucks. This factor weighs in favor of an exceptional enhancement. *See Baughman*, 723 F. Supp. 2d at 753 (exceptional enhancement warranted when "the result achieved is significant and of broad public interest").

In sum, the risk of non-payment to a lawyer representing a terminated employee on a straight contingency fee basis is by its very nature so substantial that many, if not most, employment lawyers in the Philadelphia/South Jersey area are unable or unwilling to take on such representation or devote the necessary time and resources to be able to successfully litigate these cases to verdict. Console Decl. ¶36. This fact coupled with the factors set forth above support the imposition of an 85% contingency enhancement. This premium is critical to incentivize attorneys in this market to use their talents to act as private attorney generals and vindicate employees' civil rights and the important goals of the NJLAD.

### D.  Plaintiff is Entitled to Recover Reasonable Costs Incurred

Title VII, Section 1981, and the NJLAD also provide for the award of costs to a prevailing Plaintiff. *See* 42 U.S.C.S. § 2000e-5 (Title VII); 42 U.S.C. § 1988 (referencing, *inter alia*, Section 1981); N.J. Stat. 10:5-21.1 (NJLAD). The out-of-pocket costs and expenses incurred and paid by CML in connection with this litigation were reflected on the books and records of the firm. Console Decl. ¶34. These books and records were prepared from records that were regularly maintained by the firm in the ordinary course of business and accurately reflect the costs and expenses incurred. *Id*. A printout of the detailed and individualized record of costs and expenses is attached as **Exhibit 9** to Plaintiff's Petition.

Through the date of judgment, CML incurred $36,369.45 in costs and expenses in pursuant this action on behalf of Plaintiff. Those costs are summarized as follows:

| Category | Cost Incurred |
| --- | --- |
| Filings and Transcript Fees | $5,610.40 |
| Printing | $1,111.46 |
| Medical Records | $108.02 |
| Expert Witness Fees | $12,291.50 |
| Document Hosting | $2,276.75 |
| Depositions | $10,317.90 |
| Witness Fees | $299.65 |
| Transportation and Parking | $1,802.40 |

28

| Category | Cost Incurred |
|---|---|
| Meals | $1,242.72 |
| Courier Services | $1,288.65 |

These costs were reasonably incurred in the prosecution of this litigation. Console Decl. ¶54. Consistent with Title VII, Section 1981, and the NJLAD, these costs should be awarded to Ms. Phillips as the prevailing Plaintiff.

## III.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter the proposed Order submitted herewith and award to Plaintiff her reasonable attorneys' fees and costs, calculated as follows: a lodestar amount of $767,356 with an 85% percent contingency enhancement of $652,252.60, equaling a total fee award of $1,419,608.60 for services rendered through June 28, 2023; and $36,369.45 for reasonable costs incurred through July 6, 2023.


                                         Respectfully submitted,

                                         **CONSOLE MATTIACCI LAW, LLC**

Dated: July 14, 2023               By:   */s/ Laura C. Mattiacci*
                                         Laura C. Mattiacci, Esquire
                                         Katherine C. Oeltjen, Esquire
                                         Holly W. Smith, Esquire (*pro hac vice*)
                                         110 Marter Ave, Suite 502
                                         Moorestown, NJ 08057
                                         (856) 854-4000

                                         *Attorneys for Plaintiff*