# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHANNON PHILLIPS, | ) Case No. 1:19-cv-19432-JHS-AMD |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Courtroom 13A |
| | ) U.S. Courthouse |
| STARBUCKS CORPORATION *doing* | ) 601 Market Street |
| *business as* STARBUCKS COFFEE | ) Philadelphia, PA 19106 |
| COMPANY, | ) |
| | ) July 19, 2023 |
| Defendant. | ) 10:10 a.m. |

### TRANSCRIPT OF POST TRIAL MOTION HEARING
### BEFORE HONORABLE JOEL H. SLOMSKY
### UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:          Console Mattiacci Law, LLC
                            By:  LAURA C. MATTIACCI, ESQ.
                                 KATHERINE OELTJEN, ESQ.
                                 HOLLY SMITH, ESQ.
                            1525 Locust Street, 9TH Floor
                            Philadelphia, PA 19102

For the Defendant:          Littler Mendelson, PC
                            By:  TARA PARAM, ESQ.
                            1601 Cherry Street, Suite 1400
                            Philadelphia, PA 19102

                            Holland & Knight LLP
                            By:  KATHLEEN M PRINCIVALLE, ESQ.
                                 RICHARD R. HARRIS, ESQ.
                            2929 Arch Street, Suite 800
                            Philadelphia, PA 19104

ESR Operator:               Matthew Higgins

TRANSCRIPTION SERVICE:      TRANSCRIPTS PLUS, INC.
                            435 Riverview Circle
                            New Hope, Pennsylvania 18938
                            Telephone:  215-862-1115
                            e-mail CourtTranscripts@aol.com

Proceedings recorded by electronic sound recording, transcript
            Produced by transcription service.

<u>INDEX</u>

<u>PLAINTIFF'S WITNESSES</u>                              <u>PAGE</u>

SHANNON PHILLIPS
 Direct Examination by Ms. Mattiacci          6
 Cross-Examination by Mr. Harris              14
 Redirect Examination by Ms. Mattiacci        32
 Examination by the Court                     32

STEPHEN SCHERF
 Direct Examination by Ms. Mattiacci          35
 Cross-Examination by Mr. Harris              51
 Examination by the Court                     60

<u>DEFENDANT'S WITNESSES</u>

HOWARD SILVERSTONE
 Direct Examination by Mr. Harris             63
 Cross-Examination by Ms. Mattiacci           87
 Redirect Examination by Mr. Harris           89
 Examination by the Court                     93
 Further Redirect Examination by Mr. Harris   94
 Recross-Examination by Ms. Mattiacci         94
 Further Redirect Examination by Mr. Harris   95

<u>PLAINTIFF'S TRIAL EXHIBITS</u>                    <u>ID</u>    <u>EVID</u>

21A  W-2s (Phillips/2011 through 2022)        10     10
126  Expert report (Scherf)                   53     --
126A Past Lost Earnings                       36     51
126B Front pay calculation                    45     51
126C Fidelity statement (as of 4/30/2018)     11     11

<u>DEFENDANT'S TRIAL EXHIBITS</u>

23   Report (Silverstone)                     69     --
189  Curriculum Vitae (Silverstone)           63     --

3

1        THE COURT:  Please be seated.

2        MR. HARRIS:  Good morning, Your Honor.

3        THE COURT:  This is the case of Phillips versus

4   Starbucks Corporation, Civil Action Number 19-19432, from the

5   District of New Jersey.

6        On behalf of the Plaintiffs, we have -- let's see,

7   Laura Mattiacci -- I'm at the docket now -- Esquire, welcome.

8        MS. MATTIACCI:  Thank you, Your Honor.

9        THE COURT:  I Katherine Oeltjen, Esquire.

10        MS. OELTJEN:  Good morning, Your Honor.

11        THE COURT:  Welcome.  And Holly Smith, Esquire.

12        MS. SMITH:  Good morning, Your Honor.

13        THE COURT:  Welcome.  And I note that the Plaintiff,

14   Holly Smith [sic], is at the counsel table, too.  Welcome,

15   everyone.

16        And on behalf of the Defendants, we have Richard

17   Harris, Esquire.

18        MR. HARRIS:  Good morning.

19        THE COURT:  Good morning; welcome.  And Tara Param,

20   Esquire, welcome.

21        MS. PARAM:  Good morning, Your Honor.

22        THE COURT:  Good morning.

23        We are here today with respect to a hearing on front

24   pay and back pay, the economic issue.  And when I arrived in

25   chambers this morning, I saw three letters on my desk:

4

1           One is a letter dated July 18, 2023 from Plaintiff's

2   counsel requesting until August 7th to respond to the various

3   motions found by Defendant, which are referred to in the

4   letter.  And Defendant does not object to Plaintiff's request,

5   so we'll give you until August 7th.

6           MR. HARRIS:  That's correct.

7           MS. MATTIACCI:  Thank you, Your Honor.

8           MR. HARRIS:  Counsel and I have had a conversation

9   with respect to a request for additional time, and we have no

10  objection.

11          THE COURT:  All right.  And we also have a letter

12  from Mr. Harris, defense counsel, dated July 18th, 2023, also

13  requesting until August 7th to respond to Plaintiff's motion to

14  -- well, it would be with respect to the economic loss and

15  attorney's fees.  And that is unopposed, so that will be

16  granted also.  All right?

17          MR. HARRIS:  Thank you, Your Honor.

18          THE COURT:  August 7th.

19          And then there was a third letter from Mr. Harris on

20  behalf of the Defendant to close that hearing -- this hearing,

21  and this request will be denied.  This is a hearing today as

22  part of a litigation, and I see no reason to close the

23  proceeding.

24          So with that, we are here to have a hearing on the

25  damages I mentioned with regard to front pay and back pay, so

5

1 how do you wish to proceed?

2          MS. MATTIACCI:  Your Honor, we are prepared to put on

3 two witnesses for the hearing, the first being the Plaintiff,

4 and then secondly, our expert, Mr. Scherf.

5          THE COURT:  Okay.

6          MS. MATTIACCI:  We do -- Your Honor, we did file a

7 motion in limine in regards to the Defendant's economic expert,

8 which at the time we had oral argument pretrial, Your Honor

9 decided to wait until the time of the economic loss hearing to

10 address that.  So I don't know if you want me to address our

11 argument concerning the Defendant's expert at this time, or you

12 want me to wait until Plaintiff closes her portion of the case

13 on economic loss.

14          THE COURT:  I have not reviewed that motion

15 beforehand, but why don't you present your evidence, and then

16 if you'll give me the docket number, I'll look at it, that will

17 refresh my recollection, and we'll deal with it at that point.

18          MS. MATTIACCI:  Okay, Your Honor, very well.

19          THE COURT:  All right?

20          MS. MATTIACCI:  So the Plaintiff calls the Plaintiff,

21 Shannon Phillips, to the stand.

22          THE COURT:  All right.

23          THE CLERK:  Good morning.

24          MS. PHILLIPS:  Good morning.

25          THE CLERK:  Please raise your right hand.

Phillips - Direct                                    6

1              SHANNON PHILLIPS, PLAINTIFF, SWORN

2          THE CLERK:  Be seated.  State and spell your name.

3          THE WITNESS:  Shannon Phillips, it's S-H-A-N-N-O-N

4    Phillips, P-H-I-L-L-I-P-S.

5                       DIRECT EXAMINATION

6    BY MS. MATTIACCI:

7    Q    Ms. Phillips, what is your date of birth?

8    A    6/29/71.

9    Q    How old are you currently?

10   A    52.

11   Q    At the time of your termination on May 9, 2018, how old

12   were you?

13   A    I was 46, about to turn 47.

14   Q    Had you not been terminated from Starbucks, when did you

15   intend to retire from there?

16   A    I intended to retire from Starbucks.  But in terms of an

17   age, I really had not planned out a retirement age, but I guess

18   I would have worked until at least 70, maybe -- maybe longer.

19   Q    Did you have any intention of ending your work at

20   Starbucks earlier than age 70 at the time of your termination?

21   A    No.

22   Q    Can you describe for the Judge the efforts that you made

23   to find another job after you were terminated from Starbucks?

24   A    Sure.  So, obviously it had been a long time since I had

25   looked for a job, so I took some classes on writing a résumé

Phillips - Direct                              7

1  and -- through the State, and my daughter also helped me; she's

2  pretty savvy with that.  I went to a job fair, also through the

3  State.  I reached out to contacts that I have through LinkedIn

4  to find, hopefully, you know, a position that -- a company that

5  was looking for someone.  And ultimately -- it's interesting, I

6  connected with somebody I used to work with many years ago at

7  Hollywood Video who worked at Raymour & Flanigan as a VP, and

8  then when I got the call from Raymour & Flanigan, I assumed it

9  was from Roger, but it ended up that a former VP from Starbucks

10 had been interviewing with Raymour and didn't want to move, so

11 -- he lived in North Jersey, and so he had said, you should

12 reach out to Shannon, and that's how I got connected to

13 Raymour.

14 Q    And then Raymour & Flanigan, you interviewed with them?

15 A    Multiple interviews.  They're based in Syracuse, so I met

16 someone locally.  I flew to Syracuse.  I went up to New

17 England, and spent time with a VP up there interviewing.  And

18 then I think I met one other time locally.  Yeah, that started

19 -- I met -- started talking to them in June.

20 Q    Okay, let's talk about time frame a little more

21 specifically, as well.  Your termination was May 9, 2018,

22 correct?

23 A    That's correct.

24 Q    How soon after your termination did you start looking for

25 a job?

1  A     I would say within a week or two, I was working on my

2  résumé and wanted to get that up-to-date first, and reaching

3  out to people that I was connected to.  I knew I needed a job,

4  so --

5  Q     And when you say that you took classes through the State,

6  do you mean the State of New Jersey?

7  A     Yes, um-hum.

8  Q     And the classes that you took through the State of New

9  Jersey, how soon after your termination, approximately, did

10 those classes take place?

11 A     I -- since I wasn't working, I don't have an Outlook

12 calendar to go back to, but I would say it was probably within

13 the first two to three weeks.  Maybe -- yeah, it was pretty

14 quick.

15 Q     Did the classes that you took through the State of New

16 Jersey also help with your résumé and interviewing skills?

17 A     Yes, um-hum.

18 Q     Approximately, how long after the termination did you

19 first connect with Raymour & Flanigan?

20 A     So, I started talking to Raymour & Flanigan in June, so it

21 would have been within -- I was let go May 9th, so it would

22 have been within three, four weeks, I guess.

23 Q     Approximately, when were you offered the job at Raymour &

24 Flanigan?

25 A     I was offered the job in July, and then I started in early

1   August.

2   Q     Why did you take the job at Raymour & Flanigan?

3   A     Well, I -- you know, I obviously needed to work.  I, you

4   know, live on my own.  I have two children that I help support;

5   one of them still lives with me.  Raymour & Flanigan had been

6   around for, like, 70 years, so I felt like they were a company

7   that was going to be in business.  The person that I had known,

8   Roger, from many years before spoke highly of the company and -

9   - it was a regional position.  You know, I certainly felt like

10  I wanted to try to stay at my level if I could.  I don't have a

11  college degree, so, you know, that hinders me a little bit, but

12  you know, I needed to work for a company that would accept

13  that.  And I was happy, quite frankly, to get the regional

14  position.

15           When I interviewed with them, one of the owners had

16  said, you know, this is the first step, and then you can work

17  your way to a VP position.  I was asked in 2022 to move to New

18  York City and take the highest volume region, that would have

19  been a stepping stone to a VP role.  But unfortunately the

20  timing was not good.  I found out I had breast cancer, and --

21  so I couldn't pick up and move.

22  Q     Let's talk about the -- your income over the years.  Did

23  you receive W-2s that evidenced your income from 2011 through

24  2022?

25  A     Yes.

1         MS. MATTIACCI:  Your Honor, may I approach the

2  witness?

3         THE COURT:  Yes.

4         MS. MATTIACCI:  We have marked these documents, Trial

5  Exhibit 21A, which are Bates stamps Starbucks 5236.  It's a

6  range of Bates numbers, Your Honor, which I can supplement at

7  the close of testimony.  But the defense counsel, I've already

8  cleared it with them to enter these in, but it is the W --

9  well, I'll have the witness identified them.

10         MR. HARRIS:  That's correct, Your Honor.  I have had

11  an opportunity to receive a copy of all of Ms. Phillips' W-2 --

12         THE COURT:  All right.

13         MR. HARRIS:  -- earning wage statements.

14  BY MS. MATTIACCI:

15  Q    Ms. Phillips, do you recognize those -- Exhibit 21A as

16  your W-2s from 2011 through 2022?

17  A    Yes, these are my W-2s.

18  Q    And that shows income both from Starbucks and from Raymour

19  & Flanigan, correct?

20  A    Yes.

21         MS. MATTIACCI:  Your Honor, I move for the admission

22  of Exhibit 21A.

23         MR. HARRIS:  No objection.

24         THE COURT:  Okay, so admitted.

25              (Trial Exhibit 21A in evidence)

Phillips - Direct                           11

1  Q    Did you also receive stock options when you were at

2  Starbucks -- I'm sorry.  Did you receive stock options when you

3  were at Starbucks?

4  A    I did.

5  Q    And did you receive statements regarding your stock

6  options through Fidelity?

7  A    Yes.

8         MS. MATTIACCI:  Your Honor, may I approach the

9  witness?

10        THE COURT:  Yes.

11  Q    The document that I have handed you has been marked Trial

12  Exhibit 126C, do you recognize this as your Fidelity statement

13  as of April 30th, 2018?

14  A    Yes.

15        MS. MATTIACCI:  Your Honor, I move for the admission

16  of Exhibit 126C.

17        MR. HARRIS:  No objection.

18        THE COURT:  That's a G, is that 126G?

19        MS. MATTIACCI:  C.

20        THE COURT:  Oh, C.

21        MS. MATTIACCI:  As in cat.

22        THE COURT:  All right.  So admitted.

23             (Trial Exhibit 126C in evidence)

24  BY MS. MATTIACCI:

25  Q    When you were at Starbucks, were you -- were one of the

1  benefits -- was one of the benefits that you received a 401K

2  plan?

3  A    Yes.

4  Q    Did you have the opportunity to contribute as an employee

5  to the 401K plan?

6  A    Yes.

7  Q    And typically, what would be the percentage of salary of

8  your contribution?

9  A    I contributed four percent.

10 Q    When you were at Starbucks, did they match your

11 contribution to the 401K?

12 A    They did.

13 Q    And what would be the percent match by Starbucks?

14 A    The full four percent.

15 Q    Okay.  So if you -- when you contributed the four percent,

16 they contributed four percent, as well?

17 A    That's correct.

18 Q    At Raymour & Flanigan, do you have a 401k plan?

19 A    I do.

20 Q    Do you continue -- does Raymour & Flanigan the four --

21 well, let me back up.  Are you contributing four percent of

22 your salary to the 401k plan at Raymour & Flanigan?

23 A    I am.  I am.

24 Q    Is Raymour & Flanigan also contributing the same four

25 percent that Starbucks did?

