IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHANNON PHILLIPS,<br><br>        Plaintiff,<br><br>    v.<br><br>STARBUCKS CORPORATION,<br><br>        Defendant. | CIVIL ACTION<br>NO. 19-19432 |

## OPINION

**Slomsky, J.**                                                      **August 16, 2023**

### TABLE OF CONTENTS

I.    **INTRODUCTION** ................................................................. 1

II.   **FACTS** ................................................................................. 2

   A.   Plaintiff's Testimony ................................................... 3

   B.   Scherf's Testimony ..................................................... 6

      1.   Back Pay ............................................................. 6

      2.   Front Pay ............................................................ 8

   C.   Silverstone's Testimony ............................................. 9

III.  **LEGAL STANDARDS** ....................................................... 10

   A.   Back Pay ...................................................................... 10

   B.   Front Pay .................................................................... 13

   C.   Tax Gross Up Damages ............................................. 14

IV.  **ANALYSIS** ......................................................................... 16

i

A.  Back Pay ..................................................................................................... 16

B.  Front Pay .................................................................................................... 20

C.  Medical Benefits and Stock Options.............................................................. 23

D.  Tax Gross Up Damages ................................................................................ 23

**V.  CONCLUSION** ....................................................................................................... 26

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

SHANNON PHILLIPS,

                    Plaintiff,

        v.

STARBUCKS CORPORATION,

                    Defendant.

CIVIL ACTION
NO. 19-19432

## I.      INTRODUCTION

On October 28, 2019, Plaintiff Shannon Phillips ("Plaintiff" or "Phillips") commenced this action against Defendant Starbucks Corporation ("Defendant").  (Doc. No. 1.)  On May 27, 2020, this case was transferred to the Honorable Joel H. Slomsky of the Eastern District of Pennsylvania. (Doc. No. 28.)   On August 17, 2020, Plaintiff filed a Second Amended Complaint asserting violations of three statutes: (1) 42 U.S.C. § 2000e-5 ("Title VII") (Count I); (2) 42 U.S.C. § 1981 ("Section 1981") (Count II); and (3) the New Jersey Law Against Discrimination ("NJLAD") (Count III).  (Doc. No. 36 at ¶¶ 77-95.)

Trial commenced on June 5, 2023 and concluded on June 12, 2023.  (Doc. Nos. 135, 144.) In reaching its verdict, the jury was not tasked with deliberating on an award of back pay or front pay, as the parties jointly requested that the Court make this determination.  On June 15, 2023, the Court entered judgment in favor of Plaintiff in accordance with the jury's verdict, which awarded her a total of $25,600,000.  (Doc. Nos. 150, 153.)

On July 12, 2023, Plaintiff filed the present Motion to Amend Judgment to Include Court-Determined Economic Loss and Attorneys' Fee Award (the "Motion").  (Doc. No. 164.)  On July 19, 2023, the Court held an economic loss hearing with counsel for the parties.  (Doc. No. 172.)

1

As presented during the hearing, Plaintiff requests back pay damages from May 10, 2018, the day after her termination, until April 30, 2023[1], an amount totaling $1,053,133.  Plaintiff also seeks a front pay award from May 1, 2023[2], until Plaintiff's 70th birthday, June 29, 2041, which equals $1,911,361.  Lastly, Plaintiff requests that the Court award tax gross up damages, which she proposes are $75,757.

Upon the conclusion of the hearing, the Court requested that the parties submit memoranda on the economic loss issue.  (Id. at 96:1-2; Doc. No. 173.)  On July 28, 2023, Defendant submitted a Memorandum in Opposition to Plaintiff's Request for Economic Loss Damages.  (Doc. No. 174.)  On the same day, Plaintiff filed a Memorandum on Economic Loss.  (Doc. No. 175.)

For reasons that follow, Plaintiff's Motion to Amend Judgment to Include Court-Determined Economic Loss and Attorneys' Fee Award (Doc. No. 164) will be **GRANTED IN PART**.[3]

## II.    FACTS

At the economic loss hearing held on July 19, 2023, three witnesses testified: (1) Plaintiff Shannon Phillips; (2) Stephen J. Scherf, Plaintiff's expert; and (3) Harold M. Silverstone,

---

[1]    Plaintiff relied on an expert, Stephen Scherf, to calculate her damages.  Scherf's most recent expert report is dated May 23, 2023 and the back pay calculation concludes on April 30, 2023.  (See Trial Ex. No. 126.)

[2]    Scherf testified that he selected the May 1, 2023 date because "the back pay was through April 30th, 2023.  So it [front pay] goes from May 1st, 2023 to 6/29/2041."  (Doc. No. 172 at 45:14-17.)

[3]    In the Motion to Amend, Plaintiff addresses both economic loss and attorneys' fees.  (Doc. No. 164.)  On July 14, 2023, Plaintiff filed a Petition for Attorneys' Fees and Costs.  (Doc. No. 168.)  Defendant has until August 16, 2023 to respond to Plaintiff's Petition for Attorneys' Fees and Costs.  (Doc. No. 173.)  Accordingly, the Court will only address the Motion to Amend as it relates to Plaintiff's request to amend the judgment based on the economic loss determination.

Defendant's expert.   (Doc. No. 172.)   The parties stipulated to Scherf's and Silverstone's qualifications to testify about economic loss.   (Id. at 34:19-22; 63:14-15; 65:18-20.)

A.   Plaintiff's Testimony

Plaintiff's testimony centered on her efforts to find employment following her termination from Starbucks in May 2018.   (See Doc. No. 172.)   She testified as follows: Plaintiff is currently 52 years old.   (Id. at 6:9-10.)   While employed at Starbucks, she intended to work "until at least 70, maybe – maybe longer."   (Id. at 6:16-18.)   When questioned about her post-termination job search, Plaintiff explained that she took the following steps: (1) enrolling in state-run classes on resume writing and interviewing; (2) requesting resume assistance from her daughter; (3) attending a state-run job fair; and (4) contacting individuals in her LinkedIn network.   (Id. at 6:25-7:5; 8:5-7, 15-17.)

