**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

SHANNON PHILLIPS,

*Plaintiff,*

v.

STARBUCKS CORPORATION d/b/a
STARBUCKS COFFEE COMPANY,

*Defendant.*

CIVIL ACTION NO.: 2:19-cv-19432

Hon. Joel H. Slomsky, U.S.D.J.

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR JUDGMENT
<u>AS A MATTER OF LAW</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………………..ii

I.     IN TIMES OF UNCERTAINTY—AND, IN FACT, AT ALL TIMES—CORPORATIONS MUST NOT DISCRIMINATE AGAINST THEIR EMPLOYEES BECAUSE OF RACE…………………………………………………………...1

II.    INTRODUCTION………………………………………………….................1

III.   TRIAL EVIDENCE…………………………………………………...……...2

IV.   LEGAL ARGUMENT…………………………………………………….18

      A.  Standard of Law………………………………………………………18

      B.  Ms. Phillips Presented Sufficient Evidence of Race Discrimination at Trial; Defendant's Argument Concerning the *Prima Facie* Case Is Misplaced………19

          1.  *Plaintiff Need Not Present Direct Evidence Of Race Discrimination To Succeed On Her Claims*…………………………………………..22

          2.  *Ms. Phillips Is Not Required To Offer Evidence That Similarly Situated Non-White Employees Were Treated More Favorably Than Her*……..25

      C.  The Evidence Presented at Trial Demonstrated That Defendant's Ever-Changing Stated Reason(s) for Terminating Plaintiff Was Pretext…………………………27

      D.  The Jury Understood and Believed That Plaintiff Would Never Have Been Terminated If She Was Black. Defendant's Argument That Her Scapegoat Theory of the Case Was Not "Proven" Is Misguided and Wrong………………………..32

      E.  Punitive Damages Were Warranted Given the Evidence Presented; the Court Must Not Vacate the Award……………………………………………………..34

          1.  *Defendant Did Not Make Good-Faith Efforts to Implement and Enforce its Anti-Discrimination Policies*………………………………………34

          2.  *Starbucks Acted With Reckless Indifference To Plaintiff's Rights*……..35

V.    CONCLUSION…………………………………………………………38

i

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Wachovia Mortg. Corp.,*
    621 F.3d 261 (3d Cir. 2010) ................................................. 26

*Avaya, Inc. v. Telecom Labs, Inc.,*
    838 F.3d 354 (3d Cir. 2016) ................................................. 18

*Bhaya v. Westinghouse Elec. Corp.,*
    832 F.2d 258 (3d Cir. 1987) ................................................. 24

*Bulifant v. Del. River & Bay Auth.,*
    698 F. App'x 660 (3d Cir. 2017) ................................................. 26

*Bullock v. Children's Hosp.,*
    71 F. Supp. 2d 482–88 (E.D. Pa. 1999) ................................................. 25

*CGB Occupational Therapy, Inc. v. RHA Health Servs.,*
    499 F.3d 184 (3d. Cir 2007) ................................................. 35

*Ellis v. Bank of N.Y. Mellon Corp,*
    837 F. App'x 940 (3d Cir. 2021) ................................................. 25

*Erickson v. Marsh & McLennan Co.,*
    569 A.2d 793 (N.J. 1990) ................................................. 24

*Ezold v. Wolf Block,*
    983 F.2d 509 (3d Cir. 1993) ................................................. 25

*Gerundo v. AT&T Servs.,*
    2016 U.S. Dist. LEXIS 177583 (E.D. Pa. Dec. 20, 2016) ................................................. 20, 31

*Goosby v. Johnson & Johnson Med., Inc.,*
    228 F.3d 313 (3d Cir. 2000) ................................................. 26

*Jeckell v. Crestwood Area Sch. Dist.,*
    2008 U.S. Dist. LEXIS 71380 (M.D. Pa. Sept. 18, 2008) ................................................. 24

*Johnson v. Keebler-Sunshine Biscuits, Inc.,*
    214 F. App'x 239 (3d Cir. 2007) ................................................. 26

*Kuzdrowski v. Nicholson,*
    314 F. App'x 410 (3d Cir. 2008) ................................................. 26

*Mammen v. Thomas Jefferson Univ.,*
    523 F. Supp. 3d 702 (E.D. Pa. 2021) ................................................................. 26

*Matczak v. Frankford Candy & Chocolate Co.,*
    136 F.3d 933 (3d Cir. 1997) ............................................................................... 25

*McFadden v. Whole Foods Mkt. Grp., Inc.,*
    2021 U.S. Dist. LEXIS 35644 (E.D. Pa. Feb. 24, 2021) .................................. 26

*Middlebrooks v. Teva Pharms. USA, Inc.,*
    2019 U.S. Dist. LEXIS 17609 (E.D. Pa. Feb. 4, 2019) .................................... 34

*Mogull v. CB Commercial Real Estate Grp., Inc.,*
    162 N.J. 449 (2000) .......................................................................................... 21

*Mosca v. Cole,*
    384 F. Supp. 2d 757 (D.N.J. 2005) ................................................................... 26

*Nitkin v. Main Line Health,*
    2021 U.S. Dist. LEXIS 229179 (E.D. Pa. Nov. 29, 2021) ................................ 34

*Pivirotto v. Innovative Sys.,*
    191 F.3d 344–56 (3d Cir. 1999) ....................................................................... 25

*Reeves v. Sanderson Plumbing Prods.,*
    530 U.S. 133 (2000) .......................................................................................... 18

*Sarullo v. United States Postal Serv.,*
    352 F.3d 789 (3d Cir. 2003) ............................................................................... 26

*Savarese v. Agriss,*
    883 F.2d 1194 (3d. Cir 1989) ........................................................................... 35

*Scheidermantle v. Slippery Rock Univ.,*
    470 F.3d 535 (3d Cir. 2006) ............................................................................... 25

*Sempier v. Johnson & Higgins,*
    45 F.2d 724 (3d Cir. 1995) ............................................................................... 25

*Steward v. Sears, Roebuck & Co.,*
    231 F. App'x 201 (3d Cir. 2007) ....................................................................... 19

*Tex. Dep't of Cmty. Affairs v. Burdine,*
    450 U.S. 248 (1981) .......................................................................................... 24

*TransWeb, LLC v. 3M Innovative Paper Co.,*
   16 F. Supp. 3d 385 (D.N.J. 2014) ........................................................................... 18

*USPS Bd. of Governors v. Aikens,*
   460 U.S. 711 (1983) ............................................................................................... 19

**Statutes**

   42 U.S.C. § 1981 ..................................................................................................... 1

   42 U.S.C. §§ 2000e .................................................................................................. 1

**Rules**

   Fed. R. Civ. P. 50 .................................................................................................... 18

## I. IN TIMES OF UNCERTAINTY—AND, IN FACT, AT ALL TIMES—CORPORATIONS MUST NOT DISCRIMINATE AGAINST THEIR EMPLOYEES BECAUSE OF RACE

In the midst of a crisis, a corporation must not consider the race of an employee when making a termination decision and then hide behind a sham story and lie in hopes a jury will not see through it. Rather, corporations and their members of upper management must ensure that race is not a determinative factor in termination decisions (*i.e.*, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e - 2000e17 *(as amended)* ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), and New Jersey Law Against Discrimination, NJ Rev Stat § 10:5-12 (2016) ("NJLAD")). Corporations and their members of upper management are expected to follow the law and not make egregious race-based decisions to sacrifice certain employees for their own benefit. Corporations and their members of upper management who follow the law especially do not cower in the corner, but instead rise to ensure that no employees are targeted because of their race.

## II. INTRODUCTION

Plaintiff, Shannon Phillips, was terminated from her employment with Defendant, Starbucks Corporation d/b/a Starbucks Coffee company because of her race. After a six (6) day trial, a jury unanimously found that Defendant discriminated against her because of her race in violation of her claims—*i.e.*, Title VII, Section 1981, and the NJLAD. The jury unanimously: (a) awarded Plaintiff $300,000 in compensatory damages under federal law; (b) awarded Plaintiff $300,000 in compensatory damages under state law; (c) found that Plaintiff proved by a preponderance of the evidence that Defendant's conduct was with reckless disregard to her federally protected rights (entitling her to punitive damages under federal law) and awarded her $12,500,000; and, (d) found that Plaintiff proved by ***clear and convincing evidence*** that the conduct of at least one member of

Defendant's upper management exhibited wanton and willful disregard of Plaintiff's right not to be discriminated against on account of her race (entitling her to punitive damages under state law) and awarded her $12,500,000. Dkt. Ent. 149 and 150.

Defendant has moved for Judgment as a Matter of Law ("JMOL"), or in the alternative, has requested that the punitive damages award be vacated ("Motion").[1] The Defendant, in essence, relies upon summary judgment standards for establishing a *prima facie* case, which are inapplicable at the trial and the post-trial stage, to argue this Court should hand Defendant a full victory as a matter of law. The trial record is replete with evidence that led a reasonable jury to find unanimously in her favor, and for the reasons stated more fully below, Defendant's Motion should be denied and the judgment in favor of Plaintiff therefore should be permitted to stand.

### III.   TRIAL EVIDENCE

Defendant is a public, for-profit, international coffee corporation, based out of Seattle, Washington, with a net worth of $112 Billion. Tr. 662:07-09.[2] It refers to its employees as "partners." Plaintiff was a Regional Director ("RD" or "RDO") with responsibility for $150 million annually. Tr. 203:02-09. Plaintiff's job responsibilities included making sure her stores were profitable, supervising District Managers ("DM") and ensuring a positive partner and customer experience. Plaintiff was also the Community Lead for the Region. Among other things, on behalf of Defendant, she was in charge of coordinating with students of City Year (an AmeriCorps program) to offer development opportunities. Plaintiff was asked to sit, and did serve, on the Women's Advisory Board of City Year. Tr. 2016:16-207:10. Her region included

---

[1] Neither Defendant's Motion, nor its proposed Order, seeks any relief from the jury's punitive damages award. Therefore, Defendant has waived any argument concerning punitive damages. In an abundance of caution, however, because the Defendant's Memorandum of Law does include a brief discussion related to punitive damages, Plaintiff addresses those arguments herein, in the event that the Court concludes that Defendant somehow did not waive its right to move on this claim. Plaintiff also incorporates herein her Opposition to Defendant's Motion for a New Trial or in the Alternative A Remittitur, filed on August 23, 2023.
[2] References to the trial record will be designated throughout as "Tr. (page number:line(s))."

