**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

SHANNON PHILLIPS,

                    *Plaintiff*,

      v.

STARBUCKS CORPORATION d/b/a
STARBUCKS COFFEE COMPANY,

             *Defendant*.

CIVIL ACTION NO.: 2:19-cv-19432

Hon. Joel H. Slomsky, U.S.D.J.


**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR A NEW TRIAL,
OR IN THE ALTERNATIVE, A REMITTITUR**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………..iii

I.      INTRODUCTION……………………………………………………...…..1

II.     LEGAL STANDARD………………………………………………….............2

III.    ARGUMENT: THE JURY'S VERDICT AND AWARD MUST STAND…………..3

    A.  The Jury's Verdict Was Not Against The Weight Of The Evidence…………...…3

    B.  Defendant's Motion For A New Trial Based On Alleged Errors Rests On Arguments That Have Been Waived And Otherwise Fails to Meet The High Threshold Required For A New Trial…………………………………….…..…4

        1.  Defendant's passing references to alleged errors do not raise adequately issues to be addressed by this Court or preserve them for appeal………5

            *a) The Court's seating of jurors is not grounds for a new trial*………5

            *b) Counsel's opening statement is not grounds for a new trial*………6

                i.  Defendant's narrative around the arrest and its deceit in connection with withholding the surveillance video highlight Defendant's reprehensible conduct and abusive litigation tactic……………………………………………8

        2.  The testimony of Paul Sykes regarding Plaintiff's termination is not grounds for a new trial……………………………………………9

        3.  The jury not being given a "comparator instruction" is not grounds for a new trial……………………………………………………...11

    C.  The Jury's Damages Awards Should Not Be Disturbed…………………………12

        1.  The jury's $6000,000 compensatory damages award should not be disturbed……………………………………………………...12

        2.  The jury's punitive damages award should not be disturbed…………..16

            *a) The jury's award was fully supported and is constitutionally sound*…………………………………………………..17

                i.  The jury's punitive damages award is fully supported by the evidence…………………………………………...18

i

ii.   In light of the Court's economic loss damages award, the punitive damages award is now within the single-digit ratio and is presumptively constitutional………………………...27

a.   *Defendant's conduct was exceedingly reprehensible*……………………………………29

b.   *The ratio of the punitive damages to harm or potential harm is in single digits and is constitutionally sound*…………………………..32

c.   *The difference between the damages imposed and any civil penalties authorized*……………………35

IV.   CONCLUSION………………………………………………………………37

## TABLE OF AUTHORITIES

**Cases**

*Baker v. Nat'l State Bank,*
353 N.J. Super. 145 (2002) ........................................................................................ 33, 36

*Baker v. Nat'l State Bank,*
736 A.2d 462 (N.J. 1999) ................................................................................................ 28

*Blount v. Stroud,*
915 N.E. 2d 925 (Ill. App. Ct. 2009) .............................................................................. 34

*BMW of N. Am., Inc. v. Gore,*
517 U.S. 559 (1996) .................................................................................................. 27, 28

*Braden v. Lockheed Martin Corp.,*
2017 U.S. Dist. LEXIS 207236 (D.N.J. Dec. 18, 2017) ................................................ 15

*CGB Occupational Therapy, Inc. v. RHA Health Serv., Inc.,*
499 F.3d 184 (3d Cir. 2007) ........................................................................................... 28

*Cuevas v. Wentworth Grp.,*
226 N.J. 480 (2016) ........................................................................................................ 15

*Devli v. Tasci,*
2022 N.J. Super. Unpub. LEXIS 2443 (N.J. Super. Ct. Nov. 28, 2022) ........................ 35

*Franklin Prescriptions, Inc. v. N.Y. Times,*
424 F.3d 336 (3d Cir. 2005) ........................................................................................... 11

*Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.,*
244 F. App'x 424 (3d Cir. 2007) ...................................................................................... 3

*Hampton v. Dillard Dep't Stores, Inc.,*
247 F.3d 1091–17 (10th Cir. 2001) ................................................................................ 30

*Herman v. Sunshine Chem. Specialties,*
133 N.J. 329 (1992) ........................................................................................................ 36

*Hurley v. Atlantic City Police Dep't,*
933 F. Supp. 396 (D.N.J. 1996) ...................................................................................... 18

*Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*
181 F.3d 446 (3d Cir. 1999) ........................................................................................... 11

*Klein v. Hollings,*
    992 F.2d 1285 (3d Cir. 1993) ................................................ 3

*Lesende v. Borrero,*
    752 F.3d 324 (3d Cir. 2014) ................................................. 7

*Lightning Lube, Inc. v. Witco Corp.,*
    802 F. Supp. 1180 (D.N.J. 1992) .......................................... 3

*Motter v. Everest & Jennings, Inc.,*
    883 F.2d 1223 (3d Cir. 1989) .............................................. 3

*Murray v. Fairbanks Morse,*
    610 F.2d 149 (3d Cir. 1997) ............................................ 5, 17

*O'Brien v. Middle E. Forum,*
    2021 U.S. Dist. LEXIS 171743 (E.D. Pa. Sept. 10, 2021) ..................... 2

*Paraxel Int'l Corp. v. Feliciano,*
    2008 U.S. Dist. LEXIS 98195 (E.D. Pa. Dec. 4, 2008) .............. 3, 28, 30, 33, 34

*Pritchett v. State,*
    256 A.3d 999 (N.J. 2021) ................................................ 28

*Ray v. AT&T Mobility Servs. LLC,*
    2022 U.S. Dist. LEXIS 30817 (E.D. Pa. Feb. 22, 2022) ..................... 2, 5

*Seneca Ins. Co. v. Beale,*
    2018 U.S. Dist. LEXIS 99488 (W.D. Pa. June 14, 2018) ..................... 10

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
    538 U.S. 408 (2003) .................................................... 28

*United States v. Centeno,*
    793 F.3d 378 (3d Cir. 2015) ............................................... 4

*United States v. De Rosa,*
    548 F.2d 464 (3d Cir. 1977) ............................................... 7

*Waldorf v. Shuta,*
    142 F.3d 601 (3d Cir. 1998) .......................................... 5, 9, 17

*Willow Inn, Inc. v. Public Serv. Mut. Ins. Co.,*
    399 F.3d 224 (3d Cir. 2005). ......................................... , 333

*Wright v. City of Phila.,*
    2007 U.S. Dist. LEXIS 21725 (E.D. Pa. Mar. 27, 2007) ...................................................... 10

*Zhang v. Am. Gem Seafoods, Inc.,*
    339 F.3d 1020 (9th Cir. 2003) ................................................................ 29

**Statutes**
    42 U.S.C. § 1981 ................................................................................. 1
    42 U.S.C. §§ 2000e ............................................................................. 1
    N.J.S.A. § 2A:15-5.14.c ...................................................................... 35
    N.J.S.A. § 10:5-3 ............................................................................... 30

## I.    <u>INTRODUCTION</u>

Plaintiff, Shannon Phillips, was terminated from her employment with Defendant, Starbucks Corporation d/b/a Starbucks Coffee Company, because of her race. After a six (6) day trial, an attentive and careful jury unanimously found that Defendant discriminated against Plaintiff because of her race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e - 2000e17 *(as amended)* ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), and New Jersey Law Against Discrimination, NJ Rev Stat § 10:5-12 (2016) ("NJLAD"). The jury awarded Plaintiff compensatory damages under her federal claims of $300,000 and compensatory damages under her NJLAD claim of $300,000, as well as punitive damages against Defendant of $12,500,000 for its violation of Section 1981 and $12,500,000 for its violation of the NJLAD. (Dkt. Ent. 150). On June 15, 2013, the Court entered judgment in favor of Plaintiff and against Defendant on Counts I, II and III of her Second Amended Complaint, in the total amount of $25,600,000. (Dkt. Ent. 153).

Starbucks filed a renewed Motion for Judgment as a Matter of Law pursuant to Fed. R. Civ. P. 50(b) ("JMOL") and, alternatively, has filed separately pursuant to Fed. R. Civ. P. 59 a Motion for a New Trial, Or In The Alternative Remittitur ("Rule 59 Motion") in the event that the Court denies its JMOL.  Defendant's Rule 59 Motion, which is muddled and its arguments often difficult to discern, relies on the same preposterous assertion as it made in its JMOL, *i.e.,* that Plaintiff offered <u>no</u> evidence that Starbucks terminated Ms. Phillips because of her race.  Plaintiff's Opposition to Defendant's JMOL (incorporated herein by reference) recites in great detail and with specific record support, the compelling evidence by which the jury rightfully rejected Defendant's version of events.  The jury has already heard Starbucks' (shifting) explanation that

it terminated her for reasons other than race, such as a lack of strategic leadership, and <u>did not</u> <u>believe it</u>.

There was no "miscarriage of justice" here, and nothing about the verdict or award "shocks the conscience." As set forth more fully below: A) the jury's verdict was not against the weight of the evidence; B) every one of Defendant's assertions of error has been waived and, even if considered, does not merit the extraordinary measure of a new trial; and C) the $25,000,000 punitive damages award was not excessive or unconstitutional in light of i) Starbuck's extraordinarily reprehensible conduct, ii) the punitive damages award to harm ratio is a single-digit ratio and presumptively constitutional, and iii) the award comports with the NJLAD and Section 1981 legislative authority (which recognizes discrimination damages should not be subject to caps) and similar cases.

