IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHANNON PHILLIPS,<br><br>               *Plaintiff*,<br>  v.<br><br>STARBUCKS CORPORATION d/b/a<br>STARBUCKS COFFEE COMPANY,<br><br>               *Defendant*. | CIVIL ACTION NO.: 2:19-cv-19432<br><br>Hon. Joel H. Slomsky, U.S.D.J. |

**REPLY BRIEF IN SUPPORT OF PLAINTIFF'S
<u>PETITION FOR ATTORNEYS' FEES AND COSTS</u>**

**I.     INTRODUCTION**

Plaintiff respectfully submits this Reply Brief to address Defendant's Opposition to her Petition for Attorneys' Fees and Costs ("Opposition") [Dkt. Ent. 181]. As set forth more fully below:

    A. Defendant's argument that Plaintiff is not entitled to ***any*** fee enhancement, let alone the 85% enhancement that she has requested, is ***unsupported***.

    B. The Court should not entertain Defendant's request to reduce Plaintiff's attorneys' fees leading up to summary judgment by 62.5%, since Plaintiff's claims of retaliation and failure to hire were ***interrelated*** with her successful claims of discriminatory termination at trial, and Plaintiff achieved an ***outstanding*** result in this matter.

    C. Defendant has ***not*** met its burden of demonstrating that Plaintiff is seeking attorneys' fees purportedly for certain impermissible tasks.

II.     ARGUMENT[1]

   A. **This is an Exceptional Case Warranting an 85% Enhancement**

The New Jersey Supreme Court in *Rendine* held that "a counsel fee awarded under a fee-shifting statute cannot be 'reasonable' unless the lodestar, calculated as if the attorney's compensation were guaranteed irrespective of result, is adjusted to reflect the actual risk that the attorney will not receive payment if the suit does not succeed." *Rendine v. Pantzer*, 661 A.2d 1202, 1228 (N.J. 1995). In the present case, there was no guarantee of payment for Plaintiff's counsel unless the case ended favorably for Plaintiff. Plaintiff's counsel took on the risk of non-payment over five years of hard-fought litigation and still has not received any money for their work on this case.

This is not a typical single-plaintiff civil rights case – it is exceptional. This case garnered national attention for the racial nature of the underlying event which created a PR nightmare for a $112 billion corporation. There were death threats made against the White manager who called 911 and large, aggressive protests. There was national and international press coverage, appearances on "Good Morning America" by Defendant's CEO and the men who were arrested, and coverage all over the internet. The jury was able to see how, behind the scenes, Defendant was intent on twisting this into a PR positive, profit-making event, while publicly claiming to be sincerely concerned with equality and diversity. The jury saw how members of upper management of Defendant used Plaintiff as a scapegoat in an attempt to protect themselves and the brand. The jury's verdict of $25 million in punitive damages is evidence itself that this case is not typical – it is exceptional – and Plaintiff's civil rights were intentionally and egregiously violated.

---

[1] As a preliminary matter, because Defendant is not disputing any of Plaintiff's counsel's hourly rates, and Plaintiff has sufficiently met her *prima facie* burden under the community market rate lodestar test, the Court may not exercise its discretion in adjusting those requested rates downward. *Ridley v. Costco Wholesale Corp.*, 217 F. App'x 130, 139 (3d Cir. 2007); *Hari Hotels, LLC v. SNG Props. LLC*, 2020 U.S. Dist. LEXIS 44792, at *4–5 (D.N.J. Mar. 16, 2020).