1  A     No, they contribute two percent.  They contribute half.

2  Q     In terms of health insurance, did you have health

3  insurance coverage at Starbucks when you were working there?

4  A     Yes.

5  Q     And do you have health insurance coverage now at Raymour &

6  Flanigan?

7  A     I do.

8  Q     How would you compare the health insurance plans of

9  Raymour & Flanigan versus Starbucks?  Was -- are the plan [sic]

10  that you have at Raymour & Flanigan better, worse, or the same?

11  A     It's worse.  Raymour's a very small company and -- I mean,

12  you know, compared to Starbucks.  And we private -- we -- you

13  know, they pay for the insurance, so it's higher what comes out

14  of my paycheck, and then the coverage is not as good as what it

15  was at Starbucks.

16  Q     And you mentioned that Raymour & Flanigan is a privately

17  owned company.  So are you able to receive any stock options

18  now that you're an employee of Raymour & Flanigan?

19  A     No.

20  Q     Had you continued to work at Starbucks, would you have

21  continued to receive stock options from the company?

22  A     Yes.

23  Q     In terms of PTO, or paid time off, as part of the breast

24  cancer that you -- well, let me first set the time frame of

25  that.  When were you going through breast cancer treatment?

1   A    So my surgery was March of 2022.  I found out the prior

2   November, so the end of 2021.

3   Q    Did you need to have chemo -- chemotherapy, radiation, and

4   surgery as part of the breast cancer treatment?

5   A    I did.

6   Q    And did you need to take some time off from work in

7   regards to the treatment?

8   A    I had nine weeks off after my surgery, and then I went

9   back to work and worked while I did my chemotherapy for four

10  months.  And then I had a short break, and I did radiation for

11  six weeks, and I worked all through that, as well.

12  Q    During the nine weeks that you took off after your surgery

13  in 2022, were you paid by Raymour & Flanigan for that?

14  A    No, it was unpaid.

15  Q    Had you remained employed at Starbucks, do you believe you

16  would have been paid for those nine weeks of medical leave?

17          MR. HARRIS:  Objection.

18          THE COURT:  Overruled.  Do you know?

19          THE WITNESS:  I believe I would have been paid.

20          MS. MATTIACCI:  I don't have any further questions,

21  Your Honor.

22          MR. HARRIS:  If I may.

23          THE COURT:  Yes.

24                          CROSS-EXAMINATION

25  BY MR. HARRIS:

1  Q    Ms.  Phillips, good morning.

2  A    Good morning.

3  Q    As I understand your testimony, you testified that your --

4           THE CLERK:  Excuse me, Mr. Harris.  You have to get

5  closer to a microphone.

6           MR. HARRIS:  Oh, I'm sorry.  I apologize.

7  BY MR. HARRIS:

8  Q    As I understand your testimony, you indicated that applied

9  for one role and one role only, is that fair?

10 A    No, not necessarily.  I went to a job fair through the

11 State.  They had companies that came in that were looking for

12 people, but it was not the level of what I was trying to find a

13 regional, similar position.  And I -- but in terms of actually

14 applying, I talked to lots of different people about positions.

15 I did speak with two other companies.  One, I think it was --

16 it's the company that used to be Sears and they do appliances,

17 I think it's called U.S. Appliance.  I had to have a college

18 degree, so that was not a go.

19           And then I also spoke with Total Wines -- Total Wine

20 and Spirits, I think they're called.  I didn't think that was

21 going to be a great fit.  Selling booze, that didn't seem like

22 who I was going -- I was going to be aligned with.  But I spoke

23 to the folks at both of those organizations.

24           And I also spoke with someone from 7-Eleven at one

25 point.  So I did speak with different organizations other than

Phillips - Cross                                16

1  Raymour.

2  Q    Okay.  So when you said that you spoke to an individual at

3  U.S. Appliance, did you actually apply for a role?

4  A    It was like a first interview with a recruiter.  So, no, I

5  did not submit an application to their company.

6  Q    Okay.  When you spoke to an employee of the other

7  corporation that you just identified, the second one that

8  distributed alcohol, did you apply for a role there?

9  A    No, I don't believe so.  It was an interview over the

10  phone, but I didn't think it would be a good fit, so I did not

11  apply directly to them.

12  Q    And you indicated that you applied -- or that you spoke to

13  an individual from a third organization, you identified as

14  7-Eleven --

15  A    Um-hum.

16  Q    -- is that accurate?

17  A    Um-hum, yes.

18  Q    You have to say yes or no.

19  A    I'm sorry, yes.

20  Q    And the person that you spoke to with that corporation, do

21  you recall that person's name?

22  A    Kevin.  He actually used to work at Starbucks, and so we

23  were colleagues before.

24  Q    All right.  So the person you identified as Kevin, did you

25  also apply for a role there as well at 7-Eleven?

1  A    Kevin got me connected with someone in HR.  I don't recall

2  if it was a recruiter, or if it was some other position in HR,

3  I spoke with them.  I did not apply to them.  It was going to

4  be -- their stores are open 24 hours and it did not -- they get

5  robbed a lot, and you're called in the middle of the night.  It

6  did not seem like that was going to be the best fit for me

7  either.

8  Q    Understood.  So as I understand your testimony, you spoke

9  to three individuals at three corporations, none of which you

10 actually applied for a role, yes?

11 A    I mean, the first step would be speaking to someone before

12 you actually apply, yes.  Or you might -- you send them your

13 resume, but you don't actually apply to the organization until

14 maybe later in the process.  So, yes, that's correct.

15 Q    Okay.  And so as I understand your testimony from trial,

16 as well as today, it's my understanding you were out of work

17 for approximately 14 weeks, is that fair, before you actually

18 were hired by Raymour & Flanigan?

19 A    I was let go May 9th, and I officially started with

20 Raymour, it was August 12th, I think or 13th, something like

21 that.  So that might be 10 weeks.  I'm sorry, I would have to,

22 like --

23 Q    Between 10 and 14 weeks, is that fair?

24 A    Yes, that's fair.

25 Q    Okay.  And as I understand it -- your current salary was

1 introduced through the W-2 documents that are in front of you.

2 Do you have those in front of you?

3 A    Yes.

4 Q    Okay.  Have you had a chance to speak to the expert that

5 your counsel is intending on calling prior to today, Mr.

6 Scherf?

7 A    I believe we did have one call, but it was not, like,

8 since the trial to today, it was prior to.  I think when he was

9 going through, like, my forms, he had some questions.

10 Q    All right.  During the course of the conversation that you

11 had with Mr. Scherf, did you explain to him the gross salary

12 that you were receiving at Raymour & Flanigan that were

13 consistent with your W-2 statements that you provided to the

14 Court this morning?

15 A    I'm not -- I'm not sure I understand the question.  Say it

16 again.

17 Q    Sure.  I'll try to ask it differently.  As I understand

18 your expert's report, he identified your wages based on the net

19 income, not your gross wages, is that accurate?

20 A    I'm -- I'm sorry, I don't know the answer to that.

21 Q    Okay.  Have you had a chance to review his expert report

22 that he's prepared in this case?

23 A    What he prepared?

24 Q    Yes.

25 A    Yes.

1  Q    Okay.

2  A    I'm sorry, I just didn't compare it.  I'm not sure if it

3  was the gross or the net, I think that's what you asked me.

4  Q    That is what I asked you.  Do you recall whether or not

5  Mr. Scherf identified in his report the calculation of your

6  damages model by using your gross wages or your net wages?

7  A    I'm sorry, I don't know the answer to that.

8  Q    When you had a conversation with Mr. Scherf many months

9  ago, possibly years ago, what did you discuss with him?

10  A    We talked about the difference of working at Starbucks and

11  here, like getting stock options, not getting stock options.

12  We talked about my income at Raymour versus what I made at

13  Starbucks, I believe.  It -- I don't remember actually

14  specifics, but I remember at some point, someone said, "Oh, he

15  wants to talk to you," and we did have a phone call.

16  Q    Anything else you can recall from that one conversation

17  you had?

18  A    It was more him asking me some questions, I believe, to

19  try to clarify information, so I don't actually recall

20  specifics, it's been quite some time.

21  Q    Have you spoken to him since the conclusion of the trial

22  in this case?

23  A    No.

24  Q    And if I understand -- if I can show you what's been

25  marked as -- it looks like Exhibit 21A, that's in front of you.

Phillips - Cross                          20

1   A     Um-hum, yes.

2   Q     If I can direct your attention to the document that

3   actually shows the first wage statement for Raymour & Flanigan,

4   do you have that in front of you?

5   A     (No verbal response).

6   Q     It would begin on Page 72 -- 722 Bates stamp where it says

7   "Phillips 722" --

8   A     I've got it.

9   Q     -- do you see that?

10  A     I do, um-hum.

11  Q     All right.  So the first document is -- the W-2 wage

12  statement for 2018 begins in what month, Ms. Phillips?

13  A     I started in August, so I would think August, if I could

14  find a date on here, I'm sorry.

15                            (Pause)

16  A     I'm sorry, if there's a date, I don't see it.  But it

17  should have started in August because that's when I started

18  with them.

19  Q     Understood.  And let's go to the document where it

20  actually shows the gross wages.  Do you see the first one

21  that's in front of you?

22  A     Yes.  The W-2?

23  Q     Correct.  What does it have -- what does the document

24  reflect as your gross wages on the first statement?

25  A     I believe fifty-five five nine-o point eight six.

1  Q    And when you say fifty-five, is that 55,000 for the

2  record?

3  A    Yes, I'm sorry, 55,590.86.

4  Q    And what does this document reflect as your net wages?

5          MS. MATTIACCI:  Objection, Your Honor.  I mean, the

6  document speaks for itself.  If he's pointing her to a specific

7  box on here, she's not an economist or an economic expert.

8          THE COURT:  Well, she would be familiar with it.

9  I'll overrule it -- I'll overrule the objection.

10 A    Net --

11 Q    Do you see the document where it says -- if I'm mistaken,

12 I believe this document says at the conclusion of the document

13 under "local wages, tips," etc., do you see that?

14 A    Oh, yes.  Is that net?

15 Q    I'm asking you, Ms. Phillips.

16 A    I can tell you local wages, tips, etc. says 41,730.78.

17 Q    Okay.  And does it also indicate all of the taxes that you

18 were responsible for or that were withheld from your paycheck?

19 A    Taxes, yes.  Medicare, Social Security, um-hum.

20 Q    It does?  You have to say yes.

21 A    Yes.

22 Q    Okay.

23 A    It does.

24 Q    So as I understand, when you're talking about your

25 compensation, you're actually referring to your gross wages,

Phillips - Cross                    22

1  meaning how much you actually receive annually in gross, not in

2  net, meaning not withdrawing your taxes.  Do you understand

3  what I mean by that?

4  A    When I'm talking about my wages?

5  Q    Yes, when you were saying that you made more at

6  Starbucks --

7  A    Yes.

8  Q    -- and you were comparing that to how much you were making

9  at Raymour & Flanigan -- or how much you're currently making at

10 Raymour & Flanigan, you're referring to your gross wages, are

11 you not?

12 A    Not necessarily.  I mean, my gross wages were higher, yes.

13 My -- there, I got paid every other week.  Here, I get paid

14 weekly.  I got paid more after taxes there, as well.

15 Q    Understood.

16 A    Okay.

17 Q    Because there was a slight difference in how much your

18 overall compensation was at Starbucks versus how much your

19 overall compensation is currently at Raymour & Flanigan, yes?

20 A    Yes, there's a difference, yes.

21 Q    Okay.  And so the positions that you said that you had

22 spoken to three organizations about, do you recall what the

23 actual annual compensation were for either one of those three

24 organizations?

25 A    We never got to a point that we were talking about

1  compensation.

2  Q    Can you tell us about the roles that you were actually

3  thinking about as it related to those roles?

4  A    They were also regional roles.

5  Q    When you say "regional," what does that mean for the

6  record?

7  A    Well, it's different by organization, but it's based on

8  overall revenue that you oversee.  So at Starbucks, as a

9  regional director, I had 10 district managers under me that had

10 about 12 stores each, but those stores did maybe 1.5 million a

11 year.

12        So at Raymour, I only have six stores that I oversee

13 directly.  I don't have, like, that district manager layer, but

14 the volume of the stores is much higher.

15        So at Starbucks, maybe I was in charge of about 150

16 million annually.  Here, I have about 85 million annually that

17 I oversee, but it's still considered a regional position.

18        Other companies, you know, are different.  So at

19 7-Eleven, a regional would oversee district managers.  At the

20 appliance place, you would have overseen your -- just your own

21 set of stores.

22 Q    Understood.  And so if I understand your testimony, Ms.

23 Phillips, you have a significant amount of experience of

24 running an organization that had profit and loss responsibility

25 of more than $100 million annually, is that fair?

1  A    That is fair.  And so the organizations that you were

2  actually talking about just a few moments ago, or testifying

3  to, those organizations, did any of those organizations have

4  the same profit and loss responsibility if, in fact, you were

5  going to apply for those roles?

6  A    I would assume so, yeah.

7  Q    At a minimum of $100 million or more, is that your

8  testimony?

9  A    Oh, I'm not sure, like, how wide the geography or scope

10 would have been, because we didn't get, like, far enough into

11 the process, I would say.

12 Q    Okay.  And so did you apply for any roles that had a

13 minimum profit and loss responsibility of $100 million or more?

14 A    I mean, I'm not even sure I actually applied at Raymour.

15 It's not -- it's not like you apply for a position.  You

16 connect with a recruiter.

17 Q    Correct.

18 A    You send them your resume, you have interviews, and, you

19 know, find out on both ends if it's going to be the right fit.

20 So did I actually apply to Total Wine, for example?  I didn't

21 send in an application, if that's what you're asking.

22 Q    Well, I understand.  So as I understand it, Ms. Phillips,

23 as an executive from another organization, typically the

24 process that you engage in is consistent with executives, yes?

25 A    I mean, I don't -- I guess, sure.

1  Q    You have a chat.

2  A    Yes.

3  Q    You speak to someone in the organization.

4  A    Yes.  You send a résumé, yes.

5  Q    You send a résumé --

6  A    Yes.

7  Q    -- and there's a chat to determine whether or not there's

8  a good fit.

9  A    Yes.

10  Q    Did you speak to any executive recruiters at any other

11  organization other than at Raymour & Flanigan regarding your

12  qualification and your expertise to run an organization that

13  had profit and loss responsibility of 100 million or more --

14  $100 million or more?

15  A    Yes.

16  Q    Who might that be?

17  A    Well, it was a recruiter that put me in with the appliance

18  place, the Sears, U.S. Appliance.  So recruiters frequently

19  reach out, and still do, "Are you interested in talking to this

20  organization?  They're looking for someone."  So it was a

21  recruiter that put me in touch with the U.S.A. -- the U.S.

22  Appliance position.

23  Q    Okay.  And when you speak to a recruiter, often they'll

24  contact you in reference to other positions at other

25  organizations, yes?

1   A     Yes.

2   Q     And in doing so, they also share with you what the

3   compensation model would also be, yes?