Plaintiff began searching for a new position "within a week or two" of being fired from Starbucks.   (Id. at 7:24-8:1-3.)   The resume writing classes occurred "within the first two to three weeks" after her termination.   (Id. at 8:8-13.)   While Plaintiff attended the job fair, it did not advertise regional positions, which is what Plaintiff was seeking.   (Id. at 15:10-13; 28:16-24.) During her search, she "talked to lots of different people about positions" and "spoke with two other companies."   (Id. at 15:13-15.)   One company was U.S. Appliance and the other was Total Wine and Spirits.   (Id. at 15:16-17, 19-20.)   Plaintiff did not submit a formal application to U.S. Appliance or Total Wine and Spirits, but she interviewed with recruiters for the positions.   (Id. at 15:19-23; 16:2-11.)   She did not move forward with either position because: (1) U.S. Appliance required a college degree, which she does not have, and (2) she did not feel that the Total Wine and Spirits position would "be a great fit."   (Id. at 15:17-22; 16:6-11.)

Plaintiff then spoke with an official from 7-Eleven.  (Id. at 15:24.)  She did not apply for this position because while the compensation may have been comparable to that of Starbucks's, the "stores are open 24 hours," "get robbed a lot," and employees are required to be on call all day. (Id. at 17:1-7; 26:16-20.)  Based on these considerations, Plaintiff did not believe 7-Eleven would be a good fit.  (Id. at 17:3-7; 26:19-24.)  The positions at U.S. Appliance, Total Wine and Spirits, and 7-Eleven were regional roles, which Plaintiff described as being "based on [the] overall revenue that you oversee."  (Id. at 23:2-8.)

While doing her job search, she was contacted by her current employer, Raymour & Flanigan.  (Id. at 7:8.)  She was contacted at the recommendation of one of her former Starbucks coworkers.  (Id. at 7:9-13.)  As part of the hiring process, Plaintiff traveled to New York and New England and had multiple interviews with company officials.  (Id. at 7:14-18.)  This process began in June, approximately three to four weeks after Plaintiff was fired.  (Id. at 7:18-19; 8:18-22.) Raymour & Flanigan extended an offer to her in July 2018 and she began working there in mid-August 2018.  (Id. at 8:23-9:1; 17:19-21.)

Plaintiff also explained why she took the position at Raymour & Flanigan.  (Id. at 9:2-17.) First, she said that she is a single mother with two children whom she supports and was confident in the company's ability to stay in business.  (Id. at 9:3-7.)  Second, she stated that a former colleague "spoke highly of the company."  (Id. at 9:7-8.)  Third, the company offered her a regional position, which is on the same level as the position she held at Starbucks.  (Id. at 9-10.)  Fourth, because Plaintiff does not have a college degree, she was limited to companies that hire employees without such a degree.  (Id. at 9:10-13.)  Fifth, she expressed that she was "happy" to secure another regional position.  (Id. at 9:13-14.)  Sixth, in the interview process, she was informed that she

would have the opportunity to rise to a "VP position." (Id. at 9:15-17.)  Lastly, she explained that she "didn't want to be out of work" and "had bills to pay." (Id. at 29:5-6.)

     Plaintiff next testified about her employment benefits and compared what she received during her time at Starbucks to what she currently receives at Raymour & Flanigan.  While at Starbucks, Plaintiff received stock options. (Id. at 11:1-4.)  Plaintiff testified that had she stayed at Starbucks, she would have still received stock options. (Id. at 13:20-22.)  Plaintiff does not receive stock options at Raymour & Flanigan because it is a privately owned company. (Id. at 13:16-19.)

     She also contributed to a 401k plan while at Starbucks. (Id. at 11:25-12:6.)  Plaintiff contributed four percent of her salary to this plan, which Starbucks matched. (Id. at 12:7-14.)  Plaintiff also has a 401k plan at Raymour & Flanigan, to which she contributes four percent of her salary. (Id. at 12:18-23.)  Raymour & Flanigan contributes an equivalent of two percent of Plaintiff's salary to her 401k plan. (Id. at 12:24-13:1.)  In addition, Plaintiff received health insurance while employed by Starbucks. (Id. at 13:2-4.)  While Plaintiff currently has health insurance coverage at Raymour & Flanigan, she characterizes the plan as "worse" than Starbucks's, both in terms of the amount she is required to pay into the plan to maintain coverage and the scope of that coverage. (Id. at 13:5-15.)

     Plaintiff also described the differences in her job responsibility. (Id. at 23:7-17.)  At Starbucks, she oversaw "10 district managers . . . that had about 12 stores each." (Id. at 23: 8-10.)  At Raymour & Flanigan, she oversees six stores. (Id. at 23:12-14.)  At Starbucks, she oversaw "about 150 million [dollars] annually," whereas she oversees "about 85 million [dollars] annually" at Raymour & Flanigan. (Id. at 23:15-17.)  She does not know the dollar amount she would have

overseen had she pursued a position with U.S. Appliance, Total Wine and Spirits, or 7-Eleven.  (Id. at 24:1-11.)

In November 2021, Plaintiff was diagnosed with breast cancer, which prompted surgery, chemotherapy, and radiation.  (Id. at 13:25-14:5.)  After her surgery, she took unpaid leave.  (Id. at 14:6-8, 12-14.)  When asked whether Starbucks would have continued to pay her during this medical leave, Plaintiff stated "I believe I would have been paid."  (Id. at 14:15-16, 19.)  This belief was based upon Plaintiff's experience with the insurance plan and the strength of Starbucks's leave of absence plans.  (Id. at 33:3-14.)

While working at Raymour & Flanigan, Plaintiff has been contacted by recruiters with additional opportunities, which she has turned down because she "wanted to give this [her role at Raymour & Flanigan] a shot" with the knowledge that it "could work into a VP position" and that she "very much wanted to try to grow with the company."  (Id. at 29:16-25.)  One opportunity was with Wawa.  (Id. at 31:3-9.)  The compensation may have been similar to that offered by Raymour & Flanigan and not too dissimilar from that offered by Starbucks.  (Id. at 31:3-9, 18-25-32:1-4.)  Plaintiff did not pursue this position because she learned she had breast cancer and wanted to remain in a secure position where she had insurance.  (Id. at 32:5-11.)