Philadelphia, the Main Line, South Jersey, Delaware and parts of Maryland. *Id.*

In Center City Philadelphia, the District was split in two, with Paul Sykes (Black) responsible for the stores west of Broad Street and Ben Trinsey (White) responsible for the other half—*i.e.*, east of Broad Street. Tr. 307:09-21. Below the DMs in the hierarchy were Store Managers ("SM"), then Assistant Store Managers ("ASM"), and then Baristas.

Ms. Phillips reported up to Camille Hymes (Black), Regional Vice President; who reported to Zeta Smith (Black), Divisional Vice President; who reported to Rossann Williams (White), Executive Vice President; who reported to Rosalind Brewer (Black), Chief Operating Officer ("COO") and President; who reported to Kevin Johnson (White), President & CEO and Howard Shultz (White), Founder, Executive Chairman, and Former CEO. Defendant calls its Human Resources ("HR") Department "Partner Resources." Tr. 52:09-56:19. The highest-ranking Partner Resources worker who testified at trial was Paul Pinto, Vice President, who supported Ms. Hymes. Tr. 52:05-56:09. In April and May 2018, all of the executives in the hierarchy above Plaintiff were involved in the events of this case up to and including, as Mr. Pinto confirmed, Mr. Shultz. *See* Tr. 52:05-56:09 (*"He was present in the [Philadelphia] market, yes, and involved"*).

Plaintiff was a beloved, 13-year employee at Starbucks before she was egregiously terminated. She was originally hired as a District Manager in Ohio in 2005 and, after years of hard work, was promoted to Regional Director in 2011. When Plaintiff was promoted, she moved to South Jersey as a single mom with two kids. At the time of her termination in 2018, Plaintiff was responsible for approximately 100 stores. Tr. 202:14-203:1 Ms. Smith, Plaintiff's second-level supervisor, who oversaw a $6 Billion portfolio, testified that Plaintiff's profit and loss performance, *i.e.,* the money she was generating for Starbucks, was "very strong." Tr. 564:05-22.

In evaluating Plaintiff's performance prior to April 2018, Ms. Smith described Plaintiff as

3

having a very good relationship with her partners. Tr. 564:23-565:01. Ms. Smith praised Plaintiff for doing some "quite noteworthy" community work on behalf of Starbucks. She was aware that Plaintiff was featured in a commercial for Starbucks regarding the work she did for YouthBuild, an organization that helped underprivileged youth obtain training and employment. Tr. 565:02-10. Regarding Plaintiff, his supervisor, Mr. Sykes testified:

> "…there were a lot of social organizations around the Philadelphia market that had a lot of people of color there. And [Plaintiff] would go to a lot of these meetings, and she would be more invested in the community, like really rough parts of Philadelphia, how do we upkeep and how do we build people up, how do we hire people, than sometimes even myself, you know. And I was always in awe of her because she wrapped her head around the community and really advocated not only to hire people of color from the community but to develop them into leadership positions. She was really, really passionate about that and actually inspired me to want to do better, and I'm a person of color myself."

Tr. 631:12-24. Ms. Smith admitted that she respected Plaintiff, liked her as a person, and observed her successfully connecting with her partners. Tr. 565:11-20.

Likewise, Ms. Hymes, who directly supervised Plaintiff from 2014-2018, testified that she considered Plaintiff a strong performer; that her key metrics were very good; that her customer connection scores were good as well; that her sales numbers increased year-over-year; and that her employee partner metrics in terms of stability were strong. Tr. 391:03-17. Ms. Hymes testified that she believed that Plaintiff was a partner who deeply understood the culture, was deeply immersed in connecting with partners during those four years and that she was a developer of talent. Tr. 391:18-392:01. Before April 2018, Ms. Hymes considered Plaintiff one of her stronger Regional Directors, never placed her on a Performance Improvement Plan or otherwise warned her that her performance was materially deficient, and never contemplated terminating her. Tr. 392:02-13. A year before her termination, Defendant sent Plaintiff on an all-expenses paid trip to Costa Rica in recognition of her performance. Tr. 205:03-15. Less than three months before her termination, in February 2018, Plaintiff received a bonus in the form of $41,876 in stock options in recognition

of her high-level of performance. Tr. Exh. 127; Tr. 205:16-207:13.

On Thursday April 12, 2018, two Black men were arrested at the Starbucks store located at 18th and Spruce Streets in Philadelphia. The following trial evidence related to the arrests, the viral video, and Defendant's decision to terminate Plaintiff are largely not in dispute:[3]

Prior to the arrests, Defendant instituted a policy called "Safe & Welcoming" in certain stores; the 18th and Spruce store was one of them. Tr. Exh. 43. Tr. 57:17-58:04. The "Safe & Welcoming" policy came about as a result of serious crime and drug use experienced at the stores, which posed a risk to the health and safety of employees and customers. Tr. Exh. 43; Tr. 135:01-136:01. The "Safe & Welcoming" policy provided that persons could not remain in the store or use the bathroom unless they bought something. Tr. 58:05-20.

On April 12, 2018, Defendant's Store Manager at the 18th and Spruce store, Holly Hylton (White), called 911 in accordance with Defendant's "Safe & Welcoming" policy after two men refused to buy a product or leave. Tr. 635:21-636:14. Defendant's internal emails state that Ms. Hylton did so in accordance with Defendant's policy. *See* Tr. Exh. 39, p. 2 *("[L]aw enforcement was called as a matter of standard procedure.")*. Defendant's Incident Report of the April 12th event stated that Ms. Hylton called 911 after the two men refused to buy something or leave "per Starbucks policy." Tr Exh 160. Two days after the arrests, the CEO of Defendant sent out a written message admitting that it was Defendant's policy that led to the arrests. *See* Tr. Exh. 51 (*"Regretfully, our practices and training led to a bad outcome…")*. Plaintiff did not create the

---

[3] Even though the Court must view all facts and inferences in a light most favorable to Plaintiff in deciding this Motion, Plaintiff goes a step further here and lays out the following paragraphs of key facts relying almost exclusively on the testimony Defendant's own witnesses (Ms. Hymes, Ms. Smith and Mr. Pinto) and trial exhibits that are Defendant's own documents.

"Safe & Welcoming" policy. Tr. 58:13-16.[4] Plaintiff was not at the 18th and Spruce store at the time of the arrests. Plaintiff was not responsible for the arrests that occurred on April 12, 2018. Tr. 61:18-24.  The Incident Report of Defendant stated the police spoke to the men for 10 minutes in the store before deciding to arrest them. Tr. Exh. 160.

A customer took a cell phone video of part of the arrest, posted a 46-second clip of it on Twitter, and it went viral. Tr. 565:21-566:09. Defendant believes a reason the video clip went viral was because of the race of the two men arrested. *See* Tr. Exh. 160 ("*[A] video…was sent out via Twitter which stated that the men whom were arrested were wrongfully targeted as they were African American…"*). The day after the video was posted, on Friday, April 13, 2018, Defendant's Global Corporate Communications department began "tracking the coverage" of the viral post and promised executives that it would be "providing updates on coverage across social media and traditional media throughout the weekend." Tr. Exh. 94, p.1. John Kelly, J.D., Defendant's Senior Vice President of Global Public Affairs & Social Impact, sent an email that evening, Friday, April 13, 2018, at 9:05 p.m.,[5] to Defendant's executives imploring that "we all need to have a real sense of urgency here to get comprehensive clarity on facts" of the arrests because they were "trying to manage a potentially major brand risk here without all the facts." *Id.* (emphasis added). *After* that instruction, Defendant completed and released an internal investigation report concerning the arrests the next day. Tr. Exh. 160.  The investigation was conducted by Ronda Knight, Defendant's People & Asset Protection ("P&AP") Manager, and involved viewing the surveillance video from

---

[4] In a final twist to its tale, Defendant had its Corporate Designee, Marcus Eckensberger, the last witness of the trial, wildly and falsely claim that the call to law enforcement was not Defendant's policy but instead was "Shannon's Policy"—a lie that was met with an audible gasp from the jury. Tr. 719:06-720:06.

[5] Mr. Kelly's email in Tr. Exh. 39 shows a timestamp of April 14, 2018 at 12:05 a.m. However, because Mr. Kelly was located at Defendant's headquarters in Seattle, Washington, and the response from Paul Sykes (who was located on the East coast) to this email is timestamped April 13, 2018 at 9:39 p.m., it is reasonable to infer that Mr. Kelly's email was sent at 9:05 p.m. EST on April 13, 2018.

inside the store of the incident; having a call with the "operations leaders as well as support services;" contacting Shannon Boldizsar in Defendant's Government Affairs Department; and, attempting to contact the Philadelphia Police Department. Tr. Exh. 160. On Saturday, April 14, 2018, at 2:39 p.m., Ms. Knight emailed the completed Incident Report to several members of upper management, including Ms. Hymes, Ms. Smith and Defendant's Global Security Operations Center. Tr. Exh 160.  Defendant's Incident Report states that the men were in the store for approximately 22 minutes before 911 was called. Tr. Exh. 160. [6] Later that evening, Defendant's CEO released a written statement and appeared in a video message on its website, where, among other things, he apologized for the arrests occurring and relayed that it was not Ms. Hylton's fault. Tr. Exh 51; Tr. 217:01-12; Tr. 219:10-219:25. As Mr. Pinto testified, there was internal support for Ms. Hylton and there were concerns for her safety as she was receiving death threats. Tr. 68:21-69:3. That same night of the CEO's statement, Saturday, April 14, 2018, Mr. Kelly and Ms. Hymes exchanged emails where Mr. Kelly suggested that the CEO call Ms. Hylton the next day, relaying he "want[ed] him to engage and support her." Tr. Exh. 155. Ms. Hymes replied in agreement, relaying: "[the CEO's] call would be a reinforcement of our commitment to support her during this challenging time." *Id.*

---

[6] Contrary to Defendant's allegation that Plaintiff's counsel argued in her Opening that the men were in the store for 20 minutes before the police were called, Plaintiff's counsel never stated this; instead, she relayed to the jury what Defendant's *own* Investigation Report (Tr. Exh. 160) stated. Plaintiff's counsel said: "Starbucks did an investigation on it, and Starbucks' conclusion on the investigation was that the men were in the store for about 20 minutes (before Ms. Hylton called 911)."  Tr. 33:08-18.