Starbucks does not get a do-over and its Rule 59 Motion should be denied in its entirety.

## II.  LEGAL STANDARD

After a jury trial, a court may grant a new trial under Rule 59 "only when the great weight of the evidence cuts against the verdict and . . . a miscarriage of justice would result if the verdict were to stand." *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016); Fed. R. Civ. P. 59(a)(1)(A). "Absent a showing of 'substantial' injustice or 'prejudicial' error, a new trial is not warranted" and the court should leave undisturbed a plausible jury verdict. *O'Brien v. Middle E. Forum*, 2021 U.S. Dist. LEXIS 171743, at *4 (E.D. Pa. Sept. 10, 2021) (quoting *Goodwin v. Seven-Up Bottling Co. of Phila.*, 1998 U.S. Dist. LEXIS 11852, at *8 (E.D. Pa. July 31, 1998)).

The Court has discretion to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1); *see also Ray v. AT&T Mobility Servs. LLC*, 2022 U.S. Dist. LEXIS 30817, at *11 (E.D. Pa. Feb. 22, 2022). The decision to grant a new trial is left to the sound discretion of the trial judge. Nonetheless, a trial

court may not grant a new trial simply because it would have come to a different conclusion than that reached by the jury. *See, e.g., Lightning Lube, Inc. v. Witco Corp.*, 802 F. Supp. 1180, 1186 (D.N.J. 1992). Nor should it grant a new trial for harmless error. *E.g., Ray,* 2022 U.S. Dist. LEXIS 30817 at \*11.

"To prevent judicial overreaching, trial courts must give a measure of deference to a jury's determination when evaluating the appropriateness of a punitive damages award." *Paraxel Int'l Corp. v. Feliciano*, 2008 U.S. Dist. LEXIS 98195, at \*18 (E.D. Pa. Dec. 4, 2008) (citing *Willow Inn, Inc. v. Public Serv. Mut. Ins. Co.*, 399 F.3d 224, 231 (3d Cir. 2005)). "If a court finds the punitive damages award is unconstitutionally excessive, it should decrease the award to an amount the evidence will bear. . . . Where the jury's punitive damages award is free of irrationality, passion, and prejudice, however, and falls within the broad discretion in authorizing and limiting permissible punitive damages awards lodged with state legislatures, the Court should not substitute its own judgment for that of the jury's." *Id.* at \*18 (internal quotations omitted).

## III.   ARGUMENT: THE JURY'S VERDICT AND AWARD MUST STAND.

### A.   The Jury's Verdict Was Not Against The Weight Of The Evidence.

Because granting a new trial based on the weight of the evidence is akin to a court substituting its judgment for that of the jury and usurping the jury's role as fact-finder, a district court has limited discretion to grant a new trial on this basis, with the exercise of such discretion receiving close scrutiny on appeal. *Klein v. Hollings,* 992 F.2d 1285, 1287 (3d Cir. 1993) (internal citations omitted) (reversing trial court's decision to grant new trial). This is particularly true where, as in this case, the subject matter was simple and within a layperson's understanding. *See id.* at 1290 (quoting *Williamson v. Consol Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991)). A jury's verdict should stand against a challenge based on the weight of the evidence unless it would result in a miscarriage of justice or shocks the conscience. *See, e.g., id.* at 1290.

3

The jury's verdict in favor of Ms. Phillips is not a miscarriage of justice and does not "shock the conscience."  As with its JMOL, Defendant's instant motion for a new trial seems to overlook a key and obvious fact:  The jury **disbelieved** Starbucks' (shifting) explanation that it terminated Ms. Phillips' employment expressed variously as deficient performance, misconduct or lack of leadership.

In support of its Rule 59 Motion for a new trial based on the weight of the evidence, Defendant largely restates its arguments in support of its JMOL Motion.  As in its JMOL Motion, *Defendant's argument ignores the evidence that does not support their defenses and version of events and presumes that the Court will accept entirely Starbuck's version of events.  Its Brief repeats its preposterous assertion that Plaintiff presented no evidence of race discrimination*. The jury's rejection of Starbuck's stated reason (which was ever-shifting) for terminating Ms. Phillips and its finding that Defendant discriminated against Plaintiff because of her race was amply supported by the evidence presented, as detailed in Plaintiff's Opposition to Defendant's JMOL.

Defendant does not meet its heavy burden of showing that the jury's verdict was a miscarriage of justice or shocks the conscience.

**B.     Defendant's Motion For A New Trial Based On Alleged Errors Rests On Arguments That Have Been Waived And Otherwise Fails to Meet The High Threshold Required For A New Trial.**

Defendant contends that errors made during the trial, both individually and cumulatively, resulted in a miscarriage of justice which warrant a new trial.  Some of the alleged errors are stated by Defendant merely in passing.  Because they are not adequately raised, they have been waived. *See, e.g., United States v. Centeno*, 793 F.3d 378, 388 n.9 (3d Cir. 2015) (holding that issues that were not "squarely argued" and were merely raised in passing (such as, in a footnote) were waived).

4

Other alleged errors were not objected to at trial and thus have been waived and should also not be addressed by the Court at this stage. "It is clear that a party who fails to object to errors at trial waives the right to complain about them following trial." *Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998) (citing *Murray v. Fairbanks Morse*, 610 F.2d 149, 152 (3d Cir. 1997)); *see also Ray*, 2022 U.S. Dist. LEXIS 30817 at *31–32 (quoting *Murray* and rejecting defendant's argument that counsel's remarks that were not objected to at the time warranted a new trial).

Finally, Defendant's punitive damages arguments, though couched in terms of "error," are really arguments regarding the sufficiency of the evidence (essentially, its renewed JMOL repackaged) and the reasonableness of the amount of the award, addressed separately below. To the extent it is presented as an "error" of giving a jury instruction, Defendant made no objection to the instructions on punitive damages that were given and that argument, too, has been waived.

In short, Defendant's assertions of "error" have been waived and should not be considered at this stage. If the Court were to consider them, the arguments should be rejected. The alleged errors were not, in fact, erroneous and certainly – whether considered separately or cumulatively-- did not result in the type of extraordinary sort of prejudice to Defendant required to warrant a new trial.

**1.     Defendant's passing references to alleged errors do not raise adequately issues to be addressed by this Court or preserve them for appeal.**

*a)     The Court's seating of jurors is not grounds for a new trial.*

Defendant asserts in the introduction section of its Memorandum that the Court committed "reversible error" when it "did not strike jurors for cause that articulated a personal bias against Starbucks that went beyond mere 'hints' of bias." Memorandum (Dkt. Ent. 167-2) at ECF p. 12. This assertion was not developed or argued in the body of the Memorandum; it has been waived on that basis alone and should not be considered.

Moreover, Defendant states falsely that several seated jurors "stated outright" that they did not like Starbucks or thought Starbucks was too political without a citation to the transcript supporting this sweeping assertion.  Notably, Defendant does not identify by name or number any juror that it believes falls into the category as "not liking" Starbucks or thinking that Starbucks was too "political."  Nor does Defendant's Brief cite to any specific juror that was seated over its objection. The only citation to the record made by Defendant is to the voir dire of Juror No. 8 (the juror number references his number at the panel/voir dire stage). This juror was questioned separately by counsel and the Court. *See* Tr. 72:14-81:03.[1] Ultimately, Defendant moved for the juror's removal from the panel, only if the juror (who worked overnight hours as a welder) was not able to take time off from work amid a fear that he would be overly tired—***not*** amid any concern that this juror was biased against Starbucks. Trial Tr. 81:04-07. In fact, defense counsel did not raise with the Court any objection over the juror's ability to be impartial. *Id*.  Defendant's failure to object to the seating of this juror is a separate and independent basis to conclude that the argument has been waived.  *Waldorf*, 142 F.3d at 629.

 Further, if the Court were to consider the argument (which it should not), it should be rejected.  The juror stated that he would be fair and impartial and there is not an iota of evidence that he was not. Tr. 72:14-81:03. The Defendant did not exercise any strike of this juror; however, it did strike other jurors who had not made any statements about Starbucks being too "political"— demonstrating the disingenuous nature of Defendant's efforts to now suggest that the jury was unfair.  The Court did not commit any error in seating any juror and the jury was fair and impartial.

### b)    *Counsel's opening statement is not grounds for a new trial.*

---

[1] Because the entire trial transcript has already been filed by Starbucks (see ECF 165-3-9), Plaintiff does not submit it again here.  The transcript is cited herein as "Tr. at [page]:[line]."

Defendant asserts (falsely) in its Introduction section that Plaintiff's counsel made "false material misrepresentations" during her opening statement concerning the arrests of two Black men at the Starbucks' 18th & Spruce store. This assertion was not developed or argued in the body of the Memorandum; it has been waived on that basis alone and should not be considered. Moreover, Defendant made no objection to Plaintiff's statement during her opening statement. Any argument now that counsel's statement warrants a new trial now, even if were adequately raised in the instant Motion, has been waived on that basis, as well. Objections to opening remarks not made contemporaneously are deemed waived. *Murray*, 610 F.2d at 152 ("Counsel's failure to object precludes [a party] from seeking a new trial on the grounds of impropriety of opposing counsel's remarks."); *United States v. De Rosa*, 548 F.2d 464 (3d Cir. 1977).