2

Unlike a typical employment discrimination case, the very public and racial nature of the event garnered, and still garners, heated reactions from different perspectives and segments of our society, many of which were negative toward Plaintiff and her counsel. Plaintiff was accused of being a "White supremacist" during the protests. Tr. 317:318:23. Plaintiff's counsel received threatening messages in the wake of the verdict.[2] Fighting to ensure that the civil rights laws protect all citizens is not a universally popular position, but it is essential to ensure "that the economic prosperity and general welfare of the inhabitants of the State" are preserved. N.J.S.A. 10:5-3. As the New Jersey Legislature made clear, the laws protect all citizens; it found and declared: "…practices of discrimination against any of its inhabitant, because of race… are matter of concern to the government of the State, and such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State." *Id.* Similarly, despite Defendant's proclamations to the contrary, federal law protects all races from discrimination. In the closing Senatorial debate for the passing of the Civil Rights Act of 1866, Senator Trumbull, who introduced and strongly supported the bill, emphasized: ""Sir, *this bill applies to white men as well as black men.* It declares that all persons in the United States shall be entitled to the same civil rights, the right to the fruit of their own labor, the right to make contracts, the right to buy and sell, and enjoy liberty and happiness…*the very object of the bill is to break down all discrimination between black men and white men.*" *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 287 (1976) (*emphasis in the original*).

But at trial, Defense counsel showed the jury a picture of a Black person being attacked by a White police officer's dog in the 1960s while telling them: "Ms. Phillips is hoping and trying to appeal to what's the worst in some of us… [w]e're relying on what's the best in you, not what's

---

[2] Plaintiff's lead trial counsel received written messages to her directly, which included calling her obscene and derogatory terms based on her race and gender as well obscene language concerning her husband and children.

the worst in you," and, while pointing to the picture, implying to the jury that the laws Plaintiff brought this case under were not to protect people of her race. *("The backdrop. The backdrop, which Ms. Phillips is suing for, is based on that, what's in that photograph. That's the backdrop.")* Tr. 795:19-796:13. Ms. Hymes angrily told Plaintiff's counsel several times from the stand that her questions regarding race were "offensive." Tr. 444-447; 400:10-401:03.

Nevertheless, in order to properly function, our legal system needs civil rights attorneys to come forward and be willing to represent *all* victims of discrimination, *regardless* of their race, and be willing to take on a significant economic and personal risk in doing so.

### 1. Defendant's Argument That Plaintiff Is Not Entitled to Any Fee Enhancement Because She Succeeded in Her Federal Claims Is Unsupported.

Defendant's contention that her application for a contingency enhancement should be rejected, or substantially reduced, because Plaintiff prevailed both on her NJLAD claim, and her two federal claims under Title VII and Section 1981, is without legal support. Opposition [Dkt. Entr. 181] at ECF pp. 9–12. To the contrary, where a plaintiff has prevailed on NJLAD claims in federal court, the district court is ***required*** to consider the possible application of a contingency multiplier to enhance the calculated lodestar amount, and ***even where a plaintiff also succeeded on interrelated federal claims***. *Hurley v. Atlantic City Police Dep't*, 933 F. Supp. 396, 430 (D.N.J. 1996) (explicitly rejecting Defendant's argument that an enhancement only applies to the NJLAD where there was also success on the Title VII claims); *Hightower v. Ingerman Mgmt. Co.*, 2022 U.S. Dist. LEXIS 224051, at *3–13 (D.N.J. Dec. 1, 2022) (awarding 40% enhancement, no reduction made for Plaintiff's success on both her NJLAD and Sections 1981 claims).

Defendant points to ***zero*** case law in support of its contention that this Court should reduce the fee enhancement simply because Plaintiff succeeded on both federal and state claims; ***nor can it do so***. Defendant's reliance *on Blakely v. Cont'l Airlines, Inc.*, 2 F. Supp. 2d 598, 607 (D.N.J.

4

1998) is head-scratching. In that case, Plaintiff won her claims of sexual harassment under the NJLAD and Title VII, and the Court awarded a contingency fee enhancement. There was no discussion or distinction made concerning a potential reduction because she had succeeded on her federal claim. *Id*. Defendant's reliance on *Middlebrooks v. Teva Pharms. USA, Inc.*, 2019 U.S. Dist. LEXIS 30530, at *30–31 (E.D. Pa. Feb. 26, 2019) is also inapplicable because there was no NJLAD claim in that case – the only claims were under federal and Pennsylvania state statutes.