4   A     I mean, a range, yes.

5   Q     Yes.  And so the recruiter that you spoke to at the other

6   organizations would have shared with you the range that you

7   would have been eligible for, had you applied for those roles,

8   yes?

9   A     It's possible.  I -- I -- you -- a recruiter will

10  typically talk a range for the positions.  So, yes, not an

11  actual dollar amount, but a range, sure.

12  Q     Yes.  As well as the benefit packages that would also --

13  you'd be eligible for, if, in fact, you were selected for that

14  role, as well.

15  A     Yes.

16  Q     All right.  Are any of the positions that you just

17  referred to with the recruiter, did any of them have a

18  compensation model that was consistent with Starbucks?

19  A     So, let me think.  7-Eleven might have been more

20  comparable, but it would have been overseeing stores that were

21  open 24 hours.  So, you would be on call 24-7, you know, if a

22  store got robbed and whatnot, and I wasn't sure that that would

23  necessarily be the quality of life that, you know, I wanted to

24  sign on for.

25  Q     Understood.  Because that wasn't a good fit for your

1  lifestyle.  But in terms of economic compensation, it may have

2  been comparable, yes?

3  A    It might have been.  We never got far enough to talk

4  actual salary.

5  Q    Okay.  What about the other organization that you

6  identified, the appliance organization?

7  A    So that one was the one I believe I needed a college

8  degree for, so I wasn't able to move forward with that one.  Or

9  was -- or maybe it was Total -- let me think about that for a

10  second.  I'm pretty certain that the appliance place was the

11  one I needed a college degree for.  No, that was 7-Eleven.  I'm

12  sorry, I don't remember a hundred percent.

13  Q    Okay.

14  A    It's been many years.

15  Q    Understood.  Absent you not having a college degree, did

16  you have all the other qualifications for that role?

17  A    I certainly think I do.

18  Q    And you also had an experience of operating an

19  organization that had over $100 million in profit and loss

20  responsibility, yes?

21  A    Yes.

22  Q    All right.  Did you share that with the recruiter?

23  A    I'm sure I would have.  We talked about my

24  responsibilities at Starbucks, and what I had done, and what

25  that entailed, so sure.

1  Q    Did the recruiter inform you specifically that you were no

2  longer eligible for the role because you did not have a college

3  degree?

4  A    One did, yes.

5  Q    Any other recruiter share that with you?

6  A    Not for the two other positions that I was talking to

7  about.

8  Q    You identified a job fair in New Jersey that you also had

9  attended prior to you actually being selected by Raymour &

10  Flanigan --

11  A    That's right.

12  Q    -- do you recall testifying about that?

13  A    Um-hum.

14  Q    Yes or no?

15  A    I'm sorry, yes.

16  Q    At the job fair, did you recall applying for any roles of

17  -- for any of the employers that were present at the job fair?

18  A    No.  Unfortunately, they were entry level positions.  They

19  weren't, like, the level of position that I was trying to, you

20  know, stay in.

21  Q    Understood.  So you -- that's a no, you did not apply for

22  any roles because those roles were certainly beneath your

23  expertise.

24  A    Yes.

25  Q    Did you attend any other job fairs of senior level

1  managers that you are aware of?

2  A    No, it was -- it was a short time before I started talking

3  with Raymour, because I started talking to them in June.  And

4  then at that point I was pursuing, you know, obviously the

5  position.  I didn't want to be out of work.  Obviously I had

6  bills I had to pay, and so I was trying to get another job.

7  Q    Understood.  And you said that you have two children that

8  you continued to support?

9  A    Yes.

10  Q    They're adults, yes?

11  A    Yes.

12  Q    What are their ages?

13  A    My son is 25, he lives with me, he's still in college.

14  Well, on a second degree now.  My daughter just graduated from

15  college in May, she's 24.

16  Q    Understood.  And as I understand your testimony, you said

17  that you continue to receive calls from recruiters, did I

18  understand that correctly?

19  A    Sure.

20  Q    And the recruiters identify other opportunities for you

21  based on your experience?

22  A    I really didn't talk to a lot of other recruiters.  Once I

23  started at Raymour, I wanted to give this a shot, and I knew

24  that this could work into a VP position that, you know, that I

25  very much wanted to try to grow with the company.  And -- and

Phillips - Cross                                30

1  then at some point, I started thinking Raymour's not maybe the

2  company I want to work with forever.  But -- but to be

3  perfectly frank, my recruiter, when one of my leaders puts

4  their résumé on social media, they tell us.  So, "Shannon,

5  Dan's résumé is on Indeed, he might be looking for a job."  So

6  I certainly didn't want to jeopardize my job by putting my

7  résumé, like, online.  They would have known, and it would have

8  been shared.

9  Q    Well, Ms. Phillips, you know certainly you don't have to

10 post your résumé on Indeed in order for you to receive calls

11 from recruiters, correct?

12 A    Of course not.

13 Q    All right.

14 A    No, I -- I was saying, did I put my information out there?

15 No, I did not.

16 Q    Okay.  So are you telling us that you have not spoken to a

17 recruiter since you've begun working at Raymour & Flanigan?

18 A    I did speak with a recruiter at one point.  It's been -- I

19 think it was maybe 2021.  That position was -- that they were

20 recruiting for was with -- let me think.  Who were they?  It

21 might have -- I'm not a hundred percent sure I remember the

22 company that they were recruiting for, but --

23 Q    Do you remember the industry?

24 A    It would have been retail.

25 Q    Okay.  So all the positions -- and your expertise is in

1  retail?

2  A    Retail restaurant, yeah.

3  Q    Okay.  So the organization in which the recruiter was

4  calling you about, although you don't recall the business

5  concern, you do recall it was in the retail space?

6  A    Sure.

7  Q    Do you recall the compensation range that the recruiter

8  talked to you --

9  A    You know, it might have been Wawa.

10 Q    Okay.  Retail, yes?

11 A    Yeah, um-hum.

12 Q    It would have been in the same sort of market as you were

13 when you were at Starbucks, yes?  Starbucks is a competitor of

14 Wawa?

15 A    Sort of.  I mean, Wawa has gas and, you know, they have a

16 -- like a convenience store and whatnot.  It's not exactly the

17 same, but similar, I guess.

18 Q    Understood.  Did you speak to a recruiter in reference to

19 the compensation range as it relates to a position potentially

20 at Wawa?

21 A    I don't think we ever talked about a salary, but certainly

22 the range would have been, you know, in line with what I was

23 making at Raymour.

24 Q    Would it have been in line with what you were making at

25 Starbucks?

Phillips - Cross/Redirect                          32

1  A    I don't know.  We didn't get far enough for me to

2  determine if -- it would have been a little higher, a little

3  bit lower, but certainly it was in the range of where I was

4  currently.

5  Q    You elected not to move forward with the process?

6  A    I think what happened -- and that's still a company that,

7  you know, I would be interested in working for.  But I think at

8  the time that I talked with them, I think maybe that's when I

9  found out I had breast cancer, and so then I felt like I needed

10  to stay where I had insurance, and I already had been a few

11  years.

12  Q    Understood.

13        MR. HARRIS:  I have no further questions.  Thank you,

14  Ms. Phillips.  Thank you.

15        MS. MATTIACCI:  Just one question, Your Honor, to

16  button up the testimony.

17        THE COURT:  Yes.

18                    REDIRECT EXAMINATION

19  BY MS. MATTIACCI:

20  Q    You currently work at Raymour & Flanigan, correct?

21  A    I do.

22        MS. MATTIACCI:  No further questions, Your Honor.

23        THE COURT:  I have just one or two questions.

24        THE WITNESS:  Sure.

25        THE COURT:  In the region at Raymour & Flanigan, what

 1  is your title?

 2            THE WITNESS:  I'm a Regional Director of Sales.

 3            THE COURT:  And you also said you believed that you

 4  would have been paid for the -- I believe it was in nine weeks

 5  you were out --

 6            THE WITNESS:  Yes, they have --

 7            THE COURT:  -- by Starbucks.  What do you base that

 8  on?

 9            THE WITNESS:  They had really good insurance.  They

10  actually give insurance even to part-time baristas.  So the

11  insurance benefits were really good, and not nearly as

12  expensive, and they had really good leave of absence plans, as

13  well.  One of my district managers was off for over a year and

14  still was employed with them.

15            THE COURT:  And when you say "insurance," you're

16  talking about disability insurance?

17            THE WITNESS:  The health -- all the insurance, it was

18  better in terms of what you paid for it from your paycheck for

19  the insurance, and then also, like, copays, prescriptions,

20  out-of-pocket, tests, yeah.

21            THE COURT:  All right.  Does anyone have any

22  questions based upon my questions?

23            MR. HARRIS:  I have no questions --

24            MS. MATTIACCI:  No, Your Honor.

25            MR. HARRIS:  -- based on counsel --

1            THE COURT:  All right.

2            MR. HARRIS:  -- based on your Court's questions.

3            THE COURT:  All right.  You may step down.

4            MS. PHILLIPS:  Thank you.  Should I bring these?

5  Should I bring these?

6            MS. MATTIACCI:  Yes.

7            Would you like me to call my next witness, Your

8  Honor?

9            THE COURT:  Yes.

10            MS. MATTIACCI:  The Plaintiff calls from Stephen

11  Scherf.

12            THE CLERK:  Good morning.

13            MR. SCHERF:  Good morning.

14            THE CLERK:  Raise your right hand to be sworn.

15             STEPHEN SCHERF, PLAINTIFF'S WITNESS, SWORN

16            THE COURT:  State and spell your name.

17            THE WITNESS:  Yes, my name is Stephen Scherf.  That's

18  Stephen with a P H.  Last name, Scherf, S-C-H-E-R-F.

19            MS. MATTIACCI:  Your Honor, the defense counsel has

20  stipulated to the expert's qualifications, and to be qualified

21  to render an opinion as to Plaintiff's economic loss suffered

22  by Plaintiff in this case.  I would just like to have him give

23  a brief statement as to his background for Your Honor's

24  information.  But in terms of the Defendant, he's not

25  objecting, and stipulates to the qualification as an economist.

Scherf - Direct                              35

1        MR. HARRIS:  So stipulated, Your Honor.

2        THE COURT:  All right, yeah.  We'll find Mr. Scherf's

3   qualified to render an opinion on economic loss, and you can

4   give a -- go into his qualifications.

5        MS. MATTIACCI:  Okay.  Thank you, Your Honor.

6                      DIRECT EXAMINATION

7   BY MS. MATTIACCI:

8   Q    Mr. Scherf, can you explain to Judge Slomsky a bit about

9   your background and your qualifications?

10  A    Yes.  I have an undergraduate degree in accounting from

11  Temple University; a masters of science degree in finance from

12  Drexel University; an advanced professional certificate in

13  taxation from Drexel University, which is essentially the

14  equivalent of a second masters degree.  I'm a CPA by license,

15  and I have several other professional designations with respect

16  to damages.

17  Q    Have you testified before in court in regards to economic

18  loss?

19  A    Yes, I have.

20  Q    And approximately -- can you give His Honor just an

21  approximation of how many times you have given opinions on --

22  as an economist, as an expert economist in litigation?

23  A    I've testified at trial, and since -- I've been doing this

24  since 1995, and that would be in excess of 100 times I have

25  testified at trial.

Scherf - Direct                                    36

1  Q    Have you prepared an expert report containing your expert

2  opinions and your support for the same?

3  A    I did.

4  Q    Now, based on the information that you were provided and

5  reviewed, do you have an opinion within a reasonable degree of

6  professional certainty as to the estimated past lost earnings

7  of Ms. Phillips as a result of her termination from Starbucks?

8  A    I do.

9          MS. MATTIACCI:  Your Honor, may I approach the

10 witness?

11         THE COURT:  Yes.

12 Q    Mr. Scherf, I've handed you what has been marked as Trial

13 Exhibit 126A, which is Exhibit 1 to your expert report.  Do you

14 recognize this?

15 A    Yes, that's correct.

16 Q    And if we look -- we're just going to go column-by-column,

17 and have you explain the numbers and your calculations to His

18 Honor?  Is Exhibit 1 evidencing the past lost earnings and

19 benefits --

20 A    Yes.

21 Q    -- of Ms. Phillips?

22 A    Yes, this is the past lost earnings, it's Exhibit 1.

23 Q    Okay.  And in the first row under -- in the first column,

24 has the date of May 10th, 2018, and the end date of December

25 31st, 2018, correct?

1  A    That's correct.

2         THE COURT:  All right.  I just want to clarify

3  something for the record.

4         MS. MATTIACCI:  Sure.

5         THE COURT:  You're referring to it as Exhibit 1, and

6  that refers to a larger exhibit, but the actual exhibit number

7  for -- of this one-page document is Trial Exhibit 126A.

8         MS. MATTIACCI:  That's correct, Your Honor.  This is

9  a -- an exhibit -- this is part of Mr. Scherf's expert report.

10  It was just the chart to the expert report.  And since the

11  expert report in the trial exhibit list was marked previously

12  as Trial Exhibit 126, we're just using the chart itself for

13  purposes of the testimony, Your Honor.

14         THE COURT:  All right.

15         THE WITNESS:  And I think, Your Honor, she's

16  referring to it as Exhibit 1 because it says Exhibit 1 on it.

17  You'll see that at the third line down at the top in the

18  caption.

19         THE COURT:  I see that.

20         THE WITNESS:  Okay.

21         MS. MATTIACCI:  I'm sorry for the confusion.

22  BY MS. MATTIACCI:

23  Q    And if we look, Your Honor, at -- Mr. Scherf, that first

24  row under "Start Date," is that for the year 2018.

25  A    Correct.

1  Q    And can you explain in Column 1 of that first row where

2  you have "Expected earnings from Starbucks," and Column 2,

3  "Actual Earnings"?

4  A    Sure.  So expected earnings from Starbucks is basically

5  based upon Plaintiff's earnings at Starbucks for 2017, grown at

6  three percent.  Because based on the documents that I looked

7  at, the Plaintiff had three percent increases.  So I took the

8  2017 amount, added three percent, to come up with $289,730.

9  And the amount in Column 1 of 187,332 is the prorated amount

10 for the year.  So it's 236 days of the 365 days a year, so that

11 comes out to $187,332.  So that would be the time period from

12 her termination, starting on May 10th through the end of the

13 year, the portion of her salary that she would have earned at

14 Starbucks.

15 Q    Okay.  Great.  So just to clarify, in that Column 1, this

16 is the expected earnings had she stayed employed at Starbucks

17 from --

18 A    Correct.

19 Q    -- May 10th, 2018 through April 30th, 2023.

20 A    That's right.  Right.  So it starts with the 289,730 as

21 her wages for 2018, and grows that in each year by three

22 percent.

23 Q    And then Column 2, which goes from May 10th, 2018 through

24 April 30th of the 2023, for each of those years, is that the

25 actual earnings of Ms. Phillips when she was working at Raymour

Scherf - Direct                                           39

1  & Flanigan?