B.  Scherf's Testimony

1.  Back Pay

At the economic loss hearing, Stephen Scherf was called by Plaintiff as an expert on economic loss.  He explained the contents of his expert report, beginning with the earnings Plaintiff would have been entitled to from May 10, 2018, the day after she was terminated, until April 30,

2023.[4]  (Id. at 38:15-20.)  Scherf then discussed his calculation of her earnings at Raymour &
Flanigan during this same time.  (Id. at 38:23-40:8.)  Next, he testified about Plaintiff's "medical
premium differential."  (Id. at 40:15-41:8.)  The medical premium differential, derived from
Plaintiff's W-2s, represents the difference in the monetary amount that each company contributed
to Plaintiff's healthcare plan.  (Id. at 40:16-41:4.)  Scherf noted that this calculation "came out to
almost $2,000, but a thousand – one thousand nine hundred and I think it was ninety-some dollars."
(Id. at 41:4-6.)  He elected to then "round[] down to the nearest hundred, and made that 19 hundred
dollars . . . ."  (Id. at 41:6-7.)

        The next topic of Scherf's testimony concerned Plaintiff's "401K plan differential."  (Id.
at 41:17-42:9.)  This calculation, based upon Starbucks's 100 percent employee contribution match
and Raymour & Flanigan's 50 percent employee contribution match, represents the "50 percent
match differential for the difference in her lost wages."  (Id. at 41:19-24.)  Finally, Scherf testified
about Plaintiff's stock options and that she lost over $180,000 in non-vested stock options because
of her termination.  (Id. at 42:10-43:1-9.)  In conclusion, he opined that Plaintiff's total past loss
earnings and benefits equaled $1,053,133.  (Id. at 44:25-25:3.)

        It should be noted that in Plaintiff's Memorandum, two different back pay amounts are
presented.  (See Doc. No. 175.)  Plaintiff first requests $1,617,203 in back pay damages.  (Id. at
1.)  This appears to be a typographical error because in his expert report, Scherf states that
$1,617,203 is the value of the front pay award should the Court only grant front pay until Plaintiff
turns age 65.  (See Trial Ex. 126.)  Later in the memorandum, Plaintiff then reverts to the
$1,053,133 back pay damages award.  (Doc. No. 175 at 9-10.)  At the conclusion of the

---

[4]    As noted, Scherf's most recent expert report is dated May 23, 2023 and the back pay calculation
       concludes on April 30, 2023.  (See Trial Ex. No. 126.)

memorandum, Plaintiff again requests an order awarding Plaintiff $1,617,203 in back pay damages, the apparent typographical error.  (Id. at 14.)  As such, Plaintiff appears to only request $1,053,133 in back pay.

2.   Front Pay

Scherf then discussed his front pay calculations.  To begin, Scherf explained that he used May 1, 2023 as the starting date for his calculations and June 29, 2041, the date of Plaintiff's 70th birthday and anticipated retirement, as his end date.  (Doc. No. 172 at 45:14-19.)  The healthcare plan differential amount remained at $1,900.  (Id. at 48:13-14.)  Scherf calculated the 401K plan differential in the same manner as he did for the back pay calculation.  (Id. at 48:20-25.)

Scherf concluded that Plaintiff's total front pay award should be $1,911,361.  (Id. at 50:18-23.)  He also calculated Plaintiff's tax gross up damages, which totaled $75,757.  (Id. at 49:24-50:3, 20-23.)  Tax gross up damages are intended to "compensate[] [a plaintiff] for the negative tax consequences of receiving a lump sum award in employment discrimination actions." Andujar v. Gen. Nutrition Corp., No. 14-7696, 2018 WL 3999569, at *9 (D.N.J. Aug. 20, 2018).  Therefore, Scherf opined that Plaintiff' should be awarded $3,040,251, which consists of back pay, front pay, and tax gross up damages.  (Doc. No. 172 at 50:17-23.)

Further, Scherf, in his expert report, in addition to calculating Plaintiff's front pay damages until her desired retirement age of 70, also calculates Plaintiff's front pay damages until she turns 65.  Scherf opines that the appropriate front pay award, considering a retirement age of 65, would be $1,617,203.  (See Trial Ex. 126.)  Scherf also provides a modified calculation of tax gross up damages in consideration of this reduced front pay award, which would equal $66,419.  (Id.)  The back pay award is the same in both calculations: $1,053,133.  (Id.)  In accounting for these reduced

8

awards and in keeping the same back pay value, Scherf concludes that Plaintiff's total economic loss would be $2,736,755 if she retired at age 65.  (Id.)

    C.  <u>Silverstone's Testimony</u>

Harold Silverstone, Defendant's economic loss expert, began his testimony with a description of his methodology to calculate back pay.  He explained that in "looking at future losses, or what someone may have lost because they've left a particular position," he reviews "their earning capacity, and has there been a – has their earning capacity been diminished."  (Doc. No. 172 at 72:10-14.)  He defined earning capacity as "someone's ability to earn, and that's based on a number of aspects.  It's based on their age, their education, their work history, and their training." (Id. at 73:3-6.)  Silverstone did not opine on whether there was a "diminution or a loss in her earning capacity into the future" because he did not receive "any opinion from any employability expert or vocational expert that tells [him] that because of what happened, she actually had a loss of earning capacity into the future."  (Id. at 73:9-17.)  He emphasized this point again by stating that before calculating front pay he "would need to see an opinion that someone would tell [him] that she is permanently impaired and unable to earn what she was earning at Starbucks in the future."  (Id. at 74:10-12; 93:13-22.)  In response to this testimony, Plaintiff's counsel stated as follows:

> [I]t's not about earning capacity.  That would be something where he's saying we need to prove that she was permanently impaired from being able to get a job. That's not even part of this case.  This is – what counsel is doing, this is a backdoor way to get into mitigation issues.  The burden of proof is on the Defendant's proof that the Plaintiff failed to mitigate.  They have to identify a specific job that was reasonably available to Ms. Phillips that she unreasonably did not avail herself to. Those opinions are outside of the scope of this expert.  He cannot opine to those things.

(Id. at 78:4-14.)

Silverstone opined that Plaintiff's total loss was $78,343, which was "based on the period of time that Ms. Phillips was out of work between leaving Starbucks and starting at Raymour & Flanigan . . . ."  (Id. at 79:9-15.)  He explained his disagreement with Scherf's opinion, stating that "he hasn't provided any vocational opinion or employability opinion to say that what she is earning at Raymour & Flanigan is her absolute future earning capacity, and that's all she's ever going to be able to earn."  (Id. at 93:8-12.)