Plaintiff requested the full and complete surveillance video footage from inside the store years before the trial, but it was never produced. On the Friday evening prior to the start of trial Monday, Defendant suddenly produced a large set of spliced clips purported to be of the day of the arrests. When Plaintiff's counsel asked for a full, continuous, time-stamped copy of the surveillance video, defense counsel responded that the spliced up, non-timestamped clips were the only video evidence available. Then, on Wednesday evening, after three full days of trial were already completed, Defendant produced 10 hours of video purported to be of the day of the arrests. Tr. 243:14-260:01. Even though the Judge stated, "I can't think of a more prejudicial situation right now in this case, for that clip not to have been turned over [by Defendant] for a comprehensive examination," he ruled that Defendant would still be permitted to introduce the video if it could authenticate it. Defendant never attempted to do so. Tr. 257:07-260:23.

Unfortunately for Ms. Hylton, in response to the CEO's public message, serious protests erupted at 18th and Spruce the next day. The store was packed with protestors, Channel 6 news cameras, and other media were covering the event. Tr. 403:07-404:5; 217:01-24. Ms. Hymes remembers that a protestor with a bullhorn was screaming in her face that he did not want to talk about Defendant's "policy" and instead wanted the manager fired. Tr. 403:07-404:5. Plaintiff recalled a protestor screaming in her face that she was a "White supremacist." Tr. 318:15-23. There were death threats made against Ms. Hylton and threats against Mr. Sykes' safety. Tr. 68:21-69:03; 219:23-220:20; 386:21-387:07. Protests continued for several days that week. Tr. 403:11-14. Senior executives from Defendant, including the CEO, the COO, Ms. Hymes and others flew in from Defendant's headquarters in Seattle, Washington and came to the Philadelphia stores. Tr. 565:21-566:19, 568:02-10.  Within days, Ms. Hylton was terminated. Tr. 68:21-71:20. She was given a severance package in exchange for signing a release agreement and a non-disclosure agreement ("NDA"). *Id*. Mr. Pinto does not recall the exact date of Ms. Hylton's termination and her signing of the NDA but does recall it was around the same time he had burgers and fries in the hotel room of the COO Ms. Brewer, with Ms. Brewer and Ms. Hylton.[7] *Id.*

On Sunday, April 15, 2018, and Monday, April 16, 2018, the CEO Mr. Johnson, and Chairman Mr. Schultz, had many public appearances and private meetings scheduled specifically related to the race-based brand crises they were facing. Tr. Exh. 53; Tr. 73:18-76:16. Their schedules were packed and included meetings with lawyers, the Mayor of Philadelphia, the Philadelphia Police Chief; and interviews with *The Philadelphia Inquirer*, Philly.com, Wake Up With WURD ("Philly's most important Black radio station"), and others. *Id.* By Monday, April 16, 2018, both had flown to Philadelphia for meetings with Ms. Brewer, Ms. Williams, Ms. Smith

---

[7] Plaintiff testified that Mr. Pinto told her that Ms. Hylton signed her NDA over burgers and fries in Ms. Brewer's hotel room. Tr. 220:04-20.

and Ms. Hymes as well as for press appearances. *Id.* After Ms. Hylton was terminated, on Wednesday, April 18, 2018, Chairman Mr. Schultz appeared on "Good Morning America" and was interviewed by Gayle King in a Philadelphia store regarding the arrests. Tr. Exh. 154; Tr. 73:18-74:8. Race was the topic and reason for all of these meetings and public appearances.

With the ouster of Ms. Hylton, Defendant's storyline began to change, and blame was now placed on Ms. Hylton as a rogue manager who did not follow policy.  Tr. 292:18-25; 316:8-22. Defendant made sure that the firing of Ms. Hylton was not a secret and leaked it to the press. Tr. 634:09-635:20. Defendant was intensely tracking the press coverage and public reaction of its every statement and action it took concerning this race-based event. Tr. Exh. 142. In just the one email sent on April 19, 2018 from Defendant's Global Communications Department to the CEO, Chairman, Ms. Brewer, Ms. Williams, Ms. Hymes and others in which international reaction and brand image was being analyzed, the words "Race," "Black," "White," "Color," "Discrimination," and "Bias," appear 583 times. *Id.* The email specifically noted: "Reports on Rashon Nelson and Donte Robinson's commentary commonly noted the two men 'hoped the incident would spur a dialogue about race' (The New York Times, Reuters) that would stop this from happening to anyone else. The majority of coverage around this topic has included Starbucks perspective and mentions mediation taking place between the two gentlemen and Starbucks leadership." *Id. p. 2.* Over the next week there continued to be protests and tremendous public pressure on the store; it was very tumultuous. Tr. 402:1-19; 76:11-16.

During this time, Plaintiff was assigned to handle many tasks associated with the Protest Response Team and with partner relations. Tr. Exh. 136: Tr. 402:1-19. *See also* Tr. Exh 146, 147 (*showing Plaintiff handling arrangements for the extra store security detail*); Tr. Exh. 62 (*showing Plaintiff leading the protest response team*). Plaintiff received a mountain of "Thank You"

messages from subordinates and co-workers for her leadership and tireless support. The messages included but were not limited to: Tr. Exh. 159 (4/16/18 email from Store Manager Danielle Weisgerber: *"Words of Encouragement - The leadership and strength that… you showed all of us yesterday was one of a kind.*); Tr. Exh. 54 (4/17/18 email from Ms. Hymes: *"I'm so proud to be your partner. I know how much you have poured your heart into this community and our partners. Your amazing leadership and kindness will shine through during this very difficult time."*). Tr. Exh. 150 (4/18/18 email from Store Manager Erika Vathis-Endlein: "As *Philadelphia and Starbucks travel through this time of uncertainty, I wanted to take a moment to thank you for your unwavering leadership and support… though down here in lower Delaware we are not experiencing your tireless work firsthand, know that our partners still feel your passion*.) Tr. Exh. 57 (4/18/18 email from Elaine, Coordinator: *"Your warmth and caring is felt by all of these partners who are fortunate to know and work with you… thank you."*); Tr. Exh. 143 (4/18/18 email from J. Light, Coordinator: *"We love you, Shannon. Thank you for putting your heart on the line every day to make this company welcoming and strong. Please take care while you are helping so many others."*). Tr. Exh. 58 (4/19/18 email from Christina, Ms. Hymes' Coordinator: *"I want to say thank you for your leadership and representing all the things that do make this a wonderful, remarkable company to be a part of. I am proud and honored to be your partner."*).

Ms. Hymes admitted that as of April 19, 2018, Plaintiff had not done anything that in her mind to justify termination. Tr. 402:16-19. On April 20, 2018, Defendant instituted a "tap out" policy for "mental health and wellbeing" where employees would be required to take certain days off. Exh. 135. Tr. 180:05-21. Plaintiff was assigned to "tap out" Saturday, April 21, 2018 and Sunday, April 22, 2018. *Id.* During the week of April 23, 2018, Plaintiff continued to work, manage protests, and manage her stores. Tr. Exh. 44 (*4/23/18 email from Plaintiff to Ms. Hymes where she*

*details plans and roles for the next steps in handling the crisis*); Tr. Exh 67, 134 *(4/23/18 emails*

*from Plaintiff to Ms. Hymes and others regarding engagement in the Philly plan)*; Tr. Exh. 141

(*4/24/18 email from Plaintiff showing the work she was doing leading the Philly Task Force)*; Tr.

Exh. 66, 152 (*4/23/18 email from Store Manager Rana Beresford: "Thank you so much for your*

*courageous leadership and endless patience. It's always reassuring to know that you are out there*

*to support my entire store, and customers. Thank you!"- SM Jacqueline Johnson messaged*

*Plaintiff: "Awe how sweet! You are loved!)*). Store Manager Rebecca Stout sent an email to

Plaintiff on April 24, 2018, with the subject "Thank you!" and stated the following:

> I just wanted to reach out and thank you for your leadership over the past week-and-a-half. You truly exemplify what it means to be a servant leader… I've checked in with the [Philadelphia] partners in the area to ensure they felt safe and felt they could share any concerns if necessary… I appreciate you keeping us informed every week via conference calls and inviting shifts so that everyone is included. Multiple shifts came up to me and told me how included and supported they felt that there was a conference call for them explaining the situation as well as how we will move forward! As always I truly appreciate you positivity, compassion, and leadership!

Tr. Exh. 70.

As of April 25, 2018, one week before the termination decision was made, Plaintiff was

assigned to an assortment of tasks by Ms. Smith as part of the Philadelphia Action Plan. Tr. Exh.

15, 16, Tr. 589:15-594:20. *See also* Tr. Exh. 79 (*4/27/18 email from Plaintiff to Ms. Hymes: "I'd*

*love to engage the BPN as well as the WDN, AFN, and Hora Del Café…")*. She continued to

receive accolades for her leadership. Tr. Exh. 144 *(4/27/18 email from Katie Bowman, Defendant's*

*Construction/Store Development to Plaintiff: "I have always loved working with you and for you,*

*Shannon. I am so very grateful for the leader and partner you are; encouraging everyone to be*

*their very best and authentic self. Proud to be your partner!")*. Plaintiff was "tapped out" on April

28, 2018, and April 29, 2018. Tr. Exh. 151.

On Monday, April 30, 2018, Plaintiff emailed Dennis Brockman (Black), Regional Vice

President and a peer of Ms. Hymes at the time, to thank him for coming to Philadelphia to help support her stores while she was "tapped out" over the weekend. Mr. Brockman responded: "[i]t was my pleasure, thanks for your leadership and guidance through the lens of our mission during these difficult times. As always one team." *Id.*[8]   Plaintiff had no idea the decision to terminate her would be made in mere days.