Further, if the Court were to consider the argument (which it should not), it should be rejected. It is outrageous, frankly. First and foremost, it rests on a supposed statement by Plaintiff's counsel that she, in fact, indisputably did not make. Defendant tells this Court that Plaintiff's counsel told the jury that the men were in the store for twenty (20) minutes despite knowledge that they were in the store for less time. This is false. Counsel stated: "Starbucks did an investigation on it, and Starbucks conclusion on the investigation was that the men were in the store for about 20 minutes…." Tr. 33:09-11. Counsel's statement is accurate. At trial, Plaintiff entered Trial Exhibit 160 (without objection from the Defendant). Trial Exhibit 160 is a document produced by Defendant during discovery and contains the investigative report conducted by Starbucks employees following the arrests. *See* Tr. Exhibit 160. Trial Exhibit 160 was the only document produced by Defendant describing the arrests during discovery. Tr. 256:18-23. The Exhibit states, in part, that the men arrested were in the store for approximately twenty (20) minutes. *See* Tr. Exhibit 160.

Defendant not only did not object to the statement made by Plaintiff's counsel, but it also never sought curative instruction(s). Because statements made by Plaintiff's counsel were accurate according to Defendant's own documents, it is unclear what curative instruction would have even been appropriate. Moreover, the jury was instructed several times by the Court that statements by counsel are not evidence. *See* Tr. 9:14-18, 12:15-16, 14:13-15, 15:7-8, 828:23-829:2. Further, even if Counsel's statement were false—which it was not—Defendant has not demonstrated how the statement prejudiced it in any way. There was no miscarriage of justice here.

      i.     **Defendant's narrative around the arrest and its deceit in connection with withholding the surveillance video highlight Defendant's reprehensible conduct and abusive litigation tactic.**

Astoundingly, Defendant argues that Plaintiff's counsel's remark was "allowed to pollute the jury pool when this Court refused to allow Starbucks to introduce the video surveillance footage showing that Mr. Robinson and Mr. Nelson were in the store for ***less than three minutes*** into evidence." Memorandum (Dkt. Ent. 167-2) at ECF p. 13 (emphasis in original). Rather than establishing grounds for a new trial, Defendant's continued advancement of a narrative surrounding the arrests that is contrary to its own investigative report and its deceit in connection with improperly withholding the surveillance video highlight Defendant's reprehensible conduct. Further, Defendant's statement that the Court refused to allow its admission is false.

Plaintiff requested the full and complete surveillance video footage from inside the store years before the trial, but it was never produced.[2] On the Friday evening prior to the start of trial Monday, Defendant suddenly produced a large set of spliced clips purported to be of the day of the arrests. When Plaintiff's counsel asked for a full, continuous, time-stamped copy of the

---

[2] *See generally* Plaintiff's Motion for Sanctions (Dkt. Entr. 134-1).

surveillance video, defense counsel responded that the spliced up, non-timestamped clips were the only video available. Then, on Wednesday evening, after three full days of trial were already complete, Defendant produced 10 hours of video purported to be of the day of the arrests. Tr. 243:14-260:01. Even though the Judge stated, "I can't think of a more prejudicial situation right now in this case, for that clip not to have been turned over [by Defendant] for a comprehensive examination," he ruled that Defendant would still be permitted to introduce the video if it could authenticate it. Defendant never attempted to do so. Tr. 257:07-260:23.

> **2.   The testimony of Paul Sykes regarding Plaintiff's termination is not grounds for a new trial.**

Defendant argues that it was reversible error to admit the testimony of Paul Sykes regarding Ms. Phillips' termination.  Mr. Sykes was Plaintiff's former subordinate and the District Manager responsible for the Store Manager who called the police pursuant to Starbucks' policy.  The admissibility of his testimony has already been carefully and properly addressed by the Court in its well-reasoned opinion denying Defendant's Motion in Limine.  *See* Order (Dkt. Entr. 133). Defendant's argument repeats nearly verbatim the arguments previously made.  It should be rejected again now for several reasons.

First, all aspects of Mr. Sykes' testimony that were not objected to at trial have been waived for purposes of pre-trial motions (as distinct from their preservation for purposes of appeal). During Mr. Sykes' testimony, Defendant did not object to his testimony regarding Ms. Phillips' termination on foundational or any other grounds.  Defendant objected only once and to a single question. Tr. 625:12-633:05. The only question defense counsel objected to was: "Do you think the fact that you're black played a role in the fact that Starbucks did not terminate you?" Tr. 633:06-10. The Court overruled the objection. *Id*.  As a result, Defendant's motion on any aspect of Mr. Sykes' testimony other than his response to that question, must be denied as waived. *See Waldorf*,

142 F.3d at 629; *Wright v. City of Phila.*, 2007 U.S. Dist. LEXIS 21725, at *3 (E.D. Pa. Mar. 27, 2007).  The filing of a motion *in limine* does not preserve the objection for the purpose of post-trial motions, which is separate and apart from any appellate rights contemplated by Fed. R. Civ. P. 103(b). Therefore, Defendant's challenges to Mr. Sykes' testimony are limited to the single objection it raised at trial. *Seneca Ins. Co. v. Beale*, 2018 U.S. Dist. LEXIS 99488, at *14 (W.D. Pa. June 14, 2018).

Second, the only aspect of Mr. Sykes' testimony to which Starbucks objected at trial (and thus is subject to the Court's review in a post-trial motion) was not raised by Starbucks in its Motion.

Third, even if the Court were to address the admissibility of the "lay opinion" testimony of Mr. Sykes regarding Ms. Phillips' termination at the post-trial stage, Defendant's argument should be rejected.   Its argument essentially repeats the argument made in its motion *in limine*.  It was already properly rejected for the reasons stated in Plaintiff's Opposition to Defendant's motion *in limine* (incorporated herein by reference) and this Court's well-reasoned opinion.  Without limitation, Mr. Sykes had first-hand, personal knowledge of the pervasiveness of the race-based discussions at Starbucks at that time, including with decision-makers; he had first-hand personal knowledge of what was going on at the time; he had first-hand, personal knowledge of Ms. Phillips' leadership during that time; and, he himself was one of her subordinates who was supposedly dissatisfied with her leadership (which was not true).

Moreover, even if error to admit his testimony on Ms. Phillips' termination (which it was not), that error was harmless.  Starbucks had the opportunity to—and ***did***—cross-examine Mr. Sykes and elicited from him the testimony (as cited in their Brief) that he was not a decision-maker.  Starbucks has offered no evidence or reason to think that the jury would have been misled

into believing that Mr. Sykes was a decision-maker.   Further, Defendant's argument on his testimony goes to its weight, not to its admissibility.

### 3. The jury not being given a "comparator instruction" is not grounds for a new trial.

Defendant persists in conflating the legal standards of its various post-trial motions in now arguing that despite its own failure to seek a "comparator instruction" during the charging conference, and despite not even identifying the exact instruction it now wants to warrant a new trial, that somehow it was an "error" of the Court to fail to anticipate what Defendant would want at the post-trial phase by way of a jury charge and its failure to give that unspecified instruction constitutes reversible error.   Any objection to the Court's not giving a "comparator instruction" has been waived.

Fed. R. Civ. P. 51 regarding jury instructions is patently clear in providing that "in order to assign error either to jury instructions actually given or instructions that were requested but not given, a party must properly object." Fed. R. Civ. P. 51(d). The rule further provides that: "A party properly objects by stating the matter objected to and the grounds for objection, and may do so (a) when given the opportunity by the court before the instructions are delivered to the jury, or (b) if not previously informed of the objected-to instruction, upon learning that the instruction or requested instruction will be, or has been, given or refused." Fed. R. Civ. P. 51(b), (c). The Third Circuit has further explained that a "failure to object at the time the jury received the proposed verdict sheet or when the jury returned" constitutes a waiver of the objection being made in a post-trial motion. *Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc*., 181 F.3d 446, 463 (3d Cir. 1999). It is not sufficient to propose an instruction that the Court does not give.  *Franklin Prescriptions, Inc. v. N.Y. Times*, 424 F.3d 336, 339 (3d Cir. 2005).  Defendant's Brief does not, because it *cannot*,

point to (1) any comparator instruction sought during trial; or (2) any objection to the absence of a comparator instruction as given to the jury. The objection it raises now has been waived.

Further, even if the Court were to consider Defendant's argument (which it should not), Defendant: a) has not specified the content of the "comparator instruction" it believes should have been given; and b) has not demonstrated that the Court's failure to give this unspecified instruction was plain error as required by Fed. R. Civ. P. 51(d)(2). As the Court noted in denying Defendant's Motions for Directed Verdict, and as Plaintiff's counsel agreed, Plaintiff was not comparing herself to her subordinate, Mr. Sykes, as a method of proof of her case. Tr. 676:15. As a result, Plaintiff would have objected to a comparator instruction as an effort to confuse the jury and lead it to believe that Plaintiff was required by law to prove her case through such "comparator" evidence.

**C.      The Jury's Damages Awards Should Not Be Disturbed.**

      **1.      The jury's $600,000 compensatory damages award should not be disturbed.**

Defendant makes a half-hearted assertion, in passing and dropped into a footnote in the context of its punitive damages ratio argument, that the Court should reduce the $600,000 compensatory damages awarded to Plaintiff. Memorandum (Dkt. Entr. 167-2) at ECF p. 22 n.1. The Court should reject Defendant's suggestion.