Likewise, Defendant reliance upon *ARC of N.J. v. Twp. of Voorhees*, 986 F. Supp. 261 (D.N.J. 1997), is misplaced. There, the court rejected the plaintiffs' request for a 100% contingency enhancement, finding that the NJLAD count was one of many in the complaint and was not raised again until the plaintiffs' fee request; the plaintiffs never briefed or argued the NJLAD; and, the court "never reached the merits of, or rested its decision on, the NJLAD." *Id.* at 274. The Court also noted the Plaintiff's counsel in that case were part of the "Project," a non-profit public interest law firm. The Court compared: "[t]he Project is not in the much riskier predicament of the average plaintiff's attorney in private practice who only receives compensation if he or she prevails. Since plaintiffs' counsel [of the Project] earn salaries win, lose, or draw, they are not operating under the same level of risk which the fee multiplier under the NJLAD is intended to compensate." *Id*. The reason for declining the enhancement had nothing to do with the fact there was a victory on the federal claims. *Id*.

After citing several nonapplicable cases, Defendant highlights the important point: Plaintiff's work was "entirely overlapping." Deft. Br. p.5. The work done by plaintiff's counsel on the federal and state claims in this case is intrinsically intertwined. This is not a situation, as it was in *ARC of N.J.,* where the NJLAD claim was tacked on at the end to obtain an enhancement. The NJLAD claim was integral to this case and even required a higher level of proof for punitive damages than the federal claim – which was met.

5

To find now that Plaintiff's overall success should be substantially reduced simply because she was victorious on two federal claims in addition to her NJLAD claim cannot stand, as it would run counter to the New Jersey Supreme Court's ruling which strongly favors contingency fee enhancements to any prevailing parties under the NJLAD.

### 2. Plaintiff Has Demonstrated the Factors Required for a Fee Enhancement

As an initial matter, Defendant, without citing any caselaw, wrongly claims: "Fee-shifting statutes are meant to incentivize lawyers to take cases for indigent plaintiffs who otherwise could not afford representation." Deft. Br., p. 10. Defendant also wrongly asserts:

> The fact that CML offered Ms. Phillips an hourly option demonstrates that CML never considered Ms. Phillips an indigent plaintiff without means to pay an hourly rate. If they considered her to have little means, they would have never offered her an hourly option because they would know she cannot afford it.

Not only is this argument ludicrous, Defendant ignores the ethics rules in New Jersey which provide: "An attorney shall not enter into a contingent fee arrangement without first having advised the client of the right and afforded the client an opportunity to retain the attorney under an arrangement for compensation on the basis of the reasonable value of the services." *N.J. Court Rules, R. 1:21-7*; *Polo by Shipley v. Gotchel*, 225 N.J. Super. 429, 433 (1987). Again, without citing any caselaw, Defendant claims that Plaintiff's counsel "could have elected to bill [Plaintiff] hourly or on a hybrid model" and therefore Defendant should not now be responsible for the fee enhancement. Putting aside the complete absence of legal authority for this position, the math doesn't work either. The fees and costs as of the time of the verdict were approximately $800,000 over 5 years. Plaintiff has been making approximately $150,000 pre-tax, per year, on average, since her termination. Plaintiff would never have been able to afford the fees and costs necessary

to fight this Fortune 500 company given the income position she was in as a result of Defendant's discriminatory conduct.[3]

Defendant's assertion that Plaintiff "should have been required to show that "but-for" her race, Starbucks would not have terminated her employment" and therefore, her 85% enhancement request should be denied is nonsensical. Deft. Br. 13. As this Court knows, the jury found that race was a determinative factor and followed the model jury instructions as given. Moreover, the jury determined that there was "clear and convincing" that at least one member of Defendant's upper management acted in wanton and willful disregard of Plaintiff's right not to be discriminated against on the account of her race. Defendant's contention that the burden of proof was too light flies in the face of reality.