2  A    Yes.  Those numbers, from 2018 through 2021, reflect her

3  wages on her W-2 from Raymour & Flanigan.  The 2022 number, I

4  had to gross-up because the wages at Raymour & Flanigan on 2022

5  represented $130,097.  But as Ms. Phillips testified, she was

6  out for nine weeks.  So in order to make it comparable for the

7  entire year, I grossed that up by adding essentially $27,000 so

8  that it would be comparable because I wanted to compare what

9  she would have earned at Starbucks in 2022, and compared that

10 to what she earned at Raymour & Flanigan, but I had to take

11 care of the nine weeks.  She would have been paid for that at

12 Starbucks, but she wasn't paid for that at Raymour & Flanigan.

13 So I needed to get an apples-to-apples comparison, so I had to

14 take the W-2 of $130,000 and move it up to $157,000.

15 Q    And in formulating your calculations, did you review the

16 W-2s of Ms. Phillips from 2016 through 2022?

17 A    I did.

18 Q    And in terms of the nine weeks' calculation, her W-2 for

19 2022 indicated that she made $130,000, correct?

20 A    $130,097, correct.

21 Q    And instead of having that be the actual earnings for

22 2022, you have a higher number there, which was 157,327,

23 correct?

24 A    Correct.  And that assumes that she would have been paid

25 for the nine weeks to put them on an apples-to-apples basis.

Scherf - Direct                           40

1   Q    And so you could have made the calculation for 2022 be

2   that her actual earnings were a 130,097 because that's what

3   they were, and that would give a larger loss to Ms. Phillips,

4   correct?

5   A    That's correct, but I wanted to make sure I was comparing

6   apples-to-apples.  I do that in the calculations based upon the

7   data because I want to make sure that I'm actually comparing

8   similar things.

9   Q    And then in Column 3 of your chart under "Lost Earnings,"

10  that is just a differential between what she would have made at

11  Starbucks and what she actually made at Raymour & Flanigan for

12  the years 2015 [sic] through 2023 -- April of 2023, correct?

13  A    That's correct.  It's essentially one minus -- Column 1

14  minus Column 2 equals Column 3.

15  Q    And then Column 4, under the "Medical Premium

16  Differential," you have $1,900 for each year.  Can you explain

17  what that number represents?

18  A    Sure.  So we heard Ms. Phillips talk about the fact that

19  her health plan isn't as good at Raymour & Flanigan compared to

20  the health plan at Starbucks.  So I needed to identify

21  essentially what that differential would be.  And the best way

22  and the best information that I could get was, as reported on

23  W-2s, employers can report -- and both Raymour & Flanigan and

24  Starbucks reported the amount of money that they paid for Ms.

25  Phillips' healthcare.  And -- and the amounts at Starbucks were

Scherf - Direct                           41

1   higher than the amounts at Raymour & Flanigan.  So I took the

2   average of 2017 -- 2016, '17, and '18, annualized '18 because

3   she wasn't there for the full year, and compared that to the

4   same numbers on 2019 -- 2019 and 2020.  And that came out to

5   almost $2,000, but a thousand -- one thousand nine hundred and

6   I think it was ninety-some dollars.  And I just rounded down to

7   the nearest hundred, and made that 19 hundred dollars, and so

8   that's what I did.

9           Now you'll notice that in the first year, I didn't

10  prorate the 19 hundred dollars.  And I purposely didn't prorate

11  the 19 hundred dollars because Ms. Phillips was out of work

12  essentially for three and a half months or so.  And so I just

13  left the 19 hundred dollars in knowing that that would be a

14  conservative estimate as to what -- you know, the healthcare

15  cost.  It probably was more than that, but it just for ease of

16  calculation and consistency, I just did 19 hundred dollars.

17  Q    In Column 5, under the "401k Plan Differential," can you

18  explain to Judge Slomsky your calculations there?

19  A    Yes.  So Column 5, we heard Ms. Phillips testify about the

20  fact that she contributed four percent to her 401k, and that at

21  Starbucks she got a hundred percent match, and at Raymour &

22  Flanigan she got a 50 percent match.  And so this calculates

23  that 50 percent match differential for the difference in her

24  lost wages.

25  Q    And what documentation did you review to determine the

Scherf - Direct                                    42

1  amount for the 401k losses?

2  A    Well, the documentation that I reviewed was, first of all,

3  I had a conversation with Plaintiff -- with Ms. Phillips who

4  explained that she put four percent away in her 401k.  That

5  information -- that conversation was consistent with what I

6  could see on the other documents, the W-2s that I got.  I also

7  looked at the answers to the interrogatories as to the

8  difference in the plans and used that data to make that

9  calculation.

10 Q    And looking at Column 6, the "Non-Vested Stock Grants,"

11 the amount there being a 180,389, can you explain to His Honor

12 what you looked at to make that determination, and how you came

13 to that calculation?

14 A    Okay.  So the document that I looked at was a document

15 that was just marked earlier today that -- the Fidelity Bank

16 statement.  And the Fidelity Bank statement had -- I mean the

17 brokerage statement had the value of those securities at

18 $180,389.  It's my understanding that Ms. Phillips was not able

19 to yield that -- get that value because she was terminated.

20 And when she was terminated those securities, even though

21 $5,000 -- $5,592 of it was vested, she didn't get an

22 opportunity to achieve those -- that value.

23      And so in the "but for" world, had she stayed at

24 Starbucks, she would have vested in those benefits, and then

25 would have got the $180,000.  And, in fact, when I looked at

Scherf - Direct                                       43

1  the actual stock performance, because stock options and R -- RS

2  -- RSUs need to -- you know, is dependent somewhat on the price

3  of stock.  So I looked at the price of the stock, and during

4  the time period in April of 2018, the price of Starbucks was

5  about $57 a share.  And, you know, at the time that I did my

6  report here, it was $105 a share, so it almost doubled.  So

7  clearly, the options would have been in the money, and she

8  would have at least achieved the $180,389 shown on the

9  statement.

10        Now, I didn't want to speculate as to when she would

11  have exercised those options.  She had historically exercised

12  options during her tenure at Starbucks.  So I went

13  conservatively with the $180,000 number.

14  Q    So if we look at Footnote 6 on the chart, this is where

15  you indicate that the current value of the stocks were -- are

16  $105.51 per share as of May 19th, 2023.  So those shares

17  actually would have been worth $513,517.17, correct?

18  A    Right, on that date.  That, I think -- I just checked

19  yesterday, Starbucks is at about a hundred.  So if she had had

20  those shares and liquidated today, it still would have been a

21  lot higher than the 180,389 in my damage number.  It would be,

22  you know, $480,000 roughly.

23  Q    Okay.

24  A    So a significant difference.

25  Q    So the 180,000, just in layman's terms, this is -- 180,389

Scherf - Direct                                        44

1  was very conservative compared to the value of that stock

2  today.

3  A     That's -- that's my opinion, yes.

4  Q     And in terms of her future stock options going forward, by

5  virtue of the termination, she was not eligible for any future

6  stock options from Starbucks.

7  A     That's correct.

8  Q     And do you -- can you opine to a reasonable degree of

9  economic certainty that those stock options in the future would

10 be worth even more money?  Not the real stock price, but I mean

11 just the fact that stocks would be worth money from Starbucks.

12 A     Well, it was a benefit, and they -- that would be worth

13 some money.  Obviously, you know, when you get a stock option,

14 it depends on the performance of the stock.  But historically,

15 she was able to liquidate those options at a profit.

16 Q     And if we look at Column 7, it says "Total Lost Benefits."

17 Can you explain what Column 7's totals mean?

18 A     Yes.  Column 7, "Total Lost Benefits," is really just

19 another addition item of -- the addition of Column 4, 5, and 6.

20 So if you just add Columns 4, 5, and 6, you get to Column 7.

21 Q     And then Column 8, can you explain what that number is?

22 A     Column 8 is the past lost earnings and benefits.  So it is

23 Column 3, plus Column 7, to give you the total of the past lost

24 earnings and benefits.

25 Q     And can you tell the Court what your opinion is to a

Scherf - Direct                              45

1  reasonable degree of professional certainty what Ms. Phillips'

2  total past loss earnings and benefits are?

3  A    Yes $1,053,133.

4       MS. MATTIACCI:  Your Honor, may I approach the

5  witness?  May I approach?

6       THE COURT:  Yes.

7  Q    Mr. Scherf, I've handed you a document that has been

8  marked as 126B, as in boy.  This is Exhibit 2B of your expert

9  report, correct?

10 A    Correct.

11 Q    And can you explain for His Honor generally what this

12 document is showing?  And then we can go through the columns

13 again.

14 A    Sure.  So this document is the front pay calculation.  It

15 calculates front pay from May 1st 2023, because I -- the back

16 pay was through April 30th, 2023.  So it goes from May 1st,

17 2023 to 6/29/2041, which is when Ms. Phillips would be 70 years

18 old.  So it calculates through her anticipated retirement age

19 of 70.  Essentially the same calculations as -- or very similar

20 calculations to the past lost earnings and benefits through age

21 70.  And so it's a future calculation, so it relies on

22 projections, and I'll explain those in a couple minutes.  And

23 then present values, the total because those are items that

24 come in the future.

25 Q    Okay.  Now let's take a look at Column 1, which is

1  expected earnings from Starbucks.  That first row, starting in

2  May 1st, 2023 going to the end of 2023 is prorated based upon a

3  different gross number for the year, correct, for the year?

4  A    Yes.  It's essentially a continuation of the 2023 number,

5  which is the original 289,730 that I used grown at three

6  percent.

7  Q    Can you explain to the Court how you came to the 2023 and

8  2024 numbers as it compares to the 2021 and 2022 years when Ms.

9  Phillips had taken that time off for the breast cancer?

10 A    Well, as it relates to expected earnings from Starbucks,

11 that would just be an increase of three percent per year.  But

12 as it relates to Raymour & Flanigan, essentially I ignored 2022

13 and grew 2021 at six percent a year to get to the numbers that

14 I'm using on this because I didn't want to have 2022, which was

15 impacted by Ms. Phillips' breast cancer, impact the numbers and

16 impact, you know, the calculation.  I wanted to keep the

17 calculation clean.  And so what I did was I started with 2021,

18 and then just grew that by six percent a year to come up with

19 the number.

20 Q    Okay.  And so as we look at the future pay numbers on the

21 expected earnings from Starbucks from 2023 through 2041, you

22 assumed a three percent increase each year, correct?

23 A    Correct.

24 Q    And then for estimated future earnings from Raymour &

25 Flanigan, you assumed a six percent increase per year, correct?

Scherf - Direct                                47

1  A    That's correct.

2  Q    And so that's to the benefit of Starbucks, correct?

3  Instead of having both of the growth factors in the future be

4  equal or the same, you have six percent growth happening at

5  Raymour going into the future versus three percent growth at

6  Starbucks, correct?

7  A    Yes, that -- that's correct.  And I just want to -- you

8  know, but the facts -- my analysis of the facts indicated that

9  I should be growing one at three and one at six.  So -- but the

10 mathematical implication of that is that as a result of that,

11 the gap narrows over time.  So it, you know, enures to the

12 benefit, I guess, if you want to call it that way, to the

13 benefit of Starbucks, right.

14 Q    And instead of taking your calculation for future earnings

15 from Raymour from the 130,000 -- in other words the 130,097

16 that Ms. Phillips earned in 2002 [sic], you did not do a six

17 percent increase off of the 130,000.  Instead, you assumed --

18 you took away the nine weeks of unpaid and used, in other

19 words, a clean year as if that leave didn't happen, and

20 continued the six percent from there, correct?

21 A    Absolutely.  So what I did was I -- the math of it is that

22 I take 2021 of 158,521, which is actually higher than my pro

23 rated amount for 2022, and I actually grow that from that point

24 forward six percent a year, so it ends up with a higher number.

25 But in my view, that would be the appropriate way to get rid of

Scherf - Direct                              48

1  the aberration of 2022.

2  Q    And then in the future lost exhibit, if we look at Column

3  3, can you explain what Column 3 is?

4  A    Yes.  Column 3 is the same as it is in the past lost

5  calculation.  It's it's Column 1, the expected earnings less

6  Column 2 -- the expected earnings from Starbucks in Column 1

7  less the expected future earnings from Raymour & Flanigan is

8  the lost earnings.  So it's Column 1 minus Column 2 equals

9  Column 3.

10 Q    And then Column 4, is that the same explanation that you

11 gave for back pay as to why your number there is 1,900 per

12 year?

13 A    Yes.  I did not change the number, I just used the 19

14 hundred.  Again, I think that's a conservative assumption

15 because, you know, healthcare plans increased.  The cost of

16 those plans increase.  So if you have a differential, that

17 would increase over time.  But I just use 19 hundred dollars, a

18 flat 19 hundred dollars per year knowing that, in my opinion,

19 that's a conservative number.

20 Q    And then Column 5, the "401k Plan Differential," can you

21 explain how you came to those numbers?

22 A    Yes.  That's exactly the same calculation that was in the

23 past lost earnings calculation.  And that is based upon the

24 fact that Ms. Phillips only receives a 50 percent match instead

25 of 100 percent match on her 401k.

Scherf - Direct                              49

1  Q    And that's assuming the four percent contribution by Ms.

2  Phillips.

3  A    Yes, because that was her actual contribution, although

4  she could contribute more.  I wanted to use what she actually

5  contributed based on her past behavior.

6  Q    And then Column 6, can you explain for His Honor what that

7  is?

8  A    Column 6 is just total lost benefits.  So that is the

9  addition of Columns 4 and 5.

10 Q    And Column 7?

11 A    Column 7, it says "Past Lost Earnings and Benefits," you

12 should just cross out the "past," if you would.  So it's the

13 Future Lost Earnings and Benefits, and that's a total of Column

14 3 and Column 6.

15 Q    And Column 8, "Present Value of Lost Wages and Additional

16 Medical Costs."  Can you explain how you came to that

17 calculation?

18 A    Sure.  That is essentially the present value of Column 7.

19 So since this front pay calculation goes into the future you,

20 need to present value that at an appropriate rate.  And I use

21 the 10-year T bill rate of 3.65 when I did the calculation,

22 resulting in the fact that essentially the damages get reduced

23 by about -- call it $600,000 present value.

24 Q    And did you also do a tax gross-up analysis?

25 A    I did.

                              Scherf - Direct                    50

1  Q    And for the -- for the calculations that you did on

2  Exhibit 126B, was your tax gross-up total 75,757?

3  A    Correct.

4  Q    And the total damages to age 70 for back pay, front pay,

5  and the tax gross-up are 3,040,251, is that correct?

6  A    That's correct.

7           THE COURT:  I don't see that number on here.

8           MS. MATTIACCI:  Oh, it's it's in part of his report,

9  Your Honor.  I wasn't going to enter the report but --

10          THE COURT:  Okay.

11          MS. MATTIACCI:  -- I can have him testify to it.

12          THE COURT:  And what is that number, again?

13          MS. MATTIACCI:  3,040,251.

14          THE COURT:  Consisting of?

15          MS. MATTIACCI:  Back pay, front pay, and benefits.

16          THE COURT:  All right.

17          MS. MATTIACCI:  The total is from Exhibit 126A and

18  126B.  So 126A is 1,053,133, that's for back pay.  The front

19  pay loss of pay and benefits is 1,911,361, that's reduced to

20  present value.  And then with the tax gross-up, that amount is

21  75,757.  Bringing the total damages to age 70 to 3,040,251.