## III.   LEGAL STANDARDS

### A.  Back Pay

In her Complaint, Plaintiff asserted that Defendant breached three statutes: (1) Title VII; (2) Section 1981; and (3) the New Jersey Law Against Discrimination ("NJLAD").  Each of these statutes provides for remedies, and it is Title VII which permits a plaintiff to seek back pay as well as reinstatement.  See 42 U.S.C. § 2000e-5(g); 42 U.S.C. § 1981(a)[5]; N.J.S.A. 10:5-13[6].

Specifically, Title VII states:

---

[5]   42 U.S.C. § 1981(a) provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  The statute does not expressly provide for front pay or back pay. However, the Third Circuit's Model Civil Jury Instructions state: "Back pay awards are available against an employer under Section 1981."  Third Circuit Model Civil Jury Instruction, 6.4.3 (citing Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 459 (1975)).

[6]   N.J.S.A. 10:5-13 provides in part: "All remedies available in common law tort actions shall be available to prevailing plaintiffs, and if the Attorney General or the director is a prevailing plaintiff, those remedies shall be available on behalf of named or unnamed victims."  N.J.S.A. 10:5-13(b).  Again, this provision does not expressly address front pay or back pay, but more generally refers to "all remedies available in common law tort actions."

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.  Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

42 U.S.C. § 2000e-5(g)(1).

Back pay "is not an automatic or mandatory remedy, but one which the courts may invoke at their equitable discretion."  Donlin v. Phillips Lighting North America Corp., 581 F.3d 73, 84 (3d Cir. 2009) (internal quotation marks omitted) (quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 415 (1975)).  "The relevant time period for calculating an award of back pay begins with wrongful termination and ends at the time of trial."  Dejesus v. Kids Acad., Inc., No. 18-13822, 2020 WL 1921934, at *10 (D.N.J. Apr. 21, 2020) (internal quotation marks omitted) (quoting Blum v. Witco Chem. Corp., 829 F.2d 367, 373-74 (3d Cir. 1987)), rev'd on other grounds, No. 18-13822, 2020 WL 7383187, at *1 (D.N.J. Dec. 16, 2020).  The purpose of awarding back pay is "to make victims of unlawful discrimination whole by restoring them to the position they would have been in absent the discrimination."  Donlin, 581 F.3d at 84 (citing Loeffler v. Frank, 486 U.S. 549, 558 (1988)).  However, if the plaintiff is subsequently able to secure a position "that is equivalent or better than the position she was wrongly denied, the right to damages ends because it is no longer necessary to achieve an equitable purpose . . . ."  Id. (citing Ford Motor Co. v. EEOC, 458 U.S. 219, 236 (1982)).

There is a "presumption in favor of a back pay award," and "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of [Title VII]." Booker v. Taylor Milk Co., 64 F.3d 860, 864, 866-67 (3d Cir. 1995) (internal quotations omitted) (quoting Albemarle, 422 U.S. at 421) (alteration in original). But a plaintiff who succeeds at trial under a Title VII claim still has "a statutory duty to mitigate damages." Id. at 864 (citation omitted). This statutory duty, found in Title VII, provides: "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1).

The employer, by contrast, "has the burden of proving a failure to mitigate." Booker, 64 F.3d at 864 (citations omitted); Donlin, 581 F.3d at 89 (citation omitted). This burden requires an employer to establish that: (1) "substantially equivalent work was available" and (2) "the Title VII claimant did not exercise reasonable diligence to obtain employment." Id. (citation omitted).

Substantially equivalent work is defined as "employment which affords virtually identical promotional opportunities, compensation, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated." Booker, 64 F.3d at 866 (internal quotation marks and citations omitted). "The duty of a successful Title VII claimant to mitigate damages is not met by using reasonable diligence to obtain any employment . . . [but instead] to obtain substantially equivalent employment." Id. (citations omitted) (emphasis in original). Reasonable diligence "should be evaluated in the light of the individual characteristics of the claimant and the job market," which often includes reviewing "the economic climate and the employee's skills, qualifications, and age," and a plaintiff typically exhibits reasonable diligence "by demonstrating a continuing commitment to be a member of the work force and by

remaining ready, willing, and available to accept employment." Id. at 865 (citations omitted); Tubari Ltd. v. NLRB, 959 F.2d 451, 454 (3d Cir. 1992) (citation omitted). It is expected that a plaintiff will "exercise good faith in attempting to secure a position." Booker, 64 F.3d at 865 (citation omitted).

If these elements are proven, "the amounts that could have been earned with reasonable diligence" are applied to either "reduce or decrease a back pay award, not to wholly cut off the right to any back pay." Id. at 866 (citations omitted) (emphasis in original).

However, an employer may satisfy its burden of establishing a failure to mitigate without proving that there was substantially equivalent work available. Caufield v. Ctr. Area School Dist., 133 F. App'x 4, 11 (3d Cir. 2005) (citing Tubari, 959 F.2d at 454). An employer may do so by demonstrating that the terminated employee "withdrew entirely from the employment market." Id. "A withdrawal from the employment market or '[a] willful loss of earnings' has been found where the plaintiff 'has failed to stay in the labor market, refused to accept comparable employment, failed to search diligently for other work, or voluntarily quit alternative employment without cause.'" Lienhard v. CHC Sols., Inc., No. 21-3230, 2023 WL 4237076, at *4 (quoting Holocheck v. Luzerne Cnty. Head Start, Inc., No. 04-2082, 2007 WL 954308, at *15 (M.D. Pa. Mar. 28, 2007)). This alternative burden requires proof that the terminated employee withdrew "completely," a burden that "is more onerous than establishing a plaintiff's job search was not reasonably diligent." Id. at *5 (quoting Caulfield, 133 F. App'x at 11; Ngai v. Urban Outfitters, Inc., No. 19-1480, 2021 WL 1175155, at *20 (E.D. Pa. Mar. 29, 2021)) (emphasis in original).