On Wednesday, May 2, 2018, Defendant reached a confidential settlement for an undisclosed sum of money with the two men who were arrested. Tr. 594:25-595:05.   The settlement with the two men was a "significant" event and was big news, inside and outside of Defendant. Tr. 86:25-87:08; 594:21-24. The settlement caused the spotlight to shine on Defendant again; there was significant public pressure and renewed scrutiny from the press covering this race-based issue. Tr. 86:25-88:11. That same day, the CEO of Defendant and the two men released a public, joint statement about the settlement and race-related bias training. Tr. 594:25-595:25. Ms. Williams released a written statement to all "U.S. Company-Operated Field Leaders" which again placed blame on Ms. Hylton. *See* Tr. Exh. 86 *("…An unfortunate decision was made to escalate the situation…I can confirm the store manager is no longer with the company…").* The two men appeared on "Good Morning America" the next day, May 3, 2018, to talk to Robyn Roberts about the settlement and race relations. Tr. 86:25-88:15; 595:08-11.  Part of the message that the men expressed on "Good Morning America," after signing the confidential settlement agreement, was telling the public that Defendant's CEO had promised to be their personal mentor going forward. It also was reiterated that Defendant planned to close 8,000 of its stores on May 29, 2018 for diversity training, which featured appearances by former Attorney General, Eric Holder (Black), and the popular rapper, Common (Black). Tr. 86:25-89:03.

---

[8] In contrast, as admitted to by Ms. Hymes, there is zero documentation evidencing, in any way, Plaintiff's alleged failure to support and lead partners. Tr. 464:17-25.

As of May 2, 2018, Ms. Smith understood that the want and need of Mr. Johnson, Defendant's CEO, and Mr. Schulz, Defendant's Chairman, was that the settlement with the two men would not be the end of the situation but the beginning of taking actions in the "DE&I space" (Diversity, Equity & Inclusion). Tr. 596:01-07. As of May 2, 2018, Ms. Smith understood that the want and need of Defendant's CEO and Chairman was for further action to be taken. She understood that the CEO and Chairman did not want to just give a statement, but for actions to actually happen going forward after May 2, 2018. Tr. 596:08-14. As of May 2, 2018, Mr. Pinto believed that the want and need of the CEO and Chairman was for additional action to be taken in response to the arrests from April 12, 2018. Tr. 88:20-89:03.

The next day, May 3, 2018, the CEO and the COO (Ms. Brewer), appeared on stage for a town hall at Morehouse College—an HBCU, or Historically Black College/University—where the issues concerning the arrests were scrutinized. Tr. 87:16-19; 443:07-11.  That same day, Ms. Hymes sent an email to Plaintiff, Ms. Smith and others regarding the future plan for additional support in Philadelphia, which included having Plaintiff participate in a rotation of office hours. Tr. Exh. 90, 156; Tr. 438:22-439:19. Later that day, Ms. Smith replied to Ms. Hymes in that email chain, and instructed her to "eliminate [Plaintiff] from these action plans." Tr Exh 90, Tr. 440:07-441:13, 597:04-19.  The Community Leadership position that Ms. Hymes testified Plaintiff was in contention for, also was pulled. Tr. 406:13-407:09.

Nevertheless, that same day, May 3, 2018, Defendant had Plaintiff draft a memo to go out to all Philadelphia Store Managers explaining that a new "Safe & Welcoming" policy would soon be distributed. The first line of Plaintiff's draft included the phrase "[a]s we removed the previously shared 'Safe & Welcoming' procedures"; however, she was told by Lisa Passe, Vice President of Global Brand Communications, to change that sentence because "that isn't something we can have

13

be made public." Tr. Exh. 158., Tr. 431:14-432:16. Ms. Hymes then responded to Plaintiff: "[w]ant to take another shot at that line?" with a smiley face emoji. Tr. Exh. 158., Tr. 434:05-07.

Ms. Hymes admitted that race in general was something that was top of mind at Defendant throughout this time period. Tr. 443:12-15. Ms. Hymes admitted that at this time Defendant remained extremely concerned about its brand and was still dealing with the effects of the viral video, which she agreed caused the biggest hit to Defendant's brand in its history.  Tr. 433:12-434:04. According to Ms. Hymes, on May 4th, 5th and 6th, lots of high-level executives had flown in, or were flying in, from Seattle to Philadelphia, including the COO, CEO and Chairman, because of the settlement with the two men and next steps in the plan. Tr. 442:25-443:6. On May 4, 2018, Ms. Smith wrote an email to HR specifying that there was "an additional discussion with Ms. Williams (the EVP who reported to the COO) and Ms. Hymes today" and directing them to put together "the most lucrative severance package possible" for Plaintiff. Tr. 604:10-25; Tr. Exh 108.[9] On May 4, 2018, HR also "engaged Legal" regarding the same. Tr. Exh. 22. Meanwhile, that same day, Plaintiff was working to extend the "roving patrols" of the stores to ensure the safety of Defendant's employees. Tr. Exh. 132; Tr. 301:14-307:07.

As of Monday, May 7, 2018, Plaintiff's sales numbers were excellent. She emailed Ms. Hymes her weekly update which showed she produced $2.726 million in sales in one week just for her stores, which was a 6% increase from the week before; she also projected another $2.3 million for her stores the following week. Tr. Exh. 140; Tr. 442:02-24. Plaintiff was fully engaged and emailed Ms. Hymes that the Philadelphia stores would be ready *("…will make sure all is perfect!")* for the next day's visits from the Seattle executives. Tr. Exh. 131. Plaintiff also received

---

[9] On that same day, Plaintiff responded to an incident that occurred at a Philadelphia store to aid a barista who had to go to the hospital because she was lunged at and spit in the face by a customer who was shaking and had red eyes. Tr. Exh. 161, 162. Tr. 462:20-463:4.

a thank-you card from one of her subordinates, District Manager Michele Liontas, which she shared with Ms. Hymes; it read: "Thank you for a wonderful day last week, all your support and insight, and especially making my birthday special." *Id.* Tr. 302:21-303:04.

On that same day, May 7, 2018, Plaintiff was instructed by Ms. Hymes and Mr. Pinto to suspend District Manager Trinsey due to allegations of race discrimination in pay against him. Tr. 478:11-21. The original plan, as of the evening before, was for Ms. Hymes and Mr. Pinto to suspend Mr. Trinsey. Tr. Exh. 50. Even though they knew at that point that Plaintiff would be terminated, in a very mean and malicious move, they made Plaintiff suspend Mr. Trinsey. Tr. 478:11-21. Plaintiff told Ms. Hymes and Mr. Pinto that Mr. Trinsey was not a racist; that, in fact, he was a Community Lead; and that she did not have control over pay, as that was the responsibility of HR and the Compensation Department. Tr. 307:22-309:3. Nevertheless, Plaintiff did what she was told and suspended Mr. Trinsey the next morning, on May 8, 2018; he was in shock. Tr. 309:24-10.  Plaintiff was then to call all of her Store Managers and all of her District Managers and tell them that Mr. Trinsey was taking time off, which she did.  Tr. 310:11-311:01. Plaintiff was then summoned to Ms. Hymes' hotel lobby at the Warwick and was told by Ms. Hymes that she was being terminated because "the situation is unrecoverable." Tr. 310:11-312:14. Plaintiff was handed a severance agreement that included a general release of all claims to sign. The Agreement also included an NDA, which would prohibit Plaintiff from talking about anything that ever happened at Defendant. *Id.*, Tr. 606:04-11. Ms. Smith could not think of another employee who had been accused of terminable misconduct by Defendant who was also offered the "most lucrative severance package possible." Tr. 606:12-607:07. Ms. Smith was not in Philadelphia daily since April 12, 2018, as Plaintiff had been, and admitted to not having had a single conversation with any partner who said that Plaintiff was failing as leader in this crisis. Tr. 588:23-589:14.

According to Ms. Smith, she, Ms. Hymes and Ms. Williams were all part of the decision to terminate Plaintiff. Tr. 597:23-598:04.  According to Ms. Hymes, several people collaborated on the decision to terminate Plaintiff including herself, Ms. Smith, Ms. Williams, Mr. Pinto, Jen Frish (SVP of HR, Mr. Pinto's boss), Nathalie Cioffi (a Director of HR), and Robyn Ruderman, Esquire, in Defendant's legal department. Tr. 393:02-11. Ms. Smith admitted that it was not normal to have someone as high-level as Ms. Williams participate in the decision to terminate a Regional Director. Tr. 597:23-598:14. Ms. Hymes testified that Plaintiff was "very upset" when she was terminated. Tr. 437:17-22.  Mr. Sykes, who was the direct supervisor of Ms. Hylton and is Black, was not terminated. Tr. 608:03-14.  Ms. Hymes admitted that at the time she made the decision to terminate Plaintiff, she was aware there were laws against discrimination in the workplace. Tr. 393:12-17.

On the night of Plaintiff's termination there was a "big dinner" planned in Philadelphia where the highest levels of Defendant would attend, including Ms. Brewer (the COO), Ms. Williams, Ms. Smith, and Ms. Hymes. Tr. 106:16-108:4; 647:11-648:17. Plaintiff was supposed to be at that dinner, but instead she was terminated. It was reported and spoken about at that dinner that Plaintiff had been terminated. Tr. 647:11-648:17.

Contrary to Defendant's policies, Plaintiff was never provided a Performance Improvement Plan ("PIP") before termination, which was a process to give employees a written explanation of alleged performance deficiencies and a chance to improve. Tr. 448:17-449:07; Plaintiff was never given a single negative written performance document during her employment. *Id.* Ms. Hymes admitted to not being aware of a single email or document talking about any alleged performance deficiencies of Plaintiff. Tr. 448:17-449:01. At the time of Plaintiff's termination, Defendant had hundreds of thousands of employees; Ms. Hymes had 15,000 employees under her

16

umbrella. Ms. Hymes admitted that if Defendant wanted to place Plaintiff in another job it could have. Tr. 436:02-08. Marcus Eckensberger, Regional Director, testified that when he came to Philadelphia in the days after Plaintiff was terminated, he vacated a Regional Director position in Washington, DC that he had been covering and it was now vacant. When asked why Plaintiff was not placed in that position, Mr. Eckensberger, testifying as Defendant's Corporate Designee, said that he could not answer that question. Tr. 714:12-715:06.