First, Defendant's passing assertion has not been squarely argued and therefore has been waived. *See, e.g., Centeno*, 793 F.3d at 388 n.9.

Second, even if the Court were to consider Defendant's suggestion that the award is excessive and should be reduced (which it should not), the suggestion should be rejected. As a preliminary matter, the award is not a "duplicate recovery" and should not be halved for the reasons set forth in Plaintiff's Brief In Opposition To Defendant's Motion To Vacate Or Amend Judgment To Avoid Duplicate Damages (incorporated herein by reference). Further, the amount was not

excessive, was fully supported by the record evidence, and certainly was not so large that it would "shock the conscience."

In reviewing the propriety of a jury verdict, it is the court's "obligation to uphold the jury's award if there exists a reasonable basis to do so." *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989). The Third Circuit has cautioned: "While a district court has discretion in determining whether a jury's verdict is excessive, it is undisputed that the court *may not* vacate or reduce the award merely because it would have granted a lesser amount of damages. For the court to disturb a jury verdict, 'the damages assessed by the jury must be so unreasonable as to offend the conscience of the Court.'" *Id.* (quoting *Murray*, 610 F.2d at 152).

In support of its half-hearted assertion that the award was not supported by the record evidence, Defendant has mischaracterized the scope of the harm for which the jury awarded compensatory damages in a way that is unduly limited. Defendant is wrong when it tells the Court (in connection with the punitive damages reprehensibility factors) that Plaintiff did not allege that she suffered any physical, as opposed to economic, harm. Memorandum (Dkt. Entr. 167-2) at ECF p. 19. Plaintiff testified that she, among other things, was not eating well and was suffering from migraines. Tr. 314:4-5. Plaintiff presented evidence of present and continuing emotional distress and pain and suffering, as well as significant loss of earnings capacity. For example, having been forced to take a job with a much smaller, privately held company, she lost the capacity to earn valuable stock grants. (Ms. Phillips testified that in February 2018, she received a bonus of $41,876 from Defendant in stock options.) Tr. at 315:21-24; Tr. Exh. 127; Tr. 205:16-207:13. Ms. Hymes testified that Plaintiff was "very upset" when she was terminated. Tr. 437:17-22. Ms. Phillips spoke movingly about how the loss of the job that she loved and was devoted to for years was devastating to her. She told the jury about Starbucks contesting her application for

13

unemployment because of "misconduct" and being a single mother of two children not knowing what she was going to do.

Ms. Phillips testified that she was devastated by what Starbucks did to her, and that she was physically and mentally "awful" after her termination.  She told the jury, among things:

> Q.   How did it make you feel?
> A.   I was devastated.  I had worked there for 13 years.  I loved the job.  I loved the people that I worked with.  I loved the company.  I was a proud Starbucks partner.  I bled green, as they say.  And all of a sudden, I felt like I was being thrown out like a piece of trash.
> And I was in shock.
> Q.   Did you believe that this would happen to you if you were black?
> A.   No.

Tr. 312:8-17.  Ms. Phillips told the jury that she was very depressed, slept too much, did not eat well, suffered from migrations, saw a therapist, and was on antidepression medication.  Tr. 313:13-314:9.

Ms. Phillips, who at the time of her termination was supporting her children (Tr. 313:9-12), had "no idea what [she] was going to do."  Tr. 313:19. Regarding her loss of future earnings capacity, Ms. Phillips testified:

> Q.   Was it anywhere near the level of income and possibilities that you had at Starbucks being at Raymour.
> A.   No.   Raymour & Flanigan is a small, privately owned company with about 120-some stores.  There's no stock options, obviously, because it's privately owned.  So the salary is very different.  The additional income opportunities are very different.   The opportunity for advancement is regional director, which is what I am.  I have six stores.
> My boss is a VP, and he reports to the owners.  So the only additional opportunity would be to get to a VP.

Tr. at 314:20-315:4.

Ms. Phillips told the jury that, even five years after her termination, what Starbucks did to

her continued to be devastating.  Tr. at 315:21-24.  She testified under oath as follows:

> Q.      Ms. Phillips, what's been the worst part of all of this for you?
> A.      It was devastating.  Quite frankly, over five years later, **it's still devastating**.

Tr. at 315:21-24 (emphasis added).

The jury appeared to be extremely attentive and conscientious of its duties.  It heard Plaintiff's testimony, witnessed her demeanor, observed her emotional reactions when testifying, and assessed her credibility.  The jury was properly charged on how to come up with a fair and reasonable award, appeared by all accounts to fully understand their charge, and did so in assessing an award of $600,000 in compensatory damages.

Defendant does not even argue that the award was so large so as to shock the conscience of the Court.  Nor could it rightfully, as the award is in line with other recent awards for claims under the NJLAD and claims under federal law.  For example, in *Cuevas v. Wentworth Grp.*, 226 N.J. 480 (2016), the New Jersey Supreme Court affirmed the trial court's denial of a defendant's remittitur motion on emotional distress damages awards of $800,000 and $600,000 for claims of employment discrimination in violation of the NJLAD.  *Id.* at 493.  Neither plaintiff in *Cuevas* received treatment from a mental health professional or sought mental health counseling, and the evidence supporting the award consisted only of the plaintiffs' testimony.  *Id.* at 492.  Similarly, in a recent age discrimination trial in the District of New Jersey, the jury awarded—and the court upheld on post-trial motion—an emotional distress award of $520,000.  *See Braden v. Lockheed Martin Corp.*, 2017 U.S. Dist. LEXIS 207236, at *55 (D.N.J. Dec. 18, 2017).  The court in *Braden* upheld the award even though no other witness testified to the plaintiff's emotional distress, no medical treatment commenced as a result of the defendant's actions, and there was no expert report on damages.

The compensatory damages award of $600,000 should not be disturbed.

**2.      The jury's punitive damages award should not be disturbed.**

This case was decided by a fully attentive jury that was carefully instructed on how to consider punitive damages under federal law and under the NJLAD, and what factors to consider in determining the amount of the award.   Tr. at 846:23-849:13; 855:05-863:25. After duly considering the evidence and the instructions, the jury unanimously awarded Plaintiff $12,500,000 for Defendant's violation of Section 1981 and $12,500,000 for Defendant's violations of the NJLAD. The punitive damages award of $25,000,000 was supported by the record of extraordinarily reprehensible conduct of Defendant, is within the presumptively valid single-digit ratio of punitive damages to harm or potential harm, and is constitutionally sound.   It is large, but not excessive; a lesser amount would not even sting a company of Starbucks' size and resources.

Defendant seeks to upend the will of the jury by arguing: (1) that Plaintiff has been awarded "duplicate damages"; (2) that the Court erred in instructing the jury on punitive damages; and, (3) that the jury's punitive damages verdict was against the weight of the evidence and unconstitutional.

As to the first, Defendant's argument that the jury's award included "duplicate damages" (compensatory and punitive) is the subject of its Motion to Vacate or Amend the Judgment to Avoid Duplicate Damages. (Dkt. Ent. 166). For the reasons set forth in Plaintiff's Opposition to the Motion to Vacate or Amend the Judgment to Avoid Duplicate Damages (filed contemporaneously herewith and incorporated herein by reference), any suggestion by Defendant that the jury's verdict included "duplicate damages" and any relief associated with that argument should be rejected.

As to the second, Defendant never objected during the charging conference to the jury instructions on punitive damages.  Any such objection by Defendant now has been waived.

*Lesende v. Borrero*, 752 F.3d 324, 336 (3d Cir. 2014) ("Further, we find analogous support in our precedent. In *Chemical Leaman Tank Lines*, supra, we held that an objection to jury instructions was waived where an objection was not presented 'with sufficient clarity to give the trial judge notice of a possible error in the instruction.'"); *see also Waldorf*, 142 F.3d at 629 ("As the district court correctly noted, it is clear that a party who fails to object to errors at trial waives the right to complain about them following trial.") (citing *Murray*, 610 F.2d at 152). However, should the Court consider Defendant's re-packaging of its Motion for Judgment as a Matter of Law as an "error" for part of the present Motion, Plaintiff incorporates herein her opposition to Defendant's Motion for Judgment as a Matter of Law.

Defendant's third argument is addressed below.

### a) The jury's award was fully supported and is constitutionally sound.

It is not clear just what Defendant is arguing here and what it is asking the Court to do.

Under the heading of asking for a new trial (Section B, p. 7), Defendant does not actually ask for a new trial, and argues instead for a "remittitur pursuant to Rule 59(e) because [the $25,000,000 punitive damages award] is grossly excessive in light of the evidence presented at trial and is so grossly excessive that it violates the Due Process Clause of the Fourteenth Amendment." Defendant does not make a separate argument that the evidence is against the weight of the evidence so as to warrant a new trial, but argues that Starbucks' conduct was "not reprehensible as a matter of law" in the context of considering its constitutionality. Memorandum (Dkt. Ent. 167-2) at ECF p. 19. Defendant's discussion of remittitur improperly conflates the standards and analysis warranting a remittitur for compensatory damages with the Constitutional considerations for punitive damages. [3]

---

[3]Defendant argues that the punitive damages award must be "vacated" pursuant to a "remittitur" because "[a] remittitur is in order when a trial judge concludes that a jury verdict is 'clearly

It appears, then, that Defendant is not asking for a new trial, but instead for the Court to reduce the amount of award to a constitutionally permissible number.  As is set forth below, however, in light of the Court's recent award of $2,736,755 in compensatory economic damages for backpay, front pay and tax gross up, the award <u>already is presumptively constitutional</u>.