The chart of reductions of enhancements and the cases listed on page 8 of Defendant's brief are also not helpful to the Court's decision here. New Jersey Supreme Court cautioned:

> We also disapprove of the comparative-verdict methodology that allows parties to present supposedly comparable verdicts based on case summaries. The singular facts and particular plaintiffs in different cases that lead to varying awards of damages are not easily susceptible to comparison. That is especially so because the information about other seemingly similar verdicts is very limited. A true comparative analysis would require a statistically satisfactory cohort of cases and detailed information about each case and each plaintiff. That information is unlikely to be available, and therefore any meaningful comparative approach would be impracticable to implement.

*Cuevas v. Wentworth Group*, 226 N.J. 480, 486-487 (2016). Even though *Cuevas* dealt with a Motion for Remittitur for emotional distress damages, the same concept applies. This is a very unique case, the facts of which cannot be compared to another when setting the contingency fee

---

[3] Defendant's argument that having "a large net worth goes ***against*** awarding a fee enhancement because bringing an action against a company with a large net worth poses no risk to a plaintiff of non-payment," is also not supported by the cases it cites.  Opposition [Dkt. Entr. 181] at ECF p. 15; *see Andujar v. Gen. Nutrition Corp.*, 2018 U.S. Dist. LEXIS 141244, at *19 n.13 (D.N.J. Aug. 20, 2018) ("If plaintiff did not succeed at trial or settle the case, plaintiff would not be paid any fee.").

enhancement number – or any damages number for that matter. The 85% enhancement is certainly not common, but neither is unearthing especially egregious conduct by the highest levels of an enormous corporation who has now been assessed a verdict to punish and deter it, and other companies like it, from engaging in this intentional, reckless, and racially discriminatory conduct again. This result, which will have ripple effects on how companies handle race-based employment decisions, happened because of Plaintiff's courage in bringing the suit and Plaintiff's counsel in bringing the evidence, in a concise, comprehensive and persuasive way, to trial. For the reasons set forth in Plaintiff's Motion and herein, this Court should apply an 85% contingency enhancement.

### B. The Court Should Reject Defendant's Request To Reduce Plaintiff's Overall Lodestar Calculation Leading Up To Summary Judgment By 62.5%, As Plaintiff's "Unsuccessful" Claims Were Intertwined With Her Successful Claims At Trial And Plaintiff Achieved *Excellent* Results In This Matter.

Defendant also contends that because certain claims were dismissed prior to trial, this Court should reduce Plaintiff's total attorneys' fees accrued up to the date of summary judgment (*i.e.* August 31, 2022) by sixty-two and a half percent (62.5%). Opposition [Dkt. Entr. 181] at ECF pp. 21–22. Defendant's statistical argument severely misconstrues the law as well as Plaintiff's overall degree of success in this matter.

"When the prevailing party has only succeeded on some claims, the court must address (1) whether the unsuccessful claims were unrelated to the successful claims; and (2) whether the plaintiff achieved a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Blakey v. Continental Airlines*, 2 F. Supp. 2d 598, 605 (D.NJ. 1998) citing *Hensley*, 461 U.S. at 434. "Work on an unsuccessful claim that is based on <u>distinctly different</u> facts and theories cannot be compensated." *Id.* at 434-35. In *Blakey*, the Plaintiff succeeded on her discrimination claims, but on not her defamation claims. The Court therefore deducted time spent on the unsuccessful defamation claim because it was unrelated to Plaintiff's

8

discrimination claims. The Court also recognized that defamation was a common law cause of action, for which there is no automatic fee-shifting authority, as in Title VII or LAD. This case is inapplicable to the present one since the facts and claims Plaintiff asserted are intertwined. While the jury did not ultimately need to decide whether the denial of the Community Leadership Position was discriminatory or whether her objection to the suspension of Ben Trinsey was retaliatory, these facts were very important parts of the overall story of what happened to Plaintiff and were relevant to the jury's ultimate determination of whether Plaintiff was terminated because of her race.