22  Correct?

23          THE WITNESS:  Correct.

24          MS. MATTIACCI:  Your Honor, I move for the admission

25  of Exhibit 126A and B.

1            MR. HARRIS:  No objection.

2            THE COURT:  So admitted.

3               (Trial Exhibit 126A and 126B in evidence)

4  BY MS. MATTIACCI:

5  Q    Mr. Scherf, have all the opinions that you've given today

6  been given within a reasonable degree of professional

7  certainty?

8  A    They have.

9            MS. MATTIACCI:  I don't have any further questions,

10 Your Honor.

11           MR. HARRIS:  May I?

12           THE COURT:  Yes.

13                     CROSS-EXAMINATION

14 BY MR. HARRIS:

15 Q    Mr. Scherf, just one question regarding your experience

16 testifying.  You've testified that you had previously --

17 previously been qualified as an expert and testified at trial

18 on 100 occasions, did I get that accurately?

19 A    Yeah, approximately, right.

20 Q    In the instances in which you've testified on 100

21 occasions, how many of those were -- did you testify on behalf

22 of the defense?

23 A    You know, I've never calculated that out.  So I believe

24 that it's slightly more in favor of plaintiffs than defendants,

25 so I don't know exactly what that would be.  And I attribute

1  that typically to the fact that when I, you know, work for

2  defendants if -- if -- I -- I advise them whether it makes

3  sense to settle.  And a lot of times on a plaintiff's side,

4  they're not as interested in settling.  So I think that my

5  practice overall is about 50-50, but I've never really

6  calculated that.  But I do work for both plaintiffs and

7  defendants.

8  Q    Okay.  Your practice is 50-50, but you don't recall any

9  specific instances in which you've actually testified at trial

10 on behalf of the defense?

11 A    On -- in behalf of the defense?

12 Q    Yes.

13 A    I've testified numerous times on -- in -- for a defendant

14 in a lawsuit.

15 Q    Okay.  Can you tell us one of those cases?

16 A    Sure.  Let me just think.  I don't -- I don't keep track

17 of those.  You know, I just -- I was in Federal Court here

18 where -- I don't know.  If you -- if I see my CV, I'd be able

19 to tell you whether they were plaintiffs and defendants.

20 They're -- it's attached to my report; I think somebody has

21 that.

22 Q    Okay.  Because I looked at your CV, which is attached to

23 your report, I don't think it specifically identifies on which

24 side you were actually called as an expert.

25 A    It doesn't, but I can tell you.  If you -- if you give me

Scherf - Cross                                      53

1  that document, I'll be able to --

2  Q    Happy to do so.

3           MR. HARRIS:  May I approach?

4           THE COURT:  Yes.

5           MR. HARRIS:  Showing what's been marked as -- I

6  believe it's in Trial Exhibit Number 125.

7           MS. MATTIACCI:  I believe it's Exhibit 126, just to

8  clarify the record.

9           THE WITNESS:  Okay.  You just want trial testimony

10 for defendants, right?  Or do you care about deposition

11 testimony?

12          MR. HARRIS:  With the Court's indulgence, Mr. Scherf,

13 I'm going to make sure that I have the right exhibit number.

14          THE WITNESS:  Okay.

15          MR. HARRIS:  I have the actual report listed as 125,

16 but I'll defer to counsel if it's 126.

17          MS. MATTIACCI:  Well, if you just want to refresh his

18 recollection on the CV, I don't have an objection.  I don't

19 have an objection to counsel questioning him on his CV part,

20 that's fine.  It's just the exhibit -- the report itself.

21          THE WITNESS:  And if I -- I think I might be able to

22 clarify.  What counsel showed me was a June 4th, 2021 report,

23 which may have been listed as 125.  I've been testifying off of

24 the supplemental report, which probably was listed as 126.

25          MR. HARRIS:  That makes perfect sense, Mr. Scherf.

1  BY MR. HARRIS:

2  Q    So the current document that you've been testifying to

3  today, are there any material differences on the document as it

4  relates to your trial testimony in 125 versus 126?

5  A    Well, I can tell you that -- that it would be changed for

6  the passage of time.  So there would be cases in 2020 -- after

7  June of 2021 that are not on this -- on this list that you've

8  just showed me.  But I can use this if that's --

9  Q    Please, if you would be so kind.

10  A    And -- and --

11  Q    I think I just have an electronic version, not a hard copy

12  one.

13  A    That's fine.  So just to clarify your question, are you

14  only concerned about trial testimony?

15  Q    Yes, I am.

16  A    Okay, all right.  The -- I testified on behalf of the

17  defendant in U.S.A. versus Anmol Singh Kamra.

18  Q    Is that a criminal case?

19  A    That was a criminal case, yes.

20  Q    I'm going to direct your attention to civil cases

21  specifically.

22  A    Okay, all right.

23  Q    As it relates to damage models, and in employment cases

24  specifically.

25  A    Okay.  The -- in 2018, Alona Soyvertus (phonetic) versus

1 Vlada Rubarkh (phonetic), that was on the defense side.

2 Q    And was that an employment case?

3 A    That was a shareholder dispute case.

4 Q    I'm going to direct your attention specifically, have you

5 testified on behalf of the defense in an employment case, or a

6 matter similar to the one that you're testifying in this case.

7 A    On behalf of the defendant?

8 Q    Yes.

9 A    I'm trying to think.  I don't recall one as I'm sitting

10 here right now.

11 Q    Do you recall by looking at your CV or an attachment

12 that's been listed in 125?

13         MR. HARRIS:  Or if counsel would be so kind as to

14 provide you 126, in which that would refresh your recollection.

15 A    Okay.  None of these on 125 are on behalf of defense in an

16 employment matter.

17 Q    How about in 126, the most recent iteration of your expert

18 report.

19 A    I don't recall one as I'm sitting here in the last couple

20 years.

21 Q    Okay.  Let's go to the -- you expert report, Mr. Scherf.

22 Can you tell us every factor that you consider in rendering

23 your opinion this morning?

24 A    Sure.  Well, I -- every factor?

25 Q    Yes.

1  A    So, essentially my opinion is based upon the documents

2  that are listed in Appendix B of my report, plus my experience

3  in doing economic calculations, as well as conversations with

4  Ms. Phillips.

5  Q    Okay.  The documents that you're referring to,

6  specifically, I think counsel may have in front of you, the W-2

7  wages that --

8  A    They were marked, but I believe she --

9  Q    Oh, she has them?

10 A    They're not -- they're not in front of me right now.

11 Q    Very good.  The W-2 wages, if I understand your report --

12 Mr. Scherf, correct me if I'm wrong, as I understand the basis

13 of your analysis, you used as part of your calculation Ms.

14 Phillips' net wages as opposed to her gross wages, correct?

15 A    No.  I think -- I used in the calculation -- I used

16 Medicare wages, and I used that number because if you recall in

17 my testimony, I always like to make apples-to-apples

18 comparisons.

19 Q    Sure.

20 A    And so the information that was provided to me on those

21 W-2s, some employers provide gross wages, some employers don't.

22 The Starbucks information didn't give me any information on

23 gross wages.  So in order to make an apples-to-apples

24 comparison, I used Medicare wages, which happened to be the

25 highest wage number that appears consistently both between

1  Starbucks and Raymour & Flanigan.  So I wanted to make those

2  calculations based on an apples-to-apples comparison.

3        I will agree with you that the Starbucks -- I mean,

4  the Raymour & Flanigan gross wages are maybe $5,000 higher on

5  average or something like that, some that are closer.  But it

6  was more important to me to do a consistent calculation than to

7  do an apples and orange calculation.

8  Q    Okay.  Mr. Scherf, as part of your analysis, did you

9  consider Ms. Phillips' earning capacity?

10  A    Well, I identified her historical earnings.  I wasn't

11  asked to do a vocational analysis.  Frankly, I'm not qualified

12  to do a vocational analysis, so I didn't do that.  That wasn't

13  part of the scope of my engagement.

14  Q    All right.  When you say "vocational analysis," I'm asking

15  specifically, you've received no information from Ms. Phillips

16  to indicate that she was not capable of earning the same amount

17  in the marketplace as she was when she was at Starbucks.

18  A    Right.  Which is why I based my calculation based on what

19  her earnings were at Starbucks of $298,000.  So I compared that

20  to what she's actually earning, which is what I typically do in

21  determining damages.  And so she testified earlier today, I was

22  in the courtroom, where she explained that she looked for

23  positions, she doesn't have a college degree, and so in my

24  opinion -- well, I did the calculation the way I always do,

25  which is, you know, what was her wages and what she's actually

Scherf - Cross                                58

1  earning, and the differences are damages.

2  Q    The methodology that you employed, what is the source of

3  that?

4  A    It's the source that experts typically use, which is

5  calculating someone's expected earnings, which would be her

6  earnings capacity because we know that's her earnings capacity

7  of $289,000 before the three percent compared to actual

8  earnings, and that's what I did.

9       MR. HARRIS:  Mr. Scherf, I have no further questions.

10  Oh, no, I do have one.  I'm sorry, Judge.

11       THE COURT:  Okay.

12  BY MR. HARRIS:

13  Q    Mr. Scherf, have you had a chance to review Mr.

14  Silverstone's expert report that he prepared in this case on

15  behalf of the defense?

16  A    Yes, I did.

17  Q    And as -- looking at Mr. Silverstone's methodology, you

18  agree it differs substantially from your analysis, yes?

19  A    Well, he takes the position that Ms. Phillips -- he

20  basically provides a vocational opinion that she should have

21  been able to find a job at a higher pay than what she found.

22  Q    Or at a minimum, the same amount of pay.  Not higher, but

23  the same amount.

24  A    Right, which is a vocational opinion.  And I don't think

25  that -- I didn't -- that's not the opinion that I offered.  I

Scherf - Cross                                                  59

 1  wasn't engaged to provide that opinion.  And I, frankly, don't

 2  believe Mr. Silverstone -- I've known -- I've known Howard for

 3  years, I don't believe he's qualified to give that opinion.

 4  But, you know, that's not my decision.  That's -- but that's

 5  what I think.  I wouldn't have given that opinion.  It's not

 6  within the scope of my expertise, and I don't believe it's in

 7  the scope of Mr. Silverstone's expertise either.

 8  Q    Understood.  Mr. Silverstone, you've known him for several

 9  years, you said.

10  A    Yes, I've known him for -- for a long time.

11  Q    All right.  And Mr. Silverstone has the same educational

12  background as yours?

13  A    Similar.  We didn't go to the same schools.

14  Q    Understood.  But --

15  A    He grew up -- I -- you know, I -- I know Howard -- did you

16  -- well, you can cover that with him.

17  Q    I will cover that with Mr. Silverstone in a few minutes.

18  A    Right, yes.

19       MR. HARRIS:  I have no further questions.  Thank you.

20  Q    Oh, you said you had a few certifications.  What might

21  they be?

22  A    I'm a certified public accountant; certified fraud

23  examiner; certified in financial forensics from the AICPA.  I

24  have -- accredited in business valuations from the AICPA.  I'm

25  a certified valuation analyst.  I -- also, I'm certified

1  turnaround -- a turnaround -- a certified turnaround

2  professional.  Certified in distressed business valuation, and

3  certified insolvency and restructuring advisor.

4  Q    And have you had a chance to view Mr. Silverstone's

5  curriculum vitae?

6  A    At one point in time, I did.  I know Howard's a CPA.  I

7  don't know what other credentials he may have.

8        MR. HARRIS:  Thank you, Mr. Scherf.  I have no

9  further questions; counsel may.

10        MS. MATTIACCI:  No further questions, Your Honor.

11        THE COURT:  All right.  I just have one question.  To

12  obtain the present value of lost wages and the additional

13  medical costs, you use the 10-year treasury rate of 3.65

14  percent as of May 18, 2023?

15        THE WITNESS:  Yes, because that was the date that I

16  essentially updated my report.

17        THE COURT:  All right.  Can you just explain the

18  methodology that you use?

19        THE WITNESS:  Sure.  So the methodology is just math.

20  You know, it takes the present value formula and essentially

21  equates the number where one would be indifferent between

22  receiving cash today or cash in the future.  And the rate that

23  I used was the treasury rate, so that treasury rate of 3.65

24  percent by calculation, I assumed a mid-year convention that

25  the earnings would be earned pro ratably through the year.  And

Scherf - Court                           61

1  essentially took the calculations so that mathematically, if
2  you look at Exhibit 2B and -- and let's go to the second line
3  because that's a full year.  If you look at Column 7, the
4  second one down for 2024, the actual number is 165,971.  And if
5  you take into account an interest rate of 3.65 percent, that
6  brings that number down to $158,211.

7          So, if I were to take $158,211 and invest it in a
8  treasury bond at 3.65 percent yield, essentially a year from
9  now I'd have -- or a year and a half from now, I'd have
10 165,971. So it's the math to get there, which is what's
11 required under the statute to essentially bring a future amount
12 back to present value.

13         THE COURT:  All right.  Any questions based upon my
14 questions?

15         MR. HARRIS:  No, thank you, Your Honor.

16         MS. MATTIACCI:  No, Your Honor.

17         THE COURT:  All right.  You may step down.

18         MR. SCHERF:  Thank you, Your Honor.

19         THE COURT:  All right.  At this point -- do you rest
20 at this point?

21         MS. MATTIACCI:  Yes, Your Honor.

22         THE COURT:  All right.  I'd like to take a 10-minute
23 recess.  And the motion and the report with respect to the
24 expert of the Defendant, do you have the docket number?

25         MS. MATTIACCI:  Yes, Your Honor.  The docket number

62

1  is 120.

2          THE COURT:  And is the expert report attached to it?

3          MS. MATTIACCI:  We're going to check on that, Your

4  Honor.  I believe it would be.  If it isn't, Your Honor, we

5  have extra copies we can give you.

6          MR. HARRIS:  I'm happy to provide one to the Court.

7          THE COURT:  Okay.

8          MR. HARRIS:  May I approach?

9          THE COURT:  Yes.  All right, well, let's take a 10-

10  minute recess.

11          THE CLERK:  All rise.

12              (Recess 11:47 a.m./Reconvene 12:06 p.m.)

13          THE COURT:  All right.  Mr. Harris, call your next

14  witness.

15          MR. HARRIS:  Thank you.

16          THE COURT:  Your first witness.

17          MR. HARRIS:  The defense would call Mr. Howard

18  Silverstone.  And I believe, Your Honor, there has been a

19  stipulation regarding the qualifications of Mr. Silverstone to

20  render an opinion in this case.

21          THE COURT:  As an economic loss expert.

22          MS. MATTIACCI:  As an economic loss expert only, Your

23  Honor.

24          MR. HARRIS:  Correct.  As an economic loss expert.

25          THE COURT:  Okay.  I'll find him so qualified.

1           THE CLERK:  Good afternoon, sir.  Please raise your

2    right hand.