B.  Front Pay

As referenced above, Title VII provides for a successful plaintiff to receive back pay and reinstatement. See 42 U.S.C. § 2000e-5(g). However, if reinstatement is unavailable, which

typically occurs when there is "no position available at the time of judgment or the relationship between the parties . . . [has] been so damaged by animosity," front pay may be awarded as a substitute remedial measure. Ellis v. Ethicon, Inc., No. 05-726, 2009 WL 10641983, at *21 (D.N.J. Nov. 13, 2009) (citing Maxfield v. Sinclair Int'l., 766 F.2d 788, 796 (3d Cir. 1985)). "Since reinstatement is an equitable remedy, it is within the district court's discretion whether reinstatement is feasible." Id. (citations omitted).

Here, Plaintiff represents that "reinstatement is not possible." (Doc. No. 175 at 10.) "It is also widely recognized that reinstatement is not feasible in situations where an employee has been terminated and subsequently filed suit against their employer." (Id. at 10 n.9 (citing Ray v. AT&T, Trial Transcript Volume V (June 9, 2023) at 715:25-716:2).) Moreover, Defendant never offered to rehire Plaintiff to her former position, or a similar one.

Under these circumstances, front pay is awarded "where a victim of employment discrimination will experience a loss of future earnings because she cannot be placed in the position she was unlawfully denied." Donlin, 581 F.3d at 86 (citing Maxfield, 766 F.2d at 795-97). A failure to mitigate also precludes an award of front pay. Lienhard, 2023 WL 4237076, at *4 (citing Caufield, 133 F. App'x at 11). Accordingly, the Court will determine whether Plaintiff is entitled to front pay.

C.  Tax Gross Up Damages

Plaintiff also seeks tax gross up damages. (See Doc. No. 175 at 13.) In Eshelman v. Agere Sys., Inc., the Third Circuit noted that "employees may be subject to higher taxes if they receive a lump sum back pay award in a given year." 554 F.3d 426, 441 (3d Cir. 2009). Tax gross up damages, therefore, are intended to "compensate[] [a plaintiff] for the negative tax consequences of receiving a lump sum award in employment discrimination actions." Andujar, 2018 WL

14

3999569, at *9.  In <u>Marcus v. PQ Corp.</u>, an Age Discrimination in Employment ("ADEA") case,

the court stated:

> [A]n award to compensate a prevailing employee for her increased tax burden as a
> result of a lump sum award will, in the appropriate case, help to make a victim
> whole.  This type of an award, as with prejudgment interest, represents a recognition
> that the harm to a prevailing employee's pecuniary interest may be broader in scope
> than just a loss of back pay.  Accordingly, either or both types of equitable relief
> may be necessary to achieve complete restoration of the prevailing employee's
> economic status quo and to assure "the most complete relief possible."

458 F. App'x 207, 214 (3d Cir. 2012) (quoting <u>Eshelman</u>, 554 F.3d at 442).  The court also

cautioned that "there is no presumption in favor of an adjustment [of a verdict] for negative tax

consequences." <u>Id.</u> (citing <u>Eshelman</u>, 554 F.3d at 443).  Instead, "[e]mployees will continue to

bear the burden to show the extent of the injury they have suffered" and courts are to "grant relief

'in light of the circumstances peculiar to the case.'" <u>Eshelman</u>, 554 F.3d at 443 (citations omitted).

In <u>Montone v. City of New Jersey</u>, the court found that it was appropriate to award tax

gross up damages in cases brought under the New Jersey Law Against Discrimination.  No. 6-280,

2018 WL 3536093, at *3 (D.N.J. July 23, 2018).  The court wrote:

> As noted above, the NJ LAD entitles prevailing plaintiffs to a broad set of remedies.
> New Jersey courts have interpreted this mandate for broad, liberally construed
> remedies to include compensating prevailing plaintiffs for the negative tax
> consequences associated with receiving a lump sum award.  <u>Quinlan v. Curtiss-</u>
> <u>Wright Corp.</u>, 409 N.J. Super. 193, 201 (N.J. App. Div. 2009), rev'd on other
> grounds, 204 N.J. 239 (N.J. 2010) ("Under the 'make whole' policies of N.J.S.A.
> 10:5-3, a defendant is called upon to compensate a plaintiff for the negative
> consequences of receiving a lump sum award of economic damages."); <u>Ferrante v.</u>
> <u>Sciaretta</u>, 365 N.J. Super. 601, 607 (N.J. Law. Div. 2003) ([U]nder the 'make whole'
> policies of the statute, defendants will be required to compensate plaintiff for the
> negative tax consequences of receiving the lump sum award.").

> No Third Circuit court has yet addressed this issue with respect to the NJ LAD.
> Nevertheless, "New Jersey courts generally interpret the LAD by reliance upon
> federal court decisions construing the analogous federal antidiscrimination
> statutes."  <u>Chisolm v. Manimon</u>, 97 F.Supp.2d 615, 621 (D.N.J. 2000), rev'd on
> other grounds, 275 F.3d 315 (3d Cir. 2001).  One such analogous federal
> antidiscrimination statute is the American with Disabilities Act ("ADA").  In

addressing this issue with respect to the ADA, the Third Circuit held that "a district court may, pursuant to its broad equitable powers granted by the ADA, award a prevailing employee an additional sum of money to compensate for the increased tax burden a back pay award may create."[7]  Eshelman v. Agere Sys., Inc., 554 F.3d 426, 441-42 (3d Cir. 2009).

Id. at *3.  Accordingly, the court held that "the liberally construed 'make whole' policies of the NJ LAD militate in favor of molding the verdict to adjust for the adverse tax consequences from a lump sum award.  This holding is consistent with the Third Circuit's interpretation of the NJ LAD's federal antidiscrimination analogue in Eshelman."  Id.

## IV.   ANALYSIS

A.   Back Pay

Defendant asserts that Plaintiff may not recover back pay or front pay because she: (1) "completely failed to engage in a meaningful job search"; (2) "admittedly withdrew from seeking other employment once her colleague at Starbucks referred her the position at Raymour & Flannigan [sic]"; (3) "presented zero evidence of any loss of earning capacity"; and (4) "relies on completely speculative evidence regarding any future benefits."  (Doc. No. 174 at 1) (emphasis in original).)   Defendant further argues that "given that there is no evidence of intentional discrimination," the Court should not exercise its discretion to award "wage loss damages."[8]  (Id.)  If the Court is to award damages, Defendant "requests that this Court limit Ms. Phillips'[s] economic loss award to the difference between what she would have made at Starbucks during the interim period between her termination and the beginning of her employment at Raymour & Flannigan [sic] - $78,343.00."  (Id.)