Defendant gave yearly written performance reviews to its employees through the end of 2017. All of Plaintiff's performance reviews were positive. Defendant did not produce a single Performance Review for any employee after 2014 even though they were requested.[10] Defendant's policies provided for a "Coffee Break" which was akin to a sabbatical, where an employee was given the option of taking time off but could still maintain their employee status, health benefits and stock options until they returned. Ms. Smith considered offering Plaintiff a "Coffee Break" but ultimately terminated her instead. Tr. 603:10-604:09.

Two weeks after Mr. Trinsey's suspension it was determined that the race allegations against him were unsubstantiated. Tr. Exh 102. The pay differential was two pennies. This was easily discernable with an email to the Compensation Department. Tr. Exh. 102, Tr. 484:03-488:04. Defendants never informed Mr. Trinsey of the non-substantiation of the allegations and instead terminated him. As part of the termination, they offered him a severance agreement, which he signed. It included a general release and an NDA. No one, to Ms. Hymes' knowledge, ever called Mr. Trinsey to let him know this. Tr. Exh. 102, Tr. 483:24-488:25. Ms. Hymes also claims that Mr. Trinsey was terminated for "misconduct" because "the partners may not feel confident about his leadership." She claims there may have been a "full report" written after an alleged "full

---

[10] Mr. Pinto testified that there would have been written performance reviews for 2015, 2016, and 2017, but does not know why they were never produced in this litigation by Defendant. Tr. at 98. See also, Tr. at 203-204.

investigation" of the allegations against Mr. Trinsey but cannot explain why one was never produced in this litigation. *Id.*

After Plaintiff was terminated, Defendant contested her application for unemployment and accused her of "misconduct." Tr. 312:23-313:02.

Defendant did not terminate any of the Black employees in the chain of command related to the arrests, including, Mr. Sykes, Ms. Hymes, Ms. Smith and Ms. Brewer, but instead fired three White employees: Ms. Hylton, Mr. Trinsey and Plaintiff.

## IV.     LEGAL ARGUMENT

### A.     <u>Standard of Law</u>

A motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) should be granted only if, viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find for the non-movant. *See, e.g., TransWeb, LLC v. 3M Innovative Paper Co.*, 16 F. Supp. 3d 385, 391-92 (D.N.J. 2014), *aff'd*, 812 F.3d 1295 (3d Cir. 2016). In making this determination, "the court may not weigh the evidence, determine the credibility of the witnesses, or substitute its version of the facts for the jury's version." *Id.* The court must disregard all evidence favorable to the moving party that the jury is not required to believe. *See, e.g., Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000); *Avaya, Inc. v. Telecom Labs, Inc.*, 838 F.3d 354, 373 (3d Cir. 2016).

Defendant's Motion rehashes arguments it previously made at summary judgment and during trial, arguing incredibly that "no" evidence of race discrimination was presented to the jury. The Court properly rejected those arguments on multiple prior occasions and found that there was sufficient evidence for the jury to decide whether Defendant discriminated against Plaintiff

because of her race. The jury decided unanimously in favor of Plaintiff, rejecting the same self-serving evidence upon which Defendant's present Motion relies. Defendant may not re-try its case on paper to the Court as if the Court is acting as a super factfinder, rendering the role of the civil jury moot. Defendant's Motion should be denied.

**B.      Ms. Phillips Presented Sufficient Evidence Of Race Discrimination at Trial; Defendant's Argument Concerning the *Prima Facie* Case Is Misplaced.**

In support of its Renewed Motion for Judgment as a Matter of Law, Defendant makes the outlandish argument that "Ms. Phillips presented ***no*** evidence at trial such that a reasonable jury could find that she met her burden to prove her reverse race discrimination claim under [the statutes at issue]."

Defendant dedicates a significant portion of its Motion to re-arguing its Motion(s) for Summary Judgment and advancing (again) its incorrect belief that Plaintiff failed to make a *prima facie* showing. In arguing in this vein, Defendant fails to address the ultimate question of whether or not Defendant discriminated against Plaintiff because of her race. *See, e.g., USPS Bd. of Governors v. Aikens*, 460 U.S. 711 (1983). As the Supreme Court explained in *Aikens*, the burden-shifting framework is a sensible way to evaluate evidence, but it ***is not a substitute for the factual inquiry in a discrimination case at trial***. *Id*. at 716. The factual inquiry that the jury was to decide was whether Defendant intentionally discriminated against Plaintiff because of her race. *Id; see also Reeves*, 530 U.S. at 153 ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."). Plaintiff can meet her burden with direct or circumstantial evidence of discrimination. Plaintiff can also prove this by showing pretext. *See Steward v. Sears, Roebuck & Co.*, 231 F. App'x 201, 208 (3d Cir. 2007) (citing *Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 764 (3d Cir. 1989)).

19

A Rule 50(b) motion is not intended to be an opportunity for Defendant to rehash its evidence and arguments that Defendant's reason for termination should be believed and that it should be found not liable for her wrongful termination. The jury considered the evidence, assessed credibility, and decided in Plaintiff's favor.  The issue here, against the JMOL legal standard set forth above, is whether there was evidence, direct or circumstantial, which when viewed cumulatively, was sufficient for the jury to either disbelieve Defendant's articulated reason(s) or believe that an invidious discriminatory reason was more likely than not a determinative cause of the employer's action.  *See, e.g., Gerundo v. AT&T*, 2016 U.S. Dist. LEXIS 177583, at *14-15 (E.D. Pa. Dec. 20, 2016) (considering pretext in context of Rule 50(b) motion and citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

Moreover, the Defendant states incorrectly that "in addition to the elements of her *prima facie* case, Ms. Phillips must also establish that Starbucks is the 'unusual employer who discriminates against the majority.'" *Erickson v. Marsh & McLennan Co*., 569 A.2d 793, 799 (N.J. 1990).  According to Defendant, this "heightened standard" applies to Plaintiff's NJLAD claims at trial, without citing a single case that supports its position. Each case cited by Defendant is a case involving the grant or denial of summary judgment. This Court already rejected the notion that *Erickson* must apply to Plaintiff's Section 1981 claims at any stage, let alone at the JMOL stage. *See* Dkt. Ent. 118 ("Defendant cites three cases in support of its claim that Erickson also applies to Section 1981 claims, ***but this contention does not appear to be completely accurate***.") (emphasis added). The Court went on to identify cases where the *Erickson* standard was not applied to Section 1981 claims.  *See id.* The Defendant now appears to concede this point. Further, the *Erickson* standard is a summary judgment consideration under a *McDonnell Douglas* burden-shifting analysis. The New Jersey Model Charge 2.21 ("NJ Charge") on the NJLAD, last amended

in November 2022, more than twenty (20) years after *Erickson*,[11] does not include any additional

instruction consistent with *Erickson* for a race discrimination case where the plaintiff is white and

specifically directs that the Court shall dispense with issues associated with the first two prongs of

*McDonnell Douglas* before trial. The Charge itself states, in part:

> This revised charge is intended to implement this recommendation and remove from the jury's consideration the issues of whether the plaintiff and the defendant have met the first and second stages, respectively, of the *McDonnell Douglas* test.

New Jersey Model Charge 2.21. During trial, upon request that an "*Erickson* instruction" be given

to the jury on the NJLAD claim, the Court agreed with the analysis above, citing both that *Erickson*

is a summary judgment standard and that the NJ Charge was not updated to include any reference

or consideration of *Erickson*. The Court also recognized that "under federal law, we give the same

jury instruction for reverse discrimination once you get beyond [summary judgment] as you do for

regular discrimination. That's what we've always done." Tr. 757:01-759:03. Further, the Court

recognized that the *Erickson* summary judgment standard could be "misleading" because it would

suggest (incorrectly) that the Plaintiff was alleging that Starbucks as a corporation and across its

thousands of employees, discriminated against white employees. *Id*. Defendant has set forth no

legal authority supporting its position that the *Erickson* summary judgment standard should have

been read to the jury; the Court did not error in not giving it.

    In reaching this verdict, the jury considered *all* the evidence *cumulatively*, as it should have,

and concluded, after instruction on the law by the Court, that Defendant discriminated against

---

[11] Notably, the 2022 amendment was made in part, to incorporate *Mogull v. CB Commercial Real Estate Grp., Inc*., 162 N.J. 449 (2000), where the New Jersey Supreme Court held that charging the jury on a *prima facie* case and the burden-shifting analysis was overly confusing, and opining that the Court should decide legal issues associated with the sufficiency of a plaintiff's *prima facie* case and a defendant's stated legitimate non-discriminatory reason prior to trial.

Plaintiff because of her race when it terminated her employment.  The question now before this Court is only whether there was sufficient evidence to support the jury's verdict.  There was.

### 1.  *Plaintiff Need Not Present Direct Evidence Of Race Discrimination To Succeed On Her Claims.*

Direct evidence of race discrimination is not necessary for Plaintiff to succeed on her claims. In focusing on the *prima facie* case, rather than the ultimate question of discrimination, Defendant ignores evidence demonstrating Defendant's race bias and that Defendant terminated Plaintiff because of her race.  It is unnecessary at this stage to parse out the evidence into direct and circumstantial categories; this is largely a summary judgment construct simply intended to help the Court *at the summary judgment stage* whether a burden-shifting analysis needs to be conducted. Further, the jury was instructed on both direct evidence and pretext, and thus, it was within the jury's power to find for the Plaintiff by interpreting evidence under either instruction. Tr. 830:20-23; 839:01-11; 850:23-851:05.

The evidence regarding Defendant's race discrimination presented to the jury at trial has been set forth in the chronology above. Race permeated the thoughts, plans, conversations, and decision-making of Defendant's members of upper management during this time; as Ms. Hymes testified, race was top of mind. Tr. 443:12-15. In addition, Plaintiff and Mr. Sykes testified very credibly as to the race-based decision-making and atmosphere that existed during that time. Mr. Sykes was asked whether he believed his race played a role in the decision not to terminate him, to which he replied:

> Yes, I do.  I actually remember having that conversation with one of my peers when all of this was coming out.  And I remember thinking to myself, well, I feel okay, and I feel okay because, well, I'm black.  And obviously I didn't do anything to put this out there as well, nor do I believe Holly did.