> **i.    The jury's punitive damages award is fully supported by the evidence.**

In support of its argument that the punitive damages award was not supported by the evidence, Defendant again (as it has throughout the post-trial briefing in this case) relies to near exclusivity on the testimony of former Regional Vice President, Camille Hymes. <u>Ms. Hymes' testimony was clearly rejected by the jury</u>. The jury weighed the credibility of the witnesses as the exclusive body empowered to do so and concluded, as evidenced by the verdict, that her testimony was not to be believed. As a result, to the extent that the Defendant now asks this Court to credit Ms. Hymes on the path to overturning the punitive damages award, this effort must be ignored.

The record evidence in the case (set forth in detail in Plaintiff's JMOL Opposition) fully supports the jury's $25,000,000 punitive damages award to punish Defendant's misconduct and deter similar acts in the future.  In summary, and without limitation:

> 1.    <u>The jury found in this case that Defendant intentionally terminated Ms. Phillips' employment because of her race</u>.

---

unsupported' by the evidence and exceeds <u>the amount needed to make the plaintiff whole, i.e., to remedy the effect of the employer's discrimination</u>" citing *Hurley v. Atlantic City Police Dep't*, 933 F. Supp. 396 (D.N.J. 1996) (emphasis added). Defendant repeats again that remittitur of the punitive damages jury award is warranted because it "exceeds the amount needed to make the plaintiff whole."  First, the function of punitive damages is not to make the plaintiff whole. It is to punish the defendant and deter it and other corporations like it from engaging in similar conduct. Second, the *Hurley* case is inapplicable, as the quote repeatedly used here was specific to a jury's award for compensatory damages, not punitive damages. Defendant makes no argument that there should be a remittitur granted for compensatory damages.

18

2.      <u>Defendant's stated reason for terminating Ms. Phillips was a blatant lie.</u>
The idea that Ms. Phillips was failing her subordinates by her lack of leadership was a) not
evidenced by a single piece of documentary evidence; and b) contradicted by the mountains of
praise she received for her leadership.

3.      <u>Defendant's highest-level executives up through the entire chain of</u>
<u>command were involved in Ms. Phillips' termination.</u>   Paul Pinto, Human Resources VP, testified
that in April and May of 2018, the following were involved in the events of this case: Camille
Hymes, Regional Vice President; Zeta Smith, Divisional Vice President; Rossann Williams,
Executive Vice President; Rosalind Brewer, Chief Operating Officer ("COO") and President;
Kevin Johnson, President & CEO; and Howard Shultz, Founder, Executive Chairman, and Former
CEO. Tr. 52:05-56:09 (*"present in the [Philadelphia] market, yes, and involved"*); *see also* Tr.
597:23-598:04 (testimony by Ms. Smith that she, Ms. Hymes and Ms. Williams were all part of
the decision to terminate Plaintiff); Tr. 393:02-11 (testimony of Ms. Hymes that several people
collaborated on the decision to terminate Plaintiff including herself, Ms. Smith, Ms. Williams, Mr.
Pinto, Jen Frish (SVP of HR, Mr. Pinto's boss) and Nathalie Cioffi (a Director of HR), and Robyn
Ruderman, Esquire, in the legal department).

4.      <u>Defendant acted upon its cold and calculated considerations of race and its</u>
<u>effect on its brand and bottom line.</u>   After a clip of the April 12, 2018 arrest of two Black men in
its store located at 18th & Spruce Streets went viral (because, Defendant believed, of the race of
the two men arrested, *see* Tr. Exh. 160), Defendant's Global Corporate Communications
department on Friday, April 13, 2018, began "tracking the coverage" of the viral post and promised
executives that it would be "providing updates on coverage across social media and traditional
media throughout the weekend." Tr. Exh. 94, p.1.  Defendant was intensely tracking the press

19

coverage and public reaction of its every statement and action it took concerning this race-based event. Tr. Exh. 142. In one email sent on April 19, 2018 from Defendant's Global Communications Department to the CEO, Chairman, Ms. Brewer, Ms. Williams, Ms. Hymes and others in which international reaction and brand image was being analyzed, the words "Race," "Black," "White," "Color," "Discrimination," and "Bias," appear 583 times Tr. Exh 142.

To quell its race-based brand crises, Defendant shifted the blame for the 911 call from its policy to the White manager who, according to Defendant's own documents, acted in accordance with Defendant's policy and was not to blame.  *See* Tr. Exh. 39, p. 2 *("law enforcement was called as a matter of standard procedure.")*; Tr Exh 160; Tr. Exh. 51.

5.     <u>Race permeated the thoughts, plans, conversations, and decision-making of Defendant's members of upper-management</u>.   Ms. Hymes admitted that race in general was something that was top of mind at Starbucks throughout the time period of the arrests through the decision to terminate Ms. Phillips' employment.  Tr. 443:12-15.  Mr. Sykes told the jury that "conversations with race just continued to escalate and escalate."  Tr. 633:13-634:08.

6.     <u>Defendant engaged in an intentional scheme of race discrimination, broader than the termination of Ms. Phillips</u>.  Defendant did not terminate any of the Black employees in the chain of command related to the arrests, including, Mr. Sykes, Ms. Hymes, Ms. Smith and Ms. Brewer, but instead fired three White people: Ms. Hylton, Mr. Trinsey and Plaintiff.  Ms. Hymes testified: "The leader is responsible for the leaders, so when the partners at whatever level are expressing concerns or distress or sort of lack accountability, that's a reflection of multiple levels, including myself." Tr. 414:20-10. She made this assertion to support her claim that Plaintiff was terminated because the levels of leaders below her (*i.e.*, District Managers and Store Managers), were "suffering." However, below Plaintiff were two District Managers in Center City, one White

and one Black. The White person was terminated even though the Store Manager who called 911 was not under his umbrella. The other Store Manager, who was Black, and did have responsibility for the White Store Manager who called 911, was not fired. Similarly, Ms. Hymes, who had responsibility for Plaintiff, was not fired and neither was her boss, Ms. Smith, both of whom are Black. So, at the end of the day, in the aftermath of an internally race-based PR nightmare, the largest brand crisis Defendant ever faced, Defendant fired three White people and no Black people and then claimed that the race of the individuals had nothing to do with it. *The jury did not buy it.*

7.     <u>Defendant disregarded its own policies in order to terminate Ms. Phillips at the height of its race-based public relations nightmare and "take action" on its DE&I space</u>.  As of May 2, 2018, Ms. Smith understood that the want and need of Mr. Johnson, Defendant's CEO, and Mr. Schulz, Defendant's Chairman, was to take actions in the "DE&I space" (Diversity, Equity & Inclusion). Tr. 596:01-07. As of May 2, 2018, Ms. Smith understood that the want and need of Defendant's CEO and Chairman was for further action to be taken.  Contrary to Defendant's policies, Plaintiff was never provided a Performance Improvement Plan ("PIP") before termination, which was a process to give employees a written explanation of alleged performance deficiencies and a chance to improve. Tr. 448:17-449:07

8.     <u>Defendant was aware of laws prohibiting race discrimination</u>.  Ms. Hymes admitted that at the time she made the decision to terminate Plaintiff, she was aware there were laws against discrimination in the workplace.  Tr. 393:12-17.

9.     <u>Defendant exhibited a consciousness of wrongdoing</u>.  Race was admittedly "top of mind" when Defendant decided to terminate Ms. Phillips.  Ms. Hymes and Mr. Pinto gave Ms. Phillips a vague and carefully worded reason for her termination that implicitly acknowledged the consideration of race.  They told her that that she was being fired because "the situation is

unrecoverable." The "situation" was its race-based brand crisis. Following the termination, Defendant tried to entice Ms. Phillips to sign a general release of claims and a non-disclosure agreement by offering her "the most lucrative severance package possible." Tr. 604:10-25; Tr. Exh 108.

10. <u>Defendant used Ms. Phillips to deceive the public about its Safe and Secure policy.</u> Defendant, by May 3, 3018, had made the decision to terminate Ms. Phillips. Nevertheless, that same day, May 3rd, Defendant had Plaintiff draft a memo to go out to all Philadelphia Store Managers explaining that a new "Safe & Welcoming" policy would soon be distributed. The first line of Plaintiff's draft included the phrase "[a]s we removed the previously shared 'Safe & Welcoming' procedures," but she was told by Lisa Passe, Vice President of Global Brand Communications, to change it because "that isn't something we can have be made public." Tr. Exh. 158., Tr. 431:14-432:16. Ms. Hymes then responded to Plaintiff: "[w]ant to take another shot at that line?" with a smiley face emoji. Tr. Exh. 158., Tr. 434:05-07.