The Supreme Court recognized that where a plaintiff obtained "***excellent results***, his attorney should recover a fully compensatory fee," normally encompassing "all hours reasonably expended on the litigation," and cautioned that "[i]n these circumstances the fee award should ***not*** be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. . . . Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is ***not*** a sufficient reason for reducing a fee. ***The result is what matters***." *Hensley*, 461 U.S. at 436 (emphasis added).

Defendant does ***not*** dispute that Plaintiff's claims of retaliation and failure to hire were interrelated to the discriminatory termination claims on which she succeeded. In fact, courts have explicitly held under the first question in *Hensley* that a fee reduction is not required solely because certain claims dismissed at summary judgment are related to the successful claims at trial. *McGuffey v. Brink's, Inc.*, 598 F. Supp. 2d 659, 673–74 (E.D. Pa. 2009) (*employee's ADEA and PHRA claims of discrimination and retaliation dismissed on summary judgment were "closely related" to plaintiff's successful retaliation claim at trial and not grounds by itself for reduction*); *Warren v. Reading Sch. Dist.*, 278 F.3d 163 (E.D. Pa. 2000) (*declining to reduce fees for interrelated claims*). Instead, Defendant simply attempts to minimize Plaintiff's success in this case under the second question of *Hensley* by focusing on the statistical percentage of claims that

survived summary judgment, even though all of Plaintiff's claims were interrelated. Regardless, it is evident that Plaintiff's counsel undisputedly obtained *excellent* results on her behalf in this difficult and hard-fought case against Defendant. The jury unanimously found for Plaintiff on her discriminatory termination claims and awarded her $600,000 in compensatory damages and $25,000,000 in punitive damages for Defendant's egregious and reckless disregard for her civil rights. The Judge has additionally awarded $1,053,133 in back pay damages, $1,617,203 in front pay damages and $66,419 in tax gross up damages. [Dkt. Ent. 180]. Given the high level of success in this matter, and the non-disputed interrelatedness of all the claims, Defendant's attempt to have overall lodestar calculation cut down should not be treated with any serious regard. *See Failla v. City of Passaic*, 146 F.3d 149, 160 n.15 (3d Cir. 1998) (holding where plaintiffs' claims were significantly validated, there was no need to reduce lodestar to reflect limited success).

C. **Defendant Has Not Met Its Burden Of Demonstrating That Plaintiff Is Seeking Attorneys' Fees Purportedly For Certain Impermissible Tasks.**

Finally, Defendant argues that Plaintiff's requested attorneys' fees allegedly should be reduced based on the following three (3) categories of certain time entries: (i) block billing; (ii) excessive billing entries; and (iii) vague time entries. Opposition [Dkt. Entr. 181] at ECF pp. 22-26. Plaintiff addresses each of the categories in turn.

First, Defendant, in essence, attempts to argue that every time entry that has multiple tasks included should be cut in half, since "it is unclear how much time was spent on each specific activity." *Id.* at ECF pp. 22–23. ***That is not the law*** in this jurisdiction. At the outset, Defendant's broad objection to any and all time entries with multiple tasks, without further specificity, is insufficient to meet its burden of challenging such entries. *Witasick v. Minn. Mut. Life Ins. Co.*, 2015 U.S. Dist. LEXIS 21288, at *14 (D.N.J. Feb. 4, 2015) ("Just as the applicant cannot submit a conclusory application, an opposing party does not meet his burden merely by asserting broad

challenges to the application. It is not enough for an opposing party simply to state, for example, that the hours claimed are excessive and the rates submitted too high.") (citations omitted).