3           HOWARD SILVERSTONE, DEFENDANT'S WITNESS, SWORN

4           THE CLERK:  Thank you.  Please state and spell your

5    name.

6           THE WITNESS:  Howard Silverstone.  H-O-W-A-R-D

7    S-I-L-V-E-R-S-T-O-N-E.

8           THE CLERK:  Thank you.

9           MR. HARRIS:  Thank you.

10                    DIRECT EXAMINATION

11   BY MR. HARRIS:

12   Q    Good afternoon, Mr. Silverstone.

13   A    Good afternoon.

14   Q    Mr. Silverstone, there has been a stipulation regarding

15   your qualifications to render an opinion as an economic expert.

16   In doing so, I will still ask a few questions regarding your

17   qualifications.

18          MR. HARRIS:  Before I do so, may I approach with your

19   curriculum?

20          THE COURT:  Yes.

21   Q    Showing what's been -- we'll now mark it as Trial Exhibit

22   Number 189.

23   A    Thank you.

24   Q    Mr. Silverstone, showing you what's been marked as 189, do

25   you recognize this document, sir?

Silverstone – Direct                          64

1   A    Yes, I do.

2   Q    And could you describe to His Honor what this document

3   reflects?

4   A    This is my CV, my current CV.

5          MR. HARRIS:  We'll have this move into evidence as

6   Exhibit Number 189.

7          MS. MATTIACCI:  Your Honor, I'm just hesitating

8   because I'm comparing it to the one that we have in the case,

9   and it's different.

10         MR. HARRIS:  I think this is just an update.  May I

11  question the witness regarding the differences?

12         THE COURT:  All right.

13         MS. MATTIACCI:  Okay.  Yes, Your Honor, there is -- I

14  don't believe that this CV has ever been produced to us before

15  right now, so that's why I am hesitating to just say I don't

16  object.

17         THE COURT:  In its totality, or just --

18         MS. MATTIACCI:  Well, the CV was attached to his

19  original expert report, but since then we have never received

20  an update or an updated CV.  And just looking at the front

21  pages of the two, I'm seeing some differences, and so that's

22  why I'm hesitating to say that that could be admitted right

23  now.

24         THE COURT:  All right.  Why don't you question him?

25         MR. HARRIS:  Sure.

1  BY MR. HARRIS:

2  Q    Mr. Silverstone, showing you what's been marked as your

3  current curriculum vitae as Exhibit Number 189, is that the

4  most recent curriculum vitae that you have?

5  A    Yes, it is.

6  Q    And can you tell us if there are any material differences

7  in the current one that's just been identified as 189 from the

8  prior one that was submitted as part of your expert report in

9  this case?

10 A    Yeah, the only differences would be my expert report was

11 issued in the middle of 2021, and subsequent to then I've

12 written a couple of articles and testified a couple of times

13 since then, so it's been updated for those.

14      MR. HARRIS:  Again, move into introduction Exhibit

15 189.

16      MS. MATTIACCI:  Your Honor, I just object to the

17 extent that I don't believe that it's proper for the CV to be

18 entered into evidence.  He can certainly -- we've already

19 stipulated to his qualifications, and if he wants to -- to

20 qualifications to testify as an economic loss expert, but he

21 can ask him about that.  I don't think the introduction of the

22 CV is appropriate.

23      THE COURT:  Well, we usually don't admit into

24 evidence an expert report with a CV.  Do you want to go through

25 his -- if you want to go through his qualifications, that's

Silverstone - Direct                               66

1  fine.

2          MR. HARRIS:  Sure.  I'll just -- I'm happy to, Your

3  Honor, if I may.

4  BY MR. HARRIS:

5  Q    Mr. Silverstone, can you tell us what your educational

6  background is?

7  A    I obtained a bachelor's degree in accountancy in London,

8  England, which is my hometown, in 1981.  And subsequently

9  became a chartered accountant in the UK, which is similar to a

10 certified public accountant in the US.  And after coming to the

11 US, subsequently became a CPA.

12 Q    And what year did you receive your certified public

13 accountant certification?

14 A    Over here?

15 Q    Yes, in the United States.

16 A    I believe it was 1999.

17 Q    And prior to that, when did you receive the equivalent

18 certification in the UK?

19 A    1984.

20 Q    And, Mr. Silverstone, do you have any certifications?

21 A    Yeah, well, I'm a -- as I said, I'm a chartered accountant

22 in the UK, which I still maintain that license.  I'm a

23 certified public accountant.  I'm also certified in financial

24 forensics and a certified fraud examiner.

25 Q    As a certified forensic examiner, is that what you

Silverstone - Direct                                67

1  testified to?

2  A    A certified fraud examiner.

3  Q    A fraud examiner and certified in forensics.

4  A    In financial forensics.

5  Q    Yes.  And could you tell His Honor what that actually

6  means specifically?

7  A    That's a designation from the American Institute of CPAs

8  that you get if you -- now there's an exam for it.  But when I

9  obtained it, it was based on my experience and all the years I

10 had in forensic accounting and economic damage analysis.

11 Q    And on how many occasions have you written articles on

12 economic damages models specifically?

13 A    How many occasions?

14 Q    How many articles have you written?

15 A    In the last 35 years, I've written a lot of articles.

16 Q    Are they identified in the document that's identified as

17 Exhibit Number 189?

18 A    The only ones in here go back 10 years, so they go back to

19 2013.

20 Q    Can you give an estimate as to the number of articles in

21 which you have been published?

22 A    In here or in total?

23 Q    In total.

24 A    I would say a few dozen.

25 Q    A few dozen?

1   A    Yeah.

2   Q    More than 20.

3   A    Yes.

4   Q    Okay.  And, Mr. Silverstone, on how many occasions have

5   you testified as an expert in economic damages models

6   specifically?

7   A    In -- well, I've -- in total, I've testified in court and

8   in deposition about 60 times.  In terms of economic damage

9   models, I would say probably most of those.

10  Q    All right.  On how many of those occasions do you recall

11  testifying on behalf of the plaintiff in matters that require a

12  recovery of damages?

13  A    Testifying?  Actually testifying?

14  Q    Yes.

15  A    I'd say about five to ten percent actually testifying.

16  Q    And on behalf of the defense?

17  A    Then I would say 90 to 95 in testifying.

18  Q    Okay.  And how many times have you been qualified as an

19  expert?  Is that different than the 60 or so occasions that

20  you've already identified?

21  A    Yes, I mean in the last -- I've been doing this since

22  1986.  So in those years, I've issued literally thousands of

23  expert reports, but only, you know, a small number actually go

24  to trial or where you're deposed.

25  Q    Understood.  Mr. Silverstone, did you prepare an expert

```
                           Silverstone - Direct                    69
 1  report in this case?

 2  A    I did.

 3           MS. MATTIACCI:  Your Honor, I object to the expert

 4  report being introduced, it's hearsay.

 5           THE COURT:  Well, it hasn't been offered yet.

 6           MS. MATTIACCI:  Okay.

 7           THE COURT:  So --

 8           MS. MATTIACCI:  It was just handed to me, so --

 9           THE COURT:  Okay.

10           MR. HARRIS:  May I approach the witness, Judge?

11           THE COURT:  Yes.

12  BY MR. HARRIS:

13  Q    Showing you what's been marked as Trial Exhibit Number 23,

14  do you recognize this document, sir?

15  A    Yes, I do.

16  Q    Is this the expert report you prepared in this case?

17  A    Yes.

18  Q    Mr. Silverstone, I'm going to direct your attention to the

19  expert analysis in this case.  Did you prepare an expert

20  analysis?

21  A    Yes.

22  Q    And can you tell His Honor to a reasonable degree of

23  professional certainty, the expert analysis that you prepared?

24  A    Can you be more specific when you say as to the analysis?

25  Q    Yes, I'll back up.  You did offer an opinion in this case,
```

1  did you not?

2  A     Yes.

3  Q     And did you prepare two separate models as it relates to

4  the opinions in reference to the damages model that's been

5  presented by Ms. Phillips and her counsel?

6  A     Yes, I did.

7  Q     The first analysis, could you tell His Honor what the

8  first analysis consists of?

9  A     The first analysis is based on the fact that as of the

10 time that I had written this report, I had not received any

11 other expert reports, or had not received anything in terms of

12 affirmatively opining on the discrimination against Ms.

13 Phillips.  So under that scenario, I said there would be no

14 loss.  If there was no discrimination, then there was no loss.

15 Q     There's a second scenario that you also presented in this

16 case, did you not?

17 A     Yes, I did.

18 Q     And could you describe to His Honor the second scenario in

19 which you have identified a damages model?

20 A     So the second scenario is based on the period of time that

21 Ms. Phillips was out of work between leaving Starbucks and

22 joining Raymour & Flanigan.

23 Q     Can we go back to the first model?  You indicated that

24 your analysis was based on assuming that there was no

25 liability.

1  A    Correct.

2  Q    All right.  How did you arrive at that conclusion?

3  A    As of the time I had done my report, as I said, I had not

4  been presented with any expert reports or opinions as to a

5  determination of the discrimination that was claimed.

6  Q    And is that methodology consistent with your expertise?

7  A    Yes, it is.

8  Q    How so?

9  A    Because in doing economic analysis, I'm permitted to rely

10 on other experts and their opinions.

11 Q    Okay.

12 A    And if I have an opinion, I can do my -- make my

13 assumptions and I can opine accordingly.  And if I don't have

14 an opinion, then I can state the basis that -- the fact that I

15 didn't have an opinion.  I didn't receive an opinion from

16 another person.

17 Q    Understood.  Is that also contained in the document that's

18 been identified as Exhibit Number 23?

19 A    Yes.

20 Q    All right.  Let's go to the second scenario that you just

21 testified to.  Did you perform an analysis regarding the

22 damages model in this case as it relates to Ms. Phillips and

23 her economic loss?

24 A    Yes.

25 Q    And what was the model that you presented in this case?

1  A    So the model that's presented here, as I said, is the loss

2  I calculated for the period of time that Ms. Phillips was out

3  of work between leaving Starbucks and starting at Raymour &

4  Flanigan.  The basis for that is when you're doing this type of

5  calculation, you're looking at someone's earning capacity, and

6  that's an economic analysis concept.  And I was here to hear

7  Mr. Scherf's testimony, and I don't disagree with him on what

8  he discussed as Ms. Phillips' earning capacity from Starbucks,

9  and I agree with that.

10           But in terms of my calculation, when I'm looking at

11  future losses, or what someone may have lost because they've

12  left a particular position, I'm looking at what is their

13  earning capacity, and has there been a -- has their earning

14  capacity been diminished?

15  Q    Let me stop you there.  Mr. Silverstone, you heard Mr.

16  Scherf testify that earning capacity was outside the scope of

17  his expertise, do you agree with that?

18  A    No, I don't.

19  Q    And why not?

20  A    Because earning capacity is not specifically a vocational

21  opinion.  Earning capacity is something that's actually

22  discussed -- as a member of the American Institute of Certified

23  Public Accountants, we have various practice guides on

24  different aspects of the work that we do.  And one of the

25  practice guides is specifically on calculating losses in these

1  types of matters.  And it's also written about in the Journal

2  of Forensic Economics, which is a peer-reviewed publication in

3  our industry.  And earning capacity is what is someone's

4  ability to earn, and that's based on a number of aspects.  It's

5  based on their age, their education, their work history, and

6  their training.

7  Q    Did you offer an opinion as it relates to the earning

8  capacity of Ms. Phillips in this case?

9  A    Specifically, my opinion is -- again, as I said, I don't

10 disagree with what Mr. Scherf said her earning capacity was

11 when she was at Starbucks.  But in terms of a diminution or a

12 loss in her earning capacity into the future, I did not make a

13 determination of that.  And that's the reason why I calculated

14 the loss I did, because I don't -- I have not seen any opinion

15 from any employability expert or vocational expert that tells

16 me that because of what happened, she actually had a loss of

17 earning capacity into the future.

18 Q    And did you hear Ms. Phillips testify this morning?

19 A    I did.

20 Q    Did you hear anything in her testimony that would change

21 your opinion as to her earning capacity specifically?

22 A    Not specifically, no.

23 Q    And, in fact, did you hear Ms. Phillips testify regarding

24 her expertise in handling a business operation of north of $100

25 million in profit and loss?

1  A    I did, yes.

2  Q    And would that have an impact on your analysis to

3  determine her earning capacity?

4  A    Well, again, I'm not -- you know, I'm not a vocational

5  expert or employability expert, that would be something that

6  they would look at.

7  Q    Yes.  Would the fact that she had earned a significant --

8  more in compensation at Starbucks than she's currently making,

9  how does that impact your analysis?

10 A    Well, as I said, I would need to see an opinion that

11 someone would tell me that she is permanently impaired and

12 unable to earn what she was earning at Starbucks in the future.

13 Q    Did you hear any such evidence in this case?

14 A    No, I haven't.

15 Q    What sort of evidence would you have liked to have heard

16 in order for you to render an opinion regarding a diminished

17 earning capacity?

18 A    Typically, you know, what I'd like to see is a report from

19 a -- as I said, an employability or vocational expert that

20 would say because of the circumstances of the matter, and

21 someone's dismissal or whatever it is, that their future

22 earning capacity has been impaired, and they're only capable of

23 doing certain things from which they can only earn a specific

24 salary.

25 Q    And, in fact, you heard Ms. Phillips testify this morning

Silverstone - Direct                         75

1  that she had spoken to a recruiter in three separate instances,

2  did you not hear that?

3  A    I did hear that, yes.

4  Q    And you heard her testify that she spoke to recruiters

5  that were consistent with some of her former colleagues at

6  Starbucks.

7           MS. MATTIACCI:  Objection, Your Honor, this is --

8  number one, it's leading.

9           Number two, this is going to an area outside of his

10 expert report.

11          MR. HARRIS:  It's within the scope of his expertise,

12 Judge, and he can offer an opinion --

13          MS. MATTIACCI:  It has to be -- I'm sorry, Your

14 Honor.

15          THE COURT:  Wait.  Wait.  I just want to understand

16 the parameters of his expertise.  Number one, from what I'm

17 hearing, there's a stipulation that Mr. Silverstone is

18 qualified as a vocational expert.

19          MS. MATTIACCI:  No, Your Honor, absolutely --

20          THE COURT:  I'm sorry, as an economic expert.

21          MR. HARRIS:  That's correct.

22          MS. MATTIACCI:  Yes, as an economist.

23          THE COURT:  I misstated that, my fault.

24          MS. MATTIACCI:  And only, Your Honor, to testify as

25 to the back pay and front pay losses.

1          THE COURT:  I understand.

2          MS. MATTIACCI:  Yes.

3          THE COURT:  Mr. Silverstone is testifying that within

4  the parameters of being an economic expert, based upon reports

5  or documents as being a CPA, and perhaps the accounting

6  societies, that to determine economic loss, he can take into

7  account the ability to earn, age, education, work history, and

8  training.  So he's not being offered as an expert, a vocational

9  expert.  That was the initial objection in the pretrial motion

10  that I read.  Am I correct?