---

[7]   A front pay award is also considered in calculating tax gross up damages.  See, e.g., Andujar v. Gen. Nutrition Corp., No. 14-7696, 2018 WL 3999569, at *10 (D.N.J. Aug. 20, 2018).

[8]   The determination of intentional discrimination in this case was found by the jury.

Defendant supports its arguments by stating that Plaintiff failed to mitigate because she: (1) "has not searched for any employment since the end of her employment with Starbucks"; (2) "never applied to any positions"; and (3) "did not even apply for the Raymour & Flannigan [sic] job, but instead was referred the position through a colleague at Starbucks." (Id. at 9.) Further, Defendant claims that Plaintiff "voluntarily withdrew from seeking other employment once she secured employment at Raymour & Flannigan [sic] by failing to look for alternative employment, despite the fact that her wages were less than what she earned at Starbucks." (Id.) Moreover, Defendant claims that her decision not to proceed in the 7-Eleven application process is indicative of a failure to mitigate. (Id.)

Plaintiff counters these arguments by asserting that Defendant "has not met its affirmative burden of proving that Plaintiff failed to mitigate her damages" because it did not present a substantially equivalent employment opportunity and even if it did, Plaintiff conducted her search with reasonable diligence. (Doc. No. 175 at 4-5.)

As noted above, an employer is tasked with proving an employee's failure to mitigate, which requires an employer to demonstrate that: (1) "substantially equivalent work was available" and (2) "the Title VII claimant did not exercise reasonable diligence to obtain employment." Booker, 64 F.3d at 864 (citations omitted); Donlin, 581 F.3d at 89 (citation omitted). Alternatively, if an employer can prove that a terminated employee "withdrew entirely from the employment market," the employer has satisfied its burden of proving a failure to mitigate damages. Caufield, 133 F. App'x at 11 (citing Tubari, 959 F.2d at 454). Defendant primarily pursues this latter method of proving a failure to mitigate, that Plaintiff withdrew from seeking other employment. (Doc. No. 174 at 1, 9.)

17

Defendant's position is without merit because the evidence points to a contrary conclusion. During the hearing on economic loss, Plaintiff detailed her efforts to find a new position after Starbucks terminated her. Specifically, she enrolled in a resume and interview workshop, sought resume assistance from her daughter, attended a job fair, and communicated with her LinkedIn network. (Doc. No. 172 at 6:25-7:5; 8:5-7, 15-17.) Plaintiff began this process "within a week or two" of being fired. (Id. at 7:24-8:3.) While Defendant contends that Plaintiff has not looked for another job post-termination, Plaintiff's testimony shows that she actively took steps to improve her chances of finding a new position. Furthermore, Defendant highlights that Plaintiff never formally applied for a position, including her current position with Raymour & Flanigan. However, a lack of applications is not synonymous with a total withdrawal from the market. For example, in Lienhard, the Court stated:

> While Defendant criticizes Plaintiff's efforts as insufficient because he relied on family connections or professional contacts to obtain these positions, Defendant cites to no cases that suggest that "reasonable diligence" is measured only in terms of independent job search efforts, rather than professional networking, which is a readily acceptable means of obtaining employment.

Lienhard, 2023 WL 4237076, at *5. Again, proving that an employee withdrew from the market carries a heavier burden than proving reasonable diligence. See Ngai, 2021 WL 1175155, at *20. Accordingly, the fact that Plaintiff did not personally apply to any positions, but rather sought assistance from recruiters, does not constitute a withdrawal from the job market. Further, the fact that she ultimately secured her position with Raymour & Flanigan after being recommended by a former colleague also fails to constitute a withdrawal from the job market, as reliance on one's professional network is "a readily acceptable means of obtaining employment." Lienhard, 2023 WL 4237076, at *5.

18

Additionally, Plaintiff testified that even though she did not apply to the three potential employers she considered before Raymour & Flanigan, she interviewed with them, which also does not indicate a withdrawal from the employment market.  (Doc. No. 172 at 15:17-16:17.) Plaintiff could not apply for the position with U.S. Appliance because it required a college degree, which Plaintiff does not have.  (Id. at 15:17-18.)  Plaintiff did not pursue the positions offered by Total Wine and Spirits and 7-Eleven as she felt they were not suitable for her.  (Id. at 15:19-22; 16:6-11; 17:6-7.)  This decision does not warrant a conclusion that Plaintiff stopped seeking employment.  Instead, it is recognized that one "need not go into another line of work, accept a demotion, or take a demeaning position . . . ."  Lienhard, 2023 WL 4237076, at *4 (quoting Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32 (1982)).[9]

Lastly, Defendant argues that Plaintiff "voluntarily withdrew from seeking other employment once she secured employment at Raymour & Flannigan [sic] by failing to look for alternative employment, despite the fact that her wages were less than what she earned at Starbucks."  (Doc. No. 174 at 9.)  However, such an argument has been expressly rejected by the Third Circuit.  In Tubari, the court stated:

> There is, of course, no requirement that in seeking interim employment a discriminatee must secure equal or greater wages than his or her former salary. Indeed, the Board has held that a discriminatee who accepts suitable interim employment, even at a lower wage, has no continuing duty to search for a more lucrative job. See, e.g., F.E. Hazard, Ltd., 303 N.L.R.B. No. 130, at 1991 N.L.R.B. LEXIS 880 at *4 (July 23, 1991) ("Once a discriminatee has embarked on a

---

[9]   See also Doc. No. 175 at 5 n.4

> [I]t is Defendant's burden to identify and prove there were "virtually identical" jobs available and Plaintiff unreasonably failed to obtain them.  Plaintiff testified that she did not pursue the 7-11 regional director role because, among other things, it would have required her to be on call 24/7. . . .  "It is well-established that discrimination claimants are not required to take lesser or dissimilar work during the pendency of their claims to satisfy their duty to minimize damages."  Caufield, 133 Fed. Appx. 4, 11.

legitimate course of interim employment, there is no duty to search for more lucrative interim employment."); <u>Sioux Falls Stock Yards Co.</u>, 236 N.L.R.B. 543, 570 (1978) ("It is well established that an employee who accepts appropriate interim employment, even at a lower rate of pay, is not required to search for better employment.") (footnote omitted).