But I know that I felt safe because **there was a lot of conversations <u>about being</u> <u>black</u>** and showing up at work.  And all those conversations that were happening at the time.  And so I actually felt real safe.  But the **<u>conversations with race just</u> <u>continued to escalate and escalate</u>**, and it seemed to me, at least my point of view, it seemed that the people who were closer to the situation, like Shannon, who was my boss, and maybe Ben, there just needed to be some scapegoats.  And someone had to pay. And I felt really comfortable and safe, even though it happened in my district.  I felt that way, quite honestly, **<u>because I was black and I was the only black</u> <u>leadership team member at the DM level at the time</u>**.  And someone needed to be held accountable, I guess, for the situation.  So ultimately it ended up being Ben, and it ended up being Shannon.

Tr. 633:13-634:08. Mr. Sykes also testified that he believed that Plaintiff was terminated because she is White. Tr. 631:25-633:05. He was immersed in the Philadelphia market, having daily conversations with the partners and the leaders, and there was never any notion expressed that Plaintiff was somehow failing. To the contrary, Plaintiff kept Mr. Sykes and others afloat. It was only after Defendant reached the settlement with the two men and the firestorm of press and publicity burned again, that the COO and other executives came back to Philadelphia looking to see what action had been taken. It was clear, as Mr. Sykes testified, that more heads had to roll. On May 8, 2018, instead of attending the "big dinner" planned that night with the COO and other Seattle executives, Plaintiff was terminated. If Plaintiff was Black, would she have been terminated? *Absolutely not.* As the jury resoundingly found, her race was a determinative factor in Defendant's decision to terminate her.

Defendant relies almost exclusively on the testimony of former Regional Vice President Camille Hymes in arguing that it is entitled to JMOL. Defendant ignores the fact that the jury did not believe Ms. Hymes. The jury observed her tone, demeanor, posture and words during her time on the stand and weighed that against the tone, demeanor, posture and words of Plaintiff and Mr. Sykes. The jury weighed whether the testimony offered by Ms. Hymes "made sense" against the backdrop of all the other testimony given and exhibits entered and published. The jury did not

credit her testimony. *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 260 (3d Cir. 1987); *Jeckell v. Crestwood Area Sch. Dist.*, 2008 U.S. Dist. LEXIS 71380, at *12-13 (M.D. Pa. Sept. 18, 2008) (stating in part that it was not for the court to second guess the factfinder and credit witnesses that a jury's verdict indicated that the jury had not credited).  The jury, in reaching its verdict in favor of Plaintiff, was instructed according to the Third Circuit Model, which in part, states as follows: "In your consideration of this case, you must evaluate the credibility of the witnesses.  You are the sole judges of the credibility of each witness called to testify in this case.  Only you can determine the importance or the weight that the witness's testimony deserves.  I [the Court] have nothing to do with that determination." Tr. 833:04-09. The jury weighed the credibility of the witnesses as instructed and considered the evidence, only part of which is identified above, and found for the Plaintiff. Because Defendant has not come close to demonstrating that which is required for the granting of JMOL, Defendant's Motion should be denied.

Even if it were appropriate for the Court to consider a JMOL motion on liability that addresses an issue other than whether there was sufficient evidence to support the jury's verdict that Defendant discriminated against Plaintiff because of her race (in contrast to the law cited above), the Plaintiff easily clears Defendant's flawed analysis amid sufficient evidence supporting both a *prima facie* case and pretext.  The Defendant moved twice during the trial for a directed verdict. Tr. 667:10-12; 726:14-22. The court, after hearing the evidence and argument by counsel, concluded twice during trial that Plaintiff had met her burden to have the jury decide her claims. Tr. 680:08-25; 731:10-734:01.

Establishing a *prima facie* case is not an onerous burden and is easily met.  *See, e.g., Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  To establish her *prima facie* race discrimination burden on her federal claims, Plaintiff must demonstrate that: (1) she was qualified

24

for her position; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances that raise an inference of discrimination. *Ellis v. Bank of N.Y. Mellon Corp*, 837 F. App'x 940, 941 (3d Cir. 2021) (citing *Iadimarco v. Runyon*, 190 F.3d 151, 158 (3d Cir. 1999)). Plaintiff's *prima facie* burden is "not intended to be onerous." *See Sempier v. Johnson & Higgins,* 45 F.2d 724, 728 (3d Cir. 1995)); *see also Scheidermantle v. Slippery Rock Univ.,* 470 F.3d 535, 539 (3d Cir. 2006) (describing plaintiff's *prima facie* burden as a "low bar"); *Ezold v. Wolf Block*, 983 F.2d 509, 523 (3d Cir. 1993) ("Because the *prima facie* case is easily made out, it is rarely the focus of the ultimate disagreement."). Plaintiff has met her *prima facie* case.

Defendant's Motion not only entirely ignores all evidence that supported the jury's verdict, but also instead relies exclusively on self-serving testimony that was rejected by its mistaken belief, unsupported by caselaw, that Plaintiff must use comparator evidence to meet her *prima facie* burden and win her case. This Court has already rejected this argument as a matter of law at both the summary stage and on two directed verdict motions by Defendant.

### 2. *Ms. Phillips Is Not Required To Offer Evidence That Similarly Situated Non-White Employees Were Treated More Favorably Than Her.*

The Third Circuit has held time and again that "evidence of favorable treatment outside the protected class is not an element of a *prima facie* case." *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 939 (3d Cir. 1997); *see also Bullock v. Children's Hosp.,* 71 F. Supp. 2d 482, 487–88 (E.D. Pa. 1999) (collecting cases). The Third Circuit has expressly and repeatedly disavowed the notion that a plaintiff must prove that they were replaced by someone outside of the protected class to establish a *prima facie* case of discrimination. *See Pivirotto v. Innovative Sys.*, 191 F.3d 344, 355–56 (3d Cir. 1999) ("[I]t is inconsistent with Title VII to require a plaintiff to prove that she was replaced by someone outside her class in order to make out a *prima facie*

case.").[12]  Instead, the Third Circuit considers replacement by a person outside the protected class as an "alternative element" to a *prima facie* case while "ma[king] clear that this element **can** be but by no means **must** be present." *Matczak*, 136 F.3d at 939 (emphasis added). The *prima facie* case elements are flexible, and the facts must be evaluated in light of the circumstances of the case. *Kuzdrowski v. Nicholson,* 314 F. App'x 410, 413 (3d Cir. 2008) (quoting *Pivirotto,* 191 F.3d at 357).

Plaintiff may support an inference of discrimination through "any kind of relevant evidence," including, without limitation, "evidence of similar racial discrimination against other employees" or "statements or actions by [Defendant] suggesting racial animus." *McFadden v. Whole Foods Mkt. Grp., Inc.*, 2021 U.S. Dist. LEXIS 35644, at *20–21 (E.D. Pa. Feb. 24, 2021) (quoting *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 703 n.2 (3d Cir. 2010)). Moreover, "courts may consider as circumstantial evidence the atmosphere in which the company made its employment decisions." *Mammen v. Thomas Jefferson Univ.*, 523 F. Supp. 3d 702, 722 (E.D. Pa. 2021) (quoting *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 641 (3d Cir. 1993)).

---

[12] *See also Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000) (citing *Pivirotto* and reasoning, "[c]learly, an employer does not have to discriminate against all members of a class to illegally discriminate against a given member of that class."); *Bulifant v. Del. River & Bay Auth.*, 698 F. App'x 660, 665 (3d Cir. 2017) ("Even if the plaintiff was replaced by someone within her own class, this . . . does not establish that the employer did not fire the plaintiff on the basis of her protected status."); *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 n.7 (3d Cir. 2003) ("Nowhere did the Supreme Court describe the fourth element as hiring of (or, by implication, replacement by) a person outside the plaintiff's class."); *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 272 (3d Cir. 2010) ("[A] plaintiff need not prove, as part of her prima facie case, that she was replaced by someone outside of the relevant class," since an inability to make this showing "is not necessarily inconsistent with her demonstrating that the employer treated her less favorably than others because of her race[.]"); *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 242 (3d Cir. 2007) ("[T]his Court no longer requires a plaintiff to show that he was replaced by someone outside of the protected class to establish an inference of discrimination."); *see also Mosca v. Cole,* 384 F. Supp. 2d 757, 765 n.7 (D.N.J. 2005) ("The court does not find that a *prima facie* case requires that plaintiff be replaced by a non-white person.").

26

**C. The Evidence Presented At Trial Demonstrated That Defendant's Ever-Changing Stated Reason(s) for Terminating Plaintiff Was Pretext.**

Defendant changed its stated reason(s) for terminating Plaintiff throughout this case. At one point, it asserted that she was "physically and emotionally absent." This changed into "lack of strategic leadership skills" at some point during the trial.  At another point it was newly alleged that she was more of a "tactical" leader and not a "strategic" leader. Ms. Hymes testified that the reason Plaintiff was terminated was because she engaged in "misconduct." Tr. 393:18-22.  In contrast, Ms. Smith testified that Plaintiff did not engage in "misconduct;" she wouldn't even categorize it as "misconduct."  Tr. 599:05-19.

In its present motion, Defendant is back to "Ms. Phillips was neither physically nor emotionally present," and in support of this claim points to the testimony of Paul Pinto, one of the decision-makers and the highest-ranking HR person to testify for Defendant. Dkt. Ent. 165-1 at ECF p. 22. Problematic for the Defendant is that Mr. Pinto did not even know where the idea of saying she was "physically and emotionally absent" came from, and regarding Ms. Phillips, he testified that he "would feel odd about saying [she was] emotionally absent." Tr. 91:17-25.  How can the Defendant claim it had a legitimate, non-discriminatory reason for terminating Plaintiff when one of the decision-makers and the highest-ranking HR person who testified for Defendant did not even know where the reason came from and *flat-out disagreed* with it?