11. <u>Defendant used Ms. Phillips to execute its race-based employment decisions in an especially cruel way.</u> On May 7, 2018—knowing that Ms. Phillips was going to be notified of her own termination in a matter of hours—Ms. Hymes and Mr. Pinto instructed Plaintiff to suspend District Manager Mr. Trinsey due to allegations of race discrimination in pay against him. Tr. 478:11-21. The original plan, as of the evening before, was for Ms. Hymes and Mr. Pinto to suspend Mr. Trinsey. Tr. Exh. 50. Even though they knew at that point that Plaintiff would be terminated, in a very mean and malicious move, they made Plaintiff suspend Mr. Trinsey. Tr. 478:11-21. Plaintiff told Ms. Hymes and Mr. Pinto that Mr. Trinsey was not a racist; that in fact he was a Community Lead; and that she did not have control over pay, as that was the responsibility of HR and the Compensation Department. Tr. 307:22-309:3. Nevertheless, Plaintiff

did what she was told and suspended Mr. Trinsey the next morning, on May 8, 2018; he was in shock. Tr. 309:24-10.  Plaintiff was then to call all of her Store Managers and all of her District Managers and tell them that Mr. Trinsey was taking time off, which she did.  Tr. 310:11-311:01. Plaintiff was then summoned to Ms. Hymes' hotel lobby and terminated.  Tr. 310:11-312:14.

Two weeks after Mr. Trinsey's suspension it was determined that race allegations against him were unsubstantiated. Tr. Exh 102. The pay differential was two pennies. This was easily discernable with an email to the Compensation Department. Tr. Exh. 102, Tr. 484:03-488:04.

12.     Defendant advanced a narrative regarding the arrests of the two Black men that was contrary to its own investigative report.  Defendant asserted during trial, and even in its post-trial motions, that Ms. Hylton called 911 and summoned the police after the two men were in the store for no more than 3 minutes.  Defendant's own investigation report, prepared after an instruction to get the story straight and video surveillance tape was apparently reviewed, concluded that the men were in the store for 22 minutes (before Ms. Hylton called 911)."  Tr. 33:08-18.

13.     Defendant improperly withheld evidence that, had it been subject to proper forensic analysis, might have demonstrated that Defendant's narrative of the arrests was not true.  Plaintiff requested the full and complete surveillance video footage from inside the store years before the trial, but it was never produced. On the Friday evening prior to the start of trial Monday, Defendant suddenly produced a large set of spliced clips purported to be of the day of the arrests. When Plaintiff's counsel asked for a full, continuous, time-stamped copy of the surveillance video, defense counsel responded that the spliced up, non-timestamped clips were the only video available. Then, on Wednesday evening, after three full days of trial were already

complete, Defendant produced 10 hours of video purported to be of the day of the arrests. Tr. 243:14-260:01. Even though the Judge stated, "I can't think of a more prejudicial situation right now in this case, for that clip not to have been turned over [by Defendant] for a comprehensive examination," he ruled that Defendant would still be permitted to introduce the video if it could authenticate it. Defendant never attempted to do so. Tr. 257:07-260:23.

14.   Defendant tried to blame Ms. Phillips for Starbuck's Safe & Secure policy and pin responsibility for the 911 call on her.   Defendant had its Corporate Designee, Marcus Eckensberger, the last witness of the trial, falsely claim that the call to law enforcement was not Starbucks' policy but instead was Ms. Phillips' policy—a lie that was met with an audible gasp from the jury. Tr. 719:06-720:06.

15.   Defendant easily could have kept Ms. Phillips rather than terminate her. Ms. Smith considered offering Plaintiff a "Coffee Break" but ultimately terminated her instead. Tr. 603:10-604:09.

At the time of Plaintiff's termination, Defendant had hundreds of thousands of employees; Ms. Hymes had 15,000 employees under her umbrella. Ms. Hymes admitted that if Defendant wanted to place Plaintiff in another job it could have. Tr. 436:02-08.

Marcus Eckensberger, Regional Director, testified that when he came to Philadelphia in the days after Plaintiff was terminated, he vacated a Regional Manager position in Washington, D.C. that he had been covering and it was now vacant. When asked why Plaintiff was not placed in that position, Mr. Eckensberger, testifying as Defendant's Corporate Designee, said that he could not answer that. Tr. 714:12-715:06.

16.    During a time when Defendant was fully aware of the national attention on the racial nature of the underlying event which had created a firestorm of publicity, Defendant

falsely accused Ms. Phillips of "misconduct."  Defendant contested Ms. Phillip's application for

unemployment benefits on the grounds that she was terminated for "misconduct."  Ms. Hymes

testified that the reason Ms. Phillips was terminated was because she engaged in "misconduct."

Tr. 393:18022.  In light of the circumstances occurring at the time of her termination and racially

charged atmosphere (for example, Plaintiff recalled a protestor screaming in her face that she was

a "White supremacist," Tr. 318:15-23), being terminated for alleged "misconduct" gave the false

impression that Plaintiff bore responsibility for Defendant's race-based crisis.

17.   Defendant withheld key evidence of pretext. Defendant gave yearly written

performance reviews to its employees through the end of 2017. All of Plaintiff's performance

reviews were positive. Defendant did not produce a single Performance Review for any employee

after 2014 even though they were requested. Mr. Pinto testified that there would have been written

performance reviews for 2015, 2016, and 2017, but does not know why they were never produced

in this litigation by Defendant. Tr. at 98; *see also* Tr. at 203-20.

18.   Defendant's termination of Ms. Phillips upset many of Ms. Phillips'

coworkers.  Ms. Hymes testified to the upset caused by Ms. Phillips' termination.  *See* Tr. 454:17-

19; Tr. 454:20-25; Tr. 489:15-19; Tr. 490:25-491:09; Tr. 492:16-18; Tr. 490:03-04.   (Tim

Osevala, Delma Wells, Jackie Johnson, David General, Carmen Williams, Paul Sykes). Mr. Sykes

told the jury of his upset over what Defendant did:

> Because there was no reason.  Up until that point, Shannon – I
> remember when we toured prior to that with Camille, Camille who
> was our regional vice president, was always really – said kind things
> about Shannon.
> I never heard about my peers at district manager, we were – we
> were always kind of in awe of her.  I never heard anything with
> respect to race with – about Shannon or – I never heard anything.
> And so when she was kind of here one day, gone the next, similar
> to Ben, I just figured that, all right, she's kind of a scapegoat.  It
> happened in my district and nothing was being done to me.  I had

the district.  And I felt so bad, because my peer on the other side of me was let go, and now my boss, who had been there very single day, and when Camille was vigorously praising Shannon in front of me.

All of a sudden, I think our COO at the time came into the market at one point, and then it was just gone.

And the public – the public wanted accountability  And I'm so sorry.  I was trying to go back and remember this time.  It was really stressful.

But someone had to be – someone had to – someone had to, I guess, be blamed, for lack of a better word, about the situation.  And at the time I guess Holly wasn't enough, and so they – used Ben and Shannon.

And again, it happened in my district, and I had plenty of conversations.  Nobody even asked me about Shannon in terms of, like, how she was doing.  That's why we were all so confused when she was there one day, and then she was gone the next.  It literally came out of thin air.

19.   Defendant is a publicly traded, for profit, international corporation with a net worth of $112 Billion. Tr. 662:07-09.

20.   Defendant claimed on one hand to be "outraged" by the "reprehensible" arrests of the two Black men, but then proceeded to twist the incident into a PR positive, profit-making event.  *See* Tr. 707:02-14; 722:03-724-22 (testimony regarding celebrity involvement with an advertisement of Defendant's diversity training, and sales numbers doubling).

21.   Ms. Phillips is a single mother caring for two children, who moved her family to Philadelphia to further advance her career with Defendant.  Tr. 202:14-203:1.

22.   Ms. Hymes testified that Ms. Phillips was "very upset" when she was terminated.  Tr. 437:17-22.

23.   Ms. Phillips testified that she was devastated by what Starbucks did to her, and that she was physically and mentally "awful" after her termination.  She told the jury, among things, about feeling like she was "thrown out like a piece of trash. Tr. 312:8-17.  Ms. Phillips told the jury that she was very depressed, slept too much, did not eat well, suffered from

migrations, saw a therapist, and was on antidepression medication.  Tr. 313:13-314:9.

24.     Ms. Phillips, who at the time of her termination was supporting her children (Tr. 313:9-12), and had "no idea what [she] was going to do."  Tr. 313:19.

25.     Ms. Phillips told the jury that, even five years after her termination, what Starbucks did to her continued to be devastating.  Tr. at 315:21-24 (emphasis added).

26.     By terminating Ms. Phillips because of her race, Defendant caused Ms. Phillips to lose $1,546,243 in expected earnings (not taking into account mitigation efforts) from Starbucks through April 30, 2023 and $5,379,819 in expected future earnings (not taking into account mitigation efforts) through January 1, 2036, when she turns 65. *See* Tr. Exh. 126 (Scherf Expert Report, internal exhibits 1, 2a).

In sum, the $25,000,000 punitive damages award was fully supported by the record evidence.  It was not excessive, but rather *proportionate* with Defendant's misconduct.  Any lesser amount awarded against a company of its size and resources would be just another cost of doing business and would not even sting.

> **ii.     In light of the Court's economic loss damages award, the punitive damages award is now within the single-digit ratio and is presumptively constitutional.**

A jury's award of punitive damages is subject to constitutional Due Process constraints. *See, e.g., BMW of N. Am., Inc. v. Gore,* 517 U.S. 559 (1996) (concluding that excessive punitive damages awards violate constitutional due process); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) (relying on *Gore* and holding that awards exceeding a single-digit ratio (*i.e.*, 10:1) generally will not satisfy due process).