Nevertheless, "[i]n this Circuit, [b]lock billing is a **common practice** which itself saves time in that the attorney summarizes activities rather than detailing every task and such billing will be upheld as reasonable if the listed activities reasonably correspond to the number of hours billed." *United States v. NCH Corp.*, 2010 U.S. Dist. LEXIS 94486, at *19–20 (D.N.J. Sept. 10, 2010) (emphasis added) (citation and quotation marks omitted). It is evident that these time entries are sufficiently detailed as they are tied to a specific subject in the litigation. For instance, three of the four examples mentioned in Defendant's Opposition directly correlate to Plaintiff's counsel engaging in numerous tasks related to trial preparation and internal communications with one another regarding the same. These are the types of time entries that courts have held are more than sufficient. *See, e.g.*, *Giedgowd v. Cafaro Grp., LLC*, 2021 U.S. Dist. LEXIS 205882, at *19 (E.D. Pa. Oct. 26, 2021) (finding Plaintiff's counsel sufficiently detailed "block billing" entries, including those related to "trial prep"); *see also Middlebrooks v. Teva Pharms. USA, Inc.*, 2019 U.S. Dist. LEXIS 30530, at *30–31 (E.D. Pa. Feb. 26, 2019) (finding Plaintiff's counsel's block-billed time sufficient since it "is tied to a specific subject, such as preparing for a deposition. We cannot second guess the amount of time specifically described in a bill. Each lawyer needs the time she needs to be ready. She has a professional obligation to be prepared.").[4] Courts "do not require attorneys seeking fee-shifting provide minute-by-minute entries so long as the block billing is sufficiently specific so [they] can understand the extensive work effort performed on the billing day." *Giedgowd*, 2021 U.S. Dist. LEXIS 205882 at *19. Plaintiff has done so here.

---

[4] Plaintiff's counsel acknowledges the criticisms by the Court in 2019, in *Middlebrooks v. Teva* of her "Trial Prep" entries with no further explanation. Since then, however, Plaintiff's counsel has made sure to include expanded detail of her "Trial Prep" entries, as recognized and accepted in the 2022 cases of *Ray v. AT&T* and *Hightower v. Ingerman Mngmt, et al.*, - they have been similarly detailed and included in the present case.

Second, Defendant contests Ms. Mattiacci's 388.8 hours spent on this matter, arguing that Ms. Mattiacci should not have been brought in to try this case and should not have spent certain time on document review and organization with respect to exhibit lists. Opposition [Dkt. Entr. 181] at ECF pp. 23–24. As the Honorable Christine P. O'Hearn has previously noted, the firm's practice of bringing in Ms. Mattiacci, a highly seasoned and accomplished trial attorney, to learn the file and prepare to try a case is wholly reasonable, given that "[t]he reality today is there are fewer and fewer trial attorneys" and "[i]t is a usual and expected part, in my experience, that when a case is tried, trial counsel comes in and prepares to try the case." *Hightower v. Ingerman Mgmt. Corp., et al.*, 17-cv-08025, Dkt. Entr. 400 at ECF p. 24 (D.N.J. Oct. 25, 2022). Moreover, given that Ms. Mattiacci was lead trial counsel in this matter, her efforts to become acclimated with pertinent documents and determine which trial exhibits she would use (and in what order) is precisely the type of work ***she*** should be leading, rather than handing off such tasks to "junior associates or paralegals" as Defendant argues. *See Sec. & Data Techs. v. Sch. Dist. of Phila.*, 2016 U.S. Dist. LEXIS 176203, at *36 (E.D. Pa. Dec. 20, 2016) (noting that "it would be entirely inappropriate for [lead counsel] to formulate a trial strategy without a working knowledge of the relevant universe of documents and facts" and finding that "revising trial exhibits" is "exactly [the type of work that] lead counsel should be doing"); *see also Ray v. AT&T Mobility Servs., LLC*, 2022 U.S. Dist. LEXIS 73948, at *14 (E.D. Pa. Apr. 22, 2022).[5]