11          MR. HARRIS:  That's correct.

12          THE COURT:  All right.  So -- and I also hear him

13  saying that he doesn't dispute the calculation by Mr. Scherf of

14  the past lost earnings and benefits.  And I'm looking at

15  Exhibit 126A of $1,053,133 as to back pay, correct?

16          MR. HARRIS:  That's not accurate, Judge.  He is

17  disputing the calculation.

18          THE COURT:  Of back --

19          MR. HARRIS:  What he's not disputing is the

20  methodology.

21          THE COURT:  Of back pay?

22          MR. HARRIS:  Yes, correct.

23          THE COURT:  He's not disputing the methodology?

24          MR. HARRIS:  He is -- well, it's more nuanced than

25  that.  Specifically, Judge, if he's testifying that there

1  wasn't a diminution in earning capacity, and as a result, Mr.

2  Scherf's model is flawed, his analysis is flawed is what he's

3  testifying.  So, yes, he's not disputing that she made -- Ms.

4  Phillips made more money at Starbucks than she did at Raymour &

5  Flanigan.  So for that purpose, he's not disputing that issue.

6          What he is suggesting is is Mr. Scherf's analysis is

7  flawed because it assumes that there was a diminution in

8  earning capacity.

9          THE COURT:  So you're saying --

10          MR. HARRIS:  That's where they differ.

11          THE COURT:  You're saying that Mr. Silverstone

12  believes actual earnings should be higher?

13          MR. HARRIS:  Yes.

14          THE COURT:  Okay.  All right.

15          MS. MATTIACCI:  And, Your Honor --

16          THE COURT:  What is the objection now?

17          MS. MATTIACCI:  May I be heard on that?  That is

18  just --

19          THE COURT:  I just wanted to make sure I understood

20  exactly what the position was.

21          MR. HARRIS:  Yes.

22          THE COURT:  So he's not being offered as a vocational

23  expert.  And I'll allow him to opine based upon -- within the

24  confines of being an economic expert, that he can take into

25  account the earning capacity as I've explained it.

1          MS. MATTIACCI:  Your Honor, may I just be heard on

2    that?

3          THE COURT:  Yes.

4          MS. MATTIACCI:  Because it's not about earning

5    capacity.  That would be something where he's saying we need to

6    prove that she was permanently impaired from being able to get

7    a job.  That's not even part of this case.

8          This is -- what counsel is doing, this is a backdoor

9    way to get into mitigation issues.  The burden of proof is on

10   the Defendant's proof that the Plaintiff failed to mitigate.

11   They have to identify a specific job that was reasonably

12   available to Ms. Phillips that she unreasonably did not avail

13   herself to.  Those opinions are outside of the scope of this

14   expert.  He cannot opine to those things.  It's not part of

15   this report and he's not qualified to do it.

16         We know that within 14 weeks, she got a job at

17   Raymour & Flanigan.  There's a difference in pay between

18   Starbucks and Raymour & Flanigan.  This economist, we're

19   saying, has economic background in accounting to be able to

20   talk about those calculations.  But where counsel was heading

21   into was to start talking about testimony from Plaintiff about

22   her job search efforts.  And the job search efforts go to

23   mitigation, which are outside the scope of this expert's

24   opinion.  And that's why I stood to object, Your Honor, so that

25   we don't lead down that path.

1           THE COURT:  Well, I understand that.  I think your

2    argument's going to the weight of the testimony rather than its

3    admissibility.  He's an expert, and he's explained why earning

4    capacity fits within his expertise as an economic loss expert.

5    And certainly as an expert witness, he can base his opinion

6    upon testimony heard in court from the Plaintiff.  So I'll

7    overrule the objection.

8    BY MR. HARRIS:

9    Q    Mr. Silverstone, did you render an opinion in this case as

10   it relates to the amount of loss based on what you have

11   identified is a lack of demonstration of diminished earning

12   capacity?

13   A    Yes, I did.

14   Q    And what was the amount that you identified?

15   A    The amount that I have in my report is $78,343.

16   Q    And how did you arrive at that loss, Mr. Silverstone?

17   A    That's based on the period of time that Ms. Phillips was

18   out of work between leaving Starbucks and starting at Raymour &

19   Flanigan, and it was based on her salary that she was receiving

20   at Starbucks.

21   Q    Is there any testimony and/or evidence that you've heard

22   or been presented to suggest that Ms. Phillips had a diminish

23   in earning capacity since she had been separated from Starbucks

24   in 2018?

25   A    That she -- I'm sorry, that she had a diminished --

Silverstone - Direct                    80

1  Q    Earning capacity.

2  A    -- earning capacity?  As I said, I have not received any

3  expert report or opinion to suggest that.

4  Q    The methodology that you employed, what source do you have

5  for that methodology?

6  A    The -- in terms of the overall calculation?

7  Q    Yes.

8  A    It's based on -- as I mentioned, it's based on several

9  guides.  You know, the American Institute of CPAs, as I said,

10 has a practice guide.  It's based on articles in the Journal of

11 Forensic Economics.  It's based on what's accepted in our

12 industry and, you know, over 35 years of doing these kind of

13 calculations.

14 Q    The report -- the opinion that you just rendered, did you

15 render that opinion to a reasonable degree of professional

16 certainty?

17 A    Yes.

18         MR. HARRIS:  With the Court's indulgence.

19 Q    Can you describe the areas where you disagree in your

20 analysis as it relates to Mr. Scherf's analysis in his report?

21 A    Well, first of all, the first thing is what we've been

22 discussing is the fact that Mr. Scherf has assumed until, I

23 believe the age of 70, that this -- what Ms. Phillips was

24 earning at Raymour & Flanigan, you know, except for increases

25 over the years, that will be the ceiling on her earnings.   In

1  other words, he's assumed that she won't ever be able to earn

2  anything close to what she was earning at Starbucks, so I think

3  we've talked about that.

4  Q    And you disagree with that analysis?

5  A    Yes, for all the things I've previously discussed, yes.

6  Q    Understood.  Second point of a difference in your analysis

7  versus Mr. Scherf?

8  A    Well, I mean in terms of my analysis, my calculation is

9  just based on, as I said, the loss for the period of time that

10 she was out of work between Starbucks and Raymour & Flanigan.

11 I mean, that's essentially what my calculation is.

12 Q    Do you have any opinion as to Mr. Scherf's analysis

13 anywhere else in his expert opinion?

14 A    I do, yes.

15 Q    What other areas would you identify?

16 A    In terms of the healthcare calculation, I was a bit

17 uncertain about Mr. Scherf's calculation there.  I know he said

18 it was about 19 hundred -- I think it was 19 hundred dollars.

19 I wasn't able to do that reconciliation and kind of do that

20 calculation of where that 19 hundred dollars came from.  But

21 also, in terms of the concept of when you're doing losses

22 involving healthcare, there's other factors you have to

23 consider.  I don't know exactly -- I mean, I heard Ms. Phillips

24 say today that her healthcare benefits weren't as good at

25 Raymour -- or aren't as good at Raymour as they were at

Silverstone - Direct                                   82

1    Starbucks, but I haven't seen anything specifically to show me

2    that.  In terms of -- you know, when you look at healthcare,

3    you're looking at what your deductibles are, what your copays

4    are.  I didn't see an analysis of that by Mr. Scherf.  I think

5    it was just based on a -- what was on the W-2 as opposed to the

6    actual benefit itself.

7    Q    And is --

8    A    So I'm not sure I really agree with that method of the

9    calculation.

10   Q    And, in fact, if I understand Mr. Scherf's testimony, the

11   19 hundred dollars that he attributed was, I think, the

12   employer contribution portion.

13   A    Correct.  I think that's correct.

14   Q    How does that factor into your analysis?

15   A    Well, it's really what -- when you're looking at economic

16   losses, you're looking at the loss to the individual.  So you'd

17   have to really look at what the loss was to Ms. Phillips in

18   terms of, like, what her actual loss was as opposed to a

19   difference between what the employer was actually paying.

20   Q    Are there any other area of disagreement between your

21   analysis versus Mr. Scherf's?

22   A    The other area was in terms of the stock options.  In

23   terms of the calculations that were done there, number one,

24   it's my understanding stock options aren't always guaranteed.

25   And I think, you know, you -- I don't -- I haven't seen -- I

Silverstone - Direct                          83

1  don't think I've seen the underlying paperwork of those

2  options.  But I just know from personal experience in the last

3  company I was with, which was a public company where we had

4  stock options, you know, they weren't always guaranteed.  You

5  had to meet -- there were certain parameters we had to get

6  before we were awarded those options.

7           And the other thing is the strike price, or what the

8  price of the stock is at the date that those options are

9  exercised.  And if the -- if the price is lower than the

10 option, then you wouldn't take it up because it would actually

11 be costing you money to do that.

12 Q    So as it relates to Mr. Scherf's analysis regarding a loss

13 as it relates to the exercise of stock options, what say you on

14 that analysis?

15 A    As I said, I don't necessarily agree with that analysis.

16 For example, I think the RSUs, or the restrictive stock options

17 -- or the -- I'm sorry, yeah, the RS -- RSUs?  RSUs, yeah.

18 Q    Yes.

19 A    I think historically, Ms. Phillips had not met the

20 parameters of actually receiving those.  So she was, I think,

21 due to get a certain amount, and she got a lesser amount.  So

22 to -- you know, to project that out and say, well, she should -

23 - she would have gotten them, I think, is a little speculative.

24           THE COURT:  Are you talking about stock options now

25 or restricted stock?

1          THE WITNESS:  I'm talking about both, but

2    specifically with the restrictive stock.  I don't think she --

3    I think historically, she didn't meet the parameters of the

4    actual number that she was supposed to get.

5          THE COURT:  When you say you think, did you look into

6    it?

7          THE WITNESS:  Yes, I -- if I -- may I look at my

8    report here?

9          THE COURT:  Yes.

10         THE WITNESS:  Yes, she had -- it says here that she

11   had a target of 445, but she actually only got 144, or 32

12   percent of that target.

13   BY MR. HARRIS:

14   Q    Mr. Silverstone, could you provide more context to that

15   portion of your analysis for the Court?

16   A    Yeah, that's in the -- in the re -- in the restrictive

17   stock units.

18   Q    And what page are you referring to in your document?

19   A    That is on Page 9 of my report.

20   Q    And can you describe why substantively does that make a

21   difference between the target that she would have received

22   versus what she actually received in terms of stock options, or

23   restrictive stock?

24   A    Because when you're doing an economic analysis like this,

25   you're making certain assumptions.  So I think the assumption

Silverstone - Direct                          85

1   that was made was that she would have achieved 100 percent of

2   those RSUs.

3   Q    And historically, she had received less than 100 percent,

4   if I understand your calculation.

5   A    Yes.

6   Q    And what did she receive previously that would impact your

7   analysis?

8   A    Well, she -- she received 32 percent of her target, not

9   100 percent.

10  Q    How would that impact your actual economic damages model

11  that you presented in this case?

12  A    It would reduce the calculation.

13  Q    By how much approximately, do you know?

14  A    Well, I mean, if you -- if you projected it out, and --

15  it's by two-thirds.

16          MR. HARRIS:  Your Honor, I believe that Mr. -- if I'm

17  not mistaken, I believe Mr. Scherf's report may have been

18  introduced by me, the full report.

19          MS. MATTIACCI:  No, Your Honor.

20          MR. HARRIS:  Yes, I thought I -- I presented it.  If

21  I did not, then I'm mistaken.

22          THE COURT:  Well, I have the exhibits introduced so

23  far Trial Exhibit 21A, which is the W-2's; Exhibit 126C, the

24  Fidelity statement; Exhibit 21A [sic] -- what is 21A?

25          MS. MATTIACCI:  That was the chart of her back pay

1  loss.

2          THE COURT:  Yes, Exhibit 126A.

3          MR. HARRIS:  I think that was the before, Judge, if

4  I'm not mistaken.

5          THE COURT:  That had Exhibit 1 on it.  Exhibit 126B,

6  that was the exhibit on the front pay.  And Trial Exhibit 126

7  was the supplemental report with the CV.  Is that what you're

8  talking about?

9          MR. HARRIS:  Yes, Your Honor.  The supplemental

10 report and the CV, I think I introduced into evidence for Mr.

11 Scherf.

12          THE COURT:  Okay.

13          MS. MATTIACCI:  Your Honor, I would have -- that was

14 not entered into evidence, one --

15          THE COURT:  Yeah, I don't have a check mark next to

16 it, so I'm not sure.

17          MR. HARRIS:  It may have just been shown or

18 identified.

19          THE COURT:  Yeah, I think you just showed it to him.

20 I don't think it was introduced.

21          MR. HARRIS:  Understood.  All right.

22 BY MR. HARRIS:

23 Q   Mr. Silverstone, again, directing your attention to

24 Exhibit Number 23.  Are there any other differences in your

25 analysis as it relates to the analysis conducted by Mr. Scherf

Silverstone - Direct                        87

1   that this Court should be aware of, other than what you've

2   already testified to?

3   A     No, I think those are the -- those are the main areas.

4   Q     Mr. Silverstone, regarding the actual damages model

5   calculation that Mr. Scherf had presented in this case, do you

6   agree with it in -- the total amount in its entirety?

7   A     No.

8   Q     What amount do you agree is the appropriate amount that

9   should be attributed to the loss as it relates to this case?

10  A     Well, as I said, the calculation I did was for the loss of

11  earnings between the period that Ms. Phillips left Starbucks

12  and joined Raymour & Flanigan, for that 14-week period.

13  Q     And that amount is?

14  A     That's the 78,343.

15          MR. HARRIS:   Thank you.  I have no further questions;

16  counsel may.

17          THE COURT:   Cross-examine.

18          MS. MATTIACCI:   Thank you, Your Honor.

19                          CROSS-EXAMINATION

20  BY MS. MATTIACCI:

21  Q     Mr. Silverstone, the first opinion that you gave that

22  there would be no recovery for Ms. Phillips into the future

23  from the time of her termination into the future was based upon

24  a conclusion that you had not been given an opinion that she

25  was discriminated against based upon her race?

Silverstone - Cross                                    88

1  A     Yeah, I had not -- at the time of doing my report, there

2  was no opinion as to the basis for her termination.

3  Q     Okay.  Are you aware sitting here today that a unanimous

4  jury found that Ms. Phillips was discriminated against based

5  upon her race?

6  A     I am aware of that, yes.

7  Q     Did you revise your report to reflect that new

8  information?

9  A     No.

10 Q     You'd agree with me that in terms of the stock price of

11 Starbucks, that it almost doubled since the time that Ms.

12 Phillips was terminated, correct?

13 A     I don't know specifically because I think I only looked at

14 the stock price for the applicable dates of when the stock

15 options would be exercised.

16 Q     Well, you'd agree with me that currently the stock price

17 is around $100, do you -- are you aware of that?

18 A     I don't check -- I haven't checked the stock price of

19 Starbucks, no.

20 Q     So you're not aware that the value of the stocks of the

21 shares that she has, if she exercised them in May, that would

22 actually be worth over $500,000?