959 F.2d at 458.

Furthermore, Plaintiff's testimony as to why she did not seek additional employment, including the opportunity with Wawa, after accepting the position at Raymour & Flanigan is compelling.  Specifically, she explained that she: (1) "wanted to give this [her role at Raymour & Flanigan] a shot"; (2) knew that staying at the company would provide her the opportunity to secure a VP position; (3) "very much wanted to try to grow with the company"; and (4) learned of her breast cancer diagnosis shortly after starting at the company, and wanted to ensure that she had stable insurance coverage for her medical treatments.  (Doc. No. 172 at 29:20-25; 32:5-11.) Accordingly, Defendant's argument is unavailing and fails to prove that Plaintiff failed to mitigate her damages.

  B.  <u>Front Pay</u>

Again, front pay is awarded "where a victim of employment discrimination will experience a loss of future earnings because she cannot be placed in the position she was unlawfully denied." <u>Donlin</u>, 581 F.3d at 86.  Defendant claims that the estimates as to Plaintiff's damages "are flawed because they assume that Ms. Phillips could not and will not make more than she currently makes . . . despite the complete lack of evidence to the contrary."  (Doc. No. 174 at 2.)  Therefore, Defendant argues that Plaintiff has failed to demonstrate a loss of earning capacity warranting an award of future damages.  (<u>Id.</u> at 4-5.)

Additionally, Defendant criticizes Plaintiff's attempts to establish the damages suffered regarding her employment benefits, specifically those pertaining to her medical plans and stock

options.  (<u>Id.</u> at 6.)  Defendant argues that the evidence presented was speculative, and that it fails to prove that Plaintiff received decreased medical benefits or stock options.  (<u>Id.</u>)  Defendant claims that "Ms. Phillips has failed to present any evidence that the medical benefits she received under the plan at Raymour & Flanigan actually resulted in her paying higher premiums for her medical care, or otherwise impacted her medical care, as compared to her plan at Starbucks."  (<u>Id.</u> at 6-7.) It also asserts that Scherf incorrectly "based his loss calculation on the difference in the amounts each employer paid toward benefits . . . [which is] not the appropriate measure of damages as it does not consider what the cost to the employee is."  (<u>Id.</u> at 6.)  Defendant also argues that Scherf, in calculating the medical benefits loss, "should have considered factors such as Ms. Phillips' premiums, deductibles, and/or copays – that is, her potential out-of-pocket losses – rather than what the employer contributes."  (<u>Id.</u>)  Further, Defendant contends that "Mr. Scherf's claim that Plaintiff is entitled to the value of stock options at Starbucks is also entirely speculative."  (<u>Id.</u> at 7.)

Plaintiff responds by arguing that a loss of earning capacity, <u>i.e.</u>, diminished earning capacity, is not equivalent to front pay, as the former is "a personal injury concept" whereas the latter is meant to "compensate a plaintiff for the [past and] continuing effects of discrimination until she can be made whole."  (Doc. No. 165 at 6-7) (citing <u>Carter-Herman v. City of Philadelphia</u>, 1996 WL 745227, *2 (E.D. Pa. Dec. 23, 1996)).)

The Court agrees.  Despite Silverstone's testimony regarding earning capacity, and his declination to calculate front pay damages because he was not provided with a vocational expert's opinion on Plaintiff's future earning capacity, a vocational opinion is not required under the law. The determination of an award of economic loss hinges on a defendant's duty to prove a failure to mitigate, and as Plaintiff states, "Defendants' [sic] infusion of 'diminished earning capacity' is a

21

backdoor attempt to impose a duty upon Plaintiff to continue searching for a better paying job in perpetuity" and Defendant "is attempting to re-write the rules surrounding mitigation . . . ." (Id. at 7.)  A defendant, to illustrate a failure to mitigate, must prove either the two-pronged test of substantially equivalent employment and reasonable diligence or demonstrate that the employee completely withdrew from the market.  However, during the hearing, Silverstone claimed that Scherf's opinion was faulty because "he hasn't provided any vocational opinion or employability opinion to say that what she is earning at Raymour & Flanigan is her absolute future earning capacity, and that's all she's ever going to be able to earn." (Doc. No. 172 at 93:8-12.)  Defendant, in presenting Silverstone's testimony that Plaintiff needs to present a vocational expert, seeks to improperly shift its burden onto Plaintiff.

Finding that Plaintiff mitigated her damages and that Defendant was unable to prove otherwise, front pay is not precluded, and the court may consider whether such damages are warranted.  As noted, front pay is appropriate "where a victim of employment discrimination will experience a loss of future earnings because she cannot be placed in the position she was unlawfully denied."  Donlin, 581 F.3d at 86 (citing Maxfield, 766 F.2d at 795-97).  The Third Circuit has noted the difficulty in determining an appropriate front pay period, stating:

> [T]here will often be uncertainty concerning how long the front-pay period should be, and the evidence adduced at trial will rarely point to a single, certain number of weeks, months, or years.  More likely, the evidence will support a range of reasonable front-pay periods.  Within this range, the district court should decide which award is most appropriate to make the claimant whole.

Id. at 87 (citations omitted).

In Donlin, the District Court extended an award of front pay damages for a period of ten years, a decision which was affirmed by the Third Circuit.  Id. at 88.  In Bianchi v. City of Philadelphia, a Third Circuit opinion pre-dating Donlin, the court stated: "[t]he jury . . . could infer

that at age 52, Bianchi had approximately thirteen more years of work left until his retirement. The award was not unreasonable." 80 F. App'x 232, 237 (3d Cir. 2003).

Plaintiff seeks front pay damages until her expected retirement age of 70. (Doc. No. 175 at 11.) Plaintiff is currently 52 years old. (Doc. No. 172 at 6:9-10.) Therefore, she requests front pay damages for eighteen years. The Court, in exercising its discretion and in consideration of Donlin and Bianchi, will award Plaintiff front pay damages for thirteen years, until she reaches age 65.