Defendant asserts that "[t]he arrests garnered significant national media attention" that resulted in outrage from Starbucks' employees who reported to Plaintiff. Dkt. Ent. 165-1 at ECF p. 7. Defendant then boldly claims that "[i]n stark contrast to this emotional response [of her subordinates], Ms. Phillips… had no response." *Id.* Yet, later in its Motion, Defendant quotes Ms. Hymes who admitted: "I think [plaintiff] felt deeply for our partners." *Id.* at ECF p. 29. ***Which one***

*is it?* Moreover, not a single one of Ms. Phillips' subordinates testified that they felt Plaintiff was deficient in any way. To the contrary, throughout the 28 days between the arrests and Plaintiff's termination, she received a plethora of "Thank You" notes for her leadership and praise from other partners, including her subordinates, as set forth above. Even Mr. Eckensberger, who came into the Regional Director role over Philadelphia after Plaintiff was terminated, testified that "[Plaintiff] had built really good, deep connections with a lot of the partners in the city of Philadelphia." Tr. 715:16-18.

In addition, partners, including her subordinates, were devastated when Plaintiff was fired. Ms. Hymes admitted on the stand that Tim Osevala, a District Manager who reported to Ms. Phillips, told Ms. Hymes in an email after Ms. Phillips' termination, that managers wanted to send "notes of thanks to Shannon for her leadership over the years." Tr. Exh. 129, Tr. 453:15-24. Ms. Hymes admitted that Mr. Osevala was personally saddened by Ms. Phillips' termination. Tr. 454:17-19. Ms. Hymes spoke to Delma Wells, another District Manager who reported to Ms. Phillips, who relayed she was angry and thought the separation was due to the April 12, 2018 incident. Tr. 454:20-25. Ms. Hymes admitted that she believed she needed to follow up with Ms. Wells but wanted to give her a moment to grieve. Tr. 489:12-14. Ms. Hymes also spoke to Jackie Johnson, another District Manager who reported to Ms. Phillips, who was short in conversation and it was obvious to Ms. Hymes she was not ready to talk. Tr. 489:15-19. Ms. Johnson relayed to Ms. Hymes that the news took her by surprise. Ms. Hymes also admitted that Mr. Sykes was upset that Ms. Phillips was terminated and that she knew he admired and respected her. Tr. 490:03-04. Ms. Hymes also admitted that at no point in time did Mr. Sykes relay that he felt unsupported by Ms. Phillips; nor did Ben Trinsey, another District Manager who reported to Ms. Phillips. Ms. Hymes also admitted that she spoke to David General, a Store Manager under Plaintiff's umbrella, who

28

relayed he was feeling the loss of both Ms. Phillips and Mr. Trinsey. Tr. 490:25-491:09.  Ms. Hymes also admitted that Carmen Williams, a Black Store Manager who Plaintiff mentored, was feeling the loss and was really upset. Tr. 492:16-18.  Ms. Hymes knew that Ms. Williams was homeless at one point, that Plaintiff hired her from a program for underprivileged youth ("YouthBuild"), personally mentored her, trained her and promoted her. Tr. 492:01-13. Ms. Hymes is not aware of a single text message, a single email, or a single document that in any way mentions Plaintiff not being engaged with her subordinates or anyone ever complaining about her. Tr. 497:17-23.

When Ms. Smith was asked to identify specifically what the reasons were for Plaintiff's termination, all she could conjure up was a vague recollection of a meeting she thinks Plaintiff was late for (but could not recall any details);[13] a single "stand-up" call that she claimed Plaintiff should have led;[14] a single virtual "roundtable" she claims Plaintiff was late for (but cannot recall the date, has no notes and admitted she never spoke to Plaintiff about), Tr. 587:13-20; and "the pastry case" interaction where Ms. Smith allegedly saw Mr. Sykes ask Plaintiff a question about a pastry case display promotion to which she believed Plaintiff should have known the answer. Tr. 571:11-23, 574:20-575:03.

---

[13] Q.   Ma'am, in that particular issue, where the founder was going around to the stores in Philadelphia --
A.   Yes.
Q.   -- when you got to the first store, Ms. Phillips was there.  Right?
A.   I don't -- honestly, I don't recall what store – because we were all divided into different stores. So I was not in the same store she was in during that tour.
Q.   So you don't know in that time if she was at a different store preparing it for the CEO.  You don't know that?
A.   I don't, no. Tr. 575:23-576:19.

[14] Ms. Smith could not recall the date of this single call, nor had any documents or notes to support it. Tr. 586:04-586:17. The call was being led by the Director of Ops Services, Damon Kahwati, and the participants were the highest levels of Defendant's corporate governance, including Senior Vice Presidents in Seattle; yet, Ms. Smith now implausibly claims she expected Plaintiff, who was many levels down, to lead the call, during this time where "everything was abnormal." Tr. 582:20-586:05. The jury rejected such an absurd notion. Notably, Ms. Smith admitted that she never spoke to Plaintiff about this alleged deficiency. Tr. 586:04-586:17.

Despite the alleged "deficiencies" that Defendant now claims required termination, Defendant, in reality, was assigning Plaintiff significant roles in the "Philly Action Plan." In fact, as of April 26, 2018, five (5) working days before the decision to terminate was made, Ms. Smith had Plaintiff assigned to "select and formulate small work groups of store managers designed to elevate partner and customer experience for the market [which would be] used as a touchpoint with the Safe and Security updates." Tr. Exh. 16. Plaintiff was also tasked with maintaining ongoing communications with Lieutenant Gary, extending the private security detail for two weeks, initiating the "Protest Response Team" and meeting one-on-one with each Store Manager. She was also designated the "point person [to] provide briefing and action steps to key stakeholders." Tr. Exh 16. When asked why she would assign Plaintiff to these tasks if she was a such a miserable leader, Ms. Smith responded: "She knew the people. That was a strength of hers, knowing the partners.  So anything having to do with the partner experience, the leader of that market should have a -- play a key role in that." Tr. 590:25-593:02. Ms. Smith also admitted that she thought the partners respected Ms. Phillips: "She had the relationship with these partners that no one else on this list had.  She had the relationship.  So she would be able to have the candid conversations with these partners." *Id*. Ms. Smith also admitted that Plaintiff did a good job initiating the protest response team and leveraging her local Black Partners Network ("BPN") connections for continuing the conversations of race relations, inclusion and community.  Tr. at 593-594; Tr. 232:02-24; Tr. Exh. 148, 149. See also Tr. 266:10-267:18.

Furthermore, Ms. Hymes recommended Plaintiff for the TLA ("Temporary Limited Assignment") Community Leadership Position. In considering her for this role, Ms. Hymes declared: "[A]s a filter, this opportunity is for someone with high emotional intelligence, existing Philadelphia community connections, interpersonal savvy, executive presence and strong project

management/communication skills." Tr. Exh. 30. Ms. Hymes admits that Plaintiff was in the running for this position from April 20, 2018, when she recommended her, up until May 2, 2018, when it was suddenly pulled. Tr. Exh 30; Tr. 406:8-11. Mr. Pinto, the top HR person at trial testified that he could not name a single person who ever made a complaint about Plaintiff and admitted he never spoke to her about any complaints. Tr. 121:21-122:10.

Defendant cannot get its story straight. In order to establish pretext, Plaintiff must demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [defendant's] proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence, and hence infer that [defendant] did not act for the asserted non-discriminatory reasons." *Gerundo v. AT&T Servs.*, 2016 U.S. Dist. LEXIS 177583, at *14–15 (E.D. Pa. Dec. 20, 2016) (quoting *Fuentes v. Perskie*, 32 F. 3d 759, 765 (3d Cir. 1994)). The issue for the Court here is whether there was evidence, direct or circumstantial, which when viewed <u>cumulatively</u> was sufficient for the jury to either disbelieve Defendant's articulated reason(s) <u>or</u> believe that an invidious discriminatory reason was more likely than not a determinative cause of the employer's action. *Id.* at *15 (<u>emphasis added</u>). In contrast to the inconsistent and contradictory testimony of Defendant's decision-makers, Mr. Sykes testified clearly and credibly. He worked at Defendant for fifteen (15) years and was supervised by Plaintiff for the last three (3). He described her in testimony as follows:

> She was extremely supportive, really genuine. Every time she went into a location with me when we would tour, she had a really great relationship with the people in our locations. Everyone was really receptive of her. And I learned a lot when I would tour with her. I found her very, very easy to talk to, very easy to share any opportunities that were going on with my district. I could be completely vulnerable. She would give me great feedback. Whether it was critical or opportunistic, I knew it was coming from a good place, and I was never intimidated.

Tr. 626:05-628:18. He found her approachable, supportive of his career development, and never treated him, or any other employee, differently because of their race. *Id.* In regard to April and May 2018 specifically, he testified that Plaintiff was working in the Philadelphia market around the clock; that she was supporting all the partners; and, that he never heard any of his coworkers or subordinates complain about Plaintiff. Tr. 626:05-630:14. When asked if he felt she provided the emotional support he needed during this time, he testified:

> I did.  I don't think I could have been -- I don't think that I could have processed and have gone through that experience at that time without her being there, just because she was there and she was someone for me to talk to.  And she just provided a lot of emotional support, not only to myself but to the team members.  She was very supportive.  Everybody really, really loved Shannon.

Tr. 630:05-14; *see also* Tr. Exh. 153. For all the reasons set forth above, Plaintiff has clearly established Defendant's ever-changing articulated reason(s) is pretext, and on that basis alone, the jury was permitted to find in favor of Plaintiff.

### D. The Jury Understood And Believed That Plaintiff Would Never Have Been Terminated If She Was Black. Defendant's Argument That Her Scapegoat Theory of the Case Was Not "Proven" Is Misguided and Wrong.

There is a profusion of falsehoods asserted by Defendant in its brief. For instance, it is not true that "Ms. Phillips claim[ed] all White Leaders in the Philadelphia market were terminated following the arrests…" and that that "claim" was "prove[n] completely false at trial." Plaintiff *never* claimed that "all White leaders in the Philadelphia market were terminated following the arrests."

It also was not proven at trial that Mr. Sykes was involuntarily terminated. To the contrary, Mr. Sykes clearly testified he was not terminated. Tr. 625:19-626:02. And even Ms. Hymes agreed. *See* Tr. 415:19-20 (*Q: He was not terminated, correct? A: He was not terminated.*).  It was Mr.

Sykes' decision to resign; it was Defendant's decision to have him sign a severance agreement after the resignation, and provided him with a release and an NDA agreement. No one testified that Mr. Sykes was terminated.