The three "guideposts" to help a court assess whether Defendant received notice as constitutionally required are: a) the degree of reprehensibility of the defendant's actions; b) the

ratio of the punitive damages award to the actual or potential harm suffered by the plaintiff; and c) the difference between the punitive damages and the civil penalties authorized or imposed in comparable cases.  *See, e.g., Paraxel Int'l Corp.*, 2008 U.S. Dist. LEXIS 98195 at *17–18 (citing *Campbell*, 538 U.S. at 418).  In addition, and although wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award, "a court may consider a defendant's wealth because 'what may be awesome punishment for an impecunious individual defendant …[may be] wholly insufficient to influence the behavior of a prosperous corporation." *Id.* at *17 (citing *CGB Occupational Therapy, Inc. v. RHA Health Serv., Inc.*, 499 F.3d 184, 193 (3d Cir. 2007) (internal quotations omitted).  Further, the Third Circuit explained in *CBG Occupational Therapy, Inc.* that it was appropriate to consider Defendant's abusive litigation tactics in considering the amount of the punitive damages award.  *See* 499 F.3d at 194 (noting that there is a price to pay for abusive litigation tactics).

The constitutional/Due Process constraints set forth in *Gore, State Farm* and its progeny apply to punitive damages awards under Section 1981 and under the NJLAD.  *Baker v. Nat'l State Bank*, 736 A.2d 462 (N.J. 1999) (punitive damages awards under the NJLAD are subject to the constitutional requirements as set forth in *Gore* and *State Farm*); *see also Pritchett v. State,* 256 A.3d 999 (N.J. 2021) (noting that awards under the NJLAD with a single-digit ratio, *i.e.,* less than ten (10), generally do not violate due process).

The $25,000,000 punitive damages award should not be disturbed.  As set forth below: a) Defendant's conduct was extraordinarily reprehensible and every one of the "reprehensibility" factors weighs in favor of upholding the award; b) the award to harm ratio (in all its various iterations) is a single-digit ratio that is generally considered to be constitutional; and c) the award comports with legislative and state pronouncements on appropriate awards (NJLAD and Section

28

1981 permit uncapped awards of punitive damages) and like cases. Further, in light of Defendant's enormous wealth, it is an appropriate measure to influence its behavior.

### a. *Defendant's conduct was exceedingly reprehensible.*

The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. *BMW*, 517 U.S. at 574; *State Farm*, 538 U.S. at 419. "This principle reflects the accepted view that some wrongs are more blameworthy than others." *BMW*, 517 U.S. at 575. Certainly, terminating an employee because of her race is at the top of the list. *See, e.g., Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1043 (9th Cir. 2003) ("Racial discrimination often results in large punitive damage awards.").

In assessing reprehensibility, the Supreme Court has instructed courts to consider whether: (a) the harm caused was physical rather than economic; (b) the tortious conduct evinced an indifference to or a reckless disregard of the health and safety of others; (c) the target of the conduct had financial vulnerability; (d) the conduct involved repeated actions or was an isolated incident; and (e) the harm was the result of intentional malice, trickery, or deceit, or mere accident. *State Farm*, 538 U.S. at 419.

The factors demonstrating reprehensibility are not limited to the list. As set forth above, Defendant's conduct was extraordinarily reprehensible. Consideration of the particular factors weighs in favor of upholding the award:

**1)** **The harm to Plaintiff was not merely economic, but emotional and, to a limited degree, physical as well.** The New Jersey legislature specifically found and declared in the NJLAD that employment discrimination on the basis of race may cause injury well beyond economic loss. N.J.S.A. § 10:5-3. Plaintiff testified to the emotional distress she suffered, as well as physical effects including depression, migraines and lack of sleep. Tr. 313:09-314:09.

29

Moreover, the harm to Plaintiff was not a simple economic loss, but the loss of her livelihood. "To be sure, infliction of economic injury, especially when done intentionally through affirmative acts of misconduct … can warrant substantial penalty." *Paraxel Int'l Corp.*, 2008 U.S. Dist. LEXIS 98195 at *20 (quoting *Gore*, 517 U.S. at 576). This factor weighs in favor of upholding the award.

2)  **Defendant's conduct evinced an indifference to or a reckless disregard of the health and safety of others.** The State of New Jersey exercised its police power to enact the NJLAD for the protection of, *inter alia,* the public safety and health. N.J.S.A. § 10:5-2. The NJLAD recognizes that discrimination causes people to suffer, *inter alia,* physical and emotional stress, and in some cases severe emotional trauma, illness, and homelessness. N.J.S.A. § 10:5-3. The jury found that Defendant's action in terminating Plaintiff violated the NJLAD, and that its action was "willful," *i.e.,* that it knew or showed reckless disregard for whether Plaintiff's termination was prohibited by law. The jury found that Plaintiff suffered the types of harms the NJLAD was enacted to protect against. Further, the jury found that Plaintiff was entitled to punitive damages under federal law, concluding that Defendant acted "with reckless indifference to plaintiff's federal protected rights." Tr. 847:01-04. Moreover, Defendant's actions were not limited to Plaintiff. This factor weighs in favor of upholding the award.

3)  **Plaintiff had financial vulnerability.** Defendant terminated Plaintiff from her employment. This in and of itself made her financially vulnerable. *See Parexel Int'l Corp.,* 2008 U.S. Dist. LEXIS 98195 at *20. Moreover, Plaintiff was especially vulnerable. She was a single mother of two who did not know what she was going to do following her termination. Further, after firing Ms. Phillips because of her race, Defendant took additional steps to make her <u>even more</u> financially vulnerable. Almost unbelievably, Defendant contested Ms.

Phillips' application for unemployment benefits on the utterly false grounds that she engaged in "misconduct." This factor weighs in favor of upholding the award.

          **4)**       **Defendant's conduct was not an isolated incident.** During the weeks following the arrests of two men in its stores pursuant to a Starbucks policy, race was "top of mind." Defendant made many race-based decisions, including in connection with terminating Holly Hylton, suspending Ben Trinsey, and terminating Plaintiff. Tr. 636:01-14. This factor weighs in favor of upholding the award.

          **5)**       **Defendant's conduct was intentional and involved egregious deceit.** The evidence showed that Defendant was deceitful and calculated in its actions. Without limitation:

- The jury found that Defendant intentionally discriminated against Plaintiff on the basis of her race.
- Defendant's stated reason for terminating Ms. Phillips was a lie.
- Defendant's top executives were involved in Ms. Phillips' termination.
- Defendant at the highest levels intentionally considered race in its employment decisions and determined its course of action based on brand impact and profitability.
- Defendant used Plaintiff, after they had already decided to terminate her, to try to deceive the public about its Safe & Welcoming policy.
- Defendant used Plaintiff, after they had already decided to terminate her, to implement its race-based employment decisions when it instructed her to suspend Mr. Trinsey for bogus reasons and to falsely tell their coworkers that he was taking time off.
- Defendant advanced a narrative regarding the arrests of the two men that was contrary to its own investigative report.
- Defendant attempted to silence employees from speaking out against through non-disclosure agreements.
- Defendant claimed on one hand to be "outraged" by the "reprehensible" arrests of the two Black men, but then proceeded to twist the incident into a PR positive, profit-making event.
- Defendant improperly withheld key evidence that, had it been subject to proper forensic analysis, might have demonstrated that the narrative of the arrests was not true.
- Defendant lied about its policy, falsely attributing it to Ms. Phillips, and tried to pin the blame for the call to 911 on Ms. Phillips.
- During a time when Defendant was fully aware of the national attention on the racial nature of the underlying event which had created a firestorm of publicity, Defendant falsely accused Ms. Phillips of "misconduct."

- Defendant withheld evidence of Ms. Phillips' performance reviews which undoubtedly would have been unfavorable to their position and bolstered Ms. Phillips' evidence of pretext.

Further, not only was Defendant's withholding of the surveillance video deceptive in connection with its narrative about the arrest, it was, as noted by the Court, especially prejudicial to Plaintiff in her case. Defendant's abusive litigation tactic weighs in favor of upholding the award. *See CBG Occupational Therapy, Inc.*, 499 F.3d at 194 (finding that the defendant's abusive litigation tactics was a factor to be considered in assessing punitive damages). In sum, all of the factors weigh in favor of upholding the award.

     **b.**  **The ratio of the punitive damages to harm or potential harm is in single digits and is constitutionally sound.**

When Defendant filed the instant Motion, the Court had not yet awarded to Plaintiff $2,736,755 in economic loss damages for backpay, front pay, and a tax gross up. (Dkt. Ent. 180.) Defendant's argument was thus premised and framed as a punitive damages award of $25,000,000 on a compensatory damages award of $600,000. By Defendant's then-calculation, the ratio of punitive damages to compensatory damages was 41.6 to 1.[4] That is no longer the case in light of the Court's determination and entry of judgment on Plaintiff's economic loss damages and Defendant's discussion of the ratio is now largely inapplicable.

**The harm or potential harm**

Defendant's Memorandum recognizes that the "harm" number for purposes of the ratio includes the jury's compensatory damages award excluding economic loss damages, $600,000. At the time Defendant filed its brief, the Court had yet to award economic loss damages. The

---

[4] As noted in Defendant's Memorandum, the punitive damages award to harm ratio is the same when considered separately under the NJLAD or Section 1981 since the numbers are the same for both.