---

[5] "AT&T objects to the hours recorded by Mattiacci during the trial because she spent a significant amount of time preparing for trial before it started and her hours during the trial... This objection ignores the reality of modern trial practice and the cost-saving process whereby younger attorneys handle preliminary duties, and gradually sharpen their skills, before yielding to those with more courtroom experience as the cases progress to a jury trial. Because Mattiacci was lead trial counsel, delivered the opening and closing statements, and conducted the bulk of the direct and cross-examinations, it was reasonable for her to spend more time than Orlow preparing for trial. Attorneys are expected to spend a significant amount of time on a case during trial; it is one of the many risks of going to trial. I will not second guess the time recorded by Mattiacci during the trial. This was a difficult case to present to a jury, involving numerous employee ratings and rankings, and well-crafted defenses. It was necessary for Mattiacci to take the time she deemed necessary to present the case in a convincing and understandable way to the jury. *Ray v. AT&T Mobility Servs., LLC*, 2022 U.S. Dist. LEXIS 73948, *14, citing *Middlebrooks*, No. 17-412, 2019 U.S. Dist. LEXIS 30530, 2019 WL 936645, *9 ("Each lawyer needs the time she needs to be ready.").

Third, Defendant mentions certain time entries which it argues are "vague" and "lack[ing] substance," such as some of Ms. Mattiacci's trial and trial preparation time entries, and various emails to opposing counsel regarding various litigation tasks, internal communications between Plaintiff's counsel regarding case updates and strategy, and emails from Plaintiff's counsel to Plaintiff regarding case updates.  Opposition [Dkt. Entr. 181] at ECF pp. 24-26.  As for Ms. Mattiacci's fifty-four (54) hours of trial and trial preparation from June 6, 2023 to June 8, 2023, Plaintiff refers to her previous argument above regarding the appropriateness of such time entries. *See also Giedgowd*, 2021 U.S. Dist. LEXIS 205882 at *19–20 (finding that Plaintiff's counsel's "initial characterization of 'trial prep' is appropriate on the last days before trial.  Trial counsel have a great number of tasks and concerns in beginning a federal jury trial."); *Devore v. City of Phila.*, 2004 U.S. Dist. LEXIS 3635, at *12 (E.D. Pa. Feb. 20, 2004) (time entries "Prep for trial, trial, prep for next day" for nineteen (19) hours during each trial day were reasonably sufficient, since "[t]he court is well aware of [counsel's] activities from 9:00 a.m. to 5:00 p.m. on these days as they are the dates of the trial" and "we are sure that certain pre-trial rulings affected [counsel's] strategy in presenting his case").

As for the remaining time entries which Defendant argues are vague, such internal communications between Plaintiff's counsel regarding case updates and strategy, trial preparation meetings, and time spent reviewing of the file, are not only permissible activities but also are **sufficiently detailed**.  *See, e.g.*, *Giedgowd*, 2021 U.S. Dist. LEXIS 205882 at *18 ("Time entries such as 'miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses' are sufficiently specific"); *Sec. & Data Techs.*, 2016 U.S. Dist. LEXIS 176203 at *41–42 (descriptions such as "research, review, prepare, letter to, and conference with" meet standards of providing fairly definite information about hours devoted to various general

13

activities, since "[s]pecificity 'should only be required to the extent necessary for the district court to determine if the hours claimed are unreasonable for the work performed'").

### III. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court award to Plaintiff her reasonable attorneys' fees and costs, calculated as follows: a lodestar amount of $767,356 with an 85% contingency enhancement of $652,252.60, equaling a total fee award of $1,419,608.60 for services rendered through June 28, 2023; and $36,369.45 for reasonable costs[6] incurred through July 6, 2023.

Dated: August 23, 2023						Respectfully submitted,

							**CONSOLE LAW OFFICES LLC**

						By:	*s/ Laura C. Mattiacci*
							Laura C. Mattiacci, Esquire
							Susan M. Saint-Antoine, Esquire
							Katherine C. Oeltjen, Esquire
							Holly W. Smith, Esquire
							110 Marter Ave., Suite 502
							Moorestown, NJ 08057
							(856) 854-4000

---

[6] Defendant does not appear to challenge Plaintiff's costs.

14

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing "Reply Brief to address Defendant's Opposition to her Petition for Attorneys' Fees and Costs" was served via ECF upon all counsel of record on this day, August 23, 2023.

                                            *s/ Laura C. Mattiacci*
                                            LAURA C. MATTIACCI