23 A     I don't know what the value is of today.

24 Q     In terms of the health insurance loss, you would agree

25 with me that the 19 hundred dollars is a reasonable estimate of

Silverstone - Cross/Redirect                    89

1  the amount of money that Starbucks was contributing to Ms.

2  Phillips's health plan over and above what Raymour & Flanigan

3  contributes to her health plan, correct?

4  A    It's the difference between what the two employers pay, so

5  it's a mathematical calculation.

6  Q    Okay.

7  A    Yes.

8  Q    And before Ms. Phillips was terminated from Starbucks, she

9  had an employer that was contributing almost $2,000 more a year

10 to health insurance than she currently does, correct?

11 A    I believe so.  From what they contributed?

12 Q    Yes.

13 A    Yes.

14        MS. MATTIACCI:  I don't have any further questions,

15 Your Honor.

16        MR. HARRIS:  If I may briefly, based on what -- that

17 area of examination, Judge?

18        THE COURT:  Yes.

19                 REDIRECT EXAMINATION

20 BY MR. HARRIS:

21 Q    Mr. Silverstone, as I understand your expert opinion,

22 which you've rendered to a -- which you've rendered to a degree

23 of professional certainty, as I understand the model -- you

24 have two separate models.  Model number one deals -- assuming

25 no liability, is that accurate?

1  A    Correct.

2  Q    Model number two assumes liability, and your calculation

3  is approximately $78,000.

4  A    That's correct.

5  Q    As counsel asked about the employer contribution as it

6  relates to health insurance by the employer, how does that

7  affect your analysis, if at all?

8  A    Well, as I responded to counsel, I don't disagree with the

9  mathematics of it.  But the concept of what a person has lost

10 isn't necessarily what the employer contributes in terms of

11 dollars.  It's the benefit that you actually get out of it and

12 what it costs you for your healthcare.

13        MR. HARRIS:  Your Honor, thank you.  I'd move into

14 Exhibit Number 23, Mr. Silverstone's expert report.

15        MS. MATTIACCI:  Objection, Your Honor.

16        THE COURT:  Yeah, I'll sustain the objection.  We

17 don't admit those reports.  They're out-of-court statements.

18 It's his testimony here that is the admissible evidence.

19        MR. HARRIS:  If I may, Your Honor.  May I be heard on

20 that precise point?

21        THE COURT:  Yes.

22        MR. HARRIS:  If you look at Mr. Silverstone's expert

23 report, it provides an analysis that includes the basis of his

24 opinion.  He's certainly able to do so, and the report contains

25 the background and source information which this Court can

1  certainly consider.

2          The reason why I'm asking this Court to admit the

3  expert report, which I believe is admissible, is that it

4  provides the foundation and the basis, as well as his

5  calculations consistent with --

6          THE COURT:  I'll afford you the opportunity to -- for

7  him to testify to those things.

8          MR. HARRIS:  Understood.

9          THE COURT:  Thank you.

10         MR. HARRIS:  I have no further questions for Mr.

11 Silverstone.  Thank you.

12         THE COURT:  Do you want to question him on his

13 methodology?

14         MR. HARRIS:  If I may, yes.

15         THE COURT:  Yeah, that's what I was saying.

16         MR. HARRIS:  Okay.

17         THE COURT:  If you want to question him on his

18 methodology, and how he arrived at his opinion, and what his

19 numbers are --

20         MR. HARRIS:  Yes.

21         THE COURT:  -- I'll permit it.

22         MR. HARRIS:  Thank you.

23 BY MR. HARRIS:

24 Q    Mr. Silverstone, if I had not previously, can you describe

25 to the Court what's your methodology in rendering your opinion

1    to a professional degree of certainty?

2    A    In terms of my calculation?

3    Q    Yes.

4    A    As I stated earlier, I started off looking at the

5    Plaintiff's earning capacity, which is what she was earning at

6    Starbucks.  And I -- because, as I said, I didn't have a

7    vocational or employability opinion to tell me that there had

8    been a diminution in that earning capacity because of what was

9    being alleged in this case, I, therefore -- my methodology was

10   taking a calculation of the period of time that she was out of

11   work and not earning income, which was the roughly 14-week

12   period between when she left Starbucks and when she started at

13   Raymour & Flanigan.  That's essentially my methodology of the

14   calculation.

15   Q    And Mr. Scherf's, as I understand it, his methodology was

16   based on the fact that she had earned an actual earning that

17   was less than what she had previously earned at Starbucks, is

18   that accurate?

19   A    Yes and no.  Essentially, Mr. Scherf's calculation is

20   saying that what she was earning at Raymour & Flanigan is her

21   future earning capacity, and that she cannot earn any more than

22   that.

23   Q    And do you disagree with that analysis?

24   A    Yes.

25        MR. HARRIS:  I have no further questions.  Thank you.

Silverstone - Court                    93

1          THE COURT:  And what do you base the disagreement on?

2          THE WITNESS:  It's kind of the converse of my

3   opinion, Your Honor, is that, you know, I said that I didn't

4   have any kind of employability or vocational opinion to tell me

5   that the events that led to her departure -- the Plaintiff's

6   departure from Starbucks has in any way affected her ability to

7   earn what she was earning in the future.

8          In terms of Mr. Scherf's report, it's kind of the

9   other side of that, is that he hasn't provided any vocational

10  opinion or employability opinion to say that what she is

11  earning at Raymour & Flanigan is her absolute future earning

12  capacity, and that's all she's ever going to be able to earn.

13         THE COURT:  All right.  And do you have any opinion

14  on front pay?

15         THE WITNESS:  For that reasons -- yes, Your Honor.

16  For that reason, because I don't have any expert opinion to

17  tell me that she's not capable of earning what she was in the

18  past.  You know, I heard earlier that it was said that she

19  didn't have a college education, but she was earning what she

20  was earning at Starbucks.  And I have not seen any opinion from

21  any expert to suggest that she won't be able to earn that in

22  the future.

23         THE COURT:  All right.  Any questions based upon my

24  questions?

25         MR. HARRIS:  Yes, if I may.

1    FURTHER REDIRECT EXAMINATION

2  BY MR. HARRIS:

3  Q    Mr. Silverstone, what -- the methodology in the analysis

4  that you just provided to the Court, what source are you

5  relying on in rendering that opinion or sources, plural?

6  A    As I mentioned earlier, it's really based on -- there are

7  many publications written about the way that you do these

8  calculations.  There are -- as I said, the American Institute

9  of CPAs has a practice guide.  There are numerous articles that

10 are written in the Journal of Forensic Economics.  And it's

11 based on my experience and all of the thousands of reports I've

12 issued in the last 30 plus years.

13 Q    All of which presume that you can include earning capacity

14 as part of your analysis.

15 A    Absolutely.

16        MR. HARRIS:  Thank you.  I have no further questions.

17        MS. MATTIACCI:  One question, Your Honor.

18                    RECROSS-EXAMINATION

19 BY MS. MATTIACCI:

20 Q    The AICPA guide that you referred to, that is not

21 authoritative, correct?

22 A    That is absolutely correct, yes.  It's a practice guide.

23 It's what we -- and I was on the -- I was on the American

24 Institute of CPAs Forensic and Litigation Services Committee

25 when that practice guide was written, so I was one of the

Silverstone - Redirect                          95

1  reviewers of it.  It was written by another person.  And we

2  accept -- it's not authoritative, but for those of us who do

3  this kind of work, it is a best practices as to -- it's based

4  on everyone's experience, and what's written in our industry,

5  and case law, and everything else as the way that you should

6  approach these cases.

7          MS. MATTIACCI:  I don't have any further questions,

8  Your Honor.

9          THE COURT:  All right.

10                  FURTHER REDIRECT EXAMINATION

11 BY MR. HARRIS:

12 Q    Are you saying, Mr. Silverstone, that it's best practice

13 to consider earning capacity?

14 A    No, I was asked specifically about the AICPA guide being a

15 non-authoritative guide, and I was -- that guide is what we

16 call a best practice guide.

17         MR. HARRIS:  No further questions.  Thank you.

18         THE COURT:  All right.  You may step down, all right.

19         MR. SILVERSTONE:  Thank you.

20         MR. HARRIS:  Your Honor, the defense rests as it

21 relates to the economic damages of Ms. Phillips.

22         THE COURT:  All right.  Is there any rebuttal?

23         MS. MATTIACCI:  No, Your Honor.

24         THE COURT:  All right.  So that concludes the

25 testimony.

1           All right.  I think I should get some memorandum from

2  counsel.

3           MR. HARRIS:  Yes.

4           THE COURT:  Obviously, you have to order the

5  testimony.

6           MR. HARRIS:  Yes.

7           THE COURT:  Needless to say, an issue here would be

8  whether a vocational report is required with respect to the

9  earning capacity on front pay or back pay in the analysis.  So

10 that would be an issue to be covered.

11          MR. HARRIS:  Yes.

12          THE COURT:  And your analysis of all of the numbers

13 and how -- and the testimony of the witnesses.

14          MR. HARRIS:  Yes.

15          THE COURT:  All right?

16          MS. MATTIACCI:  Yes.

17          MR. HARRIS:  Yes, Your Honor.

18          MS. MATTIACCI:  I mean, Your Honor, the issue of

19 mitigation, I think, you know, --

20          THE COURT:  And mitigation, too.

21          MS. MATTIACCI:  And maybe that's what you were

22 referring to in the first issue.

23          THE COURT:  Yes, mitigation.

24          MS. MATTIACCI:  Mitigation.

25          THE COURT:  Mitigation, okay.

1     MS. MATTIACCI:  Can I ask, Your Honor, before you

2  dismiss us if we could maybe look at that briefing schedule

3  then, if you want briefs on this issue before ruling?  Because

4  Plaintiff's response to the Defendant's motion for a new trial

5  and the related motions are heavily contingent on the punitive

6  damages issue, which is -- it can't be fully addressed without

7  a ruling from Your Honor on the economic loss issue.  Or maybe

8  it can.  I'm just -- I'm just trying -- to try to see how to

9  best roll this out that makes sense to do the briefing

10 because --

11     MR. HARRIS:  I agree with that analysis, Judge.  I do

12 agree that --

13     THE COURT:  All right.

14     MR. HARRIS:  -- this Court will have to include in

15 its analysis the economic loss first.

16     THE COURT:  Yeah, obviously there are a number of

17 post trial matters that have to be considered and -- which

18 means I have to render an -- get briefs from you and render an

19 opinion on the economic damages before I rule on the other

20 motions.

21     So, August 7th may not be a realistic date.  I know

22 both sides wanted it in terms of a date to -- responses, but

23 it's becoming unrealistic.  And I would like to -- if you order

24 the transcript of today on an expedited basis, when would you

25 have it?  This week?

98

1          MR. HARRIS:  Probably this week, Judge.

2          THE COURT:  Probably this week.  So today is the

3   19th?

4          MR. HARRIS:  Yes.

5          MS. MATTIACCI:  Yes.

6          THE COURT:  Friday is the 21st.

7          MR. HARRIS:  Yes.

8          THE COURT:  Do you think you can have briefs in by

9   the 28th?

10          MS. MATTIACCI:  Yes, Your Honor.

11          THE COURT:  All right.  And what I'll do is I'll try

12   my best -- I can't guarantee it -- maybe to get an opinion out

13   of an economic loss within two weeks after that.

14          MR. HARRIS:  Understood.

15          THE COURT:  Which would take us to what date?

16          MR. HARRIS:  My vacations, but that's -- but I guess

17   not anymore.

18                    (Laughter)

19          THE COURT:  I try to avoid August, but I --

20          MS. MATTIACCI:  Two weeks from the 21st, Your Honor,

21   is August 4th, that's a Friday.

22          THE COURT:  So August 4th -- so if I get an opinion

23   out by August 4th, then perhaps -- when is your vacation?

24          MR. HARRIS:  It's the first week in August.

25          THE COURT:  All right.  Then why don't I, at that

99

1   point, give the parties -- let's say till Wednesday, August 16

2   to respond.

3           MR. HARRIS:  Yes.

4           THE COURT:  And then if there is any reply, seven

5   days after that.

6           MR. HARRIS:  Yes.

7           THE COURT:  All right?

8           MR. HARRIS:  Very good.  Thank you.

9           THE COURT:  Okay.  All right, would that be a good

10  briefing schedule?

11          MS. MATTIACCI:  Are you referring just to the

12  economic loss?

13          THE COURT:  Um?

14          MS. MATTIACCI:  Are you referring just to the

15  economic loss?

16          THE COURT:  No, no, no.

17          MS. MATTIACCI:  All of it?

18          THE COURT:  What did we say, by the 28th, you would

19  have your memorandums in on economic loss?

20          MR. HARRIS:  Yes.

21          MS. MATTIACCI:  Okay.

22          THE COURT:  Hopefully by August 4th, I can render an

23  opinion on that.

24          MS. MATTIACCI:  I hear you, Your Honor.  I'm sorry, I

25  missed that.

1          THE COURT:  And then I'll give you some additional

2   time to respond because the August 7th date doesn't make sense

3   at this point.  I said, August -- Wednesday, August 16th to

4   respond to both sides on post around motions --

5          MR. HARRIS:  Yes.

6          THE COURT:  -- and seven days to file any replies.

7          MS. MATTIACCI:  Great.

8          THE COURT:  All right?

9          MR. HARRIS:  Yes; thank you.

10          THE COURT:  And then I'll make more decisions.

11          MR. HARRIS:  Yes, Judge; thank you.

12          THE COURT:  Okay?

13          MS. MATTIACCI:  Great.

14          THE COURT:  All right?  I think that's the best way

15   to do this then.  And my goal is to have complete resolution

16   early in September because I know this is important to both

17   sides.

18          MR. HARRIS:  Yes, Your Honor; thank you.

19          MS. MATTIACCI:  Great.

20          THE COURT:  All right?

21          MS. MATTIACCI:  Thank you, Your Honor.

22          THE COURT:  And I always encourage counsel to discuss

23   the possibility of settling the case.

24          MR. HARRIS:  Yes.

25          THE COURT:  And if you ever do, just send in a

101

1   letter.

2           MR. HARRIS:  Will do.

3           THE COURT:  Okay, and we'll do the Rule 41 order.

4   All right?

5           MR. HARRIS:  Yes.

6           MS. MATTIACCI:  Okay, Your Honor.

7           THE COURT:  We'll stand in recess.

8           MR. HARRIS:  Thank you.

9           MS. MATTIACCI:  Thank you, Your Honor.

10          THE CLERK:  All rise.

11      (Whereupon, at 12:59 p.m., the hearing was adjourned.)

12

13                  CERTIFICATE OF TRANSCRIBER

14

15      I, KAREN HARTMANN, a certified Electronic Court

16  Transcriber, certify that the foregoing is a correct transcript

17  from the electronic sound recording of the proceedings in the

18  above-entitled matter.

19

20

21

22  Karen Hartmann, AAERT CET 475  Date:  July 20, 2023

23  TRANSCRIPTS PLUS, INC.

24

25