C. Medical Benefits and Stock Options

A plaintiff is entitled to receive the monetary value of employment benefits as part of one's back pay and front pay awards. As explained in Briggs v. Temple Univ.:

> Back pay is designed to make victims of unlawful discrimination whole by restoring them to the position they would have been in absent the discrimination. Donlin, 581 F.3d at 84 (citing Loeffler v. Frank, 486 U.S. 549, 558, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988)). It is widely understood that back pay should include all amounts received by a discriminatee, including applicable benefits. See Fillman v. Valley Pain Specialists, P.C., No. 13-1609, 2016 WL 192656, at *4[, *5] (E.D. Pa. Jan. 15, 2016) (citing Donlin, 581 F.3d at 78 n.1) (including plaintiff's benefits in back pay and front pay calculation); Anderson v. Consol. Rail Corp., No. 98-6043, 2000 WL 1622863, at *3 (E.D. Pa. Oct. 25, 2000) (citing Gelof v. Papineau, 829 F.2d 452, 457 (3d Cir. 1987)) ("A back pay award can also consist of non-wage benefits lost between termination and trial such as insurance premiums and pension contributions that the employer would have made on behalf of the plaintiff during that time.").

339 F. Supp. 3d 466, 510 (E. D. Pa. 2018) (emphasis added). Accordingly, Plaintiff will also be awarded her losses pertaining to medical benefits and stock options.

D. Tax Gross Up Damages

Plaintiff seeks $75,757 in tax gross up damages. (Doc. No. 175 at 13.) Again, these damages are intended to "compensate[] [a plaintiff] for the negative tax consequences of receiving a lump sum award in employment discrimination actions." Andujar, 2018 WL 3999569, at *9.

Plaintiff supports this request by stating that had she not been terminated by Starbucks, she would have been in the 35% income tax bracket.  (Doc. No. 175 at 13.)  If Plaintiff is to receive the total of her requested back pay and front pay damages, however, she will be in the 37% income tax bracket.  (Id.)  Plaintiff further notes that "[t]he evidence regarding Plaintiff's tax gross up damages is **unrebutted** in the record."  (Id.) (emphasis in original).

Defendant did not address tax gross up damages in its memorandum.  Furthermore, the Court considers Ellis, in which the court stated:

> The Court is inclined to award Plaintiff an additional sum of money to offset negative federal tax consequences.  This conclusion follows the reasoning in Eshelman.  In Eshelman, 554 F.3d at 440, a jury found that the defendant, the plaintiff's former employer, had discriminated against her in terminating her employment.  The jury awarded the plaintiff back pay, to which the district court then added a sum of money to compensate for the negative tax consequences of a lump sum back pay award.  Id.  The Third Circuit subsequently affirmed the district court's decision.  Here, a jury has found that Ethicon did in fact terminate Ellis in violation of the ADA.  Adhering to the remedial goals of the ADA, Ellis, being the prevailing party, is entitled to this type of award in order to restore her economic status quo to that where [she] would have existed but for Ethicon's conduct.

2009 WL 10641983, at *20.

In this case, as in Ellis, a jury found that Defendant discriminated against Plaintiff and in doing so, violated Title VII, Section 1981, and the New Jersey Law Against Discrimination ("NJLAD").  In Montone, the court recognized that the NJLAD's remedies "include compensating prevailing plaintiffs for the negative consequences associated with receiving a lump sum award." 2018 WL 3536093, at *3.  While Ellis dealt with the ADA, the remedial goals discussed are derived from Title VII.  See, e.g., Eshelman, 554 F.3d at 440 n.7 ("The ADA incorporates the remedies provided for in Title VII of the Civil Rights Act of 1964.  42 U.S.C. § 12117(a); Spencer v. Wal–Mart Stores, Inc., 469 F.3d 311, 315 n. 3 (3d Cir. 2006).  Accordingly, we will rely upon Title VII

law to analyze the issue presented herein [the issue of whether the court could award tax gross up

damages on a lump sum back pay award as part of fulfilling the ADA's remedial purpose].").

Therefore, the Court, in exercising its discretion and with the goal of "restor[ing] [Plaintiff

to] her economic status quo," will award tax gross up damages.

## V.      CONCLUSION[10]

For the foregoing reasons, Plaintiff's Motion to Amend Judgment to Include Court-Determined

Economic Loss and Attorneys' Fee Award (Doc. No. 164) will be granted in part.  In accordance

with this Opinion, Plaintiff may provide a revised calculation of proposed damages by August 23,

2023.[11]  An appropriate Order follows.

BY THE COURT:

/s/ Joel H. Slomsky
JOEL H. SLOMSKY, J.

---

[10]  In its Memorandum, Defendant requests the following: "if the Court does conclude that Ms. Phillips is entitled to wage loss damages, it must refrain from awarding duplicative damages." (Doc. No. 174 at 10.)  As noted earlier, each of the statutes involved in this case enable Plaintiff to recover either back pay, front pay, tax gross up damages, or, under Title VII, all three.  Title VII provides for back pay and reinstatement.  See 42 U.S.C. § 2000e-5(g)(1).  As discussed above, if reinstatement is unavailable, front pay is substitute damages.  Title VII has also been construed as permitting tax gross up damages.  Section 1981's language does not expressly provide for front pay, back pay, or tax gross up damages, but it has been construed by case law to afford back pay.  See Third Circuit Model Jury Instructions, 6.4.3 (citing Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 4[58]-59 (1975).  Similarly, the New Jersey Law Against Discrimination does not expressly provide for front pay, back pay, or tax gross up damages. Again, however, case law construing this provision affords back pay, front pay, and tax gross up damages.  See Montone v. City of New Jersey, No. 6-280, 2018 WL 3536093, *1, *3 (D.N.J. July 23, 2018); Dejesus, No. 18-13822, 2020 WL 1921934, at *10 (D.N.J. Apr. 21, 2020) (citations omitted), rev'd on other grounds, No. 18- 13822, 2020 WL 7383187, at *1 (D.N.J. Dec. 16, 2020) ("Plaintiff seeks back pay and front pay . . . such damages are available under . . . . [the] NJLAD.") (citation omitted).  Here, the Court is not duplicating damages; rather, it is only providing a single award for economic loss.

[11]  One further matter must be addressed.  The parties sought a calculation of economic damages before filing responses to other pending post-trial motions.  Plaintiff, however, may update the calculation of economic damages if deemed necessary.  Because the opportunity to update the calculation of damages consistent with this Opinion is being afforded to Plaintiff, the Court will extend the parties' deadline to file their responses to the pending post-trial motions to August 23, 2023.  The deadline to file replies will be extended to August 30, 2023.