In addition, the "theme" or "theory" of the case, while established, is not an element of the causes of action regarding Plaintiff's race discrimination claims. The jury was instructed on the law, which it followed. Whether the "theory" was "proven" or not is not the question. The question for the jury was whether the evidence showed it was more likely than not that Plaintiff's race was a determinative factor in the decision to terminate her. ***It was.***

Ms. Hymes testified: "The leader is responsible for the leaders, so when the partners at whatever level are expressing concerns or distress or sort of lack accountability, that's a reflection of multiple levels, including myself." Tr. 414:20-10. She made this proclamation to support her claim that Plaintiff was terminated because the levels of leaders below her (*i.e.*, District Managers and Store Managers), were "suffering." The problem with her "rationale" is that below Plaintiff were two District Managers in Center City, one White and one Black. The White District Manager was terminated even though the Store Manager who called 911 was *not* under his umbrella; rather, she was under the supervision of the *Black* District Manager. Similarly, Ms. Hymes, who had responsibility for Plaintiff, was not fired and neither was her boss, Ms. Smith, both of whom are Black. So, at the end of the day, in the aftermath of an international race-based PR nightmare and the largest brand crisis Defendant ever faced, Defendant fired three (3) White employees and no Black employees and then claimed that the race of the individuals had nothing to do with it. The jury did not buy it and its assessment should not be disturbed.

**E. Punitive Damages Were Warranted Given the Evidence Presented; the Court Must Not Vacate the Award.**

Defendant sets forth two reasons why the jury's punitive damages' award should be tossed out: (1) that Defendant had written anti-discrimination policies; and, (2) Defendant's conduct was not reprehensible as a matter of law. Defendant misstates the law and confuses state law and federal law standards. Plaintiff will address each in turn below.

### 1. *Defendant Did Not Make Good-Faith Efforts to Implement and Enforce its Anti-Discrimination Policies.*

Defendant implores the Court to toss the jury's award of punitive damages based on a false legal standard it sets forth. Defendant wrongly asserts that the United States Supreme Court has stated that if an employer has written, anti-discrimination company policies, then an award of punitive damages under Title VII and Section 1981 is "precluded." If this were the case, then any employer who simply puts together a handbook would be automatically immune from punitive damages liability. This is not the case.

What the law provides is that the jury is permitted to assess whether Defendant engaged in good faith efforts to comply with federal law as part of its assessment of Defendant's "reckless" state of mind. *Nitkin v. Main Line Health*, 2021 U.S. Dist. LEXIS 229179, at *27–28 (E.D. Pa. Nov. 29, 2021) ("At trial, the Court found that a reasonable jury could conclude that MLH had not presented evidence that it acted in good faith compliance with Title VII in its efforts to prevent retaliation for making complaints of sexual harassment. And even if it did, a jury was entitled to disbelieve that evidence."); *see also Middlebrooks v. Teva Pharms. USA, Inc.*, 2019 U.S. Dist. LEXIS 17609, at *30–31 (E.D. Pa. Feb. 4, 2019) ("The issue of [the defendant's] good faith defense is a question for the jury. We allowed [the defendant] to repeatedly argue good faith. The jury disagreed. After hearing evidence, the jury found an award of punitive damages appropriate . . .

34

[The defendant] made the good faith arguments, but the jury could have easily found its witnesses lacked credibility.").

Here, the jury was charged on the "good faith compliance standard" and found that the Defendant did not establish it. The jury saw how the policies were not worth the paper they were written on and the Defendant cared only about its "brand." Everything Defendant did in that period to protect its brand it viewed through the lens of race. The members of upper management knew there were laws against discrimination in the workplace, but they nonetheless chose to fire three White people, and no Black people, at the same time the public pressure was re-mounting and further actions were vowed by the CEO to be taken to counter the brand-damaging effects of the viral video of the two Black men being arrested at Defendant's store. Defendant does not address the punitive damages standard under the NJLAD.

### 2. *Starbucks Acted With Reckless Indifference To Plaintiff's Rights.*

In arguing that "Starbucks' conduct was not reprehensible as a matter of law," and therefore the jury's award for punitive damages should be reduced to zero, Defendant again does not cite to any cases on the punitive damages law under the NJLAD. Instead, Defendant cites *CGB Occupational Therapy, Inc. v. RHA Health Servs.*, 499 F.3d 184 (3d. Cir 2007)—a tortious interference case under Pennsylvania state law in which the Third Circuit upheld a 7.5 to 1 ratio of compensatory damages to punitive damages—and *Savarese v. Agriss*, 883 F.2d 1194 (3d. Cir 1989)—a case brought under Section 1983 and other laws not at issue in the present case. Defendant claims that "[t]o sustain an award of punitive damages, Ms. Phillips had to introduce evidence of conduct demonstrating Starbucks' malicious intent" and cites *Saravese*. Defendant then wrongly proclaims that "[i]t was Ms. Phillip's burden to marshal evidence of specific conduct through which a rational jury could infer Starbucks' maliciousness. She could not conjure this

evidence because none exists… [f]or these reasons the Court must vacate the jury's punitive damages award under these circumstances." Deft. Br. 23.

First, there is no statute under which a Plaintiff must prove "maliciousness" to sustain a punitive damages award. The statutes at issue in *Savarese,* are different than those in the present case. And even in *Savarase*, the Court did not require proof of maliciousness but instead concluded: "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages." 883 F.2d at 1204.

Members of upper management of Defendant used Plaintiff as a pawn. Defendant determined it best for its brand not to take responsibility for the arrests of the two Black men but instead to lay blame on (a false concept of) White managers gone rogue, even though the 911 call was made in accordance with Defendant's policy and, in the aftermath, Plaintiff did everything that was asked of her and more. If Plaintiff had signed the "most lucrative severance package possible" as Defendant had hoped, she would not have been able to defend herself because of the strict confidentiality in the severance agreement. Defendant wanted a scapegoat. This is not just a "theory," as the Corporate Designee admitted at trial. When confronted with Defendant's own Internal Investigation report which said that Ms. Hylton called 911 "per company policy," Ms. Eckensberger, boldly pointed the finger at Plaintiff:

Q. Okay. So per Starbucks policy, she [Ms. Hylton] called the police. Correct?

**A. No. That's what it says, but Starbucks' policy is not to call the police. The policy enacted in the stores in Philadelphia was instituted by Ms. Phillips. That was not a policy across all of Starbucks.**

Q. So you're taking the position that the policy of calling the police was a personal policy that Ms. Phillips instituted?

36

**A. Yes. The Safe and Welcoming that has been referred to, Ms. Phillips put that in her Philadelphia stores. That was not a company policy across all 8,000 stores.**

**

Q.   As the corporate designee of Starbucks in this trial which includes the Safe and Welcoming policy of the store manager calling 911, you're telling this jury you don't have awareness of what this policy is?

**A. It's not a policy. It was a test that Ms. Phillips enacted in her Philadelphia stores based on her decision.**

Tr. 718:13-23; 719:17-22.  At the end, Defendant showed all of its cards. Its decision to blame Plaintiff for the call to 911, after all of the evidence and testimony up until that point in the trial showed otherwise—*i.e.,* that the call was in accordance with Defendant's policy—was outrageous and explicit evidence of its egregious and reckless race-based conduct.

Mr. Pinto testified that the reason Plaintiff had to be fired right then, on May 8, 2018, without warning, was because it was like someone "in crisis and they needed surgery in a cardiac situation, it's not the time to talk about diet and exercise." Tr. 146:7-147:5; 165:10-19.  Defendant sure was having a heart attack—because it was dealing with the most significant risk to its profits this $112 Billion corporation had ever faced. The anecdote to that heart attack would not have been to fire a Black person; that would have resulted in a flatline. Defendant and its members of upper management wanted to spin a story where they were not at fault; instead it was the White managers. Defendant wanted to have someone to blame, internally and externally—*a scapegoat*. Defendant did not choose the Black District Manager below her, or the Black VP above her; instead, it chose Plaintiff because of her race and Defendant almost succeeded in silencing her through an NDA, like it did with Ms. Hylton and Mr. Trinsey. Moreover, Defendant claimed on one hand to be

"outraged" by the "reprehensible" arrests of the two Black men, but then pursued to twist the incident into a PR positive, profit-making, event. Tr. 707:02-14; 7:22:03-723:22.[15]

Defendant's conduct in terminating Plaintiff in connection with this racially charged event, in the midst of global public scrutiny, was outrageous, egregious and recklessly indifferent to Plaintiff's rights under the law. Tr. 316:11-317:1.

For all the reasons previously set forth, as well as Defendant's inability to find case law to support its made-up standard, and its sole reliance on the self-serving testimony of its own witnesses, the credibility of whom the jury soundly rejected, this Court should reject Defendant's plea to have the jury's punitive damages awards in this case vacated.

## V.   CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion in its entirety.

---

[15] Q.   You're aware that there were celebrities brought in to do -- by Starbucks, brought them in to do some videos about the diversity training.  Correct?
**A.  Yes.**
Q.  Including like the rapper Common.  Correct?
**A.  Yes.**
Q.  And former Attorney General Holder came in to do a speech.  Correct?
**A.  Yes.**
Q.  And Starbucks brought him in and advertised about that. Correct?
**A.  Yes.**
Q.  And advertised about all the diversity training that they were doing.  Correct?
**A.  Yes.**
Q.  And then you testified on direct examination that the sales numbers doubled after this event.  Correct?
**A.  In Philadelphia specifically, our operational rigor allowed us to outpace the rest of the US business in sales. Correct.**  Tr. 722:03-7:23-23.
.

Respectfully submitted,

**CONSOLE MATTIACI LAW, LLC**

Dated: <u>August 23, 2023</u>　　　　By:　<u>*s/ Laura C. Mattiacci*</u>
　　　　　　　　　　　　　　　　　Laura C. Mattiacci, Esquire
　　　　　　　　　　　　　　　　　Susan Saint-Antoine, Esquire
　　　　　　　　　　　　　　　　　Katherine C. Oeltjen, Esquire
　　　　　　　　　　　　　　　　　Holly W. Smith, Esquire (*pro hac vice*)
　　　　　　　　　　　　　　　　　1525 Locust Street, Ninth Floor
　　　　　　　　　　　　　　　　　Philadelphia, PA 19102
　　　　　　　　　　　　　　　　　(215) 545-7676
　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*