Court's award of $2,736,755 (*see* Dkt. Ent. 180) must now be included in the harm number.  *See, e.g., Baker v. Nat'l State Bank*, 353 N.J. Super. 145 (2002) (including in its ratio analysis back pay, front pay, prejudgment interest, and emotional distress damages).  At a minimum, the harm number is **$3,336,755.**[5]

Moreover, the Supreme Court has recognized that the ratio may include *potential* harm. *See State Farm,* 538 U.S. at 425.  It is thus reasonable to include the full economic loss in the compensatory amount, and Defendant should not get the benefit of Plaintiff's mitigation efforts. *See Parexel Int'l Corp.*, 2008 U.S. Dist. LEXIS 98195 at *21–22 (ruling that proper ratio should include potential harm to Plaintiff had he not been able to mitigate his damages); *contra Baker,* 353 N.J. Super. at 160 (excluding mitigation number from ratio).  If Plaintiff's full economic loss is considered without benefit of Plaintiff's mitigation efforts, the "harm" number is:  **$7,526,062** ($1,546,243 (lost earnings from Starbucks through April 30, 2023) + $5,379,819 (future lost earning earnings from Starbucks until age 65) + $600,000 jury award of compensatory damages).

Further, the harm number should include attorney's fees.  Attorney's fees are only incurred as a result of a defendant's discriminatory conduct and are necessary to make a victim a whole. The Third Circuit has included attorney's fees as part of the *State Farm* ratio analysis.  *See Willow Inn, Inc.*, 399 F.3d at 235–36 (bad faith insurance action including attorney's fees in the harm number); *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 244 F. App'x 424 (3d Cir. 2007) (same). The New Jersey Superior Court has held in a pre-*BMW* case that the amount of punitive damages should account for the plaintiff's litigation expenses.  *Herman v. Sunshine Chem. Specialties*, 133 N.J. 329 (1992); *see also Blount v. Stroud*, 915 N.E. 2d 925, 944 (Ill. App. Ct. 2009) ("The majority

---

[5] Plaintiff has today also filed a motion to amend the judgment to include pre-judgment interest in the amount of $125,122.86 on her backpay award.  (ECF 184.)  If and when awarded, it should be included within the "harm" number and considered as part of the ratio calculation.

of the courts across the country that have considered this issue have agreed that an award of attorney's fees should be taken into account as part of the compensatory damages in *BMW*.") (internal citations omitted); *contra Baker,* 353 N.J. Super. at 160 (excluding attorney's fees number from ratio).

If Plaintiff's lodestar attorney fee amount and costs are included, the "harm" number should be increased by a maximum of $803,725.45 (Plaintiff's lodestar number per Plaintiff's attorney fee petition) or a minimum of $297,777.20 (total lodestar number if reduced per Defendant's Opposition).

If Plaintiff's full economic loss is considered without benefit of Plaintiff's mitigation efforts and Plaintiff's lodestar attorney fee number are included, the "harm" number is: $8,329,787.45 ($803,725.45 (lodestar attorney's fees and costs) + $7,526,062 ($1,546,243 (lost earnings from Starbucks through April 30, 2023) + $5,379,819 (future lost earning earnings from Starbucks until age 65) + $600,000 jury award of compensatory damages)).

**The ratio**

Assuming very conservatively the numbers to be considered are the punitive damages award of $25,000,000 to compensatory damages awarded by the jury and Court in the amount of $3,336,755, **that is a ratio of punitive damages to compensatory damages of 7.5 to 1. <u>Punitive damages awards with a single-digit ratio, *i.e.*, less than ten, generally do not violate Due Process.</u>** *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003); *Paraxel Int'l Corp.*, 2008 U.S. Dist. LEXIS 98195 at *23 n.8 (observing that there is a "roughly a 5 to 1 ratio, well within the single digit ratios generally found to be well within constitutional limits"); *Pritchett*, 256 A.3d 999 (citing *State Farm*); *Devli v. Tasci,* 2022 N.J. Super. Unpub. LEXIS 2443 (N.J. Super. Ct. Nov. 28, 2022); *CBG Occupational Therapy*, 499 F.3d at 193 (setting punitive

damages ratio to approximately 7:1, which "is within the single-digit ratio, as counseled by the Supreme Court.").

Moreover, the ratio is even smaller when <u>potential</u> harm (*i.e.,* economic loss damages without the benefit of Plaintiff's mitigation efforts) is considered. Assuming a harm number of $7,526,062, the ratio of punitive damages to harm or potential harm is only 3.3 to 1.

Assuming a harm number of $8,329,787.45 (unmitigated lost earnings from Starbucks and Plaintiff's lodestar attorney fee amount) the ratio is 3 to 1. If the reduced attorney's fee amount is included, the ratio is 3.1 to 1.

Finally, even if the harm number includes only the lodestar attorney's fees number and the compensatory damages awarded by the jury ($600,000) and the Court ($2,736,755), the total harm number is $4,140,480.45 (using Plaintiff's lodestar number) or $3,634,532.2 (using Defendant's reduced lodestar number), and the ratio is only either 6:1 or 6.8:1.

### c. The difference between the damages imposed and any civil penalties authorized.

The third guidepost compares the punitive damages award and the penalties that could be imposed for comparable misconduct. *BMW*, 517 U.S. at 559. The Supreme Court has made it clear that "a reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.* (emphasis added). There are not any statutory caps applicable to Section 1981 or under the NJLAD. The New Jersey Legislature has explicitly stated that the 5:1 cap to compensatory damages "shall <u>not apply</u>" to causes of action under the LAD. N.J.S.A. § 2A:15-5.14.c (emphasis added). The New Jersey Supreme Court has stated that a court when reviewing an award of punitive damages under the NJLAD may consider, but is not bound

by, the legislature's judgment of five times compensatory damages as a normative measure of the limits of proportion.  *See Baker*, 736 A.2d 462.

The Court should defer to the legislative judgment that discrimination is different and not subject to any ratio to compensatory harm limitation.  Moreover, the punitive damages ratio—even if considering the very conservatively estimated 7.5:1 one least favorable to Plaintiff—is consistent with the case law.  For example, on remand, the New Jersey Superior Court in *Baker* (age discrimination termination case involving conduct far less egregious than here) approved the punitive damages award exceeding the compensatory damages by **six times**.  *Baker v. Nat'l State Bank*, 353 N.J. Super. 145, 166–67 (N.J. App. Div. 2002); *see also, e.g., Paraxel Int'l Corp.*, 2008 U.S. Dist. LEXIS 98195 (Sarbanes Oxley wrongful termination case upholding punitive damages award with a ratio of 5:1); *Zhang*, 339 F.3d at 1044 (race discrimination case upholding punitive damages award with a ratio of 7.2:1).  Even in the *CBG Occupational Therapy, Inc.* case cited by Defendant to support remittitur, the Third Circuit remitted the punitive damages award to one with a ratio of 7:1.  499 F.3d at 192.

In sum, a consideration of the guideposts demonstrates that the $25,000,000 punitive damages award is not "grossly excessive" and is constitutionally sound.  Moreover, in assessing the reasonableness of the punitive damages award, the Court should also take notice of Defendant's abusive litigation tactic of withholding for years video surveillance tape of the arrest incident and attempting to introduce unauthenticated clips in the midst of trial.  Further, it should also take notice of Defendant's $112 Billion net worth and the fact that a lesser punitive damages award may be wholly insufficient to influence its behavior.  *See Paraxel Int'l Corp.*, 2008 U.S. Dist. LEXIS 98195 at *24 (quoting *CGB Occupational Therapy, Inc.*, 499 F.3d at 193 (internal quotation omitted)).  As explained by the court in *Paraxel Int'l Corp.*: "Although the wealth of the

defendant 'cannot justify an otherwise unconstitutional punitive damages award,' <u>Campbell, 538 U.S. at 428</u>, it is properly considered here as further justification for an already constitutional award."  2008 U.S. Dist. LEXIS 98195 at *24.

IV.    <u>CONCLUSION</u>

"Because of the time-honored authority of the jury to render a verdict based on its collective wisdom, the trial court must exercise restraint to avoid usurping the jury's primary function." *Hurley*, 933 F. Supp. at 403 (citing *New Market Inv. Corp. v. Fireman's Fund Ins. Co.*, 774 F. Supp. 909, 917 (E.D. Pa. 1991); *Borbely v. Nationwide Mutual Ins. Co.*, 547 F. Supp. 959, 980 (D.N.J. 1981)). The Court must proceed with caution because:

> [When a] trial judge grants a new trial on the ground that the verdict was against the weight of the evidence, the judge . . . substitutes his own judgment of the facts and credibility of the witnesses for that of the jury. . . Such an action effects a denigration of the jury system. Thus, close scrutiny is required in order to protect the litigant's right to a jury trial.

*Id*. For the reasons set forth above, Plaintiff respectfully requests that the Court honor the thoughtful and deliberate work of the jury in this case and deny Defendant's Motion in its entirety.

Respectfully submitted,

**CONSOLE MATTIACI LAW, LLC**

By:    <u>/s/ *Susan Saint-Antoine*</u>
Laura C. Mattiacci, Esquire
Katherine C. Oeltjen, Esquire
Susan M. Saint-Antoine, Esquire
Holly Smith, Esquire
1525 Locust Street, Ninth Floor
Philadelphia, PA 19102
(215) 545-7676

August 23, 2023          Attorneys for Plaintiff, Shannon